# 18-0855-cv(L)
## 18-2191-cv(CON)

# United States Court of Appeals
## for the
# Second Circuit

CHEVRON CORPORATION,

*Plaintiff-Counter-Defendant-Appellee,*

— v. —

DONZIGER & ASSOCIATES, PLLC, STEVEN DONZIGER,
THE LAW OFFICES OF STEVEN R. DONZIGER,

*Defendants-Counter-Claimants-Appellants.*

*(For Continuation of Caption See Reverse Side of Cover)*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## SPECIAL APPENDIX

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

*Attorneys for Plaintiff-Counter-
   Defendant-Appellee*

STEVEN R. DONZIGER
245 West 104th Street
New York, New York 10025
(917) 566-2526

*Defendant-Appellant Pro Se*

*(For Further Appearances See Last Page of Cover)*

PABLO FAJARDO MENDOZA, LUIS YANZA, FRENTE DE DEFENSA DE LA AMAZONIA, AKA AMAZON DEFENSE FRONT, SELVA VIVA SELVIVA CIA, LTDA, MARIA AGUINDA SALAZAR, CARLOS GREFA HUATATOCA, CATALINA ANTONIA AGUINDA SALAZAR, LIDIA ALEXANDRA AGUIN AGUINDA, PATRICIO ALBERTO CHIMBO YUMBO, CLIDE RAMIRO AGUINDA AGUINDA, LUIS ARMANDO CHIMBO YUMBO, BEATRIZ MERCEDES GRETA TANGUILA, LUCIO ENRIQUE GREFA TANGUILA, PATRICIO WILSON AGUINDA AGUINDA, CELIA IRENE VIVEROS CUSANGUA, FRANCISCO MATIAS ALVARADO YUMBO, FRANCISCO ALVARADO YUMBO, OLGA GLORIA GREFA CERDA, LORENZO JOSE ALVARADO YUMBO, NARCISA AIDA TANGUILA NARVAEZ, BERTHA ANTONIA YUMBO TANGUILA, GLORIA LUCRECIA TANGUI GREFA, FRANCISCO VICTOR TANGUILA GREFA, ROSA TERESA CHIMBO TANGUILA, JOSE GABRIEL REVELO LLORE, MARIA CLELIA REASCOS REVELO, MARIA MAGDALENA RODRI BARCENES, HUGO GERARDO CAMACHO NARANJO, JOSE MIGUEL LPIALES CHICAIZA, HELEODORO PATARON GUARACA, LUISA DELIA TANGUILA NARVAEZ, LOURDES BEATRIZ CHIMBO TANGUIL, MARIA HORTENCIA VIVER CUSANGUA, SEGUNDO ANGEL AMANTA MILAN, OCTAVIO ISMAEL CORDOVA HUANCA, ELIAS ROBERTO PIYAHUA PAYAHUAJE, JAVIER PIAGUAJE PAYAGUAJE, DANIEL CARLOS LUSITAND YAIGUAJE, BENANCIO FREDY CHIMBO GREFA, GUILLERMO VICENTE PAYAGUA LUSITANTE, DELFIN LEONIDAS PAYAGU PAYAGUAJE, ALFREDO DONALDO PAYAGUA PAYAGUAJE, MIGUEL MARIO PAYAGUAJE PAYAGUAJE, TEODORO GONZALOPIAGUAJE PAYAGUAJE, FERMIN PIAGUAJE PAYAGUAJE, REINALDO LUSITANDE YAIGUAJE, LUIS AGUSTIN PAYAGUA PIAGUAJE, EMILIO MARTIN LUSITAND YAIGUAJE, SIMON LUSITANDE YAIGUAJE, ARMANDO WILMER PIAGUAJE PAYAGUAJE, ANGEL JUSTINO PIAGUAG LUCITANT, KEMPERI BAIHUA HUANI, AHUA BAIHUA CAIGA, PENTIBO BAIHUA MIIPO, DABOTA TEGA HUANI, AHUAME HUANI BAIHUA, APARA QUEMPERI YATE, BAI BAIHUA MIIPO, BEBANCA TEGA HUANI, COMITA HUANI YATE, COPE TEGA HUANI, EHUENGUINTO TEGA, GAWARE TEGA HUANI, MARTIN BAIHUA MIIPO, MENCAY BAIHUA TEGA, MENEMO HUANI BAIHUA, MIIPO YATEHUE KEMPERI, MINIHUA HUANI YATE, NAMA BAIHUA HUANI, NAMO HUANI YATE, OMARI APICA HUANI, OMENE BAIHUA HUANI, YEHUA TEGA HUANI, WAGUI COBA HUANI, WEICA APICA HUANI, TEPAA QUIMONTARI WAIWA, NENQUIMO VENANCIO NIHUA, COMPA GUIQUITA, CONTA NENQUIMO QUIMONTARI, DANIEL EHUENGEI, NANTOQUI NENQUIMO, OKATA QUIPA NIHUA, CAI BAIHUA QUEMPERI, OMAYIHUE BAIHUA, TAPARE AHUA YETE, TEWEYENE LUCIANA NAM TEGA, ABAMO OMENE, ONENCA ENOMENGA, PEGO ENOMENGA, WANE IMA, WINA ENOMENGA, CAHUIYA OMACA, MIRNA YETI,

*Defendants,*

*(For Continuation of Caption See Last Page of Cover)*

STRATUS CONSULTING, INC., DOUGLAS BELTMAN, ANN MAEST,

*Defendants-Counter-Claimants,*

ANDREW WOODS, LAURA J. GARR, H5,

*Respondents.*

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7000

– and –

GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive, 12th Floor
Irvine, California 92612
(949) 451-3937

*Attorneys for Plaintiff-Counter-
Defendant-Appellee*

i

# Table of Contents

**Page**

Judgment as to Donziger Defendants and Defendants Camacho and Piaguaje, Dated April 4, 2014 ......................................... SPA-1

Memorandum Opinion of the Honorable Lewis A. Kaplan Granting in Part an d Denying in Part Defendants' Motion for a Stay Pending Appeal, Dated April 25, 2014.............. SPA-6

Supplemental Judgment of the Honorable Lewis A. Kaplan as to Donziger Defendants and Defendants Camacho and Piaguaje, Dated February 28, 2018, Appealed From ........... SPA-39

Memorandum Opinion of the Honorable Lewis A. Kaplan, Dated February 28, 2018.................................................... SPA-41

Memorandum Opinion of the Honorable Lewis A. Kaplan, Dated May 16, 2018 .......................................................... SPA-90

Memorandum Opinion of the Honorable Lewis A. Kaplan on Donziger's Motions for a Declaratory Judgment and Dismissal, for a Protective Order and for A Stay, Dated June 27, 2018, Appealed From ........................... SPA-105

Memorandum Order of the Honorable Lewis A. Kaplan, Dated July 23, 2018, Appealed From............................ SPA-140

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHEVRON CORPORATION,

                Plaintiff,

         -against-                               11 Civ. 0691 (LAK)

STEVEN DONZIGER, et al.,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _3/4/14_

## JUDGMENT AS TO DONZIGER DEFENDANTS
## AND DEFENDANTS CAMACHO AND PIAGUAJE

LEWIS A. KAPLAN, *District Judge.*

        This action was brought against defendants Steven Donziger, The Law Offices of Steven R. Donziger, Donziger Associates, PLLC (these three defendants referred to collectively as the "Donziger Defendants"), Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje (these two defendants referred to collectively as the "LAP Representatives"), Stratus Consulting, Inc., Douglas Beltman, Anne Maest (these three defendants being referred to collectively as the "Stratus Defendants"), and others. The case has been tried and the Court has rendered its findings of fact and conclusions of law with respect to all claims against the Donziger Defendants and the LAP Representatives. All claims against the Stratus Defendants have been settled and dismissed. All other defendants have defaulted, and certificate of default has been entered against them. Accordingly, it is hereby

        ORDERED, ADJUDGED, AND DECREED, with respect to the claims against the Donziger Defendants and the LAP Representatives, as follows:

        1.     The Court hereby imposes a constructive trust for the benefit of Chevron on

2

all property, whether personal or real, tangible or intangible, vested or contingent, that Donziger has

received, or hereafter may receive, directly or indirectly, or to which Donziger now has, or hereafter

obtains, any right, title or interest, directly or indirectly, that is traceable to the Judgment or the

enforcement of the Judgment anywhere in the world including, without limitation, all rights to any

contingent fee under the Retainer Agreement and all stock in Amazonia. Donziger shall transfer and

forthwith assign to Chevron all such property that he now has or hereafter may obtain.

 2. The Court hereby imposes a constructive trust for the benefit of Chevron on

all property, whether personal or real, tangible or intangible, vested or contingent, that the LAP

Representatives, and each of them, has received, or hereafter may receive, directly or indirectly, or

to which the LAP Representatives, and each of them, now has, or hereafter obtains, any right, title

or interest, directly or indirectly, that is traceable to the Judgment or the enforcement of the

Judgment anywhere in the world. The LAP Representatives, and each of them, shall transfer and

forthwith assign to Chevron all such property that he now has or hereafter may obtain.

 3. Donziger shall execute in favor of Chevron a stock power transferring to

Chevron all of his right, title and interest in his shares of Amazonia, and Donziger and the LAP

Representatives, and each of them, shall execute such other and further documents as Chevron

reasonably may request or as the Court hereafter may order to effectuate the foregoing provisions

of this Judgment.

 4. Donziger and the LAP Representatives, and each of them, is hereby enjoined

and restrained from

  4.1. Filing or prosecuting any action for recognition or enforcement of the

  Judgment or any New Judgment or seeking the seizure or attachment of assets based

  on the Judgment or any New Judgment, in each case in any court in the United

SPA-3

3

States.

4.2.      Seeking prejudgment seizure or attachment of assets based upon the Judgment or any New Judgment,

in each case in any court in the United States.

5.      Donziger and the LAP Representatives, and each of them, is hereby further enjoined and restrained from undertaking any acts to monetize or profit from the Judgment, as modified or amended, or any New Judgment, including without limitation by selling, assigning, pledging, transferring or encumbering any interest therein.

6.      Notwithstanding anything to the contrary in this Judgment, nothing herein enjoins, restrains or otherwise prohibits Donziger, the LAP Representatives, or any of them, from (a) filing or prosecuting any action for recognition or enforcement of the Judgment or any New Judgment, or any for prejudgment seizure or attachment of assets based in courts outside the United States; or (b) litigating this action or any appeal of any order or judgment issued in this action.

7.      The following terms are defined as follows for purposes of this Judgment:

7.1      "ADF" means El Frente de Defensa de la Amazonia.

7.2.      "Amazonia" means Amazonia Recovery Limited, an entity registered in Gibralter, together with its successors and assigns.

7.3.      "Assembly" means Asamblea de Afectados Por Texaco together with its successors and assigns.

7.4.      "Chevron" means Chevron Corporation and its subsidiaries and affiliates.

7.5.      "Donziger" means the Donziger Defendants, and each of them, unless the text hereof otherwise provides.

4

7.6.    The "Judgment" means the judgment entered in the Lago Agrio Case on February 14, 2011 as modified by subsequent proceedings.

7.7.    "Lago Agrio Case" means Lawsuit No. 2003-0002, entitled *Maria Aguinda y Otros v. Chevron Corporation,* in the Sucumbíos Provincial Court of Justice of the Republic of Ecuador and all appeals with respect to any judgment, order or decree entered therein.

7.8.    "New Judgment" means any judgment or order that hereafter may be rendered in the Lago Agrio Case any court in Ecuador in or by reason of the Lago Agrio Case, or any judgment or order issued by any other court that has recognized or enforced the Judgment or any such subsequent judgment .

7.9.    "Retainer Agreement" means the agreement, dated as of January 5, 2011, between and among (a) each of the individual plaintiffs in the Lago Agrio Case, together with their respective successors and assigns,(b) the ADF, (c) the Assembly, and (d) Donziger & Associates, PLLC, together with its successors and assigns and all successors to and predecessors of the Retainer Agreement.

8.    In accordance with Federal Rule of Civil Procedure 65(d)(2), this Judgment is binding upon the parties; their officers, agents, servants, employees, and attorneys; and other persons who are in active concert and participation with any of the foregoing.

It is hereby further

ORDERED, ADJUDGED AND DECREED, as follows:

9.    Chevron shall recover of Donziger and the LAP Representatives, and each of them, jointly and severally, the costs of this action pursuant to Fed. R. Civ. P. 54(d)(1) and 28 U.S.C. § 1920.

5

10.     This Judgment finally disposes of all claims between and among Chevron, Donziger and the LAP Representatives.  All other defendants either have settled the action or defaulted.  Accordingly, there is no just reason for delay, and the Clerk shall enter this Judgment as a final judgment with respect to all claims between and among Chevron, Donziger and the LAP Representatives.  This Court retains jurisdiction of this case and over these parties for purposes of enforcing and resolving any disputes concerning this Partial Judgment.

Dated:      March 4, 2014
Issued at:   9:06 a.m.

_____
Lewis A. Kaplan
United States District Judge

**SPA-6**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

                    Plaintiff,

               -against-                                11 Civ. 0691 (LAK)

STEVEN DONZIGER, et al.,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR A STAY PENDING APPEAL

Appearances:

Randy M. Mastro
Andrea E. Neuman
Reed M. Brodsky
William E. Thompson
Anne Champion
GIBSON, DUNN & CRUTCHER, LLP
*Attorneys for Plaintiff*

Richard H. Friedman
FRIEDMAN | RUBIN

Zoe Littlepage
Rainey C. Booth
LITTLEPAGE BOOTH

Steven Donziger

*Attorneys for Defendant Steven Donziger
and Steven R. Donziger & Associates LLP*

Julio C. Gomez
JULIO C. GOMEZ, ATTORNEY AT LAW LLC
*Attorney for Defendants Hugo Gerardo
Camacho Naranjo and Javier Piaguaje
Payaguaje*

SPA-7

LEWIS A. KAPLAN, *District Judge.*

An Ecuadorian court in 2011 entered an $18.2 billion judgment (the "Lago Agrio Judgment")[1] against Chevron Corporation ("Chevron") in an action brought by 47 individuals referred to as the Lago Agrio plaintiffs (the "LAPs"). Chevron brought this action against the LAPs, their lead U.S. attorney, Steven Donziger,[2] and others involved in the Lago Agrio litigation and related events, claiming that the Lago Agrio Judgment was obtained by fraud as part of a scheme to extort money from the company. Following a lengthy trial with an enormous factual record, this Court made extensive findings, including that Donziger and the LAPs: (i) submitted fraudulent evidence; (ii) coerced a judge to use a global expert to issue a damages assessment and then to appoint to that role a man Donziger selected, paid through a secret account, and controlled; (iii) paid a Colorado consulting firm secretly to write all (or most) of the global expert's report, which was presented falsely as the expert's own work; (iv) misrepresented the facts and substance of their relationship with the global expert to U.S. courts; and, ultimately, (v) wrote secretly the Lago Agrio Judgment and promised $500,000 to the Ecuadorian judge in exchange for deciding the case in their favor and signing the judgment they prepared.[3]

This Court found Donziger liable on two independently sufficient legal theories: (1) fraud in the procurement of the Lago Agrio Judgment, and (2) violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). It found also that Hugo Gerardo Camacho Naranjo and

---

[1] The amount of the Lago Agrio Judgment was reduced later to approximately $8.646 billion. PX 8095 (Opinion of Ecuadorian National Court of Justice) at 222.

[2] Chevron sued also Donziger's law office, The Law Offices of Steven R. Donziger and Donziger Associates PLLC. As there is no material distinction among them, references to Donziger refer also to his law office.

[3] *See generally* Opinion [DI 1874].

2

Javier Piaguaje Payaguaje (the "LAP Representatives"), the only other defendants who defended

this action, were liable for the fraud because it was committed by their agents, including Donziger,

within the scope of their employment.[4]

Chevron sought and, mindful of the Circuit's ruling in *Chevron Corporation v.

Naranjo*,[5] this Court granted only narrow relief intended to preclude Donziger and the two LAP

Representatives from profiting from the misdeeds for which they were responsible. To that end, the

judgment in this case (the "NY Judgment") (i) imposed a constructive trust for Chevron's benefit

upon any proceeds "traceable to the [Lago Agrio] Judgment" or its enforcement that Donziger or

the LAP Representatives have received or might receive,[6] (ii) required that Donziger "execute in

favor of Chevron a stock power transferring" to the company "all of his right, title and interest in

his shares of Amazonia," a company organized to collect and distribute any proceeds of the Lago

Agrio Judgment,[7] (iii) enjoined Donziger and the LAP Representatives from "[f]iling or prosecuting

any action for recognition or enforcement of the [Lago Agrio] Judgment" (or any new judgment

---

[4]

   Chevron did not sue the LAP Representatives under RICO. For the purposes of this motion, the Court refers to Donziger and the LAP Representatives collectively as "movants."

[5]

   667 F.3d 232 (2d Cir. 2012).

[6]

   NY Judgment [DI 1875] ¶¶ 1, 2.

[7]

   *Id.* ¶ 3.

   Amazonia Recovery Limited ("Amazonia") is a Gibraltar company established in May 2012 for the receipt and distribution of any funds resulting from the Lago Agrio Judgment. *See* PX 657 (Amazonia Memorandum of Association); Donziger June 25, 2013 Dep. Tr. at 629:12-17, 632:4-9, 633:15-634:2; PX 1520 (Diagram of Newco [i.e. Amazonia] structure and fund flows). Donziger's equity interest is identical to the share of any proceeds from the Lago Agrio Judgment to which he otherwise would be entitled as a contingent fee. *See infra* n.43.

3

based upon the Lago Agrio Judgment) "in any court in the United States,"[8] and (iv) prohibited Donziger and the LAP Representatives from attempting to "monetize or profit from the [Lago Agrio] Judgment, . . . including . . . by selling, assigning, pledging, transferring or encumbering any interest therein."[9]  Significantly, the NY Judgment did not restrict the other LAPs, who remain free to sell, assign, or transfer their interests, if any, in the Lago Agrio Judgment and to seek to enforce it anywhere in the world.  Nor did it restrict any of the other named defendants who did not participate in this trial from doing so.

The relief this Court granted is substantially the relief the LAPs' attorney, in an appearance joined in by Donziger, conceded late last year before the Second Circuit "would not [pose] a problem" if Chevron prevailed on its bribery claims.[10]  It merely prevents these three individuals – who are among those responsible for the bribery of the presiding judge in Lago Agrio and otherwise procuring the Lago Agrio Judgment by fraud – from profiting from that misconduct. Nevertheless, Donziger and the LAP Representatives now seek a stay in order to suspend pending appeal the very relief they stated would pose no problem.

Movants' position is without merit.  A principal focus of this motion necessarily is on the question whether movants will be harmed irreparably if the NY Judgment remains in effect until this appeal is decided.  But movants identify no credible threat of irreparable injury should that

---

[8]

    NY Judgment ¶ 4.

[9]

    *Id.* ¶ 5.

[10]

    Tr. Sept. 26, 2013, at 25:3-15, *Naranjo v. Chevron Corp.*, No. 13-7772-cv (2d Cir.) [DI 1496-2] (stating that defendants "would not have a problem" with "the alternative relief that [Chevron] would be seeking, such as enjoining the person who paid the bribe from benefitting from it," assuming the judge was bribed).

4

occur.  Indeed, their claims of irreparable injury rest on a pastiche of unsupported assertions, contradictions of undisputed evidence, and fertile imagination.  Nor have they shown any likelihood of appellate success on any legal issue that would alter the relief granted here.  As a result, their motion is denied in almost all respects.  It is granted only to the limited extent that the Court will modify pending appeal the requirement that Donziger transfer immediately to Chevron his right, title and interest in his Amazonia shares to ensure that Chevron does not succeed to ownership of those shares before the appeal is decided.  In the interim, the Court orders that those shares – which represent Donziger's right, vis-à-vis his clients, to a 6.3 percent share of any money collected on the fraudulently procured judgment – and any proceeds of those shares will be held pending appeal by the Clerk of the Court for the benefit of Chevron and Donziger, as their interests ultimately may appear, and be voted, after ten days prior notice and absent a contrary order of this Court, as Donziger may direct.

*Discussion*

                    Four factors are relevant to a determination whether to issue a stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."[11]  "The probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff will suffer absent the stay.  Simply stated, more of one

---

[11]

          *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *see also Mohammed v. Reno*, 309 F.3d 95, 100 (2d Cir. 2002).

5

excuses less of the other."[12]   The sliding scale notwithstanding, however, an applicant for a stay

pending appeal must establish more than a "mere possibility" *both* of irreparable injury absent a stay

and of success on the merits of the appeal.[13]   Thus, a showing of likely irreparable harm absent a

stay pending appeal is indispensable,[14] although the required strength of that essential showing may

vary depending upon the strength of any likelihood of prevailing on the merits.


I.     *Movants Have Not Shown Any Threat of Irreparable Injury Absent a Stay Pending Appeal*
       *of the Limited Relief Granted Here*

Donziger claims that (1) the prohibition on his selling, assigning, pledging,

transferring or encumbering any interest in the Lago Agrio Judgment and the requirement that he

transfer his interest in that Judgment to Chevron would destroy his law practice and leave him no

means of earning a living,[15] (2) the required transfer of his Amazonia shares to Chevron would

deprive him of their value and of his right to participate in Amazonia's affairs and, worse yet,

introduce Chevron into the internal workings of an entity formed to collect the Lago Agrio Judgment

---

12

      *Mohammed*, 309 F.3d at 101 (quoting *Michigan Coalition of Radioactive Material Users,*
*Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)).

13

      *See Nken v. Holder*, 556 U.S. 418, 434-35 (2009).

      There is no need here to discuss precisely how much more than a "mere possibility" is
required.

14

      *See, e.g.*, *Brady v. Nat'l Football League*, 640 F.3d 785, 789 (8th Cir. 2011) ("The movant
must show that it will suffer irreparable injury unless a stay is granted.").

15

      Def. Mem. [DI 1888] at 16.

6

from Chevron,[16] and (3) Donziger would suffer a loss of good will and reputational damage absent a stay.[17]  The LAP Representatives contend that the prohibition of the monetization of any interest they may have in the Lago Agrio Judgment would render them unable to finance their appeal unless the judgment of this Court were stayed.[18]  Both the LAP Representatives and Donziger claim that they will be deprived, absent a stay, of "real property" by the NY Judgment, which would render that supposed injury irreparable.[19]

These arguments cannot be squared with the record in this case, the terms of the NY Judgment, common sense, or all three.  There simply is no material threat of *any* irreparable injury if the NY Judgment remains in effect until the Circuit has full briefing, an opportunity to study the extensive findings and record, heard oral argument, and decided the case.

A.  *The Judgment Does Not Threaten Irreparable Harm to Donziger's Law Practice*

Donziger claims that the NY Judgment "threatens to destroy . . . Donziger's law practice" by precluding him from "work[ing] on[] a case to which he has devoted the better part of the last two decades."[20] This argument is empty rhetoric.

Nothing in the NY Judgment prevents Donziger from continuing to work on the Lago

---

[16]  *Id.* at 19-20.

[17]  *Id.* at 18.

[18]  *Id.*

[19]  *Id.*

[20]  *Id.* at 16.

7

Agrio case. Period. The pertinent question is whether and to what extent it affects his compensation during the pendency of the appeal and, if so, whether any such effect would cause irreparable injury before the appeal is decided.

### 1. Donziger's Compensation Arrangements

Paragraph 1 of the NY Judgment imposes a constructive trust on any property that Donziger has received, or hereafter may receive, that is "traceable to the [Lago Agrio] Judgment" or its enforcement. But it is quite unlikely to have any effect on Donziger's law practice or compensation during the pendency of the appeal.

Donziger's compensation is governed by a written retainer agreement.[21] It provides that he is entitled to a Monthly Retainer and, in the event money ever is recovered on the Lago Agrio Judgment, a Contingent Fee that works out to 6.3 percent of the recovery.[22] While any payments of a Contingent Fee would be "traceable to the [Lago Agrio] Judgment," and thus subject to the constructive trust imposed by paragraph 1, the same would not be true of Monthly Retainer payments unless those payments were traceable to the Lago Agrio Judgment. Thus, at least as long as no collections are made in respect of the Lago Agrio Judgment and funneled to Donziger as retainer payments, the NY Judgment would not prevent Donziger from being paid, just as he has

---

[21]

PX 558 (Jan. 5, 2011 retainer agreement).

Similar arrangements were in effect prior to the execution of that agreement.

[22]

*Id.* ¶¶ 3(a), 3(b), 3(i).

The percentage of any Lago Agrio Judgment proceeds to which Donziger is entitled may have been slightly diluted subsequent to the execution of his retainer agreement in order to give equity to new investors, but this neither matters nor is shown persuasively on the record.

8

been paid at least $958,000 and likely considerably more over the past nine or ten years.[23]

To be sure, the NY Judgment would change things in respect of the payment of any Contingent Fee to Donziger, as any such payment would be traceable to the Judgment and thus subject to paragraph 1. But there are two problems with any suggestion that preventing Donziger from collecting a Contingent Fee during the pendency of the appeal would inflict irreparable injury by depriving him of the ability to work on the case or to earn a living, much less destroying his law practice.

*First*, Donziger has been litigating the case, making a living, and conducting his professional and business activities for years without receiving any contingent fees. The fact that the payment of any Contingent Fee, should any ever be due, would have to await (and would depend upon) the outcome of this appeal is not an immediate threat of irreparable injury.

*Second*, there is no evidence that the Lago Agrio Judgment is likely to be collected in any material part, if at all, during the pendency of the appeal in this case. Although the LAPs are seeking enforcement of the Lago Agrio Judgment in Argentina, Brazil, and Canada, enforcement has not been granted in any of them. Nor is there any evidence that anything likely would be collected in any of those countries during the pendency of this appeal even if any of them permitted enforcement of the Judgment before the appeal is decided.[24] And while the Lago Agrio Judgment

---

[23]

       A forensic accountant reviewed Donziger's financial records to the extent he produced them. Donziger's deficient record keeping precluded the accountant from completely verifying "where, when, and on what" money was spent in the litigation, including Donziger's own compensation. *See, e.g.*, PX 4900R (Dahlberg Witness Statement) ¶¶ 29-32, 55. The documents available, however, indicated that Donziger received roughly $958,000 in monthly payments ranging from $10,000 to $17,500 from 2004 to 2009. *Id.*¶ 60.

[24]

       The Argentine courts rejected the LAPs' efforts to enforce the Lago Agrio Judgment against Chevron subsidiaries in that country absent a showing that the corporate veil should be pierced, and the Brazilian case appears still to be in its early stages. *See* PX 273 (Order

9

is enforceable in Ecuador, and certain limited Chevron assets have been attached there for the benefit of the judgment creditors, Donziger and the LAP Representatives have characterized the possibility that they actually will receive anything as a result of that attachment as "speculation."[25] Thus, there has been no showing that Donziger has received, or is likely during the pendency of this appeal to receive, any Contingent Fee.  The risk even of a delay of his receipt of any Contingent Fee by virtue of the effectiveness of the NY Judgment pending appeal is purely speculative.

In all the circumstances, there simply is no cognizable possibility that the effectiveness of paragraph 1 of the NY Judgment during the pendency of the appeal would have any irreparable effect on Donziger, his activities, his representation of his clients, or his law practice.

### 2. The Monetization Provision

No doubt recognizing this, Donziger seeks to attribute such effects to paragraph 5 of the NY Judgment, which prohibits him from "monetiz[ing] or profit[ing] from the Judgment . . . , including without limitation by selling, assigning, pledging, transferring or encumbering any interest

---

Issued by the Supreme Court of Justice of Argentina in *Aguinda Salazar Maria v. Chevron Corp.*); PX 2306 (Filing in the Superior Court of Justice of Brazil). A court in Ontario, Canada rejected the LAPs' efforts to enforce the Judgment in Canada without considering the merits.  *See* PX 660 (Order, Yaiguaje v. Chevron Corp., File No. CV-12-9808-00CL). That decision was reversed and the case remanded with instructions to proceed to the merits. But the appellate decision now is before the Supreme Court of Canada.  *See Press Releases, Supreme Court of Canada: Judgments in Leave Applications*, JUDGMENTS OF THE SUPREME COURT OF CANADA, http://scc-csc.lexum.com/scc-csc/news/en/item/4564/index.do (last visited Apr. 24, 2014) (granting Chevron's application to appeal from a decision by the Ontario Court of Appeal overturning the lower court's decision).

[25]

DI 1888 at 6.

While the Court does not adopt that characterization, Donziger certainly is bound by his own assertion.

10

therein."[26]  But he is wrong.

The point of paragraph 5 – which is narrower than language that was proposed by Chevron in its post-trial memorandum[27] and not specifically objected to by movants in their reply memoranda[28] – was to prevent Donziger and the LAP Representatives from avoiding the effect of the constructive trust imposed on assets in their hands that otherwise would have been direct proceeds of the Judgment by selling, assigning, or borrowing on *their interests* in the Lago Agrio Judgment and thus at least confusing the issue of traceability.[29]  Indeed, Donziger's memorandum so recognized when he described paragraph 5 by saying that it would "[d]epriv[e] Mr. Donziger of *his* interest in . . . a case to which he has devoted the better part of the last two decades."[30]

The NY Judgment, including paragraph 5, in fact would deprive Donziger of the ability to profit from the Lago Agrio Judgment that he obtained by fraud.  The practical effect of

---

[26]  NY Judgment ¶ 5.

[27]  Chevron Post-Trial Mem. [DI 1847] at 340-41.

[28]  *See* Donziger Reply Mem. [DI 1857]; LAP Reps. Reply Mem. [DI 1858].

Movants of course contended that they should prevail in the action.  But they did not comment on this proposed form of relief and thus arguably have waived any objection to it.  Donziger surely did not claim that this provision, if granted, would prevent him from making a living or destroy his law practice.

[29]  *See, e.g.*, DI 1847 at 340-44.

Courts generally will impose a constructive trust not only on property that is stolen or misappropriated, but also on property that is "traceable" to property that is stolen or misappropriated.  *See, e.g.*, *United States v. Peoples Benefit Life Ins. Co.*, 271 F.3d 411, 416 (2d Cir. 2001).  "Thus, the victim may recover against the thief regardless of the form into which the thief has converted the stolen property."  *Sec. & Exch. Comm'n v. Universal Express, Inc.*, No. 04 Civ. 2322 (GEL), 2008 WL 1944803, at *3 (S.D.N.Y. Apr. 30, 2008).

[30]  DI 1888 at 16 (emphasis added).

that, however, as we have seen, is not to prevent him from working on the case nor to prevent him from being paid his monthly retainer for his labors.  It is to prevent him from benefitting personally, at Chevron's expense, from property traceable to that fraudulent Judgment.   But leaving those provisions of the NY Judgment in place pending disposition of this appeal would threaten no irreparable injury.  There is no reason to suppose that the Lago Agrio Judgment will be collected in any material part during the pendency of the appeal. Even if there were, Donziger could realize the contingent fee benefits of such collections once the appeal is decided – if he prevails.

B.    *The NY Judgment Does Not Threaten to Prevent the LAP Representatives From Financing Their Appeal*

The LAP Representatives claim that the Judgment's prohibition on monetizing the Lago Agrio Judgment would prevent them from "financ[ing] any appeal of this action."[31]  That claim borders on the irresponsible.

*First.*   There is not a shred of evidence that the LAP Representatives or any of the other LAPs ever paid or contributed anything toward the legal fees or legal expenses incurred in this case, the Lago Agrio case, or any of the other litigation involving Chevron, or that there is or ever was any intention that they would do so in the future.   The litigation against Chevron has been funded by investors in exchange for shares of any eventual recovery.   In fact, the LAPs have raised at least $15.99 million and perhaps $21 million or more from such sources.[32]   At least $7.5 million

---

[31]
      *Id.* at 18.

[32]
      PX 2143 (Funding for the Enterprise).

of that amount has been paid to U.S. counsel,[33] much of it to firms representing the LAPs.[34]  Nothing

in the NY Judgment prevents the LAPs (other than the two LAP Representatives who are named in

the NY Judgment) and their allies from continuing to raise money in the same fashion.

*Second.*  There is no reason to suppose that the Amazon Defense Front ("ADF") and the

LAPs lack funds, even at this moment, to pay for the appeal by the LAP Representatives, whom they

obviously decided to have defend this case in the interests of all in order to give them a voice in the

courtroom.  The LAPs are litigating actively against Chevron in Argentina, Brazil, Canada, Ecuador

and even elsewhere in the United States[35] and are represented in those cases by prominent counsel.

According to their lead Ecuadorian counsel, Pablo Fajardo, in a statement made on or about

March 19, 2014, "[w]e're preparing more court actions in other countries.  We're also putting

together proactive cases all over the world."[36]  Although the LAP Representatives repeatedly have

---

[33]

PX 4900R (Dahlberg Witness Statement) ¶ 65 & Ex. D.

[34]

This has included at least $4.8 million to Patton Boggs and $395,973 to Emery, Celli, Brinckerhoff & Abady LLP.  *Id.* Ex. D.

Doubtless due to the discovery cut-off date, the record does not reveal how much was paid to Smyser Kaplan & Veselka LLP, a firm that represented the LAP Representatives earlier in this action.  Likewise, the identity of the payer(s) is unknown, as a lawyer with the firm reportedly told another lawyer that "he did not know who was paying the bills" in this case.  *See* Supp. Decl. of Judith Kimerling in Support of Consolidated Reply to Mot. to Intervene [DI 710] ¶ 32 ("When I asked who would be paying me if I agreed to be an expert, [Ty Doyle of Smyser Kaplan] explained that his firm had become involved in the case through a 'series of referrals;' that they had been interviewed by Pablo Fajardo and a 'community representative' from Ecuador; and that the firm was getting paid and was not working on a contingency fee basis, but that he did not know who was paying the bills.").

[35]

Patton Boggs argued an appeal on their behalf in the Fourth Circuit only last month.  *See Chevron Corp. v. Page*, No. 13-1382 (4th Cir.).

[36]

Stavers Decl. [DI 1894], Ex. B (Mar. 19, 2014 Press Conference) at 10 ("[W]e're going to continue with the enforcement actions in the three countries we've already mentioned: Brazil, Argentina and Canada.  We're litigating in each jurisdiction.  No judge in those

13

pleaded poverty *in this case*, and their lawyers *here* have claimed non-payment of fees, they never

have produced any evidence of the financial condition of those who are bankrolling the case despite

repeated invitations to do so. Thus, the claim of inability to pay is entirely unsubstantiated and

appears to have been deployed in an effort to gain tactical advantage.

 *Third.* This conclusion is supported not only by the LAPs' apparently well funded

litigation efforts in other jurisdictions, but by another statement of Fajardo. In May 2013, he stated

that the LAPs would "scal[e] back in New York to focus on the main issue: enforcing the $19

billion judgment around the world. . . . The New York case is a distraction, a sideshow aimed at

exhausting our resources."[37] Self-created "poverty" in one of many spheres of activity that is

attributable to a party's own resource allocation decisions does not justify a stay pending appeal.

 *Finally.* Even if one were to ignore all of the above, the suggestion that the LAP

Representatives need the freedom to monetize their interests in the Lago Agrio Judgment in order

to finance their appeal ignores the fact that they have retained little if any economic interest in that

Judgment, assuming they ever had such an interest in the first place. As noted previously, the Lago

Agrio Judgment provides for the payment of the entire award to the ADF. This appears to include

the 10 percent that Ecuador's Environmental Management Act contemplates be awarded to

individual plaintiffs, essentially as a bounty for bringing such a suit.[38] Thus, it is doubtful that the

---

 jurisdictions is under any obligation to abide by Judge Kaplan's ruling. We're preparing more court actions in other countries. We're also putting together proactive cases all over the world.").

[37] Stavers Decl. [DI 1140], Ex. 3728.

[38] *See* DI 1874 at 269-70; PX 400 (Lago Agrio Judgment) at 187-88.

14

LAP Representatives themselves are or ever were entitled to receive anything at all, personally, under the Lago Agrio Judgment.[39]  They appear to have nothing to monetize.

In sum, the LAP Representatives have not shown that the provision of the NY Judgment preventing them from monetizing any interest they may have in the Lago Agrio Judgment threatens them with irreparable injury, either by preventing them from appealing here or in any other way.  This case always has been financed on the movants' side by outside investors, not the individual defendants.  There has been no showing that the money to pay for the appeal is not on hand already or, in any case, could not be raised just as millions have been raised before.  And the LAP Representatives have failed to demonstrate that they have retained whatever economic interest they ever had in the Lago Agrio Judgment, if they ever had any, that they could sell or borrow upon to pay any appellate fees but for the intervention of the NY Judgment.

---

[39]  For the sake of completeness, we note that the LAP Representatives and the rest of the LAPs in 2012 entered into a deed of trust (in which they were referred to as SETTLOR ONE) containing this provision:

"The SETTLORS hereby contribute, assign and transfer to the separate fund of the trust, each and every one of the assets listed in section Ten point One and Ten point Two of Clause Three, subsection Ten, ('Recitals') of this AGREEMENT, in other words: **One**.- SETTLOR ONE transfers as their initial contribution, the amount of one thousand United States Dollars (USD 1,000.00). In addition SETTLOR ONE agrees to contribute to the TRUST all of the monies they will receive in the future as a result of the parts of the ENFORCEABLE JUDGMENT corresponding to damages for COMPENSATION ARISING FROM THE LITIGATION." PX 2459 (Creation of a Commercial Trust for the Administration of Monies) at 9 (emphasis in original).

"COMPENSATION ARISING FROM THE LITIGATION" is defined to include all remediation awards, which are the vast bulk of the Lago Agrio Judgment, but to exclude the 10 percent referred to in the text. *Id.* at 5. Thus, it appears that the conveyance to the trust included any right that the LAPs had to any part of the damages awarded by the Lago Agrio Judgment save the 10 percent referred to, but that the right to the 10 percent resided in the ADF by virtue of the Lago Agrio Judgment itself, not in the individual plaintiffs.

15

C.      *The Transfer of Amazonia Shares Would Not Threaten Donziger With Irreparable Harm Pending Appeal*

The NY Judgment requires that Donziger "execute in favor of Chevron a stock power transferring to Chevron all of his right, title and interest in his shares of Amazonia."[40]   Donziger contends that such a transfer would threaten irreparable harm by depriving him of his "ability to exercise or sell his shares, or to participate in the entity's affairs, during the pendency of the appeal,"[41] and by granting Chevron control of his shares, which "would threaten the entity's purpose and existence."[42]   These arguments lack merit.

*First.*  For reasons explained in this Court's opinion, allowing Donziger to benefit from the Lago Agrio Judgment would be to hand him, at Chevron's expense, proceeds of the fraud he committed.  The Amazonia shares are the proxy through which Donziger and others with equity interests in any collections on the Lago Agrio Judgment will receive any benefits it may yield.  Thus, Donziger's Amazonia shares in equity belong to Chevron.  Any other conclusion would allow Donziger to be enriched unjustly if any of the Lago Agrio Judgment were collected.  Allowing the shares to remain in Donziger's hands pending appeal would enable him to benefit from his fraud prior to any collections by selling the shares and by hiding or dissipating the sale proceeds.  Taking the shares out of his hands now would prevent such a result and cause no injury to Donziger that could not be undone.  If Donziger prevailed on appeal, the shares and whatever economic benefit they may have yielded in the interim would be restored to him.  If he did not prevail, that fact would

---

[40]        NY Judgment ¶ 3.

[41]        DI 1888 at 19.

[42]        *Id.* at 20.

16

reflect the Second Circuit's determination that Chevron, not Donziger, is entitled to the shares and any proceeds of the shares. Putting the shares in Chevron's hands in the interim – the relief awarded by this Court – would cause no irreparable injury to Donziger.

      *Second.* Donziger's interest in Amazonia corresponds to his equity interest in any proceeds of the Lago Agrio Judgment, which is only 6.3 percent.[43] Corporate records show that he was not a director of the company on the date as of which they spoke,[44] and there is no suggestion that he is now. There has been no showing that any corporate action requiring or permitting shareholder approval is likely to occur before the appeal in this case is decided. Hence, Donziger has not shown that he would be injured irreparably by being deprived of the ability "to exercise . . . his shares . . . [, whatever exactly that means,] during the pendency of the appeal."

      *Third.* Donziger's suggestion that the transfer of his shares to Chevron would give Chevron "control" of its adversary, Amazonia,[45] is nonsense. Six percent shareholders without board representation do not control companies.

      *Fourth.* Donziger's suggestion that a transfer of his shares to Chevron, to speak colloquially, would put the fox in the hen house – in the sense that Chevron thereby would gain

---

[43]       *See* DI 1874 at 476-77 & n.1821; *see also* Donziger June 25, 2013 Dep. Tr. at 632:4-9, 633:15-634:2 (testifying that Donziger's shares in Amazonia are based on his proportionate equity interest in the LAPs' claim); PX 558 (Jan 5, 2011 retainer agreement) ¶¶ 3(a), 3(i).

      6.3 percent represents 31.5 percent of the Total Contingency Fee Payment, which is 20 percent of all funds collected. Donziger testified at trial that he did not know the number of Amazonia shares he owns, but confirmed that it is "the equivalent of what the contingency fee interest was before it was created." Trial Tr. 2491:19-24.

[44]       *See* PX 656 (Jan. 29, 2013 List of the Directors and Secretaries of Amazonia Recovery Limited) at 7 of 19 (naming Pablo Fajardo, Ermel Gabriel Chavez Parra, Luis Yanza, and Julian Jarvis as Directors, and GT Fiduciary Services Limited as Secretary).

[45]       *See, e.g.*, DI 1888 at 19 n.12 (referring to "Chevron's control of Amazonia . . . .").

**SPA-23**

17

access to confidential information in the hands of the company charged with trying to collect the Lago Agrio Judgment from Chevron – is overwrought.  As noted, Donziger is but a six percent shareholder without board representation in a company in which there is no evidence of any planned action requiring or permitting shareholder approval during the pendency of the appeal.  There is no reason to suppose that the holder of such a limited number of shares would have access to any sensitive corporate information except to the extent, if any, that the directors opted to share it.  Even if Chevron became a 6.3 percent shareholder, there is no likelihood that the company would share confidential information with it, as at least a majority of the directors – Fajardo, Chavez, and Yanza – are Donziger allies and Chevron adversaries.

Accordingly, an immediate transfer of Donziger's Amazonia shares to Chevron would threaten Donziger with no irreparable injury.  On the other hand, the overriding concern in ordering the transfer was immediately to prevent Donziger from benefitting from the fraud he committed through the vehicle of his Amazonia shares.  That objective may be achieved during the pendency of the appeal by taking the shares out of Donziger's hands without now placing them into Chevron's.  Accordingly, the Court will grant Donziger's motion to the extent of modifying paragraph 3 of the NY Judgment, solely pending the determination of this appeal, to require that the shares be conveyed to the Clerk of this Court, who shall hold them for the benefit of Donziger and Chevron, as their respective interests appear upon disposition of this appeal.

Case 18-855, Document 80, 12/12/2018, 2453988, Page28 of 145

18

D.     *The Constructive Trust Provision Does Not Threaten to Deprive Donziger or the*
       *LAP Representatives of Real Property*

Donziger and the LAP Representatives protest as well the NY Judgment's requirement that they transfer and assign to Chevron "all property whether personal *or real*, tangible or intangible, vested or contingent . . . traceable to the Judgment or the enforcement of the Judgment anywhere in the world."[46]  They assert that they "face the loss of real property," which they say inherently would be irreparable harm.[47]

The LAP Representatives have not shown that they own any real property at all. There is no evidence of real property ownership by Donziger except for some property that he acquired by virtue of family probate litigation.  Thus, movants have failed to show that any of them owns real property that is traceable to the Lago Agrio Judgment.  Property that is not traceable to the Lago Agrio Judgment is unaffected.

E.     *The NY Judgment's Application to Those "Acting in Concert" With Donziger and*
       *the LAP Representatives Does Not Threaten to Irreparably Harm Donziger and the*
       *LAP Representatives*

Paragraph 8 of the NY Judgment provides:

"In accordance with Federal Rule of Civil Procedure 65(d)(2), this Judgment is binding upon the parties; their officers, agents, servants, employees, and attorneys; and other persons who are in active concert or participating with any of the foregoing."

---

[46]     NY Judgment ¶¶ 1, 2 (emphasis added); *see also* DI 1888 at 18.

[47]     DI 1888 at 18.

19

In addition, Federal Rule of Civil Procedure ("FRCP") 65(d)(2) explicitly provides that the NY

Judgment is binding only upon those persons with actual notice thereof.[48]

Donziger contends that this provision will "chill third parties from funding or

associating with" him to the extent that he will be harmed irreparably during the pendency of the

appeal.[49]  The argument is without merit.

As paragraph 8 states, it is a function of FRCP 65(d)(2).  It is intended to "give[]

force to injunctions" by "prevent[ing] parties from violating them by proxy."[50]  The idea that anyone

would decline to associate with Donziger by reason of paragraph 8 of the NY Judgment is fanciful,

as there is nothing in the NY Judgment that prevents Donziger from associating with anyone.  If he

has suffered a loss of good will or esteem, that loss is attributable to the fact that the evidence at trial

established serious misconduct on his part and cannot be remedied by a stay pending appeal.

His complaint about the impact of paragraph 8 on funding is nearly as far fetched.

As discussed, Donziger's side of the Lago Agrio litigation has been funded by investments in

exchange for shares of any collections that may be obtained.  The NY Judgment does not limit

efforts to enforce the Lago Agrio Judgment outside the United States, even by Donziger and the

LAP Representatives.[51]  It limits efforts to do so in the United States only by Donziger and the LAP

---

[48]
    Fed. R. Civ. P. 65(d)(2) ("The order binds only the following who receive actual notice of it by personal service or otherwise . . . .").

[49]
    DI 1888 at 18.

[50]
    *Eli Lilly & Co. v. Gottstein*, 617 F.3d 186, 195 (2d Cir. 2010).

[51]
    It does, of course, limit the personal ability of Donziger or the LAP Representatives to profit from such efforts by, *inter alia*, imposing a constructive trust on anything that they receive that is traceable to the Lago Agrio Judgment.

20

Representatives.  The ability of the other LAPs, the ADF, Amazonia and anyone else claiming the

right to seek enforcement to attempt to do so even in the United States is unaffected as long as they

do not knowingly act in concert with Donziger or the LAP Representatives.[52]  Thus, the LAPs (other

than the two LAP Representatives) and most of their entourage are virtually unconstrained by the

NY Judgment in their ability to attempt to fund their litigation efforts against Chevron by continuing

to sell shares in anything that may be recovered for whatever investors are willing to pay.

Paragraph 8 threatens the movants with no irreparable injury.

*          *          *

In sum, Donziger and the LAP Representatives have failed to demonstrate that they

face a cognizable threat of irreparable harm, or even the possibility of such a threat, absent a stay

pending appeal.

II.     *Donziger and the LAP Representatives Do Not Have a Substantial Probability of
        Material Success on Appeal*

The movants' failure to demonstrate any real prospect of irreparable injury is fatal

to their motion.  In any case, however, their prospects of a reversal of any material part of the

judgment would be insufficient to warrant a stay pending appeal.[53]

---

[52]    NY Judgment ¶ 4.

[53]    *Nken*, 556 U.S. at 434 ("It is not enough that the chance of success on the merits be 'better
        than negligible.'") (citation omitted).

        Movants advocate that this Court require only a "substantial possibility" of success on
        appeal. *See Mohammed*, 309 F.3d at 101 (noting that the Circuit has "also used 'possibility'
        rather than 'probability'").  The Court need not determine which articulation of the standard
        applies here because it finds that movants do not meet the standard under either formulation.

21

A.      *Donziger and the LAP Representatives' Standing Argument is Unlikely to Succeed*

Movants place heaviest reliance on their argument, first conceived well after the trial,

that Chevron's decision prior to trial to withdraw its damages claim and request for a worldwide

injunction deprived the company of standing.  That argument is unlikely to fare better on appeal than

it did in this Court.

As Supreme Court and Second Circuit precedent makes absolutely plain, "standing

is to be determined as of the *commencement of suit*"[54] and is properly understood as an "evaluat[ion]

of [a plaintiff's] personal stake as of the *outset of the litigation*."[55]  Where circumstances change

subsequent to the filing of the complaint – even where those changes stem from the plaintiff's own

choices or intentions – the plaintiff's "standing" is not altered.[56]  Instead, those changes may – or

may not – render a case moot.[57]

Two Second Circuit cases not previously cited underscore this principle.  In *Comer

v. Cisneros*,[58] one of the named plaintiffs, Felicia Stokes, claimed she intentionally had been

deprived on the basis of race of the opportunity to use her Section 8 housing benefit in the Buffalo

suburbs, where she wished to live.  She sought injunctive relief against the alleged racial

---

[54]        *Azim v. Vance*, 530 F. App'x 44, 45 (2d Cir. 2013) (quoting *Lujan v. Defenders of Wildlife*, 555, 570 n.5 (1992) (internal quotation marks omitted)) (emphasis added).

[55]        *Altman v. Bedford Cent. School Dist.*, 245 F.3d 49, 70 (2d Cir. 2001) (quoting *Cook v. Colgate*, 992 F.2d 17, 19 (2d Cir. 1993)) (brackets in original) (emphasis added).

[56]        See *Comer v. Cisneros*, 37 F.3d 775, 791 (2d Cir. 1994).

[57]        *Azim*, 530 F. App'x at 46.

[58]        37 F.3d 775.

**SPA-28**

22

discrimination with respect to the availability of housing subsidies in the suburbs.  After Stokes determined that she no longer wanted to leave Buffalo, the district court dismissed her claim for lack of standing.[59]  The Second Circuit reversed, holding that, "the question whether Stokes has a current desire to live outside the City . . . is irrelevant because standing is measured as of the time the suit is brought."[60]

In *Azim v. Vance*,[61] the Circuit made the point even more plainly.  The plaintiffs, licensed taxi cab drivers, challenged the City's use of GPS devices in their cars and the administrative and/or criminal charges brought against them.  This Court dismissed the complaint for lack of standing because one plaintiff had settled with the City and another determined he no longer wanted the job from which he claimed to have been unfairly dismissed.[62]  The Second Circuit disagreed, but affirmed on a different ground.  Emphasizing the principle that "standing is to be determined as of the commencement of suit," the Circuit held that, "to the extent that the plaintiffs had standing at the time of the filing, given the subsequent actions discussed above, once the named parties lost tangible interest, their claims were rendered moot."[63]

The proper analysis here thus is mootness, not standing.  Chevron's determination,

---

[59]

*Id.* at 791.

[60]

*Id.*  Nor did the plaintiff's determination that she no longer wished to live in the suburbs mean that her claims were not redressable.  The Circuit observed that equitable relief could be "shape[d]" by the court.  *Id.*

[61]

530 F. App'x 44.

[62]

*Azim v. N.Y.C. Taxi & Limousine Comm'n*, No 11 Civ. 2921, 2012 WL 399934 (S.D.N.Y. Feb. 6, 2012).

[63]

530 F. App'x at 45-46.

subsequent to the filing of its complaint, to seek relief narrower than it demanded in its complaint did not impact its standing.  Instead, that decision bears on the question whether the company retains a "tangible interest" in the litigation's outcome.  As the Court explained in its Opinion,[64] Chevron plainly still has such an interest.  This case is not moot, and the Court granted meaningful relief to the company.[65]  Significantly, movants do not argue otherwise.  Indeed, their claims of irreparable injury evidence their tacit acknowledgment that the relief granted to Chevron is effective and significant.

Movants' new challenge to Chevron's standing as of the time the complaint was filed – not raised before this motion – is not likely to fare any better on appeal.  As the Court set forth in its opinion, Chevron pleaded at the case's outset, and then proved at trial, facts sufficient to satisfy the requirements of Article III standing: that it had been injured by movants' conduct, that movants threatened further injury through the then imminent entry of a large judgment (which issued not two weeks later as a result of their fraud), and that damages and global injunctive relief would redress those injuries.[66]  Movants reach further than their grasp by arguing that the absence of the Lago Agrio Judgment at the time of the initial complaint foreclosed Chevron's standing.[67]  Chevron plainly had been injured by movants' fraud even before the Lago Agrio Judgment was issued.  The

---

[64]
    *See* DI 1874 at 308-10.

[65]
    *See Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013) ("[A] case 'becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'") (quoting *Knox v. Serv. Emps. Int'l Union*, 132 S. Ct. 2277, 2287 (2012)).

[66]
    *See* DI 1874 at 311-13.

[67]
    *See* Def. Reply [DI 1896] at 3 ("Chevron did not have standing to seek *any* injunctive relief at the outset because there was no Ecuadorian judgment against it at that time, let alone an enforceable one, nor were there any enforcement proceedings.")

SPA-30

24

threat of the entry of that judgment – the product, as this Court now has found, of a bribe and other fraud – was imminent.[68]   No more was required.

Movants would not have a greater chance of success even if one were to accept their invalid premise that standing is determined by events subsequent to the suit's commencement.  As the Court's Opinion and prevailing case law make plain (and movants once more ignore), movants' conduct and the fraudulent Lago Agrio Judgment need not constitute the 'but for' or proximate causes of Chevron's injuries in order to satisfy Article III.[69]  Instead, Chevron was required only to demonstrate, as this Court found that it did,  that the harms it has suffered and with which it remains threatened are "fairly traceable" to movants' misconduct;[70] in other words, that the threat of enforcement that Chevron confronts is "fairly traceable" to movants' bribery, the Lago Agrio Judgment they ghostwrote, and their other fraudulent acts.  Movants' suggestions to the contrary

---

[68]  Lest there ever was any doubt, movants have continued to articulate both their desire to enforce the Lago Agrio Judgment and their confidence that other courts will recognize it.  *See* DI 1894, Ex. B (Mar. 19, 2014 Press Conference) at 4 (Donziger: "[T]he communities and their attorneys will continue the enforcement actions in several countries" pending the appeal. "And in my opinion, the judges in those countries will ultimately not be biased toward Chevron . . . ."), 5 (Donziger: "[W]e have the utmost confidence that Chevron will ultimately have to pay . . . ."), 10 (Fajardo: "[W]e're going to continue with the enforcement actions in the three countries we've already mentioned: Brazil, Argentina and Canada.  We're litigating in each jurisdiction.  No judge in those jurisdictions is under any obligation to abide by Judge Kaplan's ruling.  We're preparing more court actions in other countries.  We're also putting together proactive cases all over the world."), 16 (Donziger: "What the communities are doing now is collecting on the judgment they won. . . . We're just going to collect what Chevron owes the communities."); Ex. D (*NY Judge Rules for Chevron in Ecuador Case*, THE WALL STREET JOURNAL (Mar. 4, 2014)) at 1 (Juan Pablo Saenz: this Court's ruling "will not serve to reduce the risk the oil company faces in the imminent collection of the sentence dictated against it by the Ecuadorian justice system").

[69]  *See* DI 1874 at 314 n.1251.

[70]  *Rothstein v. UBS A.G.*, 708 F.3d 82, 91-92 (2d Cir. 2013) (noting that "the 'fairly traceable' standard is lower than that of proximate cause").

25

defy logic.[71]    Finally, Chevron plainly will "benefit in a tangible way from the [C]ourt's intervention,"[72] thus defeating movants' arguments that the injuries they have caused and still threaten to cause defy redress in this Court.

> B.    *Even If Donziger Were to Prevail on the Question of the Availability of Injunctive Relief Under RICO, Chevron Still Would Be Entitled to All the Relief this Court Granted*

The Court recognizes that the question whether injunctive relief is available to private plaintiffs is open in this Circuit.  Courts that have addressed the issue are divided.[73] It is conceivable that movants will prevail on that issue notwithstanding this Court's view. Nevertheless, that fact carries no water for the movants.

The relief granted here against Donziger rests not only on RICO, but on the independent and sufficient state law ground that the Lago Agrio Judgment was procured by fraud. Thus, even were equitable relief unavailable under RICO, the Court would have granted the same relief on the basis that Donziger procured the Lago Agrio Judgment through fraud. Any uncertainty concerning the availability of private injunctive relief under RICO provides no basis for staying Chevron's relief against Donziger.

---

[71]    Movants' arguments are no more successful under the more rigorous RICO causation standard, which applies to claims against Donziger only.  The threat of the Lago Agrio Judgment's enforcement in the United States is the direct byproduct of movants' attempts to enforce the Lago Agrio Judgment. *See* DI 1874 at 403-04.

[72]    *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 n.5 (1998) (quoting *Warth v. Seldin*, 422 U.S. 490, 508 (1975).

[73]    *See* DI 1874 at 341-45.

SPA-32

26

Moreover, the LAP Representatives were not even sued under RICO.  The relief granted against them does not depend upon that statute.  Donziger's RICO argument thus has no bearing on them at all.

C.      *The Relief Granted is Consistent with* Naranjo

Movants assert that the NY Judgment "exacerbates the very comity concerns raised in [*Chevron Corporation v.*] *Naranjo*."[74]  But they do little to explain why *Naranjo* – which was decided on the ground that declaratory relief is not available under New York's Recognition Act – precludes this Court from granting the coercive – not declaratory – relief it did grant, which was granted on entirely different theories of liability.

As the Court explained in its Opinion,[75] the constructive trust and injunction do not, as movants falsely assert, "preemptively nullify a foreign judgment or thwart its possible enforcement in other countries."[76]  As is plain on the face of the NY Judgment, its application is confined to the three movants who defended this case at trial – over whom the Court has personal jurisdiction – and prohibits enforcement of the Lago Agrio Judgment by them only within the United States.

This Court's Judgment  does not interfere with any foreign court's enforcement of the Lago Agrio Judgment, places no restrictions upon the LAPs' attempt to enforce the Lago Agrio Judgment in foreign courts, and does not preclude parties not before the Court from profiting from

---

[74]      DI 1888 at 10.

[75]      *See* DI 1874 at 479-84.

[76]      DI 1888 at 9.

Case 18-855, Document 80, 12/12/2018, 2453988, Page37 of 145

any such enforcement.  Movants make no attempt to explain their claims to the contrary.  This Court's carefully cabined relief tailored to prevent these three individuals – all subject to its personal jurisdiction – from profiting from the egregious fraud for which they are responsible is entirely consistent with *Naranjo*.

> D.      *Movants are Not Likely To Succeed on Their Argument That Chevron is Judicially Estopped from Obtaining Relief*

For the reasons already set forth in the Opinion, Donziger and the LAP Representatives' reassertion of their argument that Chevron is judicially estopped from obtaining relief is unlikely to prevail on appeal at least because (a) Texaco's assertions many years ago as to the adequacy of Ecuador's courts concerned a different time period, wholly different circumstances, and thus do not obtain here, (b) Chevron did not "merge" with Texaco in any relevant sense, and (c) it mischaracterizes the record to suggest, as movants have, that Texaco promised it would satisfy any judgment for plaintiffs subject to certain conditions.[77]

As the Court already has explained, even accepting – contrary to the facts and the law – movants' erroneous arguments that (a) Chevron stands in Texaco's shoes, and (b) movants accepted and Judge Rakoff relied upon Texaco's very conditional offer to satisfy any judgment entered in plaintiffs' favor, their judicial estoppel argument still would fail.  A promise to satisfy a judgment subject to the defenses available under New York's Recognition of Foreign Country Money Judgments Act would not affect Chevron here.  As the Second Circuit explained, "Chevron has . . . reserved its right to challenge any judgment issued in Lago Agrio on the grounds that the

---

[77]     DI 1874 at 455-61.  This Court addressed these arguments also in *Chevron Corp. v. Salazar*, 807 F. Supp. 2d 189 (S.D.N.Y. 2011).

Ecuadorian judicial system 'does not provide impartial tribunals or procedures compatible with the requirements of due process of law,' that the judgment itself 'was obtained by fraud,' or that 'the proceeding in [Lago Agrio] was contrary to an agreement between the parties.' *Nothing in that reservation of rights purports to restrict the kind of forum or type of proceeding in which Chevron can raise those defenses*."[78]  As a result, even had Chevron made or adopted that promise as movants claim – and this Court found that it did not[79] – the promise would not preclude Chevron from asserting the arguments it asserted here, all of which are defenses under the New York Recognition Act.  Accordingly, movants have failed to demonstrate a likelihood of success on appeal on these grounds also.

> E. *The LAP Representatives Are Not Likely To Prevail on Their Contention that the Court Lacks Personal Jurisdiction Over Them*

The LAP Representatives contend that they are likely to prevail on their argument that this Court lacks personal jurisdiction over them.  They are wrong.

First, as the Court already has explained, it struck the LAP Representatives' personal jurisdiction defense as a sanction for their failure to produce documents relevant to that defense.[80]  In so doing, it applied the well-settled principle that a party's refusal to produce such documents

---

[78] *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 397 (2d Cir. 2011) (citation omitted) (emphasis added).

[79] DI 1874 at 458-60.

[80] *See id.* at 434; *Chevron Corp. v. Donziger*, 296 F.R.D. 168, 220-22 (S.D.N.Y. 2013).

29

justifies the imposition of such a sanction.[81]  The likelihood of reversal of that sanction does not rise

above the level of a "mere possibility."[82]

Second, Chevron proved personal jurisdiction independent of the sanction ruling.

Donziger and the LAP Representatives do not here dispute this Court's findings of fact, which

independently supported the exercise of jurisdiction over the LAP Representatives under New

York's long-arm statute.[83]  Donziger not only acted as the LAPs' agent (and transacted business on

their behalf) in New York for nearly twenty years, he was retained to do as much.[84]  His activity on

the LAPs' behalf is imputed to them under the "usual presumption that the acts and knowledge of

an agent acting within the scope of employment are imputed to the principal."[85]  Donziger's actions

in New York on the LAP Representatives' behalf therefore satisfied the requirements of New York

CPLR § 302(a)(1).[86]

---

[81]

See *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinée*, 456 U.S. 694, 708 (1982) (affirming sanction striking personal jurisdiction defense and finding that "the District Court simply placed the burden of proof upon petitioners on the issue of personal jurisdiction. Petitioners failed to comply with the discovery order; they also failed to make any attempt to meet this burden of proof.  This course of behavior, coupled with the ample warnings, demonstrates the 'justice' of the trial court's order") (citation omitted); *accord Bayoil, S.A. v. Polembros Shipping Ltd.*, 196 F.R.D. 479, 482-83 (S.D. Tex. 2000) (striking personal jurisdiction defense as sanction for destroying documents relevant to personal jurisdiction).

[82]

*Nken*, 556 U.S. at 434 (internal quotation marks and citation omitted).

[83]

DI 1874 at 434-55.

[84]

See *id.* at 435.

[85]

*Wight v. BankAmerica Corp.*, 219 F.3d 79, 87 (2d Cir. 2000) (citing *In re Mediators, Inc.*, 105 F.3d 822, 827 (2d Cir. 1997)); *see also* DI 1874 at 448-49.

[86]

See DI 1874 at 434-55.

SPA-36

30

Movants' invocation of the adverse inference exception to the principles of agency does not change the analysis, as the exception plainly does not apply to this case.  It is a "narrow" one, "and applies only when the agent has totally abandoned the principal's interests."[87]  Unless an agent is found to have "acted entirely in his own interests and adversely to the interests" of the principal, the exception does not apply.  As movants do not – and could not – suggest that Donziger's efforts to secure a favorable judgment (albeit by illicit means) were not intended to benefit the LAP Representatives, the exception is not likely to carry the day for him.

III.    *A Stay Would Threaten Chevron With Irreparable Harm and Not Be in the Public Interest*

Among the four factors a court must consider in weighing whether to grant a stay pending appeal, "the first two factors" – the movant's likelihood of success on appeal and prospect of suffering irreparable harm – "are the most critical."[88]  As movants have failed to make the required showing on these two prongs, little more need be said as to the second two, which ask whether a stay is likely irreparably to harm Chevron and whether a stay is in the public interest.  The Court finds, however, that these two factors also cut against the stay movants seek.

Movants' claims that a stay will not harm Chevron are unpersuasive.  First, as this Court already has recognized, in the event movants were permitted to benefit from the Lago Agrio Judgment pending appeal, "there is no assurance that Chevron could recoup [that] property," which

---

[87]     *Wight*, 219 F.3d at 87 (internal quotation marks and citation omitted); *see also Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 466 (2010) ("To come within the exception, the agent must have *totally abandoned* his principal's interests. . . . A fraud that by its nature will benefit the [principal] is not 'adverse' to [his] interests, even if it was actually motivated by the agent's desire for personal gain.") (internal citations omitted) (emphasis in original).

[88]     *Nken*, 556 U.S. at 434.

**SPA-37**

31

– if it prevails on appeal – rightly belongs to it.[89]  As this Court has found, "[d]efendants . . . have taken extensive steps to ensure that any funds recovered are held offshore and beyond the reach of either U.S. or Ecuadorian courts."[90]  As a result, any benefit movants obtain in the interim between the entry of this Court's Judgment and the resolution of the appeal is likely to be lost forever. Moreover, movants' claim that "no . . . [domestic] enforcement actions exist" and that Chevron "has not" and "cannot show" that any such enforcement actions are "imminent absent the injunction" misses the point – movants' attempts to minimize the likelihood that any domestic enforcement actions will be filed is not the same thing as disclaiming any right to file them.[91]  This Court has found that the LAPs intend to seek enforcement in U.S. jurisdictions when they conclude that it would be tactically advantageous to do so.[92]  As a result, Chevron has established that it is likely to suffer irreparable harm in the event the relief it received is stayed.[93]

Nor is the stay movants seek in the public interest.  The concept that Donziger and the LAP Representatives should be permitted to profit pending appeal from the fraud for which they are responsible – with Chevron having no real prospect of recouping the loss if this Court's decision is affirmed – is not in the interests of anyone but the wrongdoers.

---

[89]  DI 1874 at 470.

[90]  *Id.* at 471.

[91]  DI 1888 at 20-21.

[92]  *See* DI 1874 at 479.

[93]  This point is underscored by the fact that the Court found in its Opinion that, absent the relief granted, Chevron was likely to suffer irreparable harm.  *See id.* at 469-75.

SPA-38

32

*Conclusion*

The motion for a stay pending appeal [DI 1888] is granted to the extent that paragraph 3 of the Judgment, solely pending the determination of the appeal in this case, is modified to read as follows:

> "Donziger shall execute in favor of the Clerk of this Court a stock power transferring to the Clerk all of his right, title and interest in his shares of Amazonia. The Clerk shall hold the Amazonia shares thus transferred, and all proceeds thereof, pending the determination of the appeal in this case, for the benefit of Donziger and Chevron, as their interests then may appear.  Upon request by Donziger, given on notice to Chevron at least ten days in advance of the date for the proposed vote, the Clerk shall vote, or direct the owner of record thereof such to vote, such shares as directed by Donziger unless otherwise ordered by the Court.  Donziger and the LAP Representatives, and each of them, shall execute such other and further documents as Chevron reasonably may request or as the Court hereafter may order to effectuate the foregoing provisions of this Judgment."

It is denied in all other respects.  This opinion includes the Court's findings of fact and conclusions of law.


SO ORDERED.

Dated:          April 25, 2014


                                   /s/  Lewis A. Kaplan
                         _____
                                   Lewis A. Kaplan
                               United States District Judge

**SPA-39**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

               Plaintiff,

         -against-

STEVEN DONZIGER, et al.,

               Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11 Civ. 0691 (LAK)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/28/2018

## SUPPLEMENTAL JUDGMENT AS TO DONZIGER
## DEFENDANTS AND DEFENDANTS CAMACHO AND PIAGUAJE

LEWIS A. KAPLAN, *District Judge.*

      This action was brought against defendants Steven Donziger, The Law Offices of
Steven R. Donziger, Donziger Associates, PLLC (these three defendants referred to collectively as
the "Donziger Defendants"), Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje (these two
defendants referred to collectively as the "LAP Representatives"), Stratus Consulting, Inc., Douglas
Beltman, Anne Maest (these three defendants being referred to collectively as the "Stratus
Defendants"), and others. The case has been tried and the Court has rendered its findings of fact and
conclusions of law with respect to all claims against the Donziger Defendants and the LAP
Representatives. Judgment, which among other things awarded costs in favor of plaintiff and against
the Donziger Defendants and the LAP Representatives, was entered against them on March 4, 2014
(the "Judgment"). DI 1875. The Judgment was affirmed in all respects and certiorari was denied.
Subsequently, the Clerk taxed costs against the Donziger Defendants and the LAP Representatives.
Steven Donziger thereafter moved for review of the Clerk's taxation of costs. The Court construed

2

that motion as having been made on behalf of all of the Donziger Defendants. It today granted that

motion in part and denied it in part in a memorandum opinion.

Accordingly, the Judgment is supplemented in that it is hereby further

ORDERED, ADJUDGED, AND DECREED, that plaintiff shall recover of the

Donziger Defendants and the LAP Representatives, jointly and severally, the sum of $813,602.71.

Dated:  February 28, 2018

_____
Lewis A. Kaplan
United States District Judge

SPA-41

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHEVRON CORPORATION,

                Plaintiff,

          -against-                                11 Civ. 0691 (LAK)

STEVEN DONZIGER, et al.,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

        Appearances:

                Randy M. Mastro
                Andrea Neuman
                William E. Thompson
                GIBSON DUNN & CRUTCHER LLP
                *Attorneys for Plaintiff*

                Steven Donziger
                THE LAW OFFICES OF STEVEN DONZIGER
                *Attorney for Defendant Steven Donziger*

LEWIS A. KAPLAN, *District Judge.*

        This Court found after a lengthy trial that Steven Donziger and his co-conspirators

attempted to extort billions of dollars from Chevron Corporation.  They did so by, among other

SPA-42

2

things, violating the Racketeering Influenced and Corrupt Organizations Act ("RICO"),[1] foisting fraudulent evidence on an Ecuadorian court, coercing Ecuadorian judges, illegally writing all or much of the Ecuadorian court's purported decision, and then procuring the signature of an Ecuadorian judge on a $19 billion judgment against Chevron that the co-conspirators had written, in part by the promise of a $500,000 bribe.  This Court found also, and independently of RICO, that Donziger's actions were wrongful under the common law.

The details of this extraordinary behavior are contained in extensive findings.  The judgment specifically provided, in words relevant here, that "Chevron shall recover of Donziger and the LAP Representatives,[2] and each of them, jointly and severally, the costs of this action pursuant to Fed. R. Civ. P. 54(d)(1) and 28 U.S.C. § 1920."[3]

While Donziger appealed from the judgment, he challenged neither the factual findings nor the costs provision of the judgment.  The entire judgment was affirmed by the Court of Appeals, which commented that "[t]he record in the present case reveals a parade of corrupt actions by the LAPs' legal team [*i.e.,* Donziger and his co-conspirators], including coercion, fraud, and bribery, culminating in the promise to [the Ecuadorian judge,] Judge Zambrano[,] of $500,000 from

---

[1]

18 U.S.C. § 1961 *et seq.*

[2]

"LAPs" refers to the Lago Agrio plaintiffs, *i.e.,* the plaintiffs in the Ecuadorian case., all of whom were defendants here.  "LAP Representatives" refers to the two LAPs who appeared in and defended this case.  The remaining LAPs and some other defendants defaulted in this case.

[3]

DI 1875, ¶ 9.

3

a judgment in favor of the LAPs."[4]  Insofar as Donziger is concerned, the case is over save for the

matters of costs and attorney fees.

Having prevailed in the litigation, Chevron gave notice of taxation of costs against

Donziger and the LAP Representatives.[5]  The Clerk taxed costs in the total amount of $944,463.85,

which consisted of fees and expenses of special masters in the amount of $872,387.63, fees for

service of papers of $1,550, interpreters' costs of $23,400, and court reporter fees of $47,126.22.[6]

Donziger[7] (though not the LAP Representatives) now seeks review of the Clerk's

taxation by a letter filed electronically on August 16, 2017.[8]  He contends that no costs should be

awarded against him for various reasons and, in any case, that the special master fees and expenses

should not be taxed because Chevron forfeited any right to recover them by its alleged failure to

comply with an earlier procedural order of the Court.

---

[4]

*Chevron Corp. v. Donziger,* 833 F.3d 74, 126 (2d Cir. 2016), *cert. denied,* 137 S. Ct. 2268 (2017).

[5]

LOCAL CIV. R. 54.1(a) prohibits taxation of costs during the pendency of an appeal.

[6]

DI 1928.

[7]

Two Donziger-related entities also are defendants against which costs were taxed, the Law Offices of Steven Donziger ("SRD Office") and Steven R. Donziger & Associates, PLLC ("PLLC").  None of Donziger's submissions with respect to costs has mentioned either. Nevertheless, Donziger in May 2013 filed a notice of appearance on behalf of himself, SRD Office and PLLC that never has been withdrawn.  Accordingly, the Court treats his submissions with respect to costs as having been made on behalf of those entities as well as on his own  behalf.  For the sake of clarity, however, the LAP Representatives throughout this litigation have been and remain represented by separate counsel.  They have raised no objections with respect to the taxation of costs against them.

[8]

DI 1931.

*The Proceedings Thus Far and Donziger's Contentions*

 *Proceedings as to Costs – The Clerk's Office*

   Chevron filed its notice of taxation of costs on December 5, 2016, not long after the docketing of the mandate affirming the judgment.[9]  Following that filing, Donziger moved to hold taxation of costs in abeyance pending the outcome of a petition for a writ of certiorari.[10]  The Court obliged.  But the Supreme Court denied certiorari on June 19, 2017.  Chevron on the same day moved to reactivate both its attorneys' fee motion and proceedings to tax costs.[11]  Donziger did not object to that motion.  On July 17, 2017, the Court directed the Clerk to tax costs.[12]

   Although Dongizer had not objected to the reactivation of proceedings to tax costs, his position changed after that motion was granted.  On August 1, 2017, he wrote to the Clerk, arguing that taxation of costs should "be held in abeyance pending resolution of a number of critical and related legal and factual issues that are now pending or will soon be presented to the district court."[13]  These were (1) Donziger's contention that any award of attorneys' fees under RICO is

---

[9]
   DI 1918.

[10]
   DI 1919, DI 1921.

   Chevron's motion for attorneys' fees against Donziger likewise was held in abeyance.

[11]
   DI 1922.

[12]
   DI 1923, ¶¶ 1-2.

[13]
   DI 1925, at 1 (footnote omitted).

Case 18-855, Document 80, 12/12/2018, 2453988, Page49 of 145

5

foreclosed by Circuit precedent,[14] (2) his vaguely described and unsupported assertion that "a variety

of appropriate judicial bodies, both in this  jurisdiction and others" may consider whether Chevron

"and its counsel knowingly suborned perjury, obstructed justice, violated numerous federal

laws, and committed a fraud on this court with respect to the testimony of [trial witness]

Alberto Guerra,"[15] (3) Donziger's assertion that Chevron forfeited its right to seek recovery of the

special masters' fees and compensation by failing to make a timely motion under the Court's July

9, 2013 order,[16] (4) a contention that the recovery of attorneys' fees and costs "to attack and to try

to disable adversary counsel [would be] in violation of the First Amendment,"[17] and (5) an

assertion that all further post-judgment proceedings against him should be moved to another court

because the then-chair of the Grievance Committee of this Court allegedly had referred his conduct

to the Departmental Disciplinary Committee of the First Department of the New York Supreme

Court in an alleged letter that Donziger has not produced.[18]  None of Donziger's contentions was

supported by any affidavit, declaration or exhibits.

The Clerk declined to hold the taxation of costs in abeyance, which was entirely

---

[14]
    *Id.*

[15]
    *Id.* at 2.

[16]
    *Id.* at 3-5.

[17]
    *Id.* at 5-6.

[18]
    *Id.* at 7-8.

6

appropriate given the Court's prior direction to "proceed to tax costs."[19]  Accordingly, costs were

taxed on August 8, 2017.[20]


*Proceedings as to Costs – The Present Position*

The procedure for objecting to costs taxed by a district court clerk is specified in Rule

54(d)(1) of the Federal Rules of Civil Procedure – "On motion served within the next 7 days, the

court may review the clerk's action."  As costs were taxed on August 8, Donziger had until August

15 to file a motion seeking review of the Clerk's action.  In fact, as discussed above, he never did

file a motion.  Rather, on August 16, 2017, the day after such a motion would have been due, he

electronically filed a letter objecting to the Clerk's actions.[21]  The letter was largely a reprise of

Donziger's August 1 letter to the Clerk.  But he added to it by (1) "insist[ing]" that the undersigned

recuse himself,[22] (2) asserting that Chevron should bear its own costs because it despoiled the

---

[19]     DI 1923, ¶ 2.

[20]     DI 1928.

         The Clerk taxed $1,550 for service fees, $47,126.22 for court reporter fees, $23,400 for
         translation services, and $872,387.63 for compensation and expenses of special masters.

[21]     DI 1931.

         Donziger's multiple prior recusal/reassignment requests all were denied.  *E.g., Chevron
         Corp. v. Donziger,* 974 F. Supp.2d at 566; *Id.* 783 F. Supp.2d 713, 718 (S.D.N.Y. 2011)
         (both citing record).

[22]     DI 1931, at 1-2.

SPA-47

7

Ecuadorian rain forest,[23] and (3) contending that Donziger has limited means and therefore ought not to bear any costs in this matter.[24]

Taken together, Donziger's letters purport to articulate reasons that no costs should be taxed against him and, in any case, that Chevron forfeited any right to recover the special master fees and expenses.  He has not challenged specifically any of the other items of costs taxed.  With respect to the special masters, however, one point warrants particular note in order to understand the proceedings.

Chevron's bill of costs contained copies of the bills it had paid for the compensation and expenses of the special masters and their assistant.  In the case of one of the two special masters, former Magistrate Judge Katz, the material included detailed, contemporaneous time records.  In the case of the other, Max Gitter, Esq., it included invoices showing the hours worked and the billing rates but not time detail.[25]  Accordingly, by order dated November 9, 2017, the Court (1) required that Mr. Gitter and Cleary, Gottlieb provide Donziger and the Court with "time records (including any description of services the existing records contain) sufficient to show the services rendered that were . . . included in the bill of costs taxed by the Clerk," and (2) requested that the special masters make a recommendation with respect to the allocation of the special master costs as between the

---

[23]
     *Id.* at 3-4.

[24]
     *Id.* at 4-5.

[25]
     The same was true of a Cleary Gottlieb associate, Mr. Ormond, whom the Court authorized to assist the special masters.

Case 18-855, Document 80, 12/12/2018, 2453988, Page52 of 145

8

defendants and Chevron.[26]   Donziger then was given until December 4, 2017 to object to the reasonableness of the hours devoted to the services performed by any or all of the special masters or their assistant and until December 23, 2017 to object to the special masters recommendation.[27]

The special masters furnished the necessary time records to Donziger on November 21, 2017,[28] and filed their report and recommendation on the recommended allocation of their fees and costs on December 8, 2017.[29]   Donziger filed no timely objection to either.   Accordingly, the Court (1) found that the hours for and the hourly rates at which the special masters and their assistant billed were reasonable and appropriate,[30] and adopted the findings set forth in the special masters' report while reserving to itself the decision whether to tax all costs against the defendants or, if not, the manner in which the costs would be apportioned.[31]   In each case, Donziger – despite his failure to object prior to the Court's ruling – thereafter submitted an intemperate, unsupported and hyperbolic letter complaining of the Court's determination.[32]

---

[26]   DI 1939.

[27]   *Id.*

[28]   DI 1949.

[29]   DI 1942; *see* DI 1939.

The special masters recommended that 85 percent of the special master costs be apportioned to the defendants, jointly and severally.   DI 1942.

[30]   DI 1940.

[31]   DI 1946.

[32]   DI 1941, DI 1947.

9

On January 12, 2018, the special masters submitted an invoice for the work they performed in preparing the report of December 8.[33]  That invoice is not at issue here, as it was not, and could not have been, included in the bill of costs now under review.

*Discussion*

I.   *Donziger's Objections to the Taxation of Costs Fail to Comply With Court Rules*

Donziger's application to review the Clerk's taxation of costs fails in material respects to comply with the Federal Rules of Civil Procedure and the rules of this Court.

The application was made by means of a letter filed electronically.  Rule 54(d)(1) provides that review of a clerk's taxation of costs is to be by motion.  Local Civil Rule 7.1(a), with exceptions not here relevant, requires that motions be brought on by notice of motion or order to show cause and that they be accompanied by memoranda of law and "[s]upporting affidavits and exhibits thereto containing any factual information and portions of the record necessary for the decision of the motion."  Section 13.1 of the Court's ECF Rules and Instructions make clear that the Court's letter motion practice, which applies to other sorts of mostly routine procedural applications, does not permit letter motions to review taxation of costs.[34]

These rules serve important purposes.  The requirement of affidavits, exhibits, and memoranda of law – rather than unsworn letters and other informal submissions – serves to place before the Court evidence, legal authority and argument "necessary for the decision of the motion."

_____

[33]  DI 1950.

[34]  *Id.*

10

Accomplishment of that purpose is especially important here, as Donziger relies on (a) factual assertions that go well beyond the record in this case which, in any event, is enormous, and (b) legal contentions, the basis for which, if there is any, is far from self evident.  Yet Donziger has not supported his contentions with the materials the rules require.

These deficiencies cannot be overlooked on the theory that Donziger is representing himself.  Donziger is a graduate of the Harvard Law School and, according to the attorney search function of the website maintained by the New York Unified Court System, a member of the New York Bar for twenty years.[35]  He is not entitled to any special indulgence as a *pro se* litigant.[36]

Accordingly, the application to review the taxation of costs – except as it relates to the taxation of the special master fees and expenses which, as discussed below, raises at least some issues that may be decided on the existing record and without briefing – is, to the extent it is denied, based on Donziger's failure to comply with the Federal Rules of Civil Procedure and the local rules of this Court.  The Court nevertheless considers all of Donziger's arguments, based on such materials as are readily at hand, to determine whether they would have been meritorious had they been presented properly.  Even on that basis, however, he would fail in substantially all respects.  Hence, the ruling on this motion rests on alternative grounds.

---

[35]    NEW YORK STATE UNIFIED COURT SYSTEM, http://iapps.courts.state.ny.us/attorney/AttorneySearch#search_result (last visited Feb. 5, 2018).

[36]    Although "a court is ordinarily obligated to afford a special solicitude to pro se litigants," such as by liberally construing their pleadings, "a lawyer representing himself ordinarily receives no such solicitude at all." *Tracy v. Freshwater,* 623 F.3d 90, 101–02 (2d Cir. 2010).

11

II.    *Donziger's Arguments to Hold Costs in Abeyance*

Donziger's letter to the Clerk requested that she hold the taxation of costs in abeyance.  While the letter thus ostensibly went to the timing rather than the substance of the taxation process, in fact only three of the several arguments he made there actually addressed the question of timing.  Everything else went to the merits.  We deal first with the timing arguments.

A.    *The Claim that Attorneys' Fees Are Foreclosed by Circuit Precedent*

Among the bases for Donziger's attempt to have the Clerk hold costs in abeyance was the argument that Circuit precedent forecloses attorneys' fees in this case.[37]  The argument is a *non sequitur*.  Even if, as Donziger claims, Circuit precedent concerning attorneys' fee awards in civil RICO cases forecloses such an award in this case, it has nothing to do with the taxation of costs under Rule 54(d)(1).

B.    *The Assertion that "A Variety of Appropriate Judicial Bodies, Both in this Jurisdiction and Others" May Consider Whether Chevron "and Its Counsel Knowingly Suborned perjury, Obstructed Justice, Violated Numerous Federal Laws, and Committed a Fraud on this Court With Respect to the Testimony of Alberto Guerra"*

Donziger's argument for delay on this basis is frivolous.[38]

---

[37]       DI 1925, at 1.

[38]       Moreover, to whatever extent it properly may be understood as arguing that this Court's findings, based on the trial record before it, were erroneous, unsupported by the evidence, or otherwise inappropriate, the argument is barred.  Donziger was entitled to contend on direct appeal that those findings were clearly erroneous but failed to do so.  The argument therefore is foreclosed here for the reasons discussed in Point III.A.

12

*First.* The reference to "a variety of appropriate judicial bodies" is unexplained, not to mention unsupported by any evidence or legal authority.[39]   What judicial bodies?  In what proceedings?  Held in abeyance until when?  And what possible relevance might these speculative possibilities, if any there are, have to the taxation of costs in this case?  All of that is unexplained.

The judgment of this Court is final and enforceable.  It stands, regardless of whether courts or other "bodies" outside the United States recognize or enforce the Ecuadorian judgment or comment on testimony of Guerra either before this Court or before any other body.

*Second.* Although the foregoing is more than sufficient to dispose of Donziger's argument, it bears mention that Donziger overlooks the fact that the testimony of Guerra was far from indispensable to the judgment rendered in this case.  As the Court's opinion makes clear, this Court would have reached precisely the same result in this case even without the testimony of Alberto Guerra.

The Court found  that Donziger and his co-conspirators, among other misdeeds, (1)

---

[39]   Presumably it refers entirely or in part to Donziger's efforts to enforce the fraudulent Ecuadorian judgment in Argentina, Canada, and Brazil. Brazil's Supreme Judicial Tribunal, reportedly its highest appellate court in non-constitutional courts, is said recently to have denied recognition to the Ecuadorian judgment. *E.g.,* Ted Folkman, LETTERS BLOGATORY, *Lago Agrio Court: STJ Rejects Ecuadoran Judgment* (available at https://lettersblogatory.com/2017/12/01/lago-agrio-court-stj-rejects-ecuadoran-judgment /#more-25727 (last visited Dec. 5, 2017); *see also id. Lago Agrio: LAPs Abandon Recognition and Enforcement Action in Brazil,* (available at https://lettersblogatory.com/2017/09/25/lago-agrio-laps-abandon-recognition-and-enforc ement-effort-in-brazil/) (last visited Oct. 8, 2017).  Argentina's court of first instance also reportedly has rejected his suit.  *Id. Lago Agrio: Argentine Court Refuses to Enforce Ecuadoran Judgment,* (available at https://lettersblogatory.com/2017/11/02/lago-agrio-argentine-court-refuses-to-enforce-ec uadoran-judgment/#more-25606 (last visited Dec. 5, 2017); *see also id. Lago Agrio: The Argentine and Brazilian Developments, In English* (available at https://lettersblogatory.com/2017/11/08/lago-agrio-the-argentine-and-brazilian-develop ments-in-english/ (last visited Dec. 5, 2017).

13

blackmailed Judge Yanez to abandon the judicial inspections and to appoint Cabrera as the global

expert, (2) corrupted Cabrera, (3) wrote Cabrera's report, (4) falsely passed off Cabrera's report as

the work of an independent and impartial expert, and (5) ghost-wrote former Judge Zambrano's

purported decision which demonstrably relied on the fraudulent Cabrera report notwithstanding its

disclaimer.[40]   The first four of those findings were made entirely without regard to Guerra's

testimony.  And Guerra's testimony was not essential to the fifth.  Moreover, the Court held that this

fraudulent behavior warranted equitable relief with respect to the Ecuadorian judgment.  It did so

without necessary regard to whether Donziger and the LAPs bribed former Judge Zambrano, the only

point on which Guerra's testimony was critical.[41]

There is no valid reason to delay the taxation of costs on the theory that someday,

somewhere, some other body may comment on Guerra's credibility in a manner more to Donziger's

liking.


C.   *Change of Venue*

Donziger argued that the Clerk should defer taxation of costs based on an assertion

that the chair of this Court's Grievance Committee has made a complaint against him to state

disciplinary authorities.[42]  This, he asserted, would justify transfer of this case to another court.

---

[40]

Chevron Corp. v. Donziger, 974 F. Supp. 2d at 482-502, 558-64.

[41]

*Id.* at 564-66.

[42]

The basis for the argument apparently is a claim by Donziger that he has received a copy
of such a letter.  He has not submitted an affidavit to that effect nor a copy of any such
letter.  As there is nothing in the record to support Donziger's assertion, we refer to it as
"alleged."

SPA-54

14

Deferral of the costs issue was warranted, he said, because he would "be taking up this issue with the district court and if necessary with an appellate court with the ultimate aim of having all post-trial issues moved to a different and non-conflicted venue for resolution."[43]

Donziger has provided no evidence, whether by affidavit or by filing a copy of the supposed letter, that any such complaint was made.  Assuming, however, that such a complaint was made, it would be immaterial here.  There is no basis for the assertion that the law requires or even permits a change of venue on such a basis.  The substance of Donziger's suggestion is frivolous.

Judges have a duty to refer reliable evidence of professional misconduct by lawyers to relevant disciplinary authority.[44]  Indeed, a judge is not disqualified from hearing a case by reason of having made a disciplinary referral regarding a lawyer in the case.[45]  In any case, Donziger does not suggest that the chair or any member of the Grievance Committee is presiding over this case.

III.    The Merits

Having disposed of the timing arguments, we come to the merits of Donziger's arguments, assuming *arguendo* that they had not been forfeited for failure to comply with court rules.

---

[43]
   DI 1925, at 7.

[44]
   CODE OF CONDUCT FOR UNITED STATES JUDGES, Canon 3B(5).

[45]
   U.S. Jud. Conf., Comm. on Codes of Conduct, *Adv. Opinion No. 66*; U.S. Jud. Conf., Comm. on Codes of Conduct, *Compendium of Selected Opinions* § 3.6-7(b).  Nor do "opinions formed by [a] judge on the basis of facts introduced or events occurring in the course of current proceedings, or of prior proceedings, . . . constitute a basis for a bias or partiality motion."  *Liteky v. United States,* 510 U.S. 540, 555 (1994).

A.     *Some of Donziger's Claims Would Be Precluded Because They Could Have Been, But Were Not, Raised on Direct Appeal*

        Donziger advances three arguments that are inconsistent with the judgment and therefore no longer available to him.  First, he contends that the imposition of costs on him would violate the First Amendment.[46]  Second, he again demands that the undersigned recuse himself.[47]  Third, he asserts that costs should be denied because Chevron was guilty of fraud on the Court and other misconduct by virtue of its payments to or for the benefit of Alberto Guerra.[48]

        The First Amendment argument, to the extent it is comprehensible at all, is a reprise of an argument in his post-trial brief.[49]  The recusal argument, as his letter makes clear, is based entirely on arguments he made prior to the entry of judgment, arguments that were rejected repeatedly by this Court and, on mandamus and other interlocutory applications, by the Court of Appeals.  So too the argument with respect to Guerra.  Chevron's payments to and other arrangements with Guerra were the subject of extensive briefing, direct testimony, and cross examination prior to, during, and after the trial.[50]  Donziger's appellate briefs rehearsed the facts at

---

[46]     DI 1931, at 1.

[47]     *Id.* at 1-2.

[48]     *Id.* at 2-3.

[49]     DI 1850, at 64-66.

[50]     Briefing: *E.g.*, DI 916, DI 976.  Direct testimony: *E.g.*, Tr. (Guerra) 1032-64; PX 1671; PX 4800, at pp. 23-64.  Cross examination: Tr. (Guerra). 1096-97; 1116-19; 1221-34.

SPA-56

16

length.[51]

Donziger made neither the First Amendment nor the recusal argument on appeal[52] although both contentions could have been raised there.[53]   Likewise, although he referred to Chevron's payments to Guerra in his appellate briefs, he never made in the Court of Appeals the argument that he now makes here – viz. that costs should be denied to Chevron because its actions with respect to Guerra were improper – although that argument too was available to him on direct appeal.[54]   Nor, for that matter, did he argue on appeal that this Court's findings that relied on Guerra's testimony were clearly erroneous.

As our Court of Appeals has held, "a [district court] legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived

---

[51] Corrected Brief for Defendants-Appellants Steven Donziger et al., *Chevron Corp. v. Donziger,* No. 14-826(L), 2d Cir. DI 150, at 52-57; Reply Brief for Defendants-Appellants Steven Donziger et al., *id.,* 2d Cir. DI 314, at 23-24.

[52] Corrected Brief on behalf of Steven R. Donziger, et al., *Chevron Corp. v. Donziger,* 833 F.3d 74, *passim.*

[53] *E.g., Stevens v. Rite Aid Corp.,* 851 F.3d 224, 228 n.4 (2d Cir. 2017) ("[An] appeal brings up for review all prior orders of the District Court that produced the judgment."); *SongByrd, Inc. v. Estate of Grossman,* 206 F.3d 172, 178 (2d Cir. 2000) ("[An] appeal from a final judgment brings up for review all reviewable rulings which produced the judgment." (citations and internal quotation marks omitted)); *Shannon v. Gen. Elec. Co.,* 186 F.3d 186, 191 (2d Cir. 1999) (quoting *Allied Air Freight, Inc. v. Pan Am. World Airways, Inc.,* 393 F.2d 441, 444 (2d Cir.1968) ("interlocutory orders and decrees are merged into the final order of the district court [and] may be reviewed on the appeal") (citation omitted)); 15A CHARLES ALLAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE: JURISDICTION AND RELATED MATTERS § 3905.1, at 250 (2d ed. 2017) ("[A]ppeal from final judgment opens the record and permits review of all rulings that led up to the judgment.").

[54] *Supra* note 53.

the right to challenge that decision at a later time."[55]  Defendants thus are bound by the judgment

provision awarding costs.  Indeed, this Court could not properly reconsider that portion of the

judgment – as opposed to determining which particular categories of costs would be awarded and

the amounts of each, which remain open because neither question was determined previously.[56]  And

even if the Court had discretion to do so, it would decline to exercise it in Donziger's favor in view

of his egregious misconduct described previously and his misconduct in this litigation.  That has

included, among other things, outright defiance of court orders requiring him to (1) produce

---

[55]
> *North River Ins. Co. v. Philadelphia Reins. Corp.,* 63 F.3d 160, 164 (2d Cir. 1995) (quoting
> *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.,* 810 F.2d 243, 250 (D.C. Cir.
> 1987) (internal quotation marks omitted).  *Accord, e.g., United States v. Philip Morris USA
> Inc.,* 801 F.3d 250, 257-58 (D.C. Cir. 2015) (litigant waives issue that could have been, but
> was not, raised on prior appeal); *Lindquist v. City of Pasadena Texas,* 669 F.3d 225, 239-40
> (5th Cir. 2012) (litigant waives issue that could have been, but was not, raised on prior
> appeal); *Med. Ctr. Pharmacy v. Holder,* 634 F.3d 830, 834-36 (5th Cir. 2011) (issue that
> could have been but was not raised on appeal is forfeited and may not be revisited by the
> district court on remand); *Empagran S.A. v. Hoffman-LaRoche, Ltd.,* 388 F.3d 337, 344
> (D.C. Cir. 2004) (argument made in second appeal waived by failure to raise it in district
> court or on prior appeal); 18 MOORE'S FEDERAL PRACTICE § 134.20[3], at 134-54.1 (3d ed.
> 2017); *see Phil-Insul Corp. v. Airlite Plastics Co.,* 854 F.3d 1344, 1357 (Fed. Cir. 2017)
> (issue within scope of the judgment appealed from and not raised by the appellant in its
> opening brief on appeal is necessarily waived); *Myers v. Central Fla. Invests., Inc.,* 592
> F.3d 1201, 1227 (11th Cir. 2010) (appellate court declined to consider issue that should
> have been raised on prior appeal); *Ward v. Santa Fe Ind. Sch. Dist.,* 393 F.3d 599, 607 (5th
> Cir. 2004) ("A party cannot raise an issue on appeal that could have been raised in an
> earlier appeal in the same case."); *Nat'l Home Equity Mtg. Assn. v. Face,* 283 F.3d 220, 225
> (4th Cir. 2002), *vacated on other grounds*, 123 S. Ct. 69 (inappropriate on second appeal
> to consider argument that could have been raised on prior appeal in same case); 18B
> CHARLES ALLAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: JURISDICTION AND
> RELATED MATTERS § 4478.6 (2d ed. 2017).

[56]
> *North River Ins. Co.* reversed a district court ruling that departed from its prior appealable
> but unappealed final decision. 63 F.3d at 165-166.  *See also Parmalat Capital Finance Ltd.
> v. Bank of America Corp.,* 671 F.3d 261, 270-71 (2d Cir. 2012) (abuse of discretion for
> district court to consider on remand from first appeal an alternative ground for prior decision
> that was advanced neither in prior district court proceedings nor on first appeal).

18

responsive documents located in Ecuador but subject to his control[57] and (2) contribute as required

to the interim payment of the expenses of the special masters.[58]   Moreover, Donziger arguably is in

contempt of the final judgment of permanent injunction in this case.[59]


     B.    *Donziger's Allegedly Limited Means*

          Donziger contends that costs should not be imposed on him because he is a person

of limited means, whether considered in and of itself or in relation to the fact that Chevron is among

the world's largest enterprises.   These arguments too would fail even if the Court were to disregard

Donziger's failure to comply with court rules governing motions to review taxation of costs.


     1.    *Donziger's Finances*

          Rule 54(d) "creates a presumption that the district court will award the prevailing

party costs."[60]   "The burden is on the non-prevailing party to overcome this presumption[, and w]hen

a district court exercises its discretion and denies costs to a prevailing party, it must provide a valid

---

[57]

    *Chevron Corp. v. Donziger*, 296 F.R.D. 168, 218-24 (S.D.N.Y. 2013).

[58]

    DI 865; DI 1204.

[59]

    The judgment directed him to "execute in favor of Chevron a stock power transferring to
Chevron all of his right, title and interest of his shares in Amazonia[,]" a Gibraltar company
set up to receive any proceeds of the enforcement of the Ecuadorian judgment.   DI 1875,
¶ 3.   According to Chevron's uncontradicted assertion, he has not done so.   DI 1922.

[60]

    *Rodriguez v. Whiting Farms, Inc.,* 360 F.3d 1180, 1190 (10th Cir. 2004); *accord Carter v.
Inc. Vill. of Ocean Beach*, 759 F.3d 159, 163 (2d Cir. 2014); *Whitfield v. Scully*, 241 F.3d
264, 270 (2d Cir. 2001).

SPA-59

19

reason for the denial."[61]  Thus, the burden is on Donziger to establish that costs should be denied in order to avoid financial hardship.[62]

Donziger has not carried, or even attempted to carry, that burden, even as to the full amount taxed by the Clerk.   Moreover, even if he had demonstrated that he would be able personally to pay the full amount of the costs taxed against him, that would not be dispositive.  Although a district court "may deny costs based on financial hardship, indigency *per se* does not preclude an award of costs against an unsuccessful litigant."[63]

Donziger and his clients have complained of a purported lack of resources through much of this litigation to support various arguments or to justify their behavior.  Indeed, they flatly refused to comply with the Court's order that they bear part of the special master costs on an interim basis.[64]  Yet, despite repeated invitations by the Court to submit financial information supporting

---

[61]

*Id.* (citation omitted).

[62]

*E.g., Chapman v. AI Transport,* 229 F.3d 1012, 1039 (11th Cir. 2000) ("If a district court in determining the amount of costs to award chooses to consider the non-prevailing party's financial status, it should require substantial documentation of a true inability to pay."); *McGill v. Foster,* 18 F.3d 456, 459 (7th Cir. 1994) (costs award affirmed where non-prevailing prisoner plaintiff "failed to establish . . . that he was incapable of paying the court-imposed costs at this time or in the future").

[63]

*Whitfield v. Scully,* 241 F.3d 264, 273 (2d Cir. 2001), *abrogated in another respect, Bruce v. Samuels,* 136 S. Ct. 627 (2016).

[64]

DI 865, at 2; DI 1204.

20

their claims of inability to pay,[65] they never did so.[66]  Indeed, Donziger has not submitted any

affidavits, declarations or other evidence of his own financial circumstances or those of his clients

in support of his motion to review the taxation of costs. To be sure, some evidence concerning the

financing of this litigation came into the trial record.[67]  But that evidence does not sustain Donziger's

burden of demonstrating that costs should be mitigated or denied on the basis of his financial

circumstances.

---

[65]

*E.g., Chevron Corp. v. Donziger,* 974 F. Supp. 2d 362, 388-89, 432-33, 453-54, 465-79, 525 n.1098 (S.D.N.Y. 2014), *aff'd,* 833 F.3d 74 (2d Cir. 2016), *cert. denied,* 137 S.Ct. 2268 (2017). DI 865, at 3; DI 1287; DI 1293.

[66]

Donziger recently asserted that "KPMG . . . fully audit[ed] his finances as part of the . . . trial." DI 1947, at 3.  That representation is entirely false.

While a KPMG forensic accountant did review some financial records and was a witness at trial, there was no audit.  The accountant's unchallenged testimony was precisely to the contrary. Tr. (Dahlberg) 863:24-864:11 ("THE COURT:  Is anything in here a certification or an opinion by you as a certified public accountant that the books and records here fairly present the financial condition of any company, entity, or person?    THE WITNESS:  No, it does not, your Honor.    THE COURT:  Okay.  Are you claiming you did any audit of anything in accordance with generally accepted auditing standards?  THE WITNESS:  I am not, your Honor.").  *See also* PX 4900R (Dahlberg witness statement) ¶¶ 24-27.

Not only was there no audit, there was no evidence at trial as to Donziger's financial situation beyond (1) his admission that he had obtained between $1.8 and $1.9 million in cash and property as the result of  from "family estate related matters" in the two years prior to trial, Tr. (Donziger) 2537:20-2538:18, and (2) what little appeared in the incomplete and disorganized document production that the KPMG accountant reviewed, *infra,* at pp. 22-23; PX 4900R (Dahlberg witness statement); Tr. 815:18-887:3 (Dahlberg live testimony).  Among other things, the accountant noted that he was not given records of payments to lawyers although they were requested by Chevron in this and related litigation. PX 4900R (Dahlberg witness statement) ¶ 27.  So there was nothing resembling an accurate picture of Donziger's financial situation at the time of trial nor even reliable assessment of how much of the millions of dollars he raised went into and remained in his own pocket.  Moreover, even if there had been adequate evidence of Donziger's financial situation as of the time of trial (fall 2013), it now would be long out of date.

[67]

*See supra* n.66.

21

As an initial matter, Donziger repeatedly has refused to provide much information concerning his personal financial situation.  Presumably to compensate for his failure to provide such information, he claims that his original trial counsel, the Keker firm, withdrew in the first half of 2013 claiming non-payment and invited an inference that it did so because Donziger lacked the ability to pay its bills.  But even assuming that Donziger stopped paying the Keker firm's bills, the fact that he ceased payments would not necessarily say anything about the financial resources available to him.[68]  Indeed, it came out at trial that Donziger received cash and real estate worth $1.8 to $1.9 million from "family estate related matters" during the two years prior to trial, i.e., in the period from October 2011 until October 2013,[69] during which payments to the Keker firm appear to have stopped or fallen well behind.  Other evidence showed that Donziger personally received somewhere between $958,000 and $1.3 million from litigation funders before trial, and the figure could well have been higher because the records from which that information was gleaned were incomplete.[70]  There simply is no factual basis from which the Court responsibly could conclude that Donziger is unable to pay costs in the full amount taxed by the Clerk or that the amount of any such judgment should be reduced to avoid undue financial hardship.

Perhaps more fundamentally, Donziger's focus on his supposed personal circumstances should not blind one to the fact that the litigation with Chevron, including this case,

---

[68]

DI 1164, at 5 & n.16 ("[T]here is no competent evidence that the non-payment [wa]s a result of inability to pay as distinguished from a decision not to pay by whomever controls resources on the defendants' side." (footnote omitted)).

[69]

Tr. (Donziger) 2537:20-2538:18.

[70]

PX 4900, ¶¶ 8, 27, attach. C. (Dahlberg).

22

has been financed by third-party funders.[71]  And it is Donziger who, with limited and apparently now

long past exceptions, essentially has controlled the money.[72]  Moreover, his clients at least arguably

are obliged to pay the reasonable costs of defending Donziger, which may include costs imposed

upon him by the Court, to the extent of monies available to them to fund the Chevron litigations.[73]

Thus, no consideration of Donziger's means would be complete without full knowledge of the

funding arrangements for this case.

---

[71]

*See, e.g., Cherry v. Champion Int'l Corp.,* 186 F.3d 442, 447 (4th Cir. 1999) (no reduction in cost award despite proof that plaintiff had "no independent income and owned no property in her own name" because she had "sufficient access to marital property" and a 401(k) plan).

[72]

*Chevron v. Donziger,* 974 F. Supp. 2d at 397-98 & n. 102.

In the period through 2009, most of the money came from the Kohn firm, but "Donziger largely controlled how and when it was spent." *Id.* After Kohn stopped its support, Donziger and Patton Boggs lined up financing from Burford Capital LLC ("Burford"), which provided $4 million but then refused to provide further funding upon its conclusion that Donziger and Patton Boggs had misled it. *Id.* at 474-75, 478-79. The funds provided by Burford were to be spent only with the agreement of both Donziger (referred to in the Funding Agreement as Claimants' U.S. Representative") and Patton Boggs (referred to as "Nominated Lawyers"). DI 356-2 (Funding Agreement), ¶¶ 3(b) and Sched. 3. Those funds, which perhaps by now have been exhausted, would have been available to pay Donziger's defense costs in this case as well as any costs imposed upon him. *Id.* ¶¶ 3(e), 3(f).

[73]

PX 558 (retainer agreement) § 9.

The retainer agreement provides also that Donziger's clients would have the right to seek to recoup from Donziger whatever they have paid to defend him in the event of a final judgment determining that Donziger "has committed actual fraud, professional malpractice or willful misconduct." *Id.* The judgment in this case determined that Donziger has committed actual fraud and willful misconduct, albeit not actual fraud on or misconduct with respect to his clients. In all the circumstances, it is questionable whether (a) the findings here would excuse Donziger's clients from their indemnity obligation given the lack of findings of fraud or misconduct *directed at those clients,* and (b) Donziger's clients would adopt this Court's findings of fraud and misconduct to avoid their obligation to pay for Donziger's defense in light of the possible implications of adopting those findings for their efforts to enforce the Ecuadorian judgment in other countries.

Neither Donziger nor his clients have come forward with complete and current evidence concerning the monies available to them.  The most that can be said is that the KPMG forensic accountant called by Chevron at trial, based on his examination of incomplete records all of which now are more than four years old, testified that:

- "[T]he activites and operations surrounding the Litigation were funded by a number of investors during varying distinct periods of time throughout the course of the Litigation.  Based on the documents I analyzed, it appears that the various individual investors, law firms, and litigation investment firms agreed to provide approximately $32 million in funds to finance the activities and operations surrounding the Litigation."[74]

- "The available documents show that the individual investors, law firms, and litigation investment firms contributed approximately $16 million to finance the activities and operations surrounding the Litigation."[75]

In addition, the accountant concluded that:

"The extremely poor organization and incomplete nature of the financial and accounting records that Donziger produced and appeared to maintain would not have allowed him to provide accountability to either his investors or to the Lago Agrio Plaintiffs (the 'LAPs')."[76]

Donziger himself admitted at trial that he spent over $21.4 million on the litigation

---

[74]  DX 4900R (Dahlberg). ¶ 34.

The available records showed receipt of only $16 million.  *Id.*

[75]  *Id.* ¶ 5.

[76]  *Id.* ¶ 8 (emphasis added).

SPA-64

24

from 2007 to 2013,[77] and the figure may well have been substantially higher.  Moreover, there is no evidence as to what additional monies have been raised in the several subsequent years.  By the time of trial four years ago, these included at least an additional $2.5 million from a British investor.[78] And Donziger has been engaged in extensive litigation in Canada and elsewhere for some time now, which at least suggests that he has raised much more.  Donziger thus has raised at least $21.4 million over the years, and probably a good deal more, a large part of which never has been accounted for. He has submitted no evidence in connection with the taxation of costs that could justify any conclusion, one way or the other, as to whether third party funding is available to pay costs in this case.

In sum, there is no substantial basis to credit Donziger's unsubstantiated claim of inability to pay.  Given that the burden of proof to establish at least that payment would cause serious financial hardship is on the party seeking to avoid imposition of costs, and given that Donziger has provided no such evidence, the Court would decline to temper the award of costs even if it were to overlook his failure to comply with court rules.

2.      *Disparity of Litigants' Resources*

The other branch of Donziger's means-related argument is straightforward.

Chevron is a huge enterprise.  According to its 2016 annual report, the consolidated

---

[77]      Tr. (Donziger) 2502:4-9.

[78]      *See* Tr. (Donziger) 2528:9–2529:11.

25

balance sheet for Chevron reflected net equity of $146.7 billion.[79]  Whatever Donziger's personal

net worth may be, the Court proceeds on the assumption that it is very small compared to that of

Chevron. But virtually every circuit to consider the question has held that disparity of wealth does

not justify denial or reduction of costs, at least in the absence of persuasive evidence of inability to

pay.[80]  Indeed, at least one circuit has reversed a reduction of costs that was made in light of the

disparity of resources between an individual plaintiff and a giant corporation.[81]


   C.    *Chevron's Alleged Pollution of the Ecuadorian Rain Forest*

         As noted previously by both this Court and the Court of Appeals:

         "The issue here [wa]s not what happened in the Oriente, more than twenty years ago
         and who, if anyone, now is responsible for any wrongs then done. [The issue] instead
         [wa]s whether a court decision was procured by corrupt means, regardless of whether

---

[79]

CHEVRON 2016 ANNUAL REPORT, at 35, *available at*
https://www.chevron.com/-/media/chevron/annual-report/2016/2016-Annual-Report.pdf
?l=2#page=3.

[80]

*Compare Moore v. CITGO Ref. & Chems. Co.,* 735 F.3d 309, 319-20 (5th Cir. 2013) ("The
court erred as a matter of law in relying on CITGO's "enormous wealth"—or the
comparative wealth of the parties—as a basis for reducing the cost award."), *Chapman v.
AI Transport,* 229 F.3d 1012, 1038-39 (11th Cir. 2000) (en banc) ("[W]hen awarding costs
a district court should not consider the relative wealth of the parties."), *In re Paoli R.R.
Yard PCB Litig.,* 221 F.3d 449, 468 (3d Cir. 2000) (same), *Cherry v. Champion Int'l Corp.,*
186 F.3d 442, 447-48 (4th Cir. 1999) (same), *Smith v. Southeastern Penn. Transp. Auth.,*
47 F.3d 97, 99-100 (3d Cir. 1995) ("We reject the general proposition that it is
"inequitable" to tax costs in favor of a prevailing party with substantially greater wealth
than the losing party."), *and Reed v. Int'l Union of Auto., Aerospace, & Agric. Implement
Workers Local Union No. 663,* 945 F.2d 198, 204 (7th Cir. 1991) (same), *with Ass'n of
Mexican-Am. Educators v. California,* 231 F.3d 572, 592-93 (9th Cir. 2000) (en banc).

[81]

*Moore,* 735 F.3d at 319-20.

SPA-66

26

the cause was just."[82]

Moreover, as one witness pointed out at trial, a singular irony of Donziger's misconduct is that its occurrence "probably means that we'll never know whether or not there was a case to be made against Chevron."[83]  An application to review the Clerk's taxation of costs is not a proper vehicle for attempting to find out, which would entail retrying on the merits a pollution case that was corruptly litigated in Ecuador.[84]  That is especially so where the application fails to comply with either the Federal Rules of Civil Procedure or this Court's rules and is unsupported by competent evidence or legal analysis.  Moreover, assuming that the Court's discretion extends so far as to permit denial of taxable costs on the basis of alleged behavior extrinsic to the conduct of the litigation, the fact of the matter is that Donziger simply has not proved what he alleges only in the most conclusory of terms.  And certainly the fraudulent Ecuadorian judgment cannot be taken as having established anything.

D.    *Donziger's Claim of Fraud by Chevron*

Donziger next argues that all costs should be denied to Chevron because it allegedly committed fraud, suborned perjury, and perhaps was guilty of other misconduct in connection with the testimony of Alberto Guerra.  In essence, he claims that Guerra's testimony was false, at least

---

[82]

    *Chevron Corp. v. Donziger,* 833 F.3d at 85 (quoting *id.* 974 F. Supp. 2d at 385-86).

[83]

    974 F. Supp. 2d at 644 (internal quotation marks and footnote omitted).

[84]

    "[D]isapproval of a prevailing [party's] *extrajudicial conduct* on which [other party's] claim was based is not a sufficient basis for denying costs to the prevailing" party.  10 MOORE'S FEDERAL PRACTICE § 54.101[1][b], at 54-157 (3d ed. 2017) (emphasis in original).

27

in material respects, and that Chevron bought and paid for the alleged perjury. And it is true that costs may be denied to a prevailing party if the prevailing party is guilty of sufficiently serious misconduct in the course of the action.[85] But all of the evidence concerning these charges was developed before and during the trial. It was considered carefully and extensively in the Court's extensive findings and conclusions.[86] And Donziger's argument fails now for several reasons.

First, as already noted, Donziger could have challenged the judgment's award of costs against him on the appeal from the final judgment but failed to do so. That failure forecloses the issue now.[87]

Second, Donziger's argument would be unpersuasive even if it were not precluded. Donziger failed to prove any misconduct, let alone any of sufficient gravity to warrant denial of costs to the prevailing party.

The crux of Donziger's argument is twofold. *First,* he argues once again, as he did at trial, that Guerra perjured himself and now contends that Chevron suborned that false testimony.[88] *Second*, he argues that Chevron at least acted improperly in providing financial support and other economic lures to Guerra to induce him to come to the United States and to testify at trial. But neither argument is well founded.

To begin with, this Court heard Guerra's testimony. It heard as well the testimony

---

[85]

     *E.g., id.*

[86]

     *Chevron Corp. v. Donziger,* 974 F. Supp. 2d at 502-35.

[87]

     *See supra* Point III.A.

[88]

     *E.g.* Tr. (Opening) 35:20-36:12.

of the other key witnesses on the relevant point, Donziger and former Ecuadorian judge Zambrano. It recognized that all three were highly flawed witnesses and laid out the economic and other inducements to Guerra to come to the United States and testify.[89]  It carefully and skeptically assessed Guerra's account as well as the extensive evidence that corroborated it in many though not all respects.[90]  It declined to credit certain aspects of his testimony,[91] although it credited a good deal of it.

To the extent that the Court already has found that Guerra's testimony was credible,[92] findings by which Donziger is bound, there was no perjury and therefore no subornation.  And the fact that the Court did not credit Guerra in some particulars is of no help to Donziger.  Even if Guerra had perjured himself, as opposed to having been mistaken, in those particulars – and the Court declines to find so – the question here would be whether Chevron suborned perjury.  In order to establish subornation of perjury, Donziger was required to prove that Chevron knew or believed that Guerra's testimony would be perjurious and nevertheless induced him to commit that perjury.[93]

---

[89]

*Chevron Corp. v. Donziger,* 974 F. Supp. 2d at 504-05, 517-18.

[90]

*E.g., id.* at 517-20, 526-28, 534.

[91]

*Id.* at 512-13 (declining to credit Guerra's testimony "that the alleged [corrupt] arrangement between Zambrano and the LAPs during Zambrano's first tenure on the Lago Agrio case [2009-10] existed or . . . with respect to the alleged 2009 Honey & Honey restaurant meeting" relating thereto).

[92]

And it bears mention that Donziger did not challenge that finding on appeal as having been clearly erroneous, the relevant standard for upsetting the finding.

[93]

*E.g., Petite v. United States*, 262 F.2d 788, 794 (4th Cir. 1959) ("[E]ssential to subornation of perjury that the suborner should have known or believed or have had good reason to believe that the testimony given would be false.") (internal quotation marks and citation

Donziger has not done so.[94]

Donziger's other argument fares no better.

To be sure, as the Court wrote previously, Guerra at the time of trial was "the beneficiary of what amount[ed] to a private witness protection program created for him by Chevron, which facilitated his relocation from Ecuador to the United States and ha[d] been supporting and assisting him since his arrival here."[95]  Chevron had paid him $48,000 for physical evidence and information it contained.[96]  In addition,

> "Fearing retaliation from the ROE, Guerra and his family (including his wife, his son, and his son's family) relocated to the United States. Chevron representatives paid for the move and, as his visa status does not allow him to work while he is in this country, Chevron pays him $10,000 per month for his living expenses, pays for health insurance coverage for Guerra and his family, leases a car for him, and pays for an attorney to represent him in any dealings with federal or state government investigative authorities or any civil litigation, and for an immigration attorney to deal with his resident status."[97]

_____

omitted), *rev'd on other grounds*, 361 U.S. 529 (1960); *Ryan v. United States*, 58 F.2d 708, 710 (7th Cir. 1932) ("[T]he suborner must know or believe that the testimony of the witness about to be given will be false, and he must know or intend that the witness is to give the testimony corruptly or with the knowledge or belief of its falsity.") (quoting *Boren v. United States*, 144 F. 801, 802 (9th Cir. 1906)); 2 LEONARD B. SAND ET AL., MODERN FEDERAL JURY INSTRUCTIONS-CRIMINAL, Instr. 48-15 (2006).

[94]

Indeed, the record establishes that Chevron went to great lengths to seek corroboration for everything that Guerra said to it and succeeded to a considerable degree. *See, e.g.*, *Chevron Corp. v. Donziger*, 974 F. Supp. 2d at 506-07, 509-11, 526-28, 533.  Moreover, his testimony was corroborated in important respects by admissions of both Donziger and Zambrano. *Id.* 506, 521-22.

[95]

*Id.* at 504.

[96]

*Id.* at 517.

[97]

*Id.* at 517 (footnotes omitted).

30

But these arrangements would provide no basis for denying costs to Chevron even if Donziger had

not forfeited the argument.

There was extensive motion practice concerning these issues prior to trial.  The

motions produced an extensive record, including expert affidavits concerning the ethical propriety

of the participation by Chevron's lawyers in the Guerra arrangements.[98]  And the bottom line of all

of that motion practice was the Court's denial of all efforts to strike or preclude Guerra's testimony

on the straightforward, common sense, and well established basis that:

> "'[i]t is the province of the [trier of fact] and not of the court to determine [as a
> matter of law] whether a witness who may have been inaccurate, contradictory and
> even untruthful in some respects was nonetheless entirely credible in the essentials
> of his testimony.'. . . .  [A]ny claims of professional or other misconduct are
> appropriately considered in other contexts, particularly in view of the fact that
> Chevron acted on the basis of substantial outside expert advice."[99]

Of course, we now consider the matter in a context distinct from whether Guerra's

testimony should have been excluded.  The concern, if the issue still were open to Donziger, would

be whether Chevron engaged in misconduct and, if so, whether it was sufficient to warrant denial

of costs.  The evidence does not justify a finding of misconduct, let alone misconduct sufficient to

---

[98]

    The first round was occasioned by defendants' motions to strike Guerra's affidavit,
submitted on a summary judgment motion. The relevant parts of the record with respect to
that motion include DI 916, DI 930, DI 976, DI 977, DI 1029, DI 1034 and DI 1071.

    The second round came on defendants' motion dismiss the action on the ground that the
Guerra arrangements alone justified such action.  The relevant papers with respect to that
motion include DI 1422, DI 1423, DI 1472, DI 1474, DI 1475, DI 1481 and DI 1650.

    The third was a motion to strike Guerra's trial testimony. The papers with respect to the
third are DI 1640 and DI 1650.  Of particular note are the expert affidavits, DI 977-4, DI
977-5, DI 977-6, and DI 1423-2, and a portion of Chevron's memorandum of law in
opposition to the second motion,  DI 1474, at 1-22.

[99]

    DI 1650 (citations omitted).

warrant such a denial.

The principles that govern the propriety of Chevron's payment for the relocation of Guerra and his family from Ecuador, living expenses in the United States prior to and during trial, the many hours he spent being debriefed by Chevron counsel and preparing to testify, and legal expenses occasioned by the relocation such as the cost of immigration counsel are not in much dispute.  Donziger and the other defendants conceded before trial that a party may pay a fact witness's expenses and reimburse the witness for time lost in connection with the litigation, provided the payments are reasonable.[100]  Moreover, defendants' proffered professional responsibility expert conceded that "it is permissible for attorneys to pay expenses reasonably necessary to keep [a] witness in a safe location" "if [the] witness faces a bona fide personal safety or security risk."[101]

In this case, there was abundant evidence, which the Court credits, that Guerra's decision to cooperate with Chevron and, ultimately, to testify in this case would have exposed him and his family to serious risks to personal safety and security had they remained in Ecuador.[102]  His

---

[100]

DI 1422, at 18-19.

Indeed, while the New York Rules of Professional Conduct prohibit offering witnesses inducement or compensation, "contingent upon the content of the witness's testimony or the outcome of the matter," that same rule allows a lawyer to "advance, guarantee or acquiesce in the payment of . . . reasonable compensation to a witness for the loss of time in attending, testifying, preparing to testify or otherwise assisting counsel, and reasonable related expenses." N.Y. R. PROF'L CONDUCT 3.4(b); *see also* N.Y. Comm. of Prof'l Ethics, Op. 668 (1994) (concluding the same under prior law); N.Y. Comm. of Prof'l Ethics, Op. 962 (2013) (reimbursement of travel expenses is reasonable).

[101]

DI 1423-2 ¶ 7; *accord,* DI 1422, at 27.

[102]

The facts are marshaled, among other places, in Chevron's memorandum in opposition to defendants' motion to impose termination sanctions.  DI 1474, at 8-10, 13-18 (citing evidence in the record).

decision to testify effectively forced him to become an exile from his native country.  The Court

finds that Chevron's payments for relocating the Guerras to this country, for legal counsel to deal

with immigration issues, and for living expenses (particularly in light of the fact that his immigration

status barred employment) were reasonable in object and in amount.  It was permissible also to

compensate him within reason for time he spent being interviewed repeatedly by Chevron counsel

and preparing to testify, and no more was done.[103]  There is no evidence that any of these payments

was conditioned upon the substance of Guerra's testimony or contingent on the outcome of this case.

The evidence of record establishes no misconduct in these respects.

So far as the payments for physical evidence are concerned, defendants' proffered

professional responsibility expert conceded that "[l]awyers may pay reasonable costs to gather

documents and other physical evidence from various sources" and for physical evidence itself.[104]

He went on to contend, however, that payments for physical evidence that exceed the replacement

cost of the physical articles themselves – and thus reflect the value of the information they contain

---

[103]
    American Bar Association, Standing Comm. on Ethics and Prof. Responsibility, Formal Opinion 96-402 (August 2, 1996) ("[A] lawyer, acting on her client's behalf, may compensate a non-expert witness for time spent in attending a deposition or trial or in meeting with the lawyer preparatory to such testimony, provided that the payment is not conditioned on the content of the testimony . . . ."). No distinction is drawn between compensation for "time spent in actually attending a deposition or trial," "time spent in pretrial interviews," and "time spent in reviewing and researching records that are germane to his or her testimony." *Id.* The Committee goes on to explain that the amount of compensation must be "reasonable," and that for a witness who is retired or unemployed, "reasonable" compensation is determined by the "value of the witness's time based on all relevant circumstances." *Id.*

[104]
    DX 1423-2, ¶¶ 8-9.

SPA-73

33

or reflect – are improper *per se*.[105]

To be sure, the Court understands the concern that motivated the defendants' witness's qualification – payments for information in a given case could edge along the spectrum in the direction of payments for testimony.  But the assertion that any payment beyond the replacement cost of a piece of physical evidence inherently is unethical was entirely unsupported by any citation of authority.  Chevron's expert, on the other hand, provided an extensive, well reasoned, and well supported opinion in which he said that Chevron's counsel appropriately could pay Guerra "solely for the information in his possession, so long as that payment [was] a fixed sum not in any way contingent on his testimony or the outcome of the litigation; the witness makes no promise to testify in return for the payment; and no future payment [would] be made to the witness for his testimony other than legally and ethically permitted payment for expenses incurred in connection with testifying."[106]

In the last analysis, the Court need not resolve this abstract disagreement between experts.  The relevance of misconduct by a prevailing party with respect to taxation of costs is that misconduct  may be an equitable factor that, in a proper case, could warrant departure from the presumption that the prevailing party is entitled to recover costs.  In this case, any undue aggressiveness with respect to the payment for physical evidence, and the Court makes no finding of any impropriety, would not warrant such a departure for a host of reasons:

- Donziger's behavior in this litigation was outrageous and, in many respects,

---

[105]

*Id.* ¶ 10.

[106]

DI 977-4, ¶ 6.

far beyond the bounds of propriety.   Among other things, he wilfully, deliberately disregarded a court order to produce relevant documents located in Ecuador but nonetheless under his practical control.[107]  He deliberately testified falsely at an evidentiary hearing on Chevron's motion for sanctions.[108]  And he falsely testified that he lacked recollection in response to nearly 300 questions at his deposition in this case and on cross-examination at trial.[109] He has no claim to a favorable exercise of discretion based on what was no more than a perhaps arguable departure long before the trial that ultimately had no effect on the case.

• Chevron fully disclosed all of its payments and other arrangements with Guerra.  There most assuredly was no concealment or fraud.[110]

• Chevron relied on extensive expert advice with respect to its dealing with Guerra and acted in the good faith belief that its actions were proper.[111]

---

[107]

*Chevron Corp. v. Donziger,* 296 F.R.D. 168, 187, 190-96, 210-12, 216-19 (S.D.N.Y. 2013).

[108]

*Chevron Corp. v. Donziger,* 974 F. Supp. 2d at 524-25.

[109]

*Id.* at 525-26.

The Court does not take into account his false protestations of lack of memory in his deposition in the 1782 proceeding or his obstruction of justice, witness tampering, and other misconduct in related cases, as it considers only misconduct in this action for purposes of striking an equitable balance with respect to costs.  *See Zeran v. Diamond Broad., Inc.*, 203 F.3d 714, 722 (10th Cir. 2000).

[110]

DI 755-14.

[111]

DI 977-4.

SPA-75

35

- Chevron even disclosed the facts concerning its interactions with Guerra to the U.S. Department of Justice long before calling Guerra at trial.[112]

No more need be said.

### E.    The Forfeiture Argument

Finally, Donziger argues that Chevron has forfeited the right to recover, whether by taxation of costs or otherwise, the fees and expenses of the special masters because it failed to make a timely motion as supposedly required by the Court's July 9, 2013 order.[113]  In order to place his argument in context, it is necessary to set out the procedural history.

---

[112]    DI 977-6, ¶ 6.

[113]    Donziger does not here challenge the appointment of the special masters or the hourly rates fixed for their compensation.  While he objected to the appointments before trial, he could have pressed that point, as well as objecting to the hourly rates which also were fixed well before trial, on appeal from the final judgment.  *See generally* 15A CHARLES ALLAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: JURISDICTION AND RELATED MATTERS 2D § 3905.1 (2d ed. 2017). That was so because  (1) the final judgment, as we have seen, awarded costs against the defendants, and (2) the fees and expenses of the special masters, as we shall see in more detail, are taxable as costs.  *E.g., Chemical Bank & Trust co. v. Prudence-Bonds Corp. (New Corp.),* 207 F.2d 67, 78, 82 (2d Cir. 1953); *Aird v. Ford Motor Co.,* 86 F.3d 216, 220-22 (D.C. Cir. 1996); *Studiengellschaft Kohle mbH v. Eastman Kodak Co.,* 713 F.2d 128, 134 (5th Cir. 1983); LOCAL CIV. R. 54.1(c)(8) ("Fees of masters . . . are taxable as costs, unless otherwise ordered by the Court.") Accordingly, any challenge to the appointments and the  hourly rates would be precluded by Donziger's failure to raise any such issues on the appeal from the final judgment.  *Supra* Point III.A.

SPA-76

36

1.    *The July 9, 2013 Order and the Special Master Bills*

For reasons well documented in the extensive record,[115] the Court appointed two special masters to coordinate discovery, to preside at or otherwise supervise depositions, to rule on objections, and to direct, supervise, monitor, and report upon implementation of the Court's discovery orders.[116] It directed that the cost of the special masters be advanced on a 50-50 basis, with plaintiffs paying one half and Donziger and the LAP Representatives paying the other, subject to later reallocation in accordance with Rule 53(g) of the Federal Rules of Civil Procedure (the "First Orders").[117]

Donziger and the other defendants refused to comply with the Court's orders to advance their half of the costs.[118] Accordingly, the Court, by a July 9, 2013 order (the "Second Order"), directed Chevron to "advance" 100 percent of the special masters' compensation on an interim basis, but afforded it the right to seek an allocation of any part of the funds thus advanced by it to one or more defendants and to recover any portion so allocated.  Any such application, the

---

[115]

See, e.g., DI 865 (referring to parties' proposal to take at least 42 depositions in a relatively short period, the extreme contentiousness of counsel, deposition misconduct by Donziger and counsel for him and the LAP Representatives in a related prior litigation, defendants' obstructive and disruptive actions in this case, the possibility that important depositions in this case would occur outside the United States and require effective and timely supervision, and the high likelihood that many claims of privilege would be asserted, including during depositions outside New York and the United States, making prompt rulings essential to proper progress of this case).

[116]

*Id.*; DI 942.

[117]

DI 942.

[118]

DI 1204.

They asserted inability to pay but never documented any such thing. *E.g.*, DI 1293, at 2-3.

Court directed, was to be made no later than 14 days after the submission of the special masters' "final billings."[119]  In response to defendants' contention that they were entitled to know the amount of the costs that could be imposed upon them, the Court stated that they would have that opportunity "at such point as Chevron seeks an order requiring them to pay all or part of the costs that it [Chevron] will advance pursuant to this order."[120]

The special master bills that were submitted in support of the bill of costs were rendered in July, August and September 2013 and covered varying periods ending no later than August 31, 2013 and in some cases earlier.[121]  In accordance with the Order, the funds to pay them were advanced by Chevron.  All of the bills are attached to Chevron's bill of costs.[122]

Chevron did not move for an allocation of any part of the funds it had advanced within 14 days after receipt of the last of the invoices included in the bill of costs it filed in late 2016. Donziger argues that Chevron thus forfeited any right to recover any part of the money it advanced, even via taxation of costs at the conclusion of the case.  This argument is unpersuasive for several

---

[119]    DI 1287.

[120]    *Id.* at 3.

[121]    DI 1928-3, Exh. 7. Special Master Katz's bill covered the period March 26 through July 25, 2013.  Special Master Gitter's bill covered his services for the period March 26 through June 30, 2013.  Two Cleary Gottlieb bills, which covered disbursements and the services of the associate who assisted both special masters, covered the period March 26 through August 31, 2013.

[122]    The bill of costs contained copies of the bills rendered by the special masters, Mr. Gitter and former magistrate Judge Katz, and the Cleary Gottlieb firm, which provided them with the services of one assistant and various other items billed as disbursements.  Mr. Katz's bills contained detailed time records for all of his services.  Those rendered by Mr. Gitter, a retired Cleary partner, and Cleary showed the hours worked and the rates charge but not detailed time records.  *Id.*

reasons.

### 2. Analysis

The starting point for this discussion is three straightforward propositions. The first is that Rule 53, which governs special masters, empowers a court to provide interim compensation for special masters, subject to reallocation of those expenses at the end of the case.[123] The second is that Local Civil Rule 54.1(c)(8) and Federal Rule 54(d)(1) contemplate taxation of the compensation and expenses of special masters as costs at the conclusion of a case.[124] Moreover, the local rules of this Court, consistent with Federal Rules 53(g)(3) and 54(d)(1), provide that costs will not be taxed prior to the entry of final judgment and, if an appeal is taken, prior to the conclusion of the appellate process.[125] The 14 day time limit in the Second Order must be considered against this background.

As the foregoing suggests, and as the First and Second Orders made clear by referring to reallocation in accordance with Rule 53(g)(3), those orders provided only for the payment of the special masters during the interim between their appointment and the conclusion of the appellate process.

It was in that context that the Second Order, which required Chevron to "advance" 100 percent of these expenses rather than to pay the 50 percent set out in the First Orders, gave

---

[123]

FED. R. CIV. P. 53(g)(3) ("An interim allocation may be amended to reflect a decision on the merits.").

[124]

LOCAL CIV. R. 54.1(c)(8) provides that "[f]ees of Masters . . . are taxable as costs." FED. R. CIV. P. 54(d)(1) provides for taxing costs in favor of the "prevailing party."

[125]

LOCAL CIV. R. 54.1(a).

SPA-79

39

Chevron on option with respect to those interim advances – half the amount of which was necessitated by Donziger and the LAP Representatives' disregard of the Court's orders and refusal to pay. The Second Order gave Chevron the option, but not the obligation, to move to recover on an interim basis any or all of the funds it advanced to cover Donziger and the LAP Representatives' share without waiting either for the ultimate reallocation of those expenses under Rule 53(g) or the taxation of costs at the conclusion of the case and any appeals.

Donziger nevertheless argues in substance that Chevron lost the right to seek to impose *any part* of the *ultimate liability* for the special masters on him by failing to move to change the *interim responsibility* to advance costs pending a determination of the ultimate liability.

Donziger's argument makes little sense. Nothing in the Second Order impaired Chevron's rights under the Order of Appointment of the Special Masters,[126] Rule 53(g)(3), Rule 54(d), and Local Civil Rule 54.1 to seek to impose all or part of the fees and expenses of the special masters on the defendants at the conclusion of the litigation. In fact, Rule 53(g)(3) expressly states that "[a]n interim allocation may be amended to reflect a decision on the merits."[127] The fact that Chevron did not avail itself of the option afforded by the Second Order with respect to interim payment did not foreclose its effort to recover all or part of what it had paid at the conclusion of the litigation.

*   *   *

In sum, none of Donziger's arguments for review of the Clerk's taxation of costs has

---

[126]

DI 942.

[127]

*Accord,* 9 Moore's Federal Practice § 53.52[2], at 53-123 (3d ed. 2017) (collecting cases).

SPA-80

40

merit.  The contention that the Clerk was obliged to hold the matter of costs in abeyance is frivolous.

All or substantially all of his arguments could be rejected on the ground that he disregarded court

rules in seeking review of the Clerk's actions.   Even if the Court were to reach the merits

notwithstanding that procedural default, the arguments would fail:

- Several are foreclosed because Donziger failed to raise them on direct appeal
  although they were available to him there.

- Donziger's claim of limited means is unproven and in any case would be
  insufficient.

- The disparity in resources between Donziger and Chevron is not an
  appropriate consideration and, in any case, would be rejected by the Court on
  the facts of this case.

- Chevron's alleged pollution of the Ecuadorian rain forest is extraneous to this
  litigation, therefore has no bearing on taxation of costs, and in any case is
  unproven.

- While misconduct by a prevailing party in some circumstances may warrant
  denial of costs, no such thing has been proved here.  In any case, Donziger
  has no equitable claim on a favorable exercise of the Court's discretion on
  this basis given his own, far more serious misconduct in this litigation.

- Donziger's forfeiture argument is without merit.


IV.     *The Ultimate Apportionment and Taxation of Costs*

So what remains to be determined?

SPA-81

The foregoing rulings require denial of Donziger's motion insofar as it seeks review of the Clerk's taxation of costs for service fees, court reporter fees and translation costs, a total of $72,076.22.  The rulings of December 6 and 27, 2017[128] require rejection also of any claims with respect to the reasonableness of the amounts taxed for special master expenses.  What remains, then, is whether some adjustment of the costs taxed for the special master expenses is warranted, whether under Rule 53(g)(3) or otherwise, notwithstanding Donziger's procedural default in bringing the motion.

### A.    General Principles

Rules 53(g)(3)and 54(d) afford district courts a modicum of discretion with respect to the imposition of expenses of special masters in particular and taxable costs generally, respectively.[129]

The pertinent factors mentioned in Rule 53(g)(3) are "the nature and amount of the controversy, the parties' means, and the extent to which any party is more responsible than other parties for the reference to the master."[130]  But "whether a party prevails in a case is probably the most important factor that the courts have historically considered in allocating the responsibility of

---

[128]     DI 1940, DI 1946.

[129]     As noted above, LOCAL CIV. R. 54.1(c)(8) provides that special master compensation is a taxable cost, which is consistent with established practice.  9 MOORE'S FEDERAL PRACTICE § 53.52[4] (3d ed. 2017).

[130]     FED. R. CIV. P. 53(g)(3).

SPA-82

42

paying a master's compensation."[131]

Rule 54(d) differs somewhat.  As previously noted, it "creates a presumption that the district court will award the prevailing party costs."[132]  Any departure from that presumption must be explained, and the explanation must be sufficient to justify the result.[133]  Moreover, as discussed in Point III, none of the arguments advanced by Donziger warrants such a departure.  Nevertheless, we pause to consider whether the factors enumerated in Rule 53(g)(3) suggest some variance here.

B.     *The Need for and Demands Upon the Special Masters and Their Proposed Allocation*

The record in this case reflects the reasons for the appointment of the special masters, which included anticipated difficulties with Donziger and the other defendants based on experience in prior related litigation.[134]  It reflects also a great deal of very important work they did – work far beyond what could have been demanded of a magistrate judge who would have been subject to the competing demands of many other assigned cases.[135]  Nevertheless, the Court did not feel itself to be fully informed with respect to the extent to which the demands upon the special masters were occasioned disproportionately and unreasonably by one side or the other.  Accordingly, it requested

---

[131]

9 MOORE'S FEDERAL PRACTICE § 53.52[3] (3d ed. 2017).

[132]

*Supra* n.60.

[133]

*Whitfield*, 241 F.3d at 270 (citing *Cantrell v. Int'l Bhd. of Elec. Workers*, 69 F.3d 456, 459 (10th Cir. 1995)).

[134]

DI 865.

[135]

*See, e.g.*, DI 1942, at 3-6.

a recommendation from the special masters concerning the appropriate apportionment of the costs of their services, taking into account the nature and amount of the controversy and the extent to which any party was more responsible than others for the reference and for the need for their services.[136]

The masters recommended ultimately that defendants, jointly and severally, be taxed 85 percent of the masters' costs and fees and that the remaining 15 percent be taxed to Chevron.[137] This recommendation was based on their experience supervising the parties, and the masters' report chronicles the "Herculean effort" that the supervision required.[138]  Such an effort was necessitated by the parties' – most often, defendants' – obstructive behavior in connection with scheduling, frivolous and repetitious assertions of privilege, and unwillingness to accept prior rulings.[139]

The masters highlighted, as an example, one occasion in which Donziger changed his position regarding a scheduling issue twice in the course of five days.[140]  He moved first for a two-week delay of all depositions and other discovery deadlines, occasioned by the withdrawal of Keker

---

[136]

DI 1939.

The Court did not ask the special masters to address the parties' means, as the Court, although not the special masters, had extensive knowledge of the prior proceedings bearing on that issue

[137]

DI 1942.

[138]

*Id.* at 8.

[139]

*Id.* at 9-12.

[140]

*Id.* at 8.

44

& Van Nest LLP and Smyser & Veselka, LLP.[141]  He then moved for a three-month delay instead of the initial request for two weeks.[142]  But after the Court granted his request for a two-week extension (though not for three months), Donziger the next day proposed to the Special Masters that depositions proceed immediately.[143]  This issue alone called for the masters to convene multiple conference calls, participate in a court hearing, prepare an interim report, and issue four written orders.[144]  And this is but one example of Donziger's behavior turning "basic matters like scheduling" into tasks requiring many hours of work.[145]

The report includes also examples of Donziger's frivolous assertions of privilege during depositions (objections that "turned the Guerra deposition from seven hours of testimony into a 10 ½-hour day"[146]) and stubborn insistence on relitigating prior final rulings ("Mr. Donziger opened the morning of the second day of his deposition by complaining about [the Court's] orders in relation to [the Special Masters'] fees and about the length of his deposition, all of which had already been the subject of prior orders."[147]).

---

[141]    DI 1168.

[142]    *See* DI 1185, at 2.

[143]    *See* DI 1189, at 1.

[144]    DI 1942, at 8.

[145]    *Id.*

[146]    *Id.* at n.9.

[147]    *Id.* at 11-12 (citation omitted).

SPA-85

45

But blame does not fall on Donziger alone.  Chevron too occasionally was recalcitrant, "tr[ying] to take advantage of [the Special Masters'] presence to relitigate issues that had already been decided."[148]  Nevertheless, the Special Masters saw a difference between Donziger's "staggeringly uncooperative" behavior that, they believe, was an attempt to prevent the truth from coming to light, and Chevron's more legitimate – if still "overzealous" – attempts to shield witnesses from the burdens of lengthy depositions.[149]  In sum, the Special Masters concluded that defendants' behavior was responsible for most, but not all, of the many hours spent supervising this litigation.

The report sheds significant light on the issue of the question of the allocation of fees.  And, as noted above, the Court adopted the special masters' findings in the absence of timely objection from Donziger.

C.    *Analysis*

I begin with the presumption created by Rule 54(d)(1), that costs are awarded to the "prevailing party."[150]  Knowing nothing about this litigation except that Chevron prevailed, it would be appropriate to tax 100 percent of the costs against defendants as a matter of course.  But doing so is not mandatory – the decision whether to tax costs "rests within the sound discretion of the

---

[148]

> *Id.* at n.10, n.12.

[149]

> *Id.* at 15 and n.12.

[150]

> *See Whitfield*, 241 F.3d at 270 ("[B]ecause Rule 54(d) allows costs 'as of course,' such an award against the losing party is the normal rule obtaining in civil litigation, not an exception.").

SPA-86

46

district court."[151]

There are, of course, reasons that a court may decline to award costs in favor of the prevailing party: for example, "misconduct by the prevailing party, the public importance of the case, the difficulty of the issues, or the losing party's limited financial resources."[152]  But Donziger has done little to warrant a favorable exercise of equitable discretion, whether based on these reasons or otherwise.

The issue of Donziger's financial resources is discussed in Point III.B.  The Court's conclusions there apply here as well: Donziger has not demonstrated a lack of resources that would warrant relief here.  Public importance and the difficulty of the issues provide little guidance here. The Advisory Committee's notes say that "parties pursuing matters of public interest . . . may deserve special protection."[153]  This litigation was about allegations that a court decision was procured by corrupt means, *not* about what happened to the Ecuadorian rainforest.[154]  Hence, this was not a case brought in the public interest in any sense that would warrant relieving Donziger from taxation of costs.  And difficulty of issues provides no reason to disturb the presumption that costs should be taxed in favor of the prevailing party.  Finally, as to misconduct, all or virtually all of it is attributable to Donziger and the other defendants.

---

151   *E.g.*, *Broadspring, Inc. v. Nashed*, 693 F. App'x 13, 15 (2d Cir. 2017) (quoting *Dattner v. Congraga Foods, Inc.*, 458 F.3d 98, 100 (2d Cir. 2006)).

152   *Whitfield*, 241 F.3d at 270.

153   FED. R. CIV. P. ADVISORY COMMITTEE NOTES, 2003 Amendments, Subdivision (h).

154   *Supra* Point III.C.

SPA-87

47

In addition to the behavior detailed by the special masters in their report and summarized in Point IV.B above, Donziger engaged in repeated misconduct throughout this litigation. One major category of misconduct was his refusal to produce to Chevron documents that were physically located in Ecuador.[155] Donziger argued in response to Chevron's motion to compel production of the documents that he was unable to obtain those documents from the Ecuadorian legal team.[156] He did so despite "overwhelming evidence" that he controlled the Lago Agrio litigation and after having made no "serious attempt" to get the documents from the Ecuadorian lawyers.[157] Donziger's refusal to produce documents that were in his practical control accords with the Special Masters' assessment of his behavior: he was "trying to prevent the basic facts coming to light."[158]

Donziger's history of misconduct in this litigation means that he has no substantial claim on the Court's exercise of its equitable discretion in his favor. But there is more to consider here. Rule 53(g)(3) instructs that special masters' fees must be allocated with consideration given to "the nature and amount of the controversy, the parties' means, and the extent to which any party is more responsible than other parties for the reference to a master." These factors – especially the third – considered in combination with other equitable principles lead to the conclusion that the masters' proposed 85/15 split of their fees is appropriate.

The nature and amount of the controversy and the parties' means have been discussed

---

[155]

*Chevron Corp. v. Donziger, et al.*, 296 F.R.D. 168, 176-77 (S.D.N.Y. 2013).

[156]

*Id.* at 195.

[157]

*Id.* at 195, 218.

[158]

DI 1942, at 15 n.12.

SPA-88

48

already, and the conclusion that these factors do nothing in defendants' favor stands.  This leaves the parties' respective responsibility for the reference to the special master.  The reference, of course, was requested by Chevron.[159]  It was granted in light of Donziger's history of difficult behavior in other, prior litigation and in this case.[160] So, although it was Chevron that initially requested the masters over Donziger's protests, it is fair to say that Donziger was significantly responsible for the reference.

Broadening the scope of the question to consider whose behavior was more responsible for the substantial amounts of time and work devoted to this litigation by the special masters confirms Donziger's responsibility for a large bulk of the many hours the masters spent overseeing discovery.  The masters' report, which is summarized in Point IV.B and which the court adopted,[161] describes the basis for the masters' conclusion on this point: that Donziger's obstructive conduct "continued unabated during discovery" and "unnecessarily increased the costs of the proceedings."[162]  Their conclusion is supported by an independent review of the record, which contains numerous instances of the masters spending time dealing with Donziger's behavior, such as addressing last minute, frivolous or repetitive requests.[163]

Given the Court's discretion to decline strict application of the Rule 54 presumption

---

[159]

DI 865.

[160]

*Id.* at 1.

[161]

DI 1946.

[162]

DI 1942, at 15.

[163]

*E.g.*, DI 1272.

when considering special masters, it is appropriate in this case to tax 85 percent of the special master

costs against Donziger and other the other defendants, jointly and severally, with the remaining 15

percent taxed to the plaintiffs.

<em>Conclusion</em>

For the foregoing reasons, Donziger's motion to review the taxation of costs is

granted to the extent that the amount taxed for special master expenses is reduced to $741,526.49

and denied in all other respects.  A supplemental judgment in the amount of $813,602.71 shall be

entered.

SO ORDERED.

Dated:        February 28, 2018

_____
Lewis A. Kaplan
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHEVRON CORPORATION,

                Plaintiff,

        -against-                            11 Civ. 0691 (LAK)

STEVEN DONZIGER, et al.,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

        Randy M. Mastro
        Andrea E. Neuman
        GIBSON, DUNN & CRUTCHER, LLP

        Herbert J. Stern
        Joel M. Silverstein
        STERN, KILCULLEN & RUFALO, LLC

        *Attorneys for Plaintiff Chevron Corporation*

        Steven R. Donziger
        Defendant *Pro Se* and *Attorney for Defendants Law Offices
        of Steven R. Donziger and Donziger & Associates, PLLC*

LEWIS A. KAPLAN, *District Judge.*

        This post judgment application arises out of the long-running battle between Steven

Donziger and Chevron Corporation ("Chevron") that has filled hundreds and by now perhaps

SPA-91

2

thousands of pages of the federal reports. The Court assumes familiarity with its decision on the merits and that of the Court of Appeals affirming it.[1] For present purposes, it suffices to note that Donziger and others were found to have engaged in fraud in the procurement of a multibillion Ecuadorian judgment against Chevron, to have carried on a years-long scheme to extort money from Chevron, and much else. He now is subject to a permanent injunction that, among other things, (1) enjoins him and others from seeking to enforce the Ecuadorian judgment in the United States, (2) requires him to convey to Chevron all of his right, title and interest in shares of Amazonia Recovery Limited ("Amazonia"), a Gibraltar company formed to collect and distribute any proceeds of the Ecuadorian judgment, and (3) forbids him from taking any action to monetize or profit from the Ecuadorian judgment, including by selling, assigning, pledging, transferring or encumbering any interest it. There also is an outstanding and unpaid supplemental judgment against him and in favor of Chevron for more than $800,000 in costs.

## I.    Background

This Court found after trial that Donziger and others have been engaged in a years-long fraudulent and extortionate scheme to obtain money from Chevron. A key – but by no means the only – part of that scheme is a multibillion dollar Ecuadorian judgment that they obtained by fraud and bribery, among other misconduct.[2] The judgment, since affirmed by the Court of Appeals, prevents Donziger and the two other defendants who appeared at trial (the "LAP Representatives," who were

---

[1]     *Chevron Corp. v. Donziger,* 974 F. Supp. 2d 362 (2014), *aff'd,* 833 F.3d 74 (2d Cir. 2016), *cert. denied,* 137 S.Ct. 2268 (2017).

[2]     *Chevron Corp.,* 974 F. Supp. 2d 362 *passim.*

3

two of 47 plaintiffs in the Ecuadorian litigation) from enforcing the Ecuadorian judgment in the United

States or profiting from it in any way. In addition to the anti-enforcement injunction, it contains three

other provisions pertinent here:

- Paragraph 1 imposes a constructive trust on all property that Donziger has received, or hereafter may receive, or to which Donziger now has, or hereafter obtains, any right, title or interest that is traceable to the Ecuadorian judgment or its enforcement anywhere in the world, *"including, without limitation, all rights to any contingent fee under [his] Retainer Agreement and all stock in Amazonia [Recovery Limited]"* and required him to *"transfer and forthwith assign to Chevron all such property that he now has or hereafter may obtain."*[3]

- Paragraph 3 directed "Donziger [to] *execute in favor of Chevron a stock power transferring to Chevron all of his right, title and interest in his shares of Amazonia,* and" both "Donziger and the LAP Representatives . . . [to] *execute such other and further documents as Chevron reasonably may request or as the Court hereafter may order to effectuate the foregoing provisions of this Judgment."*[4]

- Paragraph 5 enjoined both Donziger and the LAP Representatives *"from undertaking any acts to monetize or profit from the [Ecuadorian] Judgment . . . including without limitation by selling, assigning, pledging, transferring or*

---

[3]  Dl 1875, ¶ 1 (emphasis added).

[4]  *Id.* ¶ 3 (emphasis added).

4

*encumbering any interest therein.*"[5]


## I.   The Motion

On March 19, 2018, Chevron moved for an order (1) adjudicating Donziger in civil contempt of court for failure to comply with paragraphs 3 and 5 of the judgment as to the Donziger Defendants[6] (the latter paragraph insofar as Chevron alleges in its memorandum of law[7] and in the Grinberg declaration), and (2) granting Chevron leave to conduct post-judgment discovery of Donziger and any other person, including without limitation Katie Sullivan, Streamline Family Office, Inc., Jonathan Bush, and athenahealth, inc., as to all matters relevant to the enforcement of paragraphs 3 and 5.

Thus, the contempt application – as originally filed – related to two distinct matters. The first is Donziger's alleged failure to comply with paragraph 3 of the judgment, which requires him to execute in favor of Chevron a stock power transferring to Chevron all of his right, title and interest in his shares of Amazonia. The second is Donziger's alleged violation of paragraph 5, which enjoins him from, *inter alia,* undertaking any acts to monetize or profit from the Ecuadorian judgment that formed a significant part of this case, including by selling, assigning, pledging, transferring or encumbering any interest therein. Chevron has offered evidence which, in its view, supports its contention that Donziger violated paragraph 5 on one specific occasion involving Elliott Management

---

[5]

    *Id.* ¶ 5.

[6]

    The term is defined as in the judgment in this case, DI 1875.

[7]

    DI 1866, at 15.

5

Corporation ("Elliott").  In addition, however, it seeks discovery in an effort to determine whether he

has engaged in similar alleged violations of paragraph 5 in other instances and, should it discover such

evidence, to expand the scope of its contempt application to include them.

The motion was briefed in the ordinary course.  The Court held argument on May 8,

2018.

## II.   Contempt – Amazonia

Following the entry of the Ecuadorian judgment, Donziger and others formed

Amazonia for the purposes of collecting and distributing any proceeds of that judgment or any

settlement.[8]  Donziger owns, directly or through a nominee, Amazonia shares through which money

is to be funneled to him if any is obtained.[9]  The Court imposed a constructive trust on those shares

and directed Donziger, in paragraph 3 of the Judgment, to convey them to Chevron.[10]

Donziger does not deny that he did not comply with paragraph 3 of the Judgment

before the conclusion of the May 8, 2018 argument.  He instead offered a series of excuses.  But his

---

[8]

*Chevron Corp. v. Donziger*, 974 F. Supp. 2d at 528 n.1110.

[9]

*Id.* at 641.

[10]

Donziger did not comply with paragraph 3 upon entry of the judgment or at any time during
the pendency of appellate proceedings.  Some time after the entry of the judgment, he sought
a stay pending appeal.  The Court granted that application but only to the extent that it
temporarily modified paragraph 3 so that it required Donziger during the pendency of the
appeal to convey the Amazonia shares to the Clerk of this Court for appropriate disposition
at the conclusion of the appeal rather than to Chevron.  DI 1901, at 32.  Donziger never
complied with that direction.  The Supreme Court denied certiorari on June 19, 2017.  The
appellate process thus was concluded no later than that date and, perhaps, earlier.  In any case,
the temporary modification of paragraph 3 lapsed no later June 19, 2017, whereupon the
original paragraph 3 of the judgment came back into effect.

6

excuses lack even a semblance of merit.

First, he says that he wrote Chevron a letter seeking what Donziger calls "a common sense resolution" of that part of the injunction and that Chevron never responded.[11] But the injunction was a judgment of this Court that Chevron obtained after trial and that now has been affirmed on appeal. It had no obligation to parley with Donziger about its terms and was fully entitled to stand on its rights. No attempt to work out some alternate arrangement, let alone an attempt spurned by the adversary, altered Donziger's obligation to comply with this Court's judgment.

Second, Donziger asserted – albeit not under oath – that he "is uncertain whether Amazonia still exists and in what form."[12] But it is impossible to see what difference that would make even if one were to credit Donziger's entirely unsubstantiated speculation. He is obliged to convey all of his right, title and interest in the shares – whatever that right, title and interest may be and regardless of whether it has any economic value. If the company no longer exists, then the conveyance by Donziger of all of his right, title and interest in shares perhaps would be of no practical significance. But that is not for Donziger to decide, and it does not appear to be the case.

> Chevron asserts that Amazonia – and its share capital – remain very much in existence: "Donziger is wrong that Amazonia is defunct. Chevron sued Amazonia in Gibraltar for fraud relating to the pursuit of the Lago Agrio litigation and resulting judgment. After filing a defense, Amazonia failed to participate in the Gibraltar proceedings and defaulted. On December 9, 2015, Chevron obtained judgment against Amazonia for damages of approximately $28 million and equitable relief. Amazonia failed to pay

---

11

DI 1986, at 1-2.

12

*Id.* at 1.

this judgment debt and the Gibraltar court granted Chevron's application on July 11, 2016, placing Amazonia into liquidation.  But as a matter of Gibraltar/English law, Amazonia still exists, as does its issued share capital . . ."[13]

Finally, Donziger contended that the onus was on Chevron to propose a form of stock power and that it had not done so.  But he was wrong.  Paragraph 3 of the Judgment unambiguously required Donziger to execute and deliver the stock power.  It did not require Chevron to do anything at all.  Moreover, Donziger made abundantly clear to Chevron in his August 2014 letter that he would

---

[13]

DI 1987, at 4.

Were the current status of Amazonia material the Court would require proof beyond unsworn statements in a memorandum.  But it is not for reasons explained in the text.  Nevertheless, the Court notes the following:

First, Chevron in 2015 obtained a judgment against Amazonia for more than $28 million in the Supreme Court of Gibraltar.  *Chevron Corp. v. Amazonia Recovery Ltd.*, No. 2014-C-110 (Gib. Sup. Ct. Dec. 9, 2015) (available at http://www.gcs.gov.gi/images/judgments/supremecourt/2015/chevron_corporation_v_ama zonia_recovery_ltd_and_ors.pdf) (last visited May 15, 2018).

Second, assuming *arguendo* that a liquidator subsequently was appointed for Amazonia, the liquidator appears to be obliged to take possession of and  realize the assets of the company and to distribute the assets and proceeds of realization.  Gib. Insolvency Act 2011 § 176(1) (available at http://www.gibraltarlaws.gov.gi/articles/2011-26o.pdf) (last visited May 15, 2018).  That apparently would include realizing upon any rights Amazonia may have to any proceeds of enforcing the Ecuadorian judgment.  Thus, while Amazonia may have been insolvent if and when it was placed in liquidation, and may be today (Gib. Insolvency Act 2011 § 10(1)(b)(1) [company is insolvent if unable to pay its debts as they fall due]), a liquidator perhaps could realize more on Amazonia's assets, which appear to include the right to receive any collections on the Ecuadorian judgment, than the total of Amazonia's present liabilities.  Thus, it is possible that Donziger's Amazonia shares have substantial economic value.  Indeed, as will appear, Donziger asserts that transfer of his Amazonia shares to Chevron would result in his sustaining an "irretrievable loss," obviously by depriving him of the contingent fee he hopes to obtain by virtue of his ownership of the Amazonia shares, notwithstanding this Court's judgment.

8

not comply with paragraph 3 of the Judgment.[14]  And he made his reason very clear:

> "My clients have informed me, via the Directors of Amazonia, that if any transfer of
> stock is effectuated by me to any entity, those shares will be divested immediately
> under the by-laws of the entity that holds the shares. * * * The upshot is that *a simple
> transfer . . . of my Amazonia shares would in practice mean the complete
> divestiture—and potentially irretrievable loss—of more than two decades of labor
> on the part of me and some of my colleagues . . .*" [15]

In other words, it appears that Amazonia, whether it is in liquidation or not, still exists.
Donziger's shares are the vehicle through which he seeks to be compensated in the millions or
hundreds of millions of dollars in the event that the Ecuadorian judgment ever is enforced anywhere
or the matter settled.  He refused to part with his shares – the judgment of this Court notwithstanding
– because he believes that doing so "would . . . mean the complete divestiture – and potentially
irretrievable loss" – of the massive contingent fee he hopes to collect.  The fact, however, is that the
judgment in this case forbids him from benefitting in any way from the Ecuadorian judgment that he
obtained by fraud.  His surrender of his right, title and interest in the Amazonia shares is but one of
several specific means by which the judgment seeks to ensure that result.  Donziger simply may not
defy this Court's judgment, affirmed by the Court of Appeals, by holding on to the Amazonia shares
in the hope, however faint, of a rich pay day down the road.

"A party may be held in civil contempt for failure to comply with a court order if (1)
the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of

---

[14]   DI 1986-1.

[15]   *Id.* at 3 (emphasis added).

9

noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner."[16]

Paragraph 3 of the Judgment is clear and unambiguous. Noncompliance with it was admitted. In any case, the evidence of noncompliance is clear and convincing. From the date the judgment was entered, March 4, 2014, to and including the date of the argument of this motion, May 8, 2018, Donziger made no effort to comply. Indeed, his defiance has been brazen and deliberate.

Accordingly, the Court finds that Donziger was in civil contempt of this Court based on his noncompliance with paragraph 3 of the Judgment. But subsequent developments require further consideration inasmuch as the motion charges civil, not criminal, contempt.[17]

During the argument on May 8, 2018, the following occurred:

MR. DONZIGER:        This is a fake issue. *And if they want me to sign my shares over, which they already have because this would be a public relations exercise for them, I'm happy to do it.* I am not going to sit here and be held in contempt over something that's completely meaningless, when I'm here today ready to do that.

So tell me what you want me to do. He says he has something for me to sign. Well, why hasn't he presented that to me? Where is it? I'm sitting here. He sent me an email this morning looking for discovery. Why is he playing possum with me? To

---

[16]
    *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.,* 369 F.3d 645, 655 (2d Cir. 2004) (internal quotation marks and citation omitted).

[17]
    This would not be so in a prosecution for criminal contempt, as criminal contempt "is completed when contumacious conduct has taken place . . . That is, once the subject of an order willfully refuses to meet the court's order." *United States v. Marquando,* 149 F.3d 36, 39-40 (1st Cir. 1998).

SPA-99

10

make me look foolish? Just give me the document you want me to sign."[18] Shortly thereafter, Chevron's counsel presented Donziger with what Chevron's counsel described as two share transfer forms relating "to the different shares of stock."[19] The Court indicated that it would not decide the motion for at least 24 hours and asked that the parties advise it whether the Amazonia aspect of the pending motion had become moot.[20]

Following the argument, Donziger claimed in a court filing that he executed and notarized a Share Transfer Form.[21] But that turned out to have been less than the whole truth. While Chevron concedes that Donziger did execute one of the forms that Chevron had provided to him,[22] Donziger added to the document a so-called Addendum of Understandings that states:

"Transferor executes the instant Share Transfer Form subject to the following Understandings:

1.    This Share Transfer form is being executed pursuant to an express

---

[18]

Tr., May 8, 2018, at 29.

[19]

*Id.* at 36-37.

[20]

*Id.*

[21]

DI 2000.

[22]

He did so on behalf of Donziger & Associates PLLC rather than on his own behalf. Although Chevron has not commented on the discrepancy, Donziger previously testified that the Amazonia shares were granted to him. Donziger Dep. Tr., June 25, 2013, at 632:3-9. Thus, it is possible that the stock power was not executed on behalf of the owner of the shares. Any such a determination, however, would require additional proof should it be material.

The Court notes in this regard that paragraph 3 of the judgment imposes the duty to execute a stock power on "Donziger." Paragraph 7.5 defines "Donziger" for purposes of the judgment as "the Donziger Defendants, and each of them, unless the text hereof otherwise provides." "Donziger Defendants" is defined as Donziger, his PLLC, and The Law Offices of Steven R. Donziger. Thus, Donziger and the PLLC both are obliged to comply with paragraph 3.

11

order of judgment of the U.S. District Court for the Southern District of New York in the *Chevron Corp. v. Donziger 'civil RICO' case,* Case No. 1:11-cv-0691 (Dkt. 1875) (Kaplan, J.), and furthermore under the specific threat of imposition of 'contempt of court' sanctions if Transferor fails to execute this Form.

2.  Chevron Corp. has previously represented to Transferor that the AMAZONIA RECOVERY LIMITED entity has been 'plac[ed] into liquidation' in Gibraltar after the entity 'failed to participate in the Gibraltar' [*sic*] and subsequently 'failed to pay' a default judgment entered by the Gibraltar court against it.

3.  Transferor acknowledges that this Form is being executed notwithstanding the terms and restrictions of paragraphs 37-38 of the Articles of Association of AMAZONIA RECOVERY LIMITED, which provide, inter alia, that 'No transfer of any Shares shall be made or registered without the prior consent of a majority of the Directors (each acting in his or her absolute discretion)' and that 'Any purported transfer in violation of these Articles shall be null and void.'

4.  Transferor continues to take the position, which has been communicated in writing to Chevron Corp. and to the U.S. District Court, that the AMAZONIA RECOVERY LIMITED entity is null and void for several reasons, including the fact that it has been taken over and is now being manipulated by an adverse party to serve purposes

12

(frustration of prompt relief to the affected peoples of Ecuador) that are wholly contrary and opposite to the entity's fundamental purposes as express in its Memorandum of Association and other foundational documents."[23]

Two things are readily apparent from Donziger's addendum.

First, its obvious purpose is to seek to negate the transfer of Donziger's Amazonia shares to Chevron, either on the ground that the transfer was made under duress or is a nullity by reason of Amazonia's Articles of Association, or both.  Thus, rather than simply signing an unequivocal stock transfer form conveying all of his right, title and interest in the Amazonia shares as required by the judgment in this case – and putting the lie to his May 8, 2018 representation to this Court that "if they want me to sign my shares over, . . . I'm happy to do it" – he still seeks to retain the shares by inviting Amazonia to reject the transfer document on at least two grounds.[24]

Second, his position is internally inconsistent.  If, as Donziger claims, Amazonia somehow is "null and void for several reasons," then his shares could be of no present or future value and there would be no coherent reason for declining to transfer unconditionally whatever interest, if any, he retains in them.  Nevertheless, Donziger's execution of the stock power, albeit with the attached addendum does have one effect.

---

[23]

DI 2003-3.

[24]

It is not clear that this attempt would succeed, especially if Amazonia in fact is in liquidation. The appointment of a liquidator appears to have terminated all or most of the powers of the directors of the company and to vest in the liquidator "[p]ower to do all acts and execute, in the name and on behalf of the company, any deeds, receipts or other document."  Gib. Insolvency Act 2011 §§ 165(1)(b), 177(2) & Sched. 2, ¶ 7.  Thus, the liquidator, if there is one, may well have the power to consent to or ratify the transfer of Donziger's Amazonia shares to Chevron, even assuming that the purported transfer restriction were valid.

Paragraph 3 of the judgment required him to execute a stock power. It did not prescribe a particular form. He now has executed a purported stock power, albeit in a form to which Chevron understandably objects. In consequence, although there is no doubt whatever that Donziger was in contempt of paragraph 3 from the date the judgment was entered on March 4, 2014 until May 9, 2018, the date on which he executed the form with the addendum, at this moment he arguably no longer is in civil contempt based on the failure to comply with paragraph 3 because he ultimately signed a stock power. As the purpose of civil contempt is to coerce compliance with a judgment of order, imposition of civil contempt sanctions on the basis of the complete and absolute failure to comply with paragraph 3 from March 4, 2014 until May 9, 2018 would be inappropriate.[25]

That of course is not to say that Chevron is without recourse. It is free to request that Donziger execute a specific form of stock power without amendment or qualification and, should he fail promptly to do so, to seek an order of this Court requiring that he comply. Any failure to comply with any such order would be an appropriate subject of a new civil contempt motion.

### III.   Contempt – Alleged Monetization of the Ecuadorian Judgment

Paragraph 5 of the Judgment enjoined Donziger from, *inter alia,* undertaking any acts to monetize or profit from the Ecuadorian judgment that formed a significant part of this case, including by selling, assigning, pledging, transferring or encumbering any interest therein. Chevron contends that Donziger violated paragraph 5 by seeking to induce Elliott to purchase a share of any proceeds ultimately obtained through enforcement in foreign courts of the fraudulent Ecuadorian

---

[25]    The Court does not now express any view as to whether Donziger should be prosecuted for criminal contempt of paragraph 3 of the judgment based on his failure to comply with that provision from March 4, 2014 until May 9, 2018.

14

judgment. Its application is supported by a declaration of an Elliott portfolio manager that attests to personal knowledge of relevant events.

Having reviewed the submissions, the Court has concluded that an evidentiary hearing is appropriate with respect to this branch of the contempt motion. The hearing will commence on May 22, 2018 at 9:30 a.m. in Courtroom 21B.

### IV.    Discovery

This Court plainly has "ample authority to issue [discovery] orders necessary for the enforcement of its order.    Discovery may occur in connection with a pending contempt proceeding[.]"[26] In all of the circumstances, Chevron's application, insofar as it seeks leave to conduct discovery with respect to Donziger's compliance with the Judgment is granted.  The timing of that portion of the discovery sought by Chevron will be resolved in connection with Chevron's subsequently filed and now pending motion to compel compliance with its discovery requests.

### V.    Additional Contempt Claim

In a letter dated May 11, 2018,[27] prompted in part by Donziger's actions with respect to the required transfer of his Amazonia shares, Chevron asserts that Donziger is in contempt also of paragraph 1 of the judgment, which requires him to transfer and assign to Chevron all right, title and interest that he now or hereafter obtains that is traceable to the Ecuadorian judgment "including,

---

[26]

*State of New York v. Shore Realty Corp.*, 763 F.2d 49, 53 (2d Cir. 1985); 28 U.S.C. § 1651.

[27]

DI 2003.

15

without limitation, all rights to any contingent fee under" his retainer agreement.[28]

       The claim that Donziger is in contempt of paragraph 1 of the judgment was not made in the motion that now is before the Court. The Court therefore will not address it unless and until Chevron files an appropriate motion.

*VI.   Conclusion*

       Chevron's motion [DI 1968] is disposed of in part as follows:

       1.    So much of the motion as seeks a civil contempt adjudication based on violation of paragraph 3 of the judgment is denied without prejudice to further proceedings as indicated above.

       2.    So much of the motion as seeks leave to conduct discovery with respect to Donziger's compliance with the Judgment is granted save that the timing of such discovery will be resolved by subsequent order.

       3.    Decision on so much of the motion as seeks a civil contempt adjudication based on alleged violation of paragraph 5 of the judgment relating to the Elliott events is reserved pending a hearing.  The hearing will commence on May 22, 2018 at 9:30 a.m.

       SO ORDERED.

Dated:     May 16, 2018

                                           Lewis A. Kaplan
                                  United States District Judge

---

[28]   DI 1875,, ¶ 1.

SPA-105

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHEVRON CORPORATION,

                 Plaintiff,

          -against-                                 11 Civ. 0691 (LAK)

STEVEN DONZIGER, et al.,

                 Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION ON DONZIGER'S MOTIONS
FOR DECLARATORY JUDGMENT AND DISMISSAL,
FOR A PROTECTIVE ORDER AND FOR A STAY**

LEWIS A. KAPLAN, *District Judge.*

       This matter is before the Court in relation to Steven Donziger's motions for (1) a

declaratory judgment and other relief [DI 2018], (2) a protective order [DI 2026], and (3) an

"emergency administrative stay" [DI 2028].  On June 25, 2018, the Court decided the motions.[1]  This

opinion sets forth the reasons for those rulings.

       The crux of Donziger's applications in the three motions at issue here is a contention

that Chevron Corporation ("Chevron") – which was attempting to enforce both a money judgment

against Donziger and an injunction that restrains him from, among other things, "undertaking any

acts to monetize or profit from the [Ecuadorian] Judgment" that this Court already has held was

obtained by fraud, "including without limitation by selling, assigning, pledging, transferring or

_____

[1]      DI 2037.

2

encumbering any interest therein" – was  precluded by the First Amendment from discovering (a) the sources of his recent and present income and assets as well as (b) other information going to the question whether he has complied with the injunction and other provisions of this Court's judgment.

The Court assumes familiarity with its decision on the merits in this case and the Court of Appeals opinion affirmed that decision.[2]

### The Facts

*The Background*

Steven Donziger has engaged in a pattern of racketeering activity that has included extortion, mail fraud, wire fraud, violations of the Travel Act and other predicate acts.

As this Court found after a lengthy trial, he and his cohorts have engaged for many years in a corrupt scheme, an object of which is to extort billions of dollars from Chevron.  A lynch pin of that scheme was the fraudulent procurement of a multibillion dollar Ecuadorian judgment coupled with threats and attempts to enforce it in the United States and other countries around the world.  Were that scheme to succeed, Donziger would be made a very wealthy man.

The evidence at trial of Donziger's corruption and extortionate purpose was devastating.  The record showed that Donziger and his Ecuadorian lawyers, as well as others with whom he worked,  produced and obtained the fraudulent judgment and thoroughly corrupted that case.  Among other things:

"They submitted fraudulent evidence. They coerced one judge, first to use a court-

---

[2]

*Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362 (S.D.N.Y. 2014), *aff'd*, 833 F.3d 74 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2268 (2017).

appointed, supposedly impartial, "global expert" to make an overall damages assessment and, then, to appoint to that important role a man whom Donziger hand-picked and paid to "totally play ball" with the LAPs. They then paid a Colorado consulting firm secretly to write all or most of the global expert's report, falsely presented the report as the work of the court-appointed and supposedly impartial expert, and told half-truths or worse to U.S. courts in attempts to prevent exposure of that and other wrongdoing. Ultimately, the LAP team wrote the Lago Agrio court's Judgment themselves and promised $500,000 to the Ecuadorian judge to rule in their favor and sign their judgment."[3]

At the end of the trial, the Court found liability and granted equitable relief. It enjoined Donziger and the other defendants who appeared here from, among other things, seeking to enforce the Ecuadorian judgment in the United States, from profiting from it in any way, and "from undertaking any acts to monetize or profit from the [Ecuadorian] Judgment . . . , including without limitation by selling, assigning, pledging, transferring or encumbering any interest therein."[4] The proof at trial was sufficiently compelling that Donziger did not challenge *any* of this Court's factual findings on appeal.[5]  The Court of Appeals affirmed the judgment in full,[6] and the Supreme Court denied certiorari.

There have been several developments since the affirmance of the judgment that set the stage for the present applications.

---

[3]

*Chevron Corp. v. Donziger*, 974 F. Supp.2d at 384.

[4]

DI 1875, ¶¶ 1-5.

[5]

*Chevron v. Donziger*, 833 F.3d 74, 81, 86 (2d Cir. 2016) (noting lack of any challenge to any of trial court findings).

[6]

*Id.*

4

*The Supplemental Judgment Awarding Costs*

First, the Court entered a supplemental judgment against Donziger awarding to Chevron, the prevailing party, taxable costs in the aggregate amount of $811,602.71.[7]

*Chevron's Contempt Motion and Application for Leave to Conduct Post-Judgment Discovery*

Second, on March 19, 2018, Chevron sought an order to show cause bringing on a motion, *inter alia,* to hold Donziger in civil contempt for violating the terms of the judgment and for leave to conduct post-judgment discovery relevant its enforcement.[8] It contended that Donziger was in violation both of (1) paragraph 3, which obliged him to execute a stock power transferring to Chevron all of his right, title and interest in shares of Amazonia, a Gibraltar entity formed to receive and distribute any funds collected with respect to the Ecuadorian judgment,[9] and (2) paragraph 5, which enjoined him "from undertaking any acts to monetize or profit from the [Ecuadorian] Judgment . . . , including without limitation by selling, assigning, pledging, transferring or encumbering any interest therein."[10]

---

[7]  DI 1962.  *See also Chevron Corp. v. Donziger,* No. 11-cv-0691 (LAK), 2018 WL 1137119 (S.D.N.Y. Mar. 1, 2018) (decision on motion to review taxation of costs).

While Donziger appealed from the costs judgment, he has not obtained a stay of its enforcement either by posting a supersedeas bond or otherwise. The Court notes also that Donziger has not filed an appellate brief, and no briefing schedule has been established. *Chevron Corp. v. Donziger,* No. 18-855 (filed Mar. 29, 2018).

[8]  DI 1968.

[9]  DI 1875, ¶ 3.

[10]  *Id.* ¶ 5.

5

Insofar as the motion alleges contempt of paragraph 5 of this Court's judgment, it contends principally that Donziger violated that provision by seeking to obtain funds from Elliott Management Corporation ("Elliott") in exchange for an interest in the Ecuadorian judgment or any proceeds of it.  It supported that contention with a declaration of an Elliott official.  But, Chevron suspects other possible violations and sought discovery to determine whether he had done so with respect to other funders or potential funders.

The Court signed the order to show cause.  It observed in doing so that leave of Court was not required to conduct post-judgment discovery with respect to enforcement of the monetary portion of the judgment,[11] i.e., the $811,602.71 costs award.

In an opinion dated May 16, 2018, the Court denied the contempt motion insofar as it relied on paragraph 3 of the judgment and ordered an evidentiary hearing, originally scheduled for May 22, 2018, with respect to the alleged violation of paragraph 5 involving Elliott.[12]  In addition, it ruled that Chevron was entitled to conduct post-judgment discovery with respect to its claim that Donziger had violated paragraph 5 of the judgment, relying on the Second Circuit's ruling to that effect in *State of New York v Shore Realty Corp.*,[13] but temporarily delayed that discovery.[14]

---

[11]

*Id.,* memo endorsement ¶ 2.1.

[12]

DI 2006.  *Chevron Corp. v. Donziger,* No,. 11-0691 (LAK), 2018 WL 2247202 (S.D.N.Y. May 16, 2018).

[13]

763 F.2d 49, 53 (2d Cir. 1985).

[14]

DI 2006

6

*The Post-Judgment Discovery*

Third, Chevron propounded post-judgment discovery both to Donziger and to various non-party witnesses.  As the foregoing suggests, some of that discovery is directed at locating property in which Donziger has an interest, property to which he is or may become entitled, or property that he may have transferred fraudulently, all so that Chevron by appropriate means may obtain that property or its proceeds in satisfaction of the money judgment.  Other aspects of the discovery go, generally speaking, to determining whether Donziger has violated or is violating the provisions of the judgment that imposed a constructive trust and enjoined Donziger from engaging in certain activities.[15]  Motion practice concerning that discovery is described below.

*Injunction Granted Against Defaulting Defendants*

Fourth, on April 23, 2018, the Court granted Chevron's unopposed motion for a default judgment against the many defendants who did not appear in this action, including the plaintiffs in the Ecuadorian case, at least one of their Ecuadorian lawyers, and others associated with them.  The decree, like that against Donziger and the two other defendants who appeared in this case, enjoins the defaulted defendants from, among other things, seeking to enforce the Ecuadorian judgment in the United States, from profiting from it in any way, and "from undertaking any acts to

---

[15]   It is important to note that the discovery sought does not in each case fall neatly into only one or the other category.  That is so, among other reasons, because discovery directed at learning what payments Donziger has received, is entitled to receive, or hereafter may receive from any collections on the Ecuadorian judgment or from the proceeds of financing extended in exchange for a share of any such collections certainly is relevant to Chevron's collection of its money judgment against Donziger and, in the case of his receipt of proceeds of such financing, is likely to be relevant to whether he has violated, or threatens to violate, this Court's injunction, which among other things enjoins him from monetizing the Ecuadorian judgment.

7

monetize or profit from the [Ecuadorian] Judgment . . . , including without limitation by selling, assigning, pledging, transferring or encumbering any interest therein."[16] Thus, all of the Ecuadorian plaintiffs now also are enjoined from seeking to monetize or profit from the fraudulent judgment.

With that general background, we turn to the specific details relevant to resolution of Donziger's motions.

*Post Judgment Discovery Rulings*

*Donziger*

In April 2018, Chevron, as noted, served discovery requests on Donziger and various non-parties. Those served on Donziger included a document request, an information subpoena, and a subpoena *ad testificandum* to take the deposition of Donziger.

Donziger interposed largely boilerplate objections to substantially every discovery request[17] and ultimately took the position that he would not appear for a deposition. Despite his broad brush approach, he did not object to any discovery request on the ground now advanced in his motion for a protective order, viz. that compelled discovery of the identities of persons supporting his efforts, financially or otherwise, would violate the First Amendment.

---

[16]

DI 1984, ¶¶ 1-4.

The Court concluded that it has personal jurisdiction over all of the defaulted defendants. DI 1984, at 1 n.1.

[17]

DI 1988-2.

SPA-112

8

Chevron then moved to compel compliance.[18]  Donziger's answering memorandum made essentially two points.  He argued, first, that post-judgment discovery should be suspended because he hoped at some point to post a supersedeas bond.[19]  Second, he contended that the parties should continue to confer concerning his previously interposed objections to specific discovery requests.  He proposed that Chevron should be satisfied with "a descriptive summary or guidance as to [his] relatively simple financial condition, backed up by documentation."[20]  Once again, however, he did not contend that compelled discovery of the identities of persons supporting his efforts, financially or otherwise, would violate the First Amendment.[21]

The Court ruled on the motion to compel on May 17, 2018.[22]  For convenience of exposition, the Court divided the specific discovery requests into two rough categories.  The first category, which it referred to as Money Judgment Discovery, was directed principally but not

---

[18]

DI 2009.

He never did so.

[19]

DI 2002, at 1-2.

[20]

*Id.* at 2-3.

[21]

In an unauthorized surreply in opposition to Chevron's motion, Donziger asserted that "Chevron's obvious goal is to access information about specific funders in order to harass and intimdate them" ands suggested that this would raise "profound First Amendment concerns."  DI 2005, at 2.

It is well established, of course, that arguments first raised in reply briefs are forfeited or waived.  *E.g.*, *Harrison v. Republic of Sudan*, 838 F.3d 86, 96 (2d Cir. 2016); *Knippe v. Singer*, 999 F.2d 708, 711 (2d Cir. 1993).  It necessarily follows that the same is true of arguments first raised in an unauthorized surreply submission.

[22]

DI 2009.

exclusively to identifying assets with respect to which the money judgment for costs may be enforced.[23]   The second category, which it referred to as Paragraph 5 Compliance Discovery, principally seeks information with respect to whether Donziger has violated paragraph 5 of the March 4, 2014 judgment in this case, the provision that enjoined Donziger and the two Ecuadorian plaintiffs who appeared in this action from seeking to monetize or profit from the Ecuador judgment, including by selling, assigning, pledging, transferring or encumbering any interest therein.[24]   It is pertinent to note, however, that at least some of the specific discovery requests actually seek information that is relevant both to collecting on the costs judgment and to the question whether Donziger has violated paragraph 5 of this Court's judgment.

In relevant part, the Court's ruling modified certain of Chevron's discovery requests to make them more specific and directed Donziger to comply with the Money Judgment Discovery requests and to submit to a deposition.   But it extended the delay in required compliance with the Paragraph 5 Compliance Discovery requests.

*The Postponement of the Contempt Hearing and Its Effect on the Discovery Schedule*

On the same day as the Court's discovery ruling, Donziger moved to postpone the contempt hearing.   The Court granted the request, ultimately moving the hearing to June 28, 2018.

---

[23]      The specific document requests that the Court characterized as Money Judgment Discovery are Requests 1 through 17, 19, 23 through 28 and 30.   The specific information subpoena requests included within the term Money Judgment Discovery are paragraphs 1 through 20 and 26-31.

[24]      The specific document requests that the Court deemed to be Paragraph 5 Compliance Discovery are Requests 18, 21, 22 and 29.   The specific information subpoena requests so deemed are numbers 21 through 25.

10

Chevron responded to the postponement, however, by requesting that Donziger be required to respond to all outstanding post-judgment discovery requests, including the Paragraph 5 Compliance Discovery, in advance of the hearing.[25]

In a June 1, 2018 ruling, the Court granted only part of Chevron's request.  It ordered Donziger to comply – fully and by June 15, 2018 – with certain of the Paragraph 5 Compliance Discovery "to the extent of producing documents and providing information bearing on the attempt to obtain funds from" Elliott and related entities.[26]  It continued to reserve judgment with respect to the balance of the Paragraph 5 Compliance Discovery.

*The Sullivan Discovery Ruling*

Among the non-parties on whom Chevron had served post judgment discovery requests are Mary Katherine Sullivan and Streamline Family Office, Inc. ("Streamline"), a company she apparently controls.  Sullivan, Chevron claims, participated in Donziger's efforts to raise funds from Elliott and others.

Following the June 1, 2018 ruling with respect to discovery against Donziger concerning to the Elliott matter, Sullivan and others, according to Chevron, continued to refuse to comply with Chevron's discovery requests.  Chevron sought clarification from the Court that its rulings with respect to discovery from Donziger applied also to discovery from non-party witnesses.

---

[25]     DI 2016.

[26]     DI 2020.

11

Donziger did not oppose that request, which the Court granted.[27]  But that was not to be the end of the story.

Ms. Sullivan's counsel informed the Court of what her attorney said was their understanding of Ms. Sullivan's discovery obligations in light of the Court's rulings and sought a protective order (a) barring her deposition or, alternatively, (b) limiting the questioning to the identification of "assets available to satisfy [the] money judgment."[28]  In short, Ms. Sullivan sought to preclude any examination of her at all or, failing that, to foreclose deposition testimony with respect to the Elliott matter in which she is said to have participated.

On June 15, 2018, the Court directed Ms. Sullivan, "without further delay," to (1) produce all requested documents and information concerning (a) the attempt to obtain funds from Elliott, any affiliates of Elliot, and/or any funds managed by Elliott or its affiliates, (b) Donziger's assets, liabilities and financial situation, and (c) any payments to Donziger, past or anticipated, out of proceeds of financing granted in whole or in part in exchange for any portion of any future collections on the Ecuadorian judgment, and (2) appear for an testify at a deposition on those subjects in advance of the June 28 contempt hearing.[29]

---

[27]   DI 2021, DI 2022.

[28]   DI 2031.

[29]   DI 2027.

**SPA-116**

12

*The Present Motions*

    *The Declaratory Judgment - Dismissal Motion*

        On May 31, 2018, Donziger filed a motion styled as "Defendant Donziger's Motion for Declaratory Relief and Motion to Dismiss Plaintiff's Application to Hold Donziger in Contempt for 'Profiting' From the Judgment."[30]

        The first aspect of the motion seeks a declaration that this Court's judgment:

"in no way prevents:

"1.     Mr. Donziger or third-parties from exercising their legal rights in non-U.S. jurisdictions to obtain enforcement and related recovery on the Ecuador Judgment, consistent with the NY Judgment and the Second Circuit's affirmance thereof;

"2.     Mr. Donziger from providing legal and other services including assistance in raising funds to cover litigation expenses, debts, and fees, from third-party litigation finance investors predicated on an interest in any recovery other than his specific contingency interest (or any specific interest that Mssrs. Camacho and Piaguaje may have);

"3.     Mr. Donziger from receiving payments out of such third-party litigation finance funds to cover his legal expenses and fees for providing legal and other services, consistent with the terms of any such agreement and any applicable law."[31]

He contends in substance that certain statements in the Court's April 2014 ruling granting in part and denying in part his motion for a stay pending appeal of the Court's March 2014 injunction[32] modified that injunction as he purports to relate in the statements quoted above.

---

[30]      DI 2018.

[31]      *Id.* at 2-3.

[32]      DI 1901.

SPA-117

13

The second branch of the motion seeks "dismissal," pursuant to Fed. R. Civ. P. 12(b)(6), of Chevron's contempt motion.  In substance, his argument seems to be that the allegations of Chevron's contempt motion are insufficient to make out a claim of violation of paragraph 5 of the injunction with respect to the Elliott solicitation, as allegedly modified by the Court's comments on the motion for a stay pending appeal, with respect to the Elliott matter.

### The Protective Order Motion

On June 15, 2018, Donziger moved for a protective order

"precluding any discovery in these post-judgment proceedings (including discovery sought from third-parties) that would tend to reveal the identity of any funder or other material supporter of the Ecuador Litigation and/or the internal operational, organizational, administrative, or financial management practices of the teams of individuals and organizations that directly  and  indirectly oppose Chevron in the Ecuador Litigation ('Ecuador Litigation Team'), and/or more broadly engage in Ecuador Litigation-related advocacy ('Aguinda Supporters')."[33]

The essence of the argument is that such discovery would violate alleged First Amendment rights of Donziger funders and "material supporters" of his efforts as well as "the teams of individuals and organizations" that support them.  He asserts that disclosure of the identities of supporters would subject them to "reprisals" by Chevron.

### The So-Called "Emergency Stay" Motion

On June 19, 2018, Donziger filed yet another motion, that one for "an emergency administrative stay of provision 1(c)" of the Sullivan order of June 15, 2018 – which requires

---

[33]   DI 2026, at 2.

SPA-118

14

Sullivan to provide discovery in advance of the contempt hearing regarding "any payments to Donziger, past or anticipated, out of proceeds of financing granted in whole or in part in exchange for any portion of any future collections on the Ecuadorian judgment" – pending a decision on his protective order motion.  As the Court's June 25 denial of the protective order mooted this motion, it requires no further discussion.

*Discussion*

I have set out in detail the unnecessarily complex history of the matters now before the Court.  At the end of the day, however, the substance of the parties' disputes reduces to a few simple points.  It is useful to put them on the table before proceeding to analysis of Donziger's submissions.

1.      While Donziger would portray himself as a rescuer of the helpless dwellers of a polluted rain forest from depredations of Chevron, the facts are quite different.  As this Court found, Donziger:

> "and the Ecuadorian lawyers he led corrupted the Lago Agrio case. They submitted fraudulent evidence. They coerced one judge, first to use a court-appointed, supposedly impartial, ''global expert'' to make an overall damages assessment and, then, to appoint to that important role a man whom Donziger hand-picked and paid to ''totally play ball'' with the LAPs. They then paid a Colorado consulting firm secretly to write all or most of the global expert's report, falsely presented the report as the work of the court-appointed and supposedly impartial expert, and told half-truths or worse to U.S. courts in attempts to prevent exposure of that and other wrongdoing. Ultimately, the LAP team wrote the Lago Agrio court's Judgment themselves and promised $500,000 to the Ecuadorian judge to rule in their favor and sign their judgment."[34]

---

[34]     *Chevron Corp. v. Donziger,* 974 F. Supp. 2d at 384.

In short, the Ecuadorian judgment is a fraud and Donziger's activities extortionate.[35]  And that is no less true because this Court, out of considerations of comity, did not enjoin the plaintiffs in the Ecuadorian case from seeking to enforce the Ecuadorian judgment in countries other than the Untied States.

2.     Donziger had every opportunity to contest this Court's findings on appeal but conspicuously did not do so.  The Second Circuit affirmed the injunction barring him from profiting from his misdeeds in any way and from seeking to monetize the Ecuadorian judgment, "including by selling, assigning, pledging, transferring or encumbering any interest therein."  A largely identical injunction now has been entered against all or substantially all of the Ecuadorian plaintiffs and others in the Donziger complaint.

3.     Donziger now is liable to Chevron on an $811,670 costs judgment.  He has not obtained any stay of enforcement.  The judgment is enforceable now.  Chevron is entitled to try to collect it.  It is entitled to conduct discovery in an effort to locate assets subject to execution or other process.  It is entitled to find out from where he derives any revenue that he has received or is likely to receive because it may well have the right to execute on or otherwise reach that revenue as well as any money owed to him by others.[36]  It is not obliged to take Donziger's word that a simple statement by him as to his financial position would suffice.

4.     In addition, Chevron, in its view, has caught Donziger violating this Court's injunction with respect to Elliott.  It has sound reason to suspect that he has done so in other

---

[35]     *Id.* at 576-88.

[36]     N.Y. CPLR § 5231.  *See also id.* §§ 5225, 5227, 5232.  (New York law governs on this matter under Fed. R. Civ. P. 69.)

instances, although the Court has not reached any conclusion as to either.  Donziger contends that whatever exactly he did with respect to Elliott – and he has not submitted any affidavit or declaration disclosing his version of the events – did not violate the injunction.  Once the facts regarding are known, perhaps he will prove correct.  But the Court has ruled that a hearing is appropriate to determine whether the evidence ultimately will warrant a finding of contempt with respect to Elliott and granted limited discovery in order to facilitate that hearing.  Moreover, the evidence at that hearing may affect the Court's ultimate views regarding the Paragraph 5 Compliance Discovery.  The second and to some extent the first branch of his declaratory judgment-dismissal motion are attempts to overturn that ruling and to avoid a hearing.

5.     Donziger is concerned that post judgment discovery may reveal the identity of some or all of those funding and otherwise supporting his efforts.  He fears that Chevron will sue or otherwise discourage whoever is funding his efforts if he or others are compelled to disclose their identities.  His protective order motion and to some extent his declaratory judgment dismissal motion are attempts to overturn this Court's ruling that Chevron, at least in principle,  is entitled to some discovery with respect to whether Donziger has complied generally with paragraph 5 of the injunction in this case and to foreclose any such possibility.  So too his "emergency administrative stay" motion with respect to clause 1(c) of the Sullivan order.

So, in the last analysis, these motions reflect efforts by Donziger to block any meaningful inquiry with respect to whether he is defying this Court's injunction and to frustrate collection of the money judgment against him.

With that, the Court turns to the specific motions.

**SPA-121**

17

A.      *The Declaratory Judgment-Dismissal Motion*

Donziger's motion for a declaratory judgment construing this Court's 2014 injunction and to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), Chevron's motion to hold him in contempt suffers from fatal flaws independent of whether his arguments with respect to the 2014 injunction or Chevron's contempt motion relating to the Elliott matter have substantive merit.  In other words, no declaratory judgment would be appropriate in these circumstances for several reasons, not least because the proceedings on the contempt motion will resolve that issue.  Nor does Rule 12(b)(6) have any application to Chevron's contempt motion.

Insofar as the motion seeks a declaratory judgment, it is entirely without merit on procedural grounds alone, essentially for the reasons set forth in Chevron's memorandum.[37]  Briefly summarized, a declaratory judgment must be sought in a plenary civil action by the filing of a complaint.  It may not be sought, as it was here, by motion, least of all a motion in an action that already has been tried to judgment and remains before the Court only with respect to judgment enforcement proceedings.  Moreover, declaratory relief, even when sought properly, is discretionary. The Court would not exercise its discretion to entertain such relief here.[38]

_____

[37]      DI 2024, at 1-3.

[38]      In determining whether to grant declaratory relief, courts consider "(i) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; (ii) whether a judgment would finalize the controversy and offer relief from uncertainty; (iii) whether the proposed remedy is being used merely for procedural fencing or a race to res judicata; (iv) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and (v) whether there is a better or more effective remedy."  *Dow Jones & Co. v. Harrod's, Ltd.*, 346 F.3d 357, 359-60 (2d Cir. 2003).  Here, Donziger's motion for a declaratory judgment is being used "used merely for procedural fencing" in that he is trying to avoid a short evidentiary hearing on the contempt motion with respect to the Elliott solicitation, a hearing scheduled to take place later this week.  Resolution of that contempt application

SPA-122

18

Insofar as Donziger seeks to "dismiss" part of Chevron's contempt motion pursuant to Civil Rule 12(b)(6), his motion also is entirely without merit on procedural grounds alone, again substantially for the reasons set forth in Chevron's memorandum.[39]  In short, Rule 12(b)(6) may be employed to challenge the legal sufficiency of a complaint or other "pleading."  But Chevron's motion to hold Donziger in civil contempt is not a "pleading."  Rule 12(b)(6) does not apply to it at all.

In addition, Donziger's motion is flawed in both its prongs in yet another respect. This Court ruled that it would hold an evidentiary hearing on the portion of Chevron's contempt motion relating to the Elliott incident on May 16, 2018.  Donziger's motion is nothing more than an untimely and baseless effort to obtain reconsideration of this Court's determination that an evidentiary hearing is appropriate to the resolution of the portion of Chevron's contempt motion that relates to the Elliott solicitation.  Not only is there no proper basis for reconsideration of that ruling, but Donziger fails entirely to come to grips with the fact that, even on his view of his obligations under the judgment, the question whether the Elliott solicitation involved contumacious behavior on his part may well depend upon exactly what happened, which is not entirely clear from the papers before the Court.

Finally, events may have overtaken Donziger's motion.  On April 23, 2018, the

---

[39]

would be a better or more effective remedy, particularly as it will give the Court the benefit of a factual record with respect to what actually happened, which may prove important with respect to determining the contempt issue.  A determination of the contempt motion will settle the legal issues just as well as Donziger's request here.  Accordingly, the Court would deny the motion for a declaratory judgment even if entertaining a request for declaratory relief by motion rather than in an action were appropriate, which it is not.

DI 2024, at 3-4.

Ecuadorian plaintiffs who did not appear in this action and the Frente de la Defensa de la Amazonia (the "ADF"), also a non-appearing defendant here, also were enjoined "from undertaking any acts to monetize or profit from the [Ecuadorian] Judgment . . . , including without limitation by selling, assigning, pledging, transferring or encumbering any interest therein."[40] From that date onward, the question whether "the Court's March 4, 2014 judgment . . . prevent[ed] the beneficiaries of the Ecuadorian environmental judgment . . . from raising funds to cover litigation fees and expenses, at a minimum *so long as the specific legal interests of the three individual defendants named in the NY Judgment are not pledged or collateralized as part of any such fundraising*" – the question as to which Donziger seeks declaratory relief – arguably has become academic.[41]  In any case, it certainly casts the question of declaratory relief – even if there were a proper basis for considering it, which there is not – in quite a different light, as it places the issue in a posture that none of the parties has addressed.

---

[40]

DI 1984, ¶¶ 1-4.

The Court specifically concluded that it has personal jurisdiction over all of the defaulted defendants.  DI 1984, at 1 n.1.

[41]

Emphasis added.

It arguably has become academic in consequence of the default judgment because the non-appearing defendants also now have been enjoined "from undertaking any acts to monetize or profit from the [Ecuadorian] Judgment . . . , including without limitation by selling, assigning, pledging, transferring or encumbering any interest therein." In consequence, even if Donziger were correct that paragraph 5 of the 2014 injunction restrained him only from seeking to monetize or profit from his own interest in the Ecuadorian judgment, as Chevron has suggested (*cf.* DI 2040, at 1), the question now would arise whether Donziger's active concert or participation with any of the non-appearing and now defaulted defendants in seeking to monetize or profit from any interest whatsoever in the Ecuadorian judgment would constitute contempt of court.

B.      *The Protective Order Motion*

Donziger asks the Court for a protective order "forbidding the disclosure of, or any inquiry into matters that *would tend to reveal*, the identity of *any funder or other material supporter* of the Ecuador Litigation and/or the internal *operational*, organizational, administrative, or *financial management practices* of individuals and organizations *who directly or indirectly oppose Chevron Corporation* as regards the Ecuador Litigation *or who otherwise support the Ecuador Litigation and/or the Ecuador Environmental Cause*"[42] and requests that the order apply to "all subpoenas issued in these post-judgment proceedings, including subpoenas issued to non-parties."[43]  He thus attempts to assert the rights of a vast and diverse group of people and organizations all over the globe, some or even many of whom he probably never has nor never will meet.  Among other things, he attempts to block any discovery of the identities of people and organizations who pay or owe him money or other property and thereby to prevent or substantially hinder Chevron's efforts to collect the money judgment by which he is indebted to it.   He now asserts that the First Amendment gives him the right to such relief.   But this remarkably ambitious effort fails.

---

[42]

Donziger defines the "Ecuador Litigation" as "the *Aguinda v. Chevron Corp.* environmental case in Ecuador and the enforcement of the merits judgment in that case . . . in Canada and elsewhere."  DI 2026, at p. 1.  He defines the "Ecuador Environmental Cause as "the broader social and environmental cause related to the massive toxic contamination deliberately discharged by Texaco and still existing at the company's former oil drilling, production and storage sites in Ecuador."  *Id.* at 2.

In addition, he defines the "Ecuador Litigation Team" as "the teams of individuals and organizations that directly and indirectly oppose Chevron in the Ecuador Litigation."  *Id.* at 2.  Those that "more broadly engage in Ecuador Litigation-related advocacy" are defined as the "Aguinda Supporters."  *Id.*

[43]

*Id.* at pp. 23-24 (emphasis added).

SPA-125

21

*Waiver, Forfeiture and Standing*

The time for Donziger to object to the discovery Chevron has requested of him long came and went long before he moved for a protective order.  As noted above, Chevron served the discovery requests now at issue on Donziger on April 16, 2018.[44]  These discovery requests asked specifically for the information that Donziger now resists revealing.[45]  And Donziger objected to the requests – first in response to Chevron's requests[46] and then (twice) in response to Chevron's motion to compel.[47]  But Donziger failed to timely make the First Amendment argument that he raises now.[48]  That failure waived or forfeited the argument he advances in this motion.[49]  Moreover, this protective order motion is essentially an attempt to reargue the Court's May 17 ruling on Chevron's motion to compel.  But treating this motion as one for reargument or reconsideration would not help Donziger.

---

[44]

DI 1989-1.

[45]

*E.g.*, *id.* ¶¶ 18-22.

[46]

DI 1989-2.

[47]

DI 2002; DI 2008.

[48]

*See supra* n.21.

[49]

*See, e.g., UBS Intern. Inc. v. Itete Brasil Instalacoes Telefonicas Ltd.*, No. 09 Civ. 4286 (LAK), 2010 WL 743371, at *3 (S.D.N.Y. Feb. 24, 2010); *Eldaghar v. City of New York Dep't of Citywide Administrative Services*, No. 02 Civ. 9151 (KMW) (HBP), 2003 WL 22455224, at *1 (S.D.N.Y. Oct. 28, 2003); 8A CHARLES ALLAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2035 (3d ed. 2018) ("At least with regard to depositions, the [protective] order should ordinarily be obtained before the date set for the discovery, and failure to move at that time has been held to preclude objection later."); *id.* at § 2173 ("Failure to make a timely objection is no the only way in which an objection can be waived. A voluntary answer to an interrogatory is also a waiver of the objection.").

22

So treated, the motion would be untimely[50] and meritless, the latter because it does not "point to

controlling decisions or data that the court overlooked."[51]  Rather, it  raises a new ground for

objection without even an acknowledgment of the fact that these arguments could have been, but

were not, raised at an earlier point.

Accordingly, Donziger's belated arguments in this motion have been forfeited, at least

insofar as he makes them on behalf of himself as distinguished from the multitude of unidentified

and to some extent unidentifiable other people and organizations on behalf of whom he purports to

seek relief.  And even if Donziger's purported assertion of First Amendment rights of that multitude

has not been waived or forfeited, Donziger lacks standing to assert those interests, whatever they

may be.[52]  "In the absence of a claim of privilege a party usually does not have standing to object to

---

[50]

> Such a motion must be made within fourteen days of the ruling it would call into question. S.D.N.Y. CIV. R. 6.3.  This motion was not made until about a month after the Court ruled on Chevron's motion to compel.

[51]

> *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).

[52]

> Moreover, Donziger's First Amendment argument, insofar as it is asserted on behalf of the perhaps vast multitude of unidentified funders, material supporters, appears in significant part to be an attempt to assert First Amendment rights on the behalf of non-citizens living outside the United States and so  would fail on the merits even if he had standing.  In any case, Donziger certainly has not established that all, or even any, of the persons or entities whose alleged rights he purports to assert are citizens or residents of, or have any material connection to, the United States.  Nor has he established any other "practical considerations" that indicate that the First Amendment right to association applies extraterritorially.  *See Boumediene v. Bush*, 553 U.S. 723, 759 (2008).

> "The First Amendment provides, in relevant part, that 'Congress shall make no law . . . abridging the freedom of speech, or . . . the right of the people peaceably to assemble.'  The Supreme Court has noted that a textual analysis of the Constitution 'suggests that 'the people' protected by the [First Amendment], refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.' [footnote omitted] Indeed, as early as 1904, the Supreme Court held that the First Amendment's guarantees of freedom of speech

23

a subpoena directed to a non-party witness."[53]  "A party's general desire to thwart disclosure of information by a non-party is simply not an interest sufficient to create standing."[54]  The fact that Donziger purports to assert those interests in the form of a motion for a protective order rather than by objecting to subpoenas is of no moment because "[t]his is not a distinction recognized in this circuit. Moreover, it would be peculiar indeed if a party could circumvent the well-established standing requirements under Rule 45 simply by styling what is effectively a motion to quash as a motion for a protective order."[55]

---

and assembly do not apply to an excludable alien because '[h]e does not become one of the people to whom these things are secured by our Constitution by an attempt to enter, forbidden by law.' [footnote omitted] Much more recently, the D.C. Circuit relied on this principle in affirming a district court's determination 'that the interests in free speech and freedom of association of foreign nationals acting outside the borders, jurisdiction, and control of the United States do not fall within the interests protected by the First Amendment. [footnote omitted]'" *Chevron Corp. v. Donziger,* No. 1:12–MC–65 LAK/CFH, 2013 WL 3228753, at *4 (N.D.N.Y. June 25, 2013).

Accordingly, Donziger's attempt to rest his protective order argument on the purported First Amendment rights of unidentified non-parties all over the world fails because he has failed even to allege, let alone establish, that any of them is "acting [in]side the borders, jurisdiction, and control of the United States."  Such persons have no First Amendment rights to assert.  And even assuming, as may be true, that some of those whose purported rights Donziger seeks to assert do have First Amendment rights, his motion would be grossly overbroad as it seeks to sweep within its ambit many of do not.

[53]

*Langford v. Chrysler Motors Corp.,* 513 F.2d 1121, 1126 (2d Cir.1975).  *Accord,* 9A CHARLES ALLAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2459 (3d ed. 2018) ("Ordinarily a party has no standing to seek to quash a subpoena issued to someone who is not a party to the action, unless the objecting party claims some personal right or privilege with regard to the documents sought." (footnote omitted)).

[54]

*US Bank Nat'l Ass'n v. PHL Variable Ins. Co.,* No. 12-cv-6811 (CM)(JCF), 2012 WL 5395249, at *2 (S.D.N.Y. Nov. 5, 2012) (Francis, M.J.).

[55]

*Id.*

24

*No Good Cause Shown*

The Court may issue a protective order only if "good cause" is shown by the moving party.[56] "'Good cause' is established when it is specifically demonstrated that disclosure will cause a clearly defined and serious injury."[57] A court will not grant a request that relies on "conclusory or speculative statements about the need for a protective order and the harm that will be suffered without one."[58] Ultimately, courts will decide whether to grant a protective order after weighing the interests of both parties – the movant's interest in protecting against disclosure and the party seeking discovery's interest in full disclosure of relevant information.[59]

It is important to recall, moreover, that "[a] party's general desire to thwart disclosure of information by a non-party is simply not an interest sufficient to create standing." The type of the "injury" that disclosure allegedly would cause is relevant. After all, nearly all discovery requests may cause injury to the opposing party in the sense that disclosure of evidence helpful to the requesting party ordinarily "injures" its adversary by making the requesting party more likely to prevail. For example, a judgment creditor's discovery request that would reveal the source of a judgment debtor's income would work an "injury" to the debtor in the sense that it allows for the possibility of the creditor garnishing the debtor's wages. Yet surely a protective order cannot issue to prevent such a disclosure. Or, to present an analogy perhaps closer to the situation at hand:

---

[56] FED. R. CIV. P. 26(c)(1).

[57] 6 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE §26.104[1] (3d ed. 2017).

[58] *Huthnance v. District of Columbia et al.*, 255 F.R.D. 285, 296 (D.D.C. 2008).

[59] *Duling v. Gristede's Operating Corp.*, 266 F.R.D. 66, 71-72 (S.D.N.Y. 2010).

suppose a judgment debtor transfers his assets to a third party, post-judgment, in an attempt to shield those assets from the creditor. Suppose the creditor suspected as much and issued discovery requests in the reasonable expectation of revealing where the debtor squirreled away its assets. Surely such requests are appropriate, assuming they are reasonable. They may be "injurious" to the debtor and conceivably impose some burden on non-party discovery recipients. Yet so long as the requests are relevant, reasonable and in pursuit of the legitimate end of enforcing a court's judgment, no protective order ordinarily should issue.

This idea that appropriate litigation activity does not usually warrant a protective order is supported by principles in other areas of the law. One is found in the tort of intentional interference with a contract. To make out this tort, a plaintiff must prove not only that there was intentional interference, but also that it was improper.[60] The defendant's conduct is actionable only if it was done for an improper reason and in an improper fashion.[61] Notably, threats of civil suit are "ordinarily wrongful if the actor *has no belief in the merit of the litigation* or if, though having some belief in its merit, he nevertheless institutes or threatens to institute the litigation in bad faith, *intending only to harass the third parties* and not to bring his claim to definitive adjudication."[62]

These principles confirm that "injuries" that flow from the proper functioning of the

---

[60]     RESTATEMENT (SECOND) OF TORTS § 767 cmt. a (1979).

[61]     *Id.* (factors to determine whether interference is improper include "the nature of the actor's conduct," "the actor's motive," "the interests of the other with which the actor's conduct interferes," and "the interests sought to be advanced by the actor"); *see also* 86 C.J.S. TORTS § 48 ("The defendant may avoid liability for interference with contractual relations by showing that its actions were privileged or *justified by a lawful object that it had a right to pursue*." (emphasis added)).

[62]     RESTATEMENT (SECOND) OF TORTS § 767 cmt. c (emphasis added).

**SPA-130**

26

justice system are not circumstances that warrant a protective order.  In fact, litigation, if it has an appropriate basis and is conducted properly, "is a constitutionally protected right in the United States."[63]  Yet here, the "injury" that Donziger seeks to avoid through the requested protective order would flow, he says, from disclosure of information identifying his funders, supporters, and associates in pursuing enforcement of the judgment he procured by fraud about the sources of his income, the identification of his assets, and whether he has violated the terms of this Court's injunction.  He contends that disclosure of their identities conceivably might subject them to discovery, cause them to fear being sued or actually named in litigation, or otherwise result in complications for either them or for Donziger.  And there is a very considerable irony in Donziger making such an assertion because the position he now takes is irreconcilable with the position he took earlier in this lawsuit.

At the conclusion of the trial, Donziger argued that liability could not be imposed upon him with respect to the fraudulent and corrupt procurement of the Ecuadorian judgment and other dishonest activities because he and his associates merely "asserted their case against Chevron in courts, the halls of government," and elsewhere.[64]  "The actions about which Chevron complains," he said, "thus constitute activity that is protected either by the First Amendment or by immunity doctrines that serve the same interests."[65]  "Chevron," he asserted, "cannot premise liability . . . on

---

[63]     *Chevron Corp. v. Donziger* 974 F. Supp. 2d at 579-80.

[64]     Donziger Post-Trial Mem. [DI 1850], at 64-65.

[65]     *Id.* at 65.

such protected activity."[66]  And he was right – but only to a point.  While some of his activities no

doubt were protected, the bribery and other corruption in which he and his confederates engaged and

the false statements they knowingly made in order to tarnish and pressure Chevron "remove[d] any

shield that the First Amendment otherwise would [have] provide[d]."[67]  And the irony is that he now

complains that he and others on whose behalves he purports to seek relief would be "injured," if at

all, only by Chevron's exercise of its own right to pursue enforcement of its judgment, to seek

discovery from persons thought to have relevant knowledge necessary for that purpose, and to seek

legal redress against anyone whom it may allege is complicit in Donziger's tortious activities – in

other words, by exercising its rights under the law.  As long as it acts legally and properly, Chevron

has a constitutional right to do so – the same right that Donziger claimed for himself.  And Donziger

has offered no competent or persuasive evidence that Chevron has or is likely to pursue those rights

in any but a lawful and proper manner.

Instead, the limited material Donziger offers to support his claim of threatened injury

suffers from one or both of two flaws.  It is unsupported by competent evidence, failing the

requirement of "specifically demonstrat[ing] that disclosure will cause a clearly defined and serious

injury."  Or he complains of "injuries" that do not justify a protective order.  The past and supposedly

threatened actions, if there is any proof of his allegations at all, would amount to nothing more than

Chevron's vindication of, or possible future efforts to vindicate, its legal rights through proper

means.  That does not constitute good cause.

---

[66]
      *Id.*

[67]
      *Chevron Corp. v. Donziger,* 974 F. Supp.2d at 581-84.

*Donziger Has Not Demonstrated a Clearly Defined Threat of Serious Injury Absent a Protective Order*

The burden was on Donziger to demonstrate – with competent evidence – a substantial risk of a clearly defined and serious injury should the Court not issue a protective order. But Donziger's motion was lacking in two major respects. First, he presented little in the way of competent evidence. Second, the verifiable evidence he did present did not demonstrate that a cognizable injury would result absent a protective order.

Donziger's motion is replete with stories of his and his allies' supposed persecution at the hands of Chevron. And, his argument goes, Chevron's discovery requests are just more of the same. But he presents no actual evidence demonstrating Chevron engaging in inappropriate conduct. His motion is unaccompanied by declarations or affidavits. The majority of his sources of support are news articles, which amount to unsworn hearsay. And beyond these articles' inherent weakness as evidence, Donziger draws conclusions from them that are not there.

For example, Donziger cites a published report of Chevron allegedly firing Ogilvy & Mather after finding out that someone affiliated with the firm had worked with Amazon Watch, an NGO aligned with Donziger. Donziger says that this news article is evidence of Chevron "publicy punish[ing]" Ogilvy in order to "enforce disciplined adherence to its 'demonization' narrative."[68] But the article did not characterize it as public punishment in the service of a grand narrative; that part is all Donziger. Whatever Chevron's reasons for firing Ogilvy were, assuming *arguendo* it already did so, Donziger presents no evidence of them. Rather, he just repeats his claims

---

[68]   *Id.* at p. 8-9.

29

that Chevron is harassing or persecuting him.  Despite Donziger's words to the contrary, repetition cannot turn a lie into a fact.[69]

Donziger does present some verifiable facts, to be sure.  He revives a number of disputes from this litigation's long history that he claims are examples of "Chevron's long and sordid history of seeking to suppress speech and association by Aguinda Supporters."[70]  The problem for Donziger is that these examples are all merely instances Chevron engaging in legitimate litigation activity.  They do nothing to support a claim that Donziger's post-judgment discovery is likely to result in cognizable injury to Donziger or others.

Another example is Donziger's reliance on Chevron's efforts to get discovery from non-parties both before and during this case, which he characterizes as an improper pressure tactic used by Chevron improperly to burden Donziger's supporters.  But that, to put it mildly, is a mischaracterization of what happened.  It is conceivable that some of those efforts may have been somewhat burdensome to some of those involved.  But there is no evidence that anything was improper in any respect.  Many of the courts that saw the Section 1782 suits concluded the Chevron had established a *prima facie* case of fraud,[71] and some of those suits led to invaluable evidence of

---

[69]

See PX 1059 (Donziger email to Fajardo, Aug. 13, 2008) ("If you repeat a lie a thousand times it becomes the truth.").

[70]

*Id.* at 5.

[71]

*Chevron Corp. v. Donziger*, No. 11-cv-691, 2013 WL 646399, at *4 (S.D.N.Y. Feb. 21, 2013) (noting that six other district courts had so found as of the time of writing).

the fraud Donziger had perpetrated.[72]  Indeed, the Court understands that Chevron prevailed in the substantial majority of those cases.

Another example is Donziger's vehement complaints of Chevron's "focus on [his] financial supporters" or others, including Stratus Consulting, Burford, Russell DeLeon, and Patton Boggs.[73]  But these "supporters" were alleged to be his co-conspirators.  Stratus Consulting was a named defendant in this case.[74]  Burford, Russell DeLeon, and Patton Boggs all were named as non-party co-conspirators.[75]  And now that Donziger is enjoined from profiting from  the Ecuadorian judgment, it perhaps is arguable that a "funder" now might be accused properly of assisting Donziger or others in defying a Court order, although the Court expresses no view as to the merit of any such claim.  The fundamental point is that Chevron is entitled to use the justice system – in an appropriate manner – to assert claims against and seek discovery from such people and organizations.

Finally, and perhaps most tellingly, Donziger argues that this case itself – *in which he was found to have committed a massive fraud* – is "the most notorious example" of Chevron's allegedly bad-faith conduct.[76]  This small point in the motion is revelatory of the fact that Donziger refuses to acknowledge the legitimacy of this suit and the binding nature of this Court's judgment.

---

[72]

   *See Chevron Corp. v. Donziger* 974 F. Supp. 2d at 455-474 (describing the Colorado and New York § 1782 proceedings).

[73]

   DI 2026, at 9.

[74]

   DI 1, ¶ 14.

[75]

   *Id.* at ¶ 17.

[76]

   DI 2026, at 5.

**SPA-135**

31

In the end, the "injuries" that Donziger fears in the absence of a protective order, even if they were to come to pass, would not justify the protective order he seeks.  Chevron is entitled to enforce the judgment in its favor through appropriate discovery requests and take appropriate legal action.  The Court will not issue a protective order on the basis of such actions.

### Non-Parties Have Various Legal Protections At Their Disposal

As a final note with respect to good cause, a denial of Donziger's motion would not leave non-parties without recourse to protect themselves from any improper Chevron discovery requests or legal action.  They may file well-founded, timely motions to quash or limit any subpoena Chevron serves upon them.[77]  They may file well-founded, timely objections to discovery requests they deem unreasonable or overly burdensome.  In fact, Ms. Sullivan already has done so, and the Court responded to her motion by limiting the scope of her discovery obligations, at least for the time being.[78]  Should they be sued, they may resort to appropriate defense of any action.[79]

Because Donziger has failed to muster evidence that demonstrates any cognizable injury that probably would result from the denial of the requested protective order, the Court finds that good cause was not shown.

---

[77]  FED. R. CIV. P. 45(d).

[78]  DI 2027.

[79]  *See Arista Records, LLC v. Doe 3*, 604 F.3d 110, 119 (2d Cir. 2010).

SPA-136

32

*First Amendment Concerns Do Not Necessitate A Protective Order*

Donziger's First Amendment arguments do not support any different result.

*Standing*

Donziger has asserted no facts that would justify a conclusion that he has standing to assert the putative rights of the multitude of people and entities on whose behalf he to seek relief. Generally speaking, "an association may assert the rights of its members, at least so long as the challenged infractions adversely affect its members' associational ties."[80]  For example, in *NAACP v. Alabama*,[81] the Supreme Court found that the NAACP could assert its members' rights to freedom of association because "its nexus with them [was] sufficient to permit that it act as their representative."[82]  Facts supporting the finding of that nexus included that the NAACP and its members were "in every practical sense identical," and "the reasonable likelihood that the Association itself through diminished financial support and membership may be adversely affected if production is compelled."[83]

But here the situation is markedly different.  There is no organization asserting the rights of a discrete pool – its members.  Instead, here the Court has Donziger (not an organization) asserting the rights of essentially anyone engaged in activism related to the alleged Texaco oil spill

---

[80]    *Warth v. Seldin,* 422 U.S. 490, 511 (1975).

[81]    357 U.S. 449 (1958).

[82]    *Id.* at 458–59.

[83]    *Id.* at 459-60.

SPA-137

33

in Ecuador (not the members of an established organization).[84]  Plainly Donziger does not represent

all such people – some groups of people for whom he claims to speak have disavowed him entirely.[85]

And he has alleged no basis for showing that any of them – let alone all of them – have a connection

to the United States that affords them any protection at all under the First Amendment in any

circumstances.[86]


### Merits

Standing aside, Donziger is wrong on the merits.  He relies on *NAACP v. Alabama*,

in which the Supreme Court allowed the NAACP to withhold from the State of Alabama the list of

its rank-and-file members, which the State sought to require as a prerequisite for the NAACP

conducting business in Alabama.[87]  The Court considered the members' right to associate in order

to engage in effective advocacy; the showing of likely harm to members whose identities were

revealed, which included "economic reprisal, loss of employment, threat of physical coercion, and

other manifestations of public hostility;" and Alabama's explanation of its need for the list.  To that

final point, the Court noted that the NAACP had turned over to the State everything relevant to the

dispute over its qualifications to conduct business in Alabama – including "furnishing business

records, its charter and statement of purposes, the names of all of its directors and officers, and . .

---

[84]  *See supra* p. 20, n.42.

[85]  *E.g.*, DI 1945-1.

[86]  *See supra* n.52.

[87]  357 U.S. at 451-54.

34

. the total number of its Alabama members and the amount of their dues."[88]   In short, it gave

Alabama everything it needed.   Alabama was left with no substantial interest in obtaining the

membership list, and the interest of the NAACP members in maintaining their anonymity was

substantial indeed.[89]   As the Court put it,

> "Whether there was 'justification' in this instance turns solely on the
> substantiality of Alabama's interest in obtaining the membership lists.  *  *  * The
> exclusive purpose [of Alabama's inquiry concerning the NAACP[ was to determine
> whether [the NAACP] was conducting intrastate business in violation of the Alabama
> foreign corporation registration statute, and the membership lists were expected to
> help resolve this question.  The issues in the litigation . . . were whether the character
> of [the NAACP] and its activities in Alabama had been such as to make [it] subject
> to the registration statute, and whether the extent of [its] activities without qualifying
> suggested its permanent ouster from the State.  Without intimating the slightest view
> upon the merits of these issues, we are unable to perceive that the disclosure of the
> names of [the NAACP's] members has a substantial bearing on either of them."[90]

This case could not be more different.   Chevron (and, for that matter, the United

States) have extremely substantial interests in seeing to it that the money judgment of this federal

court is satisfied and the equitable remedies contained in its judgment complied with.   The protective

order that Donziger seeks, if granted, would promise to prevent or interfere substantially with the

vindication of these substantial interests.   The discovery that would (or, at least, should) occur, given

the denial of the requested an order, would go directly to determining the location of assets and

choses in action upon which Chevron could execute, or which it could attach in an effort to satisfy

the money judgment, and to ascertaining whether Donziger has violated the terms of the equitable

---

[88]

    *Id.* at 465.

[89]

    *Id.* at 464.

[90]

    357 U.S. at 404.

provisions of the judgment.  These are entirely appropriate purposes of post-judgment discovery.

These important private and public interests – even if Donziger's First Amendment arguments had

not been forfeited, even if he had standing to assert the alleged First Amendment interests of the

members of the large and vaguely described multitude that he purports to champion, and even if he

had shown that many or, for that matter, any of those individuals and organizations had connections

to the United States sufficient to afford them any First Amendment rights at all – would be more than

sufficient to warrant this Court's denial of the protective order.


*Conclusion*

For the foregoing reasons, Donziger's motions for a declaratory judgment and other

relief [DI 2018], for a protective order [DI 2026], and for "an emergency administrative stay" [DI

2028] all were denied.


SO ORDERED.

Dated:          June 27, 2018

_____
Lewis A. Kaplan
United States District Judge

SPA-140

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHEVRON CORPORATION,

                                        Plaintiff,

              -against-                                          11 Civ. 0691 (LAK)

STEVEN DONZIGER, et al.,

                                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/23/18

### MEMORANDUM AND ORDER

LEWIS A. KAPLAN, *District Judge*.

      Earlier this year, Chevron Corporation ("Chevron") issued post judgment discovery requests for production of documents and an information subpoena to Donziger.[1] Its focus was to obtain information pertinent to Chevron's desires to (1) collect its money judgment, and (2) determining whether Donziger has been complying with the non-monetary provisions of the judgment.

      On May 17, 2018, the Court, among other things, granted Chevron's request to conduct discovery against Donziger with respect to Donziger's compliance with the non-monetary portions of this Court's judgment but deferred the timing of that discovery pending the conduct of a hearing on a civil contempt application.[2]  That hearing now has been concluded.

---

[1]      The Court includes in its references to "Donziger" Steven Donziger, The Law Offices of Steven R. Donziger, and Donziger and Associates PLLC unless otherwise indicated.

[2]      DI 2009.

SPA-141

Accordingly, each of Steven Donziger, The Law Offices of Steven R. Donziger, and Donziger and Associates PLLC, on or before August 15, 2018, shall

1.   Produce to Chevron each document and thing within its possession, custody or control that is described by Requests 18, 21, 22 and 29 of Chevron's request for production of documents, and

2.   Serve on Chevron full and complete answers by it to paragraphs 21 through 25 of Chevron's information subpoena.

In addition, Chevron is now free to conduct discovery against non-parties with respect to Donziger's compliance or non-compliance with the judgment.

SO ORDERED.

Dated:      July 23, 2018

_____
Lewis A. Kaplan
United States District Judge