# 18-855-cv(L)

**18-2191-cv(Con)**

# United States Court of Appeals
### *for the*
## Second Circuit

CHEVRON CORPORATION,

*Plaintiff-Counter-Defendant-Appellee*,

- v. -

DONZIGER & ASSOCIATES, PLLC, STEVEN DONZIGER,
THE LAW OFFICES OF STEVEN R. DONZIGER,

*Defendants-Counter-Claimants-Appellants*.

*(caption continued on inside cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
CASE NO. 1:11-CV-00691-LAK-JCF
THE HONORABLE LEWIS A. KAPLAN

**SUPPLEMENTAL APPENDIX
VOLUME I OF IV
(Pages SA1 to SA295)**

Randy M. Mastro
Andrea E. Neuman
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

William E. Thomson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7000

*Attorneys for Chevron Corporation*

PABLO FAJARDO MENDOZA, LUIS YANZA, FRENTE DE DEFENSA DE LA AMAZONIA, AKA AMAZON DEFENSE FRONT, SELVA VIVA SELVIVA CIA, LTDA, MARIA AGUINDA SALAZAR, CARLOS GREFA HUATATOCA, CATALINA ANTONIA AGUINDA SALAZAR, LIDIA ALEXANDRA AGUIN AGUINDA, PATRICIO ALBERTO CHIMBO YUMBO, CLIDE RAMIRO AGUINDA AGUINDA, LUIS ARMANDO CHIMBO YUMBO, BEATRIZ MERCEDES GREFA TANGUILA, LUCIO ENRIQUE GREFA TANGUILA, PATRICIO WILSON AGUINDA AGUINDA, CELIA IRENE VIVEROS CUSANGUA, FRANCISCO MATIAS ALVARADO YUMBO, FRANCISCO ALVARADO YUMBO, OLGA GLORIA GREFA CERDA, LORENZO JOSE ALVARADO YUMBO, NARCISA AIDA TANGUILA NARVAEZ, BERTHA ANTONIA YUMBO TANGUILA, GLORIA LUCRECIA TANGUI GREFA, FRANCISCO VICTOR TANGUILA GREFA, ROSA TERESA CHIMBO TANGUILA, JOSE GABRIEL REVELO LLORE, MARIA CLELIA REASCOS REVELO, MARIA MAGDALENA RODRI BARCENES, HUGO GERARDO CAMACHO NARANJO, JOSE MIGUEL IPIALES CHICAIZA, HELEODORO PATARON GUARACA, LUISA DELIA TANGUILA NARVAEZ, LOURDES BEATRIZ CHIMBO TANGUIL, MARIA HORTENCIA VIVER CUSANGUA, SEGUNDO ANGEL AMANTA MILAN, OCTAVIO ISMAEL CORDOVA HUANCA, ELIAS ROBERTO PIYAHUA PAYAHUAJE, JAVIER PIAGUAJE PAYAGUAJE, DANIEL CARLOS LUSITAND YAIGUAJE, BENANCIO FREDY CHIMBO GREFA, GUILLERMO VICENTE PAYAGUA LUSITANTE, DELFIN LEONIDAS PAYAGU PAYAGUAJE, ALFREDO DONALDO PAYAGUA PAYAGUAJE, MIGUEL MARIO PAYAGUAJE PAYAGUAJE, TEODORO GONZALOPIAGUAJE PAYAGUAJE, FERMIN PIAGUAJE PAYAGUAJE, REINALDO LUSITANDE YAIGUAJE, LUIS AGUSTIN PAYAGUA PIAGUAJE, EMILIO MARTIN LUSITAND YAIGUAJE, SIMON LUSITANDE YAIGUAJE, ARMANDO WILMER PIAGUAJE PAYAGUAJE, ANGEL JUSTINO PIAGUAG LUCITANT, KEMPERI BAIHUA HUANI, AHUA BAIHUA CAIGA, PENTIBO BAIHUA MIIPO, DABOTA TEGA HUANI, AHUAME HUANI BAIHUA, APARA QUEMPERI YATE, BAI BAIHUA MIIPO, BEBANCA TEGA HUANI, COMITA HUANI YATE, COPE TEGA HUANI, EHUENGUINTO TEGA, GAWARE TEGA HUANI, MARTIN BAIHUA MIIPO, MENCAY BAIHUA TEGA, MENEMO HUANI BAIHUA, MIIPO YATEHUE KEMPERI, MINIHUA HUANI YATE, NAMA BAIHUA HUANI, NAMO HUANI YATE, OMARI APICA HUANI, OMENE BAIHUA HUANI, YEHUA TEGA HUANI, WAGUI COBA HUANI, WEICA APICA HUANI, TEPAA QUIMONTARI WAIWA, NENQUIMO VENANCIO NIHUA, COMPA GUIQUITA, CONTA NENQUIMO QUIMONTARI, DANIEL EHUENGEI, NANTOQUI NENQUIMO, OKATA QUIPA NIHUA, CAI BAIHUA QUEMPERI, OMAYIHUE BAIHUA, TAPARE AHUA YETE, TEWEYENE LUCIANA NAM TEGA, ABAMO OMENE, ONENCA ENOMENGA, PEGO ENOMENGA, WANE IMA, WINA ENOMENGA, CAHUIYA OMACA, MIMA YETI,

 *Defendants*,

STRATUS CONSULTING, INC., DOUGLAS BELTMAN, ANN MAEST,

 *Defendants-Counter-Claimants*,

ANDREW WOODS, LAURA J. GARR, H5,

 *Respondents*.

# TABLE OF CONTENTS

PAGE

## Docket Entries

Exhibit 2-13 to Declaration of Kristen L. Hendricks in Support of
Chevron Corporation's Motion for Preliminary Injunction, filed
February 6, 2011 (Dkt. 7-6)

Transcript of unreleased footage from the film *Crude* ...................... SA1

Exhibit 2075 to Declaration of Anne Champion in Support of
Chevron Corporation's Motion for Summary Judgment of Partial
Summary Judgment on Defendants' Affirmative Defenses of Res
Judicata and Collateral Estoppel, filed March 2, 2012 (Dkt. 400-
11)

Excerpts from Daniel L. Rourke deposition transcript, dated
December 20, 2010......................................................................... SA11

Excerpts from Chevron Corporation's Statement of Material Facts In
Support of Motion for Summary Judgment or Partial Summary
Judgment on the Stratus Defendants' Affirmative Defenses of
Res Judicata and Collateral Estoppel, filed June 13, 2012
(Dkt. 486) ...................................................................... SA15

Opinion on Partial Summary Judgment Motion, filed July 31, 2012
(Dkt. 550) ...................................................................... SA18

Order of Appointment of Special Masters, filed March 26, 2013
(Dkt. 942) ...................................................................... SA20

Notice of Appearance of Zoe B. Littlepage, filed October 13, 2013
(Dkt. 1543) ...................................................................... SA23

Exhibit A to Chevron Corporation's Notice of Filing of Witness
Statement of Troy A. Dahlberg, filed October 23, 2013 (Dkt.
1597-1)

ii

PAGE

Direct testimony of Troy A. Dahlberg, dated October 8, 2013 ........ SA24

Notice of Appearance of Richard H. Friedman, filed October 24, 2013
(Dkt. 1616)..................................................................................... SA30

Chevron Corporation's Notice of Application for Costs, filed
December 5, 2016 (Dkt. 1918)........................................................ SA31

Chevron Corporation's Statement of Non-Opposition to Donziger's
Motion to Hold Costs Bill in Abeyance, filed on December 29,
2016 (Dkt. 1920) ............................................................................ SA33

Order Granting in Part Donziger's Motion to Hold Chevron's Bill of
Costs in Abeyance, filed December 30, 2016 (Dkt. 1921)............... SA35

Memorandum Order Granting Chevron Corporation's Motion to
Reactivate Motion for Attorneys' Fees and Bill of Costs, filed
July 17, 2017 (Dkt. 1923)............................................................... SA37

Chevron Corporation's Notice of Application for Costs, filed July 18,
2017 (Dkt. 1924) ............................................................................ SA38

Donziger's Letter to Clerk of Court Objecting to Notice of
Application for Costs, filed August 1, 2017 (Dkt. 1925)................. SA40

Bill of Costs, filed August 8, 2017 (Dkt. 1928)...................................... SA47

Donziger's Letter to Court Objecting to Clerk's Taxation of Costs,
filed August 16, 2017 (Dkt. 1931) ................................................. SA58

Order Regarding Special Masters' Report, filed November 9, 2017
(Dkt. 1939)..................................................................................... SA64

Memorandum and Order Regarding Reasonableness of Special Master
Fees, filed December 6, 2017 (Dkt. 1940)...................................... SA66

Donziger's Objections to Notice of Taxation of Costs, filed December
6, 2017 (Dkt. 1941) ....................................................................... SA69

iii

PAGE

Special Masters' Final Report and Recommendation on Allocation of
    Their Fees and Costs, filed December 8, 2017 (Dkt. 1942)............. SA81

Exhibit A to Declaration of William E. Thomson in Support of
    Chevron Corporation's Response to Steven Donziger's
    December 6, 2017 Letter Objecting to the Fees of the Special
    Masters, filed December 13, 2017 (Dkt. 1945-1)

    Declaration of the Affected Nationalities in the Province of
    Sucumbios, dated August 20, 2016 ................................................. SA97

Order Adopting Special Masters' Final Report and Recommendation,
    filed December 27, 2017 (Dkt. 1946)...............................................SA105

Donziger's Letter to Court Objecting to December 27, 2017 Order,
    filed December 28, 2017 (Dkt. 1947)...............................................SA106

Declaration of Joseph M. Kay, filed January 9, 2018 (Dkt. 1949)...........SA110

Corrected Memorandum Opinion Granting In Part and Denying In
    Part Donziger's Motion to Review the Taxation of Costs, filed
    March 1, 2018 (Dkt. 1963) .............................................................SA112

Chevron Corporation's Memorandum of Law in Support of Its Ex
    Parte Application By Order To Show Cause For Discovery and a
    Preservation Order in Furtherance of This Court's March 4, 2014
    Judgment and to Set a Hearing Date Subsequent to That
    Discovery on Chevron's Application to Have Steven Donziger
    Held in Contempt, filed on March 19, 2018 (Dkt. 1966)................SA160

Order to Show Cause and Preservation Order in Furtherance of This
    Court's March 4, 2014 Judgment and Application to Have
    Steven Donziger Held in Contempt, filed March 19, 2018 (Dkt.
    1968) ..............................................................................................SA184

Clerk's Certificate of Default, filed April 18, 2018 (Dkt. 1984) .............SA188

iv

Opposition to Chevron's Application for Contempt and Related
    Discovery, filed April 24, 2018 (Dkt. 1986)...................................SA191

Chevron Corporation's Reply Memorandum of Law in Support of Its
    Ex Parte Application By Order To Show Cause For Discovery
    and a Preservation Order in Furtherance of This Court's March
    4, 2014 Judgment and to Set a Hearing Date Subsequent to That
    Discovery on Chevron's Application to Have Steven Donziger
    Held in Contempt, filed on May 4, 2018 (Dkt. 1987)......................SA201

Chevron Corporation's Motion to Compel Donziger to Respond to
    Post-Judgment Discovery Requests, filed on May 4, 2018
    (Dkt. 1989).....................................................................................SA215

Exhibit 2 to Chevron Corporation's Motion to Compel Donziger to
    Respond to Post-Judgment Discovery Requests, filed May 4,
    2018 (Dkt. 1989-2)

    Letter from Steven Donziger to Randy Mastro, dated April 30,
    2018.................................................................................................SA222

Donziger's Opposition to Motion to Compel, filed May 10, 2018
    (Dkt. 2002).....................................................................................SA232

Order on Motion to Compel Post-Judgment Discovery, filed May 17,
    2018 (Dkt. 2009)...........................................................................SA236

Attachment to Chevron Corporation's Letter to Court Regarding
    Canadian Appellate Decision, filed May 24, 2018 (Dkt. 2015-1)

    Decision of Court of Appeal for Ontario, dated May 23, 2018........SA241

Donziger's Motion for Declaratory Relief and Motion to Dismiss
    Plaintiff's Application to Hold Donziger in Contempt for
    "Profiting" From The Ecuadorian Environmental Judgment, filed
    May 31, 2018 (Dkt. 2018)..............................................................SA296

v

PAGE

Motion for an Emergency Administrative Stay of Provision 1(c) the
Court's Discovery Order Until the Court Has Received Briefing
and Decided Donziger's Pending Motion for a Protective Order,
filed June 19, 2018 (Dkt. 2028) .....................................................SA308

Order Denying Donziger's Motions for Declaratory Judgment,
Protective Order, and Administrative Stay, filed June 25, 2018
(Dkt. 2037)...................................................................................SA313

Chevron Corporation's Second Motion to Compel Donziger to
Respond to Post-Judgment Discovery Requests, filed August 16,
2018 (Dkt. 2073) .........................................................................SA314

Donziger Letter to Court Regarding August 15, 2018 Order, filed
August 20, 2018 (Dkt. 2075) ........................................................SA321

Attachment to Chevron Corporation's Letter to Court Regarding BIT
Decision, filed September 14, 2018 (Dkt. 2082-1)

    Second Partial Award on Track II, dated August 30, 2018..............SA322

Chevron Corporation's Memorandum of Law in Support of Its Motion
to Hold Steven Donziger, the Law Office of Steven R. Donziger,
and Donziger Associates, PLLC in Contempt of Court For Their
Failure to Comply With the RICO and Default Judgments and
the April 16, 2018 Restraining Notice, filed October 24, 2018
(Dkt. 2113)...................................................................................SA844

Exhibit 2 to Declaration of Anne Champion in Support of Chevron
Corporation's Motion to Hold Donziger in Contempt, filed
October 24, 2018 (Dkt. 2114-1)

    Excerpts from deposition transcript of Steven R. Donziger, dated
    June 25, 2018 ...............................................................................SA890

Donziger's Letter to Court Regarding February 21, 2019 Order, filed
March 1, 2019 (Dkt. 2169) ...........................................................SA893

vi

PAGE

Order of Appointment Regarding Neutral Forensic Expert, filed
    March 5, 2019 (Dkt. 2170) ...........................................................SA896

Memorandum re Forensic Inspection Protocol, filed March 5, 2019
    (Dkt. 2171)...................................................................................SA898

Forensic Inspection Protocol, filed March 5, 2019 (Dkt. 2172) ..............SA914

Order Granting Request For Oversized Brief, No. 14-826, filed June
    26, 2014 (Dkt. 77) .......................................................................SA963

Corrected Brief of Defendants-Appellants Steven Donziger, The Law
    Offices of Steven Donziger, and Donziger & Associates PLLC,
    No. 14-826, filed July 16, 2014 (Dkt. 150)...................................SA965

Testimony of Charles Calmbacher, No. 14-826, filed October 1, 2014
    (Dkt. 185-5) ...............................................................................SA1100

Response to Statements By Mr. Cabrera Regarding Alleged Impacts
    to Water Resources in the Petroecuador-Texaco Concession
    Area, No. 14-826, filed October 1, 2014 (Dkt. 217-3) .................SA1102

Corrected Reply Brief of Defendants-Appellants Steven Donziger,
    The Law Offices of Steven Donziger, and Donziger &
    Associates PLLC, No. 14-826, filed January 6, 2015 (Dkt. 317)...SA1105

# SA1



**GEOTEXT**
Translations, Inc.

STATE OF CALIFORNIA
)
)
)
COUNTY OF SAN FRANCISCO )    ss

## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from English into Spanish of the attached transcription excerpt CRS-195-

05-CLIP-01.

Lindsey Creighton, Project Manager
Geotext Translations, Inc.

State of California, County of San Francisco

Subscribed and sworn to (or affirmed) before me

on this 3rd day of August , 20 06,

by  Lindsey Creighton ,

proved to me on the basis of satisfactory evidence

to be the person(s) who appeared before me.

Signature: _____



New York  259 West 30th Street, 17th Floor, New York, NY 10001, U.S.A. tel 212.631.7432 fax 212.631.7778
San Francisco  220 Montgomery Street, 3rd Floor, San Francisco, CA 94104, U.S.A. tel 415.576.9500 fax 415.520.0525
London  107-111 Fleet Street, London EC4A 2AB, United Kingdom tel +44.(0)20.7936.9002 fax +44.(0)20.7990.9909
Hong Kong  20th Floor, Central Tower, 28 Queen's Road, Central, Hong Kong tel +852.2159.9143 fax +852.3010.0082
translations@geotext.com  |  www.geotext.com

TITLE OF CLIP:   CRS-195-05-CLIP-01

# SA2

| SPEAKER | ORIGINAL | TRANSLATION (Spanish) |
|---|---|---|
| | | |
| ANNE MAEST | What are we missing? | ¿Qué nos falta? |
| | | |
| STEVE DONZIGER | What's missing? | ¿Qué falta? |
| | | |
| DICK KAMP | What's missing? | ¿Qué falta? |
| | | |
| KAMP | And it may be -- | Y puede ser -- |
| | | |
| MAEST | Not just in terms of geography but -- | No sólo en términos de geografía, sino -- |
| | | |
| DONZIGER | It's also -- it's also. | Es también -- es también. |
| | | |
| KAMP | Right.  Not geographically -- | Correcto. No geográficamente -- |
| | | |
| DONZIGER | It's also in terms of our legal -- legal team. | También es en términos de nuestro equipo legal -- legal. |
| MAEST | Yeah.  Exactly.  Right.  Uh-huh. | Sí. Exactamente. Correcto.  Ah, sí. |
| | | |
| DONZIGER | For example, Sacha 6 and 21, the first two sites.  We produced no evidence because Dave Russell fucked up, remember? | Por ejemplo, Sacha 6 y 21, los primeros dos sitios. No producimos evidencia porque Dave Russell hizo una mierda, ¿recuerda? |
| | | |
| MAEST | No. | No. |
| | | |
| KAMP | I didn't know the connection between what he did and those sites. | No sabía la relación entre lo que él hizo y esos sitios. |
| | | |
| DONZIGER | The very first two sites. | Los dos primeros sitios. |
| | | |
| MAEST | For inspections? | ¿Para inspecciones? |
| | | |
| DONZIGER | For inspections. | Para inspecciones. |
| | | |
| MAEST | Oh. | Ah. |
| | | |
| KAMP | We didn't know that he had somebody in on it. | No sabíamos -- que tenía alguien encargado de esto. |
| | | |
| DONZIGER | We hired an American -- Dave that did the -- and his friend | Contratamos a un norteamericano -- Dave que |

**SA 3**

| | | |
|---|---|---|
| | Chuck and they couldn't get it together to produce a written product, and we never submitted a report. | hizo y su amigo Chuck y no pudieron ponerse de acuerdo para producir un informe escrito, y nunca presentamos un informe. |
| MAEST | Oh. | Ah. |
| DONZIGER | Now, can you imagine? | ¿Ahora bien, se imagina? |
| MAEST | Holy mackerel. | ¡Rayos y centellas! |
| DONZIGER | You start off a case like this and you blow it on your first two sites. | Se comienza un caso como éste y lo echamos a perder en los primeros dos sitios. |
| KAMP | What about Chevron? | ¿Y qué dice de Chevron? |
| DONZIGER | Boy, we really established our credibility, didn't we? You know what I mean? | Hombre, de verdad establecimos nuestra credibilidad, ¿no es cierto? ¿Entiende lo que quiero decir? |
| CHAMP | Two Strikes. | Dos golpes. |
| KAMP | But all that aside, did Chevron find stuff under those two sites? | Pero dejando de lado todo eso, ¿encontró Chevron algo debajo de esos dos sitios? |
| MAEST | Did Chevron submit something? | ¿Presentó Chevron algo? |
| DONZIGER | We can use Chevron's stuff. | Podemos usar los materiales de Chevron. |
| MAEST | Yeah, we will. | Sí, así haremos. |
| KAMP | Yeah, I know. | Sí, lo sé. |
| DONZIGER | Absolutely. | Absolutamente. |
| MAEST | That's why we want it all -- | Es por eso que lo queremos todo -- |
| KAMP | But that's the idea. | Pero esa es la idea. |
| DONZIGER | My point is this: Even though, technically, we don't need to go back because we can use their stuff. | Mi punto es éste: Aunque, técnicamente, no necesitamos volver atrás porque podemos usar sus materiales. |

| KAMP | Right. | Correcto. |
|------|--------|-----------|
| DONZIGER | We got to see what they have. | Tenemos que ver lo que tienen. |
| MAEST | Right. | Correcto. |
| DONZIGER | And even if they have enough. We might go back there any way -- | E inclusive si tienen suficiente. Podríamos regresar allí de todas formas -- |
| MAEST | Uh-huh. | Ah, sí. |
| DONZIGER | -- just so they can't say later -- | -- simplemente para que no puedan decir más adelante -- |
| KAMP | That you didn't turn anything in, yeah. | Que ustedes no entregaron nada, verdad. |
| DONZIGER | -- they produced no evidence from that site. | -- no presentaron ninguna evidencia de ese sitio. |
| MAEST | Oh, I see. | Ah, entiendo. |
| KAMP | Yeah, right. | Sí, correcto. |
| DONZIGER | That's like a legal call, which is why we need to work -- | Eso es algo así como una decisión [de estrategia] legal, y es por eso que necesitamos trabajar |
| KAMP | That's a hole to fill-in for you. | Ése es un agujero que usted debe rellenar. |
| Donziger | Possibly. Possibly. | Posiblemente. Posiblemente. |
| MAEST | Yeah, it could be. | Sí, podría ser. |
| DONZIGER | That's a -- | Ese es un -- |
| MAEST | There are many different kinds of holes that there could be. | Hay muchos tipos de agujeros distintos que podrían existir. |
| KAMP | Possibly. | Posiblemente. |
| DONZIGER | Yeah, you know. | Sí, es verdad. |
| KAMP | Yeah.  But you know.  And these are all possibilities, and I think that, but what we know we don't have is the extent of the contamination, the, the ground water auditors that Anne was | Sí. Pero usted sabe. Y éstas son todas posibilidades y yo creo eso, pero lo que sabemos que no tenemos es la magnitud  de la contaminación, los, los auditores del agua freática de |

Case 1:11-cv-00691-LAK Document 694-03/11/2019 3515658 Page 3 of 303
Case 1:11-cv-00691-LAK Document 7-6 Filed 02/06/11 Page 3 of 25

SA 5

| | talking about , maybe when you were asleep. | los que Anne estaba hablando, quizás cuando usted estaba durmiendo.. |
| --- | --- | --- |
| MAEST | Uh-huh. | Ah, sí. |
| KAMP | and, you know, being able to characterize as well as we possibly can before we enter into, you know, a remediation strategy per se, what we know about non-water contamination the extent of the contamination. We don't have that. | -- y, usted sabe, poder caracterizar lo mejor que nos sea posible antes de que entremos en, usted sabe, la estrategia de remediación en sí, lo que sabemos acerca de la contaminación no del agua, la magnitud de la contaminación. No tenemos eso. |
| MAEST | And right now all the reports are saying it's just at the pits and the stations and nothing has spread anywhere at all. | Y en estos momentos, todos los informes dicen que sólo está en las piscinas y las estaciones y no se ha diseminado nada a ningún lugar en absoluto. |
| DONZIGER | That's not true. | Eso no es cierto. |
| KAMP | That's not exactly true. | Eso no es exactamente cierto. |
| DONZIGER | That's not true. The reports are saying the ground water is contaminated because we've taken samples from ground water. | Eso no es cierto. Los informes dicen que el agua freática está contaminada porque hemos tomado muestras del agua freática. |
| MAEST | That's just right under the pits. | Eso es inmediatamente debajo de las piscinas. |
| DONZIGER | Yeah, but, that is evidence. | Sí, pero eso es evidencia. |
| MAEST | Uh-huh. | Ah, sí. |
| KAMP | Well, you need more. | Bueno, se necesita más. |
| CHAMP | Well one thing I visually see. | Bueno, una cosa que veo visualmente. |
| DONZIGER | I agree. | Estoy de acuerdo. |
| KAMP | Right. | Correcto. |
| DONZIGER | Hold on a second, you know, this is Ecuador, okay, | Espere un segundo, usted sabe, estamos en Ecuador – okay |

## SA6

| MAEST | Okay. | Okay. |
|---|---|---|
| | | |
| DONZIGER | You can say whatever you want and at the end of the day, there's a thousand people around the courthouse, you're going to get what you want. Sorry, but it's true. | Puede decir lo que quiera, y al final de cuentas, hay mil personas alrededor del edificio del tribunal, y se consigue lo que uno quiere. Lo lamento, pero eso es cierto. |
| | | |
| KAMP | Uh-huh. | Ah, sí. |
| | | |
| DONZIGER | Okay. Therefore, if we take our existing evidence on groundwater contamination which admittedly is right below the source. | Okay. En consecuencia, si tomamos nuestra evidencia existente sobre el agua freática, que efectivamente se encuentra directamente debajo de la fuente. |
| | | |
| MAEST | Uh-huh. | Ah, sí. |
| | | |
| DONZIGER | And wanted to extrapolate based on nothing other than our, um, theory that it is, they all, we average out to going 300 meters in a radius, depending on the – the, uh... | Y quisiéramos extrapolar basándonos nada más que nuestra, um, teoría que es, que todos, tenemos un promedio de ir 300 metros en un radio, dependiendo de -- del... |
| | | |
| MAEST | Uh-huh. | Ah, sí. |
| | | |
| DONZIGER | The what do you call it when the land goes down? The incline. You know what I mean, | La, ¿cómo lo llama cuando el, el terreno baja? La cuesta. Sabe lo que quiero decir. |
| | | |
| MAEST | Uh-huh. The gradient. | Ah, sí. La pendiente. |
| | | |
| DONZIGER | The gradient. We can do it. | La pendiente. Podemos hacerlo. |
| | | |
| KAMP | The gradient. | La pendiente. |
| | | |
| DONZIGER | We can do it. And we can get money for it. | Lo podemos hacer. Y podemos conseguir dinero por eso. |
| | | |
| MAEST | Uh-huh. | Ah, sí. |
| | | |
| DONZIGER | And if we had no more money to do more work, we would do that. You know what I'm saying? | Y si no tuviéramos más dinero para hacer más trabajo, haríamos eso. ¿Sabe lo que estoy diciendo? |
| | | |

| | | |
|---|---|---|
| MAEST | Yeah. | Sí. **SA7** |
| | | |
| DONZIGER | And it wouldn't really matter that much. | Y en realidad no importaría tanto. |
| | | |
| MAEST | Uh-huh. | Ah, sí. |
| | | |
| DONZIGER | Because at the end of the day, this is all for the Court just a bunch of smoke and mirrors and bullshit. It really is. We have enough, to get money, to win. How we define what the win is -- is -- is -- we can do it, anything we want. Now granted, I'd rather have it stronger. | Porque al final de cuentas, todo esto es nada más que mucho humo y espejos y mierda para el tribunal. De verdad lo es. Tenemos lo suficiente, para conseguir dinero, para ganar. Cómo definimos lo que es la victoria es -- es --es -- podemos hacerlo, lo que nos dé la gana. Ahora, claro, preferiría que fuera más fuerte. |
| | | |
| MAEST | Uh-huh. | Ah, sí. |
| | | |
| DONZIGER | I want to have it stronger. | Quiero que sea más fuerte. |
| | | |
| MAEST | Good. | Bueno. |
| | | |
| DONZIGER | But. | Pero. |
| | | |
| MAEST | Because. | Porque. |
| | | |
| DONZIGER | We need to keep that in mind as we design this. | ¿Necesitamos mantener eso en mente a medida que diseñemos esto? |
| | | |
| KAMP | We do. | Así es. |
| | | |
| CHAMP | Steven, the main thing to remember is, | Steven, lo más principal que debe recordar es |
| | | |
| DONZIGER | Yeah. | Sí. |
| | | |
| CHAMP | This is where I agree with Anne a thousand percent, there is not enough information on that ground water. | Aquí es donde estoy de acuerdo con Anne un mil por ciento, que no hay suficiente información sobre esa agua freática. |
| | | |
| DONZIGER | Yeah. | Sí. |
| | | |
| CHAMP | There's not. I mean. | No la hay. Quiero decir. |
| | | |
| DONZIGER | Yeah. | Sí. |

# SA8

| MAEST | No. | No. |
|-------|-----|-----|
| | | |
| CHAMP | To even approach this-- | Para siquiera enfocar esto -- |
| | | |
| DONZIGER | You guys conspiring against me? | ¿Están ustedes conspirando en contra mía? |
| | | |
| MAEST | No. | No. |
| | | |
| CHAMP | Yes. Absolutely. But no you know the -- like I said, the one hole in the remediation, is the water, because if it's not that overly contaminated. | Sí. Absolutamente. Pero, no, usted sabe el -- como dije, el único agujero en la remediación es el agua porque si no está tan excesivamente contaminada. |
| | | |
| DONZIGER | Okay, let's talk. Let's talk about the water. | Okay, hablemos. Hablemos del agua. |
| | | |
| MAEST | Okay. | Okay. |
| | | |
| CHAMP | You can bring it through and you can remediate it in a lot of ways and then put a UV filter on it. Done. It's easy, but…. | Puede pasarla y puede remediarla de muchas maneras y luego ponerla un filtro UV. Terminado. Es fácil, pero … |
| | | |
| DONZIGER | Also the cost of cleanup will be significantly lower. | También el costo de la limpieza será considerablemente más bajo. |
| | | |
| CHAMP | Yes. | Sí. |
| | | |
| MAEST | Yeah, right. | Sí, cierto. |
| | | |
| CHAMP | I mean. You know, if you take a look at what Global put out in their categories, I mean, their $6 billion bid. $2 billion was for ground water and streams and rivers. | Quiero decir.. Sabe, si echa un vistazo a lo que Global incluyó en sus categorías, quiero decir, su propuesta de $6 mil millones. $2 mil millones fueron para agua freática y esteros y ríos. |
| | | |
| DONZIGER | And do you think that that is, uh, -- | ¿Y cree usted que eso es -- |
| | | |
| CHAMP | Well, you don't touch the streams. And that's when I said these are not the right people. You don't touch the streams. | Bueno, no se tocan a los esteros. Y fue entonces cuando dije que ésa no es la gente apropiada. No se tocan los esteros. |
| | | |

**SA 9**

| | | |
|---|---|---|
| DONZIGER | No, no, no.  Understand this, I work with him and I just said you got to put all the categories in. | No, no, no.  Entienda esto, yo trabajo con él y sólo le dije que tenía que incluir todas las categorías. |
| CHAMP | Yeah. | Sí. |
| DONZIGER | Because we couldn't at that point tell our clients we're going to leave anything out. | Porque no pudimos en ese momento decirle a nuestros clientes que íbamos a omitir algo. |
| CHAMP | Yeah, well, if you're talking dredging streams and all that -- | Sí, bueno, si está hablando de dragar esteros y todo eso -- |
| MAEST | I know, but I mean -- | Lo sé, pero quiero decir -- |
| CHAMP | That's all right. | Está bien. |
| DONZIGER | Dave himself is, like, I don't know if this is a good move to go put it in because we need to show some sense that we wanted to get at everything, at the beginning. | Dave mismo es, como, no sé si esto es un paso recomendable de incluir, porque necesitamos demostrar cierto sentido de que queríamos cubrir todo al principio. |
| CHAMP | Uh-huh. | Ah, sí. |
| DONZIGER | Now it's different.  Now, we're talking about a real plan. | Ahora es diferente. Ahora estamos hablando de un verdadero plan. |
| CHAMP | Yeah.  I mean, if you -- | Sí. Quiero decir, si uno -- |
| DONZIGER | You know.  You know what I'm saying? | Usted sabe. ¿Sabe lo que estoy diciendo? |
| MAEST | Uh-huh. | Ah, sí. |
| CHAMP | So I'd go with the ground water thing, very | Entonces, iría con  la cosa del agua freática, muy |
| DONZIGER | Now we're talking about a real plan. | Ahora sí estamos hablando de un verdadero plan. |
| MAEST | Uh-huh.  But you don't have any plans to remediate ground water except to the extent that it's-- | Ah, sí.  Pero no tiene ningún plan para remediar el agua freática, excepto en la medida en que esté -- |

**SA 10**

| | | |
|---|---|---|
| CHAMP | Well, basically my concept was, is that, from the little bit I saw I said, you know, use the ground water for soil washing, you're remediating it anyway, by passing it through. | Básicamente, mi concepto fue, es, de lo poco que vi, dije, sabe, use el agua freática para el lavado del suelo, la está remediando de todas formas, pasándola. |
| | | |
| MAEST | Uh-huh. | Ah, sí. |
| | | |
| CHAMP | And you're recycling it a lot of different ways. But, you know, if we have a lot of it, you have to alter that. | Y la está reciclando de muchas maneras distintas. Pero, sabe, si tenemos mucha, hay que cambiar eso. |
| | | |
| MAEST | Yeah. | Sí. |
| | | |
| DONZIGER | Yeah. Now, there's another point. I got to make a point to these guys, but I can't get this on camera. | Sí. Bueno, allí hay otro punto. Tengo que demostrar la razón a esa gente, pero no puedo dejar que la cámara lo capte. |

**SA11**

# EXHIBIT 2075

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

GREENBELT

- - - - - - - - - - - - - - - x

CHEVRON CORPORATION,                 :

        Petitioner,              :

   vs.                              : Case No.

DANIEL LEE ROURKE,                   : 8:10-cv-02989-AW

       Respondent.              :

- - - - - - - - - - - - - - - x

                       Washington, D.C.

            Monday, December 20, 2010

Videotaped Deposition of:

            DANIEL LEE ROURKE

Called for oral examination by counsel for Petitioner,

pursuant to notice, at the law offices of Gibson,

Dunn & Crutcher, 1050 Connecticut Avenue, Northwest,

Washington, D.C., before Denise M. Brunet, RPR, of

Capital Reporting Company, a Notary Public in and for

the District of Columbia, beginning at 9:11 a.m., when

were present on behalf of the respective parties:

Case 1:11-cv-00691-LAK  Document 400-19  Filed 03/11/2019  Page 21 of 303
Case 18-855, Document 94, 03/11/2019, 2515250, Page31 of 303
Case 1:11-cv-00691-LAK  Document 400-19  Filed 03/02/12  Page 139 of 160

**SA13**
Capital Reporting Company
Rourke, Daniel Lee 12-20-2010

|   |   |   |
|---|---|---|
|   |   | 46 |
| 1 | Q    Can you turn to page 1 for me, please.  The | 10:06:39 |
| 2 | title of your report is, "Estimate of the number and | 10:06:50 |
| 3 | cost of excess cancer deaths associated with residents | 10:06:54 |
| 4 | in the oil-producing areas of Sucumbios and Orellana | 10:06:57 |
| 5 | provinces of Ecuador"; is that right? | 10:07:01 |
| 6 | A    That is correct. | 10:07:02 |
| 7 | Q    Have you ever been to either of those | 10:07:03 |
| 8 | provinces? | 10:07:06 |
| 9 | A    No, I have not. | 10:07:07 |
| 10 | Q    Have you ever been to Ecuador? | 10:07:08 |
| 11 | A    No, I have not. | 10:07:09 |
| 12 | Q    When you say "associated with residents," how | 10:07:10 |
| 13 | did you determine there was any excess cancer deaths | 10:07:17 |
| 14 | associated with residents in oil-producing areas? | 10:07:20 |
| 15 | A    I relied on one of the references to this | 10:07:24 |
| 16 | report that's in the list of references, the Hurtig | 10:07:31 |
| 17 | and San Sebastian ten paper. | 10:07:40 |
| 18 | Q    For that association -- conclusion? | 10:07:40 |
| 19 | A    That is correct. | 10:07:42 |
| 20 | Q    Did you rely exclusively on the San Sebastian | 10:07:42 |
| 21 | paper? | 10:07:46 |
| 22 | A    Yes, I did. | 10:07:46 |

Case 18-855, Document 94, 03/11/2019, 2515258, Page22 of 303
Case 1:11-cv-00691-LAK   Document 400-1   Filed 03/02/12   Page 140 of 160

SA14
Capital Reporting Company
Rourke, Daniel Lee 12-20-2010

61

| | | |
|---|---|---|
| 1 | would be up to the judge to decide, A, if there were | **10:25:55** |
| 2 | excess cancers, and, B, if there were, how they should | **10:26:00** |
| 3 | be valued. | **10:26:05** |
| 4 | BY MS. NEUMAN: | **10:26:05** |
| 5 | Q   Your report simply calculates numbers of what | **10:26:18** |
| 6 | you've labeled as excess cancers based on certain | **10:26:26** |
| 7 | assumptions regarding population at risk, correct? | **10:26:29** |
| 8 | MR. WESTENBERGER:  Objection to the form. | **10:26:33** |
| 9 | THE WITNESS:  Yes. | **10:26:33** |
| 10 | BY MS. NEUMAN: | **10:26:38** |
| 11 | Q   And you're not offering the opinion that | **10:26:38** |
| 12 | anybody actually got cancer because they live near an | **10:26:40** |
| 13 | oil production facility? | **10:26:45** |
| 14 | A   If you're saying there is causation in what | **10:26:45** |
| 15 | were offered as the conclusions of this, the answer is | **10:27:00** |
| 16 | no, I am not making any statement about causation. | **10:27:03** |
| 17 | Q   So you're not saying any particular person | **10:27:06** |
| 18 | got cancer because they live near an oil production | **10:27:08** |
| 19 | facility? | **10:27:11** |
| 20 | A   This is solely an estimate based on | **10:27:11** |
| 21 | assumptions of the number that may develop an excess | **10:27:14** |
| 22 | cancer. | **10:27:20** |

# SA15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                           :

CHEVRON CORPORATION,              :

           Plaintiff,        :

      -against-            :   Case No. 11 Civ. 0691 (LAK)

                                  :

STEVEN R. DONZIGER, et al.,    :

         Defendants.    :

                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### CHEVRON CORPORATION'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT ON THE STRATUS DEFENDANTS' AFFIRMATIVE DEFENSES OF RES JUDICATA AND COLLATERAL ESTOPPEL

Pursuant to Local Civil Rule 56.1, Plaintiff Chevron Corporation ("Chevron") hereby submits this statement of material facts as to which there is no genuine issue of fact to be tried.

//

//

//

//

//

//

## SA16

100.     David Russell, a consulting expert for the LAPs, informed the LAPs' counsel in internal documents that the LAPs' environmental testing in the former concession area was "counterproductive" and "self defeating except to show that the contamination is much more recent than we would desire, and that would lead to an argument that the contamination is by Petroecuador rather than TEXACO."  Champion Decl., Ex. 2161 (DONZ-HDD-0056423) at 1; Champion Decl., Ex. 2227 (DONZ-HDD-0054028).

101.     The LAPs submitted reports for the judicial inspections of well sites Shushufindi 48 and Sacha 94 to the Ecuadorian court on February 14 and March 8, 2005, respectively, purporting to have been authored by Dr. Charles Calmbacher and finding that "highly toxic chemicals" contaminated the area, that TexPet's remediation was "inadequate or insufficient," and opining that Shushufindi 48 and Sacha 94 required "US$26,033,400" and "15,520,000 dollars" of further remediation respectively.  Dkt. 52-4 (Sacha 94 Judicial Inspection Report filed in Dr. Calmbacher's name); Champion Decl., Ex. 2325 (Shushufindi 48 Judicial Inspection Report filed in Dr. Calmbacher's name); *see also* Champion Decl., Ex. 2156 (Calmbacher Dep. Tr.) at 113:10 (Calmbacher testifying that he "never made dollar estimates"); Dkt. 31-21 (Calmbacher Dep. Tr.) at 112:1-119:1.

102.     When shown copies of the Shushufindi 48 and Sacha 94 reports filed under his name, Dr. Calmbacher testified: "I did not reach these conclusions and I did not write this report" and that he had never "f[oun]d that any of the sites that [he] inspected had contamination of such an extent that it would endanger human health;" had never "f[oun]d that any of the sites that [he] inspected required any further remediation;" had never "conclude[d] that TexPet had failed to adequately remediate one of the sites;" and had never "conclude[d] that any particular site posed a risk to human health or the environment."

# SA17

after August 16.  This means that between August 1 and August 16, no date in which field work has been carried out should appear.").

150.    **In Section 5.0 of UBR's report, UBR recommended "a minimum of $20,000,000 to $30,000,000 will be required just to evaluate the extent of impact to the groundwater resources in these two provinces" because "no detailed groundwater investigations [had] been conducted."**  Champion Decl., Ex. 2320 (UBR Report).

151.    **The LAPs' representatives removed Section 5.0 of the UBR report and the altered UBR report was submitted to the Ecuadorian court as Annex R to the Cabrera Report.**  *Compare* Champion Decl., Ex. 2231 (VU00000136) (draft from UBR recommending groundwater study) *with* Ex. 2269 (Cabrera Report, Annex R) (containing no recommendation for groundwater study); Champion Decl., Ex. 2010 (Donziger Dep. Tr.) at 2325:3-2326:2 (Donziger testifying that Mr. Villao of UBR prepared a potable water systems report that was attached to the Cabrera Report as an annex); Dkt. 33-7 (STRATUS-NATIVE069117) at 2 (Beltman sending the Uhl potable water report to Donziger on March 6, 2008 stating, "Here is the Uhl report, cleaned and sanitized.").

152.    **Cristobal Villao never met or communicated with Cabrera.**  Champion Decl., Ex. 2267 (2011.04.19 Uhl Depo Morning Session) at 64:6-9 ("Q. To your knowledge has Mr. Villao ever communicated with Mr. Cabrera on the work that you and he did in Ecuador?  A. To my knowledge he has not.").

153.    **Cristobal Villao was identified in the Cabrera Report executive summary as "part of my technical team, which consists of impartial professionals with impeccable credentials, as can be observed in Exhibit V to this report."**  Dkt. 33-12 (Cabrera Report) at 2; Champion Decl., Ex. 2334 (Annex V).

# SA18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

                       Plaintiff,


          -against-                                       11 Civ. 0691 (LAK)


STEVEN DONZIGER, et al.,

                       Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## OPINION ON PARTIAL SUMMARY JUDGMENT MOTION


      Appearances:


Randy M. Mastro
Andrea E. Neuman
Kristen L. Hendricks
Scott A. Edelman
William E. Thompson
GIBSON, DUNN & CRUTCHER, LLP
*Attorneys for Plaintiff*

John W. Keker
Elliot R. Peters
Christopher J. Young
Jan Nielsen Little
Matthew M. Werdeger
Nikki H. Vo
Paula L. Blizzard
William S. Hicks
KEKER & VAN NEST, LLP
*Attorneys for Donziger Defendants*

Julio C. Gomez
JULIO C. GOMEZ, ATTORNEY AT LAW LLC

Tyler G. Doyle
Craig Smyser
Larry R. Veselka
Christina A. Bryan
Garland D. Murphy, IV
SMYSER KAPLAN & VESELKA, L.L.P.

*Attorneys for Defendants Hugo Gerardo,*
*Camacho Naranjo and Javier Piaguaje*
*Payaguaje*

Case 18-855, Document 94, 03/11/2019, 2515259, Page27 of 303

# SA19

36

> a.  *Defendants Secretly Were Involved in Defining the Scope of Cabrera's Report*

On March 3, 2007, shortly before his selection and more than three months before he was sworn in, Cabrera met *ex parte* with the LAPs and their agents, including Ann Maest of Stratus.[145]  The primary purpose of that meeting was for the LAPs to "lay out the entire case and legal theory for Mr. Cabrera and the other participants in the meeting."[146]  During that meeting, Fajardo made a presentation concerning the global assessment in which he discussed what eventually would become the Cabrera report and stated that "*[t]he work isn't going to be the expert[']s.  All of us bear the burden.*"[147]  Someone at the meeting then asked whether the final report would be prepared only by the expert.  Fajardo responded that the expert would "sign . . . the report and review it. . . .  But all of us, all together, have to contribute to that report."  Ann Maest of Stratus commented, "But . . . not Chevron," which caused others to laugh.[148]

After the meeting, one of the LAPs' consulting experts stated that meeting with Cabrera was "bizarre."  Donziger replied "[d]on't talk about it," and he immediately told a camera crew that had been filming the meeting for the making of *Crude* that the discussion was "off the

---

145

> Pl. 56.1 St. [DI 398] ¶ 129; Hendricks Decl. [DI 6] ¶¶ 2-5, 44 & Ex. 1 (Mar. 3, 2007 video of meeting in Ecuador attended by Fajardo, Maest, Cabrera, and others), at CRS-187-01-02; Hendricks Decl. [DI 7] ¶¶ 3-4, 52 & Ex. 2 pt. 12 (Certified translation of Mar. 3, 2007 *Crude* outtake clip), at 244.

146

> Pl. 56.1 St. [DI 398] ¶ 129; Hendricks Decl. [DI 8] ¶ 78 & Ex. 6 (Donziger deposition transcript), at 1120:23-1121:5.

147

> Pl. 56.1 St. [DI 398] ¶ 129; Hendricks Decl. [DI 6] ¶¶ 2-5, 52 & Ex. 1 (Mar. 3, 2007 *Crude* outtake clip), at CRS-191-00-CLIP-03; Hendricks Decl. [DI 7] ¶¶ 3-4, 52 & Ex. 2 pt. 12 (Certified translation of Mar. 3, 2007 *Crude* outtake clip), at 245 (emphasis added).

148

> Hendricks Decl. [DI 6] ¶¶ 2-5, 52 & Ex. 1 (Mar. 3, 2007 *Crude* outtake clip), at CRS-191-00-CLIP-03; Hendricks Decl. [DI 7] ¶¶ 3-4, 52 & Ex. 2 pt. 12 (Certified translation of Mar. 3, 2007 *Crude* outtake clip), at 245-46.

# SA20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHEVRON CORPORATION,

                     Plaintiff,

        -against-

STEVEN DONZIGER, et al.,

                     Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11 Civ. 0691 (LAK)

**USDS SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #:** _____
**DATE FILED:** 3/26/13

## ORDER OF APPOINTMENT

LEWIS A. KAPLAN, *District Judge*.

       The Court on March 1, 2013 granted Chevron's motion for the appointment of a special master to the extent that it ruled that it would appoint at least two special masters in order to handle depositions in this matter. Affidavits of Messrs. Max Gitter and Theodore H. Katz, whom the Court is considering for appointment, have been filed pursuant to Fed. R. Civ. P. 53(b)(3)(A), and the parties were given an opportunity to object. Having considered the parties' responses, it is hereby

       ORDERED, as follows:

       1.     The objections to the appointment of Mr. Gitter, all or most of which have been considered and rejected on previous occasions, all are without merit and are overruled.

       2.     The special master shall

           a.     Preside at such depositions as the parties may agree or as the Court may designate and, at each such deposition, exercise such powers (save with respect to contempt) as the trial judge could exercise if the witness were testifying at trial including without limitation to regulate the conduct of counsel and witnesses, rule on objections to questions (including privilege objections), and direct witnesses to answer questions.

           b.     Establish deposition schedules consistent with the Court's scheduling order, resolve all issues relating to the scheduling and conduct of depositions save to the extent that the Court previously has resolved or hereafter resolves such issues,

determine subject to the orders of the Court the locations of depositions, impose any non-contempt sanction provided by Rule 37 or 45 in connection with any discovery matter within the scope of this order, and recommend contempt sanctions to the Court in relation thereto.

    c.    Attempt to resolve informally any conflicts with respect to depositions where such efforts appear to the special master to warrant such attempts.

    d.    Consult with the Court with respect to such matters relating to this case as the Court may request or permit.

    e.    Direct, supervise, monitor, and report upon implementation of and compliance with the Court's orders with respect to discovery and make recommendations with respect to remedial action if he deems it advisable or the Court so requests.

    f.    Interpret any agreements reached by the parties with respect to discovery.

    g.    Communicate with parties and attorneys to permit the full and efficient performance of these duties.

    h.    Perform such other duties as the Court may request or direct or as are permitted by Fed. R. Civ. P. 53(c).

3.    The special masters may communicate *ex parte* with the Court, with each other, and with any assistant(s) employed in accordance with paragraph nine, in each case at their discretion, without providing notice to the parties.   Each may communicate *ex parte* with any party or witness, or counsel for any party or witness, upon prior notice to and with consent from counsel for all parties.

4.    The special master shall preserve and file as the record of his activities any written requests for relief and supporting papers, any opposing papers, any reply papers, any transcripts of any oral proceedings with respect to any such requests, and any ruling or recommendation to the Court with respect thereto.  He shall not otherwise be obliged to preserve or file any records.

5.    Except to the extent any different standard is prescribed by Fed. R. Civ. P. 53, the special master's orders, findings and recommendations shall be reviewable by the Court *de novo* as to issues of law and for clear error as to issues of fact.  In the event of any such request for review, the special master in question promptly shall file such parts of the record as may be designated by any party as relevant to the request for review.

6.    Any application for review of any ruling by a special master with respect to objections (including privilege) or directions to answer questions during the course of any deposition

shall be filed no later than 48 hours of the ruling. Any other objections shall be filed no later than seven days after the order or ruling with respect to which review is sought.

7. The singular use of the phrase "special master" in paragraph 1, 2 and 3 through 6 of this order includes both the singular and the plural. The special masters may act singly or collectively, as they deem appropriate, provided, however, that only one special master shall preside at the deposition of any single witness.

8. Mr. Gitter shall be compensated at the hourly rate schedule he maintains at Cleary, Gottlieb, Steen & Hamilton ("Cleary"), and Judge Katz shall be compensated at the hourly rate schedule he maintains at JAMS. The time records, compensation, and expenses of the special masters and any assistants (*infra* ¶ 9) shall be administered by Cleary and JAMS, respectively. They and any assistants shall also be reimbursed for disbursements in accordance with the policies of their respective organizations, as well as for the costs of travel, lodging, meals, and incidental expenses, while traveling in order to perform their duties hereunder. The special masters shall bill monthly for their compensation, disbursements, and expenses. On an interim basis, each shall bill plaintiff for 50 percent of the cost and defendants (other than the Stratus Defendants) for 50 percent of the costs. The defendants other than the Stratus Defendants shall be jointly and severally liable for payment of the bills. The ultimate allocation of the costs of the special masters shall be fixed at the conclusion of their services, taking into account the factors enumerated in Fed. R. Civ. P. 53(g)(3). *See Lago Agrio Plaintiffs v. Chevron Corp.,* 409 Fed. Appx. 393, 395 (2d Cir. 2010).

9. Mr. Gitter is authorized to employ up to one Cleary associate and up to one Cleary legal assistant to facilitate the performance of his duties hereunder. Any such assistants may travel in connection with their duties only if and to the extent the Court subsequently may authorize.

SO ORDERED.

Dated:      March 26, 2013

_____
Lewis A. Kaplan
United States District Judge

# SA23

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

CHEVRON CORPORATION,

                Plaintiff,

      v.

STEVEN DONZIGER *et al.*,

                Defendants.

11-CV-0691

The Honorable Lewis A. Kaplan, U.S.D.J.
The Honorable James C. Francis, U.S.M.J.

## NOTICE OF APPEARANCE

**PLEASE TAKE NOTICE** that Zoe B. Littlepage, an attorney admitted *pro hac vice* to practice in this Court, hereby enters her appearance in the above-captioned action as counsel for Defendants Steven R. Donziger, Law Offices of Steven R. Donziger, and Donziger & Associates, PLLC.

Dated: October 13, 2013
New York, New York

Respectfully submitted,

    *s/ Zoe B. Littlepage*
Zoe B. Littlepage
The Littlepage Firm
2043A W. Main St.
Houston, Texas 77098
Tel: (713) 529-8000
Fax: (713) 529-8044
Email: zoe@littlepagebooth.com

*Attorney for Defendants Steven R. Donziger, Law Offices of Steven R. Donziger and Donziger & Associates, PLLC*

Case 1:11-cv-00691-LAK-JCF   Document 1597-1   Filed 10/23/13   Page 1 of 149
Case 18-855, Document 94, 03/11/2019, 2515258, Page32 of 303

SA24

# EXHIBIT A

Case 1:11-cv-00691-LAK-JCF Document 594 03/11/2012 125 5258 Page 33 of 303

# SA25

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
CHEVRON CORPORATION,                                 :
:
Plaintiff,                  :
:
-against-                              :          Case No.  11 Civ. 0691 (LAK)
:
:
STEVEN R.  DONZIGER, et al.,                          :
:
Defendants.                :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DIRECT TESTIMONY OF TROY A. DAHLBERG

I, TROY DAHLBERG, hereby declare under penalty of perjury pursuant to 28 U.S.C. §
1746, that the following is true and correct:

1.      I am a Partner in the Forensic Practice of KPMG LLP.  I have more than 30 years
of experience providing accounting, auditing, and consulting services to companies in many
industries.  Through my experience as a forensic accountant, I have performed investigations in
which I have analyzed documents to determine whether accounting transactions were proper in
the normal course of business, as well as to identify financial and accounting irregularities based
on the facts and circumstances of various situations.

2.      I have been retained by Gibson, Dunn & Crutcher LLP ("Gibson Dunn") on
behalf of Chevron Corporation ("Chevron") in this case to review materials available through
discovery in *Chevron Corp. v. Steven Donziger et al.*, 11-CIV-0691 (LAK) (S.D.N.Y) (the
"Donziger Case") and associated proceedings to:  (1) summarize financial activity between and
among various individuals and entities in connection with the Lago Agrio Litigation (the

1



**PLAINTIFF'S**
**EXHIBIT**
**4900R**
11 Civ. 0691 (LAK)

# SA26

"Litigation"); and (2) opine on whether the available documents reflect financial recordkeeping in accordance with standards for transparency and accountability.

3.     I have prepared this declaration containing my direct testimony for this matter. This summarizes my opinions detailed in expert reports previously submitted to the parties, the bases and reasoning for my opinions, and information I considered in forming my opinions.

## I.    Summary of Expert Opinion

4.     Based on my experience and expertise, and my review and analysis of available documents, I have come, within a reasonable degree of certainty, to the following conclusions:

5.     The available documents show that individual investors, law firms, and litigation investment firms contributed approximately $16 million to finance the activities and operations surrounding the Litigation.  (*See infra* Part IV.A; PX 2143 (Funding for the Enterprise)).

6.     Steven Donziger ("Donziger") had primary control of financing and related fund disbursements to individuals and entities in connection with the Litigation from approximately 2004 and continuing through at least July of 2012.  (*See infra* Part IV.A-B).

7.     Disbursements were made to various individuals and entities in several categories, including:

> - *Steven Donziger and the Law Offices of Steven R. Donziger*.  The available documents show Evidence of Payments[1] of approximately $1,300,000 to Donziger and the Law Offices of Steven R. Donziger.  (*See infra* Part IV.B.i; PX 2137; PX 2147).[2]

---

[1]  Where I was not able to confirm that a particular payment or transfer actually occurred, but I had some evidence of a payment, I have designated those as "Evidence of a Payment" or "Evidence of Payments."  *See infra* ¶ 32.

[2]  The total payments include Evidence of Payments from wire transfers, cancelled checks, and bank statements, and also include non-traditional accounting source records, such as fund transfers and requests, agreements and contracts, emails, memoranda, invoices, and other documents.  The transactions and transfers that I was able to reconcile to documents from financial institutions (e.g., a wire transfer record, cancelled check, or bank statement) are described as "Confirmed Payments."  *See infra* ¶ 32.  Confirmed Payments to Steven Donziger and the Law Offices of Steven R. Donziger total approximately $958,000.

2

Plaintiff's Exhibit 4900R   p. 2 of 144

# SA27

- *U.S. Counsel*. The available documents show Evidence of Payments of approximately $7,600,000, to individuals or entities primarily working at Donziger's direction to provide legal services. (*See infra* Part IV.B.ii; PX 2137; PX 2147; Attachment H).[3] Specifically, several different firms throughout the United States were engaged through various arrangements to oppose the 28 U.S.C. § 1782 proceedings ("Section 1782 proceedings"). Draft agreements I reviewed also appear to show that certain individuals or entities were to be paid a contingency fee based on the outcome of the Litigation, as opposed to predetermined hourly or flat rate fees.

- *Ecuadorian Counsel*. The available documents show Evidence of Payments of approximately $684,000, to individuals or entities primarily working at Donziger's direction to provide legal services for the Lago Agrio Plaintiffs in Ecuador. (*See infra* Part IV.B.iii; PX 2137; PX 2147; Attachment E).[4]

- *Selva Viva SELVIVA CIA, Ltda ("Selva Viva")*. The available documents show Evidence of Payments of approximately $3,700,000, to Selva Viva, the primary organization managing Litigation finances in Ecuador. (*See infra* Part IV.B.iv; PX 2137; PX 2142; PX 2147).[5]

- *Experts and Consultants*. The available documents show Evidence of Payments of approximately $4,900,000, to individuals or entities working at Donziger's direction to provide scientific or technical services in the Litigation. (*See infra* Part IV.B.v; PX 2137; PX 2138; PX 2147).[6]

- *Public Relations Services*. The available documents show Evidence of Payments of approximately $601,000, to individuals or entities working at

---

[3] The transactions and transfers that I was able to reconcile to documents from financial institutions involving U.S. Counsel total approximately $959,000. The remaining Evidence of Payments are from source records, such as fund transfers and requests, agreements and contracts, emails, memoranda, invoices, and other documents.

[4] The transactions and transfers that I was able to reconcile to documents from financial institutions involving Ecuadorian counsel total approximately $141,000. The remaining Evidence of Payments are from source records, such as fund transfers and requests, agreements and contracts, emails, memoranda, invoices, and other documents.

[5] The transactions and transfers that I was able to reconcile to documents from financial institutions involving Selva Viva total approximately $3,500,000. The remaining Evidence of Payments are from source records, such as fund transfers and requests, agreements and contracts, emails, memoranda, invoices, and other documents.

[6] The transactions and transfers that I was able to reconcile to documents from financial institutions involving Experts and Consultants total approximately $1,000,000. The remaining Evidence of Payments are from source records, such as fund transfers and requests, agreements and contracts, emails, memoranda, invoices, and other documents.

Plaintiff's Exhibit 4900R    p. 3 of 144

## SA28

Donziger's direction to provide public relations services for the Litigation. (*See infra* Part IV.B.vi; PX 2137; PX 2147; Attachment F).[7]

- *Crude*.  The available documents show Evidence of Payments relating to the funding of *Crude* of approximately $2,500,000, and the documents show that Donziger lined up several sources of funding for the production of the film.  (*See infra* Part IV.B.vii; PX 2137; PX 2147; Attachment H).[8]

- *Non-Governmental Organizations ("NGOs")*.  The available documents show Evidence of Payments of approximately $765,000, to NGOs, including Amazon Watch, which was primarily working at Donziger's direction to publicize the Litigation generally and advocate Donziger's positions before government officials.  (*See infra* Part IV.B.viii; PX 2137; PX 2147; Attachment I).[9,10]

8.  The extremely poor organization and incomplete nature of the financial and accounting records that Donziger produced and appeared to maintain would not have allowed him to provide accountability to either his investors or to the Lago Agrio Plaintiffs (the "LAPs") as to the totality of the funds that were raised or the totality of disbursements made in relation to the Litigation.  (*See infra* ¶¶ 54-56).  In my experience, financial and accounting decisions primarily controlled by one individual (as Donziger controlled these decisions throughout the Litigation), and inadequate documentation to support transactions, incomplete and/or unclear

---

[7]  The transactions and transfers that I was able to reconcile to documents from financial institutions involving Public Relations Services total approximately $208,000.  The remaining Evidence of Payments are from source records, such as fund transfers and requests, agreements and contracts, emails, memoranda, invoices, and other documents.

[8]  The transactions and transfers that I was able to reconcile to documents from financial institutions involving *Crude* total approximately $38,000.  The remaining Evidence of Payments are from source records, such as fund transfers and requests, agreements and contracts, emails, memoranda, invoices, and other documents.

[9]  The transactions and transfers that I was able to reconcile to documents from financial institutions involving NGOs total approximately $260,000.  The remaining Evidence of Payments are from source records, such as fund transfers and requests, agreements and contracts, emails, memoranda, invoices, and other documents.

[10]  I also saw evidence of draft advisory agreements between the LAPs and their Attorneys and Representatives and various individuals related to lobbying activities in connection with the Litigation including Christopher Lehane of CSL Strategies LLC and Mark Fabiani of Mark Fabiani LLC; Downey McGrath Group, Inc., and the Ben Barnes Group.  Based on the documents reviewed, there is no evidence of compensation paid to Lehane, Fabiani, Downey McGrath or Barnes; it appears that the lobbyists would be paid according to contingency agreements.  (*See infra* IV.B.ix; PX 560 (WOODS00045036); PX 562 (WOODS00045051); PX 555 (WOODS00045023)).

4

# SA29

accounting records, excessive number of bank accounts, commingling of trust and personal funds, and frequent fund transfers from account to account, are all potential indicators of fraud.

### A. Analysis of Payments Made to Richard Cabrera, Stratus Consulting, Fernando Reyes, and Cristobal Villao

9. The LAPs' Attorneys and Representatives[11] appear to have expended approximately $392,000 on payments to Richard Cabrera ("Cabrera") and approximately $1.7 million on payments to Stratus Consulting ("Stratus") in connection with the April 1, 2008 expert report that Cabrera filed in the Litigation (the "Cabrera Report"). (*See infra* Part IV.C; PX 2138 (Experts and Consultants); PX 2139 (Payments to Richard Cabrera); PX 2147 (Evidence of Payments)). I have reviewed documents which show Evidence of Payments totaling approximately $392,000 to Cabrera, approximately $272,000 of which appear to represent payments that the Ecuadorian court authorized and required in connection with Cabrera's appointment as the independent expert in the Litigation, and $120,000 of which appear to represent payments from Frente de Defensa de la Amazonia (the "Amazon Defense Front," "FDA," or "Frente") to Cabrera from a "Secret Account." (*See infra* ¶¶ 114-118; PX 2139 (Cabrera Payments Timeline)). I also saw evidence of payments to Fernando Reyes ("Reyes") and Cristobal Villao ("Villao") for services in connection with the Cabrera Report, which were apparently not disclosed to the Ecuadorian Court. (*See infra* ¶¶ 121-122; PX 2138 (Experts and Consultants)).

---

[11] The LAPs' Attorneys means any of the various attorneys or law firms that have or continue to represent the LAPs, including, Steven Donziger, Pablo Fajardo, Kohn, Swift & Graf, Cristobal Bonifaz, Patton Boggs LLP, Motley Rice LLC, Emery Celli Brinckerhoff & Abady LLP, et al. The LAPs' Representatives means any of the various entities and individuals that have or continue to represent the LAPs in a non-legal capacity, including, Asamblea De Afectados Por Texaco, Frente de Defensa de la Amazonia, Luis Yanza, Selva Viva, Karen Hinton, et al.

5

# SA30

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

CHEVRON CORPORATION,

          Plaintiff,

    v.

STEVEN DONZIGER *et al.*,

          Defendants.

11-CV-0691

The Honorable Lewis A. Kaplan, U.S.D.J.
The Honorable James C. Francis, U.S.M.J.

### NOTICE OF APPEARANCE

**PLEASE TAKE NOTICE** that Richard H. Friedman, an attorney admitted *pro hac vice* to practice in this Court, hereby enters his appearance in the above-captioned action as counsel for Defendants Steven R. Donziger, Law Offices of Steven R. Donziger and Donziger & Associates, PLLC.

Dated: October 24, 2013

New York, New York

Respectfully submitted,

*s/ Richard H. Friedman*
Richard H. Friedman
Friedman | Rubin
1126 Highland Ave.
Bremerton, WA  98337
Tel: (360) 782-4300
Fax: (360) 782-4358
Email: rfriedman@friedmanrubin.com

*Attorney for Defendants Steven R. Donziger,
Law Offices of Steven R. Donziger and
Donziger & Associates, PLLC*

# SA31

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
                        :
                        :

CHEVRON CORPORATION,     :
                        :
           Plaintiff,    :
                        :   11 CV 0691 (LAK)
     v.                  :
                        :

STEVEN DONZIGER, et al.,     :
                        :
          Defendant.    :
-------------------------------------------------------x

**PLAINTIFF CHEVRON CORPORATION'S NOTICE OF APPLICATION FOR COSTS**

       PLEASE TAKE NOTICE that upon the accompanying bill of costs, the declaration of

Randy M. Mastro, dated December 5, 2016, and the exhibits attached thereto, and all other

pleadings and proceedings herein, Plaintiff Chevron Corporation ("Chevron") will and hereby

does move this Court before the Judgment Clerk, at the United States Courthouse, for the

Southern District of New York, located at 500 Pearl Street, Room 200, New York, New York at

10:00 a.m. on December 19, 2016, or as soon thereafter as counsel may be heard for an order

pursuant to Rule 54 of the Federal Rules of Civil Procedure, Rule 54.1 of the Local Rules of the

Southern District of New York,[1] Rule 39 of the Federal Rules of Appellate Procedure,

Rules 30.1, 31.1, and 39.1 of the Local Rules of the Court of Appeals for the Second Circuit, and

---

[1] This Court's Local Rule 54.1 states that Chevron's notice of taxation of costs must be filed
"within thirty (30) days after the final disposition of the appeal." It is unclear whether "final
disposition of the appeal" refers to the mandate from the Second Circuit Court of Appeals, or
to the exhaustion of any further proceedings in the United States Supreme Court.
Accordingly, Chevron files this notice now, within 30 days of the Court of Appeals'
mandate, out of an abundance of caution.

# SA32

28 U.S.C. § 1920, granting costs sought by Chevron and granting such further relief as this Court deems proper.

Dated: December 5, 2016                     Respectfully submitted,
      New York, New York

      *s/ Randy M. Mastro*
      Randy M. Mastro
      Andrea E. Neuman
      GIBSON, DUNN & CRUTCHER LLP
      200 Park Avenue
      New York, New York 10166
      Telephone: 212.351.4000
      Facsimile: 212.351.4035

      William E. Thomson
      333 South Grand Avenue
      Los Angeles, California 90071
      Telephone: 213.229.7000
      Facsimile: 213.229.7520
      Attorneys for Chevron Corporation

# SA33

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
                                          :

CHEVRON CORPORATION,         :

                Plaintiff,      :

                          :   11 CV 0691 (LAK)

        v.                     :

STEVEN DONZIGER, et al.,       :

               Defendant.    :
-------------------------------------------------------x

### PLAINTIFF CHEVRON CORPORATION'S STATEMENT OF NON-OPPOSITION TO DONZIGER'S MOTION TO HOLD COSTS BILL IN ABEYANCE

Defendant Steven Donziger ("Donziger") has moved this Court to defer consideration of Plaintiff Chevron Corporation's ("Chevron") Notice of Application for Costs (DI 1918) "until after the appellate process has been completed"—that is, until January 26, 2017 or, if Donziger by then has filed a petition for writ of certiorari, upon the determination of the petition and any ensuing consideration by the Supreme Court. DI 1919. No defendant has filed any objections to Chevron's cost bill.

Chevron does not oppose Donziger's motion, without waiving any argument as to whether objections to Chevron's costs bill would now be untimely.

Dated: December 29, 2016          Respectfully submitted,
      New York, New York

                                */s Randy M. Mastro*
                                Randy M. Mastro
                                Andrea E. Neuman
                                GIBSON, DUNN & CRUTCHER LLP
                                200 Park Avenue
                                New York, New York 10166
                                Telephone: 212.351.4000

## SA34

Facsimile: 212.351.4035

William E. Thomson
333 South Grand Avenue
Los Angeles, California 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520
Attorneys for Chevron Corporation

# SA35

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHEVRON CORPORATION,

                        Plaintiff,

                 -against-                                11 Civ. 0691 (LAK)

STEVEN DONZIGER, et al.,

                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ORDER**

LEWIS A. KAPLAN, *District Judge.*

        The motion of defendant Steven R. Donziger to hold in abeyance Chevron's bill of costs [DI 1919] is granted to the extent that the Clerk shall not tax costs as against the movant until January 26, 2017 or, if Donziger by then has filed a petition for writ of certiorari, until the determination of the petition and any ensuing consideration by the United States Supreme Court. The motion is denied in all other respects.

        This order is without prejudice to any contention by Chevron that any objections to its bill of costs now are untimely.

        SO ORDERED.

Dated:        December 30, 2016

                /s/       Lewis A. Kaplan
                _____
                      Lewis A. Kaplan
                  United States District Judge

# GIBSON DUNN

**SA36**

# MEMO ENDORSED

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Randy M. Mastro
Direct: +1 212.351.3825
Fax: +1 212.351.5219
RMastro@gibsondunn.com

June 19, 2017

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:
> DATE FILED: 7-7-17

VIA ECF

The Honorable Lewis A. Kaplan
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re:  *Chevron Corp. v. Donziger*, No. 11-cv-691 (LAK)

Dear Judge Kaplan:

I respectfully write as counsel for Plaintiff Chevron Corporation ("Chevron") to apprise the Court of today's denial of Defendants' petition for certiorari by the Supreme Court of the United States. *See* Order List (June 19, 2017), https://www.supremecourt.gov/orders/courtorders/061917zor_6537.pdf.

In view of the Supreme Court's order, Chevron respectfully requests that the Court reactivate Chevron's motion for attorneys' fees and bill of costs, which the Court previously deferred until "the determination of the petition [for certiorari] and any ensuing consideration by the Supreme Court." Dkt. 1916; Dkt. 1921.

Furthermore, Chevron requests that the Court require Steven Donziger to comply with this Court's March 4, 2014 Judgment, which required him to "execute in favor of Chevron a stock power transferring to Chevron all of his right, title and interest in his shares of Amazonia," the entity he created to try to shield any judgment proceeds from both U.S. and Ecuadorian authorities. Dkt. 1875 ¶ 3. The Court amended this order to require Donziger to transfer his Amazonia shares to the Clerk of the Court "pending the determination of the appeal in this case." Dkt. 1901 at 32. Donziger appears never to have complied with the Court's order. There is no justification for Donziger's continued violations, and Chevron respectfully requests that the Court order Donziger to comply forthwith, or else face sanctions.

Respectfully,

Randy M. Mastro

Beijing · Brussels · Century City · Dallas · Denver · Dubai · Frankfurt · Hong Kong · London · Los Angeles · Munich
New York · Orange County · Palo Alto · Paris · San Francisco · São Paulo · Singapore · Washington, D.C.

## SA37

Memorandum Endorsement                    Chevron Corp. v. Donziger, 11-cv-0691 (LAK)

       1.      Plaintiff's motion for attorneys' fees is hereby reactivated. The Court notes that Donziger long ago applied for an extension of time within which to "contest the reasonableness of the rates and hours requested." DI 1895, at 5. Bearing in mind that Donziger already has had over three years since the trial court's decision on the merits and just about a full year since the Second Circuit affirmed this Court's judgment, the application for an extension of time is granted to the extent that any papers with respect to those subjects shall be filed on or before August 7, 2017. Unless otherwise ordered, any responsive papers on those subjects shall be filed no later than August 28, 2017 and any reply papers on those subjects shall be filed no later than September 11, 2017. As the motion for attorneys' fees was fully submitted in all other respects, there shall be no papers filed that address subjects other than the reasonableness of the rates and hours requested absent leave of the Court.

       2.      The Clerk shall proceed to tax costs.

       3.      Plaintiff requests that the Court require Steven Donziger to comply with the March 4, 2014 judgment. It complains also that Donziger did not comply with that judgment as temporarily modified by order dated April 25, 2014. Whether construed as a request for a further order or for other relief, this aspect of the application may not be made by letter motion. To that extent, it is denied without prejudice to proceeding by formal motion.

       SO ORDERED.

Dated:      July 17, 2017

                                   Lewis A. Kaplan
                             United States District Judge

# SA38

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------x
                                                          :
                                                          :
                                                          :
CHEVRON CORPORATION,                                      :
                                                          :
                        Plaintiff,                        :
                                                          :     11 CV 0691 (LAK)
            v.                                             :
                                                          :
STEVEN DONZIGER, et al.,                                  :
                                                          :
                        Defendant.                        :
----------------------------------------------------------x


**PLAINTIFF CHEVRON CORPORATION'S NOTICE OF APPLICATION FOR COSTS**

PLEASE TAKE NOTICE that upon the accompanying bill of costs, the declaration of

Randy M. Mastro, dated July 18, 2017, and the exhibits attached thereto, and all other pleadings

and proceedings herein, Plaintiff Chevron Corporation ("Chevron") will and hereby does move

this Court before the Judgment Clerk, at the United States Courthouse, for the Southern District

of New York, located at 500 Pearl Street, Room 120, New York, New York at 10:00 a.m. on

August 1, 2017, or as soon thereafter as counsel may be heard for an order pursuant to Rule 54 of

the Federal Rules of Civil Procedure, Rule 54.1 of the Local Rules of the Southern District of

New York,[1] Rule 39 of the Federal Rules of Appellate Procedure, Rules 30.1, 31.1, and 39.1 of

---

[1] This Court's Local Rule 54.1 states that Chevron's notice of taxation of costs must be
filed "within thirty (30) days after the final disposition of the appeal." Chevron filed its
initial notice (Dkt. 1918) within 30 days of the issuance of the mandate of the Court of
Appeals, and consideration of that notice was deferred until after resolution of Donziger's
appeal by the Supreme Court (Dkt. 1921). The Supreme Court denied Donziger's
petition for certiorari on June 19, 2017. Pursuant to this Court's order that the Clerk
should now "proceed to tax costs" (Dkt. 1923), Chevron hereby refiles its notice of
taxation of costs.

# SA39

the Local Rules of the Court of Appeals for the Second Circuit, and 28 U.S.C. § 1920, granting

costs sought by Chevron and granting such further relief as this Court deems proper.


Dated:  July 18, 2017                     Respectfully submitted,
        New York, New York


                                          */s/ Randy M. Mastro*
                                          Randy M. Mastro
                                          Andrea E. Neuman
                                          GIBSON, DUNN & CRUTCHER LLP
                                          200 Park Avenue
                                          New York, New York 10166
                                          Telephone: 212.351.4000
                                          Facsimile: 212.351.4035

                                          William E. Thomson
                                          333 South Grand Avenue
                                          Los Angeles, California 90071
                                          Telephone: 213.229.7000
                                          Facsimile: 213.229.7520
                                          Attorneys for Chevron Corporation

# SA40

## STEVEN R. DONZIGER, ESQ.

245 WEST 104TH STREET, SUITE 7D
NEW YORK, NEW YORK 10025

212-570-4499 (O)
917-566-2526 (CELL)

August 1, 2017

**VIA ECF**

Ms. Ruby J. Krajick
Clerk of the Court
United States District Court for the Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

    RE:    *Chevron v. Donziger*, Case No. 11 Civ. 691 (LAK)

Dear Ms. Krajick:

I write to object to the notice of application for costs (Dkt. 1924) in the above-captioned matter and respectfully request that any taxation be held in abeyance pending resolution of a number of critical and related legal and factual issues that are now pending or will soon be presented to the district court.[1] Although I am not at this point presenting a full opposition to the taxation request, I want to call your attention to four important aspects of this situation which I believe merit the attention of your office prior to any exercise of its authority in this matter.

***Serious Unresolved Equitable Problems***

The costs application before your office occurs in the context of a simultaneous and interrelated request by Chevron for the recovery of roughly $32 million in attorney fees under the RICO statute. That request is contrary to law for a number of reasons particular to the RICO statute and the fact that Chevron "unequivocally [] surrendered any claim to money damages as well as to any other relief that is not equitable in nature" in order to avoid a jury, Dkt. 1500. Thus, under *Aetna Casualty & Surety Co. v. Liebowitz*, 730 F.2d 905 (2d Cir. 1984), Chevron also lost any entitlement to fees in this matter. Beyond the unavailability of fees under the RICO statute, Chevron's attorney fee request is objectionable for equitable reasons that have only come into clear focus in the time since the trial record in the case closed and that equally bear, in my view, on the availability of costs. Some of these facts are being presented to the court as part of a

---

[1]    I certainly understand that the Clerk of the Court has no responsibility or authority to decide any of the broader issues referenced in this letter. Nonetheless I believe they are important context for your office as you proceed to exercise the procedural authority you do have with respect to the taxation of costs, including your inherent authority as an officer of the judiciary to guard against misuse of your office and abuse of your powers.

briefing schedule that extends to September 11, 2017. Others will be presented in later submissions and developed in the discovery period that I intend to request in the coming days.

In brief, and as noted above, the problem for Chevron is that evidence has emerged strongly suggesting that the company and its counsel knowingly suborned perjury, obstructed justice, violated numerous federal laws, and committed a fraud on this court with respect to the testimony of Alberto Guerra—Chevron's "star witness" at the RICO trial and the source of the *only* direct evidence Chevron offered in support of the core finding of the district court that there was a "bribe" agreement in the Ecuador case. Following the issuance of the RICO judgment, Guerra admitted under cross-examination in a related international arbitration between Chevron and the Republic of Ecuador that he intentionally and repeatedly lied on the stand and in his sworn statement during the RICO trial. Further, and more devastating for Chevron, the process of digital forensic examination of the hard drives of the computers of Ecuador trial judge Nicolas Zambrano has been completed. This examination revealed unquestionably that the Ecuador judgment was drafted on those computers and that it was done slowly over the course of many months, with hundreds of interim file saves. These new facts also completely contradict Guerra's claim (credited by Judge Kaplan) that the trial judgment was written by our team and given to the judge on a flash drive. Although Chevron has tried to spin these fatally damaging revelations in various ways, it cannot deny the fact that they are utterly incompatible with the story told by Guerra and accepted by the district court that the judgment was drafted by lawyers for the plaintiffs and delivered to Judge Zambrano only days before the judgment issued. I testified under oath that the Guerra story about bribery and ghostwriting was false and was the product of Chevron's own bribery of Guerra, given that witness has received at least $2 million in cash and benefits from the company. That Guerra story—again, the basis of the district court's core RICO findings—has effectively been proven false.

I obviously am not asking your office to opine on Judge Kaplan's findings. The new evidence will be considered by a variety of appropriate judicial bodies, both in this jurisdiction and others that are considering enforcement of the Ecuador judgment. But as a judicial officer, these critical developments bear heavily on the responsibilities of the Clerk of the Court. It is my view that for purposes of any Chevron request for monetary remuneration—be it a taxation for costs, or the motion for attorney fees that will be taken up by the district court—one key question is whether equity allows a party to recover said fees and costs for a judgment obtained by fraud. Obviously, there are strong arguments that this should not be allowed. The emerging evidence suggests knowledge of the above-referenced facts on the part of Chevron and its counsel at Gibson Dunn & Crutcher, including members of the litigation team headed by Randy Mastro (the lawyer who signed the application for costs) who had advertised themselves to Chevron as a "rescue squad" for companies in legal trouble. It is highly unlikely this is a case where a witness "duped" the party and the lawyers he was assisting with his testimony. Guerra was infamously "prepared" by Gibson Dunn attorneys for 53 consecutive business days for his RICO testimony. The firm's elite investigators and digital forensic analysts at Kroll, Stroz Friedberg, and other consultancies had unfettered access to all of Guerra's files and digital media. Guerra's corrupt history and

Ms. Ruby J. Krajick
August 1, 2017
Page 3 of 7

willingness to lie to advance his financial and other interests were documented for years prior to the RICO trial. Chevron's extraordinary payments and provision of benefits to Guerra are vastly in excess of the small measure of compensation allowed under federal law and the ethical rules regarding fact witnesses. All of these factors and more suggest that Chevron and its attorneys at Gibson Dunn knew full well that Guerra's story was invented for high-priced sale. Again, the question of whether a court may make an award of either costs or fees in connection with such patently corrupt conduct will need to be fully addressed in this case. I would ask that your office refrain from acting on Chevron's application until these issues are fully resolved.[2]

### *Special Master Fees Waived Under Judge Kaplan's July 9, 2013 Order*

Chevron's application for costs is also flawed for more specific reasons that also militate in favor of the Clerk's office waiting until after the determination of the availability *vel non* of the costs procedure in light of the conduct described above. I will be presenting this timing question to the district court shortly. For present purposes, I will explain just one of the more obvious flaws with the Chevron application – namely, that the company already has forfeited any claim to Special Master fees by failing to move for such compensation within a specific time period specified by the district court during the RICO proceedings.

As background, it is important to note that I always vehemently rejected the appointment and excessive use of special masters in the case, in particular on the grounds that I was and am an individual litigant without the resources necessary to pay the top-dollar fees charged by the particular special masters Judge Kaplan favors and with whom he had an obvious personal relationship. I objected to the appointment of the masters (Dkt. 943), especially on the grounds that I was unable to afford them (Dkt. 999). My counsel at that time, John Keker, also directly advised Special Masters Katz and Gitter directly of my inability to pay. (*See* Dkt. 1111 at 4, Ex. C, D.) My financial circumstances during the pre-trial phase of this action were such that Mr. Keker was forced to withdraw, citing unpaid bills and the fact the district court showed "implacable hostility" toward me and had allowed the proceeding to degenerate into a "Dickensian farce". (Dkt. 1110 at 1.) I then acted *pro se* in the matter, including on all critical

---

[2]  To be clear, every relevant aspect of Judge Kaplan's findings and conclusions of law—not just the core "bribery" and "ghostwriting" findings—are being challenged in enforcement actions against Chevron in other jurisdictions on a far fuller evidentiary record than was before the district court or the Second Circuit. In Canada, both the Ontario Court of Appeal and the country's Supreme Court already unanimously rejected a Chevron request to block the enforcement action based on the RICO decision and other issues. Further, most of Judge Kaplan's predicate RICO findings against me (*i.e.,* money laundering, wire fraud) are derivative of the fraudulent testimony presented by Guerra in reference to the supposed bribery and ghostwriting, which render them legally irrelevant for purposes of judgment enforcement other than as evidence of the lengths to which Chevron will go to avoid paying compensation for the extensive harm it caused in Ecuador – harm Chevron never contested in the context of the RICO litigation. The other findings of the district court not related to fraud or ghostwriting (such as "extortion") are also being contested by me on legal and factual grounds in other courts that will review *all of the evidence* both as it exists and as it continues to emerge -- not just the limited and distorted evidence Chevron wishes to be considered, as was the case before the district court.

**SA43**

Ms. Ruby J. Krajick
August 1, 2017
Page 4 of 7

pre-trial matters, until just days prior to trial when I was able to retain counsel at no cost. While pro se, I litigated against at least 114 lawyers deployed by Chevron at the Gibson Dunn firm.

Without counsel to represent me and in the middle of this rather challenging situation, Judge Kaplan was required to address my objections to the fees of the special masters based on my lack of financial resources. He did so by first proposing a way forward in an Order To Show Cause dated June 19, 2013. In that Order, Judge Kaplan proposed that the Special Masters bill me and Chevron separately. He ruled that if I was unable to pay, then Chevron could "advance" 100% of the funds to the Special Masters with the option of later seeking judgment against me for any funds so advanced and supposedly owed by me. (Dkt. 1253.) I objected to the procedure on numerous grounds. (Dkt. 1267.) In particular, I argued:

> The Court's proposal in Dkt. 1253 would effectively accelerate and prioritize Chevron's and the Special Masters' claim on any available funds to shortly after the Special Masters submit their final invoices, presumably sometime this summer and in any event well before trial. In other words, the Court's proposal gives Chevron on a silver platter a means to easily drain off any funds I might secure between now and trial. (*Id.* at 4.)

The court responded to this concern by modifying its proposed approach in a July 9, 2013 order that required Chevron to pay *all* of the Special Master fees in the first instance. Critically, the court established a mid-summer 2013 deadline by which Chevron would need to submit any demands for reimbursement of those fees from me, at which point I could challenge any allocation of them to me in light of my particular circumstances and the other litigation expenses I was incurring. The deadline imposed by Judge Kaplan on Chevron was unequivocal:

> Within 14 days after the later of (a) the submission of the special masters' final billings and (b) the determination of any objections thereto by Chevron, Chevron may move, pursuant to Fed. R. Civ. P. 53(g)(3), for an allocation of part of the fees and costs advanced by it to one or more of the defendants. The motion shall include all bills and substantiation provided to Chevron by the special masters. Defendants shall file any objections to Chevron's motions within 14 days of its service. (Dkt. 1287 at 2.)

It obviously would have been highly embarrassing and counterproductive for Chevron to seek reimbursement of these substantial fees at a time when I could not afford counsel. Thus, to serve its immediate tactical needs, the company chose to let the 14-day deadline pass and waive any allocation. In fact, I never even saw a bill for the special master fees at the time despite demanding one from both the court-appointed Masters and Chevron—all of whom refused to disclose to me the extent of the fees being charged, which were surely exorbitant. The company chose to simply pay the full amount submitted by the special masters and hide that amount from

me and the public, rather than give me and my co-defendants an opportunity to exercise the right the court had conferred on us (a right obviously necessary for any semblance of due process) to know and challenge the amount we might be responsible for paying. Because I never even knew how much the special masters had billed for their costs until Chevron submitted those bills as part of its costs application years after the end of the trial, I also was deprived of the ability to fully argue the circumstances around this critical issue before the Court of Appeals when it granted two extraordinary hearings on our motions to recuse Judge Kaplan for his animus toward me and the Ecuadorian plaintiffs.[3]

Indeed, later in the July 9 order referenced above, the court observed that that "defendants complain that they are entitled to know the amount of the costs that may be imposed on them. And so they shall—at such point as Chevron seeks an order requiring them to pay all or part of the costs it will advance pursuant to this order." (*Id.* at 3.) The order that the court references at this point is clearly the order sought under the *explicit procedures it was then laying down*—not an end-of-litigation taxation of costs. My co-defendants and I successfully pressed for and obtained a mid-litigation resolution of this issue in that Chevron was given an opportunity to seek costs in 2013 and decided not to do so. Having tactically forfeited the right to recover special master fees under the express terms of the court's order in Docket 1287, Chevron cannot now attempt a do-over now by submitting a standard taxation application to your office. Especially troubling, and a surefire indicator of Chevron's bad faith, is that the company lawyers chose not to inform your office of this very case-specific and dispositive history with regard to payment of special master fees.

### Constitutional and Other Policy Implications

There are other important constitutional issues involved that militate in favor of the exercise of caution by your office at this time and that bear on Chevron's applications to recover fees and costs. It is my position (and that of my Ecuadorian indigenous clients) that Chevron's use of the RICO statute to attack and to try to disable adversary counsel is at core a SLAPP-style lawsuit in violation of the First Amendment. The fact Chevron presented what appears to be fraudulent evidence to the district court is a further demonstration of this point, as is its motion to have me (a solo practitioner) reimburse one of the largest companies in the world a total of $32,334,584 in legal fees and almost $1 million in costs following the company's own corrupt conduct both in Ecuador and in the United States as outlined partially in this correspondence.

Chevron admitted in 2009, when it was on the cusp of losing the case in its preferred forum of Ecuador, that its long-term strategy to evade paying the judgment was "to demonize Donziger" rather than to litigate on the merits. The company repeatedly has threatened the Ecuadorian indigenous groups and their counsel with a "lifetime of litigation" and financial ruin if they persist. In fact, within days of the RICO judgment being issued in March 2013, Chevron sought

---

[3]   *See Chevron Corp. v. Camacho Naranjo* et al., Case No. 11-2259, Dkt. 31 (2d Cir. Jul 8, 2011); *Camacho Naranjo* et al. *v. Chevron Corp.*, Case No. 13-772, Dkts. 72, 90, 97, 152 (2d Cir. 2013).

from the district court *prior to any appeal* an order for me to pay its legal fees, underscoring the company's plan to try to eliminate counsel from the case as early as possible. In my view, the entire Chevron RICO litigation is at core a novel attempt at a privatized, ersatz "criminal" prosecution financed by a powerful corporation using a civil standard of proof (sans jury) to vilify counsel who played a key role in helping hold the company accountable for its outrageous misconduct in Ecuador, misconduct for which it was held liable in the forum of its choosing.[4] I respectfully request that your office not to let itself be used by Chevron as another instrument in a novel corporate-financed counterattack strategy that is being challenged in courts around the world on a far fuller evidentiary record than that reviewed by either Judge Kaplan or the Second Circuit panel that affirmed his decision.

### Conflict of Interest

A final but critical issue is the conflict of interest that unfortunately in my view has been created through the efforts of certain SDNY judges to engineer disciplinary action against me by way of an advocacy-oriented and in my view powerfully misleading referral letter to the Attorney Grievance Committee of the First Judicial Department. After omitting critical facts bearing on the reliability of the RICO judgment, the letter entreats the First Department to impose a penalty against me based on theory of collateral estoppel without closely examining the truth of a protean matter that continues to engage the courts of countries around the world. The letter also fails to mention the raft of open and problematic issues surrounding the district court's RICO decision—such as the use of paid "fact" testimony and the new evidence cited above—that obviously would give disciplinary counsel pause prior to initiating action.[5] Signed by Judge Castel (and endorsed by the five other judges on the SDNY Grievance Committee), this referral letter puts me in an extremely complicated if not untenable situation: the court to which I must now seek a hearing on the numerous outstanding issues related to a potentially backbreaking

---

[4]   Interestingly, Chevron argues in courts around the world that an American attorney via the Ecuador litigation engaged in serious criminal misconduct to "extort" money from the oil company. One might think such explosive allegations in a high-profile case that has received global media coverage might attract the attention of U.S. prosecutorial authorities who (unlike Chevron) are required by law to exercise discretion in the public interest. The fact no such public authorities have initiated action against that attorney speaks volumes about the utter lack of credibility of Chevron's so-called "bribery" and "ghostwriting" evidence. At a minimum, if Chevron truly had confidence in the integrity of Guerra's story it would not have dropped money damages claims on the eve of trial, thereby depriving me and the other defendants of a jury of impartial fact finders.

[5]   As indicated, the new evidence never was heard by the district court, the Second Circuit panel, or the U.S. Supreme Court. However, the new evidence will be presented to courts in other jurisdictions that are moving to enforce the Ecuador judgment against Chevron's assets. The new evidence consists primarily of a) admissions under oath by Chevron witness Guerra that he repeatedly lied on the stand on critical issues that formed the core basis of the RICO ruling; and b) a forensic examination of the computers of the Ecuador trial judge that definitively proves the district court was wrong to conclude I was involved in bribing the judge in Ecuador and ghostwriting the judgment. Other critical evidence that the district court refused to consider, such as the 105 technical evidentiary reports and 64,000 chemical sampling results presented during the Ecuador trial documenting Chevron's responsibility for creating illegal and life-threatening amounts of pollution, also will be presented in the enforcement proceedings.

Ms. Ruby J. Krajick
August 1, 2017
Page 7 of 7

amount of fees and costs already has seven judges who have made a determination against me without apparently even understanding, much less reviewing, the full evidence.

More to the point with regard to Chevron's application for costs, all of the judges on the SDNY Grievance committee who voted to seek disciplinary action against me are connected to the supervision of your office.[6] I will be taking up this issue with the district court and if necessary with an appellate court with the ultimate aim of having all post-trial issues moved to a different and non-conflicted venue for resolution. In my view, it would be patently unfair if any judge or judicial authority in the same court where at least six judges have taken the extraordinary step of seeking my disbarment—in a recommendation that if accepted would help vindicate a colleague and friend who issued the controversial pro-Chevron decision--would now make *any determination* regarding the numerous remaining legal and factual issues involved, including those related to costs and fees. This is particularly true when those determinations could result in backbreaking burdens being imposed on a solo practitioner who continues to fight for highly vulnerable clients who suffer grievous impacts from extensive oil contamination that not even the moving party in this matter disputes it caused.

### Conclusion

In light of the above, I want to reiterate my request that the Clerk of the Court hold in abeyance any action regarding taxation of costs until the various issues raised are fully resolved. I also urge your office to take utmost care to avoid putting its taxation authority in the service of what appears to be a SLAPP-style litigation strategy of a private party where key factual, statutory, and constitutional issues that bear heavily on the process are still being litigated.

Sincerely,

_____/ s /_____

Steven R. Donziger

---

[6]   To be clear, I have high regard for the integrity of the Office of the Clerk for the SDNY. The presentation of this conflict obviously has nothing to do with anything that office has done. This is an extraordinary, and perhaps unprecedented, situation. I know of no other situation where a practicing attorney must object to an application for costs and a motion for fees before a court with a now vested interest in the disbarment of that attorney based on contested evidence, as explained herein and further in my response to the referral letter. If the Clerk of the Court would like to review the Castel letter and my submission to the Attorney Grievance Committee, I would be happy to provide the materials on a confidential basis. To be clear, neither that Committee nor the Office of Disciplinary Counsel for the District of Columbia Bar (which forwarded me a letter of inquiry based on the RICO decision) has taken action against me after being informed of the many problems with the Guerra testimony, the details of Chevron's SLAPP-style litigation strategy, and the fact there are many open factual issues that contradict Judge Kaplan's findings that are still being litigated.

Case 1:11-cv-00691-LAK-JCF Document 1918-2 Filed 12/05/16 Page 2 of 3
Case 1:11-cv-00691-LAK-JCF Document 91 03/11/2019 2545258 Page 55 of 303
SA47

☜AO 133    (Rev. 8/06) Bill of Costs

# UNITED STATES DISTRICT COURT

Southern    District of    New York

Chevron Corporation

**BILL OF COSTS**

V.

Donziger et al.

Case Number:  11-cv-0691-LAK

Judgment having been entered in the above entitled action on _____3/4/2014_____ against ___Defendants___ ,
Date

the Clerk is requested to tax the following as costs:

| | |
|---|---|
| Fees of the Clerk ............................................................... | $ 0.00 |
| Fees for service of summons and subpoena ......................................... | 1,550.00 |
| Fees of the court reporter for all or any part of the transcript necessarily obtained for use in the case *See Receipts for Deposition & Transcripts* | 47,126.22 50,872.72 |
| Fees and disbursements for printing *Costs for Briefs & Appendix's Taxable in U.S. Court of Appeals not District Court Rule 39(e) 3 State the Preparation & Transmission of the Record which is* | 0 10,487.00 |
| Fees for witnesses (itemize on page two) *The Hist. Court Record, incl. Brief & Appendix for U.S.C.A.* | 0.00 |
| Fees for exemplification and copies of papers necessarily obtained for use in the case ............. | 0.00 |
| Docket fees under 28 U.S.C. 1923 ................................................ | 0.00 |
| Costs as shown on Mandate of Court of Appeals ..................................... | 0.00 |
| Compensation of court-appointed experts ........................................... | 872,387.63 |
| Compensation of interpreters and costs of special interpretation services under 28 U.S.C. 1828 ..... | 23,400.00 |
| Other costs (please itemize) .................................................... | 0.00 |
| *Bill of Costs Done on Submission Objections Filed* TOTAL $ | 958,697.35 944,463.85 |

SPECIAL NOTE:  Attach to your bill an itemization and documentation for requested costs in all categories.

## DECLARATION

I declare under penalty of perjury that the foregoing costs are correct and were necessarily incurred in this action and that the services for which fees have been charged were actually and necessarily performed.  A copy of this bill has been served on all parties in the following manner:

☒    Electronic service by e-mail as set forth below and/or.

☐    Conventional service by first class mail, postage prepaid as set forth below.

s/ Attorney:    *s/ Randy M. Mastro*

Name of Attorney:    Randy M. Mastro

For:  Chevron Corporation                                    Date:    12/5/2016

Name of Claiming Party

Costs are taxed in the amount of  $944,463.85                          and included in the Judgment.

Ruby J. Krajick                    By: _____          8/8/2017
Clerk of Court                          Deputy Clerk                    Date

AO 133    (Rev. 8/06) Bill of Costs

# UNITED STATES DISTRICT COURT

| | ATTENDANCE | | SUBSISTENCE | | MILEAGE | | Total Cost Each Witness |
|---|---|---|---|---|---|---|---|
| **WITNESS FEES (computation, cf. 28 U.S.C. 1821 for statutory fees)** | | | | | | | |
| NAME, CITY AND STATE OF RESIDENCE | Days | Total Cost | Days | Total Cost | Miles | Total Cost | |
| | | | | | | | $0.00 |
| | | | | | | | $0.00 |
| | | | | | | | $0.00 |
| | | | | | | | $0.00 |
| | | | | | | | $0.00 |
| | | | | | | | $0.00 |
| | | | | | | **TOTAL** | $0.00 |

### NOTICE

**Section 1924, Title 28, U.S. Code (effective September 1, 1948) provides:**
"Sec. 1924. Verification of bill of costs."
    "Before any bill of costs is taxed, the party claiming any item of cost or disbursement shall attach thereto an affidavit, made by himself or by his duly authorized attorney or agent having knowledge of the facts, that such item is correct and has been necessarily incurred in the case and that the services for which fees have been charged were actually and necessarily performed."

**See also Section 1920 of Title 28, which reads in part as follows:**
    "A bill of costs shall be filed in the case and, upon allowance, included in the judgment or decree."

**The Federal Rules of Civil Procedure contain the following provisions:**
Rule 54 (d)
    "Except when express provision therefor is made either in a statute of the United States or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs, but costs against the United States, its officers, and agencies shall be imposed only to the extent permitted by law. Costs may be taxed by the clerk on one day's notice. On motion served within 5 days thereafter, the action of the clerk may be reviewed by the court."

Rule 6(e)
    "Whenever a party has the right or is required to do some act or take some proceedings within a prescribed period after the service of a notice or other paper upon him and the notice or paper is served upon him by mail, 3 days shall be added to the prescribed period."

Rule 58 (In Part)
    "Entry of the judgment shall not be delayed for the taxing of costs."

## SA49

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - -
                                                    x
CHEVRON CORPORATION,                                :
                                                    :
                Plaintiff,                          :
                                                    :
        v.                                          :    11-CV-0691 (LAK)
                                                    :
STEVEN DONZIGER, et al.,                            :
                                                    :
                                                    :
                Defendants.                         :
                                                    x
- - - - - - - - - - - - - - - - - - - - - - - - - - - -
```

### DECLARATION OF RANDY M. MASTRO IN SUPPORT OF CHEVRON
### CORPORATION'S APPLICATION FOR COSTS

I, RANDY M. MASTRO, hereby declare under penalty of perjury pursuant to 28 U.S.C.

§ 1746, that the following is true and correct:

1.      I am an attorney licensed to practice law in the State of New York and before this

Court.  I am a partner in the law firm of Gibson, Dunn & Crutcher LLP, and I am lead counsel

for Chevron Corporation ("Chevron") in the above-captioned matter.  I am personally familiar

with the facts set forth herein, unless the context indicates otherwise.

2.      I make this declaration in support of Chevron Corporation's Application for Costs

pursuant to Rule 54 of the Federal Rules of Civil Procedure, Rule 54.1 of the Local Civil Rules

of the Southern District of New York ("Local Rule 54.1"), and 28 U.S.C. § 1920.

3.      This matter was tried in the Southern District of New York before the Honorable

Lewis A. Kaplan at 500 Pearl Street, New York, New York 10007, from October 15, 2013

through November 26, 2013.

4.      Chevron incurred costs in this matter of $958,697.35, as set forth in Chevron's

December 5, 2016 Bill of Costs, attached hereto as Exhibit 1.  These costs are correctly stated,

are allowable by law, and were necessarily incurred as stated herein.

# SA50

5.     On March 4, 2014, the District Court entered an opinion constituting its findings of fact and conclusions of law in this matter following a bench trial. Dkt. 1874 ("Opinion"). In the Opinion, the Court found Steven Donziger, The Law Offices of Steven R. Donziger, and Donziger & Associates, PLLC (collectively the "Donziger Defendants") liable to Chevron under the substantive and conspiracy provisions of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. *Id.* at 353-407.

6.     The Court also found that the Donziger Defendants and Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje (the latter two collectively the "LAP Representatives") should be subject to equitable relief generally preventing them from profiting from a fraudulent Ecuadorian judgment. *Id.* at 339.

7.     Concurrent with the Opinion, the District Court issued a final judgment against the Donziger Defendants and the LAP Representatives. Dkt. 1875 ("Judgment"). A true and correct copy of the Judgment is attached hereto as Exhibit 2.

8.     The Judgment provides: "Chevron shall recover of Donziger and the LAP Representatives, and each of them, jointly and severally, the costs of this action pursuant to Fed. R. Civ. P. 54(d)(1) and 28 U.S.C. § 1920." *Id.* at ¶ 9.

9.     On August 8, 2016, a unanimous panel of the United States Court of Appeals for the Second Circuit affirmed the judgment in favor of Chevron in full. *Chevron Corp. v. Donziger*, 833 F.3d 74 (2d Cir. 2016). The Court of Appeals' mandate issued on November 3, 2016. Dkt. 1914.

10.     Chevron's costs in this action totaled $958,697.35. This consisted of the following components.

2

# SA51

11. Chevron incurred costs of $23,692.62 for daily trial transcripts. *See* Local Rule 54.1(c)(1) (allowing for recover of daily trial transcript costs); 28 U.S.C. § 1920(2) (same). Invoices for daily trial transcripts are attached hereto as Exhibit 3.

     a. "Although there is no bright-line rule for deciding whether a daily transcript was necessary, courts have considered several factors, including (1) the length and complexity of the trial; (2) the need for daily transcripts to examine witnesses; (3) the need for daily transcripts for summation; and (4) whether the credibility of witnesses was crucial in the case." *Close-Up Int'l, Inc. v. Berov*, Civil Action No. 02-CV-2363 (DGT), 2007 WL 4053682, at *10 (E.D.N.Y. Nov. 13, 2007); *see also Galella v. Onassis*, 487 F.2d 986, 999 n.22 (2d Cir. 1973); *United Rubber, Cork, Linoleum & Plastic Workers of Am., AFL-CIO v. Lee Nat'l Corp.*, 62 F.R.D. 194, 196 (S.D.N.Y. 1974); *Karibian v. Columbia Univ.*, No. 91 Civ. 3153 (TPG), 1997 WL 2538, at *2 (S.D.N.Y. Jan. 3, 1997) (holding daily trial transcript "entirely reasonable" based on substantial length of trial and important questions of credibility).

     b. The trial in this matter was long and complex. It lasted seven weeks, from October 15, 2013 through November 26, 2013. Chevron put on 24 witnesses and submitted thousands of exhibits. Defendants also put on six witnesses and submitted thousands of exhibits of their own. The parties also designated and counter-designated the deposition testimony of numerous deponents. The trial concerned several claims, including both substantive and conspiracy claims under RICO, a complex statute comprising numerous elements. *See* Dkt. 1874 (Opinion) at 353-407 (analyzing elements of Chevron's RICO claims under 18 U.S.C. § 1962(c) and (d)). Chevron's initial post-trial brief stretched 353 pages

3

## SA52

and Defendants submitted a combined 114 pages. Dkts. 1847, 1850, 1851. The Court's opinion measured 485 pages, plus 85 pages of appendices, with more than 300 pages devoted to detailing the facts of a dispute that has spanned 20 years and three continents. *See* Dkts. 1874, 1874-1. It has been called, "the world's most intensely-litigated case." Michael D. Goldhaber, The Global Lawyer: Latest Twists in Chevron's Amazon Case Run Through Latin America, AMLAW LITIG. DAILY (Nov. 12, 2012), http://www.litigationdaily.com/id=1202578138704/The-Global-Lawyer:-Latest-Twists-in-Chevron's-Amazon-Case-Run-Through-Latin-America?slreturn=20140227163910.

c.    Chevron required the use of daily transcripts in order to prepare for and examine subsequent witnesses, and to prepare its summation. *See, e.g.*, Ex. 4 (Tr.) at 986:1-5, 1813:25-1814:3, 1814:17-20, 1816:8-11, 1828:1-6, 1828:18-1829:1 (counsel for Chevron questioning witnesses Guerra and Zambrano about their testimony from the preceding day and objecting to opposing counsel's questions on the basis that they did not respond to preceding day's testimony); Dkt. 1856-4 at 46-49 (slides from Chevron's closing argument reflecting that Donziger prepared himself to give evasive answers and gave such answers, including "I don't know" and "I don't remember," more than 100 times on cross examination while not once offering an evasive answer on redirect).

d.    The credibility of witnesses was a crucial issue in the case. *See* Dkt. 1850 at 31-41 (Donziger Defendants' post-trial brief arguing that Guerra was not a credible witness); Opinion at 184 ("[T]he Court credits Guerra's explanation that they got Zambrano to sign it by bribing him."); Dkt. 1847 at 102–10 (Chevron post-trial brief challenging Zambrano's credibility); Opinion at 182 ("the Court examines

Zambrano's trial testimony and finds that it was not credible."); Dkt. 1847 at 303

(Chevron post-trial brief challenging Donziger's credibility); Dkt. 1856-4 at 46-49

(slides from Chevron's closing argument reflecting that Donziger prepared

himself to give evasive answers and gave such answers, including "I don't know"

and "I don't remember," more than 100 times on cross examination while not

once offering an evasive answer on redirect); Opinion at 264–65 (finding

Donziger's claims not to remember events not credible); *id*. at 279 (finding

Donziger's testimony regarding the bribery of Zambrano was not credible).

12. Chevron incurred costs of $27,180.10 for the deposition transcripts of the

following witnesses, portions of which were designated or counter-designated by Chevron and

admitted into evidence: Ramiro Fernando Reyes, Hugo Gerardo Camacho Naranjo, Javier

Piaguaje Payaguaje, Joe Silver, Daniel Karson, Sara McMillen, Ricardo Reis Veiga, John

Watson, Rhonda Zygocki, Ed Scott, Andrew Woods, Aaron Marr Page, Donald Moncayo,

Adolfo Callejas Ribadeneira, Santiago Escobar, Martin Beier, Donziger & Associates, PLLC

(30(b)(6) deposition), John McDermott, James Tyrrell, and Ted Dunkelberger. Tr. 46:16-49:21

(admitting into evidence designations and counter-designations); *see also* Dkt. 1782 (joint notice

of deposition designations). These costs are recoverable under 28 U.S.C. § 1920 and Local Rule

54.1. 28 U.S.C. § 1920(2) (allowing recovery of "[f]ees for printed or electronically recorded

transcripts necessarily obtained for use in the case"); Local Civ. R. 54.1(c)(2) ("Unless otherwise

ordered by the Court, the original transcript of a deposition, plus one copy, is taxable if the

## SA54

deposition was used or received in evidence at the trial, whether or not it was read in its entirety."). Invoices for copies of these deposition transcripts are attached hereto as Exhibit 5.[1]

13. Chevron incurred costs of $23,400.00 for interpretation services at depositions and at trial. *See* 28 U.S.C. § 1920(6) (allowing recovery of "compensation of interpreters"); Local Civ. R. 54.1(c)(4) (same). Invoices for interpretation services are attached hereto as Exhibit 6.

14. Chevron incurred costs of $872,387.63 for the services of the Special Masters, Max Gitter and the Honorable Theodore Katz. *See* Local Rule 54.1(c)(8) (allowing recovery of "[f]ees of masters, receivers, commissioners, and Court appointed experts"); 28 U.S.C. § 1920(6) (allowing recovery of "[c]ompensation of court appointed experts"); Dkt. 1287. The Court ordered that the Special Masters' fees and expenses were to be advanced 50 percent by Chevron and 50 percent by the defendants, jointly and severally, subject to an allocation under Federal Rule of Civil Procedure 53(g)(3). Dkt. 865. Because the defendants refused to pay, however, Chevron advanced 100 percent of the Special Masters' fees and expenses subject to a subsequent allocation. Dkt. 1287. Invoices for the fees of the Special Masters are attached hereto as Exhibit 7.

15. Chevron incurred costs in the amount of $1,550.00 for process server fees. *See* Local Rule 54.1(c)(10) (allowing for recovery of "process server [fees]")). Invoices for process server fees are attached hereto as Exhibit 8.

16. Chevron also incurred $10,487 in costs on appeal taxable in this Court. *See* Fed. R. App. P. 39(e) (providing that the "preparation and transmission of the record" is taxable in the District Court). These are costs to be taxed by the USCA, not the US DC. 39$1 portions to the U.S.D.C. record to the U.S.C.A. The question as to these costs were compared with the U.S.C.A.

---

[1] Chevron has highlighted the portions of the invoices for which it seeks costs. Chevron does not seek to recover certain costs incurred in connection with the depositions, such as videotaping fees.

    a. Due to the complexity of the case and the extensive evidence, Chevron prepared and transmitted to the Second Circuit relevant portions of the record in the form of a Supplemental Appendix. The Supplemental Appendix included exhibits, deposition testimony, witness statements, and trial testimony.

    b. Chevron was required to submit six paper copies of the Supplemental Appendix. L.R.A.P. 30.1.

    c. Costs are taxable at the rate set in the Second Circuit's Fee Schedule: Reproduction 20¢ per page; Covers $125; and Binding $5.00 per copy. L.R.A.P. 39.1(b); Fee Schedule.[2]

    d. The taxable cost of the Supplemental Appendix was $10,487 ($10,332 to print six copies of the 8,610-page Supplemental Appendix, $125 for covers, and $30 for binding the six copies). The invoice for the preparation and transmission of the record is attached hereto as Exhibit 9.

17.     WHEREFORE, Chevron respectfully requests the Clerk issue an order granting Chevron costs in the amount of $958,697.35.

Executed on this 18th day of July 2017 at New York, New York.

*/s/ Randy M. Mastro*
Randy M. Mastro

---

[2] Costs are taxable at the lesser of the actual cost or the rate set in the Fee Schedule. L.R.A.P. 39.1(b). Here, as reflected in the invoice, attached as Exhibit 9, Chevron's actual costs exceeded those taxable under the Fee Schedule.

7

# SA56

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x

|                                        |   |                     |
|----------------------------------------|---|---------------------|
| CHEVRON CORPORATION,                   | : |                     |
|                         Plaintiff,     | : | 11 CV 0691 (LAK)    |
|             v.                         | : |                     |
| STEVEN DONZIGER, et al.,               | : |                     |
|                         Defendant.     | : |                     |

-------------------------------------------------------x

## PLAINTIFF CHEVRON CORPORATION'S NOTICE OF APPLICATION FOR COSTS

PLEASE TAKE NOTICE that upon the accompanying bill of costs, the declaration of

Randy M. Mastro, dated July 18, 2017, and the exhibits attached thereto, and all other pleadings

and proceedings herein, Plaintiff Chevron Corporation ("Chevron") will and hereby does move

this Court before the Judgment Clerk, at the United States Courthouse, for the Southern District

of New York, located at 500 Pearl Street, Room 120, New York, New York at 10:00 a.m. on

August 1, 2017, or as soon thereafter as counsel may be heard for an order pursuant to Rule 54 of

the Federal Rules of Civil Procedure, Rule 54.1 of the Local Rules of the Southern District of

New York,[1] Rule 39 of the Federal Rules of Appellate Procedure, Rules 30.1, 31.1, and 39.1 of

---

[1]   This Court's Local Rule 54.1 states that Chevron's notice of taxation of costs must be
      filed "within thirty (30) days after the final disposition of the appeal." Chevron filed its
      initial notice (Dkt. 1918) within 30 days of the issuance of the mandate of the Court of
      Appeals, and consideration of that notice was deferred until after resolution of Donziger's
      appeal by the Supreme Court (Dkt. 1921). The Supreme Court denied Donziger's
      petition for certiorari on June 19, 2017. Pursuant to this Court's order that the Clerk
      should now "proceed to tax costs" (Dkt. 1923), Chevron hereby refiles its notice of
      taxation of costs.

1

# SA57

the Local Rules of the Court of Appeals for the Second Circuit, and 28 U.S.C. § 1920, granting

costs sought by Chevron and granting such further relief as this Court deems proper.


Dated:  July 18, 2017                    Respectfully submitted,
        New York, New York


                                         */s/ Randy M. Mastro*
                                         Randy M. Mastro
                                         Andrea E. Neuman
                                         GIBSON, DUNN & CRUTCHER LLP
                                         200 Park Avenue
                                         New York, New York 10166
                                         Telephone: 212.351.4000
                                         Facsimile: 212.351.4035

                                         William E. Thomson
                                         333 South Grand Avenue
                                         Los Angeles, California 90071
                                         Telephone: 213.229.7000
                                         Facsimile: 213.229.7520
                                         Attorneys for Chevron Corporation

Case 18-855, Document 94, 03/11/2019, 2515258, Page66 of 303

# SA58

August 15, 2017

**<u>VIA ECF</u>**

Honorable Lewis A. Kaplan
United States District Judge
United States District Court for the Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

    RE:    *Chevron v. Donziger*, Case No. 11 Civ. 691 (LAK)
                Objection to the Clerk's taxation of costs

Dear Judge Kaplan:

I hereby object to the exorbitant and unprecedented taxation of costs made by the Clerk's Office on August 8, 2017 (Dkt. 1928). My specific objections are elaborated in detail in my letter to the Clerk of the SDNY dated August 1, 2017 (Dkt. 1925), which I incorporate herein by reference. I also incorporate by reference my letter to Your Honor dated August 7, 2017, opposing Chevron's fee motion in this matter.

As stated in the referenced objections, an award of both costs and fees would be entirely inappropriate based on what we already know about both the nature of Chevron's lawsuit (a SLAPP-style collateral attack to avoid paying impoverished environmental victims and disable adversary counsel in violation of the First Amendment) and the specific evidence that Chevron and its legal team suborned perjury, obstructed justice, and committed a fraud on the court procurement of false testimony from Alberto Guerra. Any costs award is also premature given my pending petition to more fully develop the record on Chevron's Guerra fraud in forthcoming discovery in this and potentially other fora—a record that will be critical to properly addressing the equities underlying Chevron's demand for costs and fees. Moreover, Chevron clearly forfeited any claim to reimbursement of fees paid to the special masters (the bulk of the costs claim) under the rules and deadlines set by specific orders pertaining to those fees issued by the Court during pre-trial litigation, as described herein and in my letter to the Clerk.

### *Reassignment to an impartial fact-finder*

My letter to the Clerk also makes the self-evident argument that this matter should be reassigned forthwith to another district court in light of Your Honor's well-established "implacable hostility" towards me (as observed by former counsel, eminent trial lawyer John Keker) and the shocking

# SA59

decision by six of your colleagues to send an overzealous, argumentative, and misleading letter to the Attorney Grievance Committee of the First Department. The referral letter seeks my disbarment based on a theory of collateral estoppel related to the RICO decision without mentioning the many problems with that decision or that new facts have emerged that render its core factual findings patently unreliable. Absent reassignment of this matter, I would insist that Your Honor divulge any and all communications with Judge Castel or any member of the aforementioned grievance committee as regards the referral letter or any issue related to the undersigned as regards attorney discipline or any other matter impacting or potentially impacting the neutrality or perceived neutrality of this court.

To be clear, I am under no illusions about what where this is heading should Your Honor insist on continuing to preside. Any objective reading of the record in this case demonstrates that the court's prosecution of me has been relentless. This has been amply documented in detail in various briefs including Mr. Keker's motion to withdraw (Dkt. 1110) (describing the RICO proceeding as "Dickensian farce" unworthy of the federal judiciary), the motion to withdraw from the prestigious Smyser Kaplan firm in Houston (Dkt. 1154) (describing the RICO proceeding as a "Star Chamber"), two petitions for mandamus filed by the Patton Boggs firm (documenting Your Honor's extensive comments suggesting personal animus toward me and the Ecuadorians plaintiffs and resulting in two rare hearings at which the Second Circuit considered granting the extraordinary relief of mandamus), as well as various motions to recuse that Your Honor predictably denied. (*See, e.g.*, Dkt. 391.)

Regarding Chevron's attempt to claim reimbursement of roughly $32 million in purported legal fees from a solo practitioner and human rights lawyer, I fully expect Your Honor to discard the black letter law that precludes the awarding of said fees under RICO after having strategically dropped all its money damages claims to avoid a jury. I also expect Your Honor to again try to whitewash Chevron's outlandish cash payments and provision of benefits to an obviously corrupt "fact" witness in exchange for testimony that has now been admitted—and forensically proven—to have been false. On the costs claim, I fully expect this court to turn a blind eye to the egregious abuses and inequities that, under any impartial application of the law, would preclude an award under these circumstances. Before proceeding any further, I again insist that Your Honor recuse himself and reassign the matter to another venue or at least another federal district court judge not on the Grievance Committee. Nonetheless, in the event Your Honor does not grant my request for reassignment or recusal, and to preserve these issues for appeal, I elaborate further on my objections below.

### *Chevron must bear its own costs given the Guerra misconduct*

The court "has broad discretion in awarding costs," *L–3 Communications Corp. v. OSI Sys., Inc.*, 607 F.3d 24, 30 (2d Cir. 2010), including in "refus[ing] to impose costs on the losing party at all." *Wilder v. GL Bus Lines*, 258 F.3d 126, 129 (2d Cir. 2001).

# SA60

Courts in this Circuit have recognized several grounds upon which it is appropriate to deny costs to the prevailing party in an action. Key among these is the court's appraisal as to whether awarding costs would be "inequitable" or "unfair." Courts have found that fairness requires each party to bear its own costs where, for example, *the losing party can demonstrate misconduct on the part of the prevailing party*.

*AXA Versicherung AG v. New Hampshire Ins. Co.*, 769 F. Supp. 2d 623, 625 (S.D.N.Y. 2011) (citing *DLC Mgmt. Corp. v. Town of Hyde Park*, 45 F. Supp. 2d 314, 315 (S.D.N.Y. 1999) and *Moore v. County of Delaware*, 586 F.3d 219, 221 (2d Cir. 2009)). Misconduct by Chevron and its attorneys at Gibson Dunn & Crutcher is already evident in the record and further revealed in new evidence that I describe in my letters at Dkts. 1925 and 1927. Guerra has now admitted to knowingly and repeatedly lying on the stand before Your Honor—yet Chevron's army of lawyers, who coached him for an epic 53 days prior to his testimony, and who had unfettered access to all of his digital and paper records, said nothing. Guerra told a detailed story about receiving a draft of the judgment from the Ecuadorian plaintiffs' legal team just days before it issued. The falsehood of this statement—the core RICO finding—was undeniably evident to Randy Mastro and his team at the Gibson Dunn firm as they prepared Guerra and went through his files. For reasons I detail in the letters referenced above, it is utterly implausible to think that the sophisticated lawyers of Chevron's self-described "rescue squad" at Gibson Dunn did not know of—or recklessly disregarded clear evidence of—these and other falsehoods. By nonetheless offering the patently false testimony *as admitted to by the very witness who offered it*, Chevron and Gibson Dunn by all appearances suborned perjury and obstructed justice. *See* Dkt. 1927 at 5. By paying Guerra millions of dollars in cash and benefits for this known false testimony, these lawyers corruptly and illegally provided a gratuity to a witness under oath. *Id.* I am entitled to, and demand, the opportunity to more fully establish this misconduct in discovery in order to make a record on the factors that the law requires this Court to apply in exercise of its otherwise broad discretion. This Court cannot credibly rule on either the motion for fees or application for costs unless and until it allows me to take discovery from the Gibson Dunn lawyers and others who have the firsthand knowledge and documents related to this very disturbing process regarding Guerra.[1]

**Chevron must bear its own costs given its uncontested misconduct in Ecuador, which has decimated indigenous groups and resulted in countless illnesses and deaths**

Another independent reason Chevron must bear its own costs is the horrific environmental damage and humanitarian catastrophe it inflicted and continues to inflict on the people of Ecuador who

---

[1]   I reserve the right to seek the recusal of the Gibson Dunn firm from any further representation of Chevron in this matter, given its leading role in the coaching of Guerra prior to his false testimony. I also reiterate my position from my August 7, 2017 letter, Dkt. 1927 at 6 n.8, namely that all the Court's RICO findings (not just "ghostwriting" and "bribery") are infirm and currently being contested in the context of enforcement actions around the world before courts willing and able to consider a far more complete evidentiary record than that considered by Your Honor or any U.S. appellate court to review this matter.

# SA61

won the judgment against it. Chevron's tactical decision during the RICO trial to drop its "sham litigation" allegation to continue to conceal internal documents that likely prove it made an outrageous decision to dump cancer-causing toxic waste into the environment—comprised of substances clearly established in the scientific literature to be harmful to human health and life-threatening—further precludes any award of costs (or fees) in this matter.

Underlying scientific evidence before the Ecuador court, uncontested by Chevron in the RICO matter (and excluded by Your Honor from any mention or consideration), clearly establishes that the people in the region of Ecuador where Chevron operated were and are literally getting sick and dying from cancer and other health impacts due to Chevron's sub-standard operational practices that the aforementioned Guerra fraud clearly was designed to distract attention from. These deaths are amply documented in multiple scientific, peer-reviewed studies that Your Honor also refused to consider during the RICO matter. As summarized in the voluminous Ecuador trial court and appellate court records that Your Honor also refused to consider in full, the Ecuador proceedings in Chevron's preferred forum demonstrated overwhelmingly that the movant Chevron a) recklessly adopted sub-standard operational practices in Ecuador to cut production costs to the bare minimum, creating what experts believe could be the largest and most damaging oil-related disaster of all time; b) flagrantly violated multiple Ecuadorian laws, its own contractual obligations to protect the environment, and oil industry norms in effect at the time; and c) thereby caused massive environmental damage to an area the size of Rhode Island that for decades to come will create myriad health risks for thousands of rainforest inhabitants. The egregiousness of these acts bears on the equities analysis necessary here.

### Chevron must also bear its own costs due to equitable factors

The "limited financial resources" of the losing party is another key equitable factor relevant to any objection to a costs application. *Moore*, 586 F.3d at 221. "Taxable costs are limited to relatively minor, incidental expenses." *Taniguchi v. Kan Pac. Saipan*, 566 U.S. 560 (2012). Or at least they are supposed to be so limited. Chevron's claim of almost $1 million in costs appears to be, by orders of magnitude, the most excessive claim this court or any other ever has addressed in a case involving an individual.

Chevron's claim for costs is made against a human rights lawyer who has spent the bulk of his career litigating on behalf of victims of corporate and government abuse. Much of that time in recent years has been dedicated to representing Ecuadorian villagers in one case that—although successful all the way through a final judgment affirmed unanimously by the Ecuador Supreme Court—obviously has resulted in any payment by the judgment debtor. Although I have raised funds to support the Ecuador case from time to time, Chevron's own ridiculously detailed and invasive analysis of my financial accounts during the RICO trial revealed that there never has been any personal enrichment in my fund-raising efforts. The idea that I have $32 million available to satisfy Chevron's demands is patently absurd. The fact that the demands are made against a solo practitioner with modest means by a major fossil fuel company that generates hundreds of billions of dollars in annual revenue takes the absurdity to new heights.

Again, I reference and incorporate herein the more detailed arguments opposing any taxation of costs set out in my letter at Dkt. 1925. I will only add that, once again, Chevron is proceeding by trickery to avoid the consequences of its strategic litigation decisions. With respect to attorney fees, Chevron dropped all money damages for the critical benefit of avoiding a jury, knowing full well that bedrock Second Circuit case law, unchallenged since it was adopted in 1984, holds that attorney fees under RICO are unavailable unless a plaintiff recovers on a claim of damages. *Aetna Casualty & Surety Co. v. Liebowitz*, 730 F.2d 905 (2d Cir. 1984). With respect to the special master fees, Chevron chose not to seek any allocation under the specific process and within the time frame set out by Your Honor in your order dated July 9, 2013 (Dkt. 1287). Your Honor was aware at the time that I specifically and vociferously objected to paying any special master fees given my lack of funds and the obvious attempts by Chevron to use the RICO matter as a SLAPP-style vehicle to exhaust my resources and silence my advocacy. It did so specifically to deprive me and Mssrs. Piaguaje and Camacho the opportunity to exercise the due process right to a jury the Court had afforded us.

If simply recouping the special master fees under Rule 54 was an adequate response to the objections my co-defendants and I raised at the time, the Court could have simply noted the same. Instead, Your Honor established a specific process by which Chevron could seek to hold us responsible for any special master fees at a time when we could effectively oppose—and when we were actively budgeting for trial. It would be flagrantly unfair to allow Chevron a redo years later regarding the special master fees outside of this clearly established and judicially-sanctioned framework. Having long since eaten its cake, Chevron now seeks the Court's discretion in having it, too. Such gamesmanship is inconsistent with the requirements of due process and should not be tolerated.

### Conclusion

In sum, I request that this matter be transferred to another federal court or, at a minimum, to a different decision-maker not connected to the SDNY Grievance Committee. I vehemently oppose any taxation of costs. To allow the nation's third-largest company to seek costs and fees that could effectively wipe out the assets of the undersigned and silence the ongoing advocacy of a solo practitioner on behalf of impoverished Ecuadorian villagers would violate the First Amendment of the Constitution—especially when the request is the result of work related to the movant's own misconduct. The fact such burdens would result from a non-jury proceeding would be patently unconstitutional and only aggravate the injustice. I also demand the opportunity to more fully develop the record of misconduct by Chevron and Gibson Dunn described herein to advance my objections in equity that can and should factor into the court's exercise of discretion regarding costs.

Sincerely,

_____ / s / _____

# SA63

Steven R. Donziger

# SA64

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHEVRON CORPORATION,

                                  Plaintiff,


                   -against-                                    11 Civ. 0691 (LAK)


STEVEN DONZIGER, et al.,

                                  Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: _11/9/17_

### ORDER

LEWIS A. KAPLAN, *District Judge.*

        1.      Special Master Gitter and Cleary Gottlieb, on or before November 21, 2017, shall provide defendant Donziger and the Court with time records (including any description of services the existing records contain) sufficient to show the services rendered that were billed in the invoices included in the bill of costs taxed by the Clerk.

        2.      In the event that Donziger objects to the reasonableness of the hours devoted to the services performed by any or all of the Special Masters and Mr. Ormond, he shall file his objections on or before December 4, 2017.  Any such objections shall be in the form of a memorandum of law (not to exceed 25 double spaced pages), supported by affidavit(s) or declarations(s) containing any factual matter supporting the objections that is not already in the record.  Any such papers shall be confined to the question of the reasonableness of the hours in question.

        3.      The Special Masters are requested to file, on or before December 9, 2017, (a) a report recommending how the costs of the Special Masters should be allocated as among Chevron, Donziger and the LAP Representatives in the event the Court does not elect to tax all of those costs against the defendants and the rationale for their recommendation, and (b) their bills for the preparation of the report.  In making their recommendation, the Special Masters shall take into account the nature and amount of the controversy and the extent to which any party is more responsible than other parties for the reference to a master and for the need for the services performed by them.  As Donziger has had a full opportunity to be heard on the parties' means, which the Court ultimately will take into account to whatever extent it considers appropriate and which in any case is not within the Special Masters' unique knowledge by virtue of having performed the services for which costs may be taxed, the Special Masters' recommendation is not to take the parties' means into account.

**SA65**

4.    Any objections to the Special Masters' report pursuant to paragraph 3 shall be filed on or before December 23, 2017.  Objections shall be in the form of memoranda of law (not to exceed 25 double spaced pages).

SO ORDERED.

Dated:    November 9, 2017

_____

Lewis A. Kaplan
United States District Judge

## SA66

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHEVRON CORPORATION,

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12·6-17

Plaintiff,

-against-                                                      11 Civ. 0691 (LAK)

STEVEN DONZIGER, et al.,

Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### MEMORANDUM AND ORDER

LEWIS A. KAPLAN, *District Judge.*

   The history of this case is well known, and the Court assumes familiarity with its

opinion after trial and with the opinion of the Court of Appeals affirming the judgment in all

respects.[1] The matter now is before the Court on the application of defendant Steven Donziger to

review the Clerk's taxation of costs, the principal item of which is the Clerk's taxation of special

master fees and expenses in the aggregate amount of $872,387.63. The amount that previously had

been advanced by Chevron, pursuant to court order, in consequence of Donziger's refusal to comply

with the Court's order that he and the other defendants advance half of the special master costs on

an interim basis subject to possible later reallocation. Chevron contends that the entire amount is

taxable as costs against Donziger and the other defendants and, in any case, that it can and should

be imposed upon them pursuant to Fed. R. Civ. P. 53(g)(3).

---

[1]

   *Chevron Corp. v. Donziger,* 974 F. Supp.2d 362 (2014), *aff'd,* 833 F.3d 74, 126 (2d Cir.
2016), *cert. denied,* 137 S. Ct. 2268 (2017).

# SA67

Donziger objects to the taxation against him of any costs. He claims that Chevron in any case forfeited any right to seek reallocation to him of any of the special master costs previously advanced by Chevron. The Court does not now decide those issues. Among other things, it awaits a recommendation from the special masters with respect to a factor that may prove significant to the Court's determination.[2] But one discrete group of issues now is ripe for determination – the propriety and reasonableness of the charges of the special masters and their assistant.

The hourly billing rates of the special masters and the law firm associate the Court authorized to assist them have been a matter of public record in this case since April 2013.[3] Chevron's notice of taxation of costs, filed December 5, 2016, contained (a) invoices showing the total number of hours, rates and amounts, for which the special masters and their assistant were compensated during the pretrial proceedings, and (b) the detailed time records of one of the special masters, retired Magistrate Judge Theodore H. Katz. Neither in opposing the taxation of costs before the Clerk nor in the present application has Donziger objected to the hourly rates the Court approved over four years ago or contested the reasonableness of the total hours for which Chevron advanced all of the fees of the special masters and their assistant as well as their expenses. Nevertheless, as far as the Court is aware, Donziger did not have the detailed time records of the second special master, Max Gitter, Esq., or the assistant. In the interest of affording Donziger a fully informed opportunity to be heard on the reasonableness of the time devoted to the matter, the Court directed that Mr. Gitter and his firm provide Donziger with the detailed time records of Mr. Gitter

---

[2]

*See* DI 1939.

[3]

DI 964, DI 1062.

**SA68**

3

and the assistant for the period in respect of which the Clerk taxed special master compensation. The order further required that Donziger file, on or before December 4, 2017, any objection with respect to the reasonableness of the hours for which the special masters and their assistant billed.[4]

The time records were provided on or about November 21, 2017. Donziger has not filed any objections to the reasonableness of the time for which Chevron previously advanced payment. Accordingly, the Court hereby finds that the hours for and the hourly rates at which the special masters and their assistant billed, as well as the expenses, all were reasonable and appropriate.[5] The Court, however, continues to reserve decision on Donziger's application to review the taxation of costs by the Clerk.

SO ORDERED.

Dated: December 6, 2017

_____
Lewis A. Kaplan
United States District Judge

---

[4] DI 1939.

[5] The hourly rates of $700 for the special masters and $630 for their assistant all were commensurate with 2013 average billing rates for partners and associates of major New York law firms. *See, e,g.,* Joralemon Decl. [DI 1891] ¶¶ 14-15 & Ex. G [DI 1891-7]. Special Master Katz billed at his regular rate. Mr. Gitter and the assistant both billed at rates discounted from those normally charged for their services by their firm. DI 964, DI 1062.

Case 1:11-cv-00691-LAK-JCF    Document 1941    Filed 12/06/17    Page 1 of 12

# SA69

## STEVEN R. DONZIGER, ESQ.

245 WEST 104TH STREET, SUITE 7D
NEW YORK, NEW YORK 10025

212-570-4499 (O)
917-566-2526 (CELL)

December 6, 2017

**VIA ECF**

Honorable Lewis A. Kaplan
United States District Judge
United States District Court for the Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

RE:    *Chevron v. Donziger*, Case No. 11 Civ. 691 (LAK)

Dear Judge Kaplan:

Years after my first demand, I am finally in receipt of certain bills for services prepared by the court-appointed Special Masters in the above-captioned matter, Max Gitter and Theodore Katz, as well as Your Honor's order of today's date purporting to find that these bills are somehow reasonable. As outlined below, this could not be farther from the truth.[1] As set out in the bills, these insider corporate lawyers and their 20-something underlings all bill over $600/hour for days at time, often surmounting $10,000 per day, flying internationally first-class, enjoying meals and car services, all paid via secret wire transfers to their personal bank accounts by Chevron, as it pursued this private SLAPP-style prosecution with the overt aim of corrupting and "tainting" a historic environmental liability the company is obviously responsible for and upon which the lives of tens of thousands of indigenous people and subsistence farmers, who typically earn less (often far less) than $10 a day, utterly depend. That the Court finds this "reasonable" is telling. In truth, reasonable people would be shocked by the picture just painted.

Further, no legitimate purpose can possibly be served by ordering any taxation of costs at this juncture. Chevron is a huge company with more than $100 billion in annual revenue. It surely does not need the paltry funds it can possibly muster through this pointless exercise. The person against whom taxation is sought works on his own on behalf of the Ecuadorian affected communities and

---

[1]    I respectfully move the Court to accept this letter for the record—challenging the reasonableness of the Special Masters' fees at all levels and every aspect of this taxation procedure—despite its late submission. The basis for this request is that the undersigned is a solo practitioner with a heavy workload, that the bills of the Special Masters were detailed and voluminous and not presented until Nov. 21 on the eve of the Thanksgiving holiday, and that I am currently traveling abroad.

has few resources. As the Ontario Court of Appeal recently held, the Ecuadorian's case is clearly, despite all Chevron's demonization efforts, fundamental "public interest litigation." (See Annex A at 9-10.) Chevron already paid 100% of these costs years ago so the Special Masters themselves certainly are not clamoring for payment. These bills were so insignificant at the time to Chevron that the company never even asked for back-up for the invoices before promptly paying them in full. Forcing me to pay these fees at this point—fees I strenuously objected to when first proposed—would not be fair or just. In fact, the only conceivable reason to allow Chevron to impose taxation of costs on me at this time would be to allow the company to continue its demonization campaign against adversary counsel and attempt to knock him out of the case by creating a backbreaking financial burden on his life and that of his small family. I submit such a reason to impose taxation is not proper.

More broadly, I now understand why the supposedly "neutral" Special Masters had a motivation to keep these documents hidden from me for so long. These bills, as incomplete as they are, not only are facially exorbitant in the amounts reflected, but they are shocking on a variety of levels. They clearly reflect the use of this matter as a vehicle of personal enrichment for Mr. Gitter, who had 100% of his million-dollar plus "fee" wired directly by Chevron into his private banking account rather than via his law firm without disclosing this fact (or the huge payments he received from Chevron).[2] These bills reflect other abuses, including clearly unethical *ex parte* communications between the Special Masters and Chevron counsel related to the company's attempt to use the U.S. discovery process (including forcing me to endure 18 days of largely harassing depositions) to try to silence legitimate advocacy intended to correct one of the world's most horrific acts of deliberate industrial pollution—pollution that has been confirmed by three layers of courts in Ecuador based on voluminous scientific evidence not disputed by Chevron in the civil RICO matter. To this day, that pollution continues to contaminate soils and waterways relied on by indigenous peoples for their sustenance, driving an unprecedented spike in cancers and other oil-related diseases and deaths in Ecuador among some of the most vulnerable populations on the planet. Given Chevron's admission that it caused this pollution, and paid an admittedly corrupt witness at least $2 million to help it try to evade a court-mandated clean-up of the damage, equities alone should prohibit any taxation of costs. But there is much more that also prohibits any taxation of costs, as outlined herein.

---

[2]    The fact that I was supposedly responsible for 50% of these costs, and had already lodged strenuous objections to paying any of the costs of the Special Masters given his lack of resources and the stark resource imbalance between a solo practitioner and Chevron, make the failure to disclose these facts at the appropriate time even more outrageous. The bottom line is that these very tardy disclosures now confirm that Chevron financed the work of the Special Masters who either wittingly or unwittingly helped the company carry out its scheme to commit fraud and punish me with harassing depositions, without any timely disclosure of the underlying facts to opposing counsel or the public. These facts were kept secret at the very time when the pro-Chevron bias of the court and the Special Masters had been raised publicly and had prompted two rare and extraordinary appellate arguments regarding Your Honor's possible removal.

Hon. Lewis A. Kaplan
December 6, 2017
Page 3 of 12

As stated in my letter to the Clerk of the Court dated August 1 (Dkt. 1925), my objections to the Clerk's taxation of costs filed with Your Honor (Dkt. 1931), along with the arguments in my letter to the Court dated August 7 and elaborated upon further in this correspondence, Chevron is not legally entitled to any taxation of costs of legal fees in the RICO matter given its obvious fraud and misconduct before this Court. The legal bases for my position include protections afforded me under the U.S. Constitution, protections afforded human rights defenders under international law, the case law of this jurisdiction, and basic principles of equity. In short, Chevron is not entitled to receive *any* taxation of costs (or legal fees) given its proven fraud before this Court. It is barred as well by a previous court order that clearly renders untimely any taxation for fees related to the work of the Special Masters. I note that evidence of Chevron's larger fraud, orchestrated by a Gibson Dunn practice group led by Randy Mastro, continues to be ignored by Your Honor in his recent Orders.[3] Finally, it is clear that the costs sought by Chevron matter not a whit either to the company—which has grossed close to $1,000,000,000,000 (one trillion) since the beginning of the RICO matter—nor to the Special Masters themselves. These prior submissions regarding the issues of legal fees and costs are incorporated herein by reference. I briefly summarize the basis for my position as follows.

*No taxation of costs when Chevron and counsel at Gibson Dunn Committed Fraud*

As outlined on pp. 5-6 of the August 7 letter and explained in more detail in a recent criminal referral against Chevron and certain of its counsel at Gibson Dunn & Crutcher to the U.S. Department of Justice (see Annex B), it is incontrovertible that the company and its team of lawyers and investigators conspired to commit a massive fraud in the civil RICO matter that was designed to frame adversary counsel with false allegations of criminal activity related to his advocacy against Chevron. They did this largely by paying an admittedly corrupt Ecuadorian witness (Alberto Guerra) at least $2 million in cash and benefits in exchange for false testimony claiming that I arranged for a bribery and ghostwriting scheme in Ecuador that guaranteed a court victory against Chevron. I rejected and continue to reject these allegations categorically and there is no direct proof that I engaged in such a scheme other than the false and paid-for Guerra testimony—testimony which no other court in the world has credited, and which thankfully (given the unfortunate refusal of Your Honor and the U.S. appellate courts to even deal with it) is now the subject of review in Canadian courts where the holders of the Ecuadorian judgment are enforcing it against Chevron's assets. Your Honor knows that subsequent to the RICO trial the Guerra testimony was definitely rendered false by a forensic examination of the trial judge's computer by J. Christopher Racich and by Guerra's admissions under oath in a related arbitration

---

[3]   "Facts"—actually *fake* facts—procured by the Mastro-led Chevron rescue squad at Gibson Dunn are now being relied on by some of Your Honor's SDNY colleagues to press for what is clearly a highly inappropriate, unethical, and politically-motivated effort to leverage the attorney grievance process of the First Department to impose "discipline" on me for representing my clients effectively against one of the world's largest fossil fuel companies. I reiterate my request that Your Honor recuse himself from further involvement in the RICO matter and assign it to a non-conflicted venue for adjudication of any remaining issues, for reasons stated herein and in my earlier submissions outlining evidence of the court's animus toward me and my clients.

Hon. Lewis A. Kaplan
December 6, 2017
Page 4 of 12

proceeding that he repeatedly lied in the civil RICO matter—lies that Your Honor expressly relied on in "crediting" the false testimony. Chevron's motive for foisting this scheme on this Court was to try to evade compliance with a valid environmental judgment in Ecuador, as confirmed by three layers of courts and 220,000 pages of record evidence (which Your Honor refused to consider in the civil RICO matter) in the venue where Chevron had insisted the trial be held and where Chevron had accepted jurisdiction.[4] The Guerra testimony never would have passed muster before a jury of impartial fact finders, which is why Chevron feebly (after having focused-grouped the evidence before multiple mock juries) dropped all money damages claims on the eve of the civil RICO trial. Chevron and its counsel almost certainly knew the Guerra evidence was false or could not be corroborated, which is why the company never had the backbone to present it to a jury of impartial fact finders.[5]

*Abuse of the discovery process by Chevron and the Special Masters also bar taxation of costs*

As this Court knows, at the outset of the civil RICO proceeding, I was able at great personal expense to retain John Keker as my counsel. Mr. Keker ably and tenaciously represented me for over two years as Chevron's army of lawyers presented a tsunami of discovery requests and an "endless drumbeat" of collateral motions, all with the Court's tacit blessing if not outright encouragement. On March 1, 2013, for example, Mr. Keker wrote the Court, recounting *inter alia*, the following:

- "Over the last 30 days, Chevron has served Defendants with more than 10,000 pages of motions, briefs, letters, and notices."

- "Over the last three months alone, over 224 filings in CV-0691 have occurred"

---

[4]  The underlying Ecuador judgment is now being enforced in Canadian courts with three consecutive unanimous appellate decisions against Chevron and in favor of my Ecuadorian clients, despite Chevron's repeated attempts to mislead  those  courts by leveraging the erroneous findings in the RICO judgment. As indicated, Canadian courts will review Your Honor's judgment on a far fuller evidentiary record than considered by this court or available to it. This is a perilous situation for Chevron and Your Honor's own credibility. Rather than feather in Chevron's cap, the RICO judgment is now backfiring against the company and turning into a nightmare that likely will lead to the payment of the full amount of the Ecuador judgment and severe repercussions for certain Chevron managers who orchestrated the corrupt scheme. At this point, the RICO judgment demonstrates only the lengths to which Chevron will go to commit fraud if it thinks it can get away with it—which it has thus far in the United States, given this Court's repeated refusal to acknowledge is own mistakes in crediting the false Guerra testimony and the affirmance on appeal by a three-judge panel that never independently reviewed the fake facts that Chevron tried to launder through the district court.

[5]  No personal offense intended, but Your Honor's animus toward me, my clients, and the country of Ecuador has been well-documented in various filings and via Your Honors own self-damning words from the bench— including that Your Honor "got it from the beginning" prior to even holding as much as an evidentiary hearing. As prominent attorney John Keker explained in his motion to withdraw as counsel, Your Honor allowed the entire proceeding to degenerate into a "Dickensian farce" in favor of Chevron.

Case 1:11-cv-00691-LAK-JCF   Document 1941   Filed 12/06/17   Page 5 of 12
Case 18-855, Document 94, 03/11/2019, 2515258, Page81 of 303

SA73

- "In its recently produced privilege log, which itself exceeded 15,000 pages, Chevron listed 114 lawyers from Gibson Dunn alone, in addition to lawyers from over 60 other firms, working on this case. Chevron's list of legal personnel whose names might appear on documents exceeded 2,000 people."

- "Chevron has filed four separate motions for summary judgment in the past year, each with thousands of pages of exhibits. The last two motions included 56.1 statements, together totaling more than 175 pages in length with citations to hundreds of exhibits."

- "Chevron's intent is to leverage its huge advantage in money to bury [Donziger] under wave after wave of motions and discovery maneuvering to make it impossible for Defendants to mount a coherent defense."[6]

Consistent with its posture of ignoring its own role in allowing Chevron to abuse the discovery process and commit fraud in our federal courts to serve private and self-interested ends, the Court never responded to Mr. Keker's letter. A few months later, Mr. Keker—as foretold by his letter and countless pleas for common-sense relief from this Court—was forced to withdraw. He explained his difficult decision as follows:

> It is with regret that undersigned counsel is forced to make this motion to withdraw. This is an extraordinary case, which has degenerated into a Dickensian farce. Through scorched-earth litigation, executed by its army of hundreds of lawyers, Chevron is using its limitless resources to crush defendants and win this case through might rather than merit. There is no sign that Chevron wants a trial on the merits. Instead, it will continue its endless drumbeat of motions—for summary judgment, for attachment, to reinstate long-dismissed claims, for penetration of the attorney client privilege, for contempt and case-ending sanctions, to compel discovery already denied or deemed moot, etc., etc.—to have the case resolved in its favor without a trial. Encouraged by this Court's implacable hostility to Donziger, Chevron will file any motion, however meritless, in the hope that the Court will use it to hurt Donziger. Donziger does not have the resources to defend against Chevron's motion strategy, and his counsel should not be made to work for free to resist it.[7]

---

[6] _See_ Annex B. As evidence of Chevron's "intent," Mr. Keker cited nothing less than a public statement from Chevron's CEO, John Watson, who had recently told Forbes magazine, in response to the question of when the company's Ecuador problems would end: "The short answer is, it will end when the plaintiffs' lawyers give up." Christopher Helman, _Chevron's Expensive Problems_, Forbes, Mar. 4, 2013, at https://www.forbes.com/sites/christopherhelman/2013/02/13/chevrons-expensive-problems/

[7] Dkt. 1110. Of course once it had succeeded with the Court's blessing in creating the conditions that forced Mr. Keker out of the case, Chevron's appetite for trial changed as long as it could convince the court to quash my right to a jury in what was a quintessential damages case. It did this by purporting to drop all money damages claims and proceed "only" on claims for injunctive relief. The gamesmanship behind that maneuver was always

Hon. Lewis A. Kaplan
December 6, 2017
Page 6 of 12

The Court's own role, and that of the Special Masters, in helping Chevron and its counsel create the "Dickensian farce" described by Mr. Keker was anything but passive. Mr. Keker's reference to Chevron's multiple pre-trial summary judgments motions is illustrative. On two occasions, Chevron brought voluminous motions for partial summary judgment that were not only back-breakingly burdensome for my counsel, but also clearly premature and obviously designed to sap the little that was left of my resources. Mr. Keker appropriately moved under FRCP 56(d) to defer consideration of the substance of the motions until trial, or at least until later in the discovery period. The Court denied the motions and required Mr. Keker to undertake the massive burden of not just responding with legal and factual argument, but drafting specific paragraph-by-paragraph rebuttals to literally hundreds of assertions of supposedly undisputed but actually hotly disputed facts, as required by the local rules. Because the motions were obviously premature, the Court predictably denied them and deferred the substance to trial (in one case in a one-word order)—but only after having drained away massive defense resources.

The result of this Chevron-generated orgy of unnecessary motions practice overseen by a judge who "got it from the beginning" was predictable: the undersigned, a human rights lawyer and solo practitioner, ran out of money to pay counsel. Mr. Keker was forced to withdraw with over $1.4 million in arrears,[8] and I was left alone to litigate his defense in the RICO case *pro se* until just days before trial when Mr. Friedman and Ms. Littlepage, both entirely new to the matter and wholly unfamiliar with the details of the massive factual background of the case, agreed to represent me at trial.

While the Court of Appeals sadly refused to review the erroneous facts resulting from the Guerra testimony and let the judgment produced by this "Dickensian farce" survive as a matter of U.S. law, the reality is that neither Chevron nor this Court seems to appreciate is that this is an international case that has little or nothing to do with U.S. courts. The legitimacy of the civil RICO proceeding Your Honor presided over has been, and will be, subject to intense scrutiny when Chevron seeks to use it to defend against enforcement of the full amount of the Ecuador judgment in a trial in Canada.[9] The outrageous procedural abuses recounted here— including the egregious

---

manifest, but never more so than today, as Chevron seeks to sock me with $33 million in fees and costs after having violated my due process rights by sidestepping a jury of impartial fact finders. That the Court is playing along with this tricked-up maneuver is, I fear, a sad reflection of Your Honor's own shortcomings, ethical or otherwise.

[8]     Notably, that arrearage, set out in the sworn affidavit by Mr. Keker at Dkt. 1111, still stands today. That sworn evidence of a $1.4 million debt owing to prior counsel in this action by itself more than establishes the otherwise utterly obvious fact that I am impecunious in light of the magnitude of Chevron's fees and costs claims.

[9]     To be clear, this Court's ruling will only be scrutinized if Canadian find a basis to even consider the influence of the "findings" of a U.S. court that so clearly and inappropriately sought to inject itself—on behalf of U.S. company "of considerable importance to our economy," in Your Honor's words—into the process of the Canadian enforcement of an Ecuadorian Supreme Court decision, a process in which the U.S. judiciary has no legitimate role. It is more likely that Canadian courts will ultimately disregard this Court's findings without any consideration whatsoever. As the Ontario Court of Appeals recently noted, it is "the findings that underlie the Ecuadorian judgment" that matter, and those "findings have not yet been undermined in [Canadian] courts,"

Hon. Lewis A. Kaplan
December 6, 2017
Page 7 of 12

and wholly arbitrary blanket elimination of attorney-client privilege (something that never would be allowed under Canadian law) purportedly on the basis of a technical filing error by my prior counsel; the reliance on testimony from a lucratively paid "fact" witness; the reliance on numerous secret "John Doe" witnesses, and more—will not recede into a dark corner but rather will continue to be front and center for years to come in various proceedings outside the United States. Any decision forcing me to pay any portion of the fees of the Special Masters will be a part of this record.

*Overt bias of the Masters and apparent collusion with Chevron also bar taxation of fees*

As noted, the Special Masters clearly understood their mandate to be one of facilitating Chevron's private prosecution of me. Given the amount of money they were making, it is no surprise they seemed to approach the work with unbridled enthusiasm.[10] At times, they behaved so aggressively that they effectively "took the reins" from Chevron's counsel because they appeared to believe counsel wasn't being assertive enough. As detailed in numerous contemporaneous objections,[11] the Masters "rapidly became a full-fledged Chevron advocate, actively participating in the examination of Donziger on Chevron's behalf" and "rush[ing] to defend Chevron from any potentially damaging testimony." The transcripts are almost comical to read if they didn't present such a disturbing picture of what was essentially a proceeding akin to a Star Chamber. Here is one example of the over-the-top behavior of Mr. Gitter on behalf of Chevron:

> THE SPECIAL MASTER: Let's go back. Let me do it. Do you want to do it or shall I do it? Let's just finish this whole thing up. Go back a little bit.
>
> [CHEVRON LAWYER]: I would like to do it.
>
> THE SPECIAL MASTER: Go ahead, do it yourself. . . .
>
> THE SPECIAL MASTER: Excuse me, I want to ask some questions now. Are you finished with this clip?
>
> [CHEVRON LAWYER]: Go ahead, Mr. Gitter.
>
> THE SPECIAL MASTER: Are you finished with this clip?
>
> [CHEVRON LAWYER]: Not quite.

---

despite Chevron's relentless submission of, and argument from, this Court's findings in every aspect of the proceedings.  See Annex A at 10.

[10]   Special Master Katz, who actually comes off as a man of courtesy even if he too fell prey to Chevron's pressure, seemed to enjoy his duties so much that he offered his services if the parties decide to mediate a global resolution of the matter.

[11]   *See, e.g.*, Dkt. 943, 999, Dkt. 1111 at Exs. C, D.

**SA76**

> THE SPECIAL MASTER: You finish first.
>
> [CHEVRON LAWYER]: Please, you are the Special Master. You ask the questions.
>
> THE SPECIAL MASTER: That is okay. I want you to finish first. . . .
>
> THE SPECIAL MASTER: Did you say it on film? The question is, did you say it on film?
>
> THE WITNESS: I don't remember, sir.
>
> THE SPECIAL MASTER: When did you review the outtakes that you saw in preparation for this deposition?
>
> THE WITNESS: On different occasions starting many weeks ago. There are a lot of outtakes.
>
> THE SPECIAL MASTER: I know, because I saw a lot of outtakes. Are you unable to answer the question? And the question is, is it true, are you unable to answer that question? The question is -- you know, it makes a declarative statement, you are on film on numerous occasions saying in effect you are out to get in this lawsuit as much money as you can; isn't that true? The entirety of the question is, isn't that true, and are you telling us you cannot answer that question? Is that what you are telling us?

Even more disturbing are the numerous indications that the Special Masters engaged in secret *ex parte* communications with Chevron's legal team. For example, when one of his relevance rulings in the middle of a deposition was challenged by my counsel, Special Master Gitter cryptically said on the record that "there ***will be a filing*** . . . at some point that will show you the relevance that I was satisfied about . . . ***Mr. Mastro, am I correct about that?***" Mastro: "***You are absolutely correct.*** But it won't come as a surprise to [Donziger's counsel] that ***I'm not going to discuss it with them today***." At another deposition, the Special Master responds to another relevance challenge similarly: "Actually, as I believe you will find out in the not that distant future, there was real relevance to this. Go on."

*Chevron's forfeiture of reimbursement of fees under the Court's July 9, 2013 Order*

As set out in my letter of objection to the Clerk dated August 1, and in my objections to the Clerk's taxation dated August 15 (Dkt. 1931), Chevron already has forfeited any claim to Special Master fees by failing to move for compensation or contribution within the time period clearly mandated by the Court in the pre-trial phase of the RICO proceedings.

Hon. Lewis A. Kaplan
December 6, 2017
Page 9 of 12

As the Court might recall, shortly after Mr. Keker was forced to withdraw, I reiterated my objection to any requirement that I incur the costs of the Special Masters when I did not have the resources even to pay my own counsel. The Court addressed this objection in an Order To Show Cause dated June 19, 2013. This Order proposed that the Masters bill Chevron and defendants separately. It noted that if I was unable to pay, Chevron could "advance" 100% of the funds to the Masters with the option of later seeking a separate judgment against me for my supposed share of the fees – not dissimilar, in my view, to the humiliating notion of forcing a person executed to pay up front for the bullet of his executioner. *See* Dkt. 1253. I objected on numerous grounds. Dkt. 1267. In response, the Court modified the procedure by requiring (in an order dated July 9, 2013) Chevron to pay the Master fees in their totality and set a deadline for the time within which Chevron could seek any compensation or contribution by me, as follows:

> Within 14 days after the later of (a) the submission of the special masters' final billings and (b) the determination of any objections thereto by Chevron, Chevron may move, pursuant to Fed. R. Civ. P. 53(g)(3), for an allocation of part of the fees and costs advanced by it to one or more of the defendants. The motion shall include all bills and substantiation provided to Chevron by the special masters. Defendants shall file any objections to Chevron's motions within 14 days of its service.

Dkt. 1287 at 2. The court specifically observed that that "defendants complain that they are entitled to know the amount of the costs that may be imposed on them. And so they shall—at such point as Chevron seeks an order requiring them to pay all or part of the costs it will advance pursuant to this order." *Id.* at 3.

Likely because it would have revealed the punitive nature of Chevron's strategy at a time when the entire RICO case still had to survive appellate review, Chevron chose to let the 14-day deadline expire. Indeed, because I never even knew how much the Masters had billed and for what purposes, I also was deprived of my right to argue the relevant due process issues and implications not only on the merits appeal of the RICO judgment but also on the interlocutory mandamus petitions, which the Court of Appeals denied after holding rare and extraordinary hearings including one in September 2013 around the same time that Chevron decided not to apply for any allocation of costs. This was a clear tactical decision that worked to Chevron's advantage. By not moving for an allocation for the fees at the mandated time, under a Court order clearly setting out Chevron's exclusive remedy as to those costs, Chevron voluntarily forfeited any claim to allocation, contribution, or compensation regarding the Masters' fees. Chevron, a company that operates with 1,500 subsidiaries in dozens of countries around the world while grossing billions of dollars per month in revenue, cannot now receive a do-over by way of a generic taxation application that is obviously being used for punitive purposes against a solo practitioner.

Hon. Lewis A. Kaplan
December 6, 2017
Page 10 of 12

*Overarching abuses and outstanding omissions in the billing records of Mr. Gitter*

Even a cursory review of the incomplete billings provided by Mr. Gitter and his law firm suggest he unethically used his role as Special Master—in a case ultimately about the health and human rights of thousands of impoverished indigenous people and subsistence farmers—as a vehicle for personal enrichment, even where this meant acting as a handmaiden in Chevron's fraudulent scheme to taint the Ecuador environmental case with utterly and obviously false evidence. Among many problems with the ethics reflected in Mr. Gitter's billing records:

- In his cover letter dated November 21, Gitter claims that I never requested his billing records or those of his law firm. This is a brazen lie, given the fact that Mr. Keker and I repeatedly demanded complete information on what Mr. Gitter was purporting to charge. The lie is designed to cover up the fact that Mr. Gitter refusal to disclose his billing records earlier prevented me from having access to facts that would have exposed his unethical behavior at a more meaningful time, and that would have allowed the defendants a full challenge to his bias and that of the court.

- Indeed, while the Ecuadorians affected by Chevron's reckless drilling practices might be lucky to earn $200 in monthly income—largely because of the extreme poverty inflicted on them by the oil company's refusal to clean up its pollution—Mr. Gitter had the nerve to bill close to $400,000 for only three months of work. Mr. Gitter's young associate, Mr. Ormand, billed significant sums for luxury car services and meals, flew first-class to Peru (charging $630 per hour while he sat on the plane), and billed a total of $394,932.59 for three months of work that was apparently largely administrative in nature, or involved junior capacity legal work consistent with what Your Honor gets from his law clerks. Gitter and Ormand on occasion billed at or around $10,000 per day—or what the average Ecuadorian indigenous person might hope to make in about four years of work.

- Chevron secretly wired Mr. Gitter these outlandish sums directly to his personal account. Mr. Gitter's earlier refusal to disclose his bills is surely explained by his desire to downplay the fact that he was essentially on Chevron's dole as he purported (not very convincingly) to be a "neutral" referee in the case. Your Honor was complicit in this strategy by refusing my repeated requests to learn of Gitter's bills at a time that I could use the information in the mandamus petition that sought Your Honor's recusal for your own bias and unethical behavior.

- Gitter has yet to produce what surely are far higher bills for his work as Special Master during the 1782 depositions—including his work "overseeing" roughly 15 days of depositions imposed on the undersigned. Clearly Mr. Gitter billed well over $1 million and probably closer to $2 million, for the work of himself and that perhaps administrative and associate assistance during that period of the case.

Hon. Lewis A. Kaplan
December 6, 2017
Page 11 of 12

The idea that the district court would now even entertain the idea of letting Chevron recoup some of the funds it secretly wired years ago into the personal account of Mr. Gitter and into the account of his law firm is an astonishing affront to basic principles of fairness. That those funds are potentially being recouped from a solo practitioner for the benefit of an oil company that cared so little about this money that it never even asked for the back-up only underscores the point.

*Conclusion*

The points above are in addition to those presented in my objections to the Clerk's taxation of costs (Dkt. 1931) and my objections filed directly with the Clerk (Dkt. 1925). This includes my argument that any costs award is inappropriate where "the losing party can demonstrate misconduct on the part of the prevailing party," *AXA Versicherung AG v. New Hampshire Ins. Co.*, 769 F. Supp. 2d 623, 625 (S.D.N.Y. 2011), a standard I can meet based on Chevron's and Gibson Dunn's involvement in the fabrication of Guerra's "bribery" and "ghostwriting" testimony that has now been proven false and was likely known to be false by the Gibson Dunn attorneys who coached Guerra for 53 days before presenting it to this Court. See Letters dated Aug. 7 and Sept. 11, 2017, Dkts. 1927, 1936.[12] To the extent there is any doubt as to the existence of misconduct on the part of Chevron and Gibson Dunn, the *prima facie* evidence is at minimum sufficient to entitle me to discovery into the alleged misconduct in order to more fully establish it. With regard to fees for the Masters, I demand the Court set dates to file motions seeking discovery of Messrs. Gitter, Katz, and Ormand prior to issuing any ruling in favor of the company.

As I noted in my August 15 objections, "[t]axable costs are limited to relatively minor, incidental expenses." *Taniguchi v. Kan Pac. Saipan*, 566 U.S. 560 (2012). Chevron's claim of almost $1 million in costs, primarily based on the fees of the  Special Masters, appears to be, by orders of magnitude, the most excessive claim this court or any other ever has addressed in a case involving an individual. The fact that the costs claim is made against a human rights lawyer who has spent the bulk of his career litigating on behalf of victims of corporate and government malfeasance makes it all the more egregious. The fact that the claim is utterly disconnected both from my

---

[12]  Chevron's and the Court's desperation to suppress new and incontrovertible evidence that has utterly disproven the key testimony at the core of this Court's RICO findings is palpable. Chevron's hilarious and ultimately futile attempt to simply eradicate the reality of this evidence via judicial fiat is illustrated beautifully by its motion to strike my filings from the docket. The Court's embrace of this strategy by ordering the filings stricken is yet another illustration of how Your Honor seems to lack proper independence and is simply continuing the "Dickensian farce" described by Mr. Keker. The move successfully reburies Chevron and the Court in the quicksand of fantasy that posits that what this Court says and does will resolve this 25-year struggle for environmental justice. In fact, this matter is being resolved at the moment via courts with far more jurisdiction, evidence, and neutrality than that possessed by the district court. As noted above, the new evidence—and this Court's refusal to allow argument regarding the same—will be fully considered in Canada and other enforcement jurisdictions. And of course, the filing is available to the public at http://stevendonziger.com/wp-content/uploads/2017/11/20170807-Ltr-to-Kaplan-re-July-17-order.pdf.

Hon. Lewis A. Kaplan
December 6, 2017
Page 12 of 12

practical ability to pay and Chevron's actual need, and instead so clearly serves Chevron's punitive and personal demonization strategies, is worse still.

Sincerely,

_____/ s /_____

Steven R. Donziger

# SA81

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
CHEVRON CORPORATION,

Plaintiff,

-against-                                    11 Civ. 0691 (LAK)

STEVEN DONZIGER, et al.,

Defendants.
------------------------------------------------------------------X

## SPECIAL MASTERS' FINAL REPORT AND RECOMMENDATION
## ON ALLOCATION OF THEIR FEES AND COSTS

Pursuant to Your Honor's Order of November 9, 2017 (ECF No. 1939) (the "Allocation

Order"), the Order of Appointment (ECF No. 942) (the "Order of Appointment"), and Rule 53 of

the Federal Rules of Civil Procedure, we respectfully submit this report and recommendation on

the allocation of our fees and costs. For Your Honor's consideration, we have also included a

summary of our work performed in connection with our appointment, which is intended to serve

as our final report on discovery under paragraph 2(e) of the Order of Appointment.

## BACKGROUND

The long and tortured history of this dispute, started in this Court in 1993, has spanned

decades and continents. For a full recounting, we refer the reader to Your Honor's opinion

following the trial of this matter and to the opinion of the United States Court of Appeals for the

Second Circuit affirming Your Honor's judgment in favor of plaintiff Chevron Corporation

("Chevron"). *See Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362 (S.D.N.Y. 2014) ("*Chevron

I*"), *aff'd*, 833 F.3d 74 (2d Cir. 2016) ("*Chevron II*"), *cert. denied*, 137 S. Ct. 2268 (2017). This

# SA82

report and recommendation assumes familiarity with those exhaustive opinions. We now consider our role in pre-trial discovery, and how the fees and costs associated with our work, which have to date been advanced by Chevron, should be allocated, "in the event the Court does not elect to tax all of the costs against the defendants." Allocation Order ¶ 3.

## A.    Our Appointment and the Work Performed

On February 13, 2013, Chevron moved for the appointment of a special master to oversee party and non-party depositions in this matter. At that time the discovery deadline was May 31, 2013, and the parties contemplated some 42 depositions. *See* Chevron Corporation Motion to Appoint Special Master (ECF No. 797 at 1). The trial was scheduled for October 15, 2013, *see* Trial Order (ECF No. 606). Chevron based its request primarily on its expectation that the depositions in this matter would be contentious and would require resolution of "among other things, privilege and work product objections in connection with dozens of depositions . . . ." *Id.* at 1, 4. Defendants objected to Chevron's request. *See* Joint Memorandum of Law in Opposition to Motion to Appoint Special Master (ECF No. 822).

On March 1, 2013, Your Honor granted Chevron's request. *See* Memorandum Endorsement (ECF No. 865) ("Appointment Memorandum"). Your Honor observed that this case was "exceptionally contentious" and plagued by exceedingly difficult relations between counsel; the Court wrote that "[t]here [was] no reason to expect that depositions of many or all of the important witnesses in this case [would] proceed properly without supervision." *Id.* ¶ 1. Your Honor pointed to the following prior history:

- In the Section 1782 proceeding Chevron brought to obtain discovery from Donziger in connection with litigation and arbitration abroad,[1] Your Honor

---

[1] References in this report and recommendation to "the Section 1782 proceeding" are to the action captioned *In re Application of Chevron Corporation*, 10-MC-00002 (LAK) (S.D.N.Y. filed Aug. 4, 2010).

# SA83

"concluded that it was necessary to order Donziger to respond to questions without evasion, self-serving statements, or criticism of the questions . . . ." *Id.* ¶ 2 (citation and quotations omitted).

- In the severed litigation of Count 9 of the amended complaint in this case, Defendants directed witnesses "not to answer questions on ground of alleged privilege despite prior rulings by magistrate judges in both the District of Maryland and this Court that the claimed privileges and had been waived, vitiated by the crime-fraud exception or both." *Id.* (citation omitted).

- During prior document discovery in this case, Defendants and their allies had been "remarkably obstructive" and that "[t]he likelihood of further attempts to preclude or disrupt discovery [was] palpable." *Id.* ¶ 3.

- Your Honor further found that the problems identified above would "likely be compounded by the possibility that some important depositions will take place outside the United States and others in this country but in districts remote from this one, making effective and timely supervision by [Your Honor] or a magistrate judge, both having substantial other responsibilities, virtually impossible." *Id.* ¶ 4.

Given the imminent discovery cut-off date and the large number of depositions contemplated, Your Honor concluded that at least two special masters would be necessary to handle the depositions in this matter. On March 26, 2013 you appointed us to serve as Special Masters in this case. *See* Order of Appointment.

Between the date of our appointment and the formal end of discovery (which was later extended from May 31, 2013 to June 30, 2013, see below) Special Master Gitter and Mr. Ormand worked essentially full time on this assignment.[2] Special Master Katz's schedule in that period was, from time to time, subject to pre-existing, binding commitments as special master in

---

[2] At the time of the work described herein, Mr. Ormand was an associate with Cleary Gottlieb Steen & Hamilton LLP. Citing Mr. Ormand's exceptional abilities and his work in the Section 1782 discovery, the Special Masters jointly requested his assistance, which was so-ordered by the Court. *See* Order of Appointment ¶ 9 (ECF No. 942); Endorsed Letter (ECF No. 1062). Given his familiarity with this matter and our role as Special Masters in it, Mr. Ormand has in effect served as "of counsel" to us in connection with the preparation of this report and recommendation.

# SA84

a case before another judge of this Court (a case involving supervision of a deposition in Hong Kong) and as an arbitrator or mediator for JAMS. After June 30, 2013, and through the end of the trial in late November 2013, the work on this assignment became far more sporadic for both us and for Mr. Ormand (although it did entail supervision of a very few depositions that Your Honor afforded to the parties during the trial).

In addition to the preparation of this report, the work we performed, with the invaluable assistance of Mr. Ormand, included the following, among other tasks:

- Supervision of depositions of 25 witnesses (supervision of seventeen in person and four by video conference, to avoid travel costs, and supervision by phone availability of four additional depositions – most of the "availability" events ultimately turned into a supervisory event, in part).[3] The parties had been allowed by the Court 21 depositions per side (Rule 16 Order, ECF No. 910, ¶ 1) during the short period between March 15, 2013 and the original discovery cut-off date, May 31, 2013, but that number became substantially reduced in part through our mediation efforts.

- Responding to numerous and varied applications by the parties, and mediating the number, scheduling, and venues of the depositions, all of which necessitated hundreds of emails, conference calls, and phone calls, as well as an occasional in-person conference with all counsel.

- Daily, including weekends, close attention to (by initial screening reviews and often later detailed readings of) nearly 400 court filings made by the parties and Your Honor in the 95 days between March 26 and June 30, 2013, including: motions (some involving voluminous exhibits), Your Honor's orders and opinions (many of which were lengthy), court hearing or conference transcripts, stipulations, letters, and other filings.[4]

---

[3] We endeavored, successfully, to split roughly evenly the time each of us spent on deposition supervision, taking into account the fact that several depositions consumed only a half day while others consumed far more than a full working day, going even well past 8:00 p.m., or two days. (Mr. Ormand attended each deposition supervised by us.) As a consequence of Special Master Katz's pre-existing commitments mentioned above, and for other reasons, including several reflected below and because of Mr. Gitter's ready access to secretarial, copying, filing, and other office services, some other tasks, or the lead role in other tasks (such as the initial drafting of most of our formal written orders), fell disproportionately to Special Master Gitter.

[4] As in many other large law firms, monitoring of court filings and their retrieval (both hard copy and electronic) are made at Cleary Gottlieb by non-legal staff in Cleary Gottlieb's managing

# SA85

- Issuance of hundreds of oral rulings at the depositions, some of which required factual or legal research at a break in the deposition prior to ruling, and 20 numbered, formal written orders, several of which were lengthy. (Only three rulings or orders were appealed to Your Honor by one or more parties; all three were affirmed.)

- Review of often voluminous document productions in connection with the depositions, at times on very short notice.[5]

- Review of portions of correspondence and transcripts in the Section 1782 proceeding, when required to deal with issues of subject matter waiver of privilege that arose in several of those supervised depositions. *See, e.g.*, Special Masters Order No. 6 at 5 & n.3 (ECF No. 1093); Tyrrell Tr. at 58:5-74:14 (June 13, 2013).[6]

- Extensive review of the court filings and email correspondence relating to various related section 1782 proceedings brought in other jurisdictions (particularly the proceeding in the United States District Court for the District of Colorado), which became highly relevant to the privilege issues in the depositions of the witnesses whose testimony concerned those proceedings.[7]

- Review of a great many other documents, transcripts, court filings, opinions and correspondence from a variety of prior proceedings and depositions, which was necessary to prepare for the supervised depositions.

- Substantial legal research on many issues relating to attorney-client and work product privilege that were raised by the parties immediately before or during nearly every supervised deposition, including: waiver (express, implied, by conduct, by client, by failure to object timely, by prior voluntary testimony), joint defense, common interest, crime-fraud exception, proper holders of the privileges, and others.

---

attorney's office. Given their physical proximity and ready electronic access via Cleary Gottlieb's managing attorney's office, Special Master Gitter and Mr. Ormand conducted the screening reviews to determine relevance to our work (which proved to be the case for the majority of filings, or parts thereof) and the screener determined whether further dissemination and closer reading of a court filing, or a portion of it, was warranted.

[5] For example, late in the evening before the deposition of witness Martin Beier, his counsel delivered to Special Master Gitter, who was scheduled to supervise that deposition, an especially large number of documents, necessitating nearly all night review of the documents.

[6] Given his familiarity with that Section 1782 correspondence and the transcripts, Special Master Gitter conducted those reviews.

[7] As Special Master Gitter was supervising the depositions of the first two of those witnesses in the Colorado proceedings, those reviews fell to him.

# SA86

These tasks required hundreds of hours of work by both of us and Mr. Ormand, as our time records show. This included time before and after business hours, *see, e.g.*, Special Masters Order No. 6 at 5 n.3 (ECF No. 1093) (describing late night *in camera* review conducted in advance of a deposition scheduled for the next morning), over weekends, *see, e.g.*, Joint Order No. 2 (ECF No. 972) (issued on a Saturday), and -- for Special Master Katz and Mr. Ormand -- travel to supervise depositions of Ecuadorian citizens at the U.S. Embassy in Lima, Peru. The logistics of scheduling the depositions in Peru alone required a substantial amount of our and Mr. Ormand's time, *see, e.g.*, Special Masters' Interim Report No. 1 (ECF No. 1146), as our time records reflect.

While the sheer bulk of the material with which the Special Masters were required to become familiar can be gleaned by the massive factual record set out in this Court's, and the Court of Appeals', opinions *Chevron I* and *Chevron* II, much of the work we were required to do was actually occasioned by the parties' -- and in particular Defendants' -- conduct during discovery. We now turn to that subject.

**B.     The Parties' Conduct During the Depositions**

Regrettably, Your Honor's stated concerns about the parties' contentiousness and Defendants' obstructive behavior were reflective of our experiences as Special Masters in this matter. Even routine requests were met with pitched battle by Defendants. Defendants frequently treated our orders not as directives but as statements to be litigated or ignored. Defendants also repeatedly interposed frivolous privilege objections -- even after those same or similar objections had been overruled (and no appeal had been taken) -- in an effort to block the people who witnessed or participated in the underlying events at issue from testifying about what happened. We provide the following non-exhaustive examples by way of illustration:

# SA87

*Obstructive Behavior in Connection with Scheduling*

Three days after our appointment, we attempted to convene a conference call with the counsel for all the parties to address elementary, preliminary matters such as the identities of witnesses to be deposed, which depositions would require supervision, and the parties' views on scheduling. Defendants responded to this most simple and basic of requests by obstructing our efforts to schedule the call and attempting to relitigate whether our presence in this matter was necessary. We had to issue two separate written orders just to have a lawyer for Mr. Donziger -- any lawyer, however junior -- on the phone. *See* Joint Order No. 1 (ECF No. 971), Joint Order No. 2 (ECF No. 972).

We spent many hours mediating disputes over the deposition schedule, disputes generated mostly by Defendants. One scheduling dispute that bears particular mention in analyzing allocation arose out of Mr. Donziger's request for an extension of the discovery cut-off date then set for May 31, 2013 -- a deposition scheduling dispute that occasioned more than five orders, a court hearing, and a Special Masters Interim Report.[8] The dispute came about after the motions to withdraw filed by Keker & Van Nest LLP and Smyser & Veselka, LLP (ECF No. 1164) were granted. In light of this development, we understood that the deposition schedule that had been in effect at that time would no longer be practicable. A more complete account of the circumstances is provided in our Interim Report No. 2 (ECF No. 1183), and in Your Honor's May 24, 2013 Order (ECF No.1185), but in brief, after initial positive developments toward

---

[8] This dispute was the subject of, among others, Special Masters Order No. 10 (ECF No. 1171), Your Honor's Order of May 21, 2013 (ECF No. 1176) ("May 21 Order"), Special Masters Interim Report No. 2 (ECF No. 1183), Your Honor's Order of May 24, 2013 (ECF No. 1185) ("May 24 Order"), Special Masters Order No. 11 (ECF No. 1188) ("Order No. 11"), and Special Masters Order No. 12 (ECF No. 1189) ("Order No. 12").

# SA88

agreement on a new deposition schedule, Defendants' positions underwent a radical change, over the course of one night.

In connection with this negotiation, on May 20, 2013, Mr. Donziger made a motion for Your Honor to implement "procedural safeguards" that would provide a "workable transition" to his *pro se* representation, including a two week delay of all depositions and other deadlines. May 21, 2013 Order (ECF No. 1176). At Your Honor's request, we submitted our Interim Report No. 2 on May 23, 2013, which (for reasons set forth therein) recommended that Your Honor reject Mr. Donziger's motion. That same day (three days after his initial request), Mr. Donziger sought an even longer, three-month delay in the completion of the depositions. *See* May 23, 2013 Minute Entry. Your Honor rejected this modified request, but granted Mr. Donziger's initial request for a two-week extension. *Id.*

The day after the Court granted Mr. Donziger's request, we received correspondence from Defendants, including Mr. Donziger, which suggested that the depositions should proceed immediately -- notwithstanding that their request for a two-week total hiatus had just been granted by Your Honor. As described by Special Master Katz in Special Masters Order No. 11: "In my 21 years as a magistrate judge, I never encountered a shifting of positions as stark and inexplicable as those which have occurred here in just the last five days." The following day, Defendants reversed their position yet again. *See* Special Masters Order No. 12.

As a result of this dispute, we were required to convene several conference calls, participate in a court hearing, submit an interim report, and issue four written orders. Attending to basic matters like scheduling should never require Herculean effort, but in this case, due to Defendants' obstructive behavior, we were forced to devote many hours to that most basic task.

# SA89

*Frivolous and Repetitious Assertions of Privilege*

As Your Honor predicted in the Appointment Memorandum: "[I]t is virtually certain that many claims of privilege will be made in certain depositions. It is important to the proper progress of this action that they be ruled upon promptly. Any other course will cause unnecessary delay and expense." Appointment Memorandum ¶ 5. Your Honor's prediction came true. While an occasional difficult privilege issue required our attention, there were, more frequently, frivolous assertions of privilege (and other frivolous objections by Defendants), which generated substantial unnecessary work and used up a great deal of the deposition day.[9]

One notable example is the subject of Special Masters Order No. 6 (ECF No. 1093) ("Order No. 6"). Special Master Gitter issued Order No. 6 shortly after the deposition of Martin Beier of Silver & DeBoskey, P.C., former counsel for Stratus Consulting, Inc. ("Stratus"). The order addressed two points that had previously been decided orally during Mr. Beier's deposition. *See* Beier Tr. at 140:25-146:22 (April 30, 2013). First, Special Master Gitter rejected a bare, blanket, conclusory assertion of "work product and common interest privileges" made via email from defense counsel prior to the deposition. *See* Order No. 6, at 3-4. Second, Special Master Gitter rejected additional "alleged common interest" privilege objections raised during Mr. Beier's deposition by defense counsel in response to a line of questioning about the desire of Patton Boggs LLP, counsel for the Lago Agrio Plaintiffs, to delay Stratus's document production in section 1782 proceedings filed against it. *See* Order No. 6, at 5-7. As the Order

---

[9] As is customary, we required that arguments about objections take place outside the presence of the witness. Defendants used this mechanism frequently, for inappropriate questioning or frivolous objections, creating undue interruptions of testimony and expanding our time expenditures. For example, Defendants' behavior turned the Guerra deposition from seven hours of testimony into a 10 ½- hour day for us.

# SA90

notes, much of the asserted privilege of a "common interest" dealt not with communications between defendant and the witness but solely between the witness and his own law partners.

Further, to address fully Defendants' privilege claims (and avoid undue delay), Special Master Gitter and Mr. Ormand were required to invest substantial time researching privilege issues and thoroughly reviewing the factual record in the Colorado Section 1782 proceeding against Stratus. This research revealed that (a) the privilege assertions were legally lacking in specificity; (b) the privilege assertions, when probed, were substantively spurious; (c) the privilege assertions had previously been found to have been waived in the New York Section 1782 proceeding (defense counsel had not objected to voluntary testimony by Mr. Donziger about purportedly privileged subject matter); and (d) the documentary evidence was inconsistent with the purported common interest relationship and instead demonstrated "divergent and at times even antagonistic interests." *See generally* Order No. 6. Nevertheless, and without having taken an appeal, Defendants re-argued this frivolous privilege position on the record at a number of subsequent depositions. *See, e.g.*, McDermott Tr. 38:7-50:7 (May 21, 2013); Garr Tr. 64:19-66:23 (June 5, 2013); Kohn Tr. 219:19-221:11 (June 6, 2013); Tyrell Tr. 58:5-74:14 (June 13, 2013). *See also* Dunkelberger Tr. at 37:11-48:5 (June 26, 2013) (in a telephone availability deposition supervised by Special Master Gitter, overruling privilege objection on waiver grounds and, observing that "we have been through this before several times, at least in five depositions that I can recall . . . [t]he basis for my ruling [now] is the same one I made at the time in the McDermott deposition and the Beier deposition and in the Garr deposition and in the Kohn deposition and in the Tyrrell deposition"). Many of these repetitive objections caused delay at the depositions.

# SA91

Our experience with Defendants' frivolous assertions of privilege was consistent with

Your Honor's experience in the severed Count 9 litigation.  *See* Appointment Memorandum ¶ 2

("counsel for . . . these defendants repeatedly directed witnesses . . . not to answer questions on

ground of alleged privilege despite prior rulings by magistrate judges in both the District of

Maryland and this Court that the claimed privileges had been waived, vitiated by the crime-fraud

exception or both").  Dealing with these objections, which should never have been made,

required substantial effort by both us and Mr. Ormand.

*Unwillingness to Accept Prior Rulings*

Defendants also repeatedly demonstrated an unwillingness to accept and/or follow both

Your Honor's and our prior orders – often by relitigating them after they became final.[10]  To cite

just a few examples:

- Defendants repeatedly disobeyed our prohibition on speaking objections, *see* Special Masters Order No. 3 (ECF No. 1058), which unnecessarily lengthened many of the depositions days.

- As noted above, Defendants repeatedly re-argued frivolous privilege positions.

- Mr. Donziger (having shown up late for his deposition both days) spent the better part of two hours at the beginning of the first day of his deposition complaining about his status as a Rule 30(b)(6) witness, Donziger Tr. at 4:22-41:24, even though all concerned, including the Special Masters, had been operating on the assumption from the outset of our appointment, as the parties well knew, that he would testify in that capacity on behalf of his law firm.

- Mr. Donziger opened the morning of the second day of his deposition by complaining about Your Honor's orders in relation to our fees and about the length of his deposition, Donziger Tr. at 319:2-333:6, all of which had already

---

[10] In two instances Chevron also was an offender on this score:  (a) Chevron had sought to limit the subjects for permissible examination of its so-called "apex" witnesses, notwithstanding Your Honor's prior orders on the scope of permissible discovery.  *See* Special Masters Order No. 10 (ECF No. 1171).  We denied that request.  *Id.*  Undeterred, Chevron again sought similar relief with respect to its Rule 30(b)(6) witnesses, and we again denied the request.  *See* Special Masters Order No. 17 (ECF no. 1242).  (b) Both sides sought to relitigate our order concerning the length of the deposition of Judge Nicolas Zambrano.  *See* Special Masters Order No. 7 (ECF No. 1122).  We denied those requests.  *Id.*

# SA92

been the subject of prior orders from either Your Honor, or us, rejecting his complaint. Order (ECF No. 12531, Special Masters Order No. 13 (ECF No. 1190).

Dealing with the parties' -- and in particular Defendants' -- unwillingness to accept or follow prior orders also required substantial effort by both us and Mr. Ormand.

## DISCUSSION

Rule 53(g)(3) of the Federal Rules of Civil Procedure provides that "[t]he court must allocate payment among the parties after considering the nature and amount of the controversy, the parties' means, and the extent to which any party is more responsible than other parties for the reference to a master. An interim allocation may be amended to reflect a decision on the merits." Courts enjoy "broad discretion" in determining cost allocations for special master fees. *See, e.g.*, *Roy v. Cnty. of Lexington*, 141 F.3d 533, 549 (4th Cir. 1998); *Aird v. Ford Motor Co.*, 86 F.3d 216, 221 (D.C. Cir. 1996); *Apponi v. Sunshine Biscuits, Inc.*, 809 F.2d 1210, 1220 (6th Cir. 1987).

In making our recommendation on allocation, we have considered the factors set forth in Rule 53 and Your Honor's Order. At Your Honor's instruction, we have not considered "the parties' means" in preparing this report. *See* Allocation Order ¶ 3.

## A. The Nature and Amount of the Controversy

As Your Honor has observed, "[t]his case is extraordinary. The facts are many and sometimes complex." *Chevron I*, 974 F. Supp. 2d at 384. The conflict between the parties in this case, as the Second Circuit observed, "must be among the most extensively chronicled in the history of the American federal judiciary." *Chevron II*, 833 F.3d at 83 (citations, quotations and alteration omitted). The substance of this matter has proceeded since 1993 in the court systems of the United States and Ecuador, among other fora. This particular action was commenced by Chevron in 2011, and sought, successfully, to enjoin Defendants from enforcing in this country

# SA93

an $8.646 billion Ecuadorian judgment against Chevron that was "procured through, *inter alia*, defendants' bribery, coercion, and fraud . . . ." *Chevron II*, 833 F.3d at 80.

While this case is unique and the amount in controversy is obviously huge, we have found little guidance in the case law concerning whether, and if so how, those facts should inform our recommendation on allocation in this case. The Advisory Committee notes to Rule 53 suggest that the amount in controversy might be considered relative to the parties' means (which we have been instructed not to consider). Those notes also state that "[t]he nature of the dispute also may be important -- parties pursuing matters of public interest, for example, may deserve special protection." Fed. R. Civ. P. 53(h) advisory committee's note to 2003 amendment. Neither the example in the Advisory Committee Notes nor case law with similar examples[11] has anything to do with the "nature of the controversy" in this case.

As this Court has stated repeatedly this case is about allegations (now proven and found) of bribery and fraud; more precisely, about a series of frauds that include frauds designed to obstruct the revelations of the underlying bribery and frauds. Put another way, "the nature of the controversy" in this case is inextricably bound up with the other factors -- "responsibility for the reference"; the parties' conduct in discovery after the reference; and the "decision on the merits."

**B.     Responsibility for the Reference**

  *i).     Responsibility for Initial Reference*

The Advisory Committee Notes on the 2003 Amendment states, in pertinent part, that "[a] party whose unreasonable conduct has occasioned the need to appoint a master . . . may

---

[11] *See, e.g., Morgan Hill Concerned Parents Assoc. v. Cal. Dep't of Educ.*, No. 2:11-cv-03471-KJM-AC, 2015 WL 10939711, at *2 (E.D. Cal. July 2, 2015) (plaintiffs were nonprofit associations pursuing "a free appropriate public education on behalf of their members' children with disabilities").

# SA94

properly be charged with all or a major portion of the masters' fees."

As discussed more fully above, Your Honor's Appointment Memorandum makes clear that Defendants' obstructive conduct, both in this case and in related proceedings, gave rise to the need for our involvement at the deposition phase of this case. That prior conduct included Mr. Donziger's refusal to behave properly as a witness in the Section 1782 proceeding (which continued at his deposition in this case); it also included the practice of interposing frivolous privilege objections to block important testimony.

While we recognize and have taken into account that the reference to us was made on Chevron's motion, Defendants were far more responsible than Chevron for both the reference to us and the need for our intervention at the depositions. This latter factor weighs heavily in favor of substantially increasing the portion of our fees and costs allocated to Defendants.

ii).     *Parties' Conduct before the Special Masters*

The cases dealing with "responsibility for the reference" also indicate that the parties conduct before the master can be an important factor in an allocation. *See e.g.*, *Glover v. Wells Fargo Home Mortg.*, 629 F. App'x 331, 339 n.7 (3d Cir. 2015), *cert. denied*, 136 S. Ct. 2388 (2016) (allocation may take into account "frivolous or bad faith positions that have unnecessarily increased the costs associated with the proceeding <u>before the Special Master</u>") (emphasis added); *see also Evolution, Inc. v. Suntrust Bank*, No. 01-2409-CM DJW, 2004 WL 2278559 at *5 (D. Kan. Sept. 28, 2004) (a party's "lack of cooperation" with special master a major factor in apportioning 70% of masters' fees to that party). Further, the sentence in Rule 53 that provides for amendment of an interim allocation after a decision on the merits may be read to indicate an intention that the allocating court take account of the parties behavior during special master supervision.

14

# SA95

Here, the very conduct that created the need for a reference to us continued unabated during the discovery we supervised, and it unnecessarily increased the costs of the proceedings before us, as exemplified by the incidents described above and countless others. Defendants were staggeringly uncooperative, including with respect to basic matters such as scheduling. Defendants also continued their practice of interposing frivolous privilege assertions in an attempt to block testimony, but that practice proved unsuccessful given our physical presence and ability to compel testimony at the depositions.[12] Our experience with Defendants in this matter indicated to us that their obstructive behavior during the deposition phase of discovery was in substantial part aimed at keeping the facts under wraps.

### C. The Decision on the Merits

This is, without doubt, one of the most extraordinary cases ever to have been litigated in this or any other federal court. Due to the nature of this controversy, many lawyers who represented or were affiliated with Defendants had to sit for deposition, which gave rise to privilege issues that added to the complexity of our assignment. Our assignment required hundreds of hours of work over approximately three months, including the extensive study of the record in this case and related proceedings, the issuance of 20 written orders and countless oral orders, and oversight of about two dozen depositions (sometimes over multiple days).

At the time of our appointment, this case was in the middle of discovery, and Your Honor issued an interim allocation providing that 50 percent of our fees would be advanced by Chevron

---

[12] To be sure, counsel for Chevron were on occasion overzealous, and both Chevron and Defendants tried to take advantage of our presence to relitigate issues that had already been decided. But there is a world of difference between (for example) Chevron trying to protect irrelevant or peripheral witnesses from being burdened by lengthy depositions and testifying about ancillary subject matter, on the one hand, and Defendants trying to prevent the basic facts coming to light, on the other.

## SA96

and 50 percent would be advanced by Defendants (jointly and severally). Appointment Memorandum at 2.[13] We now have a decision on the merits, and Rule 53 explicitly permits reconsideration of Your Honor's interim allocation to be amended to reflect that decision. Although not a fee-shifting provision, the final sentence of Rule 53(g)(3) may be read, in addition to the reading mentioned above at p. 15, *supra*, to suggest that the prevailing party should not bear the brunt of special master costs and fees. On that reading of the final sentence, the fact that there is a final judgment in this case concluding that Defendants obtained a multi-billion dollar judgment against Chevron through bribery and fraud would also weigh in favor of increasing the portion of our fees and costs allocated to Defendants in order to "reflect [Your Honor's] decision on the merits." Fed. R. Civ. P. 53(g)(3).

### CONCLUSION AND RECOMMENDED ALLOCATION

Having weighed the relevant factors, and in light of all of the foregoing, in the event Your Honor elects not to tax all costs against Defendants, we recommend that our fees and costs be allocated as follows: 85 percent to Defendants (jointly and severally) and 15 percent to Chevron.

Respectfully submitted,

_____
Theodore H. Katz, Special Master

_____
Max Gitter, Special Master

Dated: December 8, 2017
     New York, New York

---

[13] Your Honor later directed Chevron to advance all of our fees, after Defendants repeatedly stated that they would not advance their share. Order (ECF No. 1253).

# EXHIBIT A

# SA98

**DECLARATION OF THE AFFECTED NATIONALITIES IN THE PROVINCE OF SUCUMBIOS**

On August 20, 2016, the presidents of the nationalities represented by Mr. Juan Yiyocuro, in his capacity as president of the Siona nationality, ONISE; Mr. Justino Piaguaje, as president of the Siekopai nationality, NASIEPAI; Mr. Roberto Aguinda, President of the Indigenous Nationality A'i Cofan of Ecuador, NOAIKE; and Mr. Guillermo Grefa, representative of the Kichwa nationality, meet in the city of Lago Agrio.

We are the plaintiffs and people affected—Siekopai, "Secoya," Siona, A'i Cofan, and Kichwa nationalities—who have supported and backed this fight for over 22 years, together with the settler peasants who live in the oil fields operated by Texaco in the provinces of Sucumbios and Orellana. The immense desire and dream of the nationalities is to achieve justice, repair the environmental and cultural damage, and remediate the natural habitat of the indigenous groups of Ecuador's northern Amazon. For all these reasons, for over two decades we have kept UNITY, AND TOGETHER WE SEEK JUSTICE FOR THE DIGNITY OF THOSE CURRENTLY ALIVE AND FOR FUTURE GENERATIONS, AND FOR THE HEALTH OF OUR AMAZON AND THE PLANET.

In recent months the technicians, advisors and leaders of the AMAZON DEFENSE FRONT, FDA, have made public statements about the position they have adopted. These statements have appeared in local, national and international media and have been made at meetings and conversations held with different people, both in the communities of Orellana and Sucumbios, and with NGO allies of the UDAPT. They have discussed the fight that belongs exclusively to the plaintiffs, the different communities of the nationalities who have been affected. They state that "we do not represent [them], and we have no right to the proceeds from this fight," disregarding the UNION OF PEOPLE AFFECTED BY TEXACO'S OIL OPERATIONS, UDAPT, claiming that it has exclusively prosecuted the court case against Chevron on behalf of the indigenous nationalities and peasants affected by the oil fields through the 47 plaintiffs that signed the complaint and under a power of attorney given to Atty. Pablo Fajardo, joint counsel in the case.

WHEREAS:

This seriously harms our fight and the unity of the indigenous nationalities and peasants and the UDAPT, the highest body, which represents us, due to the malicious and reckless actions of some former leaders, such as Luis Yanza, Steven Dozinger and Ermel Chavez, who led this historic case, through the FDA, at the start of the court case in the U.S. and Ecuador, and Dr. Patricio Salazar, whom we have never met.

On January 19, 2016, Mr. Steven Donziger and Mr. Luis Yanza, without informing and without authorization from the undersigned Nationalities, or from the plaintiffs, executed an agreement with financers from a so-called tax haven on behalf of the people affected and the nationalities, without any authorization to do so.

Judging by their actions, Mr. Luis Yanza, Mr. Steven Donziger, Mr. Ermel Chavez, and Dr. Patricio Salazar are working to break up and to deprive the indigenous nationalities and plaintiffs of any right to social and cultural benefit from the case.

Steven Donziger, who is not authorized to represent the nationalities, has repeatedly issued statements in different media in the

# SA99

U.S., and lately in Ecuador, claiming to be the attorney in the case, though he does not represent any nationality or any of the plaintiffs.

Mr. Steven Donziger, Mr. Luis Yanza, and, in recent years, Mr. Pablo Fajardo, have administered or managed money owned by the Plaintiffs. Consequently, on January 29, 2016, the UDAPT, convened at a general meeting, issued a resolution to ask Mr. Steven Donziger, Mr. Luis Yanza, and Mr. Pablo Fajardo to provide an accounting, in other words, to provide the UDAPT with detailed information about all of the money they have managed that belongs to the UDAPT. To date, only Mr. Pablo Fajardo has provided that information. Mr. Steven Donziger and Mr. Luis Yanza have failed to do so.

It is clear that the above individuals have an obvious desire to take economic advantage of the case and to achieve some public fame for personal benefit, without considering the UDAPT's fight, which seeks to achieve a dignified, healthy life without contamination, through remediation of the damage caused by the human rights violation caused by the oil operations of Texaco, now Chevron, in the Ecuadorian Amazon.

Based on the foregoing background and considerations, the nationalities Siona, Siekopai, Cofan and Kichwa, exercising our right and in order to protect the fight we have carried on and unity we have had for 22 years while fighting Texaco in search for JUSTICE for human life and nature, publicly

DECLARE THE FOLLOWING:

1. Mr. Luis Yanza and Mr. Steven Donziger are hereby considered personae non gratae because they failed to defend the collective interest rights of the indigenous nationalities and peasants. It is clear to us that they seek to advance their own private and personal interests.

2. Mr. Luis Yanza, Mr. Steven Donziger, Mr. Ermel Chavez and Mr. Patricio Salazar are prohibited perpetually and absolutely from speaking for or representing the Siona, Siekopai and Cofan nationalities before any organization, court, or media of any kind, investor, or any other person. None of them represent the undersigned Nationalities.

3. We demand that within two months, starting August 20 of this year, Mr. Luis Yanza and Mr. Steven Donziger submit a detailed report accounting for all of the money they have managed on behalf of the people affected or the plaintiffs in the case that our people have against Chevron.

4. In previous years, the leaders of the nationalities, trusting him, gave Mr. Luis Yanza a power of attorney to conduct certain acts. However, it is apparent that Mr. Yanza abused that power and used it inappropriately, signing documents on behalf of the nationalities without the power to do so. Consequently, the special power of attorney the three nationalities gave Mr. Luis Yanza is hereby revoked, as is any other document that gave him power to act on our behalf. Also, as nationalities, we disavow any contract, agreement, arrangement or any other document that Mr. Luis Yanza may have signed on our behalf in 2015 and 2016. Those documents were not authorized by the nationalities and therefore are not, and will not be, valid.

Case 18-855, Document 91, 03/11/2019, 2515258, Page108 of 303

# SA100

5.  This resolution will be immediately sent to all social organizations, law firms and other persons who, in any way, work jointly or in cooperation with the plaintiffs in the case we are pursuing against Chevron.

In the defense of the ancestral and cultural rights of our nationalities, we, the presidents of the nationalities, sign this declaration on the 20th day of August 2016.

[signature]

Mr. Justino Piaguaje

PRESIDENT SIEKOPAI

[signature]

Mr. Juan Yiyocuro

PRESIDENT ONISE-SIONA

[signature]

Mr. Roberto Aguinda

PRESIDENT NOAIKE KOFAN

[signature]

Mr. Guillermo Grefa

REPRESENTATIVE OF THE KICHWA NATIONALITY



**SA101**

United Language Group
3 Columbus Circle
14th Floor
New York, NY 10119
+1 888.601.9814
legaltranslations@ulgroup.com

State of New York )
Estado de Nueva York

) ss:
) a saber:
County of New York )
Condado de Nueva York

**Certificate of Accuracy**
**Certificado de Exactitud**

This is to certify that the attached translation is, to the best of our knowledge and belief, a true and accurate translation from Spanish into English of the attached document.

Por el presente certifico que la traducción adjunta es, según mi leal saber y entender, traducción fiel y completa del idioma español al idioma inglés del documento adjunto.

Dated: October 11, 2017
Fecha: 11 de octubre 2017

_Yasushi Sasaki_
Senior Project Manager– Legal Translations
United Language Group
_____[firmado]_____
Yasushi Sasaki
Gerente de Proyeto Senior – Traducciones Legales
United Language Group

Sworn to and signed before
Jurado y firmado ante
Me, this _____11th_____ day of
mí, a los _____11_____ días del
_____October_____ 2017
mes de _____octubre____ de 2017

_____
Notary Public
Notario Público

SELIN CAYIRLI
Notary Public, State of New York
No. 01CA6275260
Qualified in New York County
Commission Expires Jan 22, 20___

[firmado]
[sello]

Case 1:11-cv-00691-LAK-JCF  Document 1945-1  Filed 12/13/17  Page 6 of 8
Case 18-833, Document 94, 03/11/2019, 2515258, Page110 of 303

**SA102**

## DECLARATORIA DE LAS NACIONALIDADES AFECTADAS DE LA PROVINCIA DE SUCUMBIOS

A los 20 días del mes de Agosto del 2016, se reúnen en la ciudad de Lago Agrio los presidentes de las nacionalidades representado por el Sr. Juan Yiyocuro en calidad de Presidente de la Nacionalidad Siona ONISE, por el Sr. Justino Piaguaje en calidad de Presidente de la nacionalidad Siekopar NASIEPAI, el Sr Roberto Aguinda Presidente de la Nacionalidad Ongheria A'i Kofan del Ecuador NOA'IKE y el Señor Guillermo Grefa Representante de las Nacionalidad Kichwa.

Somos las Nacionalidades Siekopar "Secoya", Siona, A'i "Kofán" y Kichwa demandantes y afectados quienes llevamos respaldando y apoyando esta lucha más de 22 años, conjuntamente con los compañeros campesinos colonos que viven en los campos petroleros operados por la Texaco en las provincias de Sucumbíos y Orellana. El gran sentimiento y sueño de las nacionalidades es lograr justicia, reparar los daños ambientales y culturales, la reparación del hábitat natural de los grupos originarios de esta Amazonia Norte del Ecuador, por todas aquellas razones es que, durante más de dos décadas, hemos mantenido la UNIDAD Y JUNTOS BUSCAMOS JUSTICIA POR LA DIGNIDAD DE LA VIDA ACTUAL Y DE NUESTRA FUTURA GENERACIÓN, ASI COMO POR LA SALUD DE NUESTRA AMAZONIA Y DEL PLANETA.

En los últimos meses, se han generado pronunciamientos y versiones públicos, sobre la posición que han adoptaron los técnicos, asesores y dirigentes del FRENTE DE DEFENSA DE LA AMAZONIA, FDA, a través de los medios de comunicación local, nacional e internacional, así como también a través de reuniones y conversaciones con distintas personas tanto en las comunidades de Orellana y Sucumbíos, como con ONGs, aliadas de la UDAPT, sobre la lucha exclusivamente de los demandantes afectados por las diferentes comunidades de las nacionalidades en donde mencionan que "no lo representamos ni tenemos derechos al beneficio a este lucha", y por el desconocimiento a la UNION DE AFECTADOS Y AFECTADAS POR LAS OPERACIONES PETROLERAS TEXACO "UDAPT" a la instancia que viene representando exclusivamente al proceso del juicio en contra de Chevron a favor de las nacionalidades indígenas y campesinos afectados de los campos petroleros, a través de los 47 demandantes firmantes y bajo poder concedido al Abg. Pablo Fajardo Procurador Común del caso.

### CONSIDERANDO:

Que, afecta severamente a nuestra lucha y la unidad de las nacionalidades indígenas y campesinos y a la UDAPT instancia máxima que nos representa, por algunos actos maliciosos y temerarios de algunos líderes históricos como Luis Yanza, Steven Dozinger y Ermel Chavez dirigentes que llevaron este proceso de lucha histórica mediante el FDA al inicio del caso Judicial en los EEUU y en Ecuador, el señor Dr. Patricio Salazar a quien nunca le habíamos conocido.

Que, los señores Steven Donziger y Luis Yanza sin previo información y sin la autorización de las Nacionalidades suscriptoras de esta resolución, ni de los demandantes, el día 19 de Enero del 2016, procedieron a suscribir un convenio, con gestores de financiamiento, de un lugar denominado Paraiso Fiscal, a nombre de los afectados y de las nacionalidades, sin tener ninguna facultad ni autorización para aquello.

Que, de acuerdo a las acciones y actitudes, los señores Luis Yanza, Steven Donziger, Ermel Chávez y el Dr. Patricio Salazar, están trabajando con el fin de lograr la desunión y dejar sin derecho a ningún beneficio social y cultural de las nacionalidades indígenas y a los demandantes.

Que, el Ab. Steven Donziger sin ser abogado autorizado por las nacionalidades reiteradamente emite pronunciamiento en distintos medios de comunicación en los

## SA103

EEUU y últimamente en los medios nacional como abogado del caso, cuando él, no representa a ninguna Nacionalidad, ni a ninguno de los demandantes.

Que, los señores Steven Donziger, Luis Yanza y en los últimos años el abogado Pablo Fajardo, han administrado o manejado cantidades de dinero, de propiedad de los Demandantes, en consecuencia, el día 29 de enero del 2016, la Asamblea Ordinaria de la UDAPT, resolvió pedir a los señores Steven Donziger, Luis Yanza y Pablo Fajardo, que rindan cuenta, es decir, que informen detalladamente a la UDAPT sobre todo el dinero que ellos han manejado y que es propiedad de la UDAPT. Hasta éste día únicamente el señor Pablo Fajardo ha rendido cuentas. No le han hecho los señores Steven Donziger y Luis Yanza.

Que, es evidente, que los señores antes mencionados, existe una clara muestra de ambición por aprovecharse económicamente del caso y lograr algún tipo de Notoriedad Pública para su beneficio personal; sin considerar ni tener en cuenta la lucha de la UDAPT que es *Hacer realidad una vida digna, sana y sin contaminación, mediante la reparación de los daños provocados debido a la violación de los derechos humanos causados por la operación petrolera de Texaco, hoy Chevron, en la Amazonía ecuatoriana.*

Con todos estos antecedentes y consideraciones las nacionalidades Siona, Siekopai, A'i y Kichwa bajo nuestro derecho y por precautelar la lucha y la unidad que sostenemos y seguimos los 22 años de lucha a Texaco en busca de JUSTICIA a la vida humana y naturaleza, ante la opinión pública;

#### DECLARAMOS.-.

1.- Persona no grata al señor Luis Yanza y al Abogado Steven Donziger por no defender a los derechos intereses colectivos de las nacionalidades indígenas y campesinos; es más está claro para nosotros que ellos defienden sus interés particulares y personales

2.- Se prohíbe de forma absoluta y perpetua a los señores Luis Yanza y Steven Donziger, Ermel Chávez y Patricio Salazar, hablar y representar a las nacionalidades Siona, Siekopai y A'i en cualquier instancia, judicial, medios de comunicación de cualquier naturaleza, inversores, o cualquier persona. Ninguno de ellos representa a las Nacionalidades suscriptoras de ésta resolución

3. Le exigimos a los señores Luis Yanza y Steven Donziger, que en un plazo de dos meses, contados a partir del día 20 de agosto del presente año, entreguen el informe detallado de todo el dinero que ellos han administrado en nombre de los afectados o demandantes del caso que nuestros pueblos mantenemos en contra de Chevron

4.- En años anteriores, los dirigentes de las Nacionalidades, en confianza, le otorgaron algún tipo de poder para determinadas actuaciones al señor Luis Yanza; sin embargo, es visible que el señor Yanza abusó de ese poder y lo ha utilizado en forma inadecuada, ha suscrito documentos en nombre de las nacionalidades sin tener ninguna facultad para hacerlo. En consecuencia, dejamos sin efecto, el poder especial de representación otorgado por las tres nacionalidades en favor del señor Luis Yanza, y cualquier otro documento que le daba algún tipo de facultad para actuar en nombre nuestra. A la vez, que como Nacionalidades no reconocemos ningún tipo de contratos, convenios, acuerdos o cualquier documento que el señor Yanza Luis haya suscrito en nuestro nombre, durante los años 2015 y 2016. Los mismos no fueron autorizados por las Nacionalidades y no tienen ni tendrán ningún valor

5 - Esta resolución, será enviada de forma inmediata a todas las organizaciones sociales, bufetes de abogados, y más personas que de una u otra manera tienen algún tipo de trabajo en solidaridad, cooperación, con los demandantes del caso que sostenemos en contra de Chevron

En defensa a los derechos ancestrales y culturales de nuestras nacionalidades firmamos esta declaratoria los presidentes de las nacionalidades, a los 20 días del mes de Agosto del 2016.

Sr Justino Piaguaje

**PRESIDENTE SIEKOPAI**

Sr Juan Yaicuro

**PREIDENTE ONISE - SIONA**

Sr Roberto Aguinda

**PRESIDENTE NOAIKE KOFAN**

Sr Guadalupe Grefa

**REPRESENTANTE DE LA NACIONALIDAD KICHWA**

# SA105

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHEVRON CORPORATION,

                      Plaintiff,

              -against-                                 11 Civ. 0691 (LAK)

STEVEN DONZIGER, et al.,

                      Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ORDER**

LEWIS A. KAPLAN, *District Judge.*

        There having been no objections to the Special Masters' Final Report and Recommendation [DI 1942] and the time for filing such objections having expired, the Court hereby adopts the findings set forth therein while reserving for its determination whether to tax all costs against the defendants or, if not, the manner in which such costs shall be apportioned.

        SO ORDERED.

Dated:      December 27, 2017

                      /s/       Lewis A. Kaplan
                                      _____
                                        Lewis A. Kaplan
                              United States District Judge

# SA106

December 28, 2017

<u>**VIA ECF**</u>

Honorable Lewis A. Kaplan
United States District Judge
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

RE:     *Chevron v. Donziger*, Case No. 11 Civ. 691 (LAK)

Dear Judge Kaplan:

I write to object to the court's characterization in its Order of December 27 that "[t]here hav[e] been no objections to the Special Masters' Final Report" regarding the reasonableness and *post hoc* allocation of their outrageous fees. First, the court recently extended the time for the Special Masters to provide me with the actual bills for their services until January 12, 2018. Obviously I cannot be expected to file objections to the Special Masters' Report until I have seen all of the relevant materials (including not just the records supposedly forthcoming on January 12 but the still secret invoices related to the work of Mr. Gitter and his associate on the numerous 1782 depositions—depositions that were ultimately used by Chevron in the RICO matter). More importantly, in filings this year dated August 1, August 8, August 15, August 24, September 11, and December 6, I have robustly and unequivocally opposed and objected, on numerous grounds, to every aspect of the Special Masters' work in this case, including specifically the notion that any fees for such work should be charged to me. To be clear, I now reiterate my various objections to the work of the Special Masters as outlined in my previous submissions and in this letter.

Among the many points relevant to this issue that I have already established and argued on the record are the following:

- There is nothing remotely reasonable about the core facts of the Special Masters' work in this case. It was designed to carry out a strategically-designed effort to "taint" a historic human rights judgment and to immunize a wealthy oil company from an environmental liability owed to thousands of indigenous people and subsistence farmers. These Masters' and their junior associate, culled in part from an elite corporate law firm, each charged over $600/hour for hundreds of hours of time "supervising" depositions, flying first-class on utterly pointless international trips, enjoying expensive meals, and the like, all paid for secretly by Chevron while the Masters themselves pretended (although not very hard) to act impartially in their work.

# SA107

- This kind of gross overbilling directed at a major multinational oil company is scandalous in substance although perhaps not atypical. It is consistent with the immense amount of money that Chevron "invested" in the RICO matter generally in a last-ditch attempt to bury the undersigned in litigation and thereby force him off the case. To direct the same levels of billing at a solo practitioner and/or the indigent victims of Chevron's contamination would be utterly obscene. In tacit recognition of the same, the court appears to have adopted if not designed a "bait and switch" whereby, during the time when the court's vulnerable RICO judgment was on review, it was pretended that only the $250-billion dollar oil company would pay the fees, and he gruesome details of the bills themselves (and the actual payments by Chevron to Mr. Gitter's personal account) were kept secret. Only now, years later is the court entertaining the motion of "shifting" these outrageous fees to the undersigned.

- As discussed in detail in my most recent filing (Dkt. 1940), the Special Masters were in fact rampantly biased in their work. They eagerly participated in and even took steps to intensify Chevron's attacks on and demonization of me. The evidence indicates that the Masters were regularly in private contact with Chevron, without disclosing the same.

- The substance of the Masters' work reveals the intensity of their bias—a bias now reflected in the substance of their Report, which seeks to punish me for exercising my rights to object to questioning during depositions. In addition to explicitly seeking to intensify the pressure on me during the repetitive and abusive 19 days of pre-trial depositions that this court subjected me to, the Masters "supervised" the few depositions I was allowed to take of Chevron witnesses so as to block almost all substantive lines of questioning.

- The court already implemented a regime whereby Chevron could have sought re-allocation of the Masters' fees by a date certain in the pre-trial period. Dkts. 1925, 1931, 1940. By failing to move for a re-allocation within the time allotted under the court's specific order in this regard (Dkt. 1287), Chevron forfeited any claim to allocation and cannot now seek a "do over" given that (it thinks) some of the heat is off and it can get away with again "punishing" the primary target of its avowed demonization campaign.

- No recovery of fees or costs, including and especially in the form of re-allocation of costs already paid, is available where the petitioning party engaged in misconduct in the litigation. It is now well-documented that Chevron and its lead law firm Gibson Dunn actively defrauded the court by illegally paying for and presenting the testimony of Alberto Guerra, the falsity of which has now been confirmed by forensic examination of the presiding Ecuadorian judge's hard drives and was either known by Chevron and Gibson Dunn at the time (most likely) or recklessly disregarded.

- Any order directing the payment by me of fees or costs in the amounts sought by Chevron would be abusive and improper in that it would be manifestly punitive in nature, entirely unconnected from either Chevron's need regarding such funds or my ability to pay.

# SA108

- Any order directing payment by me to Chevron contravenes the substance of Chevron's relinquishment, just days before trial, of "all claims for money damages relief against the Donziger Defendants." This was the strategic maneuver Chevron was *required* to make to deny me my constitutional jury trial right in any civil case where more than a mere $20 is at stake. Clearly, this was because Chevron knew (as I knew and the court knew) that an impartial jury would never have accepted its obviously false and trumped-up claims against me, whereas this court, in its own words, "got it from the beginning" and was going to rule in Chevron's favor no matter what the evidence really showed.

The Special Masters' Report, although I have yet to see all of the actual billing that backs it up, simply regurgitates the bias and false pretenses that have accompanied their work from the beginning. The bases for the absurd allocation of 85% of their "costs" to me, a solo practitioner, over the multi-billion dollar oil company are either frivolous (e.g., scheduling disputes) or simply penalize me and my co-defendants for standing up for our rights and our "unwillingness" to accept the profound illegitimacy of the Special Masters' appointment, their work, and indeed the entire SLAPP-style RICO lawsuit brought upon us. As such, the Report and its conclusions are simply derivative of the larger record of the bias of the Special Masters, their secret receipt (in the case of Mr. Gitter) of exorbitant payments from Chevron, their ongoing refusal (in the case of Mr. Gitter) to disclose the full amounts received from Chevron either directly or to his law firm from the 1782 depositions, and the participation of Masters in Chevron's demonization campaign, all of which I have aggressively objected to in recent filings and over the last several years.

Finally, I will use the opportunity of this filing to address just a few of the many falsehoods in Chevron's unauthorized and gratuitous recent reply brief (Dkt. 1944), as follows:

- Chevron's lawyer Randy Mastro – now under a formal complaint for criminal behavior to the U.S. Department of Justice -- falsely claims that I refused demands "by [my] own clients" for evidence of how various funds raised to support the case and the defense of this lawsuit (in the early months after it was filed) were spent. In fact, all funds have been fully accounted for directly to my clients and through the democratically-controlled community organization that has operationalized the will of the larger client base for the last 25 years, the Frente de Defensa de la Amazonía. I would remind the court that Chevron paid an outlandish $5 million to the accounting firm KPMG to fully audit my finances as part of the RICO trial, and while the auditor's conclusions where biased against me in numerous respects, it is noteworthy that he presented no evidence of misappropriation of funds by me in any respect.

- Chevron continues with the blatantly false claim that "the forensic analysis of Zambrano's computers corroborate this Court's core findings." This is laughably wrong and desperate. As the filings in the BIT arbitration detail, and as I summarized for the court at pages 6-9 of my filing dated September 11, 2017 (Dkt. 1936), the hard drive evidence utterly eviscerates the Guerra's "bribery" and "ghostwriting" testimony, which was already suspect and shifting (and paid-for) from the beginning.

# SA109

- Chevron's suggestion that I should be foreclosed from objecting now because I "had the billing records for **one** of the Special Masters since December 2016" and had the "hourly billing rates" for the other Special Master is comical in its desperation to avoid the plain fact that I ***still to this day do not have the full billing records for which I will supposedly be charged*** and which reflect the full amount of the unilateral, undisclosed, and secret payments from Chevron to Mr. Gitter and his law firm. Dkt. 1944 n.3.

- The claim that that I "conceded (by not challenging on appeal) the overwhelming evidence" against me is tired, false, and desperate. It also ignores the fact that the "evidence" against me was manufactured by way of illegal payments to a suspect witness for knowingly false testimony. In dozens of pages in my appellate briefs, I challenged every aspect of this proceeding and the fundamentally flawed "findings of fact" produced by this court. The fact my appellate counsel chose to focus on the profound legal flaws in the court's decision obviously is typical appellate strategy rather than the supposed "concession" that Chevron has been flogging, in utterly unconvincing fashion, for years.

- Ironically, Chevron itself chooses not to challenge the vast majority of arguments made in my December 6, 2017 filing, to which its reply in Dkt. 1944 supposedly responds.

## <u>Conclusion</u>

Based on my objections in the aforementioned filings before this Court, and those contained herein, I reiterate my demand that none of the fees of the Special Masters—already paid in full by Chevron—should be allocated to me, a solo practitioner and human rights lawyer whose limited resources are being used to continue efforts, broadly supported by leading civil society groups all over the world, to enforce an historic environmental liability affirmed by Ecuador's Supreme Court and to hold Chevron accountable for the devastation caused its toxic practices in Ecuador.

Sincerely,

    / s /

Steven R. Donziger

Case 18-855, Document 94, 03/11/2019, 2515258, Page118 of 303

# SA110

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
CHEVRON CORPORATION,

                Plaintiff,

        -against-                       11 Civ. 0691 (LAK)

STEVEN DONZIGER, et al.,

                Defendants.
-----------------------------------------------------------------X

## DECLARATION OF JOSEPH M. KAY

I, Joseph M. Kay, declare as follows pursuant to 28 U.S.C. § 1746:

1.     I am an associate at the law firm Cleary Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb"). I am duly admitted to this Court.

2.     On November 21, 2017, I caused to be hand delivered by messenger to the address of record for Steven R. Donziger, as listed on the docket sheet for this case and on his personal letterhead, the following: (1) a letter from Mr. Gitter to Judge Kaplan, dated November 21, 2017, which served as a cover letter for Mr. Gitter's invoice to Chevron Corp., dated July 24, 2013, and the detailed time records underlying his invoice, and (2) a letter from Breon S. Peace (the billing partner at Cleary Gottlieb for this matter) to Judge Kaplan, dated November 21, 2017, which served as a cover letter for the invoices of Cleary Gottlieb to Chevron Corp. and the computerized time and disbursement records underlying these invoices for services provided to the Special Masters for the period March 26, 2013 through August 31, 2013. Attached as

# SA111

Exhibits 1 and 2 are true and correct copies of the letters and enclosures from Mr. Gitter and Mr. Peace, respectively.

3.      On November 21, 2017, I further caused copies of the letters together with their enclosures, as described in paragraph 2 above, to be delivered by email to Mr. Donziger at his email address, as provided on the docket sheet.  Attached as Exhibit 3 is a true and correct copy of an email, time-stamped November 21, 2017 at 2:34 PM EST, sent from my email address at Cleary Gottlieb to the email address of record for Mr. Donziger on the docket sheet. The attachments to this email, when opened, show that the letters and their enclosures described in paragraph 2, including the invoices, time detail, and disbursement records, were included in my email.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 9, 2018 in New York, New York.

Joseph M. Kay

# SA112

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

                            Plaintiff,

            -against-                                    11 Civ. 0691 (LAK)

STEVEN DONZIGER, et al.,

                            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### MEMORANDUM OPINION
### (Corrected)

Appearances:

> Randy M. Mastro
> Andrea Neuman
> William E. Thompson
> GIBSON DUNN & CRUTCHER LLP
> *Attorneys for Plaintiff*

> Steven Donziger
> THE LAW OFFICES OF STEVEN DONZIGER
> *Attorney for Defendant Steven Donziger*

LEWIS A. KAPLAN, *District Judge.*

This Court found after a lengthy trial that Steven Donziger and his co-conspirators attempted to extort billions of dollars from Chevron Corporation. They did so by, among other

Case 1:11-cv-00691-LAK-JCF  Document 1963  Filed 03/04/18  Page 2 of 48
Case 18-855, Document 96, 03/11/2019, 2515258, Page121 of 303

# SA113

2

things, violating the Racketeering Influenced and Corrupt Organizations Act ("RICO"),[1] foisting fraudulent evidence on an Ecuadorian court, coercing Ecuadorian judges, illegally writing all or much of the Ecuadorian court's purported decision, and then procuring the signature of an Ecuadorian judge on a $19 billion judgment against Chevron that the co-conspirators had written, in part by the promise of a $500,000 bribe.  This Court found also, and independently of RICO, that Donziger's actions were wrongful under the common law.

The details of this extraordinary behavior are contained in extensive findings.  The judgment specifically provided, in words relevant here, that "Chevron shall recover of Donziger and the LAP Representatives,[2] and each of them, jointly and severally, the costs of this action pursuant to Fed. R. Civ. P. 54(d)(1) and 28 U.S.C. § 1920."[3]

While Donziger appealed from the judgment, he challenged neither the factual findings nor the costs provision of the judgment.  The entire judgment was affirmed by the Court of Appeals, which commented that "[t]he record in the present case reveals a parade of corrupt actions by the LAPs' legal team [*i.e.,* Donziger and his co-conspirators], including coercion, fraud, and bribery, culminating in the promise to [the Ecuadorian judge,] Judge Zambrano[,] of $500,000

---

[1]

18 U.S.C. § 1961 *et seq.*

[2]

"LAPs" refers to the Lago Agrio plaintiffs, *i.e.,* the plaintiffs in the Ecuadorian case., all of whom were defendants here. "LAP Representatives" refers to the two LAPs who appeared in and defended this case.  The remaining LAPs and some other defendants defaulted in this case.

[3]

DI 1875, ¶ 9.

3

from a judgment in favor of the LAPs."[4]  Insofar as Donziger is concerned, the case is over save for

the matters of costs and attorney fees.

Having prevailed in the litigation, Chevron gave notice of taxation of costs against

Donziger and the LAP Representatives.[5]  The Clerk taxed costs in the total amount of $944,463.85,

which consisted of fees and expenses of special masters in the amount of $872,387.63, fees for

service of papers of $1,550, interpreters' costs of $23,400, and court reporter fees of $47,126.22.[6]

Donziger[7] (though not the LAP Representatives) now seeks review of the Clerk's

taxation by a letter filed electronically on August 16, 2017.[8]  He contends that no costs should be

awarded against him for various reasons and, in any case, that the special master fees and expenses

should not be taxed because Chevron forfeited any right to recover them by its alleged failure to

comply with an earlier procedural order of the Court.

---

[4]

*Chevron Corp. v. Donziger,* 833 F.3d 74, 126 (2d Cir. 2016), *cert. denied,* 137 S. Ct. 2268 (2017).

[5]

LOCAL CIV. R. 54.1(a) prohibits taxation of costs during the pendency of an appeal.

[6]

DI 1928.

[7]

Two Donziger-related entities also are defendants against which costs were taxed, the Law Offices of Steven Donziger ("SRD Office") and Steven R. Donziger & Associates, PLLC ("PLLC").  None of Donziger's submissions with respect to costs has mentioned either. Nevertheless, Donziger in May 2013 filed a notice of appearance on behalf of himself, SRD Office and PLLC that never has been withdrawn.  Accordingly, the Court treats his submissions with respect to costs as having been made on behalf of those entities as well as on his own behalf.  For the sake of clarity, however, the LAP Representatives throughout this litigation have been and remain represented by separate counsel.  They have raised no objections with respect to the taxation of costs against them.

[8]

DI 1931.

# SA115

4

*The Proceedings Thus Far and Donziger's Contentions*

    *Proceedings as to Costs – The Clerk's Office*

        Chevron filed its notice of taxation of costs on December 5, 2016, not long after the docketing of the mandate affirming the judgment.[9]  Following that filing, Donziger moved to hold taxation of costs in abeyance pending the outcome of a petition for a writ of certiorari.[10]  The Court obliged.  But the Supreme Court denied certiorari on June 19, 2017.  Chevron on the same day moved to reactivate both its attorneys' fee motion and proceedings to tax costs.[11]  Donziger did not object to that motion.  On July 17, 2017, the Court directed the Clerk to tax costs.[12]

        Although Dongizer had not objected to the reactivation of proceedings to tax costs, his position changed after that motion was granted.  On August 1, 2017, he wrote to the Clerk, arguing that taxation of costs should "be held in abeyance pending resolution of a number of critical and related legal and factual issues that are now pending or will soon be presented to the district court."[13]  These were (1) Donziger's contention that any award of attorneys' fees under RICO is foreclosed by Circuit precedent,[14] (2) his vaguely described and unsupported assertion that "a variety

---

[9]     DI 1918.

[10]     DI 1919, DI 1921.

     Chevron's motion for attorneys' fees against Donziger likewise was held in abeyance.

[11]     DI 1922.

[12]     DI 1923, ¶¶ 1-2.

[13]     DI 1925, at 1 (footnote omitted).

[14]     *Id.*

Case 18-855, Document 96, 03/11/2019, 2515258, Page124 of 308
Case 1:11-cv-00691-LAK-JCF Document 1963 Filed 03/04/18 Page 5 of 48

SA116

5

of appropriate judicial bodies, both in this jurisdiction and others" may consider whether Chevron "and its counsel knowingly suborned perjury, obstructed justice, violated numerous federal laws, and committed a fraud on this court with respect to the testimony of [trial witness] Alberto Guerra,"[15] (3) Donziger's assertion that Chevron forfeited its right to seek recovery of the special masters' fees and compensation by failing to make a timely motion under the Court's July 9, 2013 order,[16] (4) a contention that the recovery of attorneys' fees and costs "to attack and to try to disable adversary counsel [would be] in violation of the First Amendment,"[17] and (5) an assertion that all further post-judgment proceedings against him should be moved to another court because the then-chair of the Grievance Committee of this Court allegedly had referred his conduct to the Departmental Disciplinary Committee of the First Department of the New York Supreme Court in an alleged letter that Donziger has not produced.[18] None of Donziger's contentions was supported by any affidavit, declaration or exhibits.

The Clerk declined to hold the taxation of costs in abeyance, which was entirely appropriate given the Court's prior direction to "proceed to tax costs."[19] Accordingly, costs were

---

[15]
  *Id.* at 2.

[16]
  *Id.* at 3-5.

[17]
  *Id*. at 5-6.

[18]
  *Id.* at 7-8.

[19]
  DI 1923, ¶ 2.

Case 18-855, Document 94, 03/11/2019, 2515258, Page125 of 303

# SA117

6

taxed on August 8, 2017.[20]


*Proceedings as to Costs – The Present Position*

The procedure for objecting to costs taxed by a district court clerk is specified in Rule 54(d)(1) of the Federal Rules of Civil Procedure – "On motion served within the next 7 days, the court may review the clerk's action." As costs were taxed on August 8, Donziger had until August 15 to file a motion seeking review of the Clerk's action. In fact, as discussed above, he never did file a motion. Rather, on August 16, 2017, the day after such a motion would have been due, he electronically filed a letter objecting to the Clerk's actions.[21] The letter was largely a reprise of Donziger's August 1 letter to the Clerk. But he added to it by (1) "insist[ing]" that the undersigned recuse himself,[22] (2) asserting that Chevron should bear its own costs because it despoiled the Ecuadorian rain forest,[23] and (3) contending that Donziger has limited means and therefore ought not to bear any costs in this matter.[24]

---

[20]

DI 1928.

The Clerk taxed $1,550 for service fees, $47,126.22 for court reporter fees, $23,400 for translation services, and $872,387.63 for compensation and expenses of special masters.

[21]

DI 1931.

Donziger's multiple prior recusal/reassignment requests all were denied. *E.g., Chevron Corp. v. Donziger,* 974 F. Supp.2d at 566; *Id.* 783 F. Supp.2d 713, 718 (S.D.N.Y. 2011) (both citing record).

[22]

DI 1931, at 1-2.

[23]

*Id.* at 3-4.

[24]

*Id.* at 4-5.

# SA118

7

Taken together, Donziger's letters purport to articulate reasons that no costs should be taxed against him and, in any case, that Chevron forfeited any right to recover the special master fees and expenses. He has not challenged specifically any of the other items of costs taxed. With respect to the special masters, however, one point warrants particular note in order to understand the proceedings.

Chevron's bill of costs contained copies of the bills it had paid for the compensation and expenses of the special masters and their assistant. In the case of one of the two special masters, former Magistrate Judge Katz, the material included detailed, contemporaneous time records. In the case of the other, Max Gitter, Esq., it included invoices showing the hours worked and the billing rates but not time detail.[25] Accordingly, by order dated November 9, 2017, the Court (1) required that Mr. Gitter and Cleary, Gottlieb provide Donziger and the Court with "time records (including any description of services the existing records contain) sufficient to show the services rendered that were . . . included in the bill of costs taxed by the Clerk," and (2) requested that the special masters make a recommendation with respect to the allocation of the special master costs as between the defendants and Chevron.[26] Donziger then was given until December 4, 2017 to object to the reasonableness of the hours devoted to the services performed by any or all of the special masters or their assistant and until December 23, 2017 to object to the special masters recommendation.[27]

The special masters furnished the necessary time records to Donziger on November

---

[25]

    The same was true of a Cleary Gottlieb associate, Mr. Ormond, whom the Court authorized to assist the special masters.

[26]

    DI 1939.

[27]

    *Id.*

# SA119

8

21, 2017,[28] and filed their report and recommendation on the recommended allocation of their fees and costs on December 8, 2017.[29]  Donziger filed no timely objection to either.  Accordingly, the Court (1) found that the hours for and the hourly rates at which the special masters and their assistant billed were reasonable and appropriate,[30] and adopted the findings set forth in the special masters' report while reserving to itself the decision whether to tax all costs against the defendants or, if not, the manner in which the costs would be apportioned.[31]  In each case, Donziger – despite his failure to object prior to the Court's ruling – thereafter submitted an intemperate, unsupported and hyperbolic letter complaining of the Court's determination.[32]

On January 12, 2018, the special masters submitted an invoice for the work they performed in preparing the report of December 8.[33]  That invoice is not at issue here, as it was not, and could not have been, included in the bill of costs now under review.

---

[28] DI 1949.

[29] DI 1942; *see* DI 1939.

The special masters recommended that 85 percent of the special master costs be apportioned to the defendants, jointly and severally.  DI 1942.

[30] DI 1940.

[31] DI 1946.

[32] DI 1941, DI 1947.

[33] DI 1950.

*Discussion*

I.    *Donziger's Objections to the Taxation of Costs Fail to Comply With Court Rules*

Donziger's application to review the Clerk's taxation of costs fails in material respects to comply with the Federal Rules of Civil Procedure and the rules of this Court.

The application was made by means of a letter filed electronically.  Rule 54(d)(1) provides that review of a clerk's taxation of costs is to be by motion.  Local Civil Rule 7.1(a), with exceptions not here relevant, requires that motions be brought on by notice of motion or order to show cause and that they be accompanied by memoranda of law and "[s]upporting affidavits and exhibits thereto containing any factual information and portions of the record necessary for the decision of the motion."  Section 13.1 of the Court's ECF Rules and Instructions make clear that the Court's letter motion practice, which applies to other sorts of mostly routine procedural applications, does not permit letter motions to review taxation of costs.[34]

These rules serve important purposes.  The requirement of affidavits, exhibits, and memoranda of law – rather than unsworn letters and other informal submissions – serves to place before the Court evidence, legal authority and argument "necessary for the decision of the motion."  Accomplishment of that purpose is especially important here, as Donziger relies on (a) factual assertions that go well beyond the record in this case which, in any event, is enormous, and (b) legal contentions, the basis for which, if there is any, is far from self evident.  Yet Donziger has not supported his contentions with the materials the rules require.

These deficiencies cannot be overlooked on the theory that Donziger is representing himself.  Donziger is a graduate of the Harvard Law School and, according to the attorney search

---

[34]    *Id.*

# SA121

function of the website maintained by the New York Unified Court System, a member of the New York Bar for twenty years.[35]  He is not entitled to any special indulgence as a *pro se* litigant.[36]

Accordingly, the application to review the taxation of costs – except as it relates to the taxation of the special master fees and expenses which, as discussed below, raises at least some issues that may be decided on the existing record and without briefing – is, to the extent it is denied, is denied based on Donziger's failure to comply with the Federal Rules of Civil Procedure and the local rules of this Court.  The Court nevertheless considers all of Donziger's arguments, based on such materials as are readily at hand, to determine whether they would have been meritorious had they been presented properly.  Even on that basis, however, he would fail in substantially all respects.  Hence, the ruling on this motion rests on alternative grounds.

## II.      *Donziger's Arguments to Hold Costs in Abeyance*

Donziger's letter to the Clerk requested that she hold the taxation of costs in abeyance.  While the letter thus ostensibly went to the timing rather than the substance of the taxation process, in fact only three of the several arguments he made there actually addressed the question of timing.  Everything else went to the merits.  We deal first with the timing arguments.

---

[35]

N E W   Y O R K   S T A T E   U N I F I E D   C O U R T   S Y S T E M , http://iapps.courts.state.ny.us/attorney/AttorneySearch#search_result (last visited Feb. 5, 2018).

[36]

Although "a court is ordinarily obligated to afford a special solicitude to pro se litigants," such as by liberally construing their pleadings, "a lawyer representing himself ordinarily receives no such solicitude at all." *Tracy v. Freshwater,* 623 F.3d 90, 101–02 (2d Cir. 2010).

## SA122

A.    *The Claim that Attorneys' Fees Are Foreclosed by Circuit Precedent*

Among the bases for Donziger's attempt to have the Clerk hold costs in abeyance was the argument that Circuit precedent forecloses attorneys' fees in this case.[37]  The argument is a *non sequitur.*  Even if, as Donziger claims, Circuit precedent concerning attorneys' fee awards in civil RICO cases forecloses such an award in this case, it has nothing to do with the taxation of costs under Rule 54(d)(1).

B.    *The Assertion that "A Variety of Appropriate Judicial Bodies, Both in this Jurisdiction and Others" May Consider Whether Chevron "and Its Counsel Knowingly Suborned perjury, Obstructed Justice, Violated Numerous Federal Laws, and Committed a Fraud on this Court With Respect to the Testimony of Alberto Guerra"*

Donziger's argument for delay on this basis is frivolous.[38]

*First.*  The reference to "a variety of appropriate judicial bodies" is unexplained, not to mention unsupported by any evidence or legal authority.[39]  What judicial bodies?  In what

---

[37]

DI 1925, at 1.

[38]

Moreover, to whatever extent it properly may be understood as arguing that this Court's findings, based on the trial record before it, were erroneous, unsupported by the evidence, or otherwise inappropriate, the argument is barred.  Donziger was entitled to contend on direct appeal that those findings were clearly erroneous but failed to do so.  The argument therefore is foreclosed here for the reasons discussed in Point III.A.

[39]

Presumably it refers entirely or in part to Donziger's efforts to enforce the fraudulent Ecuadorian judgment in Argentina, Canada, and Brazil.  Brazil's Supreme Judicial Tribunal, reportedly its highest appellate court in non-constitutional courts, is said recently to have denied recognition to the Ecuadorian judgment.  *E.g.,* Ted Folkman, LETTERS BLOGATORY, *Lago Agrio Court: STJ Rejects Ecuadoran Judgment* (available at https://lettersblogatory.com/2017/12/01/lago-agrio-court-stj-rejects-ecuadoran-judgment/#more-25727 (last visited Dec. 5, 2017); *see also id. Lago Agrio: LAPs Abandon Recognition and Enforcement Action in Brazil,* (available at https://lettersblogatory.com/2017/09/25/lago-agrio-laps-abandon-recognition-and-enforcement-effort-in-brazil/) (last visited Oct. 8, 2017).  Argentina's court of first instance also

# SA123

proceedings?  Held in abeyance until when?  And what possible relevance might these speculative

possibilities, if any there are, have to the taxation of costs in this case?  All of that is unexplained.

        The judgment of this Court is final and enforceable.  It stands, regardless of whether

courts or other "bodies" outside the United States recognize or enforce the Ecuadorian judgment or

comment on testimony of Guerra either before this Court or before any other body.

        *Second.*  Although the foregoing is more than sufficient to dispose of Donziger's

argument, it bears mention that Donziger overlooks the fact that the testimony of Guerra was far

from indispensable to the judgment rendered in this case.  As the Court's opinion makes clear, this

Court would have reached precisely the same result in this case even without the testimony of

Alberto Guerra.

        The Court found  that Donziger and his co-conspirators, among other misdeeds, (1)

blackmailed Judge Yanez to abandon the judicial inspections and to appoint Cabrera as the global

expert, (2) corrupted Cabrera, (3) wrote Cabrera's report, (4)  falsely passed off Cabrera's report as

the work of an independent and impartial expert, and (5) ghost-wrote former Judge Zambrano's

purported decision which demonstrably relied on the fraudulent Cabrera report notwithstanding its

disclaimer.[40]  The first four of those findings were made entirely without regard to Guerra's

testimony.  And Guerra's testimony was not essential to the fifth.  Moreover, the Court held that this

---

reportedly has rejected his suit.  *Id. Lago Agrio: Argentine Court Refuses to Enforce Ecuadoran Judgment*, (available at https://lettersblogatory.com/2017/11/02/lago-agrio-argentine-court-refuses-to-enforce-ec uadoran-judgment/#more-25606 (last visited Dec. 5, 2017); *see also id. Lago Agrio: The Argentine and Brazilian Developments, In English* (available at https://lettersblogatory.com/2017/11/08/lago-agrio-the-argentine-and-brazilian-develop ments-in-english/ (last visited Dec. 5, 2017).

[40]     *Chevron Corp. v. Donziger,* 974 F. Supp. 2d at 482-502, 558-64.

Case 18-855, Document 91, 03/11/2019, 2515258, Page132 of 303

# SA124

13

fraudulent behavior warranted equitable relief with respect to the Ecuadorian judgment. It did so without necessary regard to whether Donziger and the LAPs bribed former Judge Zambrano, the only point on which Guerra's testimony was critical.[41]

There is no valid reason to delay the taxation of costs on the theory that someday, somewhere, some other body may comment on Guerra's credibility in a manner more to Donziger's liking.

## C.    *Change of Venue*

Donziger argued that the Clerk should defer taxation of costs based on an assertion that the chair of this Court's Grievance Committee has made a complaint against him to state disciplinary authorities.[42] This, he asserted, would justify transfer of this case to another court. Deferral of the costs issue was warranted, he said, because he would "be taking up this issue with the district court and if necessary with an appellate court with the ultimate aim of having all post-trial issues moved to a different and non-conflicted venue for resolution."[43]

Donziger has provided no evidence, whether by affidavit or by filing a copy of the supposed letter, that any such complaint was made. Assuming, however, that such a complaint was made, it would be immaterial here. There is no basis for the assertion that the law requires or even

---

[41]    *Id.* at 564-66.

[42]    The basis for the argument apparently is a claim by Donziger that he has received a copy of such a letter. He has not submitted an affidavit to that effect nor a copy of any such letter. As there is nothing in the record to support Donziger's assertion, we refer to it as "alleged."

[43]    DI 1925, at 7.

14

permits a change of venue on such a basis.  The substance of Donziger's suggestion is frivolous.

Judges have a duty to refer reliable evidence of professional misconduct by lawyers to relevant disciplinary authority.[44]  Indeed, a judge is not disqualified from hearing a case by reason of having made a disciplinary referral regarding a lawyer in the case.[45]  In any case, Donziger does not suggest that the chair or any member of the Grievance Committee is presiding over this case.

III.    *The Merits*

Having disposed of the timing arguments, we come to the merits of Donziger's arguments, assuming *arguendo* that they had not been forfeited for failure to comply with court rules.

A.    *Some of Donziger's Claims Would Be Precluded Because They Could Have Been, But Were Not, Raised on Direct Appeal*

Donziger advances three arguments that are inconsistent with the judgment and therefore no longer available to him.  First, he contends that the imposition of costs on him would

---

[44]

CODE OF CONDUCT FOR UNITED STATES JUDGES, Canon 3B(5).

[45]

U.S. Jud. Conf., Comm. on Codes of Conduct, *Adv. Opinion No. 66*; U.S. Jud. Conf., Comm. on Codes of Conduct, *Compendium of Selected Opinions* § 3.6-7(b).  Nor do "opinions formed by [a] judge on the basis of facts introduced or events occurring in the course of current proceedings, or of prior proceedings, . . . constitute a basis for a bias or partiality motion."  *Liteky v. United States,* 510 U.S. 540, 555 (1994).

15

violate the First Amendment.[46]  Second, he again demands that the undersigned recuse himself.[47]

Third, he asserts that costs should be denied because Chevron was guilty of fraud on the Court and

other misconduct by virtue of its payments to or for the benefit of Alberto Guerra.[48]

The First Amendment argument, to the extent it is comprehensible at all, is a reprise

of an argument in his post-trial brief.[49]  The recusal argument, as his letter makes clear, is based

entirely on arguments he made prior to the entry of judgment, arguments that were rejected

repeatedly by this Court and, on mandamus and other interlocutory applications, by the Court of

Appeals.   So too the argument with respect to Guerra.   Chevron's payments to and other

arrangements with Guerra were the subject of extensive briefing, direct testimony, and cross

examination prior to, during, and after the trial.[50]  Donziger's appellate briefs rehearsed the facts at

length.[51]

Donziger made neither the First Amendment nor the recusal argument on appeal[52]

---

[46]

DI 1931, at 1.

[47]

*Id.* at 1-2.

[48]

*Id.* at 2-3.

[49]

DI 1850, at 64-66.

[50]

Briefing: *E.g.*, DI 916, DI 976.  Direct testimony: *E.g.*, Tr. (Guerra) 1032-64; PX 1671; PX 4800, at pp. 23-64.  Cross examination: Tr. (Guerra). 1096-97; 1116-19; 1221-34.

[51]

Corrected Brief for Defendants-Appellants Steven Donziger et al., *Chevron Corp. v. Donziger,* No. 14-826(L), 2d Cir. DI 150, at 52-57; Reply Brief for Defendants-Appellants Steven Donziger et al., *id.,* 2d Cir. DI 314, at 23-24.

[52]

Corrected Brief on behalf of Steven R. Donziger, et al., *Chevron Corp. v. Donziger,* 833 F.3d 74, *passim*.

# SA127

although both contentions could have been raised there.[53]  Likewise, although he referred to

Chevron's payments to Guerra in his appellate briefs, he never made in the Court of Appeals the

argument that he now makes here – viz. that costs should be denied to Chevron because its actions

with respect to Guerra were improper – although that argument too was available to him on direct

appeal.[54]  Nor, for that matter, did he argue on appeal that this Court's findings that relied on

Guerra's testimony were clearly erroneous.

　　　　As our Court of Appeals has held, "a [district court] legal decision made at one stage

of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, becomes

the law of the case for future stages of the same litigation, and the parties are deemed to have waived

the right to challenge that decision at a later time."[55]  Defendants thus are bound by the judgment

---

[53]

　　　*E.g., Stevens v. Rite Aid Corp.,* 851 F.3d 224, 228 n.4 (2d Cir. 2017) ("[An] appeal brings up for review all prior orders of the District Court that produced the judgment."); *SongByrd, Inc. v. Estate of Grossman,* 206 F.3d 172, 178 (2d Cir. 2000) ("[An] appeal from a final judgment brings up for review all reviewable rulings which produced the judgment." (citations and internal quotation marks omitted)); *Shannon v. Gen. Elec. Co.,* 186 F.3d 186, 191 (2d Cir. 1999) (quoting *Allied Air Freight, Inc. v. Pan Am. World Airways, Inc.,* 393 F.2d 441, 444 (2d Cir.1968) ("interlocutory orders and decrees are merged into the final order of the district court [and] may be reviewed on the appeal") (citation omitted)); 15A CHARLES ALLAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE: JURISDICTION AND RELATED MATTERS § 3905.1, at 250 (2d ed. 2017) ("[A]ppeal from final judgment opens the record and permits review of all rulings that led up to the judgment.").

[54]

　　　*Supra* note 53.

[55]

　　　*North River Ins. Co. v. Philadelphia Reins. Corp.,* 63 F.3d 160, 164 (2d Cir. 1995) (quoting *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.,* 810 F.2d 243, 250 (D.C. Cir. 1987) (internal quotation marks omitted)).  *Accord, e.g., United States v. Philip Morris USA Inc.,* 801 F.3d 250, 257-58 (D.C. Cir. 2015) (litigant waives issue that could have been, but was not, raised on prior appeal); *Lindquist v. City of Pasadena Texas,* 669 F.3d 225, 239-40 (5th Cir. 2012) (litigant waives issue that could have been, but was not, raised on prior appeal); *Med. Ctr. Pharmacy v. Holder,* 634 F.3d 830, 834-36 (5th Cir. 2011) (issue that could have been but was not raised on appeal is forfeited and may not be revisited by the district court on remand); *Empagran S.A. v. Hoffman-LaRoche, Ltd.,* 388 F.3d 337, 344 (D.C. Cir. 2004) (argument made in second appeal waived by failure to raise it in district

# SA128

provision awarding costs. Indeed, this Court could not properly reconsider that portion of the judgment – as opposed to determining which particular categories of costs would be awarded and the amounts of each, which remain open because neither question was determined previously.[56] And even if the Court had discretion to do so, it would decline to exercise it in Donziger's favor in view of his egregious misconduct described previously and his misconduct in this litigation. That has included, among other things, outright defiance of court orders requiring him to (1) produce responsive documents located in Ecuador but subject to his control[57] and (2) contribute as required to the interim payment of the expenses of the special masters.[58] Moreover, Donziger arguably is in contempt of the final judgment of permanent injunction in this case.[59]

---

court or on prior appeal); 18 MOORE'S FEDERAL PRACTICE § 134.20[3], at 134-54.1 (3d ed. 2017); *see Phil-Insul Corp. v. Airlite Plastics Co.,* 854 F.3d 1344, 1357 (Fed. Cir. 2017) (issue within scope of the judgment appealed from and not raised by the appellant in its opening brief on appeal is necessarily waived); *Myers v. Central Fla. Invests., Inc.,* 592 F.3d 1201, 1227 (11th Cir. 2010) (appellate court declined to consider issue that should have been raised on prior appeal); *Ward v. Santa Fe Ind. Sch. Dist.,* 393 F.3d 599, 607 (5th Cir. 2004) ("A party cannot raise an issue on appeal that could have been raised in an earlier appeal in the same case."); *Nat'l Home Equity Mtg. Assn. v. Face,* 283 F.3d 220, 225 (4th Cir. 2002), *vacated on other grounds*, 123 S. Ct. 69 (inappropriate on second appeal to consider argument that could have been raised on prior appeal in same case); 18B CHARLES ALLAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: JURISDICTION AND RELATED MATTERS § 4478.6 (2d ed. 2017).

[56]

*North River Ins. Co.* reversed a district court ruling that departed from its prior appealable but unappealed final decision. 63 F.3d at 165-166. *See also Parmalat Capital Finance Ltd. v. Bank of America Corp.,* 671 F.3d 261, 270-71 (2d Cir. 2012) (abuse of discretion for district court to consider on remand from first appeal an alternative ground for prior decision that was advanced neither in prior district court proceedings nor on first appeal).

[57]

*Chevron Corp. v. Donziger*, 296 F.R.D. 168, 218-24 (S.D.N.Y. 2013).

[58]

DI 865; DI 1204.

[59]

The judgment directed him to "execute in favor of Chevron a stock power transferring to Chevron all of his right, title and interest of his shares in Amazonia[,]" a Gibraltar company set up to receive any proceeds of the enforcement of the Ecuadorian judgment. DI 1875,

Case 18-855, Document 91, 03/11/2019, 2515258, Page137 of 303

## SA129

18

B.    *Donziger's Allegedly Limited Means*

Donziger contends that costs should not be imposed on him because he is a person of limited means, whether considered in and of itself or in relation to the fact that Chevron is among the world's largest enterprises.  These arguments too would fail even if the Court were to disregard Donziger's failure to comply with court rules governing motions to review taxation of costs.

1.    *Donziger's Finances*

Rule 54(d) "creates a presumption that the district court will award the prevailing party costs."[60] "The burden is on the non-prevailing party to overcome this presumption[, and w]hen a district court exercises its discretion and denies costs to a prevailing party, it must provide a valid reason for the denial."[61]  Thus, the burden is on Donziger to establish that costs should be denied in order to avoid financial hardship.[62]

Donziger has not carried, or even attempted to carry, that burden, even as to the full

---

¶ 3.  According to Chevron's uncontradicted assertion, he has not done so.  DI 1922.

[60]

*Rodriguez v. Whiting Farms, Inc.,* 360 F.3d 1180, 1190 (10th Cir. 2004); *accord Carter v. Inc. Vill. of Ocean Beach*, 759 F.3d 159, 163 (2d Cir. 2014); *Whitfield v. Scully*, 241 F.3d 264, 270 (2d Cir. 2001).

[61]

*Id.* (citation omitted).

[62]

*E.g., Chapman v. AI Transport,* 229 F.3d 1012, 1039 (11th Cir. 2000) ("If a district court in determining the amount of costs to award chooses to consider the non-prevailing party's financial status, it should require substantial documentation of a true inability to pay."); *McGill v. Foster,* 18 F.3d 456, 459 (7th Cir. 1994) (costs award affirmed where non-prevailing prisoner plaintiff "failed to establish . . . that he was incapable of paying the court-imposed costs at this time or in the future").

amount taxed by the Clerk.   Moreover, even if he had demonstrated that he would be able

personally to pay the full amount of the costs taxed against him, that would not be dispositive.

Although a district court "may deny costs based on financial hardship, indigency *per se* does not

preclude an award of costs against an unsuccessful litigant."[63]

Donziger and his clients have complained of a purported lack of resources through

much of this litigation to support various arguments or to justify their behavior.  Indeed, they flatly

refused to comply with the Court's order that they bear part of the special master costs on an interim

basis.[64]  Yet, despite repeated invitations by the Court to submit financial information supporting

their claims of inability to pay,[65] they never did so.[66]  Indeed, Donziger has not submitted any

---

[63]

    *Whitfield v. Scully,* 241 F.3d 264, 273 (2d Cir. 2001), *abrogated in another respect, Bruce v. Samuels,* 136 S. Ct. 627 (2016).

[64]

    DI 865, at 2; DI 1204.

[65]

    *E.g., Chevron Corp. v. Donziger,* 974 F. Supp. 2d 362, 388-89, 432-33, 453-54, 465-79, 525 n.1098 (S.D.N.Y. 2014), *aff'd,* 833 F.3d 74 (2d Cir. 2016), *cert. denied,* 137 S.Ct. 2268 (2017). DI 865, at 3; DI 1287; DI 1293.

[66]

    Donziger recently asserted that "KPMG . . . fully audit[ed] his finances as part of the . . . trial." DI 1947, at 3.  That representation is entirely false.

    While a KPMG forensic accountant did review some financial records and was a witness at trial, there was no audit.  The accountant's unchallenged testimony was precisely to the contrary. Tr. (Dahlberg) 863:24-864:11 ("THE COURT:  Is anything in here a certification or an opinion by you as a certified public accountant that the books and records here fairly present the financial condition of any company, entity, or person?     THE WITNESS:  No, it does not, your Honor.     THE COURT:  Okay.  Are you claiming you did any audit of anything in accordance with generally accepted auditing standards?  THE WITNESS: I am not, your Honor.").  *See also* PX 4900R (Dahlberg witness statement) ¶¶ 24-27.

    Not only was there no audit, there was no evidence at trial as to Donziger's financial situation beyond (1) his admission that he had obtained between $1.8 and $1.9 million in cash and property as the result of  from "family estate related matters" in the two years prior to trial, Tr. (Donziger) 2537:20-2538:18, and (2) what little appeared in the incomplete

# SA131

affidavits, declarations or other evidence of his own financial circumstances or those of his clients in support of his motion to review the taxation of costs. To be sure, some evidence concerning the financing of this litigation came into the trial record.[67] But that evidence does not sustain Donziger's burden of demonstrating that costs should be mitigated or denied on the basis of his financial circumstances.

As an initial matter, Donziger repeatedly has refused to provide much information concerning his personal financial situation. Presumably to compensate for his failure to provide such information, he claims that his original trial counsel, the Keker firm, withdrew in the first half of 2013 claiming non-payment and invited an inference that it did so because Donziger lacked the ability to pay its bills. But even assuming that Donziger stopped paying the Keker firm's bills, the fact that he ceased payments would not necessarily say anything about the financial resources available to him.[68] Indeed, it came out at trial that Donziger received cash and real estate worth $1.8 to $1.9 million from "family estate related matters" during the two years prior to trial, i.e., in

---

and disorganized document production that the KPMG accountant reviewed, *infra,* at pp. 22-23; PX 4900R (Dahlberg witness statement); Tr. 815:18-887:3 (Dahlberg live testimony). Among other things, the accountant noted that he was not given records of payments to lawyers although they were requested by Chevron in this and related litigation. PX 4900R (Dahlberg witness statement) ¶ 27. So there was nothing resembling an accurate picture of Donziger's financial situation at the time of trial nor even reliable assessment of how much of the millions of dollars he raised went into and remained in his own pocket. Moreover, even if there had been adequate evidence of Donziger's financial situation as of the time of trial (fall 2013), it now would be long out of date.

[67]

*See supra* n.66.

[68]

DI 1164, at 5 & n.16 ("[T]here is no competent evidence that the non-payment [wa]s a result of inability to pay as distinguished from a decision not to pay by whomever controls resources on the defendants' side." (footnote omitted)).

# SA132

the period from October 2011 until October 2013,[69] during which payments to the Keker firm appear to have stopped or fallen well behind.  Other evidence showed that Donziger personally received somewhere between $958,000 and $1.3 million from litigation funders before trial, and the figure could well have been higher because the records from which that information was gleaned were incomplete.[70]  There simply is no factual basis from which the Court responsibly could conclude that Donziger is unable to pay costs in the full amount taxed by the Clerk or that the amount of any such judgment should be reduced to avoid undue financial hardship.

Perhaps more fundamentally, Donziger's focus on his supposed personal circumstances should not blind one to the fact that the litigation with Chevron, including this case, has been financed by third-party funders.[71]  And it is Donziger who, with limited and apparently now long past exceptions, essentially has controlled the money.[72]  Moreover, his clients at least arguably

---

[69]

Tr. (Donziger) 2537:20-2538:18.

[70]

PX 4900, ¶¶ 8, 27, attach. C. (Dahlberg).

[71]

*See, e.g., Cherry v. Champion Int'l Corp.,* 186 F.3d 442, 447 (4th Cir. 1999) (no reduction in cost award despite proof that plaintiff had "no independent income and owned no property in her own name" because she had "sufficient access to marital property" and a 401(k) plan).

[72]

*Chevron v. Donziger,* 974 F. Supp. 2d at 397-98 & n. 102.

In the period through 2009, most of the money came from the Kohn firm, but "Donziger largely controlled how and when it was spent."  *Id.*  After Kohn stopped its support, Donziger and Patton Boggs lined up financing from Burford Capital LLC ("Burford"), which provided $4 million but then refused to provide further funding upon its conclusion that Donziger and Patton Boggs had misled it.  *Id.* at 474-75, 478-79.  The funds provided by Burford were to be spent only with the agreement of both Donziger (referred to in the Funding Agreement as Claimants' U.S. Representative") and Patton Boggs (referred to as "Nominated Lawyers").  DI 356-2 (Funding Agreement), ¶¶ 3(b) and Sched. 3.  Those funds, which perhaps by now have been exhausted, would have been available to pay Donziger's defense costs in this case as well as any costs imposed upon him.  *Id.* ¶¶ 3(e),

# SA133

are obliged to pay the reasonable costs of defending Donziger, which may include costs imposed upon him by the Court, to the extent of monies available to them to fund the Chevron litigations.[73] Thus, no consideration of Donziger's means would be complete without full knowledge of the funding arrangements for this case.

Neither Donziger nor his clients have come forward with complete and current evidence concerning the monies available to them.  The most that can be said is that the KPMG forensic accountant called by Chevron at trial, based on his examination of incomplete records all of which now are more than four years old, testified that:

- "[T]he activites and operations surrounding the Litigation were funded by a number of investors during varying distinct periods of time throughout the course of the Litigation.  Based on the documents I analyzed, it appears that the various individual investors, law firms, and litigation investment firms agreed to provide approximately $32 million in funds to finance the activities

---

3(f).

[73]

PX 558 (retainer agreement) § 9.

The retainer agreement provides also that Donziger's clients would have the right to seek to recoup from Donziger whatever they have paid to defend him in the event of a final judgment determining that Donziger "has committed actual fraud, professional malpractice or willful misconduct."  *Id.*  The judgment in this case determined that Donziger has committed actual fraud and willful misconduct, albeit not actual fraud on or misconduct with respect to his clients.  In all the circumstances, it is questionable whether (a) the findings here would excuse Donziger's clients from their indemnity obligation given the lack of findings of fraud or misconduct *directed at those clients*, and (b) Donziger's clients would adopt this Court's findings of fraud and misconduct to avoid their obligation to pay for Donziger's defense in light of the possible implications of adopting those findings for their efforts to enforce the Ecuadorian judgment in other countries.

# SA134

and operations surrounding the Litigation."[74]

- "The available documents show that the individual investors, law firms, and litigation investment firms contributed approximately $16 million to finance the activities and operations surrounding the Litigation."[75]

In addition, the accountant concluded that:

"The extremely poor organization and incomplete nature of the financial and accounting records that Donziger produced and appeared to maintain would not have allowed him to provide accountability to either his investors or to the Lago Agrio Plaintiffs (the 'LAPs')."[76]

Donziger himself admitted at trial that he spent over $21.4 million on the litigation from 2007 to 2013,[77] and the figure may well have been substantially higher. Moreover, there is no evidence as to what additional monies have been raised in the several subsequent years. By the time of trial four years ago, these included at least an additional $2.5 million from a British investor.[78] And Donziger has been engaged in extensive litigation in Canada and elsewhere for some time now, which at least suggests that he has raised much more. Donziger thus has raised at least $21.4 million over the years, and probably a good deal more, a large part of which never has been accounted for. He has submitted no evidence in connection with the taxation of costs that could justify any

---

[74] DX 4900R (Dahlberg). ¶ 34.

The available records showed receipt of only $16 million. *Id.*

[75] *Id.* ¶ 5.

[76] *Id.* ¶ 8 (emphasis added).

[77] Tr. (Donziger) 2502:4-9.

[78] *See* Tr. (Donziger) 2528:9–2529:11.

Case 18-0551 Document 91 03/11/2019 2515258 Page143 of 303

# SA135

conclusion, one way or the other, as to whether third party funding is available to pay costs in this case.

In sum, there is no substantial basis to credit Donziger's unsubstantiated claim of inability to pay.  Given that the burden of proof to establish at least that payment would cause serious financial hardship is on the party seeking to avoid imposition of costs, and given that Donziger has provided no such evidence, the Court would decline to temper the award of costs even if it were to overlook his failure to comply with court rules.

### 2.   *Disparity of Litigants' Resources*

The other branch of Donziger's means-related argument is straightforward.

Chevron is a huge enterprise.  According to its 2016 annual report, the consolidated balance sheet for Chevron reflected net equity of $146.7 billion.[79]  Whatever Donziger's personal net worth may be, the Court proceeds on the assumption that it is very small compared to that of Chevron. But virtually every circuit to consider the question has held that disparity of wealth does not justify denial or reduction of costs, at least in the absence of persuasive evidence of inability to pay.[80]  Indeed, at least one circuit has reversed a reduction of costs that was made in light of the

---

[79]

CHEVRON 2016 ANNUAL REPORT, at 35, *available at* https://www.chevron.com/-/media/chevron/annual-report/2016/2016-Annual-Report.pdf ?l=2#page=3.

[80]

*Compare Moore v. CITGO Ref. & Chems. Co.,* 735 F.3d 309, 319-20 (5th Cir. 2013) ("The court erred as a matter of law in relying on CITGO's "enormous wealth"—or the comparative wealth of the parties—as a basis for reducing the cost award."), *Chapman v. AI Transport,* 229 F.3d 1012, 1038-39 (11th Cir. 2000) (en banc) ("[W]hen awarding costs a district court should not consider the relative wealth of the parties."), *In re Paoli R.R. Yard PCB Litig.,* 221 F.3d 449, 468 (3d Cir. 2000) (same), *Cherry v. Champion Int'l Corp.,* 186 F.3d 442, 447-48 (4th Cir. 1999) (same), *Smith v. Southeastern Penn. Transp. Auth.,* 47 F.3d 97, 99-100 (3d Cir. 1995) ("We reject the general proposition that it is "inequitable"

disparity of resources between an individual plaintiff and a giant corporation.[81]

      C.    *Chevron's Alleged Pollution of the Ecuadorian Rain Forest*

      As noted previously by both this Court and the Court of Appeals:

> "The issue here [wa]s not what happened in the Orienté, more than twenty years ago and who, if anyone, now is responsible for any wrongs then done. [The issue] instead [wa]s whether a court decision was procured by corrupt means, regardless of whether the cause was just."[82]

Moreover, as one witness pointed out at trial, a singular irony of Donziger's misconduct is that its occurrence "probably means that we'll never know whether or not there was a case to be made against Chevron."[83]  An application to review the Clerk's taxation of costs is not a proper vehicle for attempting to find out, which would entail retrying on the merits a pollution case that was corruptly litigated in Ecuador.[84]  That is especially so where the application fails to comply with either the Federal Rules of Civil Procedure or this Court's rules and is unsupported by competent evidence or legal analysis.  Moreover, assuming that the Court's discretion extends so far as to permit denial of taxable costs on the basis of alleged behavior extrinsic to the conduct of the

---

      to tax costs in favor of a prevailing party with substantially greater wealth than the losing party."), *and Reed v. Int'l Union of Auto., Aerospace, & Agric. Implement Workers Local Union No. 663,* 945 F.2d 198, 204 (7th Cir. 1991) (same), *with Ass'n of Mexican-Am. Educators v. California,* 231 F.3d 572, 592-93 (9th Cir. 2000) (en banc).

[81]      *Moore,* 735 F.3d at 319-20.

[82]      *Chevron Corp. v. Donziger,* 833 F.3d at 85 (quoting *id.* 974 F. Supp. 2d at 385-86).

[83]      974 F. Supp. 2d at 644 (internal quotation marks and footnote omitted).

[84]      "[D]isapproval of a prevailing [party's] *extrajudicial conduct* on which [other party's] claim was based is not a sufficient basis for denying costs to the prevailing" party.  10 MOORE'S FEDERAL PRACTICE § 54.101[1][b], at 54-157 (3d ed. 2017) (emphasis in original).

litigation, the fact of the matter is that Donziger simply has not proved what he alleges only in the most conclusory of terms. And certainly the fraudulent Ecuadorian judgment cannot be taken as having established anything.

D. *Donziger's Claim of Fraud by Chevron*

Donziger next argues that all costs should be denied to Chevron because it allegedly committed fraud, suborned perjury, and perhaps was guilty of other misconduct in connection with the testimony of Alberto Guerra. In essence, he claims that Guerra's testimony was false, at least in material respects, and that Chevron bought and paid for the alleged perjury. And it is true that costs may be denied to a prevailing party if the prevailing party is guilty of sufficiently serious misconduct in the course of the action.[85] But all of the evidence concerning these charges was developed before and during the trial. It was considered carefully and extensively in the Court's extensive findings and conclusions.[86] And Donziger's argument fails now for several reasons.

First, as already noted, Donziger could have challenged the judgment's award of costs against him on the appeal from the final judgment but failed to do so. That failure forecloses the issue now.[87]

Second, Donziger's argument would be unpersuasive even if it were not precluded. Donziger failed to prove any misconduct, let alone any of sufficient gravity to warrant denial of costs to the prevailing party.

---

[85]    *E.g., id.*

[86]    *Chevron Corp. v. Donziger,* 974 F. Supp. 2d at 502-35.

[87]    *See supra* Point III.A.

Case 18-855, Document 91, 03/11/2019, 2515258, Page146 of 303
Case 1:11-cv-00691-LAK-JCF   Document 1963   Filed 03/01/18   Page 27 of 48
**SA138**

27

The crux of Donziger's argument is twofold.  *First,* he argues once again, as he did at trial, that Guerra perjured himself and now contends that Chevron suborned that false testimony.[88] *Second*, he argues that Chevron at least acted improperly in providing financial support and other economic lures to Guerra to induce him to come to the United States and to testify at trial.  But neither argument is well founded.

To begin with, this Court heard Guerra's testimony.  It heard as well the testimony of the other key witnesses on the relevant point, Donziger and former Ecuadorian judge Zambrano. It recognized that all three were highly flawed witnesses and laid out the economic and other inducements to Guerra to come to the United States and testify.[89]  It carefully and skeptically assessed Guerra's account as well as the extensive evidence that corroborated it in many though not all respects.[90]  It declined to credit certain aspects of his testimony,[91] although it credited a good deal of it.

To the extent that the Court already has found that Guerra's testimony was credible,[92] findings by which Donziger is bound, there was no perjury and therefore no subornation.  And the

---

[88]

    *E.g.* Tr. (Opening) 35:20-36:12.

[89]

    *Chevron Corp. v. Donziger,* 974 F. Supp. 2d at 504-05, 517-18.

[90]

    *E.g., id.* at 517-20, 526-28, 534.

[91]

    *Id.* at 512-13 (declining to credit Guerra's testimony "that the alleged [corrupt] arrangement between Zambrano and the LAPs during Zambrano's first tenure on the Lago Agrio case [2009-10] existed or . . . with respect to the alleged 2009 Honey & Honey restaurant meeting" relating thereto).

[92]

    And it bears mention that Donziger did not challenge that finding on appeal as having been clearly erroneous, the relevant standard for upsetting the finding.

# SA139

fact that the Court did not credit Guerra in some particulars is of no help to Donziger. Even if Guerra had perjured himself, as opposed to having been mistaken, in those particulars – and the Court declines to find so – the question here would be whether Chevron suborned perjury. In order to establish subornation of perjury, Donziger was required to prove that Chevron knew or believed that Guerra's testimony would be perjurious and nevertheless induced him to commit that perjury.[93] Donziger has not done so.[94]

Donziger's other argument fares no better.

To be sure, as the Court wrote previously, Guerra at the time of trial was "the beneficiary of what amount[ed] to a private witness protection program created for him by Chevron, which facilitated his relocation from Ecuador to the United States and ha[d] been supporting and assisting him since his arrival here."[95] Chevron had paid him $48,000 for physical evidence and information it contained.[96] In addition,

---

[93]

*E.g., Petite v. United States*, 262 F.2d 788, 794 (4th Cir. 1959) ("[E]ssential to subornation of perjury that the suborner should have known or believed or have had good reason to believe that the testimony given would be false.") (internal quotation marks and citation omitted), *rev'd on other grounds*, 361 U.S. 529 (1960); *Ryan v. United States*, 58 F.2d 708, 710 (7th Cir. 1932) ("[T]he suborner must know or believe that the testimony of the witness about to be given will be false, and he must know or intend that the witness is to give the testimony corruptly or with the knowledge or belief of its falsity.") (quoting *Boren v. United States*, 144 F. 801, 802 (9th Cir. 1906)); 2 LEONARD B. SAND ET AL., MODERN FEDERAL JURY INSTRUCTIONS-CRIMINAL, Instr. 48-15 (2006).

[94]

Indeed, the record establishes that Chevron went to great lengths to seek corroboration for everything that Guerra said to it and succeeded to a considerable degree. *See, e.g., Chevron Corp. v. Donziger*, 974 F. Supp. 2d at 506-07, 509-11, 526-28, 533. Moreover, his testimony was corroborated in important respects by admissions of both Donziger and Zambrano. *Id.* 506, 521-22.

[95]

*Id.* at 504.

[96]

*Id.* at 517.

> "Fearing retaliation from the ROE, Guerra and his family (including his wife, his son, and his son's family) relocated to the United States. Chevron representatives paid for the move and, as his visa status does not allow him to work while he is in this country, Chevron pays him $10,000 per month for his living expenses, pays for health insurance coverage for Guerra and his family, leases a car for him, and pays for an attorney to represent him in any dealings with federal or state government investigative authorities or any civil litigation, and for an immigration attorney to deal with his resident status."[97]

But these arrangements would provide no basis for denying costs to Chevron even if Donziger had not forfeited the argument.

There was extensive motion practice concerning these issues prior to trial. The motions produced an extensive record, including expert affidavits concerning the ethical propriety of the participation by Chevron's lawyers in the Guerra arrangements.[98] And the bottom line of all of that motion practice was the Court's denial of all efforts to strike or preclude Guerra's testimony on the straightforward, common sense, and well established basis that:

> "'[i]t is the province of the [trier of fact] and not of the court to determine [as a matter of law] whether a witness who may have been inaccurate, contradictory and even untruthful in some respects was nonetheless entirely credible in the essentials of his testimony.'. . . . [A]ny claims of professional or other misconduct are appropriately considered in other contexts, particularly in view of the fact that

---

[97] *Id.* at 517 (footnotes omitted).

[98] The first round was occasioned by defendants' motions to strike Guerra's affidavit, submitted on a summary judgment motion. The relevant parts of the record with respect to that motion include DI 916, DI 930, DI 976, DI 977, DI 1029, DI 1034 and DI 1071.

The second round came on defendants' motion dismiss the action on the ground that the Guerra arrangements alone justified such action. The relevant papers with respect to that motion include DI 1422, DI 1423, DI 1472, DI 1474, DI 1475, DI 1481 and DI 1650.

The third was a motion to strike Guerra's trial testimony. The papers with respect to the third are DI 1640 and DI 1650. Of particular note are the expert affidavits, DI 977-4, DI 977-5, DI 977-6, and DI 1423-2, and a portion of Chevron's memorandum of law in opposition to the second motion, DI 1474, at 1-22.

## SA141

Chevron acted on the basis of substantial outside expert advice."[99]

Of course, we now consider the matter in a context distinct from whether Guerra's testimony should have been excluded.  The concern, if the issue still were open to Donziger, would be whether Chevron engaged in misconduct and, if so, whether it was sufficient to warrant denial of costs.  The evidence does not justify a finding of misconduct, let alone misconduct sufficient to warrant such a denial.

The principles that govern the propriety of Chevron's payment for the relocation of Guerra and his family from Ecuador, living expenses in the United States prior to and during trial, the many hours he spent being debriefed by Chevron counsel and preparing to testify, and legal expenses occasioned by the relocation such as the cost of immigration counsel are not in much dispute.  Donziger and the other defendants conceded before trial that a party may pay a fact witness's expenses and reimburse the witness for time lost in connection with the litigation, provided the payments are reasonable.[100]   Moreover, defendants' proffered professional responsibility expert conceded that "it is permissible for attorneys to pay expenses reasonably necessary to keep [a] witness in a safe location" "if [the] witness faces a bona fide personal safety

---

[99]        DI 1650 (citations omitted).

[100]       DI 1422, at 18-19.

Indeed, while the New York Rules of Professional Conduct prohibit offering witnesses inducement or compensation, "contingent upon the content of the witness's testimony or the outcome of the matter," that same rule allows a lawyer to "advance, guarantee or acquiesce in the payment of . . . reasonable compensation to a witness for the loss of time in attending, testifying, preparing to testify or otherwise assisting counsel, and reasonable related expenses."  N.Y. R. PROF'L CONDUCT 3.4(b); *see also* N.Y. Comm. of Prof'l Ethics, Op. 668 (1994) (concluding the same under prior law); N.Y. Comm. of Prof'l Ethics, Op. 962 (2013) (reimbursement of travel expenses is reasonable).

or security risk."[101]

In this case, there was abundant evidence, which the Court credits, that Guerra's decision to cooperate with Chevron and, ultimately, to testify in this case would have exposed him and his family to serious risks to personal safety and security had they remained in Ecuador.[102] His decision to testify effectively forced him to become an exile from his native country. The Court finds that Chevron's payments for relocating the Guerras to this country, for legal counsel to deal with immigration issues, and for living expenses (particularly in light of the fact that his immigration status barred employment) were reasonable in object and in amount. It was permissible also to compensate him within reason for time he spent being interviewed repeatedly by Chevron counsel and preparing to testify, and no more was done.[103] There is no evidence that any of these payments was conditioned upon the substance of Guerra's testimony or contingent on the outcome of this case. The evidence of record establishes no misconduct in these respects.

So far as the payments for physical evidence are concerned, defendants' proffered

---

[101]
    DI 1423-2 ¶ 7; *accord,* DI 1422, at 27.

[102]
    The facts are marshaled, among other places, in Chevron's memorandum in opposition to defendants' motion to impose termination sanctions. DI 1474, at 8-10, 13-18 (citing evidence in the record).

[103]
    American Bar Association, Standing Comm. on Ethics and Prof. Responsibility, Formal Opinion 96-402 (August 2, 1996) ("[A] lawyer, acting on her client's behalf, may compensate a non-expert witness for time spent in attending a deposition or trial or in meeting with the lawyer preparatory to such testimony, provided that the payment is not conditioned on the content of the testimony . . . ."). No distinction is drawn between compensation for "time spent in actually attending a deposition or trial," "time spent in pretrial interviews," and "time spent in reviewing and researching records that are germane to his or her testimony." *Id.* The Committee goes on to explain that the amount of compensation must be "reasonable," and that for a witness who is retired or unemployed, "reasonable" compensation is determined by the "value of the witness's time based on all relevant circumstances." *Id.*

# SA143

professional responsibility expert conceded that "[l]awyers may pay reasonable costs to gather documents and other physical evidence from various sources" and for physical evidence itself.[104] He went on to contend, however, that payments for physical evidence that exceed the replacement cost of the physical articles themselves – and thus reflect the value of the information they contain or reflect – are improper *per se*.[105]

       To be sure, the Court understands the concern that motivated the defendants' witness's qualification – payments for information in a given case could edge along the spectrum in the direction of payments for testimony.  But the assertion that any payment beyond the replacement cost of a piece of physical evidence inherently is unethical was entirely unsupported by any citation of authority.  Chevron's expert, on the other hand, provided an extensive, well reasoned, and well supported opinion in which he said that Chevron's counsel appropriately could pay Guerra "solely for the information in his possession, so long as that payment [was] a fixed sum not in any way contingent on his testimony or the outcome of the litigation; the witness makes no promise to testify in return for the payment; and no future payment [would] be made to the witness for his testimony other than legally and ethically permitted payment for expenses incurred in connection with testifying."[106]

       In the last analysis, the Court need not resolve this abstract disagreement between experts.  The relevance of misconduct by a prevailing party with respect to taxation of costs is that misconduct  may be an equitable factor that, in a proper case, could warrant departure from the

---

[104]       DX 1423-2, ¶¶ 8-9.

[105]       *Id.* ¶ 10.

[106]       DI 977-4, ¶ 6.

presumption that the prevailing party is entitled to recover costs.  In this case, any undue aggressiveness with respect to the payment for physical evidence, and the Court makes no finding of any impropriety, would not warrant such a departure for a host of reasons:

- Donziger's behavior in this litigation was outrageous and, in many respects, far beyond the bounds of propriety.  Among other things, he wilfully, deliberately disregarded a court order to produce relevant documents located in Ecuador but nonetheless under his practical control.[107]  He deliberately testified falsely at an evidentiary hearing on Chevron's motion for sanctions.[108]  And he falsely testified that he lacked recollection in response to nearly 300 questions at his deposition in this case and on cross-examination at trial.[109] He has no claim to a favorable exercise of discretion based on what was no more than a perhaps arguable departure long before the trial that ultimately had no effect on the case.

- Chevron fully disclosed all of its payments and other arrangements with Guerra.  There most assuredly was no concealment or fraud.[110]

---

[107]

*Chevron Corp. v. Donziger,* 296 F.R.D. 168, 187, 190-96, 210-12, 216-19 (S.D.N.Y. 2013).

[108]

*Chevron Corp. v. Donziger,* 974 F. Supp. 2d at 524-25.

[109]

*Id.* at 525-26.

The Court does not take into account his false protestations of lack of memory in his deposition in the 1782 proceeding or his obstruction of justice, witness tampering, and other misconduct in related cases, as it considers only misconduct in this action for purposes of striking an equitable balance with respect to costs.  *See Zeran v. Diamond Broad., Inc.*, 203 F.3d 714, 722 (10th Cir. 2000).

[110]

DI 755-14.

- Chevron relied on extensive expert advice with respect to its dealing with Guerra and acted in the good faith belief that its actions were proper.[111]

- Chevron even disclosed the facts concerning its interactions with Guerra to the U.S. Department of Justice long before calling Guerra at trial.[112]

No more need be said.


### E.    The Forfeiture Argument

Finally, Donziger argues that Chevron has forfeited the right to recover, whether by taxation of costs or otherwise, the fees and expenses of the special masters because it failed to make a timely motion as supposedly required by the Court's July 9, 2013 order.[113]  In order to place his argument in context, it is necessary to set out the procedural history.

---

[111]

DI 977-4.

[112]

DI 977-6, ¶ 6.

[113]

Donziger does not here challenge the appointment of the special masters or the hourly rates fixed for their compensation.  While he objected to the appointments before trial, he could have pressed that point, as well as objecting to the hourly rates which also were fixed well before trial, on appeal from the final judgment.  *See generally* 15A CHARLES ALLAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: JURISDICTION AND RELATED MATTERS 2D § 3905.1 (2d ed. 2017). That was so because  (1) the final judgment, as we have seen, awarded costs against the defendants, and (2) the fees and expenses of the special masters, as we shall see in more detail, are taxable as costs.  *E.g., Chemical Bank & Trust co. v. Prudence-Bonds Corp. (New Corp.),* 207 F.2d 67, 78, 82 (2d Cir. 1953); *Aird v. Ford Motor Co.,* 86 F.3d 216, 220-22 (D.C. Cir. 1996); *Studiengellschaft Kohle mbH v. Eastman Kodak Co.,* 713 F.2d 128, 134 (5th Cir. 1983); LOCAL CIV. R. 54.1(c)(8) ("Fees of masters . . . are taxable as costs, unless otherwise ordered by the Court.") Accordingly, any challenge to the appointments and the  hourly rates would be precluded by Donziger's failure to raise any such issues on the appeal from the final judgment.  *Supra* Point III.A.

# SA146

> 1.      *The July 9, 2013 Order and the Special Master Bills*

For reasons well documented in the extensive record,[115] the Court appointed two

special masters to coordinate discovery, to preside at or otherwise supervise depositions, to rule on

objections, and to direct, supervise, monitor, and report upon implementation of the Court's

discovery orders.[116]  It directed that the cost of the special masters be advanced on a 50-50 basis,

with  plaintiffs paying one half and Donziger and the LAP Representatives paying the other, subject

to later reallocation in accordance with Rule 53(g) of the Federal Rules of Civil Procedure (the "First

Orders").[117]

Donziger and the other defendants refused to comply with the Court's orders to

advance their half of the costs.[118]  Accordingly, the Court, by a July 9, 2013 order (the "Second

Order"), directed Chevron to "advance" 100 percent of the special masters' compensation on an

interim basis, but afforded it the right to seek an allocation of any part of the funds thus advanced

by it to one or more defendants and to recover any portion so allocated.  Any such application, the

---

[115]

See, e.g., DI 865 (referring to parties' proposal to take at least 42 depositions in a relatively short period, the extreme contentiousness of counsel, deposition misconduct by Donziger and counsel for him and the LAP Representatives in a related prior litigation, defendants' obstructive and disruptive actions in this case, the possibility that important depositions in this case would occur outside the United States and require effective and timely supervision, and the high likelihood that many claims of privilege would be asserted, including during depositions outside New York and the United States, making prompt rulings essential to proper progress of this case).

[116]

Id.; DI 942.

[117]

DI 942.

[118]

DI 1204.

They asserted inability to pay but never documented any such thing.  E.g., DI 1293, at 2-3.

Court directed, was to be made no later than 14 days after the submission of the special masters'

"final billings."[119]  In response to defendants' contention that they were entitled to know the amount

of the costs that could be imposed upon them, the Court stated that they would have that opportunity

"at such point as Chevron seeks an order requiring them to pay all or part of the costs that it

[Chevron] will advance pursuant to this order."[120]

      The special master bills that were submitted in support of the bill of costs were

rendered in July, August and September 2013 and covered varying periods ending no later than

August 31, 2013 and in some cases earlier.[121]  In accordance with the Order, the funds to pay them

were advanced by Chevron.  All of the bills are attached to Chevron's bill of costs.[122]

      Chevron did not move for an allocation of any part of the funds it had advanced

within 14 days after receipt of the last of the invoices included in the bill of costs it filed in late

2016.  Donziger argues that Chevron thus forfeited any right to recover any part of the money it

advanced, even via taxation of costs at the conclusion of the case.  This argument is unpersuasive

---

119

    DI 1287.

120

    *Id.* at 3.

121

    DI 1928-3, Exh. 7. Special Master Katz's bill covered the period March 26 through July 25, 2013.  Special Master Gitter's bill covered his services for the period March 26 through June 30, 2013.  Two Cleary Gottlieb bills, which covered disbursements and the services of the associate who assisted both special masters, covered the period March 26 through August 31, 2013.

122

    The bill of costs contained copies of the bills rendered by the special masters, Mr. Gitter and former magistrate Judge Katz, and the Cleary Gottlieb firm, which provided them with the services of one assistant and various other items billed as disbursements.  Mr. Katz's bills contained detailed time records for all of his services.  Those rendered by Mr. Gitter, a retired Cleary partner, and Cleary showed the hours worked and the rates charge but not detailed time records.  *Id.*

# SA148

for several reasons.

### 2.    *Analysis*

The starting point for this discussion is three straightforward propositions.  The first

is that Rule 53, which governs special masters, empowers a court to provide interim compensation

for special masters, subject to reallocation of those expenses at the end of the case.[123]  The second

is that Local Civil Rule 54.1(c)(8) and Federal Rule 54(d)(1) contemplate taxation of the

compensation and expenses of special masters as costs at the conclusion of a case.[124]  Moreover, the

local rules of this Court, consistent with Federal Rules 53(g)(3) and 54(d)(1), provide that costs will

not be taxed prior to the entry of final judgment and, if an appeal is taken, prior to the conclusion

of the appellate process.[125]  The 14 day time limit in the Second Order must be considered against

this background.

As the foregoing suggests, and as the First and Second Orders made clear by referring

to reallocation in accordance with Rule 53(g)(3), those orders provided only for the payment of the

special masters during the interim between their appointment and the conclusion of the appellate

process.

It was in that context that the Second Order, which required Chevron to "advance"

100 percent of these expenses rather than to pay the 50 percent set out in the First Orders, gave

---

[123]

        FED. R. CIV. P. 53(g)(3) ("An interim allocation may be amended to reflect a decision on the merits.").

[124]

        LOCAL CIV. R. 54.1(c)(8) provides that "[f]ees of Masters . . . are taxable as costs."  FED. R. CIV. P. 54(d)(1) provides for taxing costs in favor of the "prevailing party."

[125]

        LOCAL CIV. R. 54.1(a).

Case 18-855, Document 91, 03/11/2019, 2515258, Page157 of 303

# SA149

Chevron on option with respect to those interim advances – half the amount of which was necessitated by Donziger and the LAP Representatives' disregard of the Court's orders and refusal to pay. The Second Order gave Chevron the option, but not the obligation, to move to recover on an interim basis any or all of the funds it advanced to cover Donziger and the LAP Representatives' share without waiting either for the ultimate reallocation of those expenses under Rule 53(g) or the taxation of costs at the conclusion of the case and any appeals.

Donziger nevertheless argues in substance that Chevron lost the right to seek to impose *any part* of the *ultimate liability* for the special masters on him by failing to move to change the *interim responsibility* to advance costs pending a determination of the ultimate liability.

Donziger's argument makes little sense. Nothing in the Second Order impaired Chevron's rights under the Order of Appointment of the Special Masters,[126] Rule 53(g)(3), Rule 54(d), and Local Civil Rule 54.1 to seek to impose all or part of the fees and expenses of the special masters on the defendants at the conclusion of the litigation. In fact, Rule 53(g)(3) expressly states that "[a]n interim allocation may be amended to reflect a decision on the merits."[127] The fact that Chevron did not avail itself of the option afforded by the Second Order with respect to interim payment did not foreclose its effort to recover all or part of what it had paid at the conclusion of the litigation.

*   *   *

In sum, none of Donziger's arguments for review of the Clerk's taxation of costs has

---

[126]

DI 942.

[127]

*Accord,* 9 MOORE'S FEDERAL PRACTICE § 53.52[2], at 53-123 (3d ed. 2017) (collecting cases).

merit.  The contention that the Clerk was obliged to hold the matter of costs in abeyance is frivolous. All or substantially all of his arguments could be rejected on the ground that he disregarded court rules in seeking review of the Clerk's actions.   Even if the Court were to reach the merits notwithstanding that procedural default, the arguments would fail:

- Several are foreclosed because Donziger failed to raise them on direct appeal although they were available to him there.

- Donziger's claim of limited means is unproven and in any case would be insufficient.

- The disparity in resources between Donziger and Chevron is not an appropriate consideration and, in any case, would be rejected by the Court on the facts of this case.

- Chevron's alleged pollution of the Ecuadorian rain forest is extraneous to this litigation, therefore has no bearing on taxation of costs, and in any case is unproven.

- While misconduct by a prevailing party in some circumstances may warrant denial of costs, no such thing has been proved here.  In any case, Donziger has no equitable claim on a favorable exercise of the Court's discretion on this basis given his own, far more serious misconduct in this litigation.

- Donziger's forfeiture argument is without merit.

*IV.    The Ultimate Apportionment and Taxation of Costs*

So what remains to be determined?

The foregoing rulings require denial of Donziger's motion insofar as it seeks review

Case 18-855, Document 91, 03/11/2019, 2515258, Page159 of 303

# SA151

of the Clerk's taxation of costs for service fees, court reporter fees and translation costs, a total of $72,076.22. The rulings of December 6 and 27, 2017[128] require rejection also of any claims with respect to the reasonableness of the amounts taxed for special master expenses. What remains, then, is whether some adjustment of the costs taxed for the special master expenses is warranted, whether under Rule 53(g)(3) or otherwise, notwithstanding Donziger's procedural default in bringing the motion.

### A.    General Principles

Rules 53(g)(3)and 54(d) afford district courts a modicum of discretion with respect to the imposition of expenses of special masters in particular and taxable costs generally, respectively.[129]

The pertinent factors mentioned in Rule 53(g)(3) are "the nature and amount of the controversy, the parties' means, and the extent to which any party is more responsible than other parties for the reference to the master."[130] But "whether a party prevails in a case is probably the most important factor that the courts have historically considered in allocating the responsibility of paying a master's compensation."[131]

---

[128]

DI 1940, DI 1946.

[129]

As noted above, LOCAL CIV. R. 54.1(c)(8) provides that special master compensation is a taxable cost, which is consistent with established practice. 9 MOORE'S FEDERAL PRACTICE § 53.52[4] (3d ed. 2017).

[130]

FED. R. CIV. P. 53(g)(3).

[131]

9 MOORE'S FEDERAL PRACTICE § 53.52[3] (3d ed. 2017).

# SA152

Rule 54(d) differs somewhat.  As previously noted, it "creates a presumption that the district court will award the prevailing party costs."[132]  Any departure from that presumption must be explained, and the explanation must be sufficient to justify the result.[133]  Moreover, as discussed in Point III, none of the arguments advanced by Donziger warrants such a departure.  Nevertheless, we pause to consider whether the factors enumerated in Rule 53(g)(3) suggest some variance here.

    *B.*    *The Need for and Demands Upon the Special Masters and Their Proposed Allocation*

The record in this case reflects the reasons for the appointment of the special masters, which included anticipated difficulties with Donziger and the other defendants based on experience in prior related litigation.[134]  It reflects also a great deal of very important work they did – work far beyond what could have been demanded of a magistrate judge who would have been subject to the competing demands of many other assigned cases.[135]  Nevertheless, the Court did not feel itself to be fully informed with respect to the extent to which the demands upon the special masters were occasioned disproportionately and unreasonably by one side or the other.  Accordingly, it requested a recommendation from the special masters concerning the appropriate apportionment of the costs of their services, taking into account the nature and amount of the controversy and the extent to which any party was more responsible than others for the reference and for the need for their

---

[132]    *Supra* n.60.

[133]    *Whitfield*, 241 F.3d at 270 (citing *Cantrell v. Int'l Bhd. of Elec. Workers*, 69 F.3d 456, 459 (10th Cir. 1995)).

[134]    DI 865.

[135]    *See, e.g.*, DI 1942, at 3-6.

Case 18-855, Document 94, 03/11/2019, 2515258, Page161 of 303

# SA153

services.[136]

The masters recommended ultimately that defendants, jointly and severally, be taxed 85 percent of the masters' costs and fees and that the remaining 15 percent be taxed to Chevron.[137] This recommendation was based on their experience supervising the parties, and the masters' report chronicles the "Herculean effort" that the supervision required.[138]   Such an effort was necessitated by the parties' – most often, defendants' – obstructive behavior in connection with scheduling, frivolous and repetitious assertions of privilege, and unwillingness to accept prior rulings.[139]

The masters highlighted, as an example, one occasion in which Donziger changed his position regarding a scheduling issue twice in the course of five days.[140]   He moved first for a two-week delay of all depositions and other discovery deadlines, occasioned by the withdrawal of Keker & Van Nest LLP and Smyser & Veselka, LLP.[141]   He then moved for a three-month delay instead of the initial request for two weeks.[142] But after the Court granted his request for a two-week

---

[136]   DI 1939.

The Court did not ask the special masters to address the parties' means, as the Court, although not the special masters, had extensive knowledge of the prior proceedings bearing on that issue

[137]   DI 1942.

[138]   *Id.* at 8.

[139]   *Id.* at 9-12.

[140]   *Id.* at 8.

[141]   DI 1168.

[142]   *See* DI 1185, at 2.

## SA154

extension (though not for three months), Donziger the next day proposed to the Special Masters that depositions proceed immediately.[143]   This issue alone called for the masters to convene multiple conference calls, participate in a court hearing, prepare an interim report, and issue four written orders.[144]   And this is but one example of Donziger's behavior turning "basic matters like scheduling" into tasks requiring many hours of work.[145]

The report includes also examples of Donziger's frivolous assertions of privilege during depositions (objections that  "turned the Guerra deposition from seven hours of testimony into a 10 ½-hour day"[146]) and stubborn insistence on relitigating prior final rulings ("Mr. Donziger opened the morning of the second day of his deposition by complaining about [the Court's] orders in relation to [the Special Masters'] fees and about the length of his deposition, all of which had already been the subject of prior orders."[147]).

But blame does not fall on Donziger alone.   Chevron too occasionally was recalcitrant, "tr[ying] to take advantage of [the Special Masters'] presence to relitigate issues that had already been decided."[148]   Nevertheless, the Special Masters saw a difference between Donziger's "staggeringly uncooperative" behavior that, they believe, was an attempt to prevent the

---

[143]   *See* DI 1189, at 1.

[144]   DI 1942, at 8.

[145]   *Id.*

[146]   *Id.* at n.9.

[147]   *Id.* at 11-12 (citation omitted).

[148]   *Id.* at n.10, n.12.

# SA155

truth from coming to light, and Chevron's more legitimate – if still "overzealous" – attempts to shield witnesses from the burdens of lengthy depositions.[149]  In sum, the Special Masters concluded that defendants' behavior was responsible for most, but not all, of the many hours spent supervising this litigation.

The report sheds significant light on the issue of the question of the allocation of fees. And, as noted above, the Court adopted the special masters' findings in the absence of timely objection from Donziger.

### C.    Analysis

I begin with the presumption created by Rule 54(d)(1), that costs are awarded to the "prevailing party."[150]  Knowing nothing about this litigation except that Chevron prevailed, it would be appropriate to tax 100 percent of the costs against defendants as a matter of course.  But doing so is not mandatory – the decision whether to tax costs "rests within the sound discretion of the district court."[151]

There are, of course, reasons that a court may decline to award costs in favor of the prevailing party: for example, "misconduct by the prevailing party, the public importance of the

---

[149]

 *Id.* at 15 and n.12.

[150]

 *See Whitfield*, 241 F.3d at 270 ("[B]ecause Rule 54(d) allows costs 'as of course,' such an award against the losing party is the normal rule obtaining in civil litigation, not an exception.").

[151]

 *E.g.*, *Broadspring, Inc. v. Nashed*, 693 F. App'x 13, 15 (2d Cir. 2017) (quoting *Dattner v. Congraga Foods, Inc.*, 458 F.3d 98, 100 (2d Cir. 2006)).

# SA156

case, the difficulty of the issues, or the losing party's limited financial resources."[152]  But Donziger has done little to warrant a favorable exercise of equitable discretion, whether based on these reasons or otherwise.

The issue of Donziger's financial resources is discussed in Point III.B.  The Court's conclusions there apply here as well: Donziger has not demonstrated a lack of resources that would warrant relief here.  Public importance and the difficulty of the issues provide little guidance here.  The Advisory Committee's notes say that "parties pursuing matters of public interest . . . may deserve special protection."[153]  This litigation was about allegations that a court decision was procured by corrupt means, *not* about what happened to the Ecuadorian rainforest.[154]  Hence, this was not a case brought in the public interest in any sense that would warrant relieving Donziger from taxation of costs.  And difficulty of issues provides no reason to disturb the presumption that costs should be taxed in favor of the prevailing party.  Finally, as to misconduct, all or virtually all of it is attributable to Donziger and the other defendants.

In addition to the behavior detailed by the special masters in their report and summarized in Point IV.B above, Donziger engaged in repeated misconduct throughout this litigation.  One major category of misconduct was his refusal to produce to Chevron documents that were physically located in Ecuador.[155]  Donziger argued in response to Chevron's motion to compel

---

152

    *Whitfield*, 241 F.3d at 270.

153

    FED. R. CIV. P. ADVISORY COMMITTEE NOTES, 2003 Amendments, Subdivision (h).

154

    *Supra* Point III.C.

155

    *Chevron Corp. v. Donziger, et al.*, 296 F.R.D. 168, 176-77 (S.D.N.Y. 2013).

## SA157

46

production of the documents that he was unable to obtain those documents from the Ecuadorian legal team.[156]  He did so despite "overwhelming evidence" that he controlled the Lago Agrio litigation and after having made no "serious attempt" to get the documents from the Ecuadorian lawyers.[157]  Donziger's refusal to produce documents that were in his practical control accords with the Special Masters' assessment of his behavior: he was "trying to prevent the basic facts coming to light."[158]

Donziger's history of misconduct in this litigation means that he has no substantial claim on the Court's exercise of its equitable discretion in his favor.  But there is more to consider here.  Rule 53(g)(3) instructs that special masters' fees must be allocated with consideration given to "the nature and amount of the controversy, the parties' means, and the extent to which any party is more responsible than other parties for the reference to a master."  These factors – especially the third – considered in combination with other equitable principles lead to the conclusion that the masters' proposed 85/15 split of their fees is appropriate.

The nature and amount of the controversy and the parties' means have been discussed already, and the conclusion that these factors do nothing in defendants' favor stands.  This leaves the parties' respective responsibility for the reference to the special master.  The reference, of course, was requested by Chevron.[159]  It was granted in light of Donziger's history of difficult

---

[156]    *Id.* at 195.

[157]    *Id.* at 195, 218.

[158]    DI 1942, at 15 n.12.

[159]    DI 865.

## SA158

behavior in other, prior litigation and in this case.[160] So, although it was Chevron that initially requested the masters over Donziger's protests, it is fair to say that Donziger was significantly responsible for the reference.

Broadening the scope of the question to consider whose behavior was more responsible for the substantial amounts of time and work devoted to this litigation by the special masters confirms Donziger's responsibility for a large bulk of the many hours the masters spent overseeing discovery. The masters' report, which is summarized in Point IV.B and which the court adopted,[161] describes the basis for the masters' conclusion on this point: that Donziger's obstructive conduct "continued unabated during discovery" and "unnecessarily increased the costs of the proceedings."[162] Their conclusion is supported by an independent review of the record, which contains numerous instances of the masters spending time dealing with Donziger's behavior, such as addressing last minute, frivolous or repetitive requests.[163]

Given the Court's discretion to decline strict application of the Rule 54 presumption when considering special masters, it is appropriate in this case to tax 85 percent of the special master costs against Donziger and other the other defendants, jointly and severally, with the remaining 15 percent taxed to the plaintiffs.

---

[160]    *Id.* at 1.

[161]    DI 1946.

[162]    DI 1942, at 15.

[163]    *E.g.*, DI 1272.

when considering special masters, it is appropriate in this case to tax 85 percent of the special master costs against Donziger and other the other defendants, jointly and severally, with the remaining 15 percent taxed to the plaintiffs.

*Conclusion*

For the foregoing reasons, Donziger's motion to review the taxation of costs is granted to the extent that the amount taxed for special master expenses is reduced to $741,526.49 and denied in all other respects. A supplemental judgment in the amount of $813,602.71 shall be entered.

SO ORDERED.

Dated:      February 28, 2018
Corrected:  March 1, 2018

Lewis A. Kaplan
United States District Judge

# SA160

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                           :

CHEVRON CORPORATION,          :

                 Plaintiff,      :

                                             :

           v.                    :    11 Civ. 0691 (LAK)

                                           :

STEVEN DONZIGER, *et al.*,      :

              Defendants.   :

                                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## CHEVRON CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS EX PARTE APPLICATION BY ORDER TO SHOW CAUSE FOR DISCOVERY AND A PRESERVATION ORDER IN FURTHERANCE OF THIS COURT'S MARCH 4, 2014 JUDGMENT AND TO SET A HEARING DATE SUBSEQUENT TO THAT DISCOVERY ON CHEVRON'S APPLICATION TO HAVE STEVEN DONZIGER HELD IN CONTEMPT

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

STERN, KILCULLEN & RUFOLO LLC
325 Columbia Tpke, Ste 110
P.O. Box 992
Florham Park, New Jersey 07932-0992
Telephone: 973.535.1900
Facsimile: 973.535.9664

*Attorneys for Plaintiff Chevron Corporation*

# SA161

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .................................................................................. 1

I.  FACTUAL BACKGROUND ......................................................................... 5

  A.  Donziger's Ongoing Attempts to Monetize and Profit From the Ecuadorian
      Judgment ................................................................................................ 5

  B.  Donziger's Monetization of His Involvement in the Ecuador Litigation, His
      Diversion of Litigation Funds for His Personal Benefit, and the Formation
      of Amazonia to Keep any Judgment Proceeds "Out of Ecuador" ........................... 7

II.  ARGUMENT ................................................................................................ 10

  A.  Legal Standard ........................................................................................ 10

  B.  Chevron Has Established That Donziger Is in Contempt. ....................................... 11

      1.  Donziger Has Violated the Judgment's Command That He Transfer
          His Amazonia Shares to Chevron ........................................................... 12

      2.  Donziger and His Co-Conspirators Have Violated, and Likely
          Continue to Violate, the Judgment's Prohibition of Acts to
          "Monetize or Profit From" the Corrupt Ecuadorian Judgment ................... 14

  C.  A Preservation Order and Post-Judgment Discovery Are Necessary to
      Determine the Full Extent of Donziger's Violations of the Judgment and
      Ensure Compliance ................................................................................ 16

  D.  Coercive Sanctions Are Appropriate to Ensure Compliance With the
      Judgment .............................................................................................. 18

III.  CONCLUSION ............................................................................................ 19

# SA162

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Application of Chevron Corp.,*
736 F. Supp. 2d 773 (S.D.N.Y. 2010).......................................................................17

*In re Application of Chevron Corp.,*
No. 1:10-mc-00002, ECF No. 147 (Jan. 10, 2011)................................................16

*In re Application of Chevron Corp.,*
No. 1:10-mc-00002, ECF No. 171 (Jan. 21, 2011)..................................................1

*In re Application of Hornbeam Corp.,*
No. 14 Misc. 424, 2014 WL 8775453 (S.D.N.Y. Dec. 24, 2014) ...........................17

*Avant Capital Partners, LLC v. Strathmore Dev. Co. Michigan, LLC,*
703 F. App'x 362 (6th Cir. 2017) ...........................................................................11

*Ayyash v. Bank Al-Madina,*
233 F.R.D. 325 (S.D.N.Y. 2005) .....................................................................10, 17

*CBS Broad. Inc. v. FilmOn.com, Inc.,*
814 F.3d 91 (2d Cir. 2016).....................................................................................10

*Chevron Corp. v. Donziger,*
296 F.R.D. 168 (S.D.N.Y. 2013) ...........................................................................10

*Chevron Corp. v. Donziger,*
833 F.3d 74 (2d Cir. 2016), *cert. denied*, No. 16-1178, 2017 WL 1198372
(U.S. June 19, 2017) ...........................................................................................7, 11

*Chevron Corp. v. Donziger,*
No. 16-1178, 2017 WL 1198372 (U.S. June 19, 2017)..........................................11

*Energy Capital Co. v. Caribbean Trading and Fidelity Corp.,*
No. 93 Civ. 8100, 1994 WL 698210 (S.D.N.Y. Dec. 13, 1994).............................16

*Exports v. Lee,*
No. 95 Civ. 8082, 1996 WL 631718 (S.D.N.Y. Oct. 31, 1996) .............................17

*Fujitsu Ltd. v. Federal Exp. Corp.,*
247 F.3d 423 (2d Cir. 2001)...................................................................................16

*Handwerker v. AT&T Corp.,*
211 F.R.D. 203 (S.D.N.Y. 2002) ...........................................................................13

Gibson, Dunn &
Crutcher LLP

# SA163

## TABLE OF AUTHORITIES

Page(s)

*King v. Allied Vision, Ltd.*,
   65 F.3d 1051 (2d Cir. 1995) .......................................................................12, 14

*Motorola Credit Corp. v. Uzan*,
   73 F. Supp. 3d 397 (S.D.N.Y. 2014) .................................................................11

*N.A. Sales Co. v. Chapman Indus. Corp.*,
   736 F.2d 854 (2d Cir. 1984) ........................................................................10, 18

*N.Y. State Nat'l Org. for Women v. Terry*,
   886 F.2d 1339 (2d Cir. 1989) ...........................................................................10

*Paramedics Electromedecina Comercial, Ltda. v. GE Med. Sys. Info. Techs, Inc.*,
   369 F.3d 645 (2d Cir. 2004) ..............................................................................11

*S.E.C. v. Oxford Capital Sec., Inc.*,
   794 F. Supp. 104 (S.D.N.Y. 1992) ...............................................................10, 18

*State of N.Y. v. Shore Realty Corp.*,
   763 F.2d 49 (2d Cir. 1985) ...............................................................................4, 15

*Utica Coll. v. Gordon*,
   389 F. App'x 71 (2d Cir. 2010) .........................................................................13

**Rules**

Fed. R. Civ. P. 70(e) ..............................................................................................10

Local Civil Rule 6.1(d) ..........................................................................................10

Gibson, Dunn &
Crutcher LLP

# SA164

## PRELIMINARY STATEMENT

Steven Donziger is in knowing, serial contempt of this Court's March 4, 2014 judgment ("Judgment"). The evidence currently in Chevron's possession demonstrates this beyond question, and at the same time it indicates a high likelihood that Donziger has engaged in other acts of contempt that are presently unknown. Accordingly, Chevron here seeks leave to conduct post-judgment discovery of Donziger and those acting in concert with him, as well as issuance of a document preservation order, in order to uncover the full extent of Donziger's violations. Donziger's long record of obstruction and concealment is recounted in this Court's March 1 corrected memorandum opinion. *See, e.g.*, Dkt. 1963 at 33. Donziger's "outrageous" behavior required this Court to order him to produce his computer hard drives (s*ee In re Application of Chevron Corp.*, No. 1:10-mc-00002, ECF No. 171 (Jan. 21, 2011)), and to sanction him for refusing to produce documents he controlled overseas (*see, e.g.*, *Chevron Corp. v. Donziger*, 296 F.R.D. 168 (S.D.N.Y. 2013)). Chevron here proceeds *ex parte* to ensure that Donziger and those acting in concert with him do not destroy or divert evidence confirming their contempt. Any other relief sought in conjunction with contempt proceedings would, of course, be on the public record after Donziger has an opportunity to be heard.

Even on the present record, however, Donziger's contempt is clear, and a hearing date should be set now, to occur after discovery is completed, on Chevron's application to have Donziger held in contempt for violating this Court's Judgment in multiple respects. The Judgment enjoins Donziger from "undertaking any act[] to monetize or profit from the Judgment, as modified or amended, or any New Judgment, including without limitation by selling, assigning, pledging or encumbering any interest therein." Dkt. 1875 ¶ 5. The Judgment also requires Donziger to "execute in favor of Chevron a stock power transferring to Chevron all of his right,

1

# SA165

title and interest in his shares of Amazonia," a Gibraltar entity organized to collect and disburse—and keep out of Ecuador—the proceeds from the corrupt Ecuadorian judgment. *Id.* ¶ 3; PX 4900 (Dahlberg Direct) ¶ 14.[1] Despite the Judgment's express provisions, Donziger refuses to transfer his Amazonia shares to Chevron, and he is actively conspiring to monetize and profit from the fraudulent Ecuadorian judgment by offering to sell, assign, pledge or encumber interests in New York City, among other places.

Donziger's contemptuous actions are deliberate and intentional. He expressly acknowledged that he understood that "this Court's order . . . require[s] [him] to transfer *forthwith* 'all of his right, title, and interest' in Amazonia Recovery Limited," when he sought "emergency" relief from that provision in March, 2014. Dkt. 1888 at 19 (quoting Dkt. 1875 ¶ 3) (emphasis added). Yet, nearly four years later, Donziger continues to flout the Court's directive.

At the same time that he refuses to transfer his shares in Amazonia to Chevron as ordered, Donziger is actively trying to monetize and profit from the fraudulent Ecuadorian judgment. Chevron has obtained evidence that he has been soliciting funding by offering interests in the judgment to litigation funders in New York as recently as January 2018. Marketing himself as "the architect of successfully winning" the Ecuador judgment, on November 6, 2017, Donziger met in person with a funder in New York requesting money to continue the extortionate litigation against Chevron in exchange for an interest in any proceeds realized from the foreign enforcement of the judgment. Declaration of Randy M. Mastro ("Mastro Decl.")), Exhibit 2 (Declaration of Lee Grinberg ("Grinberg Decl.")) ¶¶ 4-5. In the words of the potential funder with whom he met, Donziger "inquired whether Elliott would provide him with funds . . . in ex-

---

[1] The Court's April 25, 2014 order amended the Judgment "solely pending the determination of the appeal in this case" to require Donziger to transfer his Amazonia shares to the Clerk of the Court. Dkt. 1901 at 32. Donziger did not transfer his shares to the Clerk of the Court as ordered and this amendment has become moot as there is no further right of appeal in this matter.

# SA166

change for an interest in proceeds that may result from enforcement of the Ecuadorian judgment." *Id*. ¶ 6.

Underscoring his consciousness of the illicit nature of his actions, Donziger asks potential funders to sign a non-disclosure agreement so that he can "speak freely" (Grinberg Decl., Ex. 1) with them in attempting to monetize and profit from the fraudulent Ecuadorian judgment. And while Donziger's attempt to profit from and monetize the judgment in this most recent instance was unsuccessful, his solicitation by itself violates this Court's injunction. Moreover, in an email to the potential funder, Donziger referred to a "packet of materials" that he "generally send[s]" when soliciting investment in the fraudulent judgment, indicating that the acts of contempt shown here are likely just the tip of the iceberg. *Id*., Ex. 4. In order to expose the extent of his contemptuous activity and to determine whether he has succeeded in profiting from the Judgment contrary to the injunction, Chevron requires immediate discovery from Donziger and the newly revealed third-parties involved.

Separate and apart from the profit that Donziger would reap as the owner of the largest single contingency interest in the corrupt judgment, the recently discovered funding solicitation documents also disclose other mechanisms by which Donziger is likely profiting from the Ecuador litigation in violation of the Judgment, which also justify further discovery. In his 2013 review of Donziger and the LAPs' fundraising scheme, Chevron's expert, while not able to conduct a full audit (Dkt. 1963 at 19 n.66), was able to trace only about $16 million out of the approximately $33 million raised. *Id*. at 23 n.74. And of that amount, Chevron proved that Donziger paid himself "salary" in excess of $1.3 million, and that he repeatedly deposited litigation funds into his personal accounts. Discovery is thus necessary to account for how Donziger has deployed infusions of new litigation funds and to uncover whether he has continued a pattern

# SA167

and practice of using such funds for personal benefit and enrichment. *See id.* at 19 n.66 ("[T]here was nothing resembling an accurate picture of Donziger's financial situation at the time of trial nor even reliable assessment of how much of the millions of dollars he raised went into and remained in his own pocket.").

Donziger is subject to this Court's jurisdiction and had a lawful judgment entered against him after a full trial on the merits. It is well established that this Court has the power to enforce compliance with its Judgment through contempt and to enter related discovery and preservation orders. *See, e.g.*, *State of N.Y. v. Shore Realty Corp.*, 763 F.2d 49, 53 (2d Cir. 1985) ("The District Court had ample authority to issue [discovery orders] necessary for the enforcement of its [injunction] order."). Based on Donziger's latest acts of contempt, evidence suggesting other contemptuous acts by Donziger that require further inquiry through discovery, and his long history of obstruction, disregard of lawful Court orders, and witness and document tampering—all of which indicate a high risk of document destruction and further witness tampering—Chevron moves for limited *ex parte* relief by order to show cause to authorize this targeted discovery and to require preservation of evidence in the interim. Chevron therefore respectfully requests that the Court (1) grant *ex parte* an order requiring Donziger, as well as any other person or entity acting at his direction or in concert with him, to preserve and maintain within the U.S. any and all documents or evidence relating to the Judgment or compliance therewith; (2) authorize Chevron *ex parte* to serve post-judgment discovery on Donziger and any other person or entity reasonably calculated to possess information relevant to enforcement of the Judgment, and; (3) set a prompt briefing schedule and hearing date to adjudicate Donziger's contempt and determine the appropriate remedy to compel Donziger's compliance with the Judgment, following an appropriate period of time for Chevron to conduct the requested discovery.

## I.  FACTUAL BACKGROUND

**A.    Donziger's Ongoing Attempts to Monetize and Profit From the Ecuadorian Judgment**

Donziger has boasted on camera that he is in "[t]he business of getting press coverage as part of a legal strategy … [t]o make f—ing money."  Dkt. 1874 at 260.  He has obtained tens of millions of dollars for this "business" from a wide variety of investors, and he continues to seek billions more through settlement or enforcement of the corrupt Ecuadorian judgment.  Despite this Court's entry of the RICO Judgment against him, Donziger's efforts to profit from and monetize the Ecuadorian judgment continue unabated.  Chevron has learned that, in November 2017, Donziger and an associate met with representatives of the hedge fund Elliott Management Corporation in Elliott's New York office to offer an interest in proceeds from the fraudulent Ecuadorian judgment as the basis for a "strategic capital partnership."  The documents that Chevron has discovered to date indicate the following:

On November 3, 2017, Jonathan Bush, who is CEO, president, and a director of athenahealth, Inc., a NASDAQ listed healthcare technology company headquartered in Watertown, Massachusetts, sent an email from his athenahealth business email account to Elliott entitled, "Chevron Deal," introducing Katie Sullivan and stating that he was "[l]ooking forward to hearing what you think."  Mastro Decl., Ex. 3.  Ms. Sullivan is the founder and president of Streamline Family Office, Inc., a private financial advisory firm based in Dover, Massachusetts.  Grinberg Decl., ¶ 2.  She followed up with Elliott to arrange a meeting regarding a potential investment by Elliott "'to help the successful plaintiffs in the Chevron Ecuador deal.'"  *Id*.  A meeting was set for November 6, 2017 at 4 PM.  *Id*., ¶ 3.

A few hours before the meeting, Ms. Sullivan informed Elliott that Donziger, "'the architect of successfully winning the judgement (sic),'" would be attending the meeting.  Grinberg

# SA169

Decl. ¶ 4.  Ms. Sullivan also requested that Elliott execute a non-disclosure agreement so that Donziger could "'speak freely'" during the meeting.  *Id*; *see also* Grinberg Decl., Ex. 2.  The proposed non-disclosure agreement is offered by one of the defaulting defendants in the RICO action, the "Frente de Defensa de la Amazonia ('FDA'), as represented by Steven R. Donziger, Esq., with address at 245 West 104th Street, #7D, New York, New York," and is explicit in its purpose—to facilitate "discussions concerning a possible financing of a judgment collection action in the *Aguinda v. ChevronTexaco* case where the FDA is the beneficiary[.]"  *Id*. at 1.  The agreement provides that "counterparty agrees to accept the FDA's Confidential Information for the sole purpose of evaluation in connection with counterparty's _business discussions_ with the FDA," *id*. (emphasis added); represents that "the Confidential Information is proprietary to and commercially and competitively valuable to the FDA," *id*. at 2; specifies that it is governed by the laws of New York, *id*.; and identifies Donziger as the "U.S. Legal Representative" of the FDA.  *Id*. at 3.  Elliott did not execute the agreement.  Grinberg Decl. ¶ 5.

Handwritten notes taken at the November 6, 2017 meeting confirm that Donziger represented to Elliott that he and his co-conspirators had raised $33 million from third-party funders and individuals.  Grinberg Decl., Ex. 3.  The notes further confirm that Donziger stated that between 15%-20% of the Ecuadorian judgment has been committed to "15" people or entities, and that he personally holds an interest of 6.3% in the Ecuadorian judgment proceeds.[2]  *Id*.  The notes also show that Elliott and Donziger discussed the ongoing Canadian enforcement proceedings and whether the proceeds of the fraudulent Ecuadorian judgment could "come in to [the] U.S."  *Id*.

---

[2]  This admission by Donziger is consistent with Chevron's analysis of the Intercreditor Agreement, which sets forth nine priorities for the distribution of the fraudulent Ecuadorian judgment.  The amounts to be paid to various litigation funders and law firms equals roughly 20%.  *See* PX 552.

6

# SA170

Shortly after the meeting, Ms. Sullivan emailed Elliott again to state that "[i]t was a pleasure to meet with you to introduce you to the Chevron case and share the opportunity for you to be a key partner in enforcing and collecting the historical $9.5B/now $12B environmental judgement (sic)." Grinberg Decl., Ex. 4 at 2. Donziger followed up on that email the next day, stating that "[i]t was nice to meet and talk with someone who obviously gets the situation with the Chevron matter," and that he was willing to transmit "a packet of materials that I generally send out to those doing due diligence on the opportunity." *Id.* On January 19, 2018, Ms. Sullivan and Donziger again contacted Elliott and stated that they wished "to bring [Elliott] up to date on recent developments with the Ecuador case and discuss our vision for a strategic capital partnership." *Id.* at 1. Elliott responded by declining involvement with Donziger and the Ecuador case. *Id.*

**B.      Donziger's Monetization of His Involvement in the Ecuador Litigation, His Diversion of Litigation Funds for His Personal Benefit, and the Formation of Amazonia to Keep any Judgment Proceeds "Out of Ecuador"**

The Elliott notes confirm that Donziger has likely diverted or hidden millions of dollars raised in the name of the Ecuador litigation—funds that he may still possess and about which Chevron is entitled to discovery to uncover the full extent of Donziger's contempt.

During the course of the Ecuador litigation, Donziger took the lead in soliciting funds from investors and was primarily responsible for engaging investment firms. *See, e.g.*, PX 2396 at 301-02. Donziger also largely controlled or had veto power over the manner in which the funds provided to the Ecuadorian team were spent. *See* Dkt. 1874 at 27 & n.102; *see also* Dkt. 1963 at 21 ("And it is Donziger who, with limited and apparently now long past exceptions, essentially has controlled the money."). And while the Ecuador litigation and its funding was under Donziger's control, individual investors, law firms, and litigation investment firms agreed to provide over $32 million in funds to Donziger and his co-conspirators. PX 4900 ¶ 34. Con-

7

# SA171

sistent with the documents showing that this level of funding was ***agreed to***, Donziger related in the recent Elliott meeting that the LAPs had in fact ***actually received*** the $33 million in funding. Grinberg Decl., Ex. 3. As recounted in the November 6, 2017 notes from his "Donziger conversation," the potential funder was told *by Donziger himself* that he and his co-conspirators had already raised "$33mm" from "3rd party funders / individuals." *Id.* Yet over half of these monies—*i.e.*, over $16 million—have never been accounted for by Donziger. Dkt. 1963 at 23 n.74. When this Court repeatedly invited him to present evidence of his finances or funding efforts, Donziger refused. Dkt. 1874 at 263 n.1098; *see also* Dkts. 1253, 1287, 1963 at 20-21. Similarly, when the Ecuadorian groups he claims as clients demanded an accounting for the funds raised to finance the litigation, Donziger refused to provide one. Dkt. 1945-1 (Aug, 20, 2016 UDAPT resolution). Indeed, the UDAPT has publicly denounced Donziger, stating that he is "driven by [his] greed," is characterized by a "lack of transparency in managing the resources of the people affected," and has "taken advantage" of the Ecuadorian plaintiffs' lawsuit for his own benefit.[3] Dkt. 1945-2 (Sept. 12, 2017 UDAPT letter).

As Chevron's forensic accounting expert, Troy Dahlberg, testified at the RICO trial, the "extremely poor organization and incomplete nature of the financial and accounting records that Donziger produced and appeared to maintain" did not account for "the totality of the funds that were raised or the expenses incurred in relation to the [Ecuadorian] Litigation." PX 4900 ¶ 55. Even after an in-depth analysis of documents of all types produced during the RICO case, Mr.

---

[3] According to the minutes from a January 2013 UDAPT meeting, Donziger confirmed that, between 2010 and 2013, the Ecuadorian plaintiffs had raised "approximately 25 million" from outside funders. PX 7033A at 2. During this same meeting Donziger pledged to give back 1.3% of his interest in the fraudulent Ecuadorian judgment. *Id.* at 5. Despite making this pledge, Donziger's recent solicitation efforts reveal that he still claims entitlement to the full 6.3% contingency stake. *See* Grinberg Decl., Ex. 3; *see also* Trial Tr. at 2492 at 1-4 (Donziger testifying that his contingency interest is 31.5% of the 20% owed to the lawyers, *i.e.*, 6.3% of the total Ecuadorian judgment).

# SA172

Dahlberg was able to trace the in-flow of only $16 million. Dkt. 1963 at 23 n.74 (citing PX 4900 ¶ 34). Hence, of the $33 million in funding Donziger obtained and controlled, there is no record of what happened to over $16 million. *Id*. at 23 (noting that a "large part" of Donziger's fund-raising for the Ecuadorean litigation "never has been accounted for").

Of the $16 million in funds Mr. Dahlberg was able to trace to some extent, there was confirmation that Donziger took as a "salary" approximately $1.3 million (Dkt. 4900 ¶ 64), in addition to providing himself with the single largest contingency interest in the fraudulent Ecuadorian judgment. *See* Dkt. 1874 at 398 ("Roughly 30 percent of the 20 percent contingency fee owed to the [Ecuadorian plaintiffs'] litigation team accrues to Donziger."); *id.* at 404-05 ("Donziger's retainer agreement with the LAPs and the ADF . . . provides that Donziger is entitled to be paid (a) 6.3 percent of all amounts collected in respect of the Lago Agrio litigation, plus (b) any arrearages in his monthly retainer, plus (c) reimbursement for expenses."); *id.* at 404 n.1539 (citing PX 558 (Donziger's Jan. 5, 2011 retainer agreement) ¶ (3)(a) (the 6.3% is the product of 31.5% of the Total Contingency Fee Payment, which is 20% of all funds collected)). There was also confirmation that on multiple occasions, Donziger deposited litigation funds into his personal accounts. *See, e.g.*, PX 586 at p. 185-87.

In addition, Donziger participated in the creation of Amazonia to appease potential funders and keep the Ecuadorian judgment proceeds "'outside the Republic of Ecuador.'" PX 4900 ¶ 184 (quoting PX 1527R at 30–31, "Invictus: Path Forward: Securing and Enforcing Judgment and Reaching Settlement"); *see also* Dkt. 1874 at 172-73. As this Court found, "Donziger owns, directly or through a nominee, shares of a Gibraltar company, Amazonia, through which the property collected on the Judgment is to be funneled." Dkt. 1874 at 477. Donziger, in fact, "testified that he has been given shares in Amazonia based on his proportionate equity interest in the

# SA173

LAPs' claim."  Dkt. 1874 at 477 n.1821.  To prevent Donziger from "receiv[ing] a benefit by virtue of [his] fraud," this Court imposed a constructive trust on Donziger's right to a contingent fee, among other property traceable to the Ecuadorian judgment.  Dkt. 1874 at 475-76. Donziger's Amazonia shares are subject to the constructive trust, "as whatever value they now or hereafter may have is a direct function of the fraud perpetrated by Donziger." *Id.* at 477.  And the Court entered an order requiring Donziger "to pay over and assign to Chevron all fees and other payments, property, and other benefits that [he had] received or hereafter receive[s], direct-ly or indirectly, in consequence of the Judgment." *Id.* at 478; *see also* Dkt. 1875 ¶¶ 1, 3.  Yet he has refused to comply with this order in failing to assign the Amazonia shares and in failing to assign the other monies received in consequence of the corrupt Ecuadorian judgment. *See* Dkt. 1963 at 17 n.59.  The evidence of Donziger's solicitation, receipt, and diversion—through off-shore devices and otherwise—of millions of dollars in "profit" from the fraudulent Ecuadorian judgment more than substantiates Chevron's request for post-judgment discovery into the profits from the judgment that Donziger continues to retain beyond the Amazonia shares themselves.

## II.    ARGUMENT

### A.    Legal Standard

Federal Rule of Civil Procedure 70 outlines the procedure for "[e]nforcing a [j]udgment for a [s]pecific [a]ct."[4]  Subpart (e) allows a court to "hold the disobedient party in contempt" un-til the disobedient party complies with the Court's judgment.  Fed. R. Civ. P. 70(e).

District courts also have "inherent power to enforce compliance with [their] lawful orders through civil contempt." *S.E.C. v. Oxford Capital Sec., Inc.*, 794 F. Supp. 104, 106 (S.D.N.Y. 1992); *see also CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 98-100 (2d Cir. 2016) (af-firming finding of civil contempt for violation of an injunction).  If a party is held in contempt,

---

[4]  Local Civil Rule 83.6 outlines the local procedure for contempt proceedings in civil cases.

## SA174

contempt sanctions may be imposed to "coerce the contemnor into future compliance with the court's order. . . . " *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989) (citations omitted).  "A district court has broad discretion to fashion an appropriate coercive remedy in a case of civil contempt, based on the nature of the harm and the probable effect of alternative sanctions." *N.A. Sales Co. v. Chapman Indus. Corp.*, 736 F.2d 854, 857 (2d Cir. 1984) (citations omitted).

At this time, Chevron requests that the Court grant *ex parte* a preservation order and authorization to conduct post-judgment discovery of Donziger and other persons or entities reasonably calculated to possess information relevant to enforcement of the Judgment, in order to prevent destruction or diversion of evidence in the interim.  This Court may grant an order *ex parte* "upon a clear and specific showing by affidavit of good and sufficient reasons."  S.D.N.Y. Local Civil Rule 6.1(d); *see also Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 327 (S.D.N.Y. 2005) (holding that *ex parte* orders for expedited discovery prior to a Rule 26(f) conference are permissible "under the flexible standard of reasonableness and good cause, applying particularly careful scrutiny since plaintiff not only seeks expedition, but also moves on an ex parte basis").  Courts have found cause to grant *ex parte* motions to compel discovery in support of judgment enforcement.  *See Motorola Credit Corp. v. Uzan*, 73 F. Supp. 3d 397, 398-99 (S.D.N.Y. 2014) (Rakoff, J.) (noting grant of *ex parte* discovery to assist plaintiff in collecting a judgment); *Avant Capital Partners, LLC v. Strathmore Dev. Co. Michigan, LLC*, 703 F. App'x 362, 364 (6th Cir. 2017) (same).

**B.    Chevron Has Established That Donziger Is in Contempt.**

To support a finding of contempt, Chevron must show that (1) the Judgment is lawful, clear, and unambiguous, (2) Donziger's noncompliance with the Judgment is clear and convincing, and (3) Donziger has not "diligently attempted to comply" with the Judgment "in a reasona-

# SA175

ble manner." *Paramedics Electromedecina Comercial, Ltda. v. GE Med. Sys. Info. Techs, Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) (internal quotation marks omitted).

To begin, the relief granted in the Judgment is lawful. Donziger challenged this Court's Judgment on appeal, and the Second Circuit rejected that challenge. *See Chevron Corp. v. Donziger*, 833 F.3d 74, 151 (2d Cir. 2016), *cert. denied*, No. 16-1178, 2017 WL 1198372 (U.S. June 19, 2017). The Second Circuit held that "[t]he relief tailored by the district court . . . prohibit[s] Donziger and the LAP Representatives from profiting from [their] corrupt conduct" and that the district court did not abuse its discretion in granting that relief. *Id.* Donziger sought a panel rehearing and a rehearing *en banc* of the Second Circuit's opinion, but both requests were summarily denied. Donziger then petitioned the United States Supreme Court to review the Second Circuit's opinion. That petition was also denied. *Chevron Corp. v. Donziger*, No. 16-1178, 2017 WL 1198372 (U.S. June 19, 2017). Donziger has exhausted all avenues for appeal and cannot now dispute that the Judgment is lawful and final.

The facts here clearly and convincingly establish the remaining requirements for contempt, namely two brazen, ongoing violations of the Judgment by Donziger and his co-conspirators.

## 1. Donziger Has Violated the Judgment's Command That He Transfer His Amazonia Shares to Chevron

"A clear and unambiguous order is one that leaves no uncertainty in the minds of those to whom it is addressed." *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995) (internal citations and quotation marks omitted). Here, the Judgment is clear and unambiguous in its decree that "Donziger shall execute in favor of Chevron a stock power transferring to Chevron all

# SA176

of his right, title and interest in his shares of Amazonia. . . .”  Dkt. 1875 ¶ 3.[5]  Donziger demonstrated his full understanding of this requirement in his "emergency motion to stay," filed in this Court on March 18, 2014, which acknowledged that "this Court's order would require [him] to transfer *forthwith* 'all of his right, title, and interest' in Amazonia Recovery Limited."  Dkt. 1888 at 19 (quoting Dkt. 1875 ¶ 3) (emphasis added).

It is beyond dispute that Donziger has not complied with this aspect of the Judgment. Donziger has not executed a stock transfer certificate transferring his shares to Chevron.  Mastro Decl. ¶ 8.  Nor has he transferred any shares of Amazonia to the Clerk of Court.  *Id.* ¶ 10; *see also* Mastro Decl., Ex. 1 (showing docket entries in this matter since the entry of the Court's March 4, 2014 Judgment, reflecting no transfer of Amazonia shares to the Clerk).  Rather than "diligently attempt[ing] to comply" with the Judgment in a reasonable manner, the evidence shows that Donziger has done the opposite.  More than four years have elapsed since the entry of the Judgment, and Donziger has not complied—or even attempted to communicate with Chevron about complying—with it.  Mastro Decl. ¶ 9.

In a letter sent to the Court on June 19, 2017, Chevron noted Donziger's failure to comply with the Judgment and requested that the Court order Donziger to "comply forthwith." Dkt. 1922.  Donziger did not respond to that request.  The Court ruled that Chevron's request could not be made by way of a letter, so it was "denied without prejudice to proceeding by formal motion."  Dkt. 1923 at 2.  At that point, Donziger could have avoided unnecessary motion practice by transferring the Amazonia shares to Chevron, but instead he chose to continue to flout the Judgment by doing nothing.  In its March 1 corrected memorandum opinion, the Court

---

[5]  On April 24, 2014, the Court amended this Judgment "solely pending the determination of the appeal in this case" to require Donziger to transfer his Amazonia shares to the Clerk of the Court. Dkt. 1901 at 32.  As Donziger's appeal is no longer pending, Donziger must transfer all of his rights, title and interest in his shares of Amazonia directly to Chevron.

# SA177

expressly recognized that, notwithstanding the Judgment's directive to transfer the Amazonia shares, Donziger had failed to challenge Chevron's assertion that he had not turned over his Amazonia shares and that he was "arguably . . . in contempt of the final judgment of permanent injunction in this case." Dkt. 1963 at 17 & n.59. Donziger's willful, persistent inaction is more than sufficient to justify contempt. *See, e.g.*, *Handwerker v. AT&T Corp.*, 211 F.R.D. 203, 209 (S.D.N.Y. 2002) (holding that "[n]on-compliance may be deemed willful when the court's orders have been clear, when the party has understood them, and when the party's non-compliance is not due to factors beyond the party's control" and that "a party's persistent refusal to comply with a[n] . . . order presents sufficient evidence of willfulness, bad faith or fault") (internal quotation marks and citations omitted).[6]

### 2. Donziger and His Co-Conspirators Have Violated, and Likely Continue to Violate, the Judgment's Prohibition of Acts to "Monetize or Profit From" the Corrupt Ecuadorian Judgment

The Judgment is also "clear and unambiguous" (*King*, 65 F.3d at 1058) that Donziger is "enjoined and restrained from undertaking any acts to monetize or profit from" the fraudulent Ecuadorian judgment, "including without limitation by selling, assigning, pledging, transferring or encumbering any interest therein." Dkt. 1875 ¶ 5. Here, too, Donziger's prior filings show that he fully understands that the Judgment prevents him from, among other things, offering shares of the fraudulent Ecuadorian judgment or other consideration to solicit funds from third parties in support of enforcing that judgment. *See* Dkt. 1888 at 16-17 (arguing that the Judgment's restrictions would "[d]epriv[e] Mr. Donziger of his interest in, and ability to work on," enforcement of the Ecuadorian judgment, and that, "by broadly enjoining him from 'undertaking any acts to monetize or profit from the Judgment,' the Court's order threatens to "obliterate" his

---

[6] A showing of "willful[]" or "bad faith" conduct is not required for a finding of contempt. *See Utica Coll. v. Gordon*, 389 F. App'x 71, 73 (2d Cir. 2010).

# SA178

practice[.]") (quoting Dkt. 1875 ¶ 5); *see also id.* at 18 ("[The Judgment is] likely to (and intended to) chill third parties from funding or associating with Mr. Donziger and his law practice . . . .").

Chevron has uncovered direct evidence that, as recently as January 2018, Donziger has done precisely that: attempted to monetize the fraudulent Ecuadorian judgment by offering an interest in proceeds from the judgment to at least one New York City hedge fund. The documents evidencing the Elliott meeting establish that (i) Donziger arranged and attended an in-person meeting on November 6, 2017 with Elliott for the purpose of obtaining financing to enforce the fraudulent Ecuadorian judgment; (ii) Donziger solicited an investment from Elliott in exchange "for an interest in proceeds that may result from enforcement" of the judgment (Grinberg Decl. ¶ 6); (iii) Donziger stated at the meeting that he had raised $33 million from third-party funders and individuals in support of judgment enforcement efforts against Chevron; (iv) Donziger also stated that between 15-20% of the fraudulent Ecuadorian judgment had been committed to 15 people, and; (v) Donziger himself continues to possess a 6.3% share. Grinberg Decl., Exs. 1-4. When Elliott did not respond to Donziger's offer, he and his associate, Katie Sullivan, contacted Elliott again on January 19, 2018, seeking to provide additional information and discuss their "vision for a strategic capital partnership" with Elliott. *Id.*, Ex. 4 at 1.

This evidence clearly and convincingly shows that Donziger has not "diligently attempted to comply" with the Judgment's restrictions on monetizing the corrupt Ecuadorian judgment. Instead, Donziger and his co-conspirators have been acting—and are likely continuing to act—behind the scenes to shop the fraudulent judgment around. This is, as the Court recently recognized, evidenced by Donziger's engagement in "extensive litigation in Canada and elsewhere for some time now, which at least suggests that he has raised much more" money than has been un-

# SA179

covered to date.  Dkt. 1963 at 23.  Donziger's use of a carefully drafted non-disclosure agreement so that he can "speak freely" (Grinberg Decl., Ex. 1) to potential third-party funders, as well as his offering of a pre-prepared packet of materials that he "generally send[s] out to those doing due diligence on the opportunity" (*id*., Ex. 4 at 2) are irrefutable evidence of his past and likely ongoing violations of the Judgment's clear commands.

**C.    A Preservation Order and Post-Judgment Discovery Are Necessary to Determine the Full Extent of Donziger's Violations of the Judgment and Ensure Compliance**

In light of the already-established violations of the Judgment and indications that other violations likely exist, post-judgment discovery is necessary to uncover the full extent of Donziger and his co-conspirators' ongoing violations of this Court's orders.  *See* Mastro Decl., Exs. 4-7 (proposed post-judgment discovery requests and subpoenas to Donziger, Sullivan, Bush, and athenahealth, Inc.).  The Court has authority to grant such discovery requests as part of contempt proceedings or under 28 U.S.C. § 1651.  *See Shore Realty Corp.*, 763 F.2d at 53 ("The District Court had ample authority to issue [discovery orders] necessary for the enforcement of its October [injunction] order."); *see also Energy Capital Co. v. Caribbean Trading and Fidelity Corp.*, No. 93 Civ. 8100, 1994 WL 698210, at *5-6 (S.D.N.Y. Dec. 13, 1994) (entering finding of civil contempt and ordering discovery as a sanction "warranted in order to both coerce compliance and to compensate plaintiffs for the losses they have suffered on account of defendants' noncompliance").

Donziger and his co-conspirators, well aware of the Judgment and its injunctive commands, are already under an obligation to preserve evidence relevant to enforcement of the Judgment.  *See, e.g.*, *Fujitsu Ltd. v. Federal Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001) ("The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litiga-

# SA180

tion.") (citation omitted). Nonetheless, in light of Donziger's serial violations of the Judgment, and his "outright defiance" (Dkt. 1964 at 17) of the Court's orders,[7] the Court should assert its inherent authority to order preservation of evidence relevant to enforcement of the Judgment. *See In re Application of Chevron Corp.*, 736 F. Supp. 2d 773, 787 (S.D.N.Y. 2010) ("[C]ourts almost certainly have inherent authority to order those before them to preserve potentially relevant evidence . . . ."); *see also In re Application of Hornbeam Corp.*, No. 14 Misc. 424, 2014 WL 8775453, at *7 (S.D.N.Y. Dec. 24, 2014) (granting § 1782 application and ordering preservation of all "documents and evidence" that may contain "potentially relevant" information); *Exports v. Lee*, No. 95 Civ. 8082, 1996 WL 631718, at *1 (S.D.N.Y. Oct. 31, 1996) (denying post-judgment discovery until entry of judgment but ordering "both defendants (and all persons or en-

---

[7] This Court's March 1 corrected memorandum opinion explains in detail Donziger's "outrageous" behavior and "egregious misconduct," which was, "in many respects, far beyond the bounds of propriety." Dkt. 1963 at 17, 33. This behavior includes, "[a]mong other things," a willful and deliberate "disregard[] [of] a court order to produce relevant documents located in Ecuador [that were] under his practical control," deliberately false testimony "at an evidentiary hearing on Chevron's motion for sanctions," and repeated false testimony during depositions and at the trial "in response to nearly 300 questions[.]" *Id*. at 33. Donziger also flouted the Court's order to contribute to interim payment of the expenses of the special masters. *Id*. at 17. In response to some of this misconduct, the Court granted sanctions against Donziger and the LAPs, finding that they acted "willfully and in bad faith" and with "gamesmanship" to "frustrate Chevron's efforts to obtain discovery in this Court to which it was entitled." Dkt. 1529 at 80-87. Donziger and the LAPs' strategy, the Court found, had "always been to produce materials when it suits their purposes and is most helpful to their case, notwithstanding Court orders for full production or prejudice to" Chevron. *Id*. at 92; *see also* Dkt. 1963 at 46 ("Donziger's refusal to produce documents that were in his practical control accords with the Special Masters' assessment of his behavior: he was 'trying to prevent the basic facts coming to light.'").

Separately, Chevron detailed Donziger's discovery misconduct in its memorandum of law in support of contempt in the Donziger § 1782 proceedings. *See In re Application of Chevron Corp.*, No. 1:10-mc-00002, ECF No. 147 (Jan. 10, 2011). There, Chevron showed that Donziger, in defiance of numerous Court orders, acted in bad faith by withholding thousands of responsive documents, refused to search relevant databases, and engaged in repeated attempts to delay and frustrate production of responsive materials.

# SA181

tities under the direction or control of either defendant) to *preserve* all documents that are responsive" to proposed discovery requests) (emphasis in original).

Donziger's contempt of the lawful Judgment provides "good and sufficient reason" to grant this motion *ex parte*—especially since the threat of sanction gives Donziger "an incentive to conceal" his fraudulent and contumacious conduct.  *See Ayyash*, 233 F.R.D. at 327 (finding "good cause" to grant an *ex parte* motion for expedited discovery where defendants had "both incentive and capacity to hide their assets" in order to circumvent a court award of damages). Moreover, if the requested discovery reveals evidence that Donziger has successfully monetized his interests in Amazonia or the Ecuadorian judgment, Chevron will request that this Court enter an order disgorging Donziger and any of his agents of any money or property obtained.

## D.    Coercive Sanctions Are Appropriate to Ensure Compliance With the Judgment

Donziger has made no effort to comply with one aspect of the Judgment and has intentionally violated another.  And even after unsuccessfully exhausting his appeals, Donziger continues his baseless attacks on the Judgment's "legitimacy" and "viability."  *See, e.g.*, Dkt. 1927 at 6 Donziger letter, stating that there are supposedly "glaringly critical facts that undermine the legitimacy of the RICO judgment," such that "the continued viability of the court's ruling will be a very open question"); Dkt. 1925 at 6 (Donziger letter questioning "the reliability of the RICO judgment").  Under these circumstances, and after Chevron has conducted discovery of Donziger and his cohorts, the Court should hold a hearing and hold Donziger in contempt.

As Chevron will further demonstrate at the appropriate time, Donziger's past behavior shows that the only way to obtain his compliance is through a coercive sanction.  *See N.A. Sales Co.*, 736 F.2d at 857-58 ("In light of Chapman's continuous and obviously willful violation of Judge Mishler's orders, he had ample reason to conclude that only a stiff remedy would suffice to coerce compliance.").  While a district court has broad discretion to fashion a sanction to co-

18

# SA182

erce compliance, it should consider "(1) the character and magnitude of the harm threatened by the continued contumacy; (2) the probable effectiveness of any suggested sanction in bringing about compliance; and (3) the contemnor's financial resources and the consequent seriousness of the burden of the sanction[.]" *Oxford Capital Sec., Inc.*, 794 F. Supp. at 109 n.4 (citations and internal quotation marks omitted).

The magnitude of the harm threatened by Donziger's contumacy is significant. He time and again has shown that he is absolutely unwilling to abide by this Court's orders voluntarily, and he will continue to enlarge and profit from his vast fraud until he is restrained from doing so. Donziger's misconduct not only further victimizes Chevron, it threatens to infect other U.S. companies, such as those solicited or involved in solicitations, and it ultimately threatens the integrity of the U.S. courts. Donziger's solicitations to Elliott are clear admissions that he continues to seek U.S. investors in the fraudulent Ecuadorian judgment. *See* Grinberg Decl., Ex. 4 at 2 (Donziger Nov. 2017 email: "I have a packet of materials that I generally send out to those doing due diligence on the opportunity."); *id.* at 1 ("We would like to bring you up to date on recent developments with the Ecuador case and discuss our vision for a strategic capital partnership."). Donziger's ongoing refusal to comply with the Judgment, four years after it was entered, warrants imposing coercive sanctions. Chevron will pursue these sanctions, as well as any other relief deemed just and proper, in the briefing and hearing to determine the extent of Donziger's contempt.

## III.   CONCLUSION

For the foregoing reasons, Chevron requests that the Court (1) grant *ex parte* an order requiring Donziger, as well as any other person or entity acting at his direction or in concert with him, to preserve and maintain within the U.S. any and all documents or evidence relating to the

# SA183

Judgment or compliance therewith; (2) authorize Chevron *ex parte* to serve post-judgment discovery requests on Donziger and any other person or entity reasonably calculated to possess information relevant to enforcement of the Judgment, and; (3) set a prompt briefing schedule and hearing date to adjudicate Donziger's contempt and determine the appropriate remedy to compel Donziger's compliance with the Judgment, following an appropriate period of time for Chevron to conduct the requested discovery.  In addition, Chevron requests any other relief the Court deems just and proper.

Dated: March 19, 2018                               Respectfully submitted,

New York, New York                                GIBSON, DUNN & CRUTCHER LLP

                                                  /s/ Randy M. Mastro

                                                  Randy M. Mastro
                                                  Andrea E. Neuman
                                                  200 Park Avenue
                                                  New York, New York 10166
                                                  Telephone: 212.351.4000
                                                  Facsimile: 212.351.4035
                                                  Email: RMastro@gibsondunn.com

                                                  William E. Thomson
                                                  333 South Grand Avenue
                                                  Los Angeles, California 90071
                                                  Telephone: 213.229.7000
                                                  Facsimile: 213.229.7520

                                                  STERN, KILCULLEN & RUFOLO LLC
                                                  Herbert J. Stern
                                                  Joel M. Silverstein
                                                  325 Columbia Tpke, Ste 110
                                                  P.O. Box 992
                                                  Florham Park, New Jersey 07932-0992
                                                  Telephone:  973.535.1900
                                                  Facsimile:  973.535.9664

                                                  *Attorneys for Chevron Corporation*

SA184

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _3/19/2018_

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

      Plaintiff,

    v.

STEVEN DONZIGER, et al.,

      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11 Civ. 0691 (LAK)

ORDER TO SHOW CAUSE AND PRESERVATION ORDER IN
FURTHERANCE OF THIS COURT'S MARCH 4, 2014 JUDGMENT AND
APPLICATION TO HAVE STEVEN DONZIGER HELD IN CONTEMPT

WHEREAS, on March 19, 2018, petitioner Chevron Corporation ("Chevron") filed a

Motion By Order to Show Cause to grant Chevron's ex parte application to (1) require Donziger,

as well as any other person or entity acting at his direction or in concert with him, to preserve

and maintain within the U.S. any and all documents or evidence relating to the Judgment or

compliance therewith; (2) authorize Chevron ex parte to serve post-judgment discovery on

Donziger and any other person or entity reasonably calculated to possess information relevant to

enforcement of the Judgment, and; (3) set a prompt briefing schedule and hearing date to adjudi-

cate Donziger's contempt and determine the appropriate remedy to compel Donziger's compli-

ance with the Judgment, following an appropriate period of time for Chevron to conduct the re-

quested discovery.

1

# SA185

The Court has considered the accompanying Memorandum of Law In Support Of Chevron's Application, Declarations of Randy Mastro and Lee Grinberg (and attached exhibits), and arguments presented, and sufficient reason appearing, it is hereby:

ORDERED that Chevron shall serve on Donziger, by hand, facsimile, or e-mail a copy of this Order to Show Cause and all papers submitted in support thereof on or before *5:00* *hr*

p.m. on March *20*, 2018; and

ORDERED that Donziger, as well as any other person or entity *[having actual notice of this order and]* acting at his direction or in concert with him, including, without limitation, Katie Sullivan, Streamline Family Office, Inc., Jonathan Bush, and athenahealth, Inc., preserve and maintain within the United States any and all documents or evidence relating to the Judgment or compliance therewith;

~~Donziger and any other person or entity reasonably calculated to possess information relevant to enforcement of the Judgment, including, without limitation, Katie Sullivan, Streamline Family Office, Inc., Jonathan Bush, and athenahealth, Inc., in the form of the discovery requests and subpoenas submitted with this Application; and~~

~~ORDERED that the Court shall permit a reasonable period of 60 days or more for Chevron to conduct this discovery up to and including _____, 2018, and, afterward, permit briefing and then hold a hearing on Chevron's Application on the dates set forth below;~~

~~ORDERED that, after conducting discovery, Chevron shall file and serve additional papers in support of its Application to have Donziger held in contempt, if any, on or before _____, 2018; and~~

~~ORDERED that Donziger shall file and serve papers in opposition to Chevron's Application _____ on or before _____, 2018; and~~

(2)

# SA186

Chevron Corp. v. Donziger, 11-cv-0691 (LAK)

ORDERED, that Donziger SHOW CAUSE, on April **20**, 2018 at **4** p.M. in Courtroom 26**A**, 500 Pearl Street, New York, New York, why orders should not be entered (1) adjudicating Donziger in civil contempt of court for failure to comply with the judgment as to Donziger defendants and others [DI 1875] ¶¶ 3 and 5 (the latter insofar as Chevron alleges in its memorandum of law [DI 1966] at 15 and in the Grinberg declaration), as supplemented (collectively, the "Judgment"), (2) granting Chevron leave to conduct post-judgment discovery of Donziger and any other person, including without limitation Katie Sullivan, Streamline Family Office, Inc., Jonathan Bush, and athenahealth, Inc., as to all matters relevant to enforcement of paragraphs 3 and 5 of DI 1875, *provided, however*, that nothing herein precludes Chevron from conducting discovery without leave to the Court as to all matters relevant to enforcement of the monetary provisions of the Judgment, and

ORDERED, that any papers in opposition to, and any reply papers in support of, this application shall be served and filed on or before April 3, 2018 and April 13, 2018, respectively.

SO ORDERED.

Dated:        March 19, 2018
Issued at:    **4:15** p.m.

_____
Lewis A. Kaplan
United States District Judge

# SA187

Memorandum Endorsement        Chevron Corp. v. Donziger, 11-cv-0691 (LAK)

       Chevron has presented an ex parte application for an order (1) requiring Donziger and certain others to preserve and maintain within the United States certain evidence, (2) authorizing Chevron to serve post-judgment discovery on Donziger and others, and (3) requiring Donziger to show cause why he should not be held in contempt for his failure to comply with the judgment in this case and setting a briefing schedule and hearing date following a reasonable period within which to conduct discovery on the contempt charge.

       1.      The attached order grants, in somewhat modified form, so much of the application as seeks a preservation order.

       2.      It has stricken out the language that, if signed, would have authorized post-judgment discovery for the purpose of enforcing the Judgment, but solely on the grounds that it is superfluous in part and otherwise not relief that the Court will grant *ex parte* on the present showing.

       2.1.      Insofar as the judgment is for the payment of money, enforcement proceedings are governed by Fed. R. Civ. P. 69(a). That rule provides in relevant part and in substance that the procedure applicable to enforcement of a money judgment rendered by a federal court is governed by the procedure of the state where the court is located except where a federal statute otherwise provides. Thus, proceedings to enforce a money judgment of this Court generally are governed by the New York CPLR. CPLR § 5223 provides in relevant part that "[a]t any time before a judgment is satisfied or vacated, the judgment creditor may compel disclosure of all matter relevant to the satisfaction of the judgment, by serving upon any person a subpoena . . ." Rule 5224 provides for the service of subpoenas for depositions and for the production of documents, among other things. Accordingly, to the extent the discovery is sought in aid of enforcement of the monetary portion of the judgment, leave of court is not required.

       2.2.      Enforcement of judgments requiring a specific act is governed by Fed. R. Civ. P. 70, which among other things provides for contempt proceedings to enforce compliance. *Id.* 70(e). Contempt is available also for violations of injunctions, whether mandatory or prohibitory.

       2.3.      In one respect, Chevron's current motion is for contempt of a portion of the judgment that directed the performance of a specific act. In another, it contends that Donziger has violated a prohibitory portion of the judgment by virtue of its approach to one possible investor. And it seeks discovery, in part to prove up those contentions and in part to obtain evidence of any other such alleged violations.

       2.4.      In all the circumstances, the Court concludes that there is no need for a determination with respect to discovery with respect to enforcement of the non-monetary portions of the judgment that is so immediate that Donziger should not be afforded an opportunity respond to so much of the application as seeks discovery with respect to the alleged and possible contempts.

       SO ORDERED.

Dated:       March 19, 2018

                                    Lewis A. Kaplan
                               United States District Judge

## SA188

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

      Plaintiff,

    v.

STEVEN DONZIGER, *et al.*,

      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4|18|18

11 Civ. 0691 (LAK)

### CLERK'S CERTIFICATE OF DEFAULT

I, RUBY J. KRAJICK, Clerk of the United States District Court for the Southern District of New York, do hereby certify that this action was commenced by Chevron Corporation ("Chevron") on February 1, 2011, with the filing of a summons and complaint. I further certify that a copy of the summons and complaint was served on, among others, non-appearing Defendants Pablo Fajardo Mendoza ("Fajardo"), Luis Yanza ("Yanza"), Frente de Defensa de la Amazonia (the "Front"), Selva Viva Selviva Cia, Ltda. ("Selva Viva"), and 45 non-appearing Lago Agrio Defendants.

The 45 non-appearing Lago Agrio Defendants are: Maria Aguinda Salazar, Carlos Grefa Huatatoca, Catalina Antonia Aguinda Salazar, Lidia Alexandra Aguinda Aguinda, Patricio Alberto Chimbo Yumbo, Clide Ramiro Aguinda Aguinda, Luis Armando Chimbo Yumbo, Beatriz Mercedes Grefa Tanguila, Lucio Enrique Grefa Tanguila, Patricio Wilson Aguinda Aguinda, Celia Irene Viveros Cusangua, Francisco Matias Alvarado Yumbo, Francisco Alvarado Yumbo, Olga Gloria Grefa Cerda, Lorenzo Jose Alvarado Yumbo, Narcisa Aida Tanguila Narvaez, Bertha Antonia Yumbo Tanguila, Gloria Lucrecia Tanguila Grefa, Francisco Victor Tanguilla Grefa, Rosa Teresa Chimbo Tanguila, Jose Gabriel Revelo Llore, Maria Clelia

1

## SA189

Reascos Revelo, Maria Magdalena Rodriguez Barcenes, Jose Miguel Ipiales Chicaiza, Heleodoro Pataron Guaraca, Luisa Delia Tanguila Narvaez, Lourdes Beatriz Chimbo Tanguila, Maria Hortencia Viveros Cusangua, Segundo Angel Amanta Milan, Octavio Ismael Cordova Huanca, Elias Roberto Piyahuaje Payahuaje, Daniel Carlos Lusitande Yaiguaje, Benancio Fredy Chimbo Grefa, Guillermo Vicente Payaguaje Lusitante, Delfin Leonidas Payaguaje Payaguaje, Alfredo Donaldo Payaguaje Payaguaje, Teodoro Gonzalo Piaguaje Payaguaje, Miguel Mario Payaguaje Payaguaje, Fermin Piaguaje Payaguaje, Reinaldo Lusitande Yaiguaje, Luis Agustin Payaguaje Piaguaje, Emilio Martin Lusitande Yaiguaje, Simon Lusitande Yaiguaje, Armando Wilfrido Piaguaje Payaguaje, and Angel Justino Piaguage Lucitante.

Chevron personally served the summons and complaint on Fajardo and Yanza, both individually and on behalf of the non-appearing Lago Agrio Defendants and the Front. Dkt. 205 at 6. As authorized by the Court (Dkt. 4), Chevron also served the non-appearing Defendants by overnight mail and email. *Id.* at 4-5. Defendant Selva Viva accepted service by overnight mail. *Id*. at 5. Proofs of service were filed on March 11, 2011. Dkt. 206. On the same day, the Clerk of this Court entered a Certificate of Default against the non-appearing Defendants. Dkt. 469.

Chevron filed its Amended Complaint on April 20, 2011. Dkt. 283. The Amended Complaint did not add any new claims for relief. Chevron did not serve the Amended Complaint on the non-appearing Defendants. *See* Fed. R. Civ. P. 5(a)(2).

# SA190

I certify that the docket entries indicate that Fajardo, Yanza, the Front, Selva Viva, and the 45 non-appearing Lago Agrio Defendants have failed to appear or file any proper response with respect to the Amended Complaint herein.

The default of the aforementioned Defendants is hereby noted.

Dated: New York, New York
     April 18 , 2018

**RUBY J. KRAJICK**
**Clerk of Court**

By: _____
**Deputy Clerk**

# SA191

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

CHEVRON CORPORATION,

        Plaintiff,

    v.

STEVEN DONZIGER *et al.*,

        Defendants.

11 Civ. 0691 (LAK)

---

### OPPOSITION TO CHEVRON'S APPLICATION FOR CONTEMPT AND RELATED DISCOVERY (DKT. 1966)

Chevron's contempt application is baseless. ***First,*** with respect to the "Amazonia shares," it is the understanding of undersigned that the "Amazonia" entity in Gibraltar either no longer exists or is entirely owned by Chevron after Chevron forced it into receivership as part of its blitzkrieg of global collateral litigation in and around 2014. To the best of the undersigned's knowledge, the entity—a public interest vehicle, as explained below—never effectively received sufficient funds due to Chevron's litigation assault and thus has been considered irrelevant and ignored by the plaintiffs for years. Undersigned is uncertain whether Amazonia still exists and if so, in what status or form.[1] In 2014, undersigned

---

[1] Assuming the entity or any part of it has been taken over by Chevron, it is now, in undersigned's view, null and void. The whole purpose of the entity was to aid in the enforcement of the affirmed environmental judgment against Chevron, structure the subsequent remediation of Chevron's massive contamination, and offer relief to the tens of thousands of affected indigenous peoples and farmers suffering the impacts of Chevron's contamination. It would utterly contrary to the entity's fundamental

# SA192

contacted Chevron seeking a common sense resolution to the relevant part of the Court's 2014 judgment. *See* Ex. 1. In an obvious sign of bad faith, ***Chevron never responded to this letter*** and ***failed to include it in among its multitude of exhibits offered in support of its contempt application***. Indeed, before filing its contempt application, Chevron never even contacted the undersigned to clearly state what it needed in regards to these imagined "shares."[2]

While undersigned cannot be compelled to act in a manner that would materially prejudice his clients (as a transfer of shares, were the entity functioning and/or before Chevron took it over, might have entailed), at this point in time there appears to be any number of possible approaches that could satisfy any concerns the Court might have concerning Amazonia. To better understand the situation, the Court should first require Chevron to fully disclose the status of Amazonia, the result of the Gibraltar litigation, what "shares" it thinks undersigned has given that Chevron appears to control the entirety of Amazonia, and what concerns Chevron

---

purpose for it be used ***by*** Chevron as some sort of litigious device to frustrate that enforcement, delay that remediation, and deny Chevron's victims timely relief. While it is unclear where such voidature would need to be established, undersigned and those impacted have little concern that Chevron's apparent strategy to abuse the captured entity will be embraced by any legitimate court where judgment enforcement is being effectuated, such as those in Canada.

[2]    Chevron asserts as relevant that it "requested that the Court order Donziger to 'comply forthwith'" with the share transfer request and that "Donziger did not respond to that request." Dkt. 1966 at 13. But of course Chevron's letter was to the Court, not to undersigned, and Chevron puts a lot of nonsense in its various letters and motions. Chevron fails to note that the Court did not respond or otherwise appear to take any note of the mention of the share request. To the extent undersigned was aware of the issue, undersigned presumed that the Court, like undersigned, considered the whole issue obsolete and pointless given that Chevron now seems to hold all shares in Amazonia.

# SA193

has that could be addressed at this point by further action by the Court.

Before moving on, it is worth noting the palpable bad faith behind Chevron's continued effort to demonize the intentions behind the Amazonia entity and the good faith of the many financial supporters of the Ecuadorian litigation. Most of these persons are public interest oriented individuals seeking to assist impoverished indigenous peoples and farmer communities access justice and vindicate a meritorious environmental claim that they otherwise would not have the resources to prosecute. It always has been important to these individuals that justice be achieved for the affected indigenous peoples and farmer communities and that Chevron's horrific contamination properly remediated. More specifically, the Amazonia entity, as undersigned understands it, was an effort to organize investor interests in a fair and transparent (across investors) manner, and to ensure an orderly and responsible use of funds once the Ecuadorian judgment results in a recovery. To that end, efforts to shield and ensure sufficient funds for a full remediation as ordered by the Ecuadorian court were literally written into the governing bylaws (Memorandum and Articles of Association, trial exhibit PX 657) of the entity. The Court cited this governing document at footnote 1110 of its RICO Judgment, but never observed that the entity is actually structured to fully protect monies dedicated to environmental remediation. The Articles provide, in the definition section, that "Remediation Proceeds" are as follows:

# SA194

> All proceeds of the Award attributable to amounts paid or collected pursuant to, or in respect of amounts described in, Section Thirteen of the Judgment. For the avoidance of doubt, the Company has no right, title or interest in or to any Remediation Proceeds. In the event that any such Remediation Proceeds are paid to the Company, the Company shall hold such Remediation Proceeds on trust for the Remediation Trust, and immediately remit the same to the Remediation Trust.

RICO Trial PX 657 at 11.[3] "Available Proceeds," out of which investors could be legally paid by ARL, was in turn defined as "[t]he total proceeds of the Award, *reduced by . . . any portion of the Award consisting of or attributable to Remediation Proceeds*." *Id.* at 5 (emphasis added).  Amazonia was a private entity that obviously was organized with a public interest purpose linked to the environmental, human rights, and access to justice objectives of the underlying litigation. Chevron and its lawyers (who are closely linked to a broader effort to undermine third-party litigation finance and taint "plaintiffs lawyers," in particular through Chevron's highest-tier funding of related projects through the U.S. Chamber of Commerce) breezily demonized it as some nefarious effort to steal away monies. It appears that this Court unfortunately bought the Chevron story without reading the fine print.

    ***Second,*** with respect to the claim that the undersigned is attempting to

---

[3]   Section Thirteen of the Ecuador judgment sets out all the actual damages figures and found and calculated by the Ecuadorian court. It does not set out the punitive damages figure nor the separate 10% incentive award under Ecuador's Environmental Management Act to the community organization that led prosecution of the lawsuit, the *Frente de Defensa de la Amazonía*.

# SA195

monetize or profit from the Ecuadorian judgment in violation of this Court's RICO judgment, the bad faith of this claim is clear. Most critically, Chevron **completely fails to cite** on this point the applicable order of the Court, namely its order dated April 25, 2014 (Dkt. 1901). Because undersigned moved for relief from the "monetize or profit from" portions of the original RICO judgment, and the Court granted relief, or at least very distinct clarification, in regard to the same, it is Dkt. 1901 that is effectively the applicable order of the Court on which Chevron thinks the undersigned should be held in contempt. Yet, Chevron fails to even cite it. Thinking what—that it will somehow go unnoticed?

Chevron fails to cite the relevant RICO order because it is fatal to its pretense of contempt. That order makes clear that funds "traceable to the judgment" would **not** include the sorts of funds that undersigned raised and used to pay case expenses, including for his own fees, in the years prior to the RICO litigation.[4] The only funds subject to the order are those obtained by way of "**collections** [that] are made in respect of the Lago Agrio Judgment." Dkt. 1901 at 8 (emphasis added). The Court outright chastised the undersigned for seeing any concern regarding his ability to raise funds (and compensate himself and others) implied in the language of paragraph 5 of the RICO Judgment:

---

[4]  Dkt. 1901 at 7-8 ("[A]s long as no collections are made in respect of the Lago Agrio Judgment and funneled to Donziger as retainer payments, the NY Judgment would not prevent Donziger from being paid, just as he has been paid at least $958,000 and likely considerably more over the past nine or ten years.").

# SA196

> The point of paragraph 5 . . . was to prevent Donziger and the LAP Representatives from avoiding the effect of the constructive trust imposed on assets in their hands that otherwise would have been direct proceeds of the Judgment [and that the Court had just made clear did not include funds raised to cover litigation expenses and fees] by selling, assigning, or borrowing on *their* interests in the Lago Agrio Judgment and thus at least confusing the issue of traceability. Indeed, Donziger's memorandum so recognized when he described paragraph 5 by saying that it would "[d]epriv[e] Mr. Donziger of *his* interest in . . . a case to which he has devoted the better part of the last two decades."

*Id.* at 10 (emphasis original). To the extent that case litigation fund-raising could even be brought within the ambit of the paragraph 5 (and undersigned believes it is not), the Court emphasized, literally, that the paragraph would only apply to "selling, assigning, or borrowing on *their* interests"—the specific interests of the undersigned or the two individual plaintiffs (who do not hold any personal interests in the judgment).

In case the forgoing wasn't clear enough, the Court also established that "The NY Judgment Does Not Threaten to Prevent the LAP Representatives From Financing Their Appeal," *id.* at 11 (section heading), specifically making clear that "[n]othing in the NY Judgment prevents the LAPs (other than the two LAP Representatives who are named in the NY Judgment) and their allies from ***continuing to raise money in the same fashion***" as prior fund-raising efforts noted by the Court, *i.e.* accepting funds for litigation expenses from investors in return for

a contingency interest in any recovery. *Id.* at 12 (emphasis added).

Chevron apparently thinks that this interpretation by the Court of its own judgment does not merit citation, much less discussion, in its 24-page contempt application which is the sixth such application filed against the undersigned since the commencement of the action. More importantly, Chevron's application is entirely devoid of any allegation that the fund-raising at issue is an attempt to "avoid[] the effect of the constructive trust imposed on assets in their hands that otherwise would have been direct proceeds of the Judgment," *i.e.* on funds from a "collections . . . made in respect of the Lago Agrio Judgment." *Supra.* It is further devoid of any allegation that the interests supposedly being "monetized" were specifically Donziger's or Mssrs. Camacho or Piaguaje's ("their") interests, as opposed to the majority outstanding interest in the case that the Court recognized would legitimately allow the Ecuadorian plaintiffs to "continu[e] to raise money in the same fashion" as they had been doing.

Now comes Chevron's game. It is hardly subtle. Chevron filed its contempt application with *zero* allegations that would satisfy the Court's own interpretation of the contours of its second RICO order. Why? Because Chevron's next move almost certainly will be to exclaim that it should not be required to trust undersigned's word that the interests being pledged for investment purposes are not specifically his own or those of Mssrs Camacho/Piaguaje, but rather should be entitled to extensive and

# SA198

invasive discovery into confidential and privileged internal matters of the team litigating against it in Canada and elsewhere in order to prove the same—and in the process, intimidate and scare off the financial supporters of the case as the company has done regarding, among others, Burford, Woodsford, Mr. DeLeon, H5, and now Elliott Capital Management. This Court should not countenance such a fishing expedition intended to cut off financing for enforcement efforts, the legitimacy of which was recognized by the Second Circuit when it affirmed this Court's RICO Judgment expressly on the grounds that "[t]he relief tailored by [this Court] . . . does not invalidate the Ecuadorian judgment and does not prohibit any of the LAPs from seeking enforcement of that judgment anywhere outside of the United States."[5]

Chevron's desperation to access this confidential information is evident from its application and the blizzard of subpoenas it served in recent weeks on the undersigned and others. Undersigned will need to move to quash those subpoenas separately (requiring more time stolen from broader efforts to hold Chevron accountable for its environmental crimes—another express strategic purpose of Chevron's discovery tactics), but for present purposes it is noted that Chevron has not met even the weakest threshold showing that discovery is warranted. Again, Chevron has not presented *any* specific claim that the interest offered for investment is specific to the undersigned or Mssrs. Camacho/Piaguaje; certainly there is nothing

---

[5]     *Chevron Corporation v. Donziger*, 833 F.3d 74, 151 (2016).

Case 1:11-cv-00691-LAK-JCF Document 1986 Filed 04/24/18 Page 9 of 10
Case 18-855, Document 94, 03/11/2019, 2515258, Page307 of 303

# SA199

in the Lee Grinwald affidavit to back up this contention.

Absent such specificity, the notion that the undersigned's fund-raising efforts are in violation of the Court's RICO Judgment are baseless. Chevron could have offered such speculation up bare, at any time, for no reason, but it knows it would be rejected. So instead Chevron tried to dress up the speculation in association with the declaration it managed to obtain from Mr. Grinburg, hoping that the lack of any specific reference to undersigned's interest of Piaguaje/Camacho's interest will go unnoticed. That hope is as weak as the hope that the Court's order at Dkt. 1901 would go unnoticed.

In sum, Chevron's sixth application to hold the undersigned in contempt (the previous five being unsuccessful) is manifestly in bad faith given the absence of any specific evidence of a violation of the Court's RICO Judgment and the extent to which the application instead serves Chevron's larger "demonization" strategy against counsel for the plaintiffs. To the extent Chevron has a specific claim with regards to the Amazonia shares, it should first inform the Court—and undersigned— of the current status and existence (or not) of the Amazonia entity, and its own interest in the same. Chevron's claim regarding fund-raising should be expressly rejected. The application for contempt should be dismissed and all discovery predicated on the application should be immediately withdrawn.

DATED:      April 24, 2018                    Respectfully submitted,

                                             *s/ Steven R. Donziger*
                                             Steven R. Donziger
                                             245 W. 104th Street, #7D
                                             New York, NY 10025
                                             Tel: (917) 678-3943
                                             Fax: (212) 409-8628
                                             Email:
                                              sdonziger@donzigerandassociates.com

                                             *Pro se*
                                             *Counsel to Donziger & Associates,*
                                             *PLLC, and the Law Offices of Steven R.*
                                             *Donziger*

# SA201

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

                  Plaintiff,

       v.

STEVEN DONZIGER, *et al.*,

               Defendants.

11 Civ. 0691 (LAK)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## CHEVRON CORPORATION'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS EX PARTE APPLICATION BY ORDER TO SHOW CAUSE FOR DISCOVERY AND A PRESERVATION ORDER IN FURTHERANCE OF THIS COURT'S MARCH 4, 2014 JUDGMENT AND TO SET A HEARING DATE SUBSEQUENT TO THAT DISCOVERY ON CHEVRON'S APPLICATION TO HAVE STEVEN DONZIGER HELD IN CONTEMPT

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

STERN, KILCULLEN & RUFOLO LLC
325 Columbia Tpke, Ste 110
P.O. Box 992
Florham Park, New Jersey 07932-0992
Telephone:  973.535.1900
Facsimile:  973.535.9664

*Attorneys for Plaintiff Chevron Corporation*

# SA202

## TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ........................................................... 1

II.   ARGUMENT ..................................................................................... 3

    A.   Donziger Has No Legitimate Defense to His Defiance of the Judgment's Express Command Requiring Him to Turn Over His Amazonia Shares to Chevron ........................................................................................... 3

    B.   Donziger's Excuses for His Attempted Monetization of the Ecuadorian Judgment Do Not Withstand Scrutiny ....................................................... 5

    C.   Donziger's Opposition Confirms That Discovery in Support of a Judgment Enforcement and a Contempt Hearing is Necessary .................................. 8

III.  CONCLUSION ................................................................................... 10

Gibson, Dunn &
Crutcher LLP

# SA203

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Badgley v. Santacroce,*
  800 F.2d 33 (2d Cir. 1986)........................................................................5

*Canada Dry Del. Valley Bottling Co. v. Hornell Brewing Co., Inc.,*
  No. 11 Civ. 4308, 2013 WL 5434623 (S.D.N.Y. Sept. 30, 2013)...........9

*Chevron Corp. v. Donziger,*
  974 F. Supp. 2d 362 (S.D.N.Y. 2014)......................................................6

*Chevron Corp. v. Donziger,*
  833 F.3d 74 (2d Cir. 2016).......................................................................6

*Hamilton v. Kerik,*
  No. 01 CV 6934, 2002 WL 31834428 (S.D.N.Y. Dec. 17, 2002)...........9

*Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.,*
  369 F.3d 645 (2d Cir. 2004)......................................................................3

*State of N.Y. v. Shore Realty Corp.,*
  763 F.2d 49 (2d Cir. 1985)........................................................................9

*U.S. S.E.C. v. Universal Exp., Inc.,*
  546 F. Supp. 2d 132 (S.D.N.Y. 2008).......................................................5

*U.S. v. Dist. Council of New York City,*
  No. 90 Civ. 5722, 2007 WL 2324338 (S.D.N.Y. Aug. 14, 2007).........10

**Statutes**

CPLR Rule 5223 .........................................................................................10

CPLR Rule 5224 .........................................................................................10

**Rules**

Fed. R. Civ. P. 69(a)(2)..............................................................................10

Fed. R. Civ. P. 70.......................................................................................10

Gibson, Dunn &
Crutcher LLP

# SA204

## I.   PRELIMINARY STATEMENT

Steven Donziger is in contempt of this Court's Judgment, and he offers no defense for his admitted contempt, but only obfuscation and attempts to shift blame.  Indeed, his outright refusal to accept this Court's rulings against him is the literal definition of contempt.  And Donziger's Opposition leaves no doubt that, absent contempt sanctions compelling him to comply, he will continue to flout this Court's orders.

Donziger admits that he has refused to transfer his shares in Amazonia to Chevron (Opp. at 2), even though this Court's Judgment ordered him to do just that.  Dkt. 1875 ¶ 3 ("Donziger shall execute in favor of Chevron a stock power transferring to Chevron all of his right, title and interest in his shares of Amazonia . . . .").  Instead, Donziger offers a series of excuses that do not justify his continued refusal to take the simple step of transferring his shares to Chevron, as the Court has commanded.  Donziger's position is also inconsistent:  If Amazonia is "null and void," as Donziger asserts (Opp. at 1 n.1), he should have no problem transferring his Amazonia shares to Chevron.  Yet, instead of performing that simple act, Donziger continues his willful defiance of the Court's Judgment.  Given this intransigence, the Court should issue contempt sanctions that will ensure Donziger finally transfers his Amazonia shares to Chevron.

Donziger also admits that he continues to seek to monetize interests in the Ecuadorian judgment, despite this Court's prohibition.  Dkt. 1875 ¶ 5 ("Donziger and the LAP Representatives, and each of them, is hereby further enjoined and restrained from undertaking any acts to monetize or profit from the Judgment, as modified or amended, or any New Judgment, including without limitation by selling, assigning, pledging, transferring or encumbering any interest therein.").  In defending the purported "legitimacy" of his ongoing attempts to obtain "financing for enforcement efforts" (Opp. at 8), Donziger effectively concedes his contempt.  Indeed, he does

# SA205

not deny that previous "fundraising" efforts resulted in many millions of dollars flowing into Donziger's control that he could not account for. *See* Dkt. 1963 at 23 n.74 (noting $16 million unaccounted for). Having been caught red-handed seeking to sell interests in the Ecuadorian judgment to Elliott Management Corporation just months ago—a fact Donziger does not deny— he, instead, suggests that his conduct was made permissible by the Court's April 25, 2014 Order on Defendants' motion for a stay pending appeal (which, contrary to Donziger's accusations, Chevron did cite in its moving papers—*twice* (*see* Dkt. 1966 at 2 n.1, 13 n.5)).

This Court never gave Donziger free reign to monetize and sell off pieces of the fraudulent Ecuadorian judgment, and Donziger is wrong to suggest otherwise. In addition to being divorced from the April 25, 2014 Order's context (which dealt only with a request for a stay pending appeal), Donziger's purported reading of that order would enable him to continue to conduct the very scheme that this Court's Judgment aimed to bring to an end. This Court enjoined Donziger from "undertaking any acts to monetize" the fraudulent Ecuadorian judgment, including "selling, assigning, pledging, transferring or encumbering any interest" in that judgment. Admittedly, Donziger was discussing just that during his meeting with Elliott—exchanging an "interest" in that judgment for financing from Elliott to further judgment enforcement and monetization efforts. Opp. at 8–9. Donziger also admits that neither his interest nor those of the LAP Representatives can be "offered for investment" (Opp. at 8), but he insists that he was selling some other "interest" in the Ecuadorian judgment to Elliott, without identifying what other interest that could possibly have been—a transparent and weak attempt to effectively nullify the Court's injunction against him "undertaking any acts to monetize or profit from the Judgment." Indeed, any such acts would necessarily be to his personal benefit, because, by his own account, he will receive 6.3% of the Ecuadorian judgment. And he does not deny that he attempted to ar-

# SA206

range a deal from which he would profit from funds traceable to the corrupt Ecuadorian judgment. In short, Donziger effectively concedes he is violating this Court's injunction.

Donziger fares no better in arguing that Chevron should be denied discovery on his monetization efforts. He has stonewalled that discovery thus far, interposing specious objections and seeking delay upon delay. Donziger suggests that Chevron's allegations are not specific enough (Opp. at 9), but that shows his fundamental misunderstanding of the basic purpose of discovery—to obtain facts that one does not yet possess and that are uniquely in the possession of one's adversary. In any event, Donziger is wrong about the state of the current evidentiary record, as Chevron has already submitted substantial and undisputed evidence that Donziger has been attempting to monetize the Ecuadorian judgment. Only through discovery can Chevron learn the full extent of those efforts and, thus, reveal the full extent of Donziger's contempt.

In short, Donziger must be made to comply with this Court's Judgment, and it is apparent he will not do so unless the Court now imposes contempt sanctions.

## II.    ARGUMENT

### A.    Donziger Has No Legitimate Defense to His Defiance of the Judgment's Express Command Requiring Him to Turn Over His Amazonia Shares to Chevron

The Court ordered Donziger to turn over his Amazonia shares to Chevron. Dkt. 1875 ¶ 3. He has refused. Dkt. 1967 ¶ 8; Opp. at 2. Nothing more is needed to establish Donziger's contempt on this score: the Judgment was "clear and unambiguous," Chevron's "proof of noncompliance is clear and convincing," and Donziger "has not diligently attempted to comply in a reasonable manner." *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) (quotation marks and citation omitted).

Donziger makes no attempt to defend his conduct under the standard applicable to contempt motions. Instead, he argues that his non-compliance with the Judgment is excused because

# SA207

it is his "understanding" that Amazonia "either no longer exists or is entirely owned by Chevron[.]"  Opp. at 1; *see also id.* at 1 n.1 ("Assuming the entity or any part of it has been taken over by Chevron, it is now, in undersigned's view, null and void.").  Donziger also suggests that Chevron should first disclose information about Amazonia's current status so that the Court "can better understand the situation" and "satisfy any concerns [it] might have concerning Amazonia." *Id*. at 2.  Donziger further claims he "cannot be compelled to act in a manner that would materially prejudice his clients," which he says would be the case if "the entity were functioning." *Id.*

What does any of this have to do with Donziger's refusal to obey the Judgment by transferring his shares in Amazonia to Chevron, as the Court has ordered?  Nothing.  The current status of Amazonia is irrelevant to whether Donziger has complied with *his* obligations under the Court's Judgment.  In any event, Donziger is wrong that Amazonia is defunct.  Chevron sued Amazonia in Gibraltar for fraud relating to the pursuit of the Lago Agrio litigation and resulting judgment.  After filing a defense, Amazonia failed to participate in the Gibraltar proceedings and defaulted.  On December 9, 2015, Chevron obtained judgment against Amazonia for damages of approximately $28 million and equitable relief.  Amazonia failed to pay this judgment debt and the Gibraltar court granted Chevron's application on July 11, 2016, placing Amazonia into liquidation.  But as a matter of Gibraltar/English law, Amazonia still exists, as does its issued share capital, and Pablo Fajardo, Luis Yanza, and Ermel Chavez remain Amazonia directors.

But even if Amazonia were no longer "functioning" or was actually "null and void," that does not mean Donziger can simply retain his shares and ignore this Court's clear command.  Donziger's cursory suggestion that transferring the Amazonia shares would "prejudice his clients" is at best another belated (and waived) attack on the propriety of the relief the Court ordered more than four years ago.  That vague, unexplained prejudice in no way justifies his failure

4

# SA208

to comply with the Judgment.  Simply put, Donziger "is not entitled to satisfy the . . . judgment at his convenience and only insofar as it does not cause him any discomfort."  *U.S. S.E.C. v. Universal Exp., Inc.*, 546 F. Supp. 2d 132, 140 (S.D.N.Y. 2008).

Donziger also references a letter he sent to Chevron's counsel in August 2014 regarding his Amazonia shares.  *See* Opp. at 2 (citing Dkt. 1986-1).  Nothing in this letter demonstrates compliance with the Judgment.  To the contrary, Donziger's letter made clear that he would *not* comply with this Court's order that he transfer the Amazonia shares to the Clerk (and Donziger never made such a transfer).  And, of course, Donziger has still not transferred his Amazonia shares to Chevron—even though all of Donziger's appellate options have been exhausted.  Donziger's self-serving attempts to shift the burden onto Chevron for his own knowing failure to comply are unavailing.[1]  Donziger does not claim he does not know how to or cannot comply with this Court's Judgment.  He just refuses to do so.

In short, Donziger continues to defy the Judgment and keep his Amazonia shares.  In light of his refusal to comply, contempt sanctions are necessary to coerce Donziger into satisfying the Court's commands.  *See Badgley v. Santacroce*, 800 F.2d 33, 36 (2d Cir. 1986) ("The purpose of civil contempt . . . is to compel a reluctant party to do what a court requires of him.").

**B.**     **Donziger's Excuses for His Attempted Monetization of the Ecuadorian Judgment Do Not Withstand Scrutiny**

As with Amazonia, Donziger does not deny, so much as try to obscure, the fact that he has attempted to monetize the Ecuadorian judgment.  Nor could he, given the evidence that

---

[1] Donziger's August 2014 letter suggested that the "onus" was on Chevron to "propose and request the form of the stock power and any other transactional documents deemed necessary to ensure compliance."  Dkt. 1986-1 at 1.  But the Judgment did not make Donziger's obligation contingent on any act by Chevron.  To the contrary, the Court required Donziger to affirmatively "execute in favor of Chevron a stock power transferring to Chevron all of his right, title and interest in his shares of Amazonia."  Dkt. 1875 ¶ 3.  While the Judgment also required Donziger to "execute such other and further documents" requested by Chevron or ordered by the Court, that was a separate obligation that in no way eliminated Donziger's affirmative obligation to transfer the Amazonia shares in the first instance.  *Id.*

Chevron has adduced, which proves that Donziger was attempting to sell interests in the Ecuadorian judgment to Elliott Management Corporation as recently as January 2018.  *See* Dkt. 1967-2.

Donziger's response hinges on language in the Court's April 25, 2014 Order on Defendants' motion for a stay pending appeal.  Under its express terms, that Order centered on whether a stay was appropriate *pending appeal* of the Judgment, and the Court did not license Donziger to profit from funds traceable to the corrupt Ecuadorian judgment, much less purport to decide conclusively what would or would not constitute a violation of the Judgment's prohibition on attempts to monetize it.  *See, e.g.*, Dkt. 1901 at 3 (describing the "principal focus" of the motion subject to decision as "necessarily . . . on the question [of] whether movants will be harmed irreparably if the NY Judgment remains in effect until this appeal is decided").  The appeal has since concluded, Chevron has prevailed, and Donziger must now comply with all aspects of the Judgment.  It is now beyond dispute that the Ecuadorian judgment, in the words of the Second Circuit, is a "wrongful debt."  *Chevron Corp. v. Donziger*, 833 F.3d 74, 135 (2d Cir. 2016).  And under this Court's Judgment, it is likewise beyond dispute that neither Donziger nor the LAP Representatives can monetize or profit from that wrongful debt.  Dkt. 1875 ¶¶ 1, 5; *see also Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 644 (S.D.N.Y. 2014) ("The decision in the Lago Agrio case was obtained by corrupt means. The defendants here may not be allowed to benefit from that in any way.  The order entered today will prevent them from doing so.").[2]

Nothing in the April 25, 2014 Order permitted Donziger's attempts to monetize the Ecuadorian judgment.  That Order confirmed that Donziger was prohibited from "benefitting personally, at Chevron's expense, from property traceable to [the] fraudulent Judgment" (Dkt. 1901 at 11), and money raised in exchange for pieces of a potential recovery is certainly "traceable" to

---

[2]  In light of the Court's recent entry of default judgment against Fajardo, the ADF, the non-appearing LAPs, and the other defaulting Defendants (Dkt. 1985), they, too, are now subject to the same restrictions on monetization of the Ecuadorian judgment.

# SA210

the "fraudulent Judgment." Moreover, while the Court explained that the March 2014 Judgment did not restrict the LAPs who defaulted in this action "from continuing to raise money in the same fashion" they did before (i.e., by obtaining funding from "investors in exchange for shares of any eventual recovery"), it did restrict the "two LAP Representatives who are named in the NY Judgment" from doing so. Dkt. 1901 at 11–12 ; *see also id.* at 20 ("[T]he LAPs (*other than the two LAP Representatives*) and most of their entourage are virtually unconstrained by the NY Judgment in their ability to attempt to fund their litigation efforts against Chevron by continuing to sell shares in anything that may be recovered for whatever investors are willing to pay.") (emphasis added). In other words, the Judgment prohibits Donziger and the LAP Representatives from attempting to monetize their interests in the Ecuadorian judgment.

Thus, there is every reason to believe that Donziger has been selling an undifferentiated interest in the Ecuadorian judgment that constitutes selling (at least in part) an interest held by the LAP Representatives and his own. *Any* possibility of a recovery, or monetization of that recovery, is sufficient to trigger the Court's injunction. As the Court observed in its April 25, 2014 Order, the Judgment "prohibited Donziger and the LAP Representatives from *attempting* to 'monetize or profit from the [Lago Agrio] Judgment, . . . including . . . by selling, assigning, pledging, transferring or encumbering any interest therein.'" *Id*. at 3 (quoting Dkt. 1875) (emphasis added) (alterations in original). And any actual receipt by Donziger of such a recovery, even in respect of another party's interest in the Ecuadorian judgment, would automatically fall within the constructive trust created by paragraph 1 of the Judgment. *See* Dkt. 1901 at 7 (noting that "collections . . . in respect of the Lago Agrio Judgment" may not be "funneled to Donziger as retainer payments"); Dkt. 1875 ¶ 1.

# SA211

In his solicitations to Elliott, Donziger and his co-conspirators repeatedly pitched an investment in enforcement of the corrupt Ecuadorian judgment as a whole. Dkt. 1967-2 ¶ 6 ("Mr. Donziger inquired whether Elliott would provide him with funds for that purpose in exchange for an interest in proceeds that may result from enforcement of the Ecuadorian judgment."); *id*., Ex. 4 at 2 ("It was a pleasure to meet with you to introduce you to the Chevron case and share the opportunity for you to be a key partner in enforcing and collecting the historical $9.5B/now $12B environmental judgement."). There is no indication that Donziger separated out for sale any particular interest in the judgment during his solicitation. Dkt. 1967-3 (J. Bush email to Elliott) ("Here is Katie who is trying to help the successful plaintiffs in the Chevron Ecuador deal."). And Donziger's Opposition is silent on what specific interests he was pitching to Elliott.

The April 25, 2014 Order also stated that the Judgment prevented Donziger from attempting to monetize *his* own interest in the Ecuadorian judgment. Dkt. 1901 at 10. While Donziger says that "there is nothing in the Lee Grin[berg] affidavit to back up" the contention that Donziger was attempting to sell his own interest to Elliott (Opp. at 8–9), that is wrong. In his contemporaneous notes, Mr. Grinberg wrote down a "6.3% personally of the 100%" (Dkt. 1967-2, Ex. 3), which corresponds exactly to Donziger's "equity interest in any proceeds of the Lago Agrio Judgment." Dkt. 1901 at 16. Even if this reference to Donziger's interest did not alone establish that Donziger was attempting to cash in his personal stake in the Ecuadorian judgment, at a minimum it justifies the discovery Chevron seeks into Donziger's monetization efforts.

## C.   Donziger's Opposition Confirms That Discovery in Support of a Judgment Enforcement and a Contempt Hearing is Necessary

Donziger does not challenge the Court's power to order discovery as part of an inquiry into whether its injunctions are being obeyed or as part of a contempt proceeding. *See State of N.Y. v. Shore Realty Corp.,* 763 F.2d 49, 53 (2d Cir. 1985) ("The District Court had ample au-

# SA212

thority to issue [discovery] orders necessary for the enforcement of its [injunction] order.  Discovery may occur in connection with a pending contempt proceeding[.]") (citations omitted).  Instead, Donziger argues that Chevron is not entitled to discovery because it has not already alleged specific facts to prove a forbidden monetization of the corrupt Ecuadorian judgment.  This is wrong on both the law and the facts.

As a legal matter, Chevron is entitled to seek and receive proof of Donziger's compliance with the Judgment.  *See, e.g.*, *Canada Dry Del. Valley Bottling Co. v. Hornell Brewing Co., Inc.*, No. 11 Civ. 4308, 2013 WL 5434623, at *11–12 (S.D.N.Y. Sept. 30, 2013) (requiring defendant to "produce proof of compliance with the Judgment previously issued by" the court and to submit to discovery concerning its "compliance with [its] Judgment . . . .") (citation omitted).  Donziger argues that discovery should be closed to Chevron because it does not already know what specific facts that discovery may reveal.  But this is baseless.  *See, e.g.*, *Hamilton v. Kerik*, No. 01 CV 6934, 2002 WL 31834428, at *1 n.2 (S.D.N.Y. Dec. 17, 2002) ("[D]efendants['] objection that the request 'assumes facts not established' is frivolous since the purpose of discovery is to learn facts.").  That is especially so here, as the record shows that Donziger endeavors to keep his attempts to monetize the Ecuadorian judgment secret through the use of non-disclosure agreements.  *See* Dkt. 1967-2, Ex. 2; *see also id.*, Ex. 1 ("Please execute [the NDA] prior to the meeting so [Donziger] can speak freely."); *id.*, Ex. 4 at 2 ("I have a packet of materials that I generally send out to those doing due diligence on the opportunity.").

On the facts, Donziger is wrong to suggest that Chevron has not put forward sufficient allegations of his monetization of the Ecuadorian judgment—as the evidence discussed in Chevron's moving papers and in the previous section confirms.  While Donziger denies he has violated the Judgment, Chevron is entitled to explore through discovery and test through fact-finding

# SA213

the veracity of that denial.  *See, e.g.*, *U.S. v. Dist. Council of New York City*, No. 90 Civ. 5722,

2007 WL 2324338, at *8 (S.D.N.Y. Aug. 14, 2007) ("[T]here is no substance to the [defend-

ants'] suggestion that the government is not entitled to discovery because their officers submitted

'sworn' statements. . . . [T]he discovery rules do not recognize litigation by *ipse dixit*.").[3]

Accordingly, the Court should authorize Chevron's discovery under either Federal Rule

of Civil Procedure 70 or through its authority to ensure compliance with its injunctive orders.[4]

## III.    CONCLUSION

For the foregoing reasons, Chevron requests that the Court (1) authorize Chevron to serve

post-judgment discovery requests on Donziger and any other person or entity reasonably calcu-

lated to possess information relevant to any attempts by Donziger to monetize or profit from, or

obtain property traceable to, the Ecuadorian judgment; (2) find Donziger to be in contempt for

established violations of the Judgment and; (3) determine the appropriate remedy to compel

Donziger's compliance with the Judgment.  Chevron also requests any other relief the Court

deems just and proper.

---

[3]  There is already reason to believe that Donziger is enriching himself from funds raised to pursue enforcement of
the corrupt Ecuadorian judgment.  The UDAPT has publicly denounced Donziger, stating that he is "driven by [his]
greed," is characterized by a "lack of transparency in managing the resources of the people affected," and has "taken
advantage" of the Ecuadorian plaintiffs' lawsuit for his own benefit. Dkt. 1945-2 (Sept. 12, 2017 UDAPT letter).
And he apparently continues to refuse a demand by the UDAPT to account for missing litigation funds. Dkt. 1945-1
(Aug. 20, 2016 UDAPT resolution).

[4]  Separate from discovery related to Donziger's injunction violations, Chevron is currently conducting discovery of
Donziger and various third parties in support of enforcing the Court's February 28, 2018 supplemental judgment
awarding $813,602.71 in taxed costs.  Dkt. 1962.  Donziger does not address this discovery in his Opposition other
than a vague reference to a potential motion to quash.  Opp. at 8.  During attempted meet and confer efforts, howev-
er, it became clear that counsel for some third parties colluded to respond—in nearly verbatim terms—with blanket
refusals to comply with any aspect of Chevron's subpoenas, notwithstanding Chevron's right to seek such discovery
under Federal Rule of Civil Procedure 69(a)(2) and CPLR Rules 5223 and 5224.  *See* Dkt. 1968 at 4.  Donziger him-
self has refused to provide *any* information to Chevron, has interposed objections to virtually all of Chevron's dis-
covery requests, and has informed Chevron that he will refuse to appear for a deposition unless ordered by the
Court.  *See* Declaration of Randy M. Mastro ¶ 4; *id.*, Ex. 8 (Chevron's discovery requests); Ex. 9 (Donziger's objec-
tions).  This is yet another example of Donziger's continued intransigence and refusal to obey this Court's judg-
ments.  Chevron intends to move to compel Donziger to comply with Chevron's discovery requests related to the
supplemental judgment.

# SA214

Dated: May 4, 2018

New York, New York

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

/s/ Randy M. Mastro

Randy M. Mastro
Andrea E. Neuman
200 Park Avenue
New York, New York 10166
Telephone: 212.351.4000
Facsimile: 212.351.4035
Email: RMastro@gibsondunn.com

William E. Thomson
333 South Grand Avenue
Los Angeles, California 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

STERN, KILCULLEN & RUFOLO LLC
Herbert J. Stern
Joel M. Silverstein
325 Columbia Tpke, Ste 110
P.O. Box 992
Florham Park, New Jersey 07932-0992
Telephone:  973.535.1900
Facsimile:  973.535.9664

*Attorneys for Plaintiff Chevron Corporation*

# SA215

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
CHEVRON CORPORATION,                                             :
:
Plaintiff,                                   :
:
v.                                        :     11 Civ. 0691 (LAK)
:
STEVEN DONZIGER, *et al.*,                                       :
:
Defendants.                                  :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### CHEVRON CORPORATION'S MOTION TO COMPEL DONZIGER
### TO RESPOND TO POST-JUDGMENT DISCOVERY REQUESTS

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

STERN, KILCULLEN & RUFOLO LLC
325 Columbia Tpke, Ste 110
P.O. Box 992
Florham Park, New Jersey 07932-0992
Telephone:  973.535.1900
Facsimile:  973.535.9664

*Attorneys for Plaintiff Chevron Corporation*

# SA216

On March 1, 2018, the Court confirmed the Clerk's taxation of costs against Steven Donziger, the Law Offices of Steven Donziger, and Donziger & Associates, PLLC.  Dkt. 1963. A supplemental judgment in the amount of $813,602.71 was entered on February 28, 2018.  Dkt. 1962; Dkt. 1963.  On April 16, 2018, in aid of enforcement of the judgment, Chevron served Donziger with a restraining notice, information subpoena, requests for production of documents, and a deposition notice for May 7, 2018, under Fed. R. Civ. P. 69(a)(2) and CPLR 5223 and 5224.  Ex. 1.[1]  *See* Dkt. 1968 at 4 (noting leave of court not required for discovery in aid of enforcement).  Given his claimed 6.3% stake in the Ecuadorian judgment (Dkt. 1901 at 16) and the fact that Donziger's own clients claim not to have been informed of the extent to which he has personally benefited from the tens of millions of dollars he has raised to support the Ecuadorian litigation and enforcement efforts (Ex. 3 at 3, Exs. 4–6), the discovery includes requests seeking information and documents related to those fundraising efforts.  *See* Ex. 1.

The parties met and conferred on April 27 and May 4, 2018, with Donziger informing Chevron that he would not appear for his May 7 deposition and that he intended to move to quash the discovery requests.  Donziger served objections and responses on April 30, 2018, interposing blanket "general" objections and failing to respond meaningfully to any of Chevron's information requests.  Ex. 2.  Earlier today, Donziger refused to commit to providing any discovery at all, much less to a schedule for providing discovery, absent an order of the Court.

Chevron will continue to meet and confer with Donziger to narrow disputes where possi-

---

[1]   Chevron also served discovery on third parties it reasonably believes have information relevant to Donziger's ability to satisfy the money judgment: Katie Sullivan, Streamline Family Office, Inc., Jonathan Bush, athenahealth, Inc., Joshua Rizack, The Rising Group, and JP Morgan Chase Bank, N.A.  Several of these targets have engaged in what appears to be a coordinated effort to frustrate Chevron's legitimate discovery requests.  In a good-faith attempt to resolve the disputes, Chevron agreed to extend the return dates for some of these third party requests pending the Court's resolution of Donziger's objections regarding the permissible scope of discovery.

# SA217

ble, but the parties are at an impasse on three threshold issues: (1) the appropriate scope of discovery; (2) whether Chevron is entitled to discovery now; and (3) the requirement that Donziger produce not just documents in his possession, but in his possession, custody, or control, including documents in the possession of his current and former agents.

**(1) Scope.** Donziger has taken the position that "[t]he only thing Chevron would be entitled to in a discovery process supporting enforcement of a monetary judgment is a clear picture of [his] available assets and net worth." Ex. 2 at 2. Moreover, he claims even that discovery should be restricted to "a short summary of [his] financial condition and assets, backed up by supporting documents." *Id*.

That is not the law. "The rules governing discovery in postjudgment execution proceedings are quite permissive." *Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250, 2254 (2014); *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 207 (2d Cir. 2012) (broad execution discovery "is the norm in federal and New York state courts"). A judgment creditor is entitled to "a 'very thorough examination' of a judgment debtor with respect to its assets." *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, No. 88 CV 3039 (ILG), 1993 WL 50528, at *1 (E.D.N.Y. Feb. 23, 1993); *see also Banco Central Del Paraguay v. Paraguay Humanitarian Found. Inc.*, No. 01 Civ. 9649 (JFK), 2006 WL 3456521, at *9 (S.D.N.Y. Nov. 30, 2006) ("[E]ven if the discovery request is a 'fishing expedition,' . . . this Court recognized long ago that 'a judgment creditor is entitled to fish for assets of the judgment debtor.'") (citation omitted).

Setting aside that Donziger still has not committed to providing any discovery absent court order, his "vague assurances" of minimal compliance are "simply unacceptable." *Onyemaobi v. Covenant House*, No. 09 Civ. 2434 (PAC), 2011 WL 1044490, at *3–4 (S.D.N.Y. Mar. 21, 2011) ("A party is not permitted to produce only what the party chooses."). Donziger com-

2

# SA218

plains that Chevron is improperly seeking to "learn information about the financing of the pro-

cess of enforcing the Ecuadorian environmental judgment in Canada and elsewhere," Ex. 2 at 2,

but Chevron is entitled to discovery regarding Donziger's ongoing monetization of the Ecuadori-

an judgment as part of the permitted "very thorough" examination of his assets.  Efforts to mone-

tize the judgment benefit Donziger directly, not just through his own percentage interest, but also

through any payments he receives for work on the case and the transfer of shares or other pro-

ceeds obtained by monetizing the judgment to defray his debts, including to compensate his at-

torneys and accountants, and to provide other benefits to himself.  As this Court has found, there

is a direct line between enforcement of the fraudulent Ecuadorian judgment and Donziger receiv-

ing substantial amounts of money.  *See Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 602

(S.D.N.Y. 2014) ("[T]o the extent the Judgment is enforced in the future, Donziger will be en-

riched further at Chevron's expense to the extent of 6.3 percent of the property thus obtained.").

Indeed, Donziger's own purported clients have demanded an accounting of the tens of

millions of dollars he has raised in their name, including following issuance of the RICO judg-

ment, and claim to be uninformed as to how that money has been spent or the extent to which he

has personally benefited.  *See, e.g.*, Ex. 3 at 3 ($25 million); Ex. 4 (noting demand that Donziger

"explain to the affected people how he has managed the funds he has raised on behalf of the

case, and that he continues to raise, abusing the group's name, [because] the group knows noth-

ing about how that money is actually used"); Ex. 5 (Donziger has "failed to" provide "detailed

information about all of the money they have managed that belongs to the UDAPT"); Ex. 6 (Fa-

jardo accusing Donziger of raising funds on behalf of the FDA and LAPs without authority).

Moreover, courts have recognized an expansive approach to post-judgment discovery is

particularly appropriate where, as here, a defendant has "refus[ed] to obey orders of [the] court,"

3

# SA219

such that his "voluntary compliance" with discovery is in doubt. *Greyhound Exhibitgroup, Inc.*, 1993 WL 50528, at *2. Donziger has a long history of non-compliance with discovery and court orders. *See* Dkt. 1529 at 94 ("It is clear that the defendants have 'decided when [they] will be co-operative, and when [they] will not be cooperative, which [they] ha[ve] no right to do.'").

**(2) Timing.** Donziger has thus far refused to commit to providing any discovery absent a court order, arguing that it would be wasteful because there is a "reasonable chance that the underlying judgment will be vacated." Ex. 2 at 1. The Court has confirmed that Chevron is permitted to seek discovery in support of its money judgment ***now***, and Donziger has neither sought a stay of enforcement on appeal nor posted a bond. Dkt. 1968 at 4. Donziger cannot unilaterally exempt himself from the normal requirements of civil litigation.

**(3) Documents in the Possession of Donziger's Agents.** Finally, Donziger objects to the production of documents "not in [his] possession but rather . . . in the possession of purported 'agents[.]'" On May 4, Donziger said that if he provides any discovery at all, he would attempt to get documents from his agents, but that he might not be able to because many no longer work for him. These objections are meritless—discovery extends to all documents within his possession, custody, or control, including those he has the "legal right or the practical ability to obtain." *See Riddell Sports Inc. v. Brooks*, 158 F.R.D. 555, 558 (S.D.N.Y. 1994) (Francis, M.J.) ("If the producing party has the legal right or the practical ability to obtain the documents, then it is deemed to have 'control,' even if the documents are actually in the possession of a non-party.").

For the foregoing reasons, Chevron requests that the Court order Donziger to comply fully with Chevron's discovery requests, including by responding to the information subpoena, producing documents related to his efforts to monetize the judgment, and by producing all documents in his possession, custody, or control.

# SA220

Dated: May 4, 2018                        Respectfully submitted,

New York, New York                        GIBSON, DUNN & CRUTCHER LLP

                                          */s/ Randy M. Mastro*

                                          Randy M. Mastro
                                          Andrea E. Neuman
                                          200 Park Avenue
                                          New York, New York 10166
                                          Telephone: 212.351.4000
                                          Facsimile: 212.351.4035
                                          Email: RMastro@gibsondunn.com

                                          William E. Thomson
                                          333 South Grand Avenue
                                          Los Angeles, California 90071
                                          Telephone: 213.229.7000
                                          Facsimile: 213.229.7520

                                          STERN, KILCULLEN & RUFOLO LLC
                                          Herbert J. Stern
                                          Joel M. Silverstein
                                          325 Columbia Tpke, Ste 110
                                          P.O. Box 992
                                          Florham Park, New Jersey 07932-0992
                                          Telephone:  973.535.1900
                                          Facsimile:  973.535.9664

                                          *Attorneys for Plaintiff Chevron Corporation*

# SA221

*Chevron v. Donziger*, No. 11 Civ. 0691-LAK (S.D.N.Y.)

**Index of Exhibits to Plaintiff Chevron Corporation's Motion to Compel
Donziger to Respond to Post-Judgment Discovery Requests**

Exhibit 1: Chevron Corporation's April 16, 2018 Restraining Notice and Post-Judgment Subpoenas to Steven Donziger

Exhibit 2: Steven Donziger's April 30, 2018 Objections and Responses to Chevron Corporation's April 16, 2018 Post-Judgment Subpoenas

Exhibit 3: PX 7033A: Regular Meeting of the Executive Committee of the UDAPT, Minutes No. 3 dated January 15, 2013 and an English translation thereof

Exhibit 4: March 2, 2018 UDAPT Letter and an English translation thereof

Exhibit 5: August 20, 2016 Declaration by the "Affected Nationalities in the Province of Subumbios" and an English translation thereof

Exhibit 6: Undated Letter from Pablo Fajardo Mendoza of Fromboliere to the President of the Amazon Defense Front and an English translation thereof

# EXHIBIT 2

**SA223**

## STEVEN R. DONZIGER, ESQ.

245 West 104th Street, Suite 7D
New York, New York 10025

212-570-4499 (O)
917-566-2526 (Cell)

April 30, 3018

**VIA EMAIL**

Mr. Randy Mastro
Ms. Anne Champion
Gibson Dunn & Crutcher
200 Park Avenue
New York, NY 10166
rmastro@gibsondunn.com
achampion@gibsondunn.com

*Re: Objections and Responses to Subpoena dated Apr. 16, 2018*

Mr. Mastro and Ms. Champion:

Contained herein are my responses and objections to the subpoena dated April 16, 2018. Please note these are preliminary and subject to the general objections outlined. I suggest we meet and confer again by the end of this week to better identify any areas of dispute prior to the hearing before the district court scheduled for May 8.

**General Objections**

For the sake of efficiency and to avoid repetition, I hereby describe and assert a number of general objections that will be specified in response to specific document requests and "information subpoena" requests or interrogatories (together "requests"). I also provide additional specification as needed in light of the unreasonably short time allowed.

G1.     ***Timing.*** Discovery at this time is not appropriate in light of the fact that the supplemental judgment supposedly justifying discovery is currently on appeal. As a common sense matter, there is no basis to rush ahead with discovery when there remains a reasonable chance that the underlying judgment will be vacated. Nonetheless, despite this objection and without waiving any rights, objections, or defenses, I have in good faith taken a limited number of preliminary steps to collect, review, and organize documents. I provide such responsive information as I am able in light of the objectionable nature of essentially all of Chevron's requests and the timing of the requests.

Mr. Randy Mastro
Ms. Anne Champion
April 30, 2018

G2.  ***Burdensome approach.*** The approach taken by Chevron with its requests is unduly
burdensome. The only thing Chevron would be entitled to in a discovery process
supporting enforcement of a monetary judgment is a clear picture of my available assets
and net worth. Chevron's approach appears predicated on the false presumption that my
finances are so complex and far-flung that it will require significant investigation to
create such a clear picture. In fact, my financial situation is not much more complicated
than that of an average household, and has remained relatively stable over the years.
Furthermore, Chevron has access to substantial information and analysis from the RICO
trial period where it conducted an extensive investigation of my bank records that cover
at least some of the requests that are currently being made. Presently, I have personal
bank accounts, a contingency interest in the Ecuador case, an apartment, a car, and some
property in Florida that I inherited. (Chevron is already aware of the latter as it sent a
lawyer to a legal proceeding relating to these properties.) As soon as possible after
preliminary objections are addressed, I am prepared to provide Chevron with a short
summary of my financial condition and assets, backed up by supporting documents. I can
prepare this summary within a reasonable time taking into account I am operating pro se
and have burdensome responsibilities in my legal practice. If Chevron has concerns or
questions at that point, supported by concrete reason or evidence as opposed to mere
speculation, I obviously will endeavor to be responsive.  In light of the availability of this
more appropriate way to proceed, Chevron's requests are each and all unduly
burdensome and objectionable.

G3.  ***Overbroad and irrelevant.*** Chevron's requests sweep broadly past what is necessary to
establish a clear picture of my available assets and net worth and instead reveal
themselves to be a fishing expedition to learn information about the financing of the
process of enforcing the Ecuadorian environmental judgment in Canada and elsewhere, a
process that the Second Circuit has recognized as valid. Chevron likely seeks this
information to continue its well-documented pattern of initiating a blitzkrieg of SLAPP
litigation on financial and other supporters of the Ecuadorian Indigenous peoples and
communities, in order once again to seek to win by might what it is once again losing by
merit. The obviously strategic purpose behind Chevron's overbroad requests should be
acknowledged and must be rejected. Only requests narrowly tailored to give Chevron a
clear picture of my financial condition are supportable in this post-judgment context, and
very few of Chevron's requests evince such narrow tailoring.

G4.  ***Privilege.*** Many of the requests are objectionable because they appear to call for the
production of information subject to the attorney-client privilege, work product doctrine,
or common interest doctrine privileges, or that otherwise may reflect the opinions,
conclusions, legal theories, mental impressions, or strategic thinking of myself, other
counsel, or other individuals whose assistance was required for the development and
provision of informed advice protected by the attorney-client privilege. Additionally,

2

Mr. Randy Mastro
Ms. Anne Champion
April 30, 2018

should any discovery beyond the sufficient approach I outline above (G2) be required, I object to any production until appropriate protections against waiver (Rule 501(d)) and inadvertent production are in place.

G5.   ***Logistical burden.*** To the extent that extensive document collection, review, and production is required beyond the more appropriate and entirely sufficient approach I outline above (G2), I have limited capacity to undertake the necessary effort and expense. Chevron, as the party requesting the information, must bear the burden by paying a retainer to a discovery or litigation support specialist who will work at my direction and under all applicable privileges.

G6.   ***Control.*** The requests are objectionable to the extent they seek production of documents not in my possession but rather allegedly in my "control" and actually in the possession of purported "agents" including those listed in paragraph 2 of the Instructions. Specifically, my objection is based on facts including that  (1) I do not have "control" over many of the individuals so specified (*e.g.* Joseph Kohn); (2) to my knowledge, none of the individuals have any information responsive to the narrow inquiry about my present financial condition; and (3) to my knowledge, none of the individuals so specified have any documents or information responsive to any of the requests that would not be entirely duplicative of what I possess.

G7.   ***Present knowledge.*** The objections and responses provided here are accurate to the best of my present knowledge and recollection, informed by the diligent (albeit preliminary) inquiry and research into these issues I have been conducting and will continue to conduct. I will amend these objections and responses if I learn of or recall information that materially contradicts anything here.

G8.   ***No waiver.*** By objecting and responding herein, and by producing documents now or later, I expressly do not make any admission or waiver and reserve all rights with respect to any such response or documents, including as to relevance, authenticity, admissibility, privilege, or burden in light of the objections stated made above.

**Objections to Instructions**

I object to the request for production of documents from individuals specified in paragraph 2 of the Instruction for the reasons already described at G6.

Paragraphs 3, 4, 8, 9 and 12 of the Instructions are objectionable as unduly burdensome and requiring assistance as outlined in G5. *See also* G2, G3, G4.

I will note that despite the assertion that "Chevron will meet and confer with YOU to discuss the logistics of production" in paragraph 7 of the Instructions, Chevron did not in fact initiate any

# SA226

Mr. Randy Mastro
Ms. Anne Champion
April 30, 2018

meet-and-confer, and the parties have only conferred in response to communication initiated by me as the return date of the subpoena approached and Chevron had failed to communicate.

## **Specific Objections**

I hereby incorporate by reference all of the General Objections above into these Specific Responses and Objections below.

*Document Requests*

RFP1.    While Chevron may be entitled to some information responsive to this request, the information is more appropriately provided as outlined in G2 and thus this request as stated is unduly burdensome as well as overbroad. G2, G3. I will provide appropriate information responsive to this request as part of the process outlined at G2, when all timing issues have been resolved. G1. Without waiving any of objections, I note that my assets are limited as described at G2. Further, I note that I do not believe I have any foreign assets. G7. To the extent more significant documentation is required, privilege and work product protections must be preserved and Chevron must bear the logistical burden and expense. G4, G5. I am currently collecting, organizing, and reviewing documents, as diligently as a I can given my limited capacity, for potential production once timing issues are resolved. G5, G1. *See also* G7, G8.

RFP2.    Duplicative of RFP1. Same responses and objections. Despite but without waiving any of objections, *see* G7, G8, I note that I do not believe I have any foreign property.

RFP3.    Duplicative of RFP1. Same responses and objections. Despite but without waiving any of objections, *see* G7, G8, I note that I do not believe I have any foreign real estate interests.

RFP4.    Duplicative of RFP1. Same responses and objections. Despite but without waiving any of objections, *see* G7, G8, I note that I do not believe I have any interests in the categories listed, except my contingency interest in the Ecuador case.

RFP5.    Duplicative of RFP1. Same responses and objections. Despite but without waiving any of objections, *see* G7, G8, I note that I do not believe I have inheritance property or interests other than the Florida properties mentioned in G2.

RFP6.    Duplicative of RFP1. Same responses and objections. Despite but without waiving any of objections, *see* G7, G8, I note that I do not believe I have any interest in foreign entities or accounts.

RFP7.    I will provide appropriate information responsive to this request as part of the process outlined at G2. *Also:* G3, G4, G5, G7.

4

Mr. Randy Mastro
Ms. Anne Champion
April 30, 2018

RFP8.    I will provide appropriate information responsive to this request as part of the process
outlined at G2. *Also:* G3, G4, G5, G7.

RFP9.    Overbroad and irrelevant. *See* G3, G4, G7.

RFP10.   I will provide appropriate information responsive to this request as part of the process
outlined at G2. *Also:* G3, G4, G5, G7.

RFP11.   Overbroad and frankly incomprehensible. *Also:* G2, G3, G4, G7.

RFP12.   Same responses and objections as RFP1.

RFP13.   Overbroad and irrelevant, except as it may impact my present net worth. Same
responses and objections as RFP1.

RFP14.   I am able to provide the requested information as soon as preliminary objections are
addressed. Also: G2, G3, G5, G7.

RFP15.   I am able to provide the requested information as soon as preliminary objections are
addressed. Also: G2, G3, G5, G7.

RFP16.   No corporate tax returns.

RFP17.   No corporate tax returns.

RFP18.   Duplicative of RFP1. Same responses and objections.

RFP19.   Duplicative of RFP1. Same responses and objections. Despite but without waiving any
of objections, see G7, G8, I have not received any property "traceable to the Ecuador
Judgment" as I understand that language.

RFP20.   Overbroad and irrelevant. *Also:* G2, G3, G4, G7.

RFP21.   Overbroad and irrelevant. *Also:* G2, G3, G4, G7.

RFP22.   Overbroad and irrelevant. *Also:* G2, G3, G4, G7.

RFP23.   Overbroad and irrelevant. *Also:* G2, G3, G4, G7.

RFP24.   Overbroad and irrelevant. *Also:* G2, G3, G4, G7.

RFP25.   Overbroad and irrelevant. *Also:* G2, G3, G4, G7.

RFP26.   Duplicative of RFP1. Same responses and objections.

# SA228

Mr. Randy Mastro
Ms. Anne Champion
April 30, 2018

RFP27.    Overbroad and irrelevant. *Also:* G2, G3, G4, G7.

RFP28.    Overbroad and irrelevant. *Also:* G2, G3, G4, G7.

RFP29.    Overbroad and irrelevant. *Also:* G2, G3, G4, G7.

RFP30.    Overbroad and irrelevant. *Also:* G2, G3, G4, G7.

RFP31.    Overbroad and irrelevant. *Also:* G2, G3, G4, G7.

RFP32.    Overbroad and irrelevant. *Also:* G2, G3, G4, G7.

RFP33.    Overbroad and irrelevant. *Also:* G2, G3, G4, G7.

RFP34.    Overbroad and irrelevant. *Also:* G2, G3, G4, G7.

RFP35.    Overbroad and irrelevant. *Also:* G2, G3, G4, G7.

RFP36.    Overbroad and irrelevant. *Also:* G2, G3, G4, G7.

RFP37.    Duplicative of RFP1. Same responses and objections.

RFP38.    Overbroad and irrelevant. *Also:* G2, G3, G4, G7.

*Information Subpoena Requests / Interrogatories*

ROG1.    Duplicative of the RFPs. While Chevron may be entitled to some information
responsive to this request, the information is more appropriately provided as outlined
in G2 and thus this request as stated is unduly burdensome as well as overbroad. G2,
G3. I will provide appropriate information responsive to this request as part of the
process outlined at G2, when all timing issues have been resolved. G1. Despite but
without waiving any of objections, I reference my notations and representations
regarding my assets as stated above.

ROG2.    Duplicative of the RFPs. Overbroad. G2, G3. I will provide appropriate information
responsive to this request as part of the process outlined at G2, when all timing issues
have been resolved. G1. *Also:* G3, G4, G5, G7.

ROG3.    Duplicative of the RFPs. Overbroad. G2, G3. I will provide appropriate information
responsive to this request as part of the process outlined at G2, when all timing issues
have been resolved. G1. *Also:* G3, G4, G5, G7.

Case 18-855, Document 91, 03/11/2019, 2515358, Page237 of 303

**SA229**

Mr. Randy Mastro
Ms. Anne Champion
April 30, 2018

ROG4.    Duplicative of the RFPs. Overbroad. G2, G3. I will provide appropriate information responsive to this request as part of the process outlined at G2, when all timing issues have been resolved. G1. *Also:* G3, G4, G5, G7.

ROG5.    Duplicative of the RFPs. Overbroad. G2, G3. I will provide appropriate information responsive to this request as part of the process outlined at G2, when all timing issues have been resolved. G1. *Also:* G3, G4, G5, G7.

ROG6.    Duplicative of the RFPs. Overbroad. G2, G3. I will provide appropriate information responsive to this request as part of the process outlined at G2, when all timing issues have been resolved. G1. *Also:* G3, G4, G5, G7.

ROG7.    Duplicative of the RFPs. Overbroad. G2, G3. I will provide appropriate information responsive to this request as part of the process outlined at G2, when all timing issues have been resolved. G1. *Also:* G3, G4, G5, G7.

ROG8.    Duplicative of the RFPs. Overbroad. G2, G3. I will provide appropriate information responsive to this request as part of the process outlined at G2, when all timing issues have been resolved. G1. *Also:* G3, G4, G5, G7.

ROG9.    Duplicative of the RFPs. Overbroad. G2, G3. I will provide appropriate information responsive to this request as part of the process outlined at G2, when all timing issues have been resolved. G1. *Also:* G3, G4, G5, G7.

ROG10.   Duplicative of the RFPs. Overbroad. G2, G3. I will provide appropriate information responsive to this request as part of the process outlined at G2, when all timing issues have been resolved. G1. *Also:* G3, G4, G5, G7.

ROG11.   Duplicative of the RFPs. Overbroad. G2, G3. I will provide appropriate information responsive to this request as part of the process outlined at G2, when all timing issues have been resolved. G1. *Also:* G3, G4, G5, G7.

ROG12.   Overbroad and irrelevant. *Also:* G2, G3, G4, G7.

ROG13.   Overbroad and irrelevant. Also: G2, G3, G4, G7.

ROG14.   Duplicative of the RFPs. Overbroad. G2, G3. I will provide appropriate information responsive to this request as part of the process outlined at G2, when all timing issues have been resolved. G1. *Also:* G3, G4, G5, G7.

ROG15.   Unknown. G7.

7

# SA230

Mr. Randy Mastro
Ms. Anne Champion
April 30, 2018

ROG16.  Duplicative of the RFPs. Overbroad. G2, G3. I will provide appropriate information responsive to this request as part of the process outlined at G2, when all timing issues have been resolved. G1. *Also:* G3, G4, G5, G7.

ROG17.  Duplicative of the RFPs. Overbroad. G2, G3. I will provide appropriate information responsive to this request as part of the process outlined at G2, when all timing issues have been resolved. G1. Also: G3, G4, G5, G7.

ROG18.  Overbroad and irrelevant. Also: G2, G3, G4, G7. Despite but without waiving any of objections, *see* G7, G8, I have not received any value for any such rights.

ROG19.  Overbroad and irrelevant. Also: G2, G3, G4, G7. Despite but without waiving any of objections, *see* G7, G8, I have not received any value for any such media project.

ROG20.  Duplicative of the RFPs. Overbroad. G2, G3. I will provide appropriate information responsive to this request as part of the process outlined at G2, when all timing issues have been resolved. G1. Also: G3, G4, G5, G7. Despite but without waiving any of objections, *see* G7, G8, I have not received any property "traceable to the Ecuador Judgment" as I understand that language.

ROG21.  Overbroad and irrelevant. Also: G2, G3, G4, G7.

ROG22.  Overbroad and irrelevant. Also: G2, G3, G4, G7.

ROG23.  Overbroad and irrelevant. Also: G2, G3, G4, G7.

ROG24.  Overbroad and irrelevant. Also: G2, G3, G4, G7.

ROG25.  Overbroad and irrelevant. Also: G2, G3, G4, G7.

ROG26.  Overbroad and irrelevant. Also: G2, G3, G4, G7.

ROG27.  Overbroad and irrelevant. Also: G2, G3, G4, G7.

ROG28.  Overbroad and irrelevant. Also: G2, G3, G4, G7.

ROG29.  Overbroad and irrelevant. Also: G2, G3, G4, G7.

ROG30.  Duplicative of the RFPs. Overbroad. G2, G3. I will provide appropriate information responsive to this request as part of the process outlined at G2, when all timing issues have been resolved. G1. Also: G3, G4, G5, G7.

ROG31.  Overbroad and irrelevant. Also: G2, G3, G4, G7.

Mr. Randy Mastro
Ms. Anne Champion
April 30, 2018


After reviewing, please reach out about scheduling another "meet and confer" prior to the
scheduled appearance before the district court.


                                    Sincerely,



                                    _____
                                    Steven R. Donziger

# SA232

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

CHEVRON CORPORATION,

        Plaintiff,

    v.

STEVEN DONZIGER *et al.*,

        Defendants.

11 Civ. 0691 (LAK)

## OPPOSITION TO MOTION TO COMPEL (DKT. 1989)

This filing responds to Chevron's most recent motion to compel (Dkt. 1989). While I address issues raised by Chevron in its motion briefly below, my primary contention is that the issues are moot or potentially moot because I am preparing to post a supersedeas bond that will stay all proceedings on the Court's Supplemental Judgment (Dkt. 1962) pending resolution of my lodged appeal. If I am unsuccessful in the appeal, the bond will be used to satisfy the Supplemental Judgment. Accordingly, Chevron will soon be fully protected and there will remain no basis for discovery into my assets, or those of any other person, in aid of enforcement of the Supplemental Judgment. Because Chevron's discovery requests are now proceeding entirely and exclusively on the aid-of-enforcement basis, those requests should be suspended forthwith and withdrawn as soon as the bond is posted.

The only complication is that the posting of the bond presents some administrative difficulties in that I will need to use a certain inheritance property as collateral for surety payment of the bond. I have been assured that using the services of a bonding company is a workable solution. While I do not yet have a firm estimate of when that process can be completed, I am sure

# SA233

the bond amount can be adjusted to address any concerns Chevron might have about this minor delay, and I will apprise the Court on a regular basis of the progress. I request an administrative stay of all discovery while I diligently pursue the posting of the bond.

To avoid inconvenience on the Court, I asked Chevron to agree to suspend its discovery requests in light of my intention to post a bond and my commitment to provide regular updates on the procedure. Counsel for Chevron refused.

To avoid any possibility of waiver or forfeiture, I also will respond briefly to the other two "threshold" issues (issues 1 and 3) raised by Chevron in its motion to compel. Chevron's first issue, "scope" is not, for the most part, a threshold issue. I have lodged individual relevance, overbreadth, and undue burden objections to Chevron's various requests; should discovery on the Supplemental Judgment ever proceed, the parties should first seek resolution of these objections through the meet-and-confer process rather than seek a resolution from the Court in the abstract.

My proposal to provide Chevron with a descriptive summary or guidance as to my relatively simple financial condition, backed up by documentation, should be seen in the context of this process. I submit that it would be a useful tool for narrowing and obviating the need for many of Chevron's requests. As I offered Chevron, were Chevron to have any concerns or objections as to the summary, it could raise them with me in a meet-and-confer process, and if necessary seek further relief from the Court. The summary/guidance furthermore would be useful to the Court—especially if Chevron is unable to make any specific challenges to it—in deciding on the substance of any particular relevance, overbreadth, or undue burden objections that the parties are unable to resolve privately. Thus my position regarding the proposed summary/guidance is at most a request for a reasonable period of time with which to prepare the summary (again, only if discovery properly proceeds on the Supplemental Judgment, which should

# SA234

not be the case in light of my intention to post a bond).[1]

Chevron's third issue is also not really a threshold issue. There is no legal dispute in the abstract. I do not contest that, where discovery is proceeding appropriately, I am under an obligation to produce documents "within [my] possession, custody, or control, including those [I] ha[ve] the 'legal right or the practical ability to obtain.'" Dkt. 1989 at 4. This fact does not, however, exempt Chevron's discovery requests from the requirement that they be tailored to seek relevant, discoverable information without imposing an undue burden. Documents in the actual possession of other persons, even those I have a legal right or practical ability to obtain, may nonetheless be more burdensome to obtain than documents in my own actual possession. If all that can be shown is that other individuals have identical copies of documents in my actual possession, such as corresponding copies of email correspondence, then it might well be unduly burdensome to require production of such identical copies. Once again, the inquiry here is specific to the individuals and requests involved. Should discovery on the Supplemental Judgment ever need to proceed, the parties should first seek resolution of any such issues through the meet-and-confer process and only involve the Court as necessary to resolve any concrete disputes.

---

[1] I could also begin a rolling production of the most relevant non-privileged responsive documents during this time period, though of course such efforts would take time from the project of preparing the summary/guidance. I submit that it would be most efficient to focus on the summary first, and then begin rolling production as deemed necessary.

# SA235

DATED:      May 10, 2018                    Respectfully submitted,

                                            *s/ Steven R. Donziger*
                                            Steven R. Donziger
                                            245 W. 104th Street, #7D
                                            New York, NY 10025
                                            Tel: (917) 678-3943
                                            Fax: (212) 409-8628
                                            Email: sdonziger@donzigerandassociates.com

                                            *Pro se*
                                            *Counsel to Donziger & Associates, PLLC, and*
                                            *the Law Offices of Steven R. Donziger*

# SA236

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHEVRON CORPORATION,

                              Plaintiff,

           -against-                                           11 Civ. 0691 (LAK)

STEVEN DONZIGER, et al.,

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## ORDER ON MOTION TO
## COMPEL POST-JUDGMENT DISCOVERY

LEWIS A. KAPLAN, *District Judge.*

        Chevron Corporation ("Chevron") holds a money judgment in excess of $800,000 against Steven Donziger, Donziger & Associates PLLC, and others. There is no stay of enforcement of the judgment. Chevron seeks post-judgment discovery. The matter is before the Court on Chevron's motion to compel compliance with its requests.

        Chevron served discovery requests on the Donziger Defendants in April of this year. These included a document request, an information subpoena, and a subpoena *ad testificandum* to take the deposition of Donziger. Donziger objected to every discovery request and ultimately took the position that he would not appear for a deposition. In the main, the discovery requests are directed to identifying assets with respect to which the judgment may be enforced and related matters (the "Money Judgment Discovery").[1] Some requests, however, seek information with respect to whether Donziger has violated paragraph 5 of the March 4, 2014 judgment in this case, which enjoined Donziger and the two Ecuadorian plaintiffs who appeared in this action (the "LAP Representatives") from seeking to monetize or profit from the March 4, 2014 judgment, including by selling, assigning, pledging, transferring or encumbering any interest therein. Those requests (the "Paragraph 5 Compliance Discovery")[2] seek information bearing on the civil contempt motion that the Court ruled upon in some but not all respects in a memorandum opinion dated May 16, 2018 (DI 2006).

---

[1]         The specific document requests that the Court characterizes as Money Judgment Discovery are Requests 1 through 17, 19, 23 through 28 and 30. The specific information subpoena requests included within the term Money Judgment Discovery are paragraphs 1 through 20 and 26-31.

[2]         The specific document requests that the Court deems to be Paragraph 5 Compliance Discovery are Requests 18, 21, 22 and 29. The specific information subpoena requests so deemed are numbers 21 through 25.

# SA237

Chevron then moved to compel compliance and the matter was fully briefed. The Court now has had the benefit of written presentations by both sides and has decides the matter on submission.

Donziger's objections to the Money Judgment Discovery are almost entirely without merit, substantially for the reasons set out by Chevron, although the Court has modified certain of the requests as set forth in Schedule A (modifying aspects of the document request) and Schedule B (modifying aspects of the information subpoena). The Court, however, emphasizes the following points:

1.     Donziger's contention that Chevron should not be permitted to conduct discovery for the purpose of enforcing the money judgment because he has appealed from it is frivolous. He is entitled under Fed. R. Civ. P. 62(d) to a stay of execution upon posting a supersedeas bond. He has not done so in the months since the money judgment was entered. Nor has he attempted to demonstrate that a stay without bond or on different security should be granted as a matter of discretion. *See, e.g., In re Nassau Cnty. Strip Search Cases*, 783 F.3d 414, 417–18 (2d Cir. 2015) (identifying criteria for a stay of execution absent a bond). Accordingly, execution on the judgment is not stayed. Discovery is entirely appropriate.

2.     The contention that the discovery requests are unduly burdensome is entirely unsubstantiated. Moreover, Donziger's suggestion that Chevron is entitled to nothing more than "a short summary of [his] financial condition and assets, backed up by supporting documents" (DI 1989-2, at 2) is without merit. As the record in this case discloses, millions of dollars have passed through Donziger's hands over the years. Much of it is unaccounted for.[3] He has had years in which to move assets around. And it should be borne in mind that he was involved in the creation of an offshore entity, Amazonia Recovery Limited ("Amazonia"), to which he and others intended to funnel any proceeds of the Ecuadorian judgment that was a subject of this action. The trial record gives substantial basis for concluding that the purposes of the formation of Amazonia and its capital structure included placing any judgment proceeds beyond the territorial reach of the Ecuadorian courts to protect against the possibility that those courts would interfere with plaintiffs' "fee splitting" arrangements. Invictus memo, PX 1407, at 27-28; *see also Chevron Corp. v. Donziger*, 974 F. Supp. 2d at 528 (discussing Invictus Memo more generally). And it is reasonable to infer that the creation of Amazonia was intended also to place those proceeds beyond the reach of U.S. courts or, at least, to complicate efforts to reach them. Thus, there already is a record of willingness on the part of Donziger to shift assets in which he has an interest into foreign locations to avoid what he may regard as judicial "interference."

3.     Donziger's contention that he cannot or should not be compelled to furnish documents and information that are within his control but not in his immediate physical possession is frivolous. *E.g., Chevron Corp. v. Donziger*, 296 F.R.D. 168, 189 (S.D.N.Y. 2013).

The Court has concluded also that Chevron is entitled to appropriate Paragraph 5

---

[3]     *E.g., Chevron Corp. v. Donziger*, 2018 WL 1137119, at *8-9 (S.D.N.Y. Mar. 1, 2018).

Case 1:11-cv-00691-LAK-JCF Document 2009 Filed 05/17/18 Page 3 of 5
Case 18-855, Document 94, 03/11/2019, 2515258, Page 246 of 303

SA238

3

Compliance Discovery. (DI 2006, at 14). The Court, however, will defer ruling on the specific discovery requests that constitute the Paragraph 5 Compliance Discovery for the time being in the expectation that the hearing with respect to the Elliott Management matter, which is scheduled to begin on May 22, 2018, will be completed swiftly.

Finally, having reviewed the various discovery requests, request numbers 8, 9, 11 and 12 of the document request and item 11 of the information subpoena are modified to read as set forth in Schedules A and B attached to this order, respectively. Request number 15 of the document request is stricken.

Chevron's motion [DI 1989] to compel Donziger to comply is granted to the following extent.

1.    The Donziger Defendants, on or before June 15, 2018, shall comply fully with all of the Money Judgment Discovery Requests, as modified by this order, that are contained in Chevron's First Set of Requests for Production of Documents in Aid of the Supplemental Judgment ("the "RFP"). Full compliance includes, but is not limited to, production of all responsive documents within their possession, custody or control.

2.    The Donziger Defendants, on or before June 15, 2018, shall answer fully all of the Money Judgment Discovery Requests, as modified by this order, that are contained in Chevron's First Information Subpoena in Aid of the Supplemental Judgment (the "Information Subpoena"). Full compliance includes, but is not limited to, production of all responsive documents within their possession, custody or control.

3.    Donziger shall appear for and testify pursuant to Chevron's Subpoena *ad testificandum*. The deposition pursuant to the AT Subpoena shall commence on a date mutually agreed by the parties or, if no agreement is reached, on May 29, 2018 and, if complete responses to the RFP and the Information Subpoena, both as modified, have not been furnished before that date, may be adjourned until after that occurs. Any such adjourned date shall be fixed by mutual agreement of the parties or, if no agreement is reached, by the Court.

The Court defers decision with respect to the Paragraph 5 Compliance Discovery. The oral argument previously set for May 21, 2018 is cancelled.

SO ORDERED.

Dated:      May 17, 2018

_____
Lewis A. Kaplan
United States District Judge

Case 18-855, Document 94, 03/11/2019, 2515258, Page247 of 303

**SA239**

### SCHEDULE A

(Modifying Chevron Corporation's First Set of Requests for Production of Documents in Aid of the Supplemental Judgment to Defendants Steven Donziger, The Law Offices of Steven R. Donziger, and Donziger & Associates, PLLC)

8.      All DOCUMENTS that are or contain balance sheets, income statements, inventories and/or profit and loss statements showing YOUR ASSETS, PROPERTY, expenses, and/or liabilities, dated on or after the issuance of the Court's March 4, 2014 Judgment (Dkt. 1875), as modified.

9.      All DOCUMENTS evidencing or relating to any claims, lawsuits, proceedings, liens or demands that have been threatened and/or filed by YOU since the issuance of the Court's March 4, 2014 Judgment (Dkt. 1875), as modified.

11.     All DOCUMENTS evidencing the source, date, and amount of any means by which YOU, since March 4, 2014, have transferred, paid, or received property equal to or in excess of $2,000 in value.

12.     All DOCUMENTS evidencing or relating to any sale, assignment, pledge, gift, encumbrance, or other disposition by you of property since the issuance of the Court's March 4, 2014 Judgment (Dkt. 1875), as modified.

# SA240

## SCHEDULE B

(Modifying Chevron Corporation's First Information Subpoena in Aid of the Supplemental Judgment and Restraining Notice fto Defendants Steven Donziger, The Law Offices of Steven R. Donziger, and Donziger & Associates, PLLC)

11.     Identify the source, date, and amount of any means by which YOU, since March 4, 2014, have transferred, paid, received, or conducted any financial transactions in an amount or having a value of more than $2,000.

## SA241

### COURT OF APPEAL FOR ONTARIO

CITATION: Yaiguaje v. Chevron Corporation, 2018 ONCA 472
DATE: 20180523
DOCKET: C63309 and C63310

Hourigan, Huscroft and Nordheimer JJ.A.

BETWEEN

Daniel Carlos Lusitande Yaiguaje, Benancio Fredy Chimbo Grefa, Miguel Mario Payaguaje Payaguaje, Teodoro Gonzalo Piaguaje Payaguaje, Simon Lusitande Yaiguaje, Armando Wilmer Piaguaje Payaguaje, Angel Justino Piaguaje Lucitante, Javier Piaguaje Payaguaje, Fermin Piaguaje, Luis Agustin Payaguaje Piaguaje, Emilio Martin Lusitande Yaiguaje, Reinaldo Lusitande Yaiguaje, Maria Victoria Aguinda Salazar, Carlos Grefa Huatatoca, Catalina Antonia Aguinda Salazar, Lidia Alexandria Aguinda Aguinda, Clide Ramiro Aguinda Aguinda, Luis Armando Chimbo Yumbo, Beatriz Mercedes Grefa Tanguila, Lucio Enrique Grefa Tanguila, Patricio Wilson Aguinda Aguinda, Patricio Alberto Chimbo Yumbo, Segundo Angel Amanta Milan, Francisco Matias Alvarado Yumbo, Olga Gloria Grefa Cerda, Narcisa Aida Tanguila Narvaez, Bertha Antonia Yumbo Tanguila, Gloria Lucrecia Tanguila Grefa, Francisco Victor Tanguila Grefa, Rosa Teresa Chimbo Tanguila, Maria Clelia Reascos Revelo, Heleodoro Pataron Guaraca, Celia Irene Viveros Cusangua, Lorenzo Jose Alvarado Yumbo, Francisco Alvarado Yumbo, Jose Gabriel Revelo Llore, Luisa Delia Tanguila Narvaez, Jose Miguel Ipiales Chicaiza, Hugo Gerardo Camacho Naranjo, Maria Magdalena Rodriguez Barcenes, Elias Roberto Piyahuaje Payahuaje, Lourdes Beatriz Chimbo Tanguila, Octavio Ismael Cordova Huanca, Maria Hortencia Viveros Cusangua, Guillermo Vincente Payaguaje Lusitande, Alfredo Donaldo Payaguaje Payaguaje and Delfin Leonidas Payaguaje Payaguaje

Plaintiffs (Appellants)

and

Chevron Corporation, Chevron Canada Limited and Chevron Canada Finance Limited

Defendants (Respondents)

Case 18-855, Document 94, 03/11/2019, 2515258, Page249 of 303

Case 18-855, Document 94, 03/11/2019, 2515258, Page250 of 303

Alan Lenczner, Brendan Morrison, Kirk Baert and Celeste Poltak, for the appellants (see Schedule I)

Peter Grant, for the appellants (see Schedule II)

Benjamin Zarnett, Suzy Kauffman and Peter Kolla, for the respondent Chevron Canada Limited

Larry P. Lowenstein, Laura K. Fric, Clarke Hunter and Robert Frank, for the respondent Chevron Corporation

Terrence O'Sullivan and Paul Michell, for Chevron Canada Capital Company

Heard: April 17 and 18, 2018

On appeal from the judgments of Justice Glenn A. Hainey of the Superior Court of Justice, dated January 20 and 25, 2017, with reasons reported at 2017 ONSC 135 and 2017 ONSC 604 respectively, and from the costs order dated May 26, 2015.

**Hourigan J.A.:**

**A.   OVERVIEW**

[1]   The appellants are indigenous peoples of the Orienté region of the Republic of Ecuador. During the period from 1964 to 1992, oil exploration and extraction were undertaken on their traditional lands. The result was extensive environmental pollution of the area.

[2]   One of the corporations involved in the oil operations was an indirect subsidiary of Texaco Inc. ("Texaco"). The Texaco subsidiary left Ecuador when its oil project was completed, in 1992. Since 2001, Texaco has been part of the global conglomerate Chevron Corporation. Chevron Corporation is a public company with its head office in California. Its principal business is holding shares in its subsidiary corporations and managing those investments. It owns 100 percent of the shares

Case 18-855, Document 94, 03/11/2019, 2515258, Page251 of 303

of its direct subsidiary, Chevron Investments Inc., which was also incorporated in the United States. Chevron Investments Inc. owns 100 percent of the shares of its own direct subsidiary, and so on down the corporate chain.

[3]     The appellants first sought compensation for the environmental devastation through a class action in the United States. Texaco opposed that action, not on the merits, but on jurisdictional grounds. It was successful and ultimately the appellants commenced a new action in the Ecuadorian courts. There followed an eight-year trial and two appeals. The eventual result was a $9.5 billion USD judgment against Chevron Corporation.

[4]     The difficulty was that Chevron Corporation had no assets in Ecuador. So the appellants took the next logical step of seeking enforcement of their judgment in the United States. In its home jurisdiction, Chevron Corporation opposed the enforcement of the judgment on the ground that it had been obtained by fraud.

[5]     The United States District Court for the Southern District of New York ("S.D.N.Y.") accepted Chevron Corporation's submission. In a comprehensive judgment, the court detailed a litany of fraudulent behaviour, not by the appellants, but by their counsel in the Ecuadorian proceeding. The court made an order enjoining any enforcement proceedings of the Ecuadorian judgment in the United States. That decision was upheld on appeal.

Case 18-855, Document 94, 03/11/2019, 2515258, Page252 of 303

[6]    Having had no success in enforcing their judgment in the United States, the appellants commenced the present action in the Ontario Superior Court of Justice. The enforcement targets this time were the shares and assets of Chevron Canada Limited ("Chevron Canada"), a seventh-level subsidiary of Chevron Corporation, with its head office in Calgary. After a jurisdictional challenge by Chevron Corporation and Chevron Canada that was ultimately rejected by the Supreme Court of Canada, the parties agreed to determine by means of a summary judgment motion the issue of whether Chevron Canada's shares and assets are exigible to satisfy the judgment debt of Chevron Corporation. Chevron Corporation and Chevron Canada were successful on that motion.

[7]    On appeal to this court, the appellants advance two primary submissions. First, they argue that the *Execution Act*, R.S.O., 1990, c. E.24 (the "*Act*"), permits execution on Chevron Canada's shares and assets to satisfy the Ecuadorian judgment. Second, and in the alternative, they submit that this court should pierce the corporate veil in order to render Chevron Canada's shares and assets exigible.

[8]    This is a tragic case. There can be no denying that, through no fault of their own, the appellants have suffered lasting damages to their lands, their health, and their way of life. Their frustration in obtaining justice is understandable. Notwithstanding those legitimate concerns, our courts must decide cases in a manner that is consistent with the common law as developed in our jurisprudence and the statutes enacted by our democratically elected legislatures.

Case 18-855, Document 94, 03/11/2019, 2515258, Page253 of 303

[9]    The legal arguments advanced by the appellants cannot succeed. They urge upon us an interpretation of the *Act* that finds no support in the wording of the legislation or its jurisprudence. If this court endorsed this interpretation it would result in significant changes to fundamental principles of our corporate law and the law of execution. It would also create new substantive rights arising from what is supposed to be a purely procedural statute.

[10]    Nor can the appellants' alternative argument, that this court should ignore the corporate separateness of Chevron Corporation and Chevron Canada, succeed. They submit that our courts have an equitable ability to pierce the corporate veil whenever it appears just. That is not the law in this province. Indeed, this submission ignores more than twenty years of jurisprudence. The appellants cannot bring themselves within the existing two-part test for piercing the corporate veil, as they do not even attempt to address the second part of the test. Moreover, they proffer no principled basis for piercing the corporate veil other than the assertion that we should do so in the interests of justice.

[11]    What is really driving the appellants' appearance in our courts is their inability to enforce their judgment in the United States. This is not a case where a judgment debtor does not have sufficient assets available to pay the judgment debt. In the ordinary course, enforcement of a judgment against a parent corporation judgment debtor, including against its shares held in subsidiaries, is a routine matter. It is only because of the court order in the United States that

Case 18-855, Document 94, 03/11/2019, 2515258, Page254 of 303

enforcement measures are not being pursued there, and that the appellants are asking us to radically alter our law.

[12]   In the result, I would dismiss the appeals from the motion judge's orders, save for his costs award. I would grant leave to appeal the costs order and reduce the amounts awarded in accordance with these reasons.

## B.   HISTORY OF PROCEEDINGS

[13]   The dispute among the parties has a long and complex history. The following summary provides sufficient context to consider the issues raised on these appeals. As numerous relevant events occurred in overlapping timeframes, my review of the proceedings will not be strictly chronological.

### (1) TexPet drills in Ecuador and the plaintiffs bring the initial U.S. action

[14]   In 1964, the Republic of Ecuador granted TexPet, an indirect subsidiary of Texaco, as well as another oil company, a concession to explore for and extract oil from the Orienté region of Ecuador. In 1973, Ecuador's state-owned oil company, PetroEcuador, joined the consortium and soon thereafter became its majority owner. In 1992, when TexPet's concession came to an end, TexPet began winding down its operations.

[15]   In 1993, a group of Ecuadorian plaintiffs, the current appellants, brought a class action against Texaco in New York. Among the appellants' counsel was American lawyer Steven Donziger. The S.D.N.Y. eventually dismissed this action

Case 18-855, Document 94, 03/11/2019, 2515258, Page255 of 303

on the basis of *forum non conveniens* and international comity: *Aguinda v. Texaco, Inc.*, 142 F.Supp.2d 534 (S.D.N.Y. 2001). The United States Court of Appeals for the Second Circuit ("2nd circ.") upheld the dismissal, in part because Texaco agreed to commit to the jurisdiction of the Ecuadorian courts: *Aguinda v. Texaco, Inc.*, 303 F.3d 470 (2d Cir. 2002).

**(2) The appellants obtain judgment against Chevron Corporation in Ecuador**

[16]   In 2001, Texaco merged with Chevron Corporation. In 2003, the appellants brought an action against Chevron Corporation in Ecuador both in their names and on behalf of some 30,000 Ecuadorian indigenous villagers from the Orienté region. Mr. Donziger was again among the appellants' lawyers. The appellants sought damages and remediation for the environmental harm that TexPet's oil operations allegedly caused.

[17]   After lengthy proceedings, Judge Zambrano of the Provincial Court of Justice of Sucumbíos entered a judgment against Chevron Corporation for approximately $17 billion. That amount included about $8.6 billion in punitive damages to be paid unless Chevron Corporation issued a public apology within 15 days of the judgment. Chevron Corporation did not apologize. The Appellate Division of the Provincial Court upheld the judgment. In 2013, the National Court of Justice, Ecuador's highest court, reduced the award to $9.5 billion, as

Case 18-855, Document 94, 03/11/2019, 2515258, Page256 of 303

Ecuadorian law did not contemplate awarding punitive damages where a tortfeaser failed to publicly apologize.

### (3) Chevron files an action in New York, contending that the Ecuadorian judgment was obtained by fraud

[18]   On February 1, 2011, Chevron filed an action in New York against the appellants[1], Mr. Donziger, and other individuals and entities involved with his legal team, seeking damages and a global injunction against the enforcement of Ecuadorian judgment. Chevron Corporation alleged that Mr. Donziger and his legal team obtained the Ecuadorian judgment fraudulently by, among other things, submitting false evidence, ghostwriting the judgment, and bribing Judge Zambrano to sign it.

[19]   In March of that year, Judge Kaplan of the S.D.N.Y. granted preliminary relief in the form of a global injunction with respect to the enforcement of the Ecuadorian judgment: *Chevron Corp. v. Donziger*, 768 F.Supp.2d 581 (S.D.N.Y. 2011). In 2012, however, the 2nd circ. overturned the injunction and held that the appellants could seek to enforce the Ecuadorian judgment in any country where Chevron Corporation had assets: *Chevron Corp. v. Naranjo*, 667 F.3d 232 (2d Cir. 2012).

---

[1] Two of the appellants answered and defended the action, Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje. A certificate of default was entered against the rest of the appellants.

Case 18-855, Document 94, 03/11/2019, 2515258, Page257 of 303

### (i)      Judge Kaplan rules that the Ecuadorian judgment was obtained by fraud

[20]   The action proceeded to a full bench trial in the S.D.N.Y. before Judge Kaplan. By that time, five causes of action remained, including the allegation that Mr. Donziger and his team engaged in fraud and civil conspiracy. In addition, Chevron had waived all claims for damages and sought only equitable relief. On March 4, 2014, Judge Kaplan released a lengthy decision with extensive and detailed factual findings: *Chevron Corp. v. Donziger*, 974 F.Supp.2d 362 (S.D.N.Y. 2014). He ultimately found that Mr. Donziger and his team corrupted the Ecuadorian proceedings. He summarized his findings at the outset of his decision, at p. 384:

> They coerced one judge, first to use a court-appointed, supposedly impartial, "global expert" to make an overall damages assessment and, then, to appoint to that important role a man whom Donziger hand-picked and paid to "totally play ball" with the [appellants]. They then paid a Colorado consulting firm secretly to write all or most of the global expert's report, falsely presented the report as the work of the court-appointed and supposedly impartial expert, and told half-truths or worse to U.S. courts in attempts to prevent exposure of that and other wrongdoing. Ultimately, the [appellants'] team wrote the [Ecuadorian] court's Judgment themselves and promised $500,000 to the Ecuadorian judge to rule in their favor and sign their judgment.

[21]   Judge Kaplan held that Chevron Corporation was entitled to equitable relief as the record established both corruption and coercion of judges: p. 558. Even

Case 18-855, Document 94, 03/11/2019, 2515258, Page258 of 303

absent the bribery, ghostwriting the judgment and misrepresenting the nature of the expert report constituted fraud: pp. 560-66. Judge Kaplan imposed a constructive trust for Chevron Corporation's benefit on Mr. Donziger's contractual and other rights to fees and payments and issued injunctive relief to ensure that Mr. Donziger will never benefit in any material way from the Ecuadorian judgment. He also ordered Mr. Donziger and the other defendants in that action to pay over and assign to Chevron Corporation all fees and other payments and benefits that they had received or will receive as a result of the Ecuadorian judgment: pp. 639-41. Finally, Judge Kaplan enjoined the defendants in that action from initiating any enforcement proceedings of the Ecuadorian judgment in the United States: pp. 641-44.

### (ii)    Judge Kaplan's decision is upheld on appeal

[22]    The 2nd circ. upheld Judge Kaplan's decision in 2016: *Chevron Corporation v. Donziger*, 833 F.3d 74 (2d Cir. 2016). In 2017, the Supreme Court of the United States denied the petition for writ of *certiorari*: *Donziger v. Chevron Corp.*, 137 S.Ct. 2268.

### (4) The appellants commence proceedings in Ontario

[23]    In 2012, the appellants commenced an action in the Ontario Superior Court of Justice for the recognition and enforcement of the Ecuadorian judgment. The action was originally commenced against Chevron Corporation, Chevron Canada,

Case 18-855, Document 94, 03/11/2019, 2515258, Page259 of 303

and Chevron Canada Finance Limited. It was discontinued against the last corporation.

[24]   In their Amended Statement of Claim, the appellants sought against Chevron Canada, *inter alia*, the Canadian equivalent of approximately $18.2 billion US resulting from the Ecuadorian judgment (later reduced to reflect the National Court of Justice's ruling); a declaration that Chevron Canada's shares and assets are exigible to satisfy the Ecuadorian judgment if enforced in Ontario; and the appointment of an equitable receiver over Chevron Canada's shares and assets.

### (i)      The proceedings involving jurisdiction

[25]   In response to the Amended Statement of Claim, Chevron Corporation and Chevron Canada brought motions seeking a declaration that the Ontario court had no jurisdiction to hear the action. Brown J., then of the Superior Court of Justice, heard the motions: *Yaiguaje v. Chevron Corporation*, 2013 ONSC 2527, 361 D.L.R. (4th) 489. He concluded that the Ontario court had jurisdiction to recognize and enforce the Ecuadorian judgment. However, he also found that this was an appropriate case in which to exercise the court's power to stay the proceedings pursuant to s. 106 of the *Courts of Justice Act*, R.S.O. 1990, c. C.43.

[26]   Among his reasons for the stay was his finding that there was no basis for asserting that Chevron Canada's assets were Chevron Corporation's assets for the purposes of satisfying the Ecuadorian judgment. Nor was there a legal basis

Case 18-855, Document 94, 03/11/2019, 2515258, Page260 of 303

for piercing Chevron Canada's corporate veil. He thus concluded that there was "nothing in Ontario to fight over", and no reason to allow the claim to proceed: para. 111.

[27]   The appellants appealed the stay, and Chevron Corporation and Chevron Canada cross-appealed the jurisdictional ruling. This court affirmed that the Ontario court had jurisdiction, but reversed the imposition of the stay: *Yaiguaje v. Chevron Corporation*, 2013 ONCA 758, 118 O.R. (3d) 1. This court noted that the only issue at that juncture of the proceedings was jurisdiction; issues concerning Chevron Canada's corporate veil could be properly addressed in later proceedings: para. 39.

[28]   The matter reached the Supreme Court of Canada, which confirmed that the Ontario court had jurisdiction: *Chevron Corp. v. Yaiguaje*, 2015 SCC 42, [2015] 3 S.C.R. 69. Gascon J., writing for the court, was careful to indicate that his reasons "should not be understood to prejudice future arguments with respect to the distinct corporate personalities of Chevron [Corporation] and Chevron Canada" and that the court took "no position on whether Chevron Canada can properly be considered a judgment-debtor to the Ecuadorian judgment" (para. 95). As jurisdiction was the only issue in these proceedings, Gascon J. noted that Brown J.'s findings concerning the separate corporate personalities of Chevron Corporation and Chevron Canada were not entitled to deference.

Case 18-855, Document 94, 03/11/2019, 2515258, Page261 of 303

**(5) The judgments under appeal**

[29]   Following the Supreme Court of Canada's decision on jurisdiction, Chevron Corporation and Chevron Canada filed Statements of Defence in the action. Chevron Corporation's defences included that the Ecuadorian judgment could not be recognized or enforced in Ontario because, as Judge Kaplan found in 2014, it was obtained by fraudulent means. The appellants moved to strike Chevron Corporation's defences. Hainey J. granted that motion in part, striking certain paragraphs that he found contained impermissible defences. That portion of Hainey J.'s ruling is not at issue on this appeal.[2]

### (i)   Justice Hainey dismisses the appellants' claim against Chevron Canada

[30]   The appellants did not allege any wrongdoing against Chevron Canada, nor did they allege that the corporate structure of which Chevron Canada is a part was designed or used as an instrument of fraud or wrongdoing. They pleaded that Chevron Corporation wholly owned and controlled Chevron Canada, and beneficially owned Chevron Canada's assets. As such, Chevron Canada's assets were exigible pursuant to s. 18(1) of the *Act*, since they represented "any legal, equitable or other right...whether direct or indirect" of Chevron Corporation.

---

[2] Leave to appeal this part of Hainey J.'s ruling to the Divisional Court was denied: *Yaiguaje v. Chevron Corporation*, 2017 ONSC 2251, 278 A.C.W.S. (3d) 229.

**SA254**

Page: 14

Case 18-855, Document 94, 03/11/2019, 2515258, Page262 of 303

[31]   Chevron Corporation and Chevron Canada each moved for summary dismissal with respect to the appellants' claim against Chevron Canada. They submitted that Chevron Canada's shares and assets were not exigible pursuant to the *Act*, and that there was no basis to pierce the corporate veils between Chevron Canada and its indirect parent Chevron Corporation so that Chevron Canada's shares and assets could be available to satisfy the Ecuadorian judgment.

[32]   Hainey J. heard the motions for summary judgment: *Yaiguaje v. Chevron Corporation*, 2017 ONSC 135, 136 O.R. (3d) 261. He articulated the issues to be decided upon the motions as follows, at para. 23:

> (1) Are the shares and assets of Chevron Canada exigible and available for execution and seizure pursuant to the *Execution Act* to satisfy the Ecuadorian judgment against Chevron?
>
> (2) If they are not, should Chevron Canada's corporate veil be pierced so that its shares and assets are available to satisfy the Ecuadorian judgment against its indirect parent, Chevron?

Hainey J. answered both questions in the negative and dismissed the appellants' claim against Chevron Canada.

[33]   The appellants' principal submission before Hainey J., as it is on appeal, was that Chevron Canada is an asset of Chevron Corporation that is exigible and available for execution and seizure. They argued that the broad wording of the *Act* permits the sheriff to seize any property in which a judgment debtor has a direct or indirect legal or beneficial interest. According to the appellants, Chevron

Case 18-855, Document 94, 03/11/2019, 2515258, Page263 of 303

Corporation has an indirect beneficial interest in Chevron Canada because Chevron Corporation is "the sole owner of the shares of Chevron Canada…through the 100 [percent] ownership of cascading intermediary subsidiaries which carry on no business."

[34]   Hainey J. rejected this submission. He noted that Chevron Corporation does not own the shares of Chevron Canada. Rather, all of Chevron Canada's shares are owned by its direct parent, Chevron Canada Capital Company ("CCCC"). Hainey J. held that Chevron Canada was not an asset of Chevron Corporation, or indeed any other person or corporation, including CCCC. He further found that the *Act* is a procedural statute that "does not create any rights in property but merely provides for the seizure and sale of property in which a judgment-debtor already has a right or interest". On a plain reading of the *Act*, nothing in it "override[s] or supplant[s] the long-established principle of corporate separateness." As such, the *Act* did not give Chevron Corporation any right or interest in the shares or assets of Chevron Canada: paras. 37, 47. Absent a finding that Chevron Canada's corporate veil should be pierced, Chevron Canada's shares and assets were not exigible to satisfy the Ecuadorian judgment.

[35]   Hainey J. also rejected the appellants' submission that the principle of corporate separateness should not apply in this case. He held that the principle "has been recognized and respected since the 1896 decision of the House of Lords in *Salomon v. Salomon & Co*" (para. 58, citing [1897] A.C. 22 (H.L. (Eng.)). Further,

Case 18-855, Document 94, 03/11/2019, 2515258, Page264 of 303

he found that the principle applies equally to groups of companies, like Chevron Corporation's group of companies of which Chevron Canada is a part.

[36]   Because the principle of corporate separateness applied to Chevron Corporation and Chevron Canada, Hainey J. held that the appellants had to meet the test for piercing Chevron Canada's corporate veil, established in *Transamerica Life Insurance Co. of Canada v. Canada Life Assurance Co.*, (1996), 28 O.R. (3d) 423 (Gen. Div.), affirmed: (1997) 74 A.C.W.S. (3d) 207 (Ont. C.A.). That case held, at pp. 433-34, that "courts will disregard the separate legal personality of a corporate entity where it is completely dominated and controlled and being used as a shield for fraudulent or improper conduct." The appellants did not allege that the corporate structure of which Chevron Canada is a part was designed or used as an instrument of fraud or wrongdoing. This was fatal to their claim: para. 65.

[37]   Hainey J. also held that the appellants failed to establish that Chevron Corporation had "total effective control" over Chevron Canada to meet the first part of the *Transamerica test*. That test requires more than ownership, but "complete domination of the subsidiary corporation" such that the subsidiary does not function independently or is a "puppet" of the parent: paras. 69, 72.

[38]   Finally, Hainey J. rejected the appellants' argument that corporate separateness should not be applied where it will yield a result "too flagrantly opposed to justice." In his view, the jurisprudence established that courts do not

Case 18-855, Document 94, 03/11/2019, 2515258, Page265 of 303

have a *carte blanche* to pierce the corporate veil where it appears just to do so, absent fraudulent or improper conduct: paras. 66-68.

### (ii)   The motion to add CCCC as a party

[39]   Over a month after arguments concluded on the summary judgment motions, the appellants brought a motion to further amend their Amended Statement of Claim to add CCCC as a defendant. Hainey J. dismissed this motion: *Yaiguaje v. Chevron Corporation*, 2017 ONSC 604, 275 A.C.W.S. (3d) 729. He held that, because the appellants sought the same relief against CCCC as they did against Chevron Canada, their claim against CCCC could not succeed for the same reasons that it could not against Chevron Canada. Hainey J. further held that the appellants did not establish that the courts of Ontario would have jurisdiction over CCCC, a company incorporated in Nova Scotia with no assets or operations in Ontario.

### (iii)   The costs order

[40]   Hainey J. awarded costs on a partial indemnity basis in the amounts of $533,001.81 to Chevron Canada and $313,283 to Chevron Corporation: *Yaiguaje v. Chevron Corporation*, 2017 ONSC 3217 (unreported: (26 May 2017), Toronto CV-12-9808-00CL).

[41]   Hainey J. noted that the "ordinary rule is that a successful party receives its costs on a partial indemnity scale." Given the high stakes of the litigation, the

Case 18-855, Document 94, 03/11/2019, 2515258, Page266 of 303

various theories the appellants advanced, and the appellants' numerous requests for additional discovery and cross-examination, it was reasonable for the appellants to expect Chevron Corporation and Chevron Canada to expend significant resources to defend the claims.

[42]   Hainey J. rejected the appellants' submissions that he should award no or only nominal costs because the appellants' action raised novel points of law that were in the public interest. He adopted Chevron Canada's submissions that this would "detract from the finding that there was no legal basis to involve Chevron Canada in this high stakes litigation." He also rejected that the appellants' claim against Chevron Canada was analogous to a class proceeding to which s. 31(1) of the *Class Proceedings Act*, *1992*, S.O. 1992, c. 6 applied. In any event, the appellants' claim was not a test case, did not raise a novel point of law, and was not in the public interest.

[43]   As the appellants were partially successful on their motion to strike Chevron Corporation's defences, Hainey J. reduced Chevron Corporation's claim for costs by $50,000.

**(6) Proceedings for security for costs in this court**

[44]   When the appellants appealed to this court from Hainey J.'s orders, Chevron Corporation and Chevron Canada sought an order for security for costs totalling over $1 million. The motion judge concluded that the appellants had demonstrated

Case 18-855, Document 94, 03/11/2019, 2515258, Page267 of 303

neither impecuniosity, nor that third party litigation funding was unavailable. Nor had they demonstrated that their appeal had a strong chance of success. Thus, the motion judge ordered security for costs in the amount of $591,335.14 for Chevron Canada, and $351,616.33 for Chevron Corporation: *Yaiguaje v. Chevron Corporation*, 2017 ONCA 741, 137 O.R. (3d) 729.

[45]    A three-judge panel of this court set aside the motion judge's ruling: *Yaiguaje v. Chevron Corporation*, 2017 ONCA 827, 138 O.R. (3d) 1. The panel held that, in deciding motions for security for costs, "judges are obliged to first consider the specific provisions of the Rules governing those motions and then effectively to take a step back and consider the justness of the order sought in all the circumstances of the case, with the interests of justice at the forefront" (para. 22). As the motion judge failed to undertake the second part of this analysis, it fell to the panel to evaluate the justness of the order.

[46]    The panel concluded that, in the unique circumstances of this litigation, the interests of justice required that no order for security for costs be made. While the appellants' legal arguments were "innovative and untested", this did not foreclose the possibility that one or more of them may eventually prevail. It could not be said at that stage that the case was wholly devoid of merit. Moreover, given the nearly 25-year history of this litigation, the panel found it "difficult to accept that the motion for security for costs was anything more than a measure intended to bring an end to the litigation" (para. 26).

Case 18-855, Document 94, 03/11/2019, 2515258, Page268 of 303

## C.   ISSUES

[47]   These appeals raise the following issues:

(1) Did Hainey J. err in his interpretation of the *Act*, such that Chevron Canada's shares and assets are exigible to satisfy the judgment debt of Chevron Corporation?

(2) Did Hainey J. err in failing to pierce the corporate veil?

(3) Did Hainey J. err in dismissing the motion to add CCCC as a party?

(4) Should the appellants' motion to tender fresh evidence on appeal be granted?

(5) Should leave to appeal the costs order be granted and, if so, should this court interfere with the costs order?

## D.   ANALYSIS

## (1) The *Execution Act*

[48]   At the outset, it is necessary to address the appellants' submission to the effect that, because this case involves the enforcement of a foreign judgment, this court must, for reasons of comity, interpret the *Act* in an especially expansive manner to facilitate the collection of the debt.

[49]   A foreign judgment is evidence of a debt. Absent the establishment of one of the limited defences available to a judgment debtor, an enforcing court in Canada need only be satisfied that it was issued by a court of competent

Case 18-855, Document 94, 03/11/2019, 2515258, Page269 of 303

jurisdiction, that it is final, and that the amount of the judgment is correct. Thus satisfied, "the enforcing court then lends its judicial assistance to the foreign litigant by allowing him or her to use its enforcement mechanisms": *Pro Swing Inc. v. ETLA Golf Inc.*, 2006 SCC 52, [2006] 2 S.C.R. 612, at para. 111. See also *Chevron (SCC)*, at para. 46.

[50]   Critically, enforcement of a foreign judgment is done in accordance with domestic law regarding the enforcement of domestic judgments. It would hardly be equitable to have one set of enforcement rules for domestic judgments and a second, far more expansive set of rules for foreign judgments. So the task for this court is to determine whether Hainey J. erred in his application of domestic debtor-creditor law in finding that under the *Act*, the shares and assets of Chevron Canada are not exigible to satisfy Chevron Corporation's debt.

[51]   I must also address at the outset one of the appellants' requests because it is a legal impossibility. They seek a declaration against Chevron Canada that the shares of its company are exigible. Such an order cannot be made. A corporation's shares do not belong to the corporation, but to the shareholders: *Chevron* (SCC), at para. 95. In fact, under s. 30(1) of the *Canada Business Corporation Act,* R.S.C. 1985, c. C-44 (the "*CBCA*"), corporations are prohibited from owning their own shares.

Case 18-855, Document 94, 03/11/2019, 2515258, Page270 of 303

[52]    Turning to what the *Act* does permit, a judgment creditor is granted extensive rights to collect on a judgment debt. The relevant sections of the *Act* for present purposes are as follows:

> 14(1) The interest of an execution debtor in a security or security entitlement may be seized by the sheriff in accordance with sections 47 to 51 of the *Securities Transfer Act, 2006*.
>
> …
>
> (3) Every seizure and sale made by the sheriff shall include all dividends, distributions, interest and other rights to payment in respect of the security, if issued by an issuer incorporated or otherwise organized under Ontario law, or in respect of the security entitlement and, after the seizure becomes effective, the issuer or securities intermediary shall not pay the dividends, distributions or interest or give effect to other rights to payment to or on behalf of anyone except the sheriff or a person who acquires or takes the security or security entitlement from the sheriff.
>
> ***
>
> 18(1) The sheriff may seize and sell any equitable or other right, property, interest or equity of redemption in or in respect of any goods, chattels or personal property, including leasehold interests in any land of the execution debtor, and, except where the sale is under an execution against goods issued out of the Small Claims Court, the sale conveys whatever equitable or other right, property, interest or equity of redemption the debtor had or was entitled to in or in respect of the goods, chattels or personal property at the time of the delivery of the execution to the sheriff for execution, and, where the sale is under an execution against goods issued out of the Small Claims Court, the sale conveys whatever equitable or other right, property, interest or equity of redemption the debtor had or was entitled to in or in respect of the goods, chattels or personal property at the time of the seizure.

[53]    The appellants rely on s. 18(1) to argue that it permits the seizure of any interest and further submit that Chevron Corporation has an "indirect interest" in

Case 18-855, Document 94, 03/11/2019, 2515258, Page271 of 303

Chevron Canada. In oral argument, Mr. Lenczner undertook a detailed review of various internal documents produced by Chevron Corporation and Chevron Canada, wherein Chevron Canada sought approval from Chevron Corporation to undertake certain corporate actions, such as investment in oil exploration projects. The point of this exercise, he said, was to demonstrate the extent of Chevron Corporation's interest in Chevron Canada. This submission reflects a fundamental misunderstanding of the *Act*.

[54]    It is common ground that the *Act* is procedural only and does not purport to grant substantive rights to judgment creditors. Its only function is to facilitate the collection of judgments through the various methods provided therein to enforce the judgment debtor's existing rights. The sheriff effectively steps into the judgment debtor's shoes and enforces his or her rights for the benefit of the judgment creditor.

[55]    The difficulty in the present case is that Chevron Corporation has no existing rights as against the assets of Chevron Canada. It is not enough to state that Chevron Corporation has an amorphous indirect right to the assets of Chevron Canada; there must be an existing legal right that permits seizure of the assets. To understand why Chevron Corporation does not hold such a right, it is necessary to consider how the *Act* operates in practice, basic principles of corporate law, and the policy implications of the appellants' submission.

Case 18-855, Document 94, 03/11/2019, 2515258, Page272 of 303

[56]   I start with a review of how the *Act* operates. If a judgment debtor is a corporation with money in the bank, the sheriff may seize that money. If it owns equipment, the sheriff may seize that equipment and sell it. Shares that a judgment debtor owns are also exigible and may be seized and sold by the sheriff. But the assets of the issuing corporation are not exigible: Kevin P. McGuinness, *Canadian Business Corporations Law*, 3rd ed., vol. 1 (Markham: LexisNexis Canada, 2017) at para. 6.71. So, for example, if a judgment debtor owns 10,000 shares of Corporation A, the sheriff may seize and sell those shares. However, the sheriff cannot attempt to execute the judgment at the corporate offices of Corporation A by seizing assets owned by Corporation A. To do so would be to violate fundamental principles of corporate law.

[57]   It is important to understand the distinction between corporations and their shareholders. Pursuant to s. 15(1) of the *CBCA*, Parliament has made a clear policy choice that corporations have "the rights, powers and privileges of a natural person." This is not, as the appellants suggest, a mere legal fiction. It is a bedrock principle of our corporate law. Consistent with the law established in *Salomon*, Parliament has entrenched in our law the notion of corporate separateness. That means that corporations are separate entities from their shareholders, capable of carrying on business and incurring debts on their own behalf. Thus, if a judgment debtor is a parent corporation, it and not its shareholders or subsidiaries, is

Case 18-855, Document 94, 03/11/2019, 2515258, Page273 of 303

responsible for the debts it incurs. It also means that a corporation's assets are its own and do not belong to related corporations.

[58]    A shareholder of a corporation does not have a right to claim a proportionate share of the corporation's assets while it is ongoing. That right only arises if and when the corporation is wound up: *BCE Inc. v. Debentureholders,* 2008 SCC 69, [2008] 3 S.C.R. 560, at para. 34. This makes logical sense because the corporation is deemed to be a natural person. While it is extant, it holds its assets. When it ceases to exist, the assets are distributed to the shareholders, subject to claims from creditors and others, because there is at that point no existing entity capable of holding the assets.

[59]    If we accept the appellants' submission, a judgment creditor would have greater rights to the issuing corporation's assets than a judgment debtor shareholder because access would occur while the corporation is ongoing. This enforcement of future contingent rights is also contrary to the wording of s. 18(1) of the *Act*. It does not purport to enforce future rights, such as a right upon wind-up. It allows only for the enforcement of rights as "at the time of the delivery of the execution to the sheriff for execution."

[60]    In the case at bar, granting the rights sought would be even more extraordinary because it would ignore the corporate separateness of the various subsidiaries in between Chevron Corporation and Chevron Canada. The

Case 18-855, Document 94, 03/11/2019, 2515258, Page274 of 303

appellants would have this court proceed on the basis that Chevron Canada's shares are directly owned by Chevron Corporation. They are not. CCCC owns those shares, and it is not a party to this action. Another corporation owns CCCC's shares and so it goes up the corporate chain. We are being asked to ignore the legal reality of the way Chevron Corporation structured its subsidiary corporations. Clearly we are being asked to pierce the corporate veil, notwithstanding appellant counsel's assertion, made in reply, that we are not.

[61]   The appellants' proposed interpretation of the *Act* would also have a significant policy impact on how corporations carry on business in Canada. Corporations have stakeholders. Creditors, shareholders, and employees, among others, rely on the corporate separateness doctrine that is long-established in our jurisprudence and that is a deliberate policy choice made in the *CBCA*. Those stakeholders have a reasonable expectation that when they do business with a Canadian corporation, they need only consider the liabilities of that corporation and not the liabilities of some related corporation.

[62]   Finally, it is necessary to address the appellants' policy submission that it is unconscionable that a parent corporation can incorporate a number of wholly-owned subsidiaries and secrete valuable assets away from judgment creditors. That submission is not consistent with how the *Act* operates. Let us assume for the moment that Chevron Corporation held in Canada 100 percent of the shares of a subsidiary corporation. Those shares could be seized and sold. If that

Case 18-855, Document 94, 03/11/2019, 2515258, Page275 of 303

subsidiary had substantial assets, the sale price of the shares would reflect the value of the underlying assets. Even if the assets were held by a distant subsidiary protected by a series of 100-percent-owned subsidiaries, the sale price of the shares in the first subsidiary would reflect the underlying value of the ultimate assets. Therefore, there would be no need for the sheriff to seize and sell the assets of the first subsidiary corporation because he or she would achieve the same result, without violating the principle of corporate separateness, by selling its shares. In either case the judgment debtor would obtain the value of the underlying assets.

[63]   In summary, I am not persuaded that Hainey J. erred in rejecting the appellants' submission that under the *Act*, Chevron Canada's shares and assets are exigible to satisfy the Ecuadorian judgment. The appellants' interpretation is not supported by the wording of the *Act* and would violate fundamental principles of our corporate law. Reading the *Act* in the way the appellants suggest would amount to the granting of extraordinary rights to a judgment creditor through a purely procedural statute, designed to permit only the enforcement of existing rights.

## (2) Piercing the corporate veil

[64]   The appellants alternatively submit that this court has the ability to pierce the corporate veil when the interests of justice demand it. In support of that

Case 18-855, Document 94, 03/11/2019, 2515258, Page276 of 303

argument, they rely on Wilson J.'s remarks in *Kosmopoulos v. Constitution Insurance Co.*, [1987] 1 S.C.R. 2, where she stated at p. 10:

> The law on when a court may disregard this principle by "lifting the corporate veil" and regarding the company as a mere "agent" or "puppet" of its controlling shareholder or parent corporation follows no consistent principle. The best that can be said is that the "separate entities" principle is not enforced when it would yield a result "too flagrantly opposed to justice, convenience or the interests of the Revenue".

[65]   *Kosmopoulos* was decided approximately thirty years ago. Not surprisingly, the law has developed. The starting point is the decision of Sharpe J., as he then was, in *Transamerica*. Justice Sharpe rejected the notion that the test for piercing a corporate veil is "anything like a just and equitable standard" (p. 433). Relying on Gower: *Principles of Modern Company Law*, 5th ed. (London: Sweet & Maxwell, 1992), he found, at p. 433, that there are only three circumstances where the court will pierce a corporate veil:

> (1)   When the court is construing a statute, contract or other document;
>
> (2)   When the court is satisfied that a company is a "mere facade" concealing the true facts; and
>
> (3)   When it can be established that the company is an authorized agent of its controllers or its members, corporate or human.

Case 18-855, Document 94, 03/11/2019, 2515258, Page277 of 303

[66]   With respect to cases where it is alleged that a subsidiary corporation is a mere facade that protects its parent corporation, in order to ignore the corporate separateness principle, the court must be satisfied that: (i) there is complete control of the subsidiary, such that the subsidiary is the "mere puppet" of the parent corporation; and (ii) the subsidiary was incorporated for a fraudulent or improper purpose or used by the parent as a shell for improper activity: *Transamerica,* at pp. 433-34.

[67]   This court has repeatedly rejected an independent just and equitable ground for piercing the corporate veil in favour of the approach taken in *Transamerica*: see *Boyd v. Wright Environmental Management Inc.*, 2008 ONCA 779, 243 O.A.C. 185, at paras. 44-45; *Parkland Plumbing & Heating Ltd. v. Minaki Lodge Resort 2002 Inc.*, 2009 ONCA 256, 250 O.A.C. 232, at paras. 50-51; and *Indocondo Building Corp v. Sloan*, 2015 ONCA 752, 259 A.C.W.S. (3d) 691, at para. 9.

[68]   The Supreme Court of Canada has protected the principle of corporate separateness without suggesting a standalone just and equitable exception. In *Sun Indalex Finance v. United Steelworkers*, 2013 SCC 6, [2013] 1 S.C.R. 271, at para. 238, Cromwell J. rejected the submission that a subsidiary should be liable for a breach of fiduciary duty committed by its parent corporation, holding that "unless there is a legal basis for ignoring the separate corporate personality of separate entities, those separate corporate existences must be respected." See also

Case 18-855, Document 94, 03/11/2019, 2515258, Page278 of 303

*Continental Bank Leasing Corp. v. Canada*, [1998] 2 S.C.R. 298, at paras. 108-112.

[69]   The appellants rely on a number of cases that they submit demonstrate that the principle of corporate separateness is sufficiently malleable that courts are free to ignore it when they see fit. However, an examination of those cases makes clear that their reliance is misplaced:

- *Lynch v. Segal* (2006), 82 O.R. (3d) 641 (C.A.), involved the use of a corporation to disguise property so that the defendant's wife and children would not have access to it for support purposes. This is precisely the type of abusive use of a corporation that *Transamerica* says justifies an exception to the corporate separateness principle.

- *Downtown Eatery (1993) Limited v. Ontario* (2001), 54 O.R. (3d) 161 (C.A.), was an employment case where this court found that the plaintiff had entered into an employment contract with a non-legal entity and was paid by a corporation that was simply acting as the paymaster for a group of companies. This court held that in those unique circumstances, the entire group of companies had in fact employed the plaintiff. In my view, this conclusion rested more on the plaintiff's relationship to the group of companies rather than the relationships among the companies in the group.

- *Buanderie centrale de Montréal Inc. v. Montreal (City)*, [1994] 3 S.C.R. 29, is actually an example of one of the exceptions to the corporate

Case 18-855, Document 94, 03/11/2019, 2515258, Page279 of 303

separateness principle listed in *Transamerica*. This was a case where the corporate veil was pierced because it was provided for by statute.

- *Bazley v. Curry*, [1999] 2 S.C.R. 534, is a vicarious liability case. That doctrine makes one person liable for the acts of another. There must, however, be some basis for imposing vicarious liability. In that case, it was the employment relationship and the question was whether the employee's wrongful act was sufficiently related to conduct authorized by the employer to justify the imposition of vicarious liability. There is no suggestion in the present case that Chevron Corporation and Chevron Canada were engaged in any employment, agency, or other relationship in undertaking oil exploration in Ecuador.

[70]  The *Transamerica* test is consistent with the principle reflected in the various business corporation statutes in Canada that corporate separateness is the rule. Where the corporate form is being abused to the point that the corporation is not a truly separate corporation and is being used to facilitate fraudulent or improper conduct, the law recognizes an exception to this rule. It is important that courts be rigorous in their application of the *Transamerica* test because the rule is provided for in statute and stakeholders of corporations have a right to believe that, absent extraordinary circumstances, they may deal with the corporation as a natural person.

Case 18-855, Document 94, 03/11/2019, 2515258, Page280 of 303

[71]   The significance of the *Transamerica* decision should not be underestimated. In a single case, Sharpe J. synthesized the jurisprudence regarding piercing the corporate veil. More importantly, he brought clarity and certainty to our law by providing a framework for determining when it is appropriate to ignore the principle of corporate separateness. This can be contrasted to the state of the American jurisprudence, where years of cases decided with no identifiable and consistent test has resulted in an *ad hoc* and unpredictable application of the remedy: Jonathan Macey & Joshua Mitts, "Finding Order in the Morass: The Three Real Justifications for Piercing the Corporate Veil" (2014) 100:1 Cornell L. Rev. 99.

[72]   The current state of the law in the United States is comparable to the state of the Canadian jurisprudence at the time of *Kosmopoulos*. The appellants misinterpret Wilson J.'s statement in that case, quoted above at para. 64, as an endorsement of a standalone just and equitable standard for piercing the corporate veil. It was not. Rather, the court was decrying the absence of a coherent set of criteria for ignoring corporate separateness. Wilson J. stated, at p. 12, that corporate separateness should not ignored to "ameliorate its ill effects on a case-by-case basis". *Transamerica* rejected the *ad hoc* approach previously employed and achieved the needed certainty in the law. The question for determination in this case is whether this court is prepared to sacrifice certainty for the sake of expediency.

Case 18-855, Document 94, 03/11/2019, 2515258, Page281 of 303

[73]   The appellants advance a number of arguments to justify ignoring the corporate separateness between Chevron Corporation and Chevron Canada. I do not find any of them to be persuasive.

[74]   First, they submit that Hainey J. erred in finding that Chevron Corporation did not wield sufficient control of Chevron Canada to meet the first part of the *Transamerica* test. I need not consider that argument, as it is plain that the appellants cannot meet the second part of the conjunctive test. Chevron Canada was incorporated over 50 years ago. There is no allegation of wrongdoing on its part and no suggestion that it was established or used for fraudulent or improper purposes. Indeed, in their Amended Statement of Claim, the appellants specifically plead that Chevron Canada has not engaged in any inappropriate conduct. As Hainey J. correctly found, under the *Transamerica* test, this is a complete bar to the request to pierce the corporate veil.

[75]   Next the appellants argue that *Transamerica* is not applicable because in this case we are dealing with the enforcement of a judgment debt, not a case of first instance where the issue is establishing liability. This submission cannot be accepted. If it were, a judgment against any corporation could be enforced against the assets of any other related corporation. Resourceful litigators would not sue multiple related corporations who could rely on the *Transamerica* test. Instead, they would pick one company to sue and then enforce their judgment against all related corporations who would then be barred from relying on the *Transamerica*

Case 18-855, Document 94, 03/11/2019, 2515258, Page282 of 303

test. The non-judgment debtor corporation would thus lose all of its protection as a natural person under the *CBCA*. The exception to the rule of corporate separateness would become the rule once judgment was obtained.[3]

[76]   Not only is such an argument problematic from a policy standpoint, it comes dangerously close to the adoption of the group enterprise theory of liability. That theory holds that where several corporations operate closely as part of the same "group" of corporations, they are in reality a single enterprise and should, accordingly, be responsible for each other's debts. It has been consistently rejected by our courts: *Meditrust Healthcare Inc. v. Shoppers Drug Mart* (2002), 61 O.R. (3d) 786 (C.A.), at paras. 30- 31 and *Fairview Donut Inc. v. The TDL Group Corp.*, 2012 ONSC 1252, 112 O.R. (3d) 190, at paras. 651-665, affirmed: 2012 ONCA 867, 225 A.C.W.S. (3d) 31, leave to appeal refused: [2013] S.C.C.A. No. 47.[4] It has also been rejected in England: see *Adams v. Cape* [1990], 1 Ch. 433 (Eng. C.A.) at pp. 532 and 536-38.

[77]   There is good reason for this rejection. There is a difference between economic reality and legal reality. The fact that on an operational level corporate separateness is more nuanced among a group of related corporations is of no

---

[3] An example of this court applying the principle of corporate separateness in the enforcement context is *Belokon v. Krygyz*, 2016 ONCA 981, 136 O.R. (3d) 39, leave to appeal refused: [2017] S.C.C.A. Nos. 74 & 75.
[4] The sole exception in this court appears to be *Manley Inc. v. Fallis* (1977), 2 B.L.R. 277 (Ont. C.A.). However, on closer examination the court was simply endorsing that an employee could owe a fiduciary duty to both his employer and its parent corporation.

Case 18-855, Document 94, 03/11/2019, 2515258, Page283 of 303

moment. It is the legal reality, as provided for in the relevant business corporation statutes, that counts. The *CBCA* permits subsidiary corporations but also says that each corporation is a natural person. If Parliament wished to carve out an exception to the natural person rule for subsidiaries, it would have been very easy to do so.

[78]   As stated by Mary Elisabeth Kors in her article, "Altered Egos: Deciphering Substantive Consolidation" (1998), 59 U. Pitt. L. Rev. 381, at pp. 437-38, there are also good policy reasons for the rejection of this sweeping doctrine:

> While enterprise liability may offer some appeal, measuring the extent of an "economic unit" introduces an intolerable level of uncertainty into the question of liability. The task of marking the limits of liability on the basis of incorporation is relatively simple: the corporation has either complied with the technical requirements of incorporation or it has not. Extending liability to the edges of the enterprise requires courts to determine the scope of the economic enterprise. The answer to this issue will rarely, if ever, be clear. Creditors extending credit would not be able to determine with any precision the liabilities for which the debtor will be responsible and the assets that will be available to satisfy their claims. Such uncertainty substantially reduces both the efficiency and fairness of corporate law.

[79]   The appellants further submit that the corporate separateness of Chevron Corporation and Chevron Canada should be ignored for policy reasons. Yet they provide no guidance regarding the basis upon which it will be appropriate to pierce the corporate veil in future cases. Once the *Transamerica* test is jettisoned and no principled basis for piercing the corporate veil replaces it, we are left with a purely

Case 18-855, Document 94, 03/11/2019, 2515258, Page284 of 303

*ad hoc* test. In the end, Mr. Lenczner's submissions boil down to an exhortation that we should do the right thing for his clients, untethered to the jurisprudence, the statutory rights of corporations, or any discernible principle. Even if we were free to do that, which we are not, this case illustrates the difficulties with this approach. At this stage, the equities of this case are far from clear. On the one hand, the appellants have suffered devastating loss through no fault of their own. On the other, on the finding of the United States courts, the Ecuadorian judgment against Chevron Corporation was the result of a massive fraud.[5]

[80]   It is also important to remember the context in which the request to pierce the corporate veil is being made in this case. It is common ground that the judgment debtor has more than enough assets to satisfy the Ecuadorian judgment. This is also not a case where the judgment debtor's assets are being funnelled to a related corporation and as a consequence the judgment creditor cannot execute on its judgment. In fact, the appellants allege that the opposite is true. They say the profits of Chevron Canada are being funnelled up to Chevron Corporation as dividends. If they are correct, Chevron Canada is actually enhancing the ability of Chevron Corporation to pay the Ecuadorian judgment.

[81]   As noted above, the appellants' submissions fail to acknowledge that the real fact driving their appearance in the Canadian courts is that they have not

---

[5] In making this observation, this court is not purporting to adopt the findings of the United States courts.

Case 18-855, Document 94, 03/11/2019, 2515258, Page285 of 303

enforced their judgment in the United States. The reason for this seems clear, but in his oral submissions, Mr. Lenczner stated that the existing United States court order does not prohibit his clients from enforcing the Ecuadorian judgment, whereas in his factum filed on the costs appeal he asserted that his clients are prohibited from enforcing that judgment in the United States. Query if there truly is no prohibition, why he is in the Ontario courts making novel legal arguments to get at the assets of a seventh level subsidiary?

[82]   Whatever the reason for not enforcing the Ecuadorian judgment in the United States, it is clear that the difficulties the appellants are encountering in collecting the judgment are not related to Chevron Corporation's structuring of its subsidiaries. What we are really being invited to do is to assist the appellants in doing an end-run around the United States court order by breaking with well-established jurisprudence and creating an exception to the principle of corporate separateness that is both ill-defined and will be unnecessary for similarly situated judgment creditors.

[83]   To be clear, as this court stated in its reasons on the review of the security for costs order, the common law is not set in stone. It evolves over time to respond to pressing legal issues. The existing rules for piercing the corporate veil can and likely will evolve. But the law must evolve on a principled basis and in a manner that brings certainty and clarity, not in a way that sows confusion and is devoid of principle.

Case 18-855, Document 94, 03/11/2019, 2515258, Page286 of 303

### (3) Adding CCCC as a party

[84]    I agree with Hainey J. that it was not appropriate to add CCCC as a party because the claim against its assets must fail for the same reasons that the claim against Chevron Canada's assets must fail. Accordingly, the amended pleading was not legally tenable and did not disclose a cause of action as against CCCC. The test under rule 5.04(2) was not met: see *Steel Tree Structures Ltd. v. Gemco Solar Inc.*, 2016 ONSC 955.

### (4) Fresh evidence

[85]    I would deny the appellant's motion for fresh evidence. The documents proposed to be tendered relate primarily to the interactions among Chevron Canada and its subsidiaries. They are, at best, of marginal relevance to the matters at issue on these appeals and could not have affected the result of the motions. Accordingly, they do not meet the test for admission articulated in *R. v. Palmer*, [1980] 1 S.C.R. 759, at p. 775.

### (5) Costs

[86]    In my view, Hainey J. erred when he found that this was not public interest litigation. As this court held in its reasons on the review of the security for costs order, at para. 26:

> The appellants are seeking to enforce a judgment in which they have no direct economic interest. Funds collected on the judgment will be paid into a trust and net

Case 18-855, Document 94, 03/11/2019, 2515258, Page287 of 303

> funds are to be used for environmental rehabilitation or
> health care purposes. This is public interest litigation.

[87]   I agree with Mr. Zarnett's submission that the fact that this is public interest litigation does not mean that the appellants are immune from the usual costs consequences of an unsuccessful action. This court in its reasons on the review of the security for costs order was dealing with whether it was just to deny the appellants their day in court on the basis of a security for costs order. It did not consider whether the appellants should ultimately be ordered to pay costs.

[88]   Despite the foregoing, the fact that this is public interest litigation impacts on the quantum of costs. It should have been factored into Hainey J.'s analysis of a reasonable amount of costs in all of the circumstances. This constituted an error in principle and thus it is appropriate to grant leave to appeal the costs award: *Walsh Energy Inc. v. Better Business Bureau of Ottawa-Hull Incorporated*, 2018 ONCA 383, at para. 40; *Hamilton v. Open Window Bakery Ltd.*, 2004 SCC 9, [2004] 1 S.C.R. 303. It also falls to this court to make the proper costs award in all of the circumstances.

[89]   In my view, when the true nature of the litigation is considered, the amounts awarded below were excessive. I would reduce those amounts to $150,000 to Chevron Canada and $100,000 to Chevron Corporation, all-inclusive.

SA280

Page: 40

Case 18-855, Document 94, 03/11/2019, 2515258, Page288 of 303

### E.    DISPOSITION

[90]    For the foregoing reasons, I would dismiss the appeals of the motion judge's orders, save for his costs award. I would grant leave to appeal that order and reduce the amounts awarded in accordance with these reasons.

[91]    The parties agreed on the costs of these appeals. Pursuant to that agreement, I would order that the appellants pay Chevron Canada and Chevron Corporation jointly their costs of the appeal in the all-inclusive total amount of $100,000.

Case 18-855, Document 94, 03/11/2019, 2515258, Page289 of 303

**Nordheimer J.A. (concurring):**

[92]   I have read the reasons of my colleague, Hourigan J.A., and agree with the result that he reaches.   I also largely agree with the careful analysis he has undertaken.   Specifically, I agree with his analysis in respect of the interpretation of the *Execution Act*, R.S.O. 1990, c. E.24 and his conclusion that Chevron Corporation has no exigible interest in the assets or shares of Chevron Canada – or indeed in any of its indirect subsidiaries – on the basis of the *Act* alone. However, I part company with him on (i) whether the test established in *Transamerica Life Insurance Co. of Canada v. Canada Life Assurance Co.* (1996), 28 O.R. (3d) 423 (Gen. Div.), affirmed [1997] O.J. No. 3754 (C.A.) is the appropriate one to apply in these circumstances and (ii) on the general approach he adopts with respect to when it is appropriate to pierce the corporate veil.

[93]   What is at the root of this case is whether the corporate veil can be pierced in situations where it would be necessary to do so in order to permit a judgment creditor to realize on a judgment that would otherwise go unsatisfied.   While I accept my colleague's conclusion that it would not be appropriate to do so in this case, for the reasons that he gives at paras. 79-82, I do not agree with what I perceive to be the thrust of his reasons, that is, that it would never be appropriate to lift the corporate veil to permit the enforcement of a judgment, unless the requirements of the *Transamerica* test are met.

Case 18-855, Document 94, 03/11/2019, 2515258, Page290 of 303

[94]    In my view, the decision in *Transamerica*, as important as it was in providing a clear test for lifting the corporate veil, should not have its scope expanded beyond the situations from which it arose.  Of considerable importance on this point is the fact that the decision in *Transamerica* dealt with imposing liability on a party through the mechanism of lifting the corporate veil.  It did not deal with the situation here, that is, the enforcement of a judgment debt.  In the latter situation, liability has already been established.  The proceeding has moved past that hurdle to a stage that concerns the remedies that are available to enforce a valid judgment.

[95]    I am not satisfied that the *Transamerica* test can simply be lifted out of the liability context and then dropped into, and applied to, the judgment enforcement context.  Among other reasons for that conclusion is the fact that it would appear to be very difficult to conceive of a factual situation where the *Transamerica* test could be met by a judgment creditor, that is, where the corporate structure would be found to have been "used as a shield for fraudulent or improper conduct" solely in the execution context.

[96]    In his analysis on this point, my colleague downplays the significance of the observation of Wilson J. in *Kosmopoulos v. Constitution Insurance Co.*, [1987] 1 S.C.R. 2, where she said, at pp. 10-11:

> The best that can be said is that the "separate entities" principle is not enforced when it would yield a result "too flagrantly opposed to justice, convenience or the interests of the Revenue": L.C.B. Gower, *Modern*

Case 18-855, Document 94, 03/11/2019, 2515258, Page291 of 303

> *Company Law* (4th ed. 1979) at p. 112. <u>I have no doubt that theoretically the veil could be lifted in this case to do justice</u>, as was done in *American Indemnity Co. v. Southern Missionary College, supra*, cited by the Court of Appeal of Ontario. But a number of factors lead me to think it would be unwise to do so.

> [Emphasis added.]

[97]   My colleague says that this quotation from Wilson J. was not "an endorsement of a standalone just and equitable standard for piercing the corporate veil" but was, rather, simply the court "decrying the absence of a coherent set of criteria for ignoring corporate separateness".

[98]   I do not read Wilson J.'s decision in that way.  I agree that she was expressing concern about the lack of a consistent principle for lifting the corporate veil, but I do not view her reasons as dismissing the concept that the corporate veil can be pierced when not doing so would yield a result "too flagrantly opposed to justice".  Indeed, Wilson J. stated that she theoretically had "no doubt" that the veil could be lifted to do justice.  Moreover, the result in *Kosmopoulos* was based, in part, on the court seeing a need to take a more expansive view of an "insurable interest" than that which had been adopted in the United Kingdom, because of the corporate separateness principle.  In reaching her conclusion, Wilson J. referred to the decision in *Salomon v. Salomon & Co.*, [1897] A.C. 22 (U.K. H.L.) and noted that "[t]he unhappy consequences of that case for corporate creditors are well-known".  She also said, at p. 27:

Case 18-855, Document 94, 03/11/2019, 2515258, Page292 of 303

I have already noted that while in the case of a single shareholder corporation courts are unlikely to lift the corporate veil for the benefit of that single shareholder, they may be willing to lift the corporate veil "in the interests of third parties who would otherwise suffer as a result of that choice": *Gower, supra*, at p. 138.

[99]   I can envisage situations where a judgment creditor would be such a third party.   Indeed, the appellants might well fall into that category were it not for the findings of the U.S. courts respecting the fraudulent manner in which the Ecuadorian judgment, that the appellants seek to enforce, is alleged to have been obtained.

[100]  In response to this perspective, my colleague says, at para. 67, that this court "has repeatedly rejected an independent just and equitable ground for piercing the corporate veil in favour of the approach taken in *Transamerica*".   He then cites three decisions of this court as examples of that approach.   However, it does not seem to me that those cases fully support the broad proposition that he states.

[101]  I begin by noting that all of those cases were again decisions respecting liability, not judgment enforcement decisions.   But, in any event, it seems to me that those cases are not as restricted as my colleague suggests.   For example, in *Parkland Plumbing & Heating Ltd. v. Minaki Lodge Resort 2002 Inc.*, 2009 ONCA 256, 250 O.A.C. 232, this court reversed a decision of the Divisional Court and upheld the trial judge's decision to pierce the corporate veil.   In doing so, Cronk

Case 18-855, Document 94, 03/11/2019, 2515258, Page293 of 303

J.A., at para. 49, expressly reiterated the above quotation from *Kosmopoulos*. In doing so, she did not suggest that the decision in *Transamerica* had eliminated that general principle. Nor in *Transamerica* itself did this court, in its appeal book endorsement, affirmatively foreclose other bases upon which the corporate veil might be pierced in future cases.

[102] I also do not agree with my colleague's assertion that all four cases relied upon by the appellants do not support their position. In particular, it seems to me that the decision in *Downtown Eatery (1993) Ltd. v. Ontario* (2001), 54 O.R. (3d) 161 (C.A.), leave to appeal refused [2001] S.C.C.A. No. 397 is, in fact, a situation where the corporate veil was pierced because not to do so would result in manifest unfairness.

[103] In that case, the employer operated a nightclub enterprise through various related corporations. The employee signed an employment agreement with the nightclub entity but was paid by a related corporation. The employee was fired and sued for wrongful dismissal. However, the employer had reorganized its corporate structure by the end of the trial. The corporation that the employee named in his suit no longer had any assets to satisfy the judgment against it. As a result, the sheriff executed the judgment by seizing assets owned by a corporation related to the judgment debtor. The related corporation then sued the employee for conversion in a subsequent action. The employee counterclaimed that he was entitled to enforce his judgment against corporations related to the

Case 18-855, Document 94, 03/11/2019, 2515258, Page294 of 303

employer judgment debtor.   The trial judge dismissed the employee's counterclaim.

[104] This court reversed the decision on appeal.  Importantly, the new corporate structure did not preclude this court from granting a remedy.  Justices Borins and MacPherson said, at paras. 35-43:

> [The employer] could easily have operated the nightclub through a single company. They chose not to. There is nothing unlawful or suspicious about their choice...
>
> However, although an employer is entitled to establish complex corporate structures and relationships, the law should be vigilant to ensure that permissible complexity in corporate arrangements does not work an injustice in the realm of employment law. At the end of the day, [the employee's] situation is a simply, common and important one – he is a man who had a job, with a salary, benefits and duties. He was fired – wrongfully. His employer must meet its legal responsibility to compensate him for its unlawful conduct. The definition of "employer" in this simple and common scenario should be one that recognizes the complexity of modern corporate structures, but does not permit that complexity to defeat the legitimate entitlements of wrongfully dismissed employees.
>
> [...]
>
> In these circumstances, when he was wrongfully dismissed, [the employee] did his best – he sued the company which had paid him. Later, it turned out that that company had no assets. Yet the nightclub continued in business, various companies continued to operate it and, presumably, [the corporation's shareholders] continued to make money. In these circumstances, [the employee] decided to try to collect the money to which a superior court of justice had determined he was entitled. In our

Case 18-855, Document 94, 03/11/2019, 2515258, Page295 of 303

> view, the common employer doctrine provides support for his attempt.
>
> …In these circumstances […] we conclude that [the employer] when he was wrongfully dismissed was all of [the related corporations]. This group of companies functioned as a single, integrated unit in relation to the operation of [the nightclub].
>
> [The related organizations went through various reorganizations before the end of the trial]. The trial judge found that there was nothing nefarious about these reorganizations; they were undertaken for business reasons unrelated to [the employee's action]. We see no reason to disagree with this conclusion.
>
> The question which the reorganizations pose is whether [the judgment] […] should also be enforced against the successor or merged companies which have been created by the reorganizations.
>
> We have no hesitation in answering this question in the affirmative.
>
> [Emphasis added.]

[105]  In my view, *Downtown Eatery* provides some support for the proposition that the law on piercing the corporate veil might allow the appellants to enforce their Ecuadorian judgment against Chevron Canada.  I say this for three reasons.

[106] First, this court pierced the corporate veil of the related corporations in *Downtown Eatery* despite the express finding that neither the corporate structure, nor the reorganization leaving the judgment debtor corporation without assets, was fraudulent.

Case 18-855, Document 94, 03/11/2019, 2515258, Page296 of 303

[107]  Second, this court enunciated a principle that the law should not allow even legitimate corporate structures to work an "injustice".   This strikes me as the invocation of a general equitable jurisdiction to ensure that persons who hold valid judgments have an enforceable remedy.

[108]  And third, unlike the cases my colleague cites at paras. 67-68, *Downtown Eatery* is a case of the enforcement of one corporation's judgment debt against a related corporation.  It is arguably therefore far more relevant to the instant appeal than *Transamerica*.   Moreover, the decision in *Downtown Eatery* post-dates *Transamerica*.  Thus, it can be seen as an example of how *Transamerica* has not been applied in the debt enforcement context.

[109]  Further, the decision in *Bazley v. Curry*, [1999] 2 S.C.R. 534 also tends to support the concept that equitable principles may be relied upon to override the principle of corporate separateness where it is necessary to do justice.  Indeed, it seems difficult to see a legal foundation for the imposition of vicarious liability, other than a foundation in equity.  I note that in *Bazley*, McLachlin J. expressly based the imposition of vicarious liability on two policy considerations, the first of which was to provide "a just and practical remedy to people who suffer as a consequence of wrongs perpetrated by an employee."  Transferred into this context, a party, who holds a valid judgment, has, by definition, been found to have suffered a wrong.  I can conceive of situations, albeit rare ones, where piercing the corporate veil for enforcement purposes would be necessary in order to provide a "just and practical

Case 18-855, Document 94, 03/11/2019, 2515258, Page297 of 303

remedy" to a person who holds a valid judgment, especially in the context of related corporations.

[110]  Another concern that my colleague expresses regarding any deviation from the corporate separateness principle is that "it comes dangerously close to the adoption of the group enterprise theory of liability".  First, I note that this concern again relates to liability and not to enforcement.  I also note that the decision in *Downtown Eatery* could be seen as having already adopted the group enterprise theory of liability, or at least a variation of it.

[111]  Second, my colleague says that, if Parliament had wished to carve out an exception to the corporate separateness principle for subsidiaries, it could have done so.  While that is undoubtedly correct, the fact that Parliament has not made such an exception has not prevented the courts from invoking equity to make exceptions, as the whole concept of lifting the corporate veil makes clear.

[112]  Third, my colleague refers to an article by Mary Elisabeth Kors in which she rejects this doctrine because, in her view, the concept of group enterprise is vague or amorphous.  While that may be a legitimate concern in some instances, there is nothing vague or amorphous about a situation where a corporation owns 100% of the shares of another corporation.  For example, in this case, the corporate structure that exists between Chevron Corporation and Chevron Canada is very clear.  On this point, I would add, in passing, that the motions judge's blanket

Case 18-855, Document 94, 03/11/2019, 2515258, Page298 of 303

conclusion, at para. 36, that "Chevron Canada is not an asset of Chevron" is one that is completely detached from real-world realities. Although the law dictates that only the shares of a corporation can be the assets of another person (and not the corporation itself), it is crystal clear that Chevron Canada is an asset of Chevron Corporation, as that term is understood in common business parlance. All of Chevron Canada's shares are owned by Chevron Corporation (albeit indirectly) and, as the evidence in this case makes clear, it is ultimately controlled, for all practical purposes, by Chevron Corporation. Consequently, there are no innocent shareholders that would be affected by the execution of the Ecuadorian judgment against Chevron Canada – a concern that is often raised as militating against any effort to interfere with corporate separateness.

[113] It seems clear that the genesis of the courts' corporate veil piercing power stems from its equitable jurisdiction: see, e.g., *A-C-H International Inc. v. Royal Bank* (2005), 254 D.L.R. (4th) 327 (Ont. C.A.), at para. 29; and *Burke Estate v. Royal & Sun Alliance Insurance Co. of Canada*, 2011 NBCA 98, 381 N.B.R. (2d) 81, at paras. 54 and 58. The origins of equity flow from the need to ameliorate the harshness of positive law in principled circumstances. In fact, some commentators describe equity as the "conscience of law". It draws upon principles of natural law to "harmoniz[e] law with the needs and requirements of evolving social structures and relationships": Leonard I. Rotman, "The 'Fusion' of Law and Equity?: A

Case 18-855, Document 94, 03/11/2019, 2515258, Page299 of 303

Canadian Perspective on the Substantive, Jurisdictional, or Non-Fusion of Legal and Equitable Matters" (2016) 2(2) Can. J. Comp. Cont. L. 497 at pp. 503-04.

[114] The importance of equity in our system of laws is highlighted by the precedence it takes over the common law. It is "[trite] law that where common law and equity conflict, equity is to prevail": *Bathgate v. National Hockey League Pension Society* (1992), 11 O.R. (3d) 449 (Gen. Div.), cited with approval by the Supreme Court of Canada in *Schmidt v. Air Products of Canada Ltd.*, [1994] 2 S.C.R. 611, at p. 641. This court, and the Superior Court of Justice, have been expressly entrusted with such equitable powers under s. 96 of the *Courts of Justice Act*, R.S.O. 1990, c. C.43.

[115] As such, in my view, it would take much stronger language in the jurisprudence, or a clear statutory amendment, to displace or limit the courts' equitable power to pierce the corporate veil in those extraordinary situations where liability has been established but the judgment creditor is nevertheless left without any remedy because of the judgment debtor's internal corporate structure. On this issue, I agree with the majority of the opinions offered in the most recent decision of the Supreme Court of the United Kingdom on this subject in *Prest v. Petrodel Resources Ltd.*, [2013] UKSC 34, [2013] 2 A.C. 415. Although Lords Sumption and Neuberger, held that corporate veil piercing should be restricted to circumstances that are akin to the ones identified in *Transamerica*, the five other justices gave concurring reasons – each explaining why the jurisdiction to pierce

Case 18-855, Document 94, 03/11/2019, 2515258, Page300 of 303

the corporate veil was not so narrow. As Lord Neuberger himself said, at para. 80, the doctrine of piercing the corporate veil:

> …has been generally assumed to exist in all common law jurisdictions, and represents a potentially valuable judicial tool to undo wrongdoing in some cases, where no other principle is available.

[116]  My colleague states the ultimate question in this case as being "whether this court is prepared to sacrifice certainty for the sake of expediency."  With respect, I believe that puts the question too starkly.  It is not a question of expediency.  It is a question of equity.  Consequently, I would reframe the question: Is this court prepared to recognize that there may be situations where equity would demand a departure from the strict application of the corporate separateness principle in the context of the enforceability of a valid judgment, whether foreign or domestic?  I suggest that that question should be answered in the affirmative while, at the same time, recognizing that the situations where such a remedy will be appropriate are likely to be rare and exceptional.  On that latter point, I adopt the observation made by Lord Mance in *Prest*, at para. 100:

> It is however often dangerous to seek to foreclose all possible future situations which may arise and I would not wish to do so.  What can be said with confidence is that the strength of the principle in *Salomon's* case and the number of other tools which the law has available mean that, if there are other situations in which piercing the veil may be relevant as a final fall-back, they are likely to be novel and very rare.

Case 18-855, Document 94, 03/11/2019, 2515258, Page301 of 303

[117] However, even accepting my reframed question as the proper one, my colleague aptly puts the dilemma that this court faces in answering it, at para. 79 of his reasons.  On the one hand, we have an apparently valid foreign judgment.  On the other hand, we have a finding by the U.S. courts that the judgment was obtained by fraud.  Comity demands that this court, at this stage, should respect both decisions.  But, at the same time, we must recognize the obvious conflict between them.  Because of the manner in which this matter has proceeded, our courts have not yet been called upon to make their own determination of the validity of the Ecuadorian judgment.  Absent such a finding, even on my approach to the judgment enforceability question, the circumstances here cannot rise to the level that would be necessary to conclude that the result is "too flagrantly opposed to justice" as to permit the corporate veil to be pierced.

[118]  In the end result, I agree that the appeals must be dismissed, save for the costs appeal.

Released: _____   MAY 2 3 2018

**SA294**
Page: 54

Case 18-855, Document 94, 03/11/2019, 2515258, Page302 of 303

**SCHEDULE I**
**LENCZNER SLAGHT ROYCE SMITH GRIFFIN LLP/ KOSKIE MINSKY LLP**
**37 plaintiffs**

Daniel Carlos Lusitande Yaiguaje
Benancio Fredy Chimbo Grefa
Miguel Mario Payaguaje Payaguaje
Teodoro Gonzalo Piaguaje Payaguaje
Simon Lusitande Yaiguaje
Armando Wilmer Piaguaje Payaguaje
Angel Justino Piaguaje Lucitante
Javier Piaguaje Payaguaje
Fermin Piaguaje
Luis Agustin Payaguaje Piaguaje
Emilio Martin Lusitande Yaiguaje
Reinaldo Lusitande Yaiguaje
Maria Victoria Aguinda Salazar
Carlos Grefa Huatatoca
Catalina Antonia Aguinda Salazar
Lidia Alexandria Aguinda Aguinda
Clide Ramiro Aguinda Aguinda
Luis Armando Chimbo Yumbo
Beatriz Mercedes Grefa Tanguila
Lucio Enrique Grefa Tanguila
Patricio Wilson Aguinda Aguinda
Patricio Alberto Chimbo Yumbo
Francisco matias Alvarado Yumbo
Olga Gloria Grefa Cerda
Narcisa Aida Tanguila Narvaez
Bertha Antonia Yumbo Tanguila
Gloria Lucrecia Tanguila Grefa
Celia Irene Viveros Cusangua
Lorenzo Jose Alvarado Yumbo
Francisco Alvarado Yumbo
Luisa Delia Tanguila Narvaez
Elias Roberto Piyahuaje Payahuaje
Lourdes Beatriz Chimbo Tanguila
Octavio Ismael Cordova Huanca
Guillermo Vincente Payaguaje Lusitande
Alfredo Donaldo Payaguaje Payaguaje
Delfin Leonidas Payaguaje Payaguaje

**SA295**
Page: 55


## SCHEDULE II
### GRANT HUBERMAN BARRISTERS & SOLICITORS
10 plaintiffs (as per Notice of Change of October 4, 2017)

Segundo Angel Amanta Milan
Heleodoro Pataron Guaraca
Hugo Gerardo Camacho Naranjo
Maria Clelia Reascos Revelo
Maria Magdalena Rodriguez Barcenes
Francisco Victor Tanguila Grefa
Rosa Teressa Chimbo Tanguila
Maria Hortencia Viveros Cusangua
Jose Gabriel Revelo Llore
Jose Miguel Ipiales Chicaiza

Case 18-855, Document 94, 03/11/2019, 2515258, Page303 of 303