# 18-855-cv(L)

**18-2191-cv(Con)**

## United States Court of Appeals
### *for the*
## Second Circuit

CHEVRON CORPORATION,

*Plaintiff-Counter-Defendant-Appellee*,

- v. -

DONZIGER & ASSOCIATES, PLLC, STEVEN DONZIGER,
THE LAW OFFICES OF STEVEN R. DONZIGER,

*Defendants-Counter-Claimants-Appellants*.

*(caption continued on inside cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
CASE NO. 1:11-CV-00691-LAK-JCF
THE HONORABLE LEWIS A. KAPLAN

**SUPPLEMENTAL APPENDIX
VOLUME II OF IV
(Pages SA296 to SA595)**

Randy M. Mastro
Andrea E. Neuman
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

William E. Thomson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7000

*Attorneys for Chevron Corporation*

PABLO FAJARDO MENDOZA, LUIS YANZA, FRENTE DE DEFENSA DE LA AMAZONIA, AKA AMAZON DEFENSE FRONT, SELVA VIVA SELVIVA CIA, LTDA, MARIA AGUINDA SALAZAR, CARLOS GREFA HUATATOCA, CATALINA ANTONIA AGUINDA SALAZAR, LIDIA ALEXANDRA AGUIN AGUINDA, PATRICIO ALBERTO CHIMBO YUMBO, CLIDE RAMIRO AGUINDA AGUINDA, LUIS ARMANDO CHIMBO YUMBO, BEATRIZ MERCEDES GREFA TANGUILA, LUCIO ENRIQUE GREFA TANGUILA, PATRICIO WILSON AGUINDA AGUINDA, CELIA IRENE VIVEROS CUSANGUA, FRANCISCO MATIAS ALVARADO YUMBO, FRANCISCO ALVARADO YUMBO, OLGA GLORIA GREFA CERDA, LORENZO JOSE ALVARADO YUMBO, NARCISA AIDA TANGUILA NARVAEZ, BERTHA ANTONIA YUMBO TANGUILA, GLORIA LUCRECIA TANGUI GREFA, FRANCISCO VICTOR TANGUILA GREFA, ROSA TERESA CHIMBO TANGUILA, JOSE GABRIEL REVELO LLORE, MARIA CLELIA REASCOS REVELO, MARIA MAGDALENA RODRI BARCENES, HUGO GERARDO CAMACHO NARANJO, JOSE MIGUEL IPIALES CHICAIZA, HELEODORO PATARON GUARACA, LUISA DELIA TANGUILA NARVAEZ, LOURDES BEATRIZ CHIMBO TANGUIL, MARIA HORTENCIA VIVER CUSANGUA, SEGUNDO ANGEL AMANTA MILAN, OCTAVIO ISMAEL CORDOVA HUANCA, ELIAS ROBERTO PIYAHUA PAYAHUAJE, JAVIER PIAGUAJE PAYAGUAJE, DANIEL CARLOS LUSITAND YAIGUAJE, BENANCIO FREDY CHIMBO GREFA, GUILLERMO VICENTE PAYAGUA LUSITANTE, DELFIN LEONIDAS PAYAGU PAYAGUAJE, ALFREDO DONALDO PAYAGUA PAYAGUAJE, MIGUEL MARIO PAYAGUAJE PAYAGUAJE, TEODORO GONZALOPIAGUAJE PAYAGUAJE, FERMIN PIAGUAJE PAYAGUAJE, REINALDO LUSITANDE YAIGUAJE, LUIS AGUSTIN PAYAGUA PIAGUAJE, EMILIO MARTIN LUSITAND YAIGUAJE, SIMON LUSITANDE YAIGUAJE, ARMANDO WILMER PIAGUAJE PAYAGUAJE, ANGEL JUSTINO PIAGUAG LUCITANT, KEMPERI BAIHUA HUANI, AHUA BAIHUA CAIGA, PENTIBO BAIHUA MIIPO, DABOTA TEGA HUANI, AHUAME HUANI BAIHUA, APARA QUEMPERI YATE, BAI BAIHUA MIIPO, BEBANCA TEGA HUANI, COMITA HUANI YATE, COPE TEGA HUANI, EHUENGUINTO TEGA, GAWARE TEGA HUANI, MARTIN BAIHUA MIIPO, MENCAY BAIHUA TEGA, MENEMO HUANI BAIHUA, MIIPO YATEHUE KEMPERI, MINIHUA HUANI YATE, NAMA BAIHUA HUANI, NAMO HUANI YATE, OMARI APICA HUANI, OMENE BAIHUA HUANI, YEHUA TEGA HUANI, WAGUI COBA HUANI, WEICA APICA HUANI, TEPAA QUIMONTARI WAIWA, NENQUIMO VENANCIO NIHUA, COMPA GUIQUITA, CONTA NENQUIMO QUIMONTARI, DANIEL EHUENGEI, NANTOQUI NENQUIMO, OKATA QUIPA NIHUA, CAI BAIHUA QUEMPERI, OMAYIHUE BAIHUA, TAPARE AHUA YETE, TEWEYENE LUCIANA NAM TEGA, ABAMO OMENE, ONENCA ENOMENGA, PEGO ENOMENGA, WANE IMA, WINA ENOMENGA, CAHUIYA OMACA, MIMA YETI,

     *Defendants*,

STRATUS CONSULTING, INC., DOUGLAS BELTMAN, ANN MAEST,

     *Defendants-Counter-Claimants*,

ANDREW WOODS, LAURA J. GARR, H5,

     *Respondents*.

# TABLE OF CONTENTS

PAGE

## Docket Entries

Exhibit 2-13 to Declaration of Kristen L. Hendricks in Support of
    Chevron Corporation's Motion for Preliminary Injunction, filed
    February 6, 2011 (Dkt. 7-6)

    Transcript of unreleased footage from the film *Crude* ...................... SA1

Exhibit 2075 to Declaration of Anne Champion in Support of
    Chevron Corporation's Motion for Summary Judgment of Partial
    Summary Judgment on Defendants' Affirmative Defenses of Res
    Judicata and Collateral Estoppel, filed March 2, 2012 (Dkt. 400-
    11)

    Excerpts from Daniel L. Rourke deposition transcript, dated
    December 20, 2010........................................................................ SA11

Excerpts from Chevron Corporation's Statement of Material Facts In
    Support of Motion for Summary Judgment or Partial Summary
    Judgment on the Stratus Defendants' Affirmative Defenses of
    Res Judicata and Collateral Estoppel, filed June 13, 2012
    (Dkt. 486) ..................................................................... SA15

Opinion on Partial Summary Judgment Motion, filed July 31, 2012
    (Dkt. 550) ..................................................................... SA18

Order of Appointment of Special Masters, filed March 26, 2013
    (Dkt. 942) ..................................................................... SA20

Notice of Appearance of Zoe B. Littlepage, filed October 13, 2013
    (Dkt. 1543) ................................................................... SA23

Exhibit A to Chevron Corporation's Notice of Filing of Witness
    Statement of Troy A. Dahlberg, filed October 23, 2013 (Dkt.
    1597-1)

ii

PAGE

Direct testimony of Troy A. Dahlberg, dated October 8, 2013 ........ SA24

Notice of Appearance of Richard H. Friedman, filed October 24, 2013
(Dkt. 1616)..................................................................................... SA30

Chevron Corporation's Notice of Application for Costs, filed
December 5, 2016 (Dkt. 1918)........................................................ SA31

Chevron Corporation's Statement of Non-Opposition to Donziger's
Motion to Hold Costs Bill in Abeyance, filed on December 29,
2016 (Dkt. 1920) ........................................................................... SA33

Order Granting in Part Donziger's Motion to Hold Chevron's Bill of
Costs in Abeyance, filed December 30, 2016 (Dkt. 1921)................ SA35

Memorandum Order Granting Chevron Corporation's Motion to
Reactivate Motion for Attorneys' Fees and Bill of Costs, filed
July 17, 2017 (Dkt. 1923)............................................................... SA37

Chevron Corporation's Notice of Application for Costs, filed July 18,
2017 (Dkt. 1924) ........................................................................... SA38

Donziger's Letter to Clerk of Court Objecting to Notice of
Application for Costs, filed August 1, 2017 (Dkt. 1925)................. SA40

Bill of Costs, filed August 8, 2017 (Dkt. 1928)...................................... SA47

Donziger's Letter to Court Objecting to Clerk's Taxation of Costs,
filed August 16, 2017 (Dkt. 1931) ................................................. SA58

Order Regarding Special Masters' Report, filed November 9, 2017
(Dkt. 1939)..................................................................................... SA64

Memorandum and Order Regarding Reasonableness of Special Master
Fees, filed December 6, 2017 (Dkt. 1940)....................................... SA66

Donziger's Objections to Notice of Taxation of Costs, filed December
6, 2017 (Dkt. 1941) ....................................................................... SA69

iii

PAGE

Special Masters' Final Report and Recommendation on Allocation of
    Their Fees and Costs, filed December 8, 2017 (Dkt. 1942).............. SA81

Exhibit A to Declaration of William E. Thomson in Support of
    Chevron Corporation's Response to Steven Donziger's
    December 6, 2017 Letter Objecting to the Fees of the Special
    Masters, filed December 13, 2017 (Dkt. 1945-1)

    Declaration of the Affected Nationalities in the Province of
    Sucumbios, dated August 20, 2016 ................................................. SA97

Order Adopting Special Masters' Final Report and Recommendation,
    filed December 27, 2017 (Dkt. 1946)............................................SA105

Donziger's Letter to Court Objecting to December 27, 2017 Order,
    filed December 28, 2017 (Dkt. 1947)............................................SA106

Declaration of Joseph M. Kay, filed January 9, 2018 (Dkt. 1949)...........SA110

Corrected Memorandum Opinion Granting In Part and Denying In
    Part Donziger's Motion to Review the Taxation of Costs, filed
    March 1, 2018 (Dkt. 1963) ...........................................................SA112

Chevron Corporation's Memorandum of Law in Support of Its Ex
    Parte Application By Order To Show Cause For Discovery and a
    Preservation Order in Furtherance of This Court's March 4, 2014
    Judgment and to Set a Hearing Date Subsequent to That
    Discovery on Chevron's Application to Have Steven Donziger
    Held in Contempt, filed on March 19, 2018 (Dkt. 1966).................SA160

Order to Show Cause and Preservation Order in Furtherance of This
    Court's March 4, 2014 Judgment and Application to Have
    Steven Donziger Held in Contempt, filed March 19, 2018 (Dkt.
    1968) ........................................................................................SA184

Clerk's Certificate of Default, filed April 18, 2018 (Dkt. 1984) .............SA188

iv

PAGE

Opposition to Chevron's Application for Contempt and Related Discovery, filed April 24, 2018 (Dkt. 1986)....................................SA191

Chevron Corporation's Reply Memorandum of Law in Support of Its Ex Parte Application By Order To Show Cause For Discovery and a Preservation Order in Furtherance of This Court's March 4, 2014 Judgment and to Set a Hearing Date Subsequent to That Discovery on Chevron's Application to Have Steven Donziger Held in Contempt, filed on May 4, 2018 (Dkt. 1987).......................SA201

Chevron Corporation's Motion to Compel Donziger to Respond to Post-Judgment Discovery Requests, filed on May 4, 2018 (Dkt. 1989)........................................................................................SA215

Exhibit 2 to Chevron Corporation's Motion to Compel Donziger to Respond to Post-Judgment Discovery Requests, filed May 4, 2018 (Dkt. 1989-2)

Letter from Steven Donziger to Randy Mastro, dated April 30, 2018........................................................................................SA222

Donziger's Opposition to Motion to Compel, filed May 10, 2018 (Dkt. 2002)........................................................................................SA232

Order on Motion to Compel Post-Judgment Discovery, filed May 17, 2018 (Dkt. 2009).........................................................................SA236

Attachment to Chevron Corporation's Letter to Court Regarding Canadian Appellate Decision, filed May 24, 2018 (Dkt. 2015-1)

Decision of Court of Appeal for Ontario, dated May 23, 2018........SA241

Donziger's Motion for Declaratory Relief and Motion to Dismiss Plaintiff's Application to Hold Donziger in Contempt for "Profiting" From The Ecuadorian Environmental Judgment, filed May 31, 2018 (Dkt. 2018).............................................................SA296

v

PAGE

Motion for an Emergency Administrative Stay of Provision 1(c) the
    Court's Discovery Order Until the Court Has Received Briefing
    and Decided Donziger's Pending Motion for a Protective Order,
    filed June 19, 2018 (Dkt. 2028) ....................................................SA308

Order Denying Donziger's Motions for Declaratory Judgment,
    Protective Order, and Administrative Stay, filed June 25, 2018
    (Dkt. 2037)....................................................................................SA313

Chevron Corporation's Second Motion to Compel Donziger to
    Respond to Post-Judgment Discovery Requests, filed August 16,
    2018 (Dkt. 2073) ..........................................................................SA314

Donziger Letter to Court Regarding August 15, 2018 Order, filed
    August 20, 2018 (Dkt. 2075) ........................................................SA321

Attachment to Chevron Corporation's Letter to Court Regarding BIT
    Decision, filed September 14, 2018 (Dkt. 2082-1)

    Second Partial Award on Track II, dated August 30, 2018..............SA322

Chevron Corporation's Memorandum of Law in Support of Its Motion
    to Hold Steven Donziger, the Law Office of Steven R. Donziger,
    and Donziger Associates, PLLC in Contempt of Court For Their
    Failure to Comply With the RICO and Default Judgments and
    the April 16, 2018 Restraining Notice, filed October 24, 2018
    (Dkt. 2113)....................................................................................SA844

Exhibit 2 to Declaration of Anne Champion in Support of Chevron
    Corporation's Motion to Hold Donziger in Contempt, filed
    October 24, 2018 (Dkt. 2114-1)

    Excerpts from deposition transcript of Steven R. Donziger, dated
    June 25, 2018 ................................................................................SA890

Donziger's Letter to Court Regarding February 21, 2019 Order, filed
    March 1, 2019 (Dkt. 2169) ...........................................................SA893

vi

PAGE

Order of Appointment Regarding Neutral Forensic Expert, filed
    March 5, 2019 (Dkt. 2170) ............................................................SA896

Memorandum re Forensic Inspection Protocol, filed March 5, 2019
    (Dkt. 2171).................................................................................SA898

Forensic Inspection Protocol, filed March 5, 2019 (Dkt. 2172) ..............SA914

Order Granting Request For Oversized Brief, No. 14-826, filed June
    26, 2014 (Dkt. 77) ......................................................................SA963

Corrected Brief of Defendants-Appellants Steven Donziger, The Law
    Offices of Steven Donziger, and Donziger & Associates PLLC,
    No. 14-826, filed July 16, 2014 (Dkt. 150)....................................SA965

Testimony of Charles Calmbacher, No. 14-826, filed October 1, 2014
    (Dkt. 185-5) ..............................................................................SA1100

Response to Statements By Mr. Cabrera Regarding Alleged Impacts
    to Water Resources in the Petroecuador-Texaco Concession
    Area, No. 14-826, filed October 1, 2014 (Dkt. 217-3) ..................SA1102

Corrected Reply Brief of Defendants-Appellants Steven Donziger,
    The Law Offices of Steven Donziger, and Donziger &
    Associates PLLC, No. 14-826, filed January 6, 2015 (Dkt. 317)...SA1105

Case 18-855, Document 95, 03/11/2019, 2515360, Page9 of 308

# SA296

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

CHEVRON CORPORATION,

        Plaintiff,

    v.

STEVEN DONZIGER *et al.*,

        Defendants.

11 Civ. 0691 (LAK)

## DEFENDANT DONZIGER'S MOTION FOR DECLARATORY RELIEF AND MOTION TO DISMISS PLAINTIFF'S APPLICATION TO HOLD DONZIGER IN CONTEMPT FOR "PROFITING" FROM THE ECUADORIAN ENVIRONMENTAL JUDGMENT

Defendant Steven Donziger hereby moves the Court pursuant to 28 U.S.C. § 2201 and FRCP Rule 57 for declaratory relief confirming that the Court's March 4, 2014 judgment (Dkt. 1875) ("NY Judgment"), as interpreted and limited in the Court's subsequent order dated April 25, 2014 (Dkt. 1901) ("Clarification Order") (together the "NY Judgment"), does not prevent the beneficiaries of the Ecuadorian environmental judgment affirmed by Ecuador's Supreme Court (the "Lago Agrio Judgment" or "Ecuador Judgment") from raising funds to cover litigation fees and expenses, at minimum so long as the specific legal interests of the three individual defendants named in the NY Judgment are not pledged or collateralized as part of any such fund-raising. In light of this already-established understanding of the scope, which was relied on by the Second Circuit in its affirmance of this Court's final opinion in the case (Dkt. 1874) ("RICO Opinion"), Mr. Donziger also hereby moves pursuant to Rule 12(b)(6) and (f) to dismiss those claims in plaintiff Chevron's Motion for Contempt ("Contempt Motion") which seek to hold Mr. Donziger

# SA297

in contempt for alleged non-compliance with the NY Judgment.

The foundational legal basis for the Court to grant the relief requested in the Contempt Motion are the limits imposed on Mr. Donziger (and Mssrs. Camacho and Piaguaje) by the NY Judgment. The NY Judgment, however, does not prevent Mr. Donziger from providing legal representation and other services to the beneficiaries of the Ecuadorian Judgment, who are prosecuting its enforcement in non-U.S. jurisdictions. To that end, the NY Judgment expressly does not prevent Mr. Donziger from assisting the beneficiaries of the Ecuador Judgment in their efforts to raise funds to cover legal expenses, debts, and fees (including Mr. Donziger's own fees) by means including but not limited to arranging third-party litigation financing predicated on the grant of an interest in any recovery in such non-U.S. jurisdiction. This is so, first, because any such financing for expenses is not a "profit" on, nor involves "proceeds" of, the Ecuador Judgment, and thus is not property "traceable" to the Ecuador Judgment, as this Court has established. *See* Clarification Order at 7-8 (distinguishing between contingency fee payments made after a "collection" on the Ecuador Judgment, which would be subject to the NY Judgment "constructive trust" and profit/monetization injunction, and retainer fee payments, which would not); *infra* at Section I.A. Second, even if the NY Judgment did apply to litigation finance funds, it only would apply to funds "traceable" or otherwise based on Mr. Donziger's (or Camacho/Piaguaje's) specific interests, in Mr. Donziger's case his extant contingency interest. So long as the litigation finance agreements do not involve Mr. Donziger pledging, assigning, committing, or otherwise collateralizing his specific contingency interest—and Chevron **has not even alleged** that they do— the NY Judgment does not have any impact.

The Contempt Motion not only denies *sub silentio* Mr. Donziger's legal rights, but asserts claims without a plausible factual showing that Mr. Donziger has violated the NY Judgment by

acting with respect to any "proceeds" on a collection or other recovery, or by profiting or monetizing **his** interest in the Ecuador Judgment as part of any third-party litigation funding arrangement. There is no evidence, suggestion, or even allegation that Mr. Donziger's specific legal interest impacted by the NY Judgment has been part of any past or proposed financing arrangement, nor any common sense reason to think that it would be when that interest is subject to the NY Judgment while all other interests in the Ecuador judgment (except those of Mr. Camacho and Mr. Piaguaje) are not. The burden of proof on the Contempt Motion is squarely on Chevron, and has clearly not been met. Mr. Donziger thus respectfully requests that the Court grant this motion for declaratory relief and dismissal of the related claims in the Contempt Motion.

## I.     Declaratory Relief

In light of the chilling effect on potential funders and Chevron's continuous overbearing and harassing efforts to thwart Mr. Donziger's exercise of his right to provide effective legal representation for the beneficiaries of the Ecuador Judgment, it is imperative that the Court grant the requested declaratory relief.  In particular, it is necessary for the Court to declare that the NY Judgment in no way prevents:

1. Mr. Donziger or third-parties from exercising their legal rights in non-U.S. jurisdictions to obtain enforcement and related recovery on the Ecuador Judgment, consistent with the NY Judgment and the Second Circuit's affirmance thereof;

2. Mr. Donziger from providing legal and other services including assistance in raising funds to cover litigation expenses, debts, and fees, from third-party litigation finance investors predicated on an interest in any recovery other than his specific contingency interest (or any specific interest that Mssrs. Camacho and Piaguaje may have);

3. Mr. Donziger from receiving payments out of such third-party litigation finance funds

# SA299

to cover his legal expenses and fees for providing legal and other services, consistent with the terms of any such agreement and any applicable law.

Under 28 U.S.C. § 2201(a), a court may "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." In this Circuit, "federal district courts must entertain declaratory judgment actions when the judgment 'will serve a useful purpose in clarifying and settling the legal relations in issue' or 'when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Gonzalez v. J.P. Morgan Chase Bank*, N.A., 228 F. Supp. 3d 277, 286 (S.D.N.Y. 2017) (quoting *Cont'l Cas. Co. v. Coastal Sav. Bank*, 977 F.2d 734, 737 (2d Cir. 1992)).

In light of the Court's treatment of the Contempt Motion in its order dated May 16, 2018 on the "first branch" of the Contempt Motion (Dkt. 2006) (First Branch Order), Mr. Donziger currently faces profound insecurity—and the actual burden of preparing for an evidentiary hearing which he must litigate *pro se* and at which he has been called to testify—on the question of whether the NY Judgment allows for the execution of third-party litigation finance agreements to cover litigation expenses, including Mr. Donziger's own fees. Critically, this is a pure question of law, determinable by interpretation of the language of the NY Judgment itself. An evidentiary hearing is entirely unnecessary and inappropriate.

That the scope of the NY Judgment is a pure question of law already been decided and is law of the case. *Infra* Section I.A. This limited scope completely resolves the relevant claims in the Contempt Motion, rendering them subject to dismissal for failure to state a claim. *Infra* at Section II. To remove the "uncertainty, insecurity, and controversy" the Court created by failing to acknowledge the limited scope of the NY Judgment in its First Branch Order, the Court should articulately address that scope as a matter of law, and should issue declaratory relief sufficient to

# SA300

confirm the interpretation established by the Clarification Order, and relied on by the Second Circuit, *viz.* that the NY Judgment does "not prevent Donziger from being paid [non-contingency fees for legal and other work], just as he has been paid . . . over the past nine or ten years," nor "prevent[] the [Lago Agrio Plaintiffs] (other than the two LAP Representatives who are named in the NY Judgment) and their allies from continuing to raise money in the same fashion" as prior litigation finance efforts well-known to the Court. Clarification Order at 7-8, 12.

Because the scope of the NY Judgment was carefully articulated by the Court in the Clarification Order, that limited scope is law of the case. *See, e.g.*, *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) ("when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case" unless "cogent and compelling reasons militate otherwise"); *see also Tomasino v. Estee Lauder Companies, Inc.*, 2015 WL 1470177, at *1 (E.D.N.Y. Mar. 31, 2015) ("The law of the case doctrine is usually considered to have two branches. The first—the so-called mandate rule—requires trial courts to follow an appellate court's ruling on an issue in the same case. The second branch is more flexible but generally holds that a court should adhere to its earlier decisions in subsequent stages of litigation unless compelling reasons counsel otherwise.") (internal citations omitted; citing *Quintieri*). In fact, the Court's interpretations as set out in the Clarification Order are now law of the case under both "branches" of the doctrine, because the Second Circuit expressly relied on the limited scope of the NY Judgment in its affirmance of the Court's RICO Opinion. *See infra* Section I.B. The Clarification Order is thus part of the Circuit's mandate of affirmance and cannot now be disturbed. *See, e.g.*, *In re FCC*, 217 F.3d 125, 133 (2d Cir. 2000) ("the terms of the mandate [must be] scrupulously and fully carried out and [] the inferior court's actions on remand [must] not [be] inconsistent with either the express terms or the spirit of the mandate."); *cf. In re MidAmerican*

# SA301

*Energy Co.*, 286 F.3d 483, 487 (8th Cir. 2002) (an appellate court's mandate "encompasses everything decided, either expressly or by necessary implication" on appeal).

A. *The Court already has unambiguously concluded that the NY Judgment does not preclude pre-collection arrangements to finance litigation expenses, or arrangements that do not involve the specific interests of Mr. Donziger, Mr. Camacho, or Mr. Piaguaje*

In the NY Judgment, the Court imposed a constructive trust over all property "that Donziger has received, or hereafter may receive," or "that [Camacho or Piaguaje], or each of them, has received, or hereafter may receive," "that is traceable to the [Environmental] Judgment or the enforcement of the Judgment." NY Judgment at ¶¶ 1-2 (emphasis added). In the Clarification Order, the Court interpreted the scope of what property would be considered "traceable" in the context of Mr. Donziger's concern that the NY Judgment arguably prevented him from getting paid for his work on the case out of funds provided by litigation finance agreements. The Court concluded that while

> payments of a Contingent Fee would be 'traceable to the [Lago Agrio] Judgment,' and thus subject to the constructive trust imposed by paragraph 1, the same would not be true of Monthly Retainer payments unless those payments were traceable to the Lago Agrio Judgment. Thus, at least ***as long as no collections are made in respect of the Lago Agrio Judgment*** and funneled to Donziger as retainer payments, the NY Judgment would not prevent Donziger from being paid, just as he has been paid at least $958,000 and likely considerably more over the past nine or ten years.

Clarification Order at 7-8 (emphasis added). As indicated, the Court was very familiar with the litigation finance agreements that had been used in prior years to cover litigation expenses, including Mr. Donziger's legal fees, and which it endorsed in the foregoing paragraph. The Court similarly addressed Mr. Donziger's concern that Paragraph 5 of the NY Judgment, which enjoins "any acts to monetize or profit from the [Lago Agrio] Judgment," could be interpreted as preventing him from getting paid out of litigation finance arrangements, and unequivocally held

# SA302

that any such interpretation was "wrong." Clarification Order at 10. In response, the Court explained, "[t]he point of paragraph 5 . . . was to prevent Donziger and the LAP Representatives from avoiding the effect of the constructive trust imposed on assets in their hands that otherwise would have been direct proceeds of the Judgment by selling, assigning, or borrowing on ***their*** interests in the Lago Agrio Judgment and thus at least confusing the issue of traceability." *Id.* **(emphasis original)**. With this clarification, the Court limited the scope of Paragraph 5 on two levels. First, it only applies as a backup or support provision to effectuate the constructive trust, and thus is correspondingly limited by the limited scope of the constructive trust, *i.e.* to property received as "proceeds" on a "collection" on the Lago Agrio Judgment. Second, with its emphasis, the Court noted that the injunction would only apply to enjoin the treatment of interests specific to the three individual defendants—"***their*** interests"—leaving any and all other interests on the Lago Agrio Judgment free to be leveraged for litigation finance purposes.

Indeed, beyond payments of fees, defendants had more broadly expressed concern that the NY Judgment would prevent the execution of financing arrangements necessary to fund their appeal and pursue enforcement of the Lago Agrio Judgment in Canada and elsewhere, noting that Chevron had even "boast[ed]" that the NY Judgment would have precisely such an effect. *See, e.g.*, Dkts. 1898 at 2, 6, and 1893 at 20-21; Dkt. 1988 at 10 n.5. The Court dismissed such concerns as so unfounded as to "border on the irresponsible." Clarification Order at 11. Rather, the Court held that there was "no[] show[ing] that the provision of the NY Judgment preventing [defendants] from monetizing any interest they may have in the Lago Agrio Judgment threatens them with irreparable injury, either by preventing them from appealing here or in any other way." *Id.* at 14.

On the basis of this unambiguous language, Mr. Donziger and others have proceeded to raise funds from investors to cover litigation expenses and fees, in return for grants of interests in

# SA303

any recovery in a  non-U.S. jurisdiction. There is no basis to support even the supposition—and Chevron makes no evidentiary showing whatsoever—that these agreements have been supported or collateralized in any way by interests specific to Mr. Donziger (or Camacho or Piaguaje).  The NY Judgment itself renders such a proposition impracticable. And the evidentiary burden on Chevron's Contempt Motion is entirely Chevron's.  Despite its attempt to dress the Contempt Motion in evidence such as the Declaration of Lee Grinburg, Chevron (and Grinburg) have failed to even allege, let alone substantiate with evidence, that the specific interests of Mr. Donziger, and Mssrs. Piaguaje and Camachohave played any role in any actual or proposed litigation finance agreements. Accordingly, the conjoined motion to dismiss the relevant allegations in Chevron's Contempt Motion is appropriate. *Infra* at Section II.

> B. *The Second Circuit relied on the limited scope and effect of the NY Judgment in its affirmance of the Court's RICO Decision such that modification of that scope now would disturb the Circuit's mandate*

It is important to note that the Court's conclusions regarding the scope and application of Paragraphs 1-2 and 5 of the NY Judgment, as set out in the Clarification Order, are also subject to the "mandate rule" of the law of the case doctrine. *See Tomasino*, *supra*. The Second Circuit's affirmance of this Court's RICO Opinion was expressly and repeatedly predicated on the fact that "[t]he relief tailored by [this Court] . . . does not invalidate the Ecuadorian judgment and does not prohibit any of the LAPs from seeking enforcement of that judgment anywhere outside of the United States." *Chevron Corporation v. Donziger*, 833 F.3d 74, 151 (2016). *See also id.* at 81 ("For the reasons that follow, including . . . the district court's **confinement of its injunction to a grant of in personam relief against the three defendants-appellants without disturbing the Ecuadorian judgment**, we find no basis for dismissal or reversal, and we affirm the judgment of the district court.) (emphasis added); *id.* at 119 ("The district court pointed out that its final

# SA304

judgment would merely 'prevent Donziger and the LAP Representatives from profiting from the [Lago Agrio] Judgment or seeking to enforce it in this country,' *i.e.*, the judgment '**prevents the three defendants who appeared at trial**—over whom [the district court] has personal jurisdiction—from profiting from their fraud'") (internal citations omitted) (**emphasis original to the Second Circuit**); *id.* at 143 ("the injunction in the District Court Judgment is directed at *only three persons*") (emphasis added); *id.* at 144 (the district court granted only "limited, non-global equitable relief"); *id.* at 145 (the district court only "granted equitable *in personam* relief *that does not invalidate the Ecuadorian judgment*") (emphasis added); *id.* at 151 ("we see no abuse of discretion in the equitable *in personam* relief granted by the district court").

In their post-judgment emergency relief, the three defendants articulated the concern that the language swept far beyond this "confined" interpretation, specifically that by shutting down the ability to raise funds to cover litigation expenses, the NY Judgment would indeed "disturb[]" and effectively "invalidate" the Ecuadorian Judgment. *See* Dkts. 1888 at 10, 1898 at 2, 6. Had they not received the Court's ruling that the NY Judgment did no such thing, Mr. Donziger and the Ecuadorian defendants would have advanced these arguments about the sweeping practical effect of the NY Judgment on appeal, and the Second Circuit would not have been able to rely on "confine[d]" nature of the NY Judgment as it did. Were this Court to reverse course on its interpretation of the NY Judgment now, in post-judgment proceedings on remand, it would undermine a premise foundational to the decision preserved in the Second Circuit's mandate of affirmance, and thus run flagrantly afoul of the standing rule that a district court's "actions on remand [must] not [be] inconsistent with either the express terms or the spirit of the mandate." *In re FCC*, *supra*, 217 F.3d at 133; *cf. In re MidAmerican Energy Co.*, *supra*, 286 F.3d at 487 (an appellate court's mandate "encompasses everything decided, either expressly or by necessary

# SA305

implication" on appeal).

The Court cannot and should not alter the law of the case and upset the appellate mandate. Were it to do so, appellate response on a writ of mandamus would be necessary. *See, e.g.*, *In re Cont'l Ill. Sec. Litig.*, 985 F.2d 867, 869 (7th Cir. 1993) ("One of the less controversial functions of mandamus is to assure that a lower court complies with the spirit as well as the letter of the mandate issued to that court by a higher court.").

## II.    Motion to Dismiss

Under the familiar pleading standards, a party asserting a claim for relief in federal court must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That is, "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the court will "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party," *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007), this principle is this "inapplicable to legal conclusions" and "mere conclusory statements." *Iqbal*, 556 U.S. at 678. The facts accepted as true are only those facts "asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy*, *supra* at 191. Moreover, where the claim sounds in fraud or deception, it must meet the heightened pleading standards of Fed. R. Civ. P. 9(b) requiring the plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25 (2d Cir. 2016) (quoting *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).

# SA306

With reference to the proper scope of the RICO Judgment as described in the Clarification Order, *supra*, Chevron's non-compliance contempt claims should be dismissed because they fail to allege the existence of any collection or other recovery from the Ecuadorian judgment (and of course, there has been no such collection as yet), and thus cannot legitimately claim that either the constructive trust provisions of Paragraphs 1-2 or the monetization provisions of Paragraph 5 of the RICO Judgment even apply. (In its First Branch Order, the Court appears to have recognized the insufficiency of any claim of non-compliance with Paragraphs 1-2 and simply ignored that part of the Contempt Motion.) The Contempt Motion is also devoid of any allegation of fund-raising designed to "avoid[] the effect of the constructive trust imposed on assets in their hands that otherwise would have been direct proceeds of the Judgment," *i.e.* on funds from a "collections . . . made in respect of the Lago Agrio Judgment," which is what Paragraph 5 of the NY Judgment was drafted to enjoin. *See supra.*

To the extent there exists a question as to whether Paragraph 5 potentially applies to investment funds for litigation expenses received prior to any collection or other recovery, Paragraph 5 nonetheless can only apply to the specific interests of Mr. Donziger, Mr. Camacho, or Mr.Piaguaje. *Supra.* As long as any expense funding does not specifically assign, commit, or otherwise leverage interests specific to those three individuals, there is no violation of Paragraph 5. *Supra.* Both the Contempt Motion and the attached Declaration of Lee Grinburg fail entirely to allege the critical fact that any interest specific to these three individuals was ever even suggested as part of any proposed funding arrangement.  And there is no factual allegation that any prior agreements involved interests specific to the three. The Court does not need a hearing to confirm that Chevron did not just somehow overlook this critical fact. In light of the Clarification Order, it is the only critical fact. If Grinburg could provide even a hint or suggestion that Mr. Donziger's

# SA307

particular interest was being monetized, that obviously would have been showcased in both his declaration and the larger contempt motion. Indeed, Chevron does not even bother to make a "conclusory statement," *Iqbal*, 556 U.S. at 678, in this regard; rather, the Contempt Motion relies entirely on the false presumption that any monetization of any interest is in violation of the RICO Judgment. Because that assertion is contrary to the law of the case and the Contempt Motion lacks any factual content suggesting the involvement of the specific interests of Mr. Donziger, Mr. Camacho, or Mr. Piaguaje in any funding arrangement, Chevron's claims for non-compliance with Paragraph 5 are frivolous and must be dismissed.

## Conclusion

For the foregoing reasons, Mr. Donziger requests that this Court issue declaratory relief sufficient to confirm the interpretations of NY Judgment established by the Clarification Order, and relied on by the Second Circuit, specifically that the constructive trust articulated in the NY Judgment does not apply to funds obtained to cover litigation expenses and fees prior to a "collection" or other recovery of "proceeds" on the Ecuadorian Judgment, and further that the Court dismiss the remainder of the Contempt Motion as a matter of law.

DATED:      May 31, 2018                Respectfully submitted,

                                        *s/ Steven R. Donziger*
                                        Steven R. Donziger
                                        245 W. 104th Street, #7D
                                        New York, NY 10025
                                        Tel: (917) 678-3943
                                        Fax: (212) 409-8628
                                        Email: sdonziger@donzigerandassociates.com

                                        *Pro se*
                                        *Counsel to Donziger & Associates, PLLC, and*
                                        *the Law Offices of Steven R. Donziger*

# SA308

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHEVRON CORPORATION, | |
| Plaintiff, | |
| v. | 11 Civ. 0691 (LAK) |
| STEVEN DONZIGER *et al.*, | |
| Defendants. | |

## MOTION FOR AN EMERGENCY ADMINISTRATIVE STAY OF PROVISION 1(c) THE COURT'S DISCOVERY ORDER [DKT. 2027] UNTIL THE COURT HAS RECEIVED BRIEFING AND DECIDED DONZIGER'S PENDING MOTION FOR A PROTECTIVE ORDER

Defendant Steven Donziger hereby moves on an emergency basis for an administrative stay of provision 1(c) of the Court's Order with Respect to Certain Pre-Hearing Discovery, issued today directing disclosure of some certain responsive discovery by third-party Katie Sullivan. Dkt. 2027 ("Sullivan Order"). The partial stay requested is necessary to prevent the potential irreparable harm of the disclosure of certain information (such as the identity of funders) for which Mr. Donziger has sought protection by way of his recent Motion for a Protective Order, Dkt. 2026 ("First Amendment Motion" or "Motion"), at least until such time as the Court has been able to receive full briefing and issue a ruling on that Motion.[1]

---

[1] The ECF docket entry text for Dkt. 2027 indicates that the Sullivan Order is "denying 2026 Motion for Protective Order," i.e. the First Amendment Motion, which has not been fully briefed. However, no reference to Dkt. 2026 is made in the Sullivan Order itself; rather, the part of the Sullivan Order stating that "[t]he application for a protective order is denied" would appear to reference the application for a protective order made by Ms. Sullivan's counsel by letter dated June 13, 2018 (Dkt. 2025-1), which is otherwise the subject of the Sullivan Order.

# SA309

Ms. Sullivan is a third-party who has worked closely with Mr. Donziger and others who directly and indirectly form the advocacy group that has sought to impose accountability on Chevron for the toxic contamination deliberately discharged in Ecuador by its predecessor Texaco. As set out in detail in the First Amendment Motion, this group ("Aguinda Supporters") faces a concrete and significant threat of reprisal from Chevron due to their advocacy. The Sullivan Order directs Ms. Sullivan to produce, "without further delay," discovery concerning (a) Elliott Management Corp.; (b) "Donziger's assets, liabilities, and financial situation"; and (c) any payments to Donziger, past or anticipated, out of proceeds of financing granted in whole or in part in exchange for any portion of any future collections of the Ecuadorian judgment." Dkt. 2027 at 1-2.

Pursuant to a FRE 502(d) stipulation between the parties, Mr. Donziger has already produced discovery on the Elliott Management issue, the subject of the forthcoming hearing. Absent a threat of any claim of waiver of any privilege or protection, Mr. Donziger does not seek relief regarding this part of the Sullivan Order because he does not perceive any risk of disclosure of information that would be protected if relief were granted under the First Amendment Motion. Similarly, Mr. Donziger has already produced discovery regarding his present assets, liabilities, and financial situation, and so long as the discovery ordered by the Sullivan Order is limited to Mr. Donziger's personal finances, Mr. Donziger does not perceive a significant risk of disclosure of potentially protected information.

However, Mr. Donziger is concerned that the third category of discovery ordered by the Sullivan Order could contain information that should be protected by the Court in response to the

---

Dkt. 2027 at 1. Mr. Donziger respectfully suggests that the note that Dkt. 2027 "den[ies]" Dkt. 2026 is a clerk's error and request confirmation regarding the same.

# SA310

First Amendment Motion, such as the identity of specific funders or other Aguinda Supporters. Admittedly, Mr. Donziger does not know whether the information that Ms. Sullivan would produce would necessarily cause this harm. But counsel for Ms. Sullivan has declined to offer any assurances or allow Mr. Donziger to review the discovery to be produced prior to production. In fact, Ms. Sullivan's counsel has refused to offer any assurances regarding the timing of Ms. Sullivan's production, creating the severely urgent situation driving this Emergency Motion. As such, Mr. Donziger is compelled to seek the simple, temporary relief requested herein: that the Court stay provision 1(c) of the Sullivan Order, at least to the extent that responsive discovery thereto "would tend to reveal the identity of any funder or other material supporter of the Ecuador Litigation and/or the internal operational, organizational, administrative, or financial management practices of the [Aguinda Supporters]." *Cf.* Dkt. 2026 at 2.

The Court has the authority to issue the temporary, administrative stay requested here at its discretion, and indeed in its own interest in preventing an issue of constitutional dimension properly before the Court from being mooted by the actions of a third-party who has already sought the Court's guidance. To the extent additional analysis is necessary, the Court can consider this request under the factors concerning issuance of a stay pending appeal: "(1) whether the movant will suffer irreparable injury absent a stay, (2) whether a party will suffer irreparable injury if a stay is issued, (3) whether the movant has demonstrated a substantial possibility, although less than a likelihood, of success on appeal, and (4) the public interests that may be affected." *Torres v. N.Y. State Bd. of Elections*, 462 F.3d 161, 207 (2d Cir. 2006).

The first and most important factor compels issuance of the requested relief. Absent the narrow requested stay, discovery produced by Ms. Sullivan pursuant to the Sullivan Order could effectively moot the First Amendment Motion, expose the constitutionally protected materials

# SA311

described in the Motion, expose Aguinda Supporters to the sorts of abusive reprisals for which Chevron is notorious (as described and supported with record evidence in the First Amendment Motion), and ultimately violate the essential and other First Amendment rights sought to be protected. The public interest weighs strongly against the imposition of such a result without even so much process as the briefing of, and reasoned decision on, a motion for protection. Chevron cannot pretend that it will suffer any cognizable harm, much less significant or irreparable harm, from a temporary administrative stay that would in fact just give Chevron the opportunity to make known its own views on the Motion. And without rehashing the substance of the Motion, Mr. Donziger submits that it sets out compelling facts fully justifying the prudent relief sought therein and thus raises "a substantial possibility" of success.

## CONCLUSION

For the foregoing reasons, Mr. Donziger respectfully requests that the Court stay provision 1(c) of the Sullivan Order, or otherwise issue instructions to Ms. Sullivan sufficient to ensure that she not produce discovery that would tend to reveal the identity of any funder or other material supporter of the Ecuador Litigation and/or the internal operational, organizational, administrative, or financial management practices of the Aguinda Supporters until Mr. Donziger's First Amendment Motion has been briefed and decided.

Case 1:11-cv-00691-LAK-JCF   Document 2028   Filed 06/19/18   Page 5 of 5

**SA312**

DATED:          June 19, 2018                    Respectfully submitted,

<u>s/ Steven R. Donziger</u>
Steven R. Donziger
245 W. 104th Street, #7D
New York, NY 10025
Tel: (917) 678-3943
Fax: (212) 409-8628
Email: sdonziger@donzigerandassociates.com

*Pro se*
*Counsel to Donziger & Associates, PLLC, and*
*the Law Offices of Steven R. Donziger*

# SA313

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

                     Plaintiff,

        -against-

STEVEN DONZIGER, et al.,

                     Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/25/18

11 Civ. 0691 (LAK)

## ORDER

LEWIS A. KAPLAN, *District Judge.*

        Defendant Donziger's motions for a declaratory judgment and other relief [DI 2018], for a protective order [DI 2026], and for an "emergency administrative stay" [DI 2028] all are denied. An opinion will be filed promptly.

        SO ORDERED.

Dated:     June 25, 2018

                                      _____
                                        Lewis A. Kaplan
                               United States District Judge

# SA314

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                      :

CHEVRON CORPORATION,       :

                      :

        Plaintiff,       :

                      :

    v.                   :    11 Civ. 0691 (LAK)

                      :

STEVEN DONZIGER, *et al.*,      :

                      :

        Defendants.     :

                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## CHEVRON CORPORATION'S SECOND MOTION TO COMPEL DONZIGER TO RESPOND TO POST-JUDGMENT DISCOVERY REQUESTS


GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

STERN, KILCULLEN & RUFOLO LLC
325 Columbia Tpke, Ste 110
P.O. Box 992
Florham Park, New Jersey 07932-0992
Telephone:  973.535.1900
Facsimile:  973.535.9664

*Attorneys for Plaintiff Chevron Corporation*

i

# SA315

Donziger is in blatant violation of multiple discovery orders. The Court ordered him to respond to Chevron's Money Judgment Discovery requests by June 15, 2018 (Dkt. 2009), and to Paragraph 5 Compliance requests by August 15 (Dkt. 2056), but instead of serving good-faith responses (or in the case of the August 15 deadline, serving any responses at all), Donziger has concealed bank accounts and assets, and failed to conduct even the most basic document searches. Indeed, after months of delay, Donziger has produced a mere 22 pages worth of documents—relying on previously overruled scope and First Amendment objections, unsubstantiated privilege claims, and a supposed lack of resources. Ex. 1 at 25:11-26:2; Dkt. 2045 at 21-35; Ex. 2. And he refused to answer dozens of questions at his June 25 deposition, stalled the deposition with speeches, took four breaks even before lunch, and made multiple threats to terminate the deposition. *See, e.g.*, Ex. 1 at 8:18-9:7; 13:5-18; 34:12-17; 38:16-18; 70:11; 87:5; 89:19-90:4; 99:4-13; 102:2-103:1; 123:22-124:7; 128:11-129:12;139:23-143:18.

Discovery obtained from third parties leaves no doubt that these tactics are intended to prevent Chevron from discovering his assets and his receipt of at least $1.4 million traceable to the Ecuadorian Judgment since entry of the RICO injunction. Chevron thus respectfully requests that the Court order Donziger to fully comply with Chevron's subpoenas (Dkt. 1988-1) (including another deposition regarding both Money Judgment and Compliance topics), and provide adequate assurances that relevant records have been preserved by presenting his laptop and other electronic devices for forensic imaging to be lodged with the Court. Chevron also requests a finding that he has waived privilege in view of his failure to serve a privilege log.

**Information Requests.** Donziger's responses to Chevron's Information Requests are an exercise in obfuscation. Rather than provide substantive responses, Donziger reiterates the positions that led to Chevron's last motion to compel—that he is entitled to determine the extent of

# SA316

permissible discovery unilaterally despite the law to the contrary.  *Compare EM Ltd. v. Republic of Argentin*a, 695 F.3d 201, 207 (2d Cir. 2012) (broad execution discovery "is the norm in federal and New York state courts") *with* Ex. 6 at 2 ("the only discovery 'relevant to the satisfaction of the judgment' is discovery into the present whereabouts and extent of assets potentially available to satisfy the judgment" and "past payments are not relevant").  Donziger also refuses to respond based on First Amendment objections this Court has overruled.  *See, e.g.*, Ex. 3 (Responses to Requests 14, 16, 17, 26-29); Ex. 9 (email chain showing Donziger's failure to reply or produce documents after the Court overruled his discovery objections); Dkt. 2045 at 20, 22 n.52, 35.  And despite the August 15 deadline, Donziger has failed altogether to respond to Paragraph 5 Compliance requests.  Dkt. 2067.  Donziger should be required to provide full responses to Chevron's Information Requests.

Consistent with a longstanding pattern, Donziger also concealed material information until confronted with contradictory documents.  For example, Donziger disclosed five TD Bank accounts he claimed were "the only bank accounts [he had] used since March 4, 2014."  Ex. 3 at 1 (response to RFP 1).  But Documents produced by Sullivan reveal Donziger's use of at least seven TD Bank accounts, including one Donziger did not disclose from which hundreds of thousands of dollars were paid to him and to co-conspirators.  Ex. 4 (showing incoming transfers from Streamline Family Office Inc. (Katie Sullivan's company) of $25,000, $25,000, and $75,000); Ex. 7 (showing incoming transfers from Lenczner Slaght Royce Smith Griffin LLP (the LAPs' enforcement counsel in Canada) of $74,990, $104,990, $143,490, $99,990, $64,9990, and a transfer from an unknown source of $404,049.67); Dkt. 2059-4.  Having received a copy of Sullivan's production before his deposition, he admitted that there "might be have been other [TD] accounts," and that he did receive payments from post-RICO raised "case funds."  Ex. 1 at

# SA317

110:11-13; 100:8-18; Ex. 3 (RFPs 1, 7, 11, 19, 25-26; Information Requests 1, 3, 11, 16-17, 20); Ex. 8.

**Document Requests.** In response to more than 30 requests, Donziger has produced 22 pages of documents, and not a single financial account statement, tax return, or document related to his receipt of over a million dollars from post-RICO financing of the Ecuadorian judgment. "Reasonable diligence, at the very least, requires a party to develop reasonably effective methods of compliance." *Zino Davidoff SA v. CVS Corp.*, No. 06 CN 15332 (RJS), 2008 WL 1775410, at *8 (S.D.N.Y. Apr. 17, 2008). Yet Donziger admits to the inadequacy of his search, Ex. 1 at 48:3-5 ("I have not searched for documents responsive to every request"), claiming he is a "sole practitioner with limited time and limited technical capacity to effectuate the kind of search that, say, Chevron would do or you guys would do at Gibson Dunn on behalf of Chevron," *id.* at 47:3-8; 53:16-20. He admits to withholding "a few hundred pages" of responsive document on the basis of First Amendment objections that had already been rejected, *id.* at 47:16-22, that he has Elliott-related emails he failed to produce, *id.* at 83:15-17 ("I have realized now with Katie Sullivan's production there are some other e-mails that I obviously missed in my search. So yes, I do have other e-mails."), and that "if Judge Kaplan were to order me to produce everything that you are asking for, it obviously would be a lot more than that," *id.* at 47:16-22. But this Court *had already* ordered him to respond fully to Chevron's Money Judgment Discovery requests and now to the Paragraph 5 requests. Dkts. 2009; 2045; 2056. Donziger also admitted he "may" have destroyed emails related to the Elliott solicitation. Ex. 1 at 84:20-85:19. Given these admissions, the Court should order Donziger to comply fully with Chevron's document requests and to present his electronic devices for forensic imaging, with the images to be lodged with the Court. *See Super Future Equities, Inc. v. Wells Fargo Bank Minnesota, N.A.*, No. CIV.A.3:06-CV-

3

# SA318

0271-B, 2008 WL 3261095, at *3 (N.D. Tex. Aug. 8, 2008) (ordering party who refused to "agree not to destroy any electronic documents" "to preserve as evidence [his] hard drives," "image the hard drives, and file the images with the Court under seal").

**Donziger Has Waived Privilege.** On June 15, 2018, Donziger and Chevron stipulated under Rule 502(d) of the Federal Rules of Evidence at Donziger's request supposedly to relieve him of the burden of a privilege review. Dkt. 2030. But as Donziger testified, he hasn't "produced" his documents "under the 502," instead withholding documents on the basis of unspecified claims of privilege, for which he has provided no log. Ex. 1 at 48:17-49:8. Donziger's failure to provide a log waives any claim of privilege. *See, e.g.*, *Rahman v. Smith & Wollensky Rest. Group, Inc.*, No. 06 Civ. 6198, 2007 WL 1521117, at *3 (S.D.N.Y. May 24, 2007).

**Deposition.** At his deposition, Donziger was evasive[1] and refused to answer questions on his finances and numerous other topics on the basis of the "First Amendment" and baseless scope objections.[2] "[A] judgment creditor is entitled to "a 'very thorough examination' of a judgment debtor." *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, No. 88 CV 3039 (ILG), 1993 WL 50528, at *1 (E.D.N.Y. Feb. 23, 1993). Donziger should be required to sit for an additional deposition of 7 hours (exclusive of breaks).

Dated: August 16, 2018        Respectfully submitted,

New York, New York        GIBSON, DUNN & CRUTCHER LLP

                                       *Randy M. Mastro*

---

[1] *See, e.g.*, Ex. 1 at 99:24-100:7; 100:23-101:18; 69:11-70:5; 112:25-113:7; 31:8-9 ("I don't believe so. It is possible. I'm not really sure."); 68:21-22 ("I don't believe that it was executed, although I'm not sure.").

[2] *See, e.g.*, *id*. at 63:2-13 (refusing to identify his role in Canadian enforcement proceeding); 68:23-69:5 (refusing to respond why Sullivan was hired); 80:6-81:5 (refusing to describe disposition of funds in the CWP ("Chevron Will Pay") case account); 127:18-128:8 (refusing to respond to whether he entered into a funding agreement).

4

# SA319

Randy M. Mastro
Andrea E. Neuman
Anne Champion
200 Park Avenue
New York, New York 10166
Telephone: 212.351.4000
Facsimile: 212.351.4035
Email: rmastro@gibsondunn.com
Email: aneuman@gibsondunn.com
Email: achampion@gibsondunn.com

William E. Thomson (*pro hac vice*)
333 South Grand Avenue
Los Angeles, California 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520
Email: wthomson@gibsondunn.com

STERN, KILCULLEN & RUFOLO LLC
Herbert J. Stern (*pro hac vice*)
Joel M. Silverstein
325 Columbia Tpke, Ste 110
P.O. Box 992
Florham Park, New Jersey 07932-0992
Telephone:  973.535.1900
Facsimile:  973.535.9664
Email: hstern@sgklaw.com
Email: jsilverstein@sgklaw.com

*Attorneys for Plaintiff Chevron Corporation*

# SA320

***Chevron v. Donziger***, No. 11 Civ. 0691-LAK (S.D.N.Y.)

**Index of Exhibits to Plaintiff Chevron Corporation's Second Motion to Compel
Donziger to Respond to Post-Judgment Discovery Requests**

Exhibit 1: Excerpts from the Deposition of Steven Donziger (June 25, 2018)

Exhibit 2: Email Chain Between A. Champion, S. Donziger, R. Mastro, and A. Herrera (June 29, 2018 to July 24, 2018)

Exhibit 3: Chart of Chevron's Discovery Requests and Steven Donziger's Responses

Exhibit 4: Document Produced by Mary Katherine Sullivan (Redacted)

Exhibit 5: Steven Donziger's Objections and Responses to Subpoena dated Apr. 16, 2018 (Apr. 30, 2018)

Exhibit 6: Steven Donziger's Supplemental Objections and Responses to Subpoena dated Apr. 16, 2018 (June 15, 2018)

Exhibit 7: Excerpts from July 13, 2018 Document Production of TD Bank (Redacted)

Exhibit 8: Emails from A. Champion to S. Donziger (June 24, 2018)

Exhibit 9: Email Chain Between A. Champion, S. Donziger, R. Mastro, A. Neuman, and A. Herrera (June 25, 2018 to June 27, 2018)

Exhibit 10: [Proposed] Order

# SA321

August 20, 2018

<u>**VIA ECF**</u>

Honorable Lewis A. Kaplan
United States District Judge
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

RE:    *Chevron v. Donziger*, Case No. 11 Civ. 691 (LAK)

Dear Judge Kaplan:

I write in regard to the Court's recent order dated August 15, 2018 (Dkt. 2072) that I execute documents transferring certain property interests to Chevron Corporation. I am currently out of the country through Labor Day, with no way to access a U.S.-qualified notary, and I am not sure that a foreign notary would meet the Court's requirements. Additionally, I am seeking adequate counsel on the issue of transferring my contingency interest. My clients have forbidden me to make such a transfer and made it clear that, despite the Court's order, a transfer would be considered an act of cooperation with and enrichment of Chevron in violation of my fiduciary duties toward them, that could result in my termination. I respectfully request a modest extension of time through the end of the week after Labor Day (*i.e.*, to September 7) to return from travel and properly address the ethical issues raised by the ordered transfer.

Sincerely,

    / s /

Steven R. Donziger

**SA322**

# ATTACHMENT A

# SA323

### PCA CASE NO. 2009-23

**IN THE MATTER OF AN ARBITRATION BEFORE A TRIBUNAL CONSTITUTED IN ACCORDANCE WITH THE TREATY BETWEEN THE UNITED STATES OF AMERICA AND THE REPUBLIC OF ECUADOR CONCERNING THE ENCOURAGEMENT AND RECIPROCAL PROTECTION OF INVESTMENT, SIGNED 27 AUGUST 1993 (THE "TREATY" OR "BIT") AND THE UNCITRAL ARBITRATION RULES 1976 (THE "UNCITRAL ARBITRATION RULES")**

**BETWEEN: –**

|   |   |   |
|---|---|---|
| 1. | **CHEVRON CORPORATION** | **("Chevron")** |
| 2. | **TEXACO PETROLEUM COMPANY** | **("TexPet")** |
|   | **(both of the United States of America)** | |

*The First and Second Claimants*

**- and -**

### THE REPUBLIC OF ECUADOR

*The Respondent*

_____

### Second Partial Award on Track II
### dated 30 August 2018

**The Arbitration Tribunal:**

**Dr Horacio A. Grigera Naón**
**Professor Vaughan Lowe QC**
**V.V. Veeder (President)**

**Secretary to the Tribunal: Martin Doe**

# SA324

### *TABLE OF CONTENTS*
### *(references in the right-hand column*
### *are to Parts and page numbers)*

A: Selected Abbreviations.............................................................vii
B: Selected Dramatis Personae.....................................................ix
C: Glossary of Principal Written Submissions 2009-2016 ..........xii
D: Selected Legal Materials..........................................................xv

**PART I:      The Arbitration – Track II ..................................................I-001**

A: The Parties and Other Persons .........................................I-001
B: The Arbitration Agreement.................................................I-003
C: The Arbitral Tribunal .........................................................I-004
D. The Arbitral Procedure ......................................................I-005
E: The Parties' Respective Claims for Relief .........................I-021
F: "Closing the Record" .........................................................I-021

Annex 1: The Tribunal's Orders on Interim Measures, Awards and Decision.......I-023
Annex 2: The Tribunal's Procedural Orders ..........................I-033
Annex 3: The Parties' Respective Claims for Relief ...............I-036
Annex 4: The Enforcement Proceedings .................................I-058
Annex 5: The Ecuador-USA Treaty.........................................I-062

**PART II:     The Principal Issues.......................................................... II-001**

A: Introduction ......................................................................II-001
B: The Principal Legal and Other Texts ................................II-004
C: The Facts and Other Matters ............................................II-004
D: Forensic (Computer) Evidence .........................................II-005
E: Jurisdiction and Admissibility ..........................................II-005
F: Merits................................................................................II-005
G: Forms of Relief.................................................................II-005
H: The Operative Part............................................................II-005

**PART III:    The Principal Legal and Other Texts .............................III-001**

A: Introduction .....................................................................III-001
B: The Treaty.........................................................................III-001
C: The UNCITRAL Arbitration Rules ....................................III-004
D: The 1995-1998 Settlement and Release Agreements.......III-006
E: The Universal Declaration of Human Rights ....................III-009
F: The International Covenant on Civil and Political Rights ...........III-009
G: The ILC Articles on State Responsibility ..........................III-010
H: The UN Basic Principles on the Independence of the Judiciary...................III-013
I: The Ecuadorian Constitution.............................................III-014
J: The Ecuadorian Civil Code...............................................III-015
K: The Ecuadorian Code of Civil Procedure .........................III-020
L: The Environmental Management Act (EMA)......................III-021
M: The Collusion Prosecution Act (CPA) ..............................III-023

# SA325

***PART IV:***     ***The Facts and Other Matters*** ............................................................... *IV-001*

     *A: Introduction* ............................................................... *IV-001*
     *B: Evidential Sources* ............................................................... *IV-002*
         *(1) Dr Zambrano* ............................................................... *IV-002*
         *(2) Mr Donziger* ............................................................... *IV-008*
         *(3) The Lago Agrio Plaintiffs' Representatives* ...................................... *IV-010*
         *(4) Dr Guerra* ............................................................... *IV-011*
     *C: Ecuador's Oriente and its Inhabitants* ............................................... *IV-012*
     *D: Ecuador's Government and Judiciary* ............................................... *IV-013*
         *(1) The Ecuadorian Government* ......................................................... *IV-013*
         *(2) The Ecuadorian Judiciary* ............................................................ *IV-014*
     *E: The 1964 and 1973 Concessions* ..................................................... *IV-016*
     *F: Crude Oil Pollution in the Oriente* ................................................. *IV-019*
     *G: The Lawsuits, Arbitrations, Prosecutions & Investigations* ........................ *IV-020*
         *(1) The Aguinda Litigation (New York)* ................................................ *IV-021*
         *(2) The Lago Agrio Litigation (Ecuador)* .............................................. *IV-026*
         *(3) The "Commercial Cases" Arbitration (The Hague)* ................................ *IV-028*
         *(4) The Ecuador-USA Treaty Arbitration (PCA)* ...................................... *IV-029*
         *(5) The AAA Arbitration (New York)* .................................................. *IV-029*
         *(6) The New York Stay Legal Proceedings (New York)* ............................... *IV-030*
         *(7) The Section 1782 Litigation (USA)* ................................................ *IV-030*
         *(8) The RICO Litigation (New York)* ................................................... *IV-031*
         *(9) The Huaorani Litigation (New York)* ............................................... *IV-033*
         *(10) The Veiga-Pérez Criminal Prosecutions (Ecuador)* .............................. *IV-035*
         *(11) The Enforcement Litigation (Ecuador)* ........................................... *IV-038*
         *(12) The Gibraltar Litigation (Gibraltar)* .............................................. *IV-040*
         *(13) The Criminal Investigations (Ecuador)* ........................................... *IV-040*
         *(14) This Treaty Arbitration (The Hague)* ............................................. *IV-041*
     *H: The Tribunal's Annotated Chronology 1993-2018* ................................ *IV-043*
         *1993* ............................................................... *IV-043*
         *1994* ............................................................... *IV-044*
         *1995* ............................................................... *IV-045*
         *1996* ............................................................... *IV-046*
         *1997* ............................................................... *IV-050*
         *1998* ............................................................... *IV-050*
         *1999* ............................................................... *IV-052*
         *2001* ............................................................... *IV-052*
         *2002* ............................................................... *IV-054*
         *2003* ............................................................... *IV-054*
         *2004* ............................................................... *IV-058*
         *2005* ............................................................... *IV-060*
         *2006* ............................................................... *IV-063*
         *2007* ............................................................... *IV-073*
         *2008* ............................................................... *IV-084*
         *2009* ............................................................... *IV-088*
         *2010* ............................................................... *IV-099*
         *2011* ............................................................... *IV-114*
         *2012* ............................................................... *IV-117*
         *2013* ............................................................... *IV-122*
         *2014* ............................................................... *IV-124*
         *2015-2018* ............................................................... *IV-126*

     *Annex 6: Map of the Oriente and Concession Area* ................................. *IV-131*

# SA326

**PART V:** **The Lago Agrio, Appellate, Cassation and Constitutional Court Judgments.....V-001**

    *A: Introduction* ...............................................................................................*V-001*
    *B: The Lago Agrio Judgment (2011)* ...............................................................*V-001*
    *C: The Lago Agrio Judgment – The "Merger" between Texaco and Chevron* .....*V-005*
    *D: The Lago Agrio Judgment – "Unfiled Materials"* ........................................*V-007*
        *(1) The Clapp Report* ...............................................................*V-009*
        *(2) The Draft Alegato* ...............................................................*V-010*
        *(3) The Erion Memorandum* .......................................................*V-011*
        *(4) The Fajardo Trust Email* ......................................................*V-012*
        *(5) The Fusión Memorandum* .....................................................*V-013*
        *(6) The January and June Index Summaries* ...............................*V-014*
        *(7) The Moodie Memorandum* ....................................................*V-015*
        *(8) The Selva Viva Database* ......................................................*V-016*
    *E: The Lago Agrio Judgment – Forensic Linguistics* .........................................*V-021*
    *F: The Lago Agrio Judgment – The Cabrera Report: Dr Barnthouse* ................*V-023*
    *G: The Lago Agrio Judgment – The Cabrera Report: The Oil Pits* .....................*V-023*
    *H: The Lago Agrio Judgment – Diffuse Liability* ..............................................*V-031*
    *I: The Lago Agrio Judgment – Judge Zambrano* ..............................................*V-037*
    *J: The Lago Agrio Judgment – Ms "C"* ..........................................................*V-043*
    *K: The Lago Agrio Judgment – Dr Guerra* ......................................................*V-046*
    *L: The Lago Agrio Judgment – Mr Donziger* ...................................................*V-048*
    *M: The Judgment of the Lago Agrio Appellate Court (2012)* ..............................*V-049*
    *N: The Judgment of the Cassation Court (2013)* ...............................................*V-053*
    *O: The Judgment of the Constitutional Court (2018)* .........................................*V-058*
    *P: The Tribunal's Conclusions* .......................................................................*V-076*

    *Annex 7: The Lago Agrio Judgment on "Merger"* ...........................................*V-083*
    *Annex 8: Dr Leonard's and Other Examples* ...................................................*V-098*
    *Annex 9: Dr Leonard's Marked-Up Text* ........................................................*V-105*

**PART VI:** **The Forensic Issues.............................................................................. VI-001**

    *A: Introduction* .............................................................................................. *VI-001*
    *B: Summary of Forensic Evidence* ................................................................... *VI-003*
    *C: Judge Zambrano's Two Computers* ............................................................ *VI-003*
    *D: The Development of the Lago Agrio Judgment's Text* ................................... *VI-004*
    *E: The "Unfiled Materials"* ........................................................................... *VI-011*
    *F: Internet Usage* ........................................................................................... *VI-019*
    *G: USB Analysis* ............................................................................................ *VI-024*
    *H: Bulk Copying* ........................................................................................... *VI-027*
    *I: The Tribunal's Conclusions* ........................................................................ *VI-029*

**PART VII:** **Jurisdiction and Admissibility........................................................ VII-001**

    *A: Introduction* .............................................................................................. *VII-001*
    *B: The Treaty* ................................................................................................. *VII-002*
        *(1) The Treaty* ........................................................................... *VII-002*
        *(2) The FET Standard and Customary International Law* .................... *VII-003*
        *(3) The FPS Standard* .................................................................. *VII-004*
        *(4) Effective Means* ..................................................................... *VII-004*
        *(5) The Umbrella Clause* .............................................................. *VII-006*
    *C: Special Features* ........................................................................................ *VII-006*
        *(1) Transnational Enforcement* ..................................................... *VII-006*
        *(2) The Individual Plaintiffs* ......................................................... *VII-007*

## SA327

   (3) Environmental Damage ................................................................ *VII-010*
  D: Issues as to Jurisdiction and Admissibility .................................................. *VII-012*
   (1) Introduction ................................................................................ *VII-012*
   (2) The Third Interim Award ............................................................ *VII-012*
   (3) The Respondent's Case .............................................................. *VII-015*
   (4) The Claimants' Case .................................................................. *VII-016*
  E: The Tribunal's Analysis as to Jurisdiction and Admissibility ...................... *VII-016*
   (1) Introduction ................................................................................ *VII-016*
   (2) Chevron ...................................................................................... *VII-017*
   (3) TexPet ........................................................................................ *VII-019*
   (4) Good Faith. ................................................................................ *VII-020*
   (5) The Tribunal's Conclusion as to "Investment" ............................... *VII-033*
   (6) Judicial Finality (Local Remedies) .............................................. *VII-033*
    (i) The Bond ............................................................................ *VII-037*
    (ii) The Collusion Prosecution Act (CPA) ................................ *VII-040*
    (iii) The Constitutional Court ................................................... *VII-044*
   (7) The Tribunal's Conclusion as to Judicial Finality ......................... *VII-045*
   (8) Amendment of the Claims .......................................................... *VII-045*
    (i) The UNCITRAL Arbitration Rules ...................................... *VII-046*
    (ii) The Treaty ......................................................................... *VII-051*
    (iii) Dutch Law ....................................................................... *VII-053*
   (9) The Tribunal's Conclusion as to the Amended Claims ................... *VII-053*
  F: The Tribunal's Final Conclusions ............................................................... *VII-053*

**PART VIII: The Merits of the Claimants' Claims and the Respondent's Defences .......... VIII-001**

  A: Introduction .............................................................................................. *VIII-001*
  B: The Tribunal's Analysis & Conclusion on the 1995 Settlement Agreement .... *VIII-001*
  C: The Parties' Cases as to Denial of Justice .................................................... *VIII-003*
   (1) The Claimants' Case .................................................................. *VIII-003*
   (2) The Respondent's Case. .............................................................. *VIII-005*
  D: The Tribunal's Analysis as to Denial of Justice ........................................... *VIII-006*
   (1) Introduction ................................................................................ *VIII-006*
   (2) The Legal Test for Denial of Justice under the Treaty ................... *VIII-006*
   (3) Attribution under International Law ............................................. *VIII-012*
   (4) The 'Ghostwriting' of the Lago Agrio Judgment ........................... *VIII-015*
   (5) Other Allegations ....................................................................... *VIII-018*
   (6) The Tribunal's Conclusion as to Denial of Justice ........................ *VIII-021*
  E: The Tribunal's Final Conclusions ............................................................... *VIII-021*
  F: Postscript .................................................................................................. *VIII-021*

**PART IX: The Forms of Relief ........................................................................ IX-001**

  A: Introduction .............................................................................................. *IX-001*
  B: The Tribunal's General Approach ............................................................... *IX-001*
  C: The Claimants' Requests for Relief ............................................................. *IX-006*
  D: The Respondent's Requests for Relief ......................................................... *IX-014*
  E: Miscellaneous .......................................................................................... *IX-016*

**PART X: The Operative Part ........................................................................... X-001**

  A: Introduction .............................................................................................. *X-001*
  B: Declarations as to Jurisdiction and Admissibility ......................................... *X-001*
  C: Declarations as to the Merits ..................................................................... *X-001*
  D: Orders as to the Merits .............................................................................. *X-003*

*E: Compensation*......................................................................................................*X-005*
*F: Legal and Arbitration Costs*..............................................................................*X-005*
*G: Miscellaneous*.....................................................................................................*X-005*

# SA329

## *A: SELECTED ABBREVIATIONS*

| | |
|---|---|
| *Aguinda Litigation* | Litigation initiated by complaint filed by María Aguinda and others against Texaco before the US District Court for the Southern District of New York, USA on 3 November 1993. |
| *April Hearing* | Hearing on Track I(b) held on 28-29 April 2014. |
| *Chevron* | The First Claimant, Chevron Corporation, a legal person organised under the laws of the USA. |
| *February Hearing* | Hearing on interim measures held on 11 February 2012. |
| *Jurisdiction Hearing* | Hearing on jurisdiction held on 22-23 November 2010. |
| *Lago Agrio Litigation* | Litigation initiated by Ángel Piaguage and others against Chevron by a complaint (the "Lago Agrio Complaint") filed before the Superior Court of Justice of Nueva Loja in Ecuador (the "Lago Agrio Court") on 7 May 2003. The Lago Agrio Court issued a judgment on 14 February 2011 and a clarification order on 4 March 2011 (the "Lago Agrio Judgment"). The Lago Agrio Judgment was affirmed by the Lago Agrio Appellate Court by its judgment dated 3 January 2012 and a clarification order dated 13 January 2012 (the "Lago Agrio Appellate Court Judgment"). The National (Cassation) Court of Justice of Ecuador affirmed the Lago Agrio Judgment in part by its Judgment dated 12 November 2013 (the "Cassation Court Judgment"). The Constitutional Court of Ecuador affirmed the Cassation Court Judgment, dismissing Chevron's extraordinary action for protection, by its Judgment dated 27 June 2018 (the "Constitutional Court Judgment"). |
| *November Hearing* | Hearing on Track I held on 26-28 November 2012. |
| *TexPet* | The Second Claimant, Texaco Petroleum Company, a legal person organised under the laws of the USA, currently a wholly-owned indirect subsidiary of Chevron. Until 2001, TexPet was a wholly-owned direct subsidiary of Texaco. |
| *Texaco* | Texaco Inc., a legal person organised under the laws of the USA. |
| *Treaty (or BIT)* | Treaty between the USA and Ecuador concerning the Encouragement and Reciprocal Protection of Investment, signed on 27 August 1993, in effect from 11 May 1997. |

# SA330

| | |
|---|---|
| *PetroEcuador* | Empresa Pública de Hidrocarburos del Ecuador, an Ecuadorian State-owned oil corporation; successor to Corporación Estatal Petrolera Ecuatoriana, or "CEPE", from 1989. |
| *RICO Litigation* | Litigation initiated by Chevron on 1 February 2011 before the US District Court for the Southern District of New York, USA against Stephen Donziger and others pursuant to (inter alia) 18 USC Section 1962 (Racketeer Influenced and Corrupt Organizations), leading to the RICO trial in October-November 2013 and the RICO Judgment of 4 March 2014, affirmed by the US Court of Appeals for the Second Circuit by its judgment of 8 August 2016 and the US Supreme Court's denial of the appellants' petition for certiorari on 19 June 2017. |
| *Site Visit* | Tribunal's site visit in the Sucumbíos and Orellana Provinces of the Oriente in Ecuador on 4-10 June 2015. The Site Visit included the following sites: Shushufindi-34, Aguarico-06, Shushufindi-55 and Lago Agrio-02. |
| *Track II Hearing* | Hearing on Track II held on 21 April-8 May 2015. |
| *UNCITRAL Arbitration Rules* | Arbitration Rules of the United Nations Commission on International Trade Law (1976). |
| *Unfiled Materials* | Materials allegedly incorporated into the Lago Agrio Judgment (without attribution) which were allegedly never filed by the Lago Agrio Plaintiffs during the Lago Agrio Litigation. |
| *Zambrano Computers* | Two Hewlett Packard computers used by Judge Zambrano during the Lago Agrio Litigation. The first (serial number MXJ64005TG) was manufactured and shipped in 2006 (the "Old Computer"), and the second (serial number MXL0382C3D) was manufactured, purchased and made available to Judge Zambrano in November 2010 (the "New Computer"). |

# SA331

## B: SELECTED DRAMATIS PERSONAE

| | |
|---|---|
| *Aguinda Plaintiffs* | Plaintiffs in the Aguinda Litigation, initiated by complaint filed before the US District Court for the Southern District of New York on 3 November 1993. |
| *Douglas Beltman* | Consultant, Stratus Consulting, Inc; technical expert for the Lago Agrio Plaintiffs. |
| *Lawrence W. Barnthouse* | Technical expert for the Lago Agrio Plaintiffs; one of the "cleansing experts" for the Cabrera Report. |
| *Joseph Berlinger* | Director of the documentary film *Crude* (2009). |
| *Cristóbal Bonifaz* | Legal representative acting for the Aguinda Plaintiffs and the Lago Agrio Plaintiffs. |
| *Ms "C"* | Temporary student secretary employed by Judge Zambrano during the Lago Agrio Litigation, from mid-November 2010 to February 2011. The Tribunal has elected not to give her full name in this Award. (The Parties are aware of her full name). |
| *Richard Stalin Cabrera Vega* | Global assessment expert of the Lago Agrio Court in the Lago Agrio Litigation; purported author of the Cabrera Report. |
| *Charles W. Calmbacher* | Technical expert retained in 2004 by the Lago Agrio Plaintiffs to act as a judicial inspection expert in the Lago Agrio Litigation. |
| *Ximera Centeno* | Employee at Selva Viva (an Ecuadorian legal entity). |
| *Richard W. Clapp* | Epidemiologist; technical expert for the Lago Agrio Plaintiffs; principal author of the 'Clapp Report'. |
| *John Connor* | President, GSI Environmental Inc; technical expert for the Claimants; a defendant in US Section 1782 proceedings initiated by Ecuador for discovery for use in this arbitration. |
| *Steven Donziger* | USA attorney, acting as representative of the Aguinda Plaintiffs and the Lago Agrio Plaintiffs. |
| *Graham Erion* | USA attorney, author of the 'Erion Memorandum' (2008). |
| *Pablo Fajardo Mendoza* | Ecuadorian attorney, acting as representative of the Lago Agrio Plaintiffs. |
| *Alberto Guerra Bastidas* | Ecuadorian judge, Lago Agrio Court, presiding over the Lago Agrio Litigation from May 2003 to February 2004. |

# SA332

| | |
|---|---|
| *Judith Kimerling* | USA attorney; Professor of Law and Policy, The City University of New York, Queens College and School of Law, USA; author on the Amazon; legal representative of the plaintiffs in the Huaorani Litigation. |
| *Joseph Kohn* | USA attorney, of Kohn, Swift & Graf, acting as representative of the Lago Agrio Plaintiffs; non-party funder of the Lago Agrio Litigation. |
| *Lago Agrio Plaintiffs* | Plaintiffs in the Lago Agrio Litigation, initiated by a Complaint filed in the Lago Agrio Court on 7 May 2003. |
| *Anne Maest* | Consultant, of Stratus Consulting, Inc; technical expert for the Lago Agrio Plaintiffs. |
| *Nicholas Moodie* | Australian legal intern, assistant to the Lago Agrio Plaintiffs' representatives; author of the 'Moodie Memorandum' (2009). |
| *Rodrigo Pérez Pallares* | Legal representative of TexPet; signatory of the 1995 Settlement Agreement (with the 1998 Final Release). |
| *Alejandro Ponce Villacís* | Ecuadorian attorney, acting as representative of the Lago Agrio Plaintiffs. |
| *Julio Prieto Méndez* | Ecuadorian attorney, acting as representative of the Lago Agrio Plaintiffs. |
| *Ricardo Reis Veiga* | Vice-President, TexPet; signatory of the 1995 Settlement Agreement (with the 1995 Remedial Action Plan and the 1998 Final Release). |
| *Ramiro Fernando Reyes* | Petroleum and environmental engineer; technical expert for the Lago Agrio Plaintiffs. |
| *David Russell* | Environmental expert, of Global Environmental Operations, Inc; technical expert for the Lago Agrio Plaintiffs. |
| *Juan Pablo Sáenz* | Ecuadorian attorney, acting as representative of the Lago Agrio Plaintiffs. |
| *Norman Alberto Wray* | Ecuadorian attorney, and, at different times, judge of the Ecuadorian Supreme Court and representative of the Lago Agrio Plaintiffs. |
| *Luis Yanza* | Director of the "Frente de Defensa La Amazonia" (the Amazon Defense Front or ADF); acting as representative of the Lago Agrio Plaintiffs. |
| *Germán Yánez* | Ecuadorian judge, Lago Agrio Court, presiding over the Lago Agrio Litigation from February 2006 to October 2007. |

Case 1:16-cv-00855 Document 95 03/11/2019 1254 F2668 Page 46 of 309

# SA333

| | |
|---|---|
| *Nicolás Augusto Zambrano* | Ecuadorian judge, Lago Agrio Court, presiding over the Lago Agrio Litigation from (i) October 2009 to March 2010 and (ii) October 2010 to February/March 2011. |

# SA334

### C: GLOSSARY OF PRINCIPAL WRITTEN SUBMISSIONS 2009-2016

| | |
|---|---|
| *C-NoA Sept. 2009* | Claimants' Notice of Arbitration dated 23 September 2009. |
| *C-IM Apr. 2010* | Claimants' Request for Interim Measures dated 1 April 2010. |
| *R-IM May 2010* | Respondent's Response to Claimants' Request for Interim Measures dated 3 May 2010. |
| *R-Jur. May 2010* | Respondent's Summary Description of its Preliminary Jurisdictional and Admissibility Objections dated 3 May 2010. |
| *C-IM May 2010* | Claimants' Reply in Support of Interim Measures dated 7 May 2010. |
| *R-Jur. July 2010* | Respondent's Memorial on Jurisdictional Objections dated 26 July 2010. |
| *C-Jur. Sept. 2010* | Claimants' Counter-Memorial on Jurisdiction dated 6 September 2010. |
| *R-Jur. Oct. 2010* | Respondent's Reply Memorial on Jurisdictional Objections dated 6 October 2010. |
| *C-Mer. Sept. 2010* | Claimants' Memorial on the Merits dated 6 September 2010 (as amended on 23 September 2010). |
| *C-Jur. Nov. 2010* | Claimants' Rejoinder on Jurisdiction dated 6 November 2010. |
| *R-TI July 2012* | Respondent's Track I Counter-Memorial on the Merits dated 3 July 2012. |
| *C-Mer. Mar. 2012* | Claimants' Supplemental Memorial on the Merits dated 20 March 2012. |
| *C-TI Aug. 2012* | Claimants' Reply Memorial on the Merits Track I dated 29 August 2012. |
| *R-TI Oct. 2012* | Respondent's Track I Rejoinder on the Merits dated 26 October 2012. |
| *C-TI Nov. 2012* | Claimants' document submitted at the Track I Hearing in November 2012, setting out their prayer for relief. |
| *R-TII Feb. 2013* | Respondent's Track II Counter-Memorial on the Merits dated 18 February 2013. |

# SA335

| | |
|---|---|
| *R-Show Cause Apr. 2013* | Respondent's letter to the Tribunal on "Show Cause" and "Reconsideration" dated 15 April 2013. |
| *C-Show Cause May 2013* | Claimants' Initial Pleading on "Show Cause" and "Reconsideration" dated 6 May 2013. |
| *R-IM June 2013* | Respondent's Request for Enforcement of Interim Measures dated 3 June 2013. |
| *C-TII June 2013* | Claimants' Reply Memorial–Track II dated 5 June 2013 (as amended on 12 June 2013). |
| *C-IM June 2013* | Claimants' Response to Respondent's Request for Enforcement of Interim Measures dated 17 June 2013. |
| *R-IM July 2013* | Respondent's Reply in Support of its Request for Enforcement of Interim Measures dated 17 July 2013. |
| *R-Show Cause July 2013* | Respondent's Reply on "Show Cause" and "Reconsideration" dated 19 July 2013. |
| *C-IM Aug. 2013* | Claimants' Response to Respondent's Reply in Support of its Request for Enforcement of Interim Measures dated 8 August 2013. |
| *C-Show Cause Aug. 2013* | Claimants' Rejoinder on "Show Cause" and "Reconsideration" dated 30 August 2013. |
| *R-TII Dec. 2013* | Respondent's Track II Rejoinder on the Merits dated 16 December 2013. |
| *C-TI Jan. 2014* | Claimants' Supplemental Memorial on Track I dated 31 January 2014. |
| *R-TI Mar. 2014* | Respondent's Track I Supplemental Counter-Memorial on the Merits dated 31 March 2014. |
| *C-TII May 2014* | Claimants' Supplemental Memorial on Track II dated 9 May 2014. |
| *C-TII Aug. 2014* | Claimants Post-Submission Insert to their Supplemental Memorial on Track II – Examination of Zambrano Computer Hard Drives dated 15 August 2014. |
| *R-TII Nov. 2014* | Respondent's Track II Supplemental Counter-Memorial on the Merits dated 7 November 2014. |
| *C-TII Jan. 2015* | Claimants' Reply to the Respondent's Supplemental Track II Memorial dated 14 January 2015. |
| *R-TII Mar. 2015* | Respondent's Track II Supplemental Rejoinder on the Merits dated 17 March 2015. |

# SA336

| | |
|---|---|
| *C-TI July 2015* | Claimants' Post-Track II Hearing Brief on Track I Issues dated 15 July 2015. |
| *R-TI July 2015* | Respondent's Track IB Post-Hearing Memorial dated 15 July 2015. |
| *C-TII Aug. 2016* | Claimants' Submission Concerning Digital Forensic Evidence and the Report of the Tribunal-Appointed Digital Forensics Expert dated 12 August 2016. |
| *R-TII Aug. 2016* | Respondent's Track II Supplemental Memorial on the Forensic Evidence of the Republic of Ecuador dated 12 August 2016. |
| *C-TII Aug. 2016* | Claimants' Reply Submission Concerning Digital Forensic Evidence and the Report of the Tribunal-Appointed Digital Forensics Expert dated 26 August 2016. |
| *R-TII Aug. 2016* | Respondent's Track II Supplemental Reply on the Forensic Evidence of the Republic of Ecuador dated 26 August 2016. |

# SA337

## D: SELECTED LEGAL MATERIALS

### (1) International Court of Justice/Permanent Court of International Justice

*Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Bosnia and Herzegovina v. Serbia and Montenegro)*, ICJ, Judgment, 26 February 2007, 2007 ICJ Reports 43, CLA-640.

*Arrest Warrant of 11 April 2000 (Democratic Republic of Congo v. Belgium)*, ICJ, Judgment, 14 February 2002, 2002 ICJ Reports 3, CLA-415.

*Avena and Other Mexican Nationals (Mexico v. United States of America) I*, ICJ, Judgment, 31 March 2004, 2004 ICJ Reports 12.

*Elettronica Sicula S.p.A. (ELSI) (United States of America v. Italy)*, ICJ, Judgment, 20 July 1989, 1989 ICJ Reports 15, CLA-237.

*The Factory at Chorzów (Germany v. Poland)*, PCIJ, Judgment (Jurisdiction), 26 July 1927, 1927 PCIJ Series A No. 9; Judgment (Merits), 13 September 1928, 1928 PCIJ Series A No. 17, CLA-406.

*Fisheries Jurisdiction (Germany v. Iceland)*, ICJ, Judgment (Merits), 25 July 1974, 1974 ICJ Reports 175.

*Jurisdictional Immunities of the State (Germany v. Italy: Greece intervening)*, ICJ, Judgment, 3 February 2012, 2012 ICJ Reports 99, CLA-616.

*LaGrand (Germany v. United States of America)*, ICJ, Judgment, 27 June 2001, 2001 ICJ Reports 466, CLA-46.

*Monetary Gold Removed from Rome in 1943 (Italy v. France, United Kingdom of Great Britain and Northern Ireland and United States of America)*, ICJ, Judgment (Preliminary Question), 15 June 1954, 1954 ICJ Reports 19, RLA-19.

*Certain Questions of Mutual Assistance in Criminal Matters (Djibouti v. France),* ICJ, Judgment, 4 June 2008, 2008 ICJ Reports 177.

*Nuclear Tests (Australia v. France)*, ICJ, Judgment, 20 December 1974, 1974 ICJ Reports 253.

*Certain Phosphate Lands in Nauru (Nauru v. Australia)*, ICJ, Judgment, 26 June 1992, 1992 ICJ Reports 240.

### (2) Arbitral Decisions

*Mohammad Ammar Al-Bahloul v. Republic of Tajikstan*, SCC Case No. V (064/2008), Partial Award, 9 September 2009.

*Limited Liability Company AMTO v. Ukraine*, SCC Arb. No. 080/2005, Final Award, 26 March 2008, RLA-343.

*Franck Charles Arif v. Republic of Moldova*, ICSID Case No. ARB/11/23, Award, 8 April 2013, RLA-651.

# SA338

*Robert Azinian, Kenneth Davitian, and Ellen Baca v. United Mexican States*, ICSID Case No. ARB(AF)/97/2, Award, 1 November 1999, CLA-299.

*Estate of Jean-Baptiste Caire (France) v. United Mexican States*, French-Mexican Claims Commission, Decision No. 33, 7 June 1929, V RIAA 516, CLA-597.

*Chevron Corporation and Texaco Petroleum Corporation v. Republic of Ecuador*, PCA Case No. 2007-02/AA277, UNCITRAL, Interim Award, 1 December 2008, CLA-1; Partial Award on the Merits, 30 March 2010, CLA-47.

*Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic,* ICSID Case No. ARB/97/3, Award, 20 August 2007, CLA-288.

*Concurring and Dissenting Opinions of Howard M. Holtzmann with respect to Interlocutory Awards on Jurisdiction in Nine Cases Containing Various Forum Selection Clauses (Cases Nos. 6, 51, 68, 121, 140, 159, 254, 293 and 466)*, 5 November 1982, 1 Iran-US Claims Tribunal Reports 284.

*Duke Energy Electroquil Partners v. Republic of Ecuador*, ICSID Case No. ARB/04/19, Award, 18 August 2008, RLA-40.

*Republic of Ecuador v. United States of America*, PCA Case No. 2012-05, Award, 29 September 2012.

*EnCana Corporation. v. Republic of Ecuador*, LCIA Case No. UN3481, Award, 3 February 2006, RLA-41.

*Ethyl Corporation v. Government of Canada*, UNCITRAL (Ad hoc), Award on Jurisdiction, 24 June 1998.

*European American Investment Bank AG (EURAM) v. Slovak Republic*, PCA Case No. 2010-17, Second Award on Jurisdiction, 4 June 2014.

*Flughafen Zürich A.G. and Gestión de Ingeniería IDC S.A. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/19, Award, 18 November 2014, CLA-602.

*Frontier Petroleum Services Ltd. v. Czech Republic,* PCA Case No. 2008-09, Award, 12 November 2010.

*Award between the United States and the United Kingdom relating to the rights of jurisdiction of the United States in the Bering Sea and the preservation of fur seals,* Ad hoc, Award, 15 August 1893, XXVIII RIAA 263 reprinted from J.B. Moore, *History and Digest of the International Arbitrations to Which the United States has been a Party*, vol. I, (1898).

*GEA Group Aktiengesellschaft v. Ukraine*, ICSID Case No. ARB/08/16, Award, 31 March 2011, CLA-300, RLA-648.

*Grand River Enterprises Six Nations, Ltd., et al. v. United States of America*, UNCITRAL (Ad hoc), Decision on Objections to Jurisdiction, 20 July 2006, CLA-631.

*Himpurna California Energy Ltd. v. PT. (Persero) Perusahaan Listruik Negara*, UNCITRAL (Ad hoc), Final Award, 4 May 1999, XXV Yearbook Commercial Arbitration 11.

*Iberdrola Energía S.A. v. Republic of Guatemala,* ICSID Case No. ARB/09/5, Award, 17 August 2012, CLA-608.

*International Thunderbird Gaming Corporation v. United Mexican States*, UNCITRAL (Ad hoc), Award, 26 January 2006, CLA-223.

*Jan de Nul N.V. and Dredging International N.V. v. Arab Republic of Egypt*, ICSID Case No. ARB/04/13, Award, 6 November 2008, CLA-230.

# SA339

*Aron Kahane (successor-in-interest) v. Francesco Parsi and Austria*, Romanian-Austrian Mixed Arbitration Tribunal, Award, 19 March 1929, (1929) VIII Recueil des Décisions des Tribunaux Arbitraux Mixtes 943.

*Kunkel et. al. v. Polish State*, German-Polish Mixed Arbitration Tribunal, Award, 2 December 1925, (1927) VI Recueil des Décisions des Tribunaux Arbitraux Mixtes 979, (1929) Annual Digest of Public International Law Cases 1925-1926 418, RLA-44.

*Lanco International Inc. v. Argentine Republic*, ICSID Case No. ARB/97/6, Preliminary Decision on Jurisdiction, 8 December 1998, CLA-176.

*Liman Caspian Oil BV and NCL Dutch Investment BV v. Republic of Kazakhstan*, ICSID Case No. ARB/07/14, Award, 22 June 2010, RLA-486.

*Loewen Group, Inc. and Raymond L. Loewen v. United States of America*, ICSID Case No. ARB(AF)/98/3, Decision on Hearing of Respondent's Objection to Competence and Jurisdiction, 5 January 2001, CLA-425; Final Award, 26 June 2003, CLA-44; Decision on Respondent's Request for a Supplementary Decision, 6 September 2004, CLA-643. *See also* First Opinion of Sir Robert Jennings QC, 26 October 1998, CLA-647; First Opinion of Christopher Greenwood QC, 26 March 2001, CLA-645.

*Mamidoil Jetoil Greek Petroleum Products Societe S.A. v. Republic of Albania*, ICSID Case No. ARB/11/24, Award, 30 March 2015.

*Merrill and Ring Forestry L.P. v. Government of Canada,* ICSID Case No. UNCT/07/1, Award, 31 March 2010, CLA-606.

*Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Award, 11 October 2002, CLA-7.

*Jan Oostergetel and Theodora Laurentius v. Slovak Republic*, UNCITRAL (Ad hoc), Final Award, 23 April 2012, RLA-307.

*Orascom TMT Investments S.à r.l. v. People's Democratic Republic of Algeria*, ICSID Case No. ARB/12/35, Award, 31 May 2017.

*Pantechniki S.A. Contractors & Engineers (Greece) v. Republic of Albania*, ICSID Case No. ARB/07/21, Award, 30 July 2009, RLA-17.

*Petrobart Limited v. Kyrgyz Republic*, SCC Arb. No. 126/2003, Award, 29 March 2005.

*Petrolane, Inc. v. Islamic Republic of* Iran, IUSCT, Award No 518-131-2, 14 August 1991, 27 Iran-US Claims Tribunal Reports 64.

*Victor Pey Casado and President Allende Foundation v. Republic of Chile,* ICSID Case No. ARB/98/2, Award, 8 May 2008, CLA-82.

*Phillips Petroleum Co. Iran v. Islamic Republic of Iran and National Iranian Oil Company*, IUSCT Case No. 39, Award No. 425-39-2, 29 June 1989, RLA-71.

*Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Decision on Jurisdiction, 8 February 2005, CLA-67, RLA-350.

*Frederica Lincoln Riahi v. Islamic Republic of Iran,* IUSCT, Award No. 600-485-1, 27 February 2003.

*Spyridon Roussalis v. Romania,* ICSID Case No. ARB/06/01, Award, 7 December 2011.

# SA340

*Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v. Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Award, 29 July 2008, CLA-231.

*S.D. Myers, Inc. v. Government of Canada*, UNCITRAL (Ad hoc), Partial Award, 13 November 2000, CLA-462.

*Swisslion DOO Skopje v. The Former Yugoslav Republic of Macedonia,* ICSID Case No. ARB/09/16, Award, 6 July 2012.

*United Parcel Service of America Inc. v. Government of Canada*, ICSID Case No. UNCT/02/1, Award on Jurisdiction, 22 November 2002.

*Waste Management v. United Mexican States (No. 2)*, ICSID Case No. ARB(AF)/00/3, Award, 30 April 2004 , CLA-42.

*White Industries Australia Limited v. India*, UNCITRAL (Ad hoc), Award, 30 November 2011, RLA-347.

*World Duty Free Company Limited v Republic of Kenya*, ICSID Case No. ARB/00/7, Award, 4 October 2006, 46 ILM 339, RLA-548.

*Kenneth P. Yeager v. Islamic Republic of Iran,* IUSCT Case No. 10199, Award No. 324-10199-1, 2 November 1987, 17 Iran-US Claims Tribunal Reports 92, RLA-547.


## *(3) Decisions of National Courts*

*Loewen v. United States,* No. 04-2151, Mem. Op. (D.C. 31 October 2005), CLA-644.

*Republic of Ecuador v. Chevron Corporation & Texaco Petroleum Company*, 638 F.3d 384 (2d Cir. 17 March 2011) CLA-435, R-247.

*Republic of Ecuador v. John A. Connor et. al.*, 2013 W1 539011 (C.A.5 (Tex.)) (5th Cir. 13 February 2013), RLA-432.

*New Hampshire v. Maine*, 532 U.S. 742 (29 May 2001).


## *(4) Scholarly Writings*

S. Baker & M. Davis, *The UNCITRAL Arbitration Rules in Practice: The Experience of the Iran-United States Claims Tribunal* (1992), CLA-34, RLA-447.

D. Bowett, "Estoppel before International Tribunals and its Relation to Acquiescence" (1957) 33 British Yearbook of International Law 176, CLA-179.

D. Caron, L. Kaplan & M. Pellonpää, *The UNCITRAL Arbitration Rules: A Commentary* (2006).

D. Caron & L. Kaplan, *The UNCITRAL Arbitration Rules: A Commentary*, 2nd ed. (2013), CLA-580, RLA-545.

B. Cheng, *General Principles of Law, as Applied by International Courts and Tribunals* (1953, reprinted 1987), CLA-108, RLA-100.

J. Crawford, *The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries* (2002), CLA-288, RLA-549.

# SA341

J. Crawford, *State Responsibility: The General Part* (2013), RLA-556.

Z. Douglas, "The Hybrid Nature of Investment Treaty Arbitration" (2003) 74 British Yearbook of International Law 152, CLA-177.

G.G. Fitzmaurice, "The Meaning of the Term 'Denial of Justice'" (1932) 13 British Yearbook of International Law 93, CLA-301.

A.V. Freeman, *The International Responsibility of States for Denial of Justice* (1938), CLA-297.

J. Gaffney & J. Loftis, "The 'Effective Means Meaning' of BITs and the Jurisdiction of Treaty-based Tribunals to hear Contract Claims" (2007) 8(1) Journal of World Investment & Trade 5, CLA-213.

Harvard Law Review, "Developments in the Law of Res Judicata" (1951-1952) 65 Harvard Law Review 818.

J. van Hof, *Commentary on the UNCITRAL Arbitration Rules: The Application by the Iran-U.S. Claims Tribunal* (1991).

I. MacGibbon, "Estoppel in International Law" (1958) 7 International and Comparative Law Quarterly 468, CLA-107, CLA-107.

M. Mustill & S. Boyd, *Commercial Arbitration* (1982).

A. McNair, "The Legality of the Occupation of the Ruhr" (1924) 5 British Yearbook of International Law 17.

D.P. O'Connell, *International Law*, 2nd ed. (1970).

J. Paulsson, *Denial of Justice in International Law* (2005), RLA-61.

S. Schwebel, *International Arbitration: Three Salient Problems* (1987).

T. Webster, *Handbook of UNCITRAL Arbitration: Commentary, Precedents and Materials for UNCITRAL Based Arbitration Rules* (2010).


### (5) Other Legal Materials

Constitución de la República del Ecuador 2008 (2008 Ecuadorian Constitution), as amended on 13 July 2011, Registro Oficial 449 de 20 de octubre de 2008 (Ecuador), RLA-164.

International Law Commission, *Draft Articles on Responsibility of States for Internationally Wrongful Acts, with commentaries* (2001) II (Part Two) Yearbook of the ILC 31, CLA-291.

International Law Commission, *Draft Articles on the Law of Treaties, with commentaries* (1966) II (Part Two) Yearbook of the ILC 187.

International Law Commission, *Guiding Principles applicable to unilateral declarations of States capable of creating legal obligations, with commentaries thereto* (2006) II (Part Two) Yearbook of the ILC 161.

International Law Commission, *Law of Treaties, Report by Mr H. Lauterpacht, Special Rapporteur*, UN Doc A/CN.4/63, (1953) II Yearbook of the ILC 90.

Ley para el Juzgamiento de la Colusion (Collusion Prosecution Act), as amended on 9 March 2009, Registro Oficial 269 de 3 de febrero de 1977 (Ecuador), RLA-493.

# SA342

*Treaty of Versailles (Treaty of Peace between the Allied and Associated Powers and Germany)*, 28 June 1919, UKTS 4 (1919), CMD 153.

United Nations, *Basic Principles on the Independence of the Judiciary*, UN Doc. A/CONF.121/22/Rev.1 59 (1985), CLA-293.

United Nations General Assembly, *International Covenant on Civil and Political Rights*, 16 December 1966, UNGA res. 2200A (XXI), 21 UN GAOR Supp. (No. 16) 52, UN Doc. A/6316 (1966), 999 UNTS 171, 6 ILM 368 (1967).

United Nations General Assembly, *United Nations Convention against Corruption*, 31 October 2003, UNGA res. 58/4, UN Doc. A/58/422.

United Nations General Assembly, *Universal Declaration of Human Rights*, 10 December 1948, UNGA res. 217A (III), UN Doc. A/810 71 (1948).

United Nations Conference on the Law of Treaties, *Vienna Convention on the Law of Treaties*, 23 May 1969, UN Doc. A/CONF.39/11/Add.2, 1155 UNTS 331, 8 ILM 679 (1969), CLA-10.

# SA343

## PART I

### THE ARBITRATION – TRACK II

**A: The Parties and Other Persons**

1.1  *The First Claimant*: The First Claimant is Chevron Corporation, a legal person organised under the laws of the United States of America, with its principal place of business at 6001 Bollinger Canyon Road, San Ramon, California 94583, U.S.A. (for ease of reference, herein called "Chevron").[1]

1.2  *The Second Claimant*: The Second Claimant is Texaco Petroleum Company, also a legal person organised under the laws of the United States of America, with its principal place of business at 6001 Bollinger Canyon Road, San Ramon, California 94583 U.S.A. (for ease of reference, herein called "TexPet").

1.3  Until 2001, TexPet was a wholly-owned indirect subsidiary of Texaco Inc., a legal person organised under the laws of the United States of America (for ease of reference, herein called "Texaco"); and thereafter, as from 2001, TexPet became and remains a wholly-owned indirect subsidiary of Chevron.

1.4  *The Claimants' Legal Representatives*: The Claimants are represented by: Mr Hewitt Pate (General Counsel of the First Claimant); Mr Ricardo Reis Veiga, Mr Jose L. Martin and Mr Andrés R. Romero (in-house counsel of the First Claimant); R. Doak Bishop Esq, Tracie Renfroe Esq, Wade M. Coriell Esq, David H. Weiss Esq, Carol Wood Esq, Elizabeth Silbert Esq, Sara McBrearty Esq, Eldy Quintanilla Roché Esq, Sara McBrearty Esq, Anisha Sud Esq, and Ginny Castelan Esq (all of King & Spalding LLP, Houston, Texas, USA); Edward G. Kehoe Esq, Caline Mouawad Esq, Isabel Fernández de la Cuesta Esq, John Calabro Esq and Jessica Beess und Chrostin Esq (all of King & Spalding LLP, New York, New York, USA); Brian A. White Esq and Amelia S. Magee Esq (of King & Spalding, Atlanta, Georgia, USA); Professor James Crawford SC (of London, United Kingdom, until November 2014); and Professor Jan Paulsson and Luke Sobota Esq (both of Three Crowns LLP, Washington DC, USA, from May 2013).

---

[1] Defined Terms, here and below, are listed in the Abbreviated Terms and Glossary above.

# SA344

1.5 *The Respondent*: the Respondent is the Republic of Ecuador. It has owned and controlled at all material times Empresa Estatal de Petróleos del Ecuador (herein called "PetroEcuador", known earlier as its predecessor "CEPE"), a legal person formed under the laws of Ecuador.

1.6 *The Respondent's Legal Representatives*: The Respondent is represented by: Dr Diego García Carrión (Procurador General del Estado, until February 2018); Dr Rafael Parreño Navas (acting Procurador General del Estado, from February 2018 until August 2018); Dr Íñigo Salvador Crespo (Procurador General del Estado, from August 2018); Dra Blanca Gómez de la Torre (Directora de Asuntos Internacionales y Arbitraje, Procuraduría General del Estado, until August 2018); Dra Claudia Salgado Levy (Directora de Asuntos Internacionales y Arbitraje, Procuraduría General del Estado, from August 2018); Dra Christel Gaibor, Mr Luis Felipe Aguilar, Ms Daniela Palacios, Ms Maria Teresa Borja, Mr Xavier Rubio and Macarena Bahamonde (of the Procuraduría General del Estado) (all of Quito, Ecuador); Eric W. Bloom Esq, Tomás Leonard Esq, Nicole Silver Esq, Eric Goldstein Esq, Carolina Romero Acevedo and Kathy Ames Valdivieso (all of Winston & Strawn LLP, Washington DC, USA); Ricardo Ugarte Esq (of Winston & Strawn LLP, Chicago, Illinois, USA); Nassim Hooshmandnia Esq (of Winston & Strawn LLP, Hong Kong, China); Professor Pierre Mayer (of Paris, France); Professor Eduardo Silva Romero, José Manuel García Represa Esq and Audrey Caminades Esq (all of Dechert LLP, Paris, France); Dr Álvaro Galindo Cardona (of Dechert LLP, Washington DC, USA). The Respondent was also represented in earlier proceedings by Professor Zachary Douglas QC and Mr Luis González García (both of Matrix Chambers, London) and Gregory Ewing Esq (currently of David, Agnor, Rapaport & Skalny, Columbia, MD, USA).

1.7 *Other Persons:* These other persons include the following, none of whom are parties to this arbitration; namely the "Lago Agro Plaintiffs" in the legal proceedings in Ecuador known as the "Lago Agrio Litigation"; the "Aguinda Plaintiffs" in the earlier legal proceedings in New York known as the "Aguinda Litigation"; the several respondents in the legal proceedings in the USA known as the "US 1782 Litigation"; the several defendants in the legal proceedings known as the "RICO Litigation" in New York; and the parties in the legal proceedings known as the "Huaorani Litigation" in New York.

# SA345

These persons' legal representatives and advisers in the USA and Ecuador are not parties to, nor legally represented in, these arbitration proceedings.

1.8  Texaco, TexPet's parent company until 2001, is not a named party to these arbitration proceedings; nor is it legally represented in these proceedings. Texaco was a party to the Aguinda Litigation; but it was not a party to the Lago Agrio Litigation.

1.9  PetroEcuador is not a named party to these arbitration proceedings; nor is it legally represented in these arbitration proceedings. PetroEcuador was not a party to the Aguinda Litigation or the Lago Agrio Litigation.

1.10  Dr (formerly, Judge) Nicolás Augusto Zambrano Lozada, Dr (formerly, Judge) Alberto Guerra Bastidas and Steven Donziger Esq are not named parties to these arbitration proceedings; nor are they legally represented in these arbitration proceedings.

### B: The Arbitration Agreement

1.11  The arbitration agreement invoked by the Claimants is contained in Article VI of the Treaty between the United States of America and the Republic of Ecuador concerning the Encouragement and Reciprocal Protection of Investment of 27 August 1993 (the "Treaty"), providing, *inter alia*, as follows:

> Article VI(2): "*In the event of an investment dispute, the parties to the dispute should initially seek a resolution through consultation and negotiation. If the dispute cannot be settled amicably, the national or company concerned may choose to submit the dispute, under one of the following alternatives, for resolution*:
>
> (a)  *to the courts or administrative tribunals of the Party that is a party to the dispute; or*
>
> (b)  *in accordance with any applicable, previously agreed dispute-settlement procedures; or*
>
> (c)  *in accordance with the terms of paragraph 3".*
>
> Article VI(3): "*(a) Provided that the national or company concerned has not submitted the dispute for resolution under paragraph 2 (a) or (b) and that six months have elapsed from the date on which the dispute arose, the national or company concerned may choose to consent in writing to the submission of the dispute for settlement by binding arbitration:*
>
> ...
>
> (iii)  *in accordance with the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL); ..."*

# SA346

Article VI(4): "*Each Party hereby consents to the submission of any investment dispute for settlement by binding arbitration in accordance with the choice specified in the written consent of the national or company under paragraph 3. Such consent, together with the written consent of the national or company when given under paragraph 3 shall satisfy the requirement for*:

*(b)      an "agreement in writing" for purposes of Article II of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done at New York, June 10, 1958 ("New York Convention") ..."*

Article VI(5): "*Any arbitration under paragraph 3(a) (ii), (iii) or (iv) of this Article shall be held in a state that is a party to the New York Convention.*"

Article VI(6): "*Any arbitral award rendered pursuant to this Article shall be final and binding on the parties to the dispute. Each Party undertakes to carry out without delay the provisions of any such award and to provide in its territory for its enforcement.*"

(For ease of reference, these terms cited from Article VI of the Treaty, with the UNCITRAL Arbitration Rules (1976), are herein collectively called the "Arbitration Agreement").

1.12    Pursuant to Article VI(3)(a)(iii) of the Treaty (cited above), the Arbitration Agreement incorporates the UNCITRAL Arbitration Rules (1976) (the "UNCITRAL Arbitration Rules").

1.13    Pursuant to Article 3(2) of the UNCITRAL Arbitration Rules, these arbitration proceedings are deemed to have commenced on 29 September 2009.

1.14    By agreement of the Parties (as confirmed by the Tribunal's Agreed Procedural Order No 1), the place (or legal seat) of this arbitration is The Hague, the Netherlands within the meaning of Article 16 of the UNCITRAL Arbitration Rules. The Netherlands is a Contracting State to the 1958 New York Convention.

1.15    By further agreement of the Parties (as also confirmed by the Tribunal's Agreed Procedural Order No 1), English and Spanish are the official languages of this arbitration within the meaning of Article 17 of the UNCITRAL Arbitration Rules; and, as between them, English is to be the authoritative language, with all oral proceedings to be simultaneously interpreted and transcribed into English and Spanish.

**SA347**

*C: The Arbitral Tribunal*

1.16    Pursuant to the Arbitration Agreement, the Tribunal is comprised of three arbitrators appointed thereunder as follows:

*\* Dr Grigera Naón*: In their Notice of Arbitration dated 23 September 2009, the Claimants notified the Respondent of their appointment as co-arbitrator of Dr Horacio A. Grigera Naón, of 5224 Elliott Road, Bethesda, Maryland 20816, United States of America.

*\* Professor Lowe*: On 4 December 2009, the Respondent notified the Claimants of its appointment as co-arbitrator of Professor Vaughan Lowe QC, of Essex Court Chambers, 24 Lincoln's Inn Fields, London WC2A 3EG, United Kingdom.

*\* Mr Veeder*: By email of 22 January 2010, the Claimants informed the Permanent Court of Arbitration ("PCA") that the two co-arbitrators were unable to agree on the appointment of the presiding third arbitrator. Pursuant to the agreement between the Parties concerning the selection of the presiding third arbitrator, the PCA was requested to act as appointing authority and "if the party appointed arbitrators cannot agree on the President by Jan. 22 [2010], then the PCA will appoint the President but only after the PCA provides the parties an opportunity to comment on the candidate under consideration by the PCA." Accordingly, on 25 February 2010 and in accordance with the Parties' agreement, the Secretary-General of the PCA appointed as the presiding arbitrator Mr V.V. Veeder, of Essex Court Chambers, 24 Lincoln's Inn Fields, London WC2A 3EG, United Kingdom.

(Professor Lowe and Mr Veeder are individual members of the English Bar. As such, albeit from the same barristers' chambers, they practise as arbitrators independently from each other, as disclosed by Mr Veeder in his Declaration of Acceptance and Statement of Impartiality and Independence dated 26 January 2010).

1.17    By further agreement of the Parties, the PCA's International Bureau was appointed to administer these arbitration proceedings, with Mr Martin Doe (of the PCA) acting as Secretary to the Tribunal.

# SA348

1.18    In its Procedural Order No. 32 dated 26 March 2015, by consent of the Parties and upon the terms set out, the Tribunal appointed Ms Jessica Wells as an additional Secretary to the Tribunal in this arbitration.

### D: The Arbitral Procedure

1.19    *Earlier Orders, Decision and Awards in Tracks 1 and 1B*: This Award follows three Orders on Interim Measures, five Awards, a Decision, and more than 57 procedural orders made in these arbitration proceedings. The operative parts of these Orders on Interim Measures, Awards and Decision are cited below in Annex 1 to this Part I. The Tribunal's Procedural Orders relevant to Track II are listed below in Annex 2 to this Part I.

1.20    This Award is made in Track II of this arbitration, following Track I and Track Ib. It serves no purpose to revisit here the full procedural history of these arbitration proceedings from February 2010. For simplicity's sake, the Tribunal hereby incorporates by reference Part I of its Third Interim Award on Jurisdiction, Part A of its First Partial Award on Track I and Part B of its Decision on Track IB. It here includes only a summary of the major procedural events following the Tribunal's Decision on Track IB dated 12 March 2015 (the "Decision on Track IB").

1.21    *Orders for Interim Measures, Awards and Decision*: As already indicated, the operative parts of the Tribunal's three Orders for Interim Measures dated 14 May 2010, 6 December 2010 and 7 February 2011, its five Awards dated 25 January 2012, 16 February 2012, 27 February 2012, 7 February 2013, 17 September 2013 and its Decision dated 12 March 2015 are cited below in Annex 1 to this Part 1.

1.22    *Track II Procedure:* The Tribunal issued its Decision on Track IB on 12 March 2015. The Tribunal there decided (by a majority), in the form of a decision under the Arbitration Agreement: that (i) the Complaint dated 7 May 2003 of the Lago Agrio Plaintiffs in the Lago Agrio Litigation, as an initial pleading, included individual claims resting upon individual rights under Ecuadorian law, not falling within the scope of the 1995 Settlement Agreement as diffuse claims; (ii) the Complaint was not wholly barred at its inception by *res judicata* under Ecuadorian law, by virtue of the 1995 Settlement Agreement; and (iii) the Lago Agrio Complaint included individual claims materially similar, in substance, to the individual claims made by the Aguinda Plaintiffs in the

Aguinda Litigation in New York. The Tribunal expressly reserved its powers to address and decide the remainder of the Parties' claimed relief in Track IB by one or more further orders, decisions or awards at a later stage of these arbitration proceedings.

1.23    On 12 March 2015, the Tribunal issued Procedural Orders No. 29 and 30. In Procedural Order No. 29, the Tribunal ordered (by consent of the Parties) an amendment to the Confidentiality Clause forming part of Procedural Order No. 26 so as to exclude from confidentiality certain passages addressing the results of the joint inspection of Judge Zambrano's computer hard drives in the Parties' respective memorials of 7 November 2014 and 14 January 2015. In Procedural Order No. 30, the Tribunal designated four sites for the purpose of its Site Visit in Ecuador and decided upon a number of procedural matters related to the Site Visit.

1.24    On 26 March 2015, the Tribunal issued Procedural Orders No. 31 and 32. In Procedural Order No. 31, the Tribunal ordered that the Parties' outside counsel and their law firms refrain from making any public statement that might aggravate the Parties' dispute. In Procedural Order No. 32, as already indicated above, the Tribunal appointed Ms Jessica Wells as an additional Secretary to the Tribunal in these arbitration proceedings.

1.25    On 27 March 2015, the Tribunal issued Procedural Order No. 33. The Tribunal there indicated its wish to request Dr Zambrano to attend the Track II Hearing as a factual witness. It circulated a draft letter to Dr Zambrano for the Parties' comments. The Tribunal's letter to Dr Zambrano was sent to him on 1 April 2015.

1.26    Earlier, on 12 May 2014, by Procedural Order No 26 and upon the terms there set out, the Tribunal appointed Ms Kathryn Owen as the Tribunal's forensic expert under the Arbitration Agreement (namely, Article 27(1) of the UNCITRAL Arbitration Rules). On 30 March 2015, the Tribunal issued Procedural Order No. 34 whereby it renewed the appointment of Ms Kathryn Owen as an expert to the Tribunal.

1.27    On 7 April 2015, the Tribunal held a procedural meeting with the Parties (by telephone conference-call) to prepare for the Track II Hearing and also to address the Parties' several outstanding procedural applications. On 9 April 2015, the Tribunal issued Procedural Order No. 35. It there decided certain procedural and logistical matters relating to the Track II Hearing.

# SA350

1.28    On 14 April 2015 and again on 16 April 2015, the Claimants requested "an immediate order dissolving the confidentiality provisions of Procedural Orders No. 26 and 29 so that Claimants would be free to disclose publicly the evidence found on [Judge Zambrano's Computers' hard drives] and Mr Lynch's expert analysis of that evidence", in response to the "[public] leaking [of] a copy of the November 7, 2014 report of Ecuador's forensics expert, J. Christopher Racich." On 18 April 2015, the Tribunal informed the Parties that it could not convene an urgent telephone conference in order to decide the Claimants' application, but requested that the Claimants notify the Tribunal if any application was made to use Mr Racich's expert report in the appellate proceedings then pending before the US Court of Appeals for the Second Circuit in the RICO Litigation.

1.29    On 16 April 2015, the Claimants informed the Tribunal of the Parties' agreement on all aspects of the Site Visit Protocol, except for the presence of an audio/video team to be brought by each Party. On 17 April 2015, the Respondent submitted its comments on the presence of an audio/video team during the Site Visit. In the event, material parts of the Tribunal's Site Visit were filmed; and the sole copy of that confidential film was lodged with the PCA for safe-keeping (where it remains as at the date of this Award).

1.30    Between 21 April 2015 and 8 May 2015, the Track II Hearing took place in Washington, DC, USA (the "Track II Hearing"). It is described separately below.

1.31    At the Track II Hearing, on 5 May 2015, the Tribunal circulated its Draft Procedural Order No. 36 together with the draft Site Visit Protocol. Procedural Order No. 36, formalising the Site Visit Protocol, was issued on 7 May 2015, as executed by the Parties, the Tribunal, and the Secretary-General of the PCA. Also during the Track II Hearing, on 8 May 2015, the Tribunal issued Procedural Order No. 37. It there rescinded the confidentiality clauses of Procedural Orders No. 26 and 29, save in respect of the images of Judge Zambrano's computer hard drives that were obtained by the Parties pursuant to Procedural Order No. 26.

1.32    On 4 to 10 June 2015, the Tribunal's Site Visit (accompanied by the Parties) took place in the Sucumbíos and Orellana Provinces of the Oriente in Ecuador. It is described separately below.

# SA351

1.33    On 18 June 2015, the Tribunal issued Procedural Order No. 38, an "Omnibus Order". The Tribunal there decided a number of procedural applications made by the Parties.

1.34    On 24 November 2015, the Tribunal issued Procedural Order No. 39. It there (i) addressed an application for interim measures made by the Respondent regarding USTR and US trade preference benefits; (ii) requested the Claimants to confirm the terms of the relief sought for Track I; and, as already indicated above, (iii) extended the appointment of Ms Kathryn Owen as an expert to the Tribunal in accordance with the Revised Terms of Reference therein contained (subject to further comments from the Parties). On 14 December 2015, the Tribunal issued Procedural Order No. 40. It there confirmed the Revised Terms of Reference for the extension of the appointment of Ms Owen as an expert to the Tribunal under the Arbitration Agreement.

1.35    On 5 February 2016, Ms Owen's Final Report was sent to the Parties ("Ms Owen's Final Report").

1.36    On 29 February 2016, the Tribunal issued Procedural Order No. 41. The Tribunal there invited the Parties' comments upon Ms Owen's Final Report. In Procedural Order No. 42, issued on 16 March 2016, the Tribunal approved and agreed to send to Ms Owen part of the documentation submitted by the Parties in response to Procedural Order No. 41.

1.37    Ms Owen's Revised Final Report was sent to the Parties on 3 June 2016 ("Ms Owen's Revised Final Report"). In Procedural Order No. 43 dated 8 June 2016, the Tribunal enquired whether the Parties requested that an oral hearing be held for the Parties to question Ms Owen and make submissions on her report under the Arbitration Agreement (namely, Article 27(4) of the UNCITRAL Arbitration Rules). By letters dated 10 June and 17 June 2016, the Claimants and the Respondent respectively stated that they did not request any hearing on Ms Owen's report under the Arbitration Agreement.

1.38    On 18 June 2016, the Respondent requested that additional materials be admitted to the evidential record under Section 4 of Procedural Order No. 41. The Claimants consented to the Respondent's request on 27 June 2016. These materials were duly admitted.

# SA352

1.39   On 2 July 2016, the Tribunal issued Procedural Order No. 44. The Tribunal there recorded the agreement reached by the Parties on a number of procedural issues (as outlined in the Claimants' letter of 27 June 2016). It also ordered that the Parties make two rounds of simultaneous submissions on the significance of Ms Owen's Revised Final Report and Ms Owen's responses to the Parties' questions. The Parties did so on 12 August and 26 August 2016, respectively.

1.40   On 10 August 2016, the Claimants provided the Tribunal with a copy of the judgment dated 9 August 2016 of the Second Circuit in the RICO Litigation (the "Judgment of the Second Circuit"). On 16 August 2016, the Respondent submitted its comments on the Judgment of the Second Circuit. On 18 August 2016, the Claimants submitted further comments on the Judgment of the Second Circuit. On 29 August 2016, the Tribunal issued Procedural Order No. 45. The Tribunal there admitted the Judgment of the Second Circuit into the evidential record. It also noted that there could be no issue estoppel or *res judicata* applicable to the arbitration proceedings arising from the RICO Litigation, *inter alia*, for want of sufficient privity under international law between the Parties; and that the Parties had agreed that evidence adduced before the US Courts in the RICO Litigation, as filed in this arbitration with the Tribunal's approval, was to be treated as evidence adduced in this arbitration.

1.41   At the same time, the Tribunal requested that the Parties submit a copy of an *amicus* brief submitted by Ecuador to the Second Circuit in the RICO Litigation (the "RICO Amicus Brief"). The Claimants provided this RICO Amicus Brief on 30 August 2016.

1.42   On 31 August 2016, the Respondent submitted certain comments in relation to the RICO Amicus Brief and Procedural Order No. 45, noting "that the Tribunal has admitted evidence from those [USA] proceedings as it was submitted by the parties in their respective briefs and memorials"; and that certain FTP materials (exceeding 18.3 GB) proffered by the Claimants on 23 December 2013 had not been admitted by the Tribunal with its approval into the arbitration's evidential record.

1.43   On 19 September 2016, the Tribunal issued Procedural Order No. 46, whereby *(inter alia)* the Tribunal decided not to hold an oral hearing to question Ms Owen in connection with her Revised Final Report under the Arbitration Agreement. It also

# SA353

confirmed the Respondent's understanding regarding the Claimants' FTP materials, as expressed in the Respondent's letter dated 31 August 2016.

1.44 On 26 June 2017, the Claimants informed the Tribunal that the US Supreme Court had issued a decision in the RICO Litigation (the "Supreme Court's Decision"). On 27 June 2017, the Tribunal requested a copy of the Supreme Court's Decision, which the Claimants provided on 29 June 2017.

1.45 On 12 July 2017, the Respondent requested that the Tribunal terminate the orders made in its First, Second and Fourth Interim Awards. On 19 July 2017, the Claimants requested that these orders remain in force. On 21 July 2017, the Tribunal requested that the Parties respond to a series of queries by the Tribunal in connection with their respective applications regarding these Awards. It also requested a copy of the judgment of The Hague Court of Appeal of 18 July 2017, denying the Respondent's appeal seeking to set aside the Tribunal's Awards (the "Judgment of The Hague Court of Appeal"). On 25 July 2017, the Claimants provided a copy of the Judgment of The Hague Court of Appeal. On 1 August 2017, the Parties provided their respective written responses to the Tribunal's queries of 21 July 2017. On 31 October 2017, the Tribunal issued Procedural Order No. 47, whereby it dismissed the Respondent's application of 12 July 2017 and confirmed that its First, Second and Fourth Interim Awards remained in full force and effect.

1.46 On 5 February 2018, the Tribunal requested that the Parties provide it with certain additional information regarding the status of the related legal proceedings and identify which parts of their respective prayers for relief from the outset of the arbitration remained extant for Track II and Track III. The Tribunal otherwise advised the Parties that it was approaching the end of its deliberations and intended formally to "close the hearings" under Article 29 of the UNCITRAL Rules as regards all issues to be addressed in its award under Track II. On 19 March and 20 April 2018 the Parties provided their respective comments to the Tribunal's letter of 5 February 2018. On 23 April 2018, the Claimants requested the Tribunal's permission to respond to the Respondent's letter of 20 April 2018, which the Tribunal denied on 25 April 2018. On 30 April 2018, the Tribunal issued Procedural Order No. 48, whereby it declared the record closed under Article 29 of the UNCITRAL Rules as regards all issues to be addressed by the Tribunal in its Track II award.

# SA354

1.47 *Written Pleadings:* Pursuant to the Tribunal's procedural orders, the Parties submitted the following written pleadings during or relevant to Track II (in addition to other written pleadings under Track I, Ib and III):

(i) The Claimants' Notice of Arbitration, dated 23 September 2009 ("C-NoA Sept. 2009");

(ii) The Claimants' Request for Interim Measures, dated 1 April 2010 ("C-IM Apr. 2010");

(iii) The Respondent's Response to Claimants' Request for Interim Measures dated 3 May 2010 ("R-IM May 2010");

(iv) The Respondent's Summary Description of its Preliminary Jurisdictional and Admissibility Objections dated 3 May 2010 ("R-Jur. May 2010");

(v) The Claimants' Reply in Support of Interim Measures dated 7 May 2010 ("C-IM May 2010");

(vi) The Respondent's Memorial on Jurisdictional Objections dated 26 July 2010 ("R-Jur. July 2010");

(vii) The Claimants' Counter-Memorial on Jurisdiction dated 6 September 2010 ("C-Jur. Sept. 2010");

(viii) The Respondent's Reply Memorial on Jurisdictional Objections dated 6 October 2010 ("R-Jur. Oct. 2010");

(ix) The Claimants' Memorial on the Merits dated 6 September 2010 (as amended on 23 September 2010) ("C-Mer. Sept. 2010");

(x) The Claimants' Rejoinder on Jurisdiction dated 6 November 2010 ("C-Jur. Nov. 2010");

(xi) The Respondent's Track 1 Counter-Memorial on the Merits dated 3 July 2012 ("R-TI July 2012");

(xii) The Claimants' Supplemental Memorial on the Merits dated 20 March 2012 ("C-Mer. Mar. 2012");

(xiii) The Claimants' Reply Memorial on the Merits Track 1 dated 29 August 2012 ("C-TI Aug. 2012");

(xiv) The Respondent's Track 1 Rejoinder on the Merits dated 26 October 2012 ("R-TI Oct. 2012");

(xv) The Claimants' document submitted at the Track 1 Hearing in November 2012, claiming their prayer for relief ("C-TI Nov. 2012");

# SA355

(xvi)     The Respondent's Track 2 Counter-Memorial on the Merits dated 18 February 2013 ("R-TII Feb. 2013");

(xvii)     The Respondent's letter to the Tribunal on "Show Cause" and "Reconsideration" dated 15 April 2013 ("R-Show Cause Apr. 2013");

(xviii)     The Claimants' Initial Pleading on "Show Cause" and "Reconsideration" dated 6 May 2013 ("C-Show Cause May 2013");

(xix)     The Respondent's Request for Enforcement of Interim Measures dated 3 June 2013 ("R-IM June 2013");

(xx)     The Claimants' Reply Memorial–Track II dated 5 June 2013 (as amended on 12 June 2013) ("C-TII June 2013");

(xxi)     The Claimants' Response to Respondent's Request for Enforcement of Interim Measures dated 17 June 2013 ("C-IM June 2013");

(xxii)     The Respondent's Reply in Support of its Request for Enforcement of Interim Measures dated 17 July 2013 ("R-IM July 2013");

(xxiii)     The Respondent's Reply on "Show Cause" and "Reconsideration" dated 19 July 2013 ("R-Show Cause July 2013");

(xxiv)     The Claimants' Response to Respondent's Reply in Support of its Request for Enforcement of Interim Measures dated 8 August 2013 ("C-IM Aug. 2013");

(xxv)     The Claimants' Rejoinder on "Show Cause" and "Reconsideration" dated 30 August 2013 ("C-Show Cause Aug. 2013");

(xxvi)     The Respondent's Track 2 Rejoinder on the Merits dated 16 December 2013 ("R-TII Dec. 2013");

(xxvii)     The Claimants' Supplemental Memorial on Track 1 dated 31 January 2014 ("C-TI Jan. 2014");

(xxviii)     The Respondent's Track 1 Supplemental Counter-Memorial on the Merits dated 31 March 2014 ("R-TI Mar. 2014");

(xxix)     The Claimants' Supplemental Memorial on Track 2 dated 9 May 2014 ("C-TII SMem. May 2014");

(xxx)     The Claimants' Post-Submission Insert to their Supplemental Memorial on Track 2 – Examination of Zambrano Computer Hard Drives dated 15 August 2014 ("C-TII Aug. 2014");

(xxxi)     The Respondent's Track 2 Supplemental Counter-Memorial on the Merits dated 7 November 2014 ("R-TII Nov. 2014");

# SA356

(xxxii) The Claimants' Reply to the Respondent's Supplemental Track 2 Memorial dated 14 January 2015 ("C-TII Jan. 2015");

(xxxiii) The Respondent's Track 2 Supplemental Rejoinder on the Merits dated 17 March 2015 ("R-TII Mar. 2015");

(xxxiv) The Claimants' Post-Track II Hearing Brief on Track I Issues dated 15 July 2015 ("C-TI July 2015");

(xxxv) The Respondent's Track 1B Post-Hearing Memorial dated 15 July 2015 ("R-TI July 2015");

(xxxvi) The Claimants' Submission Concerning Digital Forensic Evidence and the Report of the Tribunal-Appointed Digital Forensics Expert dated 12 August 2016 ("C-TII Aug. 2016");

(xxxvii) The Respondent's Track 2 Supplemental Memorial on the Forensic Evidence of the Republic of Ecuador dated 12 August 2016 ("R-TII Aug. 2016");

(xxxviii) The Claimants' Reply Submission Concerning Digital Forensic Evidence and the Report of the Tribunal-Appointed Digital Forensics Expert dated 26 August 2016 ("C-TII Aug. 2016"); and

(xxxix) The Respondent's Track II Supplemental Reply on the Forensic Evidence of the Republic of Ecuador dated 26 August 2016 ("R-TII Aug. 2016").

1.48 Whilst the Parties have submitted during these proceedings other written pleadings touching upon issues decided in this Partial Award, the Tribunal considers that their respective claims for relief in Track II can fairly be taken for present purposes from the pleadings listed in Annex 3 to this Part I, save where otherwise indicated below.

1.49 *Written Factual Testimony*: In this arbitration, the Claimants submitted the following written factual testimony relevant to Track II:

(i)     The witness statement of Rodrigo Pérez Pallares dated 4 September 2010;

(ii)    The first witness statement of Ricardo Reis Veiga dated 27 August 2010;

(iii)   The witness statement of Frank G. Soler dated 27 August 2012; and

(iv)    The second witness statement of Ricardo Reis Veiga dated 28 August 2012.

1.50 *Written Expert Testimony*: In this arbitration the Claimants submitted the following written expert testimony relevant to Track II:

(i)     The expert report of Robert Wasserstrom dated 28 August 2010;

## SA357

(ii)       The first expert report of Ángel R. Oquendo dated 2 September 2010;

(iii)     The first expert report of Vladimiro Álvarez Grau dated 2 September 2010;

(iv)     The first expert report of Enrique Barros Bourie dated 3 September 2010;

(v)      The second expert report of Enrique Barros Bourie dated 3 September 2010;

(vi)     The first expert report of César Coronel Jones dated 3 September 2010;

(vii)    The second expert report of César Coronel Jones also dated 3 September 2010;

(viii)   The first expert report of David D. Caron dated 3 September 2010;

(ix)     The first expert report of Gregory S. Douglas dated 3 September 2010;

(x)      The first expert report of Gustavo Romero Ponce dated 3 September 2010;

(xi)     The first expert report of John A. Connor dated 3 September 2010;

(xii)    The expert report of Brent K. Kaczmarek dated 6 September 2010;

(xiii)   The first expert report of Michael L. Younger dated 21 December 2011;

(xiv)   The first forensic report of Robert A. Leonard dated 5 January 2012;

(xv)    The first expert report of Gerald R. McMenamin dated 20 January 2012;

(xvi)   The second expert report of Vladimiro Álvarez Grau dated 10 March 2012;

(xvii)  The first expert report of Mitchell A. Seligson dated 12 March 2012;

(xviii) The first expert report of Jan Paulsson dated 12 March 2012;

(xix)   The second expert report of David D. Caron dated 24 August 2012;

(xx)    The third expert report of Enrique Barros Bourie dated 27 August 2012;

(xxi)   The expert report of William T. Allen dated 27 August 2012;

(xxii)  The second expert report of Gustavo Romero Ponce dated 27 August 2012;

(xxiii) The third expert report of César Coronel Jones dated 28 August 2012;

(xxiv) The second expert report of Ángel R. Oquendo dated 28 August 2012;

(xxv)  The fourth expert report of Enrique Barros Bourie. dated 19 November 2012;

(xxvi) The fourth expert report of César Coronel Jones dated 19 November 2012;

(xxvii) The first expert report of Weston Anson dated 6 May 2013;

(xxviii) The second expert report of Mitchell A. Seligson dated 23 May 2013;

(xxix) The second forensic report of Robert A. Leonard dated 24 May 2013;

(xxx)  The expert report of Adam Torres dated 24 May 2013;

(xxxi) The expert report of William D. Bellamy dated 30 May 2013;

(xxxii) The first expert report of Thomas E. McHugh dated 30 May 2013;

(xxxiii) The first expert report of Robert E. Hinchee dated 31 May 2013 (including the exhibited opinions of James I. Ebert and of William D. Di Paolo and Laura B. Hall);

# SA358

(xxxiv)  The first expert report of Suresh H. Moolgavkar dated 31 May 2013;

(xxxv)  The expert report of Pedro J.J. Álvarez dated 31 May 2013;

(xxxvi)  The expert report of Douglas Southgate dated 31 May 2013;

(xxxvii)  The second expert report of Michael L. Younger dated 31 May 2013;

(xxxviii)  The second expert report of Gregory S. Douglas dated 1 June 2013;

(xxxix)  The third expert report of Vladimiro Álvarez Grau dated 3 June 2013;

(xl)  The fifth expert report of Enrique Barros Bourie dated 3 June 2013;

(xli)  The second expert report of John A. Connor dated 3 June 2013;

(xlii)  The fifth expert report of César Coronel Jones dated 3 June 2013;

(xliii)  The first forensic report of Patrick Juola dated 3 June 2013;

(xliv)  The second expert report of Jan Paulsson dated 3 June 2013;

(xlv)  The expert report of Santiago Velázquez Coello dated 3 June 2013;

(xlvi)  The first expert report of Jorge Wright-Ycaza dated 3 June 2013;

(xlvii)  The second expert report of Weston Anson dated 30 August 2013;

(xlviii)  The first forensic report of Spencer Lynch (of Stroz Friedberg) dated 7 October 2013;

(xlix)  The third expert report of John A. Connor dated 7 May 2014;

(l)  The sixth expert report of César Coronel Jones dated 7 May 2014;

(li)  The second expert report of Thomas E. McHugh dated 7 May 2014;

(lii)  The second expert report of Robert E. Hinchee dated 9 May 2014;

(liii)  The second expert report of Suresh H. Moolgavkar dated 9 May 2014;

(liv)  The second forensic report of Patrick Juola dated 12 August 2014;

(lv)  The second forensic report of Spencer Lynch (of Stroz Friedberg) dated 15 August 2014;

(lvi)  The third expert report of Robert E. Hinchee dated 11 January 2015;

(lvii)  The sixth expert report of Enrique Barros Bourie dated 12 January 2015;

(lviii)  The second expert report of Jorge Wright-Ycaza dated 12 January 2015;

(lix)  The seventh expert report of César Coronel Jones dated 13 January 2015;

(lx)  The expert report of Juan Carlos Riofrío Martínez-Villalba dated 13 January 2015;

(lxi)  The third expert report of Gregory S. Douglas dated 14 January 2015;

(lxii)  The fourth expert report of John A. Connor dated 14 January 2015;

(lxiii)  The third expert report of Thomas E. McHugh dated 14 January 2015;

## SA359

(lxiv)   The third forensic report of Spencer Lynch (of Stroz Friedberg) dated 14 January 2015; and

(lxv)   The third expert report of Suresh H. Moolgavkar dated 14 January 2015.

1.51   The Respondent submitted the following written factual testimony relevant to Track II:

(i)   The witness statement of Norman Alberto Wray dated 10 December 2013;

(ii)   The witness statement of Servio Amable Curipoma Sisalima dated 12 December 2013;

(iii)   The witness statement of José León Guamán Romero dated 12 December 2013;

(iv)   The witness statement of Mercedes Micailina Jaramillo Jiménez dated 13 December 2013; and

(v)   The witness statement of Manuel Benjamin Pallares Carrión dated 14 December 2013.

1.52   The Respondent submitted the following written expert testimony relevant to Track II:

(i)   The first expert report of Roberto Salgado Valdez dated 1 October 2010;

(ii)   The first expert report of Genaro Eguiguren dated 4 October 2010;

(iii)   The second expert report of Genaro Eguiguren dated 2 July 2012;

(iv)   The second expert report of Roberto Salgado Valdez dated 2 July 2012;

(v)   The first expert report of Gilles Le Chatelier dated 2 July 2012;

(vi)   The second expert report of Gilles Le Chatelier dated 25 October 2012;

(vii)   The third expert report of Genaro Eguiguren dated 26 October 2012;

(viii)   The third expert report of Roberto Salgado Valdez dated 26 October 2012;

(ix)   The first expert report of Fabián Andrade Narváez dated 18 February 2013;

(x)   The first expert report of Kenneth J. Goldstein and Jeffrey W. Short (of the Louis Berger Group) dated 18 February 2013 (including the annexed opinions of Harlee S. Strauss and Edwin Theriot);

(xi)   The first expert report of Philippe Grandjean dated 22 November 2013;

(xii)   The first expert report of Jeffrey W. Short dated 11 December 2013;

(xiii)   The expert report of Edwin Theriot dated 12 December 2013;

(xiv)   The second expert report of Kenneth J. Goldstein and Jeffrey W. Short (of the Louis Berger Group) dated 16 December 2013;

(xv)   The expert report of Kenneth A. Kaigler dated 16 December 2013;

# SA360

    (xvi)     The first expert report of J. Christopher Racich dated 16 December 2013;

    (xvii)    The first expert report of Harlee S. Strauss dated 16 December 2013;

    (xviii)   The expert report of Paul H. Templet dated 16 December 2013;

    (xix)     The expert report of Jan M. van Dunné dated 27 March 2014;

    (xx)      The second expert report of Fabián Andrade Narváez dated 7 November 2014;

    (xxi)     The third expert report of Kenneth J. Goldstein and Edward A. Garvey (of the Louis Berger Group) dated 7 November 2014;

    (xxii)    The second expert report of Philippe Grandjean dated 7 November 2014;

    (xxiii)   The first expert report of Blanca Laffon dated 7 November 2014;

    (xxiv)   The second expert report of J. Christopher Racich dated 7 November 2014;

    (xxv)    The second expert report of Jeffrey W. Short dated 7 November 2014;

    (xxvi)   The second expert report of Harlee S. Strauss dated 7 November 2014;

    (xxvii)  The third expert report of Fabián Andrade Narváez dated 16 March 2015;

    (xxviii) The fourth expert report of Kenneth J. Goldstein and Edward A. Garvey (of the Louis Berger Group) dated 16 March 2015;

    (xxix)   The third expert report of Philippe Grandjean dated 16 March 2015;

    (xxx)    The second expert report of Blanca Laffon dated 16 March 2015;

    (xxxi)   The third expert report of J. Christopher Racich dated 16 March 2015;

    (xxxii)  The third expert report of Jeffrey W. Short dated 16 March 2015; and

    (xxxiii) The third expert report of Harlee S. Strauss dated 16 March 2015.

1.53    The following joint expert reports were submitted to the Tribunal:

    (i)       The joint expert report of Enrique Barros Bourie, César Coronel Jones and Roberto Salgado dated 6 August 2012;

    (ii)     The joint expert report of Enrique Barros Bourie, César Coronel Jones, Genaro Eguiguren, Ángel R. Oquendo and Gustavo Romero dated 7 August 2012; and

    (iii)    The joint expert report of Gilles Le Chatelier and Ángel R. Oquendo dated 7 August 2012.

1.54    Throughout this Award, these witness statements or expert reports are referred to in abbreviated form by the witness or expert's last name and the number of the relevant statement or report, as follows: "Reis Veiga WS 1" signifies the first witness statement of Ricardo Reis Veiga dated 27 August 2010 and "Leonard ER 1" signifies the first forensic report of Robert A. Leonard dated 5 January 2012.

# SA361

1.55　*The Tribunal's Expert*: As already indicated above, by its Procedural Order No. 26 dated 12 May 2014 under the Arbitration Agreement made by consent of the Parties, the Tribunal appointed Ms Owen as the Tribunal's forensic expert for the purpose of undertaking the imaging and safe-keeping of Judge Zambrano's hard drives in Ecuador, with the Parties' respective forensic experts present during this exercise. As also already indicated, Ms Owen's mandate was renewed and expanded pursuant to Procedural Order No. 34 dated 30 March 2015 and Procedural Order No. 40 dated 14 December 2015. Ms Owen submitted her Revised Final Report on 3 June 2016.

1.56　*The Track II Hearing*: Issues under Track II were addressed by the Parties at the oral hearing at the World Bank, in Washington DC, USA held from 21 April 2015 to 8 May 2015, with the assistance of English and Spanish interpreters and recorded in the form of both English and Spanish transcripts (the "Track II Hearing"). The references below are made to the English version of the transcript, as follows: "D1.10" signifies the first day, at page 10. As regards witness examinations, "x" signifies direct examination, "xx" signifies cross-examination, "xxx" signifies re-direct examination and "QT" signifies questions from the Tribunal.

1.57　The Claimants and the Respondent were represented respectively at the Track II Hearing by those persons listed in the verbatim transcript; and it serves no purpose here listing these persons by name, save as follows.

1.58　For the Claimants, opening oral submissions were made by the First Claimant's General Counsel Mr Hewitt Pate [D1.10], Professor Paulsson [D1.13; D1.141], Doak Bishop Esq [D1.24], Wade Coriell Esq [D1.94] and Tracie Renfroe Esq [D1.119].

1.59　For the Respondent, opening oral submissions were made by the Respondent's Procurador General Diego García Carrión [D1.172], Eric W. Bloom Esq [D1.177; D1.241; D1.295], Professor Silva Romero [D1.184], Dra Blanca Gómez de la Torre [D1.197], Professor Mayer [D1.206], Ricardo Ugarte Esq [D1.223], Tomás Leonard Esq [D1.242], Gregory Ewing Esq [D1.271; D1.306], Nicole Silver Esq [D1.286] and Eric Goldstein Esq [D1.319].

1.60　For the Claimants, closing oral submissions were made by Doak Bishop Esq [D12.2506; D12.2634; D12.2680], Tracie Renfroe Esq [D12.2516; D12.2607], Wade Coriell Esq [D12.2525], David Weiss Esq [D12.2559], Professor Paulsson [D12.2570; D12.2735],

## SA362

Caline Mouawad Esq [D12.2651], Elizabeth Silbert Esq [D12.2668], Edward G. Kehoe Esq [D12.2708] and Mr Hewitt Pate [D12.2753].

1.61 For the Respondent, closing oral submissions were made by the Respondent's Procurador General Diego García Carríon [D13.2786], Eric W. Bloom Esq [D13.2792, D13.2829], Eric Goldstein Esq [D13.2804, D13.2851], Gregory Ewing Esq [D13.2808, D13.2882, D13.2906], Nassim Hooshmandnia Esq [D13.2819], Nicole Silver Esq [D13.2896], Tomás Leonard Esq [D13.2911; D13.3022], Professor Silva Romero [D13.2942], Professor Mayer [D13.2965], Dra Blanca Gómez de la Torre [D13.2978], Ricardo Ugarte Esq [D13.2983], Mark Bravin Esq [D13.3011], Ms Daniela Palacios [D13.3025], Ms Maria Teresa Borja [D13.3028] and Mr Luis Felipe Aguilar [D13.3031].

1.62 The Claimants tendered eight oral witnesses at the Track II Hearing who were all cross-examined by the Respondent: (i) Robert A. Leonard [D2.381x & 401xx]; (ii) Patrick Juola [D2.455x, 483xx & 580xxx]; (iii) Alberto Guerra Bastidas [D3.598x, 604xx, D4.769xx, 859xxx, 890QT & 898xxx]; (iv) Spencer Lynch [D5.936x, 965xx & 1126xxx]; (v) John A. Connor [D6.1288x, 1328xx, D7.1471xx & 1571xxx]; (vi) Gregory S. Douglas [D7.1606x, 1641xx, D8.1702xx & 1759xxx]; (vii) Thomas McHugh [D8.1778x, 1804xx, 1850xxx & 1861QT]; and (viii) Robert E. Hinchee [D9.1879x, 1904xx & 2002xxx].

1.63 The Respondent tendered five oral witnesses at the Track II Hearing who were all cross-examined by the Claimants: (i) J Christopher Racich [D5.1139x, 1158xx, D6.1216xx & 1270xxx]; (ii) Harlee Strauss [D9.2009x, 2035xx, 2107xxx & 2110QT]; (iii-iv) Edward A. Garvey and Kenneth J. Goldstein [D10.2135x, 2166xx, 2265xxx & 2272QT]; and (v) Fabián Andrade Narváez [D10.2286x, 2312xx, D11.2359xx, 2409xxx, 2439QT, 2450xxx & 2453xx].

1.64 *The Site Visit*: By Procedural Order No. 36 dated 7 May 2016, the Tribunal, the Parties and the Secretary-General of the PCA executed the Site Visit Protocol for the Tribunal's visit to four sites in Ecuador. The Site Visit included four sites within the area of the former Concession: (i) Shushufindi-34 (on 7 June 2015), (ii) Aguarico-06 (8 June 2015), (iii) Shushufindi-55 (also on 8 June 2015) and (iv) Lago Agrio-02 (on 9 June 2015). During the Site Visit, the Parties' legal representatives and experts addressed the

# SA363

participants at each of these four sites, as recorded in the English verbatim transcript. The references below are made to this transcript, as follows: "S1.10" signifies the first site, at page 10 of the transcript.

1.65    For the Claimants, the Site Addresses were made by Doak Bishop Esq [S1.37], Tracie Renfroe Esq [S1.40, S1.73, S4.328, S4.364], Mr John Connor [S1.48, S2.165, S3.249, S3.260, S4.340], Dr Thomas E. McHugh [S1.65, S2.157, S2.184, S3.264, S4.339], Carol Wood Esq [S2.151, S2.159, S2.187, S4.358] and Jamie M. Miller Esq. [S3.242, S3.259, S3.263, S3.267].

1.66    For the Respondent, the Site Addresses were made by Procurador General Diego García Carrión [S1.6], Gregory L. Ewing Esq [S1.9, S1.78, S1.91, S2.107, S2.133, S2.191, S2.202, S3.213, S3.271, S3.278, S4.292, S4.319, S4.323, S4.378], Dr Edward A. Garvey [S1.18, S1.85, S2.120, S2.195, S2.203, S3.227, S3.274, S3.284, S4.301, S4.322, S4.375] and Eric W. Bloom Esq [S4.384].

1.67    *Track II Procedural Orders:* The Tribunal has issued 38 orders relevant to Track II: PO Nos 10-11, 16, 18-23 and 25 to 50 as listed in Annex II to this Part I and marked "*".

1.68    *Enforcement:* From May 2012 onwards, the Lago Agrio Plaintiffs sought to enforce and execute the Lago Agrio Judgment in (i) Ecuador, (ii) Canada, (iii) Brazil and (iv) Argentina against Chevron, TexPet and certain of Chevron's associated companies. A summary of these enforcement proceedings is provided in Annex 4 to Part I of this Award.

### E: The Parties' Respective Claims for Relief

1.69    In their several written submissions relevant to Track II (including submissions in Track I, Ib and III), the Parties pleaded their respective formal prayers, as set below out in Annex 3 to this Part I, as clarified by their respective letters dated 19 March and 20 April 2018.

### F: "Closing the Record"

1.70    By letter dated 5 March 2018 and its Procedural Order No. 48 dated 30 April 2018, the Tribunal 'closed' the record of this arbitration as regards the issues under Track II that were to be decided in this Award.

# SA364

1.71    On 27 June 2018, the Respondent's Constitutional Court issued its Judgment,[2] dismissing Chevron's extraordinary action for protection against the Lago Agrio Judgment (2011),[3] as also decided by the Lago Agrio Appellate Court's Judgment (2012)[4] and the Cassation (National) Court's Judgment (2013).[5] By its Procedural Order No. 49 of 12 July 2018, the Tribunal admitted into the record of this arbitration the Constitutional Court's Judgment (in its orginal Spanish version, followed by the Parties' agreed English translation). At the Tribunal's request, confirmed by the Tribunal's Agreed Procedural Order of 19 July 2018, the Parties made their respective written submissions on the Constitutional Court's Judgment by letters dated 25 July 2018. Subsequently, prior to the issue of this Award, the Tribunal re-closed the record of this arbitration as regards the issues under Track II that are decided in this Award, by Procedural Order No. 50 and letter dated 13 August 2018.

---

[2] C-2551.
[3] C-931.
[4] C-991.
[5] C-1975.

# SA365

### PART I – ANNEX 1

### THE TRIBUNAL'S ORDERS ON INTERIM MEASURES,
### AWARDS AND DECISION
### (OPERATIVE PARTS)

#### A: Order on Interim Measures dated 14 May 2010, Operative Part (pp. 5-6):

*"1. Until further decision the Tribunal takes, pursuant to Article 26(1) of the UNCITRAL Rules, the following interim measures up to and including the next procedural meeting beginning on 22 November 2010:*

> *(i) The Claimants and the Respondent are both ordered to maintain, as far as possible, the status quo and not to exacerbate the procedural and substantive disputes before this Tribunal, including (in particular but without limiting howsoever the generality of the foregoing) the avoidance of any public statement tending to compromise these arbitration proceedings;*

> *(ii) The Claimants and the Respondent are both ordered to refrain from any conduct likely to impair or otherwise adversely affect, directly or indirectly, the ability of the Tribunal to address fairly any issue raised by the Parties before this Tribunal;*

> *(iii) The Claimants and Respondent are both ordered not to exert, directly or indirectly, any unlawful influence or pressure on the [Lago Agrio] Court addressing the pending litigation in Ecuador known as the Lago Agrio Case [The Lago Agrio Litigation];*

> *(iv) The Claimants and Respondent are ordered to inform the Tribunal (in writing) of the likely date for the issue by the Court of its judgment in the Lago Agrio Case as soon as such date becomes known to any of them;*

> *(v) The Respondent is ordered to communicate (in writing and also by any other appropriate means) the Tribunal's invitation to the [Lago Agrio] Court to make known as a professional courtesy to the Tribunal the likely date for the issue of its judgment in that Case; and, to that end, the Respondent is ordered to send to the Court the full text in Spanish and English of the Tribunal's present order.[6]*

> *(vi) The Respondent is ordered to facilitate and not to discourage, by every appropriate means, the Claimants' engagement of legal experts, advisers and representatives from the Ecuadorian legal profession for the purpose of these arbitration proceedings (at the Claimants' own expense).*

*2. This Order is and shall remain subject to modification in the light of any future event, upon the Tribunal's own motion or upon any Party's application, particularly in the light of any new development in the Lago Agrio Case [the Lago Agrio Litigation] and the issue of the [Lago Agrio] Court's judgment in such Case; and any of the Parties may apply to the Tribunal for such modification upon 24 hours' written notice.*

---

[6] This was done. The Respondent submitted this letter to the Lago Agrio Court on 21 May 2010 (R-116). The Lago Agrio Court provided a response to the Tribunal's invitation by letter dated 17 June 2018 (R-118).

# SA366

*3. This Order is made strictly without prejudice to the merits of the Parties' procedural and substantive disputes, including the Respondent's jurisdictional and admissibility objections and the merits of the Claimants' claims.*"

**B: Order No 2 on Interim Measures dated 6 December 2010, Operative Part (pp. 5-6):**

"*1. Until further decision the Tribunal takes, pursuant to Article 26(1) of the UNCITRAL Rules, the following interim measures up to and including the date of issuance of the Tribunal's decision on jurisdiction:*

> *(i) The Claimants and the Respondent are both ordered to maintain, as far as possible the status quo and not to exacerbate the procedural and substantive disputes before this Tribunal, including (in particular but without limiting howsoever the generality of the foregoing) the avoidance of any public statement tending to compromise these arbitration proceedings;*

> *(ii) The Claimants and the Respondent are both ordered to refrain from any conduct likely to impair or otherwise adversely affect, directly or indirectly, the ability of the Tribunal to address fairly any issue raised by the Parties before this Tribunal;*

> *(iii) The Claimants and Respondent are both ordered not to exert, directly or indirectly, any unlawful influence or pressure on the [Lago Agrio] Court addressing the pending litigation in Ecuador known as the Lago Agrio Case [Lago Agrio Litigation];*

> *(iv) The Claimants and Respondents are ordered to inform the Tribunal (in writing) of the likely date for the issue by the Court of its judgment in the Lago Agrio Case as soon as such date becomes known to any of them;*

> *(v) The Tribunal has decided, of its own motion, to write a letter to the Court in the Lago Agrio Case (in the form of the draft attached) inviting that Court to make known as a professional courtesy to the Tribunal the likely date for the issue of its judgment in that Case;[7] and*

> *(vi) The Respondent is ordered to facilitate and not to discourage, by every appropriate means, the Claimants' engagement of legal experts, advisers and representatives from the Ecuadorian legal profession for the purpose of these arbitration proceedings (at the Claimants' own expense).*

*2. This Order is and shall remain subject to modification in the light of any future event, upon the Tribunal's own motion or upon any Party's application, particularly in the light of any new development in the Lago Agrio Case and the issue of the Court's judgment in such Case; and any of the Parties may apply to the Tribunal for such modification upon 24 hours' written notice.*

*3. This Order is made strictly without prejudice to the merits of the Parties' procedural and substantive disputes, including the Respondent's jurisdictional and admissibility objections and the merits of the Claimants' claims.*"

---

[7] The Tribunal sent such a letter on 6 December 2010.

# SA367

### C: Further Order on Interim Measures dated 28 January 2011, Operative Part, Paragraph C  (pp. 3-4)

"*(C) Pending such oral hearing [i.e. the Hearing at the Peace Palace on 6 February 2011] or further order (on application by any Party or by the Tribunal upon its own initiative), the Tribunal takes the following interim measures pursuant to Article 26 of the UNCITRAL Arbitration Rules:*

*1. The Tribunal re-confirms Paragraphs 1(i) to (iv) of its Order dated 14 May 2010 (as amended); namely:*

*(i)      The Claimants and the Respondent are both ordered to maintain, as far as possible the status quo and not to exacerbate the procedural and substantive disputes before this Tribunal, including (in particular but without limiting howsoever the generality of the foregoing) the avoidance of any public statement tending to compromise these arbitration proceedings;*

*(ii)      The Claimants and the Respondent are both ordered to refrain from any conduct likely to impair or otherwise adversely affect, directly or indirectly, the ability of the Tribunal to address fairly any issue raised by the Parties before this Tribunal;*

*(iii)      The Claimants and the Respondent are both ordered not to exert, directly or indirectly, any unlawful influence or pressure on the Court addressing the pending litigation in Ecuador known as the Lago Agrio Case;*

*(iv)      The Claimants and the Respondent are ordered to inform the Tribunal (in writing) of the likely date for the issue by the Court of its judgment in the Lago Agrio Case as soon as such date becomes known to any of them;*

*2. Whilst the Lago Agrio plaintiffs are not named parties to these arbitration proceedings and the Respondent is not a named party to the Lago Agrio Case, the Tribunal records that, as a matter of international law, a State may be responsible for the conduct of its organs, including its judicial organs, as expressed in Chapter II of Part One of the International Law Commission's Articles on State Responsibility;*

*3. If it were established that any judgment made by an Ecuadorian court in the Lago Agrio Case was a breach of an obligation by the Respondent owed to the Claimants as a matter of international law, the Tribunal records that any loss arising from the enforcement of such judgment (within and without Ecuador) may be losses for which the Respondent would be responsible to the Claimants under international law, as expressed in Part Two of the International Law Commission's Articles on State Responsibility; and*

*4. This order for further interim measures is made by the Tribunal strictly without prejudice to any Party's case as regards the Tribunal's jurisdiction, the Claimants' First and Second Applications, the Respondent's opposition to these First and Second Applications and any claim or defence by any Party as to the merits of the Parties' dispute.*"

### D:  Order on Interim Measures dated 9 February 2011, Operative Part (pp. 3-4):

"*(A) As to jurisdiction, the Tribunal records that it has not yet determined the Respondent's challenge to its jurisdiction (as recorded in the fourth preamble to its Order o 28 January 2011). Nonetheless, for the limited purpose of the present decision, the Tribunal provisionally assumes that it has the jurisdiction to decide upon the Claimants' Second Application for*

# SA368

*Interim Measures on the ground that the Claimants have established, to the satisfaction of the Tribunal, a sufficient case for the existence of such jurisdiction at this preliminary stage of these arbitration proceedings under the Treaty between the United States of America and the Republic of Ecuador concerning the Encouragement and Reciprocal Protection of Investment (the "BIT"), incorporating by reference the 1976 UNCITRAL Arbitration Rules ("the UNCITRAL Rules");*

*(B) The Tribunal notes that: (1) Article 26 of the UNCITRAL Rules permits a tribunal, at the request of a party, to take interim measures (established in the form of an order or award) in respect of the subject-matter of the parties' dispute; (ii) Article 32(1) of the UNCITRAL Rules provides that any award is final and binding on the parties, with the parties undertaking to carry out such award without delay; and (iv) Articles VI.3(6) of the BIT provides (inter alia) than an award rendered pursuant to Article VI.3(a)(iii) of the BIT under the UNCITRAL Rules shall be binding on the parties to the dispute, with the Contracting Parties undertaking to carry out without delay the provisions of any such award and to provide in its territory for its enforcement;*

*(C) As to form, the Tribunal records that, whilst this decision under Article 26 of the UNCITRAL Rules is made in the form of an order and not an interim award, given the urgency required for such decision, the Tribunal may decide (upon its own initiative or any Party's request) to confirm such order at a later date in the form of an interim award under Articles 26 and 32 of the UNCITRAL Rules, without the Tribunal hereby intending conclusively to determine the status of this decision, one way or the other, as an award under the 1958 New York Convention.*

*(D) As to the grounds for the Claimants' Second Application, the Tribunal concludes that the Claimants have made out a sufficient case, to the Tribunal's satisfaction, under Article 26 of the UNCITRAL Rules, for the order made below in the discretionary exercise of the Tribunal's jurisdiction to take interim measures in respect of the subject-matter of the Parties' dispute;*

*(E) Bearing in mind the Respondent's several obligations under the BIT and international law, including the Respondent's obligation to carry out and provide for the enforcement of an award on the merits of the Parties' dispute in these arbitration proceedings (assuming this Tribunal's jurisdiction to make such an award) the Tribunal orders:*

> *(i)        the Respondent to take all measures at its disposal to suspend or cause to be suspended the enforcement or recognition within and without Ecuador of any judgment against the First Claimant in the Lago Agrio Case; and*

> *(ii)       the Respondent's Government to inform this Tribunal, by the Respondent's legal representatives in these arbitration proceedings, of all measures which the Respondent has taken for the implementation of this order for interim measures;*

> *pending further order or award in these arbitration proceedings, including the Tribunal's award on jurisdiction or (assuming jurisdiction) on the merits;*

*(F) The Tribunal records that it is common ground between the Claimants and the Respondent in these proceedings, as also re-confirmed by the Respondent at the oral hearing on 6 February 2011 (page 107 of the English transcript and page 101 of the Spanish transcript) that, under Ecuadorean law, a judgment entered in a domestic proceeding at first instance (such as a first-instance judgment in the Lago Agrio Case) is not final, conclusive or enforceable during the*

# SA369

*pendency of a first-level appeal until at least such time as that appeal has been decided by the first-level appellate court;*

*(G) The Tribunal continues Paragraph C (1) to (3) of its order of 28 January 2011 (which order is incorporated by reference herein);*

*(H) The Tribunal decides further that the Claimants shall be legally responsible, jointly and severally, to the Respondent for any costs or losses which the Respondent may suffer in performing its obligations under this order, as may be decided by the Tribunal within these arbitration proceedings (to the exclusion of any other jurisdiction;*

*(I) This order shall be immediately final and binding upon all Parties, subject only to any subsequent variation made by the Tribunal (upon either its own initiative or any Party's request); and*

*(J) This order, as with the earlier order of 26 [sic: 28] January 2011,[8] is made by the Tribunal strictly without prejudice to any Party's case as regards the Tribunal's jurisdiction, the Claimant's First Application made by letter dated 12 December 2010, the Respondent's opposition to such First Application, and to any claim or defence by any Party as to the merits of the Parties' dispute.*"

### E: Procedural Order No 7 dated 16 March 2011, Paragraphs 1-10:

"*1. The Tribunal here addresses the four disputed applications in these arbitration proceedings regarding the Tribunal's several orders for interim measures dated 14 May 2010, 28 January 2011 and 9 February 2011; namely: (i) the first application by the Claimants made by letter dated 23 February 2011; (ii) the second application by the Respondent made by letter dated 24 February 2011; (iii) the third application by the Respondent made by letter dated 28 February 2011; and (iv) the fourth application by the Claimants made by letter dated 4 March 2011.*

*2. First Application: As regards the first application by the Claimants for further interim measures against the Respondent in regard to the criminal proceedings in Ecuador concerning (inter alios) two of the Claimants' legal representatives (Messrs Ricardo Veiga and Rodrigo Pérez), the Tribunal refers to the Claimants' letter dated 23 February 2011, the Claimants' email message dated 25 February 2011 and the Respondent's letter dated 10 March 2011.*

*3. Having considered the Parties' written submissions listed in paragraph 2 above (with attached exhibits), together with all other relevant circumstances in this case, the Tribunal does not consider it appropriate to grant the Claimants' application pleaded specifically at page 21 of their letter dated 23 February 2011, beyond maintaining the Tribunal's existing orders for interim measures.*

*4. Second Application: As regards the second application made by the Respondent seeking the revocation of the Tribunal's order dated 9 February 2011, the Tribunal refers to Part II of the Respondent's letter dated 24 February 2011 and the Claimants' letter dated 4 March 2011.*

*5. Having considered the Parties' written submissions listed in paragraph 4 above (with attached exhibits), together with all other relevant circumstances in this case, the Tribunal does*

---

[8] This order of 28 January was mis-dated 26 January 2011.

## SA370

*not consider it appropriate to grant the Respondent's application or the Claimants' counter-application, beyond maintaining its existing order for interim measures dated 9 February 2011.*

*6. Third Application: As regards the third application made by the Respondent in regard to alleged violations by the Claimants of the Tribunal's orders for interim measures and for further interim measures, the Tribunal refers to the Respondent's letter dated 28 February 2001 and the Claimants' letters dated 4 and 10 March 2001.*

*7. Having considered the Parties' written submissions listed in paragraph 6 above (with attached exhibits), together with all other relevant circumstances in this case, the Tribunal does not consider it appropriate to grant the Respondent's application pleaded specifically at page 3 of its letter dated 28 February 2011, beyond maintaining the Tribunal's existing orders for interim measures.*

*8. Fourth Application: As regards the fourth application made by the Claimants in regard to alleged violations by the Respondent of the Tribunal's order dated 9 February 2011, the Tribunal refers to the Claimants' letter dated 4 March 2011.*

*9. Having considered the written submissions listed in paragraph 8 above (with attached exhibits), together with all other relevant circumstances in this case, the Tribunal does not consider it appropriate to grant the Claimants' application, beyond maintaining the Tribunal's existing order for interim measures dated 9 February 2011.*

*10. This procedural order shall not prejudice any issue as regards jurisdiction, admissibility or merits in these proceedings; nor shall it preclude any future application by any Party for interim measures or like relief in the event of any change in relevant circumstances.*"

### F: First Interim Award on Interim Measures dated 25 January 2012, Operative Part (pp. 16-17):

" *1. Pursuant to Paragraph (C) of its Order dated 9 February 2011 and upon the following terms, the Tribunal confirms and re-issues such Order as an Interim Award pursuant to Articles 26 and 32 of the UNCITRAL Arbitration Rules, specifically Paragraph (E) of such Order; namely (as here modified):*

*2. Bearing in mind the Respondent's several obligations under the Treaty and international law, including the Respondent's obligation to carry out and provide for the enforcement of an award on the merits of the Parties' dispute in these arbitration proceedings (assuming this Tribunal's jurisdiction to make such an award), the Tribunal orders:*

> *(i) the Respondent to take all measures at its disposal to suspend or cause to be suspended the enforcement or recognition within and without Ecuador of any judgment against the First Claimant in the Lago Agrio Case; and*

> *(ii) the Respondent's Government shall continue to inform this Tribunal, by the Respondent's legal representatives in these arbitration proceedings, of all measures which the Respondent has taken for the implementation of this Interim Award;*

*pending the February Hearing's completion and any further order or award in these arbitration proceedings;*

# SA371

*3. This Interim Award is and shall remain subject to modification (including its extension or termination) by the Tribunal at or after the February Hearing; and, in the meantime, any of the Parties may also apply to the Tribunal for such modification upon 72 hours' written notice for good cause shown;*

*4. This Interim Award is made strictly without prejudice to the merits of the Parties' substantive and other procedural disputes, including (but not limited to) the Parties' respective applications to be heard at the February Hearing;*

*5. This Interim Award shall take effect forthwith as an Interim Award, being immediately final and binding upon all Parties as an award subject only to any subsequent modifications herein provided, whether upon the Tribunal's own initiative or any Party's application; and*

*6. This Interim Award, although separately signed by the Tribunal's members on three signing pages, constitutes an 'interim award' signed by the arbitrators under Article 32 of the UNCITRAL Arbitration Rules.*"

**G: Second Interim Award on Interim Measures dated 16 February 2012, Operative Part (pp. 2-4) (issued after the February Hearing):**

*"1. The Tribunal determines that: (i) Article 26 of the UNCITRAL Rules (forming part of the arbitration agreement invoked by the Claimants under the Treaty) permits this Tribunal, at the request of a Party, to take interim measures (established in the form of an order or award) in respect of the subject-matter of the Parties' dispute; (ii) Article 32(1) of the UNCITRAL Rules permits this Tribunal to make (inter alia) an award in the form of an interim award; (iii) Article 32(2) of the UNCITRAL Rules provides that any award by this Tribunal is final and binding on the Parties, with the Parties undertaking to carry out such award without delay; and (iv) Articles VI.3(6) of the Treaty provides (inter alia) that an award rendered by this Tribunal pursuant to Article VI.3(a)(iii) of the Treaty under the UNCITRAL Rules shall be binding on the parties to the dispute (i.e. the Claimants and the Respondent), with the Contracting Parties (i.e. here the Respondent) undertaking to carry out without delay the provisions of any such award and to provide in its territory for its enforcement;*

*2. The Tribunal determines further that the Claimants have established, for the purpose of their said applications for interim measures, (i) a sufficient case as regards both this Tribunal's jurisdiction to decide the merits of the Parties' dispute and the Claimants' case on the merits against the Respondent; (ii) a sufficient urgency given the risk that substantial harm may befall the Claimants before this Tribunal can decide the Parties' dispute by any final award; and (iii) a sufficient likelihood that such harm to the Claimants may be irreparable in the form of monetary compensation payable by the Respondent in the event that the Claimants' case on jurisdiction, admissibility and the merits should prevail before this Tribunal;*

*3. Bearing in mind the Respondent's several obligations under the Treaty and international law, including the Respondent's obligation to carry out and provide for the enforcement of an award on the merits of the Parties' dispute in these arbitration proceedings and the Tribunal's mission (required under the arbitration agreement) efficaciously and fairly to decide the Parties' dispute by a final award, the Tribunal hereby orders:*

*(i) the Respondent (whether by its judicial, legislative or executive branches) to take all measures necessary to suspend or cause to be suspended the enforcement and recognition within and without Ecuador of the judgments by the Provincial Court of*

## SA372

*Sucumbíos, Sole Division (Corte Provincial de Justicia de Sucumbíos, Sala Unica de la Corte Provincial de Justicia de Sucumbíos) of 3 January 2012 and of 13 January 2012 (and, to the extent confirmed by the said judgments, of the judgment by Judge Nicolás Zambrano Lozada of 14 February 2011) against the First Claimant in the Ecuadorian legal proceedings known as "the Lago Agrio Case";*

*(ii) in particular, without prejudice to the generality of the foregoing, such measures to preclude any certification by the Respondent that would cause the said judgments to be enforceable against the First Claimant; and*

*(iii) the Respondent's Government to continue to inform this Tribunal, by the Respondent's legal representatives in these arbitration proceedings, of all measures which the Respondent has taken for the implementation of its legal obligations under this Second Interim Award;*

*until any further order or award made by the Tribunal in these arbitration proceedings;*

*4. The Tribunal determines that the Claimants shall be legally responsible, jointly and severally, to the Respondent for any costs or losses which the Respondent may suffer in performing its legal obligations under this Second Interim Award, as may be decided by the Tribunal within these arbitration proceedings (to the exclusion of any other jurisdiction); and further that, as security for such contingent responsibility the Claimants shall deposit within thirty days of the date of this Second Interim Award the amount of US$ 50,000,000.00 (United States Dollars Fifty Million) with the Permanent Court of Arbitration in a manner to be designated separately, to the order of this Tribunal;*

*5. The Tribunal dismisses the application made by the Respondent to vacate its order for interim measures of 9 February 2011;*

*6. The Tribunal's existing orders for interim measures (as recited in the First Interim Award) and the First Interim Award shall continue to have effect subject to the terms of this Second Interim Award;*

*7. This Second Interim Award is and shall remain subject to modification at any time before the Tribunal's final award in these arbitration proceedings; and, in the meantime, any of the Parties may also apply to the Tribunal for such modification upon seventy-two hours' written notice for good cause shown, including any material change in the legal or factual circumstances prevailing as at the date of the Hearing;*

*8. This Second Interim Award is made strictly without prejudice to the merits of the Parties' substantive and other procedural disputes, including the Respondent's objections as to jurisdiction, admissibility and merits;*

*9. This Second Interim Award shall take effect forthwith as an Interim Award, being immediately final and binding upon all Parties as an award subject only to any subsequent modification as herein provided, whether upon the Tribunal's own initiative or any Party's application; and*

*10. This Interim Award, although separately signed by the Tribunal's members on three signing pages constitutes an 'interim award' signed by the three arbitrators under Article 32 of the UNCITRAL Arbitration Rules."*

# SA373

**H: Third Interim Award on Jurisdiction and Admissibility of 27 February 2012, Operative Part (issued following the Hearing on Jurisdiction held on 22 and 23 November 2010 in London – the "Jurisdiction Hearing" – and after the February Hearing):**

"*5.1 For the reasons set out above, the Tribunal here decides as a third interim award:*

*5.2 The Tribunal declares that it has jurisdiction to proceed to the merits phase of these arbitration proceedings with the claims pleaded in the Claimant's [sic: Claimants'] Notice of Arbitration dated 23 September 2009, subject to the following sub-paragraphs;*

*5.3 A regards the claims pleaded by the Second Claimant (Texaco Petroleum Company or "TexPet") in the Claimants' said Notice of Arbitration, to reject all objections made by the Respondent as to jurisdiction and admissibility by its Memorial on Jurisdiction and Admissibility dated 26 July 2010, its Reply Memorial on Jurisdiction Objections dated 6 October 2010 and its further submissions at the Jurisdiction Hearing on 22 and 23 November 2010;*

*5.4 As regards the claims pleaded by the First Claimant (Chevron Corporation or "Chevron") in the Claimants' said Notice of Arbitration, to reject all objections made by the Respondent as to jurisdiction and admissibility in its said memorials and further submissions, save those relating to the jurisdictional objections raised against the First Claimant as investor under Article I(1)(a) alleging a "direct" investment under Article VI(1)(c) and an "investment agreement" under Article VI(1)(a) of the Ecuador–USA Treaty of 27 August 1993 which are joined to the merits of the First Claimants'[sic: Claimant's] claims under Article 21(4) of the UNCITRAL Arbitration Rules forming part of the Parties' arbitration agreement under the Treaty; and*

*5.5 As regards the Parties' respective claims for costs, the Tribunal here makes no order save to reserve in full its jurisdiction and powers to decide such claims by a later order or award in these arbitration proceedings.*"

**I: Fourth Interim Award on Interim Measures of 7 February 2013, Operative Part (p. 31) (issued after the Hearing on 26-28 November 2012 and further written submissions – the "November Hearing"):**

"*1)      The Tribunal declares that the Respondent has violated the First and Second Interim Awards under the Treaty, the UNCITRAL Rules and international law in regard to the finalisation and enforcement subject to execution of the Lago Agrio Judgment within and outside Ecuador, including (but not limited to) Canada, Brazil and Argentina;*

*2)      The Tribunal decides that the Respondent shall show cause, in accordance with a procedural timetable to be ordered by the Tribunal separately, why it (the Respondent) should not compensate the First Claimant for any harm caused by the Respondent's violations of the First and Second Interim Awards;*

*3)      The Tribunal declares and confirms that the Respondent was and remains legally obliged under international law to ensure that the Respondent 's commitments under the Treaty and the UNCITRAL Rules are not rendered nugatory by the finalisation, enforcement or execution of the Lago Agrio Judgment in violation of the First and Second Interim Awards; and*

# SA374

*4) The Tribunal states expressly that: (i) it has not yet decided any of the substantive merits of the Parties' dispute; and (ii) this award is made strictly without prejudice to those merits, including all claims advanced by the Claimants and all defences advanced by the Respondent.*"

### J: First Partial Award on Track I dated 17 September 2013, Operative Part, Paragraph 112:

"*112. For the reasons set out above, the Tribunal finally decides and awards as follows in Track I of these arbitration proceedings:*

*(1) The First Claimant ("Chevron") and the Second Claimant ("TexPet") are both "Releasees" under Article 5.1 of the 1995 Settlement Agreement and Article IV of the 1998 Final Release;*

*(2) As such a Releasee, a party to and also part of the 1995 Settlement Agreement, the First Claimant can invoke its contractual rights thereunder in regard to the release in Article 5.1 of the 1995 Settlement Agreement and Article IV of the 1998 Final Release as fully as the Second Claimant as a signatory party and named Releasee;*

*(3) The scope of the releases in Article 5 of the 1995 Settlement Agreement and Article IV of the 1998 Final Release made by the Respondent to the First and Second Claimants does not extend to any environmental claim made by an individual for personal harm in respect of that individual's rights separate and different from the Respondent; but it does have legal effect under Ecuadorian law precluding any "diffuse" claim against the First and Second Claimants under Article 19-2 of the Constitution made by the Respondent and also made by any individual not claiming personal harm (actual or threatened); and*

*(4) Save as aforesaid, the Tribunal does not here decide (one way or the other) any part of the formal relief claimed by the Parties respectively in regard to Track I, reserving to itself its full powers and discretion to do so in one or more later awards.*"

### K: Decision (by a majority) on Track IB Issues dated 12 March 2015: Operative Part, Paragraphs 186-187:

"*186. For the reasons set out above, as regards the said Issue (ii) in Track IB of this arbitration, the Tribunal decides (but does not award) that:*

*(1) The Lago Agrio Complaint of 7 May 2003, as an initial pleading, included individual claims resting upon individual rights under Ecuadorian law, not falling within the scope of the 1995 Settlement Agreement (as invoked by the Claimants);*

*(2) The Lago Agrio Complaint was not wholly barred at its inception by res judicata, under Ecuadorian law, by virtue of the 1995 Settlement Agreement (as invoked by the Claimants); and*

*(3) The Lago Agrio Complaint included individual claims materially similar, in substance, to the individual claims made by the Aguinda Plaintiffs in New York.*

*187. No other part of the Parties' claimed relief in Track 1B is here decided by the Tribunal; and the Tribunal retains in full its jurisdiction and powers to address and decide such relief (including costs) by one or more further orders, decisions or awards at a later stage of these arbitration proceedings.*"

# SA375

### PART I – ANNEX 2

### THE TRIBUNAL'S PROCEDURAL ORDERS
### (including Orders for Interim Measures ("OIM"))

"*" indicates those orders relevant to Track II.

| PO Number | Date | Subject-Matter |
| --- | --- | --- |
| PO (not numbered) | 9 April 2010 | Procedural Meeting on Interim Measures |
| PO (not numbered) | 27 April 2010 | Procedural Meeting on Interim Measures |
| OIM No 1 | 14 May 2010 | Maintenance of status quo |
| PO No 01 | 18 May 2010 | Terms of Appointment of the Tribunal |
| PO No 04 | 14 June 2010 | Alleged breaches of OIM 1 |
| PO No 05 | 7 July 2010 | Rules Jurisdictional Phase |
| PO No 06 | 4 November 2010 | Hearing on Jurisdiction/Admissibility |
| OIM No 2 | 6 December 2010 | Maintenance of status quo |
| PO/OIM | 18 January 2011 | Two Applications from the Claimants |
| OIM | 9 February 2011 | Jurisdiction over Request for Interim Measures |
| PO No 07 | 16 March 2011 | Applications on Interim Measures |
| PO No 08 | 18 April 2011 | Amicus Petitions |
| PO No 09 | 28 September 2011 | Claimants' Request for Conference Call |
| PO No 10* | 10 April 2012 | Twin-Track Procedure |
| PO No 11* | 15 May 2012 | Schedule Track I and Track II |
| PO No 12 | 29 June 2012 | Claimants' application for revised interim measures; Respondent's application on other matters |
| PO No 13 | 16 November 2012 | Hearing 26-28 November 2012 |
| PO No 14 | 22 November 2012 | Claimants' Applications regarding the 26-28 November 2012 Hearing |
| PO No 15 | 14 February 2013 | Parties' Applications in relation to Fourth Award on Interim Measures |
| PO No 16* | 19 March 2013 | Procedural Timetable |
| PO No 17 | 5 June 2013 | Confidentiality and Time Extension |
| PO No 18* | 9 August 2013 | "Bifurcation" of Track II Hearing |
| PO No 19* | 10 October 2013 | Alberto Guerra's requested Deposition |

# SA376

| PO No 20* | 11 November 2013 | Claimants' Request for Respondent to produce Expert Report of the Forensic analysis of Judge Zambrano's computers |
| PO No 21* | 11 November 2013 | Scope of Issues Track II Hearing |
| Urgent PO* | 5 December 2013 | Judgement of the National Court of 12 November 2013 |
| PO No 22* | 2 January 2014 | Procedural disputes on Track II Hearing |
| PO No 23* | 10 February 2014 | I-III Track Procedure, with Procedural Calendar |
| PO No 24 | 13 March 2014 | Scope of Track IB |
| PO No 25* | 14 March 2014 | Respondent's Requests for Document Production |
| PO No 26* | 12 May 2014 | Procedural Directions on Examination of Zambrano Hard Drives, Appointment of Ms Kathryn Owen as Tribunal Expert |
| PO No 27* | 13 August 2014 | Site Visit |
| PO No 28* | 4 September 2014 | Respondent's applications regarding Site Visit |
| PO No 29* | 12 March 2015 | Amendment to Confidentiality Clause |
| PO No 30* | 12 March 2015 | Format of the Site Visit |
| PO No 31* | 26 March 2015 | Counsel Communication with the Press |
| PO No 32* | 26 March 2015 | Appointment of Jessica Wells as Additional Secretary |
| PO No 33* | 27 March 2015 | Tribunal's invitation to Dr Zambrano to attend the Track II Hearing |
| PO No 34* | 30 March 2015 | Renewal of Ms Kathryn Owen's Appointment as Tribunal Expert |
| PO No 35* | 9 April 2015 | Hearing Track II |
| PO No 36* | 7 May 2015 | Site Visit Protocol |
| PO No 37* | 8 May 2015 | Rescinding Confidentiality Clause |
| PO No 38* | 18 June 2015 | "Omnibus Order" |
| PO No 39* | 24 November.2015 | Decision on various applications |
| PO No 40* | 14 December 2015 | Revised Terms of Reference of Ms Owen |
| PO No 41* | 29 February 2016 | Inviting Comments on Ms Owen's Report |
| PO No 42* | 16 March 2016 | Documentation for Ms Owen |
| PO No 43* | 8 June 2016 | Hearing on Ms Owen's Report |
| PO No 44* | 2 July 2016 | Inviting Submissions on Ms Owen's Final Report |
| PO No 45* | 29 August 2016 | Judgment of the Second Circuit of 8 August 2016 |

# SA377

| PO No 46* | 19 September 2016 | Declining Hearing on Ms Owen's Final Report, Amicus brief of 8 July 2014 filed by Ecuador before the US Court of Appeals for the Second Circuit, Evidence from USA Proceedings |
| --- | --- | --- |
| PO No 47* | 31 October 2016 | Respondent's application to the Tribunal to terminate its First, Second and Fourth Interim Awards |
| PO No 48* | 30 April 2018 | "Closing the Record" for Track II |
| PO No 49* | 12 July 2018 | Admission into the record of the Judgment of the Constitutional Court of 27 June 2018 |
| PO (not numbered)* | 19 July 2018 | Agreed Procedure for the Parties' written submissions on the Constitutional Court's Judgment |
| PO No 50* | 13 August 2018 | Re-closing the Record for Track II |
| PO No 51* | 26 August 2018 | Procedure for the Track II Award's 7-day Embargo |

# SA378

## *PART I – ANNEX 3*

### *THE PARTIES' RESPECTIVE CLAIMS FOR RELIEF*

*(1) The Claimants*

In their letter dated 19 March 2018 the Claimants indicated the parts of their requests for relief that remained extant for Track II and separately Track III. What follows are the Claimants' prayers of relief from the outset of the arbitration, highlighting **in bold** the relief extant for Track II (highlighted in green in the original), <u>in underscore</u> the relief extant for Track III (highlighted in blue in the original) and **<u>in bold and underscore</u>** the relief relevant to both Tracks II and III (highlighted in purple in the original).

**A3.1 In their Memorial on the Merits dated 6 September 2010, the Claimants made the following request for relief (footnotes here omitted):**

"547.    *Accordingly, Claimants request an Order and Award granting the following relief:*

1.    *Declaring that under the 1995, 1996 and 1998 Settlement and Release Agreements, Claimants have no liability or responsibility for environmental impact, including but not limited to any alleged liability for impact to human health, the ecosystem, indigenous cultures, the infrastructure, or any liability for unlawful profits, or for performing any further environmental remediation arising out of the former Consortium that was jointly owned by TexPet and Ecuador, or under the expired Concession Contract between TexPet and Ecuador.*

2.    *Declaring that Ecuador has breached the 1995, 1996, and 1998 Settlement and Release Agreements and the U.S.-Ecuador Treaty, including its obligations to afford fair and equitable treatment, full protection and security, an effective means of enforcing rights, non-arbitrary treatment, non-discriminatory treatment, and to observe obligations it entered into under the investment agreements.*

3.    *Declaring that under the Treaty and applicable international law, Chevron is not liable for any judgment rendered in the Lago Agrio Litigation.*

4.    *Declaring that any judgment rendered against Chevron in the Lago Agrio Litigation is not final, conclusive or enforceable.*

5.    *Declaring that Ecuador or Petroecuador (or Ecuador and Petroecuador jointly) are exclusively liable for any judgment rendered in the Lago Agrio Litigation.*

6.    *Ordering Ecuador to use all measures necessary to prevent any judgment against Chevron in the Lago Agrio Litigation from becoming final, conclusive or enforceable.*

7.  *Ordering Ecuador to use all measures necessary to enjoin enforcement of any judgment against Chevron rendered in the Lago Agrio Litigation, including enjoining the nominal Plaintiffs from obtaining any related attachments, levies or other enforcement devices.*

8.  *Ordering Ecuador to make a written representation to any court in which the nominal Plaintiffs attempt to enforce a judgment from the Lago Agrio Litigation, stating that the judgment is not final, enforceable or conclusive;*

9.  *Ordering Ecuador to dismiss the Criminal Proceedings in Ecuador against Messrs Ricardo Veiga and Rodrigo Pérez.*

10. *Ordering Ecuador not to seek the detention, arrest or extradition of Messrs Veiga or Pérez or the encumbrance of any of their property.*

11. *Awarding Claimants indemnification against Ecuador in connection with a Lago Agrio Judgment, including a specific obligation by Ecuador to pay Claimants the sum of money awarded in to the Lago Agrio judgment.*

12. *Awarding Claimants any sums that the nominal Lago Agrio Plaintiffs collect against Claimants or their affiliates in connection with enforcing a Lago Agrio judgment.*

13. *Awarding all costs and attorneys' fees incurred by Claimants in (1) defending the Lago Agrio Litigation and the Criminal Proceedings, (2) pursuing this Arbitration, (3) uncovering the collusive fraud through investigation and discovery proceedings in the United States, (4) opposing the efforts by Ecuador and the Lago Agrio Plaintiffs to stay this Arbitration through litigation in the United States, (5) as well as all costs associated with responding to the relentless public relations campaign by which the Lago Agrio Plaintiffs' lawyers (in collusion with Ecuador) attacked Chevron with false and fraudulent accusations concerning this case. These damages will be quantified at a later stage in these proceedings.*

14. *Awarding moral damages to compensate Claimants for the non-pecuniary harm that they have suffered due to Ecuador's outrageous and illegal conduct.*

15. *Awarding both pre- and post-award interest (compounded quarterly) until the date of payment.*

16. *Any other and further relief that the Tribunal deems just and proper.*"

**A3.2 In their Supplemental Memorial on the Merits dated 20 March 2012, the Claimants made the following request for relief (footnotes here omitted):**

"*137.   Accordingly, Claimants request an Order and Award granting the following relief:*

1.  *Declaring that under the 1995, 1996 and 1998 Settlement and Release Agreements, Claimants have no liability or responsibility for environmental impact, including but not limited to any alleged liability for impact to human*

*health, the ecosystem, indigenous cultures, the infrastructure, or any liability for unlawful profits, or for performing any further environmental remediation arising out of the former Consortium that was jointly owned by TexPet and Ecuador, or under the expired Concession Contract between TexPet and Ecuador;*

2. *Declaring that Ecuador has breached the 1995, 1996, and 1998 Settlement and Release Agreements;*

3. *Declaring that Ecuador has breached the U.S.-Ecuador Treaty, including its obligations to afford fair and equitable treatment, full protection and security, an effective means of enforcing rights, non-arbitrary treatment, non-discriminatory treatment, and to observe obligations it entered into under the investment agreements;*

4. *Declaring that Ecuador has committed a denial of justice under customary international law;*

5. *Declaring that under the Treaty and applicable international law, Chevron is not liable for any judgment rendered in the Lago Agrio Litigation;*

6. *Declaring that any judgment rendered against Chevron in the Lago Agrio Litigation is not final, conclusive or enforceable;*

7. *Declaring that Ecuador or Petroecuador (or Ecuador and Petroecuador jointly) are exclusively liable for any judgment rendered in the Lago Agrio Litigation;*

8. *Ordering Ecuador to use all measures necessary to prevent any judgment against Chevron in the Lago Agrio Litigation from becoming final, conclusive or enforceable;*

9. *Ordering Ecuador to use all measures necessary to enjoin enforcement of any judgment against Chevron rendered in the Lago Agrio Litigation, including enjoining the nominal Plaintiffs from obtaining any related attachments, levies or other enforcement devices;*

10. *Ordering Ecuador to make a written representation to any court in which the nominal Plaintiffs attempt to enforce a judgment from the Lago Agrio Litigation, stating that the judgment is not final, enforceable or conclusive;*

11. *Awarding Claimants indemnification against Ecuador in connection with a Lago Agrio Judgment, including a specific obligation by Ecuador to pay Claimants the sum of money awarded in to the Lago Agrio Judgment;*

12. *Awarding Claimants any sums that the nominal Lago Agrio Plaintiffs collect against Claimants or their affiliates in connection with enforcing a Lago Agrio Judgment;*

13. <u>*Awarding all costs and attorneys' fees incurred by Claimants in (1) defending the Lago Agrio Litigation **and** the Criminal Proceedings,*</u> *(2) pursuing this Arbitration, (3) uncovering the collusive fraud through investigation and discovery proceedings in the United States, (4) opposing the efforts by Ecuador*

## SA381

*and the Lago Agrio Plaintiffs to stay this Arbitration through litigation in the United States, (5) <u>as well as all costs associated with responding to the relentless public relations campaign by which the Lago Agrio Plaintiffs' lawyers (in collusion with Ecuador) attacked Chevron</u> with false and fraudulent accusations concerning this case. These damages will be quantified at a later stage in these proceedings;*

14. *Awarding moral damages to compensate Claimants for the non-pecuniary harm that they have suffered due to Ecuador's outrageous and illegal conduct;*

15. *Awarding both pre- and post-award interest (compounded quarterly) until the date of payment; and*

16. *Any other and further relief that the Tribunal deems just and proper.*"

**A3.3 At the Track 1 Hearing on the Merits in November 2012, by a written document, the Claimants made the following request for relief:**

*"I. Request for an Immediate Interim Award as a Result of Ecuador's Breaches of the First and Second Interim Awards:*

*1. Declare that Ecuador is in breach of the First and Second Interim Awards;*

*2. Declare that pending the outcome of this arbitration, the Lago Agrio Judgment is not final, enforceable, or conclusive under Ecuadorian and international law, and thus, is not subject to recognition and enforcement within or without Ecuador; and*

*3. Declare that Ecuador is responsible to Claimants in indemnification and damages for all damages, costs, expenses, and attorneys' fees incurred by Claimants as a result of its breach.*

*II. Request for a Partial Final Award as a Result of Track 1:*

*A. Declaratory Relief*

*(i) Scope of the Settlement Agreements*

*1. Declare that both Claimants are "Releasees" under the Settlement Agreements, and were released from all diffuse environmental claims arising from TexPet's operations in Ecuador; and*

*2. Declare that the claims pleaded in the Lago Agrio Litigation (and upon which the Lago Agrio Judgment is based) are the same diffuse environmental claims settled and released in the Settlement Agreements.*

*(ii) Legal Effect of the Settlement Agreements*

*4. Declare that the Lago Agrio Judgment is a nullity as a matter of international law;*

# SA382

*5. Declare that enforcement of the Lago Agrio Judgment within or without Ecuador would be inconsistent with Ecuador's obligations under the Settlement Agreements, the BIT and international law;*

**6. Declare that Claimants have no liability or responsibility for satisfying the Lago Agrio Judgment because they were fully released for all such claims by the Settlement Agreements;**

**7. Declare that the claims pleaded in the Lago Agrio Litigation (and upon which the Lago Agrio Judgment were based) are barred by res judicata and collateral estoppel;**

*8. Declare that under the Settlement Agreements, Claimants have no further liability or responsibility for diffuse environmental claims in Ecuador for Environmental Impact arising out of the Consortium's operations, or for performing any further environmental remediation;*

*9. Declare that Ecuador (through its various branches of Government) has breached the Settlement Agreements, inter alia, by refusing to specifically perform the Settlement Agreements, by refusing to ensure Claimants' enjoyment of their releases and their right to be free of litigation, by refusing to dismiss the Lago Agrio Plaintiffs' claims, by refusing to indemnify Chevron for the Lago Agrio Plaintiffs' claims, by seeking to nullify the Settlement Agreements by illegitimate means, and by refusing to comply with this Tribunal's Interim Awards;*

*10. Declare that Ecuador's actions have breached the U.S.-Ecuador BIT, including its obligations to afford fair and equitable treatment, full protection and security, effective means of enforcing rights, and to observe obligations it entered into under the overall investment agreements; and*

*11. Declare that: (i) the Judgment is not final, enforceable, or conclusive under Ecuadorian and international law, and thus, is not subject to recognition and enforcement within or without Ecuador; (ii) any enforcement of the Judgment would place Ecuador in violation of its international-law obligations; (iii) the Judgment violates international public policy and natural justice, and as a matter of international comity and public policy, the Judgment should not be recognized and enforced.*

*B. Injunctive Relief*

*1. Order Ecuador to use all measures necessary to comply with its obligations under the Settlement Agreements to release Claimants (and to ensure that Claimants may effectively enjoy the benefits of such releases) from any liability or responsibility for the Lago Agrio Judgment in Ecuador or in any other country;*

*2. Order Ecuador to use all measures necessary to prevent the Lago Agrio Judgment from becoming final, conclusive, or enforceable in Ecuador or in any other country;*

*3. Order Ecuador to use all measures necessary to stay or enjoin enforcement of the Lago Agrio Judgment, including enjoining the Lago Agrio Plaintiffs from obtaining any related attachments, levies, or other enforcement devices in Ecuador or in any other country;*

# SA383

*4. Order Ecuador to use all measures necessary to revoke and nullify the Judgment;*

*5. Order Ecuador to make a written representation to any court in which the Lago Agrio Plaintiffs attempt to recognize and enforce the Lago Agrio Judgment that: (i) the claims that formed the basis of the Judgment were released by the Government; (ii) the Lago Agrio Court had no personal or subject-matter jurisdiction over Chevron; (iii) the Judgment is a legal nullity; (iv) the Judgment is not final, enforceable, or conclusive under Ecuadorian and international law, and thus, is not subject to recognition and enforcement within or without Ecuador; (v) any enforcement of the Judgment would place Ecuador in violation of its international-law obligations; (vi) the Judgment violates international public policy and natural justice; (vii) any enforcement proceedings should be stayed pending the Tribunal's final award in this arbitration; and (viii) as a matter of international comity and public policy, the Judgment should not be recognized and enforced; and*

*6. Order that, in the event that any court orders the recognition or enforcement of the Lago Agrio Judgment, Ecuador must satisfy the Judgment directly.*

*C. Damages, Costs and Attorneys' Fees*

*1. Award Claimants full indemnification and damages against Ecuador in connection with the Lago Agrio Judgment, including a specific obligation by Ecuador to pay Claimants the sum of money awarded in the Judgment;*

*2. Award Claimants any sums of money that the Lago Agrio Plaintiffs or others collect against Claimants or their affiliates in connection with enforcing the Judgment in any forum, with such sums to be paid by Respondent;*

*3. Award all costs and attorneys' fees incurred by Claimants in (i) defending the Lago Agrio Litigation, (ii) pursuing this arbitration, (iii) opposing the efforts by Ecuador and the Lago Agrio Plaintiffs to stay this arbitration through litigation in the United States; and (iv) preparing for and defending against enforcement actions brought by the Lago Agrio Plaintiffs. These amounts will be quantified at the time and in the manner ordered by this Tribunal;*

*4. Award both pre- and post-award interest (compounded quarterly) until the date of payment; and*

*5. Award such other and further relief that the Tribunal deems just and proper, including any specific relief appropriate to wipe out all consequences of Respondent's breaches of the Settlement Agreements and its violations of its obligations under the Interim Awards, the BIT and international law."*

**A3.4  In their Amended Reply Memorial – Track II dated 12 June 2013, the Claimants made the following request for relief (footnotes here omitted):**

"*424.*     ***The unique circumstances of this case require a combination of remedies that includes declarative, injunctive and monetary relief to prevent further (and***

## SA384

*unprecedented) injury to Claimants, and to compensate them for losses resulting from Ecuador's breaches of its contractual, Treaty, and international law obligations, Claimants request a Final Award on the Merits including the following relief:*

1. *Declaring that under the 1995, 1996 and 1998 Settlement and Release Agreements, Claimants have no liability or responsibility for environmental impact, including but not limited to any alleged liability for impact to human health, the ecosystem, indigenous cultures, the infrastructure, or any liability for unlawful profits, punitive damages or penalties, or for performing any further environmental remediation arising out of the former Consortium that was jointly owned by TexPet and Ecuador, or under the expired Concession Contract between TexPet and Ecuador;*

2. *Declaring that Ecuador has breached the 1995, 1996, and 1998 Settlement and Release Agreements;*

3. *Ordering Ecuador to specifically perform the Settlement and Release Agreements;*

4. *Declaring that Ecuador has breached the U.S.-Ecuador Treaty, including its obligations to afford fair and equitable treatment, full protection and security, an effective means of enforcing rights, non-arbitrary treatment, non-discriminatory treatment, national treatment, and to observe obligations it entered into with regard to investments;*

5. *Declaring that Ecuador has committed a denial of justice under customary international law;*

6. *Declaring that under the Treaty and applicable international law, Chevron is not liable for the Judgment;*

7. *Declaring that Ecuador is exclusively liable for the Judgment;*

8. *Nullifying the existence, validity, and all effects of the Judgment, and declaring that the Judgment is a nullity as a matter of international law;*

9. *Ordering Ecuador to use all measures necessary to enjoin enforcement of the Judgment, including enjoining the nominal Plaintiffs or any Trust from obtaining any related attachments, levies or other enforcement devices;*

10. *Ordering that, in the event that any court orders the recognition or enforcement of the Judgment, Ecuador must satisfy the Judgment directly;*

11. *<u>Awarding Claimants indemnification against Ecuador in connection with the Judgment, including a specific obligation by Ecuador to pay Claimants the sum of money awarded in the Judgment;</u>*

12. *<u>Awarding Claimants any sums that the nominal Lago Agrio Plaintiffs collect against Claimants or their affiliates in connection with enforcing the Judgment, including the amounts embargoed thus far;</u>*

## SA385

13. *Declaring that: (i) the Judgment is not final, enforceable, or conclusive under Ecuadorian and/or international law, and thus, is not subject to recognition and enforcement within or without Ecuador; (ii) any enforcement of the Judgment places Ecuador in violation of its international law obligations; (iii) the Judgment violates international public policy and natural justice, and as a matter of international comity and public policy, the Judgment should not be recognized and enforced;*

14. ***Ordering Ecuador to make a written representation to any court in which the Lago Agrio Plaintiffs or any Trust attempt to recognize and enforce the Judgment that****: (i) the claims that formed the basis of the Judgment were released by the Government; (ii) **the Lago Agrio Court had no personal or subject-matter jurisdiction over Chevron;** (iii) the Judgment is a legal nullity; (iv) the Judgment is not final, enforceable, or conclusive under Ecuadorian and/or international law, and thus, is not subject to recognition and enforcement within or without Ecuador; (v) **any enforcement of the Judgment places Ecuador in violation of its international law obligations;** (vi) the Judgment violates international public policy and natural justice; (vii) any enforcement proceedings should be dismissed; and (viii) as a matter of international comity and public policy, the Judgment should not be recognized and enforced;*

15. *Awarding all costs and attorneys' fees incurred by Claimants in inter alia (1) pursuing this Arbitration, (2) uncovering the collusive fraud through investigation and discovery proceedings in the United States, and (3) defending against enforcement of the Lago Agrio Judgment in various jurisdictions including Argentina, Brazil, and Canada, as well as other attorneys' fees incurred in related matters;*

16. *Awarding both pre- and post-award interest (compounded quarterly) until the date of payment; and*

17. ***Any other and further relief that the Tribunal deems just and proper****.*"

**A3.4 In their Supplemental Memorial on Track 1 dated 31 January 2014 (Paragraph 32), the Claimants made the following request for relief**:

*A. Declaring that:*

*(1) The Lago Agrio Litigation is exclusively a diffuse-rights case.*

*(2) The 1999 EMA has no legal effect on the Settlement and Release Agreements.*

*(3) The Lago Agrio Litigation was barred at its inception by res judicata.*

*(4) By issuing the Lago Agrio Judgment and rendering it enforceable within and without Ecuador, Ecuador violated various provisions of the BIT.*

# SA386

*(5) By issuing the Lago Agrio Judgment on diffuse claims barred as res judicata, Ecuador breached the 1995, 1996, and 1998 Settlement and Release Agreements, and also violated Chevron's rights under the BIT.*

*(6) The Lago Agrio Judgment is a nullity as a matter of Ecuadorian law.*

*(7) The Lago Agrio Judgment is a nullity as a matter of international law.*

*(8) The Lago Agrio Judgment is unlawful and consequently devoid of any legal effect.*

*(9) The Lago Agrio Judgment is a violation of Chevron's rights under the BIT, and is not entitled to enforcement within or without Ecuador.*

*(10) The Lago Agrio Judgment violates international public policy and natural justice, and that as a matter of international comity and public policy, the Lago Agrio Judgment should not be recognized and enforced.*

*(11) By: (i) taking measures to enforce the Judgment against assets within Ecuador, and (ii) taking measures to facilitate enforcement of the Judgment in other jurisdictions.*

*(12) Ecuador is in breach of its obligations under the BIT, and must compensate Claimants for any sum of money collected by the Lago Agrio Plaintiffs and/or their agents as a result of the Judgment.*

*B. Ordering Ecuador (whether by its judicial, legislative, or executive branches):*

*(1) To take all measures necessary to set aside or nullify the Lago Agrio Judgment under Ecuadorian law.*

*(2) To take all measures necessary to prevent enforcement and recognition within and without Ecuador of the Lago Agrio Judgment.*

*(3) To take all measures necessary to prevent the Lago Agrio Plaintiffs or any Trust from obtaining any related attachments, levies, or other enforcement devices under the impugned Judgment.*

*(4) To make a written representation to any court in which the Lago Agrio Plaintiffs or any Trust attempt to recognize and enforce the Lago Agrio Judgment that: (i) the claims that formed the basis of the Lago Agrio Judgment were validly released under Ecuadorian law by the Government; (ii) the Lago Agrio Judgment is a legal nullity; and (iii) any enforcement of the Lago Agrio Judgment will place Ecuador in violation of its obligations under the BIT.*

# SA387

*Claimants also request that the Tribunal provide for a subsequent phase in this arbitration to determine all costs and attorneys' fees that should be awarded to Claimants for being forced to (i) pursue this arbitration; (ii) uncover the Judgment fraud; and (iii) defend against enforcement of the Lago Agrio Judgment in any jurisdiction."*

**A3.5 In their Supplemental Memorial on Track II dated 9 May 2014, the Claimants made the following request for relief:**

*"A. Declaring that:*

*1. By issuing the Judgment and rendering it enforceable within and without Ecuador, Ecuador committed a denial of justice under international law in breach of the provisions of the BIT.*

*2. By issuing the Judgment on diffuse claims barred as res judicata, Ecuador breached the 1995, 1996, and 1998 Settlement and Release Agreements, and, in doing so, violated Chevron's rights under the BIT.*

*3. The court rendering the Judgment asserted jurisdiction illegitimately and was not competent in the international sphere to try the Lago Agrio case and to pass judgment.*

*4. The Judgment was issued in a process that violated general standards of due process and in which Chevron did not have an opportunity to present its defense.*

*5. The Judgment is a nullity as a matter of international law.*

*6. The Judgment is unlawful and consequently devoid of any legal effect.*

*7. The Judgment is a violation of Chevron's rights under the BIT, and is not entitled to enforcement within or without Ecuador.*

*8. The Judgment is contrary to international public policy.*

*9. The Judgment violates international public policy and natural justice, and that as a matter of international comity and public policy, the Judgment should not be recognized and enforced.*

*10. By taking measures to enforce the Judgment against assets within Ecuador, and taking measures to facilitate enforcement of the Judgment in other jurisdictions, Ecuador is in breach of its obligations under the BIT, and must indemnify Claimants and any of their affiliates for any sum of money collected from them as a result of the Judgment.*

*B. Ordering Ecuador (whether by its judicial, legislative, or executive branches):*

*1. To take all measures necessary to set aside or nullify the Judgment under Ecuadorian law.*

*2. To take all measures necessary to prevent enforcement and recognition within and without Ecuador of the Judgment.*

*3. To take all measures necessary to prevent the Lago Agrio Plaintiffs or any Trust from obtaining any related attachments, levies, or other enforcement devices under the impugned Judgment.*

*4. To make a written representation to any court in which the Lago Agrio Plaintiffs or any Trust attempt to recognize and enforce the Judgment that: (i) the claims that formed the basis of the Judgment were validly released under Ecuadorian law by the Government; (ii) the Judgment is a legal nullity; and (iii) any enforcement of the Judgment will place Ecuador in violation of its obligations under the BIT.*

*5. To abstain from collecting or accepting any proceeds arising from or in connection with the enforcement or execution of the Judgment, and to return to Claimants any such proceeds that may come into Respondent's possession.*

*C. Awarding Claimants:*

*1. All costs and attorneys' fees incurred by Claimants in (i) pursuing this arbitration; (ii) uncovering the Judgment fraud; and (iii) defending against enforcement of the Lago Agrio Judgment in any jurisdiction.*

*2. Indemnification for any and all damages, including fees and costs, arising from Respondent's violation of any injunctive relief this Tribunal has granted or will in the future grant.*

*3. Indemnification for any and all sums that the Lago Agrio Plaintiffs collect against Claimants or their affiliates in connection with the Judgment.*

*4. Moral damages to compensate Claimants for the non-pecuniary harm that they have suffered due to Ecuador's illegal conduct.*

*5. Both pre- and post-award interest (compounded quarterly) until the date of payment.*"

**A3.6  In their Post-Submission Insert to the Claimants' Supplemental Memorial on Track II – Examination of Zambrano Computer Hard Drives dated 15 August 2014, the Claimants made the following request for relief**:

"*59.    Therefore, for the reasons stated above and in Claimants' previous submissions to the Tribunal, Claimants request the Tribunal make the findings and grant them the relief as set forth most recently in Claimants' Supplemental Memorial on Track II.*"

**A3.7  In their Supplemental Reply to the Respondent's Supplemental Track II Counter-Memorial dated 14 January 2015, the Claimants made the following request for relief:**

"*435.   For the reasons stated above, and as set out in Claimants' previous memorials and other submissions, Claimants ask the Tribunal for a Final Award granting them the combination of remedies, including declarative, injunctive, and monetary relief, to prevent further injury to Claimants and to compensate them for losses resulting from Ecuador's breaches of its contractual, Treaty, and international law obligations, as set out below:*

*A. Declaring that:*

*1.   By issuing the Judgment and rendering it enforceable within and without Ecuador, Ecuador committed a denial of justice under international law and breached provisions of the Treaty.*

*2.   By issuing the Judgment on diffuse claims barred as res judicata, Ecuador breached the 1995, 1996, and 1998 Settlement and Release Agreements, and in doing so, violated Chevron's rights under the Treaty.*

*3.   The court rendering the Judgment asserted jurisdiction illegitimately and was not competent in the international sphere to try the Lago Agrio case and to pass judgment.*

*4.   The Judgment was issued in a process that violated general standards of due process and in which Chevron did not have an opportunity to present its defense.*

*5.   The Judgment is a nullity as a matter of international law.*

*6.   The Judgment is unlawful and consequently devoid of any legal effect.*

*7.   The Judgment is a violation of Chevron's rights under the Treaty, and is not entitled to enforcement within or without Ecuador.*

*8.   The Judgment is contrary to international public policy.*

*9.   The Judgment violates international public policy and natural justice, and that as a matter of international comity and public policy, the Judgment should not be recognized and/or enforced.*

*10.   <u>By taking measures to enforce the Judgment against assets within Ecuador, and taking measures to facilitate enforcement of the Judgment in other jurisdictions, Ecuador is in breach of its obligations under the Treaty, and must indemnify Claimants and any of their affiliates for any sum of money collected from them as a result of the Judgment.</u>*

*B. Ordering Ecuador (whether by its judicial, legislative, or executive branches):*

*1.   To take all measures necessary to set aside or nullify the Judgment under Ecuadorian law.*

*2.   To take all measures necessary to prevent enforcement and recognition within and without Ecuador of the Judgment.*

3.  *To take all measures necessary to prevent the Plaintiffs or any Trust from obtaining any related attachments, levies, or other enforcement devices under the impugned Judgment.*

4.  *To make a written representation to any court in which the Plaintiffs or any Trust attempt to recognize and/or enforce the Judgment that: (i) the claims that formed the basis of the Judgment were validly released under Ecuadorian law by the Government; (ii) the Judgment is a legal nullity; and (iii) any enforcement of the Judgment will place Ecuador in violation of its obligations under the Treaty.*

5.  **To abstain from collecting or accepting any proceeds arising from or in connection with the enforcement or execution of the Judgment, and to return to Claimants any such proceeds that may come into Respondent's possession.**

*C. Awarding Claimants:*

1.  *All costs and attorneys' fees incurred by Claimants in (i) pursuing this arbitration; (ii) uncovering the Judgment fraud; and (iii) defending against enforcement of the Lago Agrio Judgment in any jurisdiction.*

2.  *Indemnification for any and all damages, including fees and costs, arising from Respondent's violation of any injunctive relief this Tribunal has granted or will in the future grant.*

3.  *Indemnification for any and all sums that the Plaintiffs collect against Claimants or their affiliates in connection with the Judgment.*

4.  *Moral damages to compensate Claimants for the non-pecuniary harm that they have suffered due to Ecuador's illegal conduct.*

5.  *Both pre- and post-award interest (compounded quarterly) until the date of payment.*

**A3.8 In their Post-Track II Hearing Brief on Track I Issues dated 15 July 2015, the Claimants made the following request for relief:**

"*46.  **Claimants request relief that effectively protects their rights and reverses the harmful effects of Ecuador's breaches of the Settlement and Release Agreements and its international law obligations. To achieve this result, Claimants respectfully request a Final Award:***

**A. Declaring that:**

1)  **The Lago Agrio Litigation is exclusively a diffuse-rights case.**

2)  **The 1999 EMA has no legal effect on the Settlement and Release Agreements.**

3)  **The Lago Agrio Litigation was barred at its inception by res judicata.**

4) *By issuing the Lago Agrio Judgment and rendering it enforceable within and without Ecuador, Ecuador violated various provisions of the Treaty.*

5) *By issuing the Lago Agrio Judgement on diffuse claims barred as* **res judicata***, Ecuador breached the 1995, 1996 and 1998 Settlement and Release Agreements, and also violated Chevron's rights under the Treaty.*

6) *The Lago Agrio Judgment is a nullity as a matter of international law.*

7) *The Lago Agrio Judgment is unlawful and consequently devoid of any legal effect.*

8) *The Lago Agrio Judgment is a violation of Chevron's rights under the Treaty, and is not entitled to enforcement within or without Ecuador.*

9) *The Lago Agrio Judgment violates international public policy and natural justice, and that as a matter of international comity and public policy, the Lago Agrio Judgment should not be recognized and enforced.*

10) *By: (i) taking measures to enforce the Judgment against assets within Ecuador, and (ii) taking measures to facilitate enforcement of the Judgment in other jurisdictions, Ecuador is in breach of its obligations under the Treaty, and must compensate Claimants for any sum of money collected by the Lago Agrio Plaintiffs and/or their agents as a result of the Judgment.*

*B. Ordering Ecuador (whether by its judicial, legislative, or executive branches):*

1) *To take all measures necessary to set aside or nullify the Lago Agrio Judgment under Ecuadorian law.*

2) *To take all measures necessary to prevent enforcement and recognition within and without Ecuador of the Lago Agrio Judgment.*

3) *To take all measures necessary to prevent the Lago Agrio Plaintiffs or any Trust from obtaining any related attachments, levies, or other enforcement devices under the impugned Judgment.*

4) *To make a written representation to any court in which the Lago Agrio Plaintiffs or any Trust attempt to recognize and enforce the Lago Agrio Judgment that: (i) the claims that formed the basis of the Lago Agrio Judgment were validly released under Ecuadorian law by the Government; (ii) the Lago Agrio Judgment is a legal nullity; and (iii) any enforcement of the Lago Agrio Judgment will place Ecuador in violation of its obligations under the Treaty.*

47. *Claimants' requested relief is without prejudice to all other remedies sought in relation to Track II or any other remedy that may effectively protect Claimants' rights, including a damage remedy as part of Track III.*"

# SA392

*(2) The Respondent*

In its letter dated 20 April 2018, the Respondent indicated the parts of its requests for relief that remained extant for Track II and separately Track III. What follows are the Respondent's prayers of relief from the outset of the arbitration, highlighting **in bold** the relief extant for Track II (indicated in red in the original) and in underscore the relief extant for Track III (indicated in blue in the original).

***A3.9 In its Track 1 Counter-Memorial dated 3 July 2012, the Respondent made the following request for relief (with sub-paragraphs here added for ease of reference):***

*"263. [1] Based on the foregoing, the Republic respectfully requests that the Tribunal declare that it does not have jurisdiction over Chevron's claims under the Settlement and Release Agreements and reject TexPet's contractual claims under the 1995 Settlement Agreement. In particular, the Republic requests that the Tribunal:*

*[2] Dismiss Chevron's claims under the 1995 Settlement Agreement and the 1998 Final Release for lack of jurisdiction under Article VI(1)(a) of the Treaty;*

*[3] Dismiss Chevron's claims for lack of jurisdiction under Article VI(1)(c) of the Treaty to the extent that its treaty claims are predicated on breach of the 1995 Settlement Agreement and/or the 1998 Final Release;*

*[4] Dismiss Chevron's claims under the 1995 Settlement Agreement and the 1998 Final Release on the merits, should the Tribunal find that Chevron has standing in this Arbitration as a matter of jurisdiction;*

*[5] Dismiss TexPet's claims under the 1995 Settlement Agreement on the merits;*
*☐ Declare specifically that the Respondent has not breached the 1995 Settlement Agreement or the 1998 Final Release;*

*[6] Dismiss all of Claimants' claims as they relate to the 1996 Local Settlements, both as a matter of jurisdiction and on the merits;*

*[7] Declare further that the Respondent is under no obligation to indemnify, protect, defend or otherwise hold Claimants harmless against claims by third parties;*

*[8] Declare that the 1995 Settlement Agreement has no effect on third parties, and specifically, that the release of liability contained therein does not extend to rights and claims potentially held by third parties or could otherwise bar third-party claims arising from the environmental impact of TexPet's operations in Ecuador against TexPet or any of the defined Releasees;*

*[9] Award Respondent all costs and attorneys' fees in connection with this phase of the proceedings;*

*[10] Award Respondent any further relief that the Tribunal deems just and proper."*

# SA393

**A3.10 In its Track 1 Rejoinder Memorial dated 16 December 2013, the Respondent made the following request for relief (with sub-paragraphs here added for ease of reference):**

> *"192. Based on the foregoing, the Republic respectfully requests that the Tribunal issue an Award that:*
>
> *[1] Denies all the relief and each remedy requested by Claimants in relation to Track 1, including the relief and remedies requested in Paragraph 272 of Claimants' Reply on the Merits;*
>
> *[2] Declares that Chevron is not a "Releasee" under the 1995 Settlement Agreement and therefore has no basis to assert claims under Article VI(1)(a) of the Treaty.*
>
> *[3] Dismisses Chevron's claims under the 1995 Settlement Agreement and the 1998 Final Release on the merits, should the Tribunal find that Chevron has standing in this Arbitration as a matter of jurisdiction;*
>
> *[4] Declares that TexPet does not have standing to assert claims under the 1995 Settlement Agreement as a matter of Ecuadorian law;*
>
> *[5] Dismisses TexPet's claims under the 1995 Settlement Agreement and the 1998 Final Release on the merits;*
>
> *[6] Declares specifically that the Respondent has not breached the 1995 Settlement Agreement or the 1998 Final Release;*
>
> *[7] Dismisses all of Claimants' claims as they relate to the 1996 Local Settlements, both as a matter of jurisdiction and on the merits;*
>
> *[8] Declares further that the Respondent is under no obligation to indemnify, protect, defend or otherwise hold Claimants harmless against claims by, or judgments or other relief obtained by, third parties including the claims filed by the Lago Agrio Plaintiffs, the Lago Agrio Judgment, and the enforcement thereof;*
>
> *[9] Declares that the 1995 Settlement Agreement has no effect on third parties, and specifically, that the release of liability contained therein does not extend to rights and claims potentially held by third parties or could otherwise bar third-party claims arising from the environmental impact of TexPet's operations in Ecuador against TexPet or any of the defined Releasees;*
>
> *[10] Declares that the Lago Agrio Litigation was not barred by res judicata or collateral estoppel;*
>
> *[11] Awards Respondent all costs and attorneys' fees incurred by Respondent in connection with this phase of the proceedings; and that*
>
> *[12] Awards Respondent any further relief that the Tribunal deems just and proper."*

**A3.11 In its Track 1 Supplementary Counter-Memorial dated 31 March 2014, the Respondent made the following request for relief:**

"*143. Based on the foregoing, together with the Republic's previous Track 1 submissions and argument and testimony presented in the November 2012 Hearing on the Merits, the Republic respectfully requests that the Tribunal issue an Award that:*

a. <u>Denies all the relief and each remedy requested by Claimants in relation to Track 1, including the relief and remedies requested in Paragraph 32 of Claimants' Supplemental Track 1 Memorial;</u>

b. **Dismisses on the merits Chevron's claims under the 1995 Settlement Agreement and the 1998 Final Release;**

c. **Dismisses on the merits TexPet's claims under the 1995 Settlement Agreement and the 1998 Final Release;**

d. **Declares specifically that the Respondent has not breached the 1995 Settlement Agreement or the 1998 Final Release;**

e. **Dismisses all of Claimants' claims as they relate to the 1996 Local Settlements, reached between TexPet and local government entities;**

f. **Declares that the Lago Agrio Litigation was not barred by res judicata or collateral estoppel;**

g. <u>Awards Respondent all costs and attorneys' fees incurred by Respondent in connection with this phase of the proceedings; and</u>

h. <u>Awards Respondent any further relief that the Tribunal deems just and proper.</u>"

**A3.12 In its Track II Counter Memorial on the Merits dated 18 February 2013, the Respondent made the following request for relief:**

"*542. For the aforementioned reasons, the Republic requests that the Tribunal issue a Final Award that grants the following relief:*

a. *Declaring that the Tribunal lacks jurisdiction over Claimants' denial of justice claims, or that it refuses to exercise such jurisdiction because such claims are too remote to any investment.*

b. *Alternatively, dismissing Claimants' denial of justice and Treaty claims due to the failure of Chevron to exhaust local remedies available to it to challenge the Lago Agrio Judgment in Ecuador.*

c. *Alternatively, dismissing Claimants' Treaty and denial of justice claims because the rights that Claimants claim to have under the 1995 Settlement Agreement do not exist or were not breached.*

      d.   *Alternatively, even if the 1995 Settlement Agreement has been breached by the Republic, dismissing all of Claimants' Treaty claims, inter alia, because Claimants have separately failed to establish that the Republic has violated the effective means clause; the fair and equitable treatment clause; the full protection and security clause; the arbitrary and discriminatory treatment clause.*

      e.   *Alternatively, even if the 1995 Settlement Agreement has been breached by the Republic, dismissing Claimants' denial of justice claims because Claimants have failed to establish that the Republic has denied justice to Claimants under principles of customary international law.*

      f.   *Otherwise dismissing all of Claimants' claims against the Republic in these arbitration proceedings as meritless.*

      g.   *Awarding all costs and attorneys' fees incurred by the Republic in this arbitral proceeding.*

      h.   *Any other and further relief that the Tribunal deems just and proper.*

543.    *To the extent the Tribunal finds the Republic responsible for a violation of international law, the Republic requests that the Tribunal conduct a further phase (Track 3) of the arbitration sufficient to determine Chevron's actual liability in fact for the claims asserted against it in Lago Agrio and to fashion a final award that takes into consideration such established liability.*

544.    *The Republic reincorporates by reference its Request for Relief in Track I to the extent that such Request remains pending.*

545.    *The Republic reserves its rights to supplement its pleadings and request for relief."*

**A3.13 In its Track II Rejoinder on the Merits dated 16 December 2013, the Respondent made the following request for relief (footnotes here omitted):**

    *"387.   For the aforementioned reasons, the Republic requests that the Tribunal issue a Final Award, in which the Tribunal:*

      a.   *Denies all the relief and each remedy requested by Claimants in relation to Track II, including the relief and remedies requested in Paragraph 424 of Claimants' Amended Track II Reply on the Merits.*

      b.   *Declares that it lacks jurisdiction over Claimants' denial of justice claims, or refuses to exercise such jurisdiction because such claims are too remote to any investment.*

      c.   *Alternatively, dismisses Claimants' denial of justice and Treaty claims due to Chevron's failure to exhaust local remedies available to it to challenge the Lago Agrio Judgment in Ecuador.*

   d. *Alternatively, dismisses Claimants' Treaty and denial of justice claims because the rights that Claimants claim to have under the 1995 Settlement Agreement, the 1998 Final Release, and/or the 1996 Local Settlements do not exist or were not breached.*

   e. *Alternatively, even if the 1995 Settlement Agreement, the 1998 Final Release, and/or the 1996 Local Settlements was breached by the Republic, dismisses all of Claimants' Treaty claims because Claimants have separately failed to establish that the Republic has violated any of the Treaty's provisions.*

   f. *Alternatively, even if the 1995 Settlement Agreement, the 1998 Final Release, and/or the 1996 Local Settlements has been breached by the Republic, dismisses Claimants' denial of justice claims because Claimants have failed to establish that the Republic has denied justice to Claimants under principles of customary international law.*

   g. *Alternatively, even if any of Claimants' Treaty or denial of justice claims are upheld, declares that the Lago Agrio Judgment is not null and void because nullification is not an available or appropriate remedy under international law and such nullification would unjustly enrich Claimants.*

   h. *Alternatively, even if any of Claimants' claims are upheld, orders the arbitration proceedings to continue to Track 3, so that the Tribunal may assess what Chevron's liability should have been for the claims asserted in Lago Agrio so that the Tribunal may fashion a final award that takes into consideration such liability.*

   i. *Declares further that the Respondent is under no obligation to indemnify, protect, defend or otherwise hold Claimants harmless against claims by third parties.*

   j. *Declares that the 1995 Settlement Agreement has no effect on the claims brought in the Lago Agrio Litigation.*

   k. *Otherwise dismisses all of Claimants' claims against the Republic in these arbitration proceedings as meritless.*

   l. *Orders, pursuant to Article 40 of the UNCITRAL Arbitration Rules, Claimants to pay all costs and expenses of this arbitration proceeding, including the fees and expenses of the Tribunal and the cost of the Republic's legal representation, plus pre-award and post-award interest thereon.*

   m. *Awards any other and further relief that the Tribunal deems just and proper.*

388. *The Republic reincorporates by reference its Request for Relief in Track I and in its Track II Counter-Memorial on the Merits to the extent that such Request remains pending.*

389. *The Republic reserves its rights to supplement its pleadings and request for relief.*"

*A3.14 In its Track II Supplemental Counter-Memorial dated 7 November 2014, the Respondent made the following request for relief (footnotes here omitted):*

"481.    For the aforementioned reasons, the Republic requests that the Tribunal issue a Final Award:

    a.   Declaring that it lacks jurisdiction over Claimants' denial of justice and Treaty claims against the Republic.

    b.   Alternatively, assuming the Tribunal finds it has jurisdiction over the denial of justice and Treaty claims, it should dismiss Claimants' denial of justice and Treaty claims against the Republic as meritless.

    c.   Declaring that Claimants do not possess the rights they claim to have under the 1995 Settlement Agreement, the 1998 Final Release, and/or the 1996 Local Settlements in connection with the Lago Agrio Litigation.

    d.   Declaring further that no breach of the 1995 Settlement Agreement, the 1998 Final Release, and/or the 1996 Local Settlements occurred in connection with the Lago Agrio Litigation.

    e.   Denying all the relief and each remedy requested by Claimants in relation to Track II, including the relief requested in Paragraph 199 of their Supplemental Track II Memorial on the Merits.

482.    Alternatively, if any of Claimants' claims are upheld, the Republic requests, for the aforementioned reasons, that the Tribunal issue a Partial Award, in which the Tribunal:

    a.   Orders the arbitration proceedings to proceed to Track 3, so that the Tribunal may assess Chevron's actual liability in respect of the claims asserted against them in the Lago Agrio Litigation so that the Tribunal may fashion a final award that takes into consideration such liability.

    b.   Declares that the Respondent is under no obligation to indemnify, protect, defend or otherwise hold Claimants harmless against claims by third parties, including but not limited to, Claimants' request for attorneys' fees incurred in any enforcement action in any jurisdiction.

    c.   Declares that Claimants are not entitled to moral damages.

    d.   Declares that the Lago Agrio Judgment is not null and void because nullification is not an available or appropriate remedy under international law and such nullification would unjustly enrich Claimants.

483.    In all events, the Republic requests that, pursuant to Article 40 of the UNCITRAL Arbitration Rules, Claimants be ordered to pay all costs and expenses of this arbitration proceeding, including the fees and expenses of the Tribunal and the cost of the Republic's legal representation, plus pre-award and post-award interest thereon. The Republic also asks that the Tribunal grant it any other and further relief that the Tribunal deems just and proper.

484. *The Republic incorporates by reference its Request for Relief in Track I and in its Track II Counter-Memorial and Rejoinder on the Merits to the extent that such Requests remain pending."*

**A3.15** **In its Track II Supplemental Rejoinder on the Merits dated 17 March 2015 the Respondent made the following request for relief (footnotes here omitted):**

"446. *For the aforementioned reasons, the Republic requests that the Tribunal issue a Final Award:*

   **a.** **Declaring that it lacks jurisdiction over Claimants' denial of justice and related treaty claims against the Republic.**

   **b.** **Alternatively, assuming the Tribunal finds it has jurisdiction over the denial of justice and Treaty claims, dismissing Claimants' denial of justice and related treaty claims against the Republic as not ripe for adjudication under international law in light of Claimants' failure to exhaust available local remedies, and as otherwise meritless.**

   **c.** **Declaring that Claimants do not possess the rights they claim to have under the 1995 Settlement Agreement, the 1998 Final Release, and/or the 1996 Local Settlements in connection with the Lago Agrio Litigation.**

   **d.** **Declaring further that no breach of the 1995 Settlement Agreement, the 1998 Final Release, and/or the 1996 Local Settlements occurred in connection with the Lago Agrio Litigation.**

   **e.** *Denying all the relief and each remedy requested by Claimants in relation to Track II, including the relief requested in Paragraph 435 of their Supplemental Track II Reply.*

447. *Alternatively, if any of Claimants' claims are upheld, the Republic requests, for the aforementioned reasons, that the Tribunal issue a Partial Award, in which the Tribunal:*

   **a.** *Orders the arbitration proceedings to proceed to Track 3, so that the Tribunal may assess Chevron's actual liability in respect of the claims asserted against them in the Lago Agrio Litigation so that the Tribunal may fashion a final award that takes into consideration such liability.*

   **b.** *Declares that the Respondent is under no obligation to indemnify, protect, defend or otherwise hold Claimants harmless against claims by third parties, including but not limited to, Claimants' request for attorneys' fees incurred in any enforcement action in any jurisdiction.*

   **c.** *Declares that Claimants are not entitled to moral damages.*

   **d.** *Declares that the Lago Agrio Judgment is not null and void because nullification is not an available or appropriate remedy under international law and such nullification would unjustly enrich Claimants.*

448.    *In all events, the Republic requests that, pursuant to Article 40 of the UNCITRAL Arbitration Rules, Claimants be ordered to pay all costs and expenses of this arbitration proceeding, including the fees and expenses of the Tribunal and the cost of the Republic's legal representation, plus pre-award and post-award interest thereon. The Republic also asks that the Tribunal grant it any other and further relief that the Tribunal deems just and proper.*

449.    *The Republic incorporates by reference its Request for Relief in Track I and in its Track II Counter-Memorial, Rejoinder, and Supplemental Counter-Memorial, to the extent that such Requests remain pending."*

### A3.16 Paragraph 449 of the Respondent's Track II Supplemental Rejoinder on the Merits (cited immediately above):

The Respondent here incorporated by general reference certain pending relief requested in its earlier pleadings submitted under both Track I and Track II, namely, as cited above (i) as to Track I, the Respondent's Track 1 Counter-Memorial (Paragraph 263), the Respondent's Track I Rejoinder (Paragraph 192), the Respondent's Track I Supplemental Counter-Memorial (Paragraph 143); and (ii) as to Track II, the Respondent's Track II Counter-Memorial on the Merits (Paragraph 542), the Respondent's Track II Rejoinder on the Merits (Paragraph 387), the Respondent's Track II Supplemental Counter-Memorial (Paragraphs 481-483).

### A3.17 The Respondent's Track 1B Post-Hearing Memorial dated 15 July 2015:

The Respondent requested relief as there more generally set out, without a formal prayer for relief.

# SA400

### *PART I – ANNEX 4*

### *THE ENFORCEMENT PROCEEDINGS[9]*

1.  From 2012 onwards, the Lago Agrio Plaintiffs have sought to enforce and execute the Lago Agrio Judgment in (i) Ecuador, (ii) Canada, (iii) Brazil and (iv) Argentina against the First Claimant (Chevron), the Second Claimant (TexPet) and/or the First Claimant's associated companies (for ease of reference, here collectively called "Chevron" save where indicated otherwise).[10]

2.  *(i) Ecuador:* On 15 October 2012, the Provincial Court for Sucumbíos ordered that the Lago Agrio Judgment's execution "be applicable to the entirety of the assets of Chevron Corporation, until such time as the entire obligation has been satisfied."[11] Assets subject to the attachment order included Chevron's intellectual property in Ecuador, including certain trademarks owned by Chevron Intellectual Property LLC, its bank accounts in Ecuador or transfers through the Ecuadorian banking system and TexPet's bank account at Banco Pichincha in Ecuador. On 25 October 2012, the Court extended the attachment order to additional trademark and intellectual property in Ecuador.[12]

3.  The Lago Agrio Plaintiffs have attempted to seize Chevron's other assets under the attachment order in Ecuador. In two motions dated 30 January 2015, the Lago Agrio Plaintiffs asked the Court to instruct the Ecuadorian Intellectual Property Institute ("EIPI") to renew certain trademarks owned by Chevron Intellectual Property LLC and separately order those trademarks embargoed pursuant to the Court's enforcement orders. On 5 April 2016, the Lago Agrio Plaintiffs asked the Court to appoint a depository to withdraw funds that were seized from TexPet's bank account at Banco Pichincha in Ecuador. On 11 April 2016, the Lago Agrio Plaintiffs requested that the Court rule on the Lago Agrio Plaintiffs' prior application for the EIPI to renew and embargo certain trademarks. On 7 June 2016, the Lago Agrio Plaintiffs requested that the court formally notify Ecuador of the 27 June 2013 attachment of the *Commercial Cases* Award. On 12

---

[9] This annex re-states, for the most part, the recital to the Tribunal's Procedural Order No 47 dated 31 October 2017.

[10] This information is largely derived from the Claimants' letters dated 19 July 2017, 1 August 2017 and 19 March 2018; and the Respondent's letters dated 1 August 2017 and 20 April 2018. (The Respondent is not a named party to any of these enforcement proceedings).

[11] C-1532.

[12] C-1541.

# SA401

July 2016, the Court, *inter alia*, denied the Lago Agrio Plaintiffs' 5 and 11 April 2016 motions, and granted their 7 June 2016 request.

4.   On 21 July 2016, the Lago Agrio Plaintiffs filed a motion requesting that the Court cancel the embargo of the *Commercial Cases* Award. The Court granted this motion on the same day. On 22 July 2016, Ecuador paid the *Commercial Cases* Award to Chevron in full.

5.   In the meantime, to the Tribunal's current understanding, these enforcement actions in Ecuador remain pending against Chevron.

6.   *(ii) Canada*: On 30 May 2012, the Lago Agrio Plaintiffs brought legal proceedings in Ontario, Canada to enforce the Lago Agrio Judgment against Chevron Corporation and Chevron Canada Limited (the latter being an indirect subsidiary of Chevron Corporation) in the principal sum of US$ 18.26 billion. By its judgment dated 1 May 2013, the Ontario Superior Court denied enforcement of the judgment and ordered a stay of the proceedings.[13]

7.   The case proceeded to the Canadian Supreme Court. In September 2015, the Canadian Supreme Court rejected Chevron's jurisdictional challenge. The Supreme Court confirmed that it had jurisdiction over Chevron to decide the Lago Agrio Plaintiffs' request to recognise the Lago Agrio Judgment.[14] After Chevron and Chevron Canada Limited filed answers in October 2015, the parties filed cross-motions for summary judgment, with the defendant parties seeking to dismiss Chevron Canada Limited from the action based (*inter alia*) on its separate corporate identity.

8.   On 20 January 2017, after discovery, written pleadings and oral argument, the Ontario Superior Court granted a motion for summary judgment in favour of Chevron Canada Limited, deciding that it was a separate entity from Chevron, was not a party to the Lago Agrio Litigation, nor a debtor under the Lago Agrio Judgment, and, therefore, to be dismissed from the case. The Lago Agrio Plaintiffs appealed that decision. A hearing of that appeal was scheduled for 10-11 October 2017, and later for 17-18 April 2018. It appears that judgment was reserved.[15]

---

[13] C-1627.
[14] C-2524.
[15] See now the Judgment dated 23 May 2018 of the Court of Appeal for Ontario, *Yaiguaje v Chevron Corporation*, 2018 ONCA 472.

# SA402

9. Earlier, in October 2016, the Lago Agrio Plaintiffs moved to amend their statement of claim to add Chevron Canada Capital Company (another indirect subsidiary of Chevron Corporation) as an additional defendant. The Court dismissed this motion to amend on 25 January 2017. The Lago Agrio Plaintiffs appealed that decision also. This appeal was also scheduled be heard on 17-18 April 2018. It appears that judgment was here also reserved.[16]

10. In the meantime, to the Tribunal's current understanding, this recognition action in Canada remains pending against Chevron.

11. *(iii) Brazil:* On 27 June 2012, the Lago Agrio Plaintiffs sought recognition of the Lago Agrio Judgment in Brazil. On 2 February 2015, the Superior Tribunal de Justiça ordered that the case file be given to the Brazilian Federal Prosecutor's Office to issue an opinion on the recognition claim. On 11 May 2015, the Federal Prosecutor issued an opinion (published on 13 May 2015) recommending that the Superior Tribunal de Justiça not recognize the Lago Agrio Judgment, concluding that recognising the Lago Agrio Judgment would be contrary to Brazilian public order. The Federal Prosecutor's opinion is a non-binding recommendation; and it has not been accepted (or rejected) by the Brazilian Court.

12. On 29 November 2017, the Court held a judgment session, wherein it rejected the request of the Lago Agrio Plaintiffs for recognition of the Lago Agrio Judgment. The Court published its final judgment on 15 March 2018.[17] According to the Claimants, the parties may seek clarification of this decision or may choose to appeal it.[18] The Respondent argues that the Court's decision is, in fact, final in all respects, since the only appeal available (a "recurso extraordinário" before the Supreme Court of Brazil) is limited in scope and restricted to the review of matters pertaining to the Federal Constitution, and there are no constitutional matters at issue involved in this decision.[19]

13. In the meantime, to the Tribunal's current understanding, this recognition action in Brazil remains pending against Chevron.

---

[16] See now *Yaiguaje v Chevron Corporation*, supra.
[17] C-2546.
[18] See the Claimants' letter dated 19 March 2018.
[19] See the Respondent's letter dated 20 April 2018.

# SA403

14.  ***(iv) Argentina***: On 12 November 2012, the Lago Agrio Plaintiffs filed enforcement proceedings in Argentina, seeking recognition of the Lago Agrio Judgment. Upon request from the Civil Court, on 30 March 2016, the Public Prosecutor issued an opinion to the effect that the Lago Agrio Judgment should not be recognized. The Public Prosecutor ratified that opinion on 20 December 2016. As in Brazil, the Public Prosecutor's opinion in Argentina is a non-binding recommendation; and it has not been accepted (or rejected) by the Argentinian Civil Court.

15.  In September 2017, Chevron requested a final judgment dismissing the enforcement proceedings, which was granted by the Civil Court on 31 October 2017. The Lago Agrio Plaintiffs appealed that decision; and the appeal is pending.[20]

16.  In the meantime, to the Tribunal's current understanding, this recognition action in Argentina remains pending against Chevron.

---

[20] See the Claimants' letter dated 19 March 2018. See also the Respondent's letter dated 20 April 2018.

# SA404

## *PART I – ANNEX 5*

## *THE ECUADOR-USA TREATY[21]*

### *Treaty between the United States of America and the Republic of Ecuador concerning the Encouragement and Reciprocal Protection of Investment*

The United States of America and the Republic of Ecuador (hereinafter the "Parties");

Desiring to promote greater economic cooperation between them, with respect to investment by nationals and companies of one Party in the territory of the other Party;

Recognizing that agreement upon the treatment to be accorded such investment will stimulate the flow of private capital and the economic development of the Parties;

Agreeing that fair and equitable treatment of investment is desirable in order to maintain a stable framework for investment and maximum effective utilization of economic resources;

Recognizing that the development of economic and business ties can contribute to the wellbeing of workers in both Parties and promote respect for internationally recognized worker rights; and

Having resolved to conclude a Treaty concerning the encouragement and reciprocal protection of investment;

Have agreed as follows:

## Article I

**1.** For the purposes of this Treaty,

> **(a)** "investment" means every kind of investment in the territory of one Party owned or controlled directly or indirectly by nationals or companies of the other Party, such as equity, debt, and service and investment contracts; and includes:

>> **(i)** tangible and intangible property, including rights, such as mortgages, liens and pledges;

>> **(ii)** a company or shares of stock or other interests in a company or interests in the assets thereof;

>> **(iii)** a claim to money or a claim to performance having economic value, and associated with an investment;

>> **(iv)** intellectual property which includes, inter alia, rights relating to:

>>> literary and artistic works, including sound recordings;

>>> inventions in all fields of human endeavour;

---

[21] Treaty between the United States of America and the Republic of Ecuador concerning the Encouragement and Reciprocal Protection of Investment, entered into force May 11, 1997 (C-279). Neither Party has raised any issue of a difference of meaning as between the English and Spanish versions of the Treaty.

# SA405

industrial designs;

semiconductor mask works;

trade secrets, know-how, and confidential business information; and

trademarks, service marks, and trade names; and

(v) any right conferred by law or contract, and any licenses and permits pursuant to law;

(b) "company" of a party means any kind of corporation, company, association, partnership, or other organization, legally constituted under the laws and regulations of a Party or a political subdivision thereof whether or not organized for pecuniary gain, or privately or governmentally owned or controlled;

(c) "national" of a Party means a natural person who is a national of a Party under its applicable law; associate

(d) "return" means an amount derived from or associated with an investment, including profit; dividend; interest; capital gain; royalty payment; management, technical assistance or other fee; or returns in kind;

(e) "associated activities" include the organization, control, operation, maintenance and disposition of companies, branches, agencies, offices, factories or other facilities for the conduct of business; the making, performance and enforcement of contracts; the acquisition, use, protection and disposition of property of all kinds including intellectual property rights; the borrowing of funds; the purchase, issuance, and sale of equity shares and other securities; and the purchase of foreign exchange for imports.

(f) "state enterprise" means an enterprise owned, or controlled through ownership interests, by a Party.

(g) "delegation" includes a legislative grant, and a government order, directive or other act transferring to a state enterprise or monopoly, or authorizing the exercise by a state enterprise or monopoly, of governmental authority.

**2.** Each Party reserves the right to deny to any company the advantages of this Treaty if nationals of any third country control such company and, in the case of a company of the other Party, that company has no substantial business activities in the territory of the other Party or is controlled by nationals of a third country with which the denying Party does not maintain normal economic relations.

**3.** Any alteration of the form in which assets are invested or reinvested shall not affect their character as investment.

## Article II

**1.** Each Party shall permit and treat investment, and activities associated therewith, on a basis no less favorable than that accorded in like situations to investment or associated activities of its own nationals or companies, or of nationals or companies of any third country, whichever is the most favorable, subject to the right of each Party to make or maintain exceptions falling within one of the sectors or matters listed in the Protocol to this Treaty. Each Party agrees to notify the other Party before or on the date of entry into force of this Treaty of all such laws and regulations of which it is aware concerning the sectors or matters listed in the Protocol.

Moreover, each Party agrees to notify the other of any future exception with respect to the sectors or matters listed in the Protocol, and to limit such exceptions to a minimum. Any future exception by either

# SA406

Party shall not apply to investment existing in that sector or matter at the time the exception becomes effective. The treatment accorded pursuant to any exceptions shall, unless specified otherwise in the Protocol be not less favorable than that accorded in like situations to investments and associated activities of nationals or companies of any third country.

**2.** **(a)** Nothing in this Treaty shall be construed to prevent a Party from maintaining or establishing a state enterprise.

**(b)** Each Party shall ensure that any state enterprise that it maintains or establishes acts in a manner that is not inconsistent with the Party's obligations under this Treaty wherever such enterprise exercises any regulatory, administrative or other governmental authority that the Party has delegated to it, such as the power to expropriate, grant licenses, approve commercial transactions, or impose quotas, fees or other charges.

**(c)** Each Party shall ensure that any state enterprise that it maintains or establishes accords the better of national or most favored nation treatment in the sale of its goods or services in the Party's territory.

**3.** **(a)** Investment shall at all times be accorded fair and equitable treatment, shall enjoy full protection and security and shall in no case be accorded treatment less than that required by international law.

**(b)** Neither Party shall in any way impair by arbitrary or discriminatory measures the management, operation, maintenance, use, enjoyment, acquisition, expansion, or disposal of investments. For purposes of dispute resolution under Articles VI and VII, a measure may be arbitrary or discriminatory notwithstanding the fact that a party has had or has exercised the opportunity to review such measure in the courts or administrative tribunals of a Party.

**(c)** Each Party shall observe any obligation it may have entered into with regard to investments.

**4.** Subject to, the laws relating to the entry and sojourn of aliens, nationals of either Party shall be permitted to enter and to remain in the territory of the other Party for the purpose of establishing, developing, administering or advising on the operation of an investment to which they, or a company of the first Party that employs them, have committed or are in the process of committing a substantial amount of capital or other resources.

**5.** Companies which are legally constituted under the applicable laws or regulations of one Party, and which are investments, shall be permitted to engage top managerial personnel of their choice, regardless of nationality.

**6.** Neither Party shall impose performance requirements as a condition of establishment, expansion or maintenance of investments, which require or enforce commitments to export goods produced, or which specify that goods or services must be purchased locally, or which impose any other similar requirements.

**7.** Each Party shall provide effective means of asserting claims and enforcing rights with respect to investment, investment agreements, and investment authorizations.

**8.** Each Party shall make public all laws, regulations, administrative practices and procedures, and adjudicatory decisions that pertain to or affect investments.

**9.** The treatment accorded by the United States of America to investments and associated activities of nationals and companies of the Republic of Ecuador under the provisions of this Article shall in any State, Territory or possession of the United States of America be no less favorable than the treatment accorded therein to investments and associated activities of nationals of the United States of America

# SA407

resident in, and companies legally constituted under the laws and regulations of other States, Territories or possessions of the United States of America.

**10.** The most favored nation provisions of this Treaty shall not apply to advantages accorded by either Party to nationals or companies of any third country by virtue of:

> **(a)** that Party's binding obligations that derive from full membership in a free trade area or customs union; or

> **(b)** that Party's binding obligations under any multilateral international agreement under the framework of the General Agreement on Tariffs and Trade that enters into force subsequent to the signature of this Treaty.

## Article III

**1.** Investments shall not be expropriated or nationalized either directly or indirectly through measures tantamount to expropriation or nationalization ("expropriation") except: for a public purpose; in a non-discriminatory manner; upon payment of prompt, adequate and effective compensation; and in accordance with due process of law and the general principles of treatment provided for in Article II (3). Compensation shall be equivalent to the fair market value of the expropriated investment immediately before the expropriatory action was taken or became known, whichever is earlier; be calculated in a freely usable currency on the basis of the prevailing market rate of exchange at that time; be paid without delay; include interest at a commercially reasonable rate from the date of expropriation; be fully realizable and be freely transferable.

**2.** A national or company of either Party that asserts that all or part of its investment has been expropriated shall have a right to prompt review by the appropriate judicial or administrative authorities of the other Party to determine whether any such expropriation has occurred and, if so, whether such expropriation, and any associated compensation, conforms to the principles of international law.

**3.** Nationals or companies of either Party whose investments suffer losses in the territory of the other Party owing to war or other armed conflict, revolution, state of national emergency, insurrection, civil disturbance or other similar events shall be accorded treatment by such other Party no less favorable than that accorded to its own nationals or companies or to nationals or companies of any third country, whichever is the most favorable treatment, as regards any measures it adopts in relation to such losses.

## Article IV

**1.** Each Party shall permit all transfers related to an investment to be made freely and without delay into and out of its territory, Such transfers include: (a) returns; (b) compensation pursuant to Article III; (c) payments arising out of an investment dispute; (d) payments made under a contract, including amortization of principal and accrued interest payments made pursuant to a loan agreement; (a) proceeds from the sale or liquidation of all or any part of an investment; and (f) additional contributions to capital for the maintenance or development of an investment.

**2.** Transfers shall be made in a freely usable currency at the prevailing market rate of exchange on the data of transfer with respect to spot transactions in the currency to be transferred.

**3.** Notwithstanding the provisions of paragraphs I and 2, either Party may maintain laws and regulations (a) requiring reports of currency transfer; and (b) imposing income taxes by such means as a withholding tax applicable to dividends or other transfers. Furthermore, either Party may protect the rights of creditors, or ensure the satisfaction of judgments in adjudicatory proceedings, through the equitable, non-discriminatory and good faith application of its law.

# SA408

## Article V

The Parties agree to consult promptly, on the request of either, to resolve any disputes in connection with the Treaty, or to discuss any matter relating to the interpretation or application of the Treaty.

## Article VI

**1.** For purposes of this Article, an investment dispute is a dispute between a Party and a national or company of the other Party arising out of or relating to (a) an investment agreement between that Party and such national or company; (b) an investment authorization granted by that Party's foreign investment authority to such national or company; or (c) an alleged breach of any right conferred or created by this Treaty with respect to an investment.

**2.** In the event of an investment dispute, the parties to the dispute should initially seek a resolution through consultation and negotiation. If the dispute cannot be settled amicably, the national or company concerned may choose to submit the dispute, under one of the following alternatives, for resolution:

> **(a)** to the courts or administrative tribunals of the Party that is a party to the dispute; or
>
> **(b)** in accordance with any applicable, previously agreed dispute-settlement procedures; or
>
> **(c)** in accordance with the terms of paragraph 3.

**3.** **(a)** Provided that the national or company concerned has not submitted the dispute for resolution under paragraph 2 (a) or (b) and that six months have elapsed from the data on which the dispute arose, the national or company concerned may choose to consent in writing to the submission of the dispute for settlement by binding arbitration:

> > **(i)** to the International Centre for the Settlement of Investment Disputes ("Centre") established by the Convention on the Settlement of Investment Disputes between States and Nationals of other States, done at Washington, March 18, 1965 ("ICSID convention"), provided that the Party is a party to such Convention; or
> >
> > **(ii)** to the Additional Facility of the Centre, if the Centre is not available; or
> >
> > **(iii)** in accordance with the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL); or
> >
> > **(iv)** to any other arbitration institution, or in accordance with any other arbitration rules, as may be mutually agreed between the parties to the dispute.

> **(b)** once the national or company concerned has so consented, either party to the dispute may initiate arbitration in accordance with the choice so specified in the consent.

**4.** Each Party hereby consents to the submission of any investment dispute for settlement by binding arbitration in accordance with the choice specified in the written consent of the national or company under paragraph 3. Such consent, together with the written consent of the national or company when given under paragraph 3 shall satisfy the requirement for:

> **(a)** written consent of the parties to the dispute for Purposes of Chapter II of the ICSID Convention (Jurisdiction of the Centre) and for purposes of the Additional Facility Rules; and
>
> **(b)** an "agreement in writing" for purposes of Article II of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done at New York, June 10, 1958 ("New York Convention").

# SA409

**5.** Any arbitration under paragraph 3(a) (ii), (iii) or (iv) of this Article shall be held in a state that is a party to the New York Convention.

**6.** Any arbitral award rendered pursuant to this Article shall be final and binding on the parties to the dispute. Each Party undertakes to carry out without delay the provisions of any such award and to provide in its territory for its enforcement.

**7.** In any proceeding involving an investment dispute, a Party shall not assert, as a defense, counterclaim, right of set-off or otherwise, that the national or company concerned has received or will receive, pursuant to an insurance or guarantee contract, indemnification or other compensation for all or part of its alleged damages.

**8.** For purposes of an arbitration held under paragraph 3 of this Article, any company legally constituted under the applicable laws and regulations of a Party or a political subdivision thereof that, immediately before the occurrence of the event or events giving rise to the dispute, was an investment of nationals or companies of the other Party, shall be treated as a national or company of such other Party in accordance with Article 25 (2) (b) of the ICSID Convention.

## Article VII

**1.** Any dispute between the Parties concerning the interpretation or application of the Treaty which is not resolved through consultations or other diplomatic channels, shall be submitted, upon the request of either Party, to an arbitral tribunal for binding decision in accordance with the applicable rules of international law. In the absence of an agreement by the Parties to the contrary, the arbitration rules of the United Nations Commission on International Trade Law (UNCITRAL), except to the extent modified by the Parties or by the arbitrators, shall govern.

**2.** Within two months of receipt of a request, each Party shall appoint an arbitrator. The two arbitrators shall select a third arbitrator as Chairman, who is a national of a third State. The UNCITRAL Rules for appointing members of three member panels shall apply mutatis mutandis to the appointment of the arbitral panel except that the appointing authority referenced in those rules shall be the Secretary General of the Centre.

**3.** Unless otherwise agreed, all submissions shall be made and all hearings shall be completed within six months of the date of selection of the third arbitrator, and the Tribunal shall render its decisions within two months of the date of the final submissions or the date of the closing of the hearings, whichever is later.

**4.** Expenses incurred by the Chairman, the other arbitrators, and other costs of the proceedings shall be paid for equally by the Parties. The Tribunal may, however, at its discretion, direct that a higher proportion of the costs be paid by one of the Parties.

## Article VIII

This Treaty shall not derogate from:

> **(a)** laws and regulations, administrative practices or procedures, or administrative or adjudicatory decisions of either Party;

> **(b)** international legal obligations; or

> **(c)** obligations assumed by either Party, including those contained in an investment agreement or an investment authorization, that entitle investments or associated activities to treatment more favorable than that accorded by this Treaty in like situations.

# SA410

## Article IX

**1.** This Treaty shall not preclude the application by either Party of measures necessary for the maintenance of public order, the fulfilment of its obligations with respect to the maintenance or restoration of international peace or security, or the protection of its own essential security interests.

**2.** This Treaty shall not preclude either Party from prescribing special formalities in connection with the establishment of investments, but such formalities shall not impair the substance of any of the rights set forth in this Treaty.

## Article X

**1.** With respect to its tax policies, each Party should strive to accord fairness and equity in the treatment of investment of nationals and companies of the other Party.

**2.** Nevertheless, the provisions of this Treaty, and in particular Article VI and VII, shall apply to matters of taxation only with respect to the following:

> **(a)** expropriation, pursuant to Article III;
>
> **(b)** transfers, pursuant to Article IV; or
>
> **(c)** the observance and enforcement of terms of an investment Agreement or authorization as referred to in Article VI (1) (a) or (b), to the extent they are not subject to the dispute settlement provisions of a Convention for the avoidance of double taxation between the two Parties, or have been raised under such settlement provisions and are not resolved within a reasonable period of time.

## Article XI

This Treaty shall apply to the political subdivisions of the Parties.

## Article XII

**1.** This Treaty shall enter into force thirty days after the date of exchange of instruments of ratification. It shall remain in force for a period of tan years and shall continue in force unless terminated in accordance with paragraph 2 of this Article. It shall apply to investments existing at the time of entry into force as well as to investments made or acquired thereafter.

**2.** Either Party may, by giving one year's written notice to the other Party, terminate this Treaty at the end of the initial ten year period or at any time thereafter.

**3.** With respect to investments made or acquired prior to the date of termination of this Treaty and to which this Treaty otherwise applies, the provisions of all of the other Articles of this Treaty shall thereafter continue to be effective for a further period often years from such date of termination.

**4.** The Protocol and Side Letter shall form an integral part of the Treaty.

IN WITNESS WHEREOF, the respective plenipotentiaries have signed this Treaty.

DONE in duplicate at Washington on the twenty-seventh day of August, 1993, in the English and Spanish languages, both texts being equally authentic.

FOR THE UNITED STATES OF AMERICA            FOR THE REPUBLIC OF ECUADOR

# SA411

***Tratado entre la República del Ecuador y los Estados Unidos de América sobre promoción y la protección de inversiones***

La República del Ecuador y los Estados Unidos de América, en adelante, "las Partes";

Deseando promover una mayor cooperación económica entre ellas, con respecto a las inversiones

hechas por nacionales y sociedades de una Parte en el territorio de la otra Parte;

Reconociendo que el acuerdo sobre el tratamiento a ser otorgado a esas inversiones estimulará el flujo de capital privado y el desarrollo económico de las Partes;

Conviniendo en que, a los fines de mantener un marco estable para las inversiones y la utilización más eficaz de los recursos económicos, es deseable otorgar un trato justo y equitativo a las inversiones;

Reconociendo que el desarrollo de los vínculos económicos y comerciales puede contribuir al bienestar de los trabajadores en las dos Partes y promover el respeto por los derechos laborales reconocidos internacionalmente; y

Habiendo resuelto concertar un tratado sobre la promoción y la protección recíproca de las inversiones,

Han acordado lo siguiente:

## Artículo I

**1.** A efectos del presente Tratado:

**a)** "Inversión" significa todo tipo de inversión tales como el capital social, las deudas y los contratos de servicio y de inversión, que se haga en el territorio de una Parte y que directa o indirectamente sea propiedad de nacionales o sociedades de la otra Parte o esté controlada por dichos nacionales o sociedades, y comprende:

**i)** Los bienes corporales e incorporales, incluso derechos tales como los de retención, las hipotecas y las prendas;

**ii)** Las sociedades o las acciones de capital u otras participaciones o en sus activos;

**iii)** El derecho al dinero o alguna operación que tenga valor económico y que esté relacionada con una inversión;

**iv)** La propiedad intelectual que, entre otros, comprende los derechos relativos a: las obras artísticas y literarias, incluidas las grabaciones sonoras, los inventos en todos los ámbitos del esfuerzo humano, los diseños industriales, las obras de estampado de semiconductores, los secretos comerciales, los conocimientos técnicos y la información comercial confidencial, y las marcas registradas, las marcas de servicio y los nombres comerciales, y

**v)** Todo derecho conferido por la ley o por contrato y cualesquiera licencias y permisos conferidos conforme a la Ley.

**b)** "Sociedad" es una parte que significa cualquier clase de sociedad anónima, compañía, asociación, sociedad comanditaria u otra entidad legalmente constituida conforme al ordenamiento interno de una

# SA412

Parte o de una subdivisión política de la misma, tenga o no fines de lucro o sea de propiedad privada o pública;

**c)** "Nacional" de una Parte significa la persona natural que sea nacional de una Parte de conformidad son su legislación.

**d)** "Rendimiento" significa la cantidad derivada de una inversión o vinculada a ella, incluidos los beneficios, los dividendos, los intereses, las plusvalías, los pagos de regalías, los honorarios de gestión, asistencia técnica u otra índole, las rentas en especie.

**e)** "Actividades afines" significa la organización, el control, la explotación, el mantenimiento y la enajenación de sociedades, sucursales, agencias, oficinas, fábricas u otras instalaciones destinadas a la realización de negocios; la celebración, el cumplimiento, y la ejecución de contratos; la adquisición, el uso, la protección y la enajenación de todo género de bienes, incluidos los derechos de propiedad intelectual; el empréstito de fondos; la compra, emisión y venta de acciones de capital y de otros valores, y la compra de divisas para las importaciones.

**f)** "Empresa estatal" significa la empresa que sea propiedad de una de las Partes o que esté controlada por esa Parte mediante derechos de propiedad.

**g)** "Delegación" significa la concesión legislativa y la orden, norma u otra disposición oficial que transfieran autoridad gubernamental a una empresa o monopolio estatal, o le autoricen el ejercicio de dicha autoridad.

**2.** Cada Parte se reserva el derecho de denegar a cualquier sociedad los beneficios del presente Tratado si dicha sociedad está controlada por nacionales de un tercer país y, en el caso de una sociedad de la otra Parte, si dicha sociedad no tiene actividades comerciales importantes en el territorio de la otra Parte o está controlada por nacionales de un tercer país con el cual la parte denegante no mantiene relaciones económicas normales.

**3.** Ninguna modificación en la forma en que se invierten o reinvierten los activos alterará el carácter de los mismos en cuanto inversión.

## Artículo II

**1.** Cada Parte permitirá y tratará las inversiones y sus actividades afines de manera no menos favorable que la que otorga en situaciones similares a las inversiones o actividades afines de sus propios nacionales o sociedades, o las de los nacionales o sociedades de cualquier tercer país, cualquiera que sea la más favorable, sin perjuicio del derecho de cada Parte a hacer o mantener excepciones que correspondan a alguno de los sectores o asuntos que figuran en el Anexo del presente Tratado. Cada Parte se compromete a notificar a la otra Parte, con anterioridad a la fecha de entrada en vigor del presente Tratado o en dicha fecha, todo ordenamiento interno del cual tenga conocimiento referente a los sectores o asuntos que figuran en el Anexo. Cada Parte se compromete igualmente a notificar a la otra Parte toda futura excepción con respecto a los sectores o asuntos que figuran en el Anexo y a limitar dichas excepciones al mínimo. Las excepciones futuras de cualquiera de las Partes no se aplicarán a las inversiones existentes en los sectores o asuntos correspondientes en el momento en que dichas excepciones entren en vigor. El trato que se otorgue conforme a los términos de una excepción será, salvo que se especifique lo contrario en el Anexo, no menos favorable que el que se otorgue en situaciones similares a las inversiones o actividades afines de los nacionales o sociedades de cualquier tercer país.

# SA413

**2.**

**a)** Lo dispuesto en el presente Tratado no impedirá que las Partes mantengan o establezcan empresas estatales.

**b)** Cada parte se asegurará de que las empresas estatales que mantenga o establezca actúen de manera compatible con las obligaciones de esa Parte en virtud del presente Tratado, cuando ejerzan cualquier facultad reguladora, administrativa o pública que le haya sido delegada por esa Parte como, por ejemplo, la facultad de expropiar, otorgar licencias, aprobar operaciones comerciales o imponer cuotas, derechos u otros gravámenes.

**c)** Cada parte se asegurará de que las empresas estatales que mantenga o establezca concedan el mejor trato, ya sea el nacional o el de la nación más favorecida, a la venta de sus bienes o servicios en el territorio de la Parte.

**3.**

**a)** Las inversiones, a las que se concederá siempre un trato justo y equitativo, gozarán de protección y seguridad plenas y, en ningún caso, se le concederá un trato menos favorable que el que exige el derecho internacional.

**b)** Ninguna de las Partes menoscabará, en modo alguno, mediante la adopción de medidas arbitrarias o discriminatorias, la dirección, la explotación, el mantenimiento, la utilización, el usufructo, la adquisición, la expansión o la enajenación de las inversiones. Para fines de la solución de diferencias, de conformidad con los Artículos VI y VII, una medida podrá tenerse por arbitraria o discriminatoria aun cuando una parte haya tenido o ejercido la oportunidad de que dicha medida se examine en los tribunales o en los tribunales administrativos de una de las Partes.

**c)** Cada Parte cumplirá los compromisos que haya contraído con respecto a las inversiones.

**4.** Sin perjuicio de las leyes relativas a la entrada y permanencia de extranjeros, se permitirá a los nacionales de cada Parte la entrada y permanencia en el territorio de la otra Parte a fines de establecer, fomentar o administrar una inversión, o de asesorar en la explotación de la misma, en la cual ellos, o una sociedad de la primera Parte que los emplee, hayan comprometido, o estén en curso de comprometer, una cantidad importante de capital u otros recursos.

**5.** A las sociedades que estén legalmente constituidas conforme al ordenamiento interno de una Parte, y que constituyan inversiones, se les permitirá emplear al personal administrativo superior que deseen, sea cual fuera la nacionalidad de dicho personal.

**6.** Como condición para el establecimiento, la expansión el mantenimiento de las inversiones, ninguna de las Partes establecerá requisitos de cumplimiento que exijan o que hagan cumplir compromisos de exportación con respecto a los bienes producidos, o que especifiquen que ciertos bienes o servicios se adquieran en el país, o que impongan cualesquiera otros requisitos parecidos.

**7.** Cada parte establecerá medios eficaces para hacer valer las reclamaciones y respetar los derechos relativos a las inversiones, los acuerdos de inversión y las autorizaciones de inversión.

**8.** Cada Parte públicos las leyes, los reglamentos, las prácticas y los procedimientos administrativos y los fallos judiciales relativos a las inversiones o que las atañan.

**9.** El trato otorgado por los estados Unidos de América a las inversiones y actividades afines de los nacionales y de las sociedades de la República del Ecuador, conforme a las disposiciones del presente

Artículo será, en cualquiera de los estados, territorios o posesiones de los Estados Unidos de América, no menos favorable que el trato que se otorgue a las inversiones y actividades afines de los nacionales

# SA414

de Estados Unidos de América que residan en los demás estados, territorios o posesiones de los Estados Unidos de América, y a las sociedades constituidas legalmente, conforme al ordenamiento interno de dichos otros estados, territorios o posesiones.

**10.** Las disposiciones del presente Tratado relativas al trato de nación más favorecida no se aplicara las ventajas concedidas por cualquiera de las Partes a los nacionales o las sociedades de ningún tercer país de conformidad con:

**a)** Los compromisos vinculantes de esa Parte que emanen de su plena participación en uniones aduaneras o en zonas de libre comercio o,

**b)** Los compromisos vinculantes de esa Parte adquiridos en virtud de cualquier convenio internacional multilateral amparado por el Acuerdo General sobre Aranceles Aduaneros y Comercio que entre en vigencia tras la firma del presente Tratado.

## Artículo III

**1.** Las inversiones no se expropiarán ni nacionalizarán directamente, ni indirectamente mediante la aplicación de medidas equivalentes a la expropiación o nacionalización (expropiación"), salvo que ello se efectúe con fines de interés público, de manera equitativa y mediante pago de una indemnización pronta, adecuada y efectiva, y de conformidad con el debido procedimiento legal y los principios generales de trato dispuestos en el párrafo 3 del Artículo II. La indemnización equivaldrá el valor justo en el mercado que tenga la inversión expropiada inmediatamente antes de que se tome la acción expropiatoria o de que ésta se llegue a conocer, si ello ocurre con anterioridad; se calculará en una moneda autorizable libremente, al tipo de cambio vigente en el mercado en ese momento; se pagará sin dilación; incluirá los intereses devengados a un tipo de interés comercialmente razonable desde la fecha de la expropiación; será enteramente realizable, y será transferible libremente.

**2.** El nacional o sociedad de una Parte que sostenga que su inversión le ha sido expropiada total o parcialmente tendrá derecho a que las autoridades judiciales o administrativas competentes de la otra Parte examinen su caso con prontitud para determinar si la expropiación ha ocurrido y, en caso afirmativo, si dicha expropiación y la indemnización correspondiente se ajustan a los principios del derecho internacional.

**3.** A los nacionales o las sociedades de una Parte cuyas inversiones sufran pérdidas en el territorio de la otra Parte con motivo de guerra o de otro conflicto armado, revolución, estado nacional de excepción, insurrección, disturbios entre la población u otros acontecimientos similares, la otra Parte les otorgará, con respeto a las medidas que adopte en lo referente a dichas pérdidas, un trato menos favorable que el trato más favorable que otorgue a sus propios nacionales o sociedades o a los nacionales o las sociedades de cualquier tercer país.

## Artículo IV

Cada parte permitirá que todas las transferencias relativas a una inversión que se envíen a su territorio o se saquen del mismo realicen libremente y sin demora. Dichas transferencias comprenden: a) los rendimientos; b) las indemnizaciones en virtud del Artículo III; c) los pagos que resulten de diferencias en materia de inversión; d) los pagos que se hagan conforme a los términos de un contrato, entre ellos, las amortizaciones de capital y los pagos de los intereses devengados en virtud de un convenio de préstamo; e) el producto de la venta o liquidación parcial o total de una inversión, y f) los aportes adicionales al capital hechos para el mantenimiento o fomento de una inversión.

# SA415

### Artículo V

Las Partes convienen en consultarse con prontitud, a solicitud de cualquier de ellas, para resolver las diferencias que surjan en relación con el presente Tratado o para considerar cuestiones referentes a su interpretación o aplicación.

### Artículo VI

**1.** A efectos del presente Artículo una diferencia en materia de inversión es una diferencia entre una Parte y un nacional o una sociedad dela otra Parte, que se deba o sea pertinente a: a) un acuerdo de inversión concertado entre esa parte y dicho nacional o sociedad; b) una autorización para realizar una inversión otorgada por la autoridad en materia de inversiones extranjeras de una Parte a dicho nacional o sociedad, o c) una supuesta infracción de cualquier derecho conferido o establecido por el presente Tratado con respecto a una inversión.

**2.** Cuando surja una diferencia en materia de inversión, las partes en la diferencia procurarán primero resolverla mediante consultas y negociaciones. Si la diferencia no se soluciona amigablemente, la sociedad o el nacional interesado, para resolverla, podrá optar por someterla a una de las siguientes vías, para su resolución:

**a)** Los tribunales judiciales o administrativos de la Parte que sea parte en la diferencia, o

**b)** A cualquier procedimiento de solución de diferencias aplicable y previamente convertido, o

**c)** Conforme a lo dispuesto en el párrafo 3 de este Artículo.

**3.**

**a)** Siempre y cuando la sociedad o el nacional interesado no haya sometido la diferencia, para su solución, según lo previsto por el inciso a) o el inciso b) del párrafo 2 y hayan transcurrido seis meses desde la fecha en que surgió la diferencia, la sociedad o el nacional interesado podrá optar con consentir por escrito a someter la diferencia, para su solución, al arbitraje obligatorio:

**i)** Del centro internacional de Arreglo de Diferencias relativas a Inversiones ("el Centro") establecido por el Convenio sobre el Arreglo de Diferencias Relativas a Inversiones entre Estados y Nacionales de otros estados, hecho en Washington el 10 de marzo de 1965 ("Convenio del CIADI"), siempre que la Parte sea parte en dicho Convenio; o

**ii)** Del Mecanismo Complementario del Centro, de no ser posible recurrir a éste; o

**iii)** Según las Reglas de Arbitraje de la Comisión de las Naciones Unidas sobre Derecho Internacional

(CNUDMI), o

**iv)** De cualquier otra institución arbitral o conforme a otra norma de arbitraje, según convenga las partes

en la diferencia.

**b)** Una vez que la sociedad o el nacional interesado dé su consentimiento, cualquiera de las partes en la diferencia podrá iniciar el arbitraje según la opción especificada en el consentimiento.

# SA416

**4.** Cada una de las Partes consiente en someter cualquier diferencia en materia de inversión al arbitraje obligatorio para su solución, de conformidad con la opción especificada en el consentimiento por escrito del nacional o de la sociedad, según el párrafo 3. Ese consentimiento, junto con el consentimiento por escrito del nacional o la sociedad, cuando se da conforme el párrafo 3, cumplirá el requisito de:

**a)** Un "consentimiento por escrito" de las partes en la diferencia a efectos del Capítulo II de la Convención del CIADI (Jurisdicción del Centro) y a efectos de las normas del Mecanismo Complementario, y

**b)** Un "acuerdo por escrito" a efectos del Artículo II de la Convención de las Naciones Unidas sobre el Reconocimiento y la Ejecución de las Sentencias Arbítrales Extranjeras, hecha en Nueva York el 10 de 1958 ("Convención de Nueva York").

**5.** Todo arbitraje efectuado de conformidad con la cláusula ii, iii o iv del inciso a), párrafo 3 del presente Artículo, tendrá lugar en un estado que sea Parte en la Convención de Nueva York.

**6.** Todo laudo arbitral dictado en virtud de este Artículo será definitivo y obligatorio para las partes en la diferencia. Cada Parte se compromete a aplicar sin demora las disposiciones de dicho laudo y a garantizar su ejecución en su territorio.

**7.** En todo procedimiento relativo a una diferencia en materia de inversión, las Partes no emplearán como defensa, reconvención, derecho de contra reclamación o de otro modo, el hecho de que la sociedad o el nacional interesado ha recibido o recibirá, según los términos de un contrato de seguro de garantía, alguna indemnización u otra compensación por todos sus supuestos daños o por parte de ellos.

**8.** A efectos de un arbitraje efectuado según lo previsto en el párrafo 3 del presente Artículo, toda sociedad legalmente constituida conforme al ordenamiento interno de una Parte o subdivisión política de la misma que, inmediatamente antes de ocurrir el suceso o los sucesos que dieron lugar a la diferencia, constituyera una inversión de nacionales o de sociedades de la otra Parte, deberá ser tratada como nacional o sociedad de esa otra Parte, conforme al inciso b), párrafo 2, del Artículo 25 de la Convención del CIADI.

## Artículo VII

**1.** Toda diferencia entre las Partes concerniente a la interpretación o aplicación del presente Tratado que no se resuelva mediante consultas u otras vías diplomáticas, se presentará, a solicitud de cualquiera de las Partes, a un tribunal de arbitraje para que llegue a una decisión vinculante conforme a las normas de arbitraje de la Comisión de las Naciones Unidas para el Derecho Mercantil Internacional (CNUDMI), excepto en cuanto dichas normas hayan sido modificadas por las partes o por los árbitros.

**2.** En el plazo de dos meses a partir de la recepción de la solicitud, cada Parte nombrará a un árbitro. Los dos árbitros nombrarán como presidente a un tercer árbitro que sea nacional de un tercer Estado. Las Normas de la CNUDMI relativas al nombramiento de vocales para las juntas de tres miembros se

aplicarán, mutatis mutandis, al nombramiento de la junta arbitral, salvo que la autoridad denominativa a la que hacen referencia esas reglas será el Secretario General del Centro.

**3.** Salvo acuerdo en contrario, todos los casos se presentarán y todas las audiencias concluirán en un plazo de seis meses a partir del nombramiento del tercer árbitro, y el Tribunal dictará su laudo en un plazo de dos meses a partir de la fecha de las últimas presentaciones o de la fecha de clausura de las audiencias, si esta última fuese posterior.

# SA417

**4.** Los gastos incurridos por el Presidente y los árbitros, así como las demás costas del procedimiento, serán sufragados en partes iguales por las partes. Sin embargo. El Tribunal podrá, a su discreción, ordenar que una de las Partes pague una proporción mayor de las costas.

### Artículo VIII

El presente Tratado no menoscabará:

**a)** Las leyes, los reglamentos, las prácticas y los procedimientos administrativos y los fallos administrativos y judiciales de cualquiera de las Partes;

**b)** Los compromisos jurídicos internacionales, ni

**c)** Los compromisos asumidos por cualquier de las Partes incluidos los que estén incorporados a los acuerdos o a las autorizaciones de inversión, que otorguen a las inversiones o a las actividades afines un trato más favorable que el que les otorga el presente Tratado en situaciones parecidas.

### Artículo IX

**1.** El presente Tratado no impedirá la aplicación por cualquiera de las Parte de las medidas necesarias para el mantenimiento de orden público, el cumplimiento de sus compromisos respecto del mantenimiento o la restauración de la paz o seguridad internacionales, o la protección de los intereses esenciales de su seguridad.

**2.** El presente Tratado no impedirá que cualquiera de las Partes prescriba trámites especiales con respecto al establecimiento de inversiones, pero dichos trámites no menoscabarán la esencia de cualquiera de los derechos que se anuncian en el presente Tratado.

### Artículo X

**1.** En lo relativo a sus normas tributarias, cada Parte deberá esforzarse por actuar justa y equitativamente en el trato de las inversiones de los nacionales y las sociedades de la otra Parte.

**2.** No obstante, las disposiciones del presente Tratado, especialmente de los Artículos VI y VII del mismo, se aplicarán a cuestiones tributarias solamente con respecto a:

**a)** La expropiación, de conformidad con el Artículo III;

**b)** Las transferencias, de conformidad con el Artículo IV, o

**c)** La observancia y el cumplimiento de los términos de un acuerdo o autorización en materia de inversión, tal como se menciona en el inciso a) o el inciso b), en la medida en que estén sujetas a las disposiciones sobre la solución de diferencias de un Convenio para evitar la doble imposición tributaria concertado entre las dos Partes, o que se hayan suscitado de conformidad con dichas disposiciones y no se hayan resuelto en un plazo razonable.

# SA418

### Artículo XI

El presente Tratado se aplicará a las subdivisiones políticas de las Partes.

### Artículo XII

**1.** El presente Tratado entrará en vigor treinta días después de la fecha de canje de los instrumentos de ratificación y permanecerá en vigor por un período de 10 años y continuará en vigor a menos que se denuncie de conformidad con las disposiciones del párrafo 2 del presente Artículo. El presente Tratado se aplicará a las inversiones existentes en el momento de su entrada en vigor y a las inversiones que se efectúen o adquieran posteriormente.

**2.** Cualquiera de las Partes podrá denunciar el presente Tratado al concluir el período inicial de diez años, o en cualquier momento posterior, mediante notificación por escrito a la otra Parte con un año de antelación.

**3.** Con respecto a las inversiones efectuadas o adquiridas antes de la fecha de terminación del presente Tratado, y a las cuales el presente Tratado sea por lo demás aplicable, las disposiciones de todos los demás artículos del presente Tratado continuarán en vigor durante un período adicional de diez años después de la fecha de terminación.

**4.** El Protocolo y la Carta Anexa formarán parte integral del presente Tratado.

EN FE DE LO CUAL, los respectivos plenipotenciarios han firmado el presente Tratado.

HECHO en Washington a los veinte y siete días del mes de agosto de mil novecientos noventa y tres, en dos textos en los idiomas español e inglés, ambos igualmente auténticos.

POR LA REPUBLICA DE ECUADOR          POR LOS ESTADOS UNIDOS DE AMERICA

# SA419

## PART II

## THE PRINCIPAL ISSUES

### A: Introduction

2.1    The several claims made by the Claimants and the several responses made by the Respondent in this arbitration are recorded in their respective pleaded requests for relief. These pleadings are fully set out in Annex 3 to Part I of this Award, above. As there formulated, these comprise a range of specific requests, reflecting the particular facts of the Parties' dispute arising from the Lago Agrio Litigation and the Judgments of the Lago Agrio Court, the Lago Agrio Appellate Court, the Cassation (National) Court and the Constitutional Court of the Respondent.

2.2    These facts were first pleaded in the Claimants' Notice of Arbitration of 23 September 2009 and disputed by the Respondent's initial pleading of 3 May 2010, during the pendency of the Lago Agrio Litigation (begun in 2003) but before the Judgments of the Lago Agrio Court (2011), the Lago Agrio Appellate Court (2012), the Cassation Court (2013) and the Constitutional Court (2018). As the Parties' dispute continued and deepened from 2009 onwards, after the commencement of this arbitration, the Parties' respective pleadings have correspondingly developed to take account of these new and other events, up to 25 July 2018.

2.3    These disputed facts and requests are, however, all focused on the overall dispute that lay and continues to lie at the heart of this case between the Claimants and the Respondent.

2.4    In brief, the Claimants assert that TexPet (with Texaco) made an investment in the form of an oil concession in the Oriente, Ecuador (beginning in 1964); that this investment was subsequently acquired by Chevron when it "merged" with Texaco and acquired TexPet, as Texaco's subsidiary (in 2001); that the Respondent agreed (in 1995-1998) on the extent of the responsibility of TexPet, Texaco and subsequently Chevron for clean-up operations and on the extent of their residual liability for environmental harm in the concession area; that, in breach of that agreement, the Respondent facilitated legal proceedings by the Lago Agrio Plaintiffs in the form of the Lago Agrio Litigation

against Chevron; that such proceedings were subject to procedural fraud and judicial misconduct by judges of the Lago Agrio Court; that the Lago Agrio Judgment was 'ghostwritten' by representatives of the Lago Agrio Plaintiffs in corrupt collusion with the presiding judge of the Lago Agrio Court; that the Lago Agrio Appellate Court, the Cassation Court and the Constitutional Court left such fraud, misconduct and corruption unremedied; that the Lago Agrio Appellate Court rendered enforceable the Lago Agrio Judgment, within and without Ecuador (in 2012); and that the Respondent (by its judicial branch, aided and abetted by its executive branch) failed to provide to both Chevron and TexPet the legal protections to which they were entitled in the Lago Agrio Litigation.

2.5    The Claimants (as USA nationals) contend that these facts disclose multiple breaches by the Respondent of their rights under the Treaty (including customary international law); that many of these breaches have a continuing character that was renewed, repeated and maintained in successive factual developments; and that these international wrongs have caused and are still causing injuries to each of them; and that the Claimants (particularly Chevron) became and remain exposed to potentially disastrous legal proceedings for the enforcement of the corrupt Lago Agrio Judgment in multiple jurisdictions, not limited to Ecuador or the USA.

2.6    The Claimants contend that these breaches of the Treaty are rooted in: (i) the failure of the Respondent to give effect to the agreements made by the Respondent concerning the responsibility and residual liability for environmental damage (collectively, the "1995 Settlement Agreement"); (ii) the issuing, rendering enforceable and maintaining the enforceability of the Lago Agrio Judgment (as varied by the Cassation Court); and (iii) the failure of the Respondent to take effective steps to address and remedy the procedural fraud, judicial misconduct and 'ghostwriting' of the Lago Agrio Judgment.

2.7    The Claimants assert that this Tribunal has jurisdiction under the Treaty to decide their claims; and, also, that their claims are admissible in this arbitration under the Treaty.

2.8    In brief, the Respondent denies: (i) that Chevron has, or has had, any investment in Ecuador relevant to the Treaty; (ii) that this Tribunal has any jurisdiction to address the Claimants' claims under the Treaty; (iii) that the Claimants' claims are admissible in

# SA421

this arbitration under the Treaty; and (iv) that the Claimants' cases, on their merits, entitle either of them to any of the relief which they claim in this arbitration.

2.9    In this arbitration, the procedural fraud, judicial misconduct and corruption in the Lago Agrio Litigation and the Lago Agrio Judgment (as alleged by the Claimants and denied by the Respondent), taken together, were commonly referred to by the Parties as a 'denial of justice'. The Tribunal is content to adopt that usage. In doing so, however, the Tribunal draws attention to the fact that its mandate in this arbitration is focused on the question of alleged breaches of the Treaty (including customary international law). The Treaty does not make express provision for denial of justice.

2.10   The principal issues to be addressed by the Tribunal in this Award, under Track II of this arbitration, are whether the Tribunal has any jurisdiction over Chevron's claims under the Treaty; (if so) whether such claims are admissible under the Treaty; if so, whether any alleged conduct attributable to the Respondent amounts to a violation of the Treaty (including customary international law); if and to the extent that these questions are answered affirmatively, to what forms of relief are Chevron and TexPet entitled under the Treaty (including customary international law); and, in any event, to what forms of relief is the Respondent entitled under the Treaty (including, again, customary international law).

2.11   These principal issues subsume a mass of lesser factual, expert, forensic and legal issues. For the purpose of this Award, the Tribunal has addressed these issues in the several Parts that follow. For ease of reference, the subject-matters of these different Parts are described below.

2.12   The Tribunal does not here revisit its determinations made in its earlier awards, orders and decision. This Award is limited to issues arising in Track II of this Arbitration, as identified by the Parties up to 25 July 2018. Thus, this Award does not address issues already decided in Tracks 1 and 1B or still to be addressed in Track III of this arbitration. Moreover, the Tribunal has not thought it necessary to decide all the issues listed for Track II by the Parties.

## SA422

### B: The Principal Legal and Other Texts – Part III

2.13    For ease of later reference in this Award, Part III of this Award sets out, verbatim, relevant texts from the Treaty, the UNCITRAL Arbitration Rules (forming part of the Parties' Arbitration Agreement derived from the Treaty), the 1995-1998 Settlement and Release Agreements, the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights, the ILC Articles on State Responsibility, the 1985 UN Basic Principles on the Independence of the Judiciary, the 1998 Ecuadorian Constitution, the Ecuadorian Civil Code, the Ecuadorian Environmental Management Act 1999 and the Ecuadorian Collusion Prosecution Act.

2.14    The full text of the Treaty (in English and Spanish) is appended to Part I, as Annex 5.

### C: The Facts and Other Matters – Parts IV and V

2.15    *Part IV* of this Award sets out the facts and other matters, including the non-computer expert evidence, relevant to the Tribunal's decisions in this Award. Part IV also contains an annotated chronology of these evidential materials from 1964 to 2018, as found by the Tribunal.

2.16    Annex 6 to Part IV contains a map of Ecuador, showing the Oriente and the area of the oil concession granted by the Respondent to (inter alios) TexPet.

2.17    In Part V of this Award, the Tribunal addresses the Judgments of the Lago Agrio Court, the Lago Agrio Appellate Court, the Cassation Court and the Constitutional Court.

2.18    Annex 7 to Part V contains an extract from the Lago Agrio Judgment, addressing the "merger" between Texaco and Chevron in 2001. Annex 8 to Part V reproduces exhibits from the expert evidence relating to the 'ghostwriting' of the Lago Agrio Judgment. Annex 9 to Part V reproduces a marked-up version of part of the Lago Agrio Judgment from the expert evidence relating to the 'ghostwriting' of the Lago Agrio Judgment.

2.19    The Tribunal summarises its Conclusions regarding these evidential materials, as found in Parts IV and V (including the four Judgments), at the end of Part V.

# SA423

### *D: Forensic (Computer) Evidence – Part VI*

2.20 In Part VI of this Award, the Tribunal addresses the expert evidence addressed by the Parties' forensic computer expert witnesses (with the Tribunal's forensic computer expert).

2.21 The Tribunal summarises its Conclusions regarding this forensic expert evidence at the end of Part VI.

### *E: Jurisdiction and Admissibility – Part VII*

2.22 In Part VII of this Award, the Tribunal addresses the issues of jurisdiction and admissibility arising from the Parties' respective pleadings.

2.23 The Tribunal summarises its Conclusions regarding jurisdiction and admissibility at the end of Part VII.

### *F: Merits – Part VIII*

2.24 In Part VIII of this Award, the Tribunal addresses the merits of the Claimants' claims and the Respondent's defences.

2.25 The Tribunal summarises its Conclusions regarding these merits at the end of Part VIII.

### *G: Forms of Relief – Part IX*

2.26 In Part IX of this Award, the Tribunal addresses (seriatim) the forms of relief requested by the Claimants and the Respondent in Track II of this arbitration, together with certain miscellaneous matters.

### *H: The Operative Part – Part X*

2.27 In Part X, the Tribunal sets out the Operative Part of this Award, derived from the Parties' requests for relief in Track II of this arbitration and consequential upon the Tribunal's earlier decisions in this and previous Awards, Orders and Decision.

**SA424**

# SA425

## PART III

## PRINCIPAL LEGAL AND OTHER TEXTS

### A: Introduction

3.1     For ease of reference later, it is here appropriate to cite in full the principal legal and other texts to which the Tribunal refers later in this Award; namely extracts from the Treaty, the UNCITRAL Arbitration Rules, the 1995-1998 Settlement and Release Agreements, the Universal Declaration on Human Rights, the International Covenant on Civil and Political Rights, the ILC Articles on State Responsibility, the 1985 UN Basic Principles on the Independence of the Judiciary, the 1998 Ecuadorian Constitution, the Ecuadorian Civil Code, the Ecuadorian Environmental Management Act 1999 and the Ecuadorian Collusion Prosecution Act.

### B: The Treaty

3.2     The Treaty between the United States of America and the Republic of Ecuador concerning the Encouragement and Reciprocal Protection of Investment (herein called the "Treaty") provides as follows.

3.3     *Preamble:* The Treaty's Preamble provides as follows:

> *"The United States of America and the Republic of Ecuador (hereinafter the "Parties");*
>
> *Desiring to promote greater economic cooperation between them, with respect to investment by nationals and companies of one Party in the territory of the other Party;*
>
> *Recognizing that agreement upon the treatment to be accorded such investment will stimulate the flow of private capital and the economic development of the Parties;*
>
> *Agreeing that fair and equitable treatment of investment is desirable in order to maintain a stable framework for investment and maximum effective utilization of economic resources;*

# SA426

*Recognizing that the development of economic and business ties can contribute to the wellbeing of workers in both Parties and promote respect for internationally recognized worker rights; and*

*Having resolved to conclude a Treaty concerning the encouragement and reciprocal protection of investment;*

*Have agreed as follows: ..."*

3.4    *Article I(1)*: Article I(1) of the Treaty provides, in material part, as follows:

"*For the purposes of this Treaty,*

(a)    "*investment" means every kind of investment in the territory of one Party owned or controlled directly or indirectly by nationals or companies of the other Party, such as equity, debt, and service and investment contracts; and includes:*

(i)    *tangible and intangible property, including rights, such as mortgages, liens and pledges;*

(ii)    *a company or shares of stock or other interests in a company or interests in the assets thereof;*

(iii)    *a claim to money or a claim to performance having economic value, and associated with an investment;*

(iv)    *intellectual property which includes, inter alia, rights relating to: ... and*

(v)    *any right conferred by law or contract, and any licences and permits pursuant to law;*

(b)    "*company" of a party means any kind of corporation, company, association, partnership, or other organization, legally constituted under the laws and regulations of a Party or a political subdivision thereof whether or not organized for pecuniary gain, or privately or governmentally owned or controlled; ..."*

3.5    *Article 1(3):* Article I(3) of the Treaty provides as follows:

"*Any alteration of the form in which assets are invested or reinvested shall not affect their character as investment.*"

# SA427

3.6    *Article II(3):* Article II(3) of the Treaty provides as follows:

> *"(a)    Investment shall at all times be accorded fair and equitable treatment, shall enjoy full protection and security and shall in no case be accorded treatment less than that required by international law.*
>
> *(b)    Neither Party shall in any way impair by arbitrary or discriminatory measures the management, operation, maintenance, use, enjoyment, acquisition, expansion, or disposal of investments. For purposes of dispute resolution under Articles VI and VII, a measure may be arbitrary or discriminatory notwithstanding the fact that a party has had or has exercised the opportunity to review such measures in the courts or administrative tribunals of a Party.*
>
> *(c)    Each Party shall observe any obligation it may have entered into with regard to investments."*

3.7    *Article II(7):* Article II(7) of the Treaty provides as follows:

> *"7. Each Party shall provide effective means of asserting claims and enforcing rights with respect to investment, investment agreements, and investment authorizations."*

3.8    *Article VI:* Article VI of the Treaty provides, in material part, as follows:

> *"1.    For purposes of this Article, an investment dispute is a dispute between a Party and a national or company of the other Party arising out of or relating to (a) an investment agreement between that Party and such national or company; (b) an investment authorization granted by that Party's foreign investment authority to such national or company; or (c) an alleged breach of any right conferred or created by this Treaty with respect to an investment.*
>
> *2.    In the event of an investment dispute, the parties to the dispute should initially seek a resolution through consultation and negotiation. If the dispute cannot be settled amicably, the national or company concerned may choose to submit the dispute, under one of the following alternatives, for resolution:*
>
> *(a)    to the courts or administrative tribunals of the Party that is a party to the dispute; or*
>
> *(b)    in accordance with any applicable, previously agreed dispute-settlement procedures; or*
>
> *(c)    in accordance with the terms of paragraph 3.*

# SA428

3.    (a) *Provided that the national or company concerned has not submitted the dispute for resolution under paragraph 2 (a) or (b) and that six months have elapsed from the date on which the dispute arose, the national or company concerned may choose to consent in writing to the submission of the dispute for settlement by binding arbitration: (iii) in accordance with the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL); ...*

4.    *Each Party hereby consents to the submission of any investment dispute for settlement by binding arbitration in accordance with the choice specified in the written consent of the national or company under paragraph 3. Such consent, together with the written consent of the national or company when given under paragraph 3 shall satisfy the requirement for: .. (b) an "agreement in writing" for purposes of Article II of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done at New York, June 10, 1958 ("New York Convention") ..."*

5.    *Any arbitration under paragraph 3(a) (ii), (iii) or (iv) of this Article shall be held in a state that is a party to the New York Convention.*

6.    *Any arbitral award rendered pursuant to this Article shall be final and binding on the parties to the dispute. Each Party undertakes to carry out without delay the provisions of any such award and to provide in its territory for its enforcement ..."*

3.9    *Article XI*: Article XI of the Treaty provides:

   "*This Treaty shall apply to the political subdivisions of the Parties.*"

3.10    *Article XII(1):* Article XII(1) of the Treaty provides, in material part, as follows:

   "*This Treaty ... shall apply to investments existing at the time of entry into force as well as to investments made or acquired hereafter.*"

   ### C: The UNCITRAL Arbitration Rules

3.11    *Article 20:* Article 20 of the UNCITRAL Arbitration Rules, "Amendment", provides (inter alia) as follows:

   "*During the course of the arbitral proceedings either party may amend or supplement his claim or defence unless the arbitral tribunal considers it inappropriate to allow such amendment having regard to the delay in making it or prejudice to the other party or any other circumstance. However, a claim may not be amended in such a manner that the amended claim falls outside the scope of the arbitration clause or separate arbitration agreement.*"

# SA429

3.12    *Article 24(1):* Article 24(1) of the UNCITRAL Arbitration Rules provides as follows:

> *"Each party shall have the burden of proving the facts relied on to support his claim or defence."*

3.13    *Article 27*: Article 27 of the UNCITRAL Arbitration Rules, "Experts", provides as follows:

> *"1.    The arbitral tribunal may appoint one or more experts to report to it, in writing, on specific issues to be determined by the tribunal. A copy of the expert's terms of reference, established by the arbitral tribunal, shall be communicated to the parties.*
>
> *2.    The parties shall give the expert any relevant information or produce for his inspection any relevant documents or goods that he may require of them. Any dispute between a party and such expert as to the relevance of the required information or production shall be referred to the arbitral tribunal for decision.*
>
> *3.    Upon receipt of the expert's report, the arbitral tribunal shall communicate a copy of the report to the parties who shall be given the opportunity to express, in writing, their opinion on the report. A party shall be entitled to examine any document on which the expert has relied in his report.*
>
> *4.    At the request of either party the expert, after delivery of the report, may be heard at a hearing where the parties shall have the opportunity to be present and to interrogate the expert. At this hearing either party may present expert witnesses in order to testify on the points at issue. The provisions of article 25 shall be applicable to such proceedings."*

3.14    *Article 32*: Article 32 of the UNCITRAL Arbitration Rues, "Form and Effect of the Award", provides (inter alia) as follows:

> *"1.    In addition to making a final award, the arbitral tribunal shall be entitled to make interim, interlocutory, or partial awards.*
>
> *2.    The award shall be made in writing and shall be final and binding on the parties. The parties undertake to carry out the award without delay. ...*
>
> *5.    The award may be made public only with the consent of both parties. ...*
>
> *7.    If the arbitration law of the country where the award is made requires that the award be filed or registered by the arbitral tribunal, the tribunal shall comply with this requirement within the period of time required by law."*

# SA430

*D: The 1995-1998 Settlement and Release Agreements*

3.15    The term "1995-1998 Settlement and Release Agreements" as generally used in this Award (save where the context requires otherwise) comprises three sets of contractual documentation: (i) the 1995 Settlement Agreement of 4 May 1995; (ii) the 1996 Municipal and Provincial Releases; and (iii) the 1998 Final Release.[1] This documentation was made in Spanish; and the citations below are all English translations.

3.16    (*1) The 1995 Settlement Agreement*: On 4 May 1995, the Respondent acting by its Ministry of Energy and Mining ("the Ministry") and PetroEcuador as "one Party" and TexPet as "the other party" initialled and signed a written agreement entitled "Contract for Implementing of Environmental, Remedial Work and Release from Obligations, Liability and Claims".

3.17    The 1995 Settlement Agreement was made on the Ministry's headed note-paper with the Respondent's coat-of-arms; and it was signed for that Ministry by the Minister of Energy and Mines. It was also signed by a senior officer of PetroEcuador and two representatives of TexPet (now, but not then, indirectly owned by Chevron): Dr Ricardo Reis Veiga and Mr Rodrigo Pérez Pallares.

3.18    The 1995 Settlement Agreement provided in the final two paragraphs of its preamble that TexPet agreed to undertake the "Environmental Remedial Work in consideration for being released and discharged of all its legal and contractual obligations and liability for Environmental Impact arising out of the Consortium's operations." By Article 1.3, the term "Environmental Impact" included: "[a]ny solid, liquid, or gaseous substance present or released into the environment in such concentration or condition, the presence or release of which causes, or has the potential to cause harm to human health or the environment."

3.19    As contemplated in the earlier 1994 MOU between the same signatory parties (which was to be substituted and become void by Article 9.6 and the last paragraph of Annex "A" of the 1995 Settlement Agreement), the 1995 Settlement Agreement, subject to its terms: (i) released TexPet from the Respondent's and PetroEcuador's claims based upon Environmental Impact (except for claims related to TexPet's performance of the Scope

---

[1] These documents were more fully set out and considered in the Tribunal's First Partial Award, which also contained a copy of the full version of the Settlement Agreement as signed by the parties (in Spanish).

of Work); and (ii) provided that TexPet would be released from all remaining environmental liability upon completion of the remediation obligations described in that Scope of Work.

3.20 Article 1.12 of the 1995 Settlement Agreement defined such release, as follows:

> *"The release, under the provisions of Article V of this Contract, of all legal and contractual obligations and liability, towards the Government and Petroecuador, for the Environmental Impact arising from the Operations of the Consortium, including any claims that the Government and Petroecuador have, or may have against Texpet, arising out of the Consortium Agreements."*

3.21 The term "Operations of the Consortium" was defined as "Those oil exploration and production operations carried out under the Consortium Agreement", i.e. the 1973 Concession Agreement.

3.22 Article 5.1 of the 1995 Settlement Agreement ("Article V") provides (inter alia), in material part:

> *"On the execution date of this Contract [i.e. 4 May 1995], and in consideration of Texpet's agreement to perform the Environmental Remedial Work in accordance with the Scope of Work set out in Annex A, and the Remedial Action Plan, the Government and Petroecuador shall hereby release, acquit and forever discharge Texpet, Texaco Petroleum Company, Compañia Texaco de Petróleos del Ecuador, S.A., Texaco Inc., and all their respective agents, servants, employees, officers, directors, legal representatives, insurers, attorneys, indemnitors, guarantors, heirs, administrators, executors, beneficiaries, successors, predecessors, principals and subsidiaries (hereinafter referred to as 'the Releasees') of all the Government's and Petroecuador's claims against the Releasees for Environmental Impact arising from the Operations of the Consortium, except for those related to the obligations contracted hereunder for the performance by Texpet of the Scope of Work (Annex A) ..."*

3.23 The Ecuadorian Government's "claims" were addressed in Article 5.2. It provides:

> *"The Government and Petroecuador intend claims to mean any and all claims, rights to Claims, debts, liens, common or civil law or equitable causes of actions and penalties, whether sounding in contract or tort, constitutional, statutory, or regulatory causes of action and penalties (including, but not limited to, causes of action under Article 19-2 of the Political Constitution of the Republic of Ecuador, Decree No. 1459 of 1971, Decree No. 925 of 1973, the Water Act, R.O. 233 of 1973, ORO No. 530 of 1974, Decree No. 374 of 1976, Decree No. 101 of 1982, or Decree No. 2144 of 1989, or any other applicable law or regulation of the Republic of Ecuador), costs, lawsuits, settlements and attorneys' fees (past, present, future, known or unknown), that the Government or Petroecuador have, or ever may have*

*against each Releasee for or in any way related to contamination, that have or ever may arise in the future, directly or indirectly arising out of Operations of the Consortium, including but not limited to consequences of all types of injury that the Government or Petroecuador may allege concerning persons, properties, business, reputations, and all other types of injuries that may be measured in money, including but not limited to, trespass, nuisance, negligence, strict liability, breach of warranty, or any other theory or potential theory of recovery."*

3.24    The reference in Article 5.2 to Article 19-2 of the Ecuadorian Constitution (being the 1978 Constitution effective in 1979 and, as later amended, in force in 1995) signified a cause of action available to the Respondent under Title II, Section 1 (On the Rights of People/Individuals)[2] whereby the Ecuadorian State guaranteed to each person, inter alia (in English translation): "… the right to live in an environment that is free from contamination. It is the duty of the State to ensure that this right is not negatively affected and to foster the preservation of nature …". The reference to Decree No. 374 of 1976 signified a cause of action available to the Respondent on the prevention and control of pollution. The reference to the Water Act of 1973 and Decree No. 2144 of 1989 signified causes of action available to the Respondent in regard to water resources and water contamination. The reference to ORO No 530 signified the Regulations for the Exploration and Exploration of Hydrocarbons of 9 April 1974.

3.25    (ii) *The 1996 Municipal and Provincial Releases*: As provided by Annex "A" to the Settlement Agreement, TexPet subsequently settled disputes with the four municipalities of the Oriente Region (Sushufindi, Francisco de Orellana (Coca), Lago Agrio and Loya de los Sachas), under written agreements made with these municipalities, as also the Province of Sucumbíos and the Napo consortium of municipalities (the "1996 Municipal and Provincial Releases").

3.26    Under these six settlements, four of which were approved by the Ecuadorian Courts owing to their nature as extant litigious disputes, TexPet, together with non-signatory parties, were released from liability to these municipalities for the Consortium's activities in the area of the concession. The 1996 Municipal and Provincial Releases provided (inter alia) for releases in somewhat different terms from Article 5.1 of the Settlement Agreement.

---

[2] As recorded in the Tribunal's First Partial Award, the Claimants translate the Spanish term "las personas" as "people" or "persons"; and the Respondent as "individuals" and "persons". For present purposes, the difference is immaterial.

3.27    (iii) *The 1998 Final Release*: On 30 September 1998, pursuant to the Settlement Agreement, the Respondent (acting by its Minister of Energy and Mines), PetroEcuador, PetroProduccion and TexPet executed the "Acta Final" (or Final Release), certifying that TexPet had performed all its obligations under the 1995 Settlement Agreement and, in accordance with its terms, releasing TexPet from (as specified) any environmental liability arising from the Consortium's operations.

3.28    Article IV of the Final Release provided (inter alia) in material part as follows:

> " ... *The Government and PetroEcuador proceed to release, absolve and discharge TexPet, Texas Petroleum Company, Compañia Texaco de Petróleos del Ecuador, S.A., Texaco Inc., and all their respective agents, servants, employees, officers, directors, legal representatives, insurers, attorneys, indemnitors, guarantors, heirs, administrators, executors, beneficiaries, successors, predecessors, principals, subsidiaries forever, from any liability and claims by the Government of the Republic of Ecuador, PetroEcuador and its Affiliates, for items related to the obligations assumed by TexPet in the aforementioned Contract [the 1995 Settlement Agreement] ....*"

3.29    The wording of the release in Article IV of the Final Release is materially the same linguistically as the wording Article 5.1 of the Settlement Agreement.

### *E: The Universal Declaration of Human Rights*

3.30    *Article 10*: Article 10 of the Universal Declaration of Human Rights reads as follows:

> "*Everyone is entitled in full equality to a fair and public hearing by an independent and impartial tribunal, in the determination of his rights and obligations and of any criminal charge against him.*"

### *F: The International Covenant on Civil and Political Rights*

3.31    *Article 2*: Article 2 of the International Covenant on Civil and Political Rights provides as follows:

> "*1. Each State Party to the present Covenant undertakes to respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status.*
>
> *2. Where not already provided for by existing legislative or other measures, each State Party to the present Covenant undertakes to take the necessary steps, in*

# SA434

*accordance with its constitutional processes and with the provisions of the present Covenant, to adopt such laws or other measures as may be necessary to give effect to the rights recognized in the present Covenant.*

*3. Each State Party to the present Covenant undertakes:*

*(a)   To ensure that any person whose rights or freedoms as herein recognized are violated shall have an effective remedy, notwithstanding that the violation has been committed by persons acting in an official capacity;*

*(b)   To ensure that any person claiming such a remedy shall have his right thereto determined by competent judicial, administrative or legislative authorities, or by any other competent authority provided for by the legal system of the State, and to develop the possibilities of judicial remedy;*

*(c)   To ensure that the competent authorities shall enforce such remedies when granted."*

3.32   *Article 14*: Article 14 of the International Covenant on Civil and Political Rights provides, in material part:

> *"All persons shall be equal before the courts and tribunals. In the determination of any criminal charge against him, or of his rights and obligations in a suit at law, everyone shall be entitled to a fair and public hearing by a competent, independent and impartial tribunal established by law."*

### G: The ILC Articles on State Responsibility

3.33   *Article 16*: Article 16 of the ILC Articles on State Responsibility, "Aid or assistance in the commission of an internationally wrongful act", provides as follows:

> *"A State which aids or assists another State in the commission of an internationally wrongful act by the latter is internationally responsible for doing so if:*

*(a)   that State does so with knowledge of the circumstances of the internationally wrongful act; and*

*(b)   the act would be internationally wrongful if committed by that State."*

3.34   *Article 28*: Article 28 of the ILC Articles on State Responsibility, "Legal consequences of an internationally wrongful act", provides as follows:

> *"The international responsibility of a State which is entailed by an internationally wrongful act in accordance with the provisions of part one involves legal consequences as set out in this part."*

# SA435

3.35   *Article 29*: Article 29 of the ILC Articles on State Responsibility, "Continued duty of performance", provides as follows:

> *"The legal consequences of an internationally wrongful act under this part do not affect the continued duty of the responsible State to perform the obligation breached."*

3.36   *Article 30*: Article 30 of the ILC Articles on State Responsibility, "Cessation and non-repetition", provides as follows:

> *"The State responsible for the internationally wrongful act is under an obligation:*
>
> *(a)      to cease that act, if it is continuing;*
>
> *(b)      to offer appropriate assurances and guarantees of non-repetition, if circumstances so require."*

3.37   *Article 31*: Article 31 of the ILC Articles on State Responsibility, "Reparation", provides as follows:

> *"1. The responsible State is under an obligation to make full reparation for the injury caused by the internationally wrongful act.*
>
> *2. Injury includes any damage, whether material or moral, caused by the internationally wrongful act of a State."*

3.38   *Article 32*: Article 32 of the ILC Articles on State Responsibility, "Irrelevance of internal law", provides as follows:

> *"The responsible State may not rely on the provisions of its internal law as justification for failure to comply with its obligations under this part."*

3.39   *Article 33*: Article 33 of the ILC Articles on State Responsibility, "Scope of international obligations set out in this part", provides as follows:

> *"1. The obligations of the responsible State set out in this part may be owed to another State, to several States, or to the international community as a whole, depending in particular on the character and content of the international obligation and on the circumstances of the breach.*
>
> *2. This part is without prejudice to any right, arising from the international responsibility of a State, which may accrue directly to any person or entity other than a State."*

# SA436

3.40   *Article 34*: Article 34 of the ILC Articles on State Responsibility, "Forms of Reparation", provides as follows:

> *"Full reparation for the injury caused by the internationally wrongful act shall take the form of restitution, compensation and satisfaction, either singly or in combination, in accordance with the provisions of this chapter."*

3.41   *Article 35*: Article 35 of the ILC Articles on State Responsibility, "Restitution", provides as follows:

> *"A State responsible for an internationally wrongful act is under an obligation to make restitution, that is, to re-establish the situation which existed before the wrongful act was committed, provided and to the extent that restitution:*
>
> *(a)      is not materially impossible;*
>
> *(b)      does not involve a burden out of all proportion to the benefit deriving from restitution instead of compensation."*

3.42   *Article 36*: Article 36 of the ILC Articles on State Responsibility, "Compensation", provides as follows:

> *"1. The State responsible for an internationally wrongful act is under an obligation to compensate for the damage caused thereby, insofar as such damage is not made good by restitution.*
>
> *2. The compensation shall cover any financially assessable damage including loss of profits insofar as it is established."*

3.43   *Article 37*: Article 37 of the ILC Articles on State Responsibility, "Satisfaction", provides as follows:

> *"1. The State responsible for an internationally wrongful act is under an obligation to give satisfaction for the injury caused by that act insofar as it cannot be made good by restitution or compensation.*
>
> *2. Satisfaction may consist in an acknowledgement of the breach, an expression of regret, a formal apology or another appropriate modality.*
>
> *3. Satisfaction shall not be out of proportion to the injury and may not take a form humiliating to the responsible State."*

# SA437

3.44    *Article 38*: Article 38 of the ILC Articles on State Responsibility, "Interest", provides as follows:

> "1. *Interest on any principal sum due under this chapter shall be payable when necessary in order to ensure full reparation. The interest rate and mode of calculation shall be set so as to achieve that result.*
>
> 2. *Interest runs from the date when the principal sum should have been paid until the date the obligation to pay is fulfilled.*"

3.45    *Article 39*: Article 39 of the ILC Articles on State Responsibility, "Contribution to the Injury", provides as follows:

> "*In the determination of reparation, account shall be taken of the contribution to the injury by wilful or negligent action or omission of the injured State or any person or entity in relation to whom reparation is sought.*"

### H: The UN Basic Principles on the Independence of the Judiciary[3]

3.46    *UN Basic Principles*: The Basic Principles on the Independence of the Judiciary, adopted by the Seventh United Nations Congress on the Prevention of Crime and the Treatment of Offenders held at Milan from 26 August to 6 September 1985 and endorsed by General Assembly Resolutions 40/32 of 29 November 1985 and 40/146 of 13 December 1985, provides (inter alia) as follows:

> "1. *The independence of the judiciary shall be guaranteed by the State and enshrined in the Constitution or the law of the country. It is the duty of all governmental and other institutions to respect and observe the independence of the judiciary.*
>
> 2. *The judiciary shall decide matters before them impartially, on the basis of facts and in accordance with the law, without any restrictions, improper influences, inducements, pressures, threats or interferences, direct or indirect, from any quarter or for any reason.*
>
> 3. *The judiciary shall have jurisdiction over all issues of a judicial nature and shall have exclusive authority to decide whether an issue submitted for its decision is within its competence as defined by law.*
>
> 4. *There shall not be any inappropriate or unwarranted interference with the judicial process, nor shall judicial decisions by the courts be subject to revision. This principle is without prejudice to judicial review or to mitigation or*

---

[3] CLA-293.

# SA438

*commutation by competent authorities of sentences imposed by the judiciary, in accordance with the law.*

*5. Everyone shall have the right to be tried by ordinary courts or tribunals using established legal procedures. Tribunals that do not use the duly established procedures of the legal process shall not be created to displace the jurisdiction belonging to the ordinary courts or judicial tribunals.*

*6. The principle of the independence of the judiciary entitles and requires the judiciary to ensure that judicial proceedings are conducted fairly and that the rights of the parties are respected.*

*7. It is the duty of each Member State to provide adequate resources to enable the judiciary to properly perform its functions."*

### I: The Ecuadorian Constitution

3.47    *Article 19-2:* Article 19-2 of the 1998 Ecuadorian Constitution provides:

> "Notwithstanding other rights which are necessary for the full moral and material development that is derived from the nature of the person, the State guarantees: ... 2. The right to live in an environment free of pollution. It is the duty of the State to ensure that this right is not affected and to promote the preservation of nature. The law shall establish the limitations on the exercising of certain rights and freedoms, to protect the environment;"

> *(In the original Spanish: "Sin perjuicio de otros derechos necesarios para el pleno desenvolvimiento moral y material que se deriva de la naturaleza de la persona, el Estado le garantiza: (...) 2. El derecho de vivir en un medio ambiente libre de contaminación. Es deber del Estado velar para que este derecho no sea afectado y tutelar la preservación de la naturaleza. La ley establecerá las restricciones al ejercicio de determinados derechos o libertades, para proteger el medio ambiente;").*

3.48    *Article 23(15):* Article 23(15) of the 1998 Ecuadorian Constitution provides:

> "Without prejudice to the rights established in the Constitution and the international instruments currently in force, the State recognizes and guarantees the following to the people: ... 15. The right to file complaints and petitions to the authorities, but under no circumstances on behalf of the people, and to receive attention or relevant responses within an appropriate period."

> *(In the original Spanish: "Sin perjuicio de los derechos establecidos en esta Constitución y en los instrumentos internacionales vigentes, el Estado reconocerá y garantizará a las personas los siguientes : (...) 15. El derecho a dirigir quejas y peticiones a las autoridades, pero en ningún caso en nombre del pueblo; y a recibir la atención o las respuestas pertinentes, en el plazo adecuado.").*

## SA439

3.49    *Article 75:* Article 75 of the 2008 Ecuadorian Constitution provides:

> "Each individual has the right to free access to justice and effective, impartial and expeditious protection of his rights and interests, subject to the principles of immediacy and celerity. In no case a person shall be left defenseless. Noncompliance with judgments shall be punished by law."

> *(In the original Spanish: "Toda persona tiene derecho al acceso gratuito a la justicia y a la tutela efectiva, imparcial y expedita de sus derechos e intereses, con sujeción a los principios de inmediación y celeridad; en ningún caso quedará en indefensión. El incumplimiento de las resoluciones judiciales será sancionado por la ley.").*

3.50    *Article 76(7)(k):* Article 76(7)(k) of the 2008 Ecuadorian Constitution provides:

> "The right of persons to a defense shall include the following guarantees: ... k) To be judged by an independent, impartial and competent judge. No one shall be judged by extraordinary courts or special commissions created for this purpose."

> *(In the original Spanish: "El derecho de las personas a la defensa incluirá las siguientes garantías: (...) k) Ser juzgado por una jueza o juez independiente, imparcial y competente. Nadie será juzgado por tribunales de excepción o por comisiones especiales creadas para el efecto.").*

### J: The Ecuadorian Civil Code[4]

3.51    *Article 7:* Article 7 of the Civil Code provides:

> "The law does not provide except for the future; it has no retroactive effect; and when a later law conflicts with a prior law, the following rules shall be observed: ...

> 18. The laws in effect when a contract is executed shall be deemed incorporated into such contract.

> This provision shall not apply to: (1) laws about how to sue for rights resulting from the contract and (2) laws indicating penalties for a violation of the contractual provisions, since the violation will be punished in accordance with the law under which it was committed;

> ...

> 20. Laws concerning the hearing of and procedure in lawsuits shall prevail over prior laws from the time at which they take effect. But time periods that have already

---

[4] As of 24 June 2005 (RLA-163). See also C-34.

# SA440

*begun to run, and any proceedings that have already commenced, shall be governed by the law that was in effect at that time;"*

*(In the original Spanish: "La ley no dispone sino para lo venidero: no tiene efecto retroactivo; y en conflicto de una ley posterior con otra anterior, se observarán las reglas siguientes: (...)*

*18. En todo contrato se entenderán incorporadas las leyes vigentes al tiempo de su celebración.*

*Exceptúanse de esta disposición: 1ro., las leyes concernientes al modo de reclamar en juicio los derechos que resultaren del contrato; y, 2., las que señalan penas para el caso de infracción de lo estipulado en los contratos; pues ésta será castigada con arreglo a la ley bajo la cual se hubiere cometido;*

*(...)*

*20. Las leyes concernientes a la sustanciación y ritualidad de los juicios, prevalecen sobre las anteriores desde el momento en que deben comenzar a regir. Pero los términos que hubieren comenzado a correr, y las actuaciones y diligencias que ya estuvieren comenzadas, se regirán por la ley que estuvo entonces vigente;").*

3.52   *Article 18:* Article 18 of the Civil Code provides:

*"Judges shall not suspend or deny the administration of justice because of the obscurity or lack of a law. In such cases, they shall adjudicate in accordance with the following rules:*

*1. When the meaning of the law is clear, they shall not disregard its literal meaning, on the pretext of determining the spirit of the law.*

*However, to interpret an obscure provision of a law, they may indeed resort to its intent or spirit as clearly manifested in the law itself, or to the trustworthy history of the law's establishment;*

*2. The words in the law shall be understood in their natural and obvious meaning, in accordance with the general use of the words themselves, but when the legislator has expressly defined them for certain subjects, the words shall be given their legal meaning;*

*3. The technical words from any science or art shall be taken in the meaning given to them by those practicing the same science or art; unless it clearly appears that they have been taken to mean something different;*

*4. The context of a law shall be used to interpret the meaning of each of its parts, so that the due connection and harmony exists among all of them.*

## SA441

*Obscure passages in a law may be illustrated by means of other laws, particularly if they deal with the same topic;*

*5. The favorable or odious aspect of a provision shall not be taken into account to broaden or restrict its interpretation. The scope that shall be given to any law shall be determined through its genuine meaning and in accordance with the foregoing rules of interpretation.*

*6. In cases where the foregoing rules of interpretation cannot be applied, obscure or contradictory passages shall be interpreted in the manner that is most consistent with the general spirit of the law and natural fairness; and,*

*7. If there is no law, the laws governing analogous cases shall be applied, and if there are no such laws, then the general principles of universal law shall be used."*

*(In the original Spanish: "Los jueces no pueden suspender ni denegar la administración de justicia por oscuridad o falta de ley. En tales casos juzgarán atendiendo a las reglas siguientes:*

*1a.- Cuando el sentido de la ley es claro, no se desatenderá su tenor literal, a pretexto de consultar su espíritu.*

*Pero bien se puede, para interpretar una expresión oscura de la ley, recurrir a su intención o espíritu claramente manifestados en ella misma, o en la historia fidedigna de su establecimiento;*

*2a.- Las palabras de la ley se entenderán en su sentido natural y obvio, según el uso general de las mismas palabras; pero cuando el legislador las haya definido expresamente para ciertas materias, se les dará en éstas su significado legal;*

*3a.- Las palabras técnicas de toda ciencia o arte se tomarán en el sentido que les den los que profesan la misma ciencia o arte, a menos que aparezca claramente que se han tomado en sentido diverso;*

*4a.- El contexto de la ley servirá para ilustrar el sentido de cada una de sus partes, de manera que haya entre todas ellas la debida correspondencia y armonía.*

*Los pasajes oscuros de una ley pueden ser ilustrados por medio de otras leyes, particularmente si versan sobre el mismo asunto;*

*5a.- Lo favorable u odioso de una disposición no se tomará en cuenta para ampliar o restringir su interpretación. La extensión que deba darse a toda ley se determinará por su genuino sentido y según las reglas de interpretación precedentes;*

*6a.- En los casos a que no pudieren aplicarse las reglas de interpretación precedentes, se interpretarán los pasajes oscuros o contradictorios del modo que*

## SA442

*más conforme parezca al espíritu general de la legislación y a la equidad natural; y,*

*7a.- A falta de ley, se aplicarán las que existan sobre casos análogos; y no habiéndolas, se ocurrirá a los principios del derecho universal.").*

3.53    *Article 1530:* Article 1530 of the Civil Code provides:

*"The creditor can act against all the joint and several debtors jointly, or against any of them, at his discretion, without the latter being able to oppose the benefit of division."*

*(In the original Spanish: "El acreedor podrá dirigirse contra todos los deudores solidarios juntamente, o contra cualquiera de ellos a su arbitrio, sin que por éste pueda oponérsele el beneficio de división.").*

3.54    *Article 1538:* Article 1538 of the Civil Code provides:

*"The joint and several debtor who has paid the debt, or has canceled it through any of the means equivalent to payment, remains subrogated in the creditor's legal action with all his privileges and securities, but is limited, vis-a-vis each of the co-debtors, to this co-debtor's part or share of the debt."*

*(In the original Spanish: "El deudor solidario que ha pagado la deuda, o la ha extinguido por alguno de los medios equivalentes al pago, queda subrogado en la acción del acreedor con todos sus privilegios y seguridades; pero limitada, respecto de cada uno de los codeudores, a la parte o cuota que tenga este codeudor en la deuda.").*

3.55    *Article 1561:* Article 1561 of the Civil Code provides:

*"Every contract legally executed is the law for the contracting parties and cannot be invalidated except by the mutual agreement of the parties or for legal reasons."*

*(In the original Spanish: "Todo contrato legalmente celebrado es una ley para los contratantes, y no puede ser invalidado sino por su consentimiento mutuo o por causas legales.").*

3.56    *Article 1562:* Article 1562 of the Civil Code provides:

*"Contracts should be performed in good faith, and thus obligate, not only what is expressly provided for, but all things that precisely emanate from the nature of the obligation whether by law or custom."*

*(In the original Spanish: "Los contratos deben ejecutarse de buena fe, y por consiguiente obligan, no sólo a lo que en ellos se expresa, sino a todas las cosas*

*que emanan precisamente de la naturaleza de la obligación, o que, por la ley o la costumbre, pertenecen a ella.").*

3.57   *Article 1572:* Article 1572 of the Civil Code provides:

"*Damages include consequential damages and lost profit, regardless of whether they result from failure to comply with the obligation, or improper performance of the obligation or delay in the performance. The foregoing rule does not apply to cases in which the law limits the damages to consequential damages. It also does not apply to damages for pain and suffering as granted by Title XXXIII of Book IV of this Code.*"

*(In the original Spanish: "La indemnización de perjuicios comprende el daño emergente y el lucro cesante, ya provengan de no haberse cumplido la obligación, o de haberse cumplido imperfectamente, o de haberse retardado el cumplimiento. Exceptúanse los casos en que la ley la limita al daño emergente. Exceptúanse también las indemnizaciones por daño moral determinadas en el Título XXXIII del Libro IV de este Código.").*

3.58   *Article 2214:* Article 2214 of the Civil Code provides:

"*Whoever commits an offense or tort resulting in harm to another shall indemnify the affected party, without detriment to the penalty provided by law for such offense or tort.*"

*(In the original Spanish: "El que ha cometido un delito o cuasidelito que ha inferido daño a otro, está obligado a la indemnización; sin perjuicio de la pena que le impongan las leyes por el delito o cuasidelito.").*

3.59   *Article 2217:* Article 2217 of the Civil Code provides:

"*If an intentional or unintentional tort has been committed by two or more persons, each of them shall be joint and severally liable for any damage stemming from the same intentional or unintentional tort, except for the exceptions in Articles 2223 and 2228.*"

*(In the original Spanish: "Si un delito o cuasidelito ha sido cometido por dos o más personas, cada una de ellas será solidariamente responsable de todo perjuicio procedente del mismo delito o cuasidelito, salvo las excepciones de los Arts. 2223 y 2228.").*

3.60   *Article 2229:* Article 2229 of the Civil Code provides:

"*As a general rule, all damages that can be attributed to malice or negligence by another person must be compensated for by that person. Individuals especially obligated to this compensation include: 1. An individual who causes fires or explosions recklessly; 2. An individual who recklessly shoots a firearm; 3. An*

# SA444

*individual who removes flagstones from a trench or pipe in the street or along a road without necessary precautions to prevent those traveling during the day or night from falling; 4. An individual who, obligated to build or repair an aqueduct or bridge that crosses a road, maintains it in such a state that it causes injury to those who cross it; and, 5. An individual who manufactures and circulates products, objects, or devices that cause accidents due to construction or manufacturing defects, shall be held liable for the respective damages."*

*(In the original Spanish: "Por regla general todo daño que pueda imputarse a malicia o negligencia de otra persona debe ser reparado por ésta. Están especialmente obligados a esta reparación: 1. El que provoca explosiones o combustión en forma imprudente; 2. El que dispara imprudentemente una arma de fuego; 3. El que remueve las losas de una acequia o cañería en calle o camino, sin las precauciones necesarias para que no caigan los que por allí transitan de día o de noche; 4. El que, obligado a la construcción o reparación de un acueducto o puente que atraviesa un camino, lo tiene en estado de causar daño a los que transitan por él; y, 5. El que fabricare y pusiere en circulación productos, objetos o artefactos que, por defectos de elaboración o de construcción, causaren accidentes, responderá de los respectivos daños y perjuicios.").*

3.61   *Article 2236:* Article 2236 of the Civil Code provides:

> *"As a general rule, a popular action is granted in all cases of contingent harm which, due to recklessness or negligence of a party threatens undetermined persons. But if the harm threatened only determined persons, only one of these may pursue the action."*

> *(In the original Spanish: "Por regla general se concede acción popular en todos los casos de daño contingente que por imprudencia o negligencia de alguno amenace a personas indeterminadas. Pero si el daño amenazare solamente a personas determinadas, sólo alguna de éstas podrá intentar la acción.").*

### K: The Ecuadorian Code of Civil Procedure

3.62   *Article 355(3):* Article 355(3) of the Code of Civil Procedure (now re-numbered Article 346(3)) provides:

> *"Substantive formalities which are common to all proceedings and instances, are: ... 3. Legal capacity;"*

> *(In the original Spanish: "Son solemnidades sustanciales comunes a todos los juicios e instancias: (...) 3. Legitimidad de personería;").*

# SA445

*L: The Environmental Management Act (EMA)*

3.63     *Article 1:* Article 1 of the Environmental Management Act 1999 provides:

> "This Act establishes the principles and guidelines for environmental policy, determines the obligations, responsibilities and levels of participation of the public and the private sectors in environmental management and indicates the permissible limits, controls and punishments in this field."

> *(In the original Spanish: "La presente Ley establece los principios y directrices de política ambiental; determina las obligaciones, responsabilidades, niveles de participación de los sectores público y privado en la gestión ambiental y señala los límites permisibles, controles y sanciones en esta materia.").*

3.64     *Article 2:* Article 2 of the Environmental Management Act 1999 provides:

> "Environmental management is subject to the principles of solidarity, mutual responsibility, cooperation, coordination, recycling and reutilization of waste, use of environmentally sustainable alternative technologies and respect for traditional cultures and practices."

> *(In the original Spanish: "La gestión ambiental se sujeta a los principios de solidaridad, corresponsabilidad, cooperación, coordinación, reciclaje y reutilización de desechos, utilización de tecnologías alternativas ambientalmente sustentables y respecto a las culturas y prácticas tradicionales.").*

3.65     *Article 41:* Article 41 of the Environmental Management Act 1999 provides:

> "In order to protect individual or collective environmental rights, a public action is hereby granted to individuals and legal entities or human groups to denounce the violation of environmental rules without prejudice to the action for constitutional protection provided for in the Political Constitution of the Republic."

> *(In the original Spanish: "Con el fin de proteger los derechos ambientales individuales o colectivos, concédese acción pública a las personas naturales, jurídicas o grupo humano para denunciar la violación de las normas de medio ambiente, sin perjuicios de la acción de amparo constitucional previsto en la Constitución Política de la República.").*

3.66     *Article 42:* Article 42 of the Environmental Management Act 1999 provides:

> "Any individual, legal entity or human group can be heard in criminal, civil, or administrative proceedings filed for violations of an environmental nature, after posting a slander bond even if their own rights have not been violated.

# SA446

*The President of the Superior Court of the place where the harm to the environment occurred shall have jurisdiction to hear the actions that may be brought as a result of such harm. If the harm covers various jurisdictions, any of the presidents of the superior courts of those jurisdictions shall have jurisdiction."*

*(In the original Spanish: Toda persona natural, jurídica o grupo humano podrá ser oída en los procesos penales, civiles o administrativos, previa fianza de calumnia, que se inicien por infracciones de carácter ambiental, aunque no haya sido vulnerados sus propios derechos.*

*El Presidente de la Corte Superior del lugar en que se produzca la afectación ambiental será el competente para conocer las acciones que se propongan a consecuencia de la misma. Si la afectación comprende varias jurisdicciones, la competencia corresponderá a cualquiera de los presidentes de las cortes superiores de esas jurisdicciones.").*

3.67    *Article 43:* Article 43 of the Environmental Management Act 1999 provides:

*"The individuals, legal entities or human groups linked by a common interest and affected directly by the harmful act or omission may file before the court with jurisdiction actions for damages and for deterioration caused to health or the environment, including biodiversity and its constituent elements.*

*Without prejudice to any other legal actions that might be available, the judge shall order the party responsible for the damage to pay compensation in favor of the community directly affected and to repair the harm and damage caused. The judge shall also order the responsible party to pay ten percent (10%) of the value of the compensation in favor of the plaintiff.*

*Without prejudice to these payments, and in the event that the community directly affected cannot be identified or such community is the entire community, the judge shall order that payment of damages be made to the institution that performs the remediation work, in accordance with this law.*

*In any event, the judge shall determine in his ruling, in accordance with the experts' reports that may be ordered, the amount required to remediate the damage caused and the amount to be given to the members of the community directly affected. The judge shall also determine the individual or legal entity that shall receive payment and perform the remediation work.*

*Claims for damages originating from harm to the environment shall be heard in verbal summary proceedings."*

*(In the original Spanish: "Las personas naturales, jurídicas o grupos humanos, vinculados por un interés común y afectados directamente por la acción u omisión dañosa podrán interponer ante el Juez competente, acciones por daños y perjuicios*

# SA447

*y por el deterioro causado a la salud o al medio ambiente incluyendo la biodiversidad con sus elementos constitutivos.*

*Sin perjuicio de las demás acciones legales a que hubiere lugar, el juez condenará al responsable de los daños al pago de indemnizaciones a favor de la colectividad directamente afectada y a la reparación de los daños y perjuicios ocasionados. Además condenará al responsable al pago del diez por ciento (10%) del valor que represente la indemnización a favor del accionante.*

*Sin perjuicio de dichos pagos y en caso de no ser identificable la comunidad directamente afectada o de constituir ésta el total de la comunidad, el juez ordenará que el pago que por reparación civil corresponda se efectúe a la institución que debe emprender las labores de reparación conforme a esta Ley.*

*En todo caso, el juez determinará en sentencia, conforme a los peritajes ordenados, el monto requerido para la reparación del daño producido y el monto a ser entregado a los integrantes de la comunidad directamente afectada. Establecerá además la persona natural o jurídica que deba recibir el pago y efectuar las labores de reparación.*

*Las demandas por daños y perjuicios originados por una afectación al ambiente, se tramitarán por la vía verbal sumaria.").*

### M: The Collusion Prosecution Act (CPA)

3.68    *Article 1:* Article 1 of the Collusion Prosecution Act provides:

> *"Any person who has suffered harm, in any way, by a collusive procedure or act, e.g., if he/she has been deprived of the ownership, possession or occupancy of a piece of real property, or of any right in rem of use, usufruct, occupancy, easement or antichresis over such piece of real property or other rights that are legally due to such person, may file an action before the civil and commercial judge of the domicile of any of the defendants."*

> *(In the original Spanish: El que mediante algún procedimiento o acto colusorio hubiere sido perjudicado en cualquier forma, como entre otros, en el caso de privársele del dominio, posesión o tenencia de algún inmueble, o de algún derecho real de uso, usufructo, habitación, servidumbre o anticresis constituido sobre un inmueble o de otros derechos que legalmente le competen, podrá acudir con su demanda ante la jueza o juez de lo civil y mercantil del domicilio de cualquiera de los demandados.").*

3.69    *Article 5:* Article 5 of the Collusion Prosecution Act provides:

> *"Once the conciliation hearing has taken place and if the proceedings continue, the judge shall grant a ten day period for evidence. The judge shall request the record of the proceedings where the collusion allegedly played a role, as well as that of*

**SA448**

*the associated proceedings, if any, and shall order, ex officio or at the request of the interested party, any evidence that deemed necessary for clarification of facts.*

*If the requested proceedings are ongoing, a copy shall be requested."*

*(In the original Spanish: "Realizada la junta de conciliación, caso de continuarse el juicio, la jueza o juez concederá el término de diez días para la prueba; pedirá entonces el juicio en que se pretende haber incidido la colusión, y los procesos conexos, si los hubiere, y ordenará, de oficio o a petición de parte, las pruebas que estimare procedentes para el esclarecimiento de los hechos.*

*Si los procesos pedidos estuvieren en trámite, se ordenará conferir copia.").*

3.70    *Article 6:* Article 6 of the Collusion Prosecution Act provides:

*"The judge shall issue the decision within a period of fifteen days. If the grounds for the claim are confirmed, measures to void the collusive proceeding will be issued, invalidating the act or acts, and contract or contracts affected by it, as the case may be, and redressing the harm caused, by restoring to the affected party the possession or holding of the property in question, or the enjoyment of the respective right, and, as a general matter, restoring the things to the state prior to the collusion.*

*If the lawsuit was brought also against judges and attorneys, and there is proof that they participated maliciously, the judge shall forward copies of the court file to the Judiciary Council to initiate proceedings for removal from office or suspension of the professional practice, as the case may be, without detriment to sentencing them to joint payment of compensation for damages.*

*Once the judgment becomes final and enforceable, the damages amount shall be liquidated by the trial court, in a separate record. Once the amount has been determined, it shall be collected by attachment order."*

*(In the original Spanish: "La jueza o juez expedirá el fallo dentro del término de quince días. De encontrar fundada la demanda, se dictarán las medidas para que quede sin efecto el procedimiento colusorio, anulando el o los actos, contrato o contratos que estuvieren afectados por el, según el caso, y se reparen los daños y perjuicios ocasionados, restituyéndose al perjudicado la posesión o tenencia de los bienes de que se trate, o el goce del derecho respectivo, y, de manera general, reponiendo las cosas al estado anterior de la colusión.*

*Si la demanda se hubiere dirigido también contra los jueces y abogados, y se probare que han intervenido maliciosamente, la jueza o juez remitirá copias del expediente al Consejo de la Judicatura para que se inicien los expedientes de destitución o de suspensión del ejercicio profesional, según sea el caso, sin perjuicio de condenarlos, a unos y a otros, al pago solidario de los daños y perjuicios ocasionados.*

# SA449

*Ejecutoriada la sentencia se liquidarán los daños y perjuicios ante el tribunal de primera instancia, en cuaderno separado. Determinado el monto, se lo cobrará con apremio real.").*

3.71    *Article 7:* Article 7 of the Collusion Prosecution Act provides:

> "The affected party may bring a private criminal action seeking a punishment ranging from one month to a year of imprisonment for those responsible for the collusion. The statute of limitations period for such action shall begin on the day on which the judgment in civil proceedings became final and enforceable."

> (In the original Spanish: "El afectado podrá iniciar la correspondiente acción penal privada, para que se imponga a los responsables de la colusión la pena de un mes a un año de prisión por el cometimiento de la colusión. El plazo de prescripción de la acción comenzará a correr desde el día en que se ejecutorie la sentencia en el juicio civil.").

**SA450**

# SA451

## PART IV

## THE FACTS AND OTHER MATTERS

### A: Introduction

4.1.   In Parts IV, V and VI of this Award, the Tribunal considers the Claimants' allegations that several judges of the Lago Agrio Court misconducted and misdecided the Lago Agrio Litigation, in breach of the protections provided to the Claimants by the Treaty. The Tribunal considers, in particular, the Claimants' allegation that Judge Zambrano did not write the Lago Agrio Judgment of 14 February 2011 (with its Clarification Order of 4 March 2011); but, rather, that the Lago Agrio Judgment was 'ghostwritten', with Judge Zambrano's corrupt connivance, by certain of the Lago Agrio Plaintiffs' representatives.[1] In addition, the Tribunal considers the Claimants' allegations that the Respondent's Government improperly intervened in the Lago Agrio Litigation, also in breach of the protections provided to the Claimants by the Treaty.

4.2.   These allegations are denied by the Respondent.

4.3.   In this Part IV, as already indicated, the Tribunal addresses the evidence relevant to the issues regarding the alleged judicial misconduct, improper intervention by the Government and the 'ghostwriting' of the Lago Agrio Judgment. In Part V, the Tribunal addresses specific aspects of the Lago Agrio Judgment of 14 February 2011, the Lago Agrio Appellate Judgment of 3 January 2012,[2] the Cassation Court Judgment of 12 November 2013[3] and the Constitutional Court Judgment of 27 June 2018.[4] In Part VI, the Tribunal considers separately the forensic computer evidence adduced by the Parties' forensic expert witnesses in support of their respective cases as to the 'ghostwriting' of the Lago Agrio Judgment, including earlier orders issued by Judge Zambrano.

4.4.   As regards the factual issues (including the expert and forensic issues), the Claimants bear the legal burden of proving the facts upon which they rely to support their claims,

---

[1] C-931, C-1367 & R-1193.
[2] C-991 (see also the Clarification Order of 13 January 2012, C-2314).
[3] C-1975.
[4] C-2551.

# SA452

under Article 24(1) of the UNCITRAL Arbitration Rules.[5] Whilst the evidential burden may shift from one side to the other depending on the evidence, it remains always for the Claimants to prove their positive case.

4.5.    The Tribunal emphasises, at the outset, that the focus of its inquiry is the conduct of the Respondent acting through its judicial branch, in the form of the Lago Agrio Court, the Lago Agrio Appellate Court, the Cassation Court and the Constitutional Court, and through its executive branch. To that inquiry, the conduct of the Lago Agrio Plaintiffs' representatives is incidental, albeit relevant as part of the factual background to the conduct of the Respondent's Courts and Government.

4.6.    Accordingly, the Tribunal does not rely upon the judgments of the New York Courts in the RICO Litigation, to which the Respondent was not a party and which bore no legal relationship to the Treaty on which the Tribunal must rest its jurisdiction and apply, as the applicable law, international law to the Parties' dispute in this arbitration under the Treaty.

### B: Evidential Sources

4.7.    The evidence of relevant factual materials is extensive, complicated and much disputed, taking place over several decades. The Tribunal has preferred to rely, where it can, upon contemporary written materials, rather than upon the unsupported oral testimony of certain witnesses who testified before this Tribunal and elsewhere. However, even this explanation is incomplete, particularly as regards three individuals: (i) Dr Zambrano; (ii) Mr Steven Donziger; (ii) certain of the Lago Agrio's other representatives in Ecuador and the USA; and (iv) Dr Alberta Guerra Bastidas.

4.8.    *(1) Dr Zambrano:* Judge Zambrano issued procedural orders in the Lago Agrio Litigation during his two periods presiding over the Lago Agrio Litigation: (i) from October 2009 to March 2010 and (ii) from October 2010 to March 2011. He also delivered the Lago Agrio Judgment and its Clarification on 14 February and 4 March 2011 respectively.[6]

---

[5] The text of Article 24(1) of the UNCITRAL Arbitration Rules is set out in Part III of this Award.
[6] C-931, C-971.

# SA453

4.9.    At the procedural meeting held with the Parties on 21 January 2014, the Tribunal indicated its concern to the Parties that very serious allegations were being made in this arbitration against Dr Zambrano (by then no longer a judge) in circumstances where he might not be called as a witness by any of the Parties. In that event, Dr Zambrano would not be afforded an opportunity to appear before the Tribunal, so as to testify in response to the allegations made against him as the Judge presiding over the Lago Agrio Litigation, first, from October 2009 to March 2010 and, second, from 11 October 2010 to 4 March 2011. In those circumstances the Tribunal stated that it would be appropriate for the Tribunal itself to extend an invitation to Dr Zambrano to attend, as a factual witness, the hearing then scheduled to take place at the World Bank in Washington D.C., USA from 21 April to 8 May 2015 ("the Track II Hearing").

4.10.   On 8 December 2014, the Claimants indicated that they wished to question Dr Zambrano at the Track II Hearing and asked whether "Ecuador would facilitate and ensure the appearance of Mr Zambrano at the hearing…". By the Claimants' subsequent list of witnesses contained in their letter dated 20 March 2015, the Claimants again confirmed their wish to question Dr Zambrano as a factual witness at the Track II Hearing. It was self-evident that the Claimants were not themselves in a position to call Dr Zambrano (being resident in Ecuador) as a witness at the Track II Hearing in the USA.

4.11.   By letter dated 11 December 2014, the Office of the Attorney-General of Ecuador informed Dr Zambrano of: (i) the Tribunal's invitation to him to attend the Track II Hearing to address the allegations made against him and (ii) the Claimants' wish to question him during that Hearing. The Tribunal is satisfied that this information did reach Dr Zambrano personally; but there was no response from him to the Tribunal.

4.12.   On 10 January 2015, the Office of the Attorney General of Ecuador sent a further letter repeating the Tribunal's invitation. The Tribunal is satisfied that this information also reached Dr Zambrano personally; but there was again no response from him to the Tribunal.

4.13.   By letter to the Tribunal dated 28 January 2015, the Respondent stated that Dr Zambrano was not under the control of the Respondent; that he was a part-time consultant for an Ecuadorian company (in Ecuador) in which the Government of Ecuador had an

# SA454

ownership interest; but that neither the Office of the Attorney General nor the Respondent's outside counsel had any relations with Dr Zambrano.

4.14.    The Claimants, by letter to the Tribunal dated 9 February 2015, contended that Dr Zambrano was under the Respondent's control and that the Respondent had the power to cause Dr Zambrano to appear at the Track II Hearing as a witness. The Claimants requested the Tribunal to draw adverse inferences against the Respondent in the event that Dr Zambrano should not give evidence at the Track II Hearing.

4.15.    At the procedural meeting held with the Parties on 10 March 2015, the Tribunal noted that, in light of the judgment (then under appeal) of the United States District Court for the Southern District of New York in *Chevron Corporation v Stephen Donziger* (the "RICO Litigation" in New York),[7] it might be thought awkward for Dr Zambrano to attend the Track II Hearing in person in the USA. If so, the Tribunal was therefore minded, as a less preferred alternative, to invite Dr Zambrano to give evidence by video-link from Ecuador. The Parties' counsel indicated that they would need to take instructions from their respective clients on this proposal. The Claimants also noted that their immediate reaction was that it would not be possible to conduct a full cross-examination by video-link, not least because it would be necessary to provide Dr Zambrano with copies of all relevant documents on which the Claimants might wish to question him.

4.16.    The Tribunal understood at this time that, without more, Dr Zambrano would not be a witness at the Track II Hearing.

4.17.    In these circumstances, the Tribunal re-stated to the Parties its wish to hear Dr Zambrano's factual testimony, it at all possible. For that purpose, the Tribunal confirmed its invitation to Dr Zambrano as a witness to attend the Track II Hearing in person or, if that was not possible, to participate by video link from Ecuador. The Tribunal considered that, as a matter of basic fairness, Dr Zambrano should be given a reasonable opportunity to participate in the Track II Hearing as a witness (subject to questioning by the Parties and the Tribunal), so as to respond to the allegations made against him in this arbitration.

---

[7] C-2135 and C-2136 (the "RICO Judgment").

# SA455

4.18.   The Tribunal therefore decided, as recorded in its Procedural Order No. 33 of 27 March 2015, that the Tribunal would invite Dr Zambrano itself, directly, to attend the Track II Hearing as a factual witness either (preferably) in person at the World Bank in Washington DC, USA or (in the less preferred alternative) via video-link from Ecuador from an appropriate place convenient for Dr Zambrano and the PCA. A draft of the Tribunal's proposed letter to Dr Zambrano to this effect was attached as Annex A to this Procedural Order, in Spanish and English translation, as to which the Parties' comments were invited.

4.19.   The Tribunal also decided that: Dr Zambrano should be free to accept or refuse the Tribunal's invitation, as he wished, without any interference from the Parties; in the event that Dr Zambrano accepted the Tribunal's invitation to testify, the Parties should do everything in their power to facilitate his participation as a factual witness during the Track II Hearing; the reasonable costs of Dr Zambrano's participation, whether it be in person or by video-link, should be paid by the PCA out of the Parties' deposits held by the PCA; and the date(s) and format of Dr Zambrano's participation during the Track II Hearing would be specified later by the Tribunal, following consultations with Dr Zambrano and the Parties.

4.20.   In the event that Dr Zambrano decided to attend the Track II Hearing via video-link only, the Tribunal decided that: the Parties should by a date to be specified later by the Tribunal (following further consultation with the Parties) compile an electronic file containing copies of any documents on which they wished to question Dr Zambrano and transmit that file to the PCA; a representative of the PCA would travel to Ecuador in order to provide Dr Zambrano with copies of the documents so identified and to provide any assistance to Dr Zambrano that he might require during the video conference; the Parties and the Tribunal could question Dr Zambrano during the video conference from the Hearing at the World Bank; no representative of any Party should be present with Dr Zambrano in Ecuador; the PCA would liaise directly with Dr Zambrano in relation to the location and other arrangements for the video conference and would ensure that all necessary logistical arrangements were in place; and the Tribunal would make a further procedural order following consultations with the Parties to regulate the procedure for the video conference.

# SA456

4.21.   By letter dated 1 April 2015, at the Tribunal's direction, the PCA sent the following letter to Dr Zambrano, enclosing the Tribunal's written invitation to testify as a witness at the Track II Hearing, in Spanish (Dr Zambrano does not know English):

> *"Estimado Dr. Zambrano:*
>
> *Me pongo en contacto con Ud. en mi capacidad de Secretario del Tribunal en el caso CPA N° 2009-23: "Chevron Corporation y Texaco Petroleum Company c. República del Ecuador" con el fin de hacerle llegar una comunicación del Señor V.V. Veeder, Presidente del Tribunal Arbitral en dicho procedimiento, invitándole a participar en una audiencia que tendrá lugar del 21 de abril al 5 de mayo de 2015 en la sede del Banco Mundial en Washington DC, EE.UU. A tales efectos, ruego sírvase encontrar adjunta a continuación copia de la misma.*
>
> *Para el caso en que decida aceptar la invitación del Tribunal para participar en esta audiencia, le ruego se ponga en contacto conmigo en la mayor brevedad en los siguientes contactos: [The Tribunal's Secretary, the PCA with full contact details supplied].*
>
> *Le ruego, a este efecto, que me avise a más tardar el viernes 10 de abril de 2015 si aceptará la invitación del Tribunal, ya que después de esta fecha no será posible tomar los arreglos necesarios para su participación.*
>
> *Desde ya le agradezco su atención para con este tema y no dude contactar conmigo para cualquier pregunta que le surja en relación con esta carta. Muy atentamente, Martín Doe Rodríguez ..."*[8]

4.22.   The Tribunal's enclosed invitation read:

> *"Estimado Dr. Zambrano,*
>
> *Como tal vez ya sea de su conocimiento, Chevron Corporation y Texaco Petroleum Company (las "Demandantes") iniciaron en 2009 un arbitraje internacional frente a la Corte Permanente de Arbitraje en la Haya (la "CPA") bajo el Reglamento de Arbitraje de la CNUDMI en contra del Estado de Ecuador como Demandada de*

---

[8] In English: "*Dear Dr Zambrano, I reach out to you in my capacity as Secretary to the Tribunal in PCA Case No. 2009-23: Chevron Corporation and Texaco Petroleum Company v. Republic of Ecuador to convey a communication from Mr V.V.Veeder, President of the Arbitral Tribunal in said proceeding, inviting you to participate in a hearing that will take place between 21 April and 5 May 2015 at the World Bank headquarters in Washington DC, U.S.A. Please find attached a copy of said communication. In the event that you decide to accept the Tribunal's invitation to participate in this hearing, I invite you to promptly contact me at the following coordinates: [The Tribunal's Secretary, the PCA with full contact details supplied]. I would be grateful, in this regard, if you could let me know by Friday, 10 April 2015 whether you will accept the Tribunal's invitation, as it will not be possible to make all the necessary arrangements for your participation past that date. I am very grateful for your attention on this matter at this stage and do not hesitate to contact me for any questions that you may have in connection with this letter. Kind regards, Martin Doe Rodríguez*".

# SA457

*acuerdo con un Tratado entre Ecuador y los Estados Unidos de América (el "Tratado").*

*Le escribimos a usted en nuestra capacidad de Tribunal Arbitral nombrado de acuerdo con el Tratado para decidir la disputa entre las Demandantes y la Demandada.*

*En este procedimiento arbitral, las Demandantes alegan que la Demandada ha violado sus obligaciones de derecho internacional, inter alia, a través de las acciones y omisiones del Poder Judicial ecuatoriano durante el caso de Lago Agrio. La Demandada niega las alegaciones de las Demandantes y se opone a la base legal jurisdiccional para las demandas de las Demandantes bajo el Tratado.*

*Se celebrará con las Demandantes y la Demandada una audiencia en este arbitraje que tendrá lugar en el Banco Mundial en Washington DC, EE.UU. del 21 de abril al 5 de mayo de 2015.*

*Si fuera del todo posible, el Tribunal Arbitral quisiera recibir su testimonio sobre los hechos del caso. Por este motivo, el Tribunal le invita a presentarse como testigo en esta audiencia, o si eso no fuera posible, que participe por medio de una videoconferencia.*

*Si acepta esta invitación, la CPA se encargará de los arreglos necesarios para su participación, incluyendo para cubrir sus gastos razonables.*

*El Tribunal ha informado a ambas las Demandantes y la Demandada de su intención de extenderle esta invitación y las Partes no han planteado ninguna objeción al respecto.*

*Esperamos su pronta rrespuesta, antes del viernes 10 de abril de 2015.*

*Atentamente, [The President of the Tribunal]."*[9]

---

[9] In English: "*Dear Dr Zambrano, As you will be aware, Chevron Corporation and Texaco Petroleum Company (the "Claimants") have commenced an international arbitration before the Permanent Court of Arbitration at The Hague (the "PCA") under the UNCITRAL Arbitration Rules against the State of Ecuador as the Respondent, pursuant to a Treaty between Ecuador and the United States of America (the "Treaty"). We write to you as the Arbitration Tribunal appointed under the Treaty to decide the dispute between the Claimants and the Respondent. In this arbitration, the Claimants allege that the Respondent breached its obligations under international law by, inter alia, the actions and omissions of the Respondent's judicial branch during the Lago Agrio Litigation. The Respondent denies the Claimants' allegations and also objects to the jurisdictional basis for the Claimants' claims under the Treaty. There is to be an oral hearing in this arbitration to take place with the Claimants and the Respondent at the World Bank in Washington DC, USA from 21 April to 8 May 2015. The Arbitral Tribunal would wish to hear your factual testimony, it at all possible. For that purpose the Tribunal invites you as a witness to attend this hearing or, if that is not possible, to participate by video link. In the event of your accepting this invitation, the PCA will make further arrangements for your participation, including provision for your reasonable expenses. This invitation is made by the Arbitration Tribunal with the support of both the Claimants and the Respondent. We look forward to your early response, but no later than 7 April 2015. Yours etc.*".

# SA458

4.23. At the procedural meeting held with the Parties on 8 April 2015, the Tribunal reported that the above correspondence had been delivered to Dr Zambrano in Manta, Ecuador, as confirmed by the courier's receipt signed for Dr Zambrano on 7 April 2015.[10] The Tribunal is satisfied that this correspondence reached Dr Zambrano personally; but there was again no response from him to the Tribunal.

4.24. The Tribunal regrets that Dr Zambrano did not testify before this Tribunal. The Tribunal recognises, however, that it was his right to choose not to do so. Further, on the materials available in this arbitration, the Tribunal accepts, as submitted by the Respondent, that his choice was not induced by the Respondent. In these circumstances, the Tribunal does not think it appropriate to draw any adverse inference against the Respondent, as requested by the Claimants, for Dr Zambrano's absence as a witness in this arbitration.

4.25. Dr Zambrano did testify, on oath, in the RICO Litigation, before the United States District Court for the Southern District of New York (Judge Kaplan). His testimony, in the form of a statement, deposition and trial testimony, is available to this Tribunal as evidence by agreement of the Parties (as submitted by the Parties with their respective written pleadings).[11] The Tribunal has made extensive use of it.

4.26. *(2) Mr Donziger:* Mr Steven Donziger is not an Ecuadorian lawyer or a citizen of Ecuador; nor is he to be regarded as an agent (or organ) of the Respondent for the purpose of attribution under international law. He is a citizen of the USA, resident in New York and a member of the New York Bar (currently suspended). For many years, since at least 1993, he acted as a representative of the Aguinda Plaintiffs first in the Aguinda Litigation in New York and, subsequently, of the Lago Agrio Plaintiffs in the Lago Agrio Litigation in Ecuador. He is Spanish-speaking.

4.27. The Tribunal would have wished to hear Mr Donziger testify personally in this arbitration. Mr Donziger was an important actor in the Lago Agrio Litigation leading up to the Lago Agrio Judgment and Clarification Order. However, it soon became apparent to the Tribunal that Mr Donziger would not be called as a witness by any Party to this arbitration. Nor was he. Moreover, as the principal defendant in the RICO Litigation brought by Chevron in New York, Mr Donziger clearly had other more pressing

---

[10] Transcript of the Procedural Meeting of 8 April 2015, p. 6; DHL Tracking Receipt for Waybill 4385719144.
[11] See the Tribunal's Procedural Order 45, para 5, and the Respondent's email message dated 31 August 2016 to the Tribunal.

# SA459

personal priorities than assisting this Tribunal as a witness. It was therefore pointless for the Tribunal itself to extend an invitation to him to testify at the Track II Hearing. Further, Mr Donziger was afforded a full opportunity to defend himself against Chevron's allegations of 'ghostwriting' and other improper conduct in the RICO Litigation.

4.28. Mr Donziger did testify at length, on oath, in the RICO Litigation in New York. His testimony, in the form of depositions and trial testimony, is available to this Tribunal with the Parties' agreement (also, as submitted by the Parties with their respective written pleadings).[12] As with Dr Zambrano's testimony, the Tribunal has made extensive use of it.[13]

4.29. The Tribunal has also made extensive use of Mr Donziger's personal notebook (or "diary"). This was originally a private document written by Mr Donziger for his own personal use only. It was disclosed by Mr Donziger to Chevron under court orders in the US Section 1782 and RICO Litigation brought by Chevron against Mr Donziger, along with his private email correspondence and computer hard drives. As a resident of New York, Mr Donziger was (and remains) subject to the jurisdiction of the courts of the USA.

4.30. The Tribunal has made use of Mr Donziger's diary and emails with caution. What is written in a private diary and also in private emails to close colleagues cannot always be taken literally by third persons, long after the event. In the Tribunal's view, even the starkest statement has to be assessed in context and in the light of other circumstances prevailing at the time.

4.31. There is a further qualification. By October 2010, Mr Donziger's emails and computers in the USA had been seized by Chevron under orders from US Courts. Thereafter, if not months before, the form and content of communications between Mr Donziger in New York and his colleagues in Ecuador doubtless underwent a precautionary change.

---

[12] Again, see the Tribunal's Procedural Order 45, para 5, and the Respondent's email message dated 31 August 2016 to the Tribunal.
[13] The Tribunal has not made use of the full materials in the RICO Litigation, said to be 3,750 exhibits totaling more than 82,800 pages, a 2,970 page transcript of the trial, 1,033 pages of written direct testimony and 7,340 pages of depositions. The Respondent recorded an objection to the Claimants' late submission of these full materials, which was accepted by the Tribunal.

# SA460

4.32.    Even earlier, in his email to Mr Donziger of 30 March 2010, Mr Prieto (one of the Lago Agrio Plaintiffs' representatives in Ecuador) had already expressed grave concerns about 'going to jail' because of email disclosures to Chevron likely to be ordered by the US Courts in the US Section 1782 Litigation (see the chronology below). Even before any court orders for such disclosure, certain of the Lago Agrio Plaintiffs' representatives had resorted to using code-words in their email messages to each other (see also the chronology below). It follows that the content of certain emails from at least October 2010 onwards is likely to have been tailored by certain of these representatives, if email was used by them for certain purposes at all.

4.33.    As regards both Mr Donziger and other representatives of the Lago Agrio Plaintiffs, the Tribunal has made extensive use of the offcuts from the documentary film "Crude". These offcuts were never intended to be made public. As described further below, these offcuts (totalling about 600 hours of video film) were disclosed to Chevron under court orders in the US Section 1782 Litigation brought by Chevron against the film's director, Mr Joseph Berlinger.[14]

4.34.    *(3) The Lago Agrio Plaintiffs' Representatives*: The Lago Agrio Plaintiffs' representatives and legal advisers, at different times, included Mr Norman Alberto Wray (a senior Ecuadorian lawyer and former judge of the Ecuadorian Supreme Court), Mr Cristóbal Bonifaz (of Amherst, MA, USA), Mr Pablo Fajardo Mendoza (from 2005), Mr Juan Pablo Sáenz, Mr Julio Prieto Méndez, Mr Alejandro Ponce Villacis, Mr Luís Yanza (a director of the "Frente de Defensa La Amazonia" or "Frente" and, in English, the "Amazon Defence Front" or "ADF"), Mr Icoca Manuel Tegautal, Mr Joseph Kohn (of Kohn, Swift & Graf, Philadelphia, PA, USA); Patton Boggs (a law firm in Washington DC, USA from about August 2010) and, as already indicated, Mr Donziger. The funding for such legal representation came principally from Mr Kohn (until 2010), Mr Russell DeLeon,[15] Patton Boggs and (from 2010) Burford Capital, in return for success fees calculated on recoveries from Chevron upon the eventual enforcement of the Lago Agrio Judgment. Other non-party funders appear to have become involved in the Lago Agrio Judgment's enforcement proceedings outside Ecuador.

---

[14] C-649, C-359.
[15] Mr Deleon also partly financed the making of the documentary film "Crude" directed by Mr Joseph Berlinger.

# SA461

4.35.   As regards the Lago Agrio Plaintiffs' representatives in Ecuador, especially Mr Fajardo, Mr Sáenz, Mr Prieto and Mr Yanza,[16] there is little evidence in this arbitration of what they said and did other than what is recorded in the "Crude" off-cuts and their written communications to and from Mr Donziger, as disclosed to Chevron in the US 1782 and RICO Litigation. Details of several significant events and relevant materials within Ecuador are therefore missing from the evidence adduced by the Parties in this arbitration. None of these individuals gave evidence in the RICO Litigation; they are not subject to the jurisdiction of the courts of the USA; and it was not in the power of this Tribunal or the Parties to compel their attendance as witnesses in these arbitration proceedings. Amongst this group, the leading figure in the Lago Agrio Litigation was Mr Fajardo, an Ecuadorian lawyer of conspicuous ability and industry who worked closely with Mr Donziger.

4.36.   *(4) Dr Guerra:* Dr Alberto Guerra Bastidas testified under oath at the Track II Hearing, called by the Claimants, cross-examined by the Respondent and questioned by the Tribunal.[17] The Respondent strongly impugned his credibility as a witness. Dr Guerra also testified under oath in the RICO Litigation and at the RICO trial in New York, where he was deposed and also cross-examined.[18] Dr Guerra's testimony in the form of his several written witness statements, depositions and oral testimony was adduced by the Claimants in this arbitration.

4.37.   In the Tribunal's view, particular caution is required in assessing Dr Guerra's testimony. In the past, Dr Guerra has conducted himself with less than probity. For the present, whilst the Claimants have taken steps to protect the integrity of his testimony (in this and other related legal proceedings), there exists still a risk that Dr Guerra could colour his testimony to favour the Claimants as his benefactors during his exile from Ecuador.

4.38.   Yet, whatever happened in the past and however great that incentive might be, having seen and heard him in person subject to vigorous cross-examination by the Respondent, the Tribunal considers that Dr Guerra was a witness of truth in his testimony at the Track

---

[16] These and other individuals are described in the Selected Dramatis Personae above at page xiii.

[17] Track II Hearing D3.593-758; D4.852-900. Dr Guerra was also deposed by the Respondent in this arbitration on 5 November 2013, R-907. He testified at the RICO trial on 23-25 October 2013 (C-1978).

[18] Dr Guerra's written testimony before the Track II Hearing comprises his declaration of 17 November 2012, C-1616a; his first supplemental declaration of 13 January 2013, C-1648; his second supplemental declaration of 11 April 2013, R-1331 & C-1828; his witness statement of 9 October 2013, C-2358 & C-2386; and his RICO deposition of 2 May 2013, R-906 and C-1888.

# SA462

II Hearing. The Tribunal has therefore relied upon his testimony where it can be corroborated by other evidence, at least in part. The Tribunal also notes that, in one material respect regarding the conduct of Respondent's executive branch towards the Lago Agrio Litigation, Dr Guerra gave evidence at the Track II Hearing that unequivocally supported the Respondent's case (to which the Tribunal returns below).

### C: Ecuador's Oriente and its Inhabitants

4.39. The Oriente area of Ecuador is situated in the eastern part of the country, within the Amazon basin, bordering on Columbia (to the north) and Peru (to the south). In describing the Oriente and its inhabitants, the Tribunal can do no better than to cite the work of Professor Kimerling and her colleagues in *Amazon Crude*, written more than 25 years ago (with footnotes here omitted):[19]

> "The tropical forests of the Oriente are among the most biologically diverse natural ecosystems on earth - a treasure trove of rare and unique species and a potential source of medicines, fruits, nuts, and other forest foods and products. Ecuador's ancient rain forests lie at the headwaters of the Amazon River system and help control flooding and erosion, even in the river's lower reaches. The Oriente's forests also help regulate the region's rainfall and climate. The forest is a storehouse of carbon. When it is burned or cleared, carbon dioxide is released into the atmosphere, heightening the potential for global warming. The rain forests of the Oriente are also home to the region's indigenous peoples who depend on the forest for their livelihoods. Without the forest, Amazonian peoples would be threatened with cultural and, in some cases, physical extinction ...".

> "Ecuador's Oriente has a rich heritage of indigenous cultures and is home to eight groups of indigenous people. Estimates of the Oriente's indigenous population range from 90,000 to 250,000 – 25 to 50 percent [of] the region's total population. Two groups, the Quichua and the Shuar, together account for the great majority of indigenous people in the Oriente. The balance of the population is found among the Achuar, Cofan, Huaorani, Shiwiar, Secoya, and Siona. The Huaorani number roughly 1,580 individuals, the Shiwiar some 600, and together the Secoya and Siona number about 350. The Cofan population, once 15,000, is now approximately 300 [citation omitted]."

> "Indigenous peoples have lived in Amazonia for thousands of years in harmony with their rain forest environment. Since the Spanish arrived in Ecuador nearly 500 years ago, the Oriente has been a magnet for fortune-seekers and missionaries. Spanish adventurers first entered upper Amazonia in what is now Ecuador, and the first mission bases were established there in the sixteenth century. It was not until the rubber extraction boom began in the late 1800s, however, that dreams of easy wealth first came true in Amazonia. A handful of 'rubber barons' became rich, but

---

[19] R-473, pp. 33-34.

## SA463

> *at great expense to the people. Their atrocities throughout Amazonia are well-documented. Thousands of indigenous people in Ecuador, Peru, and Colombia were killed [citation omitted]. The boom ended in the early 1900s, when rubber seeds were smuggled out of Brazil and successfully cultivated on plantations in Malaysia."*

4.40.   This case concerns only a part of Ecuador's Oriente, a former concession area in the north-east close to the Colombian border, near the town of Lago Agrio in the Province of Sucumbíos (see the map in Annex 6 to this Part IV below).

### D: Ecuador's Government and Judiciary

4.41.   *(1) The Ecuadorian Government:* From 1964 onwards, Ecuador had a succession of governments of different political and economic persuasions. In February 1964, when the 1964 Concession Agreement was executed, Ecuador was governed by a military junta. It was succeeded by another military junta. In 1969, President José Ibarra became the President of Ecuador. In 1972, a military junta took power in Ecuador under General Guillermo Rodríguez Lara. During this régime, the 1973 Concession Agreement was executed.

4.42.   In 1979, President Jaime Roldós Aguilera took office as the President of Ecuador, succeeded (on President Roldós' death) by President Osvaldo Hurtado Larrea in 1981. In 1984, President León Febres Cordero Rivadeneira took office as President of Ecuador, followed in 1988 by President Rodrigo Borja Cevallo and in 1992 by President Sixto Durán Ballén. During this régime, the Aguinda Litigation was commenced in New York in 1993; and the 1995 Settlement Agreement was executed, as also the 1995 Remedial Action Plan.

4.43.   In 1996, President Abdalá Bucaram took office as President of Ecuador, later (in February 1997) removed from office by the Congress and succeeded by an interim presidency, that included President Fabian Alarcón. In 1998, President Jamil Mahuad took office as the President of Ecuador, later forced into exile by a military coup in January 2000. During these régimes, the 1998 Final Release was executed.

4.44.   In 2002, President Lucio Gutiérrez took office as the President of Ecuador, but was later removed from office by the Congress in 2005 and succeeded by an interim presidency under President Alfredo Palacio. During the early part of this régime, the Lago Agrio Litigation was commenced in Ecuador in 2003.

# SA464

4.45.   In January 2007, President Rafael Correa took office as the President of Ecuador, being re-elected in 2009 and 2013. During this régime, the Lago Agrio Court, the Lago Agrio Appellate Court and the Cassation Court issued their respective judgments in 2011, 2012 and 2013 respectively. President Correa had left office (in 2017) at the time of the Constitutional Court's Judgment (2018).

4.46.   Until recently, at least, Ecuador was a country marked by political, economic and institutional instability that began long before President Correa's election in 2007.

4.47.   The Claimants' case, as regards the Respondent's executive branch, is directed principally at President Correa and his political administration during the period from 2007 onwards, during the pendency of the Lago Agrio Litigation.

4.48.   *(2) The Ecuadorian Judiciary*: The relevant court in the Oriente, the Sucumbíos Provincial Court of Justice of Nueva Loja in Lago Agrio (the "Lago Agrio Court"), operated on a meagre budget under a swift succession of presiding judges responsible for the Lago Agrio Litigation. It was not designed for and had never previously experienced any case of the size, duration, complexity and controversy comparable to the Lago Agrio Litigation. At the Track II Hearing, the Respondent's Counsel stated that the Lago Agrio Litigation grew to become 2,000 times the size of the typical Ecuadorian lawsuit.[20]

4.49.   The Lago Agrio Litigation was heard by the Lago Agrio Court before a succession of Lago Agrio Judges between May 2003 and March 2011, a period of almost eight years; namely: (i) Judge Guerra (13 May 2003 – 3 February 2004), (ii) Judge Novillo (4 February 2004 – 1 February 2006), (iii) Judge Yánez (2 February 2006 – 2 October 2007), (iv) Judge Novillo, again (3 October 2007 – 24 August 2008), (v) Judge Núñez (25 August 2008 – 20 October 2009), (vi) Judge Zambrano (21 October 2009 – 11 March 2010), (vii) Judge Ordóñez (12 March 2010 – 10 October 2010) and lastly (viii), Judge Zambrano, again (11 October 2010 – 29 February 2011). It was Judge Zambrano who issued the Lago Agrio Judgment and its Clarifying Order on 14 February 2011 and 4 March 2011 respectively.

---

[20] Track II Hearing D1.327.

# SA465

4.50.    Judges Núñez and Judge Ordóñez were recused as judges in the Lago Agrio Litigation, respectively in August 2009 and October 2010. Unconnected with the Lago Agrio Litigation, Judge Guerra was dismissed from the Ecuadorian judiciary in May 2008. In 2012, also unconnected with the Lago Agrio Litigation, one year after the Lago Agrio Judgment, Judge Zambrano was also dismissed from the Ecuadorian judiciary.

4.51.    The Claimants' case, as regards the Ecuadorian judiciary, is directed principally at Judge Zambrano during the two periods when he presided over the Lago Agrio Litigation, from (i) October 2009 to March 2010 and (ii) October 2010 to March 2011.

4.52.    It is necessary to note that the Lago Agrio Court operated on limited resources. From his time as a judge of the Lago Agrio Court, Dr Guerra gave, as an example, the fact that even court seals had to be procured by the judge or clerk using their own money.[21] The Tribunal also notes that Judge Zambrano had personally to arrange for a temporary student secretary, ostensibly at his own immediate expense, whilst presiding over the Lago Agrio Litigation. He had no law clerk or legal assistant.

4.53.    More generally, the Tribunal also refers to part of the statement made by the Respondent's Attorney-General at the Jurisdictional Hearing, as recorded in its Third Interim Award. There, the Attorney-General stated (as translated into English):[22]

> *"... As a first point, I would like to talk about the present justice system in Ecuador. In the year 2008, the latest Constitutional Assembly in Ecuador as an expression of sovereign expression of the Ecuadorian nation approved the new Constitution that rules our country at the moment ...*
>
> *In terms of the justice administration, the new Constitution consolidated previous efforts of the judicial reform of Nineties. Although still we are not in the position that we would like to be, we are achieving important progress in this ambit. First of all, we have to concentrate the existence of Courts and other Tribunals to marginal places allowing better access to justice. [Secondly,] There is an improvement in justice efficiency in relation to the number of cases that are resolved. Thirdly, we have achieved greater transparency and publicity in terms of the activities of the judiciary; and, fourthly, we have developed norms that rules behaviour of judges and lawyers.*

---

[21] Track II Hearing D3.645.
[22] Third Interim Award, pp. 73ff.

*In this way, in our system of justice is an improvement. There is advancement. We continuously improve trying to achieve high standards, standards of efficiency for the benefit of the Ecuadorian society.*

*... I accepted my designation, and I have done my job as Procurador of the State of the Republic of Ecuador convinced and respectful of the autonomy of the functions of the State because I am convinced of the independency of the justice system of my country and the process of change. But by the same token I am very conscious of the difficult problems affecting our systems still. We still have delays in processes in front of our courts. We have complaints against dishonest Courts, and we have problems of salaries for judges and magistrates and lawyers. But I am conscious of our problems.*

*... We know our deficiencies, but we are working to correct them."*

4.54. There was another factor especially relevant to Judge Zambrano: Judge Zambrano was not experienced in handling and deciding civil cases, let alone large and complex cases.

### E: The 1964 and 1973 Concessions

4.55. On 21 February 1964, the Respondent granted oil exploration and production rights in Ecuador's Oriente region to TexPet (a subsidiary of Texaco) and the Ecuadorian Gulf Oil Company (a subsidiary of Gulf) under a written concession made with these companies' local subsidiaries operating as a Consortium ("the 1964 Concession Agreement).[23] TexPet was the "Operator" for the Consortium under the Texaco-Gulf Joint Operating Agreement of 1 January 1965.[24]

4.56. In 1967, the Consortium discovered significant deposits of crude oil in the Oriente and drilled its first wells. By 1969, the Consortium had found considerable reserves of crude oil.

4.57. By 1972, the Consortium had developed nine oil fields and constructed an oil pipeline over the Andes to the Pacific coast (the "SOTE" pipeline).

4.58. On 6 August 1973, the Respondent, TexPet and Gulf entered into a further concession agreement with a term expiring on 6 June 1992 ("the 1973 Concession Agreement").[25] It was also agreed (inter alia) to grant an option to acquire an interest in the Consortium

---

[23] C-6.
[24] C-409.
[25] C-7.

to the Ecuadorian State Oil Corporation, CEPE (abbreviated from Corporacion Estatal Petrolera Ecuatoriana, later succeeded by PetroEcuador).[26]

4.59. The 1973 Concession Agreement imposed environmental and related obligations on the Contractors (TexPet and Gulf) and the Operator (TexPet). Pursuant to Section 46.1 (Preservation of Natural Resources), the Contractors "shall adopt all convenient measures for the preservation of the flora, fauna and other natural resources, and they all [shall] also refrain from polluting water courses, the atmosphere and the soil, under supervision of the relevant Government agencies." Section 51.1 provided: "Upon termination of this contract as a result of the expiration of its term ..., the contractors shall deliver to CEPE, for no consideration and in good production conditions, all the commercially exploitable hydrocarbon reserves, any wells in activity at that moment, ... and any other real and personal property that [they] acquired in connection with this contract, provided that all such property shall be in good condition." Section 40.1 provided: "The contractors shall use modern and efficient machinery, and they shall use the most adequate technology and methods in their activities so as to obtain the highest productivity in the exploitation of deposits, observing at all times the reserve preservation policy laid out by the Government..."

4.60. In 1974, CEPE (PetroEcuador) exercised its option under the 1973 Concession Agreement, thereby acquiring a 25% stake in the Consortium.[27] TexPet and Gulf each retained a 37.5% interest in the Consortium.

4.61. On 21 December 1976: CEPE (PetroEcuador) acquired Gulf's remaining interest, thereby owning a 62.5% interest in the Consortium. (TexPet retained its 37.5% minority interest until the Consortium ended in 1992).[28]

4.62. On 30 June 1990, TexPet ceased to act as the "Operator" under the 1973 Concession Agreement, after 25 years (1965 to 1990). From 1 July 1990 onwards, PetroEcuador (by its subsidiary, Petroamazonas) became the "Operator" under the 1973 Concession Agreement.[29] TexPet, as an Operator, left the Oriente in 1990.

---

[26] C-7, Articles 4, 28 & 29.
[27] C-417.
[28] C-8.
[29] C-418.

# SA468

4.63. On 6 June 1992, the term of the 1973 Concession Agreement expired. TexPet, as a Contractor, left Ecuador. There was then no longer any presence by TexPet in the concession area or Ecuador in any capacity. Texaco (TexPet's parent company) was itself never active in the concession area. Nor was Chevron at any time, before or after 1992, engaged in activities in the concession area. (Chevron only became TexPet's ultimate parent some ten years later, after the "merger" between Texaco and Chevron in 2001).

4.64. As at 1992, the Consortium with, as Operator TexPet (from 1965 to 1990) and CEPE/PetroEcuador (from 1990 to 1992), had developed within the concession area 16 production fields, with 321 wells, 18 production stations, 6 base camps and hundreds of miles of associated pipelines, together with the SOTE pipeline over the Andes. The Consortium's activities had generated about US$ 23.3 billion in revenues, of which about US$ 22.67 billion (97.3%) was received by the Respondent in the form of income taxes, royalties, contribution for domestic consumption and gross profit on PetroEcuador's share in the Consortium.[30] TexPet itself had received about US$ 480 million in revenues.[31] The Consortium had helped to make Ecuador the second largest oil exporter in Latin America (after Venezuela), doubling Ecuador's per capita GDP, but making its national budget heavily dependent on oil revenues.

4.65. From 1992 to 2008, after TexPet's departure from Ecuador, PetroEcuador's subsequent operations in the area of the former concession in the Oriente generated about 1.2 billion barrels of crude oil, representing a market value of about US$ 57 billion.[32]

4.66. The 1995 Settlement Agreement,[33] the 1995 Remedial Action Plan[34] and the 1998 Final Release[35] addressed environmental issues arising from the 1964 and 1973 Concession Agreements. The Settlement Agreement was signed for TexPet by its Vice-President, Mr Ricardo Reis Veiga and by its legal representative, Dr Rodrigo Pérez Pallares. The 1995 Remedial Action Plan was signed for TexPet by Mr Veiga. The 1998 Final Release was signed for TexPet by Mr Veiga and Dr Pérez.

---

[30] Kaczmarek ER1, Table 1 and para 84.
[31] Kaczmarek ER1, para 84, Figure 5.
[32] C-436, pp. 1 & 7.
[33] C-23.
[34] R-610.
[35] C-53.

# SA469

4.67. To perform the remediation work for environmental damage under the 1995 Settlement Agreement, TexPet selected Woodward-Clyde, a well-known engineering firm specialising in environmental remediation. Woodward-Clyde prepared the Remedial Action Plan in accordance with the 1995 Settlement Agreement. The Plan identified the specific pits at each site that required remediation and the remedial action to be taken at each site. In September 1995, the Respondent, PetroEcuador, TexPet and Woodward-Clyde approved the Remedial Action Plan. Between October 1995 and September 1998, Woodward-Clyde conducted the remediation required by the 1995 Settlement Agreement and the 1995 Remedial Action Plan (at TexPet's expense).

4.68. In all, TexPet spent approximately US$ 40 million on environmental remediation and community development in Ecuador under the 1995 Settlement Agreement and the Remedial Action Plan (together with the 1996 Municipal and Provincial Releases).

4.69. On 30 September 1998, the Respondent, PetroEcuador and TexPet signed the Final Release (the "Acta Final"), certifying that TexPet had performed all its obligations under the 1995 Settlement Agreement.

4.70. In its Third Interim Award, First Partial Award and Decision in this arbitration, the Tribunal has already considered at some length and made certain decisions upon the meaning and effect of the 1995 Settlement Agreement. It is unnecessary to repeat those decisions here, which remain in effect (see Annex 1 to Part 1 for the Operative Parts of the Third Interim Award, First Partial Award and Decision).

### F: Crude Oil Pollution in the Oriente

4.71. There is today crude oil pollution in the former concession area of the Oriente, including pollution lying close to human habitation. The Tribunal has seen such pollution, albeit only briefly during its site-visit to four sites in the former concession area in June 2015.[36] More significantly, the fact of such pollution has never been denied by the Claimants themselves. Rather, the technical and legal issues concern the nature, effect, timing and cause of such pollution, including the role played by PetroEcuador (both before and, particularly, after TexPet's departure from the concession area as Operator in 1990).

---

[36] These sites were: (i) Shushufindi Field: SSF-34 Well Site; (ii) Aguarico Field: AG-06 Well Site; (iii) Shushufindi Field: SSF-55 Well Site; and (iv) Lago Agrio Field: LA-02 Well Site. The Parties' presentations at each site were recorded by verbatim transcript and film. (This film is kept by the PCA, by order of the Tribunal).

# SA470

4.72. The origin of such crude oil pollution, apart from accidental leaks and spills, derives principally from a mixture of oil and "produced water" in pits, subject to run-off into adjoining land and water courses. It was described by the Respondent (with its expert Dr Garvey) as follows during the Tribunal's site-visit to the SSF-34 Well Site (The site was originally drilled in 1973 and "shut in", or abandoned, by TexPet in 1983; it then comprised a plugged well and three pits; and, where cleared of encroaching jungle, the land is currently used for subsistence farming, with chocolate cacao plants and natural papaya trees):[37]

> *"When TexPet came and drilled oil, they set up their oil rig here where the hole in the ground is; and to get to the oil it's approximately 3,000 meters deep. So 9 to 10,000 feet is where the oil-producing layers are in this area. To drill down that far, there's a significant amount of rock and dirt that came out of the hole; and they had to have some place to put that. These are called cuttings pits or reserve pits. And this large pit over here to the side probably started off as a cuttings and reserve pit, so the debris would [be] placed immediately to the side of the well. When you're drilling a well, to get the debris to come out, you have to force drilling mud, which is a sort of a thick mud that, as you push it down, it pushes the rocks and the debris out; and to make drilling mud, you need a significant amount of water ... After the well was drilled and they reached the oil layers, this pit and these reserve pits would often end up filled with oil ..."*

> *"... In order for us to find oil present to the surface, the reservoir that's supplying this oil has to be quite large because it has to have been insulated from weathering for 30 years. How was it insulated? ... We have leaf litter falling on top of the pit. It prevents oxygen from penetrating into the underground; and, as a result, the oil here is effectively capped temporarily by this leaf litter and prevented from weathering. What does that mean? Well, it means that a small disturbance ... that a farmer might make would very quickly release the oil back to the surface here. Additionally, a large change in the water table ... could also push the oil upward above it. This may, in fact, be the reason we see oil at the surface here ..."*.

4.73. This general description does not include the range and complexity of the environmental issues raised by the Parties and their respective expert witnesses in regard to crude oil pollution in the former concession area, as also the legal issues arising from such pollution and the 1995 Settlement Agreement.

### *G: The Lawsuits, Arbitrations, Prosecutions and Investigations*

4.74. The crude oil pollution in the concession area has given rise to extensive legal disputes over the last 25 years, producing multinational lawsuits and arbitrations on a scale

---

[37] Site-Visit Transcript S1.12ff; S1.25ff.

# SA471

unprecedented in the collective experience of this Tribunal. For ease of reference later, it is necessary to list these principal lawsuits and arbitrations at the outset. The Tribunal here also addresses the criminal prosecutions and investigations in Ecuador.

4.75. *(1) The Aguinda Litigation (New York):* The Aguinda Complaint was filed in the District Court for the Southern District of New York on 3 November 1993. It pleaded a claim by the Aguinda Plaintiffs as a putative (uncertified) class action under the USA's Federal Rules of Procedure, by named individuals and "on behalf of a class of all others similarly situated" for personal injuries and property damage caused by the defendant's wrongdoing.[38] The original defendant was Texaco.

4.76. As pleaded, the named individuals and unnamed class members estimated as numbering 30,000 were all resident in Ecuador from 1972 onwards within a geographical area defined by latitude and longitude, south of the Colombian border.[39] This complaint asserted individual civil claims for personal injury and property damage, aggregated as members of the same putative class. The causes of action were pleaded in tort, including negligence, public nuisance, private nuisance, strict liability, trespass and civil conspiracy, with relief claimed as compensatory damages, punitive damages and equitable relief to remedy the alleged pollution and contamination "of the plaintiffs' environment and the personal injuries and property damage caused thereby" (page 4).

4.77. As decided by this Tribunal in its Decision on Track 1B,[40] the Aguinda Complaint in New York was not a 'diffuse' claim. This much, at least, is common ground between the Parties.[41] As the Claimants acknowledged at the April Hearing (on Track 1B): "… both Parties agree that what was at issue in Aguinda were individual claims, aggregate[d] individual claims."[42]

4.78. As recorded by the US Court of Appeals for the Second Circuit in its judgment of 5 August 1997, the Aguinda Plaintiffs' claims for equitable relief in the Complaint were later elaborated: "Though the complaints make only a general demand for equitable relief, the plaintiffs clarified their demand somewhat during discovery. The relief they seek includes the following: undertaking or financing environmental cleanup, to include

---

[38] C-14, pp. 2-3.
[39] C-14, pp. 17-19.
[40] Decision on Track 1B, Paragraphs 147-149.
[41] Track II Hearing D1.97.
[42] April Hearing D2.372.

## SA472

access to potable water and hunting and fishing grounds, renovating or closing the Trans-Ecuadoran Pipeline, creation of an environmental monitoring fund, formulating standards to govern future Texaco oil development, creation of a medical monitoring fund, an injunction restraining Texaco from entering into activities that run that run a high risk of environmental or human injuries, and restitution."[43]

4.79. By its judgment dated 12 November 1996, the US District Court for the Southern District of New York (Judge Rakoff) dismissed the Aguinda Complaint.[44] Apart from applying the doctrine of forum non conveniens (in favour of the Ecuadorian Courts), the judgment referred to the Aguinda Plaintiffs' failure to join, as indispensable parties, PetroEcuador and Ecuador:

> "... this Court further concludes that there is another independently- sufficient reason why this action must be dismissed: plaintiffs' failure to join indispensable parties, namely, Petroecuador and the Republic of Ecuador. The extensive equitable relief sought by the plaintiffs-ranging from total environmental 'clean-up' of the affected lands in Ecuador to a major alteration of the consortium's Trans-Ecuador pipeline [i.e. the "SOTE" pipeline] to the direct monitoring of the affected lands for years to come cannot possibly be undertaken in the absence of Petroecuador, which has owned 100% of the consortium since 1992 and 100% of the pipeline since 1986, or the Republic of Ecuador, which has helped supervise the consortium's activities from the outset and which owns much, if not all, of the affected lands. Petroecuador and the Republic of Ecuador thus are necessary 'persons to be joined if feasible' under either and both prongs of Fed.R.Civ.P. 19(a) ..."

4.80. By its judgment of 12 August 1997, the US District Court for the Southern District of New York (Judge Rakoff) denied Ecuador's request to join the Aguinda Complaint as an intervener.[45]

4.81. The Aguinda Plaintiffs (and Ecuador) appealed to the US Court of Appeals for the Second Circuit. By its judgment of 5 October 1998, the Second Circuit vacated Judge Rakoff's orders and remitted the case to him at the US District Court for reconsideration.[46] It held (inter alia) that dismissal on the ground of forum non conveniens was erroneous in the absence of a condition requiring Texaco to submit to jurisdiction in Ecuador.

[43] C-291, p. 5.
[44] C-477.
[45] See C-291, p. 12.
[46] See C-291, p. 1.

# SA473

4.82. By its judgment dated 30 May 2001, the US District Court for the Southern District of New York (Judge Rakoff) dismissed the Aguinda Complaint for a second time.[47] The Court ordered an unconditional stay on the ground of forum non conveniens because the case had "everything to do with Ecuador and nothing to do with the United States [of America]". As there also recorded: "Following remand [by the Second Circuit to Judge Rakoff], Texaco provided the missing commitment to submit to the jurisdiction of the courts of Ecuador" (page 4 of the judgment).

4.83. This undertaking in favour of Ecuadorian jurisdiction took the form of a Notice of Agreements made by Texaco on 11 January 1999.[48] It provides (in material part) as follows:

> "Section A - Actions to Which Agreements Apply: Texaco Inc.'s agreements herein apply only to a lawsuit that meets all the following conditions:
>
> 1. The lawsuit must be brought by a named plaintiff in Aguinda. et al. v, Texaco Inc., Case No. 93 Civ. 7527 (JSR) (hereafter "Aguinda").
>
> 2. The lawsuit must have been filed in an appropriate court of competent civil jurisdiction in Ecuador;
>
> 3. The lawsuit must arise out of the same events and occurrences alleged in the Aguinda Complaint filed in this Court on November 3, 1993.
>
> 4. To insure prompt notice, a copy of each Complaint intended to be filed by Aguinda plaintiffs (or any of them) in Ecuador must have been delivered to Texaco Inc.'s designated representative in Ecuador identified in Section B(1) below not later than the actual date on which it is filed.
>
> Section B - Agreements: With respect to any lawsuit that meets the conditions set forth above (a "Foreign Lawsuit"), Texaco Inc. hereby makes the following agreements:
>
> 1. Texaco Inc. will accept service of process in a Foreign Lawsuit in accordance with the applicable law of Ecuador. Texaco Inc.'s designated representative in Ecuador authorized to accept service of process in a Foreign Lawsuit shall be: [Name and address of Texaco's representative in Quito Ecuador here omitted]. The authority of [Texaco's representative] to accept service of process in a Foreign Lawsuit will become effective upon final dismissal of this action and judgment by

---

[47] C-10.
[48] R-3 (as more fully described in this Tribunal's Third Interim Award on Jurisdiction and Admissibility, para 3.32).

# SA474

*this Court. (The judgment shall become "final" upon the exhaustion of all available appeals or, if no appeal is filed, the time for filing appeals has expired.)*

*2. In any such Foreign Lawsuit, Texaco Inc. will waive and/or not assert an objection based on lack of in personam jurisdiction to the civil jurisdiction of a court of competent jurisdiction in Ecuador.*

*3. In any such Foreign Lawsuit, Texaco Inc. will waive any statute of limitations-based defense that matured during the period of time between: (a) the filing date of the Aguinda Complaint in this Court (i.e. November 3, 1993), and (b) the 60th day after the dismissal of this action and judgment becomes final, as defined in Section B(1) above. Texaco Inc., however, is not waiving any statute of limitations-based rights or defenses with respect to the passage of time prior to November 3, 1993, and Texaco Inc. expressly reserves its right to contend in a Foreign Lawsuit that plaintiffs' claims were barred, in whole or in part, by the applicable statute of limitations as of November 3, 1993 when they filed their Complaint in this Court.*

*4. Texaco Inc. agrees that discovery conducted to date during the pendency of Aguinda in this Court may be used by any party in a Foreign Lawsuit, including Texaco Inc., to the same extent as if that discovery had been conducted in proceedings there, subject to all parties' rights to challenge the admissibility and relevance of such discovery under the applicable rules of evidence.*

*5. Texaco Inc. agrees to satisfy a final judgment (i.e. a judgment with respect to which all appeals have been exhausted), if any, entered against it in a Foreign Lawsuit in favor of a named plaintiff in Aguinda, subject to Texaco Inc.'s reservation of its right to contest any such judgment under New York's Recognition of Foreign Country Money Judgments Act, 7B N.Y. Civ. Prac. L&R § 5301-09 (McKinney 1978)."*

(This undertaking, as varied, came into effect with the eventual stay of the Aguinda Litigation on 16 August 2002, i.e. after Texaco's "merger" with Chevron in 2001).

4.84.  In 2001, the Aguinda Plaintiffs appealed from Judge Rakoff's dismissal to the US Court of Appeals for Second Circuit. By its judgment dated 16 August 2002, the Second Circuit affirmed, as modified, Judge Rakoff's Order.[49]

4.85.  The Second Circuit recorded (page 4): "Texaco consented to personal jurisdiction in Ecuador as to the Aguinda plaintiffs … in … Ecuador …. Texaco stipulated it would waive its statute of limitations defenses that matured during the period of time between the filing of the complaint and the 60th day after the dismissal of the action by the district court. It preserved such defenses, however, with respect to the passage of time prior to

---

[49] C-65.

# SA475

the initial filing of the complaints. It also offered to stipulate that plaintiffs could utilize the discovery obtained thus far in resumed proceedings in Ecuador or Peru. Texaco then renewed its motion to dismiss by reason of forum non conveniens." The Second Circuit decided (page 8): "The district court's judgment dismissing for forum non conveniens is affirmed, subject to the modification that the judgment be conditioned on Texaco's agreement to waive defenses based on statutes of limitation for limitation periods expiring between the institution of these actions [i.e. 3 November 1993] and a date one year subsequent to the final judgment of dismissal. " The Tribunal understands that Texaco agreed to vary its condition regarding limitation, as directed by the Second Circuit.

4.86.  Much later, in 2011, the US Court of Appeals for the Second Circuit decided in the New York Stay Legal Proceedings (described below) that Texaco's undertaking (of 1999, as varied) bound Chevron, albeit a distinct and separate legal person under the laws of the USA. The Second Circuit held :[50]

> "*Chevron Corporation claims, without citation to relevant case law, that it is not bound by the promises made by its predecessors in interest Texaco and Chevron-Texaco, Inc. However, in seeking affirmation of the district court's forum non conveniens dismissal, lawyers from Chevron-Texaco appeared in this Court and reaffirmed the concessions that Texaco had made in order to secure dismissal of Plaintiffs' complaint. In so doing, Chevron-Texaco bound itself to those concessions. In 2005, Chevron-Texaco dropped the name "Texaco" and reverted to its original name, Chevron Corporation. There is no indication in the record before us that shortening its name had any effect on Chevron-Texaco's legal obligations. Chevron Corporation therefore remains accountable for the promises upon which we and the district court relied in dismissing [the Aguinda] Plaintiffs' action.*"[51]

4.87.  The Tribunal acknowledges the continuing controversy as to whether or not Texaco's 1999 undertaking (as varied) binds Chevron, as distinct from Texaco. Although other legal materials suggest otherwise, this decision of the Second Circuit ostensibly binds both Chevron and the Respondent as a matter of issue (or collateral) estoppel and judicial estoppel under the laws of the USA. (For reasons explained in Part VIII below, the Tribunal does not think it necessary or appropriate to decide this controversy, one way or the other, in this Award).

---

[50] CLA-435; R-247.
[51] CLA-435; R-24, fn 3.

4.88. During the Aguinda Litigation, in support of its case on forum non conveniens, Texaco generally lauded the Ecuadorian judicial system as the forum for its disputes with the Aguinda Plaintiffs. In the words of one of Texaco's expert witnesses testifying in 2000: "Despite isolated problems that may have occurred in individual criminal proceedings, Ecuador's judicial system is neither corrupt nor unfair. Such isolated problems are not characteristic of Ecuador's judicial system, as a whole".[52]

4.89. *(2) The Lago Agrio Litigation (Ecuador):* The Lago Agrio Plaintiffs' Complaint against Chevron as the sole named defendant is, in its original Spanish version, a document of 17 pages.[53] It was filed with the Lago Agrio Court on 7 May 2003. By this time, the "merger" between Texaco and Chevron had taken place (in 2001).

4.90. The Lago Agrio Complaint begins with the list of the 48 individual plaintiffs, all being (as translated into English) "domiciled in the Secoya Community of San Pablo de Aguarico, Canton of Shushufundi, Province of Sucumbíos" and "Ecuadorian nationals engaged in farming activities." These plaintiffs are described as having been the same Aguinda Plaintiffs in the stayed Aguinda Litigation New York, having there sought "enforcement of their own rights as well as those of other people in the same class, as the term is used in [New York's] procedural rules to designate the people who might find themselves in an identical legal situation with regard to the specifics of the lawsuit [i.e. the Aguinda Litigation]" (Paragraph 8).

4.91. Part I of the Lago Agrio Complaint pleads the alleged "background" to the case, including the 1998 Final Release (forming part of the 1995 Settlement) and the "merger" between Texaco and Chevron. Part II pleads the alleged "contaminating methods employed by Texaco". Part III pleads the alleged consequential "damage and the affected population". Its Paragraph III.2 pleads, as a matter of causation, the alleged consequences to the health and life expectancy of the population, including but not expressly so, the Lago Agrio Plaintiffs. Part IV pleads "Texaco Inc.'s liability". In the latter's Paragraph IV.9, Texaco's liability and remedial obligation were allegedly "passed on to" Chevron by virtue of the "merger" between the two corporations" described in Paragraph I.12. Thus far, apart from the allegations directed expressly

---

[52] C-2541; R-1222A, Section II.E, fn 6.
[53] C-71.

# SA477

against Chevron, there is a broad similarity between the complaint in the Aguinda Litigation and the complaint in the Lago Agrio Litigation.

4.92.  Part V of the Lago Agrio Complaint pleads the "legal basis" for the claim under the laws of Ecuador. It invokes Articles 2241 and 2256 of the Civil Code (Paragraph V.1); Articles 23.6 and 86 of the Constitution (Paragraph V.3(a)); Article 2260 of the Civil Code, later re-numbered as Article 2236 (Paragraph V.1(b)); and Articles 41 and 43 of the 1999 Environmental Management Act, the "EMA" (Paragraph V.3(c)).[54] These EMA provisions are alleged to establish "a public action" ("acción pública") based on the breach of environmental laws" and "the right of legal entities, individuals or human groups bound by a common interest and directly affected by a harmful action or omission, to bring an action for damages based on the harm to their health and environment, including the biodiversity along with its constituting elements."[55]

4.93.  Part VI of the Lago Agrio Complaint pleads the "prayer for relief". Such relief is claimed by the Lago Agrio Plaintiffs "in our capacity as members of the affected communities and in safeguard of their recognized collective rights".[56] The relief claims specific remedial and ancillary works, with the necessary funds to be paid by Texaco to the Amazon Defense Front (the "ADF"), together with 10% of such value payable (with litigation costs) to the ADF "by express request of the plaintiffs". It does not expressly claim compensation for personal harm particular to the individual Lago Agrio Plaintiffs, or any of them. Part VI addresses "jurisdiction, amount of claim and procedure", invoking (inter alia) Articles 42(2) and 43 of the EMA. Part VIII addresses "notices".

4.94.  The Lago Agrio Court issued its Judgment in the Lago Agrio Litigation on 14 February 2011 (with its Clarification Order of 4 March 2011), adverse to Chevron. Chevron initiated three successive appeals against the Lago Agrio Judgment, resulting in the Judgments of the Appellate Court (2012), the Cassation Court (2013) and the Constitutional Court (2018).

[54] These texts are set out above, in both the original Spanish and English translation: see Part I, Annex 5.
[55] In the original Spanish: "[la Ley de Gestión Ambiental] *reconoce a las personas naturales o jurídicas y a los grupos humanos vinculados por un interés común y afectados directamente por la acción u omisión dañosa, el derecho a interponer acciones por daños y perjuicios y por el deterioro causado a la salud o al medio ambiente, incluyendo la biodiversidad con sus elementos constitutivos*".
[56] In the original Spanish, "*como miembros de las comunidades afectadas y en guardia de los derechos reconocidos colectivamente a éstas ...*".

# SA478

4.95. *(3) The "Commercial Cases" Arbitration (The Hague)* This arbitration, known as the "Commercial Cases Arbitration", was brought under Article VI of the Treaty, applying the UNCITRAL Arbitration Rules (1976) before the Permanent Court of Arbitration at The Hague, the Netherlands (PCA Case No. 2007-02/AA277), by Chevron and TexPet as the claimants, against Ecuador, as the respondent. This UNCITRAL arbitration was commenced on 21 December 2006.

4.96. The Commercial Cases tribunal made an interim award on jurisdiction of 1 December 2008, a partial award on the merits of 30 March 2010[57] and a final award of 31 August 2011.[58] The tribunal rejected the respondent's jurisdictional objections; the tribunal found a breach by the respondent of its obligation under Article II(7) of the Treaty ("effective means"),[59] through the undue delay of the Ecuadorian courts in deciding TexPet's seven cases asserting contractual claims for payment under the two Concession Agreements of 1964 and 1973; and the tribunal held the respondent liable for damages in the principal amount of US$ 77.74 million, together with pre-award and post-award compound interest.

4.97. Under challenge by the respondent, the awards in the Commercial Cases were upheld by the Dutch courts: namely, the Hague District Court (2012), the Hague Court of Appeal (June 2013) and the Hoge Raad (26 September 2014).[60] In the USA, the US District Court for the District of Columbia recognised and enforced the final award under the 1958 New York Convention in 2013.[61] The US Court of Appeals for the District Court of Columbia Circuit dismissed the respondent's appeal on 4 August 2015.[62]

4.98. To the Tribunal's understanding, on 22 July 2016, Ecuador (as the respondent) paid to Chevron and TexPet the sums due under the awards made in the Commercial Cases Arbitration.[63]

---

[57] CLA-47.
[58] RLA-351.
[59] Article II(7) of the USA-Ecuador BIT provides: "*Each Party shall provide effective means of asserting claims and enforcing rights with respect to investments, investment agreements, and investment authorizations.*" (In the Spanish version, it reads "*Cada parte establecerá medios eficaces para hacer valer las reclamaciones y respetar los derechos relativos a las inversiones, los acuerdos de inversión y las autorizaciones de inversión.*").
[60] C-1930, C-1931; see the Claimants' letter to the Tribunal dated 26 September 2014.
[61] C-1927, C-1932.
[62] C-2523.
[63] See the Claimants' letter to the Tribunal dated 19 March 2018, p. 7.

# SA479

4.99.   Apart from the Commercial Cases tribunal's interpretation of Article II(7) of the Treaty (to which the Tribunal returns in Part VII below), this Tribunal does not consider that the Commercial Cases Arbitration provides any specific guidance to the relevant issues in this arbitration.

4.100.  As to Article II(7), the Tribunal notes that the Commercial Cases tribunal decided in its Partial Award that Ecuador's obligation as to "effective means" constitutes a lex specialis and not a restatement of customary international law on denial of justice, that the failure of domestic courts to enforce rights effectively would constitute a violation of Article II(7); and that the host State's treaty obligation was a positive obligation to provide "effective means", as opposed to a mere negative obligation not to interfere in the functioning of those means.[64] It also notes the Commercial Cases tribunal's reference to the "measure of deference" to be afforded to a domestic judicial system and that the tribunal was "not empowered [by Article II(7) of the Treaty] to act as a court of appeal reviewing every individual alleged failure of the local judicial system de novo."[65] (The Tribunal returns to these matters also, in Part VII, below).

4.101.  *(4) The Ecuador-USA Treaty Arbitration (PCA):* This was an inter-state arbitration brought on 28 June 2011 by Ecuador (as the claimant) against the USA (as respondent) under Article VII of the Treaty providing for State-State arbitration,[66] resulting in an award dated 29 September 2012 dismissing Ecuador's claim for want of jurisdiction.[67] That claim concerned (inter alia) the interpretation of "effective means" in Article II(7) of the Ecuador-USA Treaty (i.e. the same Treaty in this case), as decided in the partial award issued in the Commercial Cases Arbitration.

4.102.  *(5) The AAA Arbitration (New York)*: This arbitration was commenced in June 2004 before the American Arbitration Association (the "AAA") in New York under an arbitration agreement allegedly contained in the 1965 Joint Operating Agreement (the

---

[64] See CLA-47, paras 241, 243, 244, 248.
[65] CLA-47, para 246.
[66] Article VII(1) of the Ecuador-USA Treaty provided (inter alia): "*Any dispute between the Parties concerning the interpretation or application of the Treaty which is not resolved through consultations or other diplomatic channels, shall be submitted upon the request of either Party, to an arbitral tribunal for binding decision in accordance with the applicable rules of international law ...*"
[67] *Republic of Ecuador v. United States of America*, PCA Case No. 2012-05, Award, 29 September 2012.

## SA480

"1965 JOA") and a draft JOA of 1974 under the 1964 and 1973 Concession Agreements (i.e. it was not brought under the Treaty).

4.103. The claimants were Chevron and TexPet, asserting a contractual indemnity for environmental damage from the respondents, Ecuador and PetroEcuador. The respondents applied in New York to the US District Court for the Southern District of New York for a stay of the AAA Arbitration. By orders of the US District Court (Judge Sand), the AAA Arbitration was partially stayed in June 2007,[68] affirmed on appeal by the US Court of Appeals for the Second Circuit on 7 October 2008.[69] The US Supreme Court denied Chevron's petition for a writ of certiorari in June 2009.[70]

4.104. (6) *The New York Stay Legal Proceedings (New York):* On 14 January 2010, the Respondent and the Lago Agrio Plaintiffs applied to the US District Court for the Southern District of New York to stay this arbitration between the Claimants and the Respondent under the Treaty. Their application was rejected by the District Court (Judge Sand) on 16 March 2010.[71] On appeal, the District Court's judgment was upheld by the US Court of Appeals for the Second Circuit on 17 March 2011.[72]

4.105. In its judgment, the Second Circuit recognised the autonomous nature, or 'separability', of the Treaty from the arbitration agreement between the Claimants and the Respondent derived from the Treaty:

> "At the outset, we note that Chevron is not a party to the BIT. Unlike the more typical scenario where the agreement to arbitrate is contained in an agreement between the parties to the arbitration, here the BIT merely creates a framework through which foreign investors, such as Chevron, can initiate arbitration against parties to the Treaty. In the end, however, this proves to be a distinction without a difference, since Ecuador, by signing the BIT, and Chevron, by consenting to arbitration, have created a separate binding agreement to arbitrate."[73]

4.106. (7) *The Section 1782 Litigation (USA):* Beginning in December 2009, Chevron initiated numerous legal proceedings in several US District Courts in the USA under U.S.C. Section 1782 in order to obtain discovery for use in the Lago Agrio Litigation, the

---

[68] R-73.
[69] R-74.
[70] R-75.
[71] CLA-168.
[72] R-247; CLA-435.
[73] R-247, pp. 12-13; CLA-435, p. 10.

# SA481

Veiga-Pérez Criminal Prosecutions and this arbitration. These proceedings were directed to (inter alios) Mr Donziger, Mr Berlinger, Mr Bonifaz, Mr Kohn, Mr Wray, Dr Calmbacher, Mr Champ, Mr Rourke, Stratus Consulting Inc., E-Tech and Banco Pichincha. The Respondent, in turn, later initiated legal proceedings in the USA under U.S.C. Section 1782 in order to obtain discovery for use in this arbitration, including (as later described in Part VII below) Mr Connor.

4.107. Title 28, Section 1782 of the U.S. Code permits a US district court, upon the application of any interested person, to order a person found or residing within the district "to give testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal". The factors to be considered in exercising this discretionary power are set out in the US Supreme Court's judgment in *Intel Corp. v Advanced Memo Devices Inc.* 542 US 241 (2004). Section 1782 does not apply to persons not subject to the jurisdiction of the courts of the USA.

4.108. As listed in the RICO Judgment (page 1), the reported US court decisions under Section 1782, relevant to the RICO Litigation and this arbitration, include the following*: In re Chevron Corp.*, 709 F.Supp.2d 283 (S.D.N.Y.) ("Berlinger 1782 I"), aff'd sub nom., *Chevron Corp v. Berlinger*, 629 F.3d 297 (2d Cir.2010); *In re Chevron Corp.*, 736 F.Supp.2d 773 (S.D.N.Y.2010) ("Berlinger 1782 II"); *In re Chevron Corp.*, 749 F.Supp.2d 135 (S.D.N.Y.) ("Donziger 1782 I"), fuller opinion, *In re Chevron Corp.*, 749 F.Supp.2d 141 (S.D.N.Y.) ("Donziger 1782 II, on reconsideration, 749 F.Supp.2d 170 (S.D.N.Y.) ("Donziger 1782 II") aff'd sub nom., *Lago Agrio Plaintiffs v Chevron Corp.*, Nos. 10-4341-cv, 10-4405-cv (CON), 2010 WL 5151325 (2d Cir. Dec. 15 2010).[74]

4.109. *(8) The RICO Litigation (New York)*: This lawsuit was brought by Chevron on 1 February 2011 before the US District Court for the Southern District of New York against Mr Donziger and the Law Offices of Steven R. Donziger (collectively, the "Donziger defendants"), Pablo Fajardo, Luis Yanza, Stratus Consulting, Douglas Beltman, Anne Maest, 47 of the Lago Agrio Plaintiffs and several others.[75] Chevron

---

[74] The full list of these 23 or so applications appears in footnote 56 of Mr T. Boutros's article "Ten Lessons from the Chevron Litigation: The Defense Perspective", R-893.
[75] C-916.

claimed, as originally pleaded, damages and injunctive relief for a pattern of racketeering activity and violations of 18 USC Section 1962 and New York law.

4.110. It is unnecessary here to address the numerous interlocutory orders and judgments made in the RICO Litigation by the US District Court for the Southern District of New York and the US Court of Appeals for the Second Circuit. As listed in the RICO Judgment, these include: *Chevron Corp. v. Donziger*, 768 F.Supp 581 (S.D.N.Y.2011) ("Donziger I") (granting preliminary injunction); *Chevron Corp v. Donziger*, No. 11 Civ.0691(LAK),2011 WL 979609 (S.D.N.Y. Mar.7,2011) ("Donziger II") (denying motion to transfer case to another judge); *Chevron Corp. v. Donziger*, No. 11 Civ. 0691 (LAK), 2011 WL 1408386 (S.D.N.Y. Apr. 6, 2011) ("*Donziger II*") (denying stay pending appeal and other relief); *Chevron Corp. v. Donziger*, - F. Supp. 2d - 2011 WL 1465679 (S.D.N.Y. Apr. 15, 2011) ("*Donziger IV*") (granting separate trial and expedited discovery on claim for declaratory judgment); *Chevron Corp. v. Donziger*, No. 11 Civ. 0691 (LAK), 2011 WL 1560926 (S.D.N.Y. Apr. 18, 2011) ("*Donziger V*") (denying motion to stay certain aspects of preliminary injunction pending appeal); *Chevron Corp. v. Donziger*, - F. Supp. 2d -, No. 11 Civ. 0691 (LAK), 2011 WL 1747046 (S.D.N.Y. May 9, 2011) ("*Donziger VI*") (denying recusal motion); *Chevron Corp. v. Donziger*, No. 11 Civ. 0691 (LAK), 2011 WL 2150450 (S.D.N.Y. May 31, 2011) ("*Donziger VII*") (granting in part and denying in part motion to intervene); *Chevron Corp. v. Salazar*, No. 11 Civ. 3718 (LAK), 2011 WL 2326893 (S.D.N.Y. Jun. 14, 2011) ("*Salazar I*") (denying motion to stay pending intervention appeal); *Chevron Corp. v. Salazar*, No. 11 Civ. 3718 (LAK), 2011 WL 2581784 (S.D.N.Y. Jun. 24, 2011) ("*Salazar II*") (denying motion to stay discovery); *Chevron Corp. v. Salazar*, - F. Supp. 2d -, 2011 WL 2556046 (S.D.N.Y. Jun. 28, 2011) ("*Salazar III*") (denying motion to compel deposition).

4.111. The RICO trial took place before the US District Court New York (Judge Kaplan) over seven weeks from 15 October to 26 November 2013. Its proceedings were recorded by verbatim transcript.[76] The District Court issued its judgment on 4 March 2014 in favour of Chevron and against the Donziger defendants.[77] Not counting its lengthy appendices, the RICO Judgment extends over 485 pages. Its conclusion reads in part: "The saga of

---

[76] See C-2365 to C-2384.
[77] C-2135 & 2136.

## SA483

the Lago Agrio case is sad. It is distressing that the course of justice was perverted. The LAPs [Lago Agrio Plaintiffs] received the zealous representation they wanted, but it is sad that it was not always characterised by honor and honesty as well. It is troubling that …. what happened here probably means that 'we'll never know whether or not there was a case to be made against Chevron' …"

4.112. On 8 August 2016, the Second Circuit affirmed the Judgment of the US District Court; and it dismissed the appeal by the Donziger defendants.[78] For this appeal, Ecuador (not being a disputing party) submitted to the Second Circuit an amicus brief dated 8 July 2014.[79]

4.113. On 19 June 2017, the US Supreme Court denied the Donziger defendants' petition of certiorari from the judgment of the Second Circuit,[80] as notified by the Claimants' letter dated 29 June 2017 to the Tribunal.

4.114. On 28 February 2018, the US District for the Southern District of New York (Judge Kaplan) issued its judgment regarding the allocation and assessment of costs incurred by the Parties in the RICO Litigation, as reserved in the RICO Judgment.[81] The Court ordered Mr Donziger to pay US$ 944,463.85 to Chevron towards its legal costs.

4.115. *(9) The Huaorani Litigation (New York):* This lawsuit was brought before the New York Supreme Court on 2 September 2014 by Kempera Baihua Hunai and 41 others from the Huaorani community in the Oriente against the same Donziger defendants and the Amazon Defence Front. The plaintiffs, legally represented by Professor Judith Kimerling[82], claimed from the Donziger defendants a proportional share in the proceeds of the Lago Agrio Judgment, pleading (inter alia) breaches of fiduciary duty, unjust enrichment, constructive trust and ancillary relief.

---

[78] C-2540.
[79] C-2541; R-1222A.
[80] C-2542.
[81] See C-2547.
[82] Professor Kimerling has studied and written extensively on the indigenous peoples of the Amazon, since 1989. Several of her materials were submitted in evidence by the Parties: see (i) J. Kimerling, "The Indigenous Peoples and the Oil Frontier in Amazonia: The Case of Ecuador, ChevronTexaco, and *Aguinda v Texaco*" (2006) 38 New York University Journal of International Law and Politics 413: C-483; (ii) J. Kimerling, "Disregarding Environmental Law: Petroleum Development in Protected Natural Areas and Indigenous Homelands in the Ecuadorian Amazon" (1991) 14 Hastings International and Comparative Law Review 849: R-472; and (iii) J. Kimerling et. al, *Amazon Crude* (1991): R-473. For a time, Professor Kimerling was professionally involved as a consultant to the Aguinda Plaintiffs in the Aguinda Litigation in New York. She was not a witness in this arbitration.

# SA484

4.116. The same plaintiffs had earlier applied to join, as interveners, in the RICO Litigation. The US District Court for the Southern District of New York (Judge Kaplan) had denied their request by order dated 14 January 2013, leaving them "free to pursue their claims in independent actions in the New York State and doubtless other courts." In this Huaorani litigation, the Donziger defendants were represented by Mr Steven Donziger. It appears that the ADF took no part in this litigation, not being subject to the non-consensual jurisdiction of the New York Courts.

4.117. The Huaorani complaint was described, in the first instance judgment of the New York Supreme Court, as follows:

> "... Broadly speaking, plaintiffs allege that Donziger and the ADF are seeking complete control of the proceeds of the Lago Agrio litigation, for their own benefit and to the detriment of the Huaorani ... Plaintiffs allege that the Donziger defendants have ... claimed to represent all of the indigenous people, including plaintiffs and other Huaorani, in activities related to the Lago Agrio. However, it is plaintiffs' position that plaintiffs never authorised such representation and that there is no written retainer agreement, nor any other agreement, which sets forth Donziger or ADF's obligations to plaintiffs in connection with the Lago Agrio Litigation. Nevertheless, plaintiffs allege that as a result of Donziger's and ADF's representations that Donziger is counsel for plaintiffs in the Lago Agrio litigation and that ADF brought the Lago Agrio litigation on behalf of all of the Ecuadorian people harmed by Texaco's operations, including the Huaorani, the Donziger defendants and ADF owe plaintiffs a fiduciary duty, including a duty to protect their interests in the Lago Agrio litigation, a duty to notify plaintiffs of any arrangements with third parties (investors, funders, and/or the Republic of Ecuador) regarding the proceeds of the judgment, and a duty to notify plaintiffs of enforcement efforts, settlement negotiations or any other significant developments regarding the proceeds of the litigation.
>
> Plaintiffs claim, on information and belief, that the money that the Donziger defendants and ADF collect will be 'dissipated and funnelled to off-shore havens beyond the reach of US Courts and that the Donziger Defendants and ADF intend to assign away [the Huaorani's] interest in the Lago Agrio judgment in exchange for money'. It is plaintiffs' position that the Donziger defendants and ADF have agreements with investors and funders in exchange for interests in the judgments and that they have already collected more than $10 million by selling shares in the judgment, that the Republic of Ecuador expects to receive at least 90% of the proceeds of the judgment; and that the Donziger defendants and ADF intend to distribute the remaining proceeds of the judgment to lawyers and investors before passing the remaining money to Ecuadorian trusts controlled by ADF." (pp. 4-5).

4.118. Whilst opposing the Huaorani plaintiffs' complaint as regards both the Court's exercise of jurisdiction and the merits, the Donziger defendants are recorded, in the judgment, as

# SA485

accepting: "that ADF agrees that the Huaorani people should benefit from the Lago Agrio litigation" (p.12, footnote 1). The judgment also records that the ADF executed a retainer agreement with the Donziger defendants in New York (pp. 13 & 15-16). There is no similar reference to any retainer or other agreement with the individual Huaorani plaintiffs; and, indeed, the judgment refers to Mr Donziger's "purported clients", not "clients" (p. 15).

4.119. By its judgment issued on 29 August 2014, the New York Supreme Court stayed the lawsuit under the New York legal doctrine of forum non conveniens and dismissed the plaintiffs' complaint.[83] The plaintiffs appealed to the New York Supreme Court, Appellate Division, First Department. By its judgment issued on 16 June 2015, that Court affirmed the Supreme Court's order for a stay.[84]

4.120. The Huaorani Litigation is factually significant. First, it confirms that Mr Donziger, with his colleagues in Ecuador (including the ADF), had no written retainer or power of attorney to act in the Lago Agrio Litigation on behalf of any member of the Huaorani community as individuals. Second, it confirms that Mr Donziger and his Ecuadorian colleagues (including the ADF) intended that, nonetheless, the Lago Agrio Judgment should accrue (in part) for the benefit of the members of the Huaorani community as a whole.

4.121. The Tribunal here notes again the broad language of the Lago Agrio Complaint: it alleges legal injury to and relief for all affected persons within a large geographical area, including expressly members of the Huarani community.[85] The Tribunal also notes that none of the named Aguinda Plaintiffs or the named Lago Agrio Plaintiffs were members of the Huaorani community.[86] (These matters are relevant to the Tribunal's later consideration of the "diffuse" nature of Chevron's legal liability in the Lago Agrio Judgment, to which the Tribunal returns in Part V below)

4.122. *(10) The Veiga-Pérez Criminal Prosecutions (Ecuador):* In 2003, the Respondent's Comptroller-General initiated criminal proceedings, later to become prosecutions, against (inter alios) Mr Veiga (a national of the USA) and Dr Pérez (a national of

---

[83] RLA-685.
[84] RLA-686.
[85] C-71, section III.
[86] See C-483, p. 476 (as regards the Aguinda Complaint in New York); p. 631 (as regards the Lago Agrio Complaint).

# SA486

Ecuador). These proceedings are also called "the criminal indictments" in this arbitration.

4.123.   These Criminal Prosecutions alleged "falsity in a notarial instrument" (later "ideological falsehood") under Articles 338 and 339 of the Ecuadorian Penal Code, committed by Mr Patricio Rivadeneira (the former Minister of Energy and Mines), Dr Ramiro Gordillo (the former Executive President of PetroEcuador), Mr Luis Alban Granizo (the former Manager of Petroproduccion), Mr Veiga and Dr Pérez (TexPet's Vice-President and legal representative, respectively). The alleged falsity concerned the 1995 Settlement Agreement (with associated documentation), signed by the Ministry of Energy and Mines, PetroEcuador and TexPet.

4.124.   The Lago Agrio Plaintiffs' representatives co-operated with members of President Correa's administration to bring these prosecutions in an attempt to nullify the effect of Chevron's reliance upon the 1995 Settlement Agreement as a defence in the Lago Agrio Litigation.

4.125.   For example, in her email dated 10 February 2005 to the Lago Agrio Plaintiffs' representatives, Dr Escobar described her meeting on 8 February 2005 with members of the Presidential Office, as follows:[87]

> "... I explained to Dr González [the Legal Under-Secretary General of the Presidential Office] that .... [w]ith respect to the topic of the contract, I explained that the Attorney General's Office [sic] and all of us working on the State's defense were searching for a way to nullify or undermine the value of the remediation contract and the final acta and that our greatest difficulty lay in the time that has passed."

(The "remediation contract" and "final acta" were references to the 1995 Settlement Agreement ad the 1998 Final Release. The "State's defense" referred to the pending AAA Arbitration in New York, described above).

4.126.   Later, in his email dated 10 February 2006 to the Lago Agrio Plaintiffs' representatives, Mr Donziger stated "… Now that we have the inspections schedule, it's time to request Ricardito [sic] Reis Veiga as a witness. Pablo [Fajardo] has the questions. We exploit that for the press to further create the image of fraud, to put a face on the fraud, perhaps

---

[87] C-694.

# SA487

during the mobilization and press conference about fraud. In the US it's going to be a bombshell with the press. We should set a date. Poor him …".[88] In his email message dated 1 October 2007 to Messrs Prieto, Donziger, Yanza, Saenz and Ponce, Mr Fajardo stated: " … Today I went to the Supreme Court to look for the file on the issue regarding the prosecutor's office … Now the file is being reviewed by one of the assistants to the Chief Justice of the Supreme Court. Tomorrow we will meet with the Chief Justice of the Supreme [Court] to move this issue forward …". [89]

4.127. By its decision dated 9 August 2006, for want of any evidence of criminal conduct, the Office of the Prosecutor-General dismissed these criminal prosecutions.[90] However, by its decision dated 31 March 2008, "in the light of new elements", the Office of the Prosecutor-General re-opened the criminal prosecutions.[91]

4.128. One of these elements included President Correa's visit to the former concession area in April 2007, organised by the Lago Agrio Plaintiffs' representatives. During his visit, the President was accompanied by Messrs Fajardo and Yanza. As reported by "A-F.L./Presidential Press":[92]

> *"Today, President Rafael Correa called upon the District Attorney of Ecuador to allow a criminal case to be heard against the Petroecuador officers who approved the petroleum remediation in Ecuador's Amazonia performed by the multinational company, Texaco. The petition was made after a visit was made to the covered pits of Well 7 (Shushufindi), supposedly remediated by the oil company in the 1990s. Residents in the area said that the oil company did not solve the problem, rather just covered the crude waste pits with dirt. Those affected emphasized that the waste also contaminates the river around which indigenous communities traditionally live. Similarly, some residents in the area stated their complaints about the activities being carried out by Petroecuador in the area. One person reported to the president and the Minister of Health, Caroline Chang, on a disease he has, allegedly linked to oil activities, asking the government for help. During the president's visit, the visitors became familiar with some sites where oil waste remains in spite of the fact that an environmental remediation was carried out. The others who participated in this visit were the Minister of Health, Caroline Chang; the Minister of Tourism, Marfa Isabel Salvador; the Minister of the Environment, Ana Alban; the Minister of Energy, Alberto Acosta, Petroecuador's president, Carlos Pareja; and the Secretary of Communication, Monica Chuji."*

---

[88] C-777.
[89] C-743.
[90] C-234.
[91] C-247.
[92] C-242.

# SA488

4.129. By its order dated 16 September 2008, the Supreme Court (First Criminal Division) decided that the prosecutorial record be sent to the President of the Supreme Court of Justice, for trial.[93] By order dated 19 September 2008, the President of the Court accepted the case for prosecution.[94] Subsequently, by its lengthy opinion dated 29 April 2010 (based on 65 binders comprising 6,492 documents), the Office of the Prosecutor-General decided that there was relevant evidence of criminal conduct, by (inter alios) Mr Veiga and Dr Pérez, requesting that a summons for trial be issued to the defendants by the National Court of Justice (First Criminal Division).[95] By its order dated 15 February 2011, the Court fixed 2 March 2011 as the date of the preliminary hearing in Quito.[96] By its order dated 24 February 2011, the Court adjourned that hearing.[97]

4.130. By its order dated 1 June 2011, after the resumed preliminary hearing, the National Court of Justice (First Criminal Division) declared the nullity of the Criminal Prosecutions against (inter alios) Mr Veiga and Dr Pérez.[98] By that date, the Lago Agrio Judgment and its Clarification Order had been issued (on 14 February and 4 March 2011).

4.131. In September 2013, the Respondent resumed criminal investigations of individuals who signed the 1995 Settlement Agreement and related documentation. These proceedings were and remain confidential under Ecuadorian law. The Tribunal has not been informed whether any of Chevron's representatives are the target of such investigations.[99]

4.132. *(11) Enforcement Litigation (Ecuador)*: Since 30 May 2012, the Lago Agrio Plaintiffs have sought to enforce the Lago Agrio Judgment in (i) Ecuador, (ii) Canada, (iii) Brazil and (iv) Argentina. As regards Canada, Brazil and Argentina, these enforcement proceedings have already been summarised in Annex 4 to Part I above.

4.133. As to Ecuador, on 1 March 2012, the Lago Agrio Appellate Court declared the Lago Agrio Judgment enforceable; on 3 August 2012, the Lago Agrio Court ordered Chevron

---

[93] C-261.
[94] C-262.
[95] C-346.
[96] C-935.
[97] C-961.
[98] R-250.
[99] See Track II Hearing D13.3031-3032; and see also the Claimants' letter to the Tribunal dated 19 March 2018.

# SA489

to pay the judgment debt within 24 hours; and on 13 October 2012, the Lago Agrio Court ordered that the Lago Agrio Judgment's execution "be applicable to the entirety of the assets of Chevron Corporation, until such time as the entire obligation has been satisfied." Assets subject to the attachment order included Chevron's subsidiaries' intellectual property assets in Ecuador (including certain trademarks owned by Chevron Intellectual Property LLC, indirectly owned by Chevron), bank accounts in Ecuador and bank transfers through the Ecuadorian banking system, in addition to the modest funds found in TexPet's bank account at Banco Pichincha in Ecuador (US$ 358.00). On 25 October 2012, the Court extended the attachment order to additional trademark and intellectual property in Ecuador indirectly owned by Chevron. (At the Track II Hearing, the Tribunal was informed that these trademarks in Ecuador had no commercial value).[100]

4.134. On 27 June 2013, the Lago Agrio Court granted the Lago Agrio Plaintiffs' application to garnishee the payment due from the Respondent to Chevron and TexPet under the awards issued in the Commercial Cases Arbitration.[101] This order was notified to the Respondent under the Court's Order of 12 July 2016. On 21 July 2016, the Order was discharged by the Court upon the application to the Court by Mr Fajardo acting as the Lago Agrio Plaintiffs' representative. With the Respondent's payment of the Commercial Cases awards to Chevron and TexPet on 22 July 2016, these garnishee proceedings came to an end without any benefit to the Lago Agrio Plaintiffs.

4.135. The Lago Agrio Plaintiffs have made further attempts to seize assets in Ecuador indirectly owned by Chevron under these attachment orders. For example, in two motions dated 30 January 2015, the Lago Agrio Plaintiffs asked the Lago Agrio Court to instruct the Ecuadorian Intellectual Property Institute ("EIPI") to renew certain trademarks owned by Chevron Intellectual Property LLC and separately to order those trademarks embargoed pursuant to the Court's enforcement orders. On 5 April 2016, the Lago Agrio Plaintiffs requested the Court to appoint a depository to withdraw the funds that were seized from TexPet's bank account at Banco Pichincha. On 11 April 2016, the Lago Agrio Plaintiffs requested that the Court rule on the Lago Agrio

---

[100] Track II Hearing D1.218-219.
[101] C-1921; see also the Claimants' letters to the Tribunal dated 4 September 2013 and 19 March 2018, p. 7.

Plaintiffs' prior application for the EIPI to renew and embargo certain trademarks. On 12 July 2016, the Court refused these applications of 5 and 11 April 2016.

4.136. To date, no monies (apart, possibly, from the sum of US$ 358.00) have been recovered from Chevron, TexPet or its other subsidiaries in any enforcement proceedings of the Lago Agrio Judgment by the Lago Agrio Plaintiffs in Ecuador or elsewhere.

4.137. *(12) The Gibraltar Litigation:* Chevron began legal proceedings in Gibraltar against certain non-party funders of the Lago Agrio Litigation and ostensible beneficiaries of and administrators for recoveries from the enforcement of the Lago Agrio Judgement, including Mr DeLeon, the Woodsford Group and other defendants. The defendants applied to strike out Chevron's action. The Gibraltar Court refused their application, with the Court expressing surprise in its judgment that the Ecuadorian Courts had not ordered a re-hearing of the Lago Agrio Litigation.[102]

4.138. *(13) The Criminal Investigations (Ecuador):* The Respondent's criminal prosecutors initiated one or more investigations of specific individuals in the conduct of the Lago Agrio Litigation. As stated in the Respondent's letter of 21 July 2016 to the Tribunal and confirmed by its Counsel at the Track II Hearing,[103] the details of these investigations were and remain confidential under the Criminal Code of Ecuador, even from the Respondent's Attorney-General.

4.139. One such individual was Judge Núñez, with an investigation begun in 2009 for bribery (with others). These criminal investigations were closed in 2013.[104] Another is Dr Guerra, begun in 2013.[105] The Tribunal was informed by the Claimants that this criminal investigation remains pending.

4.140. To date, no prosecution has been brought against Dr Zambrano, Dr Guerra or any of the Lago Agrio Plaintiffs' representatives in Ecuador. However, as the Respondent stated, any criminal investigations into these individuals would be confidential under Ecuadorian law.

---

[102] Track II Hearing D.12.2767-2768.
[103] Track II Hearing D13.3031-3032.
[104] C-1917.
[105] See the Claimants' letter to the Tribunal dated 19 March 2018, p. 4.

4.141. *(14) This Treaty Arbitration (The Hague):* This arbitration was commenced by Chevron and TexPet against the Respondent by the Claimants' Notice of Arbitration dated 23 September 2009 under the Treaty and the UNCITRAL Arbitration Rules (the "Notice of Arbitration").

4.142. This Notice of Arbitration, which pre-dated the Lago Agrio Judgment of 14 February 2011, claimed (inter alia) the following relief under the Treaty:

> " ... *(3) An order and award requiring Ecuador to inform the court in the Lago Agrio Litigation that TexPet, its parent company, affiliates, and principals have been released from all environmental impact arising out of the former Consortium's activities and that Ecuador and Petroecuador are responsible for any remaining and future remediation work;*
>
> *(4) A declaration that Ecuador or Petroecuador is exclusively liable for any judgment that may be issued in the Lago Agrio Litigation;*
>
> *(5) An order and award requiring Ecuador to indemnify, protect and defend Claimants in connection with the Lago Agrio Litigation, including payment to Claimants of all damages that may be awarded against Chevron in the Lago Agrio Litigation;*
>
> *(6) An award for all damages caused to Claimants, including in particular all costs including attorneys' fees incurred by Claimants in defending the Lago Agrio Litigation and the criminal indictments; ...".*

4.143. The Notice of Arbitration pleaded several events allegedly taking place within the Lago Agrio Litigation up to September 2010, amounting to a "judicial farce". These included allegations relating to Mr Cabrera (as the Lago Agrio Court's global expert) and the Cabrera Reports, as to which it alleged 'collaboration' with the Lago Agrio Plaintiffs' representatives. It also alleged gross misconduct by the Lago Agrio Court, including Judge Núñez's improper predisposition towards the Lago Agrio Plaintiffs (until his recusal in August 2009) and the Respondent's resort to the Veiga and Pérez Criminal Prosecutions, in collusion with the Lago Agrio Plaintiffs' representatives, in an attempt to subvert Chevron's defences based on the 1995 Settlement Agreement in the Lago Agrio Litigation.

4.144. Following the Notice of Arbitration, as and when new evidential materials became available to them, the Claimants supplemented their pleaded case against the Respondent, in accordance with procedural orders made by the Tribunal and the

# SA492

UNCITRAL Arbitration Rules (as did, conversely, the Respondent). In particular, by their Supplemental Memorial on the Merits of 20 March 2012, the Claimants introduced a new allegation that the Lago Agrio Court's judgment of 14 February 2011 (as issued by the Lago Agrio Court and affirmed and, on 1 March 2012, declared enforceable by the Lago Agrio Appellate Court) had been corruptly 'ghostwritten' by representatives of the Lago Agrio Plaintiffs in collusion with Judge Zambrano. (The Tribunal returns to this allegation at length below).

4.145. To date, the Tribunal has made five awards in this arbitration: (i) the First Interim Award dated 25 January 2012; (ii) the Second Interim Award dated 16 February 2012; (iii) the Third Interim Award dated 27 February 2012; (iv) the Fourth Interim Award dated 7 February 2013; and (v) the First Partial Award on Track 1 dated 17 September 2013. It has also made 55 procedural orders, including its orders for interim measures dated 14 May 2010, 6 December 2010, 28 January 2011, 9 February 2011 and 16 March 2011. These awards and orders are listed in Annexes 1 and 3 to Part I above.

4.146. The Respondent applied to annul the Tribunal's five awards before the Hague District Court and Court of Appeal. The Hague District Court rejected the Respondent's applications, by its judgment dated 20 January 2016.[106] By its judgment dated 18 July 2017,[107] the Court of Appeal of The Hague confirmed the decision of the District Court "with an improvement of the legal grounds". The Respondent was entitled under Dutch law, to appeal from this judgment to the Supreme Court of The Netherlands (the "Hoge Raad").

4.147. By letter dated 1 August 2017, the Respondent notified the Tribunal that it was "currently evaluating" whether to initiate such an appeal. On 18 October 2017, the Respondent lodged a cassation appeal to the Hoge Raad. These appellate proceedings remain pending before the Hoge Raad, as of the date of this Award.[108]

4.148. By letter dated 12 July 2017, the Respondent requested that the Tribunal "terminate" its First, Second and Fourth Interim Awards for the reasons there set out, principally because "recent events in U.S. courts and in enforcement courts demonstrate that

---

[106] See the Claimants' letters to the Tribunal dated 1 August 2017 and 19 March 2018, p. 2, and the Respondent's letter dated 20 April 2018, p. 2.

[107] C-2545.

[108] See the Claimants' letter to the Tribunal dated 19 March 2018, p. 2, and the Respondent's letter to the Tribunal dated 20 April 2018, p. 2.

# SA493

Chevron faces no current imminent threat of irreparable harm" (pp. 4-5). By letter dated 19 July 2017, the Claimants opposed the Respondent's request. By its Procedural Order No 47 dated 31 October 2017, the Tribunal dismissed the Respondent's request for the reasons and upon the terms there set out.

### H: The Tribunal's Annotated Chronology 1993-2018

4.149. The Tribunal has found it necessary to set out the relevant facts, as it finds them on the evidence, in the form of an annotated chronology: from 1993 to the Lago Agrio Judgment and Clarification Order of 14 February and 4 March 2011; and from March 2011 to 2018. The events there described should be read with the documentary evidence referenced in the corresponding footnotes.

4.150. As regards an overall account of the Aguinda Litigation and the Lago Agrio Litigation, the Tribunal emphasises that these chronologies, albeit lengthy, are incomplete. They nonetheless suffice for the purpose of this Award.

4.151. Documentation in Spanish is here reproduced in English translations prepared by the Parties for the Tribunal.

### 1993

4.152. *3 November 1993*: As already indicated, the Aguinda Plaintiffs begin the Aguinda Litigation before the US Federal Court for the Southern District of New York, USA in 1993.[109] It is a putative (not certified) class action pleading several torts against Texaco, in negligence, nuisance, strict liability, trespass, conspiracy and violations of the law of nations under the US Alien Tort Claims Act. The complaint is brought in New York because, at the time, Texaco's headquarters were located at White Plains, New York. It lists 76 named plaintiffs, including 15 Kichwa (including Maria Aguinda), 24 Secoya and 37 non-indigenous "colonists". There are no named plaintiffs from the Cofán, Siona and Huaorani communities. However, the size of the putative class, estimated at 30,000 affected persons, is defined geographically to include members of these communities; but no class is ever certified by the Court.

---

[109] C-14.

# SA494

4.153. Texaco denies any liability to the Aguinda Plaintiffs and applies to dismiss the proceedings on two grounds: (i) forum non conveniens (in favour of the Ecuadorian Courts) and (ii) the Aguinda Plaintiffs' failure to join as parties indispensable third persons (namely PetroEcuador and Ecuador).

4.154. The Aguinda Plaintiffs are represented in the Aguinda Litigation by US lawyers, including Mr Cristóbal Bonifaz, Mr Steven Donziger and Mr Joseph Kohn (of Kohn, Swift and Graf, a law firm in Philadelphia with significant financial resources). The case is assigned to Judge Broderick; he died in March 1995; and the case is then re-assigned to Judge Rakoff.

*1994*

4.155. *1994:* Between May and August 1994, four municipalities in the Oriente, Shushufindi, Francisco de Orellana (Coca), Lago Agrio and La Joya de los Sachas, begin legal proceedings against TexPet before the Ecuadorian Courts (the "Municipal Lawsuits"), seeking compensation for environmental harm and injuries to their communities allegedly caused by the former Consortium's operations and also orders requiring TexPet to remediate the alleged contamination within the area of the former Concession.[110] In May 1995, as part of the consideration for the release under the 1995 Settlement Agreement, TexPet agrees to negotiate settlements of the Municipal Lawsuits. TexPet and the four Municipalities subsequently agree settlements in 1996, approved by the Ecuadorian Courts between May and September 1996.

4.156. *14 December 1994:* A Memorandum of Understanding is made between the Respondent, PetroEcuador and TexPet (the "MOU").[111] In summary, the MOU provides that the parties would develop a detailed scope of environmental remedial work; that TexPet would perform such work; and that, after the completion of such work, the parties would negotiate "the full and complete release of TexPet's obligations for environmental impacts arising from the operations of the Consortium."[112]

---

[110] C-320 & C-321 (Shushufindi); C-325 (Orellana); C-323 (Lago Agrio); and C-322 (La Joya de los Sachas).
[111] C-17.
[112] C-17, Article IV.

# SA495

*1995*

4.157. *4 May 1995:* The Respondent, PetroEcuador and TexPet conclude the Settlement Agreement.[113] It provides (inter alia): "the scope of the Environmental Remedial Work to be undertaken by TexPet to discharge all of its legal and contractual obligations and liability [for] Environmental Impact arising out of the Consortium's operations has been determined and agreed to by TexPet, the Government and PetroEcuador as described in this Contract"; the agreed scope of the environmental remedial work is attached as Annex A; and "TexPet agrees to undertake such Environmental Remedial Work in consideration for being released and discharged of all its legal and contractual obligations and liability for Environmental Impact arising out of the Consortium's operations". [114]

4.158. By Article 5.1 of the 1995 Settlement Agreement, the Respondent and PetroEcuador release, acquit and forever discharge TexPet and its fellow "Releasees" of "all the Government's and Petroecuador's claims against the Releasees for Environmental Impact arising from the Operations of the Consortium, except for those related to the obligations contracted hereunder for the performance by TexPet of the Scope of Work (Annex A) which shall be released as the Environmental Remedial Work is performed to the satisfaction of the Government and Petroecuador …". The Settlement Agreement thereby envisages a two-stage process for this release. First, all claims by the Respondent and PetroEcuador against the Releasees are released, excepting those covered by the Scope of Work; and, later, the latter are also released if the remedial work is performed by TexPet to the satisfaction of the Respondent and PetroEcuador.

4.159. The 1995 Settlement Agreement is signed for the Respondent by the Minister of Energy and Mines (Dr Galo Abril Ojeda), for PetroEcuador by its Executive President (Dr Fererico Vintimilla Ojeda) and for TexPet by its Vice-President (Mr Veiga) and its legal representative (Dr Pérez). Later, in February 2008, Mr Veiga and Dr Pérez were defendants in the Criminal Prosecutions brought by the Respondent in relation to the 1995 Settlement Agreements (see above).

---

[113] C-23.
[114] C-23, Recitals, p. 3; Article 5.1. In Part III above, the Tribunal has set out more fully the relevant extracts from the 1995 Settlement Agreement, as also of the 1996 Municipal and Provincial Releases and the 1998 Final Release.

# SA496

4.160. The definition of "Environmental Impact" under the 1995 Settlement Agreement is broad, including any "solid, liquid, or gaseous substance present or released into the environment in such concentration or condition, the presence or release of which causes, or has the potential to cause harm to human health or the environment." [115]

4.161. By Article 5.2, the definition of the "claims" to be released under the 1995 Settlement Agreement is also broad:

> "*The Government and Petroecuador intend claims to mean any and all claims, rights to claims, debts, liens, common or civil law or equitable causes of actions and penalties, whether sounding in contract or tort, constitutional, statutory, or regulatory causes of action and penalties, whether sounding in contract or tort, constitutional, statutory, or regulatory causes of action or penalties (including, but not limited to, causes of action under Article 19-2 of the Political Constitution of the Republic of Ecuador, Decree No. 1459 of 1971, Decree No. 925 of 1973, the Water Act, R.O. 233 of 1973, ORD No. 530 of 1974, Decree No.374 of 1976, Decree No. 101 of 1982, or Decree No 2144 of 1989, or any other applicable law or regulation of the Republic of Ecuador), costs, lawsuits, settlements and attorneys' fees (past, present, future, known or unknown), that the Government and Petroecuador have, or ever may have against each Releasee for or in any way related to contamination, that have or ever may arise in the future, directly or indirectly arising out of Operations of the Consortium, including but not limited to consequences of all types of injury that the Government or Petroecuador may allege concerning persons, properties, business, reputations, and all other types of injuries that may be measured in money, including but not limited to, trespass, nuisance, negligence, strict liability, breach of warranty, or any other theory or potential theory of recovery.*" [116]

4.162. *Effect:* As already decided by the Tribunal, as here confirmed, the 1995 Settlement Agreement was made by the Respondent, acting by its Government, including the Ministry of Energy and Mines: see the Tribunal's First Partial Award at paragraph 25.

4.163. *8 September 1995:* The Remedial Action Plan, prepared by (inter alios) Woodward-Clyde International Inc (the "RAP"), is agreed by TexPet, PetroEcuador and the Respondent's Ministry of Energy and Mines. [117]

### 1996

4.164. *May-September 1996:* The Municipal Settlements (also called the "Municipal and Provincial Releases") are agreed between TexPet and four municipalities in the Oriente

---

[115] C-23, Article 1.3.
[116] C-23, Article 5.2.
[117] R-610; Connor ER, p. 7.

# SA497

(Shushufindi, Francisco de Orellana, Lago Agrio and La Joya de los Sachas), pursuant to Paragraph VII(C) of Annex A of the 1995 Settlement Agreement and approved by the Ecuadorian Courts.[118]

4.165. The approved releases provide, in materially similar terms that the representatives of the municipality (here Lago Agrio):

> "... *proceed to exempt, release, exonerate and relieve forever Texaco Petroleum Company, Texas Petroleum Company, Companía Texaco de Petróleos del Ecuador S.A., Texaco Inc., and any other affiliate, subsidiary or other related companies, and all their agents, employees, executives, directors, representatives, insurers, lawyers, guarantors, heirs, administrators, contractors, subcontractors, successors or predecessors, from any responsibility, claim, request, demand, or complaint, be it past, current, or future, for any and all reasons related to the actions, works or omissions arising from the activity of the aforementioned companies in the territorial jurisdiction of the Canton of Lago Agrio, Province of Sucumbíos, which in part comprises the area of the oil concession ...* "[119]

4.166. The Tribunal has seen no evidence in this arbitration that any of these municipalities sought authority to settle the individual claims by any person for personal harm. As with the 1995 Settlement Agreement, the Tribunal concludes that such individual claims were unaffected by these Municipal Settlements. Indeed, the Claimants have not here contended otherwise. (The Tribunal addresses the issue of "diffuse" claims separately below).

4.167. *20 November 1996:* A "waiver of rights" is ostensibly granted in favour of the Respondent and PetroEcuador by the Aguinda Plaintiffs' representatives, Mr Bonifaz and Mr Kohn.[120] It is made in the USA in the Spanish language before notaries public of Massachusetts and Pennsylvania (being the respective domiciles of Messrs Bonifaz and Kohn) by reference to the pending Aguinda Litigation in New York. Messrs Bonifaz and Kohn appear "in their capacities as lead attorneys for the plaintiffs [in the Aguinda Litigation], with full legal capacity to execute this document on behalf of the plaintiffs and of all other U.S. lawyers who, on behalf of the plaintiffs, are involved in the case ...".

---

[118] C-27 to C-32 and C-35 to C-41.
[119] C-30, p. 7 (settlement) and C-26 (court approval) for Lago Agrio.
[120] C-911.

# SA498

4.168. The Tribunal has seen no evidence in this arbitration that Messrs Bonifaz and Mr Kohn sought or received express authority to settle individual claims by any person represented by them in the Aguinda Litigation (or to be represented by them in the later Lago Agrio Litigation). If it existed, given the terms of this waiver made by and on behalf of private persons, it would be limited to the plaintiffs named in the Aguinda Complaint advancing individual claims for personal harm; and, ostensibly at least, it would not extend to other persons not so named or any person alleging only "diffuse" rights.

4.169. The Respondent and PetroEcuador, as beneficiaries, are not signatories to the waiver, it being only there recorded that:

> "The Government of Ecuador, through its counsel, the Attorney General of Ecuador, Dr Leonidas Plaza Verduga, has decided to become involved in this case not as a party to the lawsuit [the Aguinda Litigation], but [on behalf] of the Republic of Ecuador consequently states that it is willing to allow execution in its territory of any environmental remediation measures the Court may order the defendant company to perform in accordance with the remedies the plaintiffs seek. At the same time Ecuador requests that the compensation sought in the above-mentioned case be paid exclusively by TEXACO and that the Republic of Ecuador, PETROECUADOR and its affiliate companies or any other Ecuadorian public sector institution or agency not under any circumstance be required to pay such compensation."

4.170. Under the waiver, the Aguinda Plaintiffs "represented" by Messrs Bonifaz and Kohn):

> "(1) ... expressly waive the right to file any claim against the Ecuadorian State, PETROECUADOR and its affiliate companies or any other Ecuadorian public sector institution or agency, if in any eventuality the Federal Court of New York attributes to Ecuador or to the other institutions mentioned, any part of the compensation claimed by the plaintiffs for personal or environmental damage generated by the oil production activity TEXACO carried out in Ecuador."
>
> (2) This waiver includes the impossibility of filing any court action against the Ecuadorian State, Petroecuador and its affiliate companies, or any other Ecuadorian public sector institution or agency, whether in the United States of America or in Ecuador, claiming payment of any compensation that the Court of the Southern District of New York or other U.S. Court might impose upon the Ecuadorian State, PETROECUADOR and its affiliate companies or any other Ecuadorian public sector institution or agency on account of the acts that form the basis for the Aguinda v. TEXACO case.
>
> (3) If TEXACO were to sue the Ecuadorian State, PETROECUADOR and its affiliate companies, or any other Ecuadorian public sector institution or agency in

## SA499

*U.S. court to obtain a contribution to any possible judgment against TEXACO in the U.S. District Court of New York, then we will reject any decision that the New York Court makes in said regard in favor of TEXACO, and we expressly waive the right to collect any amount whatsoever arising from such decision.*

*(4) In addition, we agree to cooperate and at all times assist the attorneys of the Ecuadorian State, PETROECUADOR and its affiliate companies or any other Ecuadorian public sector institution or agency / the Ecuadorian Government in the Aguinda v. TEXACO case."*

4.171.  As between the Respondent and the Aguinda Plaintiffs, the Respondent was thereby ostensibly immunised by the terms of this waiver. It is not clear to the Tribunal whether it was intended that the Respondent was thereby to become immune from the Lago Agrio Plaintiffs' claims in the subsequent Lago Agrio Litigation. Whether or not that was so as a matter of any applicable law or laws, such was nevertheless the factual position. In the US Section 1782 Litigation, Mr Bonifaz later testified that it would have been futile for the Aguinda Plaintiffs to try to sue the Respondent in Ecuador: "… the fact is that you can sue Ecuador; you're never going to be able to collect."[121] Mr Donziger also stated, as privately recorded on film on 16-17 November 2007 in Ecuador, that "the government here will never pay for any judgment".[122]

4.172.  It is nonetheless clear that the waiver could have no legal effect on claims against the Respondent or PetroEcuador by Texaco (or by TexPet and Chevron), both in the USA and Ecuador. However, it is common ground that such a claim could not be made by Chevron against PetroEcuador or the Respondent within the Lago Agrio Litigation, being "summary proceedings" as a matter of Ecuadorian civil procedure.[123]

4.173.  The Tribunal records its disquiet at the paucity of the evidence regarding this waiver. It is possible that its purpose may have been limited in scope and time, given the pending controversy before the US District Court (Judge Rakoff) in New York over the application by the Respondent and PetroEcuador to intervene in the Aguinda Litigation as co-plaintiffs, supporting the Aguinda Plaintiffs, and Texaco's opposition to that application (see above).

---

[121] C-1220, at 19-20.
[122] C-360, Crude Outtakes, CRS-116-01-CLIP-01, p. 139 [03:20-03:30].
[123] Track II Hearing D13.2938.

# SA500

4.174. Mr Bonifaz testified, in the US Section 1782 Litigation, that the waiver had originated from a comment by Judge Rakoff that, if the Respondent did intervene in the Aguinda Litigation, "Texaco might bring counterclaims against it".[124] According to Mr Bonifaz, the waiver was drafted by the Respondent; and: "There's no question there was a quid pro quo here. In other words, okay, Mr Leonidas Plaza [the Respondent's Attorney-General at the time], I'll sign this thing and you intervene in New York. Well, that government lasted one year. And once the old government lasted a year, the government all of a sudden wrote a letter to the court - the new government of Alarcón [President Fabian Alarcón] wrote a letter to the court saying something to the effect that we're not going to intervene; we're backing off out of that intervention, but we are going to support the plaintiffs."[125]

4.175. In any event, whatever the explanation for this waiver, on 12 August 1997, the US District Court (Judge Rakoff) denies the application by Ecuador to intervene in the Aguinda Litigation. This order is not vacated by the US Court of Appeals for the Second Circuit.[126]

4.176. *12 November 1996:* The US District Court (Judge Rakoff) grants Texaco's application to stay the Aguinda Plaintiffs' complaint.[127] (This decision was later reversed by the U.S. Court of Appeals for the Second Circuit on 5 October 1998: see below).

*1997*

4.177. *11 May 1997:* The Ecuador-USA Treaty (or BIT) agreed in 1993 comes into effect on 11 May 1997.[128]

*1998*

4.178. *30 September 1998:* The Final Release is issued, signed by PetroEcuador, the Ministries and TexPet (the "Acta Final"),[129] after 52 RAP Actas and 19 Approval Actas.[130] In summary, within the former concession area, a total of 250 pits and 7 spills at 133 well

---

[124] C-1220, p. 14.
[125] C-1220, p. 33.
[126] See C-291, p. 2.
[127] C-477.
[128] C-279.
[129] C-457.
[130] Connor ER1, p. 7; Track II Hearing D6.1295-1297 (Slide 9).

sites in 10 fields had been investigated under the RAP, with remedial action taken at 168 of these locations; and the balance (of 89) not subjected to remedial action because it was not required under the RAP.[131]

4.179. Whilst there was later much disquiet within the Respondent's Government as to the making of the 1995 Settlement Agreement (with the 1998 Final Release), there is no cogent evidence before this Tribunal that TexPet (or Texaco) violated the terms of the 1995 Settlement, the RAP or any Acta.

4.180. To the contrary, Mr Giovanni Rosania Schiavone, the Respondent's Under-Secretary of Environmental Protection (1995-1996) testified in this arbitration, as to his signing of Actas:

> "Q. ..... The signing of those Actas represented to your knowledge and expertise and opinion that the work TexPet had promised to do was done successfully and completely with respect to the Acta that you signed? A. That's correct. The technical work – I insist the technical work and environmental work was done well, and we accepted that the problem had been corrected, environmental problem in that area had been corrected."[132]

4.181. In May 2006, Mr Manuel Muñoz as the Director of DINAPA (the National Environmental Protection Management of the Ministry of Energy) was to inform a Commission of the Congress:

> "I would like to share with you some very important news which are very interesting but have not come to public notice. Petroproducción [PetroEcuador] was left with a very considerable debit side derived from the pits left by Texaco. Texaco completed the remediation of the pits that were their responsibility; this was 33% of the total. However, Petroecuador, during more than three decades, had done absolutely nothing with regard to the pits that were the state-owned company's responsibility to remediate."[133]

4.182. In July 2006, in her expert report to the Office of the Prosecutor, Ms Adriana Enriquez Sanchez was to conclude:

> "The purpose of this examination was to determine whether the surface of the pits remediated according to the RAP have seeps of oil or any sort of hydrocarbons that might endanger human health, flora or fauna. The Technical-Visual examination was conducted on the pits at certain oil wells in the following fields: Sacha,

---

[131] C-43, section 3.1.
[132] November Hearing D1.146.
[133] C-58, p. 1.

# SA502

*Shushufindi, Guanta and Lago Agrio ... The surface of the soil in the remediated pits contains a great deal of organic material and there is no evidence of hydrocarbons, for which reason it does not represent a risk to human life, flora or wildlife. Similarly, no remains or leaks of hydrocarbons into the soil around the pits could be seen."[134]*

4.183. Later, in his email to Mr Donziger dated 1 August 2008, the Lago Agrio Plaintiffs' expert, Mr Beltman, was to state: "I did not find any clear instances where TexPet did not meet the conditions required in the cleanup."[135] (This email message is quoted more fully in the chronology below, under "1 August 2008").

4.184. *5 October 1998:* The US Court of Appeals for the Second Circuit reverses the decision of Judge Rakoff and remits the Aguinda Litigation to him.[136] In May 2001, Judge Rakoff again stays the Aguinda Plaintiffs' complaint, in favour of Ecuadorian jurisdiction.[137]

*1999*

4.185. *1999:* The Environmental Management Act 1999 is enacted in Ecuador (the "EMA").

*2001*

4.186. *9 October 2001:* Texaco Inc. merges with Keepep Inc., a wholly-owned subsidiary of Chevron Corporation, with Texaco Inc. emerging as the surviving corporation in the merger and becoming a direct subsidiary of Chevron Corporation,[138] and with the parent company changing its name in turn to "ChevronTexaco Corporation".[139] (In 2005, ChevronTexaco Corporation drops the name "Texaco" and is (re-) named Chevron Corporation). It is necessary, given the terms of the Lago Agrio Judgment, to describe more fully the form and effect of this merger under its applicable law, the laws of Delaware, USA.

4.187. The Tribunal refers to the written testimony of Mr Frank Soler.[140] He was personally involved for Chevron in the implementation of the Agreement and Plan of Merger of 15

---

[134] C-592, p. 3.
[135] C-2043, p. 2.
[136] R-29.
[137] C-10.
[138] C-68, C-69, C-70.
[139] C-69, p. 2.
[140] Soler WS, paras 9-26. Mr Soler's witness statement, as also Professor Allen's expert report (see below), were adduced by the Claimants in support of their submissions as to the legal effects of "merger" in C-TI Rep. Mer. Aug. 2012, paras 177-185.

# SA503

October 2000 between Chevron, Texaco and Keepep Inc. (the "Agreement and Plan of Merger")[141] under a legal procedure known under the laws of Delaware as a "reverse triangular merger". At all material times, Chevron, Texaco and Chevron's subsidiary, Keepep Inc, were companies incorporated in the State of Delaware.

4.188. Mr Soler testified that on 9 October 2001, Texaco merged with Keepep Inc., a wholly-owned subsidiary of Chevron, in accordance with Section 1.1 of the Agreement and Plan of Merger; Texaco emerged as the surviving corporation from its merger with Keepep Inc; and, as a result, Texaco became a wholly-owned direct subsidiary of Chevron; Chevron's stock in Keepep Inc. was converted into stock in Texaco, while each share of Texaco common stock held by Texaco's shareholders was converted into the right to receive 0.77 shares of Chevron's common stock, which equated in value to approximately US$ 38.012 billion.

4.189. In accordance with Section 2.l(a) of the Agreement and Plan of Merger, so Mr Soler testified, Chevron changed its name to "ChevronTexaco Corporation"; Texaco continued to exist as a subsidiary of ChevronTexaco Corporation; and the change in name from "Chevron Corporation" to "ChevronTexaco Corporation" did not affect Chevron's corporate structure.

4.190. Thus, according to Mr Soler, with this "merger", Chevron acquired all of Texaco's stock; Chevron did not acquire any of Texaco's assets or liabilities (because Texaco remained a separate corporation); and Texaco retained ownership of all of its assets and liabilities, consisting primarily of ownership interests in Texaco's subsidiary companies, including TexPet.

4.191. The legal effects of this "reverse triangular merger" were the subject of expert testimony by Professor William T. Allen, formerly the Chancellor (or Chief Judge) of the Court of Chancery of the State of Delaware. In his expert report,[142] Professor Allen testified that under Delaware law, Chevron did not assume or otherwise become liable for any obligations of Texaco as a result of the "merger"; the judicial doctrine of piercing the corporate veil, under Delaware law, does not impose upon Chevron liability for any obligations of Texaco relating to events that occurred prior to the date of the "merger";

---

[141] Soler WS, para 4.
[142] Allen ER, sections 3-8.

# SA504

Chevron had no capacity to "control and dominate" the management of Texaco prior to the "merger"; the "merger" itself did not constitute any wrong to then existing or future creditors of Texaco, since under Delaware law, which governed the effects of the "merger", those persons were left in precisely the same position vis-a-vis Texaco's assets and liabilities as they were before the "merger"'; and those assets and liabilities remained unaffected by the "merger".

4.192. The Tribunal accepts the factual testimony of Mr Soler and, as to the laws of Delaware, the expert testimony of Professor Allen. It concludes that, as a matter of Delaware law, Chevron did not succeed to the liabilities of Texaco or TexPet incurred before the merger in 2001, including liabilities resulting from their respective activities in Ecuador from 1964 to 1992.

### *2002*

4.193. *16 August 2002:* The stay of the Aguinda Litigation in New York takes effect, with Texaco's undertaking in favour of Ecuadorian jurisdiction and the dismissal of the Aguinda Plaintiffs' appeal from the decision of Judge Rakoff by the US Court of Appeals for the Second Circuit.[143]

### *2003*

4.194. *7 May 2003:* The Lago Agrio Plaintiffs file their Complaint in the Lago Agrio Court in Ecuador against "Texaco Inc." as the only named defendant in the title page ("the Lago Agrio Litigation").[144]

4.195. The Complaint is drafted by Mr Alberto Wray, the senior Ecuadorian lawyer acting for the Lago Agrio Plaintiffs in Ecuador. He testified: "I wrote the claim submitted in Lago Agrio in 2003 by the members of the 'Frente de Defensa de la Amazonia' ('the plaintiffs') … As the author of the Complaint, I intended to preserve to the extent possible the claims that had been raised and pursued in the *Aguinda* case in New York. Since Ecuadorian law does not contemplate an equivalent of a class action, I based the claims on, *inter alia*, Article 2260 of the Civil Code,[145] which grants any individual or

---

[143] C-65.
[144] C-71.
[145] Article 2236 of the Civil Code (formerly Article 2260) of the Civil Code provides (in the original Spanish and in its English translation): "*Por regla general se concede acción popular en todos los casos de daño contingente*

# SA505

group of individuals a right of action to compel the removal of any threat of damage, including an environmental threat."[146]

4.196. As the Tribunal decided in its Decision on Track IB (by a majority), the Complaint includes both claims made by individuals for personal harm (not being diffuse claims) and diffuse claims.

4.197. At this time, the assigned judge in Lago Agrio is Judge Guerra, as the President of the Superior Court of Nueva Loja (the "Lago Agrio Court").

4.198. The Tribunal understands that the title page for the court file on the Lago Agrio Litigation was mistakenly prepared by the Lago Agrio Court clerk and that the correct name of the defendant should have been "ChevronTexaco Corporation", as appears from page 7 of the Complaint.[147] For ease of reference, the Tribunal refers to this defendant in the Lago Agrio Litigation as "Chevron". Texaco and TexPet are not named parties to the Lago Agrio Litigation.

4.199. Chevron was therefore the sole defendant named in the Lago Agrio Litigation. At first sight, it was a strange decision by the Lago Agrio Plaintiffs. Chevron itself had never done business in Ecuador; nor had it participated in any capacity under the 1964 or 1973 Concession Agreements; nor was it a signatory party to the 1995 Settlement Agreement (including the 1998 Final Release). At this time, Chevron and its subsidiaries had no significant assets in Ecuador. Under US and Delaware laws, as its personal law, Chevron was and remained a legally distinct and separate company from both Texaco and TexPet.

4.200. Later, Mr Donziger complained that the Lago Agro Plaintiffs' senior Ecuadorian lawyer (Mr Alberto Wray) had made a mistake in naming "the wrong party" as the defendant: "… This goes back to Alberto's errors: suing the wrong party in the complaint, then asking for too many inspections rather than controlling the process, capitulating on the field lab at the first complaint, letting work visa slide at first inspection, signing the Plan

---

que por imprudencia o negligencia de alguno amenace a personas indeterminadas. Pero si el daño amenazare solamente a personas determinadas, sólo alguna de éstas podrá intentar la acción." ("As a general rule, a popular action is granted in all cases of contingent harm which, due to recklessness or negligence of a party threatens undetermined persons. But if the harm threatened only determined persons, only one of these may pursue the action."). The relevant texts of the Civil Code are set out in Part III of this Award, above.
[146] Wray WS, paras 3, 5.
[147] Track II Hearing D13.2920-2962.

of Analysis – most all of these a function of his inability to take on the TEX [Texaco] lawyers and take control of the litigation."[148]

4.201. Mr Wray ceased acting as the Lago Agrio Plaintiffs' senior lawyer in June 2005, when Mr Donziger assumed a more prominent role, together with Mr Fajardo and Mr Luis Yanza. Mr Wray had no participation in the Lago Agrio Litigation as the Lago Agrio Plaintiffs' "procurador" after February 2006.[149] As Mr Donziger later testified in his US deposition in the RICO Litigation, in response to the question whether Mr Wray's role had then been terminated or reduced: "I wouldn't say reduced. I would say it evolved to something different ... when the case began in Ecuador, he [Mr Wray] was the procurador common, which is the position that Pablo Fajardo occupies today [December 2010], and there came a time when he [Mr Wray] didn't want to continue in that role for a variety of reasons, so he evolved into a different role, where he was, I would say, more eminent – he would sort of advise the lawyers on the Lago Agrio team about Ecuadorian law issues."[150] (The Tribunal has seen no evidence connecting Mr Wray with any improper conduct alleged by the Claimants against the Lago Agrio Plaintiffs' representatives).

4.202. In any event, the named defendant in the Lago Agrio Complaint is never amended by the Lago Agrio Plaintiffs. The sole defendant remains Chevron, allegedly standing in the shoes of Texaco and TexPet as result of the "merger" between Chevron and Texaco in 2001.

4.203. As already indicated above, in this Award the Tribunal refers to the defendant in the Lago Agrio Litigation as "Chevron", although others at the time also referred to it as "Chevron-Texaco" and "Texaco".

4.204. The Lago Agrio Plaintiffs' technical experts are to include Mr David Russell (subsequently replaced by Stratus Consulting), Mr Douglas Beltman (of Stratus Consulting), Dr Anne Maest (also of Stratus Consulting), Dr Charles Calmbacher (used as the first judicial inspection expert), Mr Edison Camino, Dr Castro and Mr Oscar Davila (used as experts for the judicial inspections).

---

[148] C-716, p. 85 of 111 (24 January 2006).
[149] Wray WS, para 6.
[150] C-697, pp. 609-610.

# SA507

4.205. *13 May 2003*: The Lago Agrio Court (Judge Guerra) assumes jurisdiction over the Lago Agrio Complaint, ruling against Chevron's jurisdictional objection. Judge Guerra orders the case to proceed as a summary verbal proceeding under the provisions of Article 43 of the Environmental Management Act 1999 and Articles 843 et seq of the Code of Civil Procedure.[151] As already indicated, it is common ground between the Parties that such a summary proceeding does not allow Chevron to implead PetroEcuador.[152]

4.206. *June 2003*: At this time, when Mr Fajardo had not yet joined the Lago Agrio Plaintiffs' legal representatives, Mr Fajardo writes, as later recorded in the Final Report FLACSO-PetroEcuador Project Phase II of November 2003 "on the socio-environmental conflicts at the Sacha and Shushufindi fields (1994-2002)":

> *"They [Petroproducción and PetroEcuador ] are not trustworthy because Petro does not practice what it preaches. Even since Texaco left, Petro has caused more damages and far more disasters than Texaco itself. But that is not what they say at all. Therefore, there are frequent spills and pipe breaks, and swamps, rivers and marshlands become contaminated to a large extent. But as this is a state-owned company and these people are linked with the legal system and everything, no one says a thing."*[153]

Mr Fajardo is described in the Report as the president of the Shushufindi Human Rights Commission and legal advisor of the Frente de Defensa de la Amazonía.

4.207. *21 October* 2003: A "conciliation hearing" is held before Judge Guerra on 21 October 2003. At this hearing, Chevron files its Response to the Lago Agrio Complaint. Its response, inter alia, challenges the jurisdiction of the Lago Agrio court over Chevron and, without prejudice to its jurisdictional challenge, also responds to the substance of the Complaint.[154]

4.208. *29 October 2003*: The Lago Agrio Court (Judge Guerra) orders an "expertise" in two phases. The first phase is to involve the carrying out of judicial inspections of 25 sites requested by Chevron and 97 sites requested by the Lago Agrio Plaintiffs. Each side would appoint their own experts to conduct these inspections. The second phase, requested by the Lago Agrio Plaintiffs, envisages: "an expert examination intended to confirm the environmental effects of hydrocarbon production activities in all the fields

---

[151] C-492.
[152] See Track II Hearing D12.2605; C-Mem. Mer. Sept. 2010, para 176, citing Coronel ER1, para 114.
[153] C-184, p. 77.
[154] C-72.

used by TEXACO for production in its role as operator of the Consortium … this same procedure shall have the participation of Experts appointed and installed for the inspection noted in subheading I…".[155]

*2004*

4.209. *7 August 2004:* The Lago Agrio Plaintiffs and Chevron agree terms of reference in the Lago Agrio Litigation, contemplating that the Lago Agrio Court would appoint a panel of independent settling experts ["dirimentes"] to resolve any differences between the reports of the experts of the Lago Agrio Plaintiffs and Chevron conducting the judicial inspections.[156] The parties' agreement is recorded in a 91-page document, comprising: (i) terms of reference for the experts who would be carrying out the judicial inspections; (ii) a detailed sampling plan; (iii) ten "standard operating procedures" covering the taking of different samples from various locations, the decontamination of equipment etc; and (iv) an analysis plan, prepared in accordance with USEPA guidelines ["USEPA" denotes the United States Environmental Protection Agency], which covered (inter alia) data quality objectives, data validation and laboratory procedures.[157]

4.210. *26 August 2004*: The Lago Agrio Court (now Judge Novillo) orders the parties to comply with the agreed terms of reference.[158]

4.211. *Summer 2004:* The judicial site inspections begin in the Lago Agrio Litigation.

4.212. At first, the Lago Agrio Plaintiffs send their samples to be tested at a laboratory in the USA, Analytical Services Inc. However, this proves unsatisfactory because of the time that samples are held before analysis and also because the samples are inspected upon entry into the USA, which breaks the chain of custody. The Lago Agrio Plaintiffs then use the Catolica laboratory in Quito and subsequently a laboratory in Quito called HAVOC.[159] The latter became a subject of major controversy between the parties.

4.213. During the course of 2004, Dr Calmbacher carries out judicial inspections at Sacha 6, Sacha 21, Sacha 94 and Shushufindi 48 for the Lago Agrio Plaintiffs.[160] Later,

---

[155] C-176, pp. 6-7.
[156] C-177, pp. 1-2.
[157] C-177.
[158] C-496.
[159] C-186, pp. 55-59.
[160] C-186, p. 60.

# SA509

Dr Calmbacher testified that certain expert reports submitted in his name by the Lago Agrio Plaintiffs' representatives during the judicial inspections were falsified by them, and that the sites that he inspected, in fact, did not indicate a danger to human health or pose a risk to the environment.[161]

4.214. *1 November 2004:* In his email message to Mr Donziger of 1 November 2014, reporting on sampling analyses, Mr David Russell (of Global Environmental Operations, as one the Lago Agrio Plaintiffs' environmental experts) writes: "… Based upon a meeting in New York with the Attorneys on Thursday of last week, we need to stop analysing for BTEX and GRO. TPH and DRO are fine, but the analysis and reporting of GRO and BTEX data is self-defeating except to show that the contamination is much more recent that we would desire, and that would lead to an argument that the contamination is by PetroEcuador rather than Texaco. This is especially true for BTEX Data. …".[162]

4.215. It will be recalled that TexPet had left Ecuador in 1992 and that, ostensibly, the Lago Agrio Plaintiffs had "waived" their rights against PetroEcuador on 20 November 1996 (see above). PetroEcuador continued operations in the former concession area by itself, from 1992 onwards.

4.216. *27 November 2004:* The Lago Agrio Plaintiffs' Ecuadorian lawyer, Mr Alberto Wray, writes to Mr Donziger that the first two judicial inspection reports by Dr Calmbacher show that "hydrocarbons are below detection limits" and do "not help" the Lago Agrio Plaintiffs' case.[163]

4.217. *27 December 2004:* In his memorandum of 27 December 2004 to Mr Donziger, Mr Russell states, as regards DROs:

> *"Now what we are analyzing is TPH and DRO. That leaves RRO, GRO, and NNO as unknowns. If you will recall, we stopped analyzing GRO at Cristobal's insistence because it helps Texaco prove their case. The problem comes in when we look for components of the DROs which are harmful. The PAH, or Polynuclear Aromatic Hydrocarbon compounds. These compounds are powerful carcinogens, and if present in quantity would amount to a slam dunk for proving harm to people. The problem is that so far, they are not there or are not detected, even after we lower the detection limit … Right now, we can't prove harm except by inference and*

---

[161] C-186, pp. 61-63; 112-115; 117; 135.
[162] C-2044 ("BTEX" denotes Benzene, Toluene, Ethylenbenzene and Xylene; "TPH" denotes Total Petroleum Hydrocarbons; "GRO" denotes Gasoline Range Organics; "DRO" denotes Diesel Range Organics; and "RRO" denotes Residual Range Organics).
[163] C-1192.

# SA510

*claims that TPH is harmful, that DRO is harmful, and that RRO.s are harmful. But the problem is that there is nothing specific.*"[164]

### 2005

4.218. *11 February 2005:* Mr Russell notes in an email message dated 11 February 2005 to Mr Donziger:

> *"From the data I have seen so far, we are not finding any of the highly carcinogenic compounds one would hope to find when investigating the oil pits. That does not discount the findings of the metals, but I fear that may not be enough. I believe that we need a big smoking gun which will link Chevron-Texaco to cancer in and through the oil, and not through just the drilling muds and chrome and other heavy metals. There are two possible reasons for the lack of finding organic carcinogenic compounds in the oils at this time: 1) the compounds (primarily PAH) have been fully degraded or 2) because the compounds are soluble, they may have escaped the pits and are found in the groundwater outside the pit areas. Either or both of these scenarios are possible. We won't know until we begin a comprehensive look for the compounds outside the pit areas, and examine the groundwater closely.*"[165]

4.219. Mr Russell is subsequently dismissed as an expert by Mr Donziger and replaced by experts from Stratus Consulting. Later, on 14 February 2006, Mr Russell instructs Mr Donziger to cease using his (Mr Russell's) original estimate of clean-up costs of US$ 6.14 billion because it was "too high by a substantial margin, perhaps by a factor of ten or more" (see below).

4.220. *10 August 2005:* Dr Martha Escobar Koziel (of the office of the Attorney General of Ecuador) sends an email message dated 10 August 2005 to Mr Wray, Mr Bonifaz and others regarding the nullification of the 1995 Settlement Agreement and Final Release, following a visit by Chevron's representatives to the President.[166] It states, in material part:

> *"On the afternoon of August 8, I was in the Office of the President of the Republic; Dr Gonzalez, the Legal Undersecretary General, invited me to a meeting to discuss TEXACO; he confirmed that the previous week (he did not say what day) high-ranking TEXACO officials had been there; he did not give me names either, but he indicated that there had been a Brazilian (must be Reis Vega), an Argentine, a bearded American (he said he was a lawyer), and Dr Pérez (who has always been*

---

[164] C-1032.
[165] C-1050.
[166] This President was President Palacio (not President Correa). Ms Escobar was one of the lawyers assigned by the Respondent to assist outside counsel in the proceedings between Chevron and Ecuador in New York: see Track II Hearing D13.2802.

# SA511

*the legal representative in Ecuador) and an official from the Ministry of Energy and Mines (whose name he did not know because he did not leave his card). According to Dr Gonzalez, he and Max Donoso received them and later they spoke for a few minutes with the President of the Republic.*

*In the meeting, both the Ministry official as well as those from Texaco left an "Aide Memoire" (I have a copy of the Ministry's, but so far they have not sent me Texaco's). The purpose of the visit - says Gonzalez - was to propose that the State intervene in the Sucumbíos trial and allege the existence of the environmental remediation contract and the final acta de entrega-recepcion [i.e. delivery-receipt], or that a public declaration be made at the highest levels on the existence and fulfilment of that contract; in exchange, TEXACO would be willing to drop the arbitration in New York [i.e. the AAA arbitration]. They also expressed their total disagreement with the State having contracted lawyers linked to the indigenous plaintiffs.*

*According to Dr Gonzalez, both he and the President of the Republic told TEXACO that they would transmit the proposal to the State's Attorney General, given that it is an autonomous entity and they should not confuse the attorney of the State with the attorney of the President of the Republic, and that the invitation they extended to me was precisely for that reason.*

*I explained to Dr Gonzalez that the decision to accept the sponsorship of Terry Collingsworth and Cristobal was an economic one since it did not cost the State anything.[167] With respect to the topic of the contract, I explained that the Attorney General's Office and all of us working on the State's defense were searching for a way to nullify or undermine the value of the remediation contract and the final acta and that our greatest difficulty lay in the time that has passed.*

*I have not managed to speak to the Attorney General since Monday, but I am sure that he will not accept the proposal. The Attorney General remains resolved to have the Comptroller's Office conduct another audit (that also seems unlikely to me given the time); he wants to criminally try those who executed the contract (that also seems unlikely to me, since the evidence of criminal liability established by the Comptroller's Office was rejected by the prosecutor)."[168]*

4.221. *29 September 2005:* In his email message to Mr Kohn, acknowledging the legal impediment posed by the 1995 Settlement Agreement to the Lago Agrio Plaintiffs' claims, Mr Donziger notes: the "idea is to use it [i.e. fraud] to convince the government to take action against Chevron to nullify the remediation contract … this could be very important."[169] This "remediation contract" was a reference to the 1995 Settlement

---

[167] Mr Cristóbal Bonifaz and Mr Terry Collingsworth (representing the Lago Agrio Plaintiffs) were simultaneously acting for the Republic of Ecuador and PetroEcuador in the legal proceedings in New York to stay the AAA Arbitration.
[168] C-166.
[169] C-874.

Agreement (including the 1998 Final Release); and the "fraud" referred to the criminal prosecution for fraud against those persons who had signed the 1995 Settlement Agreement and Final Release (including, particularly, Mr Veiga and Dr Peréz as TexPet's representatives).

4.222. *4 October 2005:* Mr Donziger records in his diary that: "We pitched the criminal case to Archie [Archie Avila, an Ecuadorian lawyer]. Idea to pressure the company, get major press in US via Lehane [Christopher Lehane, a US attorney], and compel the Ec gov [Ecuadorian Government] to act against the company legally to nullify the remediation contract."[170]

4.223. *6 October 2005:* In his diary, Mr Donziger notes: "The key issue is [the] criminal case. Can we get that going? What does it mean? I really want to consolidate control with contract [the 1995 Settlement Agreement] before going down a road that I think could force them to the table for a possible settlement … RV [Mr Reis Veiga] likely will be knocked out of the box by the criminal investigation and being called as a witness."[171]

4.224. *18 November 2005:* At this time, Mr Donziger agrees to pay covertly, as a bribe, Mr Fernando Reyes and Mr Gustavo Pinto to act nominally as "independent experts" for the purpose of monitoring the settling experts, but answerable to him.[172] In his diary entry for 18 November 2005, Mr Donziger notes: "Deal with Gustavo Pinto – feel like I have gone over to the dark side. First meeting like that that I was not eaten alive. Made modest offer, plus bonus. Agreed to keep it between us, no written agreement. Independent monitoring."[173]

4.225. From the evidence before the Tribunal, this seems to have been a significant turning-point for Mr Donziger. Contrary to his inclination, he was doing something that was manifestly wrong by any standard for the administration of justice; and he knew it. Wrong as this was, much worse was to follow.

---

[170] C-716, p. 108 of 112 (4 October 2005).
[171] C-716, p. 105 of 112 (6 October 2005).
[172] C-1632, para 11.
[173] C-716, p. 98 of 111 (18 November 2005).

# SA513

4.226. *2006*: By 2006, Mr Donziger had by now assumed the leading role amongst the representatives of the Lago Agrio Plaintiffs, working closely with Mr Fajardo in Ecuador.

4.227. *27 January 2006*: 35 of the 123 judicial inspections have been completed. The Lago Agrio Plaintiffs apply to withdraw from the 26 pending inspections at Sacha Central and Shushufindi on the basis that these are no longer necessary since "the environmental and social reality, as well as that of chemical or toxic components reported, is virtually the same; there are no major differences between one site and any other. From this, it can be concluded that the defendant Chevron (formerly Texaco) used the same operating practices at all of the sites in these Sacha and Shushufindi fields, and possibly in the entire concession area…". The Lago Agrio Plaintiffs further argue that the "Global Assessment", namely the audit of the entire Concession Area requested by them and ordered by Judge Guerra in his Order of 29 October 2003, would provide a detailed and complete study of each site affected by Texaco.[174]

4.228. *1 February 2006:* A settling expert report is made on the judicial inspection of a former concession site that TexPet had remediated under the 1995 Settlement Agreement, Sacha 53.[175] The settling experts who reviewed the parties' experts' reports on Sacha 53 conclude that the Lago Agrio Plaintiffs had failed to substantiate their claims of environmental contamination. They found that TexPet's remediation was adequately performed and met Ecuadorian standards. They could not attribute to TexPet unremediated oil contamination near Sacha 53, which could have been caused by PetroEcuador after it assumed operations as "Operator" in 1990. This was the only site report made by the settling experts.

4.229. Dr Ramiro Fernando Reyes Cisneros was a petroleum and environmental engineer retained by the Lago Agrio Plaintiffs. In February and March 2006, Dr Reyes attends several meetings with representatives of the Lago Agrio Plaintiffs, including Mr Donziger, Mr Fajardo and Mr Yanza. Later, in 2012, Dr Reyes testifies in the US Section 1782 Litigation:

---

[174] C-188, p. 2.
[175] Connor ER2, Exhibit 48, at paras 4, 6.

# SA514

> *"In these meetings Mr Donziger was very upset by the findings of the settling experts' report [on Sacha 53], and he complained that the report supported Chevron's position and did not support the plaintiffs' position ... During our discussions, Mr Donzinger told us that our report should establish that the findings of the settling experts' report on Sacha 53 were wrong, that they lacked objectivity and were biased toward Chevron, and therefore the report should be discounted. However, in my professional opinion the evidence did not support Mr Donziger's position and I could not twist my professional assessments to make them fit the plaintiffs' interests ... Mr Donziger expressed disappointment with our report and never asked us to submit it to the Court."*[176]

4.230. *14 February 2006*: By letter dated 14 February 2006, Mr David Russell instructs Mr Donziger that he should not use his name as an expert supporting the quantum of the Lago Agrio Plaintiffs' case; namely US$ 6.14 billion for clean-up costs (see above). His letter states:

> *"To date I have seen no data which would indicate that there is any significant surface or groundwater contamination caused by petroleum sources in Ecuador. Moreover, there was not, and is not any effort being made by the Plaintiffs in Aguinda vs Texaco to characterize the groundwater or the surface waters. As I recall there was substantial opposition by Cristobal [Bonifaz] toward doing any work in this area because of the costs of the Investigation. As the surface and groundwater cleanup represent a very large portion of the cost estimate, (over half), this further invalidates the 2003 cost estimate. As such, it would cause me to state that the 2003 cost estimate is too high by a substantial margin, perhaps by a factor of ten, or more."*

4.231. In his later affidavit sworn on 8 May 2013, Mr David Russell testified: "As the lead environmental scientist for the plaintiffs in their case against Chevron in Ecuador [from late 2003 to early 2005], I spent several months investigating the environment at the oil production sites in the Oriente. I found that the environmental evidence did not and does not support the plaintiffs' claims. I saw no evidence of any widespread health effects caused by oil contamination from Texaco, and no evidence of drinking water contaminated with petroleum from Texaco's operations … there was no evidence linking residents' health problems to Texaco operations. The idea that the cleanup of the oil pits in the area would require billions of dollars is nonsense."[177]

4.232. *March 2006ff*: During his period in office for the Lago Agrio Litigation (see above), Judge Yánez holds private meetings with Messrs Donziger and Fajardo nine times or

---

[176] C-1632, paras 19-20.
[177] C-1631, paras 3, 31.

# SA515

more during 2006 and 2007, at his house, a warehouse and elsewhere, to discuss the withdrawal of judicial inspections and the appointment of a sole global expert. In March 2006, Mr Donziger notes in his diary that: "… due to some good strategising and some counter-pressure, the court is now in play, up for grabs, and accessible."[178] These meetings were not disclosed to or known by Chevron at the time.

4.233.   *4 March 2006:* Mr Fajardo reports to his legal colleagues by email dated 4 March 2006 that Judge Yánez had told him that the Lago Agrio Plaintiffs' request to withdraw [i.e. terminate] the judicial inspections had "no legal basis."[179]

4.234.   *8 March 2006*: At a judicial inspection of the Sacha Sur Station, Mr Donziger and a group of protesters are excluded from the site by police. Mr Donziger insists that the people had a right to enter and demanded that Judge Yánez come to the gate to "enforce the law". Mr Donziger warns that: "they're provoking a violent incident."[180]

4.235.   *11 March 2006:* Mr Donziger describes a private meeting with Judge Yánez on the day before the San Carlos judicial inspection.[181] He notes in his diary:

> *"These judges are really not very bright – it is like a vocational job to them, they deal with resolving disputes at a very basic level, there is little or no intellectual component to the law… The concepts of tort law and joint and several liability are acceptable in Ecuador, but nobody uses them, so judges have no exposure to them. That part of the case is a real uphill battle. But I keep thinking of what Mateo[182] told me - the only way we will win this case is if the judge thinks he will be doused with gasoline and burned if he rules against us. Given the morality or immorality of Ecuador's justice system, that type of comment did not even shock me. It is part of the rules of the game here."*

4.236.   In his later US deposition, Mr Donziger testifies: "I remember being shocked by Mateo's statement. I never thought that he meant it literally. But I did think that he meant it in the sense that there was a general feeling among the people we worked with that Chevron had bought the court and bought the judges based on their long history of the way they operated in Ecuador.[183] And we needed to be aware of that to combat that kind

---

[178] C-716, p. 73 of 111 (11 March 2006).
[179] C-1081.
[180] C-360, 8 March 2006, at CRS-028-01, pp. 10-11 [00:32-00:45].
[181] C-716, p. 73 of 111 (11 March 2006).
[182] Mr Donziger identified "Mateo" as an associate in Mr Ponce's law firm in Ecuador (representing the Lago Agrio Plaintiffs): C-952, p. 1287.
[183] As already noted, Chevron had never operated in Ecuador: Mr Donziger is here referring to TexPet.

# SA516

of institutional corruption."[184] When pressed on this inconsistency, Mr Donziger testified: "People can change their opinions, sir. I remember specifically when he told me that being shocked. When I reflected on it and understood how I felt the Ecuadorian legal system had been abused by Texaco and Chevron over a period of decades, I think I changed my opinion when I wrote that."[185]

4.237. *11 March 2006:* In this diary entry, Mr Donziger also describes another private meeting with Judge Yánez: "– had lunch with him the previous Friday in the Cangrejo Rojo I love it – this lobbying. I am good at it. But I hate it, hate that it is necessary, hate that it is part of the legal culture… I think it runs counter to any good person… I gave the judge a one-page memo on the law, and showed him the graphs from SA-53, the site where the peritos had derimido supposedly. We talked about the theory, about the need to let the people in San Carlos speak, about the need not to cancel the inspection, to not have another Guanta."[186] This conversation and documentation was not disclosed to or known by Chevron at the time.

4.238. *11 March 2006:* Mr Donziger's diary records that "Bonifax fired".[187] This was a reference to Mr Cristóbal Bonifaz, being dismissed as a legal representative of the Lago Agrio Plaintiffs.

4.239. *30 March 2006:* Chevron had filed a motion before the Ecuadorian judge in Quito on 24 March 2006, seeking an order for the judicial inspection of the HAVOC laboratory. This laboratory was analysing the soil and water samples which the Lago Agrio Plaintiffs had obtained from TexPet's sites in the former concession area. Mr Donziger asserts, privately on camera: "They're trying to harass the lab out of business, and extract information that they can use, you know, as part of their publicity campaign to damage the lab and get rid of its clients…"[188] On this day, Mr Donziger explains privately on camera: "…we're going down and we're gonna confront the judge, who we believe is paid by Texaco; we believe he is corrupt, and we're gonna confront him, uh…with – with our …suspicions about his corruption, and let him know what time it is."[189] Mr Donziger states, again privately on camera, "This is something that you would

---

[184] C-952, pp. 1288-1289.
[185] C-952, pp. 1290-1291.
[186] C-716, p. 73 of 111 (11 March 2006); C-952, pp. 1287-1288.
[187] C-716, p. 74 of 111 (11 March 2006).
[188] C-360, 30 March 2006, at CRS-052-00-CLIP 01, p. 35 [3:55-4:05].
[189] C-360, 30 March 2006, at CRS-052-00-CLIP 01, p. 35 [4:12-4:25].

never do in the United States. I mean, this is something you would – I mean, this is just out of bounds, both in terms of judicial behaviour, and what – what lawyers would do. But Ecuador, you know, there's almost no rules here. And this is how the game is played, it's dirty."[190] Mr Donziger continues, privately on camera: "So we are going down to have a little chat with the judge today, we'll see what happens".[191]

4.240. *30 March 2006:* Mr Donziger further explains, privately on camera: "… this is part – this is one more battle, it's been going on now for several weeks: we've already met with the judge [in Quito] once, we're meeting with him again. And the only language that I believe this judge is gonna understand is one of pressure, intimidation and humiliation. And that's what we're doing today. … We're going to scare the judge, I think today. We're gonna let him know what time it is. I hate doing it. I hate doing this stuff. I don't feel comfortable doin' it. As a lawyer I never do this. You don't have to do it in the United States. It's, it's dirty. I hate it. Hate it, but it's necessary. I'm not lettin' 'em get away with this stuff."[192]

4.241. There is no justification for Mr Donziger's improper conduct. There may, however, be one or more explanations. It is possible to infer, at least until this time, that Mr Donziger honestly believed that Chevron was misconducting itself in much the same way towards the Lago Agrio Plaintiffs, and to greater effect. From all the evidence seen by the Tribunal, however, there was no reasonable basis for Mr Donziger's belief (if it existed) that Chevron was conducting itself improperly in the Lago Agrio Litigation.

4.242. There is another possible explanation. It was Texaco that had ensured that the Aguinda Complaint be stayed in New York in favour of Ecuadorian jurisdiction. As Mr Donziger and his colleagues knew, that jurisdiction was not chosen by Texaco because it feared the Ecuadorian legal system or the Government of Ecuador (as then constituted).

4.243. Mr Wray, as the Lago Agrio Plaintiffs' senior legal representative (until 2005/2006), testified in the US 1782 Litigation, in 2010:[193]

> *"... since the beginning of the case and it was clear that the respondents' strategies consisted of blaming PetroEcuador of the contamination, I believed it was necessary for PetroEcuador to appear in the case as a third party defending itself*

---

[190] C-360, 30 March 2006, at CRS-052-00-CLIP 01, p. 35 [4:29-4:40].
[191] C-360, 30 March 2006, at CRS-052-00-CLIP 01, p. 39 [6:16-6:30].
[192] C-360, 30 March 2006, at CRS-052-00-CLIP-06, p. 39 [8:15-8:44].
[193] R-198, pp. 77-78 (under Court Order dated 3 November 2010, R-253).

# SA518

*from the accusations made by Texaco. When the case started, it was not possible to have any relationship with the government with PetroEcuador, at least for myself. I was very critical and actually I opposed the government at that time so that in the beginning it was not possible to do it. Moreover, it was clear that just as soon as the case began, that at that time PetroEcuador's authorities were rather inclined towards favoring the respondents, and this became clear of some statements, and I don't remember if it was made by either the Minister of Energy or Ecuador's President. And because of the fact of the legal team defended Texaco at that time was getting the clear support of the government at the time, at least to the extent that they were able to or they allowed them to -- to reside within a military complex in Lago Agrio when all the judicial inspections began. So meanwhile the team of the petitioners, the claimants, us, had to -- had to stay at hotels in the area or rent an apartment for the case. The Chevron/Texaco team was staying within a military government complex ...".*

4.244. Following Mr Correa's election as President of Ecuador in January 2007, Chevron's relations with the Respondent's Government were to undergo a significant change, for the worse.

4.245. Returning to the events of 30 March 2006 regarding the HAVOC laboratory, Mr Donziger brings video cameras into the chambers of the judge hearing the parties' dispute in Quito. Mr Donziger there tells the judge that Texaco's lawyers were "playing dirty" and "trying to corrupt the legal process…". Mr Donziger repeatedly accuses Dr Larrea, one of Chevron's lawyers, of being "a corrupt attorney".[194] The judge suspends the hearing, which appears from the video to have become unruly resulting from Mr Donziger's aggressive conduct.[195]

4.246. Mr Donziger later states, privately on camera, that: "the judicial system here is so utterly weak … [T]he only way that you can secure a fair trial is if you do things like that … like go in and confront the judge with media around. And fight and yell and scream and make a scene."[196] In Mr Donziger's own words, what he achieved "would never happen in any judicial system that had integrity."[197]

4.247. In his US deposition in the RICO Litigation, Mr Donziger is asked about this incident:

*Q: Did you pressure the judge in Ecuador who had approved the inspection of HAVOC Lab to change his opinion? A: I wouldn't characterise it as pressure. We went in and felt like he had made a decision that had no legal basis and had been*

---

[194] C-360, 30 March 2006, at CRS-052-00, p. 51ss.
[195] C-360, 30 March 2006, at CRS-052-00, p. 51ss.
[196] C-360, 30 March 2006, at CRS-053-02-CLIP 01 (also CRS-052-00-CLIP 06), p. 91 [00:08-00:21].
[197] C-360, 30 March 2006, at CRS-053-02-CLIP 01, p. 91 [00:24-00:27].

## SA519

*done ex parte and we wanted to be heard. So members of our legal team, including myself, went to his office in a scene that is depicted in the movie Crude, to try to persuade him to cancel his order.*

*Q: And going into that meeting didn't you say that you understood the only language the judge would understand was pressure, intimidation and humiliation? A: I don't know. What I did, though, was entirely proper and was captured in the movie.*[198]

4.248. *30 March 2006:* Mr Donziger, privately on camera, further asserts that Texaco's lawyers had "got to that judge first … I believe they have paid him, and paid the secretary, probably a hundred bucks … And they signed these illegal documents forcing an inspection of a lab, in an effort to destroy our case." Mr Donziger continues: "if it turns out that if a thousand people need to come up from Quito and surround that lab to prevent this inspection from happening, we'll consider doing it. 'Cause this is hand-to-hand combat."[199]

4.249. Later, in his US deposition in the RICO Litigation, Mr Donziger was asked whether he had any evidence that the Quito judge had received monies from Chevron in return for ordering the inspection of the HAVOC laboratory. Mr Donziger testified:

*"… A: We believed the judge was corrupt, but we didn't have evidence he had actually been paid.*

*Q: Did you have any factual basis for believing the judge was corrupt? A: Yes.*

*Q: What was your factual basis? A: His decision was illegal, inappropriate, bizarre, irregular, and fit into Chevron's – what we believe was Chevron's corrupt scheme to intimidate the court. And the whole thing we believed was corrupt. So therefore, since he did it, we believed he was corrupt".*[200]

(This Tribunal has been shown no evidence that the Quito judge was corrupted by Chevron, as alleged by Mr Donziger or otherwise).

4.250. *30 March 2006*: Mr Donziger states, privately on camera: "We have concluded that we need to do more, politically, to control the court, to pressure the court. We believe they

---

[198] C-943, pp.1834-1835.
[199] C-360, 30 March 2006, at CRS-053-02-CLIP 01, p. 91 [00:39-00:54, 01:00-01:10].
[200] C-943, pp. 1840-1841.

# SA520

make decisions based on who they fear the most, not based on what the laws should dictate."[201]

4.251. *5 April 2006:* Ms Leila Salazar, one of the Lago Agrio Plaintiffs' representatives privately tells Mr Donziger and Mr Alejandro Ponce that the judge would "be killed" if he rules in favour of Chevron, as recorded on camera. Mr Donziger replies, "[h]e might not be, but … he thinks he will be. Which is just as good." Mr Donziger further states, "[The judges] don't have to be intelligent enough to understand the law, just as long as they understand the politics."[202]

4.252. *30 May 2006:* A meeting is held between Messrs Donziger, Fajardo and others representing the Lago Agrio Plaintiffs to decide whether to petition the Lago Agrio Court for a global expert. Mr Donziger notes: "Pablo [Fajardo] and our legal team keep insisting that the solution is for the judge (then Judge Yánez) to appoint someone who is favorable to us … I don't trust this approach, given our experience so far."[203]

4.253. *2 June 2006:* Mr Donziger notes in his diary: "I told them we need a massive protest on the court, and only after that should we talk to the judge [Judge Yánez] about what he needs to do. The judge needs to fear us for this to move how it needs to move, and right now there is no fear, no price to pay for not making these key decisions."[204]

4.254. *8 June 2006*: The Lago Agrio Court (Judge Yánez) denies the Lago Agrio Plaintiffs' request to terminate the judicial inspections and sets dates for "the performance of judicial inspections in June and July [2006] … in response to the requests of both parties. The Court may subsequently order performance of the requested proceedings that remain pending in this document."[205]

4.255. *14 June 2006:* By email to Mr Alejandro Villacis, Mr Donziger calls for the preparation of "a detailed plan with the necessary steps to attack the judge [Judge Yánez] through legal, institutional channels and through any other channel you can think of."[206]

---

[201] C-360, 30 March 2006, at CRS-350-04-CLIP 01, p. 566 [01:18-01:29]; C-1614, p. 3.
[202] C-360, 5 April 2006, at CRS-129-00-CLIP 02, pp. 144-145 [00:40-01:47].
[203] C-716, p. 63 of 111 (31 May 2006).
[204] C-716, p. 62 of 111 (2 June 2006).
[205] C-1633, pp. 8-9.
[206] C-1285.

# SA521

4.256. *19 June 2006:* The Lago Agrio Court (Judge Yánez) denies the Lago Agrio Plaintiffs' request to terminate the judicial inspections a second time, again citing the parties' agreement for such inspections.[207]

4.257. *21 July 2006*: By this date, 42 of the 123 judicial inspections requested by the parties have been completed. The Lago Agrio Plaintiffs apply to the Lago Agrio Court, to waive their right to carry out "at this stage of the lawsuit" the judicial inspections requested by them at Sacha, Aguarico, Guanta, Auca, Cononaco, Lago Agrio, Yuca and Parahuaco Fields.[208]

4.258. *25 July 2006:* Mr Donziger notes in his diary: "Our issues first and foremost are whether the judge [Judge Yánez] will accept the renuncia of the inspections. … If it doesn't happen, then we are in all-out war with the judge to get him removed."[209]

4.259. *25 July 2006:* In his diary, on the same day, Mr Donziger notes:[210] "… At which pt I launched into my familiar lecture about how the only way the court will respect us is if they fear us – and that the only way they will fear us is if they think we have come control over their careers, their jobs, their reputations – that is to say, their ability to earn a livelihood."

4.260. *26 July 2006:* Mr Donziger writes in his email message to Mr Kohn (of Kohn, Swift & Graf) in the USA, entitled "Potentially Huge": "Pablo [Fajardo] met with the judge today [Judge Yánez]. The judge, who is on his heels from the charges of trading jobs for sex in the court, said he is going to accept our request to withdraw the rest of the inspections. … The judge also I believe wants to forestall the filing of a complaint against him by us, which we have prepared but not yet filed."[211]

4.261. This was a private meeting between Judge Yánez and Mr Fajardo not known by or disclosed to Chevron at the time. Judge Yánez' decision to accede to the Lago Agrio Plaintiffs' applications was the direct result of the blackmail committed by Mr Fajardo,

---

[207] C-191.
[208] C-505.
[209] C-716, p. 56 of 109; pp. 57-58 of 111 (25 July 2006).
[210] C-716, p. 57 of 111, p. 55 of 109 (25 July 2006).
[211] C-760, p. 1.

# SA522

with the knowledge and support of Messrs Donziger and others representing the Lago Agrio Plaintiffs.

4.262. *22 August 2006:* By court order, the Lago Agrio Court (Judge Yánez) terminates the remaining 64 judicial inspections, in response to the application made by the Lago Agrio Plaintiffs and opposed by Chevron.[212]

4.263. *13 September 2006:* Mr Donziger notes in his diary: "Legal case: going well with [Judge] Yánez decision to cancel inspections … We wrote up a complaint against Yánez, but never filed it, while letting him know we might file it if he does not adhere to the law and what we need …".[213]

4.264. *11 October 2006:* In a private meeting (not known by or disclosed to Chevron at the time), Judge Yánez tells Mr Fajardo that he would not permit Chevron to assert any further challenges to the Lago Agrio Plaintiffs' request for the waiver (i.e. termination) of judicial inspections. Mr Fajardo reports by email to Mr Donziger: "The President [of the Court] was clear and said that he will not permit any further collateral issues about the waiver of our inspections."[214]

4.265. *3 November 2006:* In an email message to Mr Neil Mitchell of Winston & Strawn (as lawyers acting for Ecuador in the USA), relating to Mr Reis Veiga's deposition in the USA, Mr Donziger writes: "It would help us for you to keep RV [Mr Veiga] on the hot seat for as long as possible and press him in a number of areas that will make him uncomfortable… Remember, the info on the fraud issue is still useful for us in Lago and in the ongoing criminal investigation in Ecuador – thus, if you could put on the 'investigatory' hat in this regard that would be helpful. The way to justify it is that this all goes to his credibility…"[215] As Mr Donziger knew, this "fraud issue" and "criminal investigation" impugned the legal validity of the 1995 Settlement Agreement signed by Mr Veiga and Dr Pérez, which the Lago Agrio Plaintiffs were seeking to negate in the Lago Agrio Litigation.

4.266. *4 December 2006*: The Lago Agrio Plaintiffs request that the Lago Agrio Court "immediately order the performance of the expert assessment for purposes of verifying

---

[212] C-195.
[213] C-716, pp. 56 of 111, 54 of 109 (13 September 2006).
[214] C-1261, p. 1.
[215] C-794, pp. 1-2.

the environmental effects of the activities associated with the production of hydrocarbons at all the fields operated by" TexPet [i.e. the "global assessment"].[216]

4.267. *16 December 2006*: Mr Donziger notes in his diary, regarding the proposed appointment of Mr Cabrera as the Court's sole global assessment expert: "I see using E-tech [E-Tech, a firm of environmental experts acting for the Lago Agrio Plaintiffs] to give him cover, but he has to totally play ball with us and let us take the lead while projecting the image that he is working for the court."[217]

*2007*

4.268. *15 January 2007:* President Rafael Correa assumes office as the President of Ecuador, for the first time.

4.269. *22 January 2007*: Having by order terminated the procedure for the judicial inspections,[218] the Lago Agrio Court (Judge Yánez) orders both sides to appear before him so that, if possible, they could mutually indicate the experts who would participate in the global expert assessment.[219]

4.270. *19 January 2007*: Mr Donziger notes in his diary: "Met with the judge [Judge Yánez] last night in house. Humble house, furniture. Made tea. I really like the guy. Remember last August I wanted to ride the wave and get him off the case? This was an example of Pablo's [Pablo Fajardo] total intelligence. We saved him, and now we are reaping the benefits."[220] Mr Donziger also notes, in the same diary entry: "Guerra will be the judge to decide the case. We have to start lobbying him, working with him." None of this was disclosed to or known by Chevron at the time.

4.271. *31 January 2007:* During a meeting between Mr Donziger and Mr Kohn privately recorded on film, regarding the Respondent's criminal prosecution of the two Chevron attorneys, Mr Reis and Dr Pérez, Mr Donziger reports that Chevron is alleging a

---

[216] C-189, p. 1.
[217] C-716, p. 32 of 111; p. 30 of 109 (16 December 2006).
[218] C-196.
[219] C-196.
[220] C-716, p. 27 of 111; p. 26 of 109 (19 January 2007).

## SA524

conspiracy between the Lago Agrio Plaintiffs' representatives and the Government of Ecuador – to which Mr Kohn replies: "if only they knew".[221]

4.272. *3 March 2007:* The Lago Agrio Plaintiffs' representatives, including Messrs Donziger and Fajardo, and their experts meet (privately) Mr Cabrera, as the Court's sole global assessment expert in the Lago Agrio Litigation soon to be formally appointed by the Lago Agrio Court (Judge Yánez).

4.273. At this meeting, recorded privately on film, Mr Fajardo identifies six steps that the Lago Agrio Plaintiffs should take, specifically: (1) "[k]eep up the pressure and constant oversight in the court"; (2) "[m]ake certain that the expert [i.e. Mr Cabrera] constantly coordinates with the plaintiffs' technical and legal team"; (3) "[t]he plaintiffs' technical coordinator must be [involved] in the process fulltime" and "[a]ccompany the expert in the field"; (4) "an attorney … will always be in the field to also protect the activity being performed"; (5) "provide the facilities and necessary support to the field team"; and (6) "support the expert in writing the report."

4.274. Mr Fajardo emphasises that the entire Lago Agrio Plaintiffs' team must contribute to the Cabrera report, explaining: "And here is where we do want the support of our entire technical team … of experts, scientists, attorneys, political scientists, so that all will contribute to that report—in other words—you see … the work isn't going to be the expert's. All of us bear the burden."

4.275. One of the meeting's participants then asks whether the final report would be prepared by the expert (i.e. Mr Cabrera). Mr Fajardo states that the expert will "sign the report and review it. But all of us … have to contribute to that report." Dr Anne Maest (of Stratus Consulting) asks, "together?", which Mr Fajardo confirms. Dr Maest then says, "But not Chevron," to which everyone laughs.[222] Towards the end of the meeting, Mr Donziger states: "We could jack this thing up to thirty billion dollars in one day."[223]

4.276. The same meeting is described by Mr Donziger in his diary, as follows:

> *"… Technical meeting on Sat in office: Richard [Cabrera] there. Sat had all-day Tech meeting in the office - unusual for a 'dia laboral' as Pablo [Fajardo] put it. Richard and Fernando [Reyes] there, as was Ann [Maest], Dick [Kamp], and*

---

[221] C-360, 31 January 2007, at CRS-169-05-CLIP 09, p. 252 [00:19].
[222] C-360, 3 March 2007, at CRS-191-00-CLIP 03, pp. 312-314 [03:08-04:36].
[223] C-360, 3 March 2007, at CRS-193-00-CLIP-01, pp. 321-322 [3:37-3:38].

# SA525

> *Champ [Charlie Kamp]. Pablo delivered first; excellent, then Olga Lucia, the best I have seen her; then Champ. Great spirit and energy in the room. It made me realize how much we have accomplished. ... I spend the whole day making comments and mostly directing them to Richard. We laid out our entire case and legal theory - what a benefit! We need to do the same with the judge ...".*[224]

4.277. No-one present at this meeting could have misunderstood the plan, namely to have Mr Cabrera formally appointed as the sole expert to the Lago Agrio Court, for the Lago Agrio Plaintiffs' representatives and advisers (but not Mr Cabrera) covertly to write the Cabrera Report and to disguise that report, dishonestly, as the work of Mr Cabrera. Astonishingly, all this was willingly recorded on film by the meeting's participants, including Mr Cabrera, Mr Fajardo and Mr Donziger. Needless to say, none of this was disclosed to or known by Chevron at the time.

4.278. *4 March 2007:* Mr Donziger and the Lago Agrio Plaintiffs' US experts meet to discuss their private meeting held with Mr Cabrera on the previous day. The experts include Dr Maest, Dr Kamp and Mr Champ. The meeting appears to have taken place in a restaurant (as privately recorded on film). These experts advise Mr Donziger that no evidence of groundwater contamination exists. Dr Maest states: "And right now all the reports are saying it's just at the pits and the stations and nothing has spread anywhere at all".[225] Mr Donziger replies: "Hold on a second, you know, this is Ecuador, okay? … You can say whatever you want and at the end of the day, there's a thousand people around the courthouse, you're going to get what you want … And we can get money for it … Because at the end of the day, this is all for the Court just a bunch of smoke and mirrors and bullshit. It really is. We have enough, to get money, to win."[226]

4.279. In his US deposition, Mr Donziger was asked whether when he made this statement he believed it to be true. He testified: "I think I made that statement for dramatic effect".[227] The Tribunal does not understand this explanation.

4.280. The participants in the meeting later discuss whether it would be helpful to test a specific site and the particular manner of doing it, also as privately recorded on film. Mr Champ states "I know we have to be totally transparent with Chevron in showing them what we

---

[224] C-716, p. 8 of 111; p. 6 of 109 (7 March 2007).
[225] "It" denotes groundwater contamination. C-360, 4 March 2007, at CRS-195-05-CLIP 01, pp. 327-329 [01:39-01:45].
[226] C-360, 4 March 2007, at CRS-195-05-CLIP 01, pp. 327-329 [02:00-03:06].
[227] C-715, pp. 798-799.

# SA526

are doing", to which Mr Donziger replies "Well, no, no, no, because they will find out everything we do". Dr Maest then suggests "Yeah, we don't have to give them our plan. I don't think, do we? Mr Donziger replies "Well, it's a little unclear. Nobody's ever done this before. This is so crazy. Our goal is that they don't know shit - and that's why they're so panicked - there's no way they can control this, because they didn't ask for it."[228]

4.281. *4 March 2007:* During a discussion with the Lago Agrio Plaintiffs' experts (except Mr Champ) following the above meeting, Mr Donziger explains as privately recorded on film, "If we have a legitimate fifty billion dollar damage claim, and they end up - judge says, well, I can't give them less than five billion. … And, say, [Chevron] had a huge victory; they knocked out ninety per cent of the damage claim."[229]

4.282. *6 March 2007:* During a meeting with Stratus Consulting and others (including Dr Maest), Mr Donziger states, as privately recorded on film: "Now, I once worked for a lawyer who said something I've never forgotten. He said, 'Facts do not exist. Facts are created.'" Everyone laughs. Mr Donziger continues, "[a]nd ever since that day, I realized how the law works."[230]

4.283. *19 March 2007*: The Lago Agrio Court (Judge Yánez) formally appoints Mr Cabrera as the sole expert for conducting the global expert assessment upon the request of the Lago Agrio Plaintiffs, opposed by Chevron.[231]

4.284. *20 March 2007*: A meeting takes place between President Correa with members of the Ecuadorian Government, including the Environment Minister, Ms Anita Albán, Mr Xavier Garaicoa Ortiz (of the Procuraduría General); Mr Alexis Mera (the President's legal adviser), PetroEcuador and representatives of the ADF and the Lago Agrio Plaintiffs, Mr Yanza, Mr Ponce, Ms Yepez and Ms Lupita Heredia.[232]

4.285. As subsequently reported by Ms Yepez in her email to Mr Donziger dated 21 March 2007:[233]

---

[228] C-360, 4 March 2007, at CRS-196-00-CLIP 01, pp. 334-335 [00:17-00:41].
[229] C-360, 4 March 2007, at CRS-196-01-CLIP 01, pp. 342-343 [00:39-00:51].
[230] C-360, 6 March 2007, at CRS-195-05-CLIP 01, pp. 327-329 [21:28-21:39].
[231] C-197.
[232] Track II Hearing, Claimants' Opening Oral Submission, Slide 5.
[233] C-1005.

## SA527

> *"... The Prez [President Correa] was very upset at Texaco. He asked the Attorney General to do everything necessary to win the trial and the arbitration in the U.S. He asked his team to urgently work on the matter. This Saturday he will report on the matter on national television. Officially now at that time he will clarify several points in order not to hurt us in the trial. He ordered that a cabinet be formed in the Amazon, inviting or bringing the press so they can visit the places affected by Texaco with his team. He also said that he would like to figure out a legal and judicial way to try Texaco for genocide. He gave us fabulous support. He even said that he would call the judge. I don't know if this could also hurt us, but the attorneys and Luis [Yanza] have to pay closer attention to delicate matters."*

4.286.   The Tribunal has seen no evidence that the Respondent's President (or any officer on his behalf) called any judge at the Lago Agrio Court, then or later.

4.287.   *26 March 2007:* In his email messages to Mr Donziger dated 26 March 2007, Mr Fajardo refers to Judge Yánez as the "cook," the Lago Agrio Court's global assessment expert, Mr Cabrera, as the "waiter", the "menu" as the work plan, the "other restaurant" as Chevron, and the "messenger" as Mr Fajardo:[234]

> *"Today the cook met with the waiter to coordinate the menu. What is new is that in view of the other restaurant's challenge, the cook has the idea of putting in another waiter, to be on the other side. This is troublesome. I suggest we activate alarms, contacts, strategies, pressures in order to avoid this happening. It is necessary to do it urgently."*

> *"The Lago Agrio messenger is waiting to meet this afternoon with the cook, to listen to his position. I suggest that the heads of Quito, Lago Agrio and NY talk at six thirty, Ecuador time. By this time the messenger will already have some news regarding what the cook is saying."*

4.288.   Mr Donziger later confirmed in his testimony at the RICO trial that the "cook" referred to Judge Yánez, the "waiter" referred to Mr Cabrera, and the "other restaurant" referred to Chevron.[235] He also confirmed that the appointment of a second global assessment expert, as intimated by Judge Yánez, was (in the words of his email to Mr Fajardo) "unacceptable". No such second expert is appointed by the Lago Agrio Court. None of this was disclosed to or known by Chevron at the time.

4.289.   *29 March 2007:* In advising the Lago Agrio Plaintiffs during a private meeting, President Correa's legal adviser, Mr Alexis Mera, recommends that the Lago Agrio Plaintiffs pressure the Prosecutor-General to "reopen" the investigation: "you have to

---

[234] C-917.
[235] C-2382, pp. 2548-2550.

## SA528

take the people from the Orient[e] there [the Public Prosecutor's Office], hold a demonstration … [T]hat's how this country works." In response, the Lago Agrio Plaintiffs' representatives tell Mr Mera that "although we could mobilize people, the – the official nature of the President could do much more in this case … an interest by the Executive Branch - and pressure on the Public Prosecutor's Office … could do a lot on this subject." When the Lago Agrio Plaintiffs' representatives continue to press that the Executive Branch's involvement would have a "political impact" on the case, Mr Mera agrees, saying: "I do understand the whole political thing."[236]

4.290. *27 April 2007*: President Correa visits the former concession area in the Oriente, with Mr Fajardo and Mr Yanza. (Mr Donziger is not present). Shortly thereafter, the President calls for the criminal prosecution of the Ecuadorian Government's officials who signed the 1995 Settlement Agreement and also of TexPet's representatives, i.e. Mr Veiga and Dr Pérez (see the Criminal Prosecutions above).

4.291. *6 June 2007:* During a meeting of the Lago Agrio Plaintiffs' advisers, recorded privately on film, Mr Donziger proposes to "take over the [Lago Agrio] court with a massive protest," in order to "shut the court down for a day." He states that there was an "institutional weakness in the judiciary," and that "they [the judges] make decisions based on who they fear [the] most."[237] Mr Donziger also describes, privately on film, the "need to make facts … that help us" even though "the facts that we need don't always exist."[238]

4.292. *7 June 2007:* Mr Fajardo states, privately on film, that the Lago Agrio Plaintiffs need to increase pressure on the Lago Agrio Court to swear in Mr Cabrera: "the judge [i.e. now Judge Yánez] is scared shitless."[239]

4.293. *13 June 20*07: Less than one week later, the Lago Agrio Court (Judge Yánez) swears in Mr Cabrera as the Court's sole "global assessment expert". At this ceremony, Mr Cabrera takes an oath "to perform his duties faithfully" and "with complete impartiality and independence" from the disputing parties.[240] Mr Cabrera was thereby to act as a

---

[236] C-360, 29 March 2007, CRS-221-02-CLIP 01, pp. 419, 422, 432 [00:28-00:33; 04:00-04:10; 13:25-13:28].
[237] C-360, 6 June 2007, at CRS-350-04-CLIP 01 at 566-567 [00:32-01:40]; Track II Hearing, Claimants' Opening Oral Submission, Slide 11.
[238] C-360, 6 June 2007, at CRS-375-00-CLIP 05, p. 600.
[239] C-360, 7 June 2007, at CRS-376-03-CLIP 10, p. 613 [00:14-00:17].
[240] C-363, p. 4.

# SA529

court expert, appointed by the Lago Agrio Court to act as a neutral expert to the Court. This was not to be.

4.294. *13 June 2007*: Mr Donziger states privately on film that Judge Yánez "never would have [appointed Mr Cabrera] had we not really pushed him." He then states: "It's just like – you know? … All of this bullshit about the law and the facts – and it factors into it because it affects the level of force… At the end of the day, it is about brute force, who could apply the pressure and who could withstand the pressure and can you get them to the breaking point …".[241]

4.295. When asked about this statement in his US deposition, Mr Donziger testified that he made it for "dramatic effect".[242] Again, the Tribunal does not understand this explanation. Nonetheless, the Tribunal infers that Mr Donziger's reference to "brute force" and "breaking point" includes the improper treatment to which Judge Yánez was deliberately subjected by Mr Donziger and his colleagues, without which Judge Yánez would not have appointed Mr Cabrera as the Court's sole Global Assessment expert.

4.296. *4 July 2007*: Mr Cabrera ostensibly begins work as the designated sole global assessment expert to the Lago Agrio Court, with his technical team.

4.297. *17 July 2007*: Mr Donziger sends an email message to Mr Fajardo: "Ideas para reunion con Richard [Cabrera]".[243] It reads:

> *"Commanders of the Urban and North Front:*
>
> *These are the fastest ideas:*
>
> *1) That we think that Richard should suspend his work in the field and we should not pay the team until after the recess. We just need him to tell the team and Texaco that he's going to start all over after the recess so there is nothing strange, everything appears normal.*
>
> *2) When I get there, we'll re analyze the work and the budget with Richard. And we'll adjust with a much smaller team. My tendency is to stop Richard from working much more in the field… or, if he continues doing it, he should continue under the*

---

[241] C-360, 13 June 2007 at CRS-361-11, CLIP 01, pp. 592-593 [00:24-00:44].
[242] C-715, pp. 801-804.
[243] C-2319.

*most strict control with an extremely limited number of samples. And we'll change the focus of the data at our offices.*

*3) It is key to have deadlines to receive drafts from all the consultants, such as the biologists, the water man, and so on. Personally, I don't want to wait for the 'final' product to determine if the work is useful or not, or we will be screwed because they will ask for even more money to make the changes if we are not properly informed of everything during the process.*

*4) The main problem with Richard is the lack of money and the distraction of the most important proof of the case, that is, the 80,000 chemical results that we already have. The most important thing of the field is the subterranean water and I think that we don't even have that planned, and now I'm worried because we don't have the money to do it.*

*I think that, without realizing it, we are being quite similar to the style of Wray/Pareja/Russell, that is, we are trying to do too much, producing waste and delaying for lack of budget, and, without realizing it, we are helping the enemy's strategy of delaying the trial.*

*I'll talk to you later on the phone. It is all about money, I know, but it is also about strategy.*

*Thank you, my bosses."*

4.298. *23 July 2007:* Mr Cabrera's letter to the Lago Agrio Court denies that he has "any relation or agreements with the plaintiff;" and he states that "it seems to me to be an insult against me that I should be linked with the attorneys of the plaintiffs."[244]

4.299. *3 September 2007*: Chevron again seeks inspections of the HAVOC Lab, which had been ordered by the Quito Court. Mr Donziger explains in an email message to Mr Fajardo and others: "An inspection of [the HAVOC Lab] would be a disaster for the Lago Agrio case. … I say that we … accuse all of them, including the judge [i.e. the Judge in Quito], of corruption for still even thinking of ordering an illegal inspection with no basis in the law in order to favour a corrupt transnational that is killing innocent Ecuadorians."[245] (It is not entirely clear to the Tribunal exactly why such an inspection would have been a "disaster" for the Lago Agrio Plaintiffs' case).

---

[244] C-366.
[245] C-1033.

# SA531

4.300. By now, the Lago Plaintiffs' representatives maintain a "secret" bank account at the Banco Pichincha for the purpose of making covert payments to Mr Cabrera.[246] This was one of the accounts used by Selva Viva, an Ecuadurian legal entity controlled by certain of the Lago Agrio Plaintiffs' representatives for the purpose of the Lago Agrio Litigation. Mr Donziger is the president of Selva Viva. One of its employees involved in banking transactions, is Ms Ximera Centeno. The Lago Agrio Plaintiffs' internal documents identify her as the Lago Agrio Plaintiffs' librarian, receptionist and payment administrator.[247] (As described below, Ms Centeno also made monetary deposits to Mr Guerra on behalf the Lago Agrio Plaintiffs' representatives).

4.301. *12 September 2007*: The Lago Agrio Plaintiffs' representatives are now paying more than US\$ 100,000 to Mr Cabrera through the "secret" bank account, including a single payment of US\$ 30,000.[248] As Mr Yanza states in an email message of 12 September 2007 to Mr Donziger:

> *"... I think we should plan ahead and not give those Texaco bastards the pleasure, using the same mechanism from weeks ago, that is, he [Mr Kohn] sends us money to our secret account, to give to Wuao [Mr Cabrera], [to] not stop the work. I estimate it will be about 30,000, but since there are expenses from the last work day in the south, it might be another 20,000. In any case, this money will then be reimbursed to SV [Selva Viva] once the judge orders us to pay. To conclude, please explain this situation to JK [Mr Kohn] so he can transfer 30 [US\$ 30,000] to our Secret Account and 20 to SV, but he could send the 50 to the secret account and then we could pass the 20 to SV to save time and paperwork. I know it's difficult for you to be dealing with JK about money all the time, but it is necessary and urgent to solve this to prevent those bastards from having the pleasure. Call us in 5 minutes....."[249]*

4.302. At the RICO trial in New York, Mr Donziger testified that he could not recall "any other purpose for which this secret account was established", other than to pay Mr Cabrera.[250]

4.303. On the evidence adduced in this arbitration, the Tribunal finds that these payments to Mr Cabrera were made corruptly as bribes by certain of the Lago Agrio Plaintiffs' representatives, including Mr Fajardo, Mr Yanza and Mr Donziger.

---

[246] C-1661, p. 37.
[247] Torres ER, p. 24; Exhibit 49.
[248] C-1053; see also C-1661, C-1750 & C-1744.
[249] C-1053.
[250] C-1041, pp. 4414-4415. Mr Donziger confirmed that "Wuao" was one of the names that was used by him and others for Mr Cabrera: C-2382, p. 2550.

# SA532

4.304. *3 October 2007:* The Lago Agrio Court (now Judge Novillo) orders Mr Cabrera to be "responsible for the entire report, the methodology used, for the work done by his assistants, etc." The Court also orders Mr Cabrera to "observe and ensure … the impartiality of his work, and the transparency of his activities as a professional appointed by … the court". The Court states that the role of the expert was one of complete impartiality and transparency with respect to the parties and their attorneys. The Court also states that Mr Cabrera "… is an auxiliary to the Court for purposes of providing to the process and to the Court scientific elements for determining the truth."[251]

4.305. In his capacity as the sole global assessment expert, Mr Cabrera was at all material times an auxiliary associate of the Lago Agrio Court and, thus, an officer of the Respondent's judicial branch. He was not permitted under Ecuadorian law to be the representative of or adviser to any disputing party to the Lago Agrio Litigation.

4.306. *11 October 2007*: Further questions arise from Chevron as to the independence of Mr Cabrera from the Lago Agrio Plaintiffs' representatives. On 11 October 2007, Mr Cabrera files a formal signed statement addressed to the Lago Agrio Court.[252] It reads (inter alia) as follows:

> *"(1) It is public knowledge that various questions have been raised with regard to my appointment, my work and the other technical officers that are working on the expert examination.*
>
> *(2) Your Honor, being the professional that I am and in compliance with the orders issued by you regarding my designation, confirmation and acceptance of my appointment as Expert, I have performed my work with absolute impartiality, honesty, transparency and professionalism.*
>
> *(3) I reject the descriptions or attacks that have been leveled against me alleging that I am biased toward one of the parties, and I also reject the unfounded accusations that I am performing my work surreptitiously. That is completely untrue. Both sides to this case have witnessed, on a daily basis, the sampling work performed, the sampling procedure employed, the number of samples collected, in addition to other activities.*

---

[251] C-364, p. 2.
[252] C-367, p. 2.

# SA533

> (4) I have complied with your orders and have provided sufficient advance notice to both litigating parties under the same conditions with regard to the sites where I planned to collect samples or perform the respective study.
>
> (5) Furthermore, both parties were initially signing the sample control sheet, but during the sampling process, first the defendant refused to sign that document, and then the plaintiff also refused to sign. I could not, in my capacity as an expert, obligate the parties to sign said document.
>
> (6) The task assigned to me includes evaluating the damage sustained by waters, soils, plant cover and fauna, among other activities. It is clear that I could not perform a job of this magnitude alone, and have therefore employed several technical officers and experts to perform these tasks under my coordination and responsibility. Once I submit my report to this court, Your Honor, the names of all of the technical officers that have collaborated in the study under my responsibility will be made public. Thus far, Your Honor, all I have done is attempt to plan and conduct the expert examination in the most complete, efficient and professional manner possible."

4.307. In particular, as to his alleged relationship with the Lago Agrio Plaintiffs, Mr Cabrera declares to the Lago Agrio Court:

> "The defendant's attorneys allege that the plaintiff [sic: plaintiffs] is in 'close contact' with me, and that the plaintiff has provided me with technical information and support staff to assist with the expert examination. This is untrue. If I need any technical information in connection with this case, all I have to do is request it from this Court; the idea that the plaintiffs would be helping me with that is unthinkable. With regard to personnel, I admit that initially, a person associated with the plaintiff did provide me with logistical support for the expert examination, but this has had no bearing on the core subjects of the expert examination, and therefore no influence or actual relationship exists. After the first days, I decided to rectify this situation and not allow any person associated with the parties to participate in my work in order to avoid absurd or ill-intentioned comments.
>
> Worse still is the accusation of the plaintiff's [sic: "defendants"] attorneys that the conduct of the other technical officers is a 'decoy', a ploy to conceal preexisting information provided by the plaintiff that I allegedly will simply attach to my expert report. I condemn this assertion because it has no basis and there is no evidence to support it, and I demand that these attorneys refrain from saying these kinds of things about me in the future."

4.308. These statements of impartiality and independence from the Lago Agrio Plaintiffs' representatives were made falsely by Mr Cabrera.

# SA534

*2008*

4.309. *2 January 2008:* In his email message dated 2 January 2008 (headed "Necessary Tasks to be Completed in the Year 2008" and "Specific Tasks") to Messrs Donziger, Saenz, Prieto, Yanza, Ponce and Alexandra Anchundia, Mr Fajardo includes: "6. Coordinate with the President of the Republic for defense on the accusation of denial of justice."[253]

4.310. *13-19 January 2008:* Mr Beltman (in charge of Stratus Consulting's "Ecuador Project" for the Lago Agrio Plaintiffs) and Dr Maest travel to Ecuador, at Mr Donziger's request, to meet Mr Cabrera privately, with certain of the Lago Agrio Plaintiffs' representatives. This meeting is not disclosed to or known by Chevron at the time. In his later witness statement, Mr Beltman testifies that:

> *"15. Based on that meeting with Cabrera and a review of his background, Cabrera lacked the skill, qualifications, and experience to conduct or review a multi-disciplinary environmental damages assessment himself.*
>
> *16. At no time did I ever see any indication of an independent Cabrera "team" nor did I ever meet anyone I understood to be a member of Cabrera's "independent team." To the contrary, individuals that I am aware of who assisted in preparing the Cabrera Report were affiliated with or working at the direction of Donziger and the LAPs' representatives.*
>
> *17. At no point during Stratus's time working on the Ecuador Project, including at the January 2008 meeting, did I have an understanding that Cabrera was preparing his own report. It was clear from statements Donziger and others made that the LAPs' team expected the Lago Agrio court to rely upon the Cabrera Report in rendering its judgment."[254]*

4.311. *22 February 2008:* In his email message to his colleagues at Stratus Consulting, Mr Beltman writes: "The project is at a key point right now. We have to write, over the next 2 to 3 weeks, probably the single most important technical document for the case. The document will pull together all of the work over the last 15 or so years on the case and make recommendations for the court to consider in making its judgment …"[255] This "document" was to be the "Cabrera Report".

---

[253] C-805, p. 2.
[254] C-1611A, paras 15-17.
[255] C-1758, p. 1.

# SA535

4.312. *26 February 2008*: Mr Beltman sends to his colleagues within Stratus Consulting an outline and chart showing how they should falsely "attribute" their work on the Cabrera Report to Mr Cabrera's "team." The chart identifies who would be responsible for drafting each section, the reviewer/approver, and to whom it would be falsely attributed.[256]

4.313. *12 March 2008*: Stratus Consulting exchanges English language drafts of the "Cabrera Report" (Mr Cabrera does not speak English). Mr Beltman emails the English draft report for Spanish translation to "info@translatingspanish.com," stating that "[t]he main [Cabrera] report (the one attached to this email) is the highest priority." Mr Beltman notes that he would travel to Quito to review and make revisions to the report in Spanish.[257]

4.314. *31 March 2008*: The Respondent resumes the Criminal Prosecutions against (inter alios) Mr Veiga and Dr Pérez, as the signatories to the 1995 Settlement Agreement for TexPet.[258]

4.315. *31 March 2008:* The Lago Agrio Plaintiffs' representatives and advisers work on the so-called "Cabrera Report" until its filing in the Lago Agrio Court.

4.316. According to Mr McGowan's expert testimony (of Stroz Friedberg, for Chevron in the US Litigation), the Lago Agrio Plaintiffs' representatives saved the latest version of the "Cabrera Report" on 31 March 2008 at 11:09 EST, and, "[t]he text of [the Lago Agrio Plaintiffs' report] … is identical to text of the report filed by Richard Stalin Cabrera Vega on April 1, 2008."[259]

4.317. *1 April 2008:* Mr Cabrera formally files the Cabrera Report with the Lago Agrio Court. It advises the Court that Chevron should pay compensation in excess of US$ 16 billion.[260] Mr Cabrera files an amended expert report in November 2008, with a revised figure for compensation of US$ 27.3 billion. (The Tribunal hereon refers to these

---

[256] C-1078.
[257] C-855, p. 1; see also C-1611A, paras 22-27, 38-45 & 59-60.
[258] See R-250.
[259] C-1048, paras 8, 24, 27.
[260] C-201.

# SA536

two reports collectively, save where the contexts requires otherwise, as the "Cabrera Report").

4.318. Later, in US legal proceedings, Mr Beltman and Mr Donziger both admitted that Stratus Consulting covertly wrote Mr Cabrera's Report.[261] In this arbitration, the Respondent does not dispute that certain of the Lago Agrio Plaintiffs' experts wrote the Cabrera Report.[262]

4.319. *1 August 2008:* Mr Beltman (of Stratus Consulting) reports in his email message, headed "Plan de Trabajo - Texpet cleanup", to Mr Fajardo and Mr Donziger:[263]

> *"One of our tasks for the comments on the Cabrera Report in the Plan de Trabajo is to conduct a technical analysis of whether the Texpet cleanup in the 1990s complied with the technical requirements for the cleanup. Cabrera already points out that the Texpet work did not actually clean up the pits, and the idea of this analysis was to determine if we could further criticize the Texpet cleanup for not complying with the technical requirements ... Although there are some ambiguities of language and potential legal issues (such as apparent contradictions between the March 1995 Statement of Works and the RAP) I did not find any clear instances where Texpet did not meet the conditions required in the cleanup. The very large exception, of course, is that sampling during the judicial inspections and by Cabrera showed that the "cleaned" pits are still contaminated – however the sampling done by Woodward Clyde post-cleanup allowed the pits to be in compliance with the contract requirements. This important discrepancy has already been addressed by Cabrera in his report. There is also the issue that the RAP conflicts with Ecuadorian laws, but again I didn't evaluate that here. Therefore, I do not have any comments to prepare on this aspect of the Cabrera Report."*

4.320. *9 August 2008*: During his weekly presidential address, President Correa referred to the Government's support for the Lago Agrio Plaintiffs in the Lago Agrio Litigation, as follows:

> *" ... Well, on Saturday the eighth, at 9:30, we had a working meeting on the Texaco case, so let's go to that, let's go to radio link number 81. Why did we have the working meeting on the Texaco case? You know that there's a lawsuit filed by the communities, the Amazon Defense Front, against Texaco Chevron, for all of the pollution that it left in the Amazon. So then, Texaco Chevron is asking to meet with the government. Well, I've told our comrades about that, to ask them what they thought, and we've agreed that we would meet with them, but with our comrades from the Amazon Defense Front present. We're not one of those right-wing sell-out governments that supported this multinational company and betrayed our people.*

---

[261] C-1611A, paras 12, 22-23, 27 & 44-46; C-902, p. 2253.
[262] R-TII CMem. Mer. Feb. 2013, Annex E, para 9.
[263] C-2043.

# SA537

> *But neither are we going to get involved in this, because it might be prejudicial to our comrades, because it's a case that's in the hands of the court, right? It's a court case. But previous governments supported Texaco Chevron and betrayed our people: they signed agreements saying that everything was resolved, which has been one of the principal arguments by Texaco Chevron in its defence, when in fact nothing was resolved. Now the Prosecutor General [Mr Washington Pesántez], has, very properly, opened an investigation to punish those people, because it was a lie: there was nothing, nothing resolved, nothing cleaned up, of all the pollution. So then, they probably want us to mediate the case, etc. If we can help, all the better, but if we meet with Texaco Chevron, we're also going to meet with our comrades from the Amazon Defense Front. That's what were going to say very clearly to our comrades from that group, who are extraordinary people. They're real heroes there, heroes that I would call anonymous heroes, don't you agree? One Luis Yanza, one Pablo Fajardo, who have fought for years for their people, for their Amazon, for the ecosystems, for nature, don't you agree? Congratulations, but watch out. There's not going to be any more of those sell-out governments. We're not going to get involved in the case, because it's a court case and we might hurt them. They've already made accusations that the State was pressuring the judges - haven't they? - to prejudice the case, but comrades ... I mean that if we receive Chevron Texaco, it will be with you there. And if we can help in some way to mediate, etc., well, all the better, but based on justice, not based on power ...".* [264]

4.321. *9 August 2008*: In an exchange of email messages, Messrs Fajardo and Donziger state that they should be "doing everything to prepare the court to issue a quick Judgment and in such a way that it can be enforced in the U.S. before appeals in Ecuador." They confirm that they soon will "start the work with the new judges."[265] The latter was a reference to the imminent end of Judge Novillo's term on 24 August 2008 as the Lago Agrio Judge presiding over the Lago Agrio Litigation, when he was succeeded by Judge Núñez. The earlier reference to the enforcement of a "quick judgment" referred to the strategy described later in the Invictus Memorandum prepared by Patton Boggs in or about August 2010 (see below).

4.322. *13 August 2008*: By email message dated 13 August 2008 to Mr Fajardo, Mr Donziger states: "If you repeat a lie a thousand times it becomes the truth."[266]

4.323. *26 August 2008*: The Respondent's Prosecutor General Washington Pesántez Muñoz brings criminal charges against (inter alios) Mr Reis and Dr Pérez, as TexPet's co-

---

[264] C-173.
[265] C-993.
[266] C-1630.

## SA538

signatories to the 1995 Settlement Agreement (with related agreements), under Articles 338 and 339 of the Criminal Code.[267]

### 2009

4.324. *January 2009:* The film "Crude", directed by Mr Joseph Berlinger, is shown at the Sundance Film Festival in Utah, USA. The film was principally funded by Mr Russell DeLeon, at the time a major non-party funder for the Lago Agrio Plaintiffs in the Lago Agrio Litigation.

4.325. The film was subsequently released to the public. Chevron's legal advisers noted that one of these public releases was differently edited, suggesting that the unpublished outtakes might contain relevant material. In particular, that public version showed Dr Carlos Martín Beristain (a member of Mr Cabrera's team) appearing to work privately with the Lago Agrio Plaintiffs' representatives. Mr Berlinger testified that he had removed from other versions of the film these scenes of Dr Beristain at the express request of the Lago Agrio Plaintiffs' representatives. (It is not clear why the other public version was not similarly edited; but it had significant consequences for the Lago Agrio Litigation).

4.326. Chevron brought legal proceedings in New York against Mr Berlinger and others to produce unpublished outtakes from the film "Crude" showing the representatives for the Lago Agrio Plaintiffs, private or court-appointed experts in that proceeding and current or former officials of the Government of Ecuador. On 15 July 2010, Chevron obtained copies of these outtakes, amounting to about 600 hours (compared to some 90 minutes of edited film), by court order made by the US District Court for the Southern District of New York (Judge Kaplan) under Section 1782 affirmed (as modified) on appeal by the US Court of Appeals for the Second Circuit on 15 July 2010.[268]

4.327. Subsequently, as a result of these "Crude outtakes", Chevron also obtained other documentation, in the US Section 1782 Litigation, from Mr Donziger, Stratus Consulting and several others. Chevron also took depositions and witness statements from several persons, including Dr Calmbacher, Mr Beltman, Dr Maest and, for 13 days,

---

[267] C-252; Reis Veiga WS, para 52.
[268] C-359.

Mr Donziger himself.[269] This unprecedented mass of evidential material, ordinarily protected by journalistic or legal privileges, was a major development for Chevron's case, both for its RICO Litigation in New York and also for this arbitration under the Treaty. It was the product of more than 20 actions brought by Chevron in different US Federal Courts across the USA.[270] As of January 2009, however, all this still lay in the future.

4.328. *5 January 2009:* Mr Donziger notes in a private email message to himself, regarding his "Strategic Plan for 2009 Ecuador": "… speed to finish, deal with release, number, reasoned opinion, relationship to alegato, final order for U.S. enforcement, ask for bond and interest to run."[271] In the Tribunal's view, the reference to the "reasoned opinion", in the context of other work to be performed by the Lago Agrio Plaintiffs' representatives, likely signified a tentative plan already formed by such representatives covertly to contribute to or draft material parts of the Lago Agrio Judgment.

4.329. *14 January 2009:* The Lago Agrio Plaintiffs' representative, Mr Prieto, writes to Mr Donziger and others in early 2009:

> *"… Let's keep in mind that Texaco is alleging in the United States that the Ecuadorian courts can be politically influenced, and that the Lago Agrio Court is under enormous pressure. The pressure should be felt by the judge, but should be subtle enough that it can't be alleged that he acted due to that pressure … To understand it, let's think about when [President] Correa visited the region and publicly condemned Texaco. It was definitely a media victory, but Correa's words that day are the basis for Texaco's main argument for saying that the Lago Agrio judge isn't independent and that he obeys Correa's orders. To summarize, this strategy should be as follows: 'increase the pressure on the Court, but without negatively impacting its image of independence.' The political pressure can be in the form of direct calls to the judge. Preferably avoid public threats!! Social and media pressure can be brought to bear in their full force – because no one can silence the voice of society itself – but it's different than the voice of the State, which supposedly remains impartial …"[272]*

4.330. *4 February 2009:* In an email message to Mr Donziger, Mr Sáenz wrote: "Dude, if the guys at Jones Day [Chevron's US lawyers] get a hold of this [i.e. the collusive abuse of Criminal Prosecutions against TexPet's two representatives to invalidate the 1995

---

[269] Mr Donziger's deposition ended on 31 January 2011. Chevron issued its RICO legal proceedings in New York against him and others the next day, on 1 February 2011.
[270] See the "US Section 1782 Litigation" above.
[271] C-1137, p. 2.
[272] C-1284, p. 1.

# SA540

Settlement Agreement in the Lago Agrio Litigation] it's gonna hurt us. It's pretty much irrefutable evidence of us collaborating with the fiscalia to get Reis Veiga and Pérez convicted."[273] Mr Donziger responds, by email: "… nothing Chevron says sticks these days, people bring evidence of crimes to prosecutors all the time … you must understand we are not collaborating with the fiscalia -- we are providing the fiscalia information about a crime, which is appropriate, and that's a big difference."[274]

4.331. *4 March 2009:* By declaration addressed to the Lago Agrio Court (Judge Núñez), in response to further accusations of impropriety made by Chevron's Ecuadorian lawyers, Mr Cabrera again attests to his impartiality and independence before the Lago Agrio Court. He states (inter alia):

> *"… All my work has been public. I have concealed absolutely nothing, my report has been submitted to the Court of Justice to which both parties have had access, I believe, without the least impediment. If my work had been clandestine, the parties would not have been able to photograph the sampling, would not have been able to observe everything that was done in the field, would not have criticized the minor technical details in the field so much"; and "… All the work done was planned, directed, and approved by me, as the person responsible for the expert examination."*[275]

This statement was false.

4.332. *5 June 2009:* Mr Fajardo informs Mr Donziger that he is giving one of the Lago Agrio Plaintiffs' legal interns "a research assignment for our legal alegato and the judgment, but without him knowing what he is doing."[276] In the Tribunal's view, the latter phrase is a reference to a covert plan for the 'ghostwriting' of the Lago Agrio Judgment. Thus, from Mr Fajardo's perspective, this mischief could not be made known to the legal intern.

4.333. *18 June 2009:* Mr Fajardo sends an email message to Mr Donziger, headed "Trust", which includes a "transcription" of part of the Ecuadorian court decision in *Andrade v. Conelec* (i.e. the "Fajardo Trust Email").[277] That transcription contains clerical mistakes not found in any published version of the court decision itself.[278] Later, these same

---

[273] C-804, p. 2.
[274] C-804, p. 2.
[275] C-365, paras 2.1b & 2.2-3.
[276] C-995.
[277] C-997, C-1216.
[278] Contrast C-997 and C-998.

# SA541

mistakes appear verbatim in the Lago Agrio Judgment.[279] In addition, this email proposes a "trust" as "the method to execute a judgment". In the Tribunal's view, this is the origin of Part 15 of the Lago Agrio Judgment for a "trust" to be formed as the payee of any proceeds from the enforcement of the Judgment, controlled by the ADF and persons designated by the ADF. (The Tribunal returns to these matters below, also in Part V).

4.334.  *18 June 2009*: Mr Fajardo sends an email message to Mr Donziger, attaching the Ecuadorian decision in *Delfina Torres v. Petroecuador*[280] and noting that: "[t]he arguments by the magistrates are very interesting, I think they serve us well for our alegato and … [sic]" The use of an ellipsis was a veiled reference to the covert plan for 'ghostwriting' the Lago Agrio Judgment, given Mr Fajardo's reference only two weeks earlier to the "alegato and the judgment" (see above under "5 June 2009").[281]

4.335.  *19 June 2009:* The Lago Agrio Plaintiffs' representatives hold an important meeting in Ecuador. According to Mr Fajardo's email message to Mr Donziger, the participants are to discuss "all of the outcome of the case and what to do, how much money to put in, how to distribute the items and everything."[282]

4.336.  *22 June 2009:* In response to a newspaper article entitled "State Assumes Environmental Clean Up," Mr Fajardo emails his colleagues, expressing concerns that [Chevron] would "say that the State finally assumed its duty and is going to clean up what it ought to." By email headed "Worrisome", Mr Donziger responds to Mr Sáenz and copied to his other colleagues, "You have to go to [President] Correa to put an end to this shit once and for all."[283] Whilst the Ecuadorian Government's initiative (if such it was) could have benefited the affected local communities, PetroEcuador's remediation activities were seen by Mr Donziger and his colleagues (including Messrs Fajardo, Sáenz, Yanza and Prieto) as an unwelcome threat to their strategy in the Lago Agrio Litigation. The Tribunal infers that the reason for their concerns was the inconsistency with their strategy that Chevron was to be the only person to be held responsible for such pollution and resulting compensation in a significant amount, to the exclusion of PetroEcuador

---

[279] Contrast C-997 and C-998; see C-931, p. 186.
[280] C-1586, RLA-286.
[281] C-1138.
[282] C-996.
[283] C-1163.

# SA542

and the Respondent. Given (inter alia) the low estimate for PetroEcuador's remediation costs and the terms of the unilateral waiver of 20 November 1996 ostensibly immunizing PetroEcuador and the Respondent from any like responsibility (see above), such concerns are understandable.

4.337. *26 July 2009:* Mr Fajardo, in his email message to Mr Donziger, attaches links and texts, adding: "Some of them are very interesting and, as a matter of fact, will help us with the alegato work and … [sic]".[284] The same point arises regarding the ellipsis. It referred to the covert plan for ghostwriting the Lago Agrio Judgment (see above).

4.338. *7 August 2009:* In his email message to Mr Donziger headed "Meeting with Ecuador Lawyers",[285] Mr Kohn (of Kohn, Swift & Graf) writes (inter alia): "In order to be effective at all in developing a judgment that will be enforceable in the US and elsewhere we need to be involved in the preparation of the final submission and proposed judgment, the major task we have all agreed upon repeatedly our firm would work on. We have been discussing meeting with our Ecuador lawyers since April or May to begin a working process to get this done …". This reference to "developing a judgment" is ambiguous; but it becomes clearer in later exchanges in September 2009.

4.339. *31 August 2009:* Chevron publicises its allegations that it has videotaped evidence of a bribery scheme implicating Judge Nuñez. This had allegedly taken place between 11 May and 22 June 2009 during four private meetings between Judge Nuñez, prospective remediation contractors and persons ostensibly representing the Government.[286] These allegations depend upon the evidence of Mr Diego Borja (one of the contractors) and video-tapes.[287] The latter prove inconclusive; and Mr Borja is soon revealed to be an unreliable witness. Judge Nuñez denies any allegation of impropriety; but, after the Ecuadorian judicial authorities begin an investigation, he recuses himself from the Lago Agrio Litigation.

4.340. *10 September 2009:* The minutes of a meeting between Mr Donziger and lawyers from Kohn, Swift & Graf refer to the "Creation of Final Order," including subheadings for "Trust or 2 phases" (under Section XI). Read with the next email, this means the

---

[284] C-1140.
[285] C-994.
[286] Track II Hearing D1.179.
[287] C-267.

# SA543

operative part of the Lago Agrio Judgment; i.e. the covert plan for ghostwriting the Lago Agrio Judgment.[288]

4.341. *11 September 2009:* A lawyer from Kohn, Swift & Graf incorporates the minutes of the meeting of 10 September 2009 into an "Ecuador Task List", sent to, amongst others, Mr Donziger and Mr Kohn. It states (inter alia): "KSG will continue to discuss and think about how to structure the judgment" (Section IIC under "Legal Issues").[289] This is again a reference to the covert plan for 'ghostwriting' the Lago Agrio Judgment.

4.342. *13 September 2009:* When the controversy over Judge Núñez emerges and his replacement by Judge Zambrano becomes likely, the Lago Agrio Plaintiffs' lawyers speculate that someone other than Judge Zambrano would draft Judge Zambrano's orders. They wonder in their internal emails who that someone would be. As stated in Mr Fajardo's email to Mr Donziger dated 13 September 2009, "I understand that Zambrano himself asked [Judge] Núñez, should the case fall to him, that Núñez help him with the orders. That would help with the continuity. The problem is, who will carry more weight: Núñez on the one hand, or Liliana [Suàrez, the Lago Agrio Court's clerk] and [Dr] Guerra on the other…"[290] It appears that the Lago Agrio Plaintiffs' representatives and Judge Zambrano chose Dr Guerra. (By now, Dr Guerra was no longer a judge, having been dismissed from the Ecuadorian judiciary in May 2008).

4.343. *15 September 2009:* Mr Fajardo sends an email to Messrs Yanza, Prieto, Saenz and Donziger referring to Judge Zambrano and Dr Guerra as the "puppet" and "puppeteer," respectively: "I think everything is quiet … The puppeteer is pulling the string and the puppet is returning the package … By now it's pretty safe that there won't be anything to worry about … The puppet will finish off the entire matter tomorrow … I hope they don't fail me …"[291] (Judge Zambrano was not yet formally re-appointed as the judge of the Lago Agrio Court presiding over the Lago Agrio Litigation).

4.344. In his testimony at the RICO trial, Mr Donziger testified:

---

[288] C-1141, item XI.
[289] C-1071.
[290] C-1650, p. 1.
[291] C-1652.

# SA544

> *Q: Sir you recall in August 2009, Judge Núñez was the subject of recusal proceedings, correct, sir? A: I remember due to the Borja scandal that Judge Núñez, I think he removed himself from the case.*
>
> *Q: And you knew that Judge Zambrano would be the person taking over the case from Judge Núñez, correct? A: I think I might have been told that by local counsel.*
>
> *Q: And isn't it also the fact that at the time your local Ecuadorian legal team told you that Zambrano was talking to Núñez about Núñez potentially helping him with orders? A: It's possible. I don't remember specifically.[292]*
>
> *... Q: Is the puppet Mr Zambrano that's referred to in these emails? A: As I've testified, I have no recollection of who it referred to. I don't even know if I knew at the time. I don't think I paid a whole lot of attention to these emails. However, as I sit here today, I have an understanding of who I think it was and it's not, it is not Zambrano."[293]*

4.345. The Tribunal considers that the use of code-names at this time is likely the sign of nefarious conduct and guilty minds by the sender and recipients; and that the "puppet" was a code name for Judge Zambrano. There is no other cogent explanation. (Judge Zambrano formally became the Lago Agrio Court's judge hearing the Lago Agrio Litigation on 21 October 2009).

4.346. *23 September 2009*: The Claimants commence these arbitration proceedings against the Respondent under the Treaty, by their Notice of Arbitration dated 23 September 2009. It was received by the Respondent on 29 September 2009.

4.347. *Early October 2009*: Dr Guerra contacts Chevron's Ecuadorian lawyers with an offer to fix with Judge Zambrano both the motion annulling Judge Núñez's rulings and "the entire case". Chevron declines his offer. Dr Guerra repeats his offer one or two months later. Chevron again declines his offer. Dr Guerra knew that his offers to Chevron were illegal under Ecuadorian law.

4.348. Dr Guerra describes these events in his First Declaration, as follows:

> *"Once it became clear that Mr Núñez would have to withdraw from the Chevron case, Mr Zambrano asked me to attempt, through friends of mine, to get in touch with the attorneys for Chevron in order to negotiate an agreement by which the company would pay Mr Zambrano and me for issuing the final judgment in Chevron's favor. Mr Zambrano told me that Chevron would have much more money*

---

[292] C-2382, p. 2590.
[293] C-2382, p. 2593.

## SA545

> *than the Plaintiffs for this agreement, and therefore we could get a better deal and greater profits for ourselves. I do not recall the exact date, but approximately between August and October of 2009, I approached attorney Alberto Racines, of Mr Adolfo Callejas' law firm, to tell him I could establish a direct connection with Judge Zambrano so they could discuss and negotiate important and decisive issues in the case, including the judgment. For several weeks I insisted on this deal with Mr Racines, but he rejected my proposal and a relationship with Chevron was never achieved. It was publicly known that I was close to Mr Zambrano, and some attorneys in the city of Lago Agrio, including an attorney close to Chevron's local attorneys, knew that I was writing rulings on his behalf. Now, it must be clearly stated that I have no personal knowledge that Chevron's attorneys ever knew about my agreement with Mr Zambrano and, obviously, Chevron's representatives never paid me for any work I did on behalf of Judge Zambrano."[294]*

4.349. This account was repeated in Dr Guerra's testimony at the RICO trial[295] and at the Track II Hearing.[296] It is materially corroborated by the contemporaneous affidavit of Dr Racines dated 16 October 2009;[297] and, indirectly, by the affidavit of Dr Adolfo Callejas Ribadeneira to whom Dr Racines reported at the time.[298] Whilst, as recorded earlier in this Part IV, the Tribunal exercises caution in accepting Dr Guerra's testimony (for the reasons there explained), the Tribunal accepts this testimony, with its material corroboration, as truthful.

4.350. In his First Declaration, Dr Guerra also testified as follows:

> *"Following Chevron's rejection of any negotiation regarding the judgment, I arranged a meeting with Mr Pablo Fajardo at Mr Zambrano's suggestion. Mr Zambrano told me to have that meeting because he had reached an agreement with the Plaintiffs' representatives to quickly move the case along in their favor, but he did not tell me the details of that agreement. Mr Fajardo and I met in Quito, at the corner of Río Coca and 6 de Diciembre streets, and we discussed my role as ghostwriter for Mr Zambrano and we agreed on 3 things: (1) I would make the case move quickly; (2) Chevron's procedural options would be limited by not granting their motions on alleged essential errors in rulings I was to write, so the case would not be delayed; and (3) the Plaintiffs' representatives would pay me approximately USD $1,000 per month for writing the court rulings Mr Zambrano was supposed to write. My understanding was that I had to follow these guidelines during the remainder of the case. After a short time, I met with Messrs Fajardo, Donziger and Yanza in the Honey & Honey Restaurant located on Eloy Alfaro and Portugal streets ... ".[299]*

---

[294] C-1616A, para 12.
[295] C-2370, p. 916.
[296] Track II Hearing D3.691ff.
[297] R-1219.
[298] R-1218, paras 4-5.
[299] C-1616A, para 13.

# SA546

4.351. This first restaurant meeting in late 2010 is described separately below. Dr Guerra's account is materially corroborated by subsequent events and forensic evidence regarding his drafting of court orders for Judge Zambrano in the Lago Agrio Litigation. Dr Guerra knew that his drafting of court orders for Judge Zambrano was illegal under Ecuadorian law, as did Judge Zambrano.

4.352. *20-21 October 2009* – Draft Orders #1 and #2 are last saved on Dr Guerra's computer.[300] Judge Zambrano's order based on Dr Guerra's Draft Orders #1 and #2 is issued in the Lago Agrio Litigation.[301]

4.353. *21 October 2009:* Judge Zambrano has assumed jurisdiction over the Lago Agrio Litigation. In his order of 21 October 2009, Judge Zambrano denies Chevron's motion to annul Judge Núñez's rulings. This motion had been made on the ground that Judge Núñez had recused himself after making statements indicating bias and prejudgment in the Lago Agrio Litigation.

4.354. *25 October 2009:* The Lago Agrio Plaintiffs' representatives seek to employ a new lawyer to assist in "organizing the office's legal information for the alegato and the other project." In context, the reference to this unnamed "other project" refers to the covert plan to 'ghostwrite' the Lago Agrio Judgment.

4.355. *27 October 2009:* In his email to Mr Donziger dated 27 October 2009, Mr Fajardo (again) refers to Dr Guerra as the "puppeteer", Judge Zambrano as the "puppet" and the Lago Agrio plaintiffs' representatives as "the audience" when he sends to Messrs Donziger and Yanza an email message with the subject "News." The email states: "The puppeteer won't move his puppet until the audience doesn't pay him something …"[302] As before, this use of code-names indicates nefarious conduct and guilty minds by both sender and recipient.

4.356. *20 October 2009:* A draft order is last saved on Dr Guerra's computer prior to Judge Zambrano issuing an order with materially matching text (on 27 October 2009).[303]

---

[300] Lynch ER1, Table 4.
[301] Lynch ER1, Table 4; Lynch ER1, Exhibit 22; and see C-230, p. 2.
[302] C-1617A.
[303] C-1616A, Attachment O.

# SA547

4.357. *29 October 2009:* The sum of US$1,000 is withdrawn from the Selva Viva bank account.[304] The bank records of Dr Guerra's bank account show a contemporaneous deposit of US$1,000.[305] The Tribunal finds that this payment, as also subsequent payments to Dr Guerra, were bribes made by the Lago Agrio Plaintiffs' representatives to Dr Guerra.

4.358. *27 October 2009:* Judge Zambrano issues his order based on Dr Guerra's draft order (of 20 October 2009).[306]

4.359. *18 November 2009:* Dr Guerra last saves Draft Orders #3 and #4 to his computer with text substantially identical to the text of an order issued five days later by Judge Zambrano (on 23 November 2009).[307]

4.360. *19 November 2009:* Dr Guerra ships a package to Ms Narcisa Leon (a Lago Agrio Court employee).[308] The Tribunal finds that this package included Dr Guerra's draft order intended for Judge Zambrano.

4.361. *23 November 2009:* Judge Zambrano issues an order with text materially identical to text found in the drafts saved on Dr Guerra's computer five days earlier (18 November 2009).[309]

4.362. *26-27 November 2009*: The sum of US$1,000 is withdrawn from the Selva Viva bank account.[310] A deposit of US$1,000 in cash is made contemporaneously to Dr Guerra's bank account.[311]

4.363. *27 November 2009:* Mr Yanza sends an email to Mr Donziger, stating: "[I]t is important to clarify on this that the budget is higher in relation to the previous months, since we are paying the puppeteer [i.e. Dr Guerra] … In addition, in reviewing the accounts with Alexandra [Achundia], we have not included in the debits report from the previous months some expenses that we incurred months ago, for example, when we bought …

---

[304] C-1661, p. 2.
[305] Torres ER, Exhibit 50, p. 3.
[306] C-878.
[307] C-1616A, Attachment P; Lynch ER1, Table 4.
[308] C-1616A, Attachment F.
[309] Lynch ER1, Exhibit 23; Table 4.
[310] C-1661, p. 2.
[311] Torres ER, Exhibit 51, p. 3.

## SA548

another computer (because we had to give one to the man)."[312] The Tribunal has not found it possible, with sufficient probability, to identify this "man" or the purpose for which this computer was supplied to him.

4.364. *29-30 November 2009:* Draft order #5 is last saved to Dr Guerra's computer.[313] Dr Guerra ships a package to Ms Narcisa Leon of the Lago Agrio Court.[314] The Tribunal finds that this package included Dr Dr Guerra's draft intended for Judge Zambrano. The next day, Judge Zambrano issues an order in the Lago Agrio Litigation with text substantially identical to the text from the Draft Order #5 saved to Dr Guerra's computer one day earlier.[315]

4.365. *6-7 December 2009:* Draft Order #6 is last saved to Dr Guerra's computer.[316] The next day, Judge Zambrano issues an order in the Lago Agrio Litigation with text that matches the text of the draft order saved to Dr Guerra's computer one day earlier.[317]

4.366. *12-14 December 2009*: Draft Order #7 last saved on Dr Guerra's computer.[318] Two days later, an order based on Draft Order #7 is issued by Judge Zambrano in the Lago Agrio Litigation.[319]

4.367. *19 December 2009*: Draft Order #8 is last saved on Dr Guerra's computer.[320]

4.368. *22-23 December 2009*: The sum of US$1,000 is withdrawn from the Selva Viva bank account.[321] Ms Ximena Centeno (of Selva Viva) deposits contemporaneously US$1,000 into Dr Guerra's bank account at Banco Pichincha.[322]

4.369. *29 December 2009*: Mr Fajardo reassures Mr Donziger that he was "99.9 percent sure" that the "plan for the judgment" would be fulfilled; but that he could not send any details by email."[323] By this last comment, the Tribunal understands that Mr Fajardo was already aware that Chevron might obtain, by court order in the USA, access to Mr

---

[312] C-1657, p. 2.
[313] C-1616A, Attachment Q; Lynch ER1, Table 4.
[314] C-1616A, Attachment F.
[315] C-1809; Lynch ER1, Table 4.
[316] C-1616A, Attachment R.
[317] C-1812; Lynch ER1, Table 4.
[318] Lynch ER1, Table 4.
[319] Lynch ER1, Table 4.
[320] Lynch ER1, Table 4; C-1616A, Attachment F.
[321] C-1661, p. 51.
[322] Torres ER, Exhibit 24.
[323] C-1001.

# SA549

Donziger's email messages (as it eventually did). It was thus necessary for Mr Fajardo to be discreet in the use of language in referring to the covert plan for the 'ghostwriting' of the Lago Agrio Judgment.

4.370. As for the reference to the "plan for the judgment", Mr Donziger confirmed in the RICO Litigation that the Lago Agrio Plaintiffs "never publicly on the record submitted a proposed judgment in Lago Agrio."[324] The Tribunal considers that Mr Fajardo's phrase referred to the covert plan to 'ghostwrite' the Lago Agrio Judgment.

### *2010*

4.371. *5 January 2010:* Order based on Dr Guerra's Draft Order #8 (of 19 December 2009) is issued by Judge Zambrano in the Lago Agrio Litigation.[325]

4.372. *16-19 January 2010*: Draft Order #9 last saved on Dr Guerra's Computer.[326] Order of 19 January 2010 based on Dr Guerra's Draft Order #9 is issued by Judge Zambrano in the Lago Agrio Litigation.[327]

4.373. *29 January - 2 February 2010:* Draft Order #10 is last saved on Dr Guerra's Computer.[328] Four days later, the order based on Draft Order #10 is issued by Judge Zambrano in the Lago Agrio Litigation.[329]

4.374. *5 February 2010:* Ms Ximena Centeno (of Selva Viva) deposits the sum of US$1,000 into Dr Guerra's bank account at Banco Pichincha.[330]

4.375. *18 February 2010:* A Draft Order #11 has been saved to Dr Guerra's computer. On 18 February 2010, the order based on Dr Guerra's draft order is issued by Judge Zambrano in the Lago Agrio Litigation.[331] On 7 March 2010, Draft Order #11 is last saved on Dr Guerra's Computer, using the "Save As" function indicating the existence of an earlier draft.[332]

---

[324] C-1003 (updated), p. 4758.
[325] Lynch ER1, Table 4.
[326] Lynch ER1, Table 4.
[327] Lynch ER1, Table 4.
[328] Lynch ER1, Table 4.
[329] Lynch ER1, Table 4.
[330] Torres ER, Exhibit 25.
[331] Lynch ER1, Table 4.
[332] Lynch ER1, Table 4; Track II Hearing D5.942.

# SA550

4.376. *11 March 2010:* Judge Zambrano is succeeded by Judge Ordóñez in the Lago Agrio Litigation.

4.377. *30 March 2010*: In his email message, Mr Prieto (in Ecuador) writes to Mr Donziger (copied to Messrs Fajardo, Yanza and Saenz) to complain at the result of the production to Chevron of the 'Crude outtakes' and other materials in the legal proceedings in the USA:

> *"Today Pablo [Fajardo] and Luís [Yanza] were kind enough to tell us what was going on in Denver [this was a reference to Chevron's legal proceedings against Stratus Consulting before the US Federal Court in Denver under US Section 1782], and the fact that certainly ALL will be made public, including correspondence. [T]he problem, my friend, is that the effects are potentially devastating in Ecuador (apart from destroying the proceeding, all of us, your attorneys, might go to jail), and we are not willing to minimize our concern and to sit to wait for whatever happens. For us its NOT acceptable for the correspondence, the emails, between Stratus Consulting and Juanpa and myself be divulged. To avoid this, we have decided to file a writ of protection before a judge in Ecuador, asking the judge to write to the judge in Denver not to reveal the correspondence because this would affect our fundamental rights. This is an idea that may not work, but with adequate support perhaps we can do it. I am telling you so you'll know. We will send you the document."[333]*

4.378. The reference to "jail" is significant. Criminal proceedings could have arisen from unlawful conduct over the bribing of Messrs Reyes and Pinto, the blackmailing of Judge Yánez, the corrupt collusion with Mr Cabrera, the 'ghostwriting' of Mr Cabrera's Report, the bribes paid to Dr Guerra for drafting Judge Zambrano's orders, the inappropriate private meetings with several judges of the Lago Agrio Court, the collusive criminal proceedings against Mr Veiga and Dr Pérez and the covert plan for 'ghostwriting' the Lago Agrio Judgment. (There was apparently no written reply from Mr Donziger to this email message).

4.379. *14 May 2010:* This Tribunal issues its Order on Interim Measures dated 14 May 2010: see its Operative Part above in Annex 1(A) to Part I above.

---

[333] C-930. These legal proceedings were an application by Chevron to the US District Court of Colorado under Section 1782 made on 18 December 2009. It eventually resulted in an order against Stratus Consulting of 1 October 2010.

# SA551

4.380. *17 June 2010:* By letter dated 17 June 2010 to the Tribunal's Secretary, responding to Paragraph 1(v) of its Order on Interim Measures dated 14 May 2010, the Lago Agrio Court (Judge Ordóñez) writes as follows:

> "*Through this letter, I want to communicate that the Attorney General's Office of the Republic of Ecuador has informed me of the Order on Provisional Measures, dated May 14, 2010, ordered by the Tribunal chaired by you within the international arbitration filed by the companies Chevron Corporation and Texaco Petroleum Company against Ecuador, where I am invited to give an indication, as a professional courtesy to the Arbitration Tribunal, of the possible date for the issuance by the Presidency of the Provincial Court of Justice of Sucumbíos, of a decision regarding lawsuit No.-002- 2003-P-CSNL, which is brought by María Aguinda and others against the Company Chevron Corporation, for compensation for environmental damages.*
>
> *In this regard, I must inform you that, within Ecuadorian procedural rules, there are no provisions that enable me to state a precise date for the issuance of the decision regarding said lawsuit; however, taking into consideration the length of the proceedings (185,152 pages), according to my professional experience as a Judge and my study of the proceedings to date, I foresee that a decision may possibly be arrived at in 8 to 10 months; nevertheless, this period may vary due to reasons beyond our control, or events we cannot foresee at this time in connection with the proceedings.*"[334]

4.381. *July 2010:* The Lago Agrio Plaintiffs' representatives dismiss Mr Kohn and his law firm as advisers and funders from the Lago Agrio Litigation.[335]

4.382. *14 July 2010: Forensic Evidence* (See Part VI):[336] Windows XP is installed on the "Old Computer" of Judge Zambrano. A significant amount of data was then copied to the Old Computer.[337] The transfer included documents named "Caso Texaco.doc" and "Providencias.doc".[338]

4.383. The Old Computer was not found to contain any of the nine draft orders prepared by Dr Guerra for the Lago Agrio Court during Judge Zambrano's first period as the judge presiding over the Lago Agrio Litigation (21 October 2009 to 11 March 2010). The subsequent installation of Windows XP on 14 July 2010 is the likely explanation.

---

[334] R-118 (sent with the Respondent's assistance, as requested by the Tribunal).
[335] C-2374, pp. 1510-1511.
[336] These references to the Forensic Evidence should be read with their corresponding fuller explanations in Part VI below. To avoid repetition, such explanations are not set out in this Part IV.
[337] Lynch ER2, p. 11.
[338] Lynch ER2, Exhibit 23.

# SA552

4.384. *23 July 2010*: A Western Digital 120 GB hard drive is attached as an external storage device to Dr Guerra's computer. The 11 Draft Orders were copied to the computer hard drive as part of a much larger transfer process during which 4,325 files and folders were placed on the computer hard drive.[339] An operating system was installed on Dr Guerra's Hard Drive. 11 Documents were created on Dr Guerra's Hard Drive.[340]

4.385. *2 August 2010*: The false origins of the "Cabrera Reports" are raised by Chevron in the Lago Agrio Litigation. Chevron had received the off-cuts from "Crude" in July 2010. Following an application in the Lago Agrio Litigation, the Lago Agrio Court (Judge Ordóñez) issues an order allowing the reports attributed to Mr Cabrera to be substituted by 'cleansing' expert reports, to be submitted within 45 days.[341]

4.386. *18 August 2010:* The Lago Agrio Plaintiffs' representatives consider the effect of Mr Cabrera's departure as the Lago Agrio Court's sole global assessment expert and his replacement with the parties' cleansing experts. This includes an email message, marked "privileged and confidential – attorney work product", from Mr Small (of Patton Boggs) to Mr Donziger: "While our new expert [sic] will most likely rely on some of the same data as Cabrera (and come to the same conclusions as Cabrera) … we probably wouldn't want to draw that much attention to Cabrera … our expert might address Cabrera's findings in such a subtle way that someone reading the new expert report (the Court in Lago or an enforcement court elsewhere) might feel comfortable concluding that certain parts of Cabrera are a valid basis for damages."[342]

4.387. None of the Lago Agrio Plaintiffs' cleansing experts visit Ecuador, inspect the former concession area or conduct any sampling or environmental testing, as Mr Donziger later confirmed during his testimony in the RICO Litigation.[343] The Lago Agrio Plaintiffs produce their seven expert reports on 16 September 2010, submitted to the Lago Agrio Court within the 45 days' time limit.[344]

---

[339] Lynch ER1, p. 9, fn 6.
[340] Lynch ER1, para 15; Racich ER2 paras 7(a) & 11.
[341] C-361.
[342] C-1250.
[343] C-1087; pp. 1652-1653.
[344] C-1087; pp. 1652-1653.

# SA553

4.388. One of the Lago Agrio Plaintiffs' cleansing experts, Dr Lawrence W. Barnthouse, relies upon the Cabrera Report "to see exactly how he [Cabrera] had done it."[345] The Lago Agrio Judgment in turn relies upon Dr Barnthouse to arrive at its damages of US$ 200,000,000 for the recovery of flora, fauna and aquatic life.[346] Hence, the Lago Agrio Judgment indirectly relies upon the Cabrera Report.[347] The Tribunal returns to this matter below: see Part V.

4.389. For its damages of US$ 5.396 billion for soil remediation, the Lago Agrio Judgment's calculation based upon 880 pits can only be traced back to Annex H1 to the Cabrera Report ("Anexo H1") and not, as the Judgment and the Clarification Order state, "various aerial photographs".[348] Anexo H1 to the Cabrera Report had not, in fact, been drafted by Mr Cabrera, but prepared by Stratus and falsely attributed to Mr Cabrera by the Lago Agrio Plaintiffs' representatives. The Tribunal returns to this matter below: see Part V.

4.390. *August 2010:* In or about August 2010, Patton Boggs produce for the representatives of the Lago Agrio Plaintiffs a lengthy undated memorandum entitled "Path Forward: Securing and Enforcing Judgment and Reaching Settlement" or, in shorthand, the "Invictus Memorandum".[349] It sets out (inter alia) a legal strategy for seizing Chevron's assets outside Ecuador in multiple jurisdictions, including the arrest of Chevron's vessels.[350] These jurisdictions included the USA, the Philippines, Singapore, Australia, Argentina, Brazil, Columbia, Venezuela, Canada, Kuwait, Nigeria, Saudi Arabia, South Africa, South Korea, Belgium, Indonesia, The Netherlands, the United Kingdom, Trinidad and Tobago, New Zealand and Russia.

4.391. The conclusion of the Invictus Memorandum reads (in part):

> *"After approximately seventeen total years of litigation in the United States and in Ecuador, the case against Chevron now enters its most critical, multi-faceted, and labor-intensive phase. As described herein, there are challenges and risks, but all are manageable. With the ultimate goal of effecting a swift and favorable settlement*

---

[345] C-899, pp. 55 & 165.
[346] C-931, page 182.
[347] C-931, p. 182.
[348] C-931, pp. 124-125; C-1367, p. 15.
[349] It was doubtless called "Invictus" after the well-known poem by William Ernest Henley.
[350] C-903.

# SA554

*in mind, the strategy of Plaintiffs' Team over the coming months preceding and following entry of a judgment will incorporate the following components: ...*

*\* Securing a defensible and enforceable judgment in Ecuador by executing an effective alegato finale and submitting a persuasive, thoughtful submission on damages that will, in many ways, moot Chevron's criticism of the Cabrera Report ...*

*\* Identifying jurisdictions globally that are most hospitable to an enforcement action, with the goal that careful selection and an investment of time on the front end will simplify the process substantially on the back-end.*

*\* Identifying Chevron's most vulnerable assets and determining whether pre-judgment attachment is a viable option for placing settlement pressure on Chevron in the various jurisdictions where enforcement is contemplated…"*

4.392. Later, as reported in *ecuardoinmediato.com* on 3 March 2012 (shortly after the Lago Agrio Judgment became enforceable),[351] Mr Sáenz (of the Lago Agrio representatives) stated: " … we can immediately go to carry out the compulsory enforcement of the judgment. We have several teams around the world who are ready to seize tankers, shares, production. In view of the fact that Chevron has no significant assets in this country, assets in Panama and Venezuela may be seized, for which the timing has been analysed and the trust was signed yesterday, the attorney says". (This trust was created under the terms of the Lago Agrio Judgment, designating it the beneficiary of the judgment's proceeds: see Part V below).

4.393. *5 September 2010:* In his email message, Dr Guerra writes to Mr Donziger:[352]

*"Alberto Guerra Bastidas here, apart from a warm greeting, I would appreciate your helping my daughter Gabriela Guerra with respect to the mechanics of obtaining her residence in the United States. She entered [the USA] last October of 2009 with a tourist visa. Later, in June of 2010 she changed her status from tourist to student, so she is legal for one year until June 2011. She has an American boyfriend who for the purpose of making her legal, and for love, she says, they want to get married. Questions: is it more convenient to have the wedding in the US or in Ecuador. With the marriage how long will it take to get the residency worked out. What is an estimate of the cost of the procedures – and attorney's fees. By the way, my daughter is in Chicago. I will support the matter of Pablo Fajardo so it will come out soon and well."*

[351] C-1133 (updated), p. 2.
[352] Torres ER, Exhibit 26.

# SA555

4.394. The last sentence in Dr Guerra's email is ambiguous; but, in context and as explained by Dr Guerra himself at the Track II Hearing,[353] it indicates, at the very least, an inappropriate willingness to assist Mr Fajardo in the Lago Agrio Litigation. There is no reply in evidence before this Tribunal from Mr Donziger to Dr Guerra.

4.395. *17 September 2010*: The Lago Agrio Court (Judge Ordóñez) issues its procedural order (autos para sentencia), closing the evidential file in the Lago Agrio Litigation and preparing the case for judgment.[354] Later, Judge Ordóñez recuses himself on 10 October 2010; he is succeeded by Judge Zambrano on 11 October 2010; and by his procedural order of 11 October 2010, Judge Zambrano revokes Judge Ordóñez's order of 17 September 2010.[355]

4.396. *October 2010:* By October 2010, Chevron has filed several US Section 1782 applications in the USA, against Mr Donziger, Stratus Consulting and others; and it had already received multiple document productions from Mr Donziger and Stratus Consulting, in addition to the "Crude Outtakes".

4.397. *6 October 2010*: As he subsequently testified by affidavit, Dr Enrique Carvajal Salas (a lawyer for Chevron in Ecuador) describes a meeting with a friend in Quito on 6 October 2010:

> *"In that meeting, my … friend told me, based on his discussion with Dr Guerra, that Judge Zambrano would no longer try to reach some agreement with Chevron because he was aware that the company would not make financial arrangements with anybody, but, instead, that Judge Zambrano was sure to do so with the plaintiffs [i.e. the [Lago Agrio Plaintiffs]. I understood this to mean that Judge Zambrano would reach an agreement with the plaintiffs to receive money from them in exchange for issuing the judgment in the Aguinda case in their favor."*[356]

4.398. Subsequently, in "late April 2012" after the Lago Agrio Judgment had been issued, Dr Carvajal runs into Dr Guerra, they greet each other, and: "As I walked away, Dr Guerra came running up behind me. When I turned around, Dr Guerra said, 'Dr Carvajal, I want to tell you that I would like to make any kind of statement about the fact that I helped to prepare the first instance judgment'. I immediately answered: 'You, and who else?'

---

[353] Track II Hearing D4.890.
[354] C-642.
[355] C-643.
[356] R-1318, para 5; see also R-1218, para. 8.

# SA556

After some hesitation, he answered: 'Fajardo and Zambrano'. Then he added: 'I am willing to make a public statement …".[357]

4.399. Dr Carvajal's testimony as regards both events is corroborated by the affidavit of Dr Adolfo Callejas Ribadeneira, to whom Dr Carvajal reported at the time.[358]

4.400. In his affidavit, Dr Callejas describes another event taking place in "approximately the last quarter of 2010":

> *"… another one of the lawyers on my legal team in the Aguinda case, Dr Patricio Efrain Campuzano Merino, told me that, earlier that day, he received a telephone call from … who said she had something important to discuss with him regarding the Aguinda case, and that he met her shortly thereafter. Dr Campuzano told me that, in his meeting with … she said that Judge Zambrano wanted to know whether Chevron would be interested in drafting the final judgment of the trial court in favour of Chevron in the Aguinda case. Dr Campuzano told me that he understood Dr Guerra had conveyed that information to … Based on Dr Campuzano's recitation of his discussion with … I understood … to mean that Chevron could pay an amount of money to Judge Zambrano to obtain and ghostwrite a judgment in its favour in the Aguinda case. I replied to Dr Campuzano with a firm, 'No' …".[359]*

4.401. *11 October 2010: Forensic Evidence* (See Part VI): A user of Judge Zambrano's Old Computer creates a new document,[360] "Providencias.docx", from some or all of the "Providencias.doc" document.[361] (The latter document had been transferred to Judge Zambrano's Old Computer in July 2010: see above).

4.402. *10-13 October 2010*: Judge Ordoñez is recused following Chevron's application of 26 August 2010 alleging untimely conduct and bias.[362] Judge Zambrano again assumes judicial responsibility for the Lago Agrio Litigation. He issues an order rejecting most of Chevron's pending motions; and he threatens to sanction Chevron's lawyers if they file further motions seeking to revoke the Court's prior orders.[363]

4.403. *18 October 2010: Forensic Evidence* (See Part VI): Microsoft Excel is active on Judge Zambrano's Old Computer for two minutes.[364]

---

[357] R-1318, para 6.
[358] R-1218, paras 8 and 9.
[359] R-1218, para 7.
[360] Lynch ER2, Exhibit 23.
[361] Lynch ER2, p. 27.
[362] C-1289.
[363] C-644.
[364] Lynch ER2, Table 6.

# SA557

4.404. *September-October 2010:* Dr Guerra meets the Lago Agrio Plaintiffs' lawyers twice at the Honey & Honey restaurant in Quito.

4.405. According to Dr Guerra, the first occasion is for Messrs Fajardo and Yanza to thank him (Dr Guerra) for his help in writing orders and "steer[ing]" the case in their favour. The second occasion is for Messrs Fajardo, Yanza and Donziger to discuss paying Dr Guerra and Judge Zambrano for a judgment drafted (i.e. 'ghostwritten') by the Lago Agrio Plaintiffs' representatives. According to Dr Guerra, Judge Zambrano later informs Dr Guerra that he (Judge Zambrano) had made direct contact with Mr Fajardo, and that the Lago Agrio Plaintiffs' representatives had agreed to pay US$ 500,000 in exchange for allowing them to write the Lago Agrio Judgment, from which Dr Guerra would receive "a proper benefit".[365]. Judge Zambrano tells Dr Guerra that he would share part of the money with him, once it was paid to him.[366]

4.406. At the RICO trial in New York, Dr Guerra testified as follows:

> *"Q. What if anything happened at that meeting at the Honey [&] Honey restaurant? A. At that meeting I took it upon myself to summarize in detail the proposal made by Mr Zambrano, and I obviously stated expressly regarding his intent of receiving at least $500,000 ... Mr Donziger and the whole group ... stated that they regretted it very much, but that for the time being, at that time they didn't have the money that Mr Zambrano was requesting."*[367]

4.407. At the Track II Hearing in this arbitration, Dr Guerra testified orally in similar terms:

> *"Q. Did you have a meeting with anyone in September or October 2010, at the Honey [&] Honey restaurant in Quito? A. I did. At that time I met with Mr Steven Donziger, with Pablo Fajardo, Luis Yanza, who represented the Plaintiffs against Chevron in Ecuador.*
>
> *Q. What did you say to them at that meeting? A. Specifically at that meeting, I conveyed a message from Judge Nicolas Zambrano related to the fact that he would accept for them to prepare the draft Judgment in the Chevron Case, in exchange of the sum of at least $500,000"*[368]

4.408. At the RICO trial in New York, Mr Donziger testified that he met Dr Guerra at a restaurant in Quito in late 2010 and that Dr Guerra there solicited a bribe from him:

---

[365] Track II Hearing D3.725.
[366] C-2358 (also C-2386), paras 41-43.
[367] C-2371, pp. 995-996.
[368] Track II Hearing D3.600.

# SA558

*"Q: You admit, sir, that you met with Mr Guerra [at] a restaurant called the Honey [&] Honey in late 2010, correct, sir? A: I met with him at a restaurant in Quito.*

*Q: And it was Mr Fajardo who arranged that meeting, correct, sir? A: I believe so.*[369]

*...*

*Q: So [Dr Guerra] made clear to you in exchange for a $500,000 bribe, he could fix the case with the judge on the Lago Agrio case at the time, correct, sir? A: Something to that effect, yeah. He basically said he could get it done for a payment."*

*Q: And your testimony, sir, is you told [Dr Guerra] no, we can't do that, correct, that's your testimony? A: Yes."*[370]

4.409. *27 October 2010:* Judge Zambrano issues an order refusing to consider evidence of the "Cabrera fraud" in the Lago Agrio Litigation, following a request by Chevron to admit such evidence.[371]

4.410. *31 October 2010*: The Intercreditor Agreement is executed, in counterparts, by Mr Donziger, Mr Fajardo, Patton Boggs, Mr Yanza, the ADF and others on the distribution of proceeds from the Lago Agrio Litigation. The Lago Agrio Plaintiffs rank ninth and last in the "distribution waterfall" (Clause 3.2.9).[372] This Agreement accompanied the "Burford Funding Agreement", also of 31 October 2010.[373]

4.411. In his deposition in the US Section 1182 Litigation on 1 December 2010, Mr Donziger stated that it is possible that he might receive personally "hundreds of millions" of US dollars from a favourable judgment in the Lago Agrio Litigation.[374]

*"Q. Is it fair to say that you have an expectation that you, Steven Donziger, might receive as much as hundreds of millions of dollars in the event that there is a judgment in favor of the plaintiffs in that case?... A. It is possible. It depends on the amount of the overall recovery. I misspoke two questions ago. I don't know if it would be appropriate to try to correct something.*

---

[369] C-2382, p. 2597.
[370] C-2382, pp. 2597-2598.
[371] C-878.
[372] C-1218.
[373] C-1217.
[374] C-697, pp. 547-549.

# SA559

> *Q. Please go ahead. A. The amount -- the top end of the overall recovery of attorneys' fees is now lower than that agreement based on an oral understanding with the clients. It is lower than 25 percent.*
>
> *Q. What is it now? A. It is 20 percent.*
>
> *Q. And when was that changed? A. This year, a few months ago. I don't know when exactly.*
>
> *Q. And for what reason? A. Various reasons, but that [sic] this stage of the case we are trying to bring in new firms and funds to sustain the case. So in coming up with a formula that would make all of that work, the total amount of the attorneys' fees dropped."[375]*

4.412. The Tribunal has also been shown a "pie chart" produced for the US State Department of 20 December 2011 (after the Lago Agrio Judgment), showing the following figures:[376] From a "total recovery" by external "Funders, Lawyers, and Advisors" of US$ 5,741,211,538 on US$ 18,156,936,000, Donziger & Associates would receive US$ 1,143,886,968, Mr Fajardo US$ 363,138,720, Patton Boggs US$ 435,768,464 and the Burford Group (as the major non-party funder) US$ 1,006,802,101.[377] Mr Donziger had earlier prepared (for internal use only) documents showing other figures for shares in the proceeds of a successful Lago Agrio Judgment, including Mr DeLeon, Mr Yanza & Mr Fajardo, on 13 April 2009[378] and February 2010.[379] The Lago Agrio Complaint had requested that the ADF be the payee of Chevron's judgment debt, together with 10% of the judgment's value. (The Lago Agrio Judgment was to award this 10% in the sum of US$ 864 million or, potentially, US$ 1.82 billion).

4.413. *4 November 2010: Forensic Evidence* (See Part VI): Microsoft Excel is active on Judge Zambrano's Old Computer for one minute.[380]

---

[375] Later, at the RICO trial, Mr Donziger also testified that he stood to receive US$ 600 million personally from the proceeds of the Lago Agrio Judgment: see C-2381, p. 2490.
[376] R-1082 (it appears that this information originated from Chevron).
[377] Burford's interest in the Lago Agrio Litigation, as a non-party funder, began in or about September 2010 [C-779]. It resulted in the Funding Agreement dated 31 October 2010, signed by Treca Financial Solutions (as the "Funder") and by the ADF and Messrs Donziger, Fajardo and Yanza ("for the Claimants") (C-1217), on the same day as the Intercreditor Agreement (C-1218).
[378] C-748.
[379] C-767 to C-770.
[380] Lynch ER2, Table 6.

# SA560

4.414. *25 November 2010: Forensic Evidence (See* Part VI): First User Account, named HP, is created on Judge Zambrano's "New Computer".[381]

4.415. *2 December 2010: Forensic Evidence (See* Part VI): Fielweb.com is accessed using the Old Computer.[382]

4.416. *6 December 2010:* This Tribunal issues its Second Order on Interim Measures dated 6 December 2010: see Annex 1(B) to Part I above.

4.417. Pursuant to this procedural order, the Tribunal (by its President) writes to Judge Zambrano at the Lago Agrio Court the following letter of 6 December 2010 (in both English and Spanish):

> "*I have the pleasure of addressing you in my capacity as President of the Arbitral Tribunal presiding over the international arbitration captioned PCA Case No. 2009-23: 'Chevron Corporation and Texaco Petroleum Company v. The Republic of Ecuador'.*
>
> *In that capacity, and on behalf of the Arbitral Tribunal, I write in order to invite you, as a professional courtesy, and in conformity with your duties to the Parties in the case named in the subject line above, to make known to the Arbitral Tribunal and to the Parties to that case, as far in advance as may be reasonably possible, the likely date that you will render judgment on the merits in that case.*
>
> *I make reference in this regard to the letter dated 17 June 2010 from the Presidency of the Provincial Court of Sucumbios, wherein Judge Leonardo Isaac Ordóñez Piña, formerly seized of the case, kindly responded to a similar prior invitation from the Arbitral Tribunal transmitted by the Attorney General and stated at that time that 'taking into consideration the length of the proceedings (185,152 pages), according to my professional experience as a Judge and my study of the proceedings to date, I foresee that a decision may possibly be arrived at in 8 to 10 months'* [383]
>
> *I request, for the above purpose, and to avoid any delays in the communication of this information to the Arbitral Tribunal, that this information be transmitted, in addition to any other means, also by e-mail and facsimile, to the following person and address:*
>
> *Martin Doe Permanent Court of Arbitration, [postal, fax and email addresses supplied.*

---

[381] Lynch ER2, p. 12.
[382] Lynch ER3, p. 13.
[383] R-118 (as sent with the Respondent's assistance: see above).

# SA561

> *In the event it is possible for you to transmit this communication also by courier, I enclose herein a prepaid FedEx envelope with the above address, in order to allow transmission to the Arbitral Tribunal also by that means.*
>
> *I thank you kindly in advance for your attention to this matter and your acceptance of the request set out in this letter ...."*

4.418.  The Tribunal receives no response to this letter from the Lago Agrio Court or Judge Zambrano as the judge now presiding over the Lago Agrio Litigation.

4.419.  *7 December 2010: Forensic Evidence* (See Part VI): First apparent use of the HP Account on Judge Zambrano's New Computer.[384]

4.420.  *17 December 2010*: In his email dated 17 December 2010 to certain of the Lago Agrio Plaintiffs' representatives, including Mr Donziger, Mr Fajardo writes:

> *"I hereby express my deep concern given the noncompliance with the completion of the legal argument for the main case, or the Lago Agrio case.*
>
> *I imagine that you are all aware of this – that the case is closing in Ecuador. From our analysis, we can deduce that the Judge can issue a writ for judgment at any time, any day; this means that we must have our legal argument ready, defined and we must all be in agreement with it, in order to submit it to the Court at any time.*
>
> *We have spoken a great deal on this matter. We have reached agreements to finish as quickly as possible, but to date, there is no real response. My friends, I think we cannot wait any longer. Thus, given this noncompliance, we will develop a second alternative.*
>
> *The subsidiary alternative, is that we will draft an argument solely with the vision of Ecuador, in the event that we must submit the argument in the next days, we will present only the document that we prepare – the rest will be set on a back-burner, if it is completed some day. I hope that this decision does not cause internal problems, but it is the option that would allow us to meet the Court's demands, in the event that we have to do so.*
>
> *The only possibility, if we are able to prepare the document and we can later correct it in Ecuador, and finally, we can submit it with the Court without any problem, is for the Judge not to issue a writ for judgment; but this scenario is not within our reach. This judge is very firm and exercises a great deal of authority; he is punishing any attempt to delay the proceeding.*

---

[384] Lynch ER2, p. 12

# SA562

> *Further, in the event that a writ for judgment is issued, it is certain that Chevron will timely submit its argument, which would be an enormous disadvantage for us if we fail to submit the document.*
>
> *I need immediate answers."*[385]

4.421. The terms of this email are, ostensibly, inconsistent with Mr Fajardo's knowledge of any scheme whereby certain of the Lago Agrio Plaintiffs' representatives were then 'ghostwriting' the Lago Agrio Judgment. The explanation, however, is straightforward. The recipients of this email included persons who had no such knowledge; and it would have served no purpose for Mr Fajardo to inform them otherwise. Several of the recipients were also amenable to the jurisdiction of the US Courts, including discovery under Section 1782. Moreover, as already indicated, Mr Fajardo knew by this time that any email to Mr Donziger would likely end up in the hands of Chevron as a result of US litigation – as it did.

4.422. *17 December 2010:* Judge Zambrano issues "autos para sentencia", formally closing the evidentiary phase of the proceedings in the Lago Agrio Litigation.[386]

4.423. *20 December 2010:* In his email dated 20 December 2010 to certain of the Lago Agrio Plaintiffs' representatives, including Mr Donziger, Mr Fajardo writes of his concern as to "how the Judge will respond to this new argument set forth by Chevron …:.[387] This concern is again, ostensibly, inconsistent with Mr Fajardo's knowledge of any scheme whereby certain of the Lago Agrio Plaintiffs' representatives were then 'ghostwriting' the Lago Agrio Judgment. In the Tribunal's view, again, the explanation lies in the range of recipients who were not privy to the 'ghostwriting' or subject to the jurisdiction of the USA courts.

4.424. *21 December 2010: Forensic Evidence* (See Part VI): "Providencias.docx" is saved by a user of the Old Computer. It had been open for 2,107 minutes (35.12 hours) in the period between 11 October 2010 and 21 December 2010. At this stage the document contained 42% of the text of the Lago Agrio Judgment.[388] This version of

---

[385] R-988.
[386] C-894.
[387] R-989.
[388] Lynch ER2, Exhibit 23; Racich ER2, para 13.

# SA563

"Providencias.docx" is the earliest file found on the Zambrano Computers that contains text of the Lago Agrio Judgment.

4.425. *28 December 2010: Forensic Evidence* (See Part VI): "Providencias.docx" is saved on the Old Computer. The document had been open for 1,046 minutes (17.5 hours) since 21 December 2010, making a total of 3,153 minutes (52.62 hours) for the period between 11 October 2010 and 28 December 2010. This version of "Providencias.docx" contains 66% of the text of the Lago Agrio Judgment.[389]

4.426. This version also contains text and nine citations to US court decisions materially identical to the unfiled Erion Memorandum of the Lago Agrio Plaintiffs' representatives; and two citations to legal materials in the unfiled Moodie Memorandum of the Lago Agrio Plaintiffs' representatives. (These wordings are subsequently edited for the final version Lago Agrio Judgment, as issued). Text and statistics from the unfiled Selva Database are also contained in this version of "Providencias.docx". (The Tribunal returns to these matters in Parts V and VI below).

4.427. *31 December 2010*: In his email dated 31 December 2010 to the Lago Agrio Plaintiffs' representatives, Mr Fajardo writes:

> "...no one knows when the Judge may issue his judgment; he could do so within two weeks, or within many months or even years. If he does so many months from now, the judge may possibly consider the legal reports ["informes en derecho"]; but if the judge issues his judgment soon, the document will remain in our hands and will be useless. We will not run this risk... I'm sorry my friend, but we are behind schedule with this memorandum of law, which could have serious consequences for the case".[390]

4.428. Again, the terms of this email are, ostensibly, inconsistent with Mr Fajardo's knowledge of any scheme whereby certain of the Lago Agrio Plaintiffs' representatives were then 'ghostwriting' the Lago Agrio Judgment. The explanation, however, is again straightforward. The recipients of this email included a person in the USA who had no knowledge of 'ghostwriting'; and it would have served no good purpose (from Mr Fajardo's perspective) to inform him otherwise. Moreover, Mr Fajardo must have been

---

[389] Lynch ER2, Exhibit 23; Racich ER2, para 14.
[390] R-896.

# SA564

by now well aware that any email message to Mr Donziger would fall into the hands of Chevron under US Court orders, sooner or later.

### *2011*

4.429. *4 January 2011: Forensic Evidence* (See Part VI): "fielweb.com" is accessed using Judge Zambrano's Old Computer.[391]

4.430. *4 January 2011: Forensic Evidence* (See Part VI): "windowslivetranslator.com" is accessed using Judge Zambrano's New Computer. This website, used for the first time, does not explain how Spanish text translated from English language case-law is contained in the earlier "Providencias.docx" of 28 December 2010.

4.431. *8 January 2011*: In his email dated 8 January 2011 to the Lago Agrio Plaintiffs' representatives headed "Chevron's Alegato"), Mr Fajardo again writes in terms, ostensibly, inconsistent with any knowledge on his part of a covert scheme to 'ghostwrite' the Lago Agrio Judgment:

> *"Friends, this is to let you know that I spent several hours yesterday visiting the Court of Justice of Sucumbíos and reviewing the latest motions filed by Chevron. I found that Chevron, on Thursday, January 6, 2011, at 5:55 p.m., had already filed their legal alegato. It is a short 292 page document and their theories are amply briefed. As you can see, my concerns are well founded. Chevron has gotten ahead of us by filing their alegato, while we are still writing ours. All the more reason to speed up our work, otherwise the Judge could be convinced by Chevron's theory ..."*[392]

4.432. Again, however, the Tribunal considers that explanation is the same as with his email messages of 17, 20 and 31 December 2010. (Moreover, by January 2011, the Federal Court in New York had ordered Mr Donziger to disclose his computers' hard drives, in addition to email messages and other documentation).

4.433. *17 January 2011*: The Lago Agrio Plaintiffs file their alegato with the Lago Agrio Court.[393] It is a pleading of some 118 pages. In the alegato, it is submitted (inter alia) that the Ecuadorian legal system "recognizes circumstances when it is appropriate to

---

[391] Lynch ER3, p. 13.
[392] R-897, p. 2.
[393] R-195.

# SA565

hold a parent company liable for the actions of a separately established subsidiary (page 94). It concludes:

> *"Chevron's attempt to now pretend that it and Texaco and Texpet are genuinely independent and invoke the corporate veil to avoid liability is clearly an abuse and manipulation of the legal instrument of corporate separation, and fraudulent perhaps by design but in any event in result, which, as discussed above, is all that is required to pierce the corporate veil under Ecuadorian law. Moreover, Chevron's attempt to shift liability to flagrantly undercapitalized entities (Texaco and TexPet) is also clear evidence of fraud (by result or by intent) sufficient to pierce the corporate veil. Finally, the fact that Chevron is invoking this immunity strategy even after explicitly promising to the U.S. court and the plaintiffs that it would submit to litigation of these claims in Ecuador and abide by any judgment, is simply more evidence of fraud that justifies lifting the corporate veil in this case."* (page 99).

4.434. This legal argument, whereby Chevron was to stand in the shoes of both Texaco and TexPet, was essentially adopted in the Lago Agrio Judgment: see the "merger" issue in Part V below.

4.435. *19 January 2011: Forensic Evidence* (See Part VI): "Caso Texaco.doc" is saved by a user of the Old Computer. At this time, the document contains 11% of the text of the Lago Agrio Judgment. This block of text is absent in the previous recoverable instance of Caso Texaco.doc dated 5 January 2011 and the next recoverable instance dated 4 March 2011.[394]

4.436. *21 January 2011: Forensic Evidence* (See Part VI): "Providencias.docx" is saved using "Save As" function, which re-set the edit time to 0 and the revision count to 2.[395]

4.437. *28 January 2011:* This Tribunal issues its Procedural Order and Further Order on Interim Measures dated 28 January 2011: see Annex 1(C) to Part I above.

4.438. *31 January 2011: Forensic Evidence* (See Part VI): Microsoft Excel is active on Judge Zambrano's Old Computer for one minute.[396]

4.439. *1 February 2011:* Chevron issues its RICO Complaint in New York in the RICO Litigation, before the Lago Agrio Judgment.[397] At the time of issue, the Complaint

---

[394] Lynch ER2, Exhibit 23; Racich ER2, para 26.
[395] Lynch ER2, Exhibit 23; Racich ER2, para 16.
[396] Lynch ER2, Table 6.
[397] C-916.

# SA566

focuses on the 'fraud' in the Lago Agrio Litigation, the Cabrera Report and the "cleansing reports". Later, on 15 February 2011 (one day after the Lago Agrio Judgment), Chevron alleges in the RICO Litigation that the Lago Agrio Judgment was corruptly "ghostwritten" by the Lago Agrio Plaintiffs' representatives.[398]

4.440. *9 February 2011*: This Tribunal issues its Procedural Order on Interim Measures dated 9 February 2011: see Annex 1(D) to Part I above. This Order requires (inter alia) the Respondent "to take all measures at its disposal to suspend or cause to be suspended the enforcement or recognition within and without Ecuador of any judgment against the First Claimant in the Lago Agrio Case." (This Procedural Order was maintained and re-stated in the Tribunal's Order on Interim Measures of 16 March 2011, its First Interim Award on Interim Measures dated 25 January 2012, and its Second Interim Award on Interim Measures dated 16 February 2012: see also Annex 1 to Part 1 above).

4.441. *14 February 2011: Forensic Evidence* (See Part VI): The SATJE logs show that a document with the "Providencia Name" *Sentencia* was uploaded by a person logged in as "zambranon".[399]

4.442. *14 February 2011*: The Lago Agrio Court issues Judge Zambrano's Lago Agrio Judgment (later clarified on 4 March 2011). It awards damages payable by Chevron in the amount of US$ 8.6 billion, with an additional US$ 8.6 billion in the event that a public apology is not made by Chevron within 15 days "as a symbolic measure of moral redress and of recognition of the effects of its misconduct, as well as a guarantee of no repetition."[400] A further 10% of the Judgment is awarded to the Amazon Defense Front, amounting to US$ 864 million (or, potentially, US$ 1.82 billion). The damages are to be paid into a trust to be established with the ADF as beneficiary.[401] (The Lago Agrio Judgment is considered at greater length in Part V(B) below).

4.443. As of this date, no final draft or issued version of the Lago Agrio Judgment can be found on the Zambrano Computers.

4.444. *4 March 2011: Forensic Evidence* (See Part VI): "Providencias.docx" is saved by a user of the Old Computer. Between 21 January and 4 March 2011, the document had been

---

[398] R-1320.
[399] Racich ER3, para 25.
[400] C-931, p.186.
[401] C-931, pp. 186-187.

# SA567

open for at least 3,500 minutes. As of 4 March 2011, "Providencias.docx" contains 99% of the text of the Lago Agrio Judgment. It also contains 24 pages of other orders in the Lago Agrio Litigation.[402]

4.445.  *4 March 2011*: The Lago Agrio Judgment is clarified by Judge Zambrano by a Clarification Order on 4 March 2011.[403] (The Clarification Order is considered at greater length in Part V below).

4.446.  *16 March 2011:* This Tribunal issues its Procedural Order No 7 dated 16 March 2011, maintaining its Order for Interim Measures dated 9 February 2011 (Paragraph 9): see Annex 1(E) to Part I above.

4.447.  *18 March 2011: Forensic Evidence (See* Part VI): "Providencias.docx" is saved for a final time by a user on Judge Zambrano's Old Computer. It had been saved four times since 4 March 2011 and had been open for at least 71 minutes between saves.[404]

4.448.  *1 June 2011*: The National Court of Justice (First Criminal Chamber) dismisses the Criminal Prosecutions brought by the Respondent against (inter alios) Mr Reis Veiga and Dr Pérez for "ideological falsehood" in February 2008.[405] Dr Pérez was then permitted to leave Ecuador and re-join his family abroad. He died shortly thereafter.

4.449.  *29 November 2011*: The Judiciary Council of Sucumbíos appoints the remaining two members of the Lago Agrio Appellate Court. It starts work on the appeal from the Lago Agrio Judgment.[406]

### *2012*

4.450.  *3 January 2012*: By its judgment of 3 January 2012, extending over 16 pages, the Lago Agrio Appellate Court affirms the Lago Agrio Judgment.[407] It upholds the punitive damages award of US$ 8.64 billion because Chevron had refused publicly to "apologise". It also decides that it cannot address Chevron's "fraud" allegations, including the 'ghostwriting' of the Lago Agrio Judgment. It is otherwise, ostensibly, a

---

[402] Lynch ER2, Exhibit. 23.
[403] C-1367; R-1193.
[404] Lynch ER2, Exhibit 23.
[405] R-250.
[406] C-1065.
[407] C-991.

## SA568

*de novo* hearing based on the evidence filed in the Lago Agrio Court. Given the volume and complexity of that evidence, if it was a *de novo* hearing, it was a judicial feat of Olympic proportions achieved within only a few months. (The Lago Agrio Appellate Court's judgment is considered at greater length in Part V below).

4.451. *13 January 2012:* The Appellate Court issues a Clarification Order of its Appellate Judgment on 13 January 2012.[408] It effectively grants the Lago Agrio Plaintiffs' requests for clarification, including a statement that the Appellate Court had considered and rejected evidence of the fraudulent conduct of the Lago Agrio Plaintiffs' representatives. (The Clarification Order is considered at greater length in Part V below).

4.452. *20 January 2012*: Chevron files a cassation appeal from the Lago Agrio Appellate Court to the Cassation Court.[409] In that appeal, Chevron requests the suspension of the enforcement of the Lago Agrio Judgment, as upheld by the Appellate Court by its Judgment of 3 January 2012 and Clarification Order of 13 January 2012. The appeal refers (inter alia) to this Tribunal's orders for interim measures, including its Order of 9 February 2011, ordering the Respondent to suspend the enforcement of the Lago Agrio Judgment (see Annex 1 to Part I above). Chevron also requests an exemption from the requirement to post a bond to suspend the enforcement of the Lago Agrio Judgment pending the cassation appeal, as provided by Article 11 of the Ecuadorian Cassation Act.

4.453. *25 January 2012:* This Tribunal issues its First Interim Award on Interim Measures dated 25 January 2012: see Annex 1(F) to Part I above. This Award requires (inter alia) the Respondent: "to take all measures at its disposal to suspend or cause to be suspended the enforcement or recognition within and without Ecuador of any judgment against the First Claimant in the Lago Agrio Case"; and to "continue to inform this Tribunal, by the Respondent's legal representatives in these arbitration proceedings, of all measures which the Respondent has taken for the implementation of this Interim Award; pending the February Hearing's completion and any further order or award in these arbitration proceedings."

---

[408] C-2314; see also R-299.
[409] C-1068.

4.454. *26 January 2012:* The Respondent's Attorney-General sends letters to President Correa, the Ministry of Foreign Affairs, the President of the Judiciary Council and the President of the National (Supreme) Court of Justice.[410] These letters inform their recipients of the content of this Tribunal's First Interim Award on Interim Measures dated 25 January 2012.

4.455. *February 2012:* Judge Zambrano is disciplined twice by the Judicial Council; and in February/May 2012, he is dismissed from judicial office, for reasons unconnected with the Lago Agrio Litigation.[411] In April 2013 Dr Zambrano resumes employment as a legal adviser to a subsidiary of PetroEcuador, the Refinery of the Pacific.[412]

4.456. *16 February 2012:* This Tribunal issues its Second Interim Award on Interim Measures dated 16 February 2012: see Annex 1(G) to Part I above.

4.457. This Second Interim Award requires (inter alia) the Respondent (whether by its judicial, legislative or executive branches) "to take all measures necessary to suspend or cause to be suspended the enforcement and recognition within and without Ecuador of the judgments by the Provincial Court of Sucumbíos, Sole Division (Corte Provincial de Justicia de Sucumbíos, Sala Única de la Corte Provincial de Justicia de Sucumbíos) of 3 January 2012 and of 13 January 2012 (and, to the extent confirmed by the said judgments, of the judgment by Judge Nicolás Zambrano Lozada of 14 February 2011) against the First Claimant in the Ecuadorian legal proceedings known as "the Lago Agrio Case"; and "in particular, without prejudice to the generality of the foregoing, such measures to preclude any certification by the Respondent that would cause the said judgments to be enforceable against the First Claimant"; and the Respondent by its Government "to continue to inform this Tribunal, by the Respondent's legal representatives in these arbitration proceedings, of all measures which the Respondent has taken for the implementation of its legal obligations under this Second Interim Award; until any further order or award made by the Tribunal in these arbitration proceedings."

4.458. *16-17 February 2012:* The Respondent's Attorney-General sends letters to President Correa, the President of the Judiciary Council, the Ministry of Foreign Affairs, the

---

[410] R-387; R-386; R-388; and R-389.
[411] C-1829; C-2116.
[412] C-1980, pp. 1791-1792.

# SA570

President of the National (Supreme) Court of Justice, the President of the Sole Chamber of the Provincial Court of Sucumbíos and the Conjueza of the Provincial Court of Sucumbíos dated 16 February 2012.[413] The Attorney sends letters to the President of the National Assembly and the Conjueza of the Provincial Court of Sucumbíos dated 17 February 2012.[414] These letters inform their recipients of the content of this Tribunal's Second Interim Award on Interim Measures dated 16 February 2012.

4.459. *17 February 2012:* By its Order of 17 February 2012, the Lago Agrio Appellate Court denies Chevron's request for the suspension of the enforcement of the Lago Agrio Judgment pending Chevron's cassation appeal. Its Order refers to Chevron's failure to post a bond.[415] It decides that Ecuadorian law requires the Lago Agrio Judgment to be declared immediately enforceable.[416] Subsequently, on 1 March 2012, the Appellate Court denies Chevron's application to revoke its Order of 17 February 2012.[417]

4.460. *24 February 2012:* Chevron requests the Lago Agrio Appellate Court to revoke its Order of 17 February 2012, denying Chevron's request to suspend the Lago Agrio Judgment's enforcement.[418]

4.461. *27 February 2012:* This Tribunal issues its Third Interim Award on Jurisdiction and Admissibility dated 27 February 2012: see Annex 1(H) to Part I above. It there decides (inter alia), in Paragraph 5.4:

> *"As regards the claims pleaded by the First Claimant (Chevron Corporation or "Chevron") in the Claimants' said Notice of Arbitration, to reject all objections made by the Respondent as to jurisdiction and admissibility in its said memorials and further submissions, save those relating to the jurisdictional objections raised against the First Claimant as a investor under Article I(1)(a) alleging a "direct" investment under Article VI(1)(c) and an "investment agreement" under Article VI(1)(a) of the Ecuador–USA Treaty of 27 August 1993 which are joined to the merits of the First Claimants' claims under Article 21(4) of the UNCITRAL Arbitration Rules forming part of the Parties' arbitration agreement under the Treaty; ...".*

---

[413] R-390; R-391; R-393; R-395; and R-397.
[414] R-394; and R-396.
[415] See C-1114, p. 4.
[416] R-398.
[417] R-399; C-1114.
[418] C-1114.

# SA571

4.462. *1 March 2012:* By its Order of 1 March 2012, the Lago Agrio Appellate Court denies Chevron's request of 23 February 2012. It confirms that the Lago Agrio Judgment, as upheld by the Appellate Court, is now enforceable.[419] This Tribunal treats the Order of 1 March 2012 as the certificate of enforceability in Ecuador of the Lago Agrio Judgment by the Respondent. It was issued and maintained in non-compliance with the Tribunal's several Orders for Interim Measures.

4.463. *4 March 2012*: The Lago Agrio Appellate Court denies Chevron's other requests regarding the Lago Agrio Judgment.[420]

4.464. *30 May 2012*: The Lago Agrio Plaintiffs commence legal proceedings in Canada to enforce the Lago Agrio Judgment against Chevron and one of its subsidiaries: see Annex 4(ii) to Part I above.

4.465. *27 June 2012*: The Lago Agrio Plaintiffs commence legal proceedings in Brazil to enforce the Lago Agrio Judgment against Chevron: see Annex 4(iii) to Part I above.

4.466. *9 July 2012: Forensic Evidence* (See Part VI): 4,701 files are created on Judge Zambrano's New Computer.[421]

4.467. *3 August 2012*: The Lago Agrio Court orders Chevron to pay the Lago Agrio Judgment in the sum of US$ 19,041,414,529.00, within 24 hours.[422]

4.468. *26 September 2012: Forensic Evidence* (See Part VI): 2,202 files are created on the Old Computer between 3.25pm and 3.29pm. All files were subsequently deleted.[423]

4.469. *15 October 2012:* The Lago Agrio Court orders the execution of the Lago Agrio Judgment against assets owned by Chevron and its subsidiaries in Ecuador, including (by name) assets owned by TexPet.[424]

---

[419] C-1114 (updated).
[420] C-1367.
[421] Lynch ER2, p. 12.
[422] C-1404.
[423] Lynch ER2, p. 11.
[424] C-1532.

# SA572

4.470. *12 November 2012:* The Lago Agrio Plaintiffs commence legal proceedings in Argentina to enforce the Lago Agrio Judgment against Chevron: see Annex 4(iv) to Part I above.

### *2013*

4.471. *7 February 2013:* This Tribunal issues its Fourth Interim Award on Interim Measures dated 7 February 2013 see Annex 1(I) to Part I above. The Tribunal (inter alia) there declares that the Respondent "has "violated the First and Second Interim Awards under the Treaty, the UNCITRAL Rules and international law in regard to the finalisation and enforcement subject to execution of the Lago Agrio Judgment within and outside Ecuador, including (but not limited to) Canada, Brazil and Argentina*."*

4.472. *28 March 2013:* Dr Zambrano signs his sworn Declaration in the RICO Litigation, shortly before commencing his new employment in Ecuador, with a subsidiary of PetroEcuador.

4.473. *21 March 2013*: In his witness statement in the RICO Litigation,[425] Mr Beltman (of Stratus Consulting) admits that Mr Cabrera did not write the Cabrera Report filed in April 2008, as follows:

> *"I prepared the first drafts of substantial parts of ... the main body of the Cabrera Report. At Donziger's direction, I drafted my portions of the report in the first person as though it was written by Richard Cabrera. I supervised the preparation by Dr Maest and other Stratus personnel or subcontractors of 11 of the 24 sub-reports and appendices, known as Annexes, to the Cabrera Report" ... "Donziger and Fajardo told me to whom authorship of the various Cabrera Report Annexes should be attributed, and I recorded those names in a table. Donziger told me that the reason for the attribution was to make it more difficult to uncover that Stratus had written the Annexes. Donziger told Stratus to indicate on the draft Summary Report that it was written 'By Richard Cabrera' and instructed Stratus to draft its portions of the Summary Report in the first person " ... "I understood that portions of the Cabrera Response that Stratus was drafting would be filed with the Lago Agrio court as if written by Cabrera. My discussions about this work with Donziger and the LAPs' representatives confirmed that Donziger and the LAPs' team wanted the Cabrera's Responses to increase the damages assessed by billions of dollars." ... "I understood that Cabrera filed the 'Cabrera Response' based at least in part on text written by the LAPs' representatives and consultants, including Stratus, on November 17, 2008. The Cabrera Response incorporated work, calculations, and*

---

[425] C-1611A, paras 12, 16, 22, 23, 27, 44-47; C-1611a.

# SA573

> *text written by Stratus, among others, and increased the damages assessed in the Cabrera Report from $16 billion to $27 billion ....".*

4.474.  *31 August 2013:* President Correa launches a political and publicity campaign, called "La Mano Sucia de Chevron" ("the Dirty Hand of Chevron") to facilitate (inter alia) payment of the Lago Agrio Judgment by Chevron. This campaign's implementation over the next several years includes several statements by President Correa during his weekly broadcasts and statements by his Government's ministers and diplomats, hostile to Chevron.

4.475.  *September 2013*: The Prosecutor General of Ecuador returns to Chevron three boxes of evidence on the "ghostwriting" of the Lago Agrio Judgment, sent by Chevron (listed as 9,014 pages and two CDs). He states that the case in question is a civil proceeding in which the Prosecutor General's office does not participate.[426]

4.476.  *17 September 2013*: This Tribunal issues its First Partial Award on Track I dated 17 September 2013 (see Annex 1(J) to Part I above). It there decides (inter alia):

> *"(1) The First Claimant ("Chevron") and the Second Claimant ("TexPet") are both 'Releasees' under Article 5.1 of the 1995 Settlement Agreement and Article IV of the 1998 Final Release;*
>
> *(2) As such a Releasee, a party to and also part of the 1995 Settlement Agreement, the First Claimant can invoke its contractual rights thereunder in regard to the release in Article 5.1 of the 1995 Settlement Agreement and Article IV of the 1998 Final Release as fully as the Second Claimant as a signatory party and named Releasee;*
>
> *(3) The scope of the releases in Article 5 of the 1995 Settlement Agreement and Article IV of the 1998 Final Release made by the Respondent to the First and Second Claimants does not extend to any environmental claim made by an individual for personal harm in respect of that individual's rights separate and different from the Respondent; but it does have legal effect under Ecuadorian law precluding any "diffuse" claim against the First and Second Claimants under Article 19-2 of the Constitution made by the Respondent and also made by any individual not claiming personal harm (actual or threatened); ...".*

4.477.  *12 November 2013*: The Cassation (National) Court issues its Judgment affirming part of the Lago Agrio Judgment; but it nullifies the punitive damages imposed for Chevron's omission to "apologise", as required by that Judgment and as upheld by the

---

[426] C-2305.

# SA574

Appellate Court.[427] As a result, the Cassation Court reduces the Lago Agrio Judgment's award of damages to US$ 8,000,646,160. (The Cassation Court's Judgment is considered at greater length in Part V below).

4.478. *15 October – 26 November 2013*: The RICO trial in New York is heard before the US District Court for the Southern District of New York (Judge Kaplan). The plaintiff was Chevron and the defendants included Steven Donziger, the Law Offices of Steven R. Donziger and Donziger Associates PLLC (the "Donziger defendants"), with Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje (two of the Lago Agrio Plaintiffs).

4.479. During the RICO trial, the following factual witnesses were examined orally, amongst others: Dr Zambrano, Mr Donziger and Dr Guerra.

4.480. *23 December 2013*: Chevron submits an "extraordinary action for protection to the Constitutional Court.[428] It is admitted for consideration by the Constitutional Court on 20 March 2014.

### *2014*

4.481. *4 March 2014*: The US District Court for the Southern District of New York (Judge Kaplan) issues its judgment and related Orders in the RICO Litigation ("the RICO Judgment").[429]

4.482. The US District Court states in the "Conclusion" to the RICO Judgment (with references here omitted):

> "*The saga of the Lago Agrio case is sad. It is distressing that the course of justice was perverted. The LAPs received the zealous representation they wanted, but it is sad that it was not always characterized by honor and honesty as well. It is troubling that, in the words of Jeffrey Shinder [a New York attorney retained by the Lago Agrio Plaintiffs], what happened here probably means that 'we'll never know whether or not there was a case to be made against Chevron.'*
>
> *But we have come full circle. As the Court wrote at the outset, '[t]he issue in this case is not what happened in the Oriente more than twenty years ago and who, if anyone, now is responsible for any wrongs then done. The issue here, instead, is*

---

[427] C-1975.
[428] See the Claimants' letter dated 19 March 2018, p. 2; and the Respondent's letter dated 20 April 2018, pp. 1-2.
[429] C-2135.

# SA575

*whether a court decision was procured by corrupt means, regardless of whether the cause was just.'*

*The decision in the Lago Agrio case was obtained by corrupt means. The defendants here may not be allowed to benefit from that in any way. The order entered today will prevent them from doing so.*

*The foregoing, together with the appendices to this opinion, constitute the Court's findings of fact and conclusions of law. Defendants' motions to dismiss are denied."*

4.483. In the Order appended to the RICO Judgment, the Court orders, adjudges and decrees as regards the Donziger Defendants and the LAP Representatives (inter alia) as follows:[430]

*"1. The Court hereby imposes a constructive trust for the benefit of Chevron on all property, whether personal or real, tangible or intangible, vested or contingent, that Donziger has received, or hereafter may receive, directly or indirectly, or to which Donziger now has, or hereafter obtains, any right, title or interest, directly or indirectly, that is traceable to the Judgment or the enforcement of the Judgment anywhere in the world including, without limitation, all rights to any contingent fee under the Retainer Agreement and all stock in Amazonia. Donziger shall transfer and forthwith assign to Chevron all such property that he now has or hereafter may obtain.*

*2. The Court hereby imposes a constructive trust for the benefit of Chevron on all property, whether personal or real, tangible or intangible, vested or contingent, that the LAP Representatives, and each of them, has received, or hereafter may receive, directly or indirectly, or to which the LAP Representatives, and each of them, now has, or hereafter obtains, any right, title or interest, directly or indirectly, that is traceable to the Judgment or the enforcement of the Judgment anywhere in the world. The LAP Representatives, and each of them, shall transfer and forthwith assign to Chevron all such property that he now has or hereafter may obtain.*

*3. Donziger shall execute in favor of Chevron a stock power transferring to Chevron all of his right, title and interest in his shares of Amazonia, and Donziger and the LAP Representatives, and each of them, shall execute such other and further documents as Chevron reasonably may request or as the Court hereafter may order to effectuate the foregoing provisions of this Judgment.*

*4. Donziger and the LAP Representatives, and each of them, is hereby enjoined and restrained from:*

---

[430] C-2134. The "Donziger Defendants" were defined as Steven Donziger, the Law Offices of Steven R. Donziger and Donziger Associates PLLC. The "LAP Representatives" were defined as Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje.

> *4.1 Filing or prosecuting any action for recognition or enforcement of the Judgment or any New Judgment or seeking the seizure or attachment of assets based on the Judgment or any New Judgment, in each case in any court in the United States.*
>
> *4.2. Seeking prejudgment seizure or attachment of assets based upon the Judgment or any New Judgment, in each case in any court in the United States.*
>
> *5. Donziger and the LAP Representatives, and each of them, is hereby further enjoined and restrained from undertaking any acts to monetize or profit from the Judgment, as modified or amended, or any New Judgment, including without limitation by selling, assigning, pledging, transferring or encumbering any interest therein.*
>
> *6. Notwithstanding anything to the contrary in this Judgment, nothing herein enjoins, restrains or otherwise prohibits Donziger, the LAP Representatives, or any of them, from (a) filing or prosecuting any action for recognition or enforcement of the Judgment or any New Judgment, or any for prejudgment seizure or attachment of assets based in courts outside the United States; or (b) litigating this action or any appeal of any order or judgment issued in this action.*
>
> *...*
>
> *8. In accordance with Federal Rule of Civil Procedure 65(d)(2), this Judgment is binding upon the parties; their officers, agents, servants, employees, and attorneys; and other persons who are in active concert and participation with any of the foregoing.*
>
> *...*
>
> *9. Chevron shall recover of Donziger and the LAP Representatives, and each of them, jointly and severally, the costs of this action pursuant to Fed. R. Civ. P. 54(d)(l) and 28 U.S.C. § 1920 ...”*

4.484. The RICO Judgment is appealed by the Donziger Defendants to the US Court of Appeals for the Second Circuit.

### 2015-2018

4.485. *12 March 2015:* This Tribunal issues its Decision on Track IB (see Annex 1(K) to Part I above). It there decides (inter alia), by a majority:

> *“(1) The Lago Agrio Complaint of 7 May 2003, as an initial pleading, included individual claims resting upon individual rights under Ecuadorian law, not falling within the scope of the 1995 Settlement Agreement (as invoked by the Claimants);*

# SA577

*(2) The Lago Agrio Complaint was not wholly barred at its inception by res judicata, under Ecuadorian law, by virtue of the 1995 Settlement Agreement (as invoked by the Claimants); and*

*(3) The Lago Agrio Complaint included individual claims materially similar, in substance, to the individual claims made by the Aguinda Plaintiffs in New York."*

4.486. *20 April 2015:* The RICO appellate hearing is heard before the US Court of Appeals for the Second Circuit. (Its judgment, dismissing the appeal, is issued on 8 August 2016. The US Supreme Court denies *certiorari* on 29 June 2017).

4.487. *13 July 2016:* By letter with attachments dated 21 July 2016, the Respondent informs the Tribunal as follows:

*"By letter dated 13 July 2016 [a copy of which was attached, with an English translation] the State's prosecutor [the Fiscalía General del Estado, or "FGE"] ordered the Attorney General's Office to produce within 15 days certified copies of any testimony given by Mr Steven Donziger that is part of the record of these arbitral proceedings. The letter notes that the Office of the Prosecutor opened this preliminary investigation, Case No. 235-2010, in response to a 7 June 2010 letter from Thomas F. Cullen, counsel for Chevron Corporation. The investigation, which is now in its sixth year but obviously active, includes 'three boxes of documents' furnished to Prosecutor by Chevron. According to Claimants, this is the criminal investigation requested by Chevron into the alleged 'extensive evidence of wholesale corruption in the court process.' See Claimants' Suppl. Track II Memorial ¶ 37.* [431]

*As we have advised previously, criminal investigations are governed by rules of secrecy. The Office of the Attorney General does not know the subjects or the direction of the investigation. However, under Ecuadorian law, Chevron - as the complaining party - at all times had access to the investigatory developments and either knew or should have known of the pendency of the investigation and the Prosecutor's decision to consider the documents furnished by Chevron."*

4.488. As the FGE letter makes clear, this preliminary investigation "for the suspected crime of forging public documents" followed the report made by Mr Cullen (of Chevron) on 7 June 2010 to the *"Fiscalía Provincial de Sucumbíos."* The investigation is said to

---

[431] The Claimants' pleading reads: *"...it was Ecuador and its courts that did nothing to stop or correct the fraud, despite the extensive evidence of wholesale corruption in the court process. The Lago Agrio Court denied every motion filed by Chevron that brought the Cabrera's misconduct and the fraud to the Court's attention. Neither the Lago Agrio Court nor any other authority in Ecuador did anything to sanction the Lago Agrio Plaintiffs or their representatives, or the judges in the Lago Agrio Litigation, with respect to the Cabrera fraud. Instead, those State authorities ignored Chevron's complaints and the uncontradicted evidence exposing that corruption. This failure to take legal action against those involved in the Cabrera fraud constitutes ratification of those actions by the State."*

# SA578

include a written report dated 31 July 2014 consisting of 14,791 pages made by the "Fiscal" of the Province of Sucumbíos to the FGE.

4.489. *19 March 2018:* By letter (with attachments) dated 19 March 2018, the Claimants inform the Tribunal about the status of the criminal investigations against the Lago Agrio Plaintiffs' representatives (footnotes here omitted):

> "*Beginning in August 2009, Chevron has sent a series of letters to Ecuador's Prosecutor General and local prosecutors, summarizing the evidence of the LAPs' misconduct, attaching the evidence, and requesting criminal investigations. In response, three preliminary investigations were opened: (a) the Prosecutor General opened a preliminary investigation in September 2009 into an alleged bribery solicitation scheme involving former Judge Juan Núñez, who was then presiding over the Lago Agrio case pending in the Sucumbíos Provincial Court, and other third parties; (b) the Sucumbíos Provincial Prosecutor opened a preliminary investigation in April 2010 into the alleged crime of falsification of documents committed by the LAPs' representatives; and (c) the Sucumbíos Provincial Prosecutor opened a preliminary investigation in July 2010 into the alleged crime of perjury committed by Richard Cabrera and others.*
>
> *The first preliminary investigation focused on an alleged bribery solicitation scheme in which then Judge Núñez and the other participants were recorded on video discussing the payment of a bribe in exchange for the issuance of a multi-billion dollar judgment against Chevron in the Lago Agrio case. Despite the unrefuted evidence provided by Chevron, Ecuador's Prosecutor General not only rejected Chevron's complaints and refused to bring charges against Judge Núñez or others, but accused Chevron's counsel of being "malicious and reckless" in filing the complaint and having caused "damage to Ecuador's national image." At the Prosecutor's request and over Chevron's objections, the National Court of Justice closed the investigation on September 30, 2013, and found that Chevron's counsel's letter – which had prompted the investigation – was reckless and malicious.*
>
> *The second and third preliminary investigations focus on the LAPs' ghostwriting of the Cabrera report and supplemental report and their ghostwriting of official communications filed by Cabrera, while the third preliminary investigation also focuses on the LAPs' falsification of the Calmbacher report and their ghostwriting of the Lago Agrio Judgment. Over the years, the Sucumbíos Provincial Prosecutor has received from Chevron several formal submissions in these investigations detailing the overwhelming evidence of misconduct and fraud. Yet to this day, these investigations remain pending, and the Prosecutor has not brought formal charges against anyone concerning these investigations.*"

4.490. *20 April 2018:* By letter (with attachments) dated 20 April 2018, the Respondent provides the following update on the status of the Criminal Investigations in Ecuador:

# SA579

> "The Office of the Procurador (the Attorney General with respect to civil matters) received a request for documents and transcripts in its possession relating to the testimony of Steven Donziger, a request with which the Procurador has complied. The caption of the correspondence, and the nature of the request, plainly indicate that, at least at the time of that request (see Respondent's Letter to the Tribunal dated 21 July 2016), there was an active and ongoing investigation into Chevron's allegations that Mr Donziger and others acted unlawfully in respect to the Lago Agrio court proceedings. The Office of the Procurador is unaware if that matter has been closed, that is, it is unaware of any court order granting an application to close the matter. We thus have every reason to believe that the investigation remains open and active. As the complaining party, Chevron would, in the regular course, be apprised of any decision to charge any persons of a crime arising out of that investigation, or alternatively, upon the closure of the investigation.
>
> Like the investigation of Mr Donziger and his associates, the investigation of Mr Guerra - consistent with the rules governing criminal investigations - is not a public investigation. Like any other criminal investigation, the subject of that investigation, here, Mr Guerra, would be apprised of any decision to charge him (or any person) of a crime arising out of that investigation, or alternatively, upon the closure of the investigation. Claimants have reported that the Prosecutor has filed a motion to close the case. Ecuador has no information contrary to Chevron's representation. We note that a motion to close the case - while available to Chevron's client, Mr Guerra - is not available to the Republic's civil attorneys and is not a public document. If and when granted, however, the Court's order will be public and the matter closed."

4.491. As at the date of this Award, whilst criminal investigations may be continuing in a confidential manner, there is no material before the Tribunal as to its further progress, scope or end-result. In the meantime, the Lago Agrio Plaintiffs are still seeking to enforce the Lago Agrio Judgment outside Ecuador, as summarised above and, probably, elsewhere as envisaged by the "Invictus" Memorandum (see above).

4.492. *27 June 2018:* The Constitutional Court issues its Judgment on 27 June 2018, affirming the Judgment of the Cassation (National) Court (2013), following public hearings held on 16 July 2015 and 22 May 2018. The Constitutional Court declares that there is no violation of constitutional law, as alleged by Chevron; the Court rejects the extraordinary action of protection made by Chevron; and it orders its judgment "[t]o be recorded, published and enforced."[432]

4.493. The Tribunal turns, in the next Part V of this Award, to the Lago Agrio Court Judgment, the Lago Agrio Appellate Judgment, the Cassation Court Judgment and the Judgment

---

[432] C-2551.

SA580

of the Constitutional Court, followed by its Conclusions in regard to the principal factual and other matters addressed in both Parts IV and V of this Award.

# SA581

## *PART IV – ANNEX 6*

## *MAP OF THE ORIENTE AND CONCESSION AREA[433]*



**SA582**

# SA583

## PART V

### THE LAGO AGRIO, APPELLATE, CASSATION AND CONSTITUTIONAL COURT JUDGMENTS

#### A: Introduction

5.1.    In this Part V, the Tribunal addresses the factual and non-forensic issues relating to the Lago Agrio Judgment of 14 February 2011, the judgment of the Lago Agrio Appellate Court of 3 January 2012, the judgment of the Cassation Court of 12 November 2013 and the judgment of the Constitutional Court of 27 June 2018.

#### B: The Lago Agrio Judgment (2011)

5.2.    On 14 February 2011, as indicated above, the Lago Agrio Court (Judge Zambrano) issues the Lago Agrio Judgment.[1] The Lago Agrio Judgment is later clarified by the Lago Agrio Court (Judge Zambrano) by a Clarification Order on 4 March 2011.[2] It awards US$ 18.2 billion in damages to be paid by Chevron, including US$ 8.6 billion as punitive damages subject to a timely public apology by Chevron, with a 10% award to the ADF.

5.3.    The Lago Agrio Judgment extends to about 88,000 words and 188 pages, typed in single spacing in unbroken text, with no line or paragraph numbering, page breaks or table of contents. It is divided into 15 Parts, with many internal sub-sections. Part 1 on "Competence" or jurisdiction (p.4), Part 2 on the form of Lago Agrio Litigation (p.6), Part 3 on Chevron's defences (p.6), Part 4 on the Parties' motions (p.35), Part 5 on due process (p.60), Part 6 on Ecuadorian environmental legislation (p.60), Part 7 on the basis of civil liability (p.74), Part 8 on the nature of the Lago Agrio Plaintiffs' claims, including Article 43 of the EMA (p.90), Part 9 on the material facts (p.92), Part 10 on causation (p.154), Part 11 on "fault" (p.175), Part 12 on the 1995 Settlement Agreement (p.175), Part 13 on measures of redress for the harm (p.176), Part 14 on Chevron's "bad

---

[1] C-931.
[2] C-1367; R-1193.

# SA584

faith" and punitive damages (p.184), and Part 15 on the establishment of a commercial trust as the beneficiary of compensation (p.186).

5.4.    At least at first sight, particularly to a non-lawyer unfamiliar with the Lago Agrio Litigation, the Lago Agrio Judgment appears to be a lengthy, detailed, reasoned and powerful decision.

5.5.    As to non-punitive damages, the Lago Agrio Judgment awards: (i) US$ 5,396,160,000 to "recover the natural condition of the soil impacted by TexPet's activities";[3] (ii) US$ 1.4 billion for a "health improvement plan" to "cover the health needs created by the public health problem occasioned by the acts of the defendant [sic: Chevron]";[4] (iii) US$ 100 million for a "community reconstruction and ethnic reaffirmation program" to redress "cultural harm";[5] (iv) US$ 150 million for the construction of "a potable water system or systems" to "benefit the persons who inhabit the area that was operated by the defendant [sic: Chevron]";[6] (v) US$ 800 million for "a plan of health which shall necessarily include treatment for the persons who suffer from cancer that can be attributed to TexPet's operation in the Concession" (not being the Lago Agrio Plaintiffs);[7] (vi) US$ 200 million "to recover the native flora, fauna, and the aquatic life of the zone";[8] and (vii) US$ 600 million for "the cleanup of groundwater".[9]

5.6.    As to the "trust" as the beneficiary of compensation, the Lago Agrio Judgment envisages a "commercial trust, to be administered by one of the fund [i.e. the ADF] and trust administrator companies located in Ecuador."[10] The beneficiary of the trust "shall be the Amazon Defense Front or the person or persons it designates, considering that 'those affected' by the environmental harm are undetermined …". The "representatives of the Defense Front, or those they designate on behalf of the affected persons, will constitute the board of the trust …". Thus, the proceeds of the Lago Agrio Judgment were to be controlled by the ADF and not, at least directly, by the individuals comprising the Lago Agrio Plaintiffs.

---

[3] C-931, p. 181.
[4] C-931, p. 183.
[5] C-931, p. 183.
[6] C-931, pp. 182-183.
[7] C-931, p. 184.
[8] C-931, p. 182.
[9] C-931, p. 179.
[10] C-931, pp. 186-187.

# SA585

5.7.    In addition, Chevron was ordered "to satisfy an additional 10% of the amount ordered as reparation of harm in [the] name of the Amazon Defense Front, with costs.[11] Apart from costs, this "reparation" appears to represent a payment due from Chevron of either US$ 1.82 billion or US$ 864 million to the ADF.

5.8.    The actual drafting of the Lago Agrio Judgment is, inevitably, the subject of a wide-ranging controversy between the Parties. The forensic expert issues are considered in the next Part VI of this Award. For the time being, the Tribunal confines itself to factual and other non-forensic expert issues below, in this Part V.

5.9.    Dr Zambrano testified in the RICO Litigation that he started drafting the Judgment in mid-November 2010, after the Lago Agrio Court had purchased the "New Computer" for his use.

5.10.   Dr Zambrano also testified that he prepared the Judgment all by himself (with the assistance of his student secretary, Ms "C")[12] between mid-November 2010 and 14 February 2011, a period of three months when he also had to attend to other unrelated cases pending before him in the Lago Agrio Court. He also testified, more than once, that he had prepared the whole of the Judgment on the New Computer because it was "the more modern computer."[13] In fact, based on objective evidence, his use of the New Computer could not have begun before 26 November 2010.[14]

5.11.   If Dr Zambrano is correct, he drafted the Lago Agrio Judgment in a period of less than three months, or 81 consecutive days (i.e. 26 November 2010 to 14 February 2011), based on a court file of some 237,000 pages that included more than 100 expert reports and many legal submissions. Given his other work on unrelated court cases, whilst not absolutely impossible, this achievement within such a short time seems inherently unlikely.

5.12.   During this period, Judge Zambrano gave several interviews to the press. In the report published by *Reuters* on 31 January 2011,[15] Judge Zambrano is described as follows:

---

[11] C-931, pp. 187-188.
[12] The identity of Ms "C" is known to the Parties and the Tribunal. As explained in the Selected Dramatis Personae in this Award, the Tribunal thinks it unnecessary to give her full name in this Award.
[13] C-1979, p. 196.
[14] Lynch ER 2, p. 9.
[15] C-919.

# SA586

> *"... The chairs and sofa in Zambrano's office are littered with 100-page makeshift notebooks full of evidence, each packet held together with white string. 'There's barely any place left to sit,' Zambrano joked with Reuters during a recent visit to his chambers in Lago Agrio, a hardscrabble Amazon town near the Colombian border. 'I have about 500 notebooks to go,' he said, holding his battered reading glasses in his hand and smiling. 'Not much.' He has already gone through 1,500 of the packets and is widely expected to issue his verdict later this year, although he declined to comment on the possible timing of his ruling ..."*

It is impossible for the Tribunal to accept these statements literally.

5.13. Each of these "notebooks" or "packets" (i.e. *cuerpos*) contain some 100 pages, so that 1,500 *cuerpos*, as reported, would correspond to some 150,000 pages.[16] With 500 *cuerpos* "to go", it would mean that Judge Zambrano had still to study 50,000 pages in the 14 or so days remaining before the Lago Agrio Judgment was issued on 14 February 2011, an average of about 3,500 pages daily without allowing any time for drafting the Judgment or other unrelated judicial work. As for the 150,000 pages already studied before 31 January 2011, that would mean an average of about 2,230 pages daily (from 26 November 2010, running consecutively), again without allowing any time for drafting the Judgment, other unrelated judicial work or non-working days.

5.14. Even allowing for the facts that not every page in every *cuerpo* might require Judge Zambrano's consideration, that he might be a better than average speed-reader of technical documentation and that he might be a superlatively efficient judicial draftsman, there still arise troubling questions as to the feasibility of his preparing, alone, the Lago Agrio Court Judgment from the court file in the time and manner described by him.

5.15. The Tribunal notes the expert report of Professor Keith Rayner, a cognitive psychologist and specialist in the scientific study of reading, adduced by the Claimants.[17] He concluded that: "given the limitations on human readers processing capabilities (both in terms of acuity limitations and attention limitations), reading rate with good comprehension is limited to 300-400 wpm". Thus, so the Tribunal calculates, if the 2,000 or so *cuerpos* (corresponding to 200,000 pages) averaged 300 words a page (as Professor Rayner calculated), Judge Zambrano would have needed, with a reading rate

---

[16] In Judge Zambrano's interview with *Expreso* on 18 December 2010, there is a reference to "*2,122 cuerpos*", corresponding to about 212,200 pages (C-896, p. 1).

[17] See C-1036.

## SA587

of 300 words per minute, at least 138 consecutive 24-hour working days to study the court file. On the account given by Judge Zambrano, he did not have the time to achieve this.

5.16. As to research into foreign laws, Dr Zambrano (who does not speak English) testified that his temporary student secretary (Ms "C") undertook legal research on the Internet and found the cases from America, Australia and England cited in the Lago Agrio Judgment, using Internet services for translation into Spanish.[18] As explained below, there arise troubling questions as to such foreign legal research, as described by him.

5.17. In the Tribunal's view, as also explained later below, the circumstantial and other evidence, including testimony by Dr Zambrano in the RICO Litigation, does not support Dr Zambrano's account of writing the Lago Agrio Judgment. Conversely, as explained below, it supports the Claimants' case that the Lago Agrio Judgment was not prepared by Judge Zambrano, but, at least in material part, that it was 'ghostwritten' by certain of the Lago Agrio Plaintiffs' representatives with Judge Zambrano's corrupt connivance.

### C: The Lago Agrio Judgment – The "Merger" between Texaco and Chevron

5.18. The Lago Agrio Judgment contains a lengthy passage addressing the issue of the "merger" ("fusión" in Spanish) between Texaco and Chevron, resulting in Chevron standing in the shoes of both Texaco and (as Texaco's "fourth level subsidiary") TexPet. It is best cited at length from pp. 6-26 of the Lago Agrio Judgment, as set out below (with added line references for ease of reference) in Annex 7 to this Part V.[19] It proceeds on the basis that Chevron is the sole defendant in the Lago Agrio Litigation; it accepts that Texaco "is not a party in this lawsuit" (Line 204); and it assumes that TexPet also is not a co-defendant in the Lago Agrio Litigation.

5.19. In brief, the Lago Agrio Judgment lifts the "corporate veils" between Chevron, Texaco and TexPet, so that Chevron bears the obligations and liabilities of both Texaco and TexPet. It invokes, in numerous passages, the principle of good faith under Ecuadorian law (Lines 163, 174, 221, 293, 310, 332 and 446). It notes: "It is appropriate to recall that in our legal system the principle prevails that that no one can benefit from his bad faith" (Lines 221-222). In support, it refers to foreign legal materials, including court

---

[18] C-1980, p. 1620.
[19] C-931, Part 3.1, pp. 6-26.

# SA588

judgments and laws of the state of Delaware, the USA and North America (Lines 251, 309, 312, 314 and 329).

5.20.   As regards the "merger" between Chevron and Texaco, it attributes "serious doubts as to the good faith with [sic: which] the defendant [Chevron] acted in this lawsuit" (Lines 332-333). It decides: "The law serves justice, and cannot allow legal institutions to be manipulated for illegitimate purposes, such as to favour a fraud or to promote injustice, which would be the case of transferring the assets to one corporation 'free of responsibility', while the responsibilities are kept in a company 'free of assets', the way the defendant tries to have us understand the transaction that took place between Chevron and Texaco, in which the new company benefits from the combined companies, but fails to mention the obligations." (Lines 237-243).

5.21.   As to the undertaking made by Texaco as a condition of the stay of proceedings in the Aguinda Litigation, it decides: "In this way the obligation to submit to Ecuadorian justice pending on Texaco Inc. was also transmitted to new company Chevron Texaco Corporation, so that consequently Chevron Corp. cannot allege that it never operated in Ecuador to give grounds for lack of a legitimate opposing party" (Lines 299-302). It concludes: "It is appropriate, for the purposes of justice, to impose on Chevron Corp., which benefits from the 'merger', the obligations of Texaco Inc." (Lines 325-327).

5.22.   As regards TexPet, it accepts the Lago Agrio Plaintiffs' Complaint that: "In reality, Texpet was nothing more than a screen behind which Texaco Inc. acted…" (Lines 339-340). It finds: "In this case, it has been proven that in reality TexPet and Texaco Inc. functioned in Ecuador as a single and inseparable operation." (Lines 627-628). It concludes: "… considering the foregoing analysis, the exceptional but justified need has been established in this case to lift any corporate veil that separates [Texaco from TexPet] given that it has been proven that it [TexPet] was a company with a capital very inferior to the volume of its operations, that required constant authorizations and investments from the parent company [Texaco] to carry out the normal course of business of its commercial activity, that the executives were the same in both companies, and principally the obvious fact that not lifting the corporate veil would imply a 'manifest injustice'." (Lines 664-671).

5.23.   The Tribunal returns to the legal consequences of this analysis below in Part VII, on the issue of jurisdiction under the Treaty.

### D: The Lago Agrio Judgment – "Unfiled Materials"

5.24.   The Claimants contend that the Lago Agrio Judgment incorporates (without attribution) eight sets of material which were never actually filed by the Lago Agrio Plaintiffs during the Lago Agrio Litigation, and were thus never seen by the Claimants during that Litigation. The Claimants allege that these materials were corruptly used by the Lago Agrio Plaintiffs' representatives, with Judge Zambrano's connivance, in the 'ghostwriting' of the Lago Agrio Judgment.

5.25.   These eight materials are: (1) the Clapp Report;[20] (2) the Draft Alegato;[21] (3) the Erion Memorandum;[22] (4) the Fajardo Trust Email;[23] (5) the Fusión Memorandum;[24] (6) the January and June Index Summaries;[25] (7) the Moodie Memorandum;[26] and (8) the Selva Viva Database.[27]

5.26.   The Respondent accepts that three of these materials were used in the Lago Agrio Judgment: (1) the Clapp Report, (5) the Fusión Memorandum and (8) the Selva Viva Database.[28]

5.27.   There is, however an important preliminary issue as to whether any of these "unfiled" materials were in fact unfiled with the Lago Agrio Court. The files of the Lago Agrio Litigation held (on paper) by the Lago Agrio Court comprised approximately 217,000 pages of documentation.

5.28.   The Claimants contend that under Ecuadorian law, as Dr Santiago Velázquez Coello testified, every document added to the court record of the Lago Agrio Litigation was required to be acknowledged by a court order, hand-numbered by the Court's clerk and invariably sewn into a "cuerpo", each of which consisted of 100 pages of

---

[20] C-2423.
[21] C-1565.
[22] C-2416.
[23] C-997.
[24] C-2118.
[25] See C-1800 (January); C-2315 (June).
[26] C-1645; R-1018.
[27] C-2316.
[28] Track II Hearing D1.32, 70 & 328.

documentation. Further, under no circumstances may an Ecuadorian judge base his judgment on a document not so included in the court record.[29]

5.29. As already indicated, the Respondent does not dispute the use of certain of these materials in the Lago Agrio Judgment; but it disputes that any of them were not filed by the Lago Agrio Plaintiffs with the Lago Agrio Court.[30] The Respondent contends that the Lago Agrio Court could have maintained its records improperly or that these materials had been presented to the Court in person or informally by the Lago Agrio Plaintiffs' representatives during one or more of the judicial inspections (attended by Chevron's representatives). The Respondent concludes that, in these circumstances, it is quite impossible for any person to know the universe of the documents submitted to the Lago Agrio Court.[31] The Respondent does not, however, seek to defend the use by an Ecuadorian Court of evidential materials not openly submitted by the disputing parties to an Ecuadorian court, formally or informally.

5.30. The Claimants adduced expert testimony from Dr Patrick Juola and Mr Samuel Hernandez. These experts conducted different forms of review of the Lago Agrio Court's record. These reviews included both OCR and hand-review. As to the latter, Dr Juola testified that about 100,000 pages of the record were hand-reviewed.[32] In their expert testimonies, both Dr Juola and Mr Hernandez confirmed that none of these eight materials are to be found in the court record. As to the Respondent's allegation that these materials were submitted informally, the unfiled documents were not found amongst the papers of Chevron's lawyers (who attended the judicial inspections), which (according to these experts) discounts this 'informal' explanation. The Tribunal accepts this expert evidence.

5.31. There is a third explanation provided by Judge Zambrano himself. In his Declaration in the RICO Litigation in the USA, Dr Zambrano testified how the content of the Lago Agrio Plaintiffs' "unfiled documents" appeared in the Lago Agrio Judgment:

*"[O]ccasionally documents related to the case that were not incorporated into the process were left at the door to my office at the Court. ... I verified all of that information regarding the case, that is to say, I made sure that it was not false*

---

[29] Velázquez ER 1, pp. 3-5.
[30] Track II Hearing D1.328.
[31] Track II Hearing D1.326.
[32] Track II Hearing D2.503.

## SA591

*information and also that the basis for such information is in the record. This was relevant information that, as I read it, I realized it could be of use in my decision."*[33]

5.32. The Tribunal notes that this third explanation required the "basis" for such additional documentary information to have been "in the record" of the Lago Agrio Court. Such information could not, therefore be entirely new, unfiled information. The eight materials at issue were new information. Accordingly, in the Tribunal's view, this third explanation must be discounted. The Tribunal also notes that the Lago Agrio Judgment itself states: "… the Presidency should only consider the elements that form part of the proceeding …". (see Annex 7 to this Part V below, Lines 41-42).

5.33. Whilst it is near-impossible to prove conclusively a negative, the Tribunal accepts, as the overwhelmingly probable explanation, that none of these eight materials had been filed with the Lago Agrio Court; that all were 'new' documents (without "a basis … in the record"); and that none were disclosed to or known by Chevron in the Lago Agrio Litigation, whether formally or informally. It is significant that all these materials favour the Lago Agrio Plaintiffs, not Chevron. It is also significant that the Respondent has not advanced any cogent explanation to this Tribunal, from any factual or expert witness, as to why these eight materials cannot be found in the record held by the Lago Agrio Court. It is also significant that the Respondent has not produced any of the disputed documents from the court record. At this point, the evidential burden of proof shifted to the Respondent. It was not discharged by the Respondent.

5.34. As explained below, the Tribunal finds, based on the evidence as a whole, that the contents of these unfiled materials were used by certain of the Lago Agrio representatives for the purpose of 'ghostwriting' the Lago Agrio Judgment.

5.35. *(1) The Clapp Report*: In brief, this document is a 37 page report of November 2006, drafted in Spanish by Dr Richard W. Clapp and others, as experts to the Lago Agrio Plaintiffs.[34] The report addresses the health impacts of TexPet's exploitation of the concession, concluding (inter alia) that soil and water samples indicated an excess of lead in the former Concession Area.

---

[33] C-1981, para 16.
[34] C-2423; R-1012.

5.36.   The Respondent accepts that the Clapp Report was used in the Lago Agrio Judgment. There is no evidence showing that this document was ever submitted by the Lago Agrio Plaintiffs to the Lago Agrio Court.

5.37.   Parts of the Clapp Report (not already covertly used by the Lago Agrio Plaintiffs' representatives in Annex K to the Cabrera Report) appear in Part 9 of the Lago Agrio Judgment in regard to contamination.[35] There is no evidence that these parts of the Clapp Report were submitted by the Lago Agrio Plaintiffs to the Lago Agrio Court. No such documentation can be found in the record of the Lago Agrio Court. The Respondent speculates that this unfiled documentation was informally submitted by the Lago Agrio Plaintiffs' representatives at a judicial inspection in April 2007. At that time, the judge of the Lago Agrio Court was Judge Yánez (not Judge Zambrano). There is no evidence to support such speculation; and the Tribunal does not accept it.

5.38.   Dr Leonard testified as to verbatim strings of words copied from the unfiled parts of the Clapp Report into the Lago Agrio Judgment, such as the latter's conclusion that oil and water samples indicated an excess of lead creating a real risk of lead poisoning.[36] That is self-evident from a comparison between page 7 of the Clapp Report and pages 109 to 110 of the Lago Agrio Judgment (in the original Spanish version): see Dr Leonard's Example 11 of his second expert report, reproduced below in Annex 8(1) to this Part V.

5.39.   These are also evident from Dr Leonard's Exhibit 5 in his second expert report, reproduced as Annex 9 to this Part V (pp. 116-117). It is a copy of the Lago Agrio Judgment highlighted to show strings of text and symbols which were copied from the Lago Agrio Plaintiffs' unfiled materials: for the Clapp Report (original pp. 109-110).

5.40.   The Tribunal concludes that material parts of the unfiled Clapp Report were used in the 'ghostwriting' of the Lago Agrio Judgment.

5.41.   *(2) The Draft Alegato:* In brief, this document is a draft Alegato ("argument") of 11 November 2010, drafted in Spanish ostensibly for submission to the Lago Agrio Court.[37] It is a different document from the Alegatos actually filed by the Lago Agrio

---

[35] C-931, Part 9, pp. 109-110.
[36] Leonard ER 2, Example 11, p. 34.
[37] C-1565.

# SA593

Plaintiffs with the Lago Agrio Court on 23 December 2010, 17 January 2011 and 1 February 2011.

5.42. There is no evidence that this draft Alegato was ever submitted by the Lago Agrio Plaintiffs to the Lago Agrio Court in the Lago Agrio Litigation.

5.43. In his expert testimony, Dr Leonard identified in the Lago Agrio Judgment several strings of texts and symbols in the unfiled draft Alegato that were not present in the filed Alegatos:[38] see his Example 14 in his second expert report comparing the unfiled draft Alegato (page 61) with the Lago Agrio Judgment (page 24) and the filed Final Alegato (page 99), reproduced in Annex 8(2) below.

5.44. These are also evident from Dr Leonard's Exhibit 5 in his second expert report, reproduced as Annex 9 to this Part V: for the unfiled Draft Alegato, see pp. 23-24 (original pp. 93-94).

5.45. The Tribunal concludes that material parts of the unfiled Draft Alegato were used in the 'ghostwriting' of the Lago Agrio Judgment.

5.46. *(3) The Erion Memorandum:* In brief, this document of 18 August 2008, attached to an email from Mr Erion to Mr Donziger of 11 November 2009, is a six-page research note, written in English by Mr Graham Erion, a US lawyer working as an intern with the Lago Agrio Plaintiff's legal representatives.[39] It addresses Chevron's case that it was not a proper defendant in the Lago Agrio Litigation because (inter alia) the "reverse triangular merger" between Chevron and Texaco maintained Texaco's separate corporate identity. The author analyses the factual materials and the principles of Delaware and other US laws on merger and on piercing the corporate veil by the Delaware Courts, as regards Texaco, TexPet and Chevron.

5.47. There is no evidence showing that this document was ever submitted by the Lago Agrio Plaintiffs to the Lago Agrio Court.

5.48. It is evident that parts of the Erion Memorandum are reproduced (in Spanish) in the draft judgment of 21 December 2010 (the "21/12 Providencias") on Judge Zambrano's Old

---

[38] Leonard ER 1, Exhibits A & C; Leonard ER 2, Exhibits 5 & 7.
[39] C-2416. (The Tribunal has seen no evidence connecting Mr Erion personally with any improper conduct alleged by the Claimants against the Lago Agrio Plaintiff's representatives).

Computer, including the citation to four US judgments from New Jersey and Oklahoma: see page 3 of the Erion Memorandum and page 16 of the 21/12 Providencias. Without citing the names of these US cases, the Lago Agrio Judgment refers to their principles on substance (over form), manifest injustice and patent injustice decided "by the Courts of the US" (pages 15- 16).

5.49.   In his expert testimony, Dr Leonard identified the use of the Erion Memorandum in the Lago Agrio Judgment: see the example comparing the Erion Memorandum (page 5), the "21/12 Providencias" (page 14) and the Lago Agrio Judgment (page 13), reproduced in Annex 8(3) below.

5.50.   The Tribunal concludes that material parts of the unfiled Erion Memorandum were used in the 'ghostwriting' of the Lago Agrio Judgment.

5.51.   *(4) The Fajardo Trust Email:* In brief, this document is a 1½ page email sent by Mr Fajardo to Messrs Prieto, Saenz and Donziger on 18 June 2009.[40] As explained in Part IV above, it also sets out an unidentified extract of text in Spanish from the decision of the Ecuadorian Supreme Court in *Andrade v Conelec* (No. 168-2007, of 11 April 2007), relating to the establishment of a trust to hold an award of damages made by a court.

5.52.   There is no evidence showing that any part of this document was ever submitted by the Lago Agrio Plaintiffs to the Lago Agrio Court in the Lago Agrio Litigation.

5.53.   As Dr Leonard testified, the email contains errors, misquotations, miscitations and strings of words that are to be found, verbatim, in the Lago Agrio Judgment but not in the official report of the *Andrade* judgment.[41] That is evident from a comparison between the first page of the email and page 186 of the Lago Agrio Judgment: see Annex 8(4) below, reproducing Dr Leonard's Example 9 from his second expert report.

5.54.   These are also evident from Dr Leonard's Exhibit 5 in his second expert report, reproduced as Annex 9 to this Part V: for the unfiled Fajardo Trust Email, see page 110 (original p 186).

---

[40] C-997; C-1216.
[41] Leonard ER 2, Example 10, p. 32.

Case 1:18-855, Document 85, 03/11/2019, 2515660, Page308 of 309

# SA595

5.55. The Respondent's explanation for this coincidence is that both Mr Fajardo and Judge Zambrano were coincidentally working from an unofficial version of the Supreme Court's judgment, even where, in the same Lago Agrio Judgment, Judge Zambrano cites the official version of that Supreme Court judgment. The Respondent's explanation is speculation unsupported by any cogent evidence. It is not accepted by the Tribunal.

5.56. The Tribunal concludes that material parts of the unfiled Fajardo Trust Email were used in the 'ghostwriting' of the Lago Agrio Judgment.

5.57. *(5) The Fusión Memorandum:* In brief, this document is a 20-page memorandum in the Spanish language that appears to have been drafted on or shortly before 15 November 2007. It was sent by email dated 15 November 2007 from Mr Sáenz to (inter alios) Messrs Donziger, Ponce and Prieto.[42] The memorandum (inter alia) describes: (i) the factual nature of the relationship between Texaco Inc and Texpet; and (ii) the nature of the "merger" between Texaco and Chevron.

5.58. As Dr Leonard testified, substantial parts of the Fusión Memorandum appear verbatim in the Lago Agrio Judgment.[43] The Judgment shares the same identical or near-identical strings of more than 90 words; the same idiosyncratic use of shorthand references; and out-of-order numerical ordering. That is evident from pages 20, 21 and 24 of the Lago Agrio Judgment: see Annex 8(5) below, reproducing Example 1 to Dr Leonard's second expert report (comparing page 8 of the Fusión Memorandum and page 24 of the Lago Agrio Judgment). It is also evident (as regards out-of-order numbering) at page 5 of the Fusión Memorandum and page 21 of the Lago Agrio Judgment (re "6964")[44] see also Annex 8(5) below.

5.59. It is also evident from Dr Leonard's Exhibit 5 in his second expert report, reproduced as Annex 9 to this Part V: for the Fusión Memorandum, see pages 90-92 and 94-95 (original pp. 20, 21, 22, 24 & 25).

5.60. The Respondent does not dispute that the Fusión Memorandum was used in the Lago Agrio Judgment. It contends, however, that its subject-matter, i.e. the "merger" between

---

[42] C-2118.
[43] Leonard ER 2, pp. 14-18.
[44] Leonard ER 2, p. 18.