# 18-855-cv(L)

**18-2191-cv(Con)**

## United States Court of Appeals
### *for the*
## Second Circuit

CHEVRON CORPORATION,

*Plaintiff-Counter-Defendant-Appellee*,

- v. -

DONZIGER & ASSOCIATES, PLLC, STEVEN DONZIGER,
THE LAW OFFICES OF STEVEN R. DONZIGER,

*Defendants-Counter-Claimants-Appellants*.

*(caption continued on inside cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
CASE NO. 1:11-CV-00691-LAK-JCF
THE HONORABLE LEWIS A. KAPLAN

**SUPPLEMENTAL APPENDIX
VOLUME III OF IV
(Pages SA596 to SA895)**

Randy M. Mastro
Andrea E. Neuman
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

William E. Thomson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7000

*Attorneys for Chevron Corporation*

PABLO FAJARDO MENDOZA, LUIS YANZA, FRENTE DE DEFENSA DE LA AMAZONIA, AKA AMAZON DEFENSE FRONT, SELVA VIVA SELVIVA CIA, LTDA, MARIA AGUINDA SALAZAR, CARLOS GREFA HUATATOCA, CATALINA ANTONIA AGUINDA SALAZAR, LIDIA ALEXANDRA AGUIN AGUINDA, PATRICIO ALBERTO CHIMBO YUMBO, CLIDE RAMIRO AGUINDA AGUINDA, LUIS ARMANDO CHIMBO YUMBO, BEATRIZ MERCEDES GREFA TANGUILA, LUCIO ENRIQUE GREFA TANGUILA, PATRICIO WILSON AGUINDA AGUINDA, CELIA IRENE VIVEROS CUSANGUA, FRANCISCO MATIAS ALVARADO YUMBO, FRANCISCO ALVARADO YUMBO, OLGA GLORIA GREFA CERDA, LORENZO JOSE ALVARADO YUMBO, NARCISA AIDA TANGUILA NARVAEZ, BERTHA ANTONIA YUMBO TANGUILA, GLORIA LUCRECIA TANGUI GREFA, FRANCISCO VICTOR TANGUILA GREFA, ROSA TERESA CHIMBO TANGUILA, JOSE GABRIEL REVELO LLORE, MARIA CLELIA REASCOS REVELO, MARIA MAGDALENA RODRI BARCENES, HUGO GERARDO CAMACHO NARANJO, JOSE MIGUEL IPIALES CHICAIZA, HELEODORO PATARON GUARACA, LUISA DELIA TANGUILA NARVAEZ, LOURDES BEATRIZ CHIMBO TANGUIL, MARIA HORTENCIA VIVER CUSANGUA, SEGUNDO ANGEL AMANTA MILAN, OCTAVIO ISMAEL CORDOVA HUANCA, ELIAS ROBERTO PIYAHUA PAYAHUAJE, JAVIER PIAGUAJE PAYAGUAJE, DANIEL CARLOS LUSITAND YAIGUAJE, BENANCIO FREDY CHIMBO GREFA, GUILLERMO VICENTE PAYAGUA LUSITANTE, DELFIN LEONIDAS PAYAGU PAYAGUAJE, ALFREDO DONALDO PAYAGUA PAYAGUAJE, MIGUEL MARIO PAYAGUAJE PAYAGUAJE, TEODORO GONZALOPIAGUAJE PAYAGUAJE, FERMIN PIAGUAJE PAYAGUAJE, REINALDO LUSITANDE YAIGUAJE, LUIS AGUSTIN PAYAGUA PIAGUAJE, EMILIO MARTIN LUSITAND YAIGUAJE, SIMON LUSITANDE YAIGUAJE, ARMANDO WILMER PIAGUAJE PAYAGUAJE, ANGEL JUSTINO PIAGUAG LUCITANT, KEMPERI BAIHUA HUANI, AHUA BAIHUA CAIGA, PENTIBO BAIHUA MIIPO, DABOTA TEGA HUANI, AHUAME HUANI BAIHUA, APARA QUEMPERI YATE, BAI BAIHUA MIIPO, BEBANCA TEGA HUANI, COMITA HUANI YATE, COPE TEGA HUANI, EHUENGUINTO TEGA, GAWARE TEGA HUANI, MARTIN BAIHUA MIIPO, MENCAY BAIHUA TEGA, MENEMO HUANI BAIHUA, MIIPO YATEHUE KEMPERI, MINIHUA HUANI YATE, NAMA BAIHUA HUANI, NAMO HUANI YATE, OMARI APICA HUANI, OMENE BAIHUA HUANI, YEHUA TEGA HUANI, WAGUI COBA HUANI, WEICA APICA HUANI, TEPAA QUIMONTARI WAIWA, NENQUIMO VENANCIO NIHUA, COMPA GUIQUITA, CONTA NENQUIMO QUIMONTARI, DANIEL EHUENGEI, NANTOQUI NENQUIMO, OKATA QUIPA NIHUA, CAI BAIHUA QUEMPERI, OMAYIHUE BAIHUA, TAPARE AHUA YETE, TEWEYENE LUCIANA NAM TEGA, ABAMO OMENE, ONENCA ENOMENGA, PEGO ENOMENGA, WANE IMA, WINA ENOMENGA, CAHUIYA OMACA, MIMA YETI,

     *Defendants*,

STRATUS CONSULTING, INC., DOUGLAS BELTMAN, ANN MAEST,

     *Defendants-Counter-Claimants*,

ANDREW WOODS, LAURA J. GARR, H5,

     *Respondents*.

# TABLE OF CONTENTS

PAGE

## Docket Entries

Exhibit 2-13 to Declaration of Kristen L. Hendricks in Support of
Chevron Corporation's Motion for Preliminary Injunction, filed
February 6, 2011 (Dkt. 7-6)

Transcript of unreleased footage from the film *Crude* ...................... SA1

Exhibit 2075 to Declaration of Anne Champion in Support of
Chevron Corporation's Motion for Summary Judgment of Partial
Summary Judgment on Defendants' Affirmative Defenses of Res
Judicata and Collateral Estoppel, filed March 2, 2012 (Dkt. 400-
11)

Excerpts from Daniel L. Rourke deposition transcript, dated
December 20, 2010........................................................................ SA11

Excerpts from Chevron Corporation's Statement of Material Facts In
Support of Motion for Summary Judgment or Partial Summary
Judgment on the Stratus Defendants' Affirmative Defenses of
Res Judicata and Collateral Estoppel, filed June 13, 2012
(Dkt. 486) ..................................................................... SA15

Opinion on Partial Summary Judgment Motion, filed July 31, 2012
(Dkt. 550) ..................................................................... SA18

Order of Appointment of Special Masters, filed March 26, 2013
(Dkt. 942) ..................................................................... SA20

Notice of Appearance of Zoe B. Littlepage, filed October 13, 2013
(Dkt. 1543) ..................................................................... SA23

Exhibit A to Chevron Corporation's Notice of Filing of Witness
Statement of Troy A. Dahlberg, filed October 23, 2013 (Dkt.
1597-1)

ii

PAGE

Direct testimony of Troy A. Dahlberg, dated October 8, 2013 ........ SA24

Notice of Appearance of Richard H. Friedman, filed October 24, 2013
(Dkt. 1616).................................................................................... SA30

Chevron Corporation's Notice of Application for Costs, filed
December 5, 2016 (Dkt. 1918)...................................................... SA31

Chevron Corporation's Statement of Non-Opposition to Donziger's
Motion to Hold Costs Bill in Abeyance, filed on December 29,
2016 (Dkt. 1920) .......................................................................... SA33

Order Granting in Part Donziger's Motion to Hold Chevron's Bill of
Costs in Abeyance, filed December 30, 2016 (Dkt. 1921)................ SA35

Memorandum Order Granting Chevron Corporation's Motion to
Reactivate Motion for Attorneys' Fees and Bill of Costs, filed
July 17, 2017 (Dkt. 1923)............................................................. SA37

Chevron Corporation's Notice of Application for Costs, filed July 18,
2017 (Dkt. 1924) .......................................................................... SA38

Donziger's Letter to Clerk of Court Objecting to Notice of
Application for Costs, filed August 1, 2017 (Dkt. 1925)................. SA40

Bill of Costs, filed August 8, 2017 (Dkt. 1928)...................................... SA47

Donziger's Letter to Court Objecting to Clerk's Taxation of Costs,
filed August 16, 2017 (Dkt. 1931) ................................................. SA58

Order Regarding Special Masters' Report, filed November 9, 2017
(Dkt. 1939).................................................................................... SA64

Memorandum and Order Regarding Reasonableness of Special Master
Fees, filed December 6, 2017 (Dkt. 1940)...................................... SA66

Donziger's Objections to Notice of Taxation of Costs, filed December
6, 2017 (Dkt. 1941) ...................................................................... SA69

iii

Special Masters' Final Report and Recommendation on Allocation of Their Fees and Costs, filed December 8, 2017 (Dkt. 1942) .............. SA81

Exhibit A to Declaration of William E. Thomson in Support of Chevron Corporation's Response to Steven Donziger's December 6, 2017 Letter Objecting to the Fees of the Special Masters, filed December 13, 2017 (Dkt. 1945-1)

Declaration of the Affected Nationalities in the Province of Sucumbios, dated August 20, 2016 ................................................ SA97

Order Adopting Special Masters' Final Report and Recommendation, filed December 27, 2017 (Dkt. 1946) .............................................SA105

Donziger's Letter to Court Objecting to December 27, 2017 Order, filed December 28, 2017 (Dkt. 1947) .............................................SA106

Declaration of Joseph M. Kay, filed January 9, 2018 (Dkt. 1949)...........SA110

Corrected Memorandum Opinion Granting In Part and Denying In Part Donziger's Motion to Review the Taxation of Costs, filed March 1, 2018 (Dkt. 1963) ...........................................................SA112

Chevron Corporation's Memorandum of Law in Support of Its Ex Parte Application By Order To Show Cause For Discovery and a Preservation Order in Furtherance of This Court's March 4, 2014 Judgment and to Set a Hearing Date Subsequent to That Discovery on Chevron's Application to Have Steven Donziger Held in Contempt, filed on March 19, 2018 (Dkt. 1966).................SA160

Order to Show Cause and Preservation Order in Furtherance of This Court's March 4, 2014 Judgment and Application to Have Steven Donziger Held in Contempt, filed March 19, 2018 (Dkt. 1968) ........................................................................................SA184

Clerk's Certificate of Default, filed April 18, 2018 (Dkt. 1984) .............SA188

iv

PAGE

Opposition to Chevron's Application for Contempt and Related
    Discovery, filed April 24, 2018 (Dkt. 1986)....................................SA191

Chevron Corporation's Reply Memorandum of Law in Support of Its
    Ex Parte Application By Order To Show Cause For Discovery
    and a Preservation Order in Furtherance of This Court's March
    4, 2014 Judgment and to Set a Hearing Date Subsequent to That
    Discovery on Chevron's Application to Have Steven Donziger
    Held in Contempt, filed on May 4, 2018 (Dkt. 1987).....................SA201

Chevron Corporation's Motion to Compel Donziger to Respond to
    Post-Judgment Discovery Requests, filed on May 4, 2018
    (Dkt. 1989).....................................................................................SA215

Exhibit 2 to Chevron Corporation's Motion to Compel Donziger to
    Respond to Post-Judgment Discovery Requests, filed May 4,
    2018 (Dkt. 1989-2)

    Letter from Steven Donziger to Randy Mastro, dated April 30,
    2018 ...............................................................................................SA222

Donziger's Opposition to Motion to Compel, filed May 10, 2018
    (Dkt. 2002).....................................................................................SA232

Order on Motion to Compel Post-Judgment Discovery, filed May 17,
    2018 (Dkt. 2009) ...........................................................................SA236

Attachment to Chevron Corporation's Letter to Court Regarding
    Canadian Appellate Decision, filed May 24, 2018 (Dkt. 2015-1)

    Decision of Court of Appeal for Ontario, dated May 23, 2018........SA241

Donziger's Motion for Declaratory Relief and Motion to Dismiss
    Plaintiff's Application to Hold Donziger in Contempt for
    "Profiting" From The Ecuadorian Environmental Judgment, filed
    May 31, 2018 (Dkt. 2018)..............................................................SA296

v

PAGE

Motion for an Emergency Administrative Stay of Provision 1(c) the
    Court's Discovery Order Until the Court Has Received Briefing
    and Decided Donziger's Pending Motion for a Protective Order,
    filed June 19, 2018 (Dkt. 2028) ....................................................SA308

Order Denying Donziger's Motions for Declaratory Judgment,
    Protective Order, and Administrative Stay, filed June 25, 2018
    (Dkt. 2037)....................................................................................SA313

Chevron Corporation's Second Motion to Compel Donziger to
    Respond to Post-Judgment Discovery Requests, filed August 16,
    2018 (Dkt. 2073) ..........................................................................SA314

Donziger Letter to Court Regarding August 15, 2018 Order, filed
    August 20, 2018 (Dkt. 2075) ........................................................SA321

Attachment to Chevron Corporation's Letter to Court Regarding BIT
    Decision, filed September 14, 2018 (Dkt. 2082-1)

    Second Partial Award on Track II, dated August 30, 2018..............SA322

Chevron Corporation's Memorandum of Law in Support of Its Motion
    to Hold Steven Donziger, the Law Office of Steven R. Donziger,
    and Donziger Associates, PLLC in Contempt of Court For Their
    Failure to Comply With the RICO and Default Judgments and
    the April 16, 2018 Restraining Notice, filed October 24, 2018
    (Dkt. 2113)....................................................................................SA844

Exhibit 2 to Declaration of Anne Champion in Support of Chevron
    Corporation's Motion to Hold Donziger in Contempt, filed
    October 24, 2018 (Dkt. 2114-1)

    Excerpts from deposition transcript of Steven R. Donziger, dated
    June 25, 2018 ................................................................................SA890

Donziger's Letter to Court Regarding February 21, 2019 Order, filed
    March 1, 2019 (Dkt. 2169) ...........................................................SA893

vi

PAGE

Order of Appointment Regarding Neutral Forensic Expert, filed
March 5, 2019 (Dkt. 2170) ...........................................................SA896

Memorandum re Forensic Inspection Protocol, filed March 5, 2019
(Dkt. 2171).................................................................................SA898

Forensic Inspection Protocol, filed March 5, 2019 (Dkt. 2172) ..............SA914

Order Granting Request For Oversized Brief, No. 14-826, filed June
26, 2014 (Dkt. 77) ......................................................................SA963

Corrected Brief of Defendants-Appellants Steven Donziger, The Law
Offices of Steven Donziger, and Donziger & Associates PLLC,
No. 14-826, filed July 16, 2014 (Dkt. 150).....................................SA965

Testimony of Charles Calmbacher, No. 14-826, filed October 1, 2014
(Dkt. 185-5) ...............................................................................SA1100

Response to Statements By Mr. Cabrera Regarding Alleged Impacts
to Water Resources in the Petroecuador-Texaco Concession
Area, No. 14-826, filed October 1, 2014 (Dkt. 217-3) ..................SA1102

Corrected Reply Brief of Defendants-Appellants Steven Donziger,
The Law Offices of Steven Donziger, and Donziger &
Associates PLLC, No. 14-826, filed January 6, 2015 (Dkt. 317)...SA1105

Texaco and Chevron, was debated between the parties during the judicial inspection on 12 June 2008.[45]

5.61. At that time, the Lago Agrio Litigation was assigned to Judge Novillo (not Judge Zambrano). No evidence supporting the document's use exists in any of the email messages passing between the Lago Agrio plaintiffs' representatives at the time of this judicial inspection, where the documents to be submitted to the Lago Agrio Court were being considered by them, including documentation on "fusión". In none of these messages dated 9 June 2008, passing between Mr Donziger, Mr Sáenz and Mr Erion is the Fusión Memorandum listed amongst those documents.[46] Further, the Fusión Memorandum does not appear in the Lago Agrio Court's formal protocol and acta recording documentation submitted by the parties during this judicial inspection.[47]

5.62. If the Fusión Memorandum was nonetheless then informally submitted to the Lago Court by the Lago Agrio Plaintiffs' representatives and unrecorded, it is significant that no witness from the Lago Agrio Court was called by the Respondent to support the suggestion made by the Respondent. In the circumstances, that suggestion remains unproven speculation. It is not accepted by the Tribunal.

5.63. The Tribunal concludes that material parts of the unfiled Fusión Memorandum were used in the 'ghostwriting' of the Lago Agrio Judgment.

5.64. *(6) The January and June Index Summaries:* In brief, these materials in the form of Excel spreadsheets, of 39 pages and 191 pages respectively, comprise tables identifying documents filed in the court record of the Lago Agrio Litigation, prepared internally by the Lago Agrio Plaintiffs' representatives in January 2007 and June 2007 respectively.[48]

5.65. There is no evidence that these Index Summaries were submitted by the Lago Agrio Plaintiffs to the Lago Agrio Court in the Lago Agrio Litigation. Neither can be found in the record of the Lago Agrio Court in any form.

5.66. In his expert testimony, Dr Leonard testified that he found multiple examples of identical errors, identical or near-identical words strings and incorrect citations in these

---

[45] Track II Hearing D1.329.
[46] C-1638; C-1639 & C-1640.
[47] R-530; R-660.
[48] C-1800 (January); C-2315 (June).

SA597

Index Summaries that were repeated in the Lago Agrio Judgment.[49] For example, the court record refers to "75003" whereas both the June Index Summary and the Lago Agrio Judgment (at pp. 142 and 150) refer mistakenly to "75013".[50] Annex 8(6) below reproduces Example 7 from Dr Leonard's second expert report, comparing identical or near-identical word strings in the unfiled Index Summaries and the Lago Agrio Judgment with the filed record.

5.67.   These are also evident from Dr Leonard's Exhibit 5 in his second expert report, reproduced as Annex 9 to this Part V: for the Index Summaries, see pages 88-89, 96-97, and 100-109 (original pp. 6, 7, 100, 101, 114, 127, 128, 129, 133, 137, 138, 142, 146 & 150).

5.68.   In his testimony at the RICO trial in New York, Dr Zambrano admitted that he did not know what an Excel spreadsheet was.[51] The actual use, or non-use, of Excel on the Zambrano Computers is considered in Part VI below. These evidential materials confirm that Dr Zambrano did not himself use the January and June Index Summaries, notwithstanding their use in the Lago Agrio Judgment.

5.69.   The Tribunal concludes that material parts of the unfiled January and June Index Summaries were used in the 'ghostwriting' of the Lago Agrio Judgment.

5.70.   *(7) The Moodie Memorandum:* In brief, this document is a 13-page memorandum in English, headed "The standard of proof in US common-law toxic tort negligence claims."[52] It was sent by Mr Nicholas Moodie, an Australian legal intern working with the Lago Agrio Plaintiffs' representatives, to Mr Prieto and Mr Saenz on 2 February 2009.[53] In this memorandum, Mr Moodie analyses Californian and Australian case law regarding causation and burden of proof in medical tort cases and considers how the tests identified in such case law might be applied to Chevron in the Lago Agrio Litigation.

---

[49] Leonard ER 2, pp. 22-30 & Exhibit 4, pp. 10-20.
[50] Leonard ER 2, p. 29.
[51] C-1979, p. 278.
[52] C-1645.
[53] C-1645, p. 1. (The Tribunal has seen no evidence connecting Mr Moodie personally with any improper conduct alleged by the Claimants against the Lago Agrio Plaintiff's representatives).

# SA598

5.71.   The Moodie Memorandum's particular use of the "substantial factor" test for causation in asbestos cases under Californian law is repeated in parts of the Lago Agrio Judgment (pp. 89-90). Annex 8(7) below reproduces these passages.

5.72.   As Professor Michael Green testified, this "substantial factor" test and other features taken from Californian law make it at least highly unlikely that the passages in the Lago Agrio Judgment were prepared independently of the Moodie Memorandum.[54]

5.73.   As to the Moodie Memorandum's use of Australian law, Mr James Spigelman AC QC (formerly the Chief Justice of New South Wales) testified that the Memorandum's particular descriptions of Australian case law were inapposite as a matter of Australian law; yet the same inapposite factors were used in the Lago Agrio Judgment, using identical language (allowing for translation).[55]

5.74.   Professor Green also referred to the idiosyncratic use of two common law jurisdictions for the purpose of applying principles of Ecuadorian law, a civil law system, in the Lago Agrio Judgment.

5.75.   The Tribunal concludes that material parts of the unfiled Moodie Memorandum were used in the 'ghostwriting' of the Lago Agrio Judgment.

5.76.   *(8) The Selva Viva Database:* In brief, the compilation of this electronic database[56] was substantially completed by Hydrosphere Resource Consultants, a contractor working with E-Tech and Stratus Consulting, both acting as environmental experts for the Lago Agrio Plaintiffs. Hydrosphere was asked to digitise data in electronic from hard copy documentation, principally inspection reports, soil samples and water samples, for use by the Lago Agrio Plaintiffs' legal representatives. The database was created in about April-June 2007 by Ms Laura Belanger, Mr John Rodgers and several others in Ecuador and Boulder, Colorado. It was delivered to Dr Anne Maest (of Stratus Consulting) and Mr Donziger.[57] It was then completed and maintained for the Lago Agrio Plaintiffs by Selva Viva, the company controlled by certain of the Lago Agrio Plaintiffs' representatives. It comprises three Excel spreadsheets.

---

[54] C-1646, paras 19-20.
[55] C-1647, paras 8-21.
[56] C-2316.
[57] C-1224, pp. 47ff.

5.77. The Respondent accepts that the Silva Viva Database was used in the Lago Agrio Judgment. There is no evidence showing that this material was ever submitted by the Lago Agrio Plaintiffs to the Lago Agrio Court.

5.78. The Respondent's speculation that the database was submitted to the Lago Agrio Court informally during a judicial inspection is unsupported by any evidence. The Tribunal has noted the evidence of Mr Rosero who sought to copy the CDs and DVDs in the record of the Lago Agrio Court and found that 11 of these devices could not be duplicated or read.[58] These 11 devices were all submitted to the Lago Agrio Court on behalf of Chevron and not the Lago Agrio Plaintiffs' representatives. Thus, contrary to the Respondent's submission, these files do not show that Dr Juola's analysis of the court record was incomplete and therefore unreliable.

5.79. The Claimants allege that there are numerous irregular commonalities between the Selva Viva Database and the Lago Agrio Judgment that are not consistent with any data filed with the Lago Agrio Court. The Claimants allege that these commonalities can only be explained by the copying of the unfiled database into the Judgment, i.e. 'ghostwriting'. Their allegations depend upon the expert evidence summarised below.

5.80. Mr Spencer Lynch (of Stroz Friedberg) is an expert in digital forensics. He was called by the Claimants. In his first expert report, Mr Lynch compared the environmental data at pages 101 – 112 of the Lago Agrio Judgment with the "Filed Lab Results in the official court record" and with the "Unfiled Selva Viva Database".

5.81. Mr Lynch identified nine categories of naming and data irregularities:[59]

> *"[i] SV and TX Suffixes – Many of the sampling results set forth in the Judgment on pages 104 through 112 end with the suffix "_sv" or "_tx." However, a review of the Judicial Inspection Reports and Filed Lab Results provided to me did not identify a single sample result referenced in this manner. In contrast, a review of the data within the Unfiled Selva Viva Data Compilation showed that a majority of the sampling results referenced in the reviewed portion of the Judgment contained these "_sv" or "_tx" suffixes. Figures 1 and 2 show examples of data in the Filed Lab Results and the Unfiled Selva Viva Data Compilation, respectively. Figure 3 shows a list of sampling results extracted from the Judgment where the names*

---

[58] R-1176; C-2424.
[59] Lynch ER 1, paras 58-70.

# SA600

*match the Unfiled Selva Viva Data Compilation but do not match any of the Filed Lab Results.*

*[ii] <u>Parentheses Placement</u> – Further review of the sampling results listed in the Judgment show another naming convention used in the Unfiled Selva Viva Data Compilation but not in the Filed Lab Results. Both the Judgment and the Unfiled Selva Viva Data Compilation used a naming convention ending with numeric ranges and an "m" or "cm" enclosed within parentheses. In contrast, the Filed Lab Results in the court record used a naming convention that ended with numeric ranges in parentheses, followed by an "m" or "cm" outside of the parentheses. Figures 4 and 5 show data for the same inspection location from the Filed Lab Results and the Unfiled Selva Viva Data Compilation. Figure 6 shows a comparison of the affected names across these data sources and the Judgment.*

*[iii] <u>Underscore Separators</u> – Stroz Friedberg found another naming irregularity in the Judgment that shows its reliance on the Unfiled Selva Viva Data Compilation. When discussing benzene results on page 108, the Judgment referred to sample result "SA_13_JI_AM1_0.1M." This name contained underscores between various parts of the title, and this naming format matches that used in the Unfiled Selva Viva Data Compilation. In contrast, the Filed Lab Results contained no such underscores. Instead, data for the SA13 sample clearly shows dashes used as separators within the title of the sample result. Figures 7 and 8 show the data for this sample in the Filed Lab Results and the Unfiled Selva Viva Data Compilation, respectively.*

*[iv] <u>Incorrectly Identified Expert</u> – Finally, page 108 of the Judgment stated, "Chevron's expert, John Connor, submitted results showing 9.9 and 2.3 mg/Kg (see samples JL-LAC-PIT1-SD2-SU1.R (1.30-1.90) M y JI-LAC-PIT1-SD1-SU1-R (1.6-2.4)M) during the judicial inspection in Lago Agrio Central…" (from translation). The Unfiled Selva Viva Data Compilation also shows John Connor as the examiner responsible for that test data. However, the Judicial Inspection Report filed with the Court shows Professor Fernando Morales as Chevron's expert for that inspection, not John Connor.*

    …

*[v] <u>Non-Detects</u> – Based on data that Stroz Friedberg has reviewed in this case, I am aware that some environmental sampling procedures have a detection limit based on the equipment, the methods used in the sampling procedure, and/or the substance being tested. Samples under a detection limit often are referred to as a "non-detect" and, when a non-detect is recorded, it often is shown as a less-than sign ("<") followed by a number that represents the minimum concentration of a substance that can be detected by the applied test or sampling method. In this case, the Filed Lab Results show that the concentrations of mercury for various inspection sites were recorded as non-detects, and expressed as "<7." The Judgment, however, dropped the "<" and failed to acknowledge that the level of mercury fell below detectible levels for several sites. Instead, the Court stated in its decision that "alarming levels of mercury have been found" with "several samples reaching 7mg/Kg" of mercury."*

# SA601

*The evidence again revealed that the Court likely relied on and subsequently misinterpreted the Unfiled Selva Viva Data Compilation, rather than relying on the Filed Lab Results submitted with the Judicial Inspection Reports. The Unfiled Selva Viva Data Compilation placed the "<" in a separate column, as described in the email thread dated March 4, 2008 and found in the SN 049997-SN 050000.pdf. The Unfiled Selva Viva Data Compilation listed the "7" in its own column, and the Court appeared to have misinterpreted this as the actual concentration of mercury for various sites. In doing so, the Judgment eliminated any non-detect results and made mercury levels appear higher and more certain than the actual filed results. The Judgment appears to have made the same mistake with respect to concentrations of benzene and toluene at other sites. Figures 9 and 10 show an example of the Filed Lab Results versus the spreadsheets from the Unfiled Selva Viva Data Compilation. Figure 11 shows a comparison of the non-detects located in the Unfiled Selva Viva Data Compilation and the Filed Lab Results relative to how they appear in the Judgment.*

*[vi] <u>Milligram (mg) vs. Microgram (µg)</u> – While comparing data points, Stroz Friedberg observed instances where concentrations of substances at specific sites were listed in both the Judgment and the Unfiled Selva Viva Data Compilation as milligrams per kilogram (mg/Kg). However, the Filed Lab Results indicate that concentrations for those same substances and sites should have been listed as micrograms per kilogram (µg/Kg) – a thousand times less concentrated than the levels reported in the Judgment. Again, the Unfiled Selva Viva Data Compilation appears to be the source of the erroneous information cited. Figures 12 and 13 show examples of the Filed Lab Results and corresponding data from the Unfiled Selva Viva Data Compilation. Figure 14 shows a comparison of the concentrations referenced in the Judgment and data for those sites reflected in the Filed Lab Results and the Unfiled Selva Viva Data Compilation, respectively.*

*...*

*[vii] <u>Chevron TPH Results</u> – On page 102 of the Judgment, the author referred to 1,984 TPH test results "… brought by the defendants' experts…." Based on Stroz Friedberg's review of The Connor Report and Anexo B to the Cabrera Report, this number appears to be too high. Those reports indicate that between 932 and 964 soil samples were taken by Chevron. An examination of the Unfiled Selva Viva Data Compilation confirmed that 1,984 was inaccurate and based on the Unfiled Selva Viva Data Compilation and not documents filed with the Court. In short, the Unfiled Selva Viva Data Compilation broke the TPH results down into two parts, and the Judgment appears to have made the mistake of double-counting these test results. Stroz Friedberg found this error when it sorted the Unfiled Selva Viva Data Compilation by the following columns and unique entries: "Fuente de datos" (Texaco); "Matriz" (Suelo); and "Parametro" ("Begins with" TPH). This sorting had the effect of limiting results to soil samples attributed to Chevron and analyzed for TPH. When Stroz Friedberg did this sorting, it found that the count of all Chevron's TPH test results in the Unfiled Selva Viva Data Compilation equaled the number cited in the Judgment – 1,984. However, the TPH results in the Unfiled Selva Viva Data Compilation contained two parts – one row for Diesel Range*

# SA602

*Organics (DRO) readings and one row for Gasoline Range Organics (GRO) readings (See Figure 15).*

*The Judgment stated that DRO and GRO readings "have to be added up to in order to have a relatively comparable equivalence with TPHs." However, to reach 1,984 TPH results for Chevron, it is necessary to count the DRO and GRO readings for the same sample as separate TPH results. The resulting 1,984 number was inconsistent with the court record because, when Stroz Friedberg counted just the TPH results from the Filed Lab Results in the record, it arrived at a number (935) that was approximately half that of the number cited in the Judgment and generally consistent with the counts given in The Connor Report (932) and Anexo B to the Cabrera Report (964). Based on this analysis, Stroz Friedberg concludes that the most likely reason the Judgment effectively double counted most of Chevron's TPH results was its author's reliance on the Unfiled Selva Viva Data Compilation, where the DRO and GRO readings for Chevron appeared in separate rows.*

*[viii] Lago Agrio Plaintiff TPH Results – In addition to the erroneous reporting of 1,984 Chevron TPH results described above, the Judgment inaccurately counted the Lago Agrio plaintiffs' TPH results, again based on its apparent reliance on the Unfiled Selva Viva Data Compilation. When discussing TPH levels, the Judgment stated, in part, "[t]he plaintiffs' expert have submitted 420 results" for TPH soil sample. Stroz Friedberg again found that this number was overstated. As a preliminary matter, The Connor Report and Anexo B to the Cabrera Report indicate that between 308 and 339 soil samples were taken by the plaintiffs. To perform the analysis, Stroz Friedberg reviewed entries associated with the plaintiffs' data in the Unfiled Selva Viva Data Compilation. Stroz Friedberg sorted the data first on the column and unique item labeled "Fuente de datos" (Demandantes), then on "Matriz" (Suelo), and finally on "Parametro" ("Begins with" TPH). This sorting had the effect of limiting results to soil samples attributed to the Lago Agrio plaintiffs and analyzed for TPH. This yielded 420 results, thereby showing a match between the Unfiled Selva Viva Data Compilation and the Judgment. Once again, there were many instances where DRO and GRO tests were counted as individual results, rather than being combined to represent one TPH value. Further distorting plaintiffs' numbers in the Judgment, some test sites in the Unfiled Selva Viva Data Compilation listed both the DRO and GRO individual tests, as well as a separate TPH value that combined these two tests. Figure 16 shows an example of this data extracted from the Unfiled Selva Viva Data Compilation. Based on this analysis, Stroz Friedberg concludes that reliance on the Unfiled Selva Viva Data Compilation resulted in a substantial over counting of the plaintiffs' test results within the Judgment.*

*[ix] Computed Percentages – The erroneous TPH counts in the Judgment had the additional effect of distorting the sample percentages listed in the decision. Stroz Friedberg was able to use the "DA00000040.xls" spreadsheet containing the Unfiled Selva Viva Data Compilation to reproduce the percentages listed in the Judgment. Stroz Friedberg did so by sorting the Unfiled Selva Viva Data Compilation spreadsheet to represent the three groups of "Texaco," "Demandantes," and "Corte," removing any reference to "Cabrera" from the Perito column, and then grouping by the three categories discussed in the Judgment*

# SA603

*(<1000, 1000-5000, >5000). Stroz Friedberg then divided the sums in each of these columns by the inaccurate TPH counts listed in the Judgment. The percentages listed in the Judgment, along with the percentages computed using the Unfiled Selva Viva Data Compilation, are shown in Figure 17. The percentages are almost identical, and any slight differences between the Judgment and the Unfiled Selva Viva Data Compilation appear to be due to variations in decimal rounding."*

5.82. For the reasons set out in his expert report, Mr Lynch concluded:[60]

*"Analysis of the 2011 Judgment indicates that it was derived from material not filed with the Court in the Lago Agrio litigation in Ecuador. Over 100 specific and repeated naming and data irregularities indicate that the data points cited in the 2011 Judgment were copied, cut-and-pasted, or otherwise taken directly from the Unfiled Selva Viva Data Compilation. Other forensic evidence shows that it is highly unlikely that the TPH counts, statistical percentages, or pit counts discussed in this report and cited in the 2011 Judgment were independently derived from the Filed Lab Results."*

5.83. Mr Lynch's report replaced the earlier reports of Mr Michael L. Younger (also of Stroz Friedberg), who had also earlier testified as an expert in digital forensics called by the Claimants and concluded that the Selva Viva database contains errors and commonalities that are to be found in the Lago Agrio Judgment.[61] (Mr Younger withdrew on grounds of ill-health; and his expert testimony was adopted by Mr Lynch, his replacement).

5.84. The Tribunal concludes that material parts of the Selva Viva Database were used in the 'ghostwriting' of the Lago Agrio Judgment.

5.85. In summary, the Tribunal finds that Lago Agrio Judgment made improper use of these eight unfiled materials in the possession of the Lago Agrio Plaintiffs' representatives. Based on the evidence adduced before this Tribunal, the Tribunal finds that such use resulted from the corrupt conduct of Judge Zambrano in permitting certain of the Lago Agrio Plaintiffs' representatives to 'ghostwrite' material parts of the Lago Agrio Judgment.

### E: The Lago Agrio Judgment – Forensic Linguistics

5.86. Professor Gerald R. McMenamin, called by the Claimants, is a specialist expert in forensic linguistics, including Spanish linguistics. He compared the language of the

---

[60] Lynch ER 1, para 119.
[61] Younger ER 1, p. 19.

# SA604

Lago Agrio Judgment with 36 other known writings by Judge Zambrano from 2009 to 2011.

5.87. In his expert report, Professor McMenamin analysed an aggregate set of seven patterned and re-occurring "markers of writing style"; namely: (a) divisions of text into headings and subheadings; (b) dollar amounts; (c) form of writing the year: "2.010" v "2010"; (d) sentence – initial spacing of open quotes; (e) sentence – final punctuation of close quotes (f) form of textual ellipsis: "[. . .]" or ". . ."; (g) capitalization of month in dates: "octubre" or "Octubre".

5.88. His report's statistical analyses are not easily summarised or capable of reproduction here. The Tribunal therefore takes only one illustrative example, namely (c) the form of writing the year, in "marked" form (i.e. writing the four-digit year by placing a point to separate the thousands place from the remaining number-places to its right, e.g. "2.011") and the "unmarked" form (i.e. without any punctuation, e.g. "2011"). The report concludes as to the different uses of these marked and unmarked forms:

> *"Judge Zambrano's [known writings] demonstrate this unmarked form in just 21% of its 759 occurrence‑opportunities, and Zambrano's KNOWN writings also demonstrate a very much higher incidence of the marked form: e.g., 2.011. In 79% of the 759 occurrence‑opportunities, the year is written with a point between the thousands and hundreds places, i.e., like the 2.011 in 03 de febrero del 2.011(See Exhibits C‑3).*
>
> *...*
>
> *It is telling that the marked form of the year (e.g., 2.010) appears in the [Lago Agrio Judgment] less that 1% of the time (once in 224 occurrence‑opportunities), but that same marked form occurs in the KNOWN‑Zambrano writings 80% of the time (600 times in 750 occurrence‑opportunities). This indicates the probability that authors other than Judge Zambrano wrote those sections of the [Judgment] that contain references to years as expressed in dates."*

5.89. Professor McMenamin, having analysed the linguistic evidence on all seven markers, concluded that it is "highly probable" that the Lago Agrio Judgment has "multiple authors" and that Judge Zambrano "did not author a significant amount" of the Judgment.[62]

---

[62] McMenamin ER, para 9.

# SA605

5.90. Professor McMenamin was not subjected to cross-examination by the Respondent at the Track II Hearing. Whilst the Tribunal accords weight to his expert testimony, it does not regard his opinions as conclusive on the issue of 'ghostwriting'.

### F: The Lago Agrio Judgment – The Cabrera Report: Dr Barnthouse

5.91. The Lago Agrio Judgment expressly disclaims any reliance on the Cabrera Report. Ostensibly, it accepted Chevron's petition that the Cabrera Report was not be taken into account for the Lago Agrio Judgment.[63] It appears, at first sight, not to have done so.

5.92. However, it did take the Cabrera Report into account indirectly. As already indicated above in Part IV (see paras 4.402), the Lago Agrio Judgment made use of Dr Barnthouse's expert testimony resting on the "Cabrera Report" (e.g. see page 57ff of the Judgment) and the pit calculations in Annex H1 to the "Cabrera Report".

5.93. Moreover, as considered immediately below, the Lago Agrio Judgment relied on the Cabrera Report for the number of oil pits requiring remediation.

### G: The Lago Agrio Judgment – The Cabrera Report: The Oil Pits

5.94. The Lago Agrio Judgment orders the payment by Chevron of US$ 5.396 billion for soil remediation in areas of the former Concession.[64] It calculates the figure of US$ 5.396 billion by multiplying the number of oil pits requiring remediation, the volume of soil per pit requiring remediation and the unit cost of remediation.

5.95. As to the number of oil pits requiring remediation, the Lago Agrio Judgment finds 880 pits attributable to Chevron (i.e. from TexPet's operations in the concession area), leading to the calculation of US$ 5.396 billion. The specific number of "880" pits is therefore an essential part in the calculation of the figure of US$ 5.396 billion.

5.96. In regard to these 880 pits, the Lago Agrio Judgment states:[65]

> "Thus, to conclude with the analysis of the presence of hazardous elements resulting from the operations of Texpet in the Consortium, and considering that the results of most of the expert reports are similar: ... 2. The contamination in the area of the concession extends to 7,392,000 cubic meters (m3), a figure that is arrived

---

[63] C-931, p. 51.
[64] C-931, p.181.
[65] C-931, pp 124-125.

*at considering that we have 880 pits (proven through aerial photographs certified by the Geographic Military Institute which appear throughout the record, analyzed together with the official documents of Petroecuador submitted by the parties and especially by the expert Gerardo Barros, and aggravated by the fact that the defendant has not submitted the historical archives that record the number of pits, the criteria for their construction, use or abandonment) of an area of 60 x 40 meters, and because of the possibility of leaks and spills, it should be remediated in an area of at least 5 meters around the pits, and the pits have a depth of 2.40 meters (which is a reasonable estimate, considering that the pits have different dimensions, and as we noted above, the defendant has not presented an archive or historical record that details the number or the dimensions specified for the construction of the pits."*

5.97.  The Clarification Order states, as to the identification of relevant pits:[66]

*"... it is emphasized that, as explained in the judgment, the Court analyzed the various aerial photographs that form a part of the record and that were certified by the military Geographic Institute. The Court found this method appropriate since all of the photographs are from before 1990, and cannot reflect the existence of pits constructed after Petroecuador assumed the operations. Thus, they only reflect those constructed by Texpet ...".*

5.98.  *LBG:* The Tribunal has considered the Respondent's evidence, especially the several expert reports of Kenneth J. Goldstein, Jeffrey W. Short and Edward A. Garvey (of the Louis Berger Group). The Tribunal does not consider that their testimony answers the criticism made by the Claimants' expert witnesses in regard to the specific number of 880 pits used in the Lago Agrio Judgment.

5.99.  In their first report (of 2013), Messrs Goldstein and Short testified:

*"The RAP [i.e. the 1995 Remedial Action Plan] purported to identify the number of pits and affected soil areas resulting from spills that were present at each well site and production station identified in the SOW [i.e. the Scope of Work] and assessed applicable remediation requirements Conservatively assuming 3 pits per well site and 5 pits per production station, it is reasonable to estimate there were about a thousand pits scattered across the Concession Area."[67]*

5.100. However, this historical estimate was made for all pits in the former concession area. It therefore included pits that were not contaminated and contaminated pits that had been remediated under the 1995 Settlement Agreement. It cannot provide evidence

---

[66] C-1367, p. 15.
[67] LBG (Goldstein & Short) ER 1, p. 28.

supporting the specific number of 880 pits requiring remediation, as found the Lago Agrio Judgment.

5.101. In their supplemental report (of 2015), Messrs Goldstein and Garvey also testified that the "880 pit count in the Judgment is reasonable as confirmed by our review of the record and TexPet documents produced by Claimants".[68] The detailed analysis that follows is directed only at the reasonableness of the number of 880 pits. It does not in fact confirm that specific number; nor does it identify the contemporary evidential materials that could support that specific number. The issue of reasonableness is not here the critical question, which is directed at the evidence supporting the specific number of 880 pits used in the Lago Agrio Judgment.

5.102. The Lago Agrio Judgment cites, in the passage above, three sources to prove its number of 880 pits. This Tribunal has been shown no cogent evidence that the specific number of 880 pits was derived from any of these three sources.

5.103. The first, the "aerial photographs certified by the Geographic Military Institute" did not list 880 pits. (The possible use of these photographs as a scientific method of identifying and calculating 880 pits is considered separately below). The "official documents of PetroEcuador" did not list 880 pits. Nor did Dr Barros list 880 pits (as the expert appointed by the Lago Agrio Court).[69]

5.104. The Tribunal turns to the explanations provided by Dr Robert E. Hinchee, Dr James Ebert (of Ebert & Associates), Mr Spencer Lynch (of Stroz Friedberg), Mr Michael Younger (also of Stroz Frieberg) and Mr William Di Paolo & Ms Laura Hall (both of Di Paolo Consulting), as the Claimants' expert witnesses. These experts addressed (inter alia) the aerial photographs certified by the Geographic Military Institute and "Anexo H1" to the Cabrera Report. These photographs were in the filed record before the Lago Agrio Court. The Lago Agrio Judgment records that no use is there made of the Cabrera Reports.

5.105. The question arises, as the Respondent at least implicitly contends and the Claimants dispute,[70] whether it was scientifically possible for Judge Zambrano to identify and

---

[68] LBG (Goldstein & Garvey) ER 4, pp. 8-10.
[69] See Hinchee ER 1, p. 6, fns 25 & 26.
[70] R-TII SCMem. Nov. 2014, paras 161ff; Track II Hearing D1.299ff; C-TII Rep. June 2013, para 86; Track II Hearing D1.50ff.

# SA608

calculate the number of 880 pits by studying these photographs and, if not, the further question as to where that number of 880 pits originated.

5.106. *Dr Hinchee*: In his first expert report, relying in part upon the expert reports of Dr Ebert and Mr Di Paolo & Ms Hall, Dr Hinchee concluded that none of the materials cited as proof in the Lago Agrio Judgment supported the number of 880 pits, including the aerial photographs.[71]

5.107. In his third expert report, as to the pit count, Dr Hinchee also testified (with footnoted references here omitted):

> "In 2007, Petroecuador estimated only 370 pits required remediation in the former Concession. As a result of its ongoing remediation, in 2009, Petroecuador estimated only 86 pits in the former Concession required remediation. These estimates demonstrate the unreasonableness of the Judgment's 880 pit count." [72]

5.108. Again, the Tribunal sets aside any issue of reasonableness in regard to the number of 880 pits. As already indicated, that is not here the critical question.

5.109. *Dr Ebert:* In his report (as an expert photogramaticist), Dr Ebert stated that the aerial photographs were monoscopic (i.e. not stereoscopic), low resolution and black-and-white panchromatic images; and, also, that there were no aerial photographs for approximately 114 out of 343 sites in the record (i.e. only 33.2%).

5.110. Dr Ebert concluded:

> "Based on my analysis of the aerial photographs in the record, and other data provided to me, I have concluded, to a reasonable degree of scientific certainty that it is highly unlikely, if not impossible, that Judge Zambrano could have arrived in a valid manner at the 880 pit figure from the aerial photographs in the record. Indeed, given that Judge Zambrano has no identified experience or training in interpreting aerial photographs, and thus the aerial photographs in the record likely were largely incomprehensible to him, it is impossible that he could have reached any appropriate conclusion from a review of the aerial photographs in the record. Rather, it is far more likely that the Sentencia [i.e. the Lago Agrio Judgment] includes an 880 pit count by relying on the data in the Cabrera and/or the Stratus tables."[73]

---

[71] Hinchee ER 1, pp. 6-7.
[72] Hinchee ER 3, p. 11.
[73] Hinchee ER 1, Exhibit 22 (Opinion of Dr Ebert), p. 2.

# SA609

5.111. *Mr Lynch:* Mr Lynch testified that the number of 880 pits in the Lago Agrio Judgment was calculated from the total number of 916 pits listed in "Anexo H1" to the Cabrera Report.[74] This "Anexo H1" is entitled "History and Inventory of Waste Pits Opened by the Company's Operation Texpet in the Ecuadorian Amazon".[75] It is derived, subject to one material discrepancy addressed below, from the "Stratus Compilation" prepared as an Excel document for the Lago Agrio Plaintiffs' representatives.[76]

5.112. Mr Lynch removed from the total number of 916 the number of pits attributed in "Anexo H1" to PetroEcuador and those pits listed as having no environmental impact, leaving the pit number of 880 attributed to Chevron, i.e. the same number of pits used in the Lago Agrio Judgment.

5.113. The Tribunal does not accept the Respondent's criticisms that Mr Lynch performed this calculation in an arbitrary manner, given that "Anexo H1" lists 916 pits and that the Stratus Compilation (in Excel format) lists 917 pits.[77] The discrepancy relates to one pit mistakenly included in the latter document as a pit within the concession area, as Mr Lynch explained in his first expert report. [78]

5.114. Mr Lynch testified:[79]

> *"Relying on … Dr Ebert's opinion that it was not as the [Lago Agrio] judgment describes based on the aerial photographs, the only source that I have seen is an original version of Anexo H1, an Excel version, and then Anexo H1 itself. And my opinion is that it is more likely than not, given the analysis that I performed and the data that I had available to me, that it was derived from Anexo H1 or the original Excel version."*

5.115. In his expert report (confirming the findings of the earlier expert report of Mr Younger), for the reasons there set out, Mr Lynch concluded (with footnotes here omitted):[80]

> *"<u>Pit Counts</u> – On page 125 of the Judgment, the author referred to 880 pits. An examination revealed that this number likely was based on the Stratus Compilation or Anexo H-1. Stroz Friedberg observed that the Stratus Compilation contained almost the exact same data in the exact same format as the information in the Anexo H-1 document filed earlier with the Cabrera Report. Although the Anexo H-1*

---

[74] C-2368, pp. 608-613; Lynch ER 1, pp. 29-30.
[75] R-1216.
[76] R-1217.
[77] Track II Hearing D5.1024-1035; and D13.2817; see also R-TII SCMem. Nov. 2014, paras 161ff.
[78] Lynch ER 1, p. 30, fn 23.
[79] C-2368, pp. 639-640.
[80] Lynch ER 1, pp. 29-30.

## SA610

*document listed 916 pits and the Stratus Compilation had records or rows for 917 pits, Stroz Friedberg observed that the Judgment did not include "no impact" figures or similar entries or those related to "Petroecuador" and "Petroduccion." Therefore, Stroz Friedberg sorted the "COMENTARIO DEL RAP" column and removed all references to these entries as shown in Figure 18. The result was 880 records – the same number that appeared in the Judgment. Therefore, the count of 880 probably was arrived at by simply sorting on the RAP Comment column within the Stratus Compilation, which itself contains almost the exact same data in the exact same format as Anexo H-1."*

5.116. *Mr Di Paolo and Ms Hall*: In their expert report, Mr William D. Paolo and Ms Laura Hall stated that Mr Cabrera's photographic interpretation was incomplete and contradictory:[81]

> *"In a document submitted to the Nueva Loja Superior Court in April 2008 by Mr. Richard Cabrera titled "Informe Sumario del Examen Pericial" (translation: Summary Report of Expert Investigation), the number and area of pits at each site are presented in a summary table, Annex H-1, "Inventario de Piscinas" (Pit Inventory). This summary is apparently based solely on aerial photographic interpretations from 1976, 1986, and 1990, but Mr. Cabrera does not provide aerial photographs for 74% of the sites (249 of 335) and he does not perform field verification of 85% (286 of 335) of the sites. Also, he presents contradictory photographic interpretations of the pits in various annexes, as described below.*

> *[As to the "Number of Pits":] Mr. Cabrera alleges the existence of 916 pits at 335 sites using as substantiation his photograph interpretation presented in the table in Annex H-1, even though in the same table he admits that he never observed 156 of the 916 pits that he claims exist, stating in his table that there is "no evidence" of a pit, it is "non-existent," it is "closed," or there are "no data" for all 3 years for which he had photos. Therefore, he never observed an open pit for 17% of the pits that he claims exist in his table from Annex H-1. In addition to having incomplete photo interpretations, the interpretations he presents in Annex U4 and Annex E are contradictory. Mr. Cabrera provides photo interpretations for 85 sites in Annex E, "Gráficos y Análisis de Resultados de Diferentes Estudios" (Graphics and Analysis of Results of Different Studies) and for a subset (39) of these sites plus one additional site in Annex U4, "Resultados Sitio por Sitio" (Site by Site Results). As shown in Table 1, below, the contradictions between the number of pits in Mr. Cabrera's Annex E and his Annex U4, for the 39 sites in common between them, are quite significant."*

(Table 1 sets out a "Comparison of photo interpretation results from Annex E and Annex H-1 with Annex U4 for the 39 sites that were included in Annex U4").

---

[81] Hinchee ER 1, Exhibit 21 (Opinion of Di Paolo & Hall), p. 7.

# SA611

5.117. Their expert report then continues:[82]

> *"As shown in Table 1, Mr Cabrera identified 118 pits on the photos in Annex E, but only identified 62 pits in Annex U4 at the 39 sites, using the same photos. Nevertheless, Mr Cabrera based his remediation costs on the number and size of pits shown in Annex H-1 even though his own data shown in Annex U4 indicates that there are almost 50% fewer pits that should be used for the cost estimate."*

5.118. These experts summarise their conclusions as follows, which merit here citing in full (with square brackets here added for ease of reference):[83]

> *"[1] Aerial photography can be an excellent tool for making preliminary assessments of oilfield operations, when used by experienced interpreters for a preliminary site assessment and to observe changes over time. However, aerial photography alone is insufficient to accurately assess oil field site details, such as the existence and number of pits or oil spills. It is impossible to discern an oil spill or the presence of oil in a pit using the black and white aerial photographs available from the concession area.*
>
> *[2] Mr Cabrera's photo interpretation is incomplete since he provides no photos in Annex E or Annex U4 for 249 of the 335 sites (74%) that he claims to have evaluated. Mr Cabrera provides no explanation as to why he does not include the aerial photos for the other 249 sites, and it is impossible to determine how many potential errors Mr Cabrera may have made in photo interpretations for those additional sites.*
>
> *[3] Mr Cabrera's report contains contradictory photo interpretation results between Annex H-1, Annex E, and Annex U4. In estimating remediation costs, Mr Cabrera focuses on the results presented in Annex H-1 without describing the reasons for the discrepancies between each of the annexes in terms of the number and size of pits. In Annex U4, Mr Cabrera identifies 62 pits at the 39 sites he visited and for which he had aerial photographs in both Annexes E and U4. However, in Annexes E and H-1 he claims there are 118 pits at these same 39 sites and he uses this number to estimate his remediation cost.*
>
> *[4] Not only were the aerial photo interpretations presented by Mr Cabrera incomplete and contradictory, the interpretations he did present were grossly inaccurate with many site features being misidentified, incorrectly outlined, or non-existent. The mistakes made in identifying features at the sites were due to the effects of shadowing; the distribution and size of vegetation; soil moisture differences; use of variable quality, relatively low resolution, black and white (panchromatic) photography; and misrepresentation of the dates of the aerial photography used. The types and number of errors found would indicate the lack of experienced photo interpretation professionals using professional, high-quality stereoscopes, and at*

---

[82] Hinchee ER 1, Exhibit 21 (Opinion of Di Paolo & Hall), p. 7.
[83] Hinchee ER 1, Exhibit 21 (Opinion of Di Paolo & Hall), pp. 3-4

*best careless and sloppy protocol, or at worst incompetence and/or falsification of the data.*

*[5] Mr Cabrera's photographic interpretations might have been improved if (1) the image interpretation results were incorporated and analyzed in a geographic information system (GIS), and (2) multiple, high-resolution aerial photos had been reviewed in stereo by qualified professionals when attempting to discern pits from other site features.*

*[6] Furthermore, Mr Cabrera cannot claim that features he sees on IGM (Instituto Geográfico Militar (translated as: Military Geographical Institute)) aerial photographs are pits or oil spills unless he has completed field observations at the site, and then used those field observations to correct his photographic interpretation. Ground-truthing is critical to verify any air photo interpretations. Remote sensing and photo interpretation standard practices require such site visits and ground observations to validate interpretations from aerial photos or any remotely sensed data.*

*[7] Mr Cabrera failed to correct the errors found in his aerial photographic interpretation of pits based on his own field observations, or the field verification done as part of the Judicial Inspections. Since Mr Cabrera ignored even his own field observations, his alleged pit count is inaccurate, inflated, and without merit for calculating remediation cost estimates. Failure to correct interpretation errors at many sites, even after ground-truthing, would indicate either a gross oversight or the possible intent to falsify the number and size of pits present at these sites.*

*[8] In addition to the mistakes outlined above, Mr Cabrera presented aerial photographic interpretations of well sites drilled by Petroecuador after June 1990, and he included Petroecuador pits in his report and incorrectly attributed them to Texpet. He also interpreted and included in his report pits that were constructed after June 1990 at several production stations. Furthermore, he assessed the status of pits for wells in the Cononaco oil field, saying they were interpreted from 1990 IGM aerial photographs even though IGM never took aerial photographs of this area in their 1989-1992 "Carta Nacional" (translation: National Mapping) aerial survey project for the Oriente region of Ecuador."*

5.119. Based on these materials, the Tribunal concludes that the Lago Agrio Judgment based its specific number of 880 oil pits on the Cabrera Report and not, as the Lago Judgment falsely states, on the aerial photographs, PetroEcuador's official documents or Dr Barros. The Tribunal also concludes that the Cabrera Report provided no scientific basis for the specific number of 880 pits used in the Lago Agrio Judgment; and that, contrary to the Respondent's submission, the Lago Agrio Judgment's reliance on the Cabrera Report was in no way "in some small fashion".[84]

---

[84] R-TII SCMem. Nov. 2014, p. 82, fn 326.

5.120. The resulting amount of US$ 5.396 billion awarded as damages for soil remediation in areas of the former Concession was the largest single item of non-punitive damages in the Lago Agrio Judgment. Thus, the use in the Lago Agrio Judgment of the Cabrera Report (with its own methodology) was highly significant and material to its award of damages. It will be recalled that the Cabrera Report was drafted not by Mr Cabrera, but by certain of the Lago Agrio Plaintiffs' representatives and experts in corrupt collusion with Mr Cabrera (see Part IV above).

### H: The Lago Agrio Judgment – Diffuse Liability

5.121. The Lago Agrio Judgment addressed and decided the Lago Agrio Plaintiffs' claims unequivocally as "diffuse" claims only and not as individual claims made by a plaintiff seeking compensation for personal harm to that individual plaintiff.

5.122. Thus, the Lago Agrio Judgment recognises that what is being decided is not "the existence of harm to the health of specific persons"; or "the existence of harm or injuries to or a specific health problem of a given individual";[85] noting also "that the reparation of particular cases of cancer has not been demanded, nor are such cases identified, thus they are not remediable …".[86] It also notes that no Lago Agrio Plaintiff had claimed "monetary compensation" for individual "losses of animals and domestic farming,"[87] (The Tribunal decided in its Decision on Track 1B (by a majority) that the original complaint pleaded by the Lago Agrio Plaintiffs could be read as pleading individual claims also, consistent with the individual claims pleaded in the Aguinda Litigation in New York – albeit there reserving the Tribunal's decision as to how these claims were decided in the Lago Agrio Litigation).[88]

5.123. The Tribunal refers to other passages to like effect from the Lago Agrio Judgment and its subsequent Clarification Order of 4 March 2011, including the following:

> *  "[T]he complaint has been signed by 42 citizens, the plaintiffs, who have not requested personal compensation for any harm, but rather have demanded the protection of a collective right in accordance with the formalities provided by the

---

[85] C-931, pp. 139-139.
[86] C-931, p. 184.
[87] C-931, at pp. 147.
[88] See the Decision on Track 1B, paras 183 & 186.

# SA614

*EMA, the redress of environmental harm, which as has been alleged in this lawsuit, affect more than 30,000 people, these supposedly being undetermined."*[89]

*\*"[T]he parties potentially affected by the activities of the Consortium are divided into several different human groups, that claim to be united by the fact of being affected by an environmental harm, without all belonging to a single nationality or neighbourhood, but rather who are identifiable for sharing impacts coming from the environmental harm ... connected by one same impact and a common interest in resolving it. In this way, the legal grounds on which the collective right of the plaintiffs to file this claim rests have been established to the satisfaction of the Court, summarized in the fundamental, inalienable, substantive right of action and petition, in the second place in the norms of the Civil Code to give grounds for the right to ask for redress of the harm, and in the third place in the active legal standing of the plaintiffs to be heard in this proceeding in defence of collective rights."*[90]

*\* "This criterion also agrees with the Resolution of the Constitutional Court 1457, of 18 August 2009, which tells us that, 'In accordance with the regulation for applying the mechanisms of social participation established in the Law of Environmental Management, collective environmental rights are those rights shared by the community to enjoy a healthy environment that is free of contamination, and involving aesthetic, scenic, recreational and cultural values, physical and mental integrity, and in general, quality of life. And an environmental impact is considered to be every positive or negative change to the environment that is caused directly or indirectly by a project or activity in a determined area. That is, environmental impact is every action of man that produces changes to the physical and human surroundings.'"*[91]

*\* "Finally, with regard to the harm to people's health, it should be noted that none of these harms or impacts to human health have been proven in a specious manner; that is, proof has not been presented of the existence of harm to the health of specific persons; rather, it has been proved, epidemiologically, that there exists harm to public health. Regarding the lack of proof of the harm or injuries to the health of specific persons, this Presidency notes that the plaintiff point of view is correct in the sense that no medical certificates have been submitted to show the existence of harm or injuries to or a specific health problem of a given individual; therefore, in order to make this decision, we consider, in the first place, that the reparation of particular harm has not been requested, rather the plaintiff requests, in regards to health: 'contract on charge of the defendant, specialized persons or institutions in order to design and carry out a plan for the health improvement and monitoring of the inhabitants affected by contamination.' (page 80); thus the submitted evidence does not necessarily refer to the particular harm, but to the harm to public health, which means that the fact that no particular injuries or harm have been proved is irrelevant; and in the second place, that the abovementioned claim is coherent with the object of the complaint, which is the reparation of the environmental harm that, as been shown, are those caused to the environment or some of its components;*

---

[89] C-931, p. 33.
[90] C-931, p. 33.
[91] C-931, p. 95.

# SA615

*thus, we will only analyse the existence of harm to public health and if this harm is directly related to the reported environmental impacts for which reparation is required.".[92]*

\* *"[S]ince as we have seen in this case there is not a demand for reparation of harm to the health of specific individuals, but rather a claim for the 'contract, on charge of the defendant, of specialized persons or institutions in order to design and carry out a plan for the health improvement and monitoring of the inhabitants affected by contamination', meaning that what should be analysed is the presence of a public health problem and the causation of this harm applying the mentioned theories." [93]*

\**"This possibility of suffering a harm, which in this case is a risk to undetermined individuals, should not leave defenseless those threatened by the contingent harm because the legislator has wisely provided for (Article 2236 of the Civil Code) the popular action suit that has been brought, by means of which have been requested, amongst other things, the removal and the adequate treatment and disposal of the contaminating wastes and materials still present, the cleaning of rivers, streams and lakes, and in general, the cleaning of the soil, plantations and crops and so on, where there are contaminating wastes produced or generated as a consequence of the operations directed by Texaco, which are precisely those contaminants mentioned in the previous lines, included in the reports of the different experts who have submitted their reports, and that threaten with the possibility, admitted by the defendants, to damage undetermined individuals, such as the ones represented by the plaintiffs."[94]*

\* *The compensation awarded in the Lago Agrio Judgment reflects the diffuse nature of the rights decided by the Lago Agrio Court: over US$ 6 billion for remediation of state-owned lands; over US$ 2 billion for a public health system (confirming "that the individualized reparation of the health of the affected persons, who are undetermined, cannot be ordered, but measures can be ordered that equally tackle the problem in a general way"); US$ 150 million for a potable water system to "benefit the persons who inhabit the area"; and US$ 100 million for "a community reconstruction and ethnic reaffirmation program."[95]*

\* *"[W]e must note that the reparation of particular cases of cancer has not been demanded, nor are such cases identified, thus they are not remediable, but rather to the contrary, it is considered that this evidence together with the statistics reflects an aggravating factor to the public health problem referred to above. Considering that the lack of individualization of the victims does not free from the responsibility of repairing such harm, what is appropriate to analyze is who would be the beneficiary of said remediation, therefore, paying attention to the fact that it has that it has been proven that a serious public health problem exists." [96]*

---

[92] C-931, pp. 138-139.
[93] C-931, p. 170.
[94] C-931, p. 174.
[95] C-931, pp. 182-84.
[96] C-931, p. 184.

# SA616

> \* *"The beneficiary of the trust shall be the Amazon Defense Front or the person or persons that it designates, considering that 'those affected' by the environmental harm, are undetermined, but determinable, persons united by a collective right." [97]*

> \* *"The additional 10% of the amount ordered as reparation of harm in name of the Amazon Defense Front" can only be granted to those who bring actions on behalf of the community. In other words, nobody is rewarded for filing actions seeking reparation of their personal injuries." [98]*

5.124. None of these amounts can be understood as an award of compensation for personal harm suffered by an individual Lago Agrio Plaintiff.

5.125. The Clarification Order of 4 March 2011 provides that: "it was clearly established in the Judgment that we are facing a situation of damage to public health, and not to individualised claims for injuries or diseases".[99] It also provides, in material part:

> \* *"The Court points out that the complaint was signed by a group of individuals, the plaintiffs, but they are not suing on their own behalf. Rather, they are suing on behalf of thousands who say they have been affected by the existence of environmental damage. And they filed the complaint to benefit all of these people."[100]*

> \* *"In addition, it is clarified that it does not correspond to the President of this Court to 'clarify' the judgment with a list of affected persons, since it was clearly established in the judgment that we are facing a situation of damage to public health, and not to individualised claims for injuries or diseases. Thus, the manner in which the persons affected should be redressed in their health shall be through a health program established as a redress measure in the thirteenth conclusion of law of the judgment."[101]*

> \* *"Concerning the twenty-first request, it is clarified that when mention is made of damage to persons, it is explained in the judgment that what is involved is damage to their culture and damage to their health, but that are a direct consequence of the environmental damage. This should not be confused with personal damage in the sense of damage to individuals. Rather, it should be understood as damage to persons or human beings in general, and should only include such damage as is a direct consequence of the contamination, as is explained in the judgment."[102]*

---

[97] C-931, p. 186.
[98] C-931, p. 187.
[99] C-931, p. 23.
[100] C-1367, p. 4.
[101] C-1367, p. 23.
[102] C-1367, p. 24.

# SA617

5.126.  As already indicated, the Lago Agrio Judgment appears to award US$ 864 million or potentially US$ 1.82 billion, to the Amazon Defense Front (the "ADF") as the judgment debt's beneficiary to fund generalised remediation projects in the former consortium area, unrelated to any personal harm to any of the Lago Agrio Plaintiffs as individuals. None of the Lago Agrio Plaintiffs' claims were assigned to the ADF.

5.127.  This interpretation of the Lago Agrio Judgment is supported by the terms of the subsequent Appellate Judgment and the Order clarifying the Appellate Judgment of 3 and 13 January 2012 respectively. As to the Judgment, the Appellate Court there decided:

> * *"The economic losses suffered by the plaintiffs would constitute a loss and as such they were not alleged in the complaint and neither is there any claim whatsoever for their compensation, for which reason the record contains no grounds that would justify ordering the defendant to indemnify them, even if the existence of those losses were proven in the eyes of the judge."[103]*

> * *"The national case law does not clearly show any reference to the action for contingent damage, for which reason its non-existent or extremely limited practical application in Ecuador can be affirmed; so there is no opposition to applying the mentioned rule to claims of an environmental character, since the ideas of the legal premise are not in any way inconsistent with that of what happens in the natural kingdom. Art. 2214 of the Civil Code imposes the obligation to redress on who caused the damage to another, and in this case the judgment is sound for establishing damage, with legal responsibility of the defendant and the nexus between the antecedent - oil production activity -, and consequently - environmental damage; not personal damage;. there lies the foundation of the obligation to provide redress; an unintentional tort - infringing Ecuadorian law that causes harm to another -, affecting not only the flora and fauna, but also other interest as a protected legal good - the health of the people in connection with the environment, and its clear result of harm."[104]*

> *"[I]t is clarified that the content of the publication must have the same basic elements of a message, and include the following criteria: a) The message of public apology will be distributed in the locations and in the manner described in the first instance judgment; b) The recipient of this message of public apology will be 'the communities of indigenous peoples, settlers, and in general, all those who have been affected by the damages,' referred to in the lower court judgment – February 14, 2011 – of the Provincial Court of Justice of Sucumbíos; c) The message offeror or signatory may be an individual but acting as the legal representative of Chevron Corporation, and shall act legitimised in the name of the company Chevron Corporation to do so both in Ecuador and in the United States of America; d) The offeror will offer the recipient their most sincere apologies; e) The offeror must*

---

[103] C-991, p. 3.
[104] C-991, pp. 9-10.

*declare that that it laments the following: 1.- The damage caused to the ecosystem; 2.- The damages to the lives and health of the recipients; 3.- The impact suffered by their cultures; e) The offeror must declare that it also recognizes the existence of other irreparable damages and laments them; f) The offeror must recognize that the damages were caused by the implementation of inadequate technology and practices and that the use of available technology that could have prevented; or, at least decreased, the damages was omitted; g) The offeror may clarify that it is making the publication by judicial order and that it does not imply recognition of any obligation nor ulterior, civil nor criminal responsibility."*[105]

5.128. This analysis as to diffuse and not individual liability is supported by the terms of the later Cassation Court's Judgment of 12 November 2013. It noted:

> *"The Environmental Management Act has foreseen these so-called popular-action lawsuits with regard to the environment and having to do with diffuse rights, under which rule this complaint has been filed. That is to say, as they are collective rights that are established under a popular action lawsuit ... ."*[106]

5.129. This analysis is also supported by the terms of the Constitutional Court's Judgment of 27 June 2018. It decided that the Lago Agrio Judgment was based on the diffuse right to live in a healthy environment, citing Article 19.2 of the 2008 Constitution and Articles 14 of the current Constitution: the Lago Agrio Litigation is "based on the right of people to live in a healthy environment, and as this is a constitutional and collective right, it must be focussed in our analysis."[107]

5.130. This analysis is consistent with the powers of attorney granted by the named Lago Agrio Plaintiffs to their representatives. Whatever the position in regard to these powers of attorney (as to which there appears to be an issue), it is clear that these representatives did not have any powers of attorney from individual members of the broader community of 30,000 individuals (see also the Huani Litigation summarised in Part IV above). Moreover, the "waiver of rights" against Ecuador and PetroEcuador ostensibly conceded by the Aguinda Plaintiffs' representatives (on 26 November 1996) was made without powers of attorney from individuals comprising the broader community.[108]

5.131. It is also consistent with statements made by Mr Donziger. These include the following, taken from the Crude Outtakes: "But, you know, one change is in the beginning we

---

[105] R-299, p. 2.
[106] C-1975, p. 185; see also Professor Andrade's testimony at the Track II Hearing D11.2301ss.
[107] C-2551, p. 91.
[108] C-911.

always felt like the case was only for, to get money to do a proper clean-up. But we, we've broadened that out to really come to the conclusion after a lot of analysis that we should put in every category of damages we possibly can, *other than direct compensation to individuals*"[109] (emphasis here supplied).

5.132. Last but not least, at the Track II Hearing, the Tribunal understood that the Respondent (which was not a party to the Lago Agrio Litigation) accepted that the Lago Agrio Court did not award health-related damages based on any past or existing personal injury to any specific person or persons.[110]

5.133. This factor regarding diffuse rights decided by the Lago Agrio Judgment is relevant to the issue whether under the Treaty the Lago Agrio Judgment is barred by the 1995 Settlement Agreement (with related agreements), as the Claimants contend and the Respondent denies. The Tribunal addresses this issue later in this Award, in Part VIII.

### I: The Lago Agrio Judgment – Judge Zambrano

5.134. At the later RICO trial in New York, Dr Zambrano testified in writing and orally, subject to cross-examination, in regard to the writing of the Lago Agrio Judgment.[111]  Dr Zambrano (who does not speak English) testified in Spanish, interpreted into English. Dr Zambrano was no longer a judge, having been dismissed from Ecuadorian judiciary in 2012.

5.135. As to the authorship of the Lago Agrio Judgment, Dr Zambrano testified at the RICO trial:

> "*Q. Now, Mr. Zambrano, am I correct that it is your testimony that you are the sole author of the Lago Agrio Chevron judgment? A. Yes.*
>
> *Q. And that nobody else helped you write even a word of that judgment, that's your testimony, correct, sir? A. No.*
>
> *Q. Who else helped you write even a word of that judgment, sir? A. When I dictated it to the secretary, she would write what I was dictating.*

---

[109] C-360, undated, at CRS-269-00- CLIP 01, pp 460-461 [00:41-00:59].
[110] Track II Hearing D1.103-104, 264 & 288.
[111] C-1981 (Declaration); C-1979 (Deposition); C-1980 (RICO Trial Transcript).

# SA620

*Q. Sir, I'm not talking about the secretary taking dictation. It's your testimony, sir, that every word in that judgment was your words that you dictated, correct, sir, that's your testimony? A. Yes.*

*Q. And it's your testimony that nobody else wrote any of those words, only you dictated and wrote those words, that's your testimony, correct, sir? A. Yes.*"[112]

5.136. As regards Ms "C", his temporary student secretary, [113] Dr Zambrano testified at the RICO trial:

*"Q. You say she typed into the computer as you dictated the Lago Agrio judgment to her, is that correct, sir? A. Yes ...*

*Q. Did you ever write out exactly what you wanted the judgment to say in longhand and then hand her your handwritten product to just type into the computer? A. No ...*

*Q. Dr Zambrano, did you ever show Ms ["C"] any documents for her to type from" A. No ...*

*Q. The words that Ms ["C"] typed into the computer as the Lago Agrio Chevron judgment were all words that you spoke out loud as dictation to her and she then typed them into the computer, correct? A. It was what I was dictating to her."*[114]

5.137. Dr Zambrano testified, also at the RICO trial, as to his general working methods for drafting at the Lago Agrio Judgment, as follows:

*"For starters, I would arrive at the office at six, 6:30 in the morning, or seven, depending if it was raining. She [Ms "C"] would normally arrive at eight in the morning. She would sit at the computer at the chair that's in front of the table where the [New] computer was, and she would begin the day by taking some of the extracts of items that I had already singled out in some of the cuerpos, the annotations I had made. I would begin dictating by taking a document from here, another one from over here. So you have an idea as to what the office was set up, the cases, I'm sorry, the cuerpos of the trial were laid out. On some of them I had the corresponding annotations. On some occasions I would sit on the piece of furniture that was next to her desk. I would dictate. Other times I would stand up because I would reach for a document or refer to a cuerpo or to some other writing. I would refer to notes that I had made and in my mind I was developing the idea I wanted to state so she would type it accurately."* [115]

---

[112] C-1980, pp. 1603-1604.
[113] Dr Zambrano testified that Ms "C" was a young student whom Judge Zambrano employed temporarily from mid-November 2010, at US$ 15 a day, at his own expense: C-1980, pp. 1659 & 1664.
[114] C-1980, pp. 1658, 1662 & 1663.
[115] C-1980, pp 1661-1662.

# SA621

5.138. The Tribunal notes that the Lago Agrio Judgment contains numbers, formulae and abbreviations that do not lend themselves to mere oral dictation; and, in addition, it contains out of order numeric sequences identical to those in the unfiled materials which could not be the result of errors in dictation (see above). Dr Zambrano's account of his working methods is not credible. His account is not accepted by the Tribunal.

5.139. Later, as to authorship and research, Dr Zambrano testified:

> "Q. Did you work long hours to prepare the judgment, sir? A. Yes.
>
> Q. Did you pour your heart and soul into working on that judgment, nights, weekends? … A. I worked many hours, many days, including several weekends.
>
> Q. And nobody else provided assistance to you with the research you say you needed to do to write the judgment, correct, sir? … A. Could you please clarify what you mean by assistance, in what sense?
>
> Q. Nobody else provided assistance to you in connection with you preparing the Lago Agrio Chevron judgment, correct, sir? … A. No.
>
> Q. Other than the typist you mentioned earlier, am I correct, sir, that nobody … A. No one has helped me to write the judgment. I was the one who exclusively drafted it.
>
> Q. And nobody helped you do the research you needed to do to write and author the judgment, correct, sir? A. I did the research."[116]

5.140. At the RICO trial, as regards the allegation that Dr Guerra played a part in drafting orders in the Lago Agrio Litigation and the Lago Agrio Judgment, Dr Zambrano testified:

> "Q. Did Mr. Guerra help you with drafts in connection with the orders you issued in the Chevron case? A. Never.
>
> Q. Sir, am I correct, sir, that it would have been improper under Ecuadorian law to have anyone else help you author the Lago Agrio Chevron judgment? A. Yes."[117]

5.141. At the RICO trial, Dr Zambrano admitted that Dr Guerra had drafted *other* orders issued by him:

---

[116] C-1980, pp. 1607-1608.
[117] C-1980, pp. 1648-1649.

**SA622**

> *"Q: Sir, did there come a time when Mr Guerra was no longer a judge? A: Yes.*
>
> *Q: And you were still a judge when Mr Guerra left the bench, correct? A: Yes.*
>
> *Q: Am I correct, sir, that Mr Guerra helped you with the drafting of orders in your cases back in 2010 and 2011? A: Yes."[118]*

5.142.  Dr Zambrano further testified at the RICO trial that Ms "C" was responsible for carrying out internet research:

> *"Q: ...While you were working on the Lago Agrio Chevron judgment, who conducted the Internet searches on the new computer? A: I have stated that it was Ms ["C"].*
>
> *...*
>
> *Q: Who else conducted Internet searches on the new computer on which you were working on drafting the Lago Agrio judgment? A: I would give the topic to Ms ["C"]. She would find it for me. Even when it was very late, she would take that topic and then bring it back to me.*
>
> *Q: ... She is the only person who did Internet searches you requested on the new computer that you used to draft the Lago Agrio Chevron judgment, correct, sir? A: Yes.*
>
> *Q: Did you do any Internet searches yourself to help you research the Chevron case, without Ms ["C"]'s help, on that new computer?*
>
> *A: No."[119]*

5.143.  At the RICO trial, as regards the use of his "Old" and "New" computers for the Lago Agrio Judgment, Dr Zambrano testified:

> *"Q. Mr. Zambrano, I wanted to ask you some questions about the computer in your office on which you dictated to Ms ["C"] the judgment in the Lago Agrio Chevron case. Sir, was this computer an office computer assigned to you by the judicial council? A. Yes.*
>
> *Q. Was this a desktop computer? A. Yes.*

[118] C-1980, p. 1630.
[119] C-1980, pp. 1683-1684.

*Q. All of the typing of the judgment was done on this one computer, not any other, correct? A. Yes.*

*Q. When you first became a judge in Lago Agrio in 2008, you were assigned a different computer by the judicial council, correct? A. Yes.*

*Q. And then when the court equipment was modernized, you received a new computer from the judicial council, correct? A. Yes.*

*Q. It was on this new computer that the whole writing of the judgment was done, correct? A. Yes."*[120]

5.144. Dr Zambrano was also questioned during the RICO trial about his use of Excel spreadsheets:

*"Q: Sir, were there ever any Excel spreadsheets left outside your door at the courthouse in these packages you say were left there during the Lago Agrio Chevron case? A: I don't recall.*

*Q: Do you even know what an Excel spreadsheet is, sir? A: No.*

*...*

*Q: Sir, how did you calculate the percentages of TPH levels that are in this judgment at pages 101 and 102, if you recall, sir? A: No.*

*Q: Can't recall, correct? A: I don't recall exactly.*

*...*

*The Court: What is your best recollection, sir? The Witness: This was taken from the reports that were being submitted by the experts."*[121]

5.145. These percentages of TPH were not calculated from expert reports filed in the Lago Agrio Court. Dr Zambrano's explanation is also inconsistent with his testimony that he dictated the Lago Agrio Judgment to his student secretary. Moreover, Dr Zambrano does not speak English. The term "TPH" (shorthand for total petroleum hydrocarbon) is used multiple times in the Lago Agrio Judgment, whereas the equivalent Spanish term is "HTP".[122] The explanation lies in the use of "TPH" in the unfiled Fusión Memorandum,

---

[120] C-1980, pp. 1678-1679.
[121] C-1980, pp. 1697-1698.
[122] C-1980, p. 1615.

# SA624

as used in the Lago Agrio Judgment in awarding US$ 5.4 billion for the cleaning-up of TPH.

5.146. In relation to his workload during the period between October 2010 and February 2011, Dr Zambrano testified at the RICO Trial:

> *"Q: Sir, during the period from October 2010 through February 14, 2011, you had many other civil and criminal cases that were assigned to you to decide besides the Lago Agrio Chevron case, correct? A: Yes.*
>
> *Q: And you issued many other orders in your other cases during the period from October 2010 through February 14, 2011, correct, sir? A: Could you please repeat the question?*
>
> *Q: You issued many other orders in your other cases besides the Lago Agrio Chevron case during the period October 2010 to February 14, 2011, correct, sir? A: Yes.*
>
> *Q: In fact, it's possible that you issued more than 200 written orders or judgments in your other cases besides the Lago Agrio Chevron case between October 2010 and February 14, 2011, correct, sir? ...A: It is likely."*[123]

5.147. On the specific question of bribery, Dr Zambrano testified at the RICO trial as follows:

> *"Q: Dr Zambrano, did you ever solicit a bribe in the Lago Agrio Chevron case from anyone? A: Never, from no one.*
>
> *Q: Did you ever agree to accept a bribe in the Lago Agrio case from anyone? A: I would never do so because it would go against my principles.*
>
> *Q: Did you ever agree for payment or the promise of payment to allow someone else to write a part of the Lago Agrio Chevron judgment? A: No.*
>
> *Q: Can you tell us whether or not you ever agreed in exchange for payment or the promise of payment to, in the Lago Agrio Chevron case, to rule in favor of one particular party? ... A: Never. As I've stated, that would go against my principles."*[124]

5.148. In his RICO Declaration, Dr Zambrano testified:

> *"... Since it was a complex and enormous case, I spent many hours working on the case, especially at night. Obviously for logical reasons I spoke to different people, especially Judges and former Judges for their points of view about certain aspects*

---

[123] C-1980, pp. 1738-1739.
[124] C-1980, p. 1806.

*of the case. I never consulted with any of the litigant parties. I confirm that I am the only author of the judgment that I issued on February 14, 2011, and of the clarification that I issued on March 4, 2011. I did not receive support or assistance from Dr Alberto Guerra or from any other person, much less from the litigant parties. It is not true that Dr Guerra reviewed the judgment, since neither he nor anyone else reviewed it before it was issued. It is false that Dr Alberto Guerra worked in my home. He has never entered my house in Lago Agrio or in any other province for any reason. I have never told Dr Guerra to approach the parties to ask them for money. I composed and prepared the judgment on the computer that the Judiciary Council had assigned to me, which was in my possession prior to the analysis of the principal subject matter of the trial. For such purpose each of the documents submitted by the litigant parties was reviewed …"*[125]

5.149. The Tribunal has tried to give Dr Zambrano, as a witness, the benefit of any reasonable doubt. He was testifying in a foreign procedure through an interpreter; he was addressing events taking place years before; no judge recalls in full the details of his or her judgment years later; he had probably never been cross-examined before; his cross-examiner during his deposition appears to have lost his temper to an extent that would shock any civilian lawyer; and, whilst Dr Zambrano was provided with his own counsel, there was clearly insufficient time for him to brief her on the complexities of the Lago Agrio Litigation and the Ecuadorian legal system. Further, it may be a significant disadvantage for this Tribunal to assess his testimony on transcripts only, without seeing Dr Zambrano testify in person.

5.150. Yet, having made all these and other allowances in his favour, it is clear from the transcripts of his testimony that Dr Zambrano was a most unsatisfactory witness. In short, the Tribunal finds his testimony, on material issues, incredible; and the Tribunal does not accept it.

### J: The Lago Agrio Judgment – Ms "C"

5.151. For the RICO Litigation in New York, Ms "C" testified, in writing, as Judge Zambrano's temporary student secretary.[126] Unfortunately, Ms "C" never gave any deposition in the RICO Litigation or oral testimony at the RICO trial. It appears that she could have done so, having received her visa from the USA before the end of the trial in the RICO Litigation; but then the RICO defendants informed the Court that she would not testify

---

[125] C-1981, paras 13-15.
[126] C-2458 (Declaration); C-2387 (Direct Examination).

# SA626

at the RICO trial. As a result of her absence from the RICO trial, Ms "C" was never cross-examined on her written testimony. Ms "C" was not a witness in this arbitration.

5.152. In her first Declaration of 30 October 2013, made in Spanish and sworn before a notary in Lago Agrio, Ms "C" testified (with paragraph numbers here added):

> *"[1] ... I declare that during the middle of the month of November of two thousand ten, I was called by Attorney Nicolás Augusto Zambrano Lozada, in order to help him with the digital entry of the cases that he was handling in his role as President of the Provincial Court of Justice of Sucumbíos, and, among others, on one very particular case that I remember, called for DAMAGES being pursued by Ms MARIA AGUINDA ET AL., against CHEVRON CORPORATION, and which was numbered as ZERO ZERO TWO DASH TWO THOUSAND THREE (002-2003)."*
>
> *[2] That my working hours were from eight a.m. to twelve p.m.; and from two p.m. until six p.m., seven p.m., eight p.m., and on some occasions until nine p.m., and that for this I received a daily salary of fifteen United States dollars. Additionally, and in all honesty, I state that on most occasions after I left for my home, attorney Nicolás Augusto Zambrano Lozada continued to work and he would lock the door; I did this until the end of the month of February of two thousand eleven when I told attorney Nicolás Augusto Zambrano Lozada that I would not go anymore, because my university studies did not allow me to do so;*
>
> *[3] Likewise, I must state that during the time that I worked exclusively for attorney Nicolás Augusto Zambrano Lozada, I only received dictation from him, and that he did it from his handwritten notes that he took every day and from the constant review of a large number of binders that case had. I also declare, that when attorney Nicolás Augusto Zambrano Lozada left the office to fulfill his duties, he asked me to also leave and wait for him outside until he returned; he never left me alone in his office, he did not allow it, and he also did not allow outside people to enter it, nor did I ever see attorney Nicolás Augusto Zambrano Lozada, with regard to the referenced case, have any discussion with anyone, at least in my presence.*
>
> *[4] The judgment of the case: María Aguinda et al. against Chevron Corporation dated February fourteenth of the year two thousand eleven, at eight thirty-seven a.m. Likewise, I declare that during the time that I spent in attorney Nicolás Augusto Zambrano Lozada's office, I did not receive instructions, or dictation, from any other person that were not those from attorney Nicolás Augusto Zambrano Lozada, neither was a pen-drive or CD or another storage device used in the digital entry of the judgment in the case being pursued by María Aguinda et al., against CHEVRON CORPORATION. This is all I have to declare, in all honesty...*"[127]

5.153. In her subsequent witness statement of 12 November 2013, made in Spanish and signed in Quito, Ms "C" testified in similar terms:

[127] C-2458.

# SA627

*"1. I am an Ecuadorian citizen of twenty years of age. I have my domicile at … of the city of Nueva Loja, in the Providence of Sucumbios. I am currently studying law at the Universidad Tecnica Particular de Loja [Private Technical University of Loja], and working at the National Development Bank, in the legal department.*

*2. Between the month of November of the year 20l0, and the end of February 2011, I worked for Dr Nicolas Augusto Zambrano Lozada. My work mainly consisted of typing on a computer the text of the ruling of the trial known as "Aguinda, et al. v. Chevron Corporation" (number 002-2003), following the dictation of Dr Zambrano. The ruling was handed down on February 14 of the year 2011.*

*3. The work for Dr Zambrano I performed in his office, in the Provincial Court of Justice of Sucumbios, in the city of Nueva Loja, at a desk with a computer that was available there. For my work, I received the amount of $15 USD daily, and my work schedule was from 8am to 12pm, and from 2pm to 5, 6, 7, 8 and even until 9pm. When I would leave, Dr Zambrano in many occasions would stay in his office.*

*4. The typing process of the aforementioned ruling was as follows: Dr Zambrano had in his office many files of the record, as well as great quantities of handwritten notes, and other research texts. He would constantly review and contrast these materials, going from one side of his office to the other, as he would dictate the sentence to me while I would type it in the computer. At no time did Dr Zambrano base his dictation on preexisting printed versions of the ruling; I can attest to this because of the slow pace that he had when dictating his ideas, sometimes returning to previous parts and correcting them.*

*5. Another of the tasks entrusted to me by Dr Zambrano was doing general Internet research of rulings and other reference texts, which I would print and hand them over for his reading and analysis. For this, I always used the computer of the Court. I do not remember which were the subjects or matters that he entrusted to me to research.*

*6. Dr Zambrano was always very careful and would verify that his office was always safe, always leaving it locked in his absence. When he was absent during my work schedule, he would ask me to wait for his return outside of his office.*

*7. During the time that I worked for Dr Zambrano typing the ruling, there was never a third person present in his office, and I never received a dictation or instructions from any person other than Dr Zambrano.*

*8. During all of the time of dictation and typing of the ruling, there was never connected to the computer on which I worked any external storage device such as USB drive (pen drive) or external hard drive, nor were there any CD or DVD inserted in the same."*[128]

---

[128] C-2387.

5.154. It is evident that Ms "C"'s written testimony, albeit limited, ostensibly supports the testimony of Dr Zambrano in general terms. However, having not been subjected to any cross-examination at the RICO trial (or in this arbitration), the Tribunal accords her written testimony no weight on any material issue of fact. There also many unanswered questions arising from her testimony, including the scope of her foreign language skills and her abilities as a researcher of foreign legal materials. Ms "C" was a 17 or 18 year-old student paid US$ 15 an hour; and she was neither a trained legal assistant nor a professional secretary.

5.155. The Tribunal records that there is no evidence before this Tribunal that Ms "C" participated in or was aware of any 'ghostwriting' during her brief and limited employment by Judge Zambrano. Moreover, the Tribunal has grave reservations as to the manner in which the two statements were produced in her name in the RICO Litigation.

### K: The Lago Agrio Judgment – Dr Guerra

5.156. For the RICO trial in New York and for this arbitration, Dr Guerra testified in the form of his three RICO statements,[129] his depositions of 2 May 2013[130] and 5 November 2013;[131] his oral testimony at the RICO trial,[132] his Witness Statement[133] and his oral testimony at the Track II Hearing.[134]

5.157. In his RICO statement, Dr Guerra testified:

> "... 25. In late January or early February of 2011, approximately two weeks before the trial court in the Chevron case issued the judgment, Mr Zambrano gave me a draft of the judgment so that I could revise it. It was through him that I found out that the attorneys for the [Lago Agrio] Plaintiffs had written that judgment and had delivered it to him. Mr Zambrano asked me to work on the document to fine-tune and polish it so it would have a more legal framework. In recalling these facts initially, I assumed I had received the document on a flash drive given to me by Mr Zambrano in the Quito airport, as he usually did with the projects I helped him with. But later on I specifically remembered that I worked on that document in Mr Zambrano's residence in Lago Agrio using Mr Fajardo's computer. I do not recall the exact date this happened, but I worked on the draft judgment for several hours

---

[129] C-1616A; C-1648; C-1828; R-1331.
[130] C-1888; R-906.
[131] R-907; C-2358.
[132] C-1978.
[133] C-2358; C-2386.
[134] Track II Hearing D3.594-D4.900.

## SA629

*during two days. Mr Zambrano explicitly asked me not to make copies nor leave traces of this document nor the changes I was making, outside of the file on which I worked.*

*26. I began to work on the document as soon as I received it. First I read the holding and I began to work on several sections that needed more structure and basis, especially with terminology related to environmental law. I remember that I called Mr Fajardo on his cell phone to ask him about some sections of the document that confused me. Mr Fajardo told me not to worry and that he would e-mail me a memory aid to clarify my questions. Mr Fajardo e-mailed me a document of around 10 to 12 pages titled "Memory Aid," with some information about the case. In reality, the document did not help me much with my doubts, so that day I worked on punctuation and spelling. I spent the following day making around 20 changes to improve its structure and make it seem more like a judgment issued by the Sucumbíos Court.*

*27. Overall, I made very few changes to this document—mostly word changes due to personal preference - and the document I returned to Mr Zambrano was not too different from the one the Plaintiffs had given him.*

*28. Based on what Mr. Zambrano told me, it is my understanding that the Plaintiffs' attorneys made changes to the judgment up to the very last minute before it was published. But I have never read the final judgment that was published on February 14, 2011 and signed by Judge Zambrano; therefore I don't know for certain what changes were made after I turned the project over to Mr. Zambrano. After Mr. Zambrano issued the judgment, I assisted him over the phone as he prepared the supplemental and clarification order for the judgment…"*[135]

5.158. At the Track II Hearing, Dr Guerra testified that Judge Zambrano gave him a draft of the Lago Agrio Judgment for his review and comments a couple of weeks before the issue of the Judgment on 14 February 2011 (i.e. in the last week of January or the first week of February 2011); and that Dr Zambrano told him he had received it from Mr Fajardo.[136] Judge Zambrano also told Dr Guerra that he (Judge Zambrano) would receive US$ 500,000 for agreeing to let the Lago Agrio Plaintiffs prepare the Lago Agrio Judgment, to be paid once they "received the product of the judgment when it was implemented."[137]

5.159. At the Track II Hearing, under cross-examination, Dr Guerra also testified that, upon studying the draft Judgment, he contacted Mr Fajardo for an explanation of certain issues that concerned him. As a result, Mr Fajardo supplied Dr Guerra with a document

---

[135] C-1616A, paras 25-28.
[136] Track II Hearing D3.601.
[137] Track II Hearing D3.679-680.

known as "the Memory Aid".[138] However, this document did not help Dr Guerra; and he did not use it.[139]

5.160. Apart from the Memory Aid, there is no corroboration of these two aspects of Dr Guerra's testimony from any contemporary documentation or electronic record. The Memory Aid, by itself, is an inconclusive document. In these circumstances, the Tribunal accords little weight to this part of Dr Guerra's testimony.

### *L: The Lago Agrio Judgment – Mr Donziger*

5.161. In his final written testimony, Mr Donziger testified:

> *"I did not write the judgment in the Aguinda case in Ecuador. I have no knowledge that anybody on the legal team of the plaintiffs wrote the judgment in this case, or wrote any part of the judgment.*
>
> *I have never met Judge Nicolas Zambrano, nor have I ever communicated with him. Other than his live testimony during this trial, I have never seen Judge Nicolas Zambrano.*
>
> *I did not bribe Judge Zambrano. The allegations by former Judge Alberto Guerra that I was involved in a meeting where I approved a plan suggested by Pablo Fajardo to pay Zambrano $500,000 is false. Chevron has no evidence that I had any involvement in bribing any judge apart from Guerra's thoroughly false and corrupt testimony.*
>
> *I have no knowledge of anybody on the plaintiffs' team paying or seeking to pay Judge Zambrano."*[140]

5.162. In his depositions, Mr Donziger testified:

> *"Q: Did anyone affiliated in any way with the Lago Agrio plaintiffs provide any portion of the text of the Fusión Memo, Exhibit 1806A, in any form to Judge Zambrano prior to February 1st, 2011? A: I don't believe so.*
>
> *Q: Did anyone affiliated in any way with the Lago Agrio plaintiffs provide any portion of the Fusión Memo marked as Exhibit 1806A to anyone associated with Judge Zambrano prior to February 1st of 2011? A: I don't believe so. But to be as clear as possible, it is possible this memo was provided to the court to be put into evidence, or some version of it.*

---

[138] R-1331, para 3.
[139] Track II Hearing D4.778-779.
[140] C-2385, paras 71-74.

# SA631

*Q: Are you aware of an occasion on which Exhibit 1806A, the Fusión memo, was provided to the court in Lago Agrio? A: No.*

*... Q: Prior to February 1st of 2011 did anyone affiliated in any way with the Lago Agrio plaintiffs draft a judgment that included any portion of the text of the Fusión memo? A: No, not that I know of.[141]*

*Q: Prior to February 1st of 2011, you were involved in having draft Lago Agrio judgments prepared, correct? A: No, I don't believe so.*

*Q: Would you agree that portions of the rest of the Fusión memo, Exhibit 1806A, were at some point in some form provided to Judge Zambrano? A: I wouldn't characterise it that way, no.[142]*

*... Q: Did the Lago Agrio plaintiff team at any time develop a proposed judgment for the Lago Agrio case? A: I don't believe so. I don't know. It is possible.*

*Q: Did you personally ever draft any portion of a draft judgment for Lago Agrio? A: I don't believe so."[143]*

5.163. In the Tribunal's view, Mr Donziger's guarded answers based on his non-belief, lack of knowledge or even possibilities, when he was one of the principal actors at all material times with personal knowledge of almost every aspect of the Lago Agrio Litigation, are curiously evasive. None can be categorised as an unequivocal denial of the 'ghostwriting' of the Lago Agrio Judgment.

5.164. In the circumstances, the Tribunal does not accept that Mr Donziger had no knowledge, at the time, as to the 'ghostwriting' of the Lago Agrio Judgment by certain of the Lago Agrio Plaintiffs' representatives, in corrupt collusion with Judge Zambrano. The Tribunal finds that Mr Donziger, with others, was privy to such 'ghostwriting' and collusion.

### M: The Judgment of the Lago Agrio Appellate Court (2012)

5.165. By its judgment of 3 January 2012, extending over 16 pages, the Lago Agrio Appellate Court affirms the Lago Agrio Judgment.[144] It upholds the punitive damages award because Chevron had refused publicly to "apologise". It also decides that it cannot

---

[141] C-1003, pp. 4686-4688.
[142] C-1003, p. 4726.
[143] C-1003, pp. 4814-4815.
[144] C-991.

# SA632

address Chevron's fraud allegations regarding the conduct of the Lago Agrio Litigation. The appeal was otherwise, ostensibly, a *de novo* hearing based on the evidence filed the Lago Agrio Court. Given the volume and complexity of that evidence, grave doubts arise as to the thoroughness required for such a *de novo* hearing,

5.166. As to the nature of the Lago Agrio Plaintiffs' claims decided by the Lago Agrio Court, the Appellate Court confirms that the Lago Agrio Judgment addressed and decided these claims unequivocally as "diffuse" claims and not as individual claims made by a plaintiff seeking compensation for personal harm to that individual plaintiff (see above for the references to the Appellate Court's Judgment and subsequent order clarifying its judgment).

5.167. As to Chevron's "fraud" allegations, this judgment of the Appellate Court reads in part:

> *"Mention is also made of fraud and corruption of plaintiffs, counsel and representatives, a matter to which this Division should not refer at all, except to let it be emphasized that the same accusations are pending resolution before authorities of the United States of America due to a complaint that has been filed by the very defendant here, Chevron, under what is known as the RICO act, and this Division has no competence to rule on the conduct of counsel, experts or other officials or administrators and auxiliaries of justice, if that were the case."*[145]

5.168. The Appellate Court issues a Clarification Order of its Appellate Judgment on 13 January 2012. It effectively grants the Lago Agrio Plaintiffs' requests for clarification, including a statement that the Appellate Court had considered and rejected evidence of the fraudulent conduct of the Lago Agrio Plaintiffs' representatives.

5.169. The relevant passage, relating to the Lago Agrio Plaintiffs' seventh request, merits citation in full. It reads (in English translation, with numbered paragraphs here added for ease of reference) as follows:[146]

> *"7. [1] In relation to the seventh request for clarification, regarding whether or not the defendant's accusations with respect to irregularities in the preparation of the trial court judgment have been considered, it is clarified that yes such allegations have been considered, but no reliable evidence of any crime have been found.*

---

[145] C-991, p. 10.
[146] R-299 (also C-2314), pp. 3-4.

SA633

[2] The Division concluded that the evidence provided by Chevron Corporation, does not lead anywhere without a good dose of imaginative representation, therefore it has not been given any merit, nor has more space been dedicated to it.

[3] But it is appropriate to say that the Division rejects in this point, and definitively, as unfounded, the defendant's affirmation in chapter "C" of its legal brief that the judgment has been based on information foreign to the record, or with secret assistance, because, as the Division reviewed and explained in the 3 January 2012 judgment, all the valid evidence that has been considered, that is to say, all of the samples, documents, reports, testimonies, interviews, transcripts and minutes, referred to in the judgment, are found in the record without the defendant identifying any that is not – the defendant's motions simply show disagreement with the reasoning, the interpretation and the value given to the evidence, but they do not identify correctly legal evidence that is in the record.

[4] The texts indicated by Chevron Corporation, as an example that the judgment has been based on information foreign to the record, are not considered or put forth as legal evidence, not even by the defendant itself in its claim, for which reason the Division understands that it is not alleging that the judgment has been sustained on evidence foreign to the record.

[5] Therefore, starting by considering that only the evidence legally produced is deemed authentic in trial about the facts in dispute, and that which must be in the record, it is concluded that the appealed judgment is based on legally presented evidence, that is in the record, although certainly the reasoning and the interpretation, as human – of the judge – having his intellect as source of origin, are incorporated in the record through his rulings.

[6] It is noted that on at least one occasion of which this Division is aware, the defendant provided a considerable amount of information to the President of the Court, related to an arbitration case between Chevron Corporation and the Government of Ecuador. This information was not introduced into the record of case 002-2003 and has not been able to be valued by this Division due to the fact that the defendant has not formally entered it into the lawsuit, but even so, and in the Division's opinion, it was known and studied by the lower court judge.

[7] In this scenario, the plaintiffs have denounced that Chevron Corporation alleged in the United States of America, one day after the appealed judgment was issued on 14 February 2011, that it suspected that Judge Zambrano had received 'secret assistance' in drafting the judgment, and therefore now it is untimely to try to say this – before the Division – and not before who ruled on the cause in the first instance so that he clarify them.

[8] And there is no explanation for reserving these 'suspicions' in order to put them forth before this Division, if we consider, as the plaintiffs' reference, that the defendant knew of this supposed fact the day following issuance of the judgment. Apart from what has been said, this Division further considers it pertinent to make an observation about the 'secret assistance' that is spoken of for drafting the first

## SA634

*instance judgment, and that is because of the sense of logical orientation it is difficult to conceive that, were a secret channel to have existed, used illegally by the plaintiffs to supplement or modify the judgment, that pathway would have allowed for the introduction of arguments that were decisive for the resolution of this lawsuit.*

*[9] The Division cannot fail to observe that the defendant's arguments to uphold its accusations revolve around points that in reality do not provide more information that would shore up the defended position, which put in doubt any attributed secret conspiracy. It would not be fitting, therefore, for the defendant to be able easily to say that what is alleged is just an indication of a greater problem since it is public knowledge that legal proceedings for production of documents proposed by the defendant in the United States of America allowed it to access the vast majority of the internal documents prepared by the plaintiffs' representatives.*

*[10] If there had been any 'secret assistance', the presumed concordance between the plaintiffs' internal documentation, and the text of the judgment would not be limited to a fairly simple interpretation of evidence that is contained in the record. This is a civil proceeding in which the Division does not find evidence of 'fraud' by the plaintiffs or their representatives, such that, as has been said, it stays out of these accusations, preserving the parties' rights to present formal complaint to the Ecuadorian criminal authorities or to continue the course of the actions that have been filed in the United States of America. This was a determining factor for the Division's considerations in the judgment that is being clarified, since it is obvious that it was not its responsibility to hear and resolve proceedings that correspond to another jurisdiction, nor was it admissible to detain the processing of this principal lawsuit – or worse, to annul it – in order to discuss and make a pronouncement on the interminable and reciprocal accusations over misconduct of some of the parties' attorneys, experts or contractors, which is why these could not affect the final result of the lawsuit.*

*[11] However, this Division expresses its concern over the possibility that the abuse of right extends abroad, with the same intent shown of depriving the plaintiffs of the right that has been declared in this proceeding. It is clarified that the interests at play in this judicial proceeding exceed the interests of the adversaries or their representatives, who in the event that they feel damaged have their rights preserved to exercise them by independent channels."[147]*

---

[147] The original Spanish reads, in the key first, second and tenth paragraphs above: "*7. En relación al séptimo pedido de aclaración, sobre si se ha considerado o no las acusaciones de la parte demandada respecto a irregularidades en la elaboración de la sentencia de primera instancia, se aclara que si ha considerado tales alegaciones, pero no ha encontrado pruebas fehacientes de ningún delito. La Sala concluyo que los indicios aportados por Chevron Corporation, no conducen a ningún lado sin una buena dosis de representación imaginativa, por lo que no se le ha dado ningún mérito ni se le dedico mayor espacio. ... De haber existido "asistencia secreta" alguna, la presunta concordancia entre la documentación interna de los demandantes, y el texto de la sentencia no estaría limitada a una interpretación bastante simple de pruebas que constan en el proceso. Este es un proceso civil en que la Sala no encuentra evidencia de "fraude" de los actores ni sus representantes, de modo que, como lo ha dicho, queda al margen de estas acusaciones, dejando a salvo los derechos de las partes para presentar denuncia formal ante las autoridades penales ecuatorianas o para continuar el curso de las acciones que se han interpuesto en los Estados Unidos de América. Esto fue determinante para las*

5.170. This statement in the Clarification Order seems materially inconsistent with the passage in the Appellate Judgment, cited above. In any event, it is somewhat difficult to follow the logic of the Appellate Court. It appears to limit its consideration to "legal evidence that is in the record" of the Lago Agrio Court. Chevron's complaint was not so limited. Nor could it have been before the Lago Agrio Judgement was issued by the Lago Agrio Court.

5.171. In the circumstances, the Tribunal adopts the expert testimony of Dr Coronel to the effect that "the appellate court specifically refused to fulfil its obligation to perform a comprehensive review of both the facts and the law regarding the dispute, as well as the allegations of fraud, as Chevron Corporation ('Chevron') had requested it to do."[148]

### N: The Judgment of the Cassation Court (2013)

5.172. *12 November 2013*: The Cassation (National) Court issues its Judgment affirming part of the Lago Agrio Judgment; but it nullifies the punitive damages imposed for Chevron's omission to "apologise", as required by that Judgment and as upheld by the Appellate Court.[149] As a result, the Cassation Court reduces the Lago Agrio Judgment's award of damages to US$ 8.6 billion, with 10% to be paid to the ADF.

5.173. The grounds for Chevron's cassation appeal included: (i) the inadequate application, lack of application or erroneous interpretation of procedural rules resulting in the irremediable nullity of the proceedings or in the appellant's defenselessness, provided they have influenced the judgment and that the respective nullity has not been legally validated; (ii) the judgment's lack of formal requirements provided for by law or the adoption of incompatible or contradictory decisions in the judgment's operative part; (iii) an extra petita or infra petita judgment; (iv) the inadequate application, lack of application or erroneous interpretation of applicable evidentiary rules, provided they lead to an erroneous application or to the lack of application of legal rules in the judgment; and (v) the inadequate application, lack of application or erroneous

---

consideraciones de la Sala en la sentencia que se aclara, pues siendo evidente que no le competía entrar en conocimiento y solución de procesos que corresponden a otra jurisdicción, tampoco era admisible detener la tramitación de este juicio principal – o peor, anularlo – para discutir y pronunciarse sobre las interminables y reciprocas acusaciones sobre inconductas de algunos abogados, peritos o contratistas de las partes, por lo que éstas no podrán afectar el resultado final del juicio. ...".
[148] Coronel ER 7, para 10.
[149] C-1975.

interpretation of applicable legal rules, including mandatory judicial precedent, which were determinative for the judgment's operative part. In short, these grounds included Chevron's fraud allegations and the 'ghostwriting' of the Lago Agrio Judgment.

5.174. The first 48 pages of the Judgment summarise the cassation claims made by Chevron. At pages 48-51, the Judgment sets forth the limits on the Cassation Court's powers to annul an inferior court's decision. Such limits are essentially of formalistic nature and are listed in Article 346 (formerly 355) of the Ecuadorian Code of Civil Procedure. Consequently, under Ecuadorian law, cassation controls do not extend to the review of evidence. An evaluation of the evidence is permissible only when the inferior decision was manifestly illogical, irrational or arbitrary (see pages 145-166 of the Judgment, No. 8.2ff). The purpose of the cassation review (as the Judgment states) is not to serve as a third instance appeal. It is limited to ensuring that the principles of legality and the respect of the Constitution of Ecuador are safeguarded. The Cassation Court confirms that its controls are limited to judging whether such principles have been infringed by the Appellate Court, but that they do not extend further to the Lago Agrio Judgment.

5.175. Accordingly, the Tribunal concludes that the Cassation Court:

(a) Did not review de novo the conclusion of the Lago Agrio Court or the confirmation by the Appellate Court of the assertion of jurisdiction over Chevron by the Lago Agrio Court on the basis of the Chevron and Texaco "merger"; the Cassation Court accepted that Chevron voluntarily accepted the jurisdiction of the Ecuadorian courts, particularly of the Lago Agrio Court, in the Aguinda Litigation in New York (Nos. 5.2-5.4, pages 51-67; No. 6.4. pages 110-111);

(b) Did not review any expert reports as to their legality, consistency, weight, intrinsic value, contradictions, whether they were "ghostwritten" or not, or review their evaluation by Judge Zambrano (No. 5.11, page 85);

(c) Did not review whether there had been any procedural fraud committed by the Lago Agrio Plaintiffs' representatives; moreover, procedural fraud would not be known under Ecuadorian civil law or criminal law; and it is not a ground to nullify a court decision in Ecuador (No. 5.13, pages 89-91; No. 6.12, pages 120-121);

(d) Did not pronounce itself on the integrity or independence of Judges Yánez, Nuñez, Ordoñez, Zambrano or the validity of Dr Calmbacher's testimony (No. 5.15, pages 93-96);

(e) Did not consider or determine whether the Lago Agrio Judgment or other court orders in the Lago Agrio Litigation were "ghostwritten" or not (No. 5.16, pages 98-99);

(f) Did not review whether the Lago Agrio Court's conclusions on the principle of causality for harm or damages were correct or whether the Lago Agrio Court contradicted itself in the calculation of damages, or whether the damages were correctly calculated by the Lago Agrio Court (Nos. 6.7, 6.8, pages 115- 117); and

(g) Did not establish whether the Lago Agrio Judgment was based on evidence not asked for, not produced or not ordered in accordance with Ecuadorian law (No. 6.9, pages .118-119).

5.176. The Judgment also rejected the submissions made by Chevron, by the Cassation Court's decisions:

(i) The Lago Agrio Court had subject-matter jurisdiction to apply the 1999 EMA; and, thus, the Lago Agrio Plaintiffs had standing to pursue "diffuse" rights (No. 5.6, pages 67-75);

(ii) Although the Judgment upheld Chevron's cassation claim of insufficient reasons regarding the falsity of signatures for some of the Lago Agrio Plaintiffs in the Lago Agrio Complaint, the Cassation Court minimises the importance of such falsity. It decides that that such falsity, even if proven true, had been cured by several presentations throughout the Lago Agrio Litigation by representatives duly empowered by such Plaintiffs; and that, in any case, such issues were not for civil courts (nor for the Cassation Court), but for criminal courts to investigate and determine. It also decides that the validity of the powers of attorneys, representing the Lago Agrio Plaintiffs, were public documents whose authenticity could only be challenged in the criminal courts (No. 5.12, pages 86-90; No. 6.2, page 104-106);

# SA638

(iii) The 1995 Settlement Agreement lacks the effect of res judicata in respect of diffuse rights such as those claimed by the Lago Agrio Plaintiffs; neither the State of Ecuador nor its Municipalities had the exclusive right to advance or protect such rights prior to the 1999 EMA; and, even before the EMA, individuals had the right to advance or assert "diffuse" rights. Therefore, Chevron's argument that there was a retrospective application of substantive provisions of the EMA by the Lago Agrio Court was unfounded (No. 9.3-9.8, pages 174-202);

(iv) The Cassation Court applies the 1999 EMA to Chevron, essentially on the basis of Article 396 of the (then current) Ecuadorian Constitution, establishing an objective basis for the causation of harm in Ecuador when attributing environmental liability. Such liability would also carry with it the jurisdiction of Ecuadorian courts to hear and decide claims, even in respect of companies not present in Ecuador and, as well, to dispense with any requirement to identify PetroEcuador's shared responsibility for environmental damage claimed in the Lago Agrio Litigation against Chevron (No. 6.6, pages 113-115); and

(v) The Cassation Court concludes that the Lago Agrio Plaintiffs' claims, as addressed by the Lago Agrio Court and the Appellate Court, were "diffuse" and not individual claims for personal loss or damage suffered by the Lago Agrio Plaintiffs as individuals.

5.177. As regards Chevron's allegations regarding "procedural fraud", the Cassation Judgment states, in material part (with citations here omitted):

> *"Chevron Corporation alleges that there is a 'great collusive demonstration'. When collusion is an independent action governed by our Ecuadorian legislation, it is so regulated under the Collusion Prosecution Act; and, as stated by this Division of the Court, it is not possible to seek the cassation of a judgment by making these kinds of allegations, even more so when, according to the cassation appellant's affirmations, Judge Nuñez was subject to a proceeding before the Judicial Council. Therefore, the affirmation made by the court of appeals is the correct one, as it is not within its scope of that court to have jurisdiction to hear collusive action cases within a summary verbal proceeding, or procedural fraud, judges' behaviours, proper and improper meetings, the appointment of substitute judges, plaintiffs' connivance, among other allegations made by the appellant company.*

*...*

*With respect to the various ancillary proceedings for clarification and expansion alleged in cassation by appellant, which are an essential part of the procedural sequence, also known as horizontal remedies and decided by the court of appeals, in that it lacks jurisdiction to hear and decide cases of procedural fraud, it is for that reason that the order for clarification requested by the parties allows such parties to bring such legal actions as they believe are available to them. In determining in a sufficient and clear manner that there was no procedural fraud in these proceedings, in the opinion of the Appeals Court, does not mean that the order issued on January 3, 2012 is inconsistent with the judgment rendered on January 13, 2012; it is clear that, by preserving the rights and actions of the parties, the court acknowledges the lack of jurisdiction to decide whether or not there has been procedural fraud.*

*The conclusion that emerges from the foregoing is that there is no contradiction between the judgment handed down on January 3, 2012 and the order issued on January 13, 2012, or any kind of arbitrariness. Arbitrariness occurs when the order or judgment go against the law, in this specific case and as already reviewed by this Cassation Court, through the lack of jurisdiction of the court of appeals to decide on matters such as procedural fraud, there is no arbitrariness and, accordingly, Article 281 of the Code of Civil Procedure has not been infringed. For these reasons the charge is dismissed.*

*...*

*As explained [above], the fact that the Trial Court has determined that there is no evidence of procedural fraud, and at the same time, lacks jurisdiction to decide on such matters, does not mean that there is any inconsistency, because 1) The subject matter of the judgment is not the existence or absence of procedural fraud. 2) Jurisdiction to decide on the existence of procedural fraud does not lie with the trial court or with the Appeals Court.*

*If the Court does not find the evidence required to determine the existence or absence of procedural fraud, this does not, in and of itself, mean that there was none, since under the law of most countries and as discussed and explained in this judgment, such matters are dealt with separately, and the subject matter of the action is the determination of whether or not procedural fraud was committed. The matters in dispute in this case are different, the action is based on other grounds, and it is a summary verbal proceeding, which cannot be used to determine this type of ancillary proceeding.*"[150]

5.178. In thus affirming the Lago Agrio Judgment, the Cassation Court did not review the merits of any of Chevron's allegations of fraud in the conduct of the Lago Agrio Litigation or the 'ghostwriting' of the Lago Agrio Judgment. However, in commenting

---

[150] C-1975, pp. 95, 120-121 (regarding Chevron's Cassation Appeal: C-1068).

# SA640

upon the Cassation Court's lack of jurisdiction to adjudicate upon Chevron's allegations, the Cassation Court noted that these allegations were being heard in the pending RICO litigation in New York, USA.[151]

5.179. It is not entirely clear to the Tribunal whether the Cassation Court (or, previously, the Appellate Court) was here effectively relinquishing to the US Courts the allegations of fraud advanced by Chevron to impugn the Lago Agrio Judgment. Although that appears to be the conclusion reached much later by the US Court of Appeals for the Second Circuit in the RICO Litigation, the Tribunal does not here assume that this was in fact so.[152] As regards the Cassation Court, that would have been inconsistent with its citation of the Ecuadorian Collusion Prosecution Act (the "CPA"; see above).

### O: The Judgment of the Constitutional Court (2018)

5.180. *27 June 2018:* The Constitutional Court issues its Judgment on 27 June 2018,[153] affirming the Judgment of the Cassation (National) Court (2013),[154] following public hearings held on 16 July 2015 and 22 May 2018. The Constitutional Court declares that there is no violation of constitutional law, as alleged by Chevron; the Court rejects the Extraordinary Action of Protection made by Chevron; and it orders its judgment "[t]o be recorded, published and enforced."[155]

5.181. The Constitutional Court Judgment includes summaries of the submissions made by Chevron, as well as submissions made by the Lago Agrio Plaintiffs, the ADF, the Office of the Respondent's Attorney-General and amici curiae. The Constitutional Court's reasons for its Judgment extend over some 100 pages (in Spanish), under nine Chapters.[156] For present purposes, its principal reasons may be summarised as follows, with parts of its text meriting full quotation.

---

[151] C-1975, pp. 120-121.
[152] In the Second Circuit's Judgment, the Court decided: "*In these circumstances, in which the district court has, on the claims of corruption, granted equitable in personam relief that does not invalidate the Ecuadorian judgment, and in which the Ecuadorian courts have expressly disclaimed jurisdiction to address the corruption claims and stated that the matter is preserved for adjudication in the United States courts, international comity is not an obstacle to the present District Court Judgment.*" (C-2540, p. 116).
[153] C-2551 (being the Parties' agreed translation from the Spanish original text into English).
[154] C-1975.
[155] C-2551, p. 148.
[156] C-2551, pp. 54 to 159. Chapter 1 (pp. 56ff); Chapter 2 (pp. 65ff); Chapter 3 (pp. 81ff); Chapter 4 (pp. 86ff); Chapter 5 (pp. 99ff); Chapter 6 (pp. 113ff); Chapter 7 (pp. 115ff); Chapter 8 (pp. 129ff); and Chapter 9 (pp. 132ff).

# SA641

5.182. Under Chapter 1 of the Judgment, the Constitutional Court decides that there was no infringement of Chevron's "right to be tried by a competent judge and in pursuance of the corresponding due process of law applicable to each proceedings"; i.e. the Lago Agrio Court, the Lago Agrio Appellate Court and the Cassation Court.

5.183. The Constitutional Court affirms (inter alia) the decisions of these three courts that, for the purpose of their jurisdiction ("competence") and liability to the Lago Agrio Plaintiffs in the Lago Agrio Litigation, Chevron had assumed Texaco's and TexPet's liabilities as a result of the "merger" between Texaco and Chevron in 2001. The Constitutional Court decides Chevron's jurisdictional objection, as follows:[157]

> *"... the first item to be discussed within the question put forward above bears relationship with the fact of identifying the linkage or relationship that, according to the affected parties, existed between the defendant company Chevron Corporation and the company that operated in the contaminated area until the year 1992, named TexPet, and that, as determined in the lawsuit for environmental damage, was the person liable for the damage caused. Although this analysis may at first sight be related to the identification of the corresponding, lawful opposing party to this lawsuit, it actually seeks to establish above all a linkage allowing for the determination of the competence of the Ecuadorian judges. That is why, after a lengthy and well-founded analysis made by the lower court judge and ratified by the Court of Appeals and the Cassation Court, it was found that the Ecuadorian company TexPet was an affiliated company of the parent company Texaco Inc., and this latter company had in turn merged with the American company Chevron Corporation, a circumstance that within the corporate setting made it possible to establish that Chevron had undertaken any and all subsequent liabilities for the acts then performed by the company Texaco Inc. and its affiliated companies. As a matter of fact, this conclusion drawn by the trial court judge did not only make it possible to identify the corresponding lawful opposing party within the lawsuit, but it also allowed for the connection of this fact with the events taking place at the Court for the Southern District of New York before the date on which the lawsuit for environmental damages was filed, where within the case for environmental damages entitled Sequihua v. Texaco [the Aguinda Litigation], the American court found that the most appropriate forum to try said controversy was Ecuador, since the alleged damage was caused in said country, a circumstance that was accepted by Texaco Inc., thus opening the way for the Ecuadorian courts to enjoy sufficient competence to hear and settle any lawsuits filed on the grounds of environmental harm then caused by the company TexPet, whose parent company was Texaco Inc. and that now is, on the basis of the merger undergone by said company, according to the Ecuadorian courts, Chevron Corporation."*

5.184. From this and other passages, the Tribunal understands that, for the purposes of both jurisdiction and liability in the Lago Agrio Litigation, the Constitutional Court treats

---

[157] C-2551, pp. 62-63.

# SA642

Chevron as if it were TexPet and Texaco and an active participant in their activities in Ecuador from 1964 onwards in the concession area. This understanding is confirmed by a later passage in the Constitutional Court's Judgment referring to the difficulty in establishing the timing of polluting incidents "from the overall operation of the oil company for about 28 years." [158] In context, this reference targets Chevron as the polluting "oil company" during the period of TexPet's concession from 1964 to 1992, a period of 28 years.

5.185. Under Chapter 2 of the Judgment, the Constitutional Court decides that the Judgment of the Cassation Court did not infringe "the constitutional right to the effective judicial protection by failing to declare the procedural fraud alleged by Chevron."

5.186. The Constitutional Court describes Chevron's allegations of procedural fraud, as follows:[159]

> *"... The actions that, in the words of the appellant, have caused a massive fraud or procedural fraud within the lawsuit brought against it, are: the plaintiffs' furtive collaboration in the ghostwriting of the trial court judgment, the influence they exerted for the appointment of the expert witness and the forgery of the expert witness' report that eventually did, whether directly or indirectly, serve as the basis for the assessment of the alleged environmental damage. On such bases, the appellant does hereby sustain that it has been proven in the various judicial stages that there has been a severely gross procedural fraud committed by the attorneys of the plaintiffs with the support of the judicial authorities, by means of the evidence produced at that moment, which was obtained by means of court orders issued in proceedings pursued in the United States of America."*

5.187. The Constitutional Court decides that the Cassation Court had no power to decide Chevron's allegations of procedural fraud. It states, as follows (with footnotes here omitted):

> *"... it should be remarked that the cassation appeal does not constitute another trial stage in the court proceedings, wherein issues of fact previously reviewed by the trial court judges can be freely discussed; but rather, it is by means of the cassation appeal that the judges of the National Court of Justice, who are in charge of hearing such an appeal, undertake a review of the jurisdictional activity of the lower trial court judges, in respect of the application of the rules of law within their judgments or orders intended to close declaratory proceedings or trials. It is thereby ruled out any possibility that the cassation court judges may order the production and examination of evidence, make any assessment of the evidentiary*

---

[158] C-2551, p. 110.
[159] C-2551, p. 67.

## SA643

> *elements or being to discuss any facts previously heard by the trial court judges, since any such actions would result in an infringement of judicial independence and legal certainty, duly guaranteed by the Constitution of the Republic of Ecuador."*

5.188.  Later, the Constitutional Court concludes:[160]

> *"… it is clear that nullity as a procedural concept corresponds to the grounds expressly set out in the Law, therefore, for such nullity to possibly take effect as an argument within a cassation appeal, it must, apart from observing the conditions established in section 3 of the Cassation Act - i.e. exert influence on the decision of the case or not having been legally validated - comply with the requirements established by Law, in the specific case at hand, the Code of Civil Procedure, as it is the currently applicable law at the time of said civil lawsuit; otherwise, the alleged error in the application or interpretation of procedural rules alleged by the company lodging this cassation appeal cannot be analyzed as a ground for the cassation appeal, insofar as it does not represent any materialization of an incurable nullity within the process, as stated by the National Court of Justice [the Cassation Court] in its ruling.*

> *This Court, based on the considerations expounded thus far, must specify that the appellant's allegations concerning the performance of fraudulent acts on the part of and attributable to its counterparty to these proceedings and the judicial authorities involved in trying the case, are not grounds or reasons expressly provided for in the Ecuadorian law as a valid foundation to argue and determine the nullity of the proceedings; otherwise, as analyzed further below and pursuant to the opinions of the National Court of Justice based on the appellant's arguments, the facts therein alleged would correspond to another type of conducts to be tried by means of the corresponding proceedings, rather than as a ground for procedural nullity. Therefore, as this is an appeal which is extremely formalistic and rigorous, the Cassation Tribunal is called on to strictly observe the legal regulations established in relation thereto, which in the case at hand have not been fulfilled, hence, there has been no concurrence whatsoever of any essential elements necessary for the judges of the National Court of Justice to find the appropriateness of the charges alleged by the appellant as grounds for nullity of the proceedings and for the very cassation appeal.*

> *In this respect, it can be noticed that the performance of judges when rendering the judgment subject to appeal is consistent with the nature of the cassation appeal and with the rules governing such subject matter, otherwise, to admit, as sought by the appellant, any argument as a ground for procedural nullity would confront us with a legal system in want of certainty in the application of legal rules and, therefore, inconsistent with the legal framework provided for by our Ecuadorian Constitution.*

> *On the other hand, as previously stated, the judges of the Cassation Court sustain within the decision subject to appeal that, should the procedural irregularities alleged by Chevron exist, the Ecuadorian law has already established the corresponding actions of administrative and criminal nature to punish such kind of*

---

[160] C-2551, pp. 75-77.

*conducts, notwithstanding the civil liabilities that may arise therefrom. The Cassation Tribunal considers that the arguments expounded by Chevron make reference to the commission of somehow collusive actions, a behavior for which, the judges explain, there is a specific regulation in the Ecuadorian law [Footnote 27 refers to the Collusion Prosecution Act] : likewise, the judged sustain [sic: "judgment?] that by means of the arguments posed by the company lodging this cassation appeal, its counterparty's lawyers, expert witnesses and trial court judges are thereby being accused of having committed several crimes, an aspect which is found as inadmissible by the national justices within the context of the cassation appeal at hand. In furtherance of its stance, the appellant argues that the Cassation Tribunal's refusal to hear and remedy the procedural fraud it reported, constitutes an infringement of its constitutional right subject matter of this legal issue, which, in turn, has led Chevron to a status of deprivation of its right to judicial defense in the proceedings pursued against it.*

*In this respect, this Court does hereby notice, in the first place, that the appellant's allegation in relation to the fact that the Cassation Tribunal refused to deal with the procedural fraud reported by the company Chevron, lacks every single foundation, since as stated and described in the foregoing paragraphs, the National Court of Justice actually analyzes the arguments proposed by means of the cassation appeal in relation to the performance of fraudulent acts within said judicial proceedings; in spite of this, the fact that the judges know the parties' allegations does not necessarily entail a favorable decision for either party's claims, as seems to be the appellant's intention, when stating that the cassation court judges infringe constitutional rights by not remedying the fraud reported by the appellant."*

5.189. From these and other passages,[161] the Tribunal concludes that the Constitutional Court both received and understood the factual allegations of procedural fraud made by Chevron, including the 'ghostwriting' of the Lago Agrio Judgment; that these allegations were materially the same as the Claimant's factual allegations made by the Claimants in this arbitration; and that the Constitutional Court decided that both the Constitutional Court and the Cassation Court had no jurisdiction under Ecuadorian law to determine the truth or effect of such allegations upon the status of the Lago Agrio Judgment, including its enforceability and execution within and without Ecuador. (As to the Constitutional Court's reference to the Collusion Prosecution Act, the Tribunal returns to this issue later below).

5.190. Under Chapter 3 of the Judgment, the Constitutional Court decides that the Cassation Court's Judgment did not infringe "the right to the due process of law as to the guarantee

---

[161] See also C-2551, pp. 80 and 81.

## SA645

enshrined in [Article] 76, paragraph 4 of the Constitution of the Ecuadorian Republic."[162]

5.191. The Constitutional Court concludes:[163]

> "Ultimately, this Court does hereby notice a series of allegations related to the field of evidence that, far from arguing a constitutional infringement, merely show a dissatisfaction with the assessment made not only by the judicial authority rendering the judgment under discussion herein, but also by the judges acting in the civil lawsuit; a circumstance that, pursuant to the previous findings of this Court, does not pertain to a constitutional sphere and as such, it should not be the subject matter of analysis within the context of this petition.
>
> Finally, it is necessary to point out that, once the arguments posed by the appellant with its intention to clearly show that the procurement of evidence occurred in violation of constitutional principles and rights have been analyzed, this Court has not found a clear and well-founded argument that may make it possible to acknowledge such kind of charges, a situation that, as expounded in the foregoing paragraph, would indeed constitute an element to be analyzed by this Court. In this line of thought, it is thus confirmed, based on the foregoing explanations, that the appellant itself expects a decision of the Constitutional Court on some aspects that are beyond the production and procurement of evidence referred to in Article 76, paragraph 4 of the Constitution of the Republic of Ecuador."

5.192. Under Chapter 4 of the Judgment, the Constitutional Court decides that the Cassation Court's Judgment did not violate "the constitutional right to legal certainty in connection with the alleged existence of res judicata."

5.193. The Constitutional Court here considers Chevron's submissions regarding the 1995 Settlement Agreement. It concludes that the 1995 Settlement Agreement does not preclude the Lago Agrio Complaint because the Ecuadorian State, as a party to the 1995 Settlement Agreement, did not represent or bind the Lago Agrio Plaintiffs; and, since the 1995 Settlement Agreement is deprived of res judicata effects, there is no infringement of the constitutional law principle "non bis in idem" or double jeopardy.[164] The Tribunal returns below to this part of the Constitutional Court's Judgment.

---

[162] Article 76(4) of the Constitution provides: *"In all proceedings determining rights and obligations of any kind, the right to due process shall be ensured, and it will include the following basic guarantees: 4. Evidence obtained or taken in violation of the Constitution or the law will have no legal validity and will lack probative value."*
[163] C-2551, pp. 84 and 85.
[164] C-2551, p. 99.

# SA646

5.194. Under Chapter 5 of the Judgment, the Constitutional Court decides that the Cassation Court's Judgment did not violate "the right to legal certainty contained in Article 82 of the Constitution of the Republic, based on the retroactive application of the 1999 Environmental Management Act [the EMA]".

5.195. The Constitutional Court here considers that, in view of the values advanced by the substantive provisions of Ecuadorian law regarding the protection of the environment, including provisions in the Civil Code pre-dating the commencement of activities by Texaco and TexPet in Ecuador, there has not been any retrospective application of Ecuadorian law in the Lago Agrio Litigation that violates constitutional Law.

5.196. The Constitutional Court concludes (with footnotes here omitted):[165]

> *"It is possible, therefore, to assert that no one has the acquired right to pollute or can claim the existence of a consolidated legal situation when his/her actions damaged the environment and also when there are collective environmental interests at stake. Under this logic, it is absolutely possible and sometimes necessary to enforce the retroactive application of the environmental regulations to the extent that it provides greater levels of protection.*
>
> *In light of the foregoing, it is the understanding of this Court that the application of the second paragraph of article 43 of the Environmental Management Act did not represent a breach of the right to legal certainty, as it addressed the constitutional principle of in dubio pro natura, which requires judges to apply the rule most favorable to nature in cases in which there are doubts about the rules to apply, and was able to protect the right to a healthy environment and nature in the best possible way."*

5.197. From this and other passages, the Tribunal understands that the Constitutional Court is again treating Chevron as TexPet. For example, in a preceding passage, the Constitutional Court refers to "Chevron" refusing "to repair the damage", namely environmental damage caused by pollution incidents "throughout the entire time", being the term of TexPet's Concession Agreements from 1964 to 1992.[166]

5.198. Under Chapter 6 of the Judgment, the Constitutional Court decides that the Cassation Court's Judgment did not breach "the right to legal certainty contained in Article 82 of

---

[165] C-2251, p. 112.
[166] C-2551, p.111.

the Constitution of the Republic due to the retroactive application of the objective liability regime".

5.199.   The Constitutional Court concludes:[167]

> "The objective liability regime, reversal of the burden of proof, the principle of enforcing the rule most favorable to the protection of nature-related rights and the non-applicability of statute of limitations to environmental rights, configure the constitutional block to protect nature and these objectives were achieved with the application of the regulations by trial court judges and by the National Court of Justice, and this situation must be backed by this Constitutional Court."

5.200.   These rulings include the judgment of the former Supreme Court in the *Delfina Torres* case (cited above).[168]

5.201.   Under Chapter 7 of the Judgment, the Constitutional Court decides that the Cassation Court's Judgment did not breach "the constitutional right to legal certainty in relation to the principle of consistency of legal decisions."

5.202.   The Constitutional Court concludes:[169]

> "... it is apparent that an impact on the environment has a direct effect on the culture of the indigenous communities that inhabit the area where pollution has occurred, as in the specific case of the damages caused in the Amazon. In such a way, having a redress mechanism that tends to remedy the cultural damage produced by environmental pollution caused by the appellant company [sic: Chevron] and as stated by the judge a quo, it is a complementary measure that contributes to redress for damages caused to the flora and fauna of the territory, which are fundamental elements for the development of life and cultural identity of the indigenous population that lived in the concession area. Therefore, this Court not only rejects the petitioner's argument but also considers that the redress ordered in the ruling to implement a community reconstruction and ethnic reaffirmation program is proper and in no way constitutes a measure that the plaintiffs did not request ..."

> "Therefore, this Court determines that the contested judgment does not infringe on the principle of non ultra petita applicable to judicial decisions, consequently, it being established that there is no infringement of the right to legal certainty."

---

[167] C-2551, p. 115.
[168] C-2551, p. 113.
[169] C-2551, pp. 128 and 129.

# SA648

5.203. Under Chapter 8 of the Judgment, the Constitutional Court decides that the Cassation Court's Judgment did not infringe "the right to due process provided for in Article 76, Number 6 of the Constitution of the Republic".[170]

5.204. The Constitutional Court concludes:[171]

> *"... the principle of proportionality from the punitive sphere, as enunciated in the Constitution of the Republic, must be observed from the perspective that any imposition of excessive and unnecessary sanctions will also represent a restriction or arbitrary deprivation of rights. Circumstance that, in turn, imposes on the legislator the need to establish clear and tolerable limits for each sanction, since, being clear from the aforementioned Constitutional text, it is through the law that the proportionality between the infringement and the sanction will be guaranteed.*
>
> *However, returning to the analysis of the arguments made by the plaintiff [sic: the appellant, Chevron] in relation to the violation of the principle of proportionality, it is necessary to refer to the fact that the compensation for damages ordered by the judge of first instance and ratified by the appeal and cassation judges, irrespective of its origin, is aimed at economic compensation to those affected by the harmful consequences caused by the performance of a wilful act or malfeasance, in this particular case, environmental pollution.*
>
> *Therefore, it is evident that the compensation described as excessive and disproportionate that were ordered in the environmental damages case against Chevron, does not have a punitive nature, that is to say sanctioning, but rather a compensatory nature, that is, redress for the damage caused, as has been noted throughout this ruling and as described in the Environmental Management Act in force on the date the claim was filed.*
>
> *Therefore, it is clear that the principle of proportionality recognized in the Constitution as a guarantee of due process, responds to the idea of controlling and limiting the exercise of the punitive power the State has, avoiding the excessive use of sanctions that entail a deprivation or restriction of rights in order to protect valuable legal assets within society; circumstance not related to the case under analysis, since it has been evidenced that we are facing an economic recovery of the damage, but not before the application of a penalty that represses unlawful conduct."*

---

[170] Article 76(6) of the Constitution provides, in material part: "*In all proceedings determining the rights and obligations of any kind, the right to due process shall be ensured, and it will include the following basic guarantees: (6) the law shall establish the proper proportionality between violations and criminal, administrative or other sanctions.*"

[171] C-2551, pp. 131 and 132.

# SA649

5.205. Under Chapter 9 of the Judgment, the Constitutional Court decides that the Cassation Court's Judgment did not violate "the right to reasoning contained in Article 76, number 7(1) of the Constitution of the Republic".[172]

5.206. The Constitutional Court listed Chevron's criticisms of the Cassation Court's reasoning, as follows:[173]

> *"[The Cassation Court] Justice refused to rule on elements such as procedural fraud; the res judicata effect of the 1995 settlement agreement; violation of procedural rules related to competition; judicial inspections; essential error; lack of application of norms related to the assessment of evidence; violation of the dispositive and congruence principles; retroactive application of substantive aspects of the Environmental Management Act; illegal and untimely appointment of the judges who heard the appeal; and lack of reasoning in the appeal decision."*

5.207. As regards Chevron's allegations of procedural fraud, the Constitutional Court concludes, approving the Cassation Court's reasoning, as follows:[174]

> *"Even if true, in the review of judgment, it can be seen that when the plaintiffs make allegations regarding procedural fraud within the second clause of Article 3 of the Cassation Act, the National Court of Justice provides a generic answer saying that '(...) never identified any law in such allegations, nor has it ever shown how this affected the validity of these proceedings, and therefore such complaints amount to vague allegations, with no legal foundation (...)'. However, further on, when analyzing specific allegations about fraudulent actions of lawyers, the fact that the judgment has not been drafted by the judge who heard the case; falsification of Calmbacher's expert report; and the lack of impartiality and independence of the judges, the National Court of Justice makes three elements clear: 1) their lack of competence within civil appeal cases to recognize unproven, fraudulent acts; 2) the existence of specific procedural channels to prosecute reported fraudulent acts, and 3) the need for plaintiffs to present their accusations before the appropriate authority.*
>
> *In this sense, although there is no substantive ruling regarding alleged fraudulent acts, that is regarding whether the fraudulent acts existed or not, the National Court of Justice provides an answer based on the rules that regulate cassation appeals and causes for invalidity, concluding that allegations of procedural fraud were not*

---

[172] Article 76(7)(1) of the Constitution provides, in material part: *"In all proceedings determining rights and obligations of any kind, the right to due process shall be ensured, and it will include the following basic guarantees: (7) Persons' right to a defence shall include the following guarantees: (1) Decisions made by public authorities must be reasoned. Reasoning will be lacking if the decision does not state the legal rules or principles on which it is based and does not explain how they apply to the facts of the case. Administrative actions, decisions or rulings that are not duly reasoned will be considered void. The responsible public servants shall be sanctioned."*
[173] C-2551, p. 136.
[174] C-2551, p. 138.

*only raised erroneously, but also demanded analysis to be made outside of its actual jurisdiction."*

5.208. As regards Chevron's jurisdictional objection, the Constitutional Court concludes, approving the reasoning of the Cassation Court, as follows:[175]

> *"The National Court of Justice gives the following premises: 1) Chevron waived the jurisdiction of its domicile, and 2) Chevron submitted voluntarily to Ecuadorian competence; these circumstances are contrasted with the relevant procedural rules and the National Court of Justice arrives at the conclusion that, in effect, the judges that knew the cause of the case, possessed the competence and applied procedural rules adequately.*
>
> *In terms of the legal problem regarding competence, this Court has undertaken an analysis of the reasons that led the National Court of Justice to consider that the procedural rules had been applied and to justify the competence of the national judges in the case. From this analysis, the correct argumentation given by the National Court of Justice is confirmed in greater detail. From the forgoing, it is concluded that the judges of Cassation did indeed rule on the matter and did so in a substantiated manner."*

5.209. The Constitutional Court also rejects Chevron's other allegations that the Cassation Court's Judgment lacks reasons or are irrational, including denial of a procedural opportunity to investigate essential mistakes in the expert evidence presented in the Lago Agrio Litigation, illegal appointment of judges who decided the appeal against the Lago Agrio Judgment, failure to apply norms concerning the evaluation of the evidence and evaluation of the res judicata effects of the 1995 Settlement Agreement.

5.210. The Constitutional Court Judgment was issued after the Track II Hearing, shortly before the Tribunal was to issue its award under Track II. In the circumstances, the Parties addressed the Tribunal on the effect of the Constitutional Court Judgment by their respective written submissions by letters dated 25 July 2018, pursuant to the Tribunal's Agreed Procedural Order of 19 July 2018.

5.211.  In the Claimants' said submissions of 25 July 2018 (with footnotes here partly omitted), the Claimants contend (inter alia) as follows:

(1) First, the Constitutional Court affirmed the Lago Agrio Judgment and failed to mitigate the denial of justice that ripened years ago. To the extent that Chevron's

---

[175] C-2551, pp. 143 and 144.

"Extraordinary Action of Protection" submitted to the Constitutional Court was a local remedy, so the Claimants conclude, it has been exhausted by the Claimants.

(2) Second, the Constitutional Court refused to consider any of the evidence of fraud presented by Chevron.[176] At the Track II Hearing, the Respondent quoted Article 94 of the Ecuadorian Constitution: "An extraordinary action of protection is available against judgments or final orders by which Constitutional rights were violated by action or omission."[177] Yet, according to the Constitutional Court, the Respondent's Appellate and Cassation Courts, seized with evidence that a party had bribed a first-instance judge and 'ghostwritten' that judge's judgment, are required to affirm that judgment; and that such judicial misconduct does not violate the Ecuadorian Constitution.

Instead, so Chevron submits, the Constitutional Court fastened onto the Respondent's "post hoc contrivance" that a prosecution is required of Chevron under the Collusion Prosecution Action (CPA).[178] The Claimants submit that this reasoning ignores the "ultima ratio rule"; and that a CPA action could not suspend enforcement of the Lago Agrio Judgment. The Claimants further submit that political reality in Ecuador means that no Ecuadorian judge would rule in Chevron's favour (as contended by the Claimants in their closing oral submissions at the Track II Hearing).[179] In any event, as Chevron concluded at the Track II Hearing: "If Ecuador is correct that its judicial system is powerless to address fraud on direct appeal or even to stay enforcement during the pendency of a CPA action, then its system falls below international standards….".[180]

(3) Third, as the Constitutional Court judgment records, an "Oversight" Council is currently deciding whether to remove certain judges involved in the Lago Agrio Litigation.[181] The Council's chairperson filed an amicus brief before the Constitutional Court demanding that the Constitutional Court reject Chevron's action for protection. Chevron requested the Constitutional Court to delay its ruling on that demand until the judges' conflict was resolved.[182] The Constitutional Court ignored Chevron's request.

---

[176] C-2551, pp. 65-81.
[177] Track II Hearing, D13; the Respondent' closing oral submissions - PowerPoint Presentation, at § VI, slide 4, quoting Article 94 of the Ecuadorian Constitution.
[178] C-2551, pp 39-40, 76 and 79-80.
[179] Track II Hearing, D12.2511-2512, 2576-2577 and 2592-2594.
[180] Track II Hearing, D12.2392.
[181] C-2551, pp 43-44, referring to "the Transitional Citizenship Participation and Public Oversight Council".
[182] C-2551, pp. 43-44.

# SA652

(4) Fourth, the Constitutional Court decided that the Lago Agrio Judgment is based exclusively on the diffuse right to live in a clean environment: 'the lawsuit [is] based on the right…to live in a healthy environment, [which] is a constitutional and collective right….'.[183] Moreover, the Constitutional Court expressly cited Article 19.2 of the former Constitution (which recognized that right).[184]

According to the Claimants, the Constitutional Court relied on two erroneous reasons to justify its disregard for the 1995 Settlement Agreement: (i) the 1995 Settlement Agreement did not 'refer' to 'third party' rights;[185] whereas the Claimants submit that this reasoning ignores the express statements in Articles 1.3, 5.1 and 5.2 of the 1995 Settlement Agreement that it releases claims based upon Article 19.2 of the Constitution;[186] and (ii) the State of Ecuador could not represent this diffuse right[187]; whereas the Claimants submit that Article 19.2 expressly states that "it is the duty of the State" to enforce this diffuse right.[188]

(5) Lastly, so the Claimants submit, the Constitutional Court's decision confirms that the denial of justice in the present case far surpasses that which occurred in *Loewen v USA* (2003).[189] At the Track II Hearing, in support of its submissions on the Claimants' non-exhaustion of local remedies, the Respondent contended that Mr Loewen's "mortal sin" was failing to petition the US Supreme Court regarding the Mississippi judgment.[190] In response, the Claimants compared two fact patterns in its closing oral submissions at the Track II Hearing.[191]

In *Loewen*, so the Claimants submitted, the NAFTA tribunal found that an "outrage" had been committed in the conduct of a trial by court in Mississippi. What should one say if, instead, several appellate jurisdictions up to the US Supreme Court had applauded and endorsed the Mississippi judgment, that prosecutors in the USA had blankly refused

---

[183] C-2551, p. 91.
[184] C-2551, p. 92.
[185] C-2551, pp. 96 and 97.
[186] C-23: (Article 5.2: "*claims … mean any and all claims … including but not limited to, causes of action under Article 19.2 of the Political Constitution of the Republic of Ecuador*"). The full text of Article 5.2 and other material provisions of the 1995 Settlement Agreement are set out above, in Part III(d) of this Award.
[187] C-2551, p. 98.
[188] C-24 ("*it is the duty of the State to ensure that this right will not be affected and to watch over the protection of nature.*").
[189] *Loewen v USA*, CLA-44.
[190] Track II Hearing, D1.236.
[191] Track II Hearing, D12.2570-2571.

# SA653

to consider evidence of gross fraud, that the USA had indicated in formal submissions in a treaty arbitration (such as this arbitration) that the remedy which Mr Loewen was required to exhaust was available in a particular appellate court, that this appellate court then denied having any authority to consider the matter, and that a US Federal Court nevertheless endorsed the Mississippi judgment for enforcement abroad? The Claimants conclude that such facts would be even more 'outrageous' than the *Loewen* case; but that, today, those are the facts of the Respondent's conduct regarding the Lago Agrio Judgment.

5.212. In the Respondent's said submissions of 25 July 2018 (with footnotes here partly omitted), the Respondent contends:

(1) First, the Constitutional Court, as the highest Ecuadorian Court endowed with the authority to interpret Ecuador's Constitution, examined Chevron's claims and, after a thorough and well-reasoned analysis, concluded that the Appellate and Cassation Courts reviewing the Lago Agrio Litigation did not violate any of Chevron's constitutional rights. Chevron's claim that multiple Ecuadorian courts over the last decade were engaged in an elaborate conspiracy with former President Correa against Chevron has even less credibility, given that the Constitutional Court rendered its decision under a new administration long at odds with the former President, no longer in office.

(2) Second, the Constitutional Court expressly found, like the Cassation (National) Court, that consideration of Chevron's extrinsic evidence of alleged fraud is precluded under Ecuadorian law.[192] Rejecting Chevron's claim that the Cassation Court should have analysed "the whole of evidence produced in order to prove the commission of the fraudulent acts", the Constitutional Court repeatedly noted the limited scope of review of the Cassation Court, adding that Chevron had available to it alternative avenues of relief, including "a specific regulation in the Ecuadorian law" to redress "collusive actions", i.e., the Collusion Prosecution Act (CPA).[193] The Respondent submits that Chevron cannot successfully prosecute its claims in this arbitration based upon the Ecuadorian Courts' alleged wrongdoings, whilst simultaneously ignoring the recourse afforded to litigants to redress such alleged wrongdoing in Ecuador.

[192] C-2551, pp. 71, 75-81.
[193] C-2551, pp. 75-77.

# SA654

(3) Third, the Constitutional Court determined that Chevron's right to legal certainty was not infringed by the Ecuadorian Courts' failure to accept its res judicata defence (by which it claimed that the 1995 Settlement Agreement released it from liability for violations to the Lago Agrio Plaintiffs' constitutional right to live in a clean environment). The Constitutional Court found res judicata inapplicable because, whether the Lago Agrio Plaintiffs' claims are collective or otherwise, there exists no identity of parties or object.[194] The Constitutional Court instead quoted from and reaffirmed the admonition in Article 2362 of the Ecuadorian Civil Code that: "[a] settlement only affects the parties to it."[195] Further, the Constitutional Court found that the "substantive law" under which Chevron was tried was 'tort law under the Civil Code'.[196] Because the Civil Code long pre-dated the Environmental Management Act (and the alleged introduction of collective rights in Ecuador), such Code provisions are individual in nature, rendering res judicata inapplicable.[197]

(4) Fourth, Chevron has long sought to use this Tribunal as an appellate court by challenging various judicial rulings regarding the application of Ecuadorian law. To the extent the Constitutional Court examined some or all of these legal questions, the Constitutional Court's findings are dispositive. Its findings are reasonable and correct as a matter of Ecuadorian law and well within the ambit of the "juridically possible", using the Claimants' own terminology.[198]

(5) Lastly, so the Respondent concludes, the Lago Agrio Litigation has always been about far more than Mr Donziger. It is also about "the conduct of an oil company that put profit over the environment, leaving indigenous residents with substantive claims for real injuries." The rule of law requires redress for these indigenous plaintiffs, not overbroad protection for a multi-national giant well equipped to protect itself.

5.213.  The Tribunal here addresses several particular features arising from the Judgment of the Constitutional Court.

---

[194] C-2551, pp. 95-96.
[195] C-2551, p. 97.
[196] C-2551, pp. 102.103.
[197] References to the Respondent's earlier written pleadings in Track II.
[198] Citing Professor Paulsson's Opinion dated 21 November 2008 in the Commercial Cases Arbitration, para. 70 [R-172].

5.214. It is clear from the Constitutional Court's Judgment, that the Constitutional Court was fully appraised of Chevron's allegations of procedural fraud in the Lago Agrio Litigation and the 'ghostwriting' of the Lago Agrio Judgment. It is equally clear that the Constitutional Court decided to leave these factual allegations unanswered, save to refer to its own lack of jurisdiction both to address these allegations and, if proven, to redress them (in addition to the same lack of jurisdiction in the Cassation Court).

5.215. The Constitutional Court decided that any alleged defects in the Lago Agrio Judgment, including the procedural fraud alleged by Chevron, could not be reviewed or decided by the Cassation Court or the Constitutional Court; the procedural laws governing their respective functions do not vest these Courts with any authority either to investigate or to redress such alleged defects; and, instead, Chevron's allegations should be the subject of criminal proceedings or proceedings under the Collusion Prosecution Act (CPA). Therefore, so the Constitutional Court concluded, there was no basis under Ecuadorian constitutional law for the Constitutional Court to decide that due process was violated by the decision of the Cassation Court not to take action in regard to such allegations.

5.216. With the Constitutional Court's Judgment, Chevron has no further appellate remedy within the Ecuadorian judicial system. Its action for protection before the Constitutional Court was its last possible opportunity to obtain judicial relief from the Ecuadorian Courts within the Lago Agrio Litigation. Save for a possible claim under the Collusion Prosecution Act (subject to a time-bar), Chevron has no judicial remedy under the Ecuadorian legal system against the enforcement and execution of the Lago Agrio Judgment under Ecuadorian law.

5.217. In several passages, the Constitutional Court emphasised the remedy available to Chevron under the Collusion Prosecution Act. The first passage cites the submission made by the Attorney General's Office, representing the Respondent:

> *"Ecuador has made it clear that the courts that heard the Lago Agrio case declined to hear those allegations because these courts do not have jurisdiction. There is an appropriate and exclusive mechanism - the proceeding established by the Collusion Prosecution Act—that Chevron should use, and it would allow the company to submit its evidence and rebut the arguments of the accused."*[199]

---

[199] C-2551, p.40.

# SA656

5.218. The second passage accepts the submission made by the Attorney General's Office:

> *"It is necessary to insist that the National Court of Justice has pronounced decisions about the procedural fraud alleged by Chevron, thereby establishing its lack of jurisdictional competence to determine the accuracy of the allegations posed by the appellant on lodging its cassation appeal, as this is neither the corresponding judicial stage nor the appropriate means to substantiate the criminal reports made by the appellant; thus, the judges pointed out that if the appellant considers that they were collusive actions or a commission of crimes, there exists the civil and criminal procedure, respectively, in order to try any behaviors so deemed as fraudulent. In this respect, this Court notices that the analysis conducted in the decision subject to appeal [the Cassation Court's Judgment] does not at all cause the appellant to be deprived of its right of judicial defense, since the Cassation Tribunal is not denying justice to the company lodging the cassation appeal, but rather, it is resolving the case in accordance with the rules governing the cassation appeal, thus leaving open the appellant's possibility to pursue any relevant actions intended for the facts being reported by means of the cassation appeal to be punished by more appropriate means."*[200]

5.219. The third longer passage expands upon the Constitutional Court's reasons regarding the Collusion Prosecution Act. It has already been cited in full above under Chapter 2 of the Constitutional Court's Judgment.

5.220. It is clear from several passages in the Constitutional Court's Judgment that the Constitutional Court equated, as regards jurisdiction and liability, Chevron with TexPet and Texaco notwithstanding their respective different legal personalities. This determination approved the like decisions of the Cassation Court, the Lago Agrio Appellate Court and the Lago Agrio Court based upon Chevron's "merger" with Texaco in 2001, as regards both jurisdiction and liability. It also accords with the last of the submissions made by the Respondent in its letter of 25 July 2018, namely that the Lago Agrio Litigation was about "the conduct of an oil company that put profit over the environment" (cited above). That "oil company" is Chevron, even though Chevron was not involved in any activity in Ecuador under TexPet's concession.

5.221. Lastly, the Tribunal regrets its inability to follow the Constitutional Court's interpretation and application of the 1995 Settlement Agreement in regard to Chevron's liability under the Lago Agrio Judgment, as affirmed by the Lago Agrio Appellate Court and (save as to punitive damages) the Cassation Court and the Constitutional Court.

---

[200] C-2551, pp. 79-80.

# SA657

5.222. In its Judgment, the Constitutional Court accepts the validity and effectiveness of the 1995 Settlement Agreement, as between (inter alios) TexPet, Texaco, Chevron and the Respondent.[201] The Constitutional Court also sets out the terms of Article 19.2 of the 1978 Constitution, being part of the release from liability expressly granted to Chevron by the Respondent under Article 5 of the 1995 Settlement Agreement (as also expressly set out).[202] In describing the environmental rights for which Chevron was adjudged liable in the Lago Agrio Judgment (as also decided by the Lago Agrio Appellate and Cassation Courts), the Constitutional Court uses synonymously the terms "diffuse right" and "collective rights"; in the original Spanish text, respectively, "un derecho difuso" and "los derechos colectivos."[203] It is clear that the Constitutional Court treats the rights of the Lago Agrio Plaintiffs, as also decided by the Cassation, Lago Agrio Appellate and Lago Agrio Courts, as constituting a diffuse right, in the words of the Constitutional Court "a constitutional and collective right".[204]

5.223. The Tribunal re-states the distinction, as set out in its First Partial Award dated 17 September 2013, between an individual claim for personal harm by a Lago Agrio Plaintiff (not being a diffuse claim) and a diffuse (or collective) claim. The former is not affected by the 1995 Settlement Agreement; but the 1995 Settlement Agreement precludes the latter, expressly so in regard to Article 19.2 of the 1978 Constitution. Accordingly, the Tribunal concludes that the Constitutional Court's interpretation of Article 5 of the 1995 Settlement Agreement deprives that settlement of any practical meaning, making it a one-sided and open-ended commitment undertaken unilaterally by TexPet and Texaco, which (as decided by all four Ecuadorian Courts) Chevron inherited based upon its "merger" between Chevron and Texaco. The Tribunal re-states its reasons for its conclusion as also set out in its First Partial Award.

5.224. In the circumstances, on the basis of the submissions and expert evidence on Ecuadorian law adduced before the Tribunal in this arbitration, the Tribunal is driven to conclude, as regards the interpretation and application of the 1995 Settlement Agreement to the Lago Agrio Judgment, that the decision of the Constitutional Court is inconsistent with the effect that the Treaty requires to be given to the 1995 Settlement Agreement.

---

[201] C-2551, p. 95.
[202] C-2551, pp. 92, 95 and 120.
[203] C-2551, pp 101, 109, 112 and 94.
[204] C-2551, p, 91.

# SA658

*P: The Tribunal's Conclusions*

5.225.  The Tribunal finds proven, on the evidence adduced in this arbitration, the following facts based on the factual and non-forensic expert evidence set out above, in Parts IV and V of this Award. (For ease of reference, these factual and non-forensic expert issues are referred to as "factual issues").

5.226.  *The Ghostwriting' of the Lago Agrio Judgmen*t: The Claimants' factual allegation that the Judgment of the Lago Agrio Court was corruptly 'ghostwritten' lies at the heart of their present dispute with the Respondent. It is by far their gravest allegation in this case; and, if attributable to the Respondent, it is the origin of the injuries of which the Claimants now complain under the Treaty.

5.227.  There is no direct factual evidence available in this arbitration proving definitively how and when the Lago Agrio Judgment was in fact written. There is, however, much circumstantial evidence, both factual and non-forensic expert evidence. Subject to the forensic issues considered in the next Part VI of this Award, that circumstantial evidence, in the Tribunal's view, proves by whom it was *not* written and why and by whom it *was* written, at least in substantial and material part.

5.228.  As already indicated, the Tribunal declines to draw any adverse inference against the Respondent from the absence of Dr Zambrano as a witness in this arbitration. First, the Tribunal does not accept that Dr Zambrano's absence was improperly induced or otherwise influenced by the Respondent. Second, the Tribunal has benefited from the written testimony of Dr Zambrano in the RICO Litigation, which the Respondent (with the Claimants) agreed could be received by the Tribunal as if it were testimony adduced in this arbitration. On the other hand, whilst drawing no such adverse inference, the Tribunal confers no special advantage upon the Respondent arising from Dr Zambrano's absence as a witness in this arbitration. Whilst it thus rejects the Claimants' criticism of the Respondent for the missing piece of the jigsaw, it must nevertheless assess the Respondent's case (as also the Claimants' case) without that missing piece, mitigated by Dr Zambrano's testimony in the RICO Litigation.

5.229.  This assessment starts with certain of the Lago Agrio Plaintiffs' representatives, especially Mr Donziger and Mr Fajardo. The evidence before this Tribunal points clearly to the conclusion that they engaged in prolonged, malign conduct towards the

Respondent's legal system generally and, particularly, the Lago Agrio Court in a manner that almost beggars belief in its arrogant contempt for elemental principles of truth and justice. It is pointless here to characterise such conduct any further, because these individuals are not the object of the exercise required for this Award under the Treaty applying international law. Such conduct, as related above, also speaks for itself. Moreover, others unknown were also involved in the 'ghostwriting' exercise. Whilst not attributable to the Respondent under international law, their collective misconduct nevertheless remains relevant because it was a necessary condition for what happened; but it was not the immediate cause of the Claimants' injuries.

5.230.  That cause came from Judge Zambrano. The Tribunal considers that Judge Zambrano actively solicited a bribe from whichever side in the Lago Agrio Litigation would be willing to pay him for issuing a favourable judgment in the Lago Agrio Litigation. Chevron refused his approaches; but certain of the Lago Agrio Plaintiffs' representatives did not. It is not proven that Judge Zambrano did receive a monetary consideration actually paid to him before the issuance of the Lago Agrio Judgment. On a balance of probabilities, however, it is proven that the consideration was a promise to reward him financially at a later date from proceeds to be recovered from the enforcement against Chevron of the Lago Agrio Judgment. It is likely to be a reward that he will never see.

5.231.  Based on the circumstantial evidence, the Tribunal finds that Judge Zambrano did not draft the entirety of the Lago Agrio Judgment by himself, as he falsely testified on oath in the RICO Litigation. The Tribunal finds that Judge Zambrano, in return for his promised reward, allowed certain of the Lago Agrio Plaintiffs' representatives, corruptly, to 'ghostwrite' at least material parts of the Lago Agrio Judgment (with its Clarification). These representatives included Mr Fajardo and Mr Donziger.

5.232.  Exactly how that was done remains uncertain on the available factual evidence. It is clear that the 'ghostwriting' exercise was begun by these Lago Agrio Plaintiffs' representatives in about mid-2009; and it was well underway by the time of Judge Zambrano's return to the Lago Agrio Litigation in October 2010. For obvious reasons, Judge Zambrano was cautious; and these representatives were still more careful (albeit not careful enough). By that time, Chevron had formed strong suspicions as to what might be happening, even if Chevron could not prove it. That situation began to change when Dr Guerra disclosed what he knew to Chevron, later. However, Dr Guerra was

## SA660

largely excluded from this 'ghostwriting' exercise at the time; and his knowledge is limited.

5.233. *Other Allegations:* The Tribunal turns to the Claimants' other factual allegations under seven headings: (i) the misconduct of Judge Yánez; (ii) the misconduct of Mr Cabrera, as an auxiliary officer of the Lago Agrio Court; (iii) Judge Zambrano's improper connivance at Dr Guerra's ghostwriting of his court orders in the Lago Agrio Litigation (between October 2009 and March 2010); (iv) the Veiga-Pérez Criminal Prosecutions; (v) the conduct of the Respondent's Government during the Lago Agrio Litigation; (vi) criminal investigations of 'fraud' in the Lago Agrio Litigation and the Lago Agrio Court's Judgment (comprising of the misconduct of Judge Yánez and Mr Cabrera and the 'ghostwriting' of the Lago Agrio Judgment); and (vii) the Judgments of the Lago Agrio Appellate, Cassation and Constitutional Courts in regard to 'fraud'. It is convenient to address these seven headings in reverse order.

5.234. *The Appellate, Cassation and Constitutional Courts*: As to (vii), as a factual matter, the Lago Agrio Appellate Court, the Cassation Court and the Constitutional Court did not address in any significant manner the allegations made by Chevron of 'fraud' in the Lago Agrio Litigation and the Lago Agrio Court Judgment, in their respective Judgments of 3 January 2012 (with its Clarification Order of 13 January 2012), 12 November 2013 and 27 June 2018.

5.235. *Criminal Investigations*: As to (vi), as a factual matter, notwithstanding the existence of at least prima facie evidence of 'fraud' in the Lago Agrio Litigation and the Lago Agrio Court's Judgment available to them, the Respondent's prosecutorial authorities were unwilling or unable to act in regard to such evidence in any significant and timely manner, before the Judgment of the Lago Agrio Court was declared enforceable by the Lago Agrio Appellate Court on 1 March 2012.

5.236. *The Government's Conduct*: As to (v), the Tribunal does not consider proven the Claimants' factual allegation that the Respondent's Government played any material part in the Lago Agrio Judgment's 'ghostwriting' exercise.

5.237. Moreover, at the Track II Hearing, Dr Guerra testified to his knowledge that the Government never sought to intervene or influence the judicial process in the Lago Agrio Litigation; and that "the administration never butted in" as regards the Lago Agrio

Case 1:11-cv-00691-LAK-JCF   Document 2082-1   Filed 09/14/18   Page 74 of 308

# SA661

Litigation.[205] The Tribunal accepts the truth of his testimony. It is also consistent with the tactics adopted by the Lago Agrio Plaintiffs' representatives themselves: see Mr Prieto's cautionary advice by his email message of 14 January 2009, recited in Part IV above. Moreover, with the covert 'ghostwriting' exercise in place, these representatives did not need any intervention from the Government. It is also consistent with the evidence that Judge Zambrano solicited a bribe from Chevron in return for issuing a judgment adverse to the Lago Agrio Plaintiffs (which Chevron rejected). That solicitation was not the result of any intervention by the Government.

5.238. As regards other conduct by the Government, subject to (iv) below, it was inevitable that the Lago Agrio Litigation should arouse strong political, if not populist, passions at the highest level in Ecuador. Oil pollution and international oil companies often do. Hostile statements by politicians, practising domestic politics, do not necessarily amount to international wrongs. In this case, the Tribunal also bears in mind that the Aguinda and Lago Agrio Plaintiffs were all nationals of the Respondent; and, further, that the Aguinda and Lago Agrio Litigation gave rise to legal proceedings in the USA in which the Respondent was a party or putative intervener sharing, at times, an over-lapping interest with its nationals. As such, a level of co-operation between them cannot be interpreted as improper collusion. Nor can it all be laid at the door of President Correa: such co-operation began before he first assumed office as President in January 2007.

5.239. *The Veiga-Pérez Criminal Prosecutions:* As to (iv), the Respondent's prosecutorial authorities actively co-operated with certain of the Lago Agrio Plaintiffs' representatives in conducting criminal investigations and initiating criminal prosecutions against (inter alios) Mr Veiga and Dr Pérez as representatives of TexPet, for the purpose of disadvantaging Chevron's defence in the Lago Agrio Litigation based on the 1995 Settlement Agreement. These intermittent investigations and prosecutions from 2003 to 2011 were accompanied by vicious and unwarranted statements directed against each of them personally by senior members of the Government, including (from 2007) President Correa.

---

[205] Track II Hearing D3.623.

## SA662

5.240. As already noted in Part IV, on 1 June 2011, these prosecutions were eventually discontinued by the Respondent's National Court, ostensibly without interference by the Respondent's Government. By that date, the Lago Agrio Judgment had been issued in favour of the Lago Agrio Plaintiffs notwithstanding the 1995 Settlement Agreement.

5.241. The Tribunal does not consider proven that these criminal investigations or prosecutions had any causative link with the conduct of the Lago Agrio Litigation or the 'ghostwriting' of the Lago Agrio Judgment by certain of the Lago Agrio Plaintiffs' representatives. Indeed, after bribing Judge Zambrano, these representatives no longer needed to impugn the 1995 Settlement Agreement (with its related agreements) by means of these collusive criminal prosecutions.

5.242. *Dr Guerra's Ghostwriting of Judge Zambrano's Court Orders*: As to (iii), during Judge Zambrano's first period as the judge presiding over the Lago Agrio Litigation (October 2009 to March 2010), certain of the Lago Agrio Plaintiffs' representatives corruptly paid Dr Guerra to 'ghostwrite' seven procedural orders for Judge Zambrano in the Lago Agrio Litigation, pursuant to which Judge Zambrano, knowing of such 'ghostwriting' by Dr Guerra, improperly issued such orders in the Lago Agrio Litigation.

5.243. That misconduct is primarily to be attributed to these representatives and to Dr Guerra (who was then no longer a judge) and not thereby to the Respondent. There is no cogent evidence that any part of the bribes paid by the Lago Agrio Plaintiffs' representatives for such orders was transmitted by Dr Guerra to Judge Zambrano. At the time, Judge Zambrano most probably knew of the payments to Dr Guerra. He could not have expected Dr Guerra to work for him *pro bono*. Judge Zambrano also knew that his delegating the drafting of procedural orders to Dr Guerra was illegal under Ecuadorian law.

5.244. However, such misconduct by Dr Guerra took place at an earlier time than the 'ghostwriting' of the Lago Agrio Judgment during Judge Zambrano's return to the Lago Agrio Litigation (October 2010 - March 2011). This later 'ghostwriting' exercise was of a different and much greater order of misconduct by Judge Zambrano, and as the action of a judge within the scope of his professional duties it was plainly conduct attributable to the Respondent. It subsumed any earlier, lesser misconduct by Judge Zambrano. Whilst it is possible, or even likely, that the earlier misconduct by both Dr

# SA663

Guerra and Judge Zambrano formed a necessary condition for the subsequent 'ghostwriting' exercise by Judge Zambrano, it was not its cause.

5.245. *Mr Cabrera*: As to (ii), Mr Cabrera, as an auxiliary officer of the Lago Agrio Court, (a) improperly favoured the case of the Lago Agrio Plaintiffs in the Lago Agrio Litigation and (b) improperly colluded with and permitted certain of the Lago Agrio Plaintiffs' representatives and experts to write, covertly, the Cabrera Report, ostensibly in his name. Mr Cabrera, mendaciously, failed to act as an independent expert to the Lago Agrio Court, in violation of his oath to so. His misconduct resulted from the bribes corruptly paid to him by certain of the Lago Agrio Plaintiffs' representatives between mid-2007 to mid-2008.

5.246. As a factual matter, Mr Cabrera's improper conduct severely prejudiced the presentation of Chevron's case in the Lago Agrio Litigation.

5.247. Again, whilst it is possible, or even likely, that this earlier misconduct formed a necessary condition for the subsequent 'ghostwriting' of the Lago Agrio Judgment, it was not its cause. To the extent (as the Tribunal finds) that the Cabrera Report influenced in part the result of the Lago Agrio Judgment, the Tribunal considers that this factor forms part of the 'ghostwriting' exercise as a whole.

5.248. *Judge Yánez:* As to (i), Judge Yánez (a) improperly terminated the procedure for the Judicial Inspections in the Lago Agrio Litigation, by order of the Lago Agrio Court dated 22 August 2006; and (b) improperly appointed Mr Cabrera as the Court's sole global assessment expert, by order of the Lago Agrio Court dated 19 March 2007. His misconduct resulted from the blackmail practised against him by certain of the Lago Agrio Plaintiffs' representatives from July 2006 onwards.

5.249. As a factual matter, the misconduct of Judge Yánez severely prejudiced the presentation of Chevron's case in the Lago Agrio Litigation. Although it was a necessary condition for what happened subsequently in the Lago Agrio Litigation, his misconduct was not the cause of the 'ghostwriting' of the Lago Agrio Judgment.

5.250. These conclusions are limited to the principal facts at issue between the Parties relevant to this Award. They remain subject to the Tribunal's consideration of the forensic issues

## SA664

considered in the next Part VI of this Award, as also to the other factual and legal issues considered in Parts VII and VIII of this Award.

# SA665

PART V – ANNEX 7

**THE LAGO AGRIO JUDGMENT ON "MERGER"**
**(pp. 6-26, with line numbers here added)**

1     *The complaint states that Chevron is the successor of Texaco, while the defendant*
2     *denies this assertion, therefore, since I must rule in this respect, according to the*
3     *record, one can see that the strict legal sense, that is, understanding succession as a*
4     *method to acquire control by which the rights and obligations are transferred from the*
5     *originator to its successors (according to the Roman tradition), the assertion that*
6     *Chevron is not the successor of Texaco Inc. is correct, in so far as the record shows*
7     *duly certified documentary evidence that demonstrates that Texaco Inc. maintains legal*
8     *status and consequently legal life (at pages 222 and 223 the original document in*
9     *English can be found, translated on pages 224 and 225), in such a way that it becomes*
10     *evident that there cannot be succession mortis causa without an originator. This*
11     *Presidency begins the analysis considering the explanation of the defendant in the*
12     *conciliation hearing, referring to there not being a merger between Texaco and*
13     *Chevron, but rather, as they proved with the certificate that lies at pages 230 and 231*
14     *(translation at page 225), the merger actually occurred between Texaco Inc. and*
15     *Keepep Inc. However, this reality, evidenced by documents, must be analyzed in light*
16     *of the entire body of evidence, therefore various aspects are considered, among which*
17     *it convenient first to refer to page 4103 where a certification is found, from October*
18     *29, 2003, at 11:18 a.m., issued by the Clerk of the Presidency, which states that the*
19     *defendant did not appear for the presentation of various documents related precisely*
20     *to this topic, which was timely requested by the plaintiffs in a motion filed October 23,*
21     *2003 at 3:25 a.m., and ordered in the ruling of October 23, 2003 at 3:30 p.m. The*
22     *documents that to the defendant should have presented included: 1) A complete and*
23     *certified copy of the 'Agreement and Plan of Merger,' which is said to be related to the*
24     *'Certificate of Merger between Keepep Inc. and Texaco Inc.,' a document with the*
25     *issuance date of October 9, 2001; 2) A complete and certified copy of the document*
26     *containing the authorization of Chevron Corporation, in order for its subsidiary*
27     *Keepep Inc. to participate in the Merger; 3) A complete and certified copy of the*
28     *authorization from the competent corporate body to proceed with the change in name*
29     *of Chevron Corporation to Chevron Texaco Corporation; 4) A complete and certified*
30     *copy of the authorization issued by the competent corporate body, for Chevron to be*
31     *able to include the word Texaco in its new name. These documents, which the defendant*
32     *did not present, despite having been timely requested to do so by the plaintiff and*
33     *ordered by the Presidency of this Court, were not filed by the defendant. As the record*
34     *shows the defendant explained the reasons that support a supposed inability to produce*
35     *said documents, via a brief on October 27, 2003, at 4:50 p.m., which was addressed*
36     *through a ruling on October 27, 2003 at 5:20 p.m., ordering compliance with what was*
37     *ordered or that the excuse be given on the indicated date. As was noted, the explanation*
38     *recorded by the Office of the Clerk clearly indicates that the defendant did not appear*
39     *on the indicated date and time, therefore did not offer a valid excuse for this failure to*

## SA666

Case 1:11-cv-00691-LAK-JCF Document 2082-1 Filed 09/14/18 Page 345 of 522

40    *comply. Considering Art. 826 of the Code of Civil Procedure with respect to the merit*
41    *of the presentation of documents requested as evidence, and given that this Presidency*
42    *should only consider the elements that form part of the proceeding, I consider that the*
43    *refusal to comply with the ordered presentation of documents cannot favor the party in*
44    *contempt, but rather to the contrary, the Code of Civil Procedure has established a*
45    *sanction for these cases, in Art. 827, which says, 'If once ordered the presentation of*
46    *evidence is not fulfilled within the term indicated, a fine will be imposed on the*
47    *reluctant party of ten to forty United States dollars for each day of delay, depending*
48    *upon the amount in dispute. This fine may not exceed the value equivalent to ninety*
49    *days,' therefore in this case, due to the time elapsed, the maximum fine must be applied,*
50    *equivalent to 40 dollars per day multiplied by the 90 days, for each document that has*
51    *not been produced as was ordered. The same thing happened with the documents whose*
52    *production was requested in the motion filed on October 24, 2003 at 4:59 p.m., that*
53    *refers to 'Chevron Texaco Notice of the 2002 Annual Meeting and the 2002 Proxy*
54    *Statement,' and to 'Chevron Texaco Notice of the 2003 Annual Meeting and the 2003*
55    *Proxy Statement,' and also by motion filed on October 24, 2003 at 5:00 p.m., in which*
56    *it is requested that a date and time be scheduled for the defendant company to produce*
57    *the following documents: 'a.- Complete and certified copy of the 'Agreement and Plan*
58    *of Merger' between Chevron Corporation and Texaco Inc., b.- Complete and certified*
59    *copy of the records of the competent body , among which appear the authorization for*
60    *the institution called 'merger,' in the legislation of the state of Delaware, of the United*
61    *States of North America, to proceed between the companies Chevron Corporation and*
62    *Texaco Inc.; c.- Certificate of Merger between Texaco Inc. and Chevron Corporation;*
63    *d.- Authorization of the competent body that permits Chevron Texaco Corporation to*
64    *establish, in the legal documents 'Chevron Texaco Notice of the 2002 Annual Meeting*
65    *and the 2002 Proxy Statement and Chevron Texaco Notice of the 2003 Annual Meeting*
66    *and the 2003 Proxy Statement,' that the legal concept called 'Merger' has occurred*
67    *between the companies Texaco Inc. and Chevron Corporation,' which motions were*
68    *addressed in the ruling of October 27, 2003 at 8:40 a.m., in which the requested*
69    *production was scheduled for November 4, 2003, without there being a record in the*
70    *proceedings of the compliance with this order. Moreover, this situation has been*
71    *considered together with the other record evidence, which indicates to us that both the*
72    *representatives of Chevron and those of Texaco each made public statements, in*
73    *different media and by different spokespersons, announcing a financial operation that*
74    *would combine the strengths of two companies to form a new one that would benefit*
75    *from this union. The case file contains important documentary evidence as of page*
76    *140700, in the notarial record made on June 6, 2008 of the true copy of the following*
77    *documents: 1. Chevron Document: Power – Point slides 'Analysis of Meeting Notice;'*
78    *Transcription of meeting of Chevron and Texaco analysts, October, 16, 2000; 3.*
79    *Chevron and Texaco Agree to a $100 Billion Merger in an Integrated Co. of energy*
80    *(Top-Tier); 4. Chevron and Texaco announce leadership team and organization*
81    *structure for proposed Post-merger Co.; 5. Proposed Chevron-Texaco merger clears*
82    *regulatory hurdle in Europe; 6. Texaco shareholders approve Chevron-Texaco*
83    *merger; 7. The United States Federal Trade Commission approves Chevron-Texaco*
84    *merger; 9. Chevron Texaco to begin first full day of global operations; 10.*
85    *ChevronTexaco announces its plans to promote retail gasoline brand in the U.S.; 11.*

# SA667

Case 1:11-cv-00691-LAK-JCF   Document 96   03/11/2019   2515363   Page 80 of 308

86    *Federal Trade Commission consent agreement allows the merger of Chevron S.A. and*
87    *Texaco Corp., preserves market competition; 12. Analysis of the proposed merger*
88    *order to aid public comment; and 13. Agreement containing consent orders, with its*
89    *respective translation, and additional documents. Considering that these documents*
90    *were publicly available, specifically the official page of Chevron, the defendant*
91    *corporation (www.chevron.com), it follows that their content be analyzed in the*
92    *following manner. In general, all of these documents refer to or announce a financial*
93    *transaction called 'merger' in the English language, which is the language in which*
94    *these documents appear. Taking into account the translation from the Spanish and*
95    *English Legal Dictionary Diccionario Jurídico Inglés-Español by Henry Saint Dahl,*
96    *McGraw-Hill's publishing company, and additionally the translations in the record,*
97    *the unmistakable conviction is reached that the English language term 'merger'*
98    *translates to Spanish as 'fusión.' Likewise, the translation submitted to the Presidency*
99    *of the Court inside the same notarial record, done by Mr Mauricio Javier Rodríguez*
100    *Sandoval, as of page 140746, invariably translates the English term 'merger' with the*
101    *Spanish word 'fusión.' With respect to what a merger is, the Law of Companies (Ley*
102    *de Compañías) dedicates a complete section, in which it explains the concept of*
103    *merger, indicating that this occurs: a) when two or more companies unite to form a*
104    *new one that succeeds them in their rights and obligations; and, b) when one or more*
105    *companies are absorbed by another that continues existing (art. 337), for which reason*
106    *it is appropriate to analyze the underlying legal transaction that occurred between*
107    *Chevron and Texaco Inc., to determine if art. 337 of the Law of Companies is*
108    *applicable to it. Under this legal approach all of the documentation has been analyzed*
109    *related to the transcript of the presentation made at the Chevron–Texaco merger*
110    *Analysts meeting held on October 16, 2000, at which Chevron's General Manager,*
111    *David O'Reilly, makes the following statements: 'First of all we'll talk about the*
112    *strategic rationale for combining Chevron and Texaco to form this new company,*
113    *ChevronTexaco Corporation' (page 140747), then goes on to say 'The capabilities of*
114    *the new company will be made stronger by the combination of the skills and talents of*
115    *both organizations,' and that 'We'll have a larger and stronger portfolio which will*
116    *enable Chevron and Texaco to better manage and absorb risk' (page 140748). The*
117    *Presidency carefully observes the fact that Chevron's General Manager emphasizes*
118    *the idea of 'combining' Chevron and Texaco so that the new company can benefit from*
119    *this combination of the skills and talents of both, which makes it evident that the new*
120    *company acquired benefits of the combined companies. It is noteworthy that, although*
121    *there is no express mention of obligations, the advantage of 'better manage and absorb*
122    *risk' is analyzed. The Presidency cannot disregard the fact that in slide 13 of the*
123    *presentation (page 140750) the benefits of the merger with respect to Latin America*
124    *are discussed, describing how the new company will benefit from the rights that the*
125    *combined companies have in South American countries; nevertheless, despite the fact*
126    *that no mention is made of the obligations of these companies in those countries, due*
127    *to an elemental principle of law we understand that the net assets are united as a whole,*
128    *made up of assets and liabilities, and therefore in terms of the law, it is understood that*
129    *be the underlying financial legal transaction what it may, or however the companies*
130    *want to call it or conceal it, what causes legal effects is the true transaction. This*
131    *Presidency is convinced that the net assets must be combined as a whole and not just*

Case 18-855, Document 96, 03/11/2019, 2515363, Page81 of 308

# SA668

132    *the rights alone, that is to say, the obligations are also combined. We understand that*
133    *the Managers of both companies publicly announced a merger, and that the legal*
134    *effects of such operation necessarily entail that the new 'combined' company succeeds*
135    *its creators in rights and obligations, in accordance with what art. 337 of the Law of*
136    *Companies has provided in this regard, and art. 338 which provides that the respective*
137    *corporate assets shall be transferred 'in a block,' that is to say, that the full net assets*
138    *are transferred, assets and liabilities, rights and obligations, without benefit of*
139    *inventory or any other limit, as is explained with total clarity in the second paragraph*
140    *of art. 341, which provides that 'the absorbing company shall take care of paying the*
141    *liability of the absorbed and shall assume, by virtue thereof, the responsibilities*
142    *inherent to a liquidator with respect to the creditors of the latter;' therefore, the*
143    *defendant's statement that 'the claimed automatic transfer To Chevron Texaco*
144    *Corporation of any obligations TEXACO INC. may have had lacks legal basis' (page*
145    *244) has no legal merit at all, since the transfer is not 'automatic,' but rather it finds*
146    *its cause in the legal transaction that has been called merger in English, and that*
147    *combined the net assets of both companies. In addition, the various press releases*
148    *issued by Chevron Corporation have been analyzed, which were published on the*
149    *official web page of the same Corporation and are certified in the case file with their*
150    *respective translation in the Notarial Record that we are now examining, in which there*
151    *appear several statements by Chevron's General Manager, expressly affirming that '*
152    *this merger positions ChevronTexaco as a much stronger global energy producer,' and*
153    *that it 'will create greater value for the shareholders of both companies' (page 140759,*
154    *reverse). The General Manager of ChevronTexaco, on October 10, 2001, also*
155    *announced that with the new company 'we have a broader mix of high-quality assets,*
156    *businesses, skills and technology, thanks to the merger' (page 140768), which*
157    *corroborates that the new company, ChevronTexaco Corporation, now called only*
158    *Chevron Corporation acquired benefits (assets, businesses, skills and technology) from*
159    *the combination of the two combined companies Texaco and Chevron. This coincides*
160    *with that said by the President and General Manager of Texaco, Glenn F. Tilton, who*
161    *said that 'the new ChevronTexaco will bring together two great companies,' as well as*
162    *that, he looks forward 'to completing the merger and creating a great new energy*
163    *company' (page 140766). Per the principle of good faith, any citizen, Ecuadorian or*
164    *North American, who heard the public statements made by the companies Chevron and*
165    *Texaco would have come inevitably to the conviction of a merger between them. This*
166    *same conviction appears to be the one that motivated such that the plaintiffs initiated*
167    *their action against the new company resulting from the combination of the other two,*
168    *since this conclusion is the result of having trusted the information that both companies*
169    *issued publicly through their representatives and official channels. On the official page*
170    *of the Company Chevron, www.chevron.com, on October 9, 2001, the defendant*
171    *company made the following public announcement: 'Chevron Texaco Corporation*
172    *announces completion of merger' (page 140767, reverse). This clear and express Said*
173    *announcement, clear and express, leaves no room for confusion, and in any case is*
174    *presumed truthful for the principle of good faith, but if it turned out that the public*
175    *statements by the Presidents and General Managers of both companies are made with*
176    *the intention of creating a false impression of reality, then we could qualify these*
177    *statements as malicious, and under basic principle of law the author or authors cannot*

# SA669

178     *benefit from such malice, in accordance with the provisions of subsection 2 or art. 17*
179     *of the Law of Companies, which provides that 'For acts of fraud, abuse or other*
180     *improper conduct committed on behalf of companies and other individuals or legal*
181     *entities, the following shall be held solidarily liable: 1. Those who order or carry them*
182     *out, without prejudice to the responsibility that may affect such persons. 2. Those who*
183     *obtained benefit to the extent of its value. 3. The holders of the properties for the*
184     *purpose of their restitution,' such that in this case, in which the actions and*
185     *announcements of the spokespersons and representatives of both companies created a*
186     *false impression of reality, the companies that participated in this financial operation*
187     *and that seek to benefit from the false information they disseminated are solidarily*
188     *liable. In addition, to issue this ruling, I consider the statements of Dr Ricardo Reis*
189     *Veiga, who gave his version of the facts (page 103.460) during the judicial inspection*
190     *of well Guanta 7, in which he states: 'I am Vice President of Texaco Petroleum*
191     *Company, professionally I am an attorney, I am responsible for all corporate legal*
192     *matters in Latin America,' and also adds, 'Yes, I do have a relationship with Chevron,*
193     *of course I have a relationship with Chevron, but I did not have a relationship with*
194     *Chevron at that time because the truth is that it had not merged (...),' making clear the*
195     *position he holds within the company Texaco, and also clarifying that he maintains*
196     *'relations' with Chevron, but that these relations are subsequent to the merger, which*
197     *is inferred when he states 'because the truth is that it had not merged,' revealing the*
198     *certain fact that the author of this testimony has the internal conviction of the existence*
199     *of the merger as a consummated, past and objective fact. Also considered is the*
200     *existence in the case file of various checks (pages 103221, 104241, 101884, 69483,*
201     *among others) that have been signed by Dr Rodrigo Pérez Pallarez, legal*
202     *representative of the company Texaco in Ecuador, to satisfy the obligations that the*
203     *defendant party, Chevron Corporation, has had to pay as part of the expenses*
204     *generated by this lawsuit. This subrogation of Texaco, who is not a party in this lawsuit,*
205     *to satisfy the obligations contracted by Chevron Corporation, necessarily denotes at*
206     *least a proprietary/patrimonial relationship between the two companies, since between*
207     *distinct, independent companies there would be no legal cause for one company to*
208     *assume the legal expenses of the other. All these public statements and procedural acts*
209     *carried out by spokespersons and representatives of both companies (Chevron Corp.*
210     *and Texaco Inc.) lead to the unequivocal conclusion that the combination of their net*
211     *assets and personalities is a legal reality, as well as a public and well-known fact. As*
212     *provided by the principle of procedural truth established in art. 27 of the OCJB, this*
213     *Presidency, as the competent Judge, does not require further proof of the merger*
214     *between Chevron and Texaco, given that it has been shown to be common knowledge*
215     *based on the evidence added to the procedural index. One cannot fail to observe the*
216     *manifest reality, that neither Chevron Corp. nor Texaco Inc., nor their spokespersons*
217     *or representatives, in any of their frequent press releases, has ever denied publicly the*
218     *existence of the merger (while they did deny, debate and denounce publicly other facts,*
219     *through paid announcements in the press media), but rather all the contrary, this*
220     *litigation being the only known scenario in which Chevron Corp. debates the existence*
221     *of the merger with Texaco Inc., for which it is appropriate to recall that in our legal*
222     *system the principle prevails that no one can benefit from his bad faith, which would*
223     *be the case of making several false public announcements to transmit a distorted idea*

224     *of the reality and to profit from the error induced, such as, for example, if said*
225     *manoeuvre is undertaken for the purpose of evading legal obligations with third parties*
226     *The fact that the shareholders of the predecessor companies are the same ones who*
227     *control the new company, leaving as the result of said merger that the shareholders of*
228     *Chevron are owners of 'approximately 61% of the new merged company, while the*
229     *Texaco shareholders would own approximately 39% of it' (page 140770); and*
230     *moreover that the executives in charge of the new company are the same ones who*
231     *managed the combined companies, (140759, 140761, 140768), as occurs in this case,*
232     *leads one to think that there is not sufficient separation between the ownership and*
233     *control of the new company and its predecessors. One considers that if the shareholder*
234     *of Texaco Inc., became the shareholders of Chevron, and consequently benefited from*
235     *the new company (same as its executives), the obligations that the latter maintained as*
236     *shareholders of Texaco Inc. transferred as well to the new company, Chevron Corp.*
237     *The law serves justice, and cannot allow legal institutions to be manipulated for*
238     *illegitimate purposes, such as to favor a fraud or to promote injustice, which would be*
239     *the case of transferring the assets to one Corporation 'free of responsibility,' while the*
240     *responsibilities are kept in a company 'free of assets,' the way the defendant tries to*
241     *have us understand the transaction that took place between Chevron and Texaco, in*
242     *which the new company benefits from the combined companies, but fails to mention the*
243     *obligations. As the First Civil and Commercial Chamber of the Former Supreme Court*
244     *of Justice tells us, 'in foreign legal treatises and case law, the need is increasingly*
245     *gaining ground to lift the veil of legal entities, particularly of corporations [sociedades*
246     *anónimas]. The unveiling consists in disregarding the external form of the legal entity*
247     *and, giving birth from there, penetrating in the interior of the same and examining the*
248     *real interests that live inside it,' (Gaceta Judicial, Year CV, Series XVIII, No. 1, Page*
249     *79, Quito, July 23, 2004, Published in file 172, Registro Oficial 553, March 29, 2005).*
250     *In cases like this one, that fit the case where the new corporate structure could provoke*
251     *a fraud on third parties or a similar injustice, North American jurisprudence teaches*
252     *us that the doctrine of lifting the corporate veil must especially be asserted. The same*
253     *thing happens in Ecuadorian jurisprudence, where developments have been such, that*
254     *it has been possible to synthesize a series of basic postulates that contain, at the same*
255     *time, both a definition and an identification of the scope of action of the institution of*
256     *veil lifting in Ecuador. In the first place, it is vitally important to highlight that the*
257     *institution of veil lifting is strictly exceptional in nature, since the important social role*
258     *that is played by a clear separation of the equity of legal entities and their owners is*
259     *undeniable (as set forth in the Ruling of the First Civil and Commercial Chamber of*
260     *the Supreme Court of Justice, File No. 393, issued on July 8, 1999 at 9:00 a.m.,*
261     *Registro Oficial No. 273 of September 9, 1999). In the second place, there is the*
262     *obvious reality that the existence of the corporate entity has lent itself in the past to a*
263     *series of abuses, being used not for the purposes provided for in the Law, but rather to*
264     *affect rights of third parties through, becoming in practice like a tool of fraud. It is in*
265     *this event that the Judges must pull open the corporate curtain of legal entities, in order*
266     *to observe and analyze the reality of things beyond the appearances (see ruling of the*
267     *First Civil and Commercial Chamber of the Supreme Court of Justice, File No. 120,*
268     *handed down on March 21, 2001 at 11:15 a.m., Registro Oficial No. 350 of June 19,*
269     *2001). In the third place, at the time of analyzing abuses of the corporate entity, it is*

# SA671

Case 18-855, Document 96, 03/11/2019, 2515363, Page84 of 308

270  *not relevant if it was organized with the clear intention of causing a fraud or a harm.*
271  *It is sufficient that said fraud or harm exists in order to justify a lifting of the veil (see*
272  *Ruling of the First Civil and Commercial Chamber of the Supreme Court of Justice,*
273  *File No. 393, handed down on July 8, 1999 at 9:00 a.m., Registro Oficial No. 273 of*
274  *September 9, 1999). Finally, it is essential to highlight that lifting the corporate veil of*
275  *a company is not simply a power of the court when faced with abuses of the corporate*
276  *form. On the contrary, the application of this institution constitutes a true obligation*
277  *of the judge, since that is the only, or at least the most effective, remedy for unmasking*
278  *these abuses of the legal entity (see Judgment of the First Civil and Commercial*
279  *Chamber of the Supreme Court of Justice, File No. 20, issued on January 28, 2003 at*
280  *11:00 a.m., Registro Oficial No. 58 of April 9, 2003). For these reasons, the fact that*
281  *the procedural index demonstrate the legal existence of Texaco and the merger of the*
282  *latter with Keepep, does not contradict the demonstrated, public and well-known fact*
283  *that the new company, Chevron Corporation, benefited from all the assets and rights*
284  *of Texaco and of Chevron, in the same way that the reverse triangular merger, cannot*
285  *serve as a legal mechanism to claim that Chevron benefited only from rights and assets,*
286  *leaving in the company Texaco the lawsuits and other pending obligations. It is*
287  *estimated that if the financial transaction between Chevron And Texaco meant that as*
288  *a result, the Texaco shareholders receive 0.77 ordinary shares of Chevron, and the*
289  *shareholders that Chevron became owners of 61% of the combined entity, valued at*
290  *100 billion, (page 140759) it is because this transaction involved the transfer of assets*
291  *and/or rights from which the new company and the shareholders of the combined*
292  *companies would directly benefit; however we must insist that it is contrary to the*
293  *principles of law and to good faith to expect that only the assets and rights have*
294  *transferred, while not the obligations. If we consider the mandate of the Law of*
295  *Companies and the principal of procedural truth, along with the evidence provided and*
296  *referred to in this judgment that demonstrate that Chevron (and its shareholders)*
297  *benefited from the merger with Texaco, plus the universal principles of law, we have*
298  *more than enough legal foundation for the transmission of the obligations of Texaco to*
299  *the defendant company, Chevron Corp.. In this way the obligation to submit to*
300  *Ecuadorian justice pending on Texaco Inc. was also transmitted to the new company*
301  *Chevron Texaco Corporation, so that consequently Chevron Corp. cannot allege that*
302  *it never operated in Ecuador to give grounds for lack of a legitimate opposing party.*
303  *The record shows that Texaco – who did operate it – was obligated to submit to this*
304  *jurisdiction, as can be seen in the judgment of the New York Court, at page 152883,*
305  *which states: 'following remand, Texaco provided the missing commitment; in other*
306  *words, to submit to the jurisdiction of the courts of Ecuador (and Peru as well),' leaving*
307  *then the initiation of the complaint, by reason of territory under the competence of the*
308  *Presidency of this Court. In addition to the well-known, justified facts and the law*
309  *invoked, this Presidency has studied and considered the precedents of US legislation,*
310  *inasmuch as it recognizes that in cases where the merger is carried out in bad faith or*
311  *in order to defraud third parties, it must be assumed that it is a de facto merger. The*
312  *precedents in Delaware establish that 'the corporations shall not be able to avoid their*
313  *responsibilities through a merger.' In a manner consistent with that provided by the*
314  *principle of procedural truth, the Courts of the US pay more attention to the substance*
315  *than to the form of this type of transactions. It has been made clear that the simple fact*

# SA672

of calling a transaction a merger does not turn it into such, and that the Courts must observe the substance of the transaction in place of what is alleged by the parties. Considered of vital importance is the general principle according to which in mergers, 'the party that benefits also assumes the obligations,' which has been established in various Codes. From the standpoint of legal scholars, imposing responsibilities on the new company is appropriate in those cases where it knew previously of the responsibility of its predecessors therefore, there being no argument whatsoever in the record that indicates lack of knowledge on the part of Chevron Corp. regarding the obligations of Texaco Inc., It is presumed that the existence of the New York Court's order was not concealed by Texaco Inc. from Chevron Corp. It is appropriate for the purposes of justice, to impose on Chevron Corp., which benefited from the 'merger,' the obligations of Texaco Inc. On the other hand, to allow the right of the victims to redress to disappear for mere formalities within the merger, would be considered by the Courts of the US as 'manifest Injustice,' always considering that in certain circumstances, allowing responsibilities to be avoided or eluded through corporate formalities can be unfair for the victims, who would end up defenseless. Everything stated leads us to raise serious doubts as to the good faith with which the defendant acted in this lawsuit in particular, since this is the only known scenario in which CHEVRON CORP. Appears disputing the merger with Texaco. Responsibility of Texaco Inc, for Texpet. The complaint states that 'The employ a subsidiary company, in this case TEXPET, created to develop operations in Ecuador as a different corporation, with little equity and patrimony, very much inferior to the real volume of its operations, corresponds to a scheme designed for the clear purpose of limiting the impact of any complaint derived from its activities in the country. In reality, TEXPET was nothing more than a screen behind which TEXACO INC acted, being proprietary by itself or through its subsidiaries of the total capital.' It also affirms that TEXACO INC directed, supervised and controlled the operations in Ecuador of its subsidiary company TEXPET and established the operating procedures and techniques to be used in the hydrocarbon exploration and production activities, however, as noted by the defendant during the conciliation hearing, the Federal Court in New York declared that neither Texaco Inc, nor Chevron Texaco Corp. 'conceived or approved of' the 'decisions related to the methods, procedures, etc., used by Texpet in Ecuador' (F.S. 253), so that it is appropriate, in the first place, to conduct an analysis of said legal decision, which in the event it constitutes material res judicata would prevent this Court from analyzing this topic again. Thus, the first thing noted is the fact that in the event that this foreign judgment constitutes res judicata, it should have been so alleged, as a defense, during the conciliation hearing, which was the appropriate procedural moment according to Ecuadorian procedural Law. This defense has not been put forth, demonstrating that the defendant did not have either the conviction or the intention that said foreign legal judgment be considered as a material decision of final instance; in the second place, it is noted that although the foreign legal judgment of the United States District Court, of the Southern District of New York, of May 30, 2001, (translation by expert Zambrano of November 14, 2008 at 2:30 p.m., from page 152840, in volume 1430) is in the record, which holds that 'the plaintiffs, after taking numerous deposition and obtaining responses to no fewer than 81 document requests and 14 interrogatories, were unable to adduce material competent evidence of

## SA673

meaningful Texaco [USA] involvement in the misconduct complained of' (page 152882), this decision refers mainly to the competence of the Court, and was based on various aspects that need to be reconsidered. From a reading of this court order in its context it stands out that what is being analysed the decision in question is the link between the evidence and the US or Ecuador as another parameter for establishing the most suitable forum, concluding that the greatest amount of evidence is found in Ecuador. The decision states that 'the record establishes overwhelmingly that these cases have everything to do with Ecuador and nothing to do with the United States' (page 152880), which is not a decision on the merits that decides that Texaco Inc did not direct or decide on operations in Ecuador, but rather that the lack of proof in this aspect is considered as one more basis for demonstrating forum non conveniens. The reasoning of the New York Court is considered correct insomuch as the majority of the evidence should be, by logic, in Ecuador, which also implies that the New York Court recognized that new evidence could be introduced. Then, if we consider the transcribed text of the judgment we read that it refers to the fact that the record has been analyzed in terms of 'admissible evidence' in the US, while in Ecuador the same norms do not necessarily prevail in order to determine what is considered admissible evidence, with this Presidency having to adhere to that which our laws establish as regards the evidence, its presentation and its evaluation; and finally, the new evidence that has been presented and that is part of this record pursuant to the referenced norms, must be considered, and must necessarily be taken into account to establish the procedural truth. In this way, the fact that only the evidence admissible and obtained in the U.S. was analyzed, along with the fact that new evidence has been presented, push for consideration of the facts at issue discussed in light of the totality of all the evidence. In addition, it is felt that this decision refers to this issue only as one additional argument that demonstrates the absence of a link of the case with the United States, in order to demonstrate precisely that there was no discretion in the lower court decision in deciding that in this case the evidence was found in Ecuador, but rather that the balance of public and private interests tilts the scale toward an Ecuadorian forum, such that what this judgment does is confirm the formal decision of the lower court, that rejects the complaint based on Forum non Conveniens, but modifies this decision by conditioning it on the commitment of Texaco to accept the interruption of the extinguishing prescription of actions, such that it is clear that it is not possible to speak of material res judicata, since the matters at issue have not been resolved, but rather on the contrary, the complaint has been rejected taking as a basis the existence of a more appropriate forum: this one. In this manner competence has settled in this Presidency of the Provincial Court of Justice of Sucumbios, where in addition we must give credit to evidence that has been presented in this lawsuit and that were not considered either by the Federal Court in New York or by the appeals Court, in handing down their judgments. Thus we conclude that the judicial decision of the Federal Court in New York has not been final as to the merits of the matter, nor has it caused state, so that material res judicata cannot be admitted, nor is it admissible as a decision on the merits binding on this Presidency which is fully competent to rule on this issue submitted to be heard by it. Therefore, what is incumbent to analyze are both the documents obtained and turned over by Texaco Inc through the Discovery process, whose existence has been accepted by the defendant as a certain fact during the

# SA674

408  conciliation hearing like other documents that have been lawfully presented, and the
409  law applicable to the specific circumstances of this case, in order to determine whether
410  it is appropriate to apply the doctrine of lifting the corporate veil, which in our legal
411  system has a jurisprudential and not legislative development. Thus, we begin again
412  remembering that the origin of this institution is due to the need that judges and courts
413  had to remedy the severe crisis in which the concept of legal entity entered due to the
414  fact that many have taken advantage of the benefits that the recognition of the
415  corporate legal entity assumes. That is how our case law recognizes it, in the decision
416  No. 135-2003, handed down in the ordinary lawsuit for payment of sales Commission
417  No. 36-2003 that José Miguel Massuh Buraye brought against Roberto Dumani,
418  published in R.O. No. 128 of July 18, 2003, which notes that '[...] cases are presented
419  in which the legal entity is abused in order to avoid the fulfilment of legal obligations,
420  especially tax-related or to be used as a screen to evade the rights of third parties. For
421  this reason, the doctrine is being consolidated which allows for judges to be able to
422  tear away the veil of legal personality and adopt measures with regard to the men and
423  the relationships covered behind it,' such that the benefits granted by the legal system
424  are limited, thought to promote the general economic development, not only of honest
425  businessmen, but of all society; however, abusing the division or separation of equity
426  and of responsibility, the corporate veil has been used for perverse purposes, that have
427  no relation with its objective. Along that same line, it has been expressed to the
428  Supreme Court of Justice in decision No.120-2001 on a petition for cassation, in verbal
429  summary proceeding 242-99, which points out that 'in the actions of legal entities, in
430  recent years a well-known and prejudicial deviation has been observed, now that it is
431  used as an oblique or detoured path to evade the law or harm third parties.' (Published
432  in R.O. No. 350 of Tuesday, June 19, 2001, Gaceta Judicial, No. 5, Year CII, Series
433  XVII, p. 1262, Quito, March 21, 2001). In view of this possibility, which has been
434  alleged by the plaintiff, it is necessary to start by analyzing it considering that this suit
435  has been brought for the redress of environmental harm supposedly caused by TEXPET
436  while it was operating the Napo Concession, therefore it is appropriate for us to
437  determine if the conditions are met that permit lifting the corporate veil in order to
438  attribute responsibility to Texaco Inc for the conduct or acts of Texpet, to which the
439  defendant has expressly objected, noting they are separate and independent companies,
440  so that in order to resolve this aspect, the various factors will be analyzed that reflect,
441  beyond formal questions, the level of dependence between subsidiary and parent
442  company in order to determine whether it can be considered that the corporate veil has
443  been used to hide the true interested parties and beneficiaries of the subsidiary's
444  affairs, or if it has been legitimate. 1.- With this purpose we first note that the capital
445  of the subsidiary company shall be consistent with the amount of business done and the
446  obligations to be met, because it is understood that business people acting in good faith
447  risk in their affairs a capital rationally adequate to face their potential responsibilities.
448  The capital of the subsidiary can be considered insufficient if it requires constant
449  authorizations and transfers of funds to proceed with the normal course of business,
450  since in that case, those really making the decisions and exercising control over the
451  activities are the people who provide the authorizations and the funds, which frequently
452  are sheltered behind the mask of the legal entity, making necessary that in certain cases
453  the formal structure of the corporate entity be disregarded in order to avoid defrauding

# SA675

454   third parties. In the record at volume 65, pages 6827, 6828,6830, 6831, 6826, 6833,
455   are the translations of various requests for authorization from Shields to Palmar, in
456   which Mr Shields makes requests in the name of the 'Ecuadorian Division' of Texaco
457   Inc. to his superiors at Texaco Inc., requesting their approval for various matters
458   pertaining to the operations in the Ecuadorian Oriente. The record contains
459   authorizations for everyday matters, of routine administration, such as tenders for
460   catering services and the cleaning of the Consortium's operating sites in Quito and the
461   Oriente region (translation of document PET 029369 at page 6827 and PET 028910
462   at page 6830), or the contracting of motion picture entertainment services at the
463   Oriente installations (PET 029086 at page 6831). Likewise we find an authorization
464   for the contracting of equipment and personnel for pipeline maintenance (PET 019212
465   on page 6828) and construction of bridges in Aguarico and Coca (PET 016879 at page
466   6833). Finally, Shields requests Palmer's authorization to begin the exploration of the
467   Sacha-84 well, in October 1976 (PET 012134). Also in the record are various
468   documents from the Texpet archives, containing authorization requests from Bischoff
469   to Palmer, in volume 65, pages 6839, 6840, 6843, 6844, 6848, where it appears that,
470   like Shields, Palmer refers to Texpet's operations in the Oriente as 'the Ecuadorian
471   Division.' Among his requests for authorization is the urgent request to approve the
472   tender for two 'workover' towers (support and maintenance) for production in the
473   Oriente (PET 030919 at page 6839), and the tender on a road between the Yuca and
474   Culebra wells (PET 016947 at page 6843), key aspects for the development of Texpet's
475   operations. Authorization also is requested to extend the contract for ferry services in
476   the zone (PET 032775 at page 6844), and more importantly, approval is requested of
477   the approval documents for Vista-1 Well. There is also a memorandum of special
478   importance revealing the existence of a lineal chain of authorization existing between
479   these executives, since Bischoff asks Palmer who, after approving the document, signs
480   and forwards it to McKinley, a higher executive of Texaco Inc (PET 022857 at page
481   6848), denoting the existence of a chain of command, which meant that the decisions
482   regarding every aspect relating to the operation of Texpet in Ecuador were made by
483   executives of Texaco Inc in the U.S. In addition, there are respective authorization
484   requests in the record from Palmer to Granville, in volume 66, pages 6930, 6938, 6943,
485   which show that the chain of authorizations extends higher than Palmer, since in
486   echoing a request from Shields (see PET 019212 at page 6828), Palmer asks Granville
487   for authorization to contract equipment and personnel for pipeline maintenance (PET
488   029976 at page 69309) and per Bischoff's requirement (see PET 030919, at page
489   6839), approves one of the offers for the construction of the 'workover' towers,
490   submitting said approval to Granville for an O.K. (PET 029991, at page 6943). The
491   record also contains letters and memorandums from Shields and Palmer to John
492   McKinley, coming from the Texaco Inc, and Texpet files. In volume 66, pages 6957,
493   6958, 6964, 6959, 6960, 6974. That show that both Shields and Palmer maintained a
494   constant flow of letters and memos with McKinley, asking for his authorization and
495   informing him of events relating to the Napo Concession. Likewise, letters from minor
496   officials addressed to Shields, in volume 65, pages 6855, 6856, 6860, 6861, 6875, 6882,
497   6885, where reference is made to letters addressed to Shields that originated in Quito,
498   in hands of minor officials who requested his authorization, such as William Saville,
499   who was a Texpet executive who operated in Quito, and sent many and daily

*communications to Shields (in New York) requesting authorizations. For example, he sent Shields the estimated costs of drilling the Sacha 36 to 41 wells (unnumbered doc) and asks his approval to start the tender for fuel transport in the Oriente (PET 031387 at page 6856). J.E.F. Caston, another executive of the oil firm based in Quito, asks Shields for his authorization to call for bids for various services (PET 020758 at page 6860) and to approve the estimated costs of installing submersible pumps in five wells in the Lago Agrio field. Finally, we have Max Crawford, another official based in Quito, who also periodically asked for Shields' approval for various purposes (PET 035974 at page 6882, and unnumbered doc at page 6885). On the other hand, it is necessary to consider the proven fact that the decisions of the 'Executive Committee' of Texpet had to be approved by the board of directors of Texaco Inc, as we see that in the Minutes of the Board of Directors No. 478 (Volume 25, page 2427), where it approved Texpet's decision to enter into negotiations with Ecuador to object to an increase in the income tax for the oil company, and additional payments, in the same way that the Texaco Inc board of directors approved the purchase of a plane for US\$ 850,000, Minutes 456 (Volume 24, page 2351), demonstrating the decision-making power of Texaco Inc. over the purchases made by Texpet. In my opinion, these minutes demonstrate the constant scrutiny that the parent firm Texaco Inc. maintained over all operations and news relative to Texpet in Ecuador. If we analyze this fact independently, perhaps it could be confused with the normal control that a board of directors exercises over its subsidiaries. However we must analyze this control by the parent firm over its subsidiary in its context, taking into account also that the Board of Directors of Texaco Inc. also delivered the 'allocations' of money with which Texpet operated, which implies that Texpet lacked not only administrative autonomy, but also financial, since it was Texaco Inc. that controlled not only the decisions, but that also authorized the funds that Texpet needed for the normal course of activities. Starting with the admitted fact that Texpet is a fourth level subsidiary company belonging one hundred per cent to a single owner, Texaco Inc., and that Texpet operated with funds coming from the coffer of Texaco Inc., it has been shown that there is not a real separation of patrimony. We understand that different legal entities necessarily imply differentiated patrimony, according to the rules of the attributes of the entity, however in this case, the confusion of patrimony is obvious, plus a confusion of entities in the same manner. Among the evidence that lead us to this conviction we cite additionally the minutes of a board of directors meeting of Texaco Inc. No. 380, dated January 22, 1965 (Volume 22, page 2166), which established allocations in favor of the Cia. Texaco Petróleos del Ecuador for an amount of US\$ 30,212.00. The minutes of the board of directors meeting of Texaco Inc. No. 387, dated September 17, 1965, (Volume 22, page 2176), established allocations in favor of Texaco Petroleum Company (Texpet) for an amount of US\$ 27,625.00. Minutes of the board of directors meeting of Texaco Inc. No. 393, dated April 19, 1966 (Volume 22, page 2182), established allocations in favor of Texaco Petroleum Company (Texpet) for an amount of US\$ 331,272.00, and in favor of the Cia. Texaco Petróleos del Ecuador for an amount of US\$ 13,631 establishing in this way the conviction of this Presidency regarding that Texaco Inc., controlled the funds both of the company exercising the concession rights (Texaco Petróleos del Ecuador) and of the one contracted to operate the concession of the fields, which makes it obvious that TEXPET was a company without any capital or sufficient autonomy to*

# SA677

546     *face the normal course of business, which in turn constitutes more evidence of lack of*
547     *independence of the subsidiary with respect to the principal, leading us to the*
548     *conviction that TEXPET was an undercapitalized company, that depended both*
549     *economically and administratively on its parent company. The amount of the contracts*
550     *that require authorizations to make likely the unavailability of its own capital, which*
551     *is an indication of inability to face the possible responsibilities that can be expected*
552     *after an oil operation. Cabanellas explains to us in his work 'Derecho Societario: Parte*
553     *General. La personalidad juridical societaria [Corporate Law: General Section. The*
554     *corporate legal entity] that 'the corporate entity is based on a set of rules that*
555     *determine what conduct is attributable to the corporation as a legal entity. The general*
556     *effects of those rules may see themselves modified according to certain norms that alter*
557     *that attribution, turning to imputing the conduct that normally would be attributable to*
558     *the corporation as a legal entity, to other physical or legal persons, such as their*
559     *partners or other people who exercise the control in fact of the corporation.' (See Vol.*
560     *3. Buenos Aires: Editorial Heliasta, 1993. P. 65.) It has been shown in the record that*
561     *the authorizations and investments required by TEXPET, made it so the de facto control*
562     *of its operations was exercised by the parent company, which constitutes an important*
563     *issue to be considered. López Mesa and José Cesano state it well in their work, El*
564     *abuso de la personalidad jurídica de las sociedades comerciales: Contribuciones a su*
565     *estudio desde las ópticas mercantil y penal [The abuse of the legal entity of commercial*
566     *corporations: Contributions to its study from the commercial and criminal*
567     *perspectives] (Buenos Aires: Depalma, 2000), when they note that 'The regime of the*
568     *legal entity cannot be used against the superior interests of the society or the rights of*
569     *third parties. The techniques manipulated to inhibit the purely instrumental use of the*
570     *corporate form vary and adopt different names, but they all propose, in substance, the*
571     *consideration of the economic and social reality and the supremacy of objective law.'*
572     *Concordantly, the Supreme Court, in Ruling 120.2001, cited above, has said that 'in*
573     *the face of these abuses, it is necessary to react by rejecting the legal entity, that is,*
574     *drawing aside the veil that separates third parties with the true final recipients of the*
575     *results of a legal business to reach them, in order to prevent that the corporate entity*
576     *be used improperly as a mechanism to harm third parties, be they creditors who would*
577     *be hindered or impeded from attaining the fulfilment of their loans, be they legitimate*
578     *holders of a good or a right who would be deprived or dispossessed of them. These are*
579     *extreme situations, that must be analyzed with extreme care, as legal certainty cannot*
580     *be affected, but neither can, on the pretext of upholding this value, the abuse of the law*
581     *or the fraud on the law through the abuse of the corporate institution be allowed.' 2.-*
582     *Now, if we consider the formal questions, such as the fact that the same people hold*
583     *the positions of executive directors and other managerial posts in both companies,*
584     *added to the admitted fact that Texaco Inc was the 100% owner of Texpet, the certainty*
585     *abounds as to the need to apply the doctrine of corporate lifting. For example, Mr*
586     *Robert C. Shields held the position of Vice President of Texaco Inc. between 1971 and*
587     *1977, while at the same time being the Head of Texpet's Board of Directors, according*
588     *to his sworn statement (volume 63, page 6595). Review of the record shows that Shields*
589     *signs his letters on behalf of Texpet, when according to his own testimony between*
590     *1971 and 1977 he held the position of Vice President of Texaco Inc. This fact is*
591     *consistent with Bischoff's statement that Texpet was the division of Texaco Inc. that*

## SA678

operated in Latin America, and not a mere subsidiary, as the defendant's defense maintains. In the same way, over the course of his career, M. Robert M. Bischoff held positions with Texaco Inc. both in the United States and in Latin America. Between 1962 and 1968 he worked as Vice President in the production division for Latin America, which he himself calls Texaco Petroleum Company (Texpet), according to his sworn statement in volume 63, page 6621. This shows how even the executives of Texaco Inc. themselves thought of Texpet as a division of Texaco Inc., and not as a separate company. Like Shields, the record clearly shows that Bischoff actively participated in the complex decision-making chains and processes that involved Texaco Inc. and Texpet. In his sworn statement Bischoff explains how the contracts of Texpet's headquarters, located in Florida, that exceeded US$500,000.00 had to be approved by an attorney of the last name Wissel, head of Texaco Inc.'s attorneys. In this case, we see how the relationship between Texpet and Texaco Inc. was not limited to this one owning the shares of the other, but rather that both worked intimately linked, with Texaco Inc. taking all the decisions while Texpet was limited to carrying them out. It is true that as a general rule a company can have subsidiaries with completely distinct legal status. However, when the subsidiaries share the same informal name, the same personnel, and are directly linked to the parent company in an uninterrupted chain of operational decision-making, the separation between entities and patrimonies is significantly clouded, or even comes to disappear. In this case, it has been proven that in reality Texpet and Texaco Inc. functioned in Ecuador as a single and inseparable operation. Both the important decisions as well as the trivial ones passed through various levels of executives and decision-making bodies of Texaco Inc., to the extent that the subsidiary depended on the parent company to contract a simple catering service. In this regard it is completely normal that the Board of Directors of a subsidiary company be made up of some officers from its parent company, and it is also normal that the parent company receive periodic reports on its condition, and take certain decisions that for their importance are beyond the reach of the regular administration. However, in the case of Texaco Inc. and its subsidiary Texaco Petroleum Company (Texpet), the role of the Directors transcends roles that might be considered normal, as they received information and made decisions about the great majority of Texpet's deeds and acts regarding everyday matters of the operation of the Napo Oil concession, responding to a well-established chain of command, as has been shown in the record. 3.- Finally, it is considered that the doctrine of lifting the corporate veil is especially applicable in the face of the abuses that can be committed in detriment to the public order or the rights of third parties, in order to avoid fraud and injustice, that is, that the corporate veil must be lifted whenever not doing so favors a fraud or promotes injustice, as would be the case in which we find schemes intentionally created to leave the profits in the parent company, while the obligations remain in a subsidiary, which in general is incapable of satisfying them. As López Mesa and José Cesano rightly say: 'Even when it is admitted as a hypothesis that two corporations are subordinate to a decision-making unit or constitute an economic unit or corporate group, this is not sufficient data to dispense with the legal autonomy of each one of the corporate subjects implicated in the acts, as long as it is not alleged and proved that the legal forms have been implemented to prejudice the plaintiff in his rights, since what is appropriate is to respect the corporation's separation of assets,

# SA679

638    *as long as this is not likely to be the means of violation of other legal rules, since*
639    *rejection of the status or attribution of responsibility to persons in distinct*
640    *appearances, is exclusively based on proving the abuse of the privilege granted to the*
641    *detriment of public order or the rights of third parties' (Pages 145 and 146). Along*
642    *these lines it is noted that the plaintiffs have indeed expressly alleged that Texpet was*
643    *a company implemented to keep pending responsibilities in a company without*
644    *sufficient capital, while keeping the capital of the parent company free of*
645    *responsibilities, with the precise objective of avoiding potential liabilities with third*
646    *parties, while the record contains abundant evidence, as has been noted above,*
647    *demonstrating the subsidiary's deep ties and lack of independence with respect to its*
648    *parent company, which was who actually took the decisions and benefited from the acts*
649    *of its subsidiary, which is moreover incapable of meeting the extent of the*
650    *responsibilities that are demanded of it. Consideration is finally given to what the*
651    *Supreme Court of Justice stated in its judgment No. 393, handed down in Ordinary*
652    *Proceeding No. 1152-95 for moral damages brought by Rubén Morán Buenaño against*
653    *Ricardo Antonio Onofre González and Leopoldo Moran Intriago, published in R.O.*
654    *No. 273 of September 9, 1999, that with respect to the lifting of the corporate veil warns*
655    *that 'the use of this instrument is not open nor indiscriminate, rather it will be in those*
656    *hypotheses in which the interpreter of the Law comes to the assessment that the legal*
657    *entity has been constituted with the aim of defrauding either the law or the interests of*
658    *third parties, or when the use of the formal cover in the legal entity consists leads to*
659    *the same defrauding effects' aspect that coincides with that indicated by the cited*
660    *authors in that this principle 'cannot be made without first applying a large dose of*
661    *prudence, mindful that its indiscriminate, frivolous, immoderate application could lead*
662    *to doing away with the formal structure of companies, or else to disallowing it under*
663    *circumstances where it is not warranted, with serious harm to the law, certainty and*
664    *security in legal relationships,' such that considering the foregoing analysis, the*
665    *exceptional but justified need has been established in this case to lift any corporate veil*
666    *that separates Texaco Inc. in its fourth-level subsidiary, Texaco Petroleum Company*
667    *(Texpet), given that it has been proven that it was a company with a capital very inferior*
668    *to the volume of its operations, that required constant authorizations and investments*
669    *from the parent company to carry out the normal course of business of its commercial*
670    *activity, that the executives were the same in both companies, and principally the*
671    *obvious fact that not lifting the corporate veil would imply a 'manifest injustice'.*

Case 18-855, Document 96, 03/11/2019, 2515363, Page93 of 308

# SA680

## PART V – ANNEX 8

### DR LEONARD'S AND OTHER EXAMPLES

**(1) The Clapp Report:** [Leonard ER 2, p. 34]

**Example 11. Identical word strings in the unfiled Clapp Report and the Sentencia, but not in the filed Record**

| Clapp Report: page 7 | Sentencia: page 109-110 | Anexo K of Cabrera Report |
|---|---|---|
| **Las muestras de suelo y agua tomadas durante las inspecciones judiciales han indicado niveles excesivos de plomo que puede plantear riesgos de salud para las poblaciones locales.  Los niveles de plomo en el suelo** más que duplican el límite legal y prueban **que el envenenamiento con plomo es un riesgo real** que fue creado por operaciones de producción de PETRÓLEO en la concesión de Texaco en la amazona ecuatoriana. | **Las muestras de suelo y agua tomadas durante las inspecciones judiciales han indicado niveles excesivos de plomo que puede plantear riesgos de salud para las poblaciones locales. Los niveles de plomo en el suelo** son mucho más elevados de lo normal, lo que contribuye a corroborar **que el envenenamiento con plomo es un riesgo real.** | {While the filed Anexo K of the Cabrera report appears to be based on the unfiled Clapp Report, it does not include this string.} |

Note: Bolding in Example 11 is added; bolding indicates exact matches. Curly brackets are used to interject text, spaces, or comments not in the original documents.  The translation of this word string in the Sentencia is: "Soil and water samples taken during the judicial inspections have indicated excessive lead levels that could pose health risks for local populations. Lead levels in the ground are much higher than normal, which tends to corroborate that lead poisoning is a real risk."

# SA681

*(2) The Draft Alegato*: [Leonard ER 2, p. 21]

**Example 4. Similar text and source citations in unfiled Fusion Memo, unfiled Draft Alegato, and Sentencia, but not in filed Final Alegato**

| Fusion Memo: pages 3-4 | Draft Alegato: page 61 | Sentencia: page 24 | Final Alegato: Enero 17, 2011 - 16H55, page 99 |
|---|---|---|---|
| **Al igual que Shields, Bischoff participaba activamente en las complejas cadenas y procesos de toma de decisiones que involucraban a Texaco Inc. y Texpet. En su declaración juramentada Bischoff explica cómo los contratos del cuartel general de Texpet, ubicados en Florida, que se excedieran de USD 500.000,oo debían ser aprobados por un abogado de apellido Wissel, jefe de los abogados de Texaco Inc**{footnote 8}. **En este caso, vemos como la relación entre Texpet y Texaco Inc. no estaba limitada a que ésta sea propietaria de las acciones de aquella. Ambas trabajaban íntimamente vinculadas, tomando Texaco Inc. todas las decisiones** y **Texpet limit**ándose **a ejecutarlas.** {footnote 7} **Declaración** Juramentada **de Robert M. Bischoff** [PSV-018/C] Cuerpo 63, foja 6621. {footnote 8} Ibíd.. | **Al igual que Shields, Bischoff participaba activamente en las complejas cadenas y procesos de toma de decisiones que involucraban a Texaco Inc. y Texpet. En su declaración juramentada Bischoff explica** cómo los contratos de Texpet **que exced**ían **ciertos valores debían ser aprobados por** el **jefe de los abogados de Texaco Inc.,** lo cual ayuda a probar la forma en que Texpet dependía de Texaco Inc. | **Al igual que Shields,** ha quedado claro en el expediente **que Bischoff participaba activamente en las complejas cadenas y procesos de toma de decisiones que involucraban a Texaco Inc. y Texpet. En su declaración juramentada Bischoff explica cómo los contratos del cuartel general de Texpet, ubicados en Florida, que se excedieran de USD 500.000,oo debían ser aprobados por un abogado de apellido Wissel, jefe de los abogado de Texaco Inc. En este caso, vemos como la relación entre Texpet y Texaco Inc. no estaba limitada a que ésta sea propietaria de las acciones de aquella,** sino que **a**mbas trabajaban íntimamente **vinculadas, tomando Texaco Inc. todas las decisiones** mientras que **Texpet se limit**a a **ejecutarlas.** | De hecho, las instancias en las **que Bischoff** tomó la medida de marcar la distinction demuestran la inseparbilidad de las comañias, en lugar de desacreditarla.  Por ejemplo, e**n** una **declaración** bajo **jurament**o Bischoff describió **cómo** debía asegurarse de que **los contratos de Texpet que** superaban **ciertos valores** recibieran la aprobación necesaria de los ejecutivos y de los asesores letrados **de Texaco**{footnote 362}. Se trata de otro ejemplo de cómo las estructuras de Texpet/Texaco eran, en efecto, indiferenciables.<br><br>La tradición de ejecutivos que se desempeñan al mismo tiempo en ambas compañías o que pasan de una a otra, una y otra vez, continúa con Chevron y Texpet en la actualidad.<br><br>{footnote 362: Foja 6639: Transcripción de la de**claración de Robert M. Bischoff** (17 de agosto de 1995). |

Note: Bolding in Example 4 is added and indicates identical or nearly identical matches in two or more documents. Curly brackets are used to interject text or comments not in the original documents.

Case 18-855, Document 106, 03/11/2019, 2515363, Page95 of 308

# SA682

*(3) The Erion Memorandum*: [C-TII Aug. 2014, p. 18]

| # | Erion Memo | Temporary File | Final Judgment |
|---|---|---|---|
| **1.** | Page 5 of 7: Did the corporate structure cause fraud or similar injustice? FN7: *Wallace v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999). See also *Outokumpu Eng'g Enters., Inc. v. Kvaerner EnviroPower, Inc.*, 685 A.2d 724, 729 (Del. Sup. Ct. 1996). | Page 14: En casos como este, que se cumpla el supuesto de que la nueva estructura corporativa podría provocar fraude a terceros o una injusticia similar, la jurisprudencia norteamericana nos enseña que se impone de manera especial la doctrina del levantamiento del velo societario. (Wallace contra Wood, 752 A.2d 1175, 1184 (Del. Ch. 1999); y también Outokumpu Eng'g Enters., Inc. contra K vaerner EnviroPower, Inc., 685 A.2d 724, 729 (Del. Sup. Ct. 1996). | Original Spanish, page 13: En casos como este, que se cumple el supuesto de que la nueva estructura corporativa podría provocar fraude a terceros o una injusticia similar, la jurisprudencia norteamericana nos enseña que se impone de manera especial la doctrina del levantamiento del velo societario. [Citations in the Temporary File omitted.]<br><br>Certified Translation, page 13: In cases like this one, that fit the case where the new corporate structure could provoke a fraud on third parties or a similar injustice, North American jurisprudence teaches us that the doctrine of lifting the corporate veil must especially be asserted. |

# SA683

*(4) The Fajardo Trust Email*: [Leonard ER 2, p. 31]

**Example 9. Identical or nearly identical word strings (more than 40 words) in the unfiled Fajardo Trust Email and the Sentencia, but not in the filed Registro Oficial**

| Fajardo Trust Email | Sentencia: page 186 | Registro Oficial: page 29 |
|---|---|---|
| L**a procedencia del fideicomiso como modo de cumplir las obligaciones** tiene como fundamento el artículo 24, numeral 17 de la Constitución anterior (debe haber una norma similar en la actual) y **ha sido reconocida** (la procedencia del modo) **en las resoluciones de Corte Suprema números 168-2007 de abril 11 de 2007, juicio No. 62-2005, propuesto por Andrade c. CONELEC; y, 229-2002, R.**{space} **O. 43 de marzo 19 de 2003**; | la **procedencia del fideicomiso como modo de cumplir las obligaciones ha sido reconocida en las resoluciones de Corte Suprema números 168-2007 de abril 11 de 2007, juicio No. 62-2005, propuesto por Andrade c. CONELEC; y, 229-2002, R.O. 43 de marzo 19 de 2003**, | {other than "artículo 24, numeral 17, de la Constitución", no overlap with the Fajardo Trust Email is found.} |

Note: Bolding and underlining in Example 9 are added; bolding indicates exact matches between the unfiled Fajardo Trust Email and the Sentencia. Curly brackets are used to interject text, spaces, or comments not in the original documents.

# SA684

*(5) The Fusion Memorandum*: [Leonard ER 2, p. 15]

**Example 1. Identical or nearly identical word strings in the unfiled Fusion Memo and the Sentencia (more than 90 words)**

| Fusion Memo: page 8 | Sentencia: page 24 |
|---|---|
| **Es cierto que por norma general una empresa puede tener subsidiarias con personalidad jurídica completamente distinta. Sin embargo, cuando las subsidiarias comparten el mismo nombre informal, el mismo personal, y están directamente vinculadas con la empresa madre en una cadena ininterrumpida de toma de decisiones operativas, la separación entre personas y patrimonios se difumina bastante. En este caso, se ha probado que en la realidad Texpet y Texaco Inc. funcionaron en el Ecuador como una operación única e inseparable. Las decisiones importante pasaban por diversos niveles de ejecutivos y órganos de decisión de Texaco Inc.,** | **Es cierto que por norma general una empresa puede tener subsidiarias con personalidad jurídica completamente distinta. Sin embargo, cuando las subsidiarias comparten el mismo nombre informal, el mismo personal, y están directamente vinculadas con la empresa madre en una cadena ininterrumpida de toma de decisiones operativas, la separación entre personas y patrimonios se difumina bastante**, o incluso llega desaparecer. **En este caso, se ha probado que en la realidad Texpet y Texaco Inc. funcionaron en el Ecuador como una operación única e inseparable.** Tanto l**as decisiones important**es como las triviales **pasaban por diversos niveles de ejecutivos y órganos de decisión de Texaco Inc.,** |

Note: Bolding in Example 1 is added and indicates identical or nearly identical matches between the documents.

# SA685

*(6) The January and June Index Summaries:* [Leonard ER 2, p. 28]

**Example 7. Identical or nearly identical word strings in the unfiled January and June Index Summaries and Sentencia, but not the filed Record.**

| January Index Summary: Pruebas pedidas por SV, Row 5, Columns H {"testimonio en fojas 2150. P75.C22"} and I | June Index Summary: Pruebas pedidas por SV, Row 5, Columns H {"testimonio en fojas 2150. P75.C22"} and I | Sentencia: page 138 | Record: fojas 2150 vuelta and 2151 |
|---|---|---|---|
| **Me contrató el Frente. Me imagino que hay un convenio interinstitucional entre Pet**{no "r"}**o y el Frente, y por eso seguramente se imprimió en hojas de Petro**. **Las muestras**{no "s"}**e tomaron al azar**. | **Me contrató el Frente. Me imagino que hay un convenio interinstitucional entre Petro y el Frente, y por eso seguramente se imprimió en hojas de Petro. Las muestras se tomaron al azar.** | **"Me contrató el Frente. Me imagino que hay un convenio interinstitucional entre Petroecuador y el Frente, y por eso seguramente se imprimió en hojas de Petro"**. Este testigo asegura que **las muestras se tomaron al azar** | 2) La metodología fue la recopilación de las muestras de suelo y agua de los diferentes campos, estas **muestras** las **tomaron al azar** y los resultados de lapsus fueron comparados con las tablas ambientales que existen en vigencia. 4) No soy asesor del Frente de Defensa de la Amazonía a mi me **contrató el Frente** de Defensa de la Amazonía para un trabajo técnico a realizarse en el listado de pozos que me presentaron. 11)...de la Amazonía m**e imagino que** las hojas en las cuales se imprimió es por el **convenio interinstitucional** que hay **entre Petr**{no "o"}**ecuador y el Frente** de Defensa de la Amazonía. |

Note: Bolding in Example 7 is added; bolding indicates exact matches between the documents. Curly brackets are used to interject text or comments not in the original documents.

# SA686

**(7) The Moodie Memorandum**: [C-TII Aug. 2014, pp. 27-28]

| # | Moodie Memo | Temporary File | Final Judgment |
|---|---|---|---|
| **1.** | The Moodie Memo discusses the "substantial factor" test for causation under California case law, citing (in six footnotes) *Whitley v. Phillip Morris, Inc.* five times and *Rutherford v. Owens-Illinois, Inc.* twice.<br><br>In discussing the elements of the substantial factor test the Memo states, among other things, that a plaintiff must show that a toxic substance played "more than . . . [a] theoretical" role in bringing about the claimed injury.  The Memo further states that a plaintiff has "[n]o need to prove that it was toxic chemical's [sic] from D[efendant]'s conduct that actually produced the malignant growth."  *See* Moodie Memo, at WOODS-HDD-0012794.[91] | p. 59:  El factor substancial, que implica que el elemento dañoso no puede ser mas meramente teórico ni tampoco jugar el papel secundario generando el daño.  Según esta teoría estos elementos deben ser considerados sin necesidad de probar cuál de ellos ha sido precisamente el que causó el daño, debido a la irreducible falta de certeza científica respecto a cuál de los elementos utilizados por el demandado provocó el daño (ver Whitley contra Philip Morris. Inc. y Rutherford contra. Owens-Illinois, Inc.). | pp. 89-90:  El factor substancial, que implica que el elemento dañoso no puede ser meramente teórico ni tampoco jugar el papel secundario generando el daño.  Según esta teoría estos elementos deben ser considerados sin necesidad de probar cuál de ellos ha sido precisamente el que causo el daño, debido a la irreducible falta de certeza científica respecto a cuál de los elementos utilizados por el demandado provocó el daño [Citation in the Temporary File omitted.]<br><br>pp. 89-90:  The substantial factor, which requires that the harmful element cannot be merely theoretical nor can it play a secondary role in the generation of the harm.  According to this theory, these elements must be considered without the need to investigate which of them was precisely the cause of the harm, due to the irrefutable lack of scientific certainty about which of the elements used by the defendant caused the harm. |

Juicio No. 2003-0002

## JUEZ PONENTE: AB. NICOLAS ZAMBRANO LOZADA

**CORTE PROVINCIAL DE JUSTICIA SUCUMBIOS. - SALA UNICA DE LA CORTE PROVINCIAL DE JUSTICIA DE SUCUMBIOS.** Nueva Loja, lunes 14 de febrero del 2011, las 08h37. **VISTOS.-** En relación a la causa signada con el No. 002-2003 que por daños ambientales sigue María Aguinda y otros, en contra de la compañía Chevron Corporation, atendiendo su estado procesal se dispone.- 1).- Téngase por incorporado al expediente los anexos y escritos presentado a las 16H24 de 03 de febrero del 2.011 por el doctor Adolfo Callejas Ribadeneira, Procurador Judicial de Chevron Corporation, en atención al mismo se dispone negar su solicitud de revocatoria de providencia de fecha 02 de Febrero del 2011 las 17H14, en virtud de que no se le está impidiendo el derecho que le asiste de presentar peticiones que se encuentren amparadas en la ley y el derecho.- 2).- En lo principal, María Aguinda, Ángel Piaguaje, y otros, amparados en el contenido de los artículos 2241 y 2256 de la anterior codificación del Código Civil (en adelante CC), actualmente artículos 2214 y 2229 respectivamente, según la nueva Codificación publicada en Registro Oficial del 24 de junio de 2005, para fundamentar la obligación de reparar el daño; en el artículo 169 de la OIT para fundamentar el derecho a compensación de los pueblos indígenas; y en cuanto al derecho a reclamar las reparaciones derivadas de una afectación ambiental, en el número 6 del artículo 23 y en el artículo 86 de la Constitución de 1998, así como en el artículo 2260 de la anterior codificación del Código Civil, actualmente artículo 2236, que dice "Por regla general se concede acción popular en todos los casos de daño contingente que por imprudencia o negligencia de alguno amenace a personas indeterminadas. Pero si el daño amenazare solamente a personas determinadas, sólo alguna de éstas podrá intentar la acción", y en el 41 de la Ley de Gestión Ambiental – en adelante LGA (fs. 78 y 79), comparecen desde fojas 73 a 80 demandando la eliminación o remoción de elementos contaminantes y la reparación de daños ambientales, en contra de CHEVRON TEXACO CORPORATION, que cambió su nombre a CHEVRON CORPORATION, conforme lo indica y demuestra mediante documento presentado por su Procurador Común, adjunto al escrito presentado el 23 de agosto del 2005, a las 08h05; esta demanda en sus considerandos Primero al Sexto resume los antecedentes (donde alega que el detalle de las obras realizadas por Chevron está comprendido en el anexo A de la demanda), métodos contaminantes empleados por Texaco, los daños y la población afectada, la responsabilidad de Texaco, los fundamentos de derecho descritos anteriormente, y expone las



## SA688

Corte, que como ha quedado establecido en este caso viene dada por la Constitución, el nuevo COFJ, el CPC, y la LGA. Esta Presidencia considera que el hecho alegado de que Chevron Corporation no es sucesora de TEXACO INC. no obsta la competencia de esta Corte, sino que eventualmente, de ser cierto el hecho alegado se configuraría como falta de legítimo contradictor, excepción que ha sido alegada como primera excepción subsidiaria en la contestación a la demanda, y que será analizada más adelante.- **SEGUNDO.-** La litis ha quedado trabada con las pretensiones de la parte actora y las excepciones propuestas por la demandada en la audiencia de conciliación; como es lógico se analizó primero los aspectos previos tratados en la contestación, los mismos que se refieren a la falta de competencia de esta Corte, que ha sido fundamentada en torno a varios hechos que también son materia de las demás excepciones tratadas posteriormente en la contestación y que se resolverán oportunamente en este fallo. Las excepciones planteadas, en su orden, se resuelven a continuación.- **TERCERO.-** La demandada ha alegado las siguientes excepciones, que serán analizadas en el orden que han sido presentadas porque en la contestación la parte demandada no las diferencia si son excepciones dilatorias o perentorias: 3.1.- Falta de legítimo contradictor. La demanda afirma que Chevron es sucesora de Texaco mientras que la demandada niega esta afirmación, por lo que debiendo pronunciarme al respecto, según consta del expediente, se observa que el estricto sentido jurídico, es decir, entendiendo la sucesión como un modo de adquirir el dominio por el que se transmiten derechos y obligaciones del causante a sus sucesores (según la tradición romanista), es correcta la afirmación de que Chevron no es sucesora de Texaco Inc., por cuanto consta del proceso prueba documental debidamente certificada que evidencia que Texaco Inc. mantiene personería jurídica y por ende vida legal (en fojas 222 y 223 se encuentra el documento original en inglés, traducido en fojas 224 y 225), de manera que resulta evidente que no puede haber sucesión mortis causa sin que exista causante. Esta Presidencia empieza el análisis considerando la exposición de la parte demandada en la audiencia de conciliación, referente a que no existió una fusión entre Texaco y Chevron, sino que como lo prueban con el certificado que reposa en fojas 230 y 231 (traducción en fojas 225), la fusión ocurrió en realidad entre Texaco Inc. y Keepep Inc. Sin embargo esta realidad probada documentalmente debe ser analizada a la luz de todo el acervo probatorio, por lo que se consideran varios aspectos, entre los que convienen referirnos primeramente que a fojas 4103 se encuentran una razón de 29 de octubre del 2003, a las 11h18, sentada por la Secretaría de la Presidencia, en la que consta que la parte

Index Summary: Pruebas pedidas por SV, Rows 6-9, Column H; June
Index Summary: Pruebas pedidas por SV, Rows 6-9, Column H

**SA689**

Index Summary: Pruebas pedidas por SV, Rows 6-9, Column H; June Index Summary: Pruebas pedidas por SV, Rows 6-9, Column H

==demandada no se presentó a la exhibición== de varios documentos relativos precisamente a este tema, la cual fue solicitada oportunamente por los demandantes mediante escrito recibido el 23 de octubre de 2003, a las 15h25, y ordenada en providencia del 23 de octubre de 2003, a las 15h30. Los documentos que a la parte demandada debía exhibir comprendían: 1) ==Copia íntegra y certificada del== "Acuerdo y Plan de Fusión", ==que dice relación con== el "Certificado de Fusión entre Keepep Inc y Texaco Inc.", documento cuya fecha de emisión es el 9 de octubre de 2001; 2) ==Copia íntegra y certificada del documento en el que conste la autorización de Chevron Corporation, para que su subsidiaria Keepep Inc. intervenga en la Fusión; 3) Copia íntegra y certificada de la autorización del órgano corporativo competente para que se proceda al cambio de denominación de Chevron Corporation a Chevron Texaco Corporation; 4) Copia íntegra y certificada de la autorización del órgano corporativo competente emitida para que Chevron pueda incorporar a su nueva denominación la palabra Texaco.== Estos documentos que la parte demandada no exhibió pese a haber sido oportunamente pedidos por la parte actora y ordenados por la Presidencia de esta Corte, no fueron presentados por la parte demandada. Según consta del expediente la demandada expresó los motivos que fundamentan una supuesta imposibilidad de exhibir dichos documentos, mediante escrito del 27 de octubre de 2003, a las 16h50, que fuera atendido mediante providencia del 27 de octubre de 2003, a las 17h20, ordenando que se cumpla con lo ordenado o que se presente la excusa el día señalado. Como se hizo notar, la razón sentada por Secretaría indica claramente que la parte demandada no se presentó en el día y hora señalada, por lo que no presentó excusa válida para este incumplimiento. Considerando el Art. 826 del Código de Procedimiento Civil respecto al mérito de la exhibición pedida como prueba, y debiendo esta Presidencia considerar únicamente los elementos que forman parte del proceso, estimo que la negativa a cumplir con la exhibición ordenada no puede favorecer a la parte en rebeldía, sino por el contrario, el Código de Procedimiento Civil ha establecido una sanción para estos casos, en el Art. 827, que dice: "Si ordenada la exhibición no se la cumpliere dentro del término señalado, se impondrá al renuente una multa de diez a cuarenta dólares de los Estados Unidos de América por cada día de retardo, según la cuantía del asunto. Esta multa no podrá exceder del valor equivalente a noventa días", por lo que en este caso en razón del tiempo transcurrido debe aplicarse la multa máxima, equivalente a 40 dólares diarios multiplicados por los 90 días, por cada documento que no ha sido exhibido conforme fuera ordenado. Del mismo modo sucede con los documentos cuya exhibición fue

Index Summary: Pruebas pedidas por SV, Rows 6-9, Column D; June Index Summary: Pruebas pedidas por SV, Rows 6-9, Column D



## SA690

Fusion Memo: p. 4

actividades son las personas que proveen las autorizaciones y los fondos, que frecuentemente se encuentren cobijadas tras la máscara de personalidad jurídica, haciendo necesario que en ciertos casos se desestime la estructura formal del ente societario para evitar la defraudación de terceros. En el expediente, en el cuerpo 65, fojas 6827, 6828,6830, 6831, 6826, 6833, constan las traducciones de varios pedidos de autorización de Shields a Palmar, en los que el señor Shields hace pedidos a nombre de la "División Ecuatoriana" de Texaco Inc. a sus superiores de Texaco Inc., solicitando su aprobación para diversos asuntos propios de las operaciones en el Oriente ecuatoriano. Constan en el expediente autorizaciones para asuntos cotidianos, de administración regular, como la licitación de servicios de catering y limpieza para los sitios de operaciones del consorcio en Quito y el Oriente (traducción de documento PET 029369 en foja 6827 y PET 028910 en foja 6830), o la contratación de servicios de entretenimiento cinematográfico en las instalaciones del Oriente (PET 029086 en foja 6831). Del mismo modo encontramos una autorización para la contratación de equipos y personal para el mantenimiento de oleoductos (PET 019212 en foja 6828) y construcción de puentes en Aguarico y Coca (PET 016879 en foja 6833). Finalmente, Shields solicita la autorización de Palmer para iniciar la exploración del pozo Sacha-84, en octubre de 1976 (PET 012134). También constan del expediente varios documentos de los archivos Texpet, con pedidos de autorización de Bischoff a Palmer, en el cuerpo 65, fojas 6839, 6840, 6843, 6844, 6848, donde consta que del mismo modo que Shields, Palmer se refiere a las operaciones de Texpet en el Oriente como "la División Ecuatoriana". Entre sus pedidos de autorización, consta el urgente pedido para aprobar la licitación de dos torres de "workover" (soporte y mantenimiento) para la explotación en el Oriente (PET 030919 en foja 6839), y la licitación de un camino entre los pozos Yuca y Culebra (PET 016947 en foja 6843), aspectos claves para el desarrollo de las operaciones de Texpet. También se solicita autorización para extender un contrato de servicios de ferri en la zona (PET 032775 en foja 6844), y con mayor importancia, se solicita aprobación de los documentos de aprobación del Pozo Vista-1. Consta además un memorando de especial importancia revelando la existencia de una cadena lineal de autorización existente entre estos ejecutivos, pues Bischoff le solicita a Palmer que, de aprobar el documento, lo firme y reenvíe a McKinley, un ejecutivo superior de Texaco Inc (PET 022857 en foja 6848), denotando la existencia de una cadena de mando, que hacía que las decisiones sobre todo aspecto relacionado con la operación de Texpet en Ecuador sean tomadas por ejecutivos de Texaco Inc, en EEUU. Adicionalmente, constan en el expediente sendos pedidos de autorización de Palmer

Fusion Memo: p. 4

Fusion Memo: pp. 4-5

Fusion Memo: p. 5

Fusion Memo: p. 5

## SA691

a Granville, en el cuerpo 66, fojas 6930, 6938, 6943, que demuestran que la cadena de autorizaciones se extiende más arriba de Palmer, ya que haciendo eco de un pedido de Shields (ver PET 019212, en foja 6828), Palmer le solicita a Granville la autorización para contratar equipos y personal para el mantenimiento de oleoductos (PET 029976, en foja 69309) y según el requerimiento de Bischoff (ver PET 030919, en foja 6839) aprueba una de las ofertas para la construcción de las torres de "workover", sometiendo dicha aprobación al visto bueno de Granville (PET 029991, en foja 6943). Existen además en el expediente cartas y memorandos de Shields y Palmer a John McKinley, provenientes de los archivos Texaco Inc, y Texpet. En el cuerpo 66, fojas 6957, 6958, 6964, 6959, 6960, 6974. Que demuestran que tanto Shields como Palmer mantenían un flujo constante de cartas y memos con McKinley, solicitando su autorización e informándole acerca de acontecimientos relacionados con la Concesión Napo. Del mismo modo, cartas de funcionarios menores dirigidas a Shields, en el cuerpo 65, fojas 6855, 6856, 6860, 6861, 6875, 6882, 6885, donde se hace referencias a cartas dirigidas a Shields que se originaron en Quito, en manos de funcionarios menores que solicitaban su autorización, como William Saville, que era un ejecutivo de Texpet que operaba en Quito, y envió muchas y cotidianas comunicaciones a Shields (en Nueva York) solicitando autorizaciones. Por ejemplo, le envía a Shields los costos estimados de la perforación de los pozos Sacha 36 al 41 (doc s/n), y solicita su aprobación para iniciar la licitación de transporte de combustibles en el Oriente (PET 031387 en foja 6856). J.E.F. Caston, otro ejecutivo de la petrolera ubicado en Quito solicita la autorización de Shields para licitar varios servicios (PET 020758 en foja 6860) y para aprobar los costos estimados de instalar bombas sumergibles en cinco pozos en el campo Lago Agrio. Finalmente tenemos a Max Crawford, otro funcionario radicado en Quito, quien también solicitaba periódicamente la aprobación de Shields para diversos objetivos (PET 035974 en foja 6882, y doc s/r en foja 6885). Por otro lado, debe ser considerado el hecho probado de que las decisiones del "Comité Ejecutivo" de Texpet debían ser aprobadas por el directorio de Texaco Inc, como vemos que en el Acta de Directorio No. 478 (Cuerpo 25, foja 2427), donde éste aprobó la decisión de Texpet de entrar en negociaciones con el Ecuador para oponerse a una elevación en el impuesto a la renta para la petrolera, y pagos adicionales, del mismo modo que el directorio de Texaco Inc. aprobó la compra de un avión de USD 850.000, Acta 456 (Cuerpo 24, foja 2351), demostrando el poder de decisión de Texaco Inc. sobre las compras realizadas por Texpet. En mi criterio estas actas demuestran el constante escrutinio que la matriz Texaco Inc. mantenía sobre toda operación y noticias

21



Fusion Memo: p. 5

Fusion Memo: p. 5

Fusion Memo: p. 6

Fusion Memo: p. 10

Fusion Memo: p. 11

## SA692

relativas a Texpet en Ecuador. Si analizamos este hecho independientemente, quizás se pueda confundir como el normal control que ejerce un directorio sobre sus subsidiarias. Sin embargo debemos analizar este control de la matriz sobre su subsidiaria dentro de su contexto, tomando en cuenta también que el Directorio de Texaco Inc. además entregaba las "asignaciones" de dinero con las cuales Texpet operaba, lo cual implica que Texpet carecía no solo de autonomía administrativa, sino financiera, ya que era Texaco Inc. quien controlaba no solo las decisiones, sino que también autorizaba los fondos que Texpet necesitaba para el normal desenvolvimiento de actividades. Partiendo del hecho admitido de que Texpet es una empresa subsidiaria de cuarto nivel perteneciente ciento por ciento a un dueño único, Texaco Inc., y que Texpet operaba con fondos provenientes de las arca de Texaco Inc., ha quedado demostrado que no existe una separación real de patrimonio. Entendemos que personalidades jurídicas distintas necesariamente implican patrimonios diferenciados, según las reglas de los atributos de la personalidad, sin embargo en este caso la confusión de patrimonios se hace evidente, confundiendo del mismo modo las personalidades. Entre las pruebas que nos llevan a este convencimiento citamos adicionalmente el acta de reunión de directorio de Texaco Inc. No. 380, de fecha 22 de enero de 1965 (Cuerpo 22, foja 2166), que estableció asignaciones a favor de la Cía. Texaco Petróleos del Ecuador por un monto de USD 30.312,oo. El acta de reunión de directorio de Texaco Inc. No. 387, de fecha 17 de septiembre de 1965 (Cuerpo 22, foja 2176) estableció asignaciones a favor de Texaco Petróleum Company (Texpet), por un monto de USD 27.625,oo. El acta de reunión de Directorio de Texaco Inc. No. 393, de fecha 19 de abril de 1966 (Cuerpo 22, foja 2182) estableció asignaciones a favor de Texaco Petróleum Company (Texpet), por un monto de USD 331.272,oo, y a favor de la Cía. Texaco Petróleos del Ecuador por USD 13.631. queda de este modo establecida la convicción de esta Presidencia respecto a que Texaco Inc., controlaba los fondos tanto de la empresa que ejercía los derechos de la concesión (Texaco Petróleos del Ecuador) como de la que fuera contratada para operar la concesión de los campos, por lo que resulta evidente que TEXPET fue una empresa sin capital ni autonomía suficiente para afrontar el giro normal del negocio, lo cual a su vez se configura como otra evidencia de falta de independencia de la subsidiaria respecto a la principal, llevándonos a la convicción de que TEXPET era una empresa infracapitalizada, que dependía tanto económica como administrativamente de su matriz. El monto de los contratos que requieren autorizaciones hacer presumible la indisponibilidad de capital propio, lo cual es una indicación de incapacidad para hacer frente a las eventuales

# SA693

responsabilidades que pueden preverse tras una operación petrolera. Cabanellas nos explica en su obra "Derecho Societario: Parte General. La personalidad jurídica societaria", que "la personalidad societaria se basa en un conjunto de reglas que determinan qué conductas se imputan a las sociedad en cuanto persona jurídica. Los efectos generales de esas reglas pueden verse modificados en función de ciertas normas que alteran tal atribución, pasando a imputarse las conductas que normalmente serían atribuibles a la sociedad como persona jurídica, a otras personas físicas o de existencia ideal, como pueden ser sus socios u otras personas que ejercen de hecho el control de la sociedad." (Ver. Vol.3. Buenos Aires: Editorial Heliasta, 1993. P. 65). Ha quedado demostrado en el expediente que las autorizaciones e inversiones requeridas por TEXPET, hacían que el control de hecho sobre sus operaciones sea ejercido de la matriz, lo que constituye un importante aspecto a ser considerado. Bien lo afirma López Mesa y José Cesano en su obra: El abuso de la personalidad jurídica de las sociedades comerciales: Contribuciones a su estudio desde las ópticas mercantil y penal (Buenos Aires: Depalma, 2000), al decir que "El régimen de la personalidad jurídica no puede ser utilizado en contra de los intereses superiores de la sociedad ni de los derechos de terceros. Las técnicas manipuladas para cohibir el uso meramente instrumental de la forma societaria varían y adoptan diversos nombres, pero todos postulan, en sustancia, la consideración de la realidad económica y social y la supremacía del derecho objetivo". Concordantemente la Corte Suprema, en la Sentencia 120.2001, citada anteriormente, ha dicho que "frente a estos abusos, hay que reaccionar desestimando la personalidad jurídica, es decir, descorriendo el velo que separa a los terceros con los verdaderos destinatarios finales de los resultados de un negocio jurídico llegar hasta éstos, a fin de impedir que la figura societaria se utilice desviadamente como un mecanismo para perjudicar a terceros, sean acreedores a quienes se les obstaculizaría o impediría el que puedan alcanzar el cumplimiento de sus créditos, sean legítimos titulares de un bien o un derecho a quienes se les privaría o despojaría de ellos. Estas son situaciones extremas, que deben analizarse con sumo cuidado, ya que no puede afectarse la seguridad jurídica, pero tampoco puede a pretexto de proteger este valor, permitir el abuso del derecho o el fraude a la ley mediante el abuso de la institución societaria". 2.- Ahora bien, si consideramos las cuestiones formales, como el hecho de que las mismas personas ejercen los cargos de directores ejecutivos y otros cargos directivos en ambas empresas, sumado al hecho admitido de que Texaco Inc era propietario del 100% de Texpet, se abunda en la convicción de la necesidad de aplicar la doctrina del levantamiento societario. Por



Draft Alegato: p. 61

23

Fusion Memo:
p. 3, Draft
Alegato: p. 61

## SA694

ejemplo, el señor Robert C. Shields, desempeñó el cargo de Vicepresidente de Texaco Inc. entre 1971 y 1977, siendo a la vez Jefe de la Junta de Directores de Texpet, según consta en su declaración juramentada (cuerpo 63, foja 6595). Al revisar el expediente consta que Shields suscribe sus cartas a nombre de Texpet, cuando según su mismo testimonio entre 1971 y 1977 ostentaba el cargo de Vicepresidente de Texaco Inc. Este hecho guarda coherencia con lo declarado por Bischoff, acerca de que Texpet era la división de Texaco Inc. que operaba en Latinoamérica, y no una mera subsidiaria, como sostiene la defensa de la parte demandada. Del mismo modo, el señor Robert M. Bischoff durante su carrera ostentó cargos de Texaco Inc. tanto en EEUU como en América Latina. Entre 1962 y 1968 trabajó como Vicepresidente en la división de producción para América Latina, a la cual él mismo llama Texaco Petroleum Company (Texpet), según consta en su declaración juramentada, en cuerpo 63, foja 6621. Esto demuestra cómo inclusive los mismos ejecutivos de Texaco Inc. pensaban en Texpet como una división de Texaco Inc., y no como una empresa separada. Al igual que Shields, ha quedado claro en el expediente que Bischoff participaba activamente en las complejas cadenas y procesos de toma de decisiones que involucraban a Texaco Inc. y Texpet. En su declaración juramentada Bischoff explica cómo los contratos del cuartel general de Texpet, ubicados en Florida, que se excedieran de USD 500.000,oo debían ser aprobados por un abogado de apellido Wissel, jefe de los abogado de Texaco Inc. En este caso, vemos como la relación entre Texpet y Texaco Inc. no estaba limitada a que ésta sea propietaria de las acciones de aquella, sino que ambas trabajaban íntimamente vinculadas, tomando Texaco Inc. todas las decisiones mientras que Texpet se limita a ejecutarlas. Es cierto que por norma general una empresa puede tener subsidiarias con personalidad jurídica completamente distinta. Sin embargo, cuando las subsidiarias comparten el mismo nombre informal, el mismo personal, y están directamente vinculadas con la empresa madre en una cadena ininterrumpida de toma de decisiones operativas, la separación entre personas y patrimonios se difumina bastante, o incluso llega desaparecer. En este caso, se ha probado que en la realidad Texpet y Texaco Inc. funcionaron en el Ecuador como una operación única e inseparable. Tanto las decisiones importantes como las triviales pasaban por diversos niveles de ejecutivos y órganos de decisión de Texaco Inc., a tal punto que la subsidiaria dependía de la matriz para contratar un simple servicio de catering. En este sentido este sentido es completamente normal que el Directorio de una empresa subsidiaria esté conformado por algunos oficiales de su matriz, y que también es normal que la matriz reciba informes periódicos

Fusion Memo: pp. 6-7

Fusion Memo: p. 3; Draft Alegato: p. 61

Fusion Memo: pp. 3-4; Draft Alegato: p. 61

Fusion Memo: p. 4

Fusion Memo: p. 8

Fusion Memo: p. 10

24

# SA695

Fusion Memo: p. 10

sobre su estado, y tomen ciertas decisiones que por su importancia están por sobre la administración regular. Sin embargo, en el caso de Texaco Inc. y su subsidiaria Texaco Petroleum Company (Texpet), el rol de los Directores trascienden los roles que pueden considerarse normales, pues éstos recibían información y tomaban decisiones acerca de la gran mayoría de hechos y actos de Texpet sobre asuntos cotidianos de la operación de la concesión Petrolera Napo, respondiendo a una cadena de mando bien establecida, como ha quedado demostrado en el expediente. 3.-Finalmente se considera que la doctrina del levantamiento del velo societario es especialmente aplicable frente a los abusos que se pueda cometer en detrimento del orden público o de derechos de terceros, para evitar el fraude y la injusticia, es decir, que se debe levantar el velo societario siempre que no hacerlo favorezca una defraudación o promueva la injusticia, como sería el caso en que encontremos esquemas intencionalmente creados para dejar los beneficios en la compañía matriz, mientras que las obligaciones quedan en una subsidiaria, que por lo general es incapaz de satisfacerlas. Como bien lo dicen López Mesa y José Cesano: "Aún cuando se admita por vía de hipótesis que dos sociedades están sometidas a una unidad de decisión o constituyen una unidad económica o grupo de sociedades, estos no son datos suficientes para prescindir de la autonomía jurídica de cada uno de los sujetos societarios implicados en las actuaciones, en tanto no se alegue y pruebe que se haya instrumentado las formas jurídicas para perjudicar al demandante en sus derechos, pues lo adecuado es respetar la separación patrimonial de la sociedad, en tanto ésta no sea probablemente el medio de violación de otras reglas jurídicas, ya que la desestimación de la personalidad o atribución de responsabilidad a personas en apariencias distintas, tiene por exclusivo fundamento la comprobación del abuso del privilegio concedido en detrimento del orden público o de derechos de terceros" (Págs. 145 y 146). En este sentido se nota que la parte actora si ha alegado de manera expresa que Texpet fue una compañía instrumentada para mantener las responsabilidades pendientes sobre una compañía sin capital suficiente, mientras se mantiene el capital de la matriz libre de responsabilidades, con el objeto precisamente de evadir las potenciales responsabilidades con terceros, al tiempo que consta en el expediente abundante evidencia, como ha sido anotado en líneas anteriores, que demuestra el profundo nivel de vinculación y falta de independencia de la subsidiaria con respecto a su matriz, que fue quien realmente tomó las decisiones y se benefició de los actos de su subsidiaria, quien además es incapaz de hacer frente a las potenciales de sus responsabilidades que se le exijan. Se considera finalmente lo dicho



25

## SA696

sitios inspeccionados, y los resultados de esas inspecciones, se considera que las muestras válidas del expediente son representativas del estado del área de concesión. De este modo con las consideraciones anotadas, se empieza el análisis de los resultados de las muestras tomadas en campo por los distintos peritos que han actuado en este juicio, haciendo una apreciación general de los resultados presentados para Hidrocarburos Totales de Petróleo (TPHs). Se toma en cuenta que la demandada ha alegado que el TPH no es un buen indicador de riesgo, al decir que "Sobre ese mismo tema Señor Presidente, voy a hacer una cantaleta que ya hice hace unos días y hace unas cuantas inspecciones judiciales, relativo a que el contenido de hidrocarburos TPH no mide la toxicidad ni el riesgo de salud por que los hidrocarburos se encuentran en la naturaleza, por ejemplo en el pasto con 14 mg/kg las hojas secas de roble con 18.00 mg/kg, en la acículas de pino con 16.000 mg/kg; y muchos productos no tóxicos que son derivados del petróleo y utilizados por el hombre; tenemos el aceite para bebés que seguramente muchas personas han utilizado, tiene 865.680 mg/kg de TPH; la vaselina, no la canción sino la que se usa para determinados fines, tiene 749.000 mg/kg" (ver foja 155068). Sin embargo en el expediente también encontrados advertencias en cuanto a los potenciales efectos nocivos de los TPHs para la salud de las personas, como las del perito Bermeo, que en las conclusiones de su dictamen nos indica que " Los análisis realizados en el tejido de pescado determinaron la presencia de hidrocarburos totales en los peces en valores muy por encima de los máximos permitidos en agua, lo cual al no existir en nuestro país referencia o norma que indique o determine la cantidad máxima en que pueden estar presentes antes de causar problemas a los peces y por ende a la salud de quienes lo consumen, tomamos como referencia los valores permisibles para el agua, y desde este punto podemos manifestar que existe contaminación por hidrocarburos; lo cual podría convertirse en un problema alimenticio de seguirse dando. La agencia para Sustancia Tóxica y el Registro de Enfermedades, ATSDR de los EEUU, indica que estos productos son altamente nocivos para la salud y son el resultado de una mezcla de diferentes productos derivados del petróleo como tal (gasolina, aceites lubricantes, grasas, breas, etc.), por lo que la presencia de hidrocarburos totales en los pescados son el resultado de las actividades petroleras que se dan en la zona" (ver fojas 159373 a 159376). Así también, el perito insinuado por los demandantes, Edison Camino, ha dicho en su informe de Sacha 10 que "Algunos de los compuestos de los TPHs pueden afectar el sistema nervioso", y en que "un compuesto TPH (benceno) es carcinogénico en seres humanos" (ver informe en fojas 52474 a

100

June Index Summary: Indice, Row 756, Columns B, D

**52780).** De este modo, atendiendo a lo dicho por el perito insinuado por la parte demandada, Gino Bianchi, en su defensa de la inspección judicial del pozo Lago Agrio 2, respecto a que "El TPH no se utiliza para evaluar los riesgos potenciales a la salud ya que solo indica la cantidad de petróleo en la muestra, y no sus características de toxicidad" pero también que "las propiedades toxicológicas del petróleo crudo pueden ser caracterizadas sobre la base de los siguientes compuestos tóxicos: Hidrocarburos Aromáticos Volátiles: benceno, tolueno, etilbenceno y xilenos; Hidrocarburos Aromáticos Policíclicos [...]; Metales pesados: bario, cadmimo, cobre, cromo, cromo hexavalente, mercurio, níquel, plomo, vanadio y cinc " (ver texto en foja 95701, que es idéntico a lo dicho por el perito Jorge Salcedo en su dictamen de la inspección judicial del pozo Shushufindi 18 y en Shushufindi 25, y reiterado por Gino Bianchi en su dictamen sobre las inspecciones judicial del pozo Guanta 7), esta Corte ha decidido que lo más adecuado es que los TPHs sean considerados en conjunto con las demás evidencias, pues aunque no fuere un indicador preciso de riesgo para la salud, es un buen indicador del estado del medio ambiente en general en cuanto a impactos por hidrocarburos, aunque debemos reconocer que para identificar posibles amenazas a la salud se debe monitorear la presencia de otros elementos. En este aspecto, de modo concordante con lo dicho por el perito Gino Bianchi respecto a ciertos compuestos tóxicos, se atiende al informe Yanacuri referidos en líneas anteriores, en tanto que éste expresa una particular preocupación que se expresa por la exposición al benceno, tolueno y xileno (BTEX), que por su solubilidad en el agua, mayor permanencia en suelo arcilloso, peligrosidad para la salud deben ser eliminados hasta los niveles cuya presencia sea natural en suelos. Del mismo modo se atiende este estudio, cuando dice "numerosos estudios epidemiológicos realizados en trabajadores de distintas profesiones han demostrado los efectos carcinogénicos de los HAPs" (ver foja 3352 y anverso), conocidos como hidrocarburos aromáticos policíclicos, son contenidos típicamente en el agua de formación, y aunque no son tan solubles en agua, pueden permanecer adosados a sólidos en suspensión y migrar grandes distancias, inclusive sin degradarse; pero también se considera que los lodos de perforación que son utilizados para una variedad de propósitos, incluyendo controlar la presión subterránea y llevar los cortes de perforación a la superficie, aunque pueden variar en composición, generalmente contienen metales pesados, así como el mercurio, plomo, cadmio, cinc, cromo VI, y el bario. En este orden, empezaremos refiriéndonos a la presencia de TPHs en los resultados de las muestras tomadas en suelo por los peritos que participaron en las inspecciones judiciales, notando que el 10% de



# SA698

y 3142 mg/kg, en las muestras tomadas por peritos insinuados por la parte demandante, ya que los peritos insinuados por la parte demandada no analizaron este compuesto. En cambio el perito Luis Villacreces, en muestras tomadas durante las inspecciones del pozo Auca 1, Cononaco 6, el pozo Sacha 51, y los pozos 18,4 y 7 del campo Shushufindi, ha presentado resultados que sobrepasan cualquier criterio de tolerancia razonable, con resultados como 3142 y 466 en Auca 1 en AU01-PIT1-SD2-SU2-R(220-240 cm)_sv y AU01-A1-SD1-SU1-R(60-100cm)_sv; 2450 y 876 en Cononaco 6 en CON6-A2-SE1_sv y CON6-PIT1-SD1-DU1-R(160-260cm)_sv; 154.152,73.6325,70.4021 en Shushufindi 18, en SSF18-A1-SU2-R(0.0m)_sv, SSF18-PIT2-SD1-SU1-R(1.5-2.0m)_sv; y SSF18-A1-SU1-R (0.0 m)_sv; el perito José Robalino reportó resultados de hasta 42.47 en Shushufindi 4; mientras que el perito Francisco Viteri reportó 34.13 en Shushufindi 7 en SSF07-A2-SD1-SU1-R(1.3-1.9)_sv; todo lo cual contribuye a formar el criterio de esta Presidencia. El mercurio ha sido considerado como un posible agente carcinógenico humano por la EPA, y existen múltiples estudios que demuestran los efectos de su exposición, siendo lo más preocupantes daños permanentes al cerebro y riñones, por lo que alerta a esta Corte que se hayan encontrado niveles alarmantes de mercurio en los campos Sacha, Shushufindi, y Lago Agrio, en donde encontramos varias muestras que llegan a los 7 mg/Kg., tomadas por los peritos José Robalino en la inspección judicial de Sacha Central (ver muestras SAC-EST-S1_sv y SAC-PIT1-S1-1_sv);y SAC-PIT-1-S1-2_sv) y Xavier Grades en Shushufindi 8 y en Lago Agrio Norte (ver muestras SSF08-PIT1-S1_sv, SSF08-PIT1-S2_sv, SSF08-PIT1-S3_sv, SSF08-PIT2-S11_sv, SSF08-PIT2-S3_SV, SSF08-PIT2-S4-1_sv, SSF08-PIT2-S5_sv, SSF08-P1T2-S6_sv, y también LAN-ESTA-B_sv, LAN-ESTA-B1_sv, LAN-ESTA-B2_sv, LAN-ESTA-C_sv, LAN- ESTB-ASUE1_sv, LAN-ESTB-ASUE2_sv, LAN-ESTB-D1_sv, LAN- ESTB-D2_sv, LAN-ESTB-E1_sv). Ante estos resultados, que demuestran la presencia de mercurio en niveles elevados en muestras de suelo recolectados durante las inspecciones judiciales, se evidencia una preocupante presencia de este elemento en los suelos del ecosistema de la concesión. EL plomo también es encontrado de forma natural en la tierra pero tiene una bien conocida fama como perjudicial en la salud reflejada por ejemplo en las crecientes restricciones para el uso de gasolina con plomo alrededor del mundo, basadas en preocupaciones por la salud, principalmente en disminuciones de la capacidad cognitiva, además de que es considerado como razonablemente presumible como agente carcinogénico humano. Las muestras de suelo y agua tomadas durante las inspecciones judiciales han indicado niveles excesivos de plomo que puede plantear riesgos de salud para las



Clapp Report: p. 7

poblaciones locales. Los niveles de plomo en el suelo son mucho más elevados de lo normal, lo que contribuye a corroborar que el envenenamiento con plomo es un riesgo real. A pesar de esto de observa que resultados que alcanzan los 294 mg/kg, como en la muestra JI-SSF-25-PIT2-SD1-(0.0M) tomada por el perito insinuado por Chevron, Jorge Salcedo, en la inspección del pozo Shushufindi 25, no ha sido suficiente para que estos profesionales encuentren un riesgo en la salud de las personas. También resaltan las muestras JI-CO-06-SB4-0.0M y SSF-13-JI-SB1-1.6M_tx, tomadas por el perito insinuado por la parte demandada, Ernesto Baca, en las inspecciones judiciales de los pozos Cononaco 6 y Shushufindi 13, que reportan 98.8 y 98.6 mg/kg., respectivamente. De modo concordante el perito insinuado por los demandantes, José Robalino, ha reportado resultados similares en las muestras SA18-SE3_sv y SA18-NE1-1_sv, tomadas durante la inspección judicial del pozo Sacha 18, y que alcanzan los 99.89 y 69.93 mg/kg., respectivamente. En cuanto al cadmio, se atiende a que éste puede irritar gravemente el estomago y la vías respiratorias, y que existe un consenso científico acerca de que el cadmio es de hecho, o probablemente, un carcinogénico humano, por lo que sin peligrosos los 151 resultados entre 1.003 y 315.79 mg/kg., de los cuales resaltamos de la muestra JI-SA18-NE1-(SS), recolectada en la inspección del pozo Sacha 18 por el perito Fernando Morales, experto insinuado por Chevron, en la que encontramos 4.1 mg/kg de Cadmio; las muestras JI-SSF-07-SB1 1.2m (DUP), JI-SSF-07-SB2 1.40 m, JI-SSF-07-SB1 1.2m, JI-SSF-07-PIT2-SBC 1.7 m, JI-SSF-07-SB1 0m, JI-SSF-07-SB2 0m tomadas durante la inspección judicial del pozo Shushufindi 07, por el perito insinuado por la parte demandada, Gino Bianchi, que representa resultados que van desde los 2.6 mg/kg a los 3.3 mg/kg; del mismo modo las muestras obtenidas por los peritos John Connor Ernesto Baca en las inspecciones judiciales de Sacha 6 y Sacha 14, respectivamente, en las que encontramos resultados superiores a los 2 mg/kg de Cadmio. Los peritos insinuados por la parte demandante por su parte reportan resultados que alcanzan los 315,79 mg/kg. (Ver muestra SSF45A-A1-SE2_sv, tomada en Shushufindi 45 A por el perito Amaury Suarez); o los 16 mg/kg. Y 5 mg/kg reportados por el perito Oscar Dávila en las muestras recolectadas SSF-SUR-C1-TW(0.60-0.80m)_sv y SA14-P3 (0.10-0.80m)_sv, en las inspecciones judiciales de Shushufindi Sur y Sacha 14, respectivamente; y los 7.9 mg/kg. Encontrados en la muestra LAN-ESTB-H2_sv, tomada por el perito Xavier Grandes en la inspección judicial de Lago Agrio Norte. Con respecto al cromo VI encontramos 108 resultados entre 0.42 y 87 mg/kg. Mientras que la Organización Mundial de la Salud, la Agencia Internacional para la investigación del Cáncer

# SA700

Agrio, según estudios publicados que existen, el agua de producción contiene cinco o seis veces menos sal que el agua de mar, eso no quiere decir que no contengan sal, si la contiene, pero también en el agua de producción contiene pequeñas cantidades de petróleo en el tanque ya se separa, por la diferencia de gravedad y por productos químicos esas pequeñas cantidades de petróleo, que generalmente están entre 20 y 40 partes por millón, insignificantes, es por eso que en el caso del Consorcio, luego de que el agua de producción era separada en el tanque de lavado se la enviaba a una o más piscinas construidas en serie para ser tratadas lograr una mayor separación aún de este hidrocarburo, que estaba ahí, también contiene ciertos metales, no estamos negando, son aquellos metales que se encuentran naturalmente en el petróleo, en cantidades también variables, el agua de producción que se produce en la región oriente del Ecuador, como se llamaba a esto, contiene metales en cantidades que no significan un riesgo para la salud humana, eso lo han demostrado los análisis del laboratorio que hemos efectuado en todas las Estaciones que hasta la fecha hemos inspeccionado y que solicito aquí también como ratificaré en su oportunidad, se haga", sin embargo los resultados de las muestras (ver muestras JI-LA-CENTRAL-PW, tomada por el perito John Connor, perito insinuado por Chevron, con un contenido de 1.31 mg/kg de bario) contradicen lo afirmado en defensa de Chevron, respaldando más bien lo afirmado por los actores, al decir que "Sabemos por ejemplo que el agua de formación contiene un 30% de sal y que obviamente esa sal en exceso, genera los cloruros de sodio, lo que produce otro tipo de cadena contaminante que puede afectar incluso a la vegetación e impide que las raíces de las plantas se desarrollen con normalidad" (ver acta en fojas 102251 a 102308). Recordamos además lo revisado al analizar qué era lo que podía esperarse de una "buena empresa petrolera", por lo que se considera con mucho cuidado el hecho de que ya se había escrito importantes advertencias acerca de los peligros del agua de formación en 1962, y de hecho se recomendaba que " El cuidado extremo debe ejercerse en el manejo y disposición del agua producida no sólo debido al posible daño a la agricultura, sino también debido a la posibilidad de contaminación de lagos y ríos que mantienen el agua para beber así como para propósitos de irrigación" (foja 158811), de manera que resulta evidente que no nos encontramos ante un elemento inofensivo, como lo aseguran los abogados que ejercen la defensa de la parte demandada. Por el contrario, como lo afirman los expertos insinuados por Chevron, " Aunque el agua de producción no contiene concentraciones significativas de componentes tóxicos, esta puede presentar un daño potencial a los cuerpos receptores y a la vegetación debido a

June Index Summary: Indice, Row 1452, Columns B, D

114

## SA701

provincias de la Amazonía reportan una cantidad determinada de casos de muertes relativas a tumores, que pueden estar relacionadas el cáncer que alegan los demandantes, pero para la provincia de Sucumbíos ni siquiera existe una tipología relacionada con cáncer como causa de muerte, por lo que existe un sesgo importante en estos datos que no permiten comparar ni apreciar la realidad que se presenta. Como se verá más adelante este sesgo se repite en la mayoría de estadísticas oficiales, debido principalmente a la falta de presencia estatal en la zona. Con respecto a las copias certificadas de las páginas 81 y 82, "Cobertura de Saneamiento Ambiental en el país y las provincias amazónicas de los años 1989 y 1990", un capítulo del documento anteriormente citado, se toman en cuenta como indicador estadístico de aquellos rubros que toma en cuenta en relación con el saneamiento ambiental, como que la provincia de Sucumbíos tiene el total más bajo de todas las provincias amazónicas en conexión domiciliaria de agua potable y también en acceso a grifo público, lo cual no significa que los pobladores de estas zonas no consumen agua, sino que necesariamente implica que los habitantes de estas provincias tienen una mayor dependencia de la fuentes de agua naturales. Se considera el documento "Situación de la Salud en el Ecuador, Indicadores Básicas por región y por Provincia" Edición 2000 y 2001. Según alegan los demandados, en este documento se revela que, a diferencia de lo que afirman los actores, el estado de todos los cantones y las provincias del Ecuador es muy similar, sin embargo es un hecho conocido, público y notorio, que no requiere de evidencia, sino que se deje constancia, como en efecto lo hacen los datos presentados en "Cobertura de Saneamiento Ambiental en el país y las provincias amazónicas de los años 1989 y 1990", y en la página 14 del documento " Endemain III" Informe de la Amazonía capítulo "Características de Vivienda por Dominio de Estudio" Cuadro # 3.1, de que las provincias de Orellana y Sucumbíos han sufrido durante décadas de un gran abandono por parte del Estado (el acceso a servicios de salud es inferior, y también es inferior al acceso a agua potable), dando cuenta de una gran brecha en cuanto a presencia estatal y necesidades insatisfechas en el ámbito de la salud humana,lo que se ha reflejado en una ausencia casi total de servicios estatales de salud, impidiendo a los pobladores acceder a prevención, diagnóstico ni tratamiento alguno, de manera que es difícil que pueden llegar siquiera a formar parte de las estadísticas oficiales, lo cual representa un sesgo importante a ser considerado . Se considera como prueba las páginas. 61-74 del documento "Informe sobre Desarrollo humano, Ecuador 1999", publicado por UNICEF en el que se consignan datos sobre políticas ambientales y sostenibilidad en el Ecuador en la década de los noventa. Se

127

Index Summary: Pruebas pedidas por CVX, Row 46, Column B; June
Index Summary: PCV-03, Row 46, Column D

Index Summary: Pruebas pedidas por CVX; Row 46, Column B; June Index Summary: PCV-03, Row 46, Column D

SA702

considera que la parte demandada alegó que si bien estos datos registran los problemas ambientales del Ecuador, las técnicas de explotación petrolera no constan como uno de los problemas ambientales, sin embargo, al revisar el documento el juzgador ha encontrado bajo el título: "Algunos Hechos y Cifras de los Problemas Ecológico- Ambientales del Ecuador", en el literal e), el siguiente texto: "Desordenada e irracional explotación de los recursos naturales no renovables. Estas actividades se realizan a nivel nacional, siendo los caos más notables y conflictivos los relacionados con petróleo y minería. Tanto la explotación minera como la petrolera se desarrollan sin una planificación que determine el costo-beneficio de tales actividades que son autorizadas ante la sola presencia de yacimientos sin una evaluación de si son o no son comparativamente rentables con los impactos colaterales que pueden ocasionar a la sociedad y al ambiente. En la práctica la mayoría de lugares en donde se desarrollan actividades mineras y petroleras, que en varios casos son en áreas protegidas, han sufrido elevados impactos ecológicos sea por contaminación o destrucción de los diferentes recursos naturales renovables." La parte demandada también ha alegado que en las páginas 63 y 64 de dicho informe se señala la carencia de políticas ambiéntales en el país en el decenio de 1980, cuando recién se da inicio a una insipiente política de protección ambiental, sin embargo no acoge este análisis legal realizado por UNICEF, y en su lugar fundamentará su decisión en su propio análisis de la normativa de protección ambiental y su desarrollo, como ha sido expuesto líneas arriba. En cuanto a la deforestación, se toma en cuenta lo dicho en la página 66, respecto a que "el proceso de deforestación está estrechamente relacionado con la expansión de la frontera agrícola y la colonización espontánea de la zonas tropicales, con algunas excepciones". Las copias certificadas de la página 160-166 del informe Sobre Desarrollo humano, del capítulo "Indicadores de Salud en el Ecuador según Regiones, Provincias, Cantones y por Área de Residencia" en donde según la parte demandada se demuestra que en todos los cantones del Ecuador se presentan los mismo datos, lo cual tras un análisis de los datos presentados se puede observar que no es del todo correcto. La parte demandada no ha considerado los sesgos referidos en líneas anteriores, causados principalmente por la falta de datos ocasionada por la ausencia estatal en estas provincias, que ha provocado que no influyan en los datos presentados, siendo un reflejo incompleto de la realidad para el juzgador. Se considera la copia certificada de la página 14 del documento " Endemain III " Informe de la Amazonía, capítulo "Característica de Vivienda por Dominio de Estudio" Cuadro #3.1 publicado por CEPAR, en la cual

**SA703**

Index Summary: Pruebas pedidas por CVX, Row 50, Column B; June Index Summary: PCV-03, Row 50, Column D

se refleja un altísimo porcentaje del 19% de habitantes de la Amazonía que utiliza como fuente de abastecimiento de agua un Río Lago o Acequia, en comparación a un 5.7% en las demás regiones (1.3% para la Región Insular) demostrando más allá de cualquier sesgo, la dependencia de los demandantes de la Amazonía hacia las fuentes de agua naturales. Con respecto a los ==cuadros 1, Tasas Generales del estado de salud Región Amazónica Ecuatoriana. Correspondiente a los años 1967, 1970, 1974, 1978, 1982, 1986, 1989; 2, expectativa de vida al nacer en la Región Amazónica. Correspondiente a los años 1962,1977,1980, 1985. 1980-1985; 1-85-1990;3, "Mortalidad Neonatal e Infantil" 1989;4, Tasa de Mortalidad Infantil 1980-1989==, se los tiene en cuenta para emitir este fallo con las consideraciones anotadas. Se tiene en consideración como prueba la publicación realizada por CEPAR " El peso de la enfermedad de las provincias del Ecuador- Años de vida Saludables perdidos por muerte prematura y discapacidad-Avisa"- Publicado en Quito , el 10 de Septiembre del 2000,en donde llama la atención los datos referentes a la cantidad de médicos disponibles por cada 10.000 habitantes, pues se nota una disparidad significativa ente las distintas provincias, como Pichincha, con 20.9 médicos por cada 10.000 habitantes, y 633 Establecimientos de Salud, y Sucumbíos, con 6.8 médicos por cada 10.000 habitantes, y apenas 38 Establecimientos de Salud. En segundo lugar, se considera que la publicación señala que "la agrupación de enfermedades fue determinada en el estudio de México por lo tanto para el estudio de las provincias no es necesario hacer ningún ajuste", lo cual llama la atención porque hay la posibilidad de que la realidad de todo el territorio mexicano no sea comparable a la que se vive en las provincias de Orellana y Sucumbíos lo cual no es suficientemente discutido en la publicación y podría representar un importante sesgo en los datos presentados. Se considera que de los 3 grupos de enfermedades que agrupan 133 enfermedades, el primer grupo se refiere a las enfermedades transmisibles, de la nutrición y de la reproducción, que no estarían relacionadas con el objeto de esta litis. El segundo grupo incluye a las enfermedades no transmisibles, crónicas, y el tercero se refiere a las muertes por violencia, lesiones accidentales o intencionales, por lo que nos interesa el segundo, que incluye los cánceres, que contribuyen con el 42.2% del peso de la enfermedad en el país (903.561 AVISA), lo que significa una pérdida de 63 años de vida saludable por cada mil habitantes. Según afirma esta publicación, "Las enfermedades agrupadas como no transmisibles son producto de la urbanización y de los nuevos estilos de vida de la población, de las nuevas dietas y el poco ejercicio." Lo cual contribuye a probar que este tipo de enfermedades responden a



## SA704

estudios realizados en humanos referidos por este informe, en su gran mayoría han demostrado que las poblaciones expuestas enfrentan un elevado riesgo de efectos graves y no reversibles en su salud, lo cual, de ser el caso, tiene el potencial de convertirlo en un importante problema de salud pública. Siendo el objetivo del estudio, "determinar si la contaminación del medio ambiente por las actividades petroleras en el Oriente de Ecuador ha afectado la salud de la población que vive en las cercanías de los pozos y estaciones de petróleo", lo dicho en éste será aplicable a la contaminación originada en actividades petrolera, cualesquiera que sea el actor, consorcio u operador. En términos generales, se comparó la salud de poblaciones en las cercanías de pozos y estaciones con la salud de otras poblaciones que viven lejos de esas instalaciones, y si la contaminación que se origina en estos sitios es un factor contribuyente a ésta diferencia encontrada. En este estudio se incluye una "evaluación medio ambiental", que se hizo en base a la recolección de muestras de agua, según consta del informe; ante este particular se aprecia que las muestras recolectadas para este informe no han sido recolectadas dentro del proceso judicial, ni por orden de autoridad competente, por lo que no se las considera como fundamento para emitir este fallo, sino como fundamento del informe. Para efectos de la ejecución de la sentencia se toma en cuenta la definición que hace el informe respecto a lo que se entenderá como "comunidades cotaminadas", entendiéndose que son "aquellas comunidades localizadas dentro de un área de 5 km, alrededor de un pozo o estación petrolero, siguiendo el río a favor de la corriente". Este estudio es tomado en consideración (juntamente con los posibles sesgos) porque los pasos seguidos comportan una metodología que esta Corte considera apropiada en un estudio epidemiológico con el objetivo propuesto, dado que el objetivo de la epidemiología es estimar la frecuencia y distribución de las enfermedades en las poblaciones, e investigar la asociación entre determinadas exposiciones y la ocurrencia de una enfermedad, aún a pesar de que el estudio de campo se realizó entre los meses de noviembre de 1998 y abril de 1999, mucho antes de que este juicio inicie y por ende sin la intervención de la Corte. <mark>Entre las conclusiones afirma el autor del informe que es difícil establecer una relación entre la contaminación por petróleo y su impacto porque sus efectos son variados y por la poca información que había de la contaminación en el pasado,</mark> sin embargo, puede afirmar que "las mujeres que viven en la cercanía de pozos y estaciones de petróleo presentan un peor estado general de salud que la mujeres que viven lejos de estos pozos y estaciones", anotando que " hay una serie de razones que sugieren que la contaminación proveniente de pozos y estaciones de petróleo es la

[Index Summary: Pruebas pedidas por SV, Row 23, Column I; June Index Summary: Pruebas pedidas por SV, Row 23, Column I]



## SA705

dice en su testimonio que lo financió la fundación Proteus (foja 2147), pero a esta Corte llegó un exhorto tramitado con información de dicha fundación que desmiente este testimonio (ver foja 156033), lo cual resulta inconsistente y le resta valor a dicho informe, pues no ha quedado clara su procedencia. Con esta apreciación se considera que en la encuesta constan recogidos varios testimonios donde se reporta afecciones a la salud desde fojas 272, hasta foja 611, sin embargo, es correcta la apreciación que hace la parte demandada en su impugnación a dicho Informe, en el sentido que para que un testigo pueda ser tomado como tal debe rendir su testimonio ante funcionario administrativo, judicial o consular competente, luego de rendir su juramento de Ley. Sin embargo se advierte que la información recogida en este informe, aunque ha sido inapropiadamente llamada "testimonio", no es tal, pues testimonio es el que ofrecen los testigos ante autoridad competente, por lo que resulta evidente que no se trata de testigos rindiendo una declaración, sino simplemente de encuestas, en las cuales no se aplican las mismas disposiciones que para un testimonio y no se necesita hacer rendir juramento a los encuestados. Dicho esto resulta evidente que dichos testimonios no tienen el valor que tuvieran si fueran rendidos por un testigo que rinde juramento, ante autoridad competente, pero mantienen su valor como fuente estadística de información, siempre y cuando la información haya sido recogido de manera técnica por personas capacitadas. También se considera el estudio de campo titulado "Estudio para conocer el alcance de los efectos de la contaminación en los pozos y estaciones perforados antes de 1990 en los campos de Lago Agrio, Dureno, Atacapi, Guanta, Shushufindi, Sacha, Yuca, Auca y Cononaco.", elaborado por Roberto Bejarano y Monserrat Bejarano, agregado al proceso mediante providencia de 22 de octubre de 2008, a las 15h00, y constante en el expediente desde el cuerpo 7,foja 614, en el que se entrevistaron 1017 familias, de las cuales 957 se consideran gravemente afectadas;-De las familias afectadas, el 42, 42%, es decir, 4006, iniciaron acciones para remediar su situación y solamente el 17, 24%, es decir, 70 obtuvo algún resultado. El informe dice literalmente lo siguiente: "Basado en observaciones de los diferentes campos, pozos, piscinas y las conversaciones directas con familias de las personas involucradas y afectadas por la contaminación hidrocarburífera ecuatoriana", "Los dueños de las fincas o conocedores de la zona donde se ubican los pozos y sus respectivas piscinas siempre acompañaron al equipo técnico y fueron fuente principal de información ya que son los únicos que conocen el historial de los sitios". También dice:"La contaminación directa hacia los ríos, fuentes indispensables de agua para la mayoría de familias, es uno de los peores problemas existentes, ya

Index Summary: Pruebas pedidas por SV, Row 4, Columns H, I; June Index Summary: Pruebas pedidas por SV, Row 4, Columns H, I



que es usada para cocinar, beber, bañarse, lavar ropa y para animales. Por estas causas la presencia de enfermedades provocadas al exponerse y consumir el agua de los ríos, les provoca afecciones dérmicas, infecciones intestinales y vaginales, y en muchos casos cáncer, en mujeres básicamente al útero, ovarios y seno; en general a la garganta, estómago, riñón, piel y cerebro". Uno de los autores de este informe, dice en su testimonio "Me contrató el Frente. Me imagino que hay un convenio interinstitucional entre Petroecuador y el Frente, y por eso seguramente se imprimió en hojas de Petro". Este testigo asegura que las muestras se tomaron al azar, sin embargo la impugnación de la parte demandada contra esta prueba acusa de falta de imparcialidad a sus autores, lo cual parece comprobarse con el mismo testimonio, en el que su autor admite haber sido contratado por el Frente de Defensa de la Amazonía, lo cual pudo haber afectado su objetividad. Por lo expuesto, esta Corte no asume este informe como prueba efectiva de los hechos que contienen, sino que constituyen en indicios a ser considerados en conjunto con los demás. Finalmente, con respecto a daños a la salud de las personas, se advierten que ninguno de estos daños o afectaciones a la salud humana han sido demostrados de manera casuística, es decir, no se han probado puntualmente la existencia de daños identificados sobre la salud de personas particulares, sino que lo que ha quedado demostrado epidemiológicamente es la existencia de daños a la salud pública. Al respecto de la falta de prueba de daños a la salud de algún individuo en particular, esta Presidencia observa que es correcta la apreciación de la parte demandada en el sentido de que no se han presentado certificados médicos que demuestren la existencia de algún daño o lesión o la salud de alguna persona determinada, por lo que para resolver se considera en primer lugar que no se ha demandado la reparación de lesiones particulares, sino que la pretensión de la demanda en el tema de salud es "La contratación a costa de la demandada de personas instituciones especializadas para que diseñen y pongan en marcha un plan de mejoramiento y monitoreo de la salud de los habitantes de las poblaciones afectadas por la contaminación" (foja 80), por lo que la prueba aportada no necesita referirse a daños particulares, sino a afectaciones a la salud pública, de manera que no es relevante el hecho cierto de que no se han probado lesiones o daños en particular; y en segundo lugar, que la pretensión citada guarda coherencia con el objeto de la demanda, que es la reparación de daños ambientales, que como se ha visto, son aquellos causados en el medio ambiente o en alguno de sus componentes, de manera que lo que compete analizar es la existencia de daños a la salud pública y si es que estos tienen relación directa con los impactos ambientales reportados y cuya

138

## SA707

señora declara cómo acostumbraba caminar sobre el crudo regado en las carreteras y cómo las aguas a veces se mezclaban con algo que la testigo llama "crudo", que ella "lavaba y continuaba igual como que eso era que ya quedaba normalmente líquida el agua", quien afirmó ante la Corte que hace pocos meses le han detectado cáncer. También en esta inspección judicial, el señor José Holger García Vargas, quien dijo tener a su esposa postrada en cama y culpó a la contaminación del río por el sufrimiento suyo y de su esposa, afirmó además que utilizaba el agua del río "porque en ese tiempo no había de donde tomar agua, del río ocupábamos y nos bañábamos y lavábamos, y es por eso que en el cuerpo le ha pegado a uno hongos que hasta la vez no se ha podido curar con ninguna medicina", declaración que es particularmente ilustradora para esta Corte sobre la dependencia de estas personas a las fuentes naturales de agua que fueron impactadas por los vertimientos de Texaco. Luego, Gerardo Plutarco Gaibor, durante la inspección judicial de la Estación Aguarico (fojas 82595-82642) quien dice estar en la zona desde 1979, afirmó en la misma inspección que : " nosotros llegamos en este tiempo, por este estero corría bastante agua turbia, obscura y era bastante salada, yo tenía una casita, bajando de aquí al margen izquierdo, en la cual ahí me radique con mi esposa y mis dos hijas que tenían en ese entonces. Entonces las niñas bajaban a bañarse a tomar esa agua y se enfermaban, en la cual tenían que les daba fiebre tifoidea, hongos, y también a nosotros porque nosotros no sabíamos que era agua contaminada y nos bañábamos", declaración que contribuye a probar que se trataba de aguas de uso humano y que los vertimientos a cargo de Texpet sometieron a una exposición indebida a las personas que las utilizaban. El señor Gaibor además afirmó y demostró al Presidente de la Corte las huellas de su enfermedad, como se aprecia en el acta que dice " yo tengo enfermedades, como verá señor Presidente en estas fotos, aquí hay hongos en la piel de mi esposa, aquí estoy en la parte posterior del lado de mí, esta es mi barriga, son años, desde tiempo, y hasta la vez eso ha seguido contaminado en la piel, y todavía tengo aquí en la canilla, sigo afectado, no es que me he sanado. Esto es de aproximadamente 20 años atrás. Sigo con esas infecciones en la piel señor Presidente. No es que estoy mintiendo, se comprueba. Entonces esta agua, como la ve ahí, es de donde viene inspeccionando el tubo, y caía abundante agua salada." Concordantemente, en la inspección judicial de Shushufindi 13 (ver acta en fojas 74973-75013),la señora Aura Fanny Melo Melo, sostuvo que "Siempre esa agua ha estado así, cuando llueve sale más, queda manchadita la hierba que va al estero, queda manchada de crudo, incluso mi hija una vez cuando fue a buscar pescado metió el pie en el estero y le empezó a

June Index Summary:
Indice, Row 930,
Columns B, D

## SA708

donde pobladores de la zona han coincidido en narrar estas mismas formas de contacto, como por ejemplo Encontramos la declaración de Amada Francisca Armijos Ajila en Conocaco 6 (ver acta en fojas 123088 a 123123), acerca de "como no sabíamos seguíamos utilizando el agua hasta que llegó el tiempo que mi esposo se enfermo y el murió el año 2002", de manera similar el señor José Segundo Córdova Encalada, en Sacha Sur (ver acta en fojas 97512 a 97585), declaró que " Ahora, por qué mi familia de enfermo? Porque caminábamos a pie, ya que no somos ricos más o menos a las doce del día, la naturaleza de aquí y el clima hacía que eso humeara en la carretera, lo que origino que muchos hombres de estas comunidades sufran de medio cuerpo para abajo y las mujeres les dio cáncer por partes que fecundaba el cuerpo cogían aspiraciones y eso era de la pura contaminación yo no soy conocedor en el arte del petróleo pero creo les afectaba ese fluido como de candela que cogían en el cuerpo"; aparte de esto, como lo habíamos anotado , a fojas 97539 consta que "El testigo manifiesta que un tío hermano de su padre vino sano de la provincia del oro y tomaba agua aquí no mas, tío le decía yo ya conozco un poco no tome esa agua pero el seguía tomándola y al año más o menos ya se sintió mal con quemazones en el estómago" Gerardo Plutarco (fojas 82595-82642) también indicó que "por este estero corría bastante agua turbia, obscura y era bastante salda, yo tenía una casita , bajando de aquí al margen izquierdo, en la cual ahí me radique con mi esposa y mis dos hijas que tenía en ese entonces. Entonces las niñas bajaban a bañarse a tomar es agua y se enfermaban, en la cual tenía que les daba fiebre tifoidea, hongos, y también a nosotros porque nosotros no sabíamos que era agua contaminada y nos bañábamos", de igual modo que el señor José Holger García Vargas, en la estación Aguarico (ver acta en fojas 82595-82642) quien dijo que utilizaba el agua del río " porque en ese tiempo no había de dónde tomar agua, del río ocupábamos y nos bañábamos y lavábamos", todo lo cual da cuenta de distintas formas de exposición, a lo cual debemos agregarle lo dicho por el perito Jorge Bermeo, referido en líneas anteriores, en relación al riesgo de que estos elementos entren en la cadena trófica. Dicho esto, en relación a los impactos sufridos en la salud de las personas por la contaminación del agua pasamos a considerar lo dicho por el estudio de campo titulado "Estudio para conocer el alcance de los efectos de la contaminación en los pozos y estaciones perforados antes de 1990 en los campos de Lago Agrio, Dureno, Atacápi, Guanta, Shushufindi, Sacha, Yuca, Auca y Cononaco", elaborado por Roberto Bejarano y Monserrat Bejarano, agregado al proceso mediante providencia de 22 de octubre de 2003, a las 15h00, y constante en el expediente desde el cuerpo 7, Foja 614, que dice:

Index Summary: Pruebas pedidas por SV, Row 4, Column H; June Index Summary: Pruebas pedidas por SV, Row 4, Column H

## SA709

decir que ya estaban contaminados. Eso era con los pequeños bagres y con los bagres grandes también". Durante esta misma inspección, Gerardo Plutarco Gaibor, quien dice estar en la zona desde 1979, afirmó que : " Y lo mismo venimos con unas pocas cabezas de ganado, que bebían esa agua y malparían, se secaban y morían, se murió el ganado, se murió todos los animales porque ingerían esta agua, señor Presidente". También se considera la declaración de Anselmo Abad Vásquez, en foja 79715, brindado durante la inspección judicial de Shushufindi 21, donde señala que " Si, yo tenía ganado, todo esto era puro potreros, todavía se ven residuos de hierba, a mi el ganado se me enfermaba, tenían unas llagas que no es el conocido Tupe y todo eso así, no se curaban por mas que yo les trataba, aquí sufrimos de falta de veterinarios, pero preguntando al uno y al otro no había posibilidad de curarlos, se flaqueaban y morían, luego nos dimos cuenta que era por la contaminación del agua, yo optaba por buscar vertientes y hacer pozos para que el ganado toma ahí el agua no de los ríos, hasta ahora nadie puede tomar el agua de los ríos." Esto es concordante también con lo dicho en la declaración de Maximo Celso, en foja 41659, en la inspección judicial de Lago Agrio Norte, afirmó que " Aquí tenía una chanchera, de donde la cual perdí todos mis chanchos, ciento veinte chanchos, de los cuales había treinta puercas que producían, desde que Texaco comenzó a botar el agua para este sector", y que " En ese entonces yo cultivaba café. En medio del café tenía una bananera que tenía una chanchera, y perdí todos mis animales, porque desde ese momento el agua de formación era continuamente. La parte que cruzaba para botar el agua de formación era por este lugar. Nos decían que era saludable, que era buena hasta para tomar. Y yo confiadamente no saque a mis animales, porque yo estaba seguro de eso. Cuando los animales, cuando las puercas parían, se quedaban con el útero afuera; yo consulté con el médico y me dijo que eso era problema de una contaminación gravísima". También el señor Simón José Rogel Robles, fue examinado durante la inspección judicial de Lago Agrio Norte (foja 41632-41693), y declaró que ": Yo y mi familia me dedicaba a la agricultura y la ganadería porque todo era potrero por donde venimos caminando hasta allá, entonces tomaban esa agua el ganado y para nosotros ya no servía el ganado porque se ponía raquítico, prácticamente nosotros perdíamos, o se caía ahí se bañaban en petróleo, y tocaba en medio, medio, medio bañarlas y venderlas." En la inspección judicial de Shushufindi 13 (foja 74973-75013), la señora Aura Fanny Melo Melo, sostuvo que "Yo aquí tengo ganado pero el ganado se me muere, siempre, siempre, yo le di unas fotos a don Padilla que era el Presidente, por aquí tengo una y la entrego, no puedo encontrar las demás, algunas se mueren así

June Index Summary: Indice, Row 930, Columns B, D

# SA710

considerando que ya se ha condenado al demandado a la reparación del daño, y por cuanto sirve a los mismos fines ejemplarizantes y disuasorios, esta penalidad civil podrá ser reemplazada, a lección del demandado, por una disculpa pública a nombre de Chevron Corp., ofrecida a los afectados por las operaciones de Texpet en el Ecuador. Este reconocimiento público del daño causado deberá publicase a más tardar dentro de 15 días, en los principales medios de comunicación escritos en el Ecuador y en el país del domicilio de la demandada, en tres días distintos, lo cual en caso de cumplirse, será considerado como una medida simbólica de reparación moral y de reconocimiento de los efectos de su inconducta, así como garantía de no repetición, que ha sido reconocida por la Corte Interamericana de Derechos humanos con el propósito de "recuperar la memoria de las víctimas, el reconocimiento de su dignidad,[y ...] transmitir un mensaje de reprobación oficial de las violaciones de los derechos humanos de que se trata, así como evitar que hechos similares se repitan" (ver caso Hermanos Gómez Paquiyauri Vs. Perú. Fondo, Reparaciones y Costas. Sentencia de 8 de julio de 2004. Serie C No. 110, Párr. 223).- **DECIMO QUINTO**.- Finalmente, considerando que es necesario establecer un mecanismo adecuado de ejecución de la condena, que permita asegurar que el criterio de Justicia empleado en la presente sentencia se haga realidad, asegurando así la tutela Judicial efectiva, y teniendo en cuenta la procedencia del fideicomiso como modo de cumplir las obligaciones ha sido reconocida en las resoluciones de Corte Suprema números 168-2007 de abril 11 de 2007, juicio No. 62-2005, propuesto por Andrade c. CONELEC; y, 229-2002, R.O. 43 de marzo 19 de 2003, y procurando precautelar los derechos de los demandantes y de los afectados, a través de la aplicación del mismo criterio que ha servido para fijar las indemnizaciones, se impone el siguiente modo de ejecución de la condena a reparación de daños, prevista en el considerando Décimo Tercero: a) En el plazo de sesenta días desde la fecha de notificación con la presente sentencia, los actores deberán constituir un fideicomiso mercantil, ser administrado por alguna de las sociedades administradoras de fondos y fideicomisos radicadas en el Ecuador al tenor de lo dispuesto por la Ley de Mercado de Valores y demás cuerpos aplicables. b) El patrimonio autónomo estará conformado por el valor total de las indemnizaciones a las que ha sido condenada la demandada en el considerando Décimo Tercero. c) El beneficiario del fideicomiso será el Frente de Defensa de la Amazonía o la persona o personas que éste designe, considerando que "los afectados" por los daños ambientales, son personas indeterminadas, pero determinables, unidas por un derecho colectivo, siendo las medidas de reparación

Fajardo Trust Email

186

# SA711

la forma de beneficiarlos. d) Las instrucciones para la administradora de fondos y fideicomisos, que contenga el contrato de fideicomiso, comprenderán de modo no exclusivo, pero sin poder contradecirse, las siguientes disposiciones: i. Todo el patrimonio tendrá como destino cubrir los costos necesarios para la contratación de las personas encargadas de ejecutar las medidas de reparación previstas en el considerando Décimo Tercero, y los gastos legales y de administración del fideicomiso; ii. Los representantes del Frente de Defensa, o quienes estos designen a nombre de los afectados, constituirán la junta de fideicomiso, que será el organismo de toma de decisiones y de control, y establecerán un plan de reparación dentro de los parámetros establecidos en el considerando Décimo Tercero de esta sentencia. iii. Es facultad de la Junta la selección de los contratistas, que deberán ser personas con dominio en las artes y técnicas aplicables a cada medida de reparación; para lo cual previa a la selección de las personas contratadas por parte del Fideicomiso para ejecutar las medidas de reparación, la Junta deberá asesorarse técnicamente y expresar un voto razonado que deberá ser transcrito y presentado a la fiduciaria; iv. La administradora, aparte de ejercer la representación legal del fideicomiso, supervisará que el plan de reparación se adecue a las medidas de reparación dispuestas en el considerando Décimo Tercero, y de manera previa también verificará que los contratos que vaya a firmar cumplan con el destino del fideicomiso; v. La administradora y la Junta del fideicomiso tienen la facultad de supervisar la correcta ejecución de los trabajos por parte de las compañías contratadas, por si mismo o mediante fiscalizadores y/o auditores externos; El Tribunal de instancia, en la etapa de ejecución, verificará el cumplimiento exacto de la obligación de constituir el fideicomiso, en el plazo otorgado para el efecto; y posteriormente, aplicadas que sean, comprobará también la efectividad de las medidas de reparación, quedando bajo responsabilidad de la fiduciaria el buen manejo de los fondos.- Por las consideraciones expuestas **ADMINISTRANDO JUSTICIA EN NOMBRE DEL PUEBLO SOBERANO DEL ECUADOR Y POR AUTORIDAD DE LA CONSTITUCIÓN Y LA LEYES DE LA REPÚBLICA,** acepta parcialmente la demanda presentada por María Aguinda, Ángel Piaguage y otros en contra de Chevron Corp., y se condena a la demandada al pago de los costos de las medidas de reparación de los daños conforme se dispone en el considerando Décimo Tercero, que deberá aportarse a un fideicomiso conforme se establece en el considerando Décimo Quinto de esta sentencia. Adicionalmente, por mandato legal el demandado deberá satisfacer un 10% adicional al valor sentenciado por concepto de reparación de daños a nombre del Frente de Defensa de la Amazonía. Con

costas.-Por renuncia de la señora Secretaria Relatora titular, actúe como tal la Lcda. Gloria Cabadiana Guanulema.- NOTIFIQUESE, f) Abg. Nicolas Zambrano, Presidente de la Sla Unica de la Corte Provincial de Justicia de Sucumbios, lo que comunico a Usted para los fines legales consiguiente.



LCDA. GLORIA CABADIANA
SECRETARIA RELATORA (E)

A4712

# SA713

## PART VI

### THE FORENSIC ISSUES

### A: Introduction

6.1  On 20 and 21 May 2014, Ms Kathryn Owen, the Tribunal-appointed expert, travelled to Quito, Ecuador together with the Secretary to the Tribunal, Mr Martin Doe, and representatives of both Parties. Ms Owen made forensic images of two computers that had been identified by the Respondent as having been used by Judge Zambrano during the Lago Agrio Litigation (the "Zambrano Computers"). Identical copies of the forensic images of the Zambrano Computers were provided to Mr Lynch (of Stroz Friedberg) and Mr Racich (of Vestigant), the forensic expert witnesses appointed by the Claimants and the Respondent respectively in this arbitration.

6.2  These forensic images were collected and held, initially, by the Parties in strict confidence by order of the Tribunal. This order was respected by both the Claimants and the Respondent. Given the timing, these forensic images played no part in the RICO trial held in New York in October-November 2013.

6.3  Mr Lynch prepared a second report on the Zambrano Computers dated 15 August 2014 ("Lynch ER 2"). Mr Racich produced his analysis of the Zambrano Computers and his response to Lynch ER 2 in his second report dated 7 November 2014 ("Racich ER 2").[1] Both expert witnesses filed third reports, on 14 January 2015 ("Lynch ER 3") and 16 March 2015 ("Racich ER 3").

6.4  At the Track II Hearing during their oral testimony, both experts gave short presentations and were cross-examined by the adverse Party(ies).[2] Ms Owen attended that part of the Track II Hearing (Days 5 and 6); but she did not give oral or written evidence before the Tribunal then or later, apart from her Final Report and Revised Final Report of 5 February 2016 and 3 June 2016.

---

[1] Mr Lynch and Mr Racich had previously filed first expert reports that addressed Dr Guerra's computer and other electronic media.

[2] The transcript of their oral evidence is at D5.935 to D6.1284 of the Track II Hearing.

# SA714

6.5    In accordance with Procedural Order No. 40, Ms Owen considered the expert reports and oral testimony of Mr Lynch and Mr Racich, in order to identify: (i) any material points on which there was common ground between the technical testimony and conclusions of Mr Lynch and Mr Racich; (ii) any material points on which there was a difference between their technical testimony and conclusions; (iii) whether the differences arose from a difference in forensic analysis or whether they were attributable to non-technical facts; and (iv) any material conclusions put forward by Mr Lynch or Mr Racich which she would not characterise as matters of forensic analysis.[3]

6.6    Ms Owen subsequently produced a draft report dated 18 December 2015, which was circulated to the Parties, but not to the Tribunal. This draft formed the basis for discussions between Ms Owen, Mr Lynch and Mr Racich in The Hague on 12 January 2016. In accordance with Procedural Order No. 40, Ms Owen's Final Report was circulated to the Parties and to the Tribunal on 5 February 2016.

6.7    In accordance with Procedural Orders No. 40[4] and No. 41[5], the Parties submitted written comments on Ms Owen's Final Report on 4 March 2016.[6] These comments[7] were transmitted to Ms Owen, pursuant to Procedural Order No. 42.[8] Further correspondence from the Parties was sent to Ms Owen in April and May 2016.[9]

6.8    Following further consultation between Ms Owen, Mr Lynch and Mr Racich, on 3 June 2016 Ms Owen provided her final written responses on the Parties' comments and a Revised Final Report.

6.9    In accordance with paragraph 4 of Procedural Order No. 44, the Parties each filed (i) submissions on the significance of Ms Owen's Revised Final Report on 13 August 2016; and (ii) their reply submissions on 26 August 2016.

6.10   The Parties indicated to the Tribunal that they did not seek to examine Ms Owen at an oral hearing, pursuant to Article 27(4) of the UNCITRAL Arbitration Rules.[10] In

---

[3] Procedural Order No. 40, para 1(a).
[4] Procedural Order No. 40, para 3.
[5] Procedural Order No. 41, para 2.
[6] The Claimants' letter of 4 March 2016; and the Respondent's letter of 4 March 2016.
[7] With the exception of the last section (at pp. 16-17) of the Respondent's letter.
[8] Procedural Order No. 42, para 2.
[9] The Claimants' letter of 27 April 2016; and the Respondent's letter of 2 May 2016.
[10] The Claimants' letter of 27 June 2016; Procedural Order No. 44, para 3.

# SA715

Procedural Order No. 46, given the Parties' joint decision, the Tribunal confirmed that it had decided not to question Ms Owen of its own motion also pursuant to Article 27(4) of the UNCITRAL Arbitration Rules.[11]

6.11    In compliance with the UNCITRAL Arbitration Rules, the Tribunal has received no private advice from Ms Owen.

### B: Summary of Forensic Evidence

6.12    Overall, it appears to the Tribunal from the expert reports and oral testimony of Mr Lynch and Mr Racich, and from the Revised Final Report of Ms Owen, that there are few, if any, material differences between the expert witnesses in relation to the forensic evidence that was retrieved from the Zambrano Computers, as distinct from their respective forensic opinions inferred from such evidence. The various points of disagreement between the expert witnesses arise from significant differences in the way in which Mr Lynch and Mr Racich have approached and interpreted that evidence.

6.13    In particular, there appears to have been a fundamental difference in the overall focus of the two experts, based upon their respective terms of reference. Mr Lynch's analysis (for the Claimants) appears to have been directed primarily at the question whether the available forensic evidence is consistent with Judge Zambrano's testimony at the RICO trial on his drafting of the Lago Agrio Judgment.[12] Conversely, the focus of Mr Racich's analysis of the forensic evidence (for the Respondent) was directed at the possibility, or probability, that a third person or persons did not "ghostwrite" the Lago Agrio Judgment.[13]

### C: Judge Zambrano's Two Computers

6.14    Judge Zambrano was issued with two Hewlett Packard ("HP") computers. The first (serial number MXJ64005TG) was manufactured and shipped by HP in 2006 ("the Old Computer"). The second (serial number MXL0382C3D) was manufactured in 2010 and

---

[11] Procedural Order No. 46, para A.
[12] See Lynch ER 2, p. 7, where Mr Lynch concluded that "*In summary, the totality of the available forensic evidence is inconsistent in all material respects with Mr Zambrano's testimony describing how the drafting of the Ecuadorian Judgment occurred on the New Computer.*"
[13] See Racich ER 2, p. 3, where Mr Racich noted that "*In my professional opinion, the evidence is more consistent with Mr Zambrano and his assistant writing the Judgment than it is with a third party writing the Judgment and giving it to Mr Zambrano for issuance at the beginning of February 2011.*"

# SA716

purchased by the Judicial Council of Ecuador in November 2010 and available to Judge Zambrano from 26 November 2010 ("the New Computer").[14]

6.15    It will be recalled that the periods here under consideration are (i) from 21 October 2009 to 11 March 2010 and (ii) from 11 October 2010 to 4 March 2011 during which Judge Zambrano presided over the Lago Agrio Litigation. He issued the Lago Agrio Judgment and its Clarification on 9 February and 4 March 2011 respectively.

6.16    Windows XP was installed on the Old Computer on 14 July 2010. Mr Lynch (with Stroz Friedberg) found evidence of files and folders that pre-dated 14 July 2010, which indicated that the Old Computer had contained a prior installation of Windows. On 14 July 2010, a significant amount of data was copied to the Old Computer, including 2,428 Microsoft Word documents. This data included files relating to the Lago Agrio Litigation. In Mr Lynch's view, this instance of bulk copying, combined with the evidence he had found of files and folders from a previous installation of Windows, was consistent with the reinstallation of the operating system, possibly as part of trouble-shooting or maintenance.[15]

6.17    The registered user name of the Old Computer at all times prior to March 2011 was "CPJS".[16] Consequently, files saved using the Old Computer had the author or last saved name "CPJS".[17]

6.18    The first user account, named "HP", was created on the New Computer on 25 November 2010. Files saved by the New Computer had the author or last saved name "HP".[18] The first apparent use of this account was on 7 December 2010. There was no evidence of any bulk transfer of documents to the New Computer prior to the issuance of the Lago Agrio Judgment on 9 February 2011.[19]

### D: The Development of the Lago Agrio Judgment's Text

6.19    Mr Lynch (with Stroz Friedberg) carried out searches on the Old and New Computers for words and phrases from the Lago Agrio Judgment. On the Old Computer, Mr Lynch

---

[14] Lynch ER 2, pp. 8-9.
[15] Lynch ER 2, p. 11.
[16] Track II Hearing D5.1147 (Racich).
[17] Track II Hearing D5.948 (Lynch).
[18] Track II Hearing D5.948 (Lynch).
[19] Lynch ER 2, p. 12.

# SA717

identified multiple copies of two files – "Providencias.docx" and "Caso Texaco.doc" – which contained text which was also found in the Lago Agrio Judgment.[20] Subsequent versions of the "Providencias.docx" and "Caso Texaco.doc" files were subsequently saved on the Old Computer.[21] No documents containing text of the Lago Agrio Judgment were recovered from the New Computer.[22]

6.20    The distinction between the date of a document's first creation, and the date(s) on which it is subsequently saved, is important. The two expert witnesses agree that the earliest recoverable instance of "Providencias.docx" was created on the Old Computer on 11 October 2010.[23] (On that date, 11 October 2010, Judge Zambrano formally resumed his role as the presiding judge hearing the Lago Agrio Litigation). The experts were not able to recover a version of "Providencias.docx" which had been last saved on or around 11 October 2010. Accordingly, they were unable to analyse the content of the document as it stood when it was created.[24]

6.21    However, Mr Lynch noted that early versions of "Providencias.docx" contained a separate section of text, not related to the text of the Lago Agrio Judgment. He searched for this section of text and found it replicated in a document called "Providencias.doc", which had been transferred to the Old Computer as part of the bulk transfer that had occurred on 14 July 2010.[25] It is not known, however, whether this document "Providencias.doc" contained any Judgment text at the time it was transferred to the Old Computer or at the time that it was used to create "Providencias.docx". (As at 14 July 2010, Judge Zambrano was not assigned to hear the Lago Agrio Litigation: it remained before Judge Ordóñez since 12 March 2010).

6.22    *The 21/12 Providencias:* The earliest version of "Providencias.docx" that the experts were able to recover was dated 21 December 2010 ("the 21/12 Providencias"). Between 11 October 2010 and 21 December 2010 (a period of 71 days), the 21/12 Providencias was saved 286 times and had been open for approximately 35 hours.[26] The Tribunal

---

[20] Lynch ER 2, p. 27.
[21] Lynch ER 2, p. 24.
[22] Lynch ER 2, p. 25-26.
[23] Lynch ER 2, p. 27-28; Racich ER 2, para 10; Track II Hearing D5.1146 (Racich).
[24] Lynch ER 2, p. 28.
[25] Lynch ER 2, p. 29.
[26] Lynch ER 2, p. 24.

## SA718

notes that the 21/12 Providencias copied text from the Unfiled Moodie Memorandum and the Unfiled Erion Memorandum (both citing foreign, English language materials).

6.23 The 21/12 Providencias contained 42% of the final text of the Lago Agrio Judgment (about 80 pages, over pages 1 to 107 of the Judgment);[27] and 94% of its text was unchanged in the Judgment.[28] Mr Racich calculated that this would equate to a work rate of approximately 1 page per day during this period, if the work were evenly spaced. Mr Lynch, however, noted that, during this period, the 21/12 Providencias had been open for approximately 35 hours (the edit time).[29]

6.24 Focussing on the edit time, Mr Lynch calculated that the text of the 21/12 Providencias would be typed at a much higher rate of approximately 26 minutes per page.[30] Mr Racich agreed, in cross-examination at the Track II Hearing, that, if it was assumed that someone was typing the document during every minute that it was open during this period, it followed that the text was entered at a rate of less than 30 minutes per page.[31]

6.25 Mr Lynch testified in his second report that the 21/12 Providencias contained formatting differences which were consistent with text having been copied and pasted from other documents.[32] Mr Racich does not appear to contest that there were formatting differences in this document (although, as discussed below, Mr Racich does not accept that this evidence is necessarily consistent with text being provided to Judge Zambrano by third persons).[33]

6.26 *The 28/12 Providencias:* The next recoverable version of "Providencias.docx" was a version that was last saved on 28 December 2010 ("the 28/12 Providencias"). Again the two experts appear to agree on the metadata of this version of the document; but they interpret it in different ways. Mr Lynch found that between 21 and 28 December 2010, the 28/12 Providencias was saved 29 times and was open for approximately 17.5 hours. He further testified that this version of the document contained 66% of the final text of

---

[27] Lynch ER 2, p. 24.
[28] Racich ER 2, para 13 suggests the text at this stage was 78 pages long. Lynch (Track II Hearing D5.950) puts it at 81 pages.
[29] Lynch ER 2, p. 24.
[30] Lynch ER 3, p. 17.
[31] Track II Hearing D6.1257 (Racich).
[32] Lynch ER 2, p. 24.
[33] Racich ER 2, para 10.

# SA719

the Lago Agrio Judgment (over pages 1 to 154 of the Judgment).[34] 96% of its additional text was unchanged in the Judgment.

6.27 On this basis, Mr Racich calculated that 45 pages had been added to the 28/12 Providencias in this period at a rate of approximately 7 pages per day.[35]

6.28 Again, Mr Lynch pointed out that this calculation did not take account of the edit time: given that the document was only open for 17.5 hours during this period, the additional text would have been added at an average rate of 27.5 minutes per page.[36] That calculation assumes that someone was typing text into the document for every single minute that the document was open during this period.[37]

6.29 Mr Lynch noted that this document, like the 21/12 Providencias, contained formatting differences that were, in his view, consistent with text having been copied and pasted from other sources.[38] Mr Racich suggested that it was likely that part of this additional text "originated in another document on Mr Zambrano's computer, and that the user copied that text into the Providencias document." However, Mr Lynch analysed the Microsoft Office Session logs ("the OSession Logs") to assess how long Microsoft Word had been active.[39] The OSession logs indicate that, in the period between 21 December and 28 December 2010, Microsoft Word was active for 18.3 hours – that is just 52 minutes longer than the time for which the 28/12 Providencias was open.[40] In cross-examination at the Track II Hearing, Mr Racich accepted that the OSession logs indicated that, if someone had been working on any different document on Judge Zambrano's computers during the period between 21 and 28 December 2010, they had done so for less than an hour.[41]

---

[34] Lynch ER 2, p. 24.
[35] Racich ER 2, para 15.
[36] Lynch ER 3, p. 17. Mr Lynch suggested, at Lynch ER 3, p. 20, that 38 pages of Judgment text were added to the 28/12 Providencias.
[37] Track II Hearing D5.951 (Lynch).
[38] Lynch ER 2, p. 24.
[39] The full OSession logs for Microsoft Word for both the Old and New Computer between 14 July 2010 and 26 June 2013 are listed at Lynch ER 2, Exhibit 85.
[40] Lynch ER 3, p. 20.
[41] Track II Hearing D6.1252-1253 (Racich). Mr Racich commented that the OSession logs could be incomplete, although he agreed that they would only be incomplete if something – such as a crash on Microsoft Word – had happened. In his third report, Mr Racich suggested that there were a number of reasons why the OSession logs might not be accurate, for instance if the programme crashed, the power went out or if Word froze (Racich ER 3, para 20).

# SA720

6.30   In his third report, Mr Lynch also explained that he had searched all the instances of "Caso Texaco.doc" for any of the text that was added to the 28/12 Providencias and did not find any of that text.[42]

6.31   *The 19/01 Caso Texaco:*  The next document containing Judgment text, which Mr Lynch was able to recover, was a document named "Caso Texaco.doc" ("the 19/01 Caso Texaco"). This document had been created on 20 October 2009 and last saved on 19 January 2011.[43] The 19/01 Caso Texaco contained 11% of the text of the Lago Agrio Judgment (over pages 154 to 178). 97% of its additional text was unchanged in the Judgment.

6.32   Neither the previous recoverable version of "Caso Texaco.doc" (last saved date 5 January 2011) nor the subsequent recoverable version (last saved date 4 March 2011) contained any text of the Lago Agrio Judgment. The 19/01 Caso Texaco had been saved 16 times and had been open for approximately 11.5 hours since 5 January 2011.[44] This version of "Caso Texaco.doc" was last saved on the Old Computer.[45] However, Mr Racich emphasised that other versions of "Caso Texaco.doc" were opened and edited on both the Old and New Computers.[46]

6.33   Mr Racich suggested that the forensic evidence relating to the 19/01 Caso Texaco was consistent with a person copying text from that document and pasting it into the draft of the Lago Agrio Judgment (i.e. "Providencias.docx") some time before 19 January 2011.[47] Mr Lynch, however, noted that none of the Judgment text found in the 19/01 Caso Texaco was added to the 28/12 Providencias[48] (although for the reason elaborated below, there is no evidence to indicate whether or not the text from the 19/01 Caso Texaco was added to "Providencias.docx" between 28 December 2010 and 19 January 2011).

6.34   In cross-examination at the Track II Hearing, Mr Lynch accepted that Judge Zambrano's computers contained documents in both Bookman Old Style and Times New Roman

---

[42] Lynch ER 3, p. 22.
[43] Lynch ER 2, p. 33, Table 16.
[44] Lynch ER 2, p. 25.
[45] Lynch ER 2, p. 33.
[46] Racich ER 2, para 27.
[47] Racich ER 2, para 26.
[48] Lynch ER 3, p. 22.

# SA721

fonts and that the blocks of text in "Providencias.docx" could have been cut and pasted from another document on Judge Zambrano's computer.[49] However neither expert was able to shed any light on where the cut-and-pasted text may have come from. Mr Racich emphasised that there was no forensic evidence to suggest that any version of the 21/12 Providencias was provided to Judge Zambrano by a third person.[50]

6.35    *21/01 Providencias:* On 21 January 2011, "Providencias.docx" was saved using the "saved as" function, which reset the edit time and revision count ("the 21/01 Providencias"). There was no recoverable temporary file showing the document's content at that date[51] Accordingly, it was not possible for either expert to determine how many changes were made to the document during the period from 28 December 2010 to 21 January 2011, or for how long it was edited during this period.[52]

6.36    *The Lago Agrio Judgment:* As already indicated, the Lago Agrio Judgment was issued by Judge Zambrano on 14 February 2011. No final draft of the Judgment was found on the Zambrano Computers.

6.37    *The 04/03 Providencias:* The earliest recovered version of any document containing all of the Judgment text was a version of "Providencias.docx" found on the Old Computer, which had been last saved on 4 March 2011 ("the 04/03 Providencias").[53]  As well as the text of the Lago Agrio Judgment, it contains the Clarification Order issued on 4 March 2011.

6.38    Mr Lynch suggests that it is odd that no "final" draft of the Lago Agrio Judgment was recovered before 14 February 2011. He testified that, in the context of a document which has ostensibly taken many months of work, "it is common, based on my experience, for someone to create a backup copy or to save the final copy as a new 'final' version of the document, particularly before using the same file to create other documents (as is the case with Providencias)."[54]

---

[49] Track II Hearing D5.1074-1075 (Lynch).
[50] Racich ER 2, para 10.
[51] Lynch ER 2, p. 25.
[52] Racich ER 2, para 17.
[53] Lynch ER 2, p. 6.
[54] Lynch ER 3, p. 32.

# SA722

6.39   However, as Mr Racich pointed out, this factor is not conclusive: "The fact that no backup of the Judgment dated 14 February, 2011 can be found on the Zambrano hard drives shows that Mr Zambrano may not have followed best practices to protect his work. In my experience, this is not evidence of ghost-writing."[55]

6.40   Between 21 January and 4 March 2011, the 04/03 Providencias had been saved 124 times and had been open for approximately 58.3 hours. This version of the document contained 99%[56] of the final text of the Lago Agrio Judgment, together with a further 24 pages comprising a version of the Clarification Order.[57]

6.41   In the light of this evidence, Mr Lynch concluded that the forensic evidence was inconsistent with Judge Zambrano's testimony in the RICO Proceedings, namely that the Lago Agrio Judgment was typed by himself and Ms "C", exclusively on the New Computer.[58]

6.42   Mr Racich disagreed with Mr Lynch. He explained that the hard drive of the Old Computer was "mapped" on the New Computer. As a consequence, a user of the Old Computer could access and edit files saved on the New Computer whilst working on the Old Computer, and vice versa.[59] On this basis, so Mr Racich testified, Judge Zambrano's testimony may have been based on a misunderstanding: if he was sitting at the New Computer, he may have assumed that the files were being saved on to the New Computer. Mr Racich also indicated that the metadata (the Author and Last Saved fields) were not conclusive, since no information is stored about which computer saved the file between its creation and its last save.[60]

6.43   Mr Lynch, however, reiterated in his oral testimony at the Track II Hearing that: "… all of the files with Judgment text were saved by CPJS [the user name of the Old Computer], showing that someone was using the Old Computer, not the New Computer."[61] In his third report, Mr Lynch explained: "… all of the 'several

---

[55] Racich ER 3, p. 10.
[56] In cross-examination, Mr Lynch accepted that the substance of the 04/03 Providencias was identical with the Lago Agrio Judgment: the only difference between the two documents is that former is missing the signature and the heading (Track II Hearing D5.1053).
[57] Lynch ER 2, p. 25.
[58] Lynch ER 2, p. 25.
[59] Racich ER 2, para 39.
[60] Racich ER 2, para 40.
[61] Track II Hearing D5.948 (Lynch).

## SA723

successive versions' of Ecuadorian Judgment text contained in Providencias and the January 19 Caso Texaco document were saved by the Old Computer and not through any 'mapping' by the New Computer. Had any of those versions been saved using the New Computer the metadata for those versions would reflect that they had been saved using the New Computer." [62]

6.44    In summary, to the Tribunal's understanding, the forensic evidence which the two experts were able to extract from the Zambrano Computers indicates the following:

6.45    Between 11 October 2010 and 4 March 2011, the recovered files that contained Judgment text (the 21/12 Providencias; the 28/12 Providencias; the 19/01 Caso Texaco; and the 04/03 Providencias) were open for a combined total of at least 162.3 hours. It is not known how long the 21/01 Providencias had been open.

6.46    Between 11 October 2010 and 4 March 2011, "Providencias.docx" was saved at least 439 times on Judge Zambrano's Computers. [63] Again, it is not known how many times the 21/01 Providencias was saved.

6.47    Between 11 October 2010 and 14 February 2011, Microsoft Word was open for (at least) 198 hours on the Old Computer and (at least) 36 hours on the New Computer. [64]

6.48    The formatting differences in the text are consistent with blocks of text being cut or copied and pasted into the Lago Agrio Judgment from other documents, but there is no way of knowing forensically where those blocks of text came from.

### E: The "Unfiled Materials"

6.49    Mr Lynch, in his first report, testified that the Final Judgment contained text and errors that did not exist in the laboratory results filed with the Lago Agrio Court but which did exist in the "Unfiled" Selva Viva Database (being Material No 8 considered in Part V above). [65] Dr Leonard's expert report had further identified blocks of text in the Lago Agrio Judgment that were identical, or almost identical, to text found in documents which were not found in documents filed with the Lago Agrio Court (referred to by Mr

---

[62] Lynch ER 3, p. 30.
[63] Racich ER 2, para 10.
[64] Lynch ER 3, p. 20.
[65] Lynch ER 1, pp. 20-30.

Lynch as "the Plagiarised Documents", but the Tribunal uses the term "Unfiled Materials").

6.50 For his second report, Mr Lynch was asked to identify whether any of the "Plagiarised Documents" and/or the text and errors from the Selva Viva Database existed on either of Judge Zambrano's Computers.[66]

6.51 Mr Lynch generated search terms from the blocks of text identified in Dr Leonard's expert report. He then searched the Old Computer and the New Computer using those search terms, to identify whether such text existed in any documents (other than documents containing text of the Lago Agrio Judgment). This search only identified a single Excel file: INDICE DE CUERPOS JUICIO 002-2003.xlsx ("the Zambrano Index Summary"), which appeared to have some connection with the unfiled January and June Index Summaries (being Material No 6 considered in Part V above).

6.52 The earliest created copy of the Zambrano Index Summary was found on the Old Computer. It was copied to the Old Computer on 6 January 2011. However, the last saved date for all copies of this document was 12 February 2010 (whereas the last saved date for the January Index Summary and the June Index Summary was January and June 2007 respectively).

6.53 Mr Lynch compared the Zambrano Index Summary with the January and June Index Summaries examined in Dr Leonard's expert report. The latter contained five worksheets, whereas the version found on Judge Zambrano's computers contained only the first worksheet. Furthermore, there were notable differences between the version of the first worksheet found on Judge Zambrano's computers and the version contained in the January and June Index Summaries.[67] Mr Lynch also reviewed the Zambrano Index Summary to see whether it contained all three instances of the text identified as plagiarised in Dr Leonard's Report. It contained only the first two instances.[68] The metadata of the three versions of the Index Summaries (i.e. the June and January Index Summaries analysed by Dr Leonard and the Zambrano Index Summary) indicated that

---

[66] Lynch ER 2, pp. 16ff.
[67] Lynch ER 2, pp. 18-19.
[68] Lynch ER 2, p. 20.

# SA725

all three share the same Created Date and Author; but the metadata for all other fields is different.

6.54   Mr Lynch therefore concluded, to a reasonable degree of scientific certainty, that:

(a)   All the versions of the Index Summaries were generated from the same original document created in January 2007 but were then separately edited (this date long preceded Judge Zambrano's first assignment to the Lago Agrio Litigation, beginning in October 2009);

(b)   The Zambrano Index Summary does not contain all of the plagiarised text which appears in the Final Judgment; and

(c)   None of the other plagiarised documents were on either of Judge Zambrano's computers.[69]

6.55   In his second report, Mr Lynch also searched for data irregularities in the laboratory results collated in the Selva Viva Data Database. He could not identify any references to these on either of Judge Zambrano's Computers, except in documents containing text from the Judgment.[70]

6.56   Both the Index Summaries and the Selva Viva Database are Microsoft Excel (electronic) documents. Mr Lynch therefore analysed the Microsoft "OSession Logs" to determine whether Microsoft Excel had been used on Judge Zambrano's Computers. He found that the OSession Logs record that, between October 2010 to March 2011, Excel was only used on the Old Computer and was only active for a total of four minutes: for two minutes on 18 October 2010; for one minute on 4 November 2010; and for one minute on 31 January 2011.[71]

6.57   Mr Lynch also considered how long it would have taken to calculate the percentages which are contained within the Unfiled Selva Viva Database. He concluded that it would not have been possible, in the four minutes of recorded activity in Microsoft Excel, either to (i) derive the statistics appearing in the Lago Agrio Judgment from the unfiled

---

[69] Lynch ER 2, p. 21.
[70] Lynch ER 2, p. 21.
[71] Lynch ER 2, p. 22.

# SA726

Excel spreadsheets; or (ii) copy the other Excel data from the "Plagiarised Documents" appearing in the Lago Agrio Judgment.[72]

6.58    In his second report, Mr Racich did not address in depth Mr Lynch's analysis of the "Plagiarised Documents", although he did question Mr Lynch's analysis of the usage of Microsoft Excel and, in particular, his reliance on the OSession logs. Mr Racich noted that Mr Lynch had not provided any evidence to support the assumption that an OSession log entry is created every time a Microsoft Office product is opened or whether the logs accurately record Microsoft Office usage.[73]

6.59    In his third report, Mr Lynch reiterated that "None of the Plagiarized Documents that served as sources of text for the Ecuadorian Judgment were on the Zambrano Computers"; and that "Mr Racich offers no analysis to account for the source of that plagiarized text in the Ecuadorian Judgments."[74]

6.60    Mr Racich responded to this criticism in his third report. He explained that he was informed that documents in the Lago Agrio Litigation were generally not filed electronically. On this basis, he concluded that there are no "authorship conclusions to be drawn from the absence of these documents on the Zambrano hard drives. Instead, the fact that the documents are not present electronically indicates only that Mr Zambrano did not have electronic copies of the documents. I see no reason why Mr Zambrano could not have copied these portions of the Judgment from filed, paper copies of these documents."[75] Mr Racich explained that he did not address this point, as he did not consider it a matter of computer forensics for the two experts.[76]

6.61    Mr Lynch, in his third report, referred to the suggestion (in the Respondent's Supplemental Counter-Memorial) that "many additional documents were submitted on CDs and DVDs." Mr Lynch analysed the Old and New Computers and found that the only evidence of a CD or DVD being accessed on either the Old or New Computer between October 2010 and March 2011 was on 25 November 2010, when a user on the New Computer opened a disc called "My Disc".[77] Mr Racich concluded, in his second

---

[72] Lynch ER 2, p. 23.
[73] Racich ER 2, para 72.
[74] Lynch ER 3, p. 6.
[75] Racich ER 3, para 31.
[76] Racich ER 3, para 32.
[77] Lynch ER 3, p. 9.

report, that "My Disc" appeared to be "related to the IT Department's set up of Microsoft Office on Mr Zambrano's New Computer".[78] Mr Lynch testified that: "There is no other forensic evidence of access to a CD or DVD between October 2010 and March 2011 on either of the Zambrano Computers."[79]

6.62 In relation to the Unfiled Selva Viva Database, Mr Lynch noted in his third report that the evidence shows that text and statistics from this document were added to "Providencias.docx" between 21 December 2010 and 28 December 2010. However, the OSession logs for Microsoft Excel show that Excel was not opened during that period on either of the Zambrano Computers.[80] In this third report, Mr Lynch reiterated his assessment that "it is not reasonably possible for someone to accurately calculate the statistics from the Unfiled Selva Viva Data Compilation without having access to the data in Microsoft Excel or similar spreadsheet or database program."[81] Mr Lynch found no evidence on the Zambrano Computers of any program (other than Excel) that could have been used to calculate the statistics. He therefore concluded that "the Unfiled Selva Viva Data Compilation spreadsheet document from which the text was plagiarized must have been available to the drafter in electronic form and accessed using Microsoft Excel. Yet there is no evidence that the Unfiled Selva Viva Database was available on the Zambrano Computers or that Microsoft Excel was used during the time period this text was inserted into Providencias."[82]

6.63 In response to Mr Racich's criticism about his reliance on the OSession logs, Mr Lynch stated that his second report had described how and when OSession logs are created, the data they track and limitations on the analysis of those logs. Mr Lynch testified that he had performed extensive testing of the log files (with Stroz Friedberg). He appended, as Appendix 1 to his third report, an additional discussion of the testing performed by Stroz Friedberg.[83]

6.64 In his third report, Mr Racich stated that Mr Lynch's testing document did not support Mr Lynch's conclusions about the amount of time that Office products were open on Judge Zambrano's Computers. In particular, Mr Racich observed, it did not explain how

---

[78] Racich ER 2, para 61.
[79] Lynch ER 3, p. 9.
[80] Lynch ER 3, p. 10.
[81] Lynch ER 3, p. 10.
[82] Lynch ER 3, p. 10.
[83] Lynch ER 3, p. 11.

## SA728

the logs function (or fail to function) in many cases and that the analysis performed by Mr Lynch did not preclude other scenarios where Office products could have been in use for a longer period than the logs suggest.[84]

6.65    In response to Mr Lynch's conclusions that: (i) Microsoft Excel must have been used to calculate the statistics in the Lago Agrio Judgment and (ii) because there is no evidence of usage of Microsoft Excel in the relevant period, Mr Racich concluded that the allegation that Judge Zambrano could not have authored the Judgment was overstated. Mr Racich testified: "On this evidence, it cannot be said either that the allegedly unfiled Selva Viva Database is the source of statistics in the Judgment or that Mr Zambrano did not simply copy those statistics from a former judge's notes. There may be still other explanations. All we can say is that the computer forensic evidence we have at present cannot answer the question."[85]

6.66    In his testimony at the Track II Hearing, Mr Lynch agreed that whether or not the "Plagiarised Documents" were in the court record was not a question of computer forensics; but he emphasised that the question whether or not someone had used Excel was a question for computer forensics. He reiterated his opinions that: (i) someone must have used Excel to calculate the statistics which appeared in the Lago Agrio Judgment; (ii) the naming and data irregularities were copied into "Providencias.docx" between 21 and 28 December 2010; but (iii) Excel (the program which would be used to open the database) was not used on either of Judge Zambrano's Computers during that period.[86]

6.67    In cross-examination at the Track II Hearing, it was put to Mr Lynch that another judge at the Lago Agrio Court could have calculated the percentages used in the Lago Agrio Judgment at an earlier date, given that the Judicial Inspections, from which the data was taken, had been suspended or completed by the end of 2006. Mr Lynch answered that he did not know if an earlier judge at the Lago Agrio Court had calculated the percentages, but he confirmed his expert opinion that, if that had been the case, that judge would have had to calculate them using a dataset that exactly double and triple counted the samples in the same way as the Selva Viva Database.[87]

---

[84] Racich ER 3, para 20.
[85] Racich ER 3, para 41.
[86] Track II Hearing D5.959- 960 (Lynch).
[87] Lynch, Track II Hearing D5.1111 (Lynch).

6.68    In his cross-examination, at the Track II Hearing, Mr Racich was asked about possible explanations for the calculation of the statistics in the Selva Viva Database. In particular, it was suggested that the calculations might just as easily have been made by Mr Fajardo as by a former judge of the Lago Agrio Court. Mr Racich confirmed that he did not know one way or another; and he agreed that it could have been anyone who had access to an electronic copy of the Selva Viva Database or the calculations.[88]

6.69    At the Track II Hearing,[89] Mr Lynch testified that the unfiled Selva Viva Database (in Excel format) was over 19 columns wide and over 65,000 rows long. It would extend to thousands of pages if printed in hard copy, and, therefore, unusable in paper form for any practical purpose. He also testified that it contains peculiar information, naming conventions, irregularities and statistical factors that appear in the Lago Agrio Judgment that do not appear in the filed lab results which it purports to compile. Yet, he continued, the Selva Viva Database could not have been used on the Zambrano Computers to draft the Lago Agrio Judgment because, according to the Microsoft Office logs, Excel was only opened for 4 minutes between October 2010 and March 2011. Moreover, it was not opened at all during the period from 21 December to 28 December 2010 when its peculiarities were used or copied into "Providencias.docx". He concluded that it would not have been possible "for someone to open the Selva Viva Database reference … and then reference them while drafting Providencias because Excel is the program that you would use to open the Selva Viva Database and it was not used."[90]

6.70    Also at the Track II Hearing, Mr Racich testified as to the Selva Viva Database under cross-examination.[91] From a forensic perspective, the Tribunal did not understand Mr Racich to be disputing Mr Lynch's expert evidence, as summarised immediately above. In particular, Mr Racich accepted that, whoever drafted the Lago Agrio Judgment, that person must have had access to an electronic copy of the Selva Viva Database or calculations derived from its statistical percentages.[92]

6.71    The Tribunal notes that, in his evidence at the RICO trial, Judge Zambrano testified that he was not familiar with Excel: see Part IV above. It is not known whether his temporary

---

[88] Track II Hearing D5.1205 (Racich).
[89] Track II Hearing D5.956ff (Lynch).
[90] Track II Hearing D5.959-960 (Lynch).
[91] Track II Hearing D5.1204-1206 (Racich).
[92] Track II Hearing D5.1205 (Racich).

# SA730

student secretary, Ms "C", was familiar with Excel. Even assuming that she was, Excel data does not lend itself to oral dictation or mental calculation; and any dictation (if possible at all) could not have been completed within the times found by Mr Lynch regarding the use of Excel on the Zambrano Computers. Thus, the Tribunal discounts, on the forensic evidence, any use by Judge Zambrano of the Selva Viva Database in paper form. Further, the Selva Viva Database did not exist in the Lago Agrio Court's record as an electronic file (which the Respondent does not dispute); and yet the author of the Lago Agrio Judgment must have made use of the Selva Viva Database in electronic form, as an Excel file, to draft the Lago Agrio Judgment (as both Mr Lynch and Mr Racich testified). It is therefore impossible for the Tribunal to understand how Judge Zambrano could have drafted the Lago Agrio Judgment from the Selva Viva Database, for want of sufficient computer skills and the non-use of Excel on his Computers.

6.72 Ms Owen recorded that it appeared to be common ground between the two experts that:

(a) There were no documents found on Judge Zambrano Computers that contained text from allegedly unfiled materials, including the Selva Viva Database;[93] and

(b) The data recorded in the Microsoft OSession log files represented the minimum amount of usage of Microsoft Office applications; and that the data had been accurately presented in evidence.[94]

6.73 As to the difference between the two experts' approach to the presence of the "Plagiarised Documents" on Judge Zambrano's Computers, Ms Owen suggested that this was a difference in factual assumptions: Mr Lynch considered that the absence of the documents was of significance when considering how the Lago Agrio Judgment came into being, whereas Mr Racich considered that this merely showed that Judge Zambrano had no electronic copies of the documents.[95]

6.74 In relation to the analysis of the use of Microsoft Excel by reference to the OSession Logs, Ms Owen similarly suggested that the difference of opinion arose out of the two experts' perceptions of technical facts. Mr Lynch was of the opinion that the author of

---

[93] Owen, Revised Report, para 40.
[94] Owen, Revised Report, para 42.
[95] Owen, Revised Report, para 65.

# SA731

the Lago Agrio Judgment must have used Microsoft Excel to calculate statistics from the Selva Viva Database, thereby adding weight to his view that the Judgment could not have been drafted on Judge Zambrano's Computers in the manner suggested by Dr Zambrano. Conversely, Mr Racich concluded that the available forensic evidence could not answer the source of the statistics and that there were other explanations for the presence of these statistics in the Lago Agrio Judgment.[96]

### F: Internet Usage

6.75    Mr Lynch's second report recorded that he had performed an analysis to recover deleted records and to aggregate all the available Internet History on the Old and New Computers (with Stroz Friedberg). He identified, on both Computers, usage of Facebook and other sites related to Ms "C" (Judge Zambrano's temporary secretary). However, he did not identify any usage of translation or legal research services in the Internet History from either computer.[97]

6.76    Mr Racich, in his second report, disputed Mr Lynch's implication, namely that because one can recover Internet History and since Mr Lynch found no Internet History to indicate that legal research or translation websites had been used, then such websites had not been used in the relevant period.[98]

6.77    Mr Racich explained that, through normal computer use, Internet History is deleted over time and the space where that History was stored becomes occupied by new data. If this happens, the previous Internet History will no longer be recoverable.[99] Mr Racich also suggested, based on his analysis of the "cookies" which remained on Judge Zambrano's Computers, that there was more Internet History for the relevant time period that had been lost due to normal computer use.[100]

6.78    Mr Racich found evidence that the website "fielweb.com" had been used between October 2010 and March 2011; and that this was a website which enabled legal research.[101] Mr Racich also found that, as early as June 2009, a user of the Old Computer

---

[96] Owen, Revised Report, para 67.
[97] Lynch ER 2, p. 23.
[98] Racich ER 2, para 42.
[99] Racich ER 2, para 44.
[100] Racich ER 2, para 47.
[101] Racich ER 2, para 48.

## SA732

had visited the translation website "traducegratis.com". He explained that the Internet History from this period included only seven entries for this website. However, these seven entries indicated that the site had been visited at least 69 times by September 2009. Mr Racich testified that these numbers illustrated his broader point that much of the Internet History is no longer available.[102] Mr Racich also found evidence that on 4 January 2011 a user of the New Computer accessed "windowslivetranslator.com".[103] He further noted that there was evidence that Ms "C" had accessed the Internet many times from both Computers during the relevant period, albeit that he only found evidence that she accessed Facebook.[104]

6.79    Mr Racich also analysed the average number of objects downloaded on particular days and identified an apparent gap in the recovered Internet History on the Old Computer between 14 July 2010 and 14 December 2010. He suggested that this could reflect a lack of Internet usage during this period or it could be (which was more likely in his opinion) because the Internet History was subsequently deleted and overwritten through normal computer use.[105]

6.80    Mr Lynch responded to these opinions in his third report, stating that: "Mr Racich's analysis [of internet usage] does not offer any evidence that is consistent with Mr Zambrano's testimony, and his conclusion is unsupported by the evidence."[106]

6.81    In particular, Mr Lynch pointed out that:

(a)    Mr Racich identified a single legal research website, "fielweb.com", that had been accessed via the Zambrano Computers, but the only recoverable Internet History between October 2010 and March 2011 showed that this website was only accessed on the Old Computer on two dates: 2 December 2010 and 3 January 2011. Mr Lynch further noted that Professor Riofrío's expert report indicated that "fielweb.com" does not contain any information about the case law from the USA which is cited in the Lago Agrio Judgment;[107]

---

[102] Racich ER 2, para 50.
[103] Racich ER 2, para 50.
[104] Racich ER 2, para 51.
[105] Racich ER 2, para 52.
[106] Lynch ER 3, p. 13.
[107] Lynch ER 3, p. 13; see Riofrío ER, paras 9 & 25.

## SA733

(b)  Mr Racich found forensic evidence that a translation website, "windowslivetranslator.com", was accessed from the New Computer. However, Mr Lynch's further analysis indicated that this website was visited only once on 4 January 2011. Mr Lynch questioned how a user of the Old Computer could find international case law on the Old Computer using "fielweb.com" if the New Computer was used to access the translation service;[108]

(c)  Mr Lynch acknowledged that Mr Racich had identified "cookies" which suggested that other legal research and translation websites had been accessed from the Zambrano Computers, but emphasised that Mr Racich did not provide any evidence that these websites had been accessed during the relevant period. Mr Lynch disagreed with Mr Racich's suggestion that the evidence in this regard may have been incomplete because these cookies may have overwritten a previous cookie or been new cookies. Mr Lynch pointed to Mr Racich's own evidence that "when as part of its normal operations the web browser deletes old Internet History, it often does not delete old cookies even while it deletes entries related to accessing the website's files." Mr Lynch highlighted that the cookies which Mr Racich discussed are not from the relevant time period, but are from periods before October 2010 or after March 2011;[109] and

(d)  Whilst Mr Lynch agreed with Mr Racich that recoverable Internet History can be limited, he emphasised that a considerable volume of Internet History – approximately 50,000 records – was recovered from the Zambrano Computers for the relevant period. Fewer than 10 of these records relate to "fielweb.com" or "windowslivetranslator.com".[110]

6.82  In his third report, Mr Racich dismissed Mr Lynch's comments on Internet History as irrelevant. In particular, he testified that: "The fact that there is not more evidence of particular sites in the recoverable history is likely a consequence of the inherent limitation of the limited history available years after the fact. And the fact that a particular number of history records (Mr Lynch says 50,000) between October 2010 and March 2011 were recovered does not tell us what percentage of the … total that number

[108] Lynch ER 3, p. 13.
[109] Lynch ER 3, p. 14.
[110] Lynch ER 3, p. 15.

## SA734

represents."[111] Mr Racich explained that his conclusion that the recovered history is necessarily limited is based on, in particular, gaps in the recorded "hit counts" of particular websites.[112]

6.83 In his direct examination at the Track II Hearing, Mr Lynch gave a general explanation of how Internet History can be recovered. Both experts agree that Internet History degrades over time, but that cookies are often not deleted even when Internet History records are deleted. On this basis, Mr Lynch stated that, "… in order for there to be no evidence of any other legal research Website on Mr Zambrano's computer, all of the Internet History records would have had to have degraded, disappeared and been overwritten such that they're no longer recoverable and the cookie would have had to have been deleted and overwritten."[113]

6.84 In cross-examination, Mr Lynch reiterated that the cookies which Mr Racich had identified for websites such as LexisWeb and LexisNexis all post-dated the relevant period. He rejected the suggestion that Judge Zambrano might have used these websites previously and that the website might have created a new cookie which replaced the record of the earlier visits. Mr Lynch explained that, when a website created a new cookie, generally "the creation date for that cookie would stay from [the first date the website was accessed] because of a property known as file tunnelling, where if you create a file in the same location with the same name where a file was recently deleted, it will adopt the creation date of the file that previously existed."[114]

6.85 Mr Racich, in his cross-examination, confirmed that the only evidence of a visit to a legal research site which had a date and time stamp within the relevant period was the "fielweb.com" site.[115] He stated that he did not know whether "fielweb.com" could be used to locate the English language cases which were in the 21 December version of "Providencias.docx" as he had not done any analysis of what documents were available on that website.[116] In relation to translation websites, Mr Racich confirmed that the only evidence of visits to "traducegratis.com" was from 2009 and that the visit to

---

[111] Racich ER 3, para 17.
[112] Racich ER 3, para 18.
[113] Track II Hearing D5.955 (Lynch).
[114] Track II Hearing D5.1090-1091 (Lynch).
[115] Track II Hearing D6.1231 (Racich).
[116] Track II Hearing D6.1231 (Racich).

# SA735

"windowslivetranslator.com" occurred on 4 January 2011, which was after English language legal authorities had appeared in the December 21 version of Providencias.[117]

6.86    Mr Racich was also questioned about visits to a website – "live.com". He agreed that this log-in page could be used to access Hotmail. He also confirmed that the hit count for this website was 14 on 7 January 2011 and had increased to 29 on 13 January 2011. He agreed that during this period in early January 2011 someone on Judge Zambrano's Computers was logging into Hotmail. Mr Racich confirmed that he had not recovered the contents of any emails that were opened from Hotmail on Judge Zambrano's Computers.[118]

6.87    Mr Racich agreed that the Internet History recovered from Judge Zambrano's Old Computer (as set out in Exhibit 21 of Mr Lynch's second report) indicated that someone on that Computer had opened Hotmail at 17.33 on 12 January 2011 and two minutes later the "Caso Texaco.doc" document was opened on the Old Computer. It was noted that 19 January 2011 was the date of a recovered version of "Caso Texaco.doc" containing Judgment text.[119]

6.88    Ms Owen highlighted the differences in the conclusions reached by Mr Lynch and Mr Racich in relation to the recoverable Internet History. Mr Lynch reported that no evidence of visits to legal research or translation websites was found and concluded that this demonstrated an inconsistency in Dr Zambrano's testimony at the RICO trial. Mr Racich, however, concluded that websites which could have been used for legal research and language translation were accessed between October 2010 and February 2011. He also concluded that the Internet History was incomplete, probably due to subsequent usage of the Computers. Ms Owen explained that, during the meeting with the two experts at The Hague on 12 January 2016, the two experts had suggested that these differences in opinion arose out of instructions to them from their respective appointing Parties.

6.89    It was noted that:

[117] Track II Hearing D6.1232-1233 (Racich).
[118] Track II Hearing D6.1239 (Racich).
[119] Track II Hearing D6.1247 (Racich).

# SA736

(a) Mr Lynch had been instructed to research the Internet History for evidence of visits to legal research and translation websites consistent with Dr Zambrano's testimony and the content of the "Providencias.docx" document; whereas

(b) Mr Racich had been instructed to search for evidence of visits to legal research and translation websites within the time-frame of October 2010 to February 2011 and to provide a general account of Internet History and an explanation of why there might be no evidence.

Ms Owen expressed the view that the difference in these opinions arises out of different expectations of how much evidence of Internet activity might be recovered in a given set of circumstances.

### G: USB Analysis

6.90    Mr Lynch, in his second report, identified 18 USB devices that were known to have been used on the Old or New Computers between October 2010 and March 2011.[120] He then reviewed the records of files accessed on both Computers to determine what files might have existed on the USB devices. He identified 41 files accessed from USB devices, but noted that the computer records reviewed by him (with Stroz Friedberg) were not designed to record every single file that was accessed or existed on USB devices; and that, therefore, many more files could have existed and/or been accessed.[121] Further, Mr Lynch did not have access to the USB devices themselves (nor did Mr Racich); and therefore he could not know the content of the files or whether any of them related to the Lago Agrio Judgment.[122] Nonetheless, so Mr Lynch suggested, the formatting differences in "Providencias.docx" are consistent with having been copied and pasted from another document, including documents accessed from USB devices.[123]

6.91    Mr Racich, in his second report, concluded that neither Mr Lynch's nor his own analysis revealed any evidence that any Lago Agrio related document was transferred to Judge Zambrano's Computers whilst he was drafting the Lago Agrio Judgment.[124] Mr Racich

---

[120] Lynch ER 2, p. 36.
[121] Lynch ER 2, p. 36.
[122] Lynch ER 2, p. 37.
[123] Lynch ER 2, pp. 37-38.
[124] Racich ER 2, paras 53-64.

## SA737

emphasised that no forensic evidence showed that USB devices were inserted into either of Judge Zambrano's computers between 1 February 2011 and 20 February 2011.[125]

6.92    Mr Racich explained that he had performed (with Vestigant) an independent analysis of all evidence of files opened from USB devices on either the Old or New Computers between October 2010 and March 2011. This analysis indicated that up to 56 documents were opened from USB devices in this time period. Mr Racich suggested that a review of file names and types indicated that the files so opened were predominantly picture and PowerPoint files, with only a small number of Word files.[126] Mr Racich identified two copies of the same document, which appeared to be connected to the Lago Agrio Litigation. Both files had the same name ("PROVIDENCIA CHEVRON TEXACO DE FECHA 15 DE JUNIO DEL 2010.docx") and almost identical metadata. However, Mr Racich noted that this document appeared to be a Word version of an order issued in June 2010 when Judge Zambrano was not the presiding judge in the Lago Agrio Litigation. This document appeared to have been copied to the New Computer on 7 December 2010 via a thumb drive with the volume name "MARIELA".[127]

6.93    In Mr Racich's opinion, the vast majority (30 out of 43) of the documents and folders opened from USB devices, as identified by Mr Lynch, appeared to have been opened from a USB device named "EVELYN" and appeared to be Ms "C"'s personal documentation. A further four documents were opened from a USB device named "MARIELA" which indicated that they were from Mariela Salazar, the court secretary. Three of the 43 documents were from a USB named "My Disc" and appeared to be related to the IT Department's set up of Microsoft Office on the New Computer.[128]

6.94    Mr Racich noted that the only other instances of documents being opened between November 2010 and February 2011 from other USB devices related to four documents and one folder (which were exhibited to Mr Lynch's second report as Exhibit 7). Mr Racich pointed out that Mr Lynch had provided no evidence that these documents had any bearing on the Lago Agrio Litigation.[129]

---

[125] Racich ER 2, para 56.
[126] Racich ER 2, para 59.
[127] Racich ER 2, para 60.
[128] Racich ER 2, para 61.
[129] Racich ER 2, para 62.

# SA738

6.95    The analysis of the USB drives was not taken much further by the two experts in their third written reports. Mr Lynch criticised Mr Racich for speculating about the contents of the files on the USB devices, emphasising that, although Mr Racich claimed to have performed a thorough analysis of all the files on all the USB devices connected to the Zambrano Computers in the relevant time frame, he had not offered any evidence of that review; nor claimed that he had had access to any of the USB devices. Mr Lynch noted that, without examining the actual USB devices, the only evidence Mr Racich had reviewed was the names of the files and the metadata highlighted in Mr Lynch's second report. Mr Lynch stated that Mr Racich's conclusions as to the content of the files were therefore mere speculation.[130] Mr Racich did not respond to this criticism in his third report.

6.96    In cross-examination, Mr Racich was pressed on the dates on which USB devices were connected to Judge Zambrano's Computers, as set out in Table 23 in Mr Lynch's second report. This cross-examination showed that:

(a)    The "Providencias.docx" document was created on 11 October 2010 and on the following day a USB device was connected;[131]

(b)    Between 12 October 2010 and 21 December 2010, at least seven USB devices were connected;[132]

(c)    In the period between 21 December and 28 December 2010, two more USB devices were connected;[133]

(d)    In the period after 28 December 2010 and 19 January 2011 (when Judgment text was recovered from the "Caso Texaco.doc" document) a further three USB connections were made to the Zambrano Computers;[134] and

(e)    Table 23 of Mr Lynch's third report indicates that a further five connections were made (three from the same device) between 20 January 2011 and 21 February 2011.

---

[130] Lynch ER 3, p. 24.
[131] Lynch ER 2, p. 36, Table 23 indicates that this USB device was connected to the Old Computer.
[132] This USB was connected to the New Computer.
[133] Again, this device was connected to the New Computer.
[134] Track II Hearing D6.1225 (Racich).

# SA739

6.97    Mr Racich confirmed that a person at one of the Zambrano Computers could have opened a document from one of the USB devices, copied text out of that document and pasted it into a document which was already on the Computer, closed the document on the USB device and unplugged the USB device; and that it would then not be possible to know what text had been transferred.[135]

6.98    Mr Racich also accepted that, during the period from October 2010 to February 2011, 13 USB devices were attached to the Zambrano Computers, as Mr Lynch had testified earlier.[136] Neither Mr Lynch nor Mr Racich had any access to these 13 USB devices.

### H: Bulk Copying

6.99    As described above, Mr Lynch's analysis (with Stroz Friedberg) of the Old Computer found that Windows XP was installed on 14 July 2010. On the same day, a significant amount of data was copied to the Old Computer, including 2,428 Microsoft Word documents. This data included files relating to the Lago Agrio Litigation. Mr Lynch's view was that this bulk copying, combined with the evidence he had found of files and folders from a previous installation of Windows, was consistent with the reinstallation of the operating system, possibly as part of trouble-shooting or maintenance.[137]

6.100   Mr Lynch also found evidence of subsequent bulk copying of data onto the Old Computer, in particular in September 2012. This was some five months after Judge Zambrano had relinquished the Old Computer; and long after he had completed his assignment to the Lago Agrio Litigation (4 March 2011). On 26 September 2012, 2,202 files were created in a four minute interval and subsequently deleted. Mr Lynch stated that the bulk copying of files on the Old Computer would have overwritten or destroyed data on the Old Computer; and that this was consistent with an attempt to overwrite previously deleted data.[138]

6.101   Mr Racich, in his second report, somewhat overstated Mr Lynch's conclusion, suggesting that Mr Lynch had concluded that "evidence of data copied in bulk to both the Old Computer and New Computer reveals some deliberate attempt to overwrite

---

[135] Track II Hearing D6.1228 (Racich).
[136] Track II Hearing D6.1223 (Racich); D5.962 (Lynch).
[137] Lynch ER 2, p. 11.
[138] Lynch ER 2, p. 11.

deleted data on these computers."[139] In Mr Racich's expert opinion, the forensic evidence did not point to data destruction as the likely motive. He explained that, because it is not possible to know where previously deleted files were stored or to determine which parts of unallocated space will be overwritten by new data, a person who is trying to destroy data will typically try to fill up as much unallocated space as possible; e.g. by copying large files such as movies.[140] By contrast, the bulk copying on 26 September 2012 involved files that consisted mainly of Microsoft Office documents These files took up less than 1% of the total space on the drive and less than 4% of the unallocated space.[141]

6.102   In his third report, Mr Lynch pointed out that Mr Racich had omitted to mention that the final action, in relation to the bulk copying carried out on 26 September 2012, was the deletion of the copied files. Mr Lynch concluded that this forensic evidence was inconsistent with Mr Racich's conclusion this activity was a normal backup.[142]

6.103   Mr Racich responded that, while Mr Lynch had discounted the fact that only 734 MB of data was copied, this was a key point in determining whether the copying and deletion was a deliberate attempt to overwrite data. He reiterated that this data comprised only 4% of the free space on the Computer. This action was therefore unlikely to overwrite any particular data and would not guarantee that any particular data was overwritten.[143] In response to Mr Lynch's view that the subsequent deletion of the copied files was a strong indicator that the user was attempting to overwrite data, Mr Racich noted that it was not the deletion of the data that overwrote the small amount of unallocated space, but the prior copying. He noted that there are many possible motivations for a person to create, fill and then delete a folder; e.g. this may have been a temporary backup; and the motivation could not be ascertained through forensic investigations.[144]

6.104   Ms Owen records that it was common ground between the two experts that, while bulk copying of data to the Zambrano Computers had the potential to overwrite previously

---

[139] Racich ER 2, para 65.
[140] Racich ER 2, para 67.
[141] Racich ER 2, para 68.
[142] Lynch ER 3, p. 34.
[143] Racich ER 3, para 51.
[144] Racich ER 3, para 52.

deleted files, there was no technical evidence which would enable them to determine the actual motive for the bulk copying in this instance.[145]

### *I: The Tribunal's Conclusions*

6.105  The Tribunal accepts that both Mr Lynch and Mr Racich were honest witnesses, seeking to assist the Tribunal in good faith consistent with their obligations as expert witnesses. The Tribunal also acknowledges that both expert witnesses are experienced and knowledgeable specialists in a specialist and complex field. The Tribunal also owes a special debt to Ms Owen, a much respected and senior specialist in this field.

6.106  For a long time during this Track II phase of the arbitration, it seemed that the forensic evidence available from Judge Zambrano's two Computers could provide a definitive answer to the 'ghostwriting' issues, one way or the other. It remains tantalisingly close; but, to the Tribunal's regret, there is no such reliable answer from the forensic evidence. There is no 'smoking gun', but rather a mass of complex questions that cannot be answered on the limited forensic materials made available at the time to Mr Lynch, Mr Racich and Ms Owen, without much more evidence from other electronic devices available to Judge Zambrano, Mr Fajardo and others in Ecuador.

6.107  Given that the Claimants bear the legal burden of proof on these forensic issues (as with its other allegations) under Article 24(1) of the UNCITRAL Arbitration Rules, the absence of such a definitive answer means that the Claimants' case does not prevail on the forensic issues by themselves, on a balance of probabilities.

6.108  Nonetheless, the Tribunal considers that much useful work was done by the Parties' two experts and Ms Owen. The eventual differences between the two experts are more differences of perspective, also influenced by non-technical factors lying outside their expert functions in this arbitration and influenced their respective terms of reference from the Parties. What this this Tribunal can safely derive for this Award from all the forensic evidence and the forensic expert evidence is therefore less than complete. However, in the aggregate, it justifies two conclusions by the Tribunal.

---

[145] Owen, Revised Report, para 29.

Case 1:11-cv-00691-LAK-JCF Document 1d5763c1ee93272a 03/11/2012 Page 155 of 308

# SA742

6.109  First, the account given at the RICO trial by Dr Zambrano as to how he wrote personally the full Lago Agrio Judgment on his New Computer (with his student secretary) is inaccurate, incomplete and unreliable.

6.110  Second, whilst the forensic evidence alone does not prove, on the balance of probabilities, that the Lago Agrio Judgment was corruptly 'ghostwritten' by one or more the Lago Agrio Plaintiffs' representatives, it is more likely than not that the Judgment was drafted in material part on a computer or device other than the Zambrano Computers. By itself, in the Tribunal's view, the likely use of another computer or device is not proof of 'ghostwriting'; but, equally, it is not proof that there was no 'ghostwriting'.

6.111  These conclusions as to the forensic evidence are consistent with the earlier conclusions reached by the Tribunal in Parts IV and V above that, based on all the evidence available to the Tribunal in this arbitration (other than the forensic evidence), the Lago Agrio Judgment was at least in material part 'ghostwritten' by certain of the Lago Agrio Plaintiffs' representatives, in corrupt collusion with Judge Zambrano.

# SA743

## PART VII

### JURISDICTION AND ADMISSIBILITY

**A: Introduction**

7.1     The Tribunal here addresses the issues arising from the Tribunal's disputed jurisdiction over the Claimants' claims and the admissibility of such claims under Articles VI(1)(a), VI(1)(c), II(3)(a), II(3)(c) and II(7) of the Treaty, as asserted by the Claimants and disputed by the Respondent. For ease of reference, where appropriate, these issues are collectively described as "jurisdictional" issues.

7.2     In its Third Interim Award on Jurisdiction and Admissibility of 27 February 2012, the Tribunal decided that it had jurisdiction over TexPet's pleaded claims under both Articles VI(1)(a) and VI(1)(c) of the Treaty, thereby rejecting all objections made by the Respondent as to jurisdiction over TexPet's claims: see Paragraph 5.3 of the Third Interim Award (set out in Annex 1(H) to Part I above), with Paragraphs 4.14ff and 4.31ff. Accordingly, in this Award as explained further below, the Tribunal addresses the merits of TexPet's pleaded claims under Articles II(3)(a), II(3)(c) and II(7) of the Treaty.

7.3     In its Third Interim Award, the Tribunal also decided that it had jurisdiction over Chevron's pleaded claims under Article VI(1)(c) of the Treaty, with respect to its 'indirect' investment in TexPet. The Tribunal there left expressly undecided whether the Tribunal had any jurisdiction over Chevron's pleaded claims under Article VI(1)(a) and also, with respect to any 'direct' investment, under Article VI(1)(c) of the Treaty, thereby joining these issues to the merits. The Tribunal otherwise rejected all jurisdictional objections made by the Respondent to Chevron's pleaded claims: see Paragraph 5.4 of the Third Interim Award (set out in Annex 1(H) to Part I above), with Paragraphs 4.22ff and 4.38ff.

7.4     As regards the Respondent's extant jurisdictional objections under Article 21 of the UNCITRAL Arbitration Rules, the Tribunal again exercises its powers of

# SA744

'Kompetenz-Kompetenz' under Article 21(1) of the UNCITRAL Arbitration Rules, forming part of the Parties' Arbitration Agreement.[1]

7.5 It is necessary first, however, to refer to the material texts of the Treaty and subsequently to several special features of this case. Whilst the latter are not exclusively relevant to issues of jurisdiction and admissibility, it is nonetheless convenient to address them in this Part of the Award.

### *B: The Treaty*

7.6 *(1) The Treaty*: The Tribunal notes that Articles II(3)(a), II(3)(c) and II(7) of the Treaty, as regards the FET standard, the FPS standard, customary international law and "effective means", provide four possible bases for the Claimants' claims, read with Articles VI(1)(a) and (c) of the Treaty. The Tribunal addresses each of these below.

7.7 *"Investment":* Article I(1) of the Treaty of the Treaty provides (in material part):[2]

> *"For the purposes of this Treaty,*
>
> *(a) 'investment' means every kind of investment in the territory of one Party owned or controlled directly or indirectly by nationals or companies of the other Party, such as equity, debt, and service and investment contracts; and includes:*
>
> *(i) ...;*
>
> *(ii) ...;*
>
> *(iii) a claim to money or a claim to performance having economic value, and associated with an investment;*
>
> *(iv) ... and*
>
> *(v) any right conferred by law or contract, and any licences and permits pursuant to law; ..."*

---

[1] The term "Arbitration Agreement" is explained above, in Part I of this Award.
[2] C-279. The relevant provisions of the Treaty are more fully set out, for ease of reference, in Part III(B) above. The full text of the Treaty (in English and Spanish) is reproduced in Annex 5 to Part I above.

# SA745

7.8 "*Investment Dispute*": Article VI(1) of the Treaty provides:[3]

> "*For purposes of this Article, an investment dispute is a dispute between a Party and a national or company of the other Party arising out of or relating to (a) an investment agreement between that Party and such national or company; ... ; or (c) an alleged breach of any right conferred or created by this Treaty with respect to an investment.*"

7.9 *Investment Protection:* Article II(3)(a) of the Treaty provides:[4]

> "*Investments shall at all times be accorded fair and equitable treatment, shall enjoy full protection and security and shall in no case be accorded treatment less than that required by international law.*"

7.10 "*Umbrella Clause*": Article II(3)(c) of the Treaty provides:[5]

> "*Each Party shall observe any obligation it may have entered into with regards to investments.*"

7.11 *Effective Means*": Article II(7) of the Treaty provides, in material part:[6]

> "*Each Party shall provide effective means of asserting claims and enforcing rights with respect to investments ...*"

7.12 *(2) The FET Standard and Customary International Law:* As regards the FET standard and customary international law in Article II(3)(a) of the Treaty, the Tribunal considers that these two bases, whether together or separately, provide similar protections against denial of justice. It was decided in *Azinian v Mexico*, as also in *Mondev v USA*,[7] that the FET standard in NAFTA Article 1105 included protection against a denial of justice. However, the FET standard, not being limited to a protection against a denial of justice, provides a broader protection than denial of justice under customary international law, both in scope and as to the time when a choate claim accrues other than for denial of justice (by reason of the principle of

---

[3] C-279.

[4] C-279.

[5] C-279.

[6] C-279.

[7] *Robert Azinian, Kenneth Davitian, and Ellen Baca v. United Mexican States*, ICSID Case No. ARB(AF)/97/2, Award, 1 November 1999, paras 91 & 102-103, CLA-299; *Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Award, 11 October 2002, para 127, CLA-7. See also the cases cited in Part VIII below, at para 8.24.

# SA746

judicial finality applicable to a claim for denial of justice, as considered separately below).[8]

7.13    Hence, the Tribunal does not need to treat the protection against denial of justice under customary international law as a separate standard of protection from denial of justice under the FET standard. It is also unnecessary to do so on the facts of the present case as found in this Award: a denial of justice under customary international law necessarily will entail a breach of the FET standard in Article II(3)(a) of the Treaty. Accordingly, references below to denial of justice under the FET standard should be understood, where appropriate, as referring also to denial of justice under customary international law.

7.14    *(3) The FPS Standard:* As to the third basis for the Claimants' claims for denial of justice, the Tribunal considers that the FPS standard, as provided in the same Article II(3)(a) of the Treaty, adds nothing material in the present case to the protection afforded by the FET standard and customary international law. Hence, the Tribunal does not address further the meaning or effect of this FPS standard.

7.15    *(4) Effective Means:* As to the fourth basis for the Claimants' claims, the Tribunal notes that this provision in Article II(7) of the Treaty, as regards "effective means", has been invoked by the Claimants and disputed by the Respondent in other arbitrations under the Treaty, as also in this arbitration.

7.16    It was the subject of the UNCITRAL tribunal's award dated 30 March 2010 between Chevron and TexPet (as claimants) and the Respondent (as respondent) in the *Commercial Cases Arbitration*.[9] It was also the subject of the Respondent's claim (as claimant) against the USA (as respondent) in the *Ecuador-USA Treaty Arbitration*.[10] That State-State arbitration did not proceed beyond the issue of jurisdiction; and it did

---

[8] As to "scope", the Tribunal refers to *Merrill and Ring Forestry L.P. v. Government of Canada,* ICSID Case No. UNCT/07/1, Award, 31 March 2010, paras 182-218, CLA-606. As to "accrual", see paras 7.116ff below.

[9] *Chevron Corporation and Texaco Petroleum Corporation v. Republic of Ecuador*, PCA Case No. 2007-02/AA277, UNCITRAL, Partial Award on the Merits, 30 March 2010, paras 242ff, CLA-47; see Part IV(G)(3) above.

[10] See Part IV(G)(4) above.

not therefore decide the parties' disputed interpretation of "effective means" in the Treaty (by reason of that tribunal's award dated 29 September 2012).[11]

7.17    The award in the *Commercial Cases Arbitration,* applying "effective means" as a protection for Chevron and TexPet under the Treaty, had followed the earlier approach taken by the tribunal in *Duke Energy v Ecuador* by its award of 18 August 2008.[12] The award in *Commercial Cases* was in turn followed, as to "effective means", by the tribunal in *White Industries v India* in its award of 30 November 2011.[13]

7.18    In the present case, the Claimants contend that the Treaty's provision as to "effective means" in Article II(7) operates as a '*lex specialis*', distinct from protection against denial of justice under the FET standard and customary international law in Article II(3)(a) of the Treaty, albeit also partly overlapping with such protections. The Claimants contend that a host State may breach the Treaty's provision as to "effective means" (being a less demanding test), even when the State's conduct does not amount to a wrongful denial of justice under Article II(3)(a) of the Treaty.[14]

7.19    The Respondent disputes these submissions. It contends that, by "effective means" under Article II(7), the two States incorporated into the Treaty pre-existing obligations under customary international law, requiring each State to provide an effective framework or system under which claims may be asserted and rights enforced. However, according to the Respondent, the two States did not thereby undertake an obligation to assure that such framework or system was to be effective in particular cases, beyond the protection against denial of justice.[15] Thus, the Respondent submits that the Claimants cannot here invoke such an obligation (with its lesser demanding

---

[11] This award on jurisdiction lies in the public domain. Ecuador's claim (as to the merits) can be gleaned from Professor Reisman's expert opinion of 24 April 2012 (for the USA), which is also publicly available.

[12] *Duke Energy Electroquil Partners v. Republic of Ecuador*, ICSID Case No. ARB/04/19, Award, 18 August 2008, para 391, RLA-40, cited in *Chevron Corporation and Texaco Petroleum Corporation v. Republic of Ecuador*, PCA Case No. 2007-02/AA277, UNCITRAL, Partial Award on the Merits, 30 March 2010, para 242, CLA-47. The latter also cited *Petrobart Limited v. Kyrgyz Republic*, SCC Arb. No. 126/2003, Award, 29 March 2005, CLA-219 (see p. 28ss) and *Limited Liability Company AMTO v. Ukraine*, SCC Arb. No. 080/2005, Final Award, 26 March 2008, RLA-343 (see para 88).

[13] *White Industries Australia Limited v. India*, UNCITRAL (Ad hoc), Award, 30 November 2011, paras 10.4 & 11.3ff, RLA-347.

[14] See Caron ER 1, particularly his conclusions (para 170); Caron ER 2, particularly his further conclusions (paras 22 to 24); see also Paulsson ER 1, paras 23-28. See generally J. Gaffney & J. Loftis, "The 'Effective Means Meaning' of BITs and the Jurisdiction of Treaty-based Tribunals to hear Contract Claims" (2007) 8(1) Journal of World Investment & Trade 5, CLA-213.

[15] See R-TII Mar. 2015, para 375.

# SA748

test), separately from protection against denial of justice under Article II(3)(a) of the Treaty.[16]

7.20   For the purposes of this Award, the Tribunal does not address further the meaning or effect of "effective means" in Article II(7) of the Treaty. It is unnecessary to do so on the facts of the present case, as found in this Award applying the FET standard under Article II(3)(a) of the Treaty (including protection against denial of justice).

7.21   Lest it be misunderstood, the Tribunal's reticence as regards the Parties' disputed interpretation of Article II(7) of the Treaty should not be taken as implicitly accepting or rejecting one or other of the Parties' interpretations.

7.22   *(5) The Umbrella Clause*: The Claimants claim (denied by the Respondent) that the Respondent did not observe its obligations under the 1995 Settlement Agreement to release Chevron and TexPet from diffuse liabilities, thereby committing a breach of Article II(3)(c) of the Treaty. These claims are distinct from the Claimants' claims for denial of justice, albeit also occasioned by the Lago Agrio Judgment with the judgments of the Lago Agrio Appellate Court, Cassation and Constitutional Courts.

### C: Special Features

7.23   There are several special features to the Claimants' claims against the Respondent for denial of justice under the FET standard in Article II(3)(a) of the Treaty.

7.24   *(1) Transnational Enforcement:* Chevron had no significant realisable assets in Ecuador, whether owned directly or indirectly, before and after the "merger" with Texaco in 2001. Before the "merger", Chevron was a stranger to Texaco and TexPet. Texaco and TexPet had left Ecuador by 1992. Neither Texaco nor TexPet left behind any significant realisable assets in Ecuador. Following the "merger", therefore, Chevron's indirect ownership of Texaco and TexPet did not endow Chevron with any significant realisable assets in Ecuador.

7.25   Outside Ecuador, however, Chevron, with its large group of associated companies, indirectly owned (and still owns) substantial assets, including ocean-going vessels, bank deposits around the world, and other properties. By their nature, vessels and bank

---

[16] See R-TII Mar. 2015, paras 375ff.

deposits were and remain vulnerable to arrest, attachment or seizure by the Lago Agrio Plaintiffs upon the Lago Agrio Judgment's enforcement in multiple jurisdictions, especially *ex parte* without prior notice. Even if Chevron were in a position to discharge promptly such an order freezing a bank deposit or arresting a vessel, the damage to Chevron and its associated companies from such repeated actions could have been very significant (as it may still be).

7.26    Hence, as confirmed by the "Invictus Memorandum" (see Part IV above), the Lago Agrio Plaintiffs' representatives always intended that the Lago Agrio Judgment should be enforced in multiple jurisdictions outside Ecuador, not limited to the USA. This Memorandum listed such other foreign jurisdictions expressly, including the Philippines, Singapore, Australia, Argentina, Brazil, Colombia, Venezuela, Canada, Kuwait, Nigeria, Saudi Arabia, South Africa, South Korea, Belgium, Indonesia, the Netherlands, the United Kingdom, Trinidad and Tobago, New Zealand and Russia. It would be possible to add many more jurisdictions to this list.

7.27    The Lago Agrio Litigation was therefore likely to involve, from its outset, numerous national jurisdictions other than Ecuador. This feature makes the present case unusual. Earlier cases on denial of justice have concerned an alleged wrong and an alleged injury taking place within the same State. Here, the injury to Chevron was always intended to take place, at least in part, in one or more foreign jurisdictions elsewhere than Ecuador, whether by the enforcement of the Lago Agrio Judgment or by an enforced "amicable" settlement. Thus, the Lago Agrio Litigation was transnational in the broadest sense, as confirmed by the multiplicity of foreign lawsuits and arbitrations in the USA, Argentina, Brazil, Canada, the Netherlands and elsewhere following the issuance of the Lago Agrio Judgment.

7.28    *(2) The Individual Plaintiffs:* The parties to the Lago Agrio Litigation are not the same as the parties to this arbitration under the Treaty. TexPet, the Second Claimant in this arbitration, was not a named party to the Lago Agrio Litigation (or the Aguinda Litigation). The Respondent was not a party to the Lago Agrio Litigation (or the Aguinda Litigation). Chevron, the First Claimant in this arbitration, was the sole defendant in the Lago Agrio Litigation.

# SA750

7.29 The Lago Agrio Judgment was made in favour of the Lago Agrio Plaintiffs in the Lago Agrio Litigation. These Lago Agrio Plaintiffs had been plaintiffs in the Aguinda Litigation. The Lago Agrio Plaintiffs are not parties to this arbitration. Moreover, they have not participated, nor could they participate, as parties to this arbitration between the Claimants and the Respondent under the terms of the Parties' Arbitration Agreement derived from the Treaty.

7.30 Thus, so the Respondent contends, Chevron's claims against the Respondent impugning the Lago Agrio Judgment under the Treaty could, if successful in this arbitration, gravely prejudice these Lago Agrio Plaintiffs. It could even require the Lago Agrio Plaintiffs to begin new legal proceedings in Ecuador, or elsewhere. The Respondent, therefore, advances in this arbitration a 'cross-claim' for environmental damage against Chevron, by way of an "offset" (or set-off), unjust enrichment, causation and contributory fault under Article 39 of the ILC Articles on State Responsibility.[17] (For ease of reference, although these grounds differ juridically, the Tribunal here refers to them collectively as a 'cross-claim').

7.31 In essence, the Respondent submits that any decision by this Tribunal that the Lago Agrio Judgment was a nullity (or any other like relief) would effectively immunise Chevron from justifiable liability to the Lago Agrio Plaintiffs because new legal proceedings by the Lago Agrio Plaintiffs would be time-barred under Ecuadorian law. As pleaded in its Counter-Memorial, the Respondent contends that: "… granting Claimants' proposed relief would have the same effect as granting them special immunity from liability for the environmental harm that [the Lago Agrio] Plaintiffs were found to have suffered from Claimants' misconduct."[18]

7.32 As a matter of international law, the Respondent again invokes the judgment of the International Court of Justice in *Monetary Gold* (1954), as it did at the November Hearing leading to the Tribunal's Third Interim Award.[19] In brief, the International Court of Justice decided in *Monetary Gold* that an international tribunal cannot

---

[17] R-TII Mar. 2015, paras 439ff.
[18] R-TII Feb. 2013, paras 464ff and 502.
[19] *Monetary Gold Removed from Rome in 1943 (Italy v. France, United Kingdom of Great Britain and Northern Ireland and United States of America)*, ICJ, Judgment (Preliminary Question), 15 June 1954, 1954 ICJ Reports 19, RLA-19. For the Respondent's earlier submissions, see the Tribunal's Third Interim Award, paras 3.59ff, 3.83ff & 4.59ff.

# SA751

exercise jurisdiction over a dispute between two States when the rights of a third State, not being a party to the legal proceedings, form the subject-matter of the dispute.

7.33   It is clear to this Tribunal that parts of the declaratory relief requested by the Claimants in this arbitration (if granted) could be used by Chevron, at least forensically, to defend the enforcement proceedings of the Lago Agrio Judgment by the Lago Agrio Plaintiffs in, for example, Canada.[20] Indeed, the Claimants recognise that the nullity of the Lago Agrio Judgment, if decided by the Tribunal, "may well have an effect on the beneficiaries of that judgment as a matter of fact."[21]

7.34   The Claimants acknowledge, however, that there was no procedural possibility for the Lago Agrio Plaintiffs to become parties to this arbitration; and "[n]or is there any forum that could adjudicate a dispute between Chevron, Ecuador and the [Lago Agrio] plaintiffs with international law as the applicable law."[22] The Claimants dispute, however, any prejudice to the Lago Agrio Plaintiffs from any applicable time-bar, relying upon the expert testimony of Dr Coronel on Ecuadorian law.[23]

7.35   In its Third Interim Award, the Tribunal decided to reject the Respondent's jurisdictional objection based upon "Third Party Rights" and *Monetary Gold*. The Tribunal there assumed, for the sake of argument, that the principle in *Monetary Gold* applied to mixed (i.e. State/Non-State) arbitrations under bilateral investment treaties (such as this arbitration) and to circumstances in which a mixed tribunal adjudicating upon the liability of a State might have to consider matters that were the subject of litigation with private persons elsewhere.[24] Nonetheless, the Tribunal decided that its decisions on the dispute between the Parties in this arbitration "would not decide the question of the effect of the 1995 Settlement Agreement as between the Lago Agrio Plaintiffs and Chevron"; that "the Lago Agrio Plaintiffs cannot here be regarded as indispensable third parties"; and that "this case can properly proceed to the merits of the Claimants' claims without them."[25]

---

[20] See Track II Hearing D12.2708-2713.
[21] Paulsson ER 2, para 50.
[22] Paulsson ER 2, para 49.
[23] Coronel ER 5, para 108; Paulsson ER 2, para 44; but see also Paulsson ER 2, para 50.
[24] Third Interim Award, para 4.60.
[25] Third Interim award, para 4.67.

# SA752

7.36    The Tribunal here confirms that decision, for these and other reasons set out in its Third Interim Award. It does not consider that any of its decisions made in this arbitration can be legally binding upon any of the Lago Agrio Plaintiffs. This Tribunal has no jurisdiction to decide upon the individual claims for personal harm (not being diffuse claims) of the Lago Agrio Plaintiffs; and it has not sought to exercise any such jurisdiction in this arbitration.

7.37    *(3) Environmental Damage:* The Respondent makes a related submission, relevant to its cross-claim for environmental damage (as defined above). The Respondent contends that there is a risk of unjustly enriching Chevron in this arbitration with a "windfall". It submits that Chevron's burden of proving loss caused by the alleged denial of justice requires Chevron to prove that: "… it is more likely than not that they would have prevailed on the merits in the underlying environmental litigation before a fair and impartial Ecuadorian court. Otherwise, Claimants would receive indemnification from the State [the Respondent] for damages that a fair and impartial court justifiably would have awarded the Lago Agrio Plaintiffs anyway."[26]

7.38    The Tribunal's several awards, orders and decisions to date have left intact any environmental claims in the Lago Agrio Litigation "made by an individual for personal harm in respect of that individual's rights separate and distinct from the Respondent": see the First Partial Award.[27] As the Tribunal also decided (by a majority) in its Decision on Track 1B, the Lago Agrio Complaint included individual claims materially similar, in substance, to the individual claims made by the Aguinda Plaintiffs in New York: see Paragraph 186(3) of the Decision.[28] It is also common ground between the Parties that claims made by an individual for personal harm (not being a diffuse claim), including one or more of the Aguinda or Lago Agrio Plaintiffs, are not precluded by the Claimants' case in this arbitration, howsoever decided by the Tribunal.

7.39    In the Tribunal's view, therefore, it remains clear that individual claims for personal harm from environmental damage, made by the Aguinda Plaintiffs in the Aguinda Litigation in New York or similar claims for personal harm (not being diffuse claims) made by the Lago Agrio Plaintiffs in the Lago Agrio Litigation, are not and cannot be

---

[26] R-TII Feb. 2013, paras 452 & 471.
[27] First Partial Award, para 112(3). (See Annex 1 to Part I above).
[28] Decision on Track 1B (see Annex 1 to Part I above).

# SA753

claims asserted by the Respondent in its own right against Chevron (or TexPet) in this arbitration.

7.40   For its cross-claim in this arbitration, therefore, the Respondent cannot assert against Chevron (or TexPet) personal rights possessed only by these Aguinda or Lago Agrio Plaintiffs as individuals. Such an assertion would require an exercise lying beyond this Tribunal's jurisdiction under the Parties' Arbitration Agreement, inconsistent with the Tribunal's application of the principle in *Monetary Gold* in its Third Interim Award (see above).

7.41   Nor can any claims be made by the Respondent, in its own right, against Chevron (or TexPet), given the effect of the 1995 Settlement Agreement as decided by the Tribunal in its First Partial Award.[29] Under the 1995 Settlement Agreement, the Respondent is precluded from asserting any diffuse claim against Chevron as a "Releasee" (as also TexPet and, likewise, Texaco as "Releasees").

7.42   Thus, whatever right is here being asserted by the Respondent for its cross-claim alleging environmental damage, it is a right belonging only to these individual plaintiffs alleging personal harm. It is not a right belonging to the Respondent. If it were otherwise, the Respondent's cross-claim could only be a diffuse claim. However, the Respondent cannot assert a diffuse claim against Chevron (or TexPet) without the Respondent violating the effect of the 1995 Settlement Agreement, as decided by this Tribunal. There is therefore no safe passage for the Respondent's cross-claim between Scylla and Charybdis.

7.43    In the circumstances, the Tribunal does not consider that the Respondent's cross-claim impugns its jurisdiction (or, as regards admissibility, the exercise of its jurisdiction) to decide other issues between the Claimants and the Respondent in this arbitration.

7.44   Conversely, the Tribunal has jurisdiction over the Respondent's cross-claim; and, in the exercise of such jurisdiction, it decides that the Respondent has no standing or right to bring such a cross-claim. Moreover, in a case (such as this) where the claimant's alleged liability to a cross-claim would result from a court judgment impugned by the claimant, the Tribunal considers that the respondent cannot rely upon

---

[29] First Partial Award, para 112(3), (see Annex 1 to Part I above).

Case 1:11-cv-00691-LAK-JCF Document 2082-1 Filed 09/14/18 Page 433 of 522
Case 1:11-cv-00691-LAK-JCF Document 96-03/11/2012-1-25462689 Page 167 of 308

SA754

that judgment to shift the legal burden of proof to the claimant; and that, in this case, the Respondent has not discharged its legal burden of proving its cross-claim.

7.45    Nonetheless, as the Respondent's Counsel rightly submitted at the Track II Hearing, the individual Aguinda and Lago Agrio Plaintiffs are "real plaintiffs" with "real claims."[30] For the avoidance of any doubt, the Tribunal re-confirms that it has no jurisdiction under the Treaty to decide upon the merits of these individual plaintiffs' claims for personal harm against Chevron (not being diffuse claims).

### D: Issues as to Jurisdiction and Admissibility

7.46    *(1) Introduction:* As already indicated, TexPet was not a named party to the Lago Agrio Litigation. Its position is therefore different from Chevron as the sole named defendant in the Lago Agrio Litigation. It is necessary to consider their respective positions separately, as partly decided in the Tribunal's Third Interim Award (see this Part VII's "Introduction" above).

7.47    It is also necessary to address separately: (i) the Claimants' claims for denial of justice under the FET standard in Article II(3)(a) of the Treaty; and (ii) the Claimants' claims as "Releasees" in the 1995 Settlement Agreement under the Umbrella Clause in Article II(3)(c) of the Treaty.

7.48    *(2) The Third Interim Award*: As decided in the Tribunal's Third Interim Award,[31] TexPet's "investment" qualifies as to jurisdiction, admissibility and protection under Articles I(1)(a)(iii), I(1)(a)(v), II(3)(a), II(3)(c), VI(1)(a) and VI(1)(c) of the Treaty.[32]

7.49    However, the Tribunal there decided that the 1995 Settlement Agreement (to which TexPet was a party and signatory) was not, by itself, an "investment" made by TexPet under the Treaty.[33] Nevertheless, as regards TexPet, the Tribunal decided that the 1995 Settlement Agreement must be treated as "a continuation" of the earlier 1964 and 1973 Concession Agreements, so that the 1995 Settlement Agreement formed part of

---

[30] Track II Hearing D13.3033.
[31] The Tribunal understands that the Respondent's legal proceedings in the Netherlands challenging the Third Interim Award (as with other Awards) remain pending before the Hoge Raad: see the Claimants' letter dated 19 March 2018, p. 2 and the Respondent's letter dated 20 April 2018, p. 2. In addition, the Respondent has requested the Tribunal to re-consider its Third Interim Award, a procedure to be completed in Track III of this arbitration: see R-TI Mar. 2014, paras 134-138 and the Respondent's letter dated 20 April 2018, p. 6, fn 15. For present purposes, the Tribunal takes no account of these pending proceedings and request.
[32] Third Interim Award, paras 4.20 & 4.36.
[33] Third Interim Award, para 4.20.

# SA755

TexPet's "overall investment agreement" with Ecuador invoked under Article VI(1)(a) of the Treaty.[34]

7.50    In the First Partial Award, the Tribunal decided that Chevron was a "co-Releasee" under the 1995 Settlement Agreement, although it was not a signatory or named party to the 1995 Settlement Agreement.[35] In the Third Interim Award, the Tribunal also decided that Chevron was not a "direct" investor by reference to TexPet's Concession Agreements of 1964 and 1973: it was never a member of the Consortium; it was not an "Operator"; and it only appeared in the chronology of this case in 2001 following its "merger" with Texaco, long after the departure from Ecuador of TexPet and Texaco, in 1992.[36] Hence, unlike TexPet, Chevron had no "direct overall investment" in Ecuador continuing from the 1964 Concession Agreement; and the 1995 Settlement Agreement, by itself, could not under the Treaty become in 2001 a "direct" investment by Chevron in Ecuador.[37]

7.51    Therefore, although both Chevron and TexPet were and remain "co-Releasees" under the 1995 Settlement Agreement (with Texaco), Chevron is not in the same position as TexPet as an investor with a "direct" investment in Ecuador under the Treaty.

7.52    For these reasons, as recited below, the Tribunal did not make in the Third Interim Award any final decision upon the Respondent's jurisdictional objections to Chevron's claims with respect to any alleged "direct" investment by Chevron under Articles I(1)(a), VI(1)(a) and VI(1)(c) of the Treaty, as distinct from Chevron's "indirect investment" in TexPet, as TexPet's ultimate parent company following Chevron's "merger" with Texaco in 2001, under Articles I(1)(a) and VI(1)(c) of the Treaty.[38]

7.53    Thus, in its Third Interim Award, the Tribunal drew a distinction between Chevron's "direct" and "indirect" investments. As to Articles I(1)(a) and VI(1)(c) of the Treaty, the Tribunal decided (inter alia) as follows:[39]

> "4.24 In the Tribunal's view, as TexPet's parent company, Chevron is a covered investor under Article I(1)(a) of the BIT because it indirectly owns or controls an

---

[34] Third Interim Award, paras 4.32-4.35.
[35] First Partial Award, para 112(1).
[36] Third Interim Award, para 4.22.
[37] Third Interim Award, para 4.23.
[38] Third Interim Award, paras 4.27, 4.96 & 5.4.
[39] Third Interim Award, paras 4.24-4.27.

# SA756

*'investment' in Ecuador. It is not disputed that Chevron is a company 'of the other Party' formed in the USA; and Article I(1)(a) does not require its indirect investment (i.e. in TexPet and its investment) to be a company formed in Ecuador. Accordingly, the Tribunal decides, as a matter of jurisdiction, that Chevron can bring its claims before this Tribunal for an alleged breach of any right conferred or created by the BIT with respect to its indirect 'investment' in TexPet.*

*4.25 A different issue arises from Chevron's exposure to the liability to the plaintiffs in the Lago Agrio Litigation. Chevron became TexPet's parent and thus an investor in 2001 only, long after the events said to give rise to Chevron's liability and occurring at a time when Texaco (not Chevron) was TexPet's parent company. Notwithstanding their ostensibly distinct legal personalities and corporate histories, the Lago Agrio Litigation appears completely to amalgamate Chevron with Texaco (for legal reasons which remain unclear to the Tribunal). In that event, Chevron here submits for jurisdictional purposes that it should be treated by this Tribunal as, effectively, standing in the shoes of Texaco, as TexPet's parent company from 1964 onwards, with the same original investment indirectly made and continued by Texaco. Otherwise, so Chevron submits, the Respondent and the Lago Agrio plaintiffs could succeed unfairly in "having it both ways", with Chevron liable in the Lago Agrio litigation because of the concession/investment made by Texaco & TexPet but with Chevron not entitled in this arbitration to assert any relief because it had in fact no such investment/concession at the material time, i.e. before 2001.*

*4.26 The Tribunal declines to cut this Gordian knot at this early stage of these arbitration proceedings: it will need a much better understanding of the legal reasons why Chevron is to be treated in the Lago Agrio Litigation as a party succeeding to Texaco's liabilities which arose before the "merger" in 2001; and it will also need a clearer understanding of what constituted such "merger" as regards the different and successive legal relationships between Texaco, TexPet and Chevron before and after such "merger", under whatever applicable law or laws, namely the laws of the USA and/or Ecuadorian law.*

*4.27 Accordingly, for the time being, the Tribunal makes no final decision in regard to the Respondent's jurisdictional objection to Chevron's own claims as a direct investor under Article VI(1)(c) of the BIT, save to join that particular objection to the merits under Article 21(4) of the UNCITRAL Arbitration Rules. In addition, the Tribunal's jurisdictional decision to treat Chevron as an indirect investor should not be understood as indicating (one way or the other) that Chevron would be entitled to all the relief claimed by Chevron in paragraph 547 of the Claimants' Memorial on the Merits (cited in Part I above). That is also a matter for the merits phase of this arbitration."*

# SA757

7.54    As to Article VI(1)(a) of the Treaty, the Tribunal also decided in the Third Interim Award to join that jurisdictional issue to the merits under Article 21(4) of the UNCITRAL Arbitration Rules. [40]

7.55    The Operative Part of this Third Interim Award, at Paragraph 5.4, provided as regards Chevron:[41]

> *"As regards the claims pleaded by the First Claimant (Chevron Corporation or 'Chevron') in the Claimants' said Notice of Arbitration, [the Tribunal here decides] to reject all objections made by the Respondent as to jurisdiction and admissibility in its said memorials and further submissions, save those relating to the jurisdictional objections raised against the First Claimant as a[n] investor under Article I(1)(a) alleging a "direct" investment under Article VI(1)(c) and an "investment agreement" under Article VI(1)(a) of the Ecuador–USA Treaty of 27 August 1993 which are joined to the merits of the First Claimants' claims under Article 21(4) of the UNCITRAL Arbitration Rules forming part of the Parties' arbitration agreement under the Treaty."*

7.56    Accordingly, in summary, the Tribunal there joined to the merits the Respondent's jurisdictional objections to Chevron as an investor with a "direct" investment. The Parties subsequently agreed, and the Tribunal so ordered, that the Respondent's objections should be further addressed by the Parties and decided by the Tribunal in Track II of this arbitration.

7.57    For present purposes, therefore, the issue arises as to whether Chevron has any relevant "investment", "investment agreement" or "investment dispute" under Articles I(1)(a), VI(1)(a) and VI(1)(c) of the Treaty, permitting this Tribunal to decide Chevron's claims as a national of the USA under the FET standard in Article II(3)(a) of the Treaty (including protection against denial of justice) or under the Umbrella Clause in Article II(3)(c) of the Treaty.

7.58    *(3) The Respondent's Case:* In brief,[42] the Respondent maintains several objections to the Tribunal's jurisdiction (including, as to admissibility, its exercise of jurisdiction) to decide Chevron's claims under Articles II(3)(a) and (c) of the Treaty.

7.59    These objections concern Chevron's alleged lack of any "direct" investment in Ecuador under Articles I(1)(a), VI(1)(a) and VI(1)(c) of the Treaty; Chevron's limited

---

[40] Third Interim Award, para 4.53.
[41] Third Interim Award, para 5.4 (see also Annex 1 to Part I above).
[42] R-TII Mar. 2015, Sections II & III; see also the Third Interim Award, Parts 3(C) and 3(E).

# SA758

interest as a "Releasee" under the 1995 Settlement Agreement; Chevron's several failures to exhaust its local remedies within the Ecuadorian legal system regarding the Lago Agrio Judgment, as required for denial of justice under Article II(3)(a) of the Treaty; and (as also raised by the Tribunal) Chevron's amendment to its claims (with TexPet) for denial of justice regarding the Lago Agrio Judgment, pleaded after the commencement of this arbitration.[43]

7.60    *(4) The Claimant's Case*: In brief,[44] the Claimants contend that the Tribunal has both jurisdiction to decide and (as to admissibility) may exercise such jurisdiction to decide Chevron's claims under Articles I(1)(a), VI(1)(a), VI(1)(c), II(3)(a) and II(3)(c) of the Treaty, on several grounds.

7.61    Chevron asserts (inter alia) that its indirect investment in TexPet is a sufficient "investment" to confer jurisdiction upon this Tribunal under the Treaty to decide its claims. Further, so Chevron contends, the Respondent should not be permitted to treat it (Chevron) differently from Texaco and TexPet under the Treaty, given the terms of the Lago Agrio Judgment merging their respective identities.[45] As regards the exhaustion of local remedies, Chevron contends that the requirement under international law is not absolute for a claim for denial of justice; and that it reasonably availed itself of such remedies as ostensibly existed within the Ecuadorian legal system; but none offered at the time any reasonable, timely and effective prospect of success against the Lago Agrio Judgment. As for the amendment to its case to plead claims in regard to the Lago Agrio Judgment, Chevron contends that such amendments were permissible under Article 20 of the UNCITRAL Arbitration Rules, forming part of the Parties' Arbitration Agreement derived from the Treaty.

### E: The Tribunal's Analysis as to Jurisdiction and Admissibility

7.62    *(1) Introduction:* It is appropriate to address separately the three parts of the Respondent's objections to jurisdiction (with admissibility); namely: (i) Chevron's lack of any relevant "investment" under Articles I(1), II(3)(a), II(3)(c), VI(1)(a) and VI(1)(c) of the Treaty; (ii) Chevron's alleged failure to exhaust local remedies in the Ecuadorian legal system for its claims regarding denial of justice in the Lago Agrio

---

[43] See R-TII Mar. 2015, para 5 (whilst this pleading may not expressly take the point, the Tribunal thinks it right to so interpret it, as also to raise the point upon its own initiative: see below).
[44] C-TII Jan. 2015, Section II; see also the Third Interim Award, Parts 3(D) and 3(F).
[45] See Track II Hearing D1.165.

# SA759

Litigation under the FET standard in Article II(3)(a) of the Treaty; and (as also raised by the Tribunal) (iii) the status of the Claimants' amended claims regarding the Lago Agrio Judgment under the UNCITRAL Arbitration Rules, the Treaty and Dutch law.

7.63   *(2) Chevron:* The Tribunal decides, confirming its Third Interim Award, that Chevron cannot establish jurisdiction for its claims under Articles II(3)(a) or II(3)(c) of the Treaty by reference only to its own status as a "Releasee" under the 1995 Settlement Agreement. The Tribunal there decided that, by itself, the 1995 Settlement Agreement is not a direct "investment" in Ecuador made by Chevron under Article I(1)(a) of the Treaty.

7.64   The Tribunal therefore decides that Chevron cannot establish jurisdiction for its claims under Article VI(1)(a) of the Treaty, based only on its own status as a "Releasee" under the 1995 Settlement Agreement. That provision requires the existence of an investment dispute "between a Party [i.e. the Respondent] and a national or company of the other Party [i.e., here, Chevron] arising out of or relating to (a) an investment agreement made between that Party and such national or company" (see the full wording set out in Section B of this Part VI above). Whilst there is, in the Tribunal's view, a dispute between Chevron and the Respondent arising out of or relating to the 1995 Settlement Agreement, the 1995 Settlement Agreement is not an "investment agreement" made by Chevron itself.

7.65   The Tribunal therefore turns to the interpretation and application of Article VI(1)(c) of the Treaty, regarding a dispute arising out of or relating to "an alleged breach of any right conferred or created by this Treaty with respect to an investment."

7.66   The Tribunal notes that Article 1(1)(a) of the Treaty defines "investment", but not "investor"; and that the protection afforded under Article II(3)(a) and (c) of the Treaty similarly addresses "investments", as does Article VI of the Treaty in regard to an "investment dispute" and "investment". The Preamble to the Treaty also records that it is "a treaty concerning the encouragement and reciprocal protection of investments."

7.67   The Tribunal has decided that Chevron had no investment under the Treaty before its "merger" with Texaco in 2001 (whether direct or indirect). However, with this "merger", Chevron acquired an interest in the investments made in Ecuador by TexPet and Texaco since 1964, including (as integral parts of their overall investments) the

# SA760

1964 Concession, the 1973 Concession and the 1995 Settlement Agreement. In about 2001, as contended by the Respondent, Chevron also became a party (with Texaco) to Texaco's earlier undertaking to the US Courts in favour of Ecuadorian jurisdiction contained in Texaco's Notice of Agreement of 11 January 1999 in the Aguinda Litigation, leading to the Lago Agrio Litigation.[46] In any event, Chevron became the sole named defendant in the Lago Agrio Litigation, leading in turn to the Lago Agrio Judgment.

7.68   There is no issue between the Parties that Chevron is a 'company' of the USA as a Party to the Treaty, within the meaning of Articles I(1)(a) and VI(1)(c) of the Treaty.

7.69   In the Tribunal's view, the meaning of the term "investment" in Articles I(1)(a) and VI(1)(c) of the Treaty is materially different than the term "investor". An "investment" identifies the subject-matter protected by the Treaty, as distinct from the person making that "investment". As a factual matter, Chevron never was a party making its own "direct" investment as an investor separate and distinct from the investments of Texaco and TexPet. Assessed as at 2001, however, Chevron acquired an "indirect" interest in TexPet's investments in Ecuador, satisfying (as regards Chevron) the definition of "investment" in Article I(1)(a) and Article VI(1)(c) of the Treaty, as applied to "investments" in Articles II(3)(a) and II(3)(c) and also to an "investment dispute" as defined Article VI(1) of the Treaty.

7.70   Accordingly, in the Tribunal's view, the dispute between Chevron and the Respondent is an investment dispute "arising out of or related to … (c) an alleged breach of any right conferred or created by this Treaty with respect to an investment" [namely Articles II(3)(a) and II(3)(c) of the Treaty]. As already decided by the Tribunal, the phrase "relating to" is very broad in scope;[47] and the definition of "investment" in Article 1(a) is equally broad, encompassing "every kind of investment [in Ecuador] …. owned or controlled directly or indirectly" by a claimant company.

7.71   The Tribunal decides, therefore, that Chevron acquired a relevant "investment" in Ecuador under the Treaty sufficient to entitle it to invoke this Tribunal's jurisdiction to decide its claims under Articles II(3)(a) and II(3)(c) of the Treaty. Such an investment

---

[46] The Respondent relies upon the US Court of Appeals for the Second Circuit in its judgment of 17 March 2011, deciding that Chevron is bound by Texaco's undertaking of 1999: see Part IV(G)(1) above.

[47] Third Interim Award, para 4.15.

## SA761

is not required by the Treaty to be a "direct" investment, still less an "investment agreement" made by Chevron itself.

7.72    *(3) TexPet:* TexPet can assert in this arbitration its own rights under the Treaty in regard to its direct investments, including TexPet's own rights as a "Releasee" under the 1995 Settlement Agreement (forming an intrinsic part of TexPet's overall "investment" from 1964 onwards) under Articles II(3)(a) and II(3)(c) of the Treaty.

7.73    The Third Interim Award decided, as regards TexPet:[48]

> *"4.20 As a co-claimant in this arbitration, the Tribunal therefore decides that TexPet has standing (as a matter of jurisdiction) to seek its claimed declaratory, specific performance, moral damages and other relief against the Respondent, even though TexPet is not a defendant in the Lago Agro Litigation (or a defendant in the criminal proceedings). As an investor with a covered investment and as a contractual party to the 1995 Settlement Agreement with the Respondent, TexPet enjoys valuable economic rights for itself; and its claimed relief can thus include relief advanced under Articles I(1)(a)(v), Article II(3)(c), Article I(1)(a)(iii) and Article VI(1)(c) of the BIT."*

7.74    In the Tribunal's view, therefore, TexPet made a relevant investment under the Treaty sufficient to invoke this Tribunal's jurisdiction to decide its claims under the Treaty. Such an investment was a direct investment made by TexPet itself from 1964 onwards, in contrast to Chevron.

7.75    For two reasons, in the Tribunal's view, it would be no answer that TexPet has itself suffered no "damage" from the Lago Agrio Judgment, not being a named party to the Lago Agrio Litigation. First, damage is not required for an international wrong under Articles II(3)(a) and II(3)(c) of the Treaty: see Article 31 of the ILC Articles on State Responsibility.[49] It suffices that TexPet with its "investment" has suffered an "injury". Such an injury was allegedly caused (inter alia) by the Respondent's international wrong committed by the Lago Agrio Court (as part of the Respondent's judicial branch) with the Lago Agrio Judgment, in violation of TexPet's release by the Respondent from any diffuse claims under the 1995 Settlement Agreement. That wrong was allegedly repeated and maintained by the judgments of the Lago Agrio Appellate, Cassation and Constitutional Courts in upholding the Lago Agrio Judgment

---

[48] Third Interim Award, para 4.20.
[49] Crawford, *The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries* (2002), for the commentary on Article 31, at para 6 (p. 203), CLA-288.

# SA762

and by the Lago Agrio Appellate Court in rendering enforceable and maintaining the enforceability of the Lago Agrio Judgment.

7.76 Second, as alleged by the Claimants, TexPet has in any event suffered damage from the Lago Agrio Litigation and Lago Agrio Judgment. TexPet, albeit not a named defendant, was held publicly responsible in the Lago Agrio Judgment, with Chevron, for extensive environmental damage from 1964 onwards in the area of the concession. Consequentially, the Lago Agrio Judgment was successfully enforced against TexPet's assets in Ecuador, by the Lago Agrio Court's execution order of 15 October 2012.[50]

7.77 Under that order, the Court ordered, under paragraph (c), the attachment of "all the funds deposited and existing in Banco Pichincha Checking Account No 30452125-04, as well as any other bank account, investment or fund owned by … Texaco Petroleum Company, Texpet …" and, under paragraph (f), "… the total amount of (US$ 96,355,369) of the award against the Government of Ecuador in the arbitration proceedings brought by Chevron and Texaco [i.e. TexPet] with the Republic of Ecuador, publicly known as the 'Chevron Case II' [i.e. the Commercial Cases Arbitration]". The Lago Agrio Court ordered this attachment of the award debt payable to TexPet (with Chevron) to be notified to the Respondent (as the award debtor), by order of 12 July 2016.[51]

7.78 Subject to other issues addressed later below, the Tribunal decides, therefore, that Chevron acquired a relevant "investment" under the Treaty sufficient to invoke this Tribunal's jurisdiction to decide its claims under the FET standard in Article II(3)(a) of the Treaty (including its protection against denial of justice) and under the Umbrella Clause in Article II(3)(c) of the Treaty. Such an investment comprised Chevron's indirect interest, as from the date of the "merger" in 2001, in TexPet's "overall" investments from 1964 onwards (including the 1995 Settlement Agreement).

7.79 *(4) Good Faith:* There is a third approach invoked by Chevron, somewhat more teleological, to address the Respondent's jurisdictional objections to Chevron's claims

---

[50] C-1532. This asset comprised the modest sum of US$ 358.00: see the Claimants' letter dated 19 March 2018, p. 7 and the Respondent's letter dated 20 April 2018, p. 4.
[51] The award debt was not recovered by the Lago Agrio Plaintiffs, owing (*inter alia*) to the settlement of the award debt made by the Respondent directly to Chevron and TexPet on 22 July 2016: see the Claimants' letter dated 19 March 2018, p. 8.

# SA763

for lack of any relevant "investment" under Articles I(1), VI(1)(a), VI(1)(c), II(3)(a) and III(3)(c) of the Treaty.

7.80    As the Claimants contend, the Respondent cannot, in good faith, 'have it both ways' as regards Chevron's "investment" in Ecuador. If the Respondent, through its judicial branch, took the position that Chevron had assets in Ecuador, standing in the shoes of TexPet and Texaco as the Lago Agrio Judgment states, the Respondent cannot now adopt the position that Chevron never had any assets in Ecuador, i.e. that it never had any investments in Ecuador. The Lago Agrio Judgment amalgamates completely Chevron with TexPet and Texaco as result of the "merger", so as to hold Chevron liable for all wrongs committed by TexPet's and Texaco's activities in Ecuador from 1964 onwards. Yet the Respondent in this arbitration now seeks, improperly according to the Claimants, to disassociate Chevron in full from any of TexPet's and Texaco's activities in Ecuador (including investments), for tactical jurisdictional purposes.

7.81    The Claimants therefore conclude that the Tribunal has jurisdiction over Chevron's claims under Article VI(1)(a) and (c) of the Treaty "because Chevron is entitled to all procedural and substantive legal rights and defences of TexPet, as a result of having been sued for TexPet's conduct as well as by reason of the [Lago Agrio] Court's improper amalgamation of Chevron with Texaco and TexPet."[52]

7.82    It is necessary to examine more closely the legal principles underlying the Claimants' submissions based upon on these apparent inconsistencies between the Lago Agrio Judgment (as also decided by the Lago Agrio Appellate, Cassation and Constitutional Courts) and the Respondent's jurisdictional objections in this arbitration. These inconsistencies and their legal effects are not accepted by the Respondent.

7.83    The Parties' obligations to resolve their dispute by consensual arbitration before an international tribunal derive from Article VI of the Treaty, subject to international law (as its applicable law). Under international law, as codified in Article 26 the Vienna Treaty on the Law of Treaties (the "VCLT"), parties are required to act in good faith in the performance of their obligations.

---

[52] C-TII Jan. 2015, para 31; see also *id.*, paras 275ff.

# SA764

7.84 Article 26 of the VCLT provides:[53] "Every treaty in force is binding upon the parties to it and must be performed in good faith". The International Law Commission stated in its commentary to the VCLT that: "In the case of treaties, … there is the special consideration that the parties by negotiating and concluding the treaty have brought themselves into a relationship in which there are particular obligations of good faith."[54] In *Nuclear Tests* (1974), the International Court of Justice decided: "One of the basic principles governing the creation and performance of legal obligations, whatever their source, is the principle of good faith".[55] That was decided in regard to unilateral declarations made by a State. In the ILC's subsequent "Guiding Principles applicable to unilateral declarations of States capable of creating legal obligations" (2006), the first guiding principle declared that the binding character of such unilateral declarations "is based on good faith."[56]

7.85 The Parties' mutual consent to arbitration derived from Article VI of the Treaty is not, course, a treaty between two States. The Parties' consent is contained in the separate Arbitration Agreement subject to international law between the Claimants and the Respondent, that was formed upon the Claimants' written acceptance (by their Notice of Arbitration) of the Respondent's standing, general offer to arbitrate contained in Article VI of the Treaty.[57] Under international law, the Parties' Arbitration Agreement, made pursuant to Article VI(2) of the Treaty, is legally autonomous, or "separable", from other provisions of the Treaty.[58] This is not a State-State arbitration under the Treaty (as to which the Treaty contains a separate provision in Article VII). This investor-State arbitration was therefore commenced by the Claimants in their own right, not deriving from the USA's espousal of their claims. Moreover, the Parties' Arbitration Agreement incorporates Article 21(2) of the UNCITRAL

---

[53] United Nations Conference on the Law of Treaties, *Vienna Convention on the Law of Treaties*, 23 May 1969, UN Doc. A/CONF.39/11/Add.2; 1155 UNTS 331, 8 ILM 679 (1969), CLA-10.

[54] International Law Commission, *Draft Articles on the Law of Treaties, with commentaries* (1966) II (Part Two) Yearbook of the ILC 187, p. 262.

[55] *Nuclear Tests (Australia v. France)*, ICJ, Judgment, 20 December 1974, 1974 ICJ Reports 253, para 46.

[56] International Law Commission, *Guiding Principles applicable to unilateral declarations of States capable of creating legal obligations, with commentaries thereto* (2006) II (Part Two) Yearbook of the ILC 161, p. 370.

[57] Z. Douglas, "The Hybrid Nature of Investment Treaty Arbitration" (2003) 74 British Yearbook of International Law 152, CLA-177. See also *Lanco International Inc. v. Argentine Republic*, ICSID Case No. ARB/97/6, Preliminary Decision on Jurisdiction, 8 December 1998, pp. 467-468, CLA-176.

[58] S. Schwebel, *International Arbitration: Three Salient Problems* (1987), "Part 1: The Severability of the Arbitration Agreement", p. 60ss. See also *Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Decision on Jurisdiction, 8 February 2005, para 212, CLA-67, RLA-350; *Concurring and Dissenting Opinions of Howard M. Holtzmann with respect to Interlocutory Awards on Jurisdiction in Nine Cases Containing Various Forum Selection Clauses (Cases Nos. 6, 51, 68, 121, 140, 159, 254, 293 and 466)*, 5 November 1982, 1 Iran-US Claims Tribunal Reports 284, p. 292.

# SA765

Arbitration Rules, which recognises the legal autonomy of an arbitration provision physically, but not legally, contained in a substantive agreement. The Tribunal refers to the legal analysis of Article VI of the Treaty made by the US Court of Appeals for the Second Circuit in its judgment of 17 March 2011 in the New York Stay Legal Proceedings, to the effect that the Parties "have created a separate binding agreement to arbitrate" (see Part IV(G)(6) above).

7.86    In the Tribunal's view, the Parties' offer and acceptance imported into the Arbitration Agreement an obligation derived from the Treaty requiring all Parties to exercise their rights and to perform their obligations in good faith in the conduct of this arbitration. This obligation of good faith applies both to substantive provisions, such as Articles II(3)(a) and II(3)(c), but also to Article VI of the Treaty. Conversely, the Arbitration Agreement precludes conduct by any Party in bad faith, calculated to defeat the object and purpose of arbitration under Article VI of the Treaty: see, particularly, the Treaty's Preamble as to "fair and equitable treatment of investment" (set out in Part III(B) above), as interpreted under Article 31(1) of the VCLT. Moreover, where the lex arbitri is international law, the obligation of good faith as a general principle of international law (with the meaning of Article 38(1)(c) of the ICJ Statute) applies to the Arbitration Agreement directly.

7.87    The general principle of good faith has a long history in regard to the conduct of dispute resolution, including arbitrations under international law, albeit under different nomenclatures. It has recently been confirmed by the ICSID award in *Orascom v Algeria* (2017),[59] where the arbitration tribunal stated that it was "undeniable" that the doctrine of abuse of rights, or "abus de procédure", has a role to play in the conduct of an arbitration under a bilateral investment treaty, prohibiting the exercise of a "right" for purposes other than those for which that right was established; and that this doctrine was a general principle applicable in international law as well as in municipal law. In the Tribunal's view, such an abuse of rights includes an abusive want of good faith in the exercise of a procedural right, such as an objection to the jurisdiction of a tribunal under Article 21 of the UNCITRAL Arbitration Rules derived from Article VI of the Treaty.

---

[59] *Orascom TMT Investments S.à r.l. v. People's Democratic Republic of Algeria*, ICSID Case No. ARB/12/35, Award, 31 May 2017, paras 540, 541 & 547.

# SA766

7.88    For present purposes, it is necessary to examine a specific want of good faith. Long before the VCLT, Lord McNair wrote, in his commentary on the *Fur Seal Arbitration*:[60] "… international jurisprudence has a place for some recognition of the principle that a State cannot blow hot and cold – *allegans contraria non audiendus est*."[61] Dr Bin Cheng later wrote in his well-known work, *General Principles of Law as Applied by International Courts and Tribunals*, under the similar heading "*Allegans Contraria Non Est Audiendum*":[62] "It is a principle of good faith that "a man shall not be allowed to blow hot and cold – to affirm at one time and deny at another … Such a principle has its basis in common sense and common justice, and whether it is called 'estoppel' or by any other name, it is one which courts of law in modern times most usefully deployed."

7.89    As these scholarly authors considered, an important feature of good faith under international law is the principle expressed in the Latin maxim *allegans contraria non est audiendum*, or sometimes, loosely adopting Anglo-Saxon legal terminology, "estoppel". Professor Hersch Lauterpacht considered that estoppel under international law was based upon a general principle of good faith: "It is of little consequence whether the rule is based on what in English law is known as the principle of estoppel or the more generally conceived requirement of good faith. The former is probably no more than one of the aspects of the latter."[63] Professor Bowett also wrote: "The rule of estoppel, whether treated as a rule of evidence or as a rule of substantive law, operates so as to preclude a party from denying before a tribunal the truth of a statement of fact made previously by that party to another whereby that other has acted to his detriment or the party making the statement has secured some benefit. The basis of the rule is the general principle of good faith and as such finds a place in many systems of law."[64]

---

[60] *Award between the United States and the United Kingdom relating to the rights of jurisdiction of the United States in the Bering's sea and the preservation of fur seals,* Ad hoc, Award, 15 August 1893, XXVIII RIAA 263 reprinted from J.B. Moore, *History and Digest of the International Arbitrations to Which the United States has been a Party*, vol. I, (1898), p. 935.
[61] A. McNair, "The Legality of the Occupation of the Ruhr" (1924) 5 British Yearbook of International Law 17, p. 35.
[62] B. Cheng, *General Principles of Law, as Applied by International Courts and Tribunals* (1953, reprinted 1987), pp. 141-149, CLA-108.
[63] International Law Commission, *Law of Treaties, Report by Mr H. Lauterpacht, Special Rapporteur*, UN Doc A/CN.4/63, (1953) II Yearbook of the ILC 90, p. 166, cited by I. MacGibbon, "Estoppel in International Law" (1958) 7 International and Comparative Law Quarterly 468, p. 471, CLA-107.
[64] D. Bowett, "Estoppel before International Tribunals and its Relation to Acquiescence" (1957) 33 British Yearbook of International Law 176, p. 176, CLA-179.

# SA767

7.90    In his work (*supra*), Dr Bin Cheng also wrote (with footnotes here omitted):[65]

> "The principle [of good faith] applies equally, though perhaps not with the same
> force, to other admissions of a State which do not give rise to an equitable
> estoppel. Thus it has been held that a State cannot be heard to repudiate liability
> for a collision after its authorities on the spot had at the time admitted liability
> and sought throughout to make the most advantageous arrangements for the
> Government under the circumstances. Again, if a State, having been fully
> informed of the circumstances, has accepted a person's claim to the ownership of
> certain property and entered into negotiation with him for its purchase, it
> becomes 'very difficult, if not impossible' for that State subsequently to allege that
> he had no title at the time. If a State, which is the lessee of a property owned by
> two joint owners, has, after the death of one of them, paid the entire rent to the
> other, who claims to have become the sole owner, 'this act can not be interpreted
> otherwise than as a recognition by the authorities of the fact that the right of
> ownership of Hassar [the deceased] has passed to Raini [the claimant].' Where a
> party negotiates for the sublease of a concession granted by a State, it thereby
> recognises the validity of the concession and the right of the State to grant it ..."

7.91    Dr MacGibbon, in "Estoppel in International Law" (1958),[66] wrote that, underlying

       most formulations of the doctrine of estoppel in international law, is "the requirement

       that a State ought to be consistent in its attitude to a given factual or legal situation;"

       and that it "may be, and often is, grounded on considerations of good faith". He

       concluded his historical survey of legal materials, as follows:

> "What appears to be the common denominator of the various aspects of estoppel
> which have been discussed, is the requirement that a State ought to maintain
> towards a given factual or legal situation an attitude consistent with that which it
> was known to have adopted with regard to the same circumstances on previous
> occasions. At its simplest, estoppel in international law reflects the possible
> variations, in circumstances and effects, of the underlying principle of consistency
> which may be summed up in the maxim allegans contraria non audiendus est. ...".

7.92    In its Memorial on Jurisdiction Objections of 26 July 2010,[67] the Respondent cited the

       Decision of the German-Poland mixed arbitration tribunal ("T.A.M.") in *Kunkel v*

---

[65] B. Cheng, *General Principles of Law, as Applied by International Courts and Tribunals* (1953, reprinted
1987), pp. 144-145, CLA-108.

[66] I. MacGibbon, "Estoppel in International Law" (1958) 7 International and Comparative Law Quarterly 468, p.
45, CLA-107.

[67] R-Jur. July 2010, para 167, fn 250. The *Kunkel* case was also cited by the Respondent in the *Commercial
Cases* Arbitration: see *Chevron Corporation and Texaco Petroleum Corporation v. Republic of Ecuador*, PCA
Case No. 2007-02/AA277, UNCITRAL, Interim Award, 1 December 2008, paras 125-131, CLA-1. The tribunal
there joined the issue of good faith to the merits where, so it appears, it did not prevail on the facts found by the
tribunal. (The *Kunkel* case had been cited earlier in the Iran-USA Claims Tribunal's award of 29 June 1989 in
*Phillips Petroleum Co. Iran v. Islamic Republic of Iran and National Iranian Oil Company*, IUSCT Case No. 39,
Award No. 425-39-2, 29 June 1989, p. 108, fn 39, RLA-71, as barring "a party's contradictory and self-serving
jurisdictional statements". Professor Bowett QC had there acted as Counsel for the respondents).

# SA768

*Poland* (1926) regarding the inconsistent conduct of the respondent State (Poland) in that mixed arbitration.[68] Professor Bowett relied upon this Decision in his 1957 article, "Estoppel before International Tribunals and Its Relation to Acquiescence".[69] As explained below, the Decision is not a case on "estoppel".[70]

7.93    As reported, the relevant facts were as follows: Under the Treaty of Versailles, Poland had the right to liquidate the property of German nationals situated within its territory. However, the Treaty also provided that former nationals of Germany, who by virtue of the Treaty had acquired Polish nationality, were not to be regarded as German nationals.[71] Poland proceeded to liquidate the property of the claimants as German nationals. These claimants contended that they had acquired Polish nationality and that their property was, therefore, not liable to such liquidation. The tribunal decided that it had no jurisdiction to decide claims put forward against Poland by Polish nationals. Hence, the tribunal rejected the claimants' claims pleaded as Polish nationals. However, the tribunal also decided that it was open to the claimants to amend their claims on the basis that they were German nationals (within the same arbitration proceedings). Having liquidated their estates on the ground that they were German nationals, Poland could not deny their German nationality in the arbitration, it being required by the Versailles Treaty that a person who had suffered damage as a German national should not be deprived of legal remedies afforded by the Treaty to German nationals.

---

[68] *Kunkel et. al. v. Polish State*, German-Polish Mixed Arbitration Tribunal, Award, 2 December 1925, (1927) VI Recueil des Décisions des Tribunaux Arbitraux Mixtes 979, (1929) Annual Digest of Public International Law Cases 1925-1926 418, RLA-44. The Respondent cited this case on an issue different from the jurisdictional issue here under consideration.

[69] D. Bowett, "Estoppel before International Tribunals and its Relation to Acquiescence" (1957) 33 British Yearbook of International Law 176, p. 187, CLA-179.

[70] The edited summary of the *Kunkel* decision in the *Annual Digest* prepared in English by Hersch Lauterpacht uses the word "estopped"; but that word is not used as an English legal term of art, as appears from the original French text below, taken from the full report in the *Recueil.*

[71] *Treaty of Versailles (Treaty of Peace between the Allied and Associated Powers and Germany)*, 28 June 1919, UKTS 4 (1919), CMD 153, Chapter V, Property Rights and Interests, Section IV provides (with square brackets here added): *Article 297: "The question of private property, rights and interests in an enemy country shall be settled according to the principles laid down in this Section and to the provisions of the Annex hereto. ...*
*(b) [1] Subject to any contrary stipulations which may be provided for in the present Treaty, the Allied and Associated Powers reserve the right to retain and liquidate all property, rights and interests belonging at the date of the coming into force of the present Treaty to German nationals, or companies controlled by them, within their territories, colonies, possessions and protectorates including territories ceded to them by the present Treaty. [2] The liquidation shall be carried out in accordance with the laws of the Allied or Associated State concerned, and the German owners shall not be able to dispose of such property, rights or interests nor to subject them to any charge without the consent of that State. [3] German nationals who acquire ipso facto the nationality of an Allied or Associated Power in accordance with the provisions of the present Treaty will not be considered as German nationals within the meaning of this paragraph."*

## SA769

7.94    The Decision was issued in the French language only. The words "estoppel" and "estopped", albeit an Anglo-Saxon legal concept expressed in Norman-French, are not French words, still less French legal terms of art. The relevant passage in the Decision's authentic text in French, provides as follows:

> *"8. En résumé, le Tribunal doit se déclarer incompétent pour statuer sur les conclusions des requérants telles qu'elles ont été formulées et motivées. Il y a lieu toutefois de faire l'importante réserve suivante:*
>
> *Si les requérants renoncent à fonder leurs réclamations contre l'Etat polonais sur leur prétendue qualité de ressortissants polonais, s'ils se bornent à invoquer les droits assurés par le Traité aux ressortissants allemands liquidés, c'est-à-dire s'ils réclament l'indemnité supplémentaire prévue par l'art. 297. litt. h, et par l'art, 92, ch. 2, ou, éventuellement, s'ils contestent l'admissibilité de la liquidation pour un motif autre que leur ressortissance polonaise, les considérations développées ci-dessus cesseront d'être applicables. Le Tribunal n'aura pas à rechercher d'office si les requérants sont Allemands ou Polonais; il devra au point de, vue de sa compétence, les tenir pour Allemands puisque c'est en raison de cette qualité qu'ils ont été liquidés et que, d'autre part, la prétendue ressortissance polonaise ne constituera plus la base juridique de la réclamation. Et l'Etat polonais ne pourra naturellement pas exciper de la ressortissance polonaise des requérants pour décliner la compétence du Tribunal, puisqu'il les a traités comme Allemands et qu'ils ne revendiqueront pas autre chose que les droits garantis aux ressortissants allemands. La condition de nationalité allemande essentielle pour la compétence du T.A.M. sera donc, dans cette hypothèse, censée réalisée. Cette solution est conforme à la jurisprudence des T.A.M. (Cf. Recueil, t. III, p. 1017-1018 et p. 606) et elle se justifie par des raisons d'équité évidentes: celui qui a subi un dommage en sa qualité d'Allemand doit pouvoir bénéficier des droits attachés à cette qualité, notamment de celui de saisir le T.A.M. .*
>
> *Strictement, les nouvelles conclusions ainsi réservées devraient faire l'objet de nouvelles requêtes, puisque leur fondement juridique différera de celui des conclusions actuelles. Cependant, dans un but de simplification, on peut autoriser les requérants à procéder, dans les deux mois, par le dépôt de mémoires qui seront joints aux dossiers déjà constitués et auxquels l'Etat défendeur aura un délai de deux mois pour répondre, l'échange d'écritures étant ensuite terminé. Ce n'est que si les conclusions en question ne peuvent être prises utilement dans le délai indiqué (par exemple parce que la liquidation ne serait pas encore achevée) que les requérants devront déposer de nouvelles requêtes."*

7.95    Whilst the tribunal invoked "*des raisons d'équité évidentes*" and did not refer expressly to bad faith or 'blowing hot and cold', this Decision can only be understood as resting upon Poland's lack of good faith in taking, unequivocally, starkly

## SA770

inconsistent positions towards the same claimants at different times, to their detriment and to Poland's benefit.

7.96   In his 1957 article, Professor Bowett concluded that "[m]any of the cases on estoppel by conduct illustrate the simple principle that the law will demand consistency in conduct where the result of inconsistency would be to prejudice another party".[72] In support of this conclusion, Professor Bowett cited not only *Kunkel* (1925)[73] but also a lengthy study on related forms of estoppel under the laws of the USA published in the Harvard Law Review (1951-1952).[74]

7.97   This study addressed (inter alia) "preclusion" by a party taking inconsistent positions in successive legal proceedings, as follows (with footnotes here omitted, save one):[75]

> *"The rule that a person is precluded from making allegations of fact inconsistent with a position he took in a previous case is not based on the policies against relitigation, but on a desire to preserve the dignity of judicial proceedings by preventing the successive assertion of factually contradictory statements as the truth. This is a form of estoppel based on the conduct of the party rather than the court, in which respect it is similar to election of remedies. The preclusion, like election of remedies, preferably should not be applied where the first position taken did not harm or cause reliance by the other party. Unlike res judicata, it operates regardless of finality of the original proceedings or identity of the parties, and it applies only to positions taken on the facts, not inconsistent points of law. Some courts apply the rule only where the position was successfully maintained, while others do not require success if the second action has some connection with the first. The preclusion seems an undesirable restriction against decision on the merits in the second action where it is applied to facts that were not major issues in the first action, or to facts that were conjectural at the time. [Footnote 30]"*

> (Footnote 30 states: *"It has been suggested that the doctrine might generally be mitigated by using the prior position as an admission, not a preclusion, so that the trier of fact in the second case could decide on the merits between the two positions asserted. See Note, 59 Harv. L. Rev. 1132, 1136 (1946)"*).

7.98   This principle of preclusion from a party's inconsistent positions was confirmed by the US Supreme Court in *New Hampshire v Maine* (2001).[76] In that case, the US Supreme

---

[72] D. Bowett, "Estoppel before International Tribunals and its Relation to Acquiescence" (1957) 33 British Yearbook of International Law 176, p, 186, CLA-179.
[73] D. Bowett, "Estoppel before International Tribunals and its Relation to Acquiescence" (1957) 33 British Yearbook of International Law 176, p, 187, CLA-179.
[74] D. Bowett, "Estoppel before International Tribunals and its Relation to Acquiescence" (1957) 33 British Yearbook of International Law 176, p, 187, fn 3, CLA-179.
[75] Harvard Law Review, "Developments in the Law of Res Judicata" (1951-1952) 65 Harvard Law Review 818, pp. 823-824.

# SA771

Court decided, applying "judicial estoppel", that New Hampshire was "equitably barred from asserting – contrary to its position in the 1970's litigation – that the inland Piscataqua River boundary runs along the Maine shore".

7.99    While they are relevant to the establishment of 'judicial estoppel' as a general principle of international law (applicable here under Article 38(1)(c) of the ICJ Statute), in other circumstances, the Tribunal would not be minded to cite such municipal legal materials in such detail in support of its approach under international law. In this case, however, there is good reason to do so in the light of the Parties' own joint experiences of these materials directly related to this arbitration, particularly the Respondent's successful invocation of preclusion, or "judicial estoppel", from contradictory statements made by Chevron to different US courts.

7.100   In disputes between the Claimants and the Respondent in US legal proceedings directly related to this arbitration, this principle of preclusion, or "judicial estoppel", based on a party's inconsistent statements, was applied by the US Court of Appeals for the Second Circuit and the US Court of Appeals for the Fifth Circuit.

7.101   The first of these judgments was issued by the US Court of Appeals for the Second Circuit on 17 March 2011 in *Republic of Ecuador v Chevron Corporation and TexPet* in the US Stay Proceedings.[77] It related to the application by the Respondent to the US Courts for an order staying this arbitration under the Treaty: see Part IV(G)(6) above. The Tribunal has already addressed the Second Circuit's judgment; and it is unnecessary to do so here again, save to note that the Court applied "judicial estoppel".[78] The Court described the purpose of "judicial estoppel", citing the US Supreme Court, as protecting "the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment".[79]

---

[76] *New Hampshire v. Maine*, 532 U.S. 742 (29 May 2001).
[77] *Republic of Ecuador v. Chevron Corporation & Texaco Petroleum Company*, 638 F.3d 384 (2d Cir. 17 March 2011), CLA-435, R-247. (The Respondent was the Petitioner Appellant, with the Lago Agrio Plaintiffs (formerly the Aguinda Plaintiffs) as Plaintiffs-Appellants).
[78] This first issue was decided in the Second Circuit's Judgment, at p. 7, fn 3: *Republic of Ecuador v. Chevron Corporation & Texaco Petroleum Company*, 638 F.3d 384 (2d Cir. 17 March 2011), CLA-435, R-247.
[79] *Republic of Ecuador v. Chevron Corporation & Texaco Petroleum Company*, 638 F.3d 384 (2d Cir. 17 March 2011), p. 15, CLA-435, R-247.

# SA772

7.102   The second of these judgments was issued by the US Court of Appeals for the Fifth Circuit on 13 February 2013 in *Republic of Ecuador v Connor,* where Chevron was an intervening party.[80] It related to an application made by the Respondent for discovery under Section 1782 against Mr Connor, for use as evidence in this arbitration under the Treaty. That application was resisted by Mr Connor (with GSI), supported by Chevron.

7.103   In its judgment granting the Respondent's application, the Court (per Jones J) applied the principle of "judicial estoppel": [81]

> *"Judicial estoppel is an equitable doctrine designed to protect the integrity of judicial proceedings by preventing litigants from asserting contradictory positions for tactical gain. The precise rationale for and consequences of the doctrine vary. 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4477 (2d ed. 2002 & Supp. 2012) (hereinafter 'Wright & Miller). Recognizing this, the Supreme Court examined the doctrine extensively in New Hampshire v. Maine, 532 U.S. 742, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001), but in the end refused to establish an 'inflexible formula.' Relying instead on several factors that often indicate the propriety of the sanction, the Court held that a party may be estopped from asserting a position in a judicial proceeding where it has previously persuaded a court to adopt a clearly contradictory position to the disadvantage of an opponent. See also Reed v. City of Arlington, 650 F.3d 571 (5th Cir.2001) (en banc). Reed also notes, 'Because judicial estoppel is an equitable doctrine, courts may apply it flexibly to achieve substantial justice.' Id. at 576."*

7.104   The Court decided that there was an inconsistency in Chevron's statements regarding the status of this arbitration under the Treaty as a 'foreign or international tribunal' within the meaning of Section 1782. In other legal proceedings under Section 1782, Chevron (as the applicant) had successfully asserted that this arbitration fell within the legislative definition, whereas in these particular proceedings Chevron (resisting the Respondent's application) was asserting the contrary. As the judgment states: "Why shouldn't sauce for Chevron's goose be sauce for the Ecuador gander as well?"[82] The answer to this question, in addition to other matters decided by the Court, was that it should.

---

[80] *Republic of Ecuador v. John A. Connor et. al.*, 2013 W1 539011 (C.A.5 (Tex.)) (5th Cir. 13 February 2013), RLA-432.
[81] *Republic of Ecuador v. John A. Connor et. al.*, 2013 W1 539011 (C.A.5 (Tex.)) (5th Cir. 13 February 2013). pp. 3-4, RLA-432.
[82] *Republic of Ecuador v. John A. Connor et. al.*, 2013 W1 539011 (C.A.5 (Tex.)) (5th Cir. 13 February 2013), p. 4, RLA-432.

# SA773

7.105   The Tribunal does not seek here to apply the doctrine of "judicial estoppel" as recognised by the laws of the USA. International law, not the laws of the USA, is the applicable law in this arbitration. However, it is clear that the mischief which this US doctrine seeks to remedy, by its own nomenclature, is the same as the mischief to be remedied under international law; namely: a deliberate want of good faith by a party's inconsistent statements calculated to thwart the integrity of the judicial process for its own benefit and to the other party's prejudice. As Dr Bin Cheng stated (quoted above), the remedy "has its basis in common sense and common justice"; or, more colloquially in the words of the Fifth Circuit, sauce for the goose should also be sauce for the gander.

7.106   Applying Article 26 of the VCLT and customary international law, the Tribunal decides that the Parties are bound to act in good faith in the exercise of their rights and the performance of their respective obligations under the Arbitration Agreement derived from Article VI of the Treaty. That duty of good faith precludes clearly inconsistent statements, deliberately made for one party's material advantage or to the other's material prejudice, that adversely affect the legitimacy of the arbitral process. In other words, no party to this arbitration can 'have it both ways' or 'blow hot and cold', to affirm a thing at one time and to deny that same thing at another time according to the mere exigencies of the moment.

7.107   The Tribunal here bases its decision on the general principle of good faith under international law applied to the Parties' obligations under their Arbitration Agreement, rather than upon any specific doctrine derived from the Anglo-Saxon concept of equitable estoppel by conduct or representation. Dr Bin Cheng recognised that, although estoppel is consistent with the general principle of good faith, it is a different doctrine under international law. As Lord McNair wrote in regard to *The Fur Seal Arbitration* (above), that decision did not involve "*estoppel eo nomine*", but a broader principle precluding a State, in his words, from 'blowing hot and cold'; i.e. the principle of good faith.

7.108   The Lago Agrio Court, by the Lago Agrio Judgment, treated Chevron following the "merger" with Texaco in 2001, as legally indistinct from Texaco and TexPet (as described in Part V above). In particular, it was there decided (inter alia): " … the obligation to submit to Ecuadorian justice pending on Texaco Inc. was also

transmitted to new company Chevron Texaco Corporation, *so that consequently Chevron Corp. cannot allege that it never operated in Ecuador to give grounds for lack of a legitimate opposing party*" (see Lines 299 to 302 of Annex 7 to Part V, emphasis here supplied). In other words, the Lago Agrio Judgment treated Chevron as if, like TexPet, it had operated in Ecuador from 1964 onwards as a party to the Concession Agreements of 1964 and 1973, with significant assets in Ecuador. Thus, according to the Lago Agrio Judgment (as upheld by the Lago Agrio Appellate and Cassation Courts), Chevron had assets equating to to investments in Ecuador from 1964 onwards.

7.109 These statements were unequivocally made in the Lago Agrio Judgment and left intact by the judgments of the Lago Agrio Appellate, Cassation and Constitutional Courts, forming part of the judicial branch of the Respondent. The acts of its judicial branch are attributable to the Respondent under international law: Article 4(1) of the ILC Articles on State Responsibility. The position of the Respondent by its judicial branch contrasts starkly with the position of the Respondent in this arbitration.

7.110 Here, for its jurisdictional objections, the Respondent seeks to distinguish between the respective legal personalities of Chevron and TexPet (as also Texaco). The Respondent then seeks to draw, under Articles 1(1), II(3)(a), II(3)(c), VI(1)(a) and VI(1)(c) of the Treaty as regards relevant "investments", a material difference between Chevron on the one hand and TexPet (with Texaco) on the other. The Respondent contends unequivocally that, unlike TexPet, Chevron never had any presence in Ecuador, with no assets and no relevant investment in Ecuador. As described above, that difference is contradicted in the Lago Agrio Judgment.

7.111 It is impossible for the Tribunal to reconcile the statements in the Lago Agrio Judgment as to the "merger" between Chevron, TexPet and Texaco with the submissions made by the Respondent in this arbitration. The Respondent's jurisdictional objections to Chevron's claims are manifestly inconsistent with the unequivocal statements made by the Respondent's own judicial branch in treating Chevron with TexPet and Texaco for all their activities in Ecuador from 1964 onwards.

# SA775

7.112 Applying the principle of good faith under international law to the exercise of rights and the performance of obligations under the Arbitration Agreement, the Tribunal decides that it is impermissible for the Respondent to 'blow hot and cold' or to 'have it both ways', to Chevron's detriment and to the Respondent's benefit. In other words, the Respondent cannot now defeat, under the principle of good faith, the object and purpose of the Arbitration Agreement derived from Article VI of the Treaty with a jurisdictional objection under Article 21 of the UNCITRAL Arbitration Rules treating Chevron so differently from TexPet and Texaco as regards assets and, therefore, "investments" in Ecuador from 1964 onwards. The Tribunal concludes that the Respondent is required in this arbitration, as a matter of good faith, to treat Chevron as 'standing in the shoes' of TexPet (with Texaco), consistently with the statements made and acted upon by the Respondent's judicial branch in the Lago Agrio Litigation.

7.113 The Tribunal has taken fully into account that the principle of good faith may be more cautiously applied to justify a tribunal's jurisdiction, as compared to other non-jurisdictional issues. Nevertheless, there is no reason why the same principle of good faith should not apply to jurisdiction (or admissibility), as well as to the merits. It did so in the *Kunkel* arbitration decided almost a century ago (1926).

7.114 Accordingly, subject to other issues addressed later below, the Tribunal decides that it has jurisdiction over Chevron's claims under of the Treaty, as it does for TexPet's claims, under Articles VI(1)(a) and VI(1)(c) of the Treaty.

7.115 *(5) The Tribunal's Conclusion as to "Investment":* For these several reasons, subject to the following issues, the Tribunal concludes that the Claimants' cases as regards a relevant investment suffice to meet the Respondent's jurisdictional objections to the Claimants' claims under the FET standard in Article II(3)(a) of the Treaty (including protection against denial of justice) and the Umbrella Clause in Article II(3)(c) of the Treaty.

7.116 *(6) Judicial Finality (Local Remedies)*: As to the second part of the Respondent's jurisdictional objections, there is no suggestion in this case that any requirement as to judicial finality has been waived by the Respondent, whether in the Treaty or otherwise. It therefore applies to the Claimants' claims for denial of justice made under the FET standard in Article II(3)(a) of the Treaty.

# SA776

7.117   In the Tribunal's view, it is well settled that a claimant asserting a claim for denial of justice committed by a State's judicial system must satisfy, whether as a matter of jurisdiction or admissibility, a requirement as to the exhaustion of local remedies or, as now better expressed, a substantive rule of judicial finality.[83] Even the grossest misconduct by a lower court or manifest unfairness in its procedures is not by itself sufficient to amount to a denial of justice by a State, unless the judicial remedies that exist in that State either do not correct the deficiencies in the lower court's judgment (once exhausted by the foreign national) or are such that none affords to the foreign national any reasonable prospect of correcting those deficiencies in a timely, fair and effective manner.

7.118   In brief,[84] as already summarised above, Chevron contends that it has met the requirement of judicial finality, by its successive but unsuccessful appeals before the Lago Agrio Appellate Court, Cassation Court and (most recently) the Constitutional Court. The Claimants' counsel, Professor Paulsson, acknowledged that an international wrong for denial of justice does not occur until reasonable attempts have been made by the wronged claimant to secure the local remedies available within the State's own local legal system. However, Professor Paulson also submitted that a claimant is not required to exhaust any local remedy that offers no reasonable prospect of success. The requirement is limited to "reasonable attempts" to right the wrong within the State's own legal system.[85]

7.119   In brief,[86] as also summarised above, the Respondent contends that Chevron has not met the requirement of judicial finality, thereby precluding its claims for denial of justice *in limine* (whether as a matter of jurisdiction or admissibility).

7.120   At the Track II Hearing, the Respondent's Counsel, Professor Mayer, accepted that a judicial remedy would not need to be pursued "in the absence of a reasonable

---

[83] J. Crawford, *The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries* (2002), explains that a claim is inadmissible if any available and effective local remedy has not been exhausted "when the claim is one to which the rule of exhaustion of local remedies applies" (Article 44). The rule does not, of course, apply where an initial defect in a lower is corrected by an appellate court because there can then be no claim for denial of justice. The Tribunal also acknowledges the scholarly debate between the two concepts underlying this rule: the procedural concept and the substantive concept. In the absence of waiver, that debate is not relevant to the present case; and the Tribunal does not therefore need to address it here.

[84] C-TI Jan. 2014, Section III.D; and C-TII Jan. 2015, Sections VIII, IX and X.

[85] Track II Hearing D1.144ff; see also J. Paulsson, *Denial of Justice* (2005), p. 130, RLA-61.

[86] R-TII Feb. 2013, paras 220ff.

# SA777

possibility of effective redress."[87] The Respondent contends that Chevron failed reasonably to pursue its effective legal remedies within the Ecuadorian legal system, particularly (as regards the alleged denial of justice) under the Ecuadorian Collusion Prosecution Act (the "CPA"). The Respondent also contends that Chevron's failure to request the Lago Agrio Appellate Court to fix the amount of a bond and to pay such bond, so as to suspend the enforceability of the Lago Agrio Judgment, led to the alleged injury of which the Claimants complain. It was, according to the Respondent, "an intervening direct and immediate cause of the enforceability of the Judgment, breaking the 'causal nexus' required for a showing of denial of justice".[88] At the Track II Hearing, the Respondent also invoked Chevron's incomplete proceedings before the Constitutional Court, a submission no longer relevant with the Constitutional Court's Judgment of 27 June 2018.

7.121 The Tribunal refers to the classic statement as to judicial finality in the final award of the NAFTA tribunal in *Loewen v USA* (2003), where the claimants were held to have failed to comply with the substantive rule of judicial finality by not appealing to the US Supreme Court:[89]

> *"154. No instance has been drawn to our attention in which an international tribunal has held a State responsible for a breach of international law constituted by a lower court decision when there was available an effective and adequate appeal within the State's legal system."*

> *"156. The purpose of the requirement that a decision of a lower court be challenged through the judicial process before the State is responsible for a breach of international law constituted by judicial decision is to afford the State the opportunity of redressing through its legal system the inchoate breach of international law occasioned by the lower court decision ..."*

> *"215. Here we encounter the central difficulty in Loewen's case. Loewen failed to present evidence disclosing its reasons for entering into the settlement agreement in preference to pursuing other options, in particular the [US] Supreme Court option ..."*

---

[87] Track II Hearing D1.211.
[88] R-TII Feb. 2013, para 225; R-TII Nov. 2014, para 239.
[89] *Loewen Group, Inc. and Raymond L. Loewen v. United States of America*, ICSID Case No. ARB(AF)/98/3, Final Award, 26 June 2003, paras 154, 156, 215 & 217, CLA-44; see also Decision on Hearing of Respondent's Objection to Competence and Jurisdiction, 5 January 2001, CLA-425; Decision on Respondent's Request for a Supplementary Decision, 6 September 2004, CLA-643; *Loewen v. United States,* No. 04-2151, Mem. Op. (D.C. 31 October 2005), CLA-644.

# SA778

> "217. Accordingly, our conclusion is that Loewen failed to pursue its domestic remedies, notably the Supreme Court option and that, in consequence, Loewen has not shown a violation of customary international law and a violation of NAFTA for which Respondent is responsible."

This decision was made unanimously by three eminent and experienced jurists, of great renown. It remains the lodestar relevant to the specific issue here under consideration.[90] The Tribunal does not understand from the Parties' submissions that there exists any material difference between them as to the applicable legal principle, as expressed in *Loewen*. Their differences arise from its application to the facts of the present case.

7.122   For the present case, the Tribunal considers that the crucial part of the statements in *Loewen,* is that the availability of a local remedy "is not a standard to be determined or applied in the abstract. It means reasonably available to the complainant in light of its situation…."[91] As also stated above, the local remedy must be available as "an effective and adequate appeal within the State's legal system." It clearly does not include any ineffective or inadequate or, equally, any untimely remedy. The test is similarly expressed in the later awards in *Jan de Nul* (2008) and *Pantechniki* (2009)*.

7.123   In the Tribunal's view, the overall test for such availability is that of reasonableness applied to the complainant, assessed at the relevant time. Applied to the present case, it would be wrong in principle to require Chevron to have pursued at the time any local remedy in Ecuador that lacked any reasonable prospect of a timely, effective and adequate protection against the enforcement of the Lago Agrio Judgment within and, especially, without Ecuador. As with all its allegations, the legal burden of proving such ineffective protection, once a potential procedure has been identified by the Respondent, rests upon Chevron under Article 24(1) of the UNCITRAL Arbitration Rules.

---

[90] The same approach was taken in *Jan de Nul N.V. and Dredging International N.V. v. Arab Republic of Egypt*, ICSID Case No. ARB/04/13, Award, 6 November 2008, paras 256-258, CLA-230 (The ICSID tribunal included Professor Mayer, who preaches what he practises); as also in *Pantechniki S.A. Contractors & Engineers (Greece) v. Republic of Albania*, ICSID Case No. ARB/07/21, Award, 30 July 2009, para 96, RLA-17 (The ICSID tribunal comprised a sole arbitrator, Professor Paulsson, who also preaches what he practises).
[91] *Loewen Group, Inc. and Raymond L. Loewen v. United States of America*, ICSID Case No. ARB(AF)/98/3, Final Award, 26 June 2003, para 169, CLA-44.

# SA779

7.124 In the light of the statements in *Loewen*, the Tribunal addresses the application of this requirement of judicial finality to: (i) the Bond, (ii) the CPA and (iii) the Constitutional Court, as invoked by the Respondent.

7.125 *(i) The Bond:* The enforcement of the Lago Agrio Judgment was suspended pending Chevron's appeal to the Lago Agrio Appellate Court. The Appellate Court issued its judgment, dismissing Chevron's appeal from the Lago Agrio Judgment, on 3 January 2012.[92] It issued its Clarification Order on 13 January 2012.[93] On 20 January 2012, Chevron filed a cassation appeal with the Appellate Court (of some 176 pages). Chevron there requested the Appellate Court (inter alia) to suspend the enforcement of its judgment (thereby continuing the suspension of the Lago Agrio Judgment's enforcement) and to declare that there was no requirement for Chevron to post a bond to suspend the Appellate Court's Judgment.[94]

7.126 On 17 February 2012, the Appellate Court refused Chevron's request to suspend the enforcement of its judgment pending Chevron's cassation appeal. The Appellate Court decided also that its judgment would have been suspended pending the cassation appeal (thereby suspending the enforcement of the Lago Agrio Judgment) if Chevron had requested the posting of a bond and had posted a bond, which it had not done.[95] On 24 February 2012, Chevron requested the Appellate Court to revoke its order of 17 February 2012.[96] By order of 1 March 2012, the Appellate Court rejected Chevron's request, confirming the non-suspension of its judgment. It thereby declared the enforceability of the Lago Agrio Judgment.[97]

7.127 By the time of the Lago Agrio Appellate Court's order of 1 March 2012, this Tribunal, in order to preserve the rights of the Parties pending its decision on the merits, had already issued interim measures requiring the Respondent (including its judicial branch) not to permit the enforceability of the Lago Agrio Judgment: see its Orders and Interim Awards on Interim Measures of 28 January 2011, 9 February 2011, 16 March 2011, 25 January 2012 and 16 February 2012.[98] As already indicated above, the

---

[92] C-991.
[93] C-2314; R-299.
[94] C-1068, Section C: "Suspension of Enforcement of Judgment pending Resolution of the International Arbitration pursued by Chevron against the Republic of Ecuador" (pp. 160ff).
[95] See C-1114, p. 5.
[96] C-1114.
[97] C-1114 (updated).
[98] These are listed in Annex 1 to Part I of this Award.

# SA780

Tribunal had secured Chevron's cross-undertaking in damages for these interim measures with an order that the Claimants pay US$ 50 million to the PCA, which was duly paid by the Claimants and is held to the order of the Tribunal in this arbitration.

7.128  One of the grounds invoked by Chevron in support of its application of 20 January 2012 to the Lago Agrio Appellate Court was that the effect of this Tribunal's orders and awards, particularly its Order of 9 February 2011, was that the enforcement of the Lago Agrio Judgment was "currently suspended" by the Tribunal. At page 160 of its cassation appeal, Chevron pleaded:

> *"(a) That the appellate judgment shall not be enforced because its enforcement is currently suspended by order of the Arbitral Tribunal at The Hague;*
>
> *(b) That, as a consequence of the foregoing, the [Appellate Court] declare that there is no requirement to post a bond to suspend enforcement of the judgment; ...*
>
> *(d) That the [Appellate Court] Clerk refrain from certifying that the judgment is enforceable;*
>
> *(e) That in the court order by which the Appellate Court declares that enforcement of the judgment is currently suspended, it orders the enforcement judge to refrain from issuing any order that initiates a proceeding for enforcement of the same; ..."*

7.129  On 30 May 2012, consistent with the order of the Lago Agrio Appellate Court of 1 March 2012, the Lago Agrio Plaintiffs began enforcement proceedings in Canada, followed by enforcement proceedings in Brazil on 27 June 2012. On 3 August 2012, the Lago Agrio Court (i.e. the enforcement judge) ordered the enforcement of the Lago Agrio Judgment in the total amount of US$ 19,041,414,529.00, payable by Chevron within 24 hours.[99]

7.130  The Respondent (by its judicial branch), in declaring the Lago Agrio Judgment to be enforceable with the Lago Agrio Appellate Court's order of 1 March 2012 and the Lago Agrio Court's enforcement order of 3 August 2012, did not comply with this Tribunal's Orders and Interim Awards.[100]

---

[99] C-1404.
[100] In its Fourth Interim Award, the Tribunal decided that the Lago Agrio Judgment was made "final, enforceable and subject to execution within Ecuador by the Respondent no later than 3 August 2012". The Tribunal relied (inter alia) upon the Respondent's submissions at the hearing on 11 February 2012 (see February Hearing

# SA781

7.131    The Tribunal recognised at the time of its orders and awards (as it does still) that national courts have legal responsibilities to discharge under their State's laws and constitution; that the exercise of such responsibilities may impinge upon the rights of third parties; and that in this new world of interaction between international tribunals and national courts, there is a need to proceed with mutual respect and sensitivity to each other's functions. Nonetheless, when the State has chosen to establish procedures in parallel to its national court system (as it has here under the Treaty), it is incumbent on the State to ensure that the commitments that it has agreed are not defeated or subverted by actions of its national agencies, including its judicial branch.

7.132    Before 1 March 2012, as already indicated, this Tribunal had ordered the Respondent, under its several orders and awards on interim measures, not to declare the Lago Agrio Judgment enforceable. Chevron was entitled to rely upon those orders and awards, which were legally binding upon the Respondent under the Arbitration Agreement to which the Respondent had decided to commit itself. Moreover, given that the Respondent (by its judicial branch) knowingly did not comply with these orders and awards, it would inappropriate for the Respondent now to profit from its own wrong under the general principle of international law known by its Latin maxim: *nullus commodum capere de sua injuria propria.*[101]

7.133    The Tribunal also relies upon two further factors. First, at the time (after the Lago Agrio Appellate Court's judgment), there were insufficient prospects of favourable relief on Chevron's appeal to the Cassation Court. Such a cassation appeal could not be a full appeal addressing Chevron's multiple complaints regarding the Lago Agrio Litigation and Lago Agrio Judgment. Apart from relief against punitive damages ordered by the Lago Agrio Judgment, this was later to prove to be the case.

7.134    Second, the amount of the bond would, on the case advanced by both the Claimants and the Respondent, have been so high as to amount to a practical denial of access to the Cassation Court by Chevron. Dr Coronel testified that the amount of the bond would have been between US$ 1.9 billion and US$ 14.6 billion.[102] At the Track II Hearing, the Respondent's Counsel stated that the amount of the bond would have

D1.167ff). For present purposes, the difference of some four months between 1 March and 3 August 2012 is not material.
[101] B. Cheng, *General Principles of Law, as Applied by International Courts and Tribunals* (1953, reprinted 1987), p. 149, CLA-108.
[102] Coronel ER 5, paras 16 & 113.

## SA782

been fixed in an amount between 1% and 5% of the amounts at stake.[103] Applied to the Lago Agrio Judgment, as affirmed by the Appellate Court in the total sum of US$ 18 billion, the amount of the bond would have been between US$ 180 million and US$ 14.6 billion. These are not trifling amounts.

7.135   In the circumstances prevailing at the time, the Tribunal does not consider it reasonable to require Chevron to have posted a bond of this size so as to suspend the enforcement of the Lago Agrio Judgment, as affirmed by the Lago Agrio Appellate Judgment. Moreover, upon the exhaustion of Chevron's appellate remedies with the Constitutional Court's Judgment of 27 June 2018, the failure to post a bond has now no legal significance: such a bond could only have suspended the enforcement of the Lago Agrio Judgment pending the completion of the appellate process; and the failure to exhaust a local remedy does not extinguish the underlying international wrong.

7.136   *(ii) The Collusion Prosecution Act (CPA):* Under Article 6 of the Collusion Prosecution Act (CPA), a party claiming to be the victim of collusive legal proceedings before an Ecuadorian Court may impugn the resulting judgment. It provides: "If the grounds for the claim are confirmed, measures to void the collusive proceeding will be issued, invalidating the act or acts … and redressing the harm caused… and, as a general matter, restoring the things to the state prior to the collusion". Articles 4 and 5 of the CPA permit the complaining party to present evidence and participate in a hearing under the CPA; and Articles 6 and 7 specify the CPA's remedies, including the judgment's nullification, damages against and imprisonment of the miscreants.[104]

7.137   In its judgment of 12 November 2013, the Cassation Court referred to the CPA, as follows (with footnotes here omitted):[105]

> *"… When collusion is an independent action governed by our Ecuadorian legislation, it is so regulated under the Collusion Prosecution Act; and, as stated by this Division of the Court, it is not possible to seek the cassation of a judgment by making these kinds of allegations … Therefore, the affirmation made by the court of appeals is the correct one, as it is not within its scope of that court to have jurisdiction to hear collusive action cases within a summary verbal*

---

[103] Track II Hearing D1.221.

[104] Ley para el Juzgamiento de la Colusion (Collusion Prosecution Act), as amended on 9 March 2009, Registro Oficial 269 de 3 de febrero de 1977 (Ecuador), RLA-493. The CPA's relevant provisions are set out in full above in Part III of this Award, with both the English translation and the Spanish original text.

[105] C-1975, p. 95. (The CPA had not been cited in the Lago Agrio Appellate Court's Judgment).

# SA783

*proceeding, or procedural fraud, judges' behaviors, proper and improper meetings, the appointment of substitute judges, plaintiffs' connivance, among other allegations made by the appellant company ..."*

7.138 The Tribunal found this passage, at first, difficult to follow. To the Tribunal's understanding, the Cassation Court was here deciding that cases of collusion under the CPA are reserved to the exclusive jurisdiction of judges vested with jurisdiction under the CPA in respect of the matters described in this passage. Accordingly, in respect of such matters, these CPA judges have exclusive jurisdiction as a first instance court, although eventually their decisions may be subject to successive appeals within the Ecuadorian judicial system.

7.139 This difficulty was resolved by the Judgment of the Constitutional Court. The Court there unequivocally confirmed that the Cassation Court was correct in deciding that it lacked any jurisdiction to address or redress "the arguments expounded by Chevron" (as also the Constitutional Court), with Chevron's only remedy avaible before CPA judges under the CPA: see the extracts from Chapter 2 of its Judgment in Part V above.

7.140 In his sixth expert report of 7 May 2014 (with footnotes here omitted), Dr Coronel testified as to 'how an action under the CPA operates':[106]

> *"32. The action for collusion must be filed before a civil judge. That judgment issued by the trial court judge may be appealed before the respective Provincial Court, and the appellate court judgment may be appealed by cassation before the National Court of Justice. Finally, even after the decision of the National Court of Justice is rendered, it could be possible to file an extraordinary action for protection before the Constitutional Court.*
>
> *33. Chevron has asked me to explain whether or not interim measures may be granted within a collusion action. Specifically, Chevron has asked me to explain if a plaintiff in an action for collusion, brought [regarding] a trial in which there has allegedly been procedural fraud, whose judgment is in the process of being enforced within and without Ecuador, could obtain any interim measure suspending the enforcement of this judgment. In my opinion, the answer is no.*
>
> *34. First, none of the applicable rules on preventive measures grants a judge the power to order the suspension of a judgment that has been declared to be enforceable by another court. There are no specific norms regarding interim measures in the Collusion Act, but the same law states that the Code of Civil*

---

[106] Coronel ER 6, paras 32-37.

## SA784

*Procedure applies in a subsidiary manner where there are no other express provisions in the law.*

*35. According to the Code of Civil Procedure, there are only four types of preventive measures that a party can seek in any state of a lawsuit: (i) the sequestration of a thing, (ii) the withholding of funds, credits, or assets, (iii) the prohibition to sell real property, and the (iv) prohibition from leaving the country. The types of interim measures are thus circumscribed by law; indeed, recognizing the limited nature of the powers of Ecuadorian judges regarding interim measures, several bills have suggested that such powers be broadened, but they have not passed. None of these four possible preventive measures are a mechanism to suspend the enforcement of a decision.*

*36. Second, under the hypothetical presented, there would not be any interim measures available because none of the requisites established by law would be in place for them to be ordered. Three of these measures (the attachment, seizure, and prohibition from leaving the country) require the existence of a credit in favor of the petitioner to be granted. A credit is a personal right which may be demanded by creditor to debtor, who must give something or do or refrain from doing something. A debt or a judgment are credits, but a right of action or a pending lawsuit are not credits. In this hypothetical case, there would be no credit in favor of petitioner. In the case of the restraining order against selling, to obtain it, the existence of a credit must be evidenced or it must be proven that a lawsuit concerning specific property is taking place and that the restraining order against selling concerns that property. In the hypothetical case presented to me, those conditions or requirements were not present.*

*37. Finally, [judicial] practice confirms what I have stated. I am unaware of any case or precedent in which the Ecuadorian courts have issued an order of this nature."*

7.141 In brief, Chevron contends that collateral (or parallel) proceedings under the CPA would have been "a wild goose chase".[107] Such proceedings would have involved a personal claim against Judge Zambrano and like claims against other alleged miscreants, in separate independent proceedings.[108] Such proceedings would not have suspended the enforcement of the Lago Agrio Judgment, within or, particularly, without Ecuador in an effective and timely manner.

7.142 In brief, the Respondent contends that proceedings under the CPA were an available local remedy (until time-barred) that would have permitted Chevron to address and, if supported by persuasive evidence, obtain effective redress for its claims for 'fraud' in

---

[107] Track II Hearing D1.144.
[108] Track II Hearing D1.155-156.

# SA785

the Lago Agrio Litigation and the 'ghostwriting' of the Lago Agrio Judgment.[109] The Respondent also submits that Chevron's chances of success under the CPA were not "tiny".[110]

7.143   In its Track II Rejoinder, the Respondent acknowledged that a judgment from the CPA would take about 18 months, followed by successive appeals within the Ecuadorian legal system.[111] At the Track II Hearing, the Respondent acknowledged that, on average, CPA proceedings take 17 months, with the CPA judgment only becoming enforceable later by order of the first instance Appellate Court.[112]

7.144   The Tribunal accepts Dr Coronel's expert testimony that there was no possibility of interim measures under the CPA protecting Chevron's position during the pendency of any CPA proceedings and any subsequent appeals.

7.145   The Tribunal does not consider that any proceedings under the CPA, at the material time, could reasonably have been expected to result in any sufficient remedy for Chevron. It would have necessarily comprised one or more separate, collateral proceedings; but, above all, the timing of any CPA proceedings made them ineffective as a remedy for Chevron against the enforceability of the Lago Agrio Judgment. Moreover, collusive action cases may be appropriate where it is alleged that there is collusion between parties, witnesses or legal representatives; but where the complaint raises procedural fraud, judicial misconduct and corruption within the Court itself, the State cannot leave remedial action to the efforts of private litigants – the State has its own responsibility to act by its several investigatory, prosecutorial and judicial agencies.

7.146   As regards timing, it was essential that the risk of enforcement of the Lago Agrio Judgment, which could have been disastrous for Chevron (as envisaged in the Invictus Memorandum), be removed whilst the serious allegations of gross procedural and judicial improprieties in the Lago Agrio Court were addressed within the Ecuadorian legal system. That was not possible, given the fact that the Lago Agrio Judgment became enforceable under Ecuadorian law and, thus, enforceable outwith Ecuador on

---

[109] Track II Hearing D1.200-201.
[110] Track II Hearing D1.212.
[111] R-TII Mar. 2015, para 80.
[112] Track II Hearing D13.2981.

1 March 2012 (see above).[113] There was, therefore, insufficient time to complete any CPA proceedings (including one or more appeals) before the Lago Agrio Judgment became enforceable, with enforcement proceedings beginning shortly thereafter on 30 May 2012.

7.147  There is therefore no reason to assume, assessed objectively at the time, that any collateral (or parallel) relief under the CPA could have protected Chevron from the enforcement of the Lago Agrio Judgment in a sufficiently timely, effective and adequate manner. The Tribunal also notes the statement, in *Pantechniki*, that it may not be necessary for a claimant to resort to "oblique or indirect applications to parallel jurisdictions".[114]

7.148  In the circumstances prevailing at the time, the Tribunal does not consider it reasonable to require Chevron to have begun collateral proceedings under the CPA in an attempt to suspend the enforcement of the Lago Agrio Judgment, as affirmed by the Lago Agrio Appellate Judgment.

7.149  *(iii) The Constitutional Court:* On 23 December 2013, Chevron submitted to the Constitutional Court its "extraordinary action for protection" impugning, on constitutional grounds, the Lago Agrio Judgment. As at the Track II Hearing, Chevron's application remained pending before the Constitutional Court.[115] At that time, there was no information available to the Claimants as to when the Constitutional Court was likely to arrive at any decision.

7.150  Subsequently, there was a procedural hearing on 16 July 2015 before the Constitutional Court; on 2 October 2015, the Constitutional Court's Secretary-General advised the Parties that the Court had received the Presiding Judge's draft ruling; on 25 July 2017, the Court advised the Parties that it would require a further hearing, at a date to be fixed; but no hearing date had been fixed as at April 2018.[116] According to the Respondent's letter dated 20 April 2018, the Constitutional Court's judgment "ought to be forthcoming in the coming months or year".

---

[113] Track II Hearing D13.2963.
[114] *Pantechniki S.A. Contractors & Engineers (Greece) v. Republic of Albania*, ICSID Case No. ARB/07/21, Award, 30 July 2009, para 96, RLA-17.
[115] Track II Hearing D1.198, D12.2771.
[116] The Tribunal refers to the Claimants' letter dated 19 March 2018, p. 2.

# SA787

7.151 As already indicated in Part V above, the Constitutional Court held a public hearing on 22 May 2018; and it issued its Judgment on 27 June 2018.[117]

7.152 The Tribunal considers that Chevron's action before the Constitutional Court did not offer to Chevron any timely and effective remedy for the Lago Agrio Judgment within the Ecuadorian legal system. As already indicated, the Lago Agrio Judgment became enforceable on 1 March 2012; foreign enforcement proceedings were commenced on 30 May 2012; and the Lago Agrio Judgment's execution was ordered against Chevron and TexPet in Ecuador on 3 August and 15 October 2012. The Constitutional Court's Judgment was issued more than 4½ years after Chevron commenced its action before the Court; and its action was dismissed by the Court. The Tribunal also notes the statement in *Jan de Nul v Egypt* (supra) that "it would make no sense to insist upon the exhaustion of remedies that are unavailable precisely because the issuance of an appealable decision is delayed".[118]

7.153 Accordingly, the Tribunal does not consider it reasonable to require Chevron to have awaited the result of its action before the Constitutional Court before pursuing its claims in this arbitration under Article II(3)(a) of the Treaty (including its protection against denial of justice. In any event, given its action's dismissal, Chevron has exhausted its remedies within the Ecuadorian judicial system comprising the Lago Agrio Appelate, Cassation and Constitutional Courts.

7.154 *(7) The Tribunal's Conclusion as to Judicial Finality:* The Tribunal rejects the Respondent's objections, both as to jurisdiction and admissibility, based on Chevron's failure to exhaust local remedies or to satisfy the requirement of judicial finality for its claims for denial of justice under the FET standard in Article II(3)(a) of the Treaty.

7.155 *(8) Amendment of the Claims:* The Tribunal turns to the third part of the jurisdictional objection to the Claimants' claims for denial of justice under Article II(3)(a) of the Treaty, as here also raised by the Tribunal upon its own initiative. Further, although not expressly pleaded by the Respondent as a jurisdictional objection, possibly because the Respondent also amended its defence during the course of these proceedings (albeit with no objection by the Claimants), the Tribunal considers it

---

[117] C-2551.
[118] *Jan de Nul N.V. and Dredging International N.V. v. Arab Republic of Egypt*, ICSID Case No. ARB/04/13, Award, 6 November 2008, para 256, CLA-230.

## SA788

appropriate to treat the Respondent's jurisdictional objections as implicitly including this third part.

7.156 The Claimants' claims for denial of justice under the FET standard in Article II(3)(a) of the Treaty, based on the alleged 'ghostwriting' of the Lago Agrio Judgment, were not pleaded in their original Notice of Arbitration submitted under Article 2 of the UNCITRAL Arbitration Rules. Nor could they be. The Claimant's Notice was submitted on 23 September 2009. The Lago Agrio Judgment was subsequently issued on 14 February 2011 and declared to be enforceable on 1 March 2012 by the Lago Agrio Appellate Court. Within five weeks, on 20 March 2012, the Claimants introduced Chevron's claims for denial of justice in this arbitration by their Supplemental Memorial on the Merits, as thereafter supplemented in writing and orally up to and including the Track II Hearing.[119]

7.157 A similar timing analysis applies, mutatis mutandis, to the Claimants' claims under the Umbrella Clause in Article II(3)(c) of the Treaty regarding the 1995 Settlement Agreement. That alleged breach of the Treaty took place not before the Lago Agrio Judgment of 14 February 2011 and crystallised on 1 March 2012 with the order of the Lago Agrio Appellate Court declaring the Lago Agrio Judgment enforceable.

7.158 The question arises whether these new claims can be maintained by the Claimants as an amendment to their pleadings under (i) Article 20 of the UNCITRAL Arbitration Rules; (ii) the Treaty; and (iii) Dutch law as *the lex loci arbitri*. The Claimants submit they can. As already explained above, even without the Respondent's express jurisdictional objection, the Tribunal has a duty to check its jurisdiction upon its own initiative, as it sought to do with the Parties at the Track II Hearing.[120]

7.159 *(i) The UNCITRAL Arbitration Rules:* Article 20 of the UNCITRAL Arbitration Rules provides:

> *"During the course of the arbitral proceedings, either party may amend or supplement his claim or defence unless the arbitral tribunal considers it inappropriate to allow such amendment having regard to the delay in making it or prejudice to the other party or any other circumstances. However, a claim may*

---

[119] C-Mer. Mar. 2012, para 257(4), re-pleaded in C-TII June 2013, and C-TII May 2014, at paras 424(5) and 199(A)(1) respectively.
[120] See Track II Hearing D1.170-171, D9.2124 and D12.2640.

## SA789

> *not be amended in such a manner that it falls outside the scope of the arbitration clause or separate arbitration agreement."*

7.160   Article 20 entitles a claimant to amend its claim without the prior permission of the arbitral tribunal. The word "claim" in Article 20 signifies the claimant's statement of claim, as does "defence" the respondent's statement of defence (or counterclaim), whether in their original form or as supplemented under Article 22 of the UNCITRAL Arbitration Rules. The amendment is not limited to a specific claim or specific defence already pleaded by a party.[121] In principle, therefore, a claimant has the right to amend its pleaded case at any time (subject to the tribunal's procedural orders otherwise), including matters occurring after the notice of arbitration. Having done so, the tribunal has a discretionary power to disallow such an amendment by virtue of any of the three factors listed in Article 20; namely (i) delay; (ii) prejudice; and (iii) other circumstances.

7.161   As regards the fourth factor (where the tribunal has no discretion), jurisdiction, the Tribunal notes that it requires that the amended claim should "not fall outside the tribunal's jurisdiction under the arbitration clause or agreement".[122] Thus, the jurisdictional difficulty that can arise in an ad hoc arbitration, resulting from the difference between the scope of the arbitration clause and the scope of the reference under that clause, does not arise in an UNCITRAL arbitration with Article 20 of the UNCITRAL Arbitration Rules.[123]

7.162   In the Tribunal's view, there is no difficulty arising from the interpretation of Article 20 of the UNCITRAL Arbitration Rules. Any difficulty arises from its application to the present case.

7.163   The application of Article 20 was considered by the UNCITRAL tribunal in *European American Bank v Slovakia* (2014). The respondent had there amended its statement of

---

[121] J. van Hof, *Commentary on the UNCITRAL Arbitration Rules: The Application by the Iran-U.S. Claims Tribunal* (1991), p. 135; S. Baker & M. Davis, *The UNCITRAL Arbitration Rules in Practice: The Experience of the Iran-United States Claims Tribunal* (1992), pp. 91-94, CLA-34, RLA-447; D. Caron & L. Kaplan, *The UNCITRAL Arbitration Rules: A Commentary*, 2nd ed. (2013), pp. 467ff; T. Webster, *Handbook of UNCITRAL Arbitration: Commentary, Precedents and Materials for UNCITRAL Based Arbitration Rules* (2010), pp. 322ff.

[122] S. Baker & M. Davis, *The UNCITRAL Arbitration Rules in Practice: The Experience of the Iran-United States Claims Tribunal* (1992), p. 93, CLA-34, RLA-447; D. Caron & L. Kaplan, *The UNCITRAL Arbitration Rules: A Commentary*, 2nd ed. (2013), p. 468.

[123] This old common law rule, as regards English law, is addressed in M. Mustill & S. Boyd, *Commercial Arbitration* (1982), pp. 93ff.

## SA790

defence to add a late jurisdictional objection. The tribunal decided (with footnotes here omitted):[124]

> *"115. The Tribunal considers that what is now explicit in Article 23(2) of the 2010 Rules was implicit in [Article 20 of] the 1976 Rules. To preclude a respondent from making a jurisdictional objection after it submitted its statement of defence when that objection concerned facts which arose only after the date on which that statement was filed would involve a grave injustice. That injustice would be particularly grave where, as here, the new facts involve conduct on the part of the Claimant which the Claimant chose not to notify to the Respondent or the Tribunal. The Tribunal notes that the leading commentary on the UNCITRAL Rules [citing D. Caron & L. Kaplan] points out that the Conference which adopted the 1976 Rules considered that the inclusion of a provision in what became Article 21(3) of the 1976 Rules expressly permitting a tribunal to allow a late jurisdictional plea was unnecessary, because the provision on amendment in Article 20 and the broad general power of the tribunal 'to conduct the arbitration in such manner as it considers appropriate' were sufficient. The commentary concludes: 'The last sentence of Article 23(2) [of the 2010 Rules] thus expressly states what was previously only implicit under the 1976 UNCITRAL Rules: that the arbitral tribunal has discretion in limited circumstances to admit justifiably late pleas, such as due to the discovery of new evidence.'*
>
> *116. In consequence, the Tribunal finds that the 1976 UNCITRAL Rules do not bar a party from raising a jurisdictional objection based upon facts which came into existence, or which it could have discovered by reasonable inquiry, only after the filing of a statement of defence."*

7.164   It would be possible here to cite at length similar decisions on the application of Article 20 of the UNCITRAL Arbitration Rules made by other UNCITRAL tribunals. It is unnecessary to do so: the legal materials on the interpretation and application of Article 20 amount to a liberal or pragmatic 'jurisprudence constante' already evident from its own terms.

7.165   As to the first factor of "delay", the Tribunal does not consider that the Claimants were guilty of any material delay. They amended their case as promptly as they reasonably could on 20 March 2012, following the Lago Agrio Appellate Court's order declaring the Lago Agrio Judgment enforceable on 1 March 2012.

7.166   Moreover, the Claimants had earlier pleaded in their Notice of Arbitration of 23 September 2009 other claims advanced under the FET standard in Article II(3)(a) of

---

[124] *European American Bank v Slovakia*, PCA Case No 2010-17, Second Award on Jurisdiction of 4 June 2014, paras 115-116.

# SA791

the Treaty.[125] The Notice of Arbitration pleaded a "judicial farce" in the Lago Agrio Litigation.[126] Its allegations related to (inter alia) the Cabrera Report and other misconduct by the Lago Agrio Court, amounting to serious allegations of gross procedural and judicial improprieties.[127] It raised complaints regarding the 1995 Settlement Agreement.[128] The amended claims of 20 March 2012 for denial of justice regarding the Lago Agrio Judgment were made under the same FET standard, materially similar to the Claimants' claims pleaded in 2009 (as supplemented by their subsequent pleadings prior to March 2012).

7.167 As to the second factor, "prejudice", the Tribunal does not consider that the Respondent has suffered any material prejudice from the Claimants' amended claims. In particular, the Respondent has been afforded a full opportunity in Track II to address the Claimants' amended claims and to present its own case, as required by Article 15(1) of the UNCITRAL Arbitration Rules, including the Track II Hearing.

7.168 As to the third factor, "any other circumstances", the Tribunal considers that no such circumstance exists for the Tribunal to disallow the Claimants' amended claims. In particular, this is not a case where a new disputing party has sought to join as a co-claimant, or where an existing party advances an entirely new claim wholly unrelated to the parties' existing dispute. The Claimants' amended claims in regard to the Lago Agrio Judgment (as affirmed by the Lago Agrio Appellate Court) were made by existing claimants advancing claims under the same FET standard in Article II(3)(a) and the same Umbrella Clause in Article II(3)(c) of the Treaty. These amended claims arose from the same evolving dispute between the same disputing parties that had led directly to the issuance and enforcement of the Lago Agrio Judgment in the same Lago Agrio Litigation.

7.169 Moreover, from the time when this Tribunal was appointed in 2010, it was evident that the Lago Agrio Judgment was a likely imminent event, with the potential to inflict grave harm not only to the Claimants (particularly Chevron) but also, paradoxically, to the Respondent also. That is why, so as to maintain the *status quo* and to avoid the aggravation of the Parties' dispute, the Tribunal made its several orders and awards for

---

[125] C-NoA Sept. 2009, paras 69 & 76(2).
[126] C-NoA Sept. 2009, para 44.
[127] C-NoA Sept. 2009, paras 47-54.
[128] C-NoA Sept. 2009, para 3, 4, 14-21, 32-35 & 68ff.

## SA792

interim measures intended temporarily to preclude the Lago Agrio Judgment's issuance and enforcement by the Respondent's judicial branch. The Claimants' amended claims following the Lago Agrio Judgment did not therefore fall unexpectedly from a clear blue sky in this arbitration. These amended claims were a foreseeable evolution of the Parties' existing dispute; and they did not transform the Claimants' case against the Respondent in this arbitration into an entirely new and different dispute.

7.170 Further, in all the circumstances, the Tribunal considers that it would be an unreasonable, if not absurd, result for the Claimants to advance their amended claims as new claims in a new arbitration before a new arbitral tribunal, at unnecessarily greater expense and delay, with the risk of inconsistent decisions. It could serve no useful purpose to any of the Parties. If the Claimants had sought to do so, the Respondent would have had every right to object to such an abuse of process. There is an overall balancing exercise to be performed by the Tribunal in the exercise of its discretion as a matter of common sense, under this third factor in Article 20 of the UNCITRAL Arbitration Rules.

7.171 In this regard, the Tribunal notes the award in *Encana v Ecuador* (2006),[129] where the UNCITRAL tribunal decided:

> *"... a balance must be struck between, on the one hand, unreasonably requiring that new proceedings be commenced where the substance of a claim of breach of the BIT [the Ecuador-Canada BIT] may arguably have been made out or very nearly made out, and subsequent events put the question of breach beyond doubt, and, on the other, allowing what are in essence new claims or new causes of action which in reality have no real relation to the events initially relied upon, to be added onto existing proceedings on the basis of events subsequent to the commencement of proceedings."*

In this arbitration, as a matter of reasonableness and common sense, the Tribunal strikes that balance towards the first and not the second of these two alternatives.

---

[129] *EnCana Corporation. v. Republic of Ecuador*, LCIA Case No. UN3481, Award, 3 February 2006, para 164, RLA-41. The tribunal there referred the ICJ's decision in *Certain Phosphate Lands in Nauru (Nauru v. Australia)*, ICJ, Judgment, 26 June 1992, 1992 ICJ Reports 240, paras 62-70, declaring claims not included in the original application inadmissible insofar as they constituted "both in form and in substance, a new claim, and the subject of the dispute originally submitted to the Court would be transformed if it entertained that claim" (para 70). See also *Grand River Enterprises Six Nations, Ltd., et al. v. United States of America*, UNCITRAL (Ad hoc), Decision on Objections to Jurisdiction, 20 July 2006, para 101, CLA-631.

# SA793

7.172  As to the fourth factor in Article 20 of the UNCITRAL Arbitration Rules, the Tribunal has decided above in favour of its jurisdiction (with admissibility) to decide the Claimants' claims. Thus, in relation to the Lago Agrio Judgment, Article 20 does not require the Tribunal to disallow the Claimants' amended claims for want of jurisdiction under the Arbitration Agreement.

7.173  *(ii) The Treaty:* As to the Treaty, the Parties' Arbitration Agreement expressly incorporates the UNCITRAL Arbitration Rules. Thus, by consent from the outset of these arbitration proceedings, the right of any Party to amend its pleaded case (whether it be as claimant or respondent) was governed by Article 20 of the UNCITRAL Arbitration Rules, as a self-contained procedural code. Provided the amendment meets the requirements of Article 20 (including jurisdiction and admissibility), the Tribunal considers that nothing in the Treaty precludes such an amendment, even in regard to an event occurring after the arbitration's commencement. Thus, the Tribunal sees no cause under the Treaty barring the Claimants' amended claims under Articles II(3)(a) and II(3)(c) of the Treaty in regard to the Lago Agrio Judgment.

7.174  The Tribunal has also considered the position under international law generally, in the absence of Article 20 of the UNCITRAL Arbitration Rules.

7.175  In *Certain Questions of Mutual Assistance in Criminal Matters (Djibouti v. France)*, the International Court of Justice observed:[130]

> *"When the Court has examined its jurisdiction over facts or events subsequent to the filing of the application, it has emphasized the need to determine whether those facts or events were connected to the facts or events already falling within the Court's jurisdiction and whether consideration of those later facts or events would transform the 'nature of the dispute' ...."*

7.176  The International Court of Justice has considered claims based on facts that occurred after the filing of the Application on multiple occasions. For example, in *Fisheries Jurisdiction (Germany v. Iceland)*, Germany raised claims based on acts that post-

---

[130] *Certain Questions of Mutual Assistance in Criminal Matters (Djibouti v. France),* ICJ, Judgment, 4 June 2008, 2008 ICJ Reports 177, para 87.

dated its Application. The Court had no difficulty in deciding that it had jurisdiction over these claims, explaining:[131]

> *"The Court cannot accept the view that it would lack jurisdiction to deal with this submission. The matter raised therein is part of the controversy between the Parties, and constitutes a dispute relating to Iceland's extension of its fisheries jurisdiction. The submission is one based on facts subsequent to the filing of the Application, but arising directly out of the question which is the subject-matter of that Application. As such it falls within the scope of the Court's jurisdiction defined in the compromissory clause of the Exchange of Notes of 19 July 1961."*

7.177  Similarly, in *LaGrand (Germany v. United States)*, Germany made a submission based entirely on facts that occurred after the filing of its Application. The Court held that it had jurisdiction over this submission:[132]

> *"The third submission of Germany concerns issues that arise directly out of the dispute between the Parties before the Court over which the Court has already held that it has jurisdiction (see paragraph 42 above), and which are thus covered by Article 1 of the Optional Protocol. The Court reaffirms, in this connection, what it said in its Judgment in the Fisheries Jurisdiction case, where it declared that in order to consider the dispute in al1 its aspects it may also deal with a submission that 'is one based on facts subsequent to the filing of the Application, but arising directly out of the question which is the subject-matter of that Application. As such it falls within the scope of the Court's jurisdiction ...' (Fisheries Jurisdiction (Federal Republic of Germany v. Iceland), Merits, Judgment, I.C.J. Reports 1974, p. 203, para. 72)."*

7.178  Before the International Court of Justice, the appropriate test for determining the existence of jurisdiction over facts occurring after the filing of an Application is whether those facts "aris[e] directly out of the question which is the subject-matter of [the] Application". In the Tribunal's view, the Claimants' amended claims under Articles II(3)(a) and II(3)(c) of the Treaty clearly arise directly from the Parties' dispute pre-dating the Claimants' Notice of Arbitration. Accordingly, even without Article 20 of the UNCITRAL Arbitration Rules, the Tribunal sees no cause under international law barring the Claimants' amended claims under Articles II(3)(a) and II(3)(c) of the Treaty in regard to the Lago Agrio Judgment.

---

[131] *Fisheries Jurisdiction (Germany v. Iceland)*, ICJ, Judgment (Merits), 25 July 1974, 1974 ICJ Reports 175, para 72.
[132] *LaGrand (Germany v. United States of America)*, ICJ, Judgment, 27 June 2001, 2001 ICJ Reports 466, para 45, CLA-46.

## SA795

7.179  *(iii) Dutch Law:* As to Dutch law, the Tribunal has been shown no mandatory or other rule of Dutch law that could preclude the Claimants' amended claims. At the Track II Hearing, the Claimants' Counsel, relaying advice from their Dutch Counsel, stated that there was no such mandatory rule.[133] The Respondent did not then suggest otherwise.

7.180  (*9) The Tribunal's Conclusion as to the Amended Claims*: The Tribunal concludes that it has jurisdiction to decide the Claimants' amended claims under the Parties' Arbitration Agreement.

### *F: The Tribunal's Final Conclusions*

7.181  For these several reasons, the Tribunal decides the first of the Respondent's jurisdictional objections, as to a relevant "investment" under to the Treaty, in favour of Chevron and (confirming its earlier decisions) TexPet. As to the requirement of judicial finality the Tribunal decides the second of the Respondent's jurisdictional objections in favour of Chevron and (if and to the extent relevant) TexPet. As regards the third part (also raised by the Tribunal upon its own initiative), the Tribunal decides to leave the Claimants' amended claims regarding the Lago Agrio Judgment (with the judgments of the Lago Agrio Appellate and Cassation Courts) as pleaded and not to disallow that pleading under Article 20 of the UNCITRAL Arbitration Rules.

7.182  Accordingly, the Tribunal rejects the Respondent's jurisdictional objections to and confirms its jurisdiction over the claims and amended claims pleaded by Chevron and TexPet under the FET standard (including its protection against denial of justice) and customary international law in Article II(3)(a) of the Treaty and also under the Umbrella Clause in Article II(3)(c) of the Treaty. Further, the Tribunal decides that these claims are all admissible in this arbitration, and it rejects the Respondent's objections to the contrary effect under Articles VI(1)(a) and VI(1)(c) of the Treaty.

---

[133] Track II Hearing D12.2652.

**SA796**

# SA797

## PART VIII

### THE MERITS OF
### THE CLAIMANTS' CLAIMS
### AND THE RESPONDENT'S DEFENCES

### A: Introduction

8.1    The Tribunal here addresses the merits of the Claimants' claims and the Respondent's defences under the FET standard and customary international law in Article II(3)(a) of the Treaty and under the Umbrella Clause in Article II(3)(c) of the Treaty.

8.2    It is again necessary to address and decide separately the issues under Article II(3)(a) of the Treaty as regards denial of justice, and the issues under Article II(3)(c) of the Treaty as regards the 1995 Settlement Agreement.

8.3    For both sets of issues, the Tribunal has again kept in mind that each of the Parties bears the legal burden of proving its positive allegations under Article 24(1) of the UNCITRAL Arbitration Rules.[1]

### B: The Tribunal's Analysis & Conclusion on the 1995 Settlement Agreement

8.4    Given the Tribunal's earlier decisions in Track I and 1B of these arbitration proceedings, which also record the Parties' principal submissions on the 1995 Settlement Agreement, it is possible to address this part of the case succinctly.

8.5    In its First Partial Award, the Tribunal decided that Chevron and TexPet were both "Releasees" under Article 5.1 of the 1995 Settlement Agreement and Article IV of the 1998 Final Release. The Tribunal also decided that Chevron and TexPet could invoke their contractual rights as "Releasees" against the Respondent in regard to "diffuse" claims (as there described).[2]

---

[1] Article 24(1) of the UNCITRAL Arbitration Rules provides: "Each party shall have the burden of proving the facts relied on to support his claim or defence."
[2] First Partial Award, para 112. (For ease of reference, as already indicated earlier in this Award, the Tribunal has referred to the 1995 Settlement Agreement, the 1996 Release and the 1998 Final Release collectively as "the 1995 Settlement Agreement").

8.6     In the Tribunal's view, such contractual rights correspond to an 'obligation' by the Respondent towards each of Chevron and TexPet within the meaning of the Umbrella Clause in Article II(3)(c) of the Treaty.

8.7     In Parts IV and V of this Award, the Tribunal has found that the Lago Agrio Judgment, with the judgments of the Lago Agrio Appellate, Cassation and Constitutional Courts, rests upon finding Chevron liable for diffuse claims in non-compliance with the Respondent's obligations to release Chevron (with TexPet and Texaco) from such liability under the 1995 Settlement Agreement.

8.8     In the Tribunal's view, by the acts of its judicial branch, attributable to the Respondent under Article 4 of the ILC Articles on State Responsibility, the Respondent violated its obligations under Article II(3)(c) of the Treaty, thereby committing international wrongs towards each of Chevron and TexPet.

8.9     Chevron's injury from such international wrong here requires no explanation: it was the sole named defendant in the Lago Agrio Litigation and the sole named judgment debtor under the Lago Agrio Judgment. Issues as to reparation for such injury in the form of compensation claimed by Chevron are currently assigned to Track III of these arbitration proceedings.

8.10    As already indicated in Part VII above, TexPet is in a different position from Chevron for any injury resulting from the Lago Agrio Litigation and the Lago Agrio Judgment (as affirmed by the Lago Agrio Appellate, Cassation and Constitutional Court Judgments). TexPet was not a named defendant to the Lago Agrio Litigation; nor was it so identified in the Lago Agrio Judgment. However, as described in Parts IV and V of this Award, the Lago Agrio Judgment held TexPet publicly responsible for extensive environmental damage in the former concession area between 1964 and 1992; and, by its order of 15 October 2012, the Lago Agrio Court ordered the execution of the Lago Agrio Judgment against (*inter alios*) TexPet by name and attached TexPet's remaining assets in Ecuador. As with Chevron, issues as to reparation for any injury in the form of compensation claimed by TexPet are currently assigned to Track III of these arbitration proceedings.

## SA799

8.11   In conclusion, under the Umbrella Clause in Article III(3)(c) of the Treaty, the Tribunal decides that the Respondent is liable to make reparation to each of Chevron and TexPet, as addressed in Parts IX and X below.

### C: The Parties' Cases as to Denial of Justice

8.12   The Parties' respective factual and expert cases have been addressed at length in Parts IV, V and VI above, on which the Tribunal has made its findings. It would therefore serve no purpose to recite these cases in full here, save for the following summaries for ease of reference.

8.13   *(1) The Claimants' Case:* In brief,[3] as regards denial of justice, the Claimants at the Track II Hearing summarised the defects in the Lago Agrio Litigation as "five types of poison: judicial fraud and corruption, gross violations of due process, executive interference, judgments which are a mockery of legal reasoning, [and] factual findings which are taken out of thin air."[4]

8.14   The first and second of these complaints refer to the alleged 'ghostwriting' of the Lago Agrio Judgment, together with judicial misconduct and procedural fraud. The third refers to alleged interference with the Lago Agrio Litigation by the Respondent's executive branch. The fourth and fifth relate to the "absurd" reasons and "junk science" in the Lago Agrio Judgment (as affirmed by the subsequent judgments of the Lago Agrio Appellate Court, Cassation and Constitutional Courts). For reasons already indicated in Part VII(C)(2) above, as regards their merits, the Tribunal does not consider these fourth and fifth complaints in this Award any further.

8.15   As to the Claimants' specific allegations in regard to these first three matters, the Tribunal refers to the description and headings in its Conclusions set out at the end of Part V above. Using these headings, this part of the Claimants' case can be summarised as follows, as decided by the Tribunal.

8.16   As to the 'ghostwriting' of the Lago Agrio Judgment, the Claimants contend that Judge Zambrano agreed to receive a bribe of US$ 500,000 from the Lago Agrio Judgment's proceeds in return for allowing the Lago Agrio Plaintiffs' representatives

---

[3] See generally C-Mer. Mar. 2012, Sections III & IV; C-TII Jan. 2015, Sections III-XI.
[4] Track II Hearing D1.20 & 141.

# SA800

corruptly to 'ghostwrite' the Lago Agrio Judgment; that Judge Zambrano did not write the Lago Agrio Judgment (as he otherwise testified in the RICO Litigation, falsely); and that the 'Cabrera fraud' taints the Lago Agrio Judgment. These allegations, as to the merits, are considered below.

8.17   As to their other allegations; the Claimants plead:

(i)     the misconduct of Judge Yánez, as the presiding judge in the Lago Agrio Litigation (from February 2006 to October 2007), in regard to his order terminating the judicial inspections, his appointment of Mr Cabrera and private meetings with the Lago Agrio Plaintiffs' representatives – as a distinct matter, this alleged denial of justice has not been accepted by the Tribunal: see its Conclusions at the end of Part V;

(ii)    the misconduct of Mr Cabrera, as an auxiliary officer of the Lago Agrio Court (from June 2007 to April 2008) – as a distinct matter, this alleged denial of justice has not been accepted by the Tribunal: see its Conclusions at the end of Part V;

(iii)   Judge Zambrano's improper connivance at Dr Guerra's 'ghostwriting' of seven of his court orders in the Lago Agrio Litigation (between October 2009 and March 2010) – as a distinct matter, this alleged denial of justice has not been accepted by the Tribunal: see its Conclusions at the end of Part V;

(iv)    the Veiga-Pérez Criminal Prosecutions by the Respondent (intermittently, from 2003 to 2011) – as a distinct matter, this alleged denial of justice has not been accepted by the Tribunal: see its Conclusions at the end of Part V;

(v)     the conduct of the Respondent's Government towards the Lago Agrio Litigation (from 2003 onwards) – as a distinct matter specifically in regard to the Lago Agrio Judgment itself, this alleged denial of justice has not been accepted by the Tribunal: see its Conclusions at the end of Part V. As a broader matter in regard to the Lago Agrio Litigation more generally, the Tribunal returns to this allegation below;

(vi)    the unwillingness or inability of the Respondent's prosecutorial authorities to conduct and complete criminal investigations in any significant manner into

## SA801

the prima facie evidence of procedural fraud, judicial misconduct in the Lago Agrio Litigation and of the 'ghostwriting' of the Lago Agrio Court's Judgment, available to them from Chevron's allegations at the time of the Lago Agrio Judgment's enforceability on 1 March 2012: this allegation forms part of the overall denial of justice alleged by the Claimants and, as regards the merits, it is addressed further below; and

(vii)   the Judgments of the Lago Agrio Appellate Court (2012), Cassation Court (2013) and Constitutional Court (2018) in leaving materially unremedied the Lago Agrio Judgment, notwithstanding the evidence of procedural fraud, judicial misconduct and 'ghostwriting' available to them from Chevron's allegations at the time, namely (as regards the Appellate Court) by the date of its order declaring the Lago Agrio Judgment's enforceability on 1 March 2012 and (as regards the Cassation and Constitutional Courts) by the date of their respective judgments on 12 November 2013 and 27 June 2018: these allegations form part of the overall denial of justice alleged by the Claimants and, as regards the merits, these are further addressed below.

8.18   It follows from this summary that the relevant allegations for the merits of the Claimants' claims for denial of justice comprise: (a) the 'ghostwriting' of the Lago Agrio Judgment; (b) the conduct of the Respondent's prosecutorial authorities; (c) the judgments of the Lago Agrio Appellate and Cassation Courts in regard to alleged judicial misconduct, procedural fraud and 'ghostwriting' and (d) the conduct of the Respondent's Government in regard to the Lago Agrio Litigation generally.

8.19   *(2) The Respondent's Case:* In brief,[5] the Respondent denies that there has been any denial of justice or any other violation of Article II(3)(a) of the Treaty; and it refutes the Claimants' claims, as to both the facts and the applicable law.

8.20   As to the facts, the Respondent submits that the Lago Agrio Judgment was not 'ghostwritten"; and that there is no cogent evidence to support the Claimants' allegations otherwise (as to which the Claimants bear the legal burden of proof). In particular, so the Respondent submits, Dr Guerra's testimony in support of the Claimants' case is inconsistent, unreliable and worthless; the contemporary evidence

---

[5] See generally R-TII Nov. 2014, Sections II-V; R-TII Mar. 2015, Sections IV-VII.

## SA802

does not support any corrupt 'ghostwriting'; the forensic expert evidence proves that the Lago Agrio Judgment was not written by the Lago Agrio Plaintiffs' representatives; the Claimants' case on the "Unfiled Materials" rests upon demonstrably false assumptions; Dr Zambrano's testimony in the RICO Litigation does not support the Claimants' allegations; Mr Cabrera was properly appointed as a court expert by the Lago Agrio Court; the Cabrera Report does not taint the Lago Agrio Judgment; and the conduct of the Respondent's Government towards the Lago Agrio Plaintiffs was not improper.

8.21    As to international law as the applicable law, the Respondent contends that the Claimants have failed to establish that Judge Zambrano's alleged misconduct should be attributed to the Respondent; that the Claimants' case regarding the Lago Agrio Litigation and Lago Agrio Judgment does not meet the requirements for a breach by the Respondent of its obligations under Article II(3)(a) of the Treaty; that the decisions in the Lago Agrio Judgment were made reasonably; that the Respondent's prosecutorial authorities have been and still are investigating, in confidence, aspects of the Lago Agrio Litigation; and that there is nothing materially amiss in the Lago Agrio Appellate, Cassation or Constitutional Court Judgments.

### D: The Tribunal's Analysis as to Denial of Justice

8.22    *(1) Introduction*: As to the relevant factual and expert evidence, as indicated above, the Tribunal has already addressed at length and decided the Parties' respective cases in Parts IV, V and VI above. For the reasons there set out, the Tribunal has not accepted the Respondent's submissions on the evidence adduced in this arbitration. It remains unnecessary here to re-state the Tribunal's conclusions. Nonetheless, as regards the merits, the Tribunal addresses below the Claimants' four complaints listed under sub-paragraphs 8.18(a) to (d) above.

8.23    *(2) The Legal Test for Denial of Justice under the Treaty:* The Tribunal begins with the legal test for denial of justice under the FET standard and customary international law in Article II(3)(a) of the Treaty.

8.24    There is a consistent line of awards over many years, amounting to a *jurisprudence constante*, deciding that a denial of justice in violation of customary international law will also amount to a breach of an FET standard in a treaty: *Azinian* (1999), *Mondev*

## SA803

(2002), *Waste Management (No 2)* (2004), *International Thunderbird* (2006), *Jan de Nul* (2008), *Rumeli* (2008), *Pey Casado* (2008), *AMTO* (2008), *Al-Bahloul* (2010), *Liman Caspian* (2010), *Frontier* (2010), *Roussalis* (2011), *Oostergete*l (2012), *Swisslion* (2012), and *Flughafen Zurich* (2014).[6] However, ordinarily, the protection for denial of justice under an FET standard in a treaty (such standard providing the international minimum standard for fair and equitable treatment of an alien) is neither broader nor narrower than protection for denial of justice under customary international law: *Iberdrola* (2012).[7] Conversely, apart from denial of justice, an FET standard in a treaty (even limited to fair and equitable treatment under international customary law) provides a broader protection to a covered investor than does denial of justice under customary international law: *Vivendi* (2007).[8]

8.25    Thus, as decided in Part VII above, the Tribunal considers that denial of justice under the FET standard equates with denial of justice under customary international law, both as provided in Article II(3)(a) of the Treaty. These impose upon the Claimants the same legal requirements to establish on the merits their case alleging a denial of justice. (For ease of reference below, the Tribunal continues to address denial of justice under the FET standard, although its analysis applies equally to denial of justice under customary international law.)

---

[6] *Robert Azinian, Kenneth Davitian, and Ellen Baca v. United Mexican States*, ICSID Case No. ARB(AF)/97/2, Award, 1 November 1999, paras 102-103, CLA-299; *Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Award, 11 October 2002, para 127, CLA-7; *Waste Management v. United Mexican States (No. 2)*, ICSID Case No. ARB(AF)/00/3, Award, 30 April 2004, paras 97-98, CLA-42; *International Thunderbird Gaming Corporation v. United Mexican States*, UNCITRAL (Ad hoc), Award, 26 January 2006, para 194, CLA-223; *Jan de Nul N.V. and Dredging International N.V. v. Arab Republic of Egypt*, ICSID Case No. ARB/04/13, Award, 6 November 2008, para 188, CLA-230; *Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v. Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Award, 29 July 2008, paras 651ff, CLA-231; *Victor Pey Casado and President Allende Foundation v. Republic of Chile,* ICSID Case No. ARB/98/2, Award, 8 May 2008 (later partially annulled on other grounds), paras 656-657, CLA-82; *Limited Liability Company AMTO v. Ukraine*, SCC Arb. No. 080/2005, Final Award, 26 March 2008, § 75, RLA-343; *Mohammad Ammar Al-Bahloul v. Republic of Tajikistan*, SCC Case No. V (064/2008), Partial Award, 2 September 2009, para 221; *Liman Caspian Oil BV and NCL Dutch Investment BV v. Republic of Kazakhstan*, ICSID Case No. ARB/07/14, Award, 22 June 2010, para 268, RLA-486; *Frontier Petroleum Services Ltd. v. Czech Republic,* PCA Case No. 2008-09, Award, 12 November 2010, para 293; *Spyridon Roussalis v. Romania,* ICSID Case No. ARB/06/01, Award, 7 December 2011, para 315; *Jan Oostergetel and Theodora Laurentius v. Slovak Republic*, UNCITRAL (Ad hoc), Final Award, 23 April 2012, para 272, RLA-307; *Swisslion DOO Skopje v. The Former Yugoslav Republic of Macedonia,* ICSID Case No. ARB/09/16, Award, 6 July 2012, para 262; and *Flughafen Zürich A.G. and Gestión de Ingeniería IDC S.A. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/19, Award, 18 November 2014, paras 630-631, CLA-602.

[7] *Iberdrola Energía S.A. v. Republic of Guatemala,* ICSID Case No. ARB/09/5, Award, 17 August 2012, para 427, CLA-608.

[8] *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic,* ICSID Case No. ARB/97/3, Award, 20 August 2007, paras 7.4.10-11, CLA-288.

# SA804

8.26    In the Tribunal's view, as to the merits, the legal test is whether any shock or surprise to an impartial tribunal occasioned by the Lago Agrio Judgment, with the judgments of the Lago Agrio Appellate, Cassation and Constitutional Courts, leads, on reflection, to justified concerns as to the judicial propriety of the Lago Agrio Judgment, as left materially uncorrected or unremedied within the Respondent's own legal system.

8.27    By the shorthand terms "uncorrected" and "unremedied", here and elsewhere in this Award, the Tribunal means that the Lago Agrio Judgment (excepting its award of punitive damages) was considered by the Lago Agrio Appellate Court, Cassation and Constitutional Courts, in full knowledge of the complaints of serious procedural impropriety, without appropriate steps being taken to address the allegations of procedural fraud, judicial misconduct and 'ghostwriting' raised by Chevron at the time.

8.28    In Part V above, the Tribunal has found that the Lago Agrio Court, the Appellate Court, the Cassation Court and the Constitutional Court did not investigate Chevron's allegations of procedural fraud and judicial misconduct; and the Appellate, Cassation and Constitutional Courts also did not investigate the allegedly corrupt 'ghostwriting' of the Lago Agrio Judgment. This was not done in ignorance of Chevron's specific allegations at the time. In the Tribunal's view, these Courts had sufficient information available to them so as to amount (at least) to a strong prima facie case of judicial misconduct, procedural fraud in the Lago Agrio Litigation and (as regards the Appellate, Cassation and Constitutional Courts) the 'ghostwriting' of the Lago Agrio Judgment.

8.29    In Chevron's Initial Alegato of 6 January 2011 addressed to the Lago Agrio Court, (extending over 263 pages of written submissions), Chevron contended (inter alia) that the Lago Agrio Litigation "should be terminated, with the entire Complaint dismissed, because they have been permeated by fraud"; that "Chevron has been denied due process and its constitutional rights"; and that "systematic constitutional violations and substantial procedural defects render these proceedings a legal nullity." The alleged fraud included the judicial misconduct of Judge Yánez; the improper appointment of Mr Cabrera; his corrupt collusion with the Lago Agrio Plaintiffs' representatives, the

# SA805

"fraudulent and flawed" Cabrera Report; and the violation of Chevron's rights including its status as a "Releasee" under the 1995 Settlement Agreement.[9]

8.30    In Chevron's Appeal to the Lago Agrio Appellate Court of 9 March 2011 (extending over 193 pages), Chevron contended (inter alia) that the Lago Agrio Judgment should be declared a nullity "due to procedural fraud and violation of the guarantee of due process". These allegations, set out at length, included the judicial misconduct of Judge Yánez; the corrupt collusion with Mr Cabrera; the fraudulent Cabrera Report; the use of information in the Lago Agrio Judgment that was "not in the record as the basis for the decision"; and the violation of Chevron's rights under the 1995 Settlement Agreement.[10]

8.31    In Chevron's Cassation Appeal of 20 January 2012 (extending over 176 pages), Chevron included amongst the grounds for its appeal: the judicial misconduct of Judge Yánez; the "illegal appointment and actions" of Mr Cabrera; the "irregularities" in the Cabrera Report; the violation of Chevron's rights under the 1995 Settlement Agreement; and the Lago Agrio Plaintiffs' "illicit participation in the drafting of" the Lago Agrio Judgment.[11]

8.32    In Chevron's action before the Constitutional Court, its submissions recorded in the Court's Judgment mirrored much of its case presented earlier at the RICO trial and in this arbitration.

8.33    There is little in this Award (or the RICO Judgment) that would add to the substance of the allegations made by Chevron to the Lago Agrio Appellate, Cassation and Constitutional Courts in 2011, 2012 and 2018. In all material respects, at these times, there was before these three Courts at least strong prima facie evidence of judicial misconduct, procedural fraud and (particularly) 'ghostwriting', raising justifiable concerns as to the judicial propriety of the Lago Agrio Litigation and the Lago Agrio Judgment. The same situation prevailed as regards the Respondent's prosecutorial authorities, beginning at an earlier time.

---

[9] C-1213.
[10] C-1178.
[11] C-1068.

## SA806

8.34    Yet, as the Tribunal finds, no appropriate steps were taken by the Lago Agrio Appellate Court, the Cassation Court, the Constitutional Court or these prosecutorial authorities to address the allegations of procedural fraud, judicial misconduct and 'ghostwriting' raised by Chevron at the time, sufficient to suspend the enforceability of the Lago Agrio Judgment and to comply with the Tribunal's several Orders and Awards on Interim Measures.

8.35    As to the doctrine of denial justice under international law, the Tribunal has been guided generally by four awards cited by the Parties: *Azinian v Mexico* (1999),[12] *Mondev v USA* (2002),[13] *Loewen v USA* (2003)[14] and *Oostergetel v Slovakia* (2012).[15]

8.36    In *Oostergetel*, it was decided that the standard for denial of justice (as part of the FET standard) was "a demanding one. To meet the applicable test, it will not be enough to claim that municipal law has been breached, that the decision of a national court is erroneous, that a judicial procedure was incompetently conducted, or that the actions of the judge in question were probably motivated by corruption. A denial of justice implies the failure of a national system as a whole to satisfy minimum standards."[16]

8.37    The Tribunal has also borne in mind, as these legal materials confirm, that the doctrine of denial of justice essentially addresses procedural unfairness and not (by itself) an error of fact or applicable national law, although both may equally defeat the complainant's substantive rights. An international tribunal, such as this Tribunal, cannot act as a court of appeal. As a former ICJ judge once wrote: "… if all that a judge does is to make a mistake, i.e. to arrive at a wrong conclusion of law or fact, the State is not responsible … the only thing that can establish a denial of justice so far as a judgment is concerned is an affirmative answer, duly supported by evidence, to some

---

[12] *Robert Azinian, Kenneth Davitian, and Ellen Baca v. United Mexican States*, ICSID Case No. ARB(AF)/97/2, Award, 1 November 1999, especially para 102, CLA-299.
[13] *Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Award, 11 October 2002, especially para 127, CLA-7.
[14] *Loewen Group, Inc. and Raymond L. Loewen v. United States of America*, ICSID Case No. ARB(AF)/98/3, Final Award, 26 June 2003, especially para 132, CLA-44.
[15] *Jan Oostergetel and Theodora Laurentius v. Slovak Republic*, UNCITRAL (Ad hoc), Final Award, 23 April 2012, especially para 273, RLA-307.
[16] *Jan Oostergetel and Theodora Laurentius v. Slovak Republic*, UNCITRAL (Ad hoc), Final Award, 23 April 2012, para 273, RLA-307.

## SA807

such question as 'Was the court guilty of bias, fraud, dishonesty, lack of impartiality, or gross incompetence?' … *bona fide* error does not entail responsibility."[17]

8.38 As to the threshold required for denial of justice, the Tribunal adopts the approach taken by the NAFTA tribunal in *Mondev v USA* (2002), citing the judgment of the International Court of Justice in *ELSI* (1989), that the impugned judgment must be clearly improper and discreditable[18] (with footnotes here omitted):[19]

> "127. In the ELSI case, a Chamber of the Court described as arbitrary conduct that which displays 'a wilful disregard of due process of law, … which shocks, or at least surprises, a sense of judicial propriety'. It is true that the question there was whether certain administrative conduct was 'arbitrary', contrary to the provisions of an FCN treaty. Nonetheless (and without otherwise commenting on the soundness of the decision itself) the Tribunal regards the Chamber's criterion as useful also in the context of denial of justice, and it has been applied in that context, as the Claimant pointed out. The Tribunal would stress that the word 'surprises' does not occur in isolation. The test is not whether a particular result is surprising, but whether the shock or surprise occasioned to an impartial tribunal leads, on reflection, to justified concerns as to the judicial propriety of the outcome, bearing in mind on the one hand that international tribunals are not courts of appeal, and on the other hand that Chapter 11 of NAFTA (like other treaties for the protection of investments) is intended to provide a real measure of protection. In the end the question is whether, at an international level and having regard to generally accepted standards of the administration of justice, a tribunal can conclude in the light of all the available facts that the impugned decision was clearly improper and discreditable, with the result that the investment has been subjected to unfair and inequitable treatment. This is admittedly a somewhat open-ended standard, but it may be that in practice no more precise formula can be offered to cover the range of possibilities."

8.39 The approach in this passage has been followed subsequently by other international tribunals, including *GEA v Ukraine* (2011), *Arif* (2013) and *Mamidoil* (2015).[20]

8.40 The Tribunal emphasises that the legal test for denial of justice requires the claimant to prove objectively that the impugned judgment was "clearly improper and discreditable", with the failure by the "national system as a whole to satisfy minimum

[17] G.G. Fitzmaurice, "The Meaning of the Term 'Denial of Justice'" (1932) 13 British Yearbook of International Law 93, pp. 112-113, CLA-301.

[18] *Elettronica Sicula S.p.A. (ELSI) (United States of America v. Italy)*, ICJ, Judgment, 20 July 1989, 1989 ICJ Reports 15, para 128, CLA-237.

[19] *Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Award, 11 October 2002, para 127, CLA-7.

[20] *GEA Group Aktiengesellschaft v. Ukraine*, ICSID Case No. ARB/08/16, Award, 31 March 2011, para 312 (by agreement of the parties), CLA-300, RLA-648; *Franck Charles Arif v. Republic of Moldova*, ICSID Case No. ARB/11/23, Award, 8 April 2013, para 445, RLA-651 and *Mamidoil Jetoil Greek Petroleum Products Societe S.A. v. Republic of Albania*, ICSID Case No. ARB/11/24, Award, 30 March 2015, paras 764-769.

# SA808

standards". There have been many shocks and surprises caused by court judgments in legal history, but without much more, amounting to discreditable improprieties and the failure of the whole national system, such judgments do not amount to a denial of justice.

8.41 A claimant's legal burden of proof is therefore not lightly discharged, given that a national legal system will benefit from the general evidential principle known by the Latin maxim as *omnia praesumuntur rite et solemniter esse acta donec probetur in contrarium*. It presumes (subject to rebuttal) that the court or courts have acted properly. This general principle was described by Professor O'Connell as follows, as cited to the NAFTA tribunal in *Loewen* (with footnotes there and here omitted):[21]

> *"When one comes to examine failure of the courts themselves 'palpable deviation' from the accepted standards of judicial practice are not so readily ascertained. For one thing, there is a presumption in favour of the judicial process. For another, defects in procedure may be of significance only internally, and not work an international injustice. For a third, wide discretion must be allowed a court in the reception and rejection of evidence, in adjournment, and in admission of documents, and it cannot be said that deviations even from the municipal law rules of evidence are deviations from an international standard. The first thing that must be ascertained is whether as a result of court manoeuvrings substantial injustice has been done to the claimant; the second is whether these manoeuvrings really amount to obstruction of the judicial process, and are extrinsic to the merits of his claim. Bad faith and not judicial error seems to be the heart of the matter, and bad faith may be indicated by an unreasonable departure from the rules of evidence and procedure."*

8.42 This general principle subsumes a second principle, namely that a court is permitted a margin of appreciation before the threshold of a denial of justice can be met.[22] Nonetheless, the balance of probabilities remains the standard of proof, with the claimant bearing the overall legal burden of proof.

8.43 *(3) Attribution under International Law*: The Respondent contends that the conduct of Judge Zambrano in regard to the 'ghostwriting' of the Lago Agrio Judgment cannot be attributed to the Respondent because it was motivated by personal gain, with the

---

[21] See D.P. O'Connell, *International Law*, 2nd ed. (1970), p. 948, RLA-150, cited in *Loewen Group, Inc. and Raymond L. Loewen v. United States of America*, ICSID Case No. ARB(AF)/98/3, First Opinion of Christopher Greenwood QC, 26 March 2001, p. 7, CLA-645.

[22] *S.D. Myers, Inc. v. Government of Canada*, UNCITRAL (Ad hoc), Partial Award, 13 November 2000, paras 261-262, CLA-462; see also *Loewen Group, Inc. and Raymond L. Loewen v. United States of America*, ICSID Case No. ARB(AF)/98/3 and the First Opinion of Sir Robert Jennings QC, 26 October 1998, para 23 (on the "Local Remedies Rule", CLA-647.

# SA809

Claimants in a better position than the Respondent to prevent such judicial misconduct.[23]

8.44 As the Tribunal has found in Parts IV and V above, the 'ghostwriting' resulted from Judge Zambrano's initiative and the bribe promised to him by certain of the Lago Agrio representatives. It was not conduct directed by the Respondent; and Judge Zambrano's misconduct was not authorised under Ecuadorian law.

8.45 The Claimants submit that their claims for denial of justice address not the bribe agreed between Judge Zambrano and certain of the Lago Agrio Plaintiffs, but rather the Lago Agrio Judgment as "the capstone of the judicial process: it bears the State's *imprimatur* of the proceedings that led to it." [24] The Claimants cite from A.V. Freeman's work (1938, with references here omitted): "… fraud and corruption either during the proceedings or in connection with the rendering of judgment may produce a denial of justice … and the responsibility of the State cannot be evaded by relying upon any misapplied theory of the apparent powers of an agent …".[25]

8.46 In the Tribunal's view, the Lago Agrio Judgment was issued by Judge Zambrano in his capacity as a judge of the Lago Agrio Court, itself part of the Respondent's judicial branch; the Lago Agrio Judgment was accorded the status of a court judgment under Ecuadorian law; and it was (and remains) subject to enforcement and execution by the Respondent's judicial branch within the Respondent's national legal system.

8.47 Article 4 of the ILC Articles on State Responsibility states: "The conduct of any State organ shall be considered an act of that State under international law, whether the organ exercises legislative, executive, judicial or any other functions, whatever position it holds in the organisation of the State and whatever its character as an organ of the central government or of a territorial unit of the State."

8.48 Article 7 of the ILC Articles on State Responsibility states: "The conduct of a State or of a person or entity empowered to exercise elements of the governmental authority shall be considered an act of the State under international law if the organ, person or entity acts in that capacity, even if it exceeds its authority or contravenes instructions."

---

[23] R-TII Mar. 2015, paras 350ff.
[24] C-TII Jan. 2015, para 285.
[25] A.V. Freeman, *The International Responsibility of States for Denial of Justice* (1938), p. 268, fn 5, CLA-297.

## SA810

The ILC Commentary to Article 7 emphasises the phrase "in that capacity", so as to distinguish the unauthorised conduct of persons acting in an official capacity from a case "where the conduct is so removed from the scope of their official functions that it should be assimilated to that of private individuals, not attributable to the State."[26] The latter case is not the present case.

8.49    In *State Responsibility: The General Part* (2013), Professor Crawford addressed the dividing-line as regards attribution and non-attribution under ILC Article 7, by reference to two cases cited by the Parties in this arbitration, to different effect: *Caire* (1929)[27] and *Yeager* (1987)[28] (with footnotes here added):[29]

> "… *The difference between the situation in Caire and the actions of the Revolutionary Guards in Yeager on the one hand [where there was attribution], and the Iran Air agent in Yeager on the other [where there was no attribution] is that the latter, although he was able to extract a bribe by virtue of his position, did not hold himself out as acting on behalf of the state. The soldiers in Caire were able to arrest their victim through the exercise of state authority; the Revolutionary Guards invoked their state power as customs officials. As was made clear in another case of the Iran-US Claims Tribunal, Petrolane Inc. v. Iran,[30] the Article 7 'extension' of liability for acts done ultra vires is predicated on the actions in question being done by 'persons cloaked with governmental authority'* …"

8.50    In the present case, the conduct of Judge Zambrano in issuing the Lago Agrio Judgment (as with all other judges of the Lago Agrio Court acting in the Lago Agrio Litigation) was manifestly done 'cloaked with governmental authority', as members of the Respondent's judicial branch. Judge Zambrano was held out by the Respondent and also held himself out as a judge acting in the name of the Respondent.

8.51    Moreover, the Lago Agrio Judgment was left unremedied by the Lago Agrio Appellate Court and (subject to the issue of punitive damages) the Cassation and Constitutional Courts, with sufficient knowledge of the Claimants' allegations regarding gross judicial improprieties in the Lago Agrio Litigation and the corrupt 'ghostwriting' of

---

[26] J. Crawford, *The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries* (2002), p.108, RLA-549.
[27] *Estate of Jean-Baptiste Caire (France) v. United Mexican States*, French-Mexican Claims Commission, Decision No. 33, 7 June 1929, V RIAA 516, CLA-597.
[28] *Kenneth P. Yeager v. Islamic Republic of Iran,* IUSCT Case No. 10199, Award No. 324-10199-1, 2 November 1987, 17 Iran-US Claims Tribunal Reports 92, RLA-547.
[29] J. Crawford, *State Responsibility: The General Part* (2013), pp. 138-139, RLA-556.
[30] *Petrolane, Inc. v. Islamic Republic of* Iran, IUSCT, Award No 518-131-2, 14 August 1991, 27 Iran-US Claims Tribunal Reports 64, p. 92.

# SA811

the Lago Agrio Judgment. Their respective judgments are also to be attributed to the Respondent under Article 4 of the ILC Articles on State Responsibility. It is not possible, therefore, to treat the misconduct of Judge Zambrano (as also other judges of the Lago Agrio Court) as private initiatives or personal frolics, unrelated to their judicial functions or otherwise unattributable to the Respondent under international law.

8.52 Accordingly, the Tribunal concludes that there can be no question as regards the attribution to the Respondent of an international wrong committed by the Lago Agrio Court (with the Lago Agrio Appellate, Cassation and Constitutional Courts), as the judicial branch of the Respondent acting in such capacity in the Lago Agrio Litigation.

8.53 *(4) The 'Ghostwriting' of the Lago Agrio Judgment*: The facts established on the factual, expert and forensic evidence speak for themselves, as set out at length in Parts IV, V and VI above.

8.54 As there explained, the details as to how exactly all or material parts of the Lago Agrio Judgment came to be written, corruptly by certain of the Lago Agrio Plaintiffs' representatives for Judge Zambrano, remain incomplete. The missing factual and forensic evidence is likely available only in Ecuador, if it still exists at all. Yet the circumstantial and other evidence adduced in this arbitration is overwhelming. Short of a signed confession by the miscreants, as rightly submitted by the Claimants at the end of the Track II Hearing, the evidence establishing 'ghostwriting' in this arbitration "must be the most thorough documentary, video, and testimonial proof of fraud ever put before an arbitral tribunal."[31]

8.55 As found by the Tribunal in Parts IV and V above, two of the Lago Agrio Plaintiffs' representatives who were privy to the 'ghostwriting' exercise were Mr Donziger and Mr Fajardo. As the Respondent acknowledged at the Track II Hearing, the participation of Mr Fajardo in 'ghostwriting' for Judge Zambrano, if correct (which the Respondent denies), would suffice to support the Claimants' claims for denial of justice.[32] The Tribunal agrees: the Claimants' inability to identify by name with sufficient probability others of the Lago Agrio Plaintiffs' representatives, also involved in 'ghostwriting' (in addition to Mr Donziger), cannot by itself exculpate the

---

[31] Track II Hearing D12.2756.
[32] Track II Hearing D1.243.

## SA812

Respondent from liability for denial of justice. If it were otherwise, the more successful the ghostwriting exercise, the less culpability would result. In any event, for denial of justice, the relevant actor is Judge Zambrano; and his participation in the 'ghostwriting' of the Lago Agrio Judgment is firmly established on the evidence before this Tribunal.

8.56 On such evidence, the Tribunal has found that Judge Zambrano acted corruptly, in return for a bribe promised to him by certain of the Lago Agrio Plaintiffs' representatives. Judge Zambrano's collusive conduct in the 'ghostwriting' of the Lago Agrio Judgment was not authorised under Ecuadorian law.[33] Nor was it under judicial standards long established under international law. He was far from acting as an independent or impartial judge deciding the Lago Agrio Litigation fairly between the parties, under minimum standards for judicial conduct long recognized under international law.

8.57 Article 10 of the Universal Declaration of Human Rights, adopted by the UN General Assembly on 10 December 1948, provides: "Everyone is entitled in full equality to a fair and public hearing by an independent and impartial tribunal, in the determination of his rights and obligations and any criminal charges against him". Article 14 of the International Covenant on Civil and Political Rights, adopted by the UN General Assembly on 16 December 1966 (in force from 23 March 1976), to which the Respondent is a party, provides, in material part: "All persons shall be equal before the courts and tribunals. In the determination of any criminal charge against him, or of his rights and obligations in a suit at law, everyone shall be entitled to a fair and public hearing by a competent, independent and impartial tribunal established by law." Article 2 of the UN Basic Principles on the Independence of the Judiciary, adopted by the UN General Assembly in November-December 1985, provides: "The judiciary shall decide matters before them impartially, on the basis of facts and in accordance with the law, without any restrictions, improper influences, inducements, pressures, threats or interferences, direct or indirect, from any quarter or for any reason." Article 6 of these Basic Principles provides: "The principle of the independence of the

---

[33] Constitución de la República del Ecuador 2008 (2008 Ecuadorian Constitution), as amended on 13 July 2011, Registro Oficial 449 de 20 de octubre de 2008 (Ecuador), Article 76, RLA-164; C-400, Article 9; Velázquez ER, pp. 11-12; Track II Hearing D10.2346 & D11.2360.

# SA813

judiciary entitles and requires the judiciary to ensure that judicial proceedings are conducted fairly and that the rights of the parties are respected."[34]

8.58    The Tribunal does not understand from the Parties' respective submissions that these international standards for judicial conduct are materially disputed between them. Moreover, in addition to the Universal Declaration of 1948 and the International Covenant of 1966, the Constitutional Court's Judgment cites Article 8 of the American Convention on Human Rights of 1969 on the right to a fair trial "by a competent, independent and impartial tribunal." [35] As to Ecuadorian law, the Constitutional Court's Judgment also cites the constitutional rights under Articles 75 and 76(7)(k) of the Respondent's Constitution "to the effective, impartial and speedy protection of his or her rights and interests" and "to be tried by an independent, impartial and competent judge."[36]

8.59    The Tribunal considers that the Claimants' case on 'ghostwriting' satisfies the legal test for denial of justice under the FET standard in Article II(3)(a) of the Treaty, as at 1 March 2012 when the Lago Agrio Judgment became enforceable as a result of the Appellate Court's judgment and order. The evidence pointing to the corrupt conduct of Judge Zambrano in regard to the 'ghostwriting" of the Lago Agrio Judgment in collusion with certain of the Lago Agrio Plaintiffs' representatives justifies the very gravest concerns as to judicial propriety in regard to the Lago Agrio Judgment, with the judgments of the Lago Agrio Appellate Court, Cassation and Constitutional Courts leaving the Lago Agrio Judgment materially unremedied. Judge Zambrano's conduct was grossly improper by any moral, professional and legal standards; and it directly impacted, adversely, the rights of Chevron (with TexPet).

8.60    Accordingly, in the Tribunal's view, the Lago Agrio Judgment was, in the words of the award in *ELSI*, "clearly improper and discreditable" with the result that the Claimants' investments have "been subjected to unfair and inequitable treatment". That judgment was left unremedied by the Respondent's own legal system, including the judgments of the Lago Agrio Appellate, Cassation and Constitutional Courts and the Respondent's prosecutorial authorities. That conduct amounted to a failure of the

---

[34] United Nations, *Basic Principles on the Independence of the Judiciary*, UN Doc. A/CONF.121/22/Rev.1 59 (1985), CLA-293; see the text of the UN Basic Principles set out in Part III(H) above.
[35] C-2551, pp. 57-58.
[36] C-2551, pp. 65 and 57.

## SA814

Respondent's national system as a whole to satisfy minimum standards required under international law.

8.61 *(5) Other Allegations:* The Tribunal does not base its decision, as secondarily alleged by the Claimants, on the institutional corruption of the Ecuadorian legal system as a whole, including the Lago Agrio Appellate, Cassation and Constitutional Courts. In view of the Tribunal's decisions concerning the Lago Agrio Judgment, it is not an allegation material to the Claimants' primary case; and it is not here necessary for the Tribunal to address this secondary case, beyond the factors listed below.

8.62 First, it was Texaco's decision to support the stay of the Aguinda Litigation in New York, thereby effectively remitting that litigation to the Ecuadorian legal system under Texaco's undertaking of 1999 to the US District Court for the Southern District of New York in the Aguinda Litigation. According to the Respondent, following its subsequent merger with Texaco, Chevron became a party to Texaco's undertaking, as ostensibly confirmed the US Court of Appeals for the Second Circuit in its judgment of 2011. It therefore lies with difficulty, so the Respondent contends, for Chevron and TexPet now to complain, in good faith, about an alleged state of affairs generally in the legal system of Ecuador, given that recourse to that system was the result of Texaco's and their own choosing. On the other hand, the Claimants deny the binding effect upon either of them of Texaco's undertaking, as also the legal effect of the Second Circuit's judgment under the laws of the USA; and the Claimants contend that the Lago Agrio Court wrongly assumed personal and subject-matter jurisdiction over Chevron.

8.63 The Tribunal prefers not to decide the issue whether or not Texaco's undertaking is binding upon Chevron. It is not necessary to do so for the purposes of this Award. Even if the Claimants were correct (which the Tribunal assumes, but does not decide), the Tribunal does not consider that the wrongful assertion of jurisdiction by the Lago Agrio Court over the Lago Agrio Plaintiffs' Complaint against Chevron can amount, by itself, to any breach of Article VI(1)(a) or Article VI(1)(c) of the Treaty by the Respondent (acting by its judicial branch). The Tribunal notes, in particular, the terms of the Second Circuit's judgment (whatever its legal effect under the laws of the USA). Hence, the Tribunal discounts this first factor.

# SA815

8.64    Second, even the general state of the Ecuadorian legal system (as alleged by the Claimants) is not uniformly applicable to all cases. As the Respondent rightly submits, the eventual dismissal of criminal charges against Mr Veiga and Dr Pérez as TexPet's signatories to the 1995 Settlement Agreement, albeit late, is inconsistent with the Ecuadorian judiciary dependent upon instructions from the Respondent's executive branch.

8.65    Third, even with knowledge of Chevron's allegations, the New York Courts have continued to stay related litigation in New York, effectively remitting that litigation to the Ecuadorian courts: see the Huaorani Litigation summarised in Part IV(G)(9) above.

8.66    Fourth, there is evidence that Judge Zambrano was willing to be bribed by Chevron in return for a favourable result in the Lago Agrio Litigation (Chevron declined this offer). That initiative is also inconsistent with uniform judicial corruption in Ecuador dependent upon instructions from the Respondent's executive branch.

8.67    Last but not least, as already indicated, the evidential materials regarding the Lago Agrio Court (including Judge Zambrano) are so overwhelming that the Claimants' broader allegations of corruption against the Ecuadorian legal system can add nothing to their proven primary case.

8.68    In Parts IV and V above, the Tribunal discounted, as a distinct matter in regard to the Lago Agrio Judgment, the numerous public condemnatory statements regarding Chevron made by President Correa and members of his administration. As regards the Lago Agrio Litigation more generally, although particularly vicious in regard to Mr Veiga and Dr Pérez, Chevron's other legal representatives in Ecuador and (later) Dr Guerra, these statements were also not the cause of any injury sustained by the Claimants in the Lago Agrio Litigation or under the Lago Agrio Judgment.

8.69    Moreover, as the Respondent submitted, Governments sometimes resort to extreme political language as regards alleged damage to the environment caused by foreign oil companies.[37] The Tribunal does not consider such political, even populist, statements

---

[37] The Respondent cited the public condemnation in 2010 of "British Petroleum" by the President and Interior Secretary of the USA in regard to the Deepwater Horizon catastrophe in the Gulf of Mexico, which involved fatalities and significant environmental pollution: see R-537 and R-621.

# SA816

by a State's executive branch, however regrettable, as amounting by themselves to a denial of justice. This applies necessarily to a situation where the sole cause for the denial of justice lies elsewhere within the State's judicial branch – as it does in the present case.

8.70    The Tribunal returns to the Claimants' summary of their case on denial of justice, as formulated at the end of the Track II Hearing, as follows:[38]

> *"[There are] at least five separate and independent denials of justice: First, the Cabrera fraud, which the private and Government conspirators never quite managed to cleanse. Second, they paid [for ghostwritten orders] on behalf of the Plaintiffs; third, the Plaintiffs' ghostwriting of the Judgment using their own unfiled materials; fourth, the absurd and discriminatory fraudulent judgment itself imposing enormous liability by ignoring the environmental standards applicable to PetroEcuador and other companies, and then manufacturing environmental costs for remediation exponentially greater than those used anywhere else in the world. Now, the fifth denial of justice is Ecuador's response to the exposure of the first four. This goes directly to the question of when international liability will attach for misconduct that began in a country's courts".*

8.71    The Tribunal has decided the first three allegations as related parts of Judge Zambrano's misconduct regarding the 'ghostwriting' of the Lago Agrio Judgment. The Tribunal has decided the fifth allegation, to the effect that the Lago Agrio Judgment was left materially unremedied by the Lago Agrio Appellate, Cassation and (now) Constitutional Courts and the Respondent's prosecutorial authorities.

8.72    As regards the merits of the fourth allegation, relating to the Claimants' criticisms of 'junk science' or 'absurd' reasoning in the Lago Agrio Judgment, the Tribunal does not consider it necessary to say more than it has already said in regard to this case's special features, namely the Respondent's cross-claim, in Parts VII(C)(2) and VII(C)(3) above.

8.73    Accordingly, for denial of justice on the merits, the Tribunal does not consider it appropriate to base its decision on the Lago Agrio Judgment's treatment of environmental standards, including its assessment of causation and damages. As indicated above, the Tribunal bears in mind that similar environmental issues may yet be argued anew by the Aguinda or Lago Agrio Plaintiffs in resumed legal proceedings against Chevron, TexPet or Texaco. Albeit not binding upon these Plaintiffs, a

---

[38] Track II Hearing D.12.2756-2757.

## SA817

decision by the Tribunal here as to this fourth allegation could prejudice the determination of these issues.

8.74 It is also unnecessary for this Tribunal to address these issues in this arbitration as regards the dispute between Claimants and the Respondent: the Lago Agrio Judgment as a whole has been successfully impugned by the Claimants on other grounds.

8.75 The Tribunal's reticence in regard to this fourth allegation, i.e. its necessary exercise of arbitral economy in this arbitration, should not be misunderstood. If there were to be individual claims for personal harm by the Aguinda or Lago Agrio Plaintiffs (not being diffuse claims) in further legal proceedings, the Claimants may well be correct that the full costs for remediating all environmental damage by whomsoever caused in the former concession area would be less than US$ 100 million.[39]

8.76 *(6) The Tribunal's Conclusion as to Denial of Justice:* As recited above, the Tribunal bases its decisions on the merits on the corrupt misconduct of the Lago Agrio Court in regard to the Lago Agrio Judgment in the Lago Agrio Litigation, together with the absence of any appropriate relief within the Respondent's own legal system from the Lago Agrio Appellate, Cassation and Constitutional Courts and the conduct of the Respondent's prosecutorial authorities.

8.77 For these reasons, on the merits of the Claimants' claims for denial of justice, the Tribunal decides that the Respondent violated the FET standard and customary international law in Article II(3)(a) of the Treaty.

### E: The Tribunal's Final Conclusions

8.78 In summary, the Tribunal decides that the Respondent is liable to make reparations to each of Chevron and TexPet for injuries caused by the breaches of the FET standard and customary international law in Article II(3)(a) of the Treaty and for breaches of the Umbrella Clause in Article II(3)(c) of the Treaty, as further addressed in Parts IX and X below.

### F: Postscript

8.79 This postscript does not form part of the reasons in this Award, or its Operative Part.

---

[39] February Hearing D1.10 (Mr Pate), referring to PetroEcuador's costs estimate.

# SA818

8.80    If the Claimants' assessment (above) of the full costs of remediating environmental damage in the concession area were correct (as to which the Tribunal here expresses no conclusion), it is deeply regrettable that individual claims for personal harm caused by such damage were not amicably settled long ago, without the massive costs expended on the multiple lawsuits and arbitrations (including this arbitration) and, also, without the involvement of non-party funders and other third persons. The latter groups ostensibly rank in priority far above the Lago Agrio Plaintiffs for any proceeds from the Lago Agrio Litigation, as to which, again in the words of the Respondent's Counsel, the "real plaintiffs" with "real claims" are likely to receive nothing after 25 years of continuous litigation.

8.81    The Tribunal here bears in mind the remarks made by Mr Pate, Chevron's General Counsel, at the beginning of the Hearing on Interim Measures held on 11 February 2012, more than six years ago:[40]

> "... I will close by repeating what I said the last time I spoke before this Tribunal.[41] Chevron takes no pleasure in a dispute with any sovereign nation. We pride ourselves in working as good partners with nations who take a very broad spectrum of policy views. Chevron would welcome a constructive dialogue with Ecuador about this case and respects Ecuador's people and officials. So long as Ecuador continues to work in league with Mr Donziger, however, the result will be only further harm to the people, the civil society, and the reputation of Ecuador. Chevron invites Ecuador to change that course."

8.82    However, then as now, the amount of compensation resulting from any such "constructive dialogue", together with PetroEcuador's share with Chevron and TexPet for any liability regarding personal harm and environmental remediation in the concession area, lies beyond the jurisdiction of this Tribunal.

[40] February Hearing D1.10-11 (Mr Pate).
[41] This was a reference to his opening statement at the Jurisdiction Hearing in November 2010 (D1.111ff). Later, Mr Pate made the same observations during the November Hearing (D1.8ff), and again at the Track 1B Hearing in April 2014 (D1.8ff).

# SA819

## PART IX

## *THE PARTIES' CLAIMS FOR RELIEF*

### A: Introduction

9.1    The Tribunal here addresses the Claimants' and the Respondent's material requests for relief in Track II as set out in Part I above, in the light of the decisions taken in this Award, together with the Tribunal's earlier awards, decisions and orders. These requests are taken, respectively, from the Claimant's letter dated 19 March 2018 (Section B with its marked-up Enclosure 1) and the Respondent's letter dated 20 April 2018 (pp. 5-8, with its marked-up Enclosure 1).

9.2    The Tribunal has fully considered the Parties' respective written and oral submissions regarding their respective requests for relief. Given the several decisions made by the Tribunal in this Award, it is unnecessary to set out these submissions for the purpose of this Award, beyond the Parties' specific requests for relief.[1]

### B: The Tribunal's General Approach

9.3    As set out in Part VIII above, on the evidence adduced in these proceedings, the Tribunal has found the Respondent in breach of its obligations towards Chevron and TexPet, for denial of justice under the FET standard and customary international law in Article II(3)(a) of the Treaty and under the Umbrella Clause in Article II(3)(c) of the Treaty.

9.4    As explained in Parts VII and VIII above, the Tribunal considers that denial of justice under the Treaty's FET standard equates to denial of justice under customary international law, both falling within the scope of Article II(3)(a) of the Treaty. It follows that the Tribunal's finding regarding denial of justice under the FET standard equates with finding the Respondent also in breach of its obligations under customary international law for denial of justice.

9.5    Conversely, the Tribunal has not found the Respondent in breach of its obligations under the Treaty from the facts only that: (i) the Lago Agrio Plaintiffs commenced legal

---

[1] As regards the Parties' oral submissions on relief at the Track II Hearing, the Tribunal refers in particular to the Claimants' closing submissions at D12.2708ff and to the Respondent's closing submissions at D13.3011ff.

proceedings against Chevron before the Lago Agrio Court on 7 May 1993; (ii) the Lago Agrio Plaintiffs pleaded individual claims for personal harm against Chevron in their original Complaint filed in the Lago Agrio Litigation (not being diffuse claims);[2] (iii) the Lago Agrio Court assumed jurisdiction over the Complaint (as regards non-diffuse claims), by reason of the undertaking in favour of Ecuadorian jurisdiction in the Aguinda Litigation; and (iv) certain of the Lago Agrio Plaintiffs' legal representatives in the Lago Agrio Litigation engaged in corrupt and other nefarious practices during the Lago Agrio Litigation (not attributable to the Respondent under international law).

9.6    In regard to the Claimants' material requests for relief regarding the Respondent's internationally wrongful acts, the Tribunal's starting-point comprises the ILC's Articles on State Responsibility,[3] the judgments of the Permanent Court of International Justice in *Chorzów Factory* (1927 & 1928)[4] and the judgment of the International Court of Justice in *Avena I* (2004).[5]

9.7    In *Avena I (Mexico v USA)*, applying the general principles enunciated in *Chorzów Factory*, the Court decided upon the form of reparation (inter alia) as follows:[6]

> *"119. The general principle on the legal consequences of the commission of an internationally wrongful act was stated by the Permanent Court of International Justice in the Factory at Chorzów case as follows: 'It is a principle of international law that the breach of an engagement involves an obligation to make reparation in an adequate form.' (Factory at Chorzów, Jurisdiction, 1927, P.C.I.J., Series A, No. 9, p. 21.) What constitutes 'reparation in an adequate form' clearly varies depending upon the concrete circumstances surrounding each case and the precise nature and scope of the injury, since the question has to be examined from the viewpoint of what is the 'reparation in an adequate form' that corresponds to the injury. In a subsequent phase of the same case, the Permanent Court went on to elaborate on this point as follows: 'The essential principle contained in the actual notion of an illegal act – a principle which seems to be established by international practice and in particular by the decisions of arbitral tribunals – is that reparation must, as far as possible, wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if that act had*

---

[2] This decision was reached by a majority of the Tribunal: see the Tribunal's Decision on Track IB.

[3] International Law Commission, *Draft Articles on Responsibility of States for Internationally Wrongful Acts, with commentaries* (2001) II (Part Two) Yearbook of the ILC 31, CLA-291.

[4] *The Factory at Chorzów (Germany v. Poland)*, PCIJ, Judgment (Jurisdiction), 26 July 1927, 1927 PCIJ Series A No. 9; Judgment (Merits), 13 September 1928, 1928 PCIJ Series A No. 17, CLA-406.

[5] *Avena and Other Mexican Nationals (Mexico v. United States of America) I*, ICJ, Judgment, 31 March 2004, 2004 ICJ Reports 12.

[6] *Avena and Other Mexican Nationals (Mexico v. United States of America) I*, ICJ, Judgment, 31 March 2004, 2004 ICJ Reports 12, para 119.

# SA821

*not been committed.' (Factory at Chorzów, Merits, 1928, PCIJ., Series A, No. 17,. p. 47)."*

9.8    In that case, the Court identified the respondent State's internationally wrongful acts as the "process" of the domestic court proceedings (under the Vienna Convention on Consular Relations), as distinct from "the correctness as such of any conviction or sentencing". Accordingly, the Court concluded that: [7]

> *"[121] ... the internationally wrongful acts committed by the United States [sic; the United States of America] were the failure of its competent authorities to inform the Mexican nationals concerned, to notify Mexican consular posts and to enable Mexico to provide consular assistance. It follows that the remedy to make good these violations should consist in an obligation on the United States to permit review and reconsideration of these nationals' cases by the United States' courts, as the Court will explain further in paragraphs 128 to 134 below, with a view to ascertaining whether in each case the violation of Article 36 committed by the competent authorities caused actual prejudice to the defendant in the process of administration of criminal justice.*
>
> *[122] The Court reaffirms that the case before it concerns Article 36 of the Vienna Convention [i.e. the Vienna Convention on Consular Relations] and not the correctness as such of any conviction or sentencing. The question of whether the violations of Article 36, paragraph 1, are to be regarded as having, in the causal sequence of events, ultimately led to convictions and severe penalties is an integral part of criminal proceedings before the courts of the United States and is for them to determine in the process of review and reconsideration. In so doing, it is for the courts of the United States to examine the facts, and in particular the prejudice and its causes, taking account of the violation of the rights set forth in the Convention."*

9.9    As regards the ILC Articles on State Responsibility, the Tribunal refers, in particular, to Articles 16 and 28 to 38.[8] An internationally wrongful act (which includes the violation of a treaty or of customary international law) entails the consequences set out in Part Two of the ILC Articles on State Responsibility. These consequences include Article 28 ("Legal consequences of an internationally wrongful act"), Article 29 ("Continued duty of performance"), Article 30 ("Cessation and non-repetition"), Article 31 ("Reparation"), Article 32 ("Irrelevance of Internal law"), Article 33 ("Scope of international obligations") and Articles 34 to 38 on forms of reparation.

---

[7] *Avena and Other Mexican Nationals (Mexico v. United States of America) I*, ICJ, Judgment, 31 March 2004, 2004 ICJ Reports 12, paras 121-122.
[8] The relevant text of these ILC Articles on State Responsibility is fully set out in Part III above; see also CLA-291.

# SA822

9.10   In regard to the enforcement of the Lago Agrio Judgment before the courts of a third State (i.e. not Ecuador or the USA), the Claimants referred to Article 16 of Part One of the ILC Articles on State Responsibility ("Aid or assistance in the commission of an internationally wrongful act").[9] This Article provides that a State which aids or assists another State in the commission of an internationally wrongful act entails the consequences set out in Part Two of the ILC Articles on State Responsibility if: (i) that State does so with knowledge of the circumstances of the internationally wrongful act and (ii) the act would be internationally wrongful if committed by that State. For this purpose, a denial of justice under customary international law would be such internationally wrongful act. As the International Court of Justice decided in the *Bosnia Genocide Case* (2007),[10] Article 16 of the ILC Articles reflects a rule of customary international law.

9.11   The Tribunal adopts the general approach suggested by the ICJ in *Avena I,* to the effect that reparation for an internationally wrongful act varies, depending upon the concrete circumstances surrounding each case and the precise nature and scope of the injury under international law.

9.12   The Tribunal also follows the distinction drawn by the ICJ in *Avena I* between the "process" of the Lago Agrio Litigation leading to the enforceability of the Lago Agrio Judgment and the "correctness" of the Lago Agrio Judgment, as decided by the Lago Agrio Appellate, Cassation and Constitutional Courts.

9.13   A similar distinction was drawn by the ICJ in the *Case Concerning the Arrest Warrant* (2002).[11] In that case, the unlawful arrest warrant engaged the respondent State's international responsibility; but the warrant continued to exist, both as a matter of the local law and also international law. The Court held: "The warrant is still extant and remains unlawful … The Court accordingly considers that Belgium must by means of its own choosing cancel the warrant in question ...". Significantly, the Court did not itself cancel the warrant. In the *Case Concerning Jurisdictional Immunities* (2012),[12]

---

[9] Track II Hearing D12.2719ff.
[10] *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Bosnia and Herzegovina v. Serbia and Montenegro)*, ICJ, Judgment, 26 February 2007, 2007 ICJ Reports 43, para 420, CLA-640.
[11] *Arrest Warrant of 11 April 2000 (Democratic Republic of Congo v. Belgium)*, ICJ, Judgment, 14 February 2002, 2002 ICJ Reports 3, para 76, CLA-415.
[12] *Jurisdictional Immunities of the State (Germany v. Italy: Greece intervening)*, ICJ, Judgment, 3 February 2012, 2012 ICJ Reports 99, para 137, CLA-616.

# SA823

the ICJ ordered the respondent State to take steps, by means of its own choosing, to ensure that decisions of its own courts "become unenforceable". Again, significantly, the ICJ did not itself annul or declare the nullity of these judicial decisions.

9.14    Accordingly, applying international law, the Tribunal does not consider that it has the power to annul the Lago Agrio Judgment as regards its lack of "correctness". Albeit unlawful under international law as to "process" (as decided by the Tribunal), the Lago Agrio Judgment exists as a concrete fact under Ecuadorian law, hence the Claimants' successive appeals to the Respondent's courts. Given such existence, the Lago Agrio Judgment has a legal effect and resulting consequences under international law. However, the remedy of annulment, as such, lies with the Respondent's internal law. This Tribunal has no power to apply such an internal remedy, as an international tribunal. It does, however, have the power to order the Respondent to take steps to secure that result.

9.15    As to international law, the Tribunal has decided that the Respondent breached its obligations, by a denial of justice, in issuing the Lago Agrio Judgment, rendering it enforceable and maintaining its enforceability by the Lago Agrio Plaintiffs.

9.16    In Part VIII above, as to the right of a party to receive a fair hearing before an impartial tribunal, the Tribunal has already referred to Article 10 of the Universal Declaration of Human Rights, Article 14 of the International Covenant on Civil and Political Rights and Articles 2 and 6 of the UN Basic Principles on the Independence of the Judiciary. The violation of such a right by judicial corruption is proscribed by the UN Convention against Corruption ratified by the General Assembly on 31 October 2003 (to which the Respondent is a Contracting Party). In *World Duty Free* (2006), in the context of corruption by bribery, the tribunal identified, as a matter of international public policy, an international consensus as to universal standards and accepted norms of conduct that must be applied in all fora. It concluded: "In light of domestic laws and international conventions relating to corruption, and in light of the decisions taken in this matter by courts and arbitral tribunals, this Tribunal is convinced that bribery is contrary to the international public policy of most, if not all, States …".[13] In the Tribunal's view, judicial bribery must rank as one of the more serious cases of corruption, striking

---

[13] *World Duty Free Company Limited v Republic of Kenya*, ICSID Case No. ARB/00/7, Award, 4 October 2006, 46 ILM 339, para 157, RLA-548.

# SA824

directly at the rule of law, access to justice and public confidence in the legal system; and also, as regards the foreign enforcement of a corrupt judgment, at the law of nations. Accordingly, the Tribunal concludes that the Lago Agrio Judgment (with the judgments of the Lago Agrio Appellate, Cassation and Constitutional Courts) violates international public policy. As a matter of international comity, it must follow that the Lago Agrio Judgment should not be recognised or enforced by the courts of other States.

9.17    In the Tribunal's view, the reinstatement of the Claimants' rights under international law requires of the Respondent the immediate suspension of the enforceability of the Lago Agrio Judgment and the implementation of such other corrective measures as are necessary to "wipe out all the consequences" of the Respondent's internationally wrongful acts, so as to re-establish the situation which would have existed if those internationally wrongful acts had not been committed by the Respondent.

9.18    The Tribunal considers that these measures, subject to their elaboration in the form of declarations and orders below, are appropriate in the present circumstances of this case. These circumstances do not require the Tribunal itself to declare the nullity of the Lago Agrio Judgment under international law.

9.19    For the time being, contrary to the Claimants' submissions,[14] the Tribunal is willing to assume that the Respondent will comply in good faith with this Award, in compliance with the Parties' Arbitration Agreement (as defined in Part I of this Award), the Treaty and the lex loci arbitri.

### C: The Claimants' Requests for Relief

9.20    For this Track II, in the light of its general approach and decisions in this Award, the Tribunal addresses below the material relief sought by the Claimants in the form of the specific declarations and orders highlighted in green and purple in its marked-up Appendix A to their 19 March 2018 letter, recited in Annex 3(1) to Part I above:[15]

9.21    A3.3 Declaration 6: "*Declare that Claimants have no liability or responsibility for satisfying the Lago Agrio Judgment because they were fully released for all such claims by the Settlement Agreements*".

---

[14] Track II Hearing D12.2733ff.
[15] As designated by the Claimants, "green" signifies relief requested in Track II and "purple" relief requested in Tracks II and III. This "purple" relief is here marked *. In Annex 3 to Part I above, "green" is italicised and "purple" italicised and underlined.

# SA825

9.22    The Respondent, whether acting through its judicial branch or otherwise, was and remains bound to ensure, by means of its own choosing, that the Claimants have no liability or responsibility as regards diffuse claims under the 1995 Settlement Agreement. To such extent, this request is granted in principle as set out in this Award's Operative Part X.

9.23    A3.3 Declaration 7: "*Declare that the claims pleaded in the Lago Agrio Litigation (and upon which the Lago Agrio Judgment were based) are barred by res judicata and collateral estoppel*".

9.24    The Respondent was and remains bound to ensure, by means of its own choosing, that in accordance with the 1995 Settlement Agreement the Claimants are not exposed to liability or responsibility for diffuse claims in the courts of Ecuador. To such extent, this request is granted in principle as set out in this Award's Operative Part X.

9.25    A3.4: Declaration 1: "*Declaring that under the 1995, 1996 and 1998 Settlement and Release Agreements [the 1995 Settlement Agreement], Claimants have no liability or responsibility for environmental impact, including but not limited to any alleged liability for impact to human health, the ecosystem, indigenous cultures, the infrastructure, or any liability for unlawful profits, punitive damages or penalties, or for performing any further environmental remediation arising out of the former Consortium that was jointly owned by TexPet and Ecuador, or under the expired Concession Contract between TexPet and Ecuador*".

9.26    This request is not granted save in regard to diffuse claims under the 1995 Settlement Agreement, as explained in Paragraphs 9.22 and 9.24 above and set out in this Award's Operative Part X.

9.27    A3.4: Declaration 2: "*Declaring that Ecuador has breached the 1995, 1996, and 1998 Settlement and Release Agreements*".

9.28    The Respondent failed to observe its obligations under the 1995 Settlement Agreement, in breach of the Umbrella Clause in Article II(3)(c) of the Treaty. To such extent, this request is granted in principle as set out in this Award's Operative Part X.

9.29    A3.4: Declaration 3: *"Ordering Ecuador to specifically perform the Settlement and Release Agreements."*

9.30    The Respondent is required to observe its obligations under the 1995 Settlement Agreement, in accordance with the Umbrella Clause in Article II(3)(c) of the Treaty. To such extent, this request is granted in principle as set out in this Award's Operative Part X.

9.31    A3.4: Declaration 4: *"Declaring that Ecuador has breached the U.S.-Ecuador Treaty, including its obligations to afford fair and equitable treatment, full protection and*

# SA826

*security, an effective means of enforcing rights, non-arbitrary treatment, non-discriminatory treatment, national treatment, and to observe obligations it entered into with regard to investments".*

9.32   This request is granted in principle as regards: (i) denial of justice under the FET standard and customary international law in Article II(3)(a) of the Treaty; and (ii) the non-observation of the 1995 Settlement Agreement under the Umbrella Clause in Article II(3)(c) of the Treaty, as set out in this Award's Operative Part X.

9.33   A3.4: Declaration 6: *"Declaring that under the Treaty and applicable international law, Chevron is not liable for the Judgment".*

9.34   Under Articles II(3)(a), Article II(3)(c) of the Treaty and customary international law, the Respondent (by its judicial branch) was obliged not to hold Chevron (or TexPet) liable under the Lago Agrio Judgment; and consequently the Claimants are, as a matter of international law, not obliged to comply with the Lago Agrio Judgment. To such extent, this request is granted in principle as set out in this Award's Operative Part X.

9.35   A3.4: Declaration 7: "*Declaring that Ecuador is exclusively liable for the Judgment.*"

9.36   This request is granted as set out in this Award's Operative Part X, to the effect that any injury to the First or Second Claimant caused by the recognition or enforcement of any part of the Lago Agrio Judgment within or without Ecuador (as also decided by the Lago Agrio Appellate, Cassation and Constitutional Courts) shall be injuries for which the Respondent is liable to make full reparation under international law.

9.37   A3.4: Declaration 8: *"Nullifying the existence, validity, and all effects of the Judgment".*

9.38   This request for nullification is not granted. Under its general approach above in Paragraphs 9.3 to 9.19, the Tribunal has decided that that a declaration of the nullity of the Lago Agrio Judgment is not an appropriate remedy under international law.

9.39   A3.4: Declaration 9: *"Ordering Ecuador to use all measures necessary to enjoin enforcement of the Judgment, including enjoining the nominal Plaintiffs or any Trust from obtaining any related attachments, levies or other enforcement devices".*

9.40   In accordance with the Tribunal's decisions in Paragraphs 9.22 and 9.24 above, the Respondent is obliged to use measures of its own choosing to prevent the enforcement of the Lago Agrio Judgment. Save to such extent, this request is not granted except as set out in this Award's Operative Part X.

9.41   A3.4: Declaration 10: *"Ordering that, in the event that any court orders the recognition or enforcement of the Judgment, Ecuador must satisfy the Judgment directly".*

# SA827

9.42    This request is not granted, save as set out in this Award's Operative Part X.

9.43    A3.4: Declaration 11*: *"Awarding Claimants indemnification against Ecuador in connection with the Judgment, including a specific obligation by Ecuador to pay Claimants the sum of money awarded in the Judgment".*

9.44    This request is not granted in this Award, any such indemnity or payment being issues allocated to Track III as set out in this Award's Operative Part X.

9.45    A3.4: Declaration 12*: *"Awarding Claimants any sums that the nominal Lago Agrio Plaintiffs collect against Claimants or their affiliates in connection with enforcing the Judgment, including the amounts embargoed thus far".*

9.46    This request is not granted in this Award, any such sums being issues allocated to Track III as set out in this Award's Operative Part X.

9.47    A3.4: Declaration 14: *"Ordering Ecuador to make a written representation to any court in which the Lago Agrio Plaintiffs or any Trust attempt to recognize and enforce the Judgment that: ... (ii) the Lago Agrio Court had no personal or subject-matter jurisdiction over Chevron; ... (v) any enforcement of the Judgment places Ecuador in violation of its international law obligations".*

9.48    This request is not granted as regards sub-paragraph (ii): see Part VIII above (Paragraph 8.63). As regards sub-paragraph (v), it is granted in principle, as set out above in Paragraphs 9.22, 9.24 and 9.40 and in this Award's Operative Part X.

9.49    A3.4: Declaration 17: *"Any other and further relief that the Tribunal deems just and proper."*

9.50    This general request has been addressed by the Tribunal in its several decisions above, subject to any further relief to be addressed in Track III. The Tribunal does not think it necessary to address here this general request any further.

9.51    A3.5B: Order: *"Claimants also request that the Tribunal provide for a subsequent phase in this arbitration to determine all costs and attorneys' fees that should be awarded to Claimants for being forced to (i) pursue this arbitration; (ii) uncover the Judgment fraud; and (iii) defend against enforcement of the Lago Agrio Judgment in any jurisdiction".*

9.52    This request is granted in principle, as set out in this Award's Operative Part X.

9.53    A3.8A: Declaration 1: *"By issuing the Judgment and rendering it enforceable within and without Ecuador, Ecuador committed a denial of justice under international law and breached provisions of the Treaty."*

9.54    This request is granted in principle, as set out this Award's Operative Part X.

# SA828

9.55    A3.8A: Declaration 3: *"The court [1] rendering the Judgment asserted jurisdiction illegitimately and was not competent in the international sphere [2] to try the Lago Agrio case and [3] to pass judgment."*

9.56    This request (as directed at the Lago Agrio Court in the Lago Agrio Litigation) is not granted as regards [1] and [2]: see Part VIII above (Paragraph 8.63).

9.57    As regards [3], this request (as directed at the terms of the Lago Agrio Judgment) is granted in principle insofar as the Judgment is inconsistent with the Respondent's obligations under Articles II(3)(a) and II(3)(c) of the Treaty, as decided above in Paragraphs 9.22, 9.24, 9.40 and 9.48 and as set out in this Award's Operative Part X.

9.58    A3.8A: Declaration 4: *"The Judgment was issued in a process that violated general standards of due process and in which Chevron did not have an opportunity to present its defense."*

9.59    This request is granted in principle, as set out in this Award's Operative Part X.

9.60    A3.8A: Declaration 5: *"The Judgment is a nullity as a matter of international law".*

9.61    This request is not granted. As decided above in Paragraph 9.38, under its general approach described in Paragraphs 9.3 to 9.19, the Tribunal has decided that a declaration of the nullity of the Lago Agrio Judgment is not an appropriate remedy under international law.

9.62    A3.8A: Declaration 6: *"The Judgment is [1] unlawful and [2] consequently devoid of any legal effect {under international law}[16]."*

9.63    As to unlawfulness under the Treaty (including customary international law), the first part of this request is granted in principle, as set out in this Award's Operative Part X. The second part is not granted. As decided above in Paragraphs 9.38 and 9.61, under its general approach described in Paragraphs 9.3 to 9.19, the Tribunal does not consider that such a declaration for the Lago Agrio Judgment is an appropriate remedy under international law.

9.64    A3.8A: Declaration 10*: *"By taking measures to enforce the Judgment against assets within Ecuador, and taking measures to facilitate enforcement of the Judgment in other jurisdictions, Ecuador [1] is in breach of its obligations under the Treaty, and [2] must indemnify Claimants and any of their affiliates for any sum of money collected from them as a result of the Judgment".*

---

[16] The words "under international law" in this Declaration 6 were added by the Claimants at the Track II Hearing: see D12.2514.

# SA829

9.65    As the first part, this request is granted in principle as set out in this Award's Operative Part X, given the order dated 1 March 2012 of the Lago Agrio Appellate Court declaring the enforceability of the Lago Agrio Judgment and the Respondent's judicial branch maintaining such enforceability (see Part IV above). As to the second part, this request is not granted in this Award, any such indemnity being allocated to Track III, as set out in this Award's Operative Part X.

9.66    A3.8B: Order 5: *"To abstain from collecting or accepting any proceeds arising from or in connection with the enforcement or execution of the Judgment, and to return to Claimants any such proceeds that may come into Respondent's possession".*

9.67    This request is granted in principle, as set out in this Award's Operative Part X.

9.68    A3.9A: Declaration 1: *"The Lago Agrio Litigation is exclusively a diffuse-rights case".*

9.69    This request is not granted: the Tribunal refers to its Decision (by a majority) dated 12 March 2015 in Track IB.

9.70    A3.9A: Declaration 2: "*The 1999 EMA has no legal effect on the Settlement and Release Agreements [the 1995 Settlement Agreement]".*

9.71    This request is not granted, in the general form requested. In its Decision on Track 1B, the Tribunal decided (by a majority) that the Lago Agrio Complaint of 7 May 2003, as an initial pleading, included individual claims resting upon personal rights under Ecuadorian law, not being diffuse claims falling within the scope of the release under the 1995 Settlement Agreement. The Tribunal also decided that Article 43 of the 1999 Environmental Management Act (the "EMA") could not by itself convert what was otherwise a personal claim by an individual into a diffuse claim. Conversely, the Lago Agrio Plaintiffs could not succeed in bringing a diffuse claim before the Ecuadorian Courts, not being an individual claim for personal harm, without the Respondent breaching the 1995 Settlement Agreement: see Paragraphs 168 and 186(1) of the Decision on Track IB. In these circumstances, the Tribunal thinks it unnecessary to answer the request any further in this Award.

9.72    A3.9A: Declaration 3: *"The Lago Agrio Litigation was barred at its inception by res judicata."*

9.73    This request is not granted. As already indicated, by its Decision on Track IB, the Tribunal decided (by a majority) that the Lago Agrio Complaint of 7 May 2003, as an initial pleading, included individual claims resting upon personal rights under Ecuadorian law, not falling within the scope of the 1995 Settlement Agreement, and that

# SA830

the Lago Agrio Complaint was not wholly barred at its inception by res judicata, under Ecuadorian law, by virtue of the 1995 Settlement Agreement: see paragraphs 186(1) and 186(2) of the Decision on Track 1B.

9.74    A3.9A: Declaration 4: *"By issuing the Lago Agrio Judgment and rendering it enforceable within and without Ecuador, Ecuador violated various provisions of the Treaty."*

9.75    This request, albeit in different forms of wording, has already been addressed above in Paragraphs 9.28, 9.32, 9.54, 9.57, 9.63 and 9.65. The Tribunal has decided that the Respondent (by its judicial branch) failed to comply with its obligations under the FET standard and customary international law in Article II(3)(a) of the Treaty and under the Umbrella Clause in Article II(3)(c) of the Treaty, by the issuance and enforceability of the Lago Agrio Judgment resulting from the conduct of the Lago Agrio Court, the Lago Agrio Appellate Court, the Cassation Court and the Constitutional Court. The Tribunal does not therefore consider it necessary to grant this further relief, as a matter of surplusage; and it is not granted.

9.76    A3.9A: Declaration 5: *"By issuing the Lago Agrio Judgment on diffuse claims barred as res judicata, Ecuador breached the 1995, 1996 and 1998 Settlement and Release Agreements, and also violated Chevron's rights under the Treaty."*

9.77    This Tribunal repeats its decision above in Paragraph 9.75; and this request is therefore not granted.

9.78    A3.9A: Declaration 6: *"The Lago Agrio Judgment is a nullity as a matter of international law."*

9.79    This request is not granted. (It repeats the requests addressed above under Paragraphs 9.38, 9.61 and 9.63; and the Tribunal provides the same reason for its decision).

9.80    A3.9A: Declaration 7: *"The Lago Agrio Judgment is [1] unlawful and [2] consequently devoid of any legal effect."*

9.81    As to the first part, this request is granted in principle, as already decided above in Paragraph 9.63 and as set out in this Award's Operative Part X. As to the second part, the Tribunal repeats its decision above in Paragraph 9.38; this request repeats the similar request addressed above under Paragraphs 9.61 and 9.63; the Tribunal does not therefore consider it necessary to grant this further relief, as a matter of surplusage; and it is not granted.

9.82    A3.9A: Declaration 8: *"The Lago Agrio Judgment is a violation of Chevron's rights under the Treaty, and is not entitled to enforcement within or without Ecuador."*

# SA831

9.83     This request is granted in principle, as already decided above in Paragraphs 9.40 and 9.63 and as set out in this Award's Operative Part X. The Tribunal does not therefore consider it necessary to consider this request separately.

9.84     A3.9A: Declaration 9: *"The Lago Agrio Judgment violates international public policy and natural justice, and that as a matter of international comity and public policy, the Lago Agrio Judgment should not be recognized and enforced".*

9.85     This request is granted in principle, as set out in this Award's Operative Part X.

9.86     A3.9A: Declaration 10*: *"By: (i) taking measures to enforce the Judgment against assets within Ecuador, and (ii) taking measures to facilitate enforcement of the Judgment in other jurisdictions, Ecuador is in breach of its obligations under the Treaty, and must compensate Claimants for any sum of money collected by the Lago Agrio Plaintiffs and/or their agents as a result of the Judgment".*

9.87     This request repeats the similar request addressed above under Paragraph 9.65. It is therefore unnecessary to address it here separately, save that all issues relating to compensation are allocated to Track III, as also set out in this Award's Operative Part X.

9.88     A3.9B: Order 1: *"To take all measures necessary to set aside or nullify the Lago Agrio Judgment under Ecuadorian law."*

9.89     This request, albeit in different forms of wording, has already been addressed above in Paragraphs 9.38, 9.61, 9.63 and 9.81. It is therefore unnecessary to address it here separately.

9.90     A3.9B: Order 2: *"To take all measures necessary to prevent enforcement and recognition within and without Ecuador of the Lago Agrio Judgment".*

9.91     This request, albeit in different form of wording, has already been addressed above in Paragraphs 9.40, 9.63 and 9.83. It is therefore unnecessary to address it here separately.

9.92     A3.9B: Order 3: *"To take all measures necessary to prevent the Lago Agrio Plaintiffs or any Trust from obtaining any related attachments, levies, or other enforcement devices under the impugned Judgment."*

9.93     This request, albeit in different form of wording, has already been addressed above in Paragraph 9.40. It is therefore unnecessary to address it here separately.

9.94     A3.9B: Order 4: *"To make a written representation to any court in which the Lago Agrio Plaintiffs or any Trust attempt to recognize and enforce the Lago Agrio Judgment that: (i) the claims that formed the basis of the Lago Agrio Judgment were validly released under Ecuadorian law by the Government; (ii) the Lago Agrio Judgment is a legal nullity; and (iii) any enforcement of the Lago Agrio Judgment will place Ecuador in violation of its obligations under the Treaty".*

# SA832

9.95  This request is not granted, save as otherwise ordered in this Award's Operative Part X (see also the decisions regarding the similar request in Paragraph 9.48 above).

9.96  Paragraph 47: *"Claimants' requested relief is without prejudice to all other remedies sought in relation to Track II or any other remedy that may effectively protect Claimants' rights, including a damage remedy as part of Track III."*

9.97  To the extent necessary and appropriate, the Tribunal defers to Track III this general request as to any undecided issues outstanding from Track I, IB and II.

### D: The Respondent's Requests for Relief

9.98  In the circumstances, it is possible to decide the Respondent's requests for relief more succinctly. As with the Claimants' requests for relief, it is appropriate to set out the Respondent's material requests in the form submitted to the Tribunal.

9.99  In its letter dated 20 April 2018, the Respondent limited its pleaded requests for relief for Track II to "those prayers referring to findings of jurisdiction and State responsibility", with "prayers that refer to remedy" assigned to Track III, along with (i) the 'show cause' issues related to the Tribunal's Fourth Interim Award; (ii) the Respondent's application of 1 March 2013 for "Reconsideration of the First, Second and Fourth Interim Awards" and (iii) any quantum issues (page 8 of its letter). Moreover, the Respondent has confirmed its agreement that all issues of costs be assigned to Track III (see below).

9.100  For this Track II, in the light of its general approach and decisions in this Award, the Tribunal addresses below the material relief sought by the Respondent in the form of the specific declarations and orders as marked-up in its Attachment 1, recited in Annex 3(2) to Part I above:[17]

9.101  *A3.12(b): "Dismisses on the merits Chevron's claims under the 1995 Settlement Agreement and the 1998 Final Release [i.e., collectively, "the 1995 Settlement Agreement"]."*

9.102  This request is not granted, as regards the Claimants' claims under the Umbrella Clause in Article II(3)(c) of the Treaty.

9.103  A3.12(c): *"Dismisses on the merits TexPet's claims under the 1995 Settlement Agreement and the 1998 Final Release."*

---

[17] As designated by the Respondent, "red" signifies relief requested in Track II and "blue" relief requested in Track III. See Annex 3 to Part I above.

# SA833

9.104   This request is not granted, as regards the Claimants' claims under the Umbrella Clause in Article II(3)(c) of the Treaty.

9.105   A3.12(d): *"Declares specifically that the Respondent has not breached the 1995 Settlement Agreement or the 1998 Final Release"*.

9.106   This request is not granted, as regards the Claimants' claims under the Umbrella Clause in Article II(3)(c) of the Treaty.

9.107   A3.12(e): *"Dismisses all of Claimants' claims as they relate to the 1996 Local Settlements, reached between TexPet and local government entities"*.

9.108   This request is not granted, subject to this Award's Operative Part X.

9.109   A3.12(f): *"Declares that the Lago Agrio Litigation was not barred by res judicata or collateral estoppel."*

9.110   In its Decision dated 12 March 2015 in Track IB, the Tribunal decided (by a majority) that the Lago Agrio Complaint of 7 May 2003 of the Lago Agrio Plaintiffs was not wholly barred at its inception by res judicata, under Ecuadorian law, by virtue of the 1995 Settlement Agreement. Save as aforesaid, this request is not granted.

9.111   A3.16(a): *"Declaring that it [the Tribunal] lacks jurisdiction over Claimants' denial of justice and related treaty claims against the Republic."*

9.112   This request is not granted.

9.113   A3.16(b): *"Alternatively, assuming the Tribunal finds it has jurisdiction over the denial of justice and Treaty claims, dismissing Claimants' denial of justice and related treaty claims against the Republic as not ripe for adjudication under international law in light of Claimants' failure to exhaust available local remedies, and as otherwise meritless."*

9.114   This request is not granted.

9.115   A3.16(c): *"Declaring that Claimants do not possess the rights they claim to have under the 1995 Settlement Agreement, the 1998 Final Release, and/or the 1996 Local Settlements in connection with the Lago Agrio Litigation."*

9.116   This request is not granted, subject to this Award's Operative Part X.

9.117   A3.16(d): *"Declaring further that no breach of the 1995 Settlement Agreement, the 1998 Final Release, and/or the 1996 Local Settlements occurred in connection with the Lago Agrio Litigation."*

9.118   This request is not granted.

# SA834

### E: Miscellaneous

9.119 *Compensation:* The Tribunal decides, confirming its earlier procedural orders, that all issues of quantum shall be addressed in Track III of these arbitration proceedings. These issues shall include issues as to reparation in the form of compensation for injuries sustained by the First Claimant or the Second Claimant, as pleaded by the Claimants, including any assessment of the amount of compensation, moral damages, indemnities, reimbursements, payments, expenses and interest. Track III may also address, to the extent still relevant, issues of non-compensatory restitution.

9.120 *Costs*: The Parties are agreed and the Tribunal here confirms that all issues relating to legal and arbitration costs under Articles 38-40 of the UNCITRAL Arbitration Rules are deferred to a later stage of these arbitration proceedings. Nevertheless, the Tribunal considers that it would be useful for the Parties to provide breakdowns of the amounts of their respective claims for legal costs to date, as set out in as set out in this Award's Operative Part X.

9.121 *Track III Issues*: Subject to any further order of the Tribunal otherwise, the issues for Track III shall include: (i) compensation (as described above); (ii) the Parties' extant requests for relief left undecided in this Award, as identified in their respective letters dated 19 March and 20 April 2018 (including any extant issues as to non-compensatory restitution); (iii) the 'show cause' issues as to compensation claimed by the Claimants for the Respondent's violations of the Tribunal's First and Second Interim Awards on Interim Measures; and (iv) the Respondent's application for the reconsideration of the Tribunal's First, Second and Fourth Interim Awards.

# SA835

## PART X

### THE OPERATIVE PART

*A: Introduction*

10.1   **For the reasons set out in this Award, based on the evidential materials adduced in these arbitration proceedings together with its earlier awards, orders and decision, the Tribunal makes the following declarations and orders under the Treaty and international law:**

*B: Declarations as to Jurisdiction and Admissibility*

10.2   **The Tribunal declares that it has jurisdiction under Article VI of the Treaty over the claims pleaded in this arbitration by the First Claimant (Chevron) and the Second Claimant (TexPet) under Articles II(3)(a) and II(3)(c) of the Treaty; and the Tribunal rejects all objections as to lack of jurisdiction pleaded by the Respondent;**

10.3   **The Tribunal declares that the claims pleaded in this arbitration by the First Claimant and the Second Claimant under Articles II(3)(a) and II(3)(c) of the treaty are admissible under Article VI of the Treaty; and the Tribunal rejects all objections as to non-admissibility pleaded by the Respondent.**

*C: Declarations as to the Merits*

10.4   **The Tribunal declares that material parts of the Lago Agrio Judgment of 14 February 2011 (as clarified by order of 4 March 2011) were corruptly 'ghostwritten' for Judge Nicolás Zambrano Lozada, as a judge of the Lago Agrio Court, by one or more of the Lago Agrio Plaintiffs' representatives in return for a promise by such representative(s) to pay to Judge Zambrano a bribe from the proceeds of the Lago Agrio Judgment's enforcement by the Lago Agrio Plaintiffs;**

10.5   **The Tribunal declares that the Respondent, by issuing, rendering enforceable, maintaining the enforceability and executing the Lago Agrio Judgment (as also**

# SA836

decided by the Lago Agrio Appellate, Cassation and Constitutional Courts) and knowingly facilitating its enforcement outside Ecuador, wrongfully committed a denial of justice under the standards both for fair and equitable treatment and for treatment required by customary international law under Article II(3)(a) of the Treaty;

10.6    The Tribunal declares that the Respondent is liable to make full reparation to the First Claimant and the Second Claimant for denial of justice under the standards both for fair and equitable treatment and for treatment required by customary international law under Article II(3)(a) of the Treaty; and the Tribunal rejects the defences pleaded by the Respondent;

10.7    The Tribunal (by a majority) declares, confirming its Decision on Track IB, that the Lago Agrio Complaint of 7 May 1998, as an initial pleading, included individual claims (for personal harm) resting upon individual rights under Ecuadorian law, not falling within the scope of the 1995 Settlement Agreement and that, therefore, the Lago Agrio Complaint was not wholly barred at its inception by res judicata under Ecuadorian law, by virtue of the 1995 Settlement Agreement;

10.8    The Tribunal declares that the said Lago Agrio Judgment (as also decided by the Lago Agrio Appellate, Cassation and Constitutional Courts) decided only diffuse claims as distinct from individual claims for personal harm by the Lago Agrio Plaintiffs, whereby the Respondent violated its obligations towards the First Claimant and the Second Claimant as "Releasees" under the 1995 Settlement Agreement;

10.9    The Tribunal declares that the Respondent is liable to make full reparation to the First Claimant and the Second Claimant under Article II(3)(c) of the Treaty for the non-observation of its obligations towards each of them as a "Releasee" under the 1995 Settlement Agreement; and the Tribunal rejects the defences pleaded by the Respondent;

10.10   The Tribunal declares that, given the Respondent's said denial of justice, the Lago Agrio Judgment (as also decided by the Lago Agrio Appellate, Cassation and Constitutional Courts) grossly violated the fundamental procedural rights of

# SA837

the First Claimant (including its rights of defence); the said Lago Agrio Judgment (as thus decided) is contrary to international public policy; and no part of the said Lago Agrio Judgment should be recognised or enforced by any State with knowledge of the Respondent's said denial of justice;

10.11   The Tribunal declares that any injury to the First Claimant or the Second Claimant caused by the recognition or enforcement of any part of the Lago Agrio Judgment within or without Ecuador (as decided by the Lago Agrio Appellate, Cassation and Constitutional Courts) shall be injuries for which the Respondent is liable to make reparation under international law;

10.12   For the avoidance of doubt, the Tribunal declares and confirms that neither this Award nor any of its earlier awards, orders and decision precludes a claim by any of the Lago Agrio Plaintiffs against the First or Second Claimants made for personal harm in respect of his or her individual rights, not being a diffuse claim within the meaning of the 1995 Settlement Agreement.

### D: Orders as to the Merits

10.13   The Respondent shall, to the satisfaction of the Tribunal and as unconditional obligations of result (save where otherwise indicated):

(i)     Take immediate steps, of its own choosing, to remove the status of enforceability from the Lago Agrio Judgment (as also decided by the Lago Agrio Appellate, Cassation and Constitutional Courts);

(ii)    take immediate steps, of its own choosing, to preclude any of the Lago Agrio Plaintiffs, any "trust" purporting to represent their interests (including the "Frente de Defensa La Amazonia"), any of the Lago Agrio Plaintiffs' representatives, and any non-party funder from enforcing any part of the Lago Agrio Judgment (as also decided by the Lago Agrio Appellate, Cassation and Constitutional Courts), directly or indirectly, whether by attachment, arrest, interim injunction, execution or howsoever otherwise;

# SA838

(iii)    on notice from the First or Second Claimants, advise promptly in writing any State (including its judicial branch), where the Lago Agrio Plaintiffs may be seeking directly or indirectly, now or in the future, the enforcement or recognition of any part of the Lago Agrio Judgment (as also decided by the Lago Agrio Appellate, Cassation and Constitutional Courts) of this Tribunal's declarations and orders regarding the Respondent's internationally wrongful acts comprising a denial of justice resulting from the Lago Agrio Judgment (as thus decided); and, for this purpose (being required by legal duty or to pursue a legal right), any Party shall be entitled, notwithstanding Article 32(5) of the UNCITRAL Arbitration Rules, to disclose to the State's judicial branch (on whatever terms that its courts may order) a copy of this Award and its earlier awards, orders and decision;

(iv)    abstain from collecting or receiving, directly or indirectly, any proceeds from the enforcement or recognition of any part of the Lago Agrio Judgment (as also decided by the Lago Agrio Appellate, Cassation and Constitutional Courts) within or without Ecuador;

(v)    return promptly to the First Claimant any such proceeds that (notwithstanding the foregoing) come into the Respondent's custody, possession or control;

(vi)    take corrective measures, of its own choosing, to "wipe out all the consequences" of all the Respondent's internationally wrongful acts in regard to the Lago Agrio Judgment (as also decided by the Lago Agrio Appellate, Cassation and Constitutional Courts), within the meaning of Article 31 of the International Law Commission's Articles on State Responsibility, excepting only reparation in the form of compensation (as to which, see Section E below);

(vii)    comply with its obligations towards the First Claimant and the Second Claimant as "Releasees" under the 1995 Settlement Agreement, in accordance with Article II(3)(c) of the Treaty; and

# SA839

(viii)   subject to further order of this Tribunal in Track III, make full reparation in the form of compensation for any injuries caused to the First Claimant and the Second Claimant by the Lago Agrio Judgment (as also decided by the Lago Agrio Appellate Court, Cassation and Constitutional Courts).

### E: Compensation

10.14   All issues as to reparation in the form of compensation for any injuries sustained by the First or Second Claimant, as claimed by the Claimants and denied by the Respondent, including any assessment of the amount of compensation, moral damages, indemnities, reimbursements, payments, expenses and interest, are currently assigned for further submissions by the Parties to Track III. These issues are not decided in this Award.

### F: Legal and Arbitration Costs

10.15   All issues relating to the allocation and assessment of costs and expenses (within the meaning of Articles 38-40 of the UNCITRAL Arbitration Rules), as claimed by the Claimants and the Respondent, are currently assigned for further submissions by the Parties later in these arbitration proceedings. These issues are not decided in this Award;

10.16   Nonetheless, so as to facilitate this later exercise as to assessment, the Claimants and the Respondent shall submit written summaries (not to exceed ten pages) of their respective claimed amounts for costs and expenses to date, to be submitted to the Tribunal not later than 90 days following the date of this Award. These summaries shall contain only a breakdown of the claimed amounts and shall not include any submissions as to the merits of the Parties' respective claims for costs (including issues of allocation).

### G: Miscellaneous

10.17   The Parties' extant requests for relief, as marked-up in the enclosures to their respective letters dated 19 March and 20 April 2018 for Track III, shall be addressed by the Parties in Track III of these arbitration proceedings;

# SA840

10.18    The Tribunal confirms, as declared in its Fourth Interim Award on Interim Measures dated 7 February 2013, that the Respondent violated its First and Second Interim Awards on Interim Measures dated 25 January and 16 February 2012 in breach of Article VI of the Treaty, Article 32(3) of the UNCITRAL Arbitration Rules and international law;

10.19    In accordance with the Tribunal's said Fourth Interim Award, at Paragraph 2 of Part IV (page 31), the 'show cause' issues relating to compensation claimed by the First and Second Claimants for the Respondent's violations of the said First and Second Interim Awards shall be addressed by the Parties in Track III of these arbitration proceedings;

10.20    The Respondent's application of 1 March 2013 for the reconsideration of the Tribunal's First, Second and Fourth Interim Awards shall be further addressed by the Parties in Track III of these arbitration proceedings;

10.21    In the light of this Award, not later than 90 days following the date of this Award, any Party may apply to the Tribunal for permission to add any further issue or request for relief to be addressed by the Parties in Track III of these arbitration proceedings;

10.22    Further, in the light of this Award, not later than 90 days following the date of this Award, the Respondent may (in writing) show cause why the Tribunal should not vary Paragraph 4 of its Second Interim Award on Interim Measures by ordering the release to the Claimants of the amount of US$ 50 million deposited by the Claimants with the Permanent Court of Arbitration as security for the Claimants' contingent responsibility to the Respondent in regard to such interim measures; and

10.23    Save as aforesaid, the requests for relief made by the First and Second Claimants for decision in this Track II are not granted; and the requests for relief made by the Respondent for decision in this Track II are not granted.

# SA841

10.24 This Award, although separately signed by the Tribunal's members on three signing pages, constitutes a "partial award" signed by the three arbitrators under Article 32 of the UNCITRAL Arbitration Rules.

**Made at The Hague, The Netherlands as the place (or seat) of this arbitration, by the Tribunal,**

On 30 August 2018

*Dr Horacio A. Grigera Naón:*

*Professor Vaughan Lowe QC:*

*V.V. Veeder (President):*

# SA842

10.24   This Award, although separately signed by the Tribunal's members on three signing pages, constitutes a "partial award" signed by the three arbitrators under Article 32 of the UNCITRAL Arbitration Rules.


Made at The Hague, The Netherlands as the place (or seat) of this arbitration, by the Tribunal,

On 30 August 2018


*Dr Horacio A. Grigera Naón:*


*Professor Vaughan Lowe QC:*


*V.V. Veeder (President):*

## SA843

10.24 This Award, although separately signed by the Tribunal's members on three signing pages, constitutes a "partial award" signed by the three arbitrators under Article 32 of the UNCITRAL Arbitration Rules.

Made at The Hague, The Netherlands as the place (or seat) of this arbitration, by the Tribunal,

On 30 August 2018

*Dr Horacio A. Grigera Naón:*

*Professor Vaughan Lowe QC:*

*V.V. Veeder (President):*

# SA844

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
CHEVRON CORPORATION, :
:
Plaintiff, :
:
v. :  11 Civ. 0691 (LAK)
:
STEVEN DONZIGER, *et al.*, :
:
Defendants. :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## CHEVRON CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO HOLD STEVEN DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER, AND DONZIGER ASSOCIATES, PLLC IN CONTEMPT OF COURT FOR THEIR FAILURE TO COMPLY WITH THE RICO AND DEFAULT JUDGMENTS AND THE APRIL 16, 2018 RESTRAINING NOTICE

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193 Telephone: 212.351.4000
Facsimile: 212.351.4035

STERN, KILCULLEN & RUFOLO LLC
325 Columbia Tpke, Ste 110
P.O. Box 992
Florham Park, New Jersey 07932-0992 Telephone: 973.535.1900
Facsimile: 973.535.9664

*Attorneys for Plaintiff Chevron Corporation*

# SA845

## TABLE OF CONTENTS

Page

I.  PRELIMINARY STATEMENT ................................................................. 1

II.  FACTUAL BACKGROUND .................................................................... 3

    A.  Since March 2014, Donziger Has Monetized the Ecuadorian Judgment by Soliciting and Receiving Funds in Exchange for Interests Therein ...................... 3

    B.  Donziger Has Received Hundreds of Thousands of Dollars for Personal Gain ............................................................................................ 6

    C.  Donziger Is Not Raising Money to Pay His "Clients'" Legal Fees or Costs .......... 8

        1.  Donziger's Retainer Agreements Do Not Authorize His Receipt of Funds .......................................................................................... 8

        2.  Donziger Has Not Accounted to the LAPs for His Use of Funds ........... 10

        3.  The LAPs Have Repeatedly Represented That They Lack Litigation Funds .................................................................. 11

    D.  Donziger Has Used Investors' Monies to Continue His Extortionate Campaign ................................................................................... 14

    E.  Donziger Has Profited from the Judgment by Using It to Pay Personal Creditors ................................................................................... 18

III.  ARGUMENT ................................................................................. 19

    A.  Donziger Is in Contempt for Violating the RICO and Default Judgments .......... 19

        1.  Donziger Is Violating Paragraph 1 of the RICO and Default Judgments ....................................................................... 21

            a.  Paragraph 1 is Clear and Unambiguous ..................................... 22

            b.  Clear and Convincing Evidence Demonstrates Donziger's Noncompliance with Paragraph 1 ................................. 23

                i.  Donziger's November 2017 Contingency Interest .......... 24

                ii.  Investor Funds Collected by Donziger ........................... 24

        2.  Donziger Is Violating Paragraph 5 of the RICO Judgment and Paragraph 4 of the Default Judgment ....................................... 25

# SA846

## TABLE OF CONTENTS
(continued)

|  |  |  | Page |
|---|---|---|---|
|  | a. | Paragraph 5 of the RICO Judgment and Paragraph 4 of the Default Judgment Are Clear and Unambiguous | 25 |
|  | b. | Clear and Convincing Evidence Proves Donziger Has Violated Paragraph 5 of the RICO Judgment and Paragraph 4 of the Default Judgment | 26 |
|  | 3. | Donziger's Arguments Regarding the April 2014 Stay Order Are Unavailing | 27 |
| B. |  | Donziger Is Violating Chevron's Restraining Notice | 32 |
| C. |  | Sanctions Are Warranted to Make Donziger Comply with the RICO and Default Judgments and the Restraining Notice, and to Compensate Chevron | 33 |
|  | 1. | Donziger's Pattern of Racketeering Continues Unabated | 33 |
|  | 2. | Sanctions Are Necessary to Force Donziger to Comply | 37 |
| IV. | REQUESTED RELIEF |  | 38 |
| V. | CONCLUSION |  | 40 |

# SA847

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Bloom v. Illinois,*
    391 U.S. 194 (1968).................................................................................21

*Chambers v. NASCO, Inc.,*
    501 U.S. 32 (1991)..................................................................................20

*Chevron Corp. v. Donziger,*
    833 F.3d 74 (2d Cir. 2016)...............................................................21, 33

*Chevron Corp. v. Donziger,*
    974 F. Supp. 2d 362 (S.D.N.Y. 2014)..............................10, 17, 21, 22, 30, 33, 34, 35, 36, 37

*City of New York v. Mickalis Pawn Shop, LLC,*
    645 F.3d 114 (2d Cir. 2011)...................................................................39

*Cooke v. United States,*
    267 U.S. 517 (1925)...............................................................................20

*Cordius Tr. v. Kummerfeld Associates, Inc.,*
    658 F. Supp. 2d 512 (S.D.N.Y. 2009)........................................32, 33, 38

*F.T.C. v. Verity Intern., Ltd.,*
    140 F. Supp. 2d 313 (S.D.N.Y. 2001)....................................................40

*Gompers v. Bucks Stove & Range Co.,*
    221 U.S. 418 (1911)...............................................................................20

*Int'l Union, United Mine Workers of Am. v. Bagwell,*
    512 U.S. 821 (1994).........................................................................20, 21

*N.A. Sales Co. v. Chapman Indus. Corp.,*
    736 F.2d 854 (2d Cir. 1984)...................................................................37

*N.Y. State Nat. Org. for Women v. Terry,*
    159 F.3d 86 (2d Cir. 1998).....................................................................20

*N.Y. State Nat. Org. for Women v. Terry,*
    886 F.2d 1339 (2d Cir. 1989).................................................................40

*Paramedics Electromedecina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.,*
    369 F.3d 645 (2d Cir. 2004)............................................................21, 38

*Roadway Express, Inc. v. Piper,*
    447 U.S. 752 (1980)...............................................................................19

# SA848

*Ex Parte Robinson,*
    86 U.S. (19 Wall.) 505 (1873) ...................................................................................20

*Spallone v. United States,*
    493 U.S. 265 (1990) ..................................................................................................40

*United States v. City of Yonkers,*
    856 F.2d 444 (2d Cir. 1988) ....................................................................................40

*United States v. Hudson,*
    11 U.S. (7 Cranch) 32 (1812) ..................................................................................20

*United States v. Solow,*
    138 F. Supp. 812 (S.D.N.Y. 1956) ..........................................................................37

*United States v. United Mine Workers of Am.,*
    330 U.S. 258 (1947) ..................................................................................................20

*Weitzman v. Stein,*
    98 F.3d 717 (2d Cir. 1996) ......................................................................................40

**Statutes**

18 U.S.C. § 1341 ...............................................................................................................35

18 U.S.C. § 1343 ...............................................................................................................35

18 U.S.C. § 1956(a)(2) ......................................................................................................36

28 U.S.C. § 1746 ..........................................................................................................39, 40

CPLR § 5222 ...................................................................................................................3, 32

CPLR § 5222(b) .................................................................................................................32

CPLR § 5222(e) .................................................................................................................33

CPLR § 5251 ......................................................................................................................32

N.Y. Penal Law § 215.50 ..................................................................................................20

**Rules**

Fed. R. Civ. P. 69(a)(1) .....................................................................................................32

# SA849

## I.   PRELIMINARY STATEMENT

Recently discovered evidence proves that during the four and a half years since this Court entered the RICO Judgment, Steven Donziger's racketeering scheme has continued unabated. Donziger willfully and repeatedly has violated the RICO injunction, monetizing and profiting from the fraudulent Ecuadorian judgment by selling, assigning, pledging, transferring, and encumbering interests therein.  At the same time, he has refused to transfer and assign to Chevron funds that are traceable to the Ecuadorian judgment.  Donziger's brazen acts of contempt continue the pattern of racketeering for which he was found liable, threaten the integrity of this Court's rulings, and are causing further harm to Chevron.  Severe sanctions are warranted to secure Donziger's compliance and compensate Chevron for its injuries because he has shown that he will not comply until compelled to do so.  In one of the many demonstrations of his disregard for this Court, Donziger proclaims on his public website that "the U.S. court decisions in Chevron's RICO case—all of which derive from Kaplan's flawed proceeding—deserve no deference by any authority, the public, the financial markets, or even Chevron's own shareholders and employees."  Ex. 1 at 1.[1]

Donziger's actions are as contumacious as his rhetoric.  With a "goal" to "'just get as much as [he] can get'" (Declaration of Mary K. Sullivan ("Sullivan Decl.") ¶ 28), since March 2014, Donziger has sold interests in the fraudulent Ecuadorian judgment on at least ten occasions, obtaining more than $1,500,000 in addition to the millions raised from earlier investors.  Over $342,000 of this amount was transferred to Donziger by his long-time co-conspirator Aaron Marr Page *after* entry of the Default Judgment in April 2018.  Though all of this property is traceable to the Ecuadorian judgment, Donziger has not transferred any of it to Chevron.

While Donziger has tried to defend his conduct as permissible under this Court's order

---

[1]  "Donziger" refers to Steven Donziger, The Law Offices of Steven R. Donziger, and Donziger Associates PLLC. Unless otherwise indicated, all citations to Ex. __ are citations to exhibits to the Declaration of Anne Champion.

# SA850

denying his request for a stay, as fundraising for foreign enforcement actions, the evidence recently obtained from his erstwhile associate Katie Sullivan eviscerates any such claim. Instead, "a majority of the investor funds were allocated to [Donziger] himself for what he claimed were case management and reimbursements, and on items related to an ongoing out-of-court strategy against Chevron." Sullivan Decl. ¶ 4 (Donziger "seemed to have full authority to decide how investor money was spent"). "Steven spent the majority of his time coordinating 'out of court' 'non-legal' strategies to put 'pressure' on Chevron." *Id.* ¶ 7. Sullivan, in fact, never "observe[d] [Donziger] working on any" legal issues. *Id.* Donziger is also using funds obtained in violation of the RICO Judgment to continue his pattern of racketeering, committing new criminal acts of extortion, wire and/or mail fraud, money laundering, and obstruction of justice.

Donziger is in ongoing contempt of paragraph 1 of both the RICO and Default Judgments. The evidence to date shows that Donziger obtained, either in his own capacity or as agent for the FDA, at least $1,525,940 in exchange for shares in the Ecuadorian judgment—much of which he then expended from his personal accounts. These funds are "traceable to the Judgment," but Donziger has failed to "transfer and forthwith assign" them to Chevron. Dkt. 1875 ¶ 1; Dkt. 1985 ¶ 1. Donziger has also failed to "transfer and assign" to Chevron the new contingency interests granted to him in a November 2017 retainer agreement with the FDA. This ongoing failure is especially egregious in light of this Court's order holding that any contingency interests Donziger has in the Ecuadorian judgment are "'subject to execution and attachment[,]'" and "were and remain immediately assignable" to Chevron. Dkt. 2072 at 7.

Donziger's solicitation and collection of proceeds in exchange for interests in the Ecuadorian judgment for himself and the FDA also violates paragraph 5 of the RICO Judgment and paragraph 4 of the Default Judgment, which prohibit Donziger from "undertaking any acts to monetize

2

or profit from the Judgment . . . including without limitation by selling, assigning, pledging, transferring or encumbering any interest therein." Dkt. 1875 ¶ 5; Dkt 1985 ¶ 4. Donziger's entry into the November 2017 retainer agreement with the FDA further violates paragraph 5 by obtaining an equity interest in the Ecuadorian judgment separate from the one granted by his prior retainer agreement, and securing the FDA's "irrevocable support" of Donziger's efforts to avoid the effect of the constructive trust and to monetize his shares in the Ecuadorian judgment. Further, by continuing to transfer tens of thousands of dollars from their accounts to outside parties, Donziger has repeatedly violated the restraining notice under CPLR § 5222 that Chevron served in April.

It is now beyond question that Donziger has not and will not voluntarily comply with either the RICO Judgment or the Default Judgment, and this Court should hold Donziger in contempt for violating these Judgments, as well as the restraining notice. Strong measures are appropriate, including coercive sanctions and damages to compensate Chevron for the losses it has incurred.

## II.    FACTUAL BACKGROUND

Donziger's long-running efforts to obtain funds in exchange for purported interests in the Ecuadorian judgment did not end upon entry of the RICO Judgment. Donziger himself admits he continues to "try to get funders to buy interest in the [Ecuadorian] judgment." Ex. 2 at 117:15–16; Dkt. 1966 at 5–10. And although he claims that these efforts were "help[ing] [his] clients in Ecuador sell interests in the judgment to raise funds to pay litigation expenses" (Ex. 3 at 33:19–21), this claim is belied by his substantial personal gain, his failure to account to his clients for his use of funds, and his clients' representations to foreign courts. *See* Sections II.B–C.

### A.    Since March 2014, Donziger Has Monetized the Ecuadorian Judgment by Soliciting and Receiving Funds in Exchange for Interests Therein

Donziger has testified to arranging for sales of shares in the Ecuadorian judgment to at least six investors since March 2014 (Ex. 3 at 34:21–24), and in fact has arranged for sales of

# SA852

judgment shares to at least seven investors on at least ten different occasions.  And, according to Sullivan, Donziger has done so with "a lack of integrity and transparency," passing along misleading and "one-sided" information.  Sullivan Decl. ¶ 26.

Agreements with at least five of the investors were signed by the LAPs' Canadian counsel Alan Lenczner.  Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8.  The agreements Chevron has obtained thus far are described below and summarized in Exhibit 2 to the Declaration of John A. Slavek ("Slavek Decl.").  Two investor agreements purport to grant interests in the Ecuadorian judgment, with a priority pari passu with other third parties including "lawyers, investors and consultants" and ahead of the LAPs.  Ex. 4; Ex. 5.  Investor Krevlin made two subsequent investments in exchange for an increased share on the same terms.  *See* Slavek Decl. Ex. 2.  Investor Eisler's interest was also subsequently increased, although there appears to have been some confusion among Donziger and his co-conspirators over how much.  Ex. 9 at MKS-0001736–37 .  Five additional investors executed agreements in which Donziger, as the "U.S. Representative," controls the distribution of any funds collected on the Ecuadorian judgment.  Ex. 6 ¶ 9, App. 2; *see also* Ex. 7; Ex. 8 ¶ 9, App. 2; Ex. 10; Sullivan Decl. Ex. 26 ¶ 11.  One of these funders subsequently increased his investment in exchange for a larger interest in the Ecuadorian judgment.  Ex. 11.

Donziger personally received and profited from these "investments," including by using the proceeds to finance his personal expenses.  *See* Ex. 6 ¶ 11 (granting Donziger authority to use funds toward "other expenses" as he determines).  The Slavek accounting analysis confirms that, since 2016, 94.5% of the funds going into Donziger's personal and firm accounts combined originated from investors buying purported interests in the Ecuador judgment.  Slavek Decl. ¶ 51(c).

Based on the evidence uncovered to date (which remains incomplete given Donziger's refusal to comply with this Court's discovery orders, *see, e.g.*, Dkt. 2073), Donziger raised at least

# SA853

$2.4 million through these agreements, in exchange for interests totaling at least 1.28525% of the Ecuadorian judgment. Slavek Decl. Ex. 2. Donziger explained to a prospective investor in no uncertain terms that what he was selling was a "percentage of the total claim owed." Ex. 12 at JVM 002161. Expenses, including payments to law firms, were to "come off the top" in any recovery, but—according to Donziger—there would be "plenty of funds to pay investors." *Id.* Donziger created a chart showing that, to date, the total amount of interests (or purported interests) in the Ecuadorian judgment Donziger had sold to investors or given to co-conspirators equals 38% of the judgment, including interests he calls "forfeited" or "disputed." Sullivan Decl. Ex. 3.

Donziger's newest funding arrangements reflect a concerted push to raise money to personally benefit himself and his co-conspirators, and to fund the ongoing pressure campaign. Donziger pitched potential investors using financial investment jargon, offering a going rate for interests in the Ecuadorian judgment. Ex. 13 ("250,000 gives one-eigth [sic] of a point in a 12b judgment[.] full recovery is a 50x multiple"). Donziger prepared misleading investor materials, such as a memorandum offering an "investment opportunity" in which "Investors will receive the right to an agreed upon share of the proceeds received by the Claimants in respect of the Claim." Ex. 14 at 1. In these materials, Donziger disparaged the RICO Judgment, and failed to disclose that this Court had prohibited him from monetizing or profiting from the Ecuadorian judgment, including through selling interests in the judgment. *Id.* at 3–4; *see also* Sullivan Decl. ¶¶ 6, 16.

In November 2017, Donziger arranged a formal "investor call." Ex. 15 at 1–2. Donziger's written agenda said that his team was committed to sourcing "a meaningful commitment of at least $25M" from "a significant capital partner or partners who will give our team the ability to put additional pressure on Chevron in and out of the courtroom." *Id.* at 2. But in the meantime, he wrote, "[w]e are raising a round of $500k to $1m to bridge us to the larger capital raise," covering

# SA854

"monthly overhead costs" of approximately $75,000. *Id.* at 2. Against this backdrop, Donziger approached Elliott Management Corporation. Sullivan Decl. ¶¶ 17–21; *see also* Dkt. 1966 at 5–7.

## B. Donziger Has Received Hundreds of Thousands of Dollars for Personal Gain

Donziger has testified that "[f]or the time period from 2014 to the present," his "only sources of income [we]re 'remuneration . . . paid out of litigation expense funds raised with [his] assistance, [and] a modest monthly income generated by two properties.'" Ex. 2 at 189:14–190:14. Donziger's bank records show he has received $1,525,940 from funds raised using the Ecuadorian judgment since January 2016—bringing the total of funds from Ecuador litigation funders deposited into Donziger's known bank accounts to "more than $9.4 million over 14½ years based on the available (though incomplete) bank records," a significant portion of nearly $40 million in committed funds that Donziger has raised but never accounted for. Slavek Decl. ¶ 24 & Exs. 3-A, 9.

As seen in Exhibit 3-A to the Slavek Declaration, excepting one investor, all the monies raised based on the Ecuadorian judgment were first deposited elsewhere and then transferred to Donziger, in an obvious attempt to obscure the provenance of the funds. The Canadian law firm Lenczner Slaght Royce Smith Griffin LLP ("Lenczner Slaght") transferred $625,940 to Donziger in six payments made between May 10, 2016 and February 21, 2017. Slavek Decl. Ex. 3-A. Though he and his firm represent the LAPs, who are not parties to these agreements and have publicly objected to Donziger's monetization of the judgment, their Canadian lawyer Alan Lenczner signed multiple funding agreements in a representative capacity and apparently received and disbursed funds under the agreements. Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8. In total Lenczner Slaght received $1,417,500. Ex. 16 at MKS-0006684; Slavek Decl. ¶ 14.[2] Lenczner Slaght appears to have taken direction regarding distributing funds to Donziger not from clients but from

---

[2] As of November 11, 2016, Lenczner Slaght confirmed that it had received nearly $1.1 million in investor funds and disbursed $423,500 of those funds to Donziger. Ex. 16.

# SA855

the investors.  Ex. 17; Ex. 18.

Using an entity Sullivan named "CWP" for "Chevron Will Pay," Sullivan transferred $125,000 to Donziger in three payments made between January 30, 2018 and March 13, 2018. Slavek Decl. Ex. 3-A.  As with the funds Donziger received through Lenczner Slaght, the CWP funds ended up in Donziger's bank accounts via an indirect route.  Bank statements for Stream-line's "CWP" account[3] show that these transfers were funded by sales of the Ecuadorian judgment. Slavek Decl. ¶ 15.  On May 1, 2018, after Sullivan received Chevron's subpoenas for documents and testimony, and in the face of "threat[s]" from Donziger's co-conspirator Aaron Marr Page (Sullivan Decl. ¶ 56), Sullivan closed the CWP account and transferred the remaining balance of $342,046.16 (after paying certain "litigation-related expenses" to herself and Donziger) to Page. Sullivan Decl. ¶¶ 57–60 & Ex. 38 at 2–3; Sullivan Decl. Ex. 39 at MKS-0021201 (two cashier's checks to Page, totaling $342,045.16).  Page wired all of the funds to Donziger's personal bank account on May 8, 2018, receiving days later an apparent $50,000 kickback.  Slavek Decl. ¶ 19.

Donziger commingled monies in his personal and law firm accounts.  Slavek Decl. ¶¶ 25– 36 & Exs. 4-A, 4-B, 4-C.  He deposited the proceeds from sales of Ecuadorian judgment interests directly into his personal accounts and frequently transferred monies back and forth between his personal and firm accounts.  He used judgment proceeds to pay personal expenses, with the top recipient being his wife, Laura Miller, who received $297,000, and also "incurred $54,037.01 in American Express charges during 2016 that was also paid out of the Donziger bank accounts." Slavek Decl. ¶ 52.  Donziger also used investment proceeds to pay his bills, including a $14,040 gym membership, a $5,225 bar tab at Walkers, and $2,578 to Acme Fine Wines.  *Id.* ¶ 46; Slavek Decl. Ex. 7-A.  Of the $725,940 originally deposited into his law firm accounts from sales of the

---

[3]  The nominal holder of the account was CWP Associates, which is "a d/b/a under the umbrella of Streamline Family Office as just a passthrough."  Ex. 19 at 87:18–20; Sullivan Decl. ¶ 49.

Case 18-0551 Document 96 03/11/2019 2515262 Page 269 of 308

# SA856

Ecuadorian judgment, over $500,000 was transferred to his personal accounts.  Slavek Decl. ¶ 32.

## C.    Donziger Is Not Raising Money to Pay His "Clients'" Legal Fees or Costs

Donziger claims that he is "help[ing] [his] clients in Ecuador sell interests in the judgment to raise funds to pay litigation expenses."  Ex. 3 at 33:19–21.  But this notion is belied by the terms of his retainer agreements, his failure to account for his use of funds, the LAPs' accusations regarding Donziger's unauthorized monetization of the Ecuadorian judgment, and by the LAPs' repeated representations to courts that they have no ability to pay litigation costs.

### 1.    Donziger's Retainer Agreements Do Not Authorize His Receipt of Funds

Donziger has raised over two million dollars since the entry of the RICO Judgment, but there is no evidence that he was entitled to keep those funds under any retainer agreement.[4]

On January 5, 2011, Donziger & Associates, PLLC entered into a retainer agreement with the LAPs, FDA, and Asamblea de Afectados por Texaco (the "Assembly").  Ex. 21.  The 2011 retainer agreement provided that Donziger & Associates, PLLC would be "entitled to an Active Lawyer Percentage of thirty-one and one-half percent (31.5%) of the Total Contingency Fee Payment," which "means an amount equal to twenty percent (20%) of all Plaintiff Collection Monies." *Id.* ¶ 3(a).  The 2011 retainer agreement also provided for a monthly retainer payment "in accordance with a budget to be provided by [Donziger & Associates, PLLC]."  *Id.* ¶ 3(b).  The budget was to be negotiated initially with the other parties to the Master Agreement among the LAPs, the FDA, the Assembly, and multiple law firms, and revisions to the budget were to be approved by a management committee and subsequently by the LAPs.  *Id.* ¶ 3(e); Ex. 22 ¶ 4(d).  And it provided that Donziger & Associates, PLLC "shall . . . be entitled to reimbursement for any reasonable out-

---

[4]    To date, Donziger has produced three retainer agreements, two of which have been operative following the RICO Judgment.  The first agreement is dated April 27, 2006 and is with the FDA; other indigenous organizations; Kohn, Swift & Graf; and the law offices of Cristóbal Bonifaz and provided for a contingency fee between 10 and 25 percent, in addition to costs incurred.  Ex. 20 at 1.  Under this agreement, Kohn financed the litigation, including paying Donziger for his work on the case and reimbursing his expenses through 2009.  Slavek Decl. Ex. 3-B.

# SA857

of-pocket expenses or other costs incurred" if the firm "submit[s] a bill to the Plaintiffs . . . setting forth in reasonable details the Expenses that it incurred during the preceding month in connection with its representation of the Plaintiffs in the Litigation."  Ex. 21 ¶ 3(d), (f).  There is no evidence that Donziger ever produced a budget or a bill with details of monthly expenses in accordance with these provisions, or that Donziger or his firm received authorization for either a retainer or reimbursement of his expenses per this retainer.  *See* Sullivan Decl. ¶ 50 ("I was not aware of any approval process that existed or was followed with respect to any of the funds disbursed from the CWP Account pursuant to Steven's directions.  I never saw any approval from the FDA, the Ecuadorian plaintiffs, or others for Steven's retainer or other invoices or for any payments of his invoices, or any agreement reflecting his entitlement to these payments.").

On November 1, 2017, Donziger entered into a third retainer agreement with the FDA, titled "Durable International Power of Attorney and Agreement for the Continuous Investment of Professional Services."  Ex. 23.  This agreement purports to authorize Donziger to "direct and manage all current and future legal, political, and public relations efforts in connection with the enforcement of the *AGUINDA JUDGMENT*, including, but not limited to, all related enforcement proceedings in Canada and other countries."  *Id.* at 2.  The agreement also states:  "In consideration of his historical leadership and professional services rendered, both in the past and in the future, the FDA irrevocably acknowledges, confirms and undertakes to support Mr. DONZIGER's existing contractual INTEREST, as set forth below, and/or hereby grants Mr. DONZIGER an INTEREST in his own right equal to his existing contractual INTEREST."  *Id.* at 1.  The "INTEREST" granted to Donziger "in his own right" was "equal to Mr. DONZIGER's existing contractual INTEREST" of "6.3% of any FUNDS RECOVERED."  *Id.* at 1, 3.  The 2017 agreement does not provide for any retainer or expense reimbursements.

9

### 2.    Donziger Has Not Accounted to the LAPs for His Use of Funds

In the RICO Judgment, this Court found that "Donziger spent, or had primary control over spending by others from whom he raised money, at least several million dollars," but "the financial records [we]re incomplete and d[id] not permit a full and accurate accounting." *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 402 n.138 (S.D.N.Y. 2014). No accounting has ever been produced for the investments received or the expenditure of any of these funds. When asked at his deposition about an accounting for the funds he has taken purportedly as counsel in the Ecuadorian litigation, Donziger testified that he "ha[d] an accounting" that was "substantially complete." Ex. 2 at 67:4–6. Donziger confirmed that the "accounting" to which he was referring was prepared by Josh Rizack. Ex. 24 at 137:19–138:4. Rizack, however, said that no such "accounting" exists. *Id.* at 10:18 ("I'm not an accountant."); *id.* at 15:3–5 ("Do you consider what you produced to be accountings? A No.").[5] Expert analysis of the Rizack spreadsheets has likewise confirmed that they are not accountings and are ridden with "numerous inconsistencies, poor record-keeping, and an apparent overall absence of compliance with even rudimentary accounting and bookkeeping principles." Slavek Decl. ¶ 54; *see also* Sullivan Decl. ¶¶ 4, 43 ("When I was working on these budgeting issues and managing expenses paid, Aaron told me he was surprised that Steven was giving me access to so much of the financial information because he usually did not allow anyone to access that information.").

Donziger has testified that a portion of the post-RICO Judgment funds he has taken for himself are to pay his monthly "retainer payments" and supposed "litigation expenses." Ex. 2 at

---

[5]   Confirming the non-existence of a Donziger accounting for the funds he has taken for purported services rendered to Ecuadorian clients is the fact that those former clients continue to request accountings: "[O]n January 29, 2016, the UDAPT, convened at a general meeting, issued a resolution to ask Mr. Steven Donziger, Mr. Luis Yanza, and Mr. Pablo Fajardo to provide an accounting, in other words, to provide the UDAPT with detailed information about all of the money they have managed that belongs to the UDAPT. To date, only Mr. Pablo Fajardo has provided that information. Mr. Steven Donziger and Mr. Luis Yanza have failed to do so." Dkt. 1989-5 at 3.

# SA859

13:6–8 ("I have been paid out of monies raised to pay litigation expenses . . . ."); *id.* at 194:16–17:2 ("Q. So the money from the Lenczner firm that was transferred to you, was any portion of that money to pay your retainer?  A. . . . The answer to that question is yes.").  But there is no evidence that any invoices for Donziger's purported services ever went to his purported clients. Sullivan disbursed funds totaling at least $125,000 to Donziger at his instruction in response to vague invoices for "Legal and consultative services," "Partial Expense Reimbursement," and  even just "Invoice, February 2018," although she was not aware of an agreement entitling him to those monies, or any approval process for that or any other expense.  Sullivan Decl. ¶ 50 ("I never saw any approval from the FDA, the Ecuadorian plaintiffs, or others for Steven's retainer or other invoices or for any payments of his invoices."); Sullivan Decl. Ex. 34.  One such invoice requested payment of $200,000 for "partial legal and consultative services and expenses" on the Ecuador case spanning from 2013 to 2017, with no documentation, and inexplicably directed $50,000 of the sum to be paid directly to Donziger's wife's account.  Sullivan Decl. Ex. 34.  The evidence shows that Donziger controlled these disbursements.  Sullivan Decl. ¶¶ 4, 50 ("As far as I could tell, Steven had complete control and discretion over how this money, which belonged to the FDA, was spent."); *see also* Sullivan Decl. Ex. 34 at MKS-0000389 (Invoice marked "Do not pay until SRD approval"); Ex. 25 at MKS-0000407 (Forum Nobis invoice marked "Okay to send SRD 3/13/18"); *id.* at MKS-0000384 (invoice marked "1/17/18 Per SRD do not send anything").

3. **The LAPs Have Repeatedly Represented That They Lack Litigation Funds**

Donziger claims he is the "lifeline for people in Ecuador to raise money."  Ex. 26 at 24:5–6.  But despite his raising of significant sums, the LAPs have represented to courts in enforcement actions that they lack funds even to pay court costs.  Section II.C.3.  Donziger, in fact, has tried to conceal his fundraising from attorneys representing the LAPs.  Sullivan Decl. ¶ 18 ("Steven told me that if the many people who performed work for him without payment, in particular in Ecuador,

# SA860

'became aware that there was money coming, they would all demand to be paid for their services, as they often worked for months or even years without any compensation from Steven.[']"); *id.* ¶ 48 ("Lenczner would ask for more money if Lenczner knew that there were new investors").

At the time of the RICO trial, Donziger testified that he represented the individual LAPs and "serve[d] at the pleasure of the clients and Mr. [Pablo] Fajardo as their representative." Ex. 27 at 2465:22–23. But since at least 2016, the LAPs (and UDAPT) have publicly stated that the agreements through which Donziger sells interests in the judgment are being entered into without their knowledge or authorization. Fajardo described Donziger and Luis Yanza's entry into a January 19, 2016 "contract for the management of financial resources on behalf of the FDA and the plaintiffs" as "extremely serious, since neither of these two persons represents the plaintiffs" and further asserted that Donziger and Yanza had since executed two more funding agreements between January and early July 2016, "asking for money in the name of persons that [they] do not represent, which clearly constitutes a serious crime, whether as a scam or because [they] are acting as if [they] have powers that neither [they] nor [their] organization has." Ex. 28 ¶¶ b–c.[6] On August 20, 2016, UDAPT issued a declaration—likewise referencing the execution of the January 19, 2016 funding agreement "without informing and without authorization . . . from the plaintiffs"—declaring them personae non gratae. Ex. 30 at 1. Donziger also sought, without UDAPT's authorization, to change Lenczner Slaght's retainer agreement to ensure that they would follow only the instructions of the FDA, but there is no evidence whether this occurred. Ex. 31 at 1–2.

The LAPs—the parties in whose names the enforcement actions are being litigated—have represented in proceedings in Brazil, Argentina, and Canada that they are bereft of funds, while at the same time, Donziger was raising hundreds of thousands of dollars. In Brazil, in a filing seeking

---

[6] Donziger has used funder monies to pay Yanza $16,100, through his daughter (Slavek Decl. Ex. 8; Ex. 29), which Yanza himself noted could potentially constitute "un problema." Ex. 29.

# SA861

to maintain indigent status, the LAPs represented that they should not be required to pay court costs because it is "undeniable" that the LAPs "themselves do not have the means to pay all the procedural costs," and their counsel "have not received any compensation for their work on the case." Ex. 32 ¶¶ 22, 26, 28. In Argentina, the LAPs likewise claimed indigence. Ex. 33 at 29.

And in Canada, where the prevailing party is entitled to costs and in some cases to security for costs from non-residents, the LAPs' counsel Lenczner Slaght challenged posting security on the basis of the LAPs' supposed financial inability to pay, representing on June 19, 2017 to the Ontario Court of Appeal that "neither the remediation trustee nor the indigenous appellants can fund the litigation," that "Chevron has known about past third party funding and has impeded any future funding," and that counsel were working on a contingency fee basis. Ex. 34 at 2. And on October 3, 2017, Lenczner Slaght represented to the Ontario Court of Appeal that "the actions by Chevron against third party funders and against the applicants' U.S. law firm, resulting in the funders withdrawing financial and other support," had the "effect of discouraging any other third party funder," and that "***any funding assistance that the plaintiffs had in place has long since evaporated***." Ex. 35 ¶¶ 27, 29 (emphasis added). But *prior* to that representation, Lenczner Slaght received at least $1,417,500 in investor monies (between May 2016 and February 2017), and then wired $625,940 *to Donziger*—at the direction of investors as opposed to any client. Slavek Decl. ¶ 14; Ex. 36 at JVM 002466. And after the representation that the LAPs' ability to pay cost awards had "evaporated," Donziger removed Lenczner as a signatory on the investment agreements and had all subsequent investor monies (at least $750,000) deposited exclusively in accounts Donziger controlled. Slavek Decl. Ex. 3-A.[7] Also in October 2017, Canadian lawyer Peter Grant attempted

---

[7] Whether Donziger informed Lenczner of his receipt of these funds is not yet known, but Donziger did use a portion to pay Canadian lawyer Peter Grant and to fund the Alberta conference. Although the Lenczner firm received $1,417,500 in funder monies and wired $625,940 to Donziger (Slavek Decl. ¶ 14) between May 2016 and February

13

# SA862

to file a declaration from Ecuadorian counsel, Patricio Salazar (who claimed to represent the FDA and ten LAPs) asserting that the LAPs were bereft of funds based on Salazar's review of their tax records. Ex. 39. Neither disclosed they were working with and being paid by Donziger, or that Salazar claims a personal interest in the judgment. *See* Slavek Decl. Ex. 8.

Because the FDA is neither the judgment creditor nor a named plaintiff in the foreign enforcement proceedings, and Donziger now claims to represent only the FDA, Donziger cannot justify his fundraising activities as "help[ing] [his] clients in Ecuador sell interests in the judgment to raise funds to pay litigation expenses." Ex. 3 at 33:19–21. According to Dr. Santiago Velázquez Coello, an Ecuadorian attorney with fifty years of experience as a professor and judge, and the former President of the Constitutional Court of Ecuador, Ecuadorian law does not permit the FDA to sell or promise interests in the Ecuadorian judgment. With respect to remediation proceeds, the FDA is the beneficiary of a Commercial Trust that expressly prohibits the FDA from assigning its rights derived from the Trust. Velázquez Decl. at 3–4. Even the 10% compensation associated with the Environmental Management Act was not awarded to the FDA—which was not a plaintiff in the Ecuadorian litigation—but to the LAPs. *Id*. at 4. Although the LAPs authorized the FDA to receive the award on their behalf, neither they nor the Ecuadorian court can assign title of the award to the FDA. *Id*. In short, the only client Donziger currently claims to represent, the FDA, has nothing to sell and no litigation to fund.

## D.    Donziger Has Used Investors' Monies to Continue His Extortionate Campaign

Donziger used investor funds to continue his ongoing campaign to extort a payment from

---

2017, Donziger may have concealed some of his fundraising from Lenczner. In an undated draft "Ecuador Judgment Investment Agreement," for example, handwritten notes state "SRD"—referring to Donziger—"is hiring 3rd party admin backup." Ex. 37 at MKS-0000629. The notes also state "not having Alan sign" and that "Alan doesn't need to know." *Id*. at MKS-0000632. In a January 11, 2018 email, Donziger asks Page for a translation of a "Krevlin side letter." Ex. 38. Page responds with attached copies, reminds Donziger that the letter is from Krevlin to the FDA, and then states, "Took out Alan because, yeah." *Id*. If Donziger were truly fundraising to pay litigation expenses, he would not hide his activities from counsel of record in the Canadian recognition action.

Case 18-0551, Document 96, 03/11/2019, 2515262, Page276 of 308

# SA863

Chevron. According to Sullivan, "Steven spent the majority of his time coordinating 'out of court' 'non-legal' strategies to put 'pressure' on Chevron." Sullivan Decl. ¶ 7. "The goal of his pressure campaign was twofold: to increase the potential for obtaining new investors and to ultimately [] force Chevron to pay some portion of [the] Ecuador judgment." *Id.* Donziger explained to prospective investors that one of the purposes of securing funding was to "give [his] team the ability to put additional pressure on Chevron in and out of the courtroom" (Ex. 15 at MKS-0001297), or to "help put major pressure on Chevron to settle the matter" (Sullivan Decl. Ex. 31 MKS-0002338). A memorandum describing the "funding opportunity" to investors explained that the matter supposedly was entering a "critical phase where a relatively modest amount of financial support can dramatically increase pressure on the company." Ex. 40 at MKS-0000588. Donziger also drafted a document for funders explaining the objective that new capital would "[r]aise risk pressure on Chevron to force settlement of Ecuador judgment at a meaningful price in the near future" and listing a range of pressure campaign activities. Ex. 41.[8]

Documents reveal that Donziger worked with a web of co-conspirators to orchestrate his pressure campaign, secretly paying them with interests in and proceeds traceable to the Ecuadorian judgment. Donziger paid self-described shareholder activist Simon Billenness thousands of dollars to "[o]rganize further shareholder pressure on Chevron" by pushing shareholder resolutions and managing related press outreach, organizing a shareholder complaint to the Securities and Exchange Commission, and organizing an investor letter to Chevron's CEO signed by a consortium of investors led by Bruce T. Herbert of Newground Social Investment and Pat Miguel Tomaino of Zevin Asset Management, LLC. Ex. 43 at MKS-00006405; *see also* Sullivan Decl. Ex.

---

[8] During Sullivan's recent deposition, Donziger stated: "And you're asking her about a public pressure campaign that obviously took place, if you just look at the documents you're giving her. So, you know, there's a lot of people who could testify to this, including myself." Ex. 42 at 368 at 16–20.

# SA864

7 at MKS-0016326–27; Exs. 44, 45. Billenness claimed that his efforts produced two shareholder resolutions relating to the Ecuador litigation. Sullivan Decl. Ex. 7 at MKS-0016326. Billenness never publicly disclosed that he was receiving payment from Donziger or his team, and in fact wrote to Donziger that it would be "bad optics" for the legal team to be seen as undertaking his efforts. Sullivan Decl. Ex. 5; Sullivan Decl. ¶ 10 ("Although [Billenness'] work was directed by Steven, he wanted to maintain the appearance that it was separate from the legal team, as he said it would be 'counterproductive' if the legal team were 'seen doing' the things he was hired to do.").

Donziger also paid a phalanx of activists and journalists to produce inflammatory media coverage against Chevron. Rex Weyler, a Greenpeace activist who wrote a blog post titled "Chevron's Amazon Chernobyl Case moves to Canada," was paid over $15,000. Slavek Decl. Ex. 8; Ex. 90 at MKS-0006527. Canadian indigenous activist Phil Fontaine, who claimed in a statement to the media that Chevron "must be held accountable" for "devastating, and shocking" environmental harm, received an interest in the Ecuadorian judgment. Sullivan Decl. Ex. 3 (showing 0.25% interest for "Consulting – PF"); Ex. 47 at 2. Donziger also planned to give Canadian indigenous activist Ed John an equity interest in the Ecuadorian judgment. Ex. 48; Sullivan Decl. ¶ 12. Prominent Venezuelan-American activist Eva Golinger, who participated in the "dirty hand of Chevron" campaign orchestrated by Ecuador and the LAPs, received a 0.125% interest in the Ecuadorian judgment. Sullivan Decl. Ex. 3 at MKS-0016124; Ex. 49 at MKS-0002060; Ex. 50.

Another prominent public supporter of Donziger's media campaign is Pink Floyd's Roger Waters, who also has an undisclosed interest in the Ecuadorian judgment. Ex. 51; Ex. 49 at MKS-0002045. Kevin Koenig, a senior strategist with Amazon Watch, who attended Chevron's shareholder meeting and contributed to the hostile media coverage surrounding it, was also paid thousands of dollars by Donziger. Slavek Decl. Ex. 8; Ex. 52. Donziger budgeted $1,500 per month—

# SA865

later marked up to $2,500—for public relations, including $500 per month for Reuters reporter Cristina Munoz.  Ex. 53.

Karen Hinton, long-time spokesperson for Donziger's team and an "important actor[] in the pressure campaign" (*Donziger*, 974 F. Supp. 2d at 600), received a 0.125% interest in the Ecuadorian judgment on January 11, 2017.  Sullivan Decl. Ex. 3 at MKS-0016124.  Hinton regularly issues press releases under her name that Donziger has written or heavily edited.  Sullivan Decl. ¶ 8 ("Steven told me that he wrote all those press releases himself."); *see also* Ex. 54 at MKS-0003270; Ex. 55.  Press releases issued by Donziger's team have also quoted Patricio Salazar and Aaron Page, both of whom have recently received interests in the Ecuadorian judgment.  Sullivan Decl. ¶ 33 & Ex. 3 at MKS-0016124; Ex. 49 at MKS-0002059–60 (Salazar and Page each held a 0.25% interest in the Judgment).  Page, who also participated in preparing press releases (Ex. 56 at MKS-0005846) and preparing investment agreements (Ex. 38), was also paid nearly $100,000 in cash (to himself or his firm, Forum Nobis) out of Donziger's accounts based on invoices bereft of detail, including to the $50,000 kickback he received after transferring the balance of the CWP account to Donziger.  Slavek Decl. Ex. 8; Ex. 57; Ex. 58.  Donziger touted these false press releases—which, like "neutral" expert Richard Cabrera, he bought and paid for—to investors as evidence of "Chevron starting to feel serious pressure."  Ex. 59; Sullivan Decl. ¶ 9 ("Steven frequently sent his press releases to investors and potential investors, and had me do the same.").

A "key part" of Donziger's current "out-of-court strategy" is an Indigenous Rights conference in Alberta, Canada, organized by University of Calgary professor Kathleen Mahoney (the wife of Phil Fontaine, who holds a 0.175% interest in the judgment) that is scheduled to be held in November 2018.  Sullivan Decl. ¶ 13 & Ex. 15.  Mahoney wrote to Donziger that she believed that she could organize a conference that would "bring significant pressure to bear on Chevron to come

# SA866

to the table" but would need "some significant funding to pull it off."  Ex. 60 at JVM 002886.[9]

Donziger agreed that the conference would "put enormous pressure on Chevron to come to table

if executed well" (Ex. 41; *see also* Ex. 61; Ex. 62; Ex. 63), and arranged funding for the conference.

Donziger authorized payment of a deposit of $50,000 and budgeted $200,000 for the conference

even as Canadian counsel were representing to the court that their clients lacked funds for court

costs.  Ex. 64 (budgeting $200,000 for conference); Ex. 65 (confirming $50,000 venue deposit).

## E.    Donziger Has Profited from the Judgment by Using It to Pay Personal Creditors

Donziger has also used interests in the Ecuadorian judgment to pay his personal creditors.

Sullivan Decl. ¶¶ 36–40.  In a Convertible Promissory Note dated February 17, 2011, Glenn

Krevlin loaned Donziger $250,000 to pay for third-party expenses incurred "by or on behalf of the

Claimants in the case *Maria Aguinda y Otros v. Chevron Corporation* . . . (in particular, for certain

legal actions instituted in the United States of America by Chevron Corporation against the

Claimants and various of its advisors and counsel)."  Sullivan Decl. Ex. 27 at MKS-0002565, 67.

When Donziger failed to repay the note, the unpaid amount of $257,500 was purportedly

"automatically converted into the right of Krevlin to receive from Donziger the Pro-Rata Portion

(as defined in the Initial Note) of Donziger's interest in the Net Recoveries (as defined in the

Funding Agreement dated as of October 31, 2010 by and among Treca Financial Solutions and the

various claimants listed in Schedule 1 thereof)."  *Id.* at MKS-0002567.  In January 2018, Krevlin's

interest had not yet been converted, and Donziger, Sullivan, and Page were still discussing whether

and how to make this conversion, as well as a similar conversion relating to a second personal loan

by a different creditor.  Sullivan Decl. Ex. 28.  And while the Krevlin and Sherman personal loan

---

[9]  Sullivan testified that she is "unaware of whether Professor Mahoney disclosed to the University or others that her partner signed an agreement to obtain a percentage interest in the Ecuador judgment or that the conference was funded by Steven using monies raised based on the Ecuador judgment."  Sullivan Decl. ¶ 14.

# SA867

conversions were initially viewed as tied to Donziger's own 6.3% share in the judgment, Donziger later sought to convert them "from SRD share to direct equity"—meaning that they would not come from Donziger's interest in the judgment.  Ex. 66 ("The loan conversions are currently tied to SRD shares unless converted pro-rata to equity."); Ex. 49 at MKS-0002064–69 (identifying loan conversions as "Payments out of Steven Donziger's Share"); Sullivan Decl. Ex. 4 at MKS-0006498.[10]

Separately, Donziger arranged for Rizack to receive an interest in the Ecuadorian judgment for the services he has provided Donziger and discussed a similar arrangement with Sullivan. Ex. 24 at 74:3–16; Ex. 49 at MKS-0002072 (showing 0.25% interest for Rizack's firm, The Rising Group Consulting); Sullivan Decl. ¶¶ 33–35.  Donziger has also paid his personal appellate counsel in this action, as well as collections and bar counsel, from monies raised from the Ecuadorian judgment.  Slavek Decl. Ex. 8 ($25,000 paid to appellate counsel Deepak Gupta; $15,750 paid to debt collections firm Meyers Saxon & Cole; $3,750 to bar counsel Michael Frisch).

## III.     ARGUMENT

### A.     Donziger Is in Contempt for Violating the RICO and Default Judgments

The most "prominent" of the "inherent powers of federal courts" is "the contempt sanction, 'which a judge must have and exercise in protecting the due and orderly administration of justice and in maintaining the authority and dignity of the court.'"  *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980) (quoting *Cooke v. United States*, 267 U.S. 517, 539 (1925)); *see also*

---

[10]  Donziger also testified that he gave portions of his 6.3% interest in the Ecuadorian judgment to Rick Friedman, Zoe Littlepage, and an unnamed individual who also lent Donziger money to retain John Keker (possibly David Sherman).  *See* Ex. 2 at 144:12–145:17; Sullivan Decl. ¶¶ 38–39.  Documents show that Friedman and Littlepage each received an interest in the Judgment of 0.32%, listed initially in documents under the heading "Shares attached to SRD interest."  Sullivan Decl. Ex. 3 at MKS-0016126.  Donziger has sought to convert these percentages, like the Krevlin and Sherman loan conversions, to direct equity interests in the judgment and thereby increase his personal interest in the judgment back to its original 6.3%.  Sullivan Decl. Ex. 4 at MKS-0006499.  And Donziger instructed Sullivan to prepare an agreement granting "[e]quity" in exchange for "100k of services" to Campbell Ford, the attorney who represented him in personal litigation relating to a family trust.  Sullivan Decl. ¶ 40 & Ex. 29; Ex. 67.

19

# SA868

*Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) ("[I]t is firmly established that '[t]he power to punish for contempts is inherent in all courts.'" (quoting *Ex Parte Robinson*, 86 U.S. (19 Wall.) 505, 510 (1873))); *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812) (holding that "[t]o fine for contempt—imprison for contumacy—inforce the observance of order" are "implied powers" of federal courts "because they are necessary to the exercise of all others").

There are two forms of contempt, criminal and civil, and the distinction between the two "turns on the character and purpose of the sanction." *N.Y. State Nat. Org. for Women v. Terry*, 159 F.3d 86, 93 (2d Cir. 1998). "Civil contempt fines seek one of two objectives," one being "coercion—to force the contemnor to conform his conduct to the court's order," and the other "compensation." *Id.* "Criminal fines, by contrast, are intended primarily to punish the contemnor and vindicate the authority of the court." *Id.*; *see also Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 826–30 (1994) (discussing distinction between criminal and civil contempt); *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 441–45 (1911) (same). "Because civil contempt sanctions are viewed as nonpunitive and avoidable, fewer procedural protections for such sanctions have been required." *Bagwell*, 512 U.S. at 831.

Although Chevron seeks only to hold Donziger in civil contempt via this motion, Donziger's contempt is also criminal given its egregiousness and willfulness. *See United States v. United Mine Workers of Am.*, 330 U.S. 258, 298–99 (1947) ("Common sense would recognize that conduct can amount to both civil and criminal contempt. The same acts may justify a court in resorting to coercive and to punitive measures."). Donziger's disregard for this Court's authority may constitute a violation of New York criminal law. *See* N.Y. Penal Law § 215.50 (a party is guilty of criminal contempt in the second degree for "[i]ntentional disobedience or resistance to the lawful process or other mandate of a court"); *see also Bagwell*, 512 U.S. at 826 ("'Criminal

# SA869

contempt is a crime in the ordinary sense.'" (quoting *Bloom v. Illinois*, 391 U.S. 194, 201 (1968)).

"A party may be held in civil contempt for failure to comply with a court order if (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *Paramedics Electromedecina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) (quotation marks and citation omitted). In clear and unambiguous language, paragraphs 1 and 5 of the RICO Judgment (and paragraphs 1 and 4 of the Default Judgment) awarded Chevron equitable relief and enjoined Donziger and the other defendants from benefiting from their corrupt and fraudulent conduct. *See Donziger*, 974 F. Supp. 2d at 639. The Second Circuit affirmed the relief granted by this Court, reiterating that it properly "prohibit[s] Donziger and the LAP Representatives from profiting from [their] corrupt conduct." *Chevron Corp. v. Donziger*, 833 F.3d 74, 151 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2268 (2017). Donziger has now exhausted his appeals and cannot question the legality and finality of this Court's mandate. But since its entry on March 4, 2014, Donziger willfully and repeatedly violated the RICO Judgment. Donziger also has violated the Default Judgment since its entry on April 23, 2018.

## 1. Donziger Is Violating Paragraph 1 of the RICO and Default Judgments

Paragraph 1 of the RICO Judgment provides:

> The Court hereby imposes a constructive trust for the benefit of Chevron on **all property**, whether personal or real, tangible or intangible, **vested or contingent**, that Donziger **has received, or hereafter may receive, directly or indirectly**, or to which Donziger now has, or hereafter obtains, any right, title or interest, directly or indirectly, that is **traceable to the Judgment or the enforcement of the Judgment** any in the world including, without limitation, all rights to any contingent fee under the Retainer Agreement and all stock in Amazonia. Donziger **shall transfer and forthwith assign** to Chevron all such property that he now has or hereafter may obtain.

Dkt. 1875 ¶ 1 (emphasis added); *see also* Dkt. 1985 ¶¶ 1, 7 (extending this prohibition to the Defaulted Defendants and their agents). In its August 15, 2018 order, this Court found that

21

# SA870

Donziger's failure to "transfer or assign" his rights to any contingent fee under his 2011 retainer agreement and all stock in Amazonia violated his obligations under paragraph 1 of the RICO Judgment. Dkt. 2072 at 2. While Donziger's failure to comply with the Court's orders to transfer and assign these items is the subject of a separate motion (Dkts. 2083, 2084), his failure to transfer to Chevron (i) the new contingency fee interests granted to him under the 2017 retainer agreement, and (ii) $1,525,940 paid to him in exchange for interests in the fraudulent Ecuadorian judgment, render him in continued contempt of the RICO Judgment and in contempt of the Default Judgment.

### a.   Paragraph 1 is Clear and Unambiguous

Paragraph 1 of the RICO Judgment and the Default Judgment is clear and unambiguous, and the Court has already rejected Donziger's arguments to the contrary. In its August 15, 2018 order, the Court held that "there is no uncertainty in the language of paragraph 1 of the judgment." Dkt. 2072 at 6. The Court went on to explain that "any property (1) that Donziger (a) had as of the date of the judgment in this case, or (b) acquired from the date of the judgment until now, or (c) hereafter may acquire *and* (2) that Donziger was 'enabled to acquire' by the Ecuadorian Judgment or its enforcement is traceable to that Judgment" and "subject to the constructive trust imposed by the judgment in this case." *Id.* (citations omitted).

In light of the August 15, 2018 order, Donziger's refusal to comply with his obligation to "transfer and assign" the contingency interests granted to him under the November 17, 2017 retainer agreement is egregious. The Court has held that the "'right to a contingent fee and the fee itself are property[,]'" "'subject to execution and attachment[,]'" and "were and remain immediately assignable." *Id.* at 7 (quoting *Donziger*, 974 F. Supp. 2d at 640). The Court then found "it is entirely plain" that Donziger's rights to a contingency fee under a 2011 retainer agreement "ha[ve] been subject since March 4, 2014 to Donziger's express obligation to transfer and assign them forthwith to Chevron, an obligation that he has disregarded for over four years." *Id.* at 8.

# SA871

Although the August 15, 2018 order did not compel Donziger to transfer to Chevron his right to a contingency fee under the 2017 retainer (as the issue was not then before the Court), the Court reaffirmed Donziger's obligation to "transfer and forthwith assign to Chevron" ***any*** contingency interests in the Ecuadorian judgment he has or may receive.

Paragraph 1 "includ[es]" and applies to the transfer of interests in the Ecuadorian judgment, but it is not limited to those interests. Paragraph 1 applies broadly to "all property . . . that is traceable to the Judgment or the enforcement of the Judgment." Dkt. 1875 ¶ 1; Dkt. 1985 ¶ 1.

> The phrase "property, whether personal or real, tangible or intangible, vestige or contingent" is perfectly clear. Nor is there any uncertainty inherent in the limitation of the operation of paragraph 1 to property "traceable to the [Ecuadorian] Judgment or the enforcement of the Judgment." The concept of traceability of property to particular sources, events or activity is extremely well established in the law. Money or other property is "traceable" to a given source, event, or activity if its "acquisition is attributable to" that source, event, or activity.

Dkt. 2072 at 6. Indeed, the Court noted that Donziger is likely obligated to transfer other "unspecified property said to be traceable to the Ecuadorian judgment or to its collection":

> To be sure, the Court assumes without now deciding that any such property interests owned by Donziger as of the date of the judgment in this case or acquired by him from that date on into the future are or will become subject to the constructive trust and to Donziger's obligation to transfer and assign it to Chevron. To the extent such property can be identified and specifically described, Donziger will be compelled, if necessary, to comply with the obligation.

*Id.* at 8–9. Chevron has now "identified and specifically described" $1,525,940.00 paid to Donziger since March 4, 2014, and in exchange for interests in the fraudulently procured Ecuadorian Judgment. *See* Section II.B. Donziger's acquisition of these funds is "attributable" to the Ecuadorian judgment and subject to the constructive trust, as the Ecuadorian judgment "enabled [Donziger] to acquire the property." Dkt. 2072 at 6 (quotation marks omitted).

> **b.** **Clear and Convincing Evidence Demonstrates Donziger's Noncompliance with Paragraph 1**

Clear and convincing evidence, including Donziger's own admissions, proves that

Case 18-855, Document 96, 03/11/2019, 2515262, Page285 of 308

# SA872

Donziger has not complied with paragraph 1 of the RICO Judgment or the Default Judgment.

### i.        Donziger's November 2017 Contingency Interest

On November 1, 2017, Donziger entered into a retainer agreement with the FDA, which granted him an additional, personal 6.3 percent contingency interest in the Ecuadorian judgment. *See* Section II.C.1; Ex. 23 at 1, 3.  Donziger has failed, and outright refused, to transfer and assign that new interest to Chevron.  *See* Champion Decl. ¶ 2; Dkt 2061 at 4 (Donziger arguing that he is under no obligation to transfer the 6.3 percent interest because "my property, including my interest in the Lago Agrio judgment, is presently unencumbered"); *see also* Dkt. 2081, Ex. A at 2 (Donziger stating that "[t]he RICO findings are not the last word on enforcement of the Ecuador judgment and on enforcement of contract the FDA has with equity-holders" and that Donziger "reserve[s]" or "maintain[s]" his rights to challenge this Court's orders).

As this Court previously held with respect to Donziger's failure to transfer and assign the contingency interests arising from the 2011 retainer agreement, Donziger's defiance of paragraph 1 in this respect has also been "brazen and deliberate."  Dkt. 2006 at 9.  In fact, it appears that the November 2017 retainer agreement itself is structured to avoid the effect of the constructive trust, as it purports to *irrevocably* commit the FDA to attempting to help Donziger recognize *his* existing interest in the Ecuadorian judgment and "to the extent it is necessary or useful" grants Donziger a new interest in the Ecuadorian judgment.  Ex. 23 at 3.  In short, Donziger is obligated to transfer this interest to Chevron under paragraph 1 of the RICO Judgment, but he has not.

### ii.       Investor Funds Collected by Donziger

Donziger has admitted that, since the RICO Judgment was entered on March 4, 2014, he has continued to solicit, collect, and retain for his personal use funds from investors in exchange for purported interests in the Ecuadorian judgment.  Ex. 3 at 34:21–24 (Donziger arranged sales of Ecuadorian judgment interests to at least six investors since March 2014).  An analysis of other

# SA873

evidence produced by Donziger and those who have worked with him reveals that Donziger has personally received at least $1,525,940.00 since March 4, 2014, in funds provided by investors in exchange for shares in the Ecuadorian judgment. *See* Section II.B. In other words, since March 4, 2014, Donziger has received $1,525,940.00 in property traceable to the Ecuadorian judgment. Donziger has not transferred or assigned this property to Chevron pursuant to his obligations under paragraph 1 of the RICO Judgment (Champion Decl. ¶ 2), instead claiming that he has a "right to help my clients fund their own litigation" and "a right . . . to be paid for my work[,]" regardless of where that payment originates. Ex. 26 at 23:7–10.

### 2. Donziger Is Violating Paragraph 5 of the RICO Judgment and Paragraph 4 of the Default Judgment

Donziger has violated and continues to violate paragraph 5 of the RICO Judgment and paragraph 4 of the Default Judgment by (i) selling off interests in the Ecuadorian Judgment, (ii) profiting personally from the Ecuadorian Judgment, and (iii) entering into the 2017 retainer agreement that required the LAPs to recognize and protect his contingency interests.

### a. Paragraph 5 of the RICO Judgment and Paragraph 4 of the Default Judgment Are Clear and Unambiguous

Paragraph 5 of the RICO Judgment and paragraph 4 of the Default Judgment prohibit Donziger and the other defendants from "***undertaking any acts to monetize or profit*** from the [Ecuadorian] Judgment, as modified or amended, or any New Judgment, ***including without limitation*** by selling, assigning, pledging, transferring or encumbering ***any interest therein***." Dkt. 1875 ¶ 5 (emphasis added). The plain language of these paragraphs is clear and unambiguous: Donziger is prohibited from undertaking ***any act*** to monetize or profit from the fraud he orchestrated. This includes, but is not limited to, prohibiting Donziger from selling, assigning, pledging, transferring or encumbering ***any*** interest in the Ecuadorian judgment.

# SA874

> b. **Clear and Convincing Evidence Proves Donziger Has Violated Paragraph 5 of the RICO Judgment and Paragraph 4 of the Default Judgment**

Clear and convincing evidence, primarily in the form of Donziger's own admissions, demonstrates that Donziger has not complied with his obligations under paragraph 5 of the RICO Judgment and paragraph 4 of the Default Judgment.

First, Donziger has admitted that he has sold interests in the Ecuadorian judgment to multiple investors since March 4, 2014.  *See* Section II.A.  Donziger has attempted to defend this practice by arguing that the Court's April 2014 stay order permitted him sell interests in the Ecuadorian judgment, as long as he did not sell his "own" shares or the shares of the two named LAPs. Dkt. 1985 at 6–7; Ex. 26 at 17:23–18:6.  But paragraph 5 prohibits Donziger from selling "***any*** interest" in the Ecuadorian judgment.  Dkt. 1875 ¶ 5 (emphasis added).  Moreover, as described further below and in Chevron's prior briefing, there is no support for Donziger's claim that he was selling his clients' (as opposed to his own) interests in the Ecuadorian judgment, and evidence suggests that the opposite is true.  *See* Dkt. 2057 at 8–10; Ex. 13 (email from Sullivan to Donziger where she is trying to confirm that percentage granted to investors is coming out of Donziger's own interest, and not the FDA's interest).

Second, Donziger admits that he has received money in his personal accounts from investors who invested cash in exchange for a share in the Ecuadorian judgment.  *See* Section II.B; *see also* Sullivan Decl. ¶ 4 ("[A] majority of the investor funds were allocated to [Donziger] . . . .").  Donziger argues that an April 2014 stay order "approved" his selling interests in the Ecuadorian judgment "as long as no collections are made in respect of the Lago Agrio Judgment and funneled to Donziger as retainer payments, the NY Judgment would not prevent Donziger from being paid." Dkt. 2068 at 7 & n.4 (quoting Dkt. 1901 at 7–8).  While Donziger is correct that nothing in the

# SA875

RICO Judgment prevents Donziger from being paid for legitimate services rendered to his Ecuadorian client, those payments cannot be ***traceable to the Ecuadorian judgment***, and money raised in exchange for shares in the Ecuadorian judgment is traceable to that judgment. Donziger has also profited from the Ecuadorian judgment by using interests in the judgment to repay his personal loans and to pay his counsel in this action and his bar proceeding. *See* Section II.E.

Third, Donziger violated paragraph 5 of the RICO Judgment by entering into the 2017 retainer agreement. The 2017 retainer agreement promises the FDA's irrevocable support for what amounts to Donziger's pursuit of an avenue of contempt by pursuing his "existing contractual [interest]" in recovery from the Ecuadorian judgment. Ex. 23 at 1, 3. Paragraph 5 prohibits Donziger from "undertaking any acts to monetize or profit from the [Ecuadorian] Judgment." Dkt. 1875 ¶ 5; *see also id.* ¶ 8. By recommitting to Donziger's enforcement efforts, and granting him a new, valuable interest in the Ecuadorean judgment separate from his contingent fee, the 2017 retainer agreement facilitates Donziger's efforts to avoid the effect of the constructive trust and amounts to an act to monetize or profit from the Ecuadorian judgment.

### 3. Donziger's Arguments Regarding the April 2014 Stay Order Are Unavailing

Donziger has made no effort, much less a diligent effort, to comply with the RICO Judgment. Donziger, instead, has argued that his noncompliance is excused by the Court's April 25, 2014 stay order, which allegedly "clarified" that "[a]bsent traceability to a collection, [his] property, including [his] interest in the Lago Agrio judgment, is presently unencumbered" and "assured that the Ecuadorian team could continue to raise funds, and pay [his] fees out of such funds, 'as long as no ***collections*** are made in respect of the Lago Agrio Judgment.'" Dkt. 2061 at 4–5. But "collections" does not mean only money gained from enforcement of the Ecuadorian judgment, and the stay order in no way changed Donziger's obligations under the RICO Judgment.

As an initial matter, this Court already rejected Donziger's argument that his contingency

# SA876

interest in the Ecuadorian judgment remains unencumbered absent traceability to a collection.  Dkt. 2072 at 8 ("[I]t is entirely plain that this particular set of contract rights has been subject since March 4, 2014 to Donziger's express obligation to transfer and assign them forthwith to Chevron, an obligation that he has disregarded for over four years."); *id.* at n.18 ("Nor is there anything in the Court's April 25, 2014 order largely denying Donziger's motion for a stay pending appeal that even remotely excused Donziger, either pending appeal or otherwise, from complying with that direction.").  Thus, Donziger cannot rely on the stay order to excuse his noncompliance.

And, as discussed above and as this Court previously held, "there is no uncertainty in the language of paragraph 1 of the judgment."  *Id.* at 6.  The plain language of paragraph 1 requires Donziger to "transfer and forthwith assign" to Chevron all property that Donziger has received, or hereafter may receive, that is traceable to the Ecuadorian judgment or its enforcement.  *See* Dkt. 1875 ¶ 1.  This language does not provide for an exception for so-called "fees" or "expenses" traceable to the Ecuadorian judgment that are paid to Donziger, nor is it conditioned on a collection of the judgment.  Donziger's argument that investors' funds are not "collections" and, therefore, not subject to the constructive trust ignores the fact that paragraph 1 of the RICO Judgment does not impose a constructive trust on property that is traceable to "collections," but on any property "that is traceable to the ***Judgment***."  *Id.* (emphasis added).

Donziger's strained interpretation of the RICO Judgment is contrary to its clear language, as well as its purpose, which was to prevent Donziger from profiting from his fraud.  Indeed, the April 2014 stay order confirmed that Donziger was prohibited from "benefitting personally, at Chevron's expense, from property traceable to [the] fraudulent Judgment."  Dkt. 1901 at 11. Paying himself money that would otherwise be transferred to Chevron certainly qualifies as Donziger "benefitting personally, at Chevron's expense, from property traceable to [the]

# SA877

fraudulent judgment."  As does repaying personal loans or compensating service providers with interests in the Ecuadorian judgment.  *See* Section II.D.–E.  Even if the stay order indicated that Donziger could do legal work on the Lago Agrio case, it would not allow him to be compensated for that work with proceeds traceable to the Ecuadorian judgment.

Even accepting the erroneous premise that the April 2014 stay order "clarified" the RICO Judgment as Donziger claims, he would still be violating paragraphs 1 and 5 for multiple reasons.

First, the funds Donziger received from investors effectively function as "collections" on Donziger's share in the Ecuadorian judgment because, in exchange for trading his rights to judgment recovery and priority of payment, Donziger received cash in hand.  As Chevron explained in its supplemental briefing on the initial motion for contempt (*see* Dkt. 2057 at 10–11; Dkt. 2080 at 6–8), the agreements governing the addition of new funders, including the Intercreditor Agreement, Donziger's 2011 retainer agreement, and the Amazonia Memorandum of Association, confirm that Donziger's collection of funds from investors necessarily amounts to monetizing his own interest in that judgment by obtaining cash in hand in exchange for rights directly traceable to the Ecuadorian judgment.  Under the Intercreditor Agreement and Donziger's 2011 retainer agreement, any new investor dilutes the value of Donziger's recovery and lowers Donziger's priority in the distribution sequence.  *See* Dkt. 2058-2 at 3–7; Dkt. 2058-1 at 63 (¶ 12), 56 (¶¶ 3.2.5–3.2.7); Dkt. 2059 ¶¶ 17–21.  This fact is even clearer under the terms of the agreements with new investors, which act as if all prior funding agreements are non-existent and render new funders first tier for repayment purposes.  *See* Section II.A.  Thus, when Donziger sold "shares" to these new investors with pro rata repayment terms, he further reduced his rights traceable to the Ecuadorian judgment, including by letting funders cut in front of him in the payment order and obtaining a portion of his contingent interest, in exchange for cash that Donziger received and controlled.  Dkt. 2058-3 at 15

# SA878

¶ 16; *id.* at 30–33 ¶ 114; Dkt. 2059 ¶¶ 17–21.

Second, even if fees and expenses paid to Donziger in exchange for legal services he provided to his Ecuadorian clients were somehow exempt from the restrictions of paragraphs 1 and 5, there is no evidence that Donziger has performed bona fide legal services for any of his purported clients in exchange for the funds he has received.  Donziger has attempted to cloak some of the payments he received with legitimacy through vague invoices—including unsupported claims for "back pay" spanning from 2013 to 2017—and obtained other funds via unfettered transfers between his personal and business accounts, but these "invoices" provide no support for his claim that he has been performing legitimate legal services, much less that any supposed clients authorized these "payments."  Moreover, now that Donziger has been suspended from practicing law in New York (Dkt. 2053-1) and the District of Columbia (Ex. 68; Ex. 69), Donziger has no justification for continuing to collect a monthly retainer or any other supposed fees for legal services, as he is unable to perform any legal services for anyone.

Not only is Donziger not counsel of record in any ongoing proceeding to enforce the Ecuadorian judgment, as documented above, there is good reason to believe that Donziger no longer has any right to perform legal services on behalf of the LAPs.  *See* Section II.C.3.  The evidence, in fact, demonstrates that at the same time that the LAPs are complaining to the Canadian courts about their lack of funds, Donziger is using the money collected from investors, as well as interests in the Ecuadorian judgment, not to fund litigation but rather to support his lifestyle and the continuation of his extortionate "pressure campaign premised on misrepresentations." *Donziger*, 974 F. Supp. 2d at 579–80; Section II.D.–E.  That this campaign continues is clear, as is the fact that funds traceable to the Ecuadorian judgment are being used to fuel this extortionate conduct.  Donziger has also been using the money collected from investors to pay off Page, Hinton,

30

# SA879

Billenness, and other individuals involved in publishing his press releases and appearing at shareholder meetings and in bar proceedings against him. *See* Section II.D.

Finally, the evidence demonstrates that Donziger has likely been selling his own interests in the Ecuadorian judgment, in violation of any interpretation of paragraph 5 of the RICO Judgment. Donziger's only client, the FDA, has no legal right to sell shares in the Ecuadorian judgment. *See* Section II.C.3. Nevertheless, Donziger found at least seven new investors willing to enter funding agreements based on interests in the Ecuadorian judgment. *See* Section II.A; Ex. 3 at 34:21–24 (Donziger testifying that he arranges sales to six investors). It is unclear what interest these investors could possibly have bought: the FDA had no right to sell its interest (Velázquez Decl. at 3–5), Donziger had no authority to act on behalf of the LAPs, and Donziger maintains he was not selling his own interest. Even if the FDA had an interest in the Ecuadorian judgment that can be sold, the 2017 retainer agreement states that the FDA is only the "intended recipient" of an award of "10% of the amount for environmental damages" in the Ecuadorian judgment, separate and apart from the damages themselves. Ex. 23 at 1. Donziger has not disputed that 15% to 20% percent of the Ecuadorian judgment has already been committed to third parties (*see* Dkt. 2080 at 5), which exceeds the FDA's alleged 10% share, and documents show that interests totaling 38% of the Ecuadorian judgment have been sold or pledged to date (Sullivan Decl. Ex. 3).[11]

In any event, the operative language in paragraph 5 of the RICO Judgment prohibits

---

[11]  Donziger continued to receive investor funds after April 23, 2018 (*see* Slavek Decl. Ex. 3-A ($342,045.16 via Forum Nobis on May 8, 2018), the date this Court entered the Default Judgment (Dkt. 1985). Thus, even under Donziger's erroneous interpretation of the 2014 stay order, he is unquestionably in contempt. *See* Ex. 3 at 70:25–71:21 ("MR. DONZIGER: I am not at this point arranging any more financing. . . . THE COURT: Look, I appreciate that, but you seriously need to consider whether, even if you are right as to what happened in days of yore, whatever that argument has any traction at all from the minute the judgment was entered against all your clients, including the Frente, which I won't prejudge it, but it certainly is a different set of facts. . . . MR. DONZIGER: On that point, you're referring to the default judgment? THE COURT: Yes, sure. MR. DONZIGER: Just to be clear, I testified in my deposition that I thought that it did not change the landscape in terms of fund raising. I, upon further reflection, realized that that is a mistake and not my position. I didn't quite understand the situation when I said that.").

31

# SA880

Donziger from profiting from the Ecuadorian judgment, which renders whose interest Donziger purports to be selling immaterial in light of his use of judgment proceeds to pay personal expenses.

## B.    Donziger Is Violating Chevron's Restraining Notice

On February 28, 2018, a supplemental judgment was entered in favor of Chevron against Steven Donziger, The Law Offices of Steven R. Donziger, Donziger & Associates, PLLC, and others (collectively, "Donziger"), for the sum of $813,602.71.  Dkt. 1962.  This amount remains due and unpaid.  Champion Decl. ¶ 2.  To facilitate the satisfaction of this judgment, on April 16, 2018, Chevron served Donziger with a restraining notice under CPLR § 5222, which forbade him from "mak[ing] or suffer[ing] any sale, assignment, transfer or interference with any PROPERTY in which [he has] an interest, or pay[ing] over or otherwise dispos[ing] of any debt owed to [him], except as provided in Section 5222." Ex. 70 at 2.  Donziger's failure to comply with the restraining notice provides a separate basis for holding him in contempt of court.

Federal money judgments are enforced through the procedures of the state where the court rendering the judgment is found.  Fed. R. Civ. P. 69(a)(1).  New York's enforcement procedures are outlined in CPLR § 5222.  *Cordius Tr. v. Kummerfeld Associates, Inc.*, 658 F. Supp. 2d 512, 517 (S.D.N.Y. 2009).  Under Section 5222, a judgment creditor can serve the debtor with a restraining order prohibiting the debtor from transferring or assigning property before the judgment's satisfaction.  CPLR § 5222(b).  "A judgment creditor may move in federal court to hold a judgment debtor in civil contempt for transferring property in violation of N.Y. C.P.L.R. § 5222(b) (2000)." *Cordius Tr.*, 658 F. Supp. 2d at 517.  "[T]he refusal or willful neglect to obey a restraining notice is punishable as contempt under C.P.L.R. § 5251," and "disobeying a restraining notice issued under CPLR § 5222 is a contempt of federal court where the restraining order was initiated by the judgment creditor as a means of executing a judgment entered in federal court." *Id.* at 518.

The form and content of the restraining notice complied with the statutory requirements in

# SA881

CPLR § 5222(e).  *See* Ex. 70 at 17–18; Ex. 71; *Cordius Tr.*, 658 F. Supp. 2d at 518–21.  The restraining notice also stated that "disobedience of this Restraining Notice is punishable as contempt of court."  Ex. 70 at 3.  Donziger, however, has ignored the restraining notice and has not yet satisfied any part of the supplemental judgment (although $150,000 was recently frozen in Donziger's TD Bank accounts as part of an effort to collect on the supplemental judgment).  Donziger's bank records reveal that, since April 16, 2018, Donziger "has continued to transfer funds from four of his five open TD Bank accounts and the CWP Account" (Slavek Decl. ¶ 62), including transferring $50,000 to Page on May 10, 2018 (Slavek Decl. ¶ 19).  These transfers, among others, violate the restraining notice and warrant holding Donziger in contempt.

## C.  Sanctions Are Warranted to Make Donziger Comply with the RICO and Default Judgments and the Restraining Notice, and to Compensate Chevron

In the RICO Opinion, this Court found that "Chevron has suffered injury—and is threatened with additional irreparable injury—in consequence of defendants' fraud."  *Donziger*, 974 F. Supp. 2d at 636.  Although it recognized that the equitable relief granted "would not provide a complete remedy for Chevron's injuries," the Court held that "[t]he relief granted here—relief that would prevent Donziger and the LAP Representatives from profiting from the Judgment or seeking to enforce it in this country—would partially remedy and partially prevent the injuries, existing and threatened, that cry out for relief."  *Id.* at 639.  But since the entry of the RICO Judgment, not only has Donziger disregarded the equitable relief this Court ordered, his pattern of racketeering has continued unabated, causing further irreparable harm to Chevron.  Significant contempt sanctions are necessary to finally end Donziger's racketeering and take away his ability to profit.

### 1.  Donziger's Pattern of Racketeering Continues Unabated

Despite this Court's RICO Opinion, Donziger, Page, and others continue to commit acts of extortion, wire and/or mail fraud, money laundering, and obstruction of justice.

# SA882

**Extortion.** From the very start of the Ecuadorian litigation, Donziger's objective has been to "subject Chevron to pressure sufficient to produce a generous settlement," based not on the merits, but the perceived threat of harm to Chevron. *Id.* at 577; *see also id.* at 403 ("the object always included ratcheting the pressure up on Chevron in order to extract money from it"). This Court determined that Donziger's corruption of the Ecuadorian litigation and use of a pressure campaign premised on misrepresentations constituted extortion under the Hobbs Act. *Id.* at 577–80. Yet Donziger persists in his "wrongful objective" by way of "wrongful means." *Id.* at 577.

Donziger and his co-conspirators are not trying to enforce the Ecuadorian judgment based on its merit. They, instead, continue to employ "pressure tactics" to coerce a payoff from Chevron. In a February 2018 document, for example, Donziger and his cohorts told investors that their objective is to "[r]aise risk pressure on Chevron to force settlement of Ecuador judgment at a meaningful price in the near future." Ex. 41. To achieve this objective, the co-conspirators strategized to "[w]ork with Chevron shareholders to pressure company management via shareholder resolutions and the like," "[l]aunch enforcement action in another jurisdiction to seize Chevron assets" to "[m]ake it feel like the risk is growing," and "[l]aunch other legal actions designed to pressure the company." *Id.*; *see also* Ex. 15 at MSK-0001297 (Donziger explaining to prospective funders the need to "give [his] team the ability to put additional pressure on Chevron").

Moreover, this Court previously determined that Donziger's pressure tactics, which rely on repeated dissemination of statements Donziger knows to be false, "increased the perceived threat of harm to Chevron" and "were inherently wrongful by any definition." *Donziger*, 974 F. Supp. 2d at 580. Donziger has not changed course. In a March 2018 email, for example, Donziger and another co-conspirator sent Ben Herbert, an individual assisting with shareholder pressure tactics, a link to a *60 Minutes* clip on the Ecuadorian litigation, which first aired in May 2009 and

34

# SA883

has long since been removed from CBS websites, despite Donziger continuing to promote it on his own website. *See* Ex. 72 at MKS-0015818. The clip discussed Richard Cabrera and his allegedly independent report, but Donziger failed to disclose that he and his team secretly drafted Cabrera's report. And Donziger's promotion of the misleading *60 Minutes* clip had its intended effect, as Herbert found it "deeply meaningful." *Id.* at MKS-0015817; *see also* Ex. 12 at JVM 002167 (Donziger circulating "confidential" investment opportunity memo to an investor, with links to *60 Minutes* clip, *Vanity Fair* article, and several Donziger press releases under the heading "Key Media on Litigation."); Ex. 59 (Donziger circulating his own misleading press release regarding Chevron "Facing Bribery Charges" to an investor and stating: "Chevron starting to feel serious pressure. We can get them to the table if we keep this up and implement the strategy.").

**Wire and Mail Fraud.** Donziger continues to engage in acts that are indictable under the wire or mail fraud statutes, which prohibit the use of the mail or wires "for the purpose of executing" a "scheme or artifice to defraud." 18 U.S.C. §§ 1341, 1343. This Court held Donziger's "false statements to the media and to public officials that were made to increase the pressure on Chevron" were such unlawful "deceitful schemes." *See Donziger*, 974 F. Supp. 2d at 588–89.

Donziger's team drafted a letter to the DOJ based on flagrant misrepresentations and continues to disseminate knowingly false information to increase the pressure on Chevron. *See, e.g.*, Ex. 54 at MKS-0003270 (email from Donziger to Sullivan with draft press release titled "Chevron Faces Criminal Investigation Over $2m Witness Bribery Payments In Ecuador Pollution Dispute" and noting the release "could affect fundraising"); Ex. 46 (Donziger email to Sullivan forwarding press release titled "Facing Critical Court Showdown, Chevron Selling Oil Assets In Canada While Trying to Evade $9.5 Billion Pollution Liability"). Moreover, because Donziger's objective is to coerce a payment from Chevron not based on merit but using inherently wrongful means, his

# SA884

emails with co-conspirators and funders are criminal acts under the wire and/or mail fraud statutes.

**Money Laundering.**  The federal money laundering statute prohibits as a felony the transfer of funds from the United States to a foreign country, or vice versa, "with the intent to promote the carrying on of specified unlawful activity."  18 U.S.C. § 1956(a)(2); *see also Donziger*, 974 F. Supp. 2d at 591 ("The record in this case contains persuasive evidence of a number of [money laundering] offenses by Donziger.").  Donziger and his co-conspirators have transferred substantial amounts of money between the United States, Ecuador, Canada, and other countries to support their unlawful scheme.  Donziger, who claims that he is the "lifeline for people in Ecuador to raise money" (Ex. 26 at 24:1–12), facilitated and controlled these transfers, which are the enterprise's only significant source of capital.  All of the co-conspirators' foreign payments further the enterprise's unlawful, extortionate scheme, and therefore constitute money laundering.

Proceeds from investors, sold in exchange for a share of the Ecuadorian judgment, often originated from New York, were routed to Canada, and then transferred, at least in part, to New York—specifically into Donziger's accounts.  *See* Section II.B.  Donziger used the funds both personally and for making international payments to support his extortionate pressure campaign.  *See* Slavek Decl. Exs. 6, 8 (showing payments from Donziger to co-conspirators in Ecuador and Rex Weyler and others in Canada); Ex. 65 (payment for Alberta conference); Sullivan Decl. Ex. 30. This funding structure is indicative of Donziger's consciousness of guilt, and appears devised to "launder" funds and to avoid the RICO Judgement's requirement that Donziger transfer any funds traceable to the Ecuadorian judgment to Chevron.  As one investor's counsel noted:  "[I]t is a very odd arrangement and gives me some pause. . . . There is some part of this that feels like the steps people may take when they are laundering money."  Ex. 89 at JVM 004913.  And as one of the escrow agents likewise confirmed, since the funds were immediately dispersed, "the only benefit

36

Case 18-0551, Document 96, 03/11/2019, 2515262, Page298 of 308
Case 1:11-cv-00691-LAK-JCF   Document 2113   Filed 10/24/18   Page 42 of 46

to this arrangement was an effort to hide the identity of the Funder from Chevron." *Id.*  The investor's counsel noted that, "I am not sure there is much we can do in this agreement to mitigate any fraud that might be involved." *Id.*[12]

**Obstruction of Justice.**  Donziger has also violated multiple discovery orders of this Court by concealing bank accounts and assets, failing to conduct even the most basic document searches, failing to produce responsive documents, and refusing to respond to deposition questions.  *See* Dkt. 2073 at 1–4.  The evidence also shows that Donziger, along with Page, encouraged the deletion of emails, at a minimum relating to his effort to sell an interest in the judgment to Elliott Management Corporation.  *See* Dkt. 2058-14; Sullivan Decl. ¶ 19.  Donziger specifically asked those on an email chain discussing the Elliott solicitation meeting, to "[p]lease delete all emails related to this and again, keep the info confidential."  Dkt. 2058-14 at MKS-0000090.  And Page explained that this request was designed to prevent Chevron from using information regarding "funding discussions to start [to] put pressure on potential funders and kill off potential deals." *Id.* Donziger's efforts are intended to obstruct these proceedings—and potentially his criminal acts— and prevent Chevron from discovering the full extent of Donziger's contempt of the RICO Judgment.  *See Donziger*, 974 F. Supp. 2d at 593–95; *see also id.* at 434 n.410 ("destruction prior to service of subpoena of evidence material to known investigation constitutes obstruction of justice") (citing *United States v. Solow*, 138 F. Supp. 812, 813–16 (S.D.N.Y. 1956)).

**2.      Sanctions Are Necessary to Force Donziger to Comply**

Donziger's repeated and flagrant violations of this Court's Judgments warrant the imposition of severe sanctions.  *See N.A. Sales Co. v. Chapman Indus. Corp.*, 736 F.2d 854, 857–

---

[12]   Another investor, referring to the judgment ghostwriting evidence, noted counsel's "statement that in the US if this happened there would be an immediate rejection of the ruling and criminal charges filed." Ex. 89 at JVM 004911. Donziger, with Page's help, responded to investor concerns with misleading claims and attacks on this Court.  Ex. 92 ("As for dear Judge Kaplan's quote, it is a typical masterwork of false and misleading information. . . . ").

# SA886

58 (2d Cir. 1984) ("continuous and obviously willful violation" of court orders provided "ample reason to conclude that only a stiff remedy would suffice to coerce compliance"). Courts "have broad discretion to fashion remedies as equity requires, to ensure compliance with their orders." *Cordius Tr.*, 658 F. Supp. 2d at 524. "The imposition of civil contempt sanctions may serve dual purposes: to secure future compliance with court orders and to compensate the party that has been wronged." *Paramedics*, 369 F.3d at 657. When considering the imposition of coercive sanctions, courts generally consider: "(1) the character and magnitude of the harm threatened by the continued contumacy, (2) the probable effectiveness of the sanction in bringing about compliance, and (3) the contemnor's financial resources and the consequent seriousness of the sanction's burden." *Cordius Tr.*, 658 F. Supp. 2d at 525 (quotation marks and citation omitted).

Donziger has demonstrated that he is unwilling to abide by this Court's authority and that he will continue to enlarge and profit from his fraud for as long as he can get away with it. Donziger's misconduct not only continues to victimize Chevron—defeating, in part, the relief it was awarded—it threatens other U.S. entities and individuals, along with the integrity of this U.S. court. Donziger's refusal to comply with the RICO Judgment to date—nearly five years after it was entered—indicates that he will not change his conduct absent a severe coercive sanction.

## IV.    REQUESTED RELIEF

To bring Donziger into compliance with the RICO Judgment and the Default Judgment, Chevron requests that Donziger be ordered within seven days of the Court's order on this motion to execute a notarized, unamended Transfer and Assignment attached hereto as Exhibit 88, transferring to Chevron the contingency interests granted to him under the 2017 retainer agreement, and to transfer $1,525,940 in funds traceable to the Ecuadorian judgment to Chevron. Donziger should also be required to provide to Chevron a complete statement of his net worth and all assets in his possession or under his control within seven days of the date of the Court's order. *Cf.*

# SA887

*Cordius Tr.*, 658 F. Supp. 2d at 526 (requiring as a sanction for contempt that judgment debtor to provide a valuation for the property at issue). This statement should disclose all agreements granting Donziger an interest in the Ecuadorian judgment, and Donziger should provide a sworn affidavit that complies with the requirements outlined in 28 U.S.C. § 1746, without any amendments thereto, verifying that the information provided in the statement is complete and accurate.

To ensure Donziger's compliance with this Court's Judgments going forward, Donziger should be required to submit quarterly reports to Chevron and this Court to include (a) an updated and complete statement of his net worth and all assets in his possession or under his control, and (b) any new or amended agreements granting Donziger an interest in the Ecuadorian judgment. Donziger should also be required to provide a sworn affidavit that complies with the requirements outlined in 28 U.S.C. § 1746, without any amendments thereto, verifying that the information provided in the quarterly reports is complete and accurate and to certify that he has complied with paragraphs 1 and 5 of the RICO Judgment and paragraphs 1 and 4 of the Default Judgment by, among other things, "transfer[ing] and forthwith assign[ing]" to Chevron all property traceable to the Ecuadorian judgment or enforcement of the Ecuadorian judgment. Chevron should also be entitled to ongoing discovery to confirm Donziger's compliance. The Court should appoint a special master to monitor this discovery and Donziger's compliance with this Court's Judgments. *See City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 145 (2d Cir. 2011) ("The power of the federal courts to appoint special masters to monitor compliance with their remedial orders is well established." (quotation marks and citation omitted)).

To bring Donziger into compliance with the restraining notice, Chevron requests that Donziger be ordered within seven days of this Court's order on this motion: to identify for Chevron each and every bank account for which Donziger or his law firms have had, since April 16, 2018,

# SA888

directly or indirectly, access to, control of or an interest in; provide a complete accounting of all funds that have entered or exited those accounts since April 16, 2018; and provide a sworn affidavit that complies with the requirements outlined in 28 U.S.C. § 1746, without any amendments thereto, verifying that the information provided is complete and accurate.

To the extent Donziger refuses to comply with any of the aforementioned obligations, Chevron submits that the Court should impose monetary sanctions on Donziger until he fully complies. *See, e.g.*, *United States v. City of Yonkers*, 856 F.2d 444, 459–60 (2d Cir. 1988), *rev'd on other grounds sub nom. Spallone v. United States*, 493 U.S. 265 (1990); *F.T.C. v. Verity Intern., Ltd.*, 140 F. Supp. 2d 313, 317–19 (S.D.N.Y. 2001) (Kaplan, J.).

Any claim by Donziger that he no longer possesses or controls the $1,525,940 in funds so-far traceable to the Ecuadorian judgment is proof that Chevron has suffered an actual loss in the amount of $1,525,940, as it would mean that Donziger has disposed of property to which the RICO and/or Default Judgments entitle Chevron to possess. If Donziger makes such a claim, the Court should award Chevron $1,525,940 in compensatory damages. *See, e.g.*, *N.Y. State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1353 (2d Cir. 1989) ("Compensatory sanctions should reimburse the injured party for its actual damages."). Given Donziger's willful violations of this Court's orders, Chevron also seeks a reasonable award of attorneys' fees and costs (including for experts) it has incurred litigating Donziger's contempt. *See, e.g.*, *Weitzman v. Stein*, 98 F.3d 717, 719–21 (2d Cir. 1996). If this request for relief is granted, Chevron will file a separate motion substantiating the amount of fees and costs.

## V.    CONCLUSION

Chevron respectfully requests that the Court hold Donziger in contempt, enter coercive sanctions to prevent further contempt of this Court's RICO Judgment, Default Judgment, and the restraining notice, and compensate Chevron for the injuries it has incurred.

# SA889

Dated: October 1, 2018

New York, New York

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

_s/ Randy M. Mastro_

Randy M. Mastro
Andrea E. Neuman
Anne M. Champion
200 Park Avenue
New York, New York 10166
Telephone: 212.351.4000
Facsimile: 212.351.4035
Email: RMastro@gibsondunn.com
Email: ANeuman@gibsondunn.com

William E. Thomson
333 South Grand Avenue
Los Angeles, California 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520
Email: WThomson@gibsondunn.com

STERN, KILCULLEN & RUFOLO LLC

Herbert J. Stern
Joel M. Silverstein
325 Columbia Tpke, Ste 110
P.O. Box 992
Florham Park, New Jersey 07932-0992
Telephone:  973.535.1900
Facsimile:  973.535.9664
Email: hstern@sgklaw.com
Email: jsilverstein@sgklaw.com

_Attorneys for Chevron Corporation_

## SA890

Page 1

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4     C.A. No. 11 Civ. 0691 (LAK)

5    -----------------------------------x

     CHEVRON CORPORATION,

6

             Plaintiff,

7

8

         - against -

9

10

     STEVEN DONZIGER, et al.,

11

             Defendants.

12    -----------------------------------x

                 June 25, 2018

13               10:07 a.m.

14

15       Videotaped Deposition of STEVEN

16    DONZIGER, taken by Plaintiff, pursuant to

17    Order, held at the offices of Gibson Dunn &

18    Crutcher LLP, 200 Park Avenue, New York,

19    New York, before Todd DeSimone, a

20    Registered Professional Reporter and Notary

21    Public of the State of New York.

22

23

24

25

Case 18-855, Document 86, 03/11/2019, 2515262, Page304 of 308

## SA891

```
 1                      DONZIGER
 2        Q.      Did you discuss with
 3   Ms. Sullivan how much you were going to ask
 4   Elliott for?
 5        A.      I think we did.
 6        Q.      When you told Elliott that you
 7   had a 6.3 percent interest in the judgment,
 8   was that an accurate statement?
 9        A.      According to my retainer, yes,
10   but I have given portions of that to other
11   people.
12        Q.      To whom have you given portions
13   of that?
14        A.      Rick Friedman, Zoe Littlepage.
15        Q.      Did you give them --
16        A.      So they would represent me in
17   the RICO case, just to be clear.
18        Q.      You gave them portions of that
19   before or after the RICO judgment?
20        A.      Before.
21        Q.      So what percentage of the 6.3
22   do you currently own?
23        A.      Again, I think it is pretty
24   much a nullity for practical purposes given
25   the RICO judgment.  But I think if you were
```

Page 145

```
 1              DONZIGER
 2   to discount what has been allocated to
 3   Mr. Friedman and Ms. Littlepage and a
 4   couple of other people --
 5        Q.     Who were the other people?
 6        A.     Two people who had loaned me
 7   money to pay John Keker, family members.  I
 8   would estimate it is about 5 or 5.2
 9   percent.
10        Q.     I'm sorry, what you have left
11   is 5 percent?
12        A.     In other words, instead of 6.3,
13   even though it is all for me and I owe
14   them, that if you were to discount what
15   they have been contractually promised, it
16   would be about 5.2 percent based on my best
17   estimates.
18        Q.     When you say discount, you mean
19   subtract out?
20        A.     Yes, subtract out.
21        Q.     From the 6.3?
22        A.     Yeah.
23        Q.     Why was your 6.3 percentage
24   being discussed with Elliott?
25        A.     I don't remember.  I think
```

Case 18-855, Document 96, 03/11/2019, 2515262, Page306 of 308

# SA893

March 1, 2019

**VIA ECF**

Honorable Lewis A. Kaplan
United States District Judge
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

   RE:   *Chevron v. Donziger*, Case No. 11 Civ. 691 (LAK)

Dear Judge Kaplan:

     I write in response to the Court's order dated February 21, 2019.[1] I respectfully take the position that yet another forced assignment of my contingency interested is unwarranted and in fact not possible. The power-of-attorney document under consideration was intended to clarify in writing the scope of my authority as it has long been conveyed to me by my clients, both orally and in writing. At the end, the document recognizes the existence of my long-standing contingency interest in a recovery in the *Aguinda* case. Importantly, the document observes that my clients have the power to grant a new interest along the same lines to the extent that it "may be necessary or useful." This conditional language does not vest in me any legal interest that I am capable of assigning. I have repeatedly assured the Court that I am aware of and intend to

---

[1]   Chevron's attacks on me for purportedly not going through the process of "meet and confer" are overwrought. While I respect the conference requirement, Chevron uses such conferences as opportunities to bully and badger, not to negotiate in good faith. In any event, the scope of the issue is limited and only a brief conference before the deadline was necessary. For these reasons, I told Ms. Neuman I would be in contact with her on February 28. Chevron flagrantly fails to acknowledge in its submission that I reached out to Ms. Neuman to inform her that my position was prepared and asking whether we should proceed in a joint filing. In typical fashion, Chevron's counsel chose to ignore my email so it could proceed with its pre-cooked attacks.

# SA894

comply with the terms of the Court's injunction—to the extent I am allowed to understand what the injunction is. I recognize that the injunction includes a constructive trust over all monies or assets "traceable to the [*Aguinda*] Judgment," and that the Court clarified in its April 2014 Opinion that this referenced all assets received upon a collection of that Judgment or "traceable" thereto. Under these clear terms, any proceeds from a recovery that would be available to satisfy my contingency interest will be subject to the Court's constructive trust, and I intend to act in lawful compliance with this understanding. This should end the matter. There is no need for an additional assignment, as I already have executed two such assignments under protest based on coercive orders of this court.

The utter minutiae of this matter is particularly galling in light of the Court's continued refusal (for more than 11 months now) to rule on Chevron's contempt motion while the company continues with its SLAPP-style discovery rampage that has now targeted at least 25 supporters of the legal case against the company with subpoenas. Those targeted include members of my own family and now my therapist and performance coach who was subjected to significant harassment this week by four Chevron lawyers during a deposition in Dallas. This latest Chevron installment of discovery-gone-wild is in my view a total abuse of power facilitated by this Court's conscious failure to rule on the scope of what is or is not permissible in terms of fundraising. If the Court is going to change the rules now, almost *five years* after the April 2014 Opinion, and after my Ecuadorian clients have made substantial progress in Canadian courts in enforcing their judgment, it must do so in a written opinion that will also allow me to pursue appellate relief. The current strategy of keeping the contempt motion pending, while allowing Chevron to intimidate and potentially bankrupting dozens of subpoena recipients with utterly

# SA895

baseless demands for all sorts of confidential internal information entirely unrelated to the "contempt" claims in the motion, is obviously disingenuous, abusive, and in flagrant violation of First Amendment associational rights.

I also highlight the fact that my two prior assignments of my interests in the *Aguinda* case were made under duress and protest related to my persistent challenge to the legitimacy of this proceeding and the Court's conclusions. I recognize that the U.S. federal judicial system has thus far declined to remedy the situation and that I am obliged to respect the force of the Court's authority, even though I am continuing to pursue relief in international human rights fora, in a New York bar proceeding, and in Canadian courts via the enforcement action where this court's flawed judgment and the false Guerra testimony surely will be scrutinized. Nonetheless, particularly in light of the collapsing factual basis for the Court's judgment in this matter after Alberto Guerra's admitted perjury and the results of the forensic examination of Judge Zambrano's hard drives, I continue to believe that there is a high probability that the Court's judgment will ultimately be set aside as a product of fraud by Chevron and Gibson Dunn with potential jeopardy facing several individuals on the Chevron team who orchestrated what in my view is a criminal scheme. A more complete basis of my protest of the previous assignments is set forth in the letter I sent to Mr. Mastro on August 22, 2018, which I attach here for the record.

Sincerely,

_____/ s /_____

Steven R. Donziger