# 18-855-cv(L)

### 18-2191-cv(Con)

## United States Court of Appeals
### *for the*
## Second Circuit

CHEVRON CORPORATION,

*Plaintiff-Counter-Defendant-Appellee*,

- v. -

DONZIGER & ASSOCIATES, PLLC, STEVEN DONZIGER,
THE LAW OFFICES OF STEVEN R. DONZIGER,

*Defendants-Counter-Claimants-Appellants*.

*(caption continued on inside cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
CASE NO. 1:11-CV-00691-LAK-JCF
THE HONORABLE LEWIS A. KAPLAN

**SUPPLEMENTAL APPENDIX
VOLUME IV OF IV
(Pages SA896 to SA1179)**

Randy M. Mastro
Andrea E. Neuman
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

William E. Thomson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7000

*Attorneys for Chevron Corporation*

PABLO FAJARDO MENDOZA, LUIS YANZA, FRENTE DE DEFENSA DE LA AMAZONIA, AKA AMAZON DEFENSE FRONT, SELVA VIVA SELVIVA CIA, LTDA, MARIA AGUINDA SALAZAR, CARLOS GREFA HUATATOCA, CATALINA ANTONIA AGUINDA SALAZAR, LIDIA ALEXANDRA AGUIN AGUINDA, PATRICIO ALBERTO CHIMBO YUMBO, CLIDE RAMIRO AGUINDA AGUINDA, LUIS ARMANDO CHIMBO YUMBO, BEATRIZ MERCEDES GREFA TANGUILA, LUCIO ENRIQUE GREFA TANGUILA, PATRICIO WILSON AGUINDA AGUINDA, CELIA IRENE VIVEROS CUSANGUA, FRANCISCO MATIAS ALVARADO YUMBO, FRANCISCO ALVARADO YUMBO, OLGA GLORIA GREFA CERDA, LORENZO JOSE ALVARADO YUMBO, NARCISA AIDA TANGUILA NARVAEZ, BERTHA ANTONIA YUMBO TANGUILA, GLORIA LUCRECIA TANGUI GREFA, FRANCISCO VICTOR TANGUILA GREFA, ROSA TERESA CHIMBO TANGUILA, JOSE GABRIEL REVELO LLORE, MARIA CLELIA REASCOS REVELO, MARIA MAGDALENA RODRI BARCENES, HUGO GERARDO CAMACHO NARANJO, JOSE MIGUEL IPIALES CHICAIZA, HELEODORO PATARON GUARACA, LUISA DELIA TANGUILA NARVAEZ, LOURDES BEATRIZ CHIMBO TANGUIL, MARIA HORTENCIA VIVER CUSANGUA, SEGUNDO ANGEL AMANTA MILAN, OCTAVIO ISMAEL CORDOVA HUANCA, ELIAS ROBERTO PIYAHUA PAYAHUAJE, JAVIER PIAGUAJE PAYAGUAJE, DANIEL CARLOS LUSITAND YAIGUAJE, BENANCIO FREDY CHIMBO GREFA, GUILLERMO VICENTE PAYAGUA LUSITANTE, DELFIN LEONIDAS PAYAGU PAYAGUAJE, ALFREDO DONALDO PAYAGUA PAYAGUAJE, MIGUEL MARIO PAYAGUAJE PAYAGUAJE, TEODORO GONZALOPIAGUAJE PAYAGUAJE, FERMIN PIAGUAJE PAYAGUAJE, REINALDO LUSITANDE YAIGUAJE, LUIS AGUSTIN PAYAGUA PIAGUAJE, EMILIO MARTIN LUSITAND YAIGUAJE, SIMON LUSITANDE YAIGUAJE, ARMANDO WILMER PIAGUAJE PAYAGUAJE, ANGEL JUSTINO PIAGUAG LUCITANT, KEMPERI BAIHUA HUANI, AHUA BAIHUA CAIGA, PENTIBO BAIHUA MIIPO, DABOTA TEGA HUANI, AHUAME HUANI BAIHUA, APARA QUEMPERI YATE, BAI BAIHUA MIIPO, BEBANCA TEGA HUANI, COMITA HUANI YATE, COPE TEGA HUANI, EHUENGUINTO TEGA, GAWARE TEGA HUANI, MARTIN BAIHUA MIIPO, MENCAY BAIHUA TEGA, MENEMO HUANI BAIHUA, MIIPO YATEHUE KEMPERI, MINIHUA HUANI YATE, NAMA BAIHUA HUANI, NAMO HUANI YATE, OMARI APICA HUANI, OMENE BAIHUA HUANI, YEHUA TEGA HUANI, WAGUI COBA HUANI, WEICA APICA HUANI, TEPAA QUIMONTARI WAIWA, NENQUIMO VENANCIO NIHUA, COMPA GUIQUITA, CONTA NENQUIMO QUIMONTARI, DANIEL EHUENGEI, NANTOQUI NENQUIMO, OKATA QUIPA NIHUA, CAI BAIHUA QUEMPERI, OMAYIHUE BAIHUA, TAPARE AHUA YETE, TEWEYENE LUCIANA NAM TEGA, ABAMO OMENE, ONENCA ENOMENGA, PEGO ENOMENGA, WANE IMA, WINA ENOMENGA, CAHUIYA OMACA, MIMA YETI,

　　　*Defendants*,

STRATUS CONSULTING, INC., DOUGLAS BELTMAN, ANN MAEST,

　　　*Defendants-Counter-Claimants*,

ANDREW WOODS, LAURA J. GARR, H5,

　　　*Respondents*.

# TABLE OF CONTENTS

PAGE

## Docket Entries

Exhibit 2-13 to Declaration of Kristen L. Hendricks in Support of
Chevron Corporation's Motion for Preliminary Injunction, filed
February 6, 2011 (Dkt. 7-6)

    Transcript of unreleased footage from the film *Crude* ...................... SA1

Exhibit 2075 to Declaration of Anne Champion in Support of
Chevron Corporation's Motion for Summary Judgment of Partial
Summary Judgment on Defendants' Affirmative Defenses of Res
Judicata and Collateral Estoppel, filed March 2, 2012 (Dkt. 400-
11)

    Excerpts from Daniel L. Rourke deposition transcript, dated
December 20, 2010........................................................................ SA11

Excerpts from Chevron Corporation's Statement of Material Facts In
Support of Motion for Summary Judgment or Partial Summary
Judgment on the Stratus Defendants' Affirmative Defenses of
Res Judicata and Collateral Estoppel, filed June 13, 2012
(Dkt. 486) ..................................................................................... SA15

Opinion on Partial Summary Judgment Motion, filed July 31, 2012
(Dkt. 550) ..................................................................................... SA18

Order of Appointment of Special Masters, filed March 26, 2013
(Dkt. 942) ..................................................................................... SA20

Notice of Appearance of Zoe B. Littlepage, filed October 13, 2013
(Dkt. 1543) ................................................................................... SA23

Exhibit A to Chevron Corporation's Notice of Filing of Witness
Statement of Troy A. Dahlberg, filed October 23, 2013 (Dkt.
1597-1)

ii

PAGE

Direct testimony of Troy A. Dahlberg, dated October 8, 2013 ........ SA24

Notice of Appearance of Richard H. Friedman, filed October 24, 2013
(Dkt. 1616)..................................................................... SA30

Chevron Corporation's Notice of Application for Costs, filed
December 5, 2016 (Dkt. 1918)........................................... SA31

Chevron Corporation's Statement of Non-Opposition to Donziger's
Motion to Hold Costs Bill in Abeyance, filed on December 29,
2016 (Dkt. 1920) ........................................................... SA33

Order Granting in Part Donziger's Motion to Hold Chevron's Bill of
Costs in Abeyance, filed December 30, 2016 (Dkt. 1921)............... SA35

Memorandum Order Granting Chevron Corporation's Motion to
Reactivate Motion for Attorneys' Fees and Bill of Costs, filed
July 17, 2017 (Dkt. 1923) ................................................ SA37

Chevron Corporation's Notice of Application for Costs, filed July 18,
2017 (Dkt. 1924) ........................................................... SA38

Donziger's Letter to Clerk of Court Objecting to Notice of
Application for Costs, filed August 1, 2017 (Dkt. 1925)................. SA40

Bill of Costs, filed August 8, 2017 (Dkt. 1928)....................... SA47

Donziger's Letter to Court Objecting to Clerk's Taxation of Costs,
filed August 16, 2017 (Dkt. 1931) ................................... SA58

Order Regarding Special Masters' Report, filed November 9, 2017
(Dkt. 1939)..................................................................... SA64

Memorandum and Order Regarding Reasonableness of Special Master
Fees, filed December 6, 2017 (Dkt. 1940)....................... SA66

Donziger's Objections to Notice of Taxation of Costs, filed December
6, 2017 (Dkt. 1941) ..................................................... SA69

2515264, Page5 of 292

iii

Special Masters' Final Report and Recommendation on Allocation of
Their Fees and Costs, filed December 8, 2017 (Dkt. 1942).............. SA81

Exhibit A to Declaration of William E. Thomson in Support of
Chevron Corporation's Response to Steven Donziger's
December 6, 2017 Letter Objecting to the Fees of the Special
Masters, filed December 13, 2017 (Dkt. 1945-1)

Declaration of the Affected Nationalities in the Province of
Sucumbios, dated August 20, 2016 ................................................. SA97

Order Adopting Special Masters' Final Report and Recommendation,
filed December 27, 2017 (Dkt. 1946).............................................SA105

Donziger's Letter to Court Objecting to December 27, 2017 Order,
filed December 28, 2017 (Dkt. 1947)............................................SA106

Declaration of Joseph M. Kay, filed January 9, 2018 (Dkt. 1949)...........SA110

Corrected Memorandum Opinion Granting In Part and Denying In
Part Donziger's Motion to Review the Taxation of Costs, filed
March 1, 2018 (Dkt. 1963) ...........................................................SA112

Chevron Corporation's Memorandum of Law in Support of Its Ex
Parte Application By Order To Show Cause For Discovery and a
Preservation Order in Furtherance of This Court's March 4, 2014
Judgment and to Set a Hearing Date Subsequent to That
Discovery on Chevron's Application to Have Steven Donziger
Held in Contempt, filed on March 19, 2018 (Dkt. 1966).................SA160

Order to Show Cause and Preservation Order in Furtherance of This
Court's March 4, 2014 Judgment and Application to Have
Steven Donziger Held in Contempt, filed March 19, 2018 (Dkt.
1968) ........................................................................................SA184

Clerk's Certificate of Default, filed April 18, 2018 (Dkt. 1984) .............SA188

iv

PAGE

Opposition to Chevron's Application for Contempt and Related
    Discovery, filed April 24, 2018 (Dkt. 1986)..................................SA191

Chevron Corporation's Reply Memorandum of Law in Support of Its
    Ex Parte Application By Order To Show Cause For Discovery
    and a Preservation Order in Furtherance of This Court's March
    4, 2014 Judgment and to Set a Hearing Date Subsequent to That
    Discovery on Chevron's Application to Have Steven Donziger
    Held in Contempt, filed on May 4, 2018 (Dkt. 1987)......................SA201

Chevron Corporation's Motion to Compel Donziger to Respond to
    Post-Judgment Discovery Requests, filed on May 4, 2018
    (Dkt. 1989)....................................................................................SA215

Exhibit 2 to Chevron Corporation's Motion to Compel Donziger to
    Respond to Post-Judgment Discovery Requests, filed May 4,
    2018 (Dkt. 1989-2)

    Letter from Steven Donziger to Randy Mastro, dated April 30,
    2018.............................................................................................SA222

Donziger's Opposition to Motion to Compel, filed May 10, 2018
    (Dkt. 2002)....................................................................................SA232

Order on Motion to Compel Post-Judgment Discovery, filed May 17,
    2018 (Dkt. 2009) ..........................................................................SA236

Attachment to Chevron Corporation's Letter to Court Regarding
    Canadian Appellate Decision, filed May 24, 2018 (Dkt. 2015-1)

    Decision of Court of Appeal for Ontario, dated May 23, 2018........SA241

Donziger's Motion for Declaratory Relief and Motion to Dismiss
    Plaintiff's Application to Hold Donziger in Contempt for
    "Profiting" From The Ecuadorian Environmental Judgment, filed
    May 31, 2018 (Dkt. 2018)..............................................................SA296

v

PAGE

Motion for an Emergency Administrative Stay of Provision 1(c) the
Court's Discovery Order Until the Court Has Received Briefing
and Decided Donziger's Pending Motion for a Protective Order,
filed June 19, 2018 (Dkt. 2028) .....................................................SA308

Order Denying Donziger's Motions for Declaratory Judgment,
Protective Order, and Administrative Stay, filed June 25, 2018
(Dkt. 2037)....................................................................................SA313

Chevron Corporation's Second Motion to Compel Donziger to
Respond to Post-Judgment Discovery Requests, filed August 16,
2018 (Dkt. 2073) ..........................................................................SA314

Donziger Letter to Court Regarding August 15, 2018 Order, filed
August 20, 2018 (Dkt. 2075) ........................................................SA321

Attachment to Chevron Corporation's Letter to Court Regarding BIT
Decision, filed September 14, 2018 (Dkt. 2082-1)

    Second Partial Award on Track II, dated August 30, 2018..............SA322

Chevron Corporation's Memorandum of Law in Support of Its Motion
to Hold Steven Donziger, the Law Office of Steven R. Donziger,
and Donziger Associates, PLLC in Contempt of Court For Their
Failure to Comply With the RICO and Default Judgments and
the April 16, 2018 Restraining Notice, filed October 24, 2018
(Dkt. 2113)....................................................................................SA844

Exhibit 2 to Declaration of Anne Champion in Support of Chevron
Corporation's Motion to Hold Donziger in Contempt, filed
October 24, 2018 (Dkt. 2114-1)

    Excerpts from deposition transcript of Steven R. Donziger, dated
    June 25, 2018 ...............................................................................SA890

Donziger's Letter to Court Regarding February 21, 2019 Order, filed
March 1, 2019 (Dkt. 2169) ...........................................................SA893

vi

PAGE

Order of Appointment Regarding Neutral Forensic Expert, filed
    March 5, 2019 (Dkt. 2170) ............................................................SA896

Memorandum re Forensic Inspection Protocol, filed March 5, 2019
    (Dkt. 2171)..................................................................................SA898

Forensic Inspection Protocol, filed March 5, 2019 (Dkt. 2172) ..............SA914

Order Granting Request For Oversized Brief, No. 14-826, filed June
    26, 2014 (Dkt. 77) .......................................................................SA963

Corrected Brief of Defendants-Appellants Steven Donziger, The Law
    Offices of Steven Donziger, and Donziger & Associates PLLC,
    No. 14-826, filed July 16, 2014 (Dkt. 150).....................................SA965

Testimony of Charles Calmbacher, No. 14-826, filed October 1, 2014
    (Dkt. 185-5) ...............................................................................SA1100

Response to Statements By Mr. Cabrera Regarding Alleged Impacts
    to Water Resources in the Petroecuador-Texaco Concession
    Area, No. 14-826, filed October 1, 2014 (Dkt. 217-3) ..................SA1102

Corrected Reply Brief of Defendants-Appellants Steven Donziger,
    The Law Offices of Steven Donziger, and Donziger &
    Associates PLLC, No. 14-826, filed January 6, 2015 (Dkt. 317)...SA1105

# SA896

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

                                Plaintiff,


                -against-                                        11-cv-0691 (LAK)


STEVEN DONZIGER, et al.,

                                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/5/2019


## ORDER OF APPOINTMENT


LEWIS A. KAPLAN, *District Judge.*

                The Court today is issuing a forensic inspection protocol (the "Protocol") that
contemplates the appointment of a Neutral Forensic Expert to perform further designated functions.
Prior to its issuance, the Court informed the parties that it was considering Mr. Ondrej Krehel for
appointment as the Neutral Forensic Expert. Mr. Krehel submitted an affidavit stating in substance
that he is subject to no grounds for disqualification and a declaration confirming that, while
employed at Stroz Friedberg, he never performed any services for Chevron or any of its counsel with
respect to the subject matter of any part of this case, or for any party to this case. Indeed, the
declaration establishes that he left Stroz Friedberg in 2009, which well antedated the entry of the
Ecuadorian judgment and the filing by Chevron of any Section 1782 proceedings and of this case.
It is hereby

                ORDERED, pursuant to Fed. R. Civ. P. 53(a)(1)(c), as follows:

        1.      Mr. Ondrej Krehel of LIFARS shall serve as the Neutral Forensic Expert.

        2.      The Neutral Forensic Expert shall

                a.      Perform the functions described in the Protocol.

                b.      Consult with the Court with respect to such matters relating to this
case as the Court may request or permit.

                c.      Communicate with parties and attorneys to permit the full and

# SA897

2

efficient performance of these duties.

   d. Perform such other duties as the Court may request or direct or as are permitted by Fed. R. Civ. P. 53(c).

   3. The Neutral Forensic Expert may communicate *ex parte* without notice to the parties with: (a) the Court; (b) Chevron's Forensic Expert, only to the extent such communications are for the purposes described in Paragraphs 7(d) and 7(e) of the Protocol; and (c) any assistant(s) employed in accordance with Paragraph 5 of this order.

   4. The Neutral Forensic Expert shall be compensated at an hourly rate of $425. Prior to the commencement of any work, LIFARS shall invoice, and Chevron shall pay, $15,000 of fees. LIFARS then shall bill Chevron monthly for services based on the actual number of hours incurred and apply the initial payment of $15,000 towards the monthly bills. LIFARS shall send these bills to Donziger as well. If travel is necessary and pre-approved by the Court, Chevron shall pay for expenses incurred from travel. Additionally, if LIFARS is requested or required to produce documents or personnel as witnesses with respect to Mr. Krehel's engagement as the Neutral Forensic Expert, Chevron shall pay fees and expenses of LIFARS counsel incurred in responding to such a request or requirement. Chevron's obligation to bear the cost of Mr. Krehel's compensation and other LIFARS compensation and expenses is without prejudice to Chevron's right to seek reimbursement of such costs.

   5. Mr. Krehel is authorized to employ assistant(s) employed by LIFARS to facilitate the performance of his duties hereunder.

   SO ORDERED.

Dated:  March 5, 2019

         _____
           Lewis A. Kaplan
         United States District Judge

SA898

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

                  Plaintiff,

        -against-                        11-cv-0691 (LAK)

STEVEN DONZIGER, et al.,

                  Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/5/2019

## MEMORANDUM RE FORENSIC INSPECTION PROTOCOL

LEWIS A. KAPLAN, *District Judge.*

The background of this case is well known and detailed in scores of opinions and orders so the Court will not begin at Square One. In a nutshell, Steven Donziger, a now suspended New York lawyer,[1] procured a $8.6 billion Ecuadorian judgment against Chevron Corporation ("Chevron"). This Court concluded that Donziger and others procured the Ecuadorian judgment by fraud.[2] It granted equitable relief and ultimately taxed costs in excess of $800,000 and entered a

---

[1] *Matter of Donziger*, 163 A.D.3d 123, 80 N.Y.S.3d 269 (1st Dept. 2018).

[2] *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362 (S.D.N.Y. 2014), *aff'd*, 833 F.3d 74 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2268 (2017).

An arbitration panel under the auspices of the Permanent Court of Arbitration at the Hague and constituted under the Bilateral Investment Treaty between the United States and Ecuador reached the same conclusion in a lengthy award rendered after extensive hearings. *Matter of Chevron Corp. v. Republic of Ecuador*, PCA Case No. 2009-23, Second Partial Award on Track II (Aug. 30, 2018) [DI 2082-1] at ¶¶ 5.85, 5.164, 5.229, 5.231. The courts of Brazil and Argentina dismissed claims for enforcement. *Aguinda v. Chevron Corp.*, No. 97260/2012 (Arg. Ct. Civ. App. July 3, 2018); Ted Folkman, *Lago Agrio Court: STJ*

# SA899

supplemental money judgment.

Chevron now is attempting to conduct post-judgment discovery both to locate Donziger assets that it may reach to satisfy the money judgment and to determine whether Donziger has violated the terms of the permanent injunction entered against him in 2014. Donziger in virtually all respects has refused to cooperate. The matter now is before the Court on one of the matters relating to that refusal.[3]

The Court today issued a protocol for the imaging and examination of Donziger's electronic devices, storage media and other materials. That protocol has been developed after careful consideration. It is far less intrusive than Chevron first proposed.

The Court writes to provide the background of this step and to respond to some of the points Donziger has made. Above all, however, it is necessary to bear in mind that the imaging and examination of Donziger's electronic devices has been necessitated only by his obdurate refusal to make any serious, good faith effort to produce the documents he has been ordered to produce. He has brought this on himself.

---

*Rejects Ecuadoran Judgment*, LETTERS BLOGATORY (Dec. 1, 2017), https://lettersblogatory.com/2017/12/01/lago-agrio-court-stj-rejects-ecuadoran-judgment /#more-25727); *see also* Ted Folkman, *Lago Agrio: LAPs Abandon Recognition and Enforcement Action in Brazil*, LETTERS BLOGATORY (Sept. 25, 2017), https://lettersblogatory.com/2017/09/25/lago-agrio-laps-abandon-recognition-and-enforc ement-effort-in-brazil/. In Canada, the only other country in which enforcement of the judgment has been sought, the Ontario Superior Court of Justice granted summary judgment dismissing claims against both Chevron and its indirectly held, seventh tier subsidiary, Chevron Canada, and appeals from that decision have been dismissed by the Ontario Court of Appeal. *Yiaguaje v. Chevron Corp.*, 2017 ONSC 135, 2017 CarswellOnt 868 (2017), *appeals dismissed*, 141 O.R. (3d) 1, 2018 ONCA 472, CarswellOnt 14968, *app. for leave to appeal filed*, 2018 CarswellOnt 14968 (S.C.C. June 25, 2018).

[3]   Two contempt applications are *sub judice* as well.

3

*The Current Posture of the Case*

Many months ago, Chevron served Donziger with a request for the production of documents. After motion practice, the Court modified it in some respects and otherwise narrowed several of the document requests.

On August 16, 2018, Chevron filed its second motion to compel Donziger to comply *inter alia,* with the narrowed document requests.[4] It pointed out, among other things, that Donziger had not complied, or even sought to comply, in any material way. Indeed, it asserted that Donziger had not even made the most rudimentary search for responsive documents and that he had admitted that he deliberately had withheld many.[5] The motion asked that Donziger be required to produce his electronic devices for forensic imaging thus permitting a proper search for responsive documents.[6]

Donziger's opposition to Chevron's motion did not deny Chevron's assertions regarding his non-compliance. Its only response to the request to image his devices was one conclusory sentence.[7] The Court granted Chevron's motion on October 18, 2018, stating:

> "Given Donziger's stonewalling of post-judgment discovery and the other circumstances described in Chevron's memorandum, it is appropriate that Donziger's electronic devices be imaged and examined for any responsive documents that Donziger has not thus far produced under appropriate safeguards of the interests of all parties. The parties, on or before October 26, 2018, shall agree upon or, in default

---

[4]

DI 2073.

[5]

*Id.* at 3.

[6]

*Id.* at 3-4.

[7]

DI 2077 at 4 ("Chevron's request that forensic images be taken of my electronic devices is drastically intrusive and unreasonable, supported by no evidence whatsoever, and must be denied.")

of an agreement, notice for settlement an order providing for the selection, compensation and precise duties of a third party to whom Donziger will be obliged to produce for forensic imaging all computers and electronic, optical and magnetic storage devices and media within his possession, custody or control (a 'Third Party'). Any such Third Party, at a minimum, will be obliged to retain any forensic images in confidence pending further order of the Court."[8]

*The Development of the Forensic Protocol*

On October 26, 2018, Chevron reported to the Court that it had met with Donziger as the Court contemplated, but that Donziger had "refused to engage in any substantive discussion regarding either issue during the scheduled meet and confer teleconference (which was delayed twice at his request). Instead, he insisted that he was going to send Chevron's counsel an email."[9] Donziger's subsequent email stated that he refused to cooperate and that he would go into contempt in an effort to obtain a ruling on his contention, previously rejected by the Court, that Chevron was engaged in a "constitutionally infirm discovery rampage targeting financial supporters and others of the Ecuadorians that is clearly designed to dry up funding for the case and to intimidate those who support both the litigation and the broader corporate accountability campaign . . . ."[10] Chevron accordingly submitted its own proposal for the conduct of the forensic imaging and examination of Donziger's materials.

The Court held a conference on Chevron's proposed protocol on January 8, 2019 at

---

[8]  DI 2108 ¶3.

[9]  DI 2119 at 1.

[10]  DI 2119-2 at 3.

# SA902

which it raised several questions and urged Chevron to reconsider its proposal. Donziger was afforded the opportunity to address the details of Chevron's proposal, but insisted on repeating his contention that he did not violate the injunction, a question *sub judice*, that the Court should so rule, and that Chevron's efforts to obtain post-judgment discovery of any kind are illegitimate, a position the Court already had rejected.[11] The Court made clear that it would decide the contempt motions in due course and that it would not stay the post-judgment discovery.[12] When Donziger finally got to the specifics of the Chevron proposal, he contended that the search terms were too broad,[13] that the discovery was too intrusive (an argument the Court had accepted in part and rejected in part in its May 17, 2018 ruling on Chevron's first motion to compel, where it compelled responses to only some of Chevron's requests, some of which it revised to narrow them[14]), and sought privileged material (an argument the Court rejected in its ruling on Chevron's second motion to compel[15]).

Following the January 8, 2019 conference, Chevron submitted a revised proposal

---

[11] *See* Tr. 9-12 Jan. 8, 2019 [DI 2149].

[12] *Id.* at 10-14.

[13] Donziger does not understand, or mischaracterizes, the role of the search terms under any version of the protocol. Contrary to his suggestion, Chevron would not obtain each and every document containing any of the search terms. Rather, the presence of one or more search terms in any document in the electronically stored information ("ESI") would result only in that document being subjected to further analysis to identify documents potentially responsive to those portions of Chevron's document requests in respect of which the Court has ordered production. Documents so identified would be further screened to determine whether they in fact are responsive and thus subject to production.

[14] DI 2009.

[15] DI 2108 ¶ 1.

# SA903

6

which responded to some of the Court's comments.[16]  Donziger replied essentially with a rehash of

his previous arguments, all based on distortions or mischaracterizations or previously ruled upon by

the Court, and an unjustified *ad hominem* attack on Chevron's proposed forensic expert.[17]  Chevron

effectively and persuasively responded to that attack.[18]

*The Final Forensic Protocol*

The Court today is filing the final product of this deliberate process, which has been

modified in important respects from both Chevron's initial and most recent proposals.  The

modifications all are intended to protect any legitimate interests in privacy that Donziger may have

to the extent they can be reconciled with Chevron's legitimate interest in discovering information

to assist in collecting its money judgment and determining whether Donziger has complied with the

injunction.  And the Court will not unduly prolong this memorandum.  But several points bear brief

mention.

A.      *Some Background Informing the Formulation of the Protocol*

This is the second occasion on which the Court has felt obliged to require forensic

imaging of Donziger materials containing electronically stored information ("ESI").  The first

occurred in Chevron's Section 1782 discovery proceeding against Donziger, which overlapped the

---

[16]

DI 2145-1.

[17]

DI 2151.

[18]

DI 2156.

commencement of this action.  The circumstances of that prior instance are informative here.

Donziger there was served with a subpoena requiring the production of documents and a deposition.  This Court denied his motion to quash and the Court of Appeals affirmed.[19]

It swiftly became apparent that there was reason to question Donziger's compliance with the subpoena.[20]  Chevron moved to compel Donziger to produce all responsive documents forthwith and, in addition, to produce his hard drives for forensic imaging.[21]

The Court initially reserved decision on the request to image Donziger's media, instead directing *Donziger and his counsel* to conduct a search of all ESI using a list of search terms provided by Chevron "and thereupon forthwith [to] produce any documents responsive to the subpoenas located by such search . . . ."[22]  Thus, the Court in the first instance trusted Donziger to do an appropriate search of his own materials using the search terms and then to produce the responsive documents as opposed to involving Chevron or a third party.  The Court did not require that he produce all documents containing the search terms, leaving to Donziger the separation of documents responsive and unresponsive to the subpoena.[23]

---

[19]

    *In re Application of Chevron Corp.*, 749 F. Supp. 2d 135 (S.D.N.Y.), *issuing full opinion*, 749 F. Supp. 2d 141 (S.D.N.Y.), *adhering on reconsideration*, 749 F. Supp. 2d 170 (S.D.N.Y.), *aff'd sub nom.*, *Lago Agrio Plaintiffs v. Chevron Corp.*, 409 Fed. App'x 393 (2d Cir. 2010).

[20]

    *See, e.g.*, 10-mc-0002 (LAK) (hereinafter *"Donziger 1782"*), DI 108.

[21]

    *Donziger 1782*, DI  135, DI 145.

[22]

    *Donziger 1782*, DI 161 ¶ 3.

[23]

    *Id.*; *accord*, Tr. 3-5, 17-20 Jan. 13, 2011.

8

Donziger then produced some 90,000 documents that had been turned up by the search terms, approximately 80 percent of which were responsive to the subpoena.[24]  Nevertheless, there remained indications that Donziger had erased or withheld other responsive documents.[25]  The Court on January 21, 2011 therefore directed that his hard drives be imaged and turned over to Chevron for examination.[26]  Forensic examination of the imaged hard drives revealed the following:

- The imaged hard drives held more than 151,000 documents containing the prescribed search terms in addition to the 90,000 documents that Donziger had claimed were the products of his search using the same terms.[27]

- Over 77,000 of those additional documents related to the Lago Agrio litigation,[28] at least a significant number (and probably most) of which should have been produced earlier.

Given this history, and Donziger's refusal to make any good faith effort to comply with this Court's orders to produce documents in this post-judgment proceeding, outside examination of his ESI is an entirely reasonable, and perhaps the only, way to obtain compliance without imposing sanctions that would be far more onerous.

---

[24]  *Donziger 1782*, Hendricks Decl., DI 175 ¶ 4.

[25]  *Donziger 1782*, DI 171 ¶ 2.

[26]  *Id.* at 2.

[27]  *Donziger 1782*, Hendricks Decl., DI 194 ¶ 3.

[28]  *Id.*

# SA906

*B.      The Structure of the Protocol*

Notwithstanding Donziger's noncompliance with his document production obligations in this case, his misbehavior in the Section 1782 proceedings, and his previously demonstrated misconduct and lack of credibility in many respects,[29] the Court has modified Chevron's proposals substantially in order to limit to a bare minimum the extent to which Chevron or even its forensic expert (as distinguished from the neutral) would be exposed to materials on Donziger's media that are not responsive to the document requests with which he is obliged to comply.

The protocol contemplates four principal steps:

- Forensic imaging (i.e., copying) of the devices and media;

- Generation of reports indexing persons and entities named on the images from which the experts and parties can assess whether to exclude or include documents in the subsequent analysis;

- Forensic analysis of the devices and media for evidence of spoliation and recovery of any destroyed files, to the extent possible; and

- Searching the documents for responsive documents.

This protocol requires that the first, second, and third steps be carried out solely by a court appointed neutral expert. The Chevron forensic expert and counsel for Chevron will be involved only in the fourth step. The Chevron forensic expert's limited involvement in the search process, to the extent that it is permitted by the protocol, is intended to give the neutral expert the benefit of the Chevron

---

[29]   *See, e.g., Chevron Corp. v. Donziger*, 296 F.R.D. 168 (S.D.N.Y. 2013).

Case 1:11-cv-00691-LAK-JCF   Document 2171   Filed 03/05/19   Page 10 of 16
Case 18-855, Document 97, 03/11/2019, 2515364, Page20 of 292

**SA907**

10

forensic expert's understanding of the case to identify more accurately and efficiently documents responsive to the document requests. The involvement of counsel for Chevron likewise is intended to ensure that responsive documents are identified and produced. However, the protocol limits counsel's involvement in this process to the greatest degree possible in light of Donziger's legitimate privacy interests. Accordingly, the search process has been designed, and will unfold, as follows.

First, the neutral expert will isolate the documents that are responsive to the search terms and potentially relevant to the document requests. Second, the neutral expert will provide the Chevron forensic expert with the greater of 100 or 10 percent of those documents for review by counsel for Chevron. Counsel will code this sample set of documents as "relevant" or "not relevant" to the document requests. Third, Chevron's forensic expert, under the supervision of the neutral expert, will create, refine, and use technical search tools, including but not limited to predictive coding[30] and concept clustering, to search the documents that are responsive to the search terms and

---

[30]     In *Moore v. Publicis Groupe*, 287 F.R.D. 182, 183-84 (S.D.N.Y. 2012), the Court explained predictive coding as follows:

"[Computer-assisted coding refers to a set of tools] that use sophisticated algorithms to enable the computer to determine relevance[] based on interaction with (i.e., training by) a human reviewer.

Unlike manual review . . . computer-assisted coding involves a [small team] who review and code a 'seed set' of documents. The computer identifies properties of those documents that it uses to code other documents. As the [team] continues to code more sample documents, the computer predicts the reviewer's coding . . . .

When the system's predictions and the reviewer's coding sufficiently coincide, the system has learned enough to make confident predictions for the remaining documents."

Predictive coding is a widely used e-discovery tool that credible sources say produce more accurate results while saving time and expense as compared to manual review.

11

potentially relevant and to identify those that indeed are relevant to the document requests.

Thus, the process limits the roles of Chevron's forensic expert and counsel for Chevron to protect Donziger's privacy interests without hamstringing Chevron's efforts to obtain the discovery to which it is entitled.

*Donziger's* Pot Pourri *of Rehashed Arguments*

As indicated previously, the Court ordered forensic imaging of Donziger's media, pursuant to a specific protocol to be determined, last October. At the January 8, 2019 conference called to discuss Chevron's initial proposed protocol, Donziger confined himself principally to attempting to reargue the ruling that he already had lost. Then, when Chevron submitted a revised proposed protocol and afforded Donziger an opportunity to respond to that proposal too, he did it again. He filed an 18-page memorandum that in substance attempts to reargue not only the Court's forensic imaging ruling, but also its prior determination that Chevron is entitled to post-judgment discovery and aspects of the pending contempt motions that have been fully submitted and are *sub judice.*[31] The Court merely notes the following.

*First.* Donziger again contends that Chevron's post-judgment discovery, including forensic imaging of his devices, violates the First Amendment. But, as this Court has pointed out previously, Donziger lacks standing to raise all or most of these claims and forfeited any such claims

---

*Chevron Corp. v. Donziger*, 11 Civ. 691 (LAK), 2013 WL 1087236, at *32 n.255 (S.D.N.Y. Mar. 15, 2013); *see also How to Make the E-Discovery Process More Efficient with Predictive Coding*, THOMSON REUTERS, https://legal.thomsonreuters.com/en/insights/articles/how-predictive-coding-makes-e-disc overy-more-efficient (last visited Feb. 19, 2019).

[31] DI 2151.

by failing to assert them in a timely fashion. Even more important, they would be entirely without merit even if he were a proper person to assert, and had not forfeited, them.[32]

*Second.* Donziger insists that "Chevron's sole basis for this extraordinary post-judgment discovery campaign is the allegation that [he] was in contempt of this Court's March 4, 2014 injunction for assisting [his] Ecuadorian clients . . . in [their] modestly successful efforts to finance ongoing litigation and advocacy against Chevron . . . ."[33] That assertion simply is false. It ignores the facts that Chevron (a) holds a substantial unpaid money judgment against Donziger, (b) enforcement of that money judgment is not stayed, and (c) Chevron therefore has the right to seek information concerning Donziger's assets, sources of income, and other such information.[34] And it ignores also the fact, as the Circuit has made clear, that district courts have:

> "ample authority to issue all orders necessary for the enforcement of [their] order[s]. 28 U.S.C. § 1651. Discovery may occur in connection with a pending contempt proceeding [citation omitted], and we see no reason why a court must await the formal initiation of contempt proceedings to order discovery concerning a party's

---

[32]

*Chevron v. Donziger*, 325 F. Supp. 3d 371, 385-87, 391-93 (S.D.N.Y. 2018).

[33]

DI 2151 at 2.

[34]

Fed. R. Civ. P. 69(a)(2) ("the judgment creditor . . . may obtain discovery from any person – including the judgment debtor – as provided in these rules or by the procedure of the state where the court is located"); N.Y. CPLR § 5223 ("the judgment creditor may compel disclosure of all matter relevant to the satisfaction of the judgment [from] . . . any person"); 11 WINSTEIN, KORN & MILLER, NEW YORK CIVIL PRACTICE: CPLR ¶ 5233.05 (2d ed.); *see also Jack London Prods., Inc. v. Samuel Bronston Prods., Inc.*, 22 A.D.2d 870, 254 N.Y.S.2d 397 (1st Dept. 1964) (disclosure proper as to judgment debtor's "borrowings, the sources thereof, and the disposition of the proceeds"); *Gorea v. Pinsky*, 80 M.2d 139, 140, 362 N.Y.S.2d 771 (Sup. Ct. Oneida Co. 1974) (disclosure proper as to possible fraudulent conveyances of debtor's assets).

ability to comply with orders issued but not carried out . . . ."[35]
It necessarily follows that a court may order discovery concerning a party's compliance with orders already issued.

*Third.*  Donziger repeats his contention that Chevron would intimidate and abuse anyone whom it discovered to be supplying him with funds or otherwise supporting his efforts and that discovery of such information therefore should be precluded.  Of course, discovery of the sources of his money is directly relevant to collection of the money judgment against him.  The precise nature and structure of his fund raising efforts is extremely pertinent to the question whether he is in compliance with the equitable relief granted by this Court and also to collection of the money judgment.  Moreover, as this Court previously has made clear, Donziger's concern that identification of his sources of funds and the identities of his funders might permit Chevron to pursue discovery or legal remedies against them is not a basis for foreclosing such discovery.  Chevron has every right – indeed, a First Amendment protected right – to use any legal processes available to it should the facts so warrant.[36]  Further, Donziger's claims of misconduct by Chevron all are unsupported by evidence, based on factual distortions or misrepresentations, or otherwise deficient.[37]  And his attempt to resuscitate his claim that "Guerra[, a trial witness who implicated Donziger in the bribery

---

[35]

*State of New York v. Shore Realty Corp.*, 763 F.2d 49, 53 (2d Cir. 1985); *see also Ermenegildo Zegna Corp. v. Lanificio Mario Zegna, S.p.A.*, No. 02 Civ. 3511 (HB), 2003 WL 21709424, at *2 (S.D.N.Y. July 22, 2003) (stating that "the Second Circuit . . . has rejected respondent's argument that federal courts lack the power to order discovery before the initiation of a contempt proceeding to verify compliance with the court's order").

[36]

*Chevron v. Donziger*, 325 F. Supp. 3d at 388-89.

[37]

*Id.* at 385-91.

of the Ecuadorian judge,] completely fabricated his bribery story"[38] carries no water. He made that argument at trial. This Court found to the contrary. Donziger did not challenge that finding on appeal. He will not be heard to attempt a second bite at the apple, particularly as a premise of his specious *ad hominem* attack on Chevron's forensic expert.

*Fourth.* Donziger contends that disclosure of the responsive documents that the Court already has ordered produced would "give [Chevron] permission to rifle through the privileged and confidential files of its key opponent (and adversarial counsel)."[39] This contention ignores the fact that the Court previously has ruled, for at least the second time in his litigation with Chevron, that Donziger has forfeited any privilege he otherwise might have had.[40] The Court so ruled

---

[38]      DI 2151 at 9.

[39]      *Id.* at 1.

[40]      DI 2108 ¶ 1 (stating that any otherwise applicable privileges were forfeited by failure to comply with Fed. R. Civ. P. 26(b)(5) and S.D.N.Y. Civ. R. 26.2). The relevant court rules and principles are laid out in *In re Chevron Corp.*, 749 F. Supp. 2d at 164-69.

The Court naturally understands that the Circuit upheld the Court's earlier waiver ruling based on Donziger's failure to produce a privilege log "almost entirely [in view of] the urgency of petitioners' need for the discovery in light of impending criminal proceedings in Ecuador." *Lago Agrio Plaintiffs*, 403 Fed. App'x at 395. The circumstances here differ. But they too are egregious for several reasons and warrant a like result.

First, Donziger knew full well that a failure to comply with the rules requiring submission of a privilege log could result in forfeiture of any otherwise applicable privilege. He knew that by virtue of the prior litigation in which his failure to comply with the same rules by failing to submit a privilege log resulted in a waiver/forfeiture ruling. Additionally, Donziger was warned of a potential waiver/forfeiture ruling in this case when Chevron submitted motion papers urging such a ruling based on Donziger's similar failings here. Nevertheless, he failed to comply with the rules, failed to seek an extension of time within which to do so, and failed to seek any dispensation from the rules. Indeed, in this case he failed to make even a colorable attempt to comply with the Court's orders even with respect to documents as to which no claim of privilege was or responsibly could have been asserted.

on October 18, 2018.[41]

\*    \*    \*

In short, the issue now before the Court has arisen only because Donziger

unjustifiably has refused to comply with his discovery obligations. Had he done so – i.e., had he

produced responsive documents as to which there was no colorable claim of privilege, submitted a

privilege log as to responsive documents as to which there was such a colorable claim, and submitted

---

Second, Donziger's responses to Chevron's discovery requests were due in late April or early May. He in fact served purported responses, which contained no meaningful information and no privilege log, on or about April 30, 2018. DI 1989-2. There is no evidence or even claim that Donziger tried to prepare, much less serve, a privilege log in the six months between being served with the document requests and the Court's eventual ruling, on October 18, 2018, that Donziger had waived any applicable privilege.

Third, Donziger disregards the fact that when he belatedly produced a "privilege log" in the prior litigation it was about 2,000 pages long and scheduled over 8,652 supposedly privileged documents. The "privilege log," however, contained *not even one communication between Donziger and his putative clients*. It claimed privilege as to more than 2,500 documents "sent or disclosed to a public relations person, the founder of the Amazon Defense Front . . . , Amazon Watch, and a host of newspapers and magazines" none of which could have been privileged if only because they were not confidential lawyer-client communications. *In re Chevron Corp.*, 749 F. Supp. 2d at 184. Thus, the privilege log tardily submitted in the prior case was not a good faith attempt to make only colorable claims of privilege as distinguished from an attempt to stall discovery. *See id.* at 184-85. So too here in the sense that Donziger has made no good faith effort to comply with his obligations concerning claims of privilege.

Fourth, Donziger's behavior here regarding privilege claims, just as in the related prior case, has been undertaken for tactical advantage. He never posted a supersedeas bond, which would have stayed enforcement of the money judgment as of right, nor sought a stay of its enforcement on any other basis. And while he did seek a stay from this Court of certain discovery from a non-party witness and a broader protective order and has appealed from the order denying his motion, *see* DI 2045, he never has sought a stay or injunction pending appeal from the Circuit in the more than three months since this Court ruled. It appears that his obdurate refusal to comply with discovery obligations and court orders is an attempt to obtain by self help the stay of discovery that this Court denied and that he has not sought from the Circuit.

[41]

DI 2108 ¶ 1.

# SA913

16

any disputes for judicial resolution -- there would be no need to examine his ESI.  But he has not. And the Court thus must take appropriate action.  His arguments to the contrary are meritless.

## *Conclusion*

For the foregoing reasons, the Court has entered the protocol for imaging and forensic examination of Donziger's electronic devices and media.

SO ORDERED.

Dated:          March 5, 2019

_____
Lewis A. Kaplan
United States District Judge

# SA914

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

Plaintiff,

-against-

11-cv-0691 (LAK)

STEVEN DONZIGER, et al.,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**FORENSIC INSPECTION PROTOCOL**

Lewis A. Kaplan, *District Judge.*

1. **Appointment of a Neutral Forensic Expert:** By order of March 5, 2019, the Court has appointed a Neutral Forensic Expert for the purposes of this Forensic Inspection Protocol. The Neutral Forensic Expert shall send his invoices to both parties and Chevron initially will bear the cost of the Neutral Forensic Expert's work as described herein, without prejudice to Chevron's right to seek reimbursement of said costs in these proceedings or otherwise.

2. **Chevron's Designation of Its Forensic Expert:** Chevron has designated as its computer forensic expert for the purposes of this protocol Spencer Lynch of Stroz Friedberg ("Chevron's Forensic Expert").

3. **Confidentiality/Protective Order:** Before any work on this matter is undertaken, including but not limited to any search, collection, or other analysis, all agents and representatives of both the Neutral and Chevron's Forensic Expert who will work on this matter will sign the Certification required by the Protective Order entered in this matter on January 11, 2013 ("Protective Order"), if not previously executed. To that end, all information received or located by either the Neutral or Chevron's Forensic Expert shall be treated as confidential except as otherwise provided in this Protocol and shall not be disclosed to anyone except in compliance with the Protective Order and this Protocol. Once materials are produced to Chevron, they shall no longer be treated as confidential unless so designated as provided in Paragraph 8(a).

4. **Donziger Identification of His Devices and Media:** Within three (3) business days of entry of this Protocol, defendant Steven Donziger ("Donziger") shall provide to both the Neutral and Chevron's Forensic Experts via email a representation listing under penalty of perjury all devices he has used to access or store information or for communication since March 4, 2012 – including, but

# SA915

not limited to, personal computers, tablets, phones, and external storage devices, such as external hard drives and thumb drives – (the "Devices"), indicating for each of the Devices whether he has possession, custody, or control of the Devices and, if not, stating the reasons why that is so, i.e., whether they were destroyed, lost, etc. and the present location of the Devices. Additionally, Donziger shall produce under penalty of perjury a list of all accounts – including, but not limited to, email accounts (including web-based email accounts); accounts (including web- or cloud-based) related to any document management services, such as Dropbox; and accounts related to any messaging services, such as WhatsApp, Facebook Messenger, instant messages, etc. – Donziger has used since March 4, 2012 (the "Media"), indicating whether he presently has the ability to access those accounts and, if not, stating the reasons why that is so. At this time, prior discovery has revealed that Donziger used the following types of accounts to conduct business related to the Ecuadorian judgment:

    a) Email addresses, including, but not limited to, sdonziger@donzigerandassociates.com, stevenrdonziger@gmail.com, steven.donziger@donfordcapital.com, and gringograndote@gmail.com;

    b) A Dropbox account; and

    c) A WhatsApp account.

5. **Imaging of Donziger's Devices and Media by the Neutral Forensic Expert:** The Neutral Forensic Expert shall take possession of Donziger's Devices and have access to his Media for the purposes of making a mirror image of those Devices and Media. The Devices shall be surrendered to the Neutral Forensic Expert at Donziger's address at 245 West 104th Street, #7D, New York, NY 10025. The Neutral Forensic Expert shall take possession, custody, and control of the Devices and transport them directly to its offices for the imaging described herein. The devices shall be surrendered to the Neutral Forensic Expert at 12:00 pm at 245 West 104th Street, #7D, New York, NY 10025 on March 18, 2019. At no time shall Chevron's Forensic Expert have access to the original Devices or to live Media accounts absent further Court order.

    a) On the date and time specified per the above, Donziger shall turn over all Devices in his possession, custody, or control to the Neutral Forensic Expert. Additionally, to the extent information contained in any of Donziger's accounts/media is not stored on any of Donziger's available Devices, Donziger shall provide the Neutral Forensic Expert with the information and/or things necessary to access and image his accounts and media. The Devices shall be returned to Donziger without unnecessary delay after the completion of the imaging required herein by the Neutral Forensic Expert.

    b) If any usernames, passwords, or other information is required to access any of the electronically stored information on any of the produced Devices or Media, Donziger shall provide such usernames, passwords, and other information to the Neutral Forensic Expert at the time of the imaging. Such information shall be kept strictly confidential by the Neutral Forensic Expert.

2

# SA916

c) Before beginning any work on the Devices and Media, the Neutral Forensic Expert will utilize a hardware write block device on the Devices and Media in order to protect the integrity of the existing data (or other techniques standard in the industry to protect the integrity of data).

d) The Neutral Forensic Expert will create full forensic images of each Device and Media/Account. The forensic images of each shall include, to the extent possible, allocated, unallocated, and host protected areas. As part of the creation of the forensic images, the Neutral Forensic Expert will record on a log, where applicable: (1) the date and time at which the Device or Media was provided for forensic imaging and the date and time at which the Device or Media was imaged; (2) the time set in the BIOS or system clock at the time of imaging; (3) the "boot order" recorded in the BIOS of the Device or Media at the time of imaging; (4) the make, model, and serial number of the Device; (5) the username associated with any Media; (6) any identifying marks or labels on any Device or Media; (7) the tool and/or method used to create the forensic images; and (8) MD5 and SHA1 hash values of the data collected from the Device or Media.

e) Upon completion of the imaging, the Neutral Forensic Expert will verify the resulting forensic images by executing the form attached hereto as Exhibit A and return the Devices and Media to Donziger.

f) The Neutral Forensic Expert then will create four (4) identical copies of the images of Donziger's Devices and Media, which shall be written to encrypted drives for security purposes. Within two (2) calendar days of the imaging of Donziger's Devices and Media, one copy shall be provided to Donziger, two copies shall be lodged with the Clerk of Court in a sealed envelope, and one copy shall be retained by the Neutral Forensic Expert. The Neutral Forensic Expert shall maintain the set of images created from Donziger's original Devices and Media unexamined and unaltered until further order from the Court. The Neutral Forensic Expert shall use the copy of the images that it retains for searches and analysis as proscribed by this Protocol.

**6. Neutral Forensic Expert's Creation of a Person/Entity Report and Donziger's Designation of "Highly Confidential and Personal" Persons/Entities:** The Neutral Forensic Expert shall create a "Person/Entity Report" listing in the first column in alphabetical order the persons or entities identified by the Neutral Forensic Expert on the Donziger Images as authors, recipients, senders or persons who last modified, saved or printed any document (as reflected in the metadata of those documents or communications). The Neutral Forensic Expert shall delete from the list any person or entity whose name or email address appears as a Search Term on Exhibit B. After these deletions, the Neutral Forensic Expert then shall provide the report to Donziger. Donziger shall have five (5) calendar days from receipt of the Person/Entity Report to designate any person or entity appearing on the Person/Entity Report as "Highly Confidential and Personal" consistent with the criteria below and under penalty of perjury and to provide the Person/Entity Report with his "Highly Confidential and Personal" designations and an executed Exhibit C to the Neutral Forensic Expert and to the

# SA917

Court.

This designation process is intended to provide Donziger with appropriate privacy protections without limiting Chevron's right to relevant discovery. Accordingly, Donziger may designate for potential exclusion from productions pursuant to this Paragraph 6 only Persons/Entities who are wholly unrelated to the discovery ordered by the Court and any contempt or judgment collections issues in this matter (such as a treating physician or relative without an interest in the judgment or information concerning Donziger assets) and these designations should not be used for any other purpose. Highly Confidential and Personal Designations cannot be made under this provision on the basis of privilege as "Donziger has waived or forfeited any claim of privilege to responsive documents and information that otherwise might have applied" as determined in the Court's October 18, 2018 order. Nor can Highly Confidential and Personal Designations be made as to persons whose names or emails appear on the Search Term List, Exhibit B hereto.

7. **Provision of Donziger Images to Chevron's Forensic Expert and Chevron:** The Neutral Forensic Expert shall make available to Chevron's Forensic Expert and Chevron the Donziger Images according to the following procedures.

   a) First, the Neutral Forensic Expert will run the Search Terms in Exhibit B on the Donziger Images.

   b) Second, the Neutral Forensic Expert will compare Donziger's "Highly Confidential and Personal" Designations to the metadata and content of any materials that contain responsive search terms. To the extent that any "Highly Confidential and Personal" entity appears on any document responsive to the search terms, those documents will be logged on a three-column report which shows the name of the "Highly Confidential and Personal" person or entity in the first column, the search terms that the document was responsive to in the second column, and in the third column all sender(s) and recipient(s) of the document if any and the author and person who last modified, saved, or printed the document per the available metadata. The Neutral Forensic Expert shall provide this log to Chevron and Donziger.

   Upon review of this information, Donziger will have five (5) calendar days either to consent to the documents being subject to further review and potential production or to object. If Donziger objects, concurrently with his objection he must provide Chevron with a description of each designated individual/entity at issue, such as a "treating physician," and a copy of his executed Exhibit C via email. Chevron then will have five (5) calendar days either to consent to the documents being excluded from further review and potential production or to object.

   If Donziger objects to further review and potential production and Chevron opposes exclusion from further review, the parties will submit double spaced papers of no more than ten (10) pages outlining their respective positions – and the Neutral Forensic Expert will submit the document(s) at issue – either to the Court or a Special Master or

4

# SA918

Magistrate Judge, as the Court directs at the time, for a determination of whether the documents at issue will be subject to further review and potential production.

If Donziger does not object, or if the Court, Special Master, or Magistrate Judge determines that the documents at issue shall be subject to further review and potential production, then the Neutral Forensic Expert will include the documents in the universe of those that are responsive to the search terms and subject to production pending further review. If Donziger objects and Chevron does not oppose the objection, or if the Court, Special Master, or Magistrate Judge determines that the documents may not be produced, then the Neutral Forensic Expert will exclude the documents from the universe of those that are responsive to the search terms and subject to production pending further review.

c) Third, Chevron's Forensic Expert will provide the Neutral Forensic Expert with copies of or access to the post-judgment third party productions made to Chevron in this matter. The Neutral Forensic Expert will remove any duplicates from the universe of documents from the Devices and Media that are responsive to the search terms and subject to production pending further review. The Neutral Forensic Expert then will return or cease to have access to the post-judgment third party productions.

d) Fourth, the Neutral Forensic Expert will analyze the documents that are responsive to the search terms and subject to possible production pending further review to determine if there are any significant categories of irrelevant materials that properly can be excluded. This would include, for example, correspondence from online merchants that responds to the Search Terms "account" or "amazon" but is not necessary to determine payment methods or Donziger's assets. The Neutral Forensic Expert will separate out these potentially irrelevant materials from the universe of documents that are responsive to the search terms and subject to possible production pending further review and provide 25 percent of these potentially irrelevant materials to Chevron's Forensic Expert to review. Chevron's Forensic Expert then will confirm whether the sample set is irrelevant or identify any documents that are relevant. If any document is identified as relevant, and the Court, Special Master, or Magistrate Judge, as the Court directs at the time, confirms its relevance, then Chevron's Forensic Expert may review the remaining 75 percent of the materials for relevance under the supervision of the Neutral Forensic Expert. The Neutral Forensic Expert will include any materials identified by Chevron's Forensic Expert as relevant in the universe of documents that are responsive to the search terms and subject to possible production pending further review. If no document in the sample set is relevant, the entire set of materials deemed potentially irrelevant by the Neutral Forensic Expert shall be excluded from the universe of documents that are responsive to the search terms and subject to possible production pending further review.

   i)   Supervision for purposes of this task and others in this Protocol that call for the same requires the following. First, Chevron's Forensic Expert shall not access or search the Donziger Images at any time in any manner without the Neutral Forensic Expert's oversight. This oversight may take place either

5

# SA919

locally or on an electronic discovery platform. The methodology of the review or searches conducted by Chevron's Forensic Expert shall be recorded in a detailed log (the "Search Log") along with a description of what files were reviewed or searched and when that review or search occurred. A copy of the Search Log shall be provided to Donziger. The Neutral Forensic Expert and Chevron's Forensic Expert shall retain their own copies of the Search Log.

e)   Fifth, the Neutral Forensic Expert will provide Chevron's Forensic Expert with the greater of 100 documents or 10 percent of the universe of documents that are responsive to the search terms and subject to production pending further review. To the extent that Chevron's Forensic Expert identifies any password protected or encrypted files, Chevron's Forensic Expert can identify those files to the Neutral Forensic Expert, who then will promptly use the passwords obtained pursuant to Paragraph 5(b) of this Protocol to allow Chevron's Forensic Expert access to the relevant files. If Donziger has failed to provide any and all passwords required to access any of the information stored on any of the Devices and/or Media, Donziger must provide the passwords to any files upon request from the Neutral Forensic Expert. Chevron's Forensic Expert then will provide the sample set of documents and communications to Chevron's counsel for coding as "relevant" or "not relevant" and additional coding as appropriate to identify documents responsive to requests 1 through 14 and 16 through 30 of Chevron's request for production of documents, attached hereto as Exhibit D, as amended by order of this Court [DI 2009] on May 17, 2018. This coding will be conducted on an "attorneys' eyes only" basis. Once the initial set of documents is coded, Chevron's Forensic Expert, under the supervision of the Neutral Forensic Expert, will utilize assistive technology, including but not limited to predictive coding and concept clustering, to run iterative searches of the remainder of the documents that are responsive to the search terms and subject to production pending further review. Chevron's Forensic Expert may have Chevron's counsel code additional batches of documents in order to refine the search parameters and use of predictive coding and concept clustering if the Neutral Forensic Expert agrees that the additional coding would be beneficial to that process. This iterative search process will be used to cull the documents that are responsive to the document requests from those that are responsive to the search terms more broadly. Once this iterative coding and search process is completed and all documents likely responsive to the document requests specified above have been located, the Neutral Forensic Expert shall compile and assign unique numbers to each file, document or communication (cumulatively "files") to be produced, and make a copy of all files, along with a report identifying any metadata the Neutral Forensic Expert deems relevant for those files, documents and communications based on the terms in Exhibit B and after consultation with Chevron's Forensic Expert. The Neutral Forensic Expert then will provide that information (the files, documents and communications and the accompanying report) to Donziger and counsel for Chevron simultaneously (the "Document Production"). The Document Production(s) will be treated as "confidential" pursuant to the Protective Order for a period of fourteen (14) calendar days.

# SA920

f) Sixth, if, after receiving the Document Production, Chevron's counsel determines within fourteen (14) calendar days that additional key words should be utilized for searches, Chevron may make an application to the Court for leave to conduct additional searches. Donziger shall file any response to Chevron's request within seven (7) calendar days. Each party's submission shall not exceed ten (10) double-spaced pages.

8. **Post-Production Procedures:**

a) **Donziger's Designation of Produced Documents as Confidential:** Within fourteen (14) calendar days of the date that the Neutral Forensic Expert makes any Document Production to the parties, Donziger shall notify Chevron via email using production numbers of any information or document contained in the Document Production that should be designated as "confidential" pursuant to the Protective Order and provide the basis for his contention. If Donziger does not designate particular information or documents as confidential pursuant to the Protective Order within fourteen (14) calendar days of the date that the Neutral Forensic Expert makes any Document Production, then that Document Production or any portion thereof shall be treated as non-confidential. Donziger cannot designate documents as confidential en mass pursuant to this provision.

b) **Donziger's Ability to Clawback Irrelevant Documents:** If Donziger believes that any information or document contained in any Document Production was produced in error or is not responsive to requests 1 through 14 and 16 through 30 of Chevron's request for production of documents, attached hereto as Exhibit D, as amended by order of this Court [DI 2009] on May 17, 2018, he must object to the production of that information or document in writing by production number and request that the information or document be returned or destroyed. Any such objection to production and request for the return or destruction of information or document(s) must be served on Chevron no later than fourteen (14) calendar days after the date the Document Production is provided to Donziger and counsel for Chevron. If the parties cannot reach agreement on any of Donziger's clawback requests, those requests shall be submitted to the Court, Special Master, or Magistrate Judge as the Court directs at that time. Donziger cannot demand the clawback of documents en mass pursuant to this provision.

9. **Destruction/Recovery Investigation:** The Neutral Forensic Expert shall perform also forensic analysis of the Donziger Images to identify any evidence that relates to the integrity, authenticity, and completeness of the data held on the Donziger Images. The Neutral Expert will also conduct a forensic examination of the contents of the Donziger Images to review activity involving the creation, downloading, transfer, deletion, obfuscation, or destruction of any files from March 4, 2012 forward. The Neutral Forensic Expert shall attempt to recover any and all files that were transferred, deleted, obfuscated, or destroyed since March 4, 2012, and examine those files for responsiveness per the procedures set forth herein in Paragraph 7 and with the involvement of Chevron's Forensic Expert and Chevron to the extent permitted by Paragraph 7. This means that any Donziger Image that was transferred, deleted, obfuscated, or destroyed since March 4, 2012 that is responsive to one

# SA921

or more search terms either via content or metadata shall be considered responsive to the search terms and subject to production pending further review. The Neutral Forensic Expert shall provide a sample set of 10 percent of these documents, but not the greater of 10 percent or 100 documents, to the Chevron Forensic Expert. The Chevron Forensic Expert will provide the sample set to Chevron for coding as "relevant" or "not relevant" and other coding as appropriate. The iterative search process will continue as described in Paragraph 7 and any documents responsive to the document requests identified through this deletion and recovery analysis shall be produced to Chevron following the procedures set forth above in Paragraph 7. If the Chevron Forensic Expert determines in conjunction with the Neutral Forensic Expert that the iterative search process described in Paragraph 7 is incompatible with the set of documents that the Neutral Forensic Expert identifies as those that have been transferred, deleted, obfuscated, or destroyed since March 4, 2012, then the parties shall submit their proposed procedures for reviewing the documents for responsiveness to the document requests specified above to the Court, Special Master, or Magistrate Judge as the Court shall direct at the time.

10. **Neutral Forensic Expert's Reports on File Information:** The Neutral Forensic Expert shall generate the following additional reports (the "Reports") for the period of March 4, 2012 to the present:

   a) **Active File Spreadsheet** – A report detailing the metadata for, but not the content of, the active files on the Donziger Images, including the name of all folders and subfolders. To the extent permitted by the available data, the report will include for each file: the filename; the creation, last modified, and last accessed dates; the folder path to the file; the file size; the MD5 hash value (a kind of digital fingerprint for a file); which Device or Media the file resided on; and, for Microsoft Office Documents, the embedded Author Name, the embedded Last Saved by Name, the embedded creation date, and the embedded last modified time.

   b) **Deleted and Tampered Files Spreadsheet** – A report detailing the metadata for, but not the content of, the deleted files on the Donziger Images and files identified through the Neutral Forensic Expert's investigation described in Paragraph 9 related to the integrity, authenticity, or completeness of any files on the Donziger Images. To the extent permitted by the available data, the report will include for each file: the filename; the creation, last modified, and last accessed dates; the folder path to the file; the file size; the MD5 hash value (a kind of digital fingerprint for a file); which Device or Media the file resided on; and, for Microsoft Office Documents, the embedded Author Name, the embedded Last Saved by Name, the embedded creation date, and the embedded last modified time.

   c) **Recent File Activity** – A report detailing the records maintained by Donziger's Devices and Media about the recent file usage. To the extent that Donziger's Devices and/or Media use the Windows operating system, these reports may include information in the recent link files, jump lists, and similar locations.

# SA922

The Neutral Forensic Expert shall indicate the following in its Active Files Report and Deleted and Tampered Files Report: (1) the total number of active or deleted/tampered files; (2) the number of active or deleted/tampered files that were included in the Document Production(s); and (3) the number of active or deleted/tampered files that were not included in the Document Production(s). The Neutral Forensic Expert shall provide copies of the three reports described above to Chevron's Forensic Expert, Donziger, and counsel for Chevron. Counsel for Chevron shall have five (5) calendar days to identify from the Active Files and Deleted and Tampered Files Reports files that counsel believes may contain materials responsive to the discovery requests. Donziger then will have five (5) calendar days to object. If there are no objections, the files will be produced to Chevron. If there are objections, then the parties will submit their request or objections and the Neutral Forensic Expert will submit the relevant files to the Court, Special Master, or Magistrate Judge, as the Court shall direct at the time, to determine whether the documents may be produced.

11. **Destruction of the Donziger Images Upon Termination of this Litigation:** Upon agreement of the parties or order of the Court that this litigation is terminated, the Neutral Forensic Expert and Chevron's Forensic Expert shall erase any data derived from the Donziger Images, including any reports, and certify to Donziger or his counsel that any such data have been irretrievably deleted. Notwithstanding the foregoing, the Court shall retain its copy of the Donziger images sealed in an envelope for a period of five (5) years. The Court shall destroy this copy after the five (5) years have passed. Prior to the mandated destruction described above, the parties jointly shall submit to the Court in a sealed envelope a copy of any reports generated and served on the parties pursuant to this Protocol. The Court shall retain these reports also for a period of five (5) years.

12. **Donziger's Representations:** Any statement or representations Donziger is required or permitted to make pursuant to the terms of this Protocol, including the disclosure of any and all information required under Paragraph 4 and any designation under Paragraphs 6, 7, or 8 must be made under penalty of perjury pursuant to 28 U.S.C. § 1746 and include the following language: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)."

SO ORDERED.

Dated:  March 5, 2019

_____
Lewis A. Kaplan
United States District Judge

9

# SA923

## Exhibit A

### Neutral Forensic Expert Certification

1. My name is _____ and I am employed by _____ as a _____.

2. On _____, 201__, Steven Donziger provided me with access to the following electronic devices and accounts:

3. On _____ [date], I created full forensic images of each electronic device and account to which I was provided access. The forensic images of each electronic device and account included allocated, unallocated, and host protected areas. As part of the creation of the forensic images, I recorded on a log, where applicable: (1) the date and time at which the electronic device or account was provided for forensic imaging and the date and time at which the electronic device or account was imaged; (2) the time set in the BIOS or system clock at the time of imaging; (3) the "boot order" recorded in the BIOS of the electronic device or account at the time of imaging; (4) the make, model, and serial number of the electronic device; (5) the username associated with any account; (6) any identifying marks or labels on any electronic device or account; (7) the tool and/or method used to create the forensic images; and (8) MD5 and SHA1 hash values of the data collected from the electronic device or account.

4. Before beginning any work on the electronic devices and accounts, I utilized a hardware write block device (or comparable techniques standard in the industry) on the electronic devices and accounts in order to protect the integrity of the existing data.

4. I have returned to Mr. Donziger's custody each electronic device to which Mr. Donziger provided me access.

4. I have made four identical copies of the forensic images of the electronic devices and accounts to which Mr. Donziger provided me access. I have provided one copy to Mr. Donziger, one copy to Chevron's designated Forensic Expert, retained one copy for my records, and provided one copy to the Court in a sealed envelope.

5. I will maintain my copy of the forensic images of the electronic devices and accounts Mr. Donziger provided me access to in an unaltered state until otherwise directed by the Court.

Date: _____                    _____

SA924

## Exhibit B

### (Iterations to be included in all search term categories)

| Search Terms Related to the Ecuador Judgment and RICO Injunction | | |
|---|---|---|
| "Ecuador" w/20 "Judgment" or "Judgement" | "Amazonia" | "Argentine" or "Brazil" |
| "Ecuadorian" w/30 "plaintiff/s" | "Amazon" | "Enforcement" w/30 "Canada" or "Argentina" or "Argentine" or "Brazil" |
| "Lago," | "Gibraltar" | "Press release" |
| "Agrio," | "Environmental" w/20 "Judgment" or "Judgement" | "Recognition" w/20 "Judgment" or "Judgement" | "Investment" |
| "Lago Agrio" | "UDAPT" | "Enforcement" w/20 "Judgment" or "Judgement" | "Invest" |
| "Chevron" | "Gibson Dunn" | "Recognition and Enforcement" | "Investor" |
| "CVX" | "Gibson" | "R&E" | "Share" w/20 "Judgment" OR "Judgement" |
| "Texaco" | "GDC" | "18 b" OR "18b" | "Interest" w/20 "Judgment" OR "Judgement" |
| "Aguinda" | "RICO" | "9.5 b" OR "9.5b" | "Shareholder" |
| "LAP" | "Kaplan" | "12 b" OR "12b" | "Calgary" |
| "Frente" | "SDNY" | "6 b" OR "6b" | "Indigenous" |
| "Amazonía" | "Mastro" | "14 b" OR "14b" | "Solicit" |
|  | "Recognition" w/30 "Canada" or "Argentina" or |  | "Game" |
|  |  |  | "Game Changer" |

# SA925

**Money Judgment and RICO Injunction**

| | | |
|---|---|---|
| "Bank" | "Interests" | "Cash" |
| "Account" | "Percent" w/20 "Interest" | "Credit card" |
| "Acct" | "Membership Interests" | "Money market" |
| "Capital" | "Stock" | "Balance Sheet" |
| "Loan" | "Deposit" | "Income Statement" |
| "Statement" w/10 "Financial" | "Withdrawal" | "Wire" w/10 of "Transfer" or "Instruction" |
| "Trust" | "Withdraw" | "Escrow" |
| "Tax" | "Withdrew" | "Payment" |
| "Accountant" | "Checking" | "Pay" |
| "Broker" | "Check" | "Paying" |
| "Brokerage" | "Checkbook" | "Payee" |
| "Certificate" | "Money order" | "Payer" |
| "Securities" | "Savings" | "Paid" |
| "Bonds" | "Bitcoin" | "Invoice" |
| "Shares" | "Blockchain" | "Receipt" |
| "IRA" | "Crypto" | "Collateral" |
| | "Cryptocurrency" | "Security" |
| | "Gold" | "Lien" |

"Force"
"Settle"
"Confidential"
"Court"
"Sell"
"Assign"
"Transfer"
"Collect"
"Profit"
"Monetize"
"Retainer"
"Reimburse"
"Expense"
"Percentage"
"10%"
"Table"

**Search Terms Related to Enforcement of the**

Case 18-855, Document 97, 03/11/2019, 2515364, Page39 of 292

# SA926

| | | | |
|---|---|---|---|
| "Guarantor" | "Debtor" | "Contacto" | "8132" |
| "Guarantee" | "Creditor" | "Contrato" | "4318633420" |
| "Leasehold" | "Safe Deposit" | "Acuerdo" | "3420" |
| "Lease" | "Loan" | "Inversion" | "3287489857" |
| "Lessor" | "Note" | "Honorarios" | "9857" |
| "Lessee" | "Lender" | "Appendix" | "4273938783" |
| "Tenant" | "Borrower" | "Appendices" | "8783" |
| "Landlord" | "Letter of Credit" | "Annex" | "6749166418" |
| "Real" w/10 "Estate" | "Mortgage" | "Paragraph" | "6418" |
| "Real" w/10 "Property" | "Asset" | "Assignment" | "4277302265" |
| "Title" | "Fund" | "Advisory" | "2265" |
| "Deed" | "Round" | "Signature" | "4782142388" |
| "Coop" | "Chart" | "(English)" | "2388" |
| "Cooperative" | "Cap" | "(Spanish)" | "Bank of America" |
| "Debt" | "Budget" | "TD Bank" | "466001799158" |
| "Indebtedness" | "Gastos" | "4311018174" | "9158" |
| "Indebted" | "Ejecución" | "8174" | "BBVA Compass" |
| "Secret" | "Recursos" | "4311018132" | "6707239997" |

# SA927

**Team Members and Consultants Related to the LAPs and the Ecuadorian Judgment**

| | |
|---|---|
| Aaron Marr Page <aaron@forumnobis.org> | Anton Tabuns <tabuns@gmail.com> |
| Acros Communications | Benjamin Goldstein |
| Adolfo Maldonado | Big House Inc. |
| Agustin Salazar <agustin.salazar@salazarcordova.com> | Bruchou, Fernandez, Madero & Lombardi |
| Alan Lenczner | Bryce <Bryce@metalrabbit.com> |
| Alberto Guerra | Cara Parks |
| Alberto Zuleta | Carlos Guaman |
| Alejandro Ponce Villacis | Carmen Aguilar |
| Alfonso Paz | Carmen Armijos |
| Amy Johnston <amy@Streamlinefamilyoffice.com> | Carmen Cartuche |
| Amy O'Meara | Charles Nesson |
| Angel Cajo | Chris Lavageth |
| | Christine Fiore <pinnacle40@msn.com> |
| | Clare Cole <Clare@Streamlinefamilyoffice.com> |
| | Cohen Strategic |

| | |
|---|---|
| "9997" | "US Bank" |
| "Chase" OR "JPMorgan" OR "JPM" | "Wells Fargo" |
| "00015111222253365" | "PNC" |
| "5365" | "State Street" |
| "0000000742190218" | "Sun Trust" |
| "0218" | "HSBC" |
| "0000000742189822" | "Capital One" |
| "9822" | "Ally Bank" |
| "00000274571S678" | "Morgan Stanley Smith Barney" OR "Morgan Stanley" |
| "5678" | "CWP" |
| "0000000828422758" | "Offshore" |
| "2758" | "Rainy day" |
| "0000000773420989" | "Code" |
| "0989" | "Contempt" |
| "000002907099890" | "Hide" |
| "9890" | "Hidden" |
| "Citibank" | |
| "333463741" | |

4

# SA928

Cristina Muñoz
<crisamunoz@gmail.com>

Cristina Munoz Egas

Cristobal Bonifaz

Cynthia Zapata Solis

Dan Firger

Dan Orlow

Daniel Saavedra

Daniela Vergel

Daria M. Fisher

Deborah Moore

Deepak Gupta
<deepak@guptawessler.co
m>

Derek Snowdy

Diego Larrea

Digitalis Media

Domingo Peas

Donald Moncayo

DonPat Gate Parkway LLC

DTI Skyline

Edwin Vasquez

Eiggan Business Alliance

Enrique Bruchou

Ermel Chavez

Eva Golinger

Farihah Zaman

Fecheimer

Fernando Villavicencio

Fideicomiso Mercanrtil de
Administracion de Flujos
ADAT

Fine and Associates

Fromboliere

Gabriela Espinoza

Gary Greenberg
<tax_com@msn.com>

Graham Erion

Grant Fine

Grant Fine and Associates

Guadalupe De Heredia
<lupitadeheredia@gmail.co
m>

Guadalupe Marisol
Asimbaya Jarrin

Guillermo Grefa

Hinton Communications

Howard Glaser
<hglaser1@gmail.com>

Humberto Piaguaje

Jamie Vargas

Jeanine Moss

Jennifer Friesen
<Jennifer@Streamlinefamil
yoffice.com>

John McDermott

John Phillips
<john.phillips@legaladvoc
ates.ca>,
<john@waddellphillips.ca>

Jorge Herrera

Jose Fajardo

Jose Medardo Shingre

Joshua Lipton

Joshua Rizack
<jrizack@therisinggroup.co
m>

Juan Aulestia
<juanaulestia01@gmail.co
m>

Juan Cristobal Villao
Yepez

Juan Pablo Saenz

Juan Yiyocuro

Julie Claire

Julio Prieto

Julio Prieto Mendez

Justin Marceau

Karen Hinton

Katie Sullivan
<Katie@Streamlinefamilyo
ffice.com>

Laura Belanger

5

## SA929

Laura Garr

Laura Miller

Lauren Schrero

Leila Salazar-Lopez

Lenczner Slaght

Lexolution

Lidia Alexandra Aguinda

Lisa Gibbons

Louis Berger Group

Luis Macas

Luis Míguez Garcia Aragon

Luis Moreno

Luis Yanza <lfya62@gmail.com>

Lupita De Heredia

Manuel Remache

Manuel Salazar

Marcos Ajila

Maria Belen Paez

Maria Eugenia Garces

Maria Eugenia Yepez

Maria Garafalo

Maria Guadalupe De Heredia

Maria Ramos

Marin Interfaith Task Force on the Americas

Marlon Vargas

Medardo Zhingre

Metal Rabbit

Meyers, Saxon & Cole

Mike Carney

Mirandao y Amado

Monica Pareja

Neal & Harwell

Neidl & Associates

Nextant LLC

Nicholas & Lence

Nidia Arrobo

Nivaldo Yiyoguaje Quenama

Oil Change International

Orin Kramer

Orlando Guamizo

Oscar Herrera

Pablo Iturralde

Pablo Balarezo

Pablo Fajardo

Pablo Fajardo Mendoza

Pablo Yepez

Paliare Roland Rosenberg Rothstein LLP

Paola Delgado

Paola Romero

Patricio Salazar

Patricio Salazar Cordova <patriciosalazarcordova@gmail.com>

Paul Cheng

Peter Fairley

Peter Grant

Peter Grant <pgrant@grantnativelaw.com>

Phil Fontaine

Producciones Nuevas

Rex Weyler <rexweyler1@gmail.com>

Robert Collier

Robert Rawson

Roberto Aguinda

Roy Cosme

Santos Arrobo

Sergio Bermudes

Shimmerlik Corporate Communications Inc.

# SA930

Perry Bellegarde

Michael S. Frisch

**<u>Individuals and Entities Involved in the Pressure Campaign</u>**

A Cancer in the Amazon

Alan Hevesi

The Rising Group

Tinoco

Alexandra Almeida

Amazon Watch

Amy Goodman

Andrew Cuomo

Andrew Miller

Arcos Communications

Assembly of First Nations OR AFN

As You Sow Foundation

Atossa Soltani <atossa@amazonwatch.org>

Ben Barnes <ben@benbarnesgroup.com>

Ben Barnes Group

Bill Fenton

Bill Twist <billtwist@pachamama.org>, <brtwist@gmail.com>,t <brtwist@pachamama.org>

Bruce Herbert

Business Wire Inc.

Carina Lundberg Markow

Cassie Stiftl <cassie@pachamama.org>

Catherine Walsh

Celia Alario

Charles Nesson <nesson@gmail.com>, <nesson@law.harvard.edu>

Christopher Lehane

Conrad McKearon

Courtney Taylor Eckel

Cristina Santa Cruz

CSL Strategies LLC

Daniel Cunningham <DCunningham@afn.ca>

Daniel Pedrotty

Downey McGrath Group, Inc.

Earth Rights International

Ebergeldo Criollo

Ed John, <edjohn@fns.bc.ca>

ELAW

Elisabeth Holm

Emilie Westholm

Emma Korpi <emma@pachamama.org>

Environmental Law Alliance Worldwide

ESG

Fabiani & Lehane

Shuyana Natalia Yanza Allauca

Siona

Steve Cohen

Streamline Family Office OR SFO

Terry Collingsworth

The Rising Group

Veronica Asimbaya

Warren Shimmerlik

Weiser Group

William Baue

Wilson Naranjo

Yolanda Leon Trujillo

Zoe Cina-Sklar

Jason Glaser

Diplomat Security International

Derrick Snowdy

7

Case 18-855, Document 97, 03/11/2019, 2515364, Page44 of 292

# SA931

| | | |
|---|---|---|
| Fadel Gheit | Jean Paul Borja Jácome | Katie Green | Maria del Carmen Garay Calero |
| Francesca Rheannon | Jen Atwood <jenatwood@me.com> | Ken Sunshine | Maria Egan |
| Friends of the Earth | Jeremy Kolodziej <JKolodziej@afn.ca> | Ken Sunshine Consulting | Maria Garay |
| Gabriela Jaramillo | Jessica Kwan <Jessica@pachamama.org> | Kerry Kennedy | MARIO TRIGUEROS <mario@pachamama.org> |
| Glass Lewis & Co. | Jim McGovern | Kevin Koenig | Mark Diab |
| Global Witness | Joan Kruckewitt | Larry Dohrs | Mark Fabiani |
| Han Shan | John Hardman | Larry Fahn | Mark Fabiani LLC |
| Heather Williams <HLW04747@pomona.edu> | John Kenney | Leslie Lowe | Martin Garbus <MGarbus@evw.com> |
| Hugh Whelan | Josefine Ekros | Leslie Samuelrich | MC2PR |
| Ian Quigley | Joseph Berlinger | Lisa Copland | MCSquared |
| Investor Voice | Joseph Mutti | Lisa Gibbons <lisaweylergibbons@gmail.com> | Media Alliance |
| ISS | Julie Gresham | Liza Sabater | Michael <mmaruca@jd18.law.harvard.edu> |
| Jack Ucciferri | Karen Hinton <karen@fenton.com>, <karen@hintoncommunications.com> | lofrias@princeton.edu | Michael Bonfiglio |
| Jacob Johansson | Kathleen Mahoney <kmahoney@ucalgary.ca> | Louis Dematteis | Michael Connelly |
| James Boneham | | Maisa Arias <maisa@pachamama.org> | |
| James Sharp | | Marco Simons | |
| Jan Schakowsky | | | |

8

# SA932

Michael Maruca
<maruca.michael@gmail.com>

Michaela D'Amico

Mila Rosenthal

Mitch Anderson

Moira Birss

MSCI Inc.

New York Common
Pension Funds

New York State Common
Retirement Fund

Newground Social
Investment

Nora Nash

<Oksana.isi@gmail.com>

Pat Jackson
<pat.jackson@pachamama.org>

Pat Tomaino

Patrick Alley

Patrick Doherty

Patsy Thomasson

Paul Neuhauser

Paul Orzulak

Paul Paz y Mino

Paul Paz y Miño
<paz@amazonwatch.org>

Paulette Tremblay
<PTremblay@afn.ca>

Penny Jacko
<pjacko@ishkonigan.com>

Peter Franchot

Pocho Alvarez

Qube Investment
Management Inc.

Radical Media

Rainforest Action Network

Regina Toulouse
<RToulouse@afn.ca>

Rex Weyler

Richard Stratton

Richard Trumka

Risk Metrics

Rob McGarrah

Robert Zevin

Robert Brooke Zevin
Associates, Inc.

Robert Friedman

Robert Kropp

Robert Rosoff

Robin Weissman

Sanford Lewis

Sarah Aird

Scott Moorhead

Selva Viva

Sergey Pustelnik
<spustelnik@jd18.law.harvard.edu>

Shannon Wright

Shelley Alpern

Simeon Tegel

Simon Billenness
<simon.billenness@gmail.com>,

<simon.billenness@csrstrategygroup.com>

Simon Taylor

smartin@benbarnesgroup.com

Sonia Kowal

Spring Water Asset
Management

Steve Westly

Steven Heim

Stuart Wuttke
<swuttke@afn.ca>

Susan Goldman

Suzanne Parish
<suzannemparrish@gmail.com>

Teddy Downey

Terra Matter

9

# SA933

The Crowd Versus

Third Eye Motion Picture Company

Thomas Cavanagh

Thomas DiNapoli

Thomas Kostigen

Timothy Smith

Toni Symonds

Tony Chapelle

Tony Cruz

Tracy Apple <tracy@pachamama.org>

Trillium Asset Management

Tyson Slocum

Universidad Andina Simon Bolivar (UASB)

Veronica Havilo <v.havilo@avalonfundaktiv.com>

Walden Asset Management

West Wing Writers

Will Thomas

Willie Littlechild <Wilton.Littlechild@Xplornet.ca>

Yancy Craig <YCraig@afn.ca>

zap@amazonwatch.org

Zevin Asset Management

**Individuals and Entities Related to Interests in the Ecuadorian Judgment**

Pachamama Foundation

The Pachamama Alliance

Fundacion Naupa

Fundacion Pachamama

Zoe Littlepage

Smyser, Kaplan & Veselka LLP

Richard Henry Friedman

Larry Veselka

Howard Glaser

Forum Nobis

Deepak Gupta

Craig Smyser

Bruce Stephen Kaplan

Adam Krevlin

Amazon Defense Coalition OR ADC

Amazon Defense Front OR ADF

Amazonia Recovery Limited

Andres Snaider

Asamblea de Afectados por Texaco

Ben OR Benjamin Eisler <ben.eisler@donfordcapital.com>, <ben.eisler@jpdsllc.com>

Burford Capital

Burford Capital Limited

Burford Capital LLC

Burford Group LLC

Campbell Ford <campbell@fordmiller.com>

Christopher Bogart

CHV LLC

Cliff Eisler <Cliff.Eisler@Atlasfinancialpartners.com>, <cliff.eisler@analectfinance.com>, <cliff.eisler@donfordcapital.com>, <cliff.eisler@jpdsllc.com>

Cofan

Compañía Fiduciaria Ecuador FIDUCUADOR

CONAIE

CONFENAIE

David Marshall <david.marshall@atlasfinancialpartners.com>

10

## SA934

David Sherman

Derek Stoldt

Donford Capital

Elizabeth van Merkensteijn <ehvm@rossteq.com>

Erik T. Moe

Excend

Frank Hirth

Frente De Defensa de la Amazonia OR FDA

George Crossman

Glenn Krevlin

Glenn Krevlin <gkrevlin@glenhillcap.com>

GT Fiduciary

H5

Hassans Gibraltar

Ian Watson

Ian Watson <iw@genagro.net>, <iw@watsonassetmanagement.com>

Indigenous People Limited

James McCaffrey

Jay Goldstein

Jeff Kahn

John Van Merkensteijn <jhvm@donfordcapital.com>, <jhvm@rossacq.com>

Jonathan Molot

Joseph Kohn

Julian Jarvis

Kate Watkins

Kaye Scholer LLP

Kichwa

Kofan

Kohn Swift & Graf, P.C.

Magister Law

Mark Fenwick

Michael Ben-Jacob

Newcorp

Nicholas Economou

Olswang LLP

ONISE

Polaris Consulting Ltd.

Rakhi Kumar

Roger Waters

Rossi Technologies LLC

Russell DeLeon

Sam Krevlin

Secoya

Selvyn Seidel

Siekopai

Stephanie Furr <pa.steph.nyc@gmail.com>, <steph@rossteq.com>

Stephen Culhane

Susan Donziger Sherman

TC Payment Services International

Tony Abbiati <tabbiati@scsfinancial.com>

Torvia Limited

Treca Financial Solutions

UDAPT

Victoria Watson <victoriawatson@me.com>

Waorani

WDIS Finance LLC

Wellbeck Partners LLC

Willie Lewis Brown

Woodsford

**Individuals and Entities Related to Potential Investors in the Ecuadorian Judgment**

88 Capital LLC

# SA935

athenahealth

Anthony Gordon <ag@genagro.net>

Bill Twist

Bryce Tom

Cathy Patterson

David Zelman <david@dzelman.com>, <dzelman@transitionsinstitute.com>

Ecuadorian Ventures LLC

Emily Schweitzer

Equitable Outcomes

Erin Ly Roman <ely@opalgroup.net>

Jeffrey Kahn <kahnadvisorsllc@gmail.com>

Jesse Cohn <JCohn@elliottmgmt.com>

John Coleman <jack.coleman@donfordcapital.com>

John Perkins

John Shue <shuej@hmc.harvard.edu>

Jonaks Limited

Jonathan Bush

kahnadvisorsllc@gmail.com

Kathy Lemay <kathylemay@me.com>, <kathylemay@raisingchange.com>

Ken Foraste <kforaste@coylecompany.com>

klentz@gmail.com

Lee Grinberg <lGrinberg@elliottmgmt.com>

Lynne Twist <lynne.twist@gmail.com>, <LynneTwist@soulofmoney.org>

Michael Delgass

Michael Donziger

Nicholas <nicholas.martell@stifel.com>

Paul Schreiber

Peter & Nancy Mortifee <peter@somersetfoundation.org>

Rod Walkey <twalkey71@comcast.net>

Russell Wiese

Sarah Rumph <srumph@bbrpartners.com>

Satee GMBH

SCS Financial Services, LLC

Stephen Weeks

Steven Haley <steven@snowshill.org>

Steve Saltzstein

Tammy White <twhite@elliot.com>

Terrence Y <terrenceyang@gmail.com>

Tim Howard <tim@howardjustice.com>

Timothy A. Haluszczak <thaluszczak@steelbridgeconsulting.com>, <tim@steelbridgelabs.com>

virginie.tardieu@pargesy.com

wschindler@sailcapital.com

**Lago Agrio Plaintiffs**

Alejandro Soto

Alfredo Donaldo Payaguaje

Armando Wilfrido Piaguaje

Beatriz Mercedes Grefa Tanguila

Benancio Freddy Chimbo Grefa

12

# SA936

Bertha Antonia Yumbo Tanguila

Carlos Grefa Huatatoca

Catalina Antonia Aguinda

Celia Irene Viveros Cusangua

Clide Ramiro Aguinda

Daniel Carlos Lusitande Yaiguaje

Delfin Leonidas Payaguaje .

Elias Roberto Piyaguaje Payaguaje

Emilio Martin Lusitande Yaiguaje

Esteban Lusitante Yaiguaje

Felipe Lucitante

Fermin Piaguaje Payaguaje

Francisco Alvarado Yumbo

Francisco Victor Tanguila

Gloria Lucrecia Tanguila Grefa

Guillermo Vicente Payaguaje Lusitande

Heleodoro Pataron Guaraca

Hugo Gerardo Camacho Naranjo

Janeth Cuji

Javier Piaguaje

Javier Piyaguaje Payaguaje

Jose Gabriel Revelo

Jose Gabriel Revello

Justino Piaguaje

Lorenzo Jose Alvarado Yumbo

Lourdes Beatriz Chimbo Tanguila

Lucio Enrique Grefa Tanguila

Luis Armando Chimbo Yumbo

Luisa Delia Tanguila Narvaez

Luz Cusangua

Maria Clelia Reascos

Maria Clelia Reascos Revelo

Maria Hortencia Viveros

Maria Magdalena Rodriguez

Maria Victoria Aguinda Salazar

Mariana Jimenez

Miguel Mario Payaguaje

Nancy Pambabay

Narcisa Aida Tanguila Narvaez

Octavio Ismael Cordova Huanca

Olga Gloria Grefa Cerda

Patricio Alberto Chimbo Yumbo

Patricio Wilson Aguinda

Reinaldo Lusitande Yaiguaje

Rosa Moreno

Rosa Teresa Chimbo

Servio Curipoma

Simon Lusitande Yaiguaje

Teodoro Gonzalo Piaguaje

William Lucitante

Yolanda Omaca

**Individuals and Entities**
**Paid from LAP Accounts**

Benjamin Klein

Bolivar-Godofredo Noblecilla Alvarado

Carlos Antonio Paredes Sandoval

Carlos Efrain Manjarres Arevalo

Cesar-Belisario Cruz

13

# SA937

| | | | |
|---|---|---|---|
| Cristobal-Mauricio Acuna Alban | PROVEEDORA ERAZO SANCHEZ S. A | Consejo de Participación Ciudadana y Control Social (CPCCS) | Julio Cesar Trujillo |
| Diego-Alipio Cueva Ochoa | Radio Sucumbios | Corte Constitucional del Ecuador | Lenin Moreno |
| Elvia Rosario Morales Villarroel | Ricardo Lara Mello | | Leonardo Isaac Ordonez Pina |
| Galo Fernando Paredes Jacome | ROMÁN HERMANOS CÍA. LTDA. | Daniel Mendoza | Liliana Suarez |
| Galo-Vicente Gonzalez Granda | Servulo Isaias Monar Camacho | Diego Garcia | Luis Hernandez |
| Groupideas S.A. | TRADEPLAST CÍA. LTDA. | Eduardo Mangas | Luis Legna |
| Jaime Arturo Robles Pillco | Vinicio Nicolas Mancheno Carrillo | Eduardo Mendoza | Manuel Viteri |
| John E. Long | WETECH CÍA. LTDA. | Eric Bloom | Marco Antonio Yaguache Mora |
| Juanito-Franklin Hernandez Chamorro | Wilmer Abel Menses Paredes | Fernando Alvarado | Maria Avila |
| Julio Cesar Valencia Ordonez | **Individuals Related to the Republic of Ecuador** | German Yanez | Maria Alejandra Vicuna Munoz |
| Julio Eduardo Apunte Romero | Alfredo Ruiz | Gregory Longstreet Ewing | Maria Fernada Espinosa |
| Julio-Floresmilo Granda Herrera | Carlos Viteri | Gustavo Larrea | Maria Fernanda Espinoza |
| Long Tuminello LLP | Charles McNeil Mitchell | Iñigo Salvador | Maria Jose Carrion |
| | | Jaime Candell | Marien Segura |
| | | Johana Pesantez | Milton Toral |
| | | Jorge Glas | Miryam Felix |
| | | Jose Ignacio Yepez | Nicolas Zambrano |
| | | Juan Sebastian Roldan | |

14

**SA938**

| Orlando Guarnizo | SENAIN | Xavier Zavala | Álvaro Galindo |
| Pablo Davila | Tatiana Ordeñana | Fander Falconí | Paolo Di Rosa |
| Pamela Martinez | Victor Butina | Marcelo Larrea | Raul Herrera |
| Rafael Correa | Victor Lopez Montero | Alvaro Galindo | |
| Alexis Mera | Washington Pesantez | Rafael Parreño Navas | |
| Roxana Silva | Wendy Molina | Blanca Gómez de la Torre | |
| Ruth Seni | Wilfrido Erazo | Tomás Leonard | |

15

# SA939

**Exhibit C**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
CHEVRON CORPORATION,                              :
:
Plaintiff,           :
:
v.                                  :        11 Civ. 0691 (LAK)
:
STEVEN DONZIGER, et al.,                          :
:
:
Defendants.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF INFORMATION CONCERNING PERSONS/ENTITIES
DESIGNATED AS "HIGHLY CONFIDENTIAL AND PERSONAL" PURSUANT TO
PARAGRAPH 6 OF THE FORENSIC INSPECTION PROTOCOL**

I, STEVEN R. DONZIGER, hereby declare under penalty of perjury pursuant to 28

U.S.C. § 1746 that the following is true and correct:

1.      Pursuant to Paragraph 6 of the Forensic Inspection Protocol, I have attached to

this Declaration, as Exhibit A, a highlighted version of the Person/Entity Report, which

highlighted persons or entities I hereby designate as "Highly Confidential and Personal."

2.      No person or entity appearing on Exhibit A has ever had any involvement of any

kind in any of the below-listed actions or in any action related to or consolidated with any of the

below-listed actions or in any appeal thereof:

- *Chevron v. Stratus Consulting, Inc.*, No. 10-cv-47 (D. Colo)
- *In re Application of Chevron Corporation*, No. 10-mi-76 (N.D. Ga.)
- *In re Application of Chevron Corporation*, No. 10-mc-134 (S.D. Tex.)
- *In re Application of Chevron Corporation for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in Foreign Proceedings*, No. 10-cv-2675 (D.N.J.)
- *In re Application of Chevron Corporation*, No. 10-cv-1146 (S.D. Cal.)

# SA940

- *In re Application to Issue a Subpoena for the Taking of a Deposition and the Production of Documents*, No. 10-mc-371 (D.D.C.)
- *Chevron Corporation v. Quarles*, No. 10-cv-686 (M.D. Tenn.)
- *In re Application of Chevron Corporation*, No. 10-mc-1 (S.D.N.Y.)
- *In re Application of Chevron Corp.*, No. 10-mc-2 (S.D.N.Y.)
- *Chevron Corporation v. Charles Champ*, No. 10-mc-27 (W.D.N.C.)
- *Chevron Corporation*, No. 10-mc-21 (D.N.M.)
- *In re Chevron Corp.*, No. 10-mc-10352 (D. Mass.)
- *Chevron Corporation*, No. 10-mc-53 (S. D. Ohio)
- *Chevron Corporation v. Rourke*, No. 10-cv-2989 (D. Md.)
- *Chevron Corp. v. Allen*, No. 10-mc-91 (D. Vt.)
- *Chevron Corporation v. Picone*, No. 10-cv-2990 (D. Md.)
- *Chevron Corp.*, No. 10-cv-549 (W.D. Va.)
- *In re Application of Chevron Corp.*, No. 10-mc-208 (E.D. Pa.)
- *Chevron Corp: In re Application for Order Enforcing a Subpoena*, No. 10-mc-30022 (D. Mass.)
- *Chevron Corp. v. Weinberg Group, Inc.*, No. 11-mc-30 (D.D.C.)
- *Chevron Corp. v. Page*, No. 11-cv-395 (D. Md.)
- *Chevron Corp. v. ELAW*, No. 11-mc-7003 (D. Ore.)
- *Chevron Corp. v. Banco Pichinca*, No. 11-cv-24599 (S.D. Fla.)
- *In re the Application of the Republic of Ecuador*, No. 10-mc-80225 (N.D. Cal.)
- *In re the Republic of Ecuador*, No. 10-mc-40 (E.D. Cal.)
- *In re Application of Carlos Lusitand Yaiguaje*, No. 10-mc-80324 (N.D. Cal.)
- *In re Application of Daniel Carlos Lusitand Yaiguaje, et al.*, No. 11-mc-80087 (N.D. Cal.)
- *In re Application of the Republic of Ecuador*, No. 11-mc-80110 (N.D. Cal.)
- *In re Application of the Republic of Ecuador*, No. 11-mc-8 (E.D. Cal.)
- *Republic of Ecuador v. Bjorkman*, No. 11-cv-1470 (D. Colo.)
- *In re Application of The Republic of Ecuador*, No. 11-mc-73 (N.D. Fla.)
- *The Republic of Ecuador v. Kelsh*, No. 11-mc-80171 (N.D. Cal.)
- *The Republic of Ecuador v. Exponent, Inc.*, No. 11-mc-80172 (N.D. Cal.)
- *The Republic of Ecuador v. TestAmerica Labs., Inc.*, No. 11-mc-88 (N.D. Fla.)
- *The Republic of Ecuador v. Gregory S. Douglas*, No. 11-mc-91287 (D. Mass.)
- *The Republic of Ecuador v. John A. Connor*, No. 11-mc-516 (S.D. Tex.)
- *The Republic of Ecuador v. GSI Environmental, Inc.*, No. 11-mc-517 (S.D. Tex.)
- *The Republic of Ecuador and Dr. Diego Garcia Carrion*, No. 13-cv-1112 (D. Colo.)
- *Chevron Corp. v. Donziger*, No. 11-cv-691 (S.D.N.Y.)
- *Chevron Corp. v. Salazar*, No. 11-cv-3718 (S.D.N.Y.)
- *In re Application of Chevron Corp.*, No. 11-cv-1942 (D. Md.)
- *Chevron Corp. v. Douglas Allen*, No. 11-mc-57 (D. Vt.)
- *Chevron Corp. v. Salazar*, No. 11-mc-409 (D.D.C.)
- *Chevron Corp. v. Salazar*, No. 11-mc-8 (S.D. Tx.)
- *Chevron Corp. v. Banco Pichincha*, No. 11-cv-23049 (S.D. Fla.)
- *Chevron Corp. v. Salazar*, No. 11-mc-80217 (N.D. Cal.)

# SA941

- *Uhl & Associates, Inc. v. Chevron Corp.*, No. 11-cv-5292 (D.N.J.)
- *Chevron Corp. v. Donziger*, No. 12-mc-80237 (N.D. Cal.)
- *Chevron Corp. v. Donziger*, No. 12-mc-80238 (N.D. Cal.)
- *Chevron Corp. v. Donziger*, No. 12-mc-65 (S.D.N.Y.)
- *Chevron Corp. v. Donziger*, No. 12-mc-673 (D.D.C.)
- *Chevron Corp. v. Donziger*, No. 13-mc-80038 (N.D. Cal.)
- *Chevron Corp. v. Salazar*, No. 11-cv-2426 (D. Colo.)
- *Chevron Corporation v. H5 et al.*, 14-mc-144 (S.D.N.Y.)
- *Chevron Corporation v. MCSquared PR, Inc.*, No. 14-mc-392 (S.D.N.Y.)
- *Patton Boggs, LLP v. Chevron Corporation*, No. 10-cv-1975 (D.D.C.)
- *Patton Boggs, LLP v. Chevron Corporation*, No. 11-cv-799 (D.D.C.)
- *Patton Boggs, LLP v. Chevron Corporation*, No. 12-cv-901 (D.N.J.)
- *Dessarrollos Punta Alta, Despunta, C.A. v. Chevron Corporation*, 16-cv-21385 (S.D. Fla.)
- *Maria Aguinda Salazar y Otros v. ChevronTexaco Corporation*, No. 002-2003-P-CSJNL (Superior Court Nueva Loja)
- *Chevron Corporation and Texaco Petroleum Company v. The Republic of Ecuador*, PCA No. 2009-23 (Permanent Court of Arbitration, The Hague, The Netherlands)
- *Yaiguaje v. Chevron Corporation*, No. cv-12-454778 (Ontario Superior Court of Justice)
- *Daniel Carlos Lusitande Yaiguaje, et al. v. Chevron Corporation, Chevron Canada Limited and Chevron Canada Finance Limited*, File No. C57019, M43289 (Court of Appeal for Ontario)
- *Daniel Carlos Lusitande Yaiguaje, et al. v. Chevron Corporation, Chevron Canada Limited and Chevron Canada Finance Limited*, File No. C63309, C63310 (Court of Appeal for Ontario)
- *Daniel Carlos Lusitande Yaiguaje, et al. v. Chevron Corporation, Chevron Canada Limited and Chevron Canada Finance Limited*, File No. CV-12-9808-00CL (Ontario Superior Court of Justice)
- *Chevron Corporation and Chevron Canada Limited v. Daniel Carlos Lusitande Yaiguaje, et al.*, File No. 35682 (Supreme Court of Canada)
- *Maria Aguinda Salazar, et al. v. Chevron Corporation* (Superior Court of Justice, Brazil)
- *Aguinda Salazar, Maria et al. v. Chevron Corporation on Exequatur and Recognition of Foreign Judgment*, Case No. 97,260/12 (Civil Court, Judiciary of Argentina)
- *Chevron Corp. v. Amazonia Recovery Ltd.*, Claim No. 2014-C-110 (Supreme Court of Gibraltar)
- *Chevron Corp. v. DeLeon*, Claim No. 2012-C-232 (Supreme Court of Gibraltar)
- *Chevron Corp. v. GT Nominees Ltd.*, Claim No. 2014-C-111 (Supreme Court of Gibraltar)
- *Chevron Corp. v. Julian Jarvis*, Claim No. 2014-C-112 (Supreme Court of Gibraltar)
- *Chevron Corp. v. TC Payment Servs Ltd.*, Claim No. 2014-C-113 (Supreme Court of Gibraltar)

# SA942

3.    No person or entity highlighted on Exhibit A hereto has ever had any involvement of any kind in the enforcement of the Ecuadorian Judgment or any attempts to monetize or profit from the Ecuadorian Judgment, including by selling, assigning, pledging, transferring or encumbering any interest therein.

4.    No person or entity highlighted on Exhibit A hereto owns or has ever been offered or discussed obtaining any right, title or interest of any kind in the Ecuadorian Judgement or any right, title or interest directly or indirectly traceable to the Ecuadorian Judgement or enforcement of the judgment anywhere in the world, including any right, title or interest in Amazonia.

5.    No person or entity highlighted on Exhibit A hereto has any knowledge regarding my assets or of any transfer of my assets since March 2012.

Executed on this _____ day of _____, 2019 at _____.

_____
Steven R. Donziger

Case 18-855, Document 97, 03/11/2019, 2515364, Page56 of 292

SA943

# EXHIBIT D

# SA944

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

CHEVRON CORPORATION,        :

      Plaintiff,        :

      v.        :     11 Civ. 0691 (LAK)

STEVEN DONZIGER, et al.,        :

      Defendants.        x

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## CHEVRON CORPORATION'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS IN AID OF THE SUPPLEMENTAL JUDGMENT TO DEFENDANTS STEVEN DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER, AND DONZIGER & ASSOCIATES, PLLC

In the above entitled action in the United States District Court for the Southern District of New York,[1] a supplemental judgment was entered on February 28, 2018 in favor of Chevron Corporation against Steven Donziger, The Law Offices of Steven R. Donziger, Donziger & Associates, PLLC, and others, for the sum of $813,602.71, which remains due and unpaid.

**YOU ARE HEREBY COMMANDED**, pursuant to Rule 69 of the Federal Rules of Civil Procedure and CPLR Sections 5223 and 5224, to produce on or before April 27, 2018

---

[1] The parties to this action are Chevron Corporation (Plaintiff) and Defendants Steven Donziger, The Law Offices of Steven R. Donziger, Donziger & Associates, PLLC, Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje, Stratus Consulting, Inc. Douglas Beltman, Anne Maest, Pablo Fajardo Mendoza, Luis Yanza, Frente de Defensa de la Amazonia A/K/A Amazon Defense Front, Selva Viva Selviva Cia, Ltda, Maria Aguinda Salazar, Carlos Grefa Huatatoca, Catalina Antonia Aguinda Salazar, Lidia Alexandra Aguinda Aguinda, Patricio Alberto Chimbo Yumbo, Clide Ramiro Aguinda Aguinda, Luis Armando Chimbo Yumbo, Beatriz Mercedes Grefa Tanguila, Lucio Enrique Grefa Tanguila, Patricio Wilson Aguinda Aguinda, Celia Irene Viveros Cusangua, Francisco Matias Alvarado Yumbo, Francisco Alvarado Yumbo, Olga Gloria Grefa Cerda, Lorenzo Jose Alvarado Yumbo, Narcisa Aida Tanguila Narvaez, Bertha Antonia Yumbo Tanguila, Gloria Lucrecia Tanguila Grefa, Francisco Victor Tanguilla Grefa, Rosa Teresa Chimbo Tanguila, Jose Gabriel Revelo Llore, Maria Clelia Reascos Revelo, Maria Magdalena Rodriguez Barcenes, Jose Miguel Ipiales Chicaiza, Heleodoro Pataron Guaraca, Luisa Delia Tanguila Narvaez, Lourdes Beatriz Chimbo Tanguila, Maria Hortencia Viveros Cusangua, Segundo Angel Amanta Milan, Octavio Ismael Cordova Huanca, Elias Roberto Piyahuaje Payahuaje, Daniel Carlos Lusitande Yaiguaje, Benancio Fredy Chimbo Grefa, Guillermo Vicente Payaguaje Lusitante, Delfin Leonidas Payaguaje Payaguaje, Alfredo Donaldo Payaguaje Payaguaje, Teodoro Gonzalo Piaguaje Payaguaje, Miguel Mario Payaguaje Payaguaje, Fermin Piaguaje Payaguaje, Reinaldo Lusitande Yaiguaje, Luis Agustin Payaguaje Piaguaje, Emilio Martin Lusitande Yaiguaje, Simon Lusitande Yaiguaje, Armando Wilfrido Piaguaje Payaguaje, and Angel Justino Piaguage Lucitante.

# SA945

responses and/or objections to each document request to counsel at Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166-0193.

## **INSTRUCTIONS**

1.      The definitions and rules of construction set forth in Rule 26.3 of the Local Rules for the Southern and Eastern Districts of New York are incorporated herein.

2.      This First Set of Requests for the Production of Documents ("REQUEST" or "REQUESTS") calls for the production of all DOCUMENTS ("documents" INCLUDES electronically stored information) in YOUR possession, or subject to YOUR custody or CONTROL, INCLUDING DOCUMENTS in the possession, custody, or CONTROL of YOUR agents, attorneys, or representatives (INCLUDING to attorneys in this action, attorneys in the ECUADOR LITIGATION, Pablo Fajardo Mendoza, Servicios Fromboliere Compania Limitada, Luis Yanza, Julio Prieto Méndez, Juan Pablo Sáenz, Andrew Woods, Aaron Marr Page, Laura Garr, Brian Parker, Joseph Kohn, Patricio Salazar Cordova, Agustin Salazar, Serafin Angel Cajo, and SELVA VIVA). Possession, custody, or CONTROL INCLUDES DOCUMENTS stored in electronic form by third-party service providers but accessible to YOU or YOUR agents, attorneys, representatives, or others acting on YOUR behalf, INCLUDING email accounts, FTP servers, instant messaging applications, texts, WhatsApp, portable storage media such as USB drives, cloud storage services such as Dropbox, iCloud, Google Drive, or OneDrive, and online workspaces such as WebEx.

3.      Each REQUEST herein constitutes a request for DOCUMENTS in their entirety, with all enclosures and attachments, and without abbreviation, redaction, or expurgation. DOCUMENTS attached to each other, INCLUDING by staple, clip, tape, email attachment, or "Post-It" note, shall not be separated, although any page on which a Post-It note covers or

2

# SA946

obscures text on the DOCUMENT shall be produced both with and without the Post-It note. The production must also INCLUDE, where applicable, any index tabs, file dividers, designations, binder spine labels, or other similar information as to the source and/or location of the DOCUMENTS.

4.     YOU shall produce any and all drafts and copies of each DOCUMENT that are responsive to any REQUEST, INCLUDING copies containing handwritten notes, markings, stamps, or interlineations. The author(s) of all handwritten notes shall be identified.

5.     Responsive DOCUMENTS that exist only in paper form shall be organized as they have been kept in the ordinary course of business.

6.     If with respect to any REQUEST there are no responsive DOCUMENTS, so state in writing.

7.     Chevron will meet and confer with YOU to discuss the logistics of production, but absent an alternative agreement with Chevron, responsive DOCUMENTS shall be produced in TIFF format with the accompanying text of the DOCUMENTS in a load file that also INCLUDES the metadata, subject to the following:

    a.  responsive DOCUMENTS that cannot be produced in TIFF format due to technical reasons shall be produced in a computer-readable and text searchable format to be mutually determined by the parties;

    b.  Microsoft Excel files, PowerPoint files, and other responsive DOCUMENTS that can be meaningfully viewed only in their native electronic format shall be produced in their native electronic format; and

3

    c.  to the extent data maintained in a database is responsive and not privileged or otherwise subject to protection, the parties shall meet and confer over the scope and format of production.

    8.    YOU shall produce the following metadata and production information associated with responsive DOCUMENTS (INCLUDING Microsoft Word DOCUMENTS that preserve and reveal any hidden notations, creation or alteration records) and make it reasonably accessible to Chevron: BEG_PROD_NUM, END_PROD_NUM, BEGATTACH, ENDATTACH, FROM, RECIPIENT, CC, BCC, DATE (sent date for email, create date for files), SUBJECT (subject line for email, filename for file, title for hard copy), UNREAD (unread status of email messages) DOCTYPE, FILENAME, ALL CUSTODIANS FILE PATHS, MD5 HASH, REVISION (revision number of DOCUMENT), AUTHOR, MODIFY DATE, MODIFIED BY, TOTAL EDIT TIME, LAST PRINTED, and ALL CUSTODIANS. This INCLUDES metadata that is stored as part of the responsive document, and metadata stored by the file system in which the responsive DOCUMENT is stored. YOU shall preserve all metadata associated with all responsive DOCUMENTS, INCLUDING metadata that is not produced pursuant to this instruction, and Chevron reserves the right to request the production of native copies of responsive DOCUMENTS for which the produced metadata is incomplete to the extent native copies are not already called for by these REQUESTS. This instruction shall be read in accordance with the requirements and limitations imposed by Rules 26(b) and 34 of the Federal Rules of Civil Procedure. Chevron will meet and confer with YOU to discuss metadata and expects to generally follow the guidance provided by the United States District Court for the Southern District of New York in *Nat'l Day Laborer Organizing Network v. U.S. Immigration and Customs Enforcement Agency*, 2011 WL 381625 (S.D.N.Y. Feb 7, 2011) (Scheindlin, J.).

# SA948

9.      If YOU object to a portion or an aspect of a REQUEST, state the grounds for YOUR objection with specificity and respond to the remainder of the REQUEST. If any DOCUMENTS, or portion thereof, are withheld because YOU claim that such information is protected under the attorney-client privilege, work product doctrine, or other privilege or doctrine, YOU are required to PROVIDE a privilege log, specifying for each such DOCUMENT or withheld information: (1) the type of DOCUMENT, e.g., letter or memorandum; (2) the general subject matter of the DOCUMENT; (3) the date of the DOCUMENT; and (4) the author of the DOCUMENT, the addressees of the DOCUMENT, and any other recipients, and, where not apparent, the relationship of the author, addressees, and recipients to each other.

10.      If YOU claim that a portion of a DOCUMENT is protected from disclosure for any reason, produce such DOCUMENT with redaction of only the portion claimed to be protected. Any DOCUMENT produced in redacted form shall clearly indicate on its face that it has been redacted.

11.      If YOU object that a REQUEST is vague or ambiguous, identify the objectionable aspect of the REQUEST, state YOUR interpretation of the REQUEST and respond to that interpretation.

12.      If any DOCUMENT called for by the REQUESTS has been destroyed, lost, discarded, or is otherwise no longer in your possession, custody, or CONTROL, identify such DOCUMENT as completely as possible, and specify the date of disposal of the DOCUMENT, the manner of disposal, the reason for disposal, the PERSON authorizing disposal, and the PERSON disposing of the DOCUMENT.

13.      Defined terms may be capitalized for the convenience of the parties; the definitions herein apply whether or not the term is capitalized.

# SA949

## DEFINITIONS

1.   The term "ACCOUNT" as used herein means and INCLUDES savings accounts, checking accounts, money market accounts, brokerage accounts, certificates of deposit, lines of credit, and any other credits or debits.

2.   The term "ACCOUNTING" means and refers to any record of financial information. This INCLUDES accountings, financial statements, bank statements, ledgers, books, audits, registers, financial reconciliations, summaries of financial information, and reports of financial information.

3.   The term "ASSET" means any tangible or intangible PROPERTY, INCLUDING real PROPERTY, personal PROPERTY, intellectual PROPERTY, chattels, cash, securities, derivative products, ACCOUNTS, debts, contract rights, security interests, claims, and causes of action, anywhere in the world.

4.   The term "PROPERTY" means anything that may be the subject of OWNERSHIP.

5.   The terms "OWN" and "OWNERSHIP" mean owned directly or indirectly, in whole or in part, as sole owner or jointly with others, either of record or beneficially, including without limitation as a partner, general or limited, limited liability member, fiduciary, and as an equity or debt holder, or demand deposit holder.

6.   The term "CONTROL" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any PERSON or ENTITY, shall mean the possession, directly or indirectly, of the power to direct or cause the actions, direction of the management, or policies of such PERSON or ENTITY, whether through the OWNERSHIP of voting securities, by contract or otherwise.

6

# SA950

7.     The terms "ENTITY" and "ENTITIES" shall INCLUDE all corporations, associations, partnerships, joint ventures, companies, funds, trusts, limited liability companies, limited liability partnerships, any government or regulatory authority, and all other forms of incorporated and unincorporated organizations that are not natural persons.

8.     The terms "INCLUDE" and "INCLUDING" mean including, but not limited to. When the word "INCLUDE" or "INCLUDING" is followed by one or more specific examples, those examples are illustrative only and do not limit in any way the information requested.

9.     "AMAZONIA RECOVERY LIMITED" means and refers to Amazonia Recovery Limited, an organization registered and/or incorporated under the Companies Act of Gibraltar on or around May 4, 2012, and any current and former subsidiaries, affiliates, partners, officers, directors, employees, representatives, agents, and any other PERSON acting, or purporting to act, on their behalf, and any predecessors or successors of the foregoing and any parent, subsidiary, division, or successor ENTITY.

10.     "AMAZON DEFENSE FRONT" means and refers to the Frente de Defensa de la Amazonía a/k/a Amazon Defense Front and INCLUDES the Front's officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates.

11.     "AMAZONIA RECOVERY LIMITED STEERING COMMITTEE" means and refers to the "advisory steering committee [to Amazonia Recovery Limited] that will be appointed by the Claimants to advise and assist the Claimants in respect of the Claim (INCLUDING with respect to remediation efforts)" as defined in paragraph 95 of Amazonia Recovery Limited's February 27, 2013 amended Memorandum of Association.

12.     "ECUADOR ENFORCEMENT ACTIONS" means and refers to any proceeding seeking recognition and/or enforcement of the ECUADOR JUDGMENT anywhere in the world.

7

# SA951

13. "ECUADOR JUDGMENT TRUST" means and refers to the trust discussed in the March 30 filing of Pablo Fajardo Mendoza to the Provincial Court of Justice of Sucumbíos regarding the "Commercial Trust for the Administration of Funds ADAT, granted by Maria Victoria Aguinda Salazar, Lidia Alexandra Aguinda Aguinda, et al., the AMAZON DEFENSE FRONT and Compañia Fiduciaria Ecuador FIDUECUADOR S.A. funds and trusts administrator" executed on March 1, 2012 by Dr. Sandra Veronica Barrazueta Molina.

14. "ECUADOR JUDGMENT" means and refers to the judgment entered in the ECUADOR LITIGATION on February 14, 2011, as modified by subsequent proceedings.

15. "ECUADOR LITIGATION" means and refers to the proceeding *Maria Aguinda y Otros v. Chevron Corporation*, in the Provincial Court of Justice of Sucumbíos in Ecuador, and all appellate proceedings and subsequent proceedings stemming therefrom.

16. "LAGO AGRIO PLAINTIFFS" means and refers to Defendants Alfredo Donaldo Payaguaje Payaguaje; Ángel Justino Piaguaje Lucitante; Armando Wilfrido Piaguaje Payaguaje; Beatriz Mercedes Grefa Tanguila; Benancio Freddy Chimbo Grefa; Bertha Antonia Yumbo Tanguila; Carlos Grega Huatatoca; Catalina Antonia Aguinda Salazar; Celia Irene Viveros Cusangua; Clide Ramiro Aguinda Aguinda; Daniel Carlos Lusitande Yaiguaje; Delfín Leonidas Payaguaje Payaguaje; Elias Roberto Piyahuaje Payahuaje; Emilio Martín Lusitande Yaiguaje; Fermin Piaguaje Payaguaje; Francisco Alvarado Yumbo; Francisco Matias Alvarado Yumbo; Francisco Victor Tanguila Grefa; Gloria Lucrecia Tanguila Grefa; Guillermo Vicente Payaguaje Lusitante; Heleodoro Pataron Guaraca; Hugo Gerardo Camacho Naranjo; Javier Piaguaje Payaguaje; José Gabriel Revelo Llore; José Miguel Ipiales Chicaiza; Lidia Alexandra Aguinda Aguinda; Lorenzo José Alvarado Yumbo; Lourdes Beatriz Chimbo Tanguila; Lucio Enrique Grefa Tanguila; Luis Agustín Payaguaje Piaguaje; Luis Armando Chimbo Yumbo; Luisa Delia

8

Tanguila Narvaez; Maria Aguinda Salazar; María Clelia Reascos Revelo; María Hortencia Viveros Cusangua; Maria Magdalena Rodriguez Barcenes; Miguel Mario Payaguaje Payaguaje; Narcisa Aida Tanguila Narváez; Octavio Ismael Córdova Huanca; Olga Gloria Grefa Cerda; Patricio Alberto Chimbo Yumbo; Patricio Wuilson Aguinda Aguinda; Reinaldo Lusitande Yaiguaje; Rosa Teresa Chimbo Tanguila; Segundo Ángel Amanta Milán; Simon Lusitande Yaiguaje; and Teodoro Gonzalo Piaguaje Payaguaje.

17.    "PERSON" means and refers to any natural person or any business, legal or governmental ENTITY, or association.

18.    "REPUBLIC OF ECUADOR" means and refers to the governing political body in Ecuador, INCLUDING all branches of government and political subdivisions, its current and former presidents, attorneys general, judges, prosecutors, other officials, politicians, partners, contractors, employees, representatives, agents, agencies, officers, attorneys, accountants, assigns, or any other person acting, or purporting to act, on the REPUBLIC OF ECUADOR's behalf, either directly or indirectly, INCLUDING: Lenin Moreno; Rafael Correa; Martha Escobar; Patricio García; Alexis Mera; Alberto Acosta; Ana Alban; Galo Chiriboga; Rene Vargas Pazos; Mauricio Montalvo Samaniego; Judge Alberto Guerra Bastidas; Judge Efrain Novillo Guzmán; Judge Germán Yánez Ricardo Ruiz; Judge Juan Evangelista Núñez Sanabria; Judge Leonardo Ordóñez Pina; Judge Nicolás Augusto Zambrano Lozada; Judge Juan Carlos Encarnación Sanchez; Judge Cruz María Ávila Delgado; Judge Marco Antonio Yaguache Mora; Judge Milton David Rafael Toral Zevallos; Judge Alejandro Kleber Orellana Pineda; Judge Lilia Marlene Ortiz Vásquez; José María Borja; Washington Pesántez; Cecilia Armas Erazo de Tobar; Jorge German; Diego Borja (former Economic Policy Minister); Esperanza Martinez; Diego

9

# SA953

García Carrión; Alianza País; the National Intelligence Secretariat; and any current or former official at the offices of the Fiscal, Prosecutor General, or Attorney General.

19. "SELVA VIVA" means and refers to Defendant Selva Viva Selviva Cia. Ltda., and its officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates.

20. "YOU" and "YOUR" mean and refer to Steven Donziger, The Law Offices of Steven R. Donziger, and Donziger & Associates, PLLC, and where applicable, their officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates.

## DOCUMENTS REQUESTED

1. All DOCUMENTS evidencing or relating to any domestic or foreign ASSET that YOU OWN or CONTROL.

2. All DOCUMENTS evidencing or relating to any information concerning the identity, location and/or value of YOUR domestic or foreign PROPERTY, domestic or foreign income, and/or domestic or foreign ASSETS.

3. All DOCUMENTS evidencing or relating to YOUR OWNERSHIP or other interest in, and value of, any domestic or foreign real estate.

4. All DOCUMENTS evidencing or relating to any OWNERSHIP interest, direct or beneficial, that YOU have in any real or personal PROPERTY, whether domestic or foreign, INCLUDING cooperative corporation shares, automobiles, trucks, other motor vehicles, boats, artwork, jewelry, aircraft, stocks, bonds, commodities, securities, partnership interests, patents, inventions, trade names, copyrights, royalty agreements, promissory notes, drafts or other commercial paper, or causes of action.

5. All DOCUMENTS evidencing or relating to YOUR current OWNERSHIP of any inherited PROPERTY, INCLUDING those ASSETS YOU received or are entitled to future

10

# SA954

receipt of, from any estates in which YOU may have or have had an interest, as well as the current value of such PROPERTY.

6. All DOCUMENTS evidencing or relating to YOUR current OWNERSHIP interest in any domestic or foreign ENTITIES or ACCOUNTS, as well as the current value of such PROPERTY and, if the PROPERTY was sold or transferred since the issuance of the Court's March 4, 2014 Judgment (Dkt. 1875), as modified, the date of such transfer, the identity of the purchaser, and the value received for such transfer.

7. All originals or copies of all financial statements, checks (fronts and backs of all checks) and/or wire transfers for bank, brokerage or trust ACCOUNTS, whether active or inactive, open or closed, relating to YOUR ASSETS, dated on or after the issuance of the Court's March 4, 2014 Judgment (Dkt. 1875), as modified.

8. All DOCUMENTS evidencing or relating to any balance sheets, income statements, inventories, profit and loss statements, and any other documents or information showing YOUR ASSETS, PROPERTY, expenses, and/or liabilities, dated on or after the issuance of the Court's March 4, 2014 Judgment (Dkt. 1875), as modified.

9. All DOCUMENTS evidencing or relating to any claims, lawsuits, proceedings, liens or demands that have been threatened and/or filed against YOU since the issuance of the Court's March 4, 2014 Judgment (Dkt. 1875), as modified.

10. All DOCUMENTS evidencing or relating to any domestic or foreign savings ACCOUNTS, checking ACCOUNTS, money market ACCOUNTS, investment ACCOUNTS, certificates of deposit, or any other ACCOUNTS in which YOU have or have had an interest since March 4, 2014, wherever found.

11

11.     All DOCUMENTS evidencing or relating to any means by which YOU, since March 4, 2014, have transferred, paid, received, or conducted any financial transactions or any other transaction involving an exchange of value.

12.     All DOCUMENTS evidencing or relating to any interest in any ASSET that YOU have transferred, sold, assigned, pledged, gifted, encumbered, or otherwise disposed of since the issuance of the Court's March 4, 2014 Judgment (Dkt. 1875), as modified.

13.     All DOCUMENTS evidencing or relating to any debts or credits due, owing, or which will become due or owing to YOU, wherever found, including documents relating to any terms on which such debts may be, have been, are, or will be forgiven or not enforced.

14.     YOUR filed federal tax returns from 2014 until the present.

15.     YOUR filed state tax returns from 2014 until the present.

16.     All DOCUMENTS evidencing or relating to filed federal corporate tax returns from 2014 until the present that relate to YOUR ASSETS.

17.     All DOCUMENTS evidencing or relating to filed state corporate tax returns from 2014 until the present that relate to YOUR ASSETS.

18.     All DOCUMENTS evidencing or relating to any financing provided to YOU, INCLUDING all promissory notes, security agreements, and UCC-1 financing statements. This REQUEST INCLUDES documents sufficient to show the original amount of the financing, the PERSON or ENTITY to whom due, balance owing, payments, maturity and collateral, and any other DOCUMENTS relating to any such debt.

19.     All DOCUMENTS evidencing or relating to all PROPERTY, whether personal or real, tangible or intangible, vested or contingent that YOU have received, or hereafter may receive, directly or indirectly, or to which YOU have or hereafter obtain any right, title or

interest, directly or indirectly, that is traceable to the ECUADOR JUDGMENT or the enforcement of the ECUADOR JUDGMENT anywhere in the world.

20.    All DOCUMENTS evidencing or relating to any acts taken by YOU or the LAGO AGRIO PLAINTIFFS to monetize or profit from the ECUADOR JUDGMENT since March 4, 2014, INCLUDING by selling, assigning, pledging, promising, transferring, borrowing against, or encumbering any interest therein.

21.    All DOCUMENTS evidencing or relating to any communication between YOU and any PERSON or ENTITY since March 4, 2014 concerning the ECUADOR JUDGMENT or any attempts by anyone, successful or not, to monetize or profit from it.

22.    All DOCUMENTS evidencing or relating to any PERSON or ENTITY who financially supported or invested in, was asked to financially support or invest in, or who offered to financially support or invest in any aspect of the ECUADOR JUDGMENT or the enforcement thereof.

23.    All DOCUMENTS related to the ECUADOR JUDGMENT TRUST.

24.    All DOCUMENTS related to AMAZONIA RECOVERY LIMITED, INCLUDING:

   a.    All DOCUMENTS using or discussing the creation of any code names, alternate names, pseudonyms, nicknames or other naming conventions ("alternate names"), other than the legal name for AMAZONIA RECOVERY LIMITED;

   b.    All DOCUMENTS related to the appointment of any PERSON, INCLUDING Julian Jarvis, Ermel Gabriel Chavez Parra, Luis Francisco Yanza Angamarca, and Pablo Fajardo Mendoza to the board of directors of AMAZONIA RECOVERY LIMITED;

13

# SA957

  c. All DOCUMENTS related to the membership, responsibilities and operations of the AMAZONIA RECOVERY LIMITED STEERING COMMITTEE;

  d. All ACCOUNTINGS related to AMAZONIA RECOVERY LIMITED;

  e. All DOCUMENTS related to any shares, rights, title, or interest in AMAZONIA RECOVERY LIMITED held directly or indirectly by YOU at any time;

  f. All DOCUMENTS related to GT Nominees Limited, Torvia Limited, or any other shareholder in AMAZONIA RECOVERY LIMITED;

  g. All DOCUMENTS related to the true beneficial OWNERS of the shares of AMAZONIA RECOVERY LIMITED;

  h. All DOCUMENTS, INCLUDING ACCOUNT opening documents and periodic statements, related to all savings, checking, money market, brokerage or any other credit or debit ACCOUNTS belonging to AMAZONIA RECOVERY LIMITED, operated by AMAZONIA RECOVERY LIMITED, CONTROLLED by AMAZONIA RECOVERY LIMITED or for which AMAZONIA RECOVERY LIMITED is a signatory; and

  i. All DOCUMENTS related to any PERSON or ENTITY, who financially supported or invested in, was asked to financially support or invest in, or who offered to financially support or invest in AMAZONIA RECOVERY LIMITED.

  25. All DOCUMENTS evidencing or relating to any past or present trust, corporation, or other ENTITY created to hold, distribute, administer, or otherwise affect any proceeds of the ECUADOR JUDGMENT.

  26. All DOCUMENTS evidencing or relating to any payment, proceeds, compensation, revenue, or any other thing of value YOU have received, contracted to receive, or

# SA958

have been promised related to any aspect of YOUR involvement in the ECUADOR LITIGATION, ECUADOR JUDGMENT, and/or ECUADOR ENFORCEMENT ACTIONS.

27.    All DOCUMENTS evidencing or relating to any attempted or completed sale or transfer of any license, copyright, life rights, trademark, media rights, or other right to exploit, market or publicize any aspect of the ECUADOR LITIGATION, the ECUADOR JUDGMENT, and/or the ECUADOR ENFORCEMENT ACTIONS, and YOUR involvement or the involvement of any other PERSON or ENTITY therein.

28.    All DOCUMENTS evidencing or relating to any actual, contemplated, anticipated, or potential movie, documentary, book, television program, podcast, or other media project relating in any way to the ECUADOR LITIGATION, the ECUADOR JUDGMENT, or the ECUADOR ENFORCEMENT ACTIONS, INCLUDING YOUR role and any value YOU might receive in connection therewith.

29.    All DOCUMENTS evidencing or relating to any payment, compensation, revenue, or any other thing of value YOU have delivered, contracted to deliver, or have promised to any PERSON or ENTITY from any proceeds that may be received from the ECUADOR JUDGMENT or the ECUADOR ENFORCEMENT ACTIONS.

30.    All DOCUMENTS evidencing or relating to any attempted or completed sale, assignment, or transfer of rights, title, claims, or interest of any proceeds or other interest held by YOU, whether directly or indirectly, in the ECUADOR JUDGMENT or the ECUADOR ENFORCEMENT ACTIONS, whether or not such attempt was successful.

31.    All DOCUMENTS evidencing or relating to any distribution of the proceeds from enforcement of the ECUADOR JUDGMENT.

32.   All DOCUMENTS evidencing or relating to any dispute concerning or relating to any monies raised in connection with the ECUADOR LITIGATION, the ECUADOR JUDGMENT, the ECUADOR ENFORCEMENT ACTIONS, and/or the ECUADOR JUDGMENT TRUST, INCLUDING any dispute regarding the beneficiary or beneficiaries of the ECUADOR JUDGMENT and ECUADOR JUDGMENT TRUST.

33.   All DOCUMENTS evidencing or relating to funding commitments in support of the ECUADOR LITIGATION or ECUADOR ENFORCEMENT ACTIONS from any PERSON or ENTITY, INCLUDING from the following:

    a.  Kohn Swift & Graf, P.C.

    b.  Russell DeLeon

    c.  Orin Kramer

    d.  Torvia Limited

    e.  Burford

    f.  88 Capital

    g.  Equitable Outcomes

    h.  Jonaks Limited

    i.  Satee GMBH

    j.  David Sherman III

    k.  Glenn Krevlin

    l.  Michael Donziger

    m.  Russell O. Wiese

    n.  TC Payment Services International

    o.  AMAZONIA RECOVERY LIMITED

# SA960

p. Woodsford Litigation Funding Limited

34.     All DOCUMENTS evidencing or relating to how monies (totaling $32,360,647) shown in the below chart as "commitments" from investors in the ECUADOR LITIGATION were expended, the identification of any ACCOUNTS into which any portion of said monies were deposited, or any specific amounts received or expended by YOU at any time:

## Funding for the Enterprise

| Investor | Investments Contributed | Commitment Amounts[1] |
|---|---|---|
| Kohn Swift & Graf, P.C. | $ 6,360,647 | $ 6,360,647 |
| Russell DeLeon | $ 1,500,000 | $ 2,000,000 |
| Orin Kramer | $ 150,000 | $ 150,000 |
| Torvia Limited | $ 3,413,367 | $ 7,250,000 |
| Burford | $ 4,000,000 | $ 15,000,000 |
| 88 Capital | | $ 250,000 |
| Equitable Outcomes | | $ 150,000 |
| Jonaks Limited | | $ 200,000 |
| Satee GMBH | | $ 300,000 |
| David Sherman III | | $ 250,000 |
| Glenn Krevlin | | $ 250,000 |
| Michael Donziger | | $ 150,000 |
| Russell O. Wiese | | $ 50,000 |
| TC Payment Services International | $ 424,948 | |
| Amazonia Recovery Limited | $ 149,000 | |
| TOTAL | $ 15,997,963 | $ 32,360,647 |

PX 2143     Confidential

[1] Commitment amounts are amounts to be loaned or advanced once indicated in investors' respective funding agreement or "Commitment Amount" or "Capital contributions". Such commitment amount is based upon listed representations of investments contributed in the respective documents, as well as governs ledger and bank records.

PLAINTIFF'S EXHIBIT 2143

Plaintiff's Exhibit 2143  p. 1 of 1
Plaintiff's Exhibit 4900  p. 114 of 144

35.     All DOCUMENTS evidencing or relating to any ACCOUNTINGS, reports, summaries, analyses, statements, ledgers, or any other kind of record relating to how funds received in support of the ECUADOR LITIGATION, ECUADOR JUDGMENT, and/or ECUADOR ENFORCEMENT ACTIONS have been received or expended, INCLUDING

17

**SA961**

anything prepared in response to a demand by the Union of People Affected by Texaco (aka UDAPT) and their agents and representatives.

36.     All DOCUMENTS evidencing or relating to any and all ASSETS, benefits, payments, or things of value that have been or will be conferred, offered, or promised to YOU or any agent, attorney, or representative of YOU or the LAGO AGRIO PLAINTIFFS (INCLUDING attorneys in this action, attorneys in the ECUADOR LITIGATION, Pablo Fajardo Mendoza, Servicios Fromboliere Compania Limitada, Luis Yanza, Julio Prieto Méndez, Juan Pablo Sáenz, Andrew Woods, Aaron Marr Page, Laura Garr, Brian Parker, Joseph Kohn, Patricio Salazar Cordova, Agustin Salazar, Serafin Angel Cajo, and SELVA VIVA), by the REPUBLIC OF ECUADOR, INCLUDING the date, description, medium and purpose of such benefits, payments, or things of value and the identification of all PERSONS and/or ENTITIES involved in, and documents concerning such ASSETS, benefits, payments, or things of value.

37.     All DOCUMENTS evidencing or relating to the current ASSETS or liabilities of the AMAZON DEFENSE FRONT.

38.     All DOCUMENTS evidencing or relating to YOUR current OWNERSHIP interest in AMAZONIA RECOVERY LIMITED.

Dated: April 16, 2018
      New York, New York       GIBSON, DUNN & CRUTCHER LLP

                            By: _____

                            Randy M. Mastro
                            Andrea E. Neuman
                            200 Park Avenue, 47th Floor
                            New York, New York 10166-0193
                            Telephone: 212.351.4000
                            Facsimile: 212.351.4035

                            William E. Thomson

## SA962

333 South Grand Avenue
Los Angeles, California 90071
Telephone: 213.229.7891
Facsimile: 213.229.6891

STERN, KILCULLEN & RUFOLO LLC
Herbert J. Stern
Joel M. Silverstein
325 Columbia Tpke, Ste 110
P.O. Box 992
Florham Park, New Jersey 07932-0992
Telephone: 973.535.1900
Facsimile: 973.535.9664

*Attorneys for Chevron Corporation*

19

## SA963

# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 26th day of June, two thousand and fourteen.

Before:      Christopher F. Droney,
                *Circuit Judge.*

---

Chevron Corporation,
    *Plaintiff-Appellee,*

    *v.*

Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje, Steven Donziger, The Law Offices of Steven R. Donziger, Donziger & Associates, PLLC,
    *Defendants-Appellants,*

Stratus Consulting, Inc., Douglas Beltman, Ann Maest,
    *Defendants-Counter-Claimants,*

Pablo Fajardo Mendoza, *et al.,*
    *Defendants,*

Andrew Woods, Laura J. Garr, H5,
    *Respondents.*

**ORDER**
Docket No. 14-826 (L);
             14-832 (con.)

---

Appellants in 14-826 request leave to file a 29,000-word principal brief. Appellants in 14-832 request leave to file a 21,000-word principal brief. Appellee requests leave to file a single, consolidated, 50,000-word principal brief addressing both appeals.

IT IS HEREBY ORDERED that the requests are GRANTED.

                For the Court:
                Catherine O'Hagan Wolfe,
                Clerk of Court



# SA964

# No. 14-826(L)

### No. 14-832(CON)

---

## In the United States Court of Appeals for the Second Circuit

_____

CHEVRON CORPORATION,

*Plaintiff-Appellee,*

V.

HUGO GERARDO CAMACHO NARANJO, JAVIER PIAGUAJE PAYAGUAJE,
STEVEN DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER,
DONZIGER & ASSOCIATES, PLLC,

*Defendants-Appellants,*

(*caption continues on inside cover*)

_____

On Appeal from the United States District Court for the
Southern District of New York (The Honorable Lewis A. Kaplan)

_____

### CORRECTED BRIEF FOR DEFENDANTS-APPELLANTS STEVEN DONZIGER, THE LAW OFFICES OF STEVEN DONZIGER, AND DONZIGER & ASSOCIATES PLLC

_____

JUSTIN MARCEAU
JOHN CAMPBELL
University of Denver
Sturm College of Law
2255 E. Evans Ave.
Denver, CO 80208
(303) 871-6000

DEEPAK GUPTA
GREGORY A. BECK
JONATHAN E. TAYLOR
Gupta Beck PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741

*Counsel for Defendants-Appellants Steven Donziger,*
*The Law Offices of Steven Donziger, and Donziger & Associates PLLC*

July 16, 2014

# SA966

STRATUS CONSULTING, INC., DOUGLAS BELTMAN, ANN MAEST,

 *Defendants-Counter-Claimants*,

PABLO FAJARDO MENDOZA, LUIS YANZA, FRENTE DE DEFENSA DE LA AMAZONIA, AKA AMAZON DEFENSE FRONT, SELVA VIVA SELVIVA CIA, LTDA, MARIA AGUINDA SALAZAR, CARLOS GREFA HUATATOCA, CATALINA ANTONIA AGUINDA SALAZAR, LIDIA ALEXANDRA AGUIN AGUINDA, PATRICIO ALBERTO CHIMBO YUMBO, CLIDE RAMIRO AGUINDA AGUINDA, LUIS ARMANDO CHIMBO YUMBO, BEATRIZ MERCEDES GREFA TANGUILA, LUCIO ENRIQUE GREFA TANGUILA, PATRICIO WILSON AGUINDA AGUINDA, CELIA IRENE VIVEROS CUSANGUA, FRANCISCO MATIAS ALVARADO YUMBO, FRANCISCO ALVARADO YUMBO, OLGA GLORIA GREFA CERDA, LORENZO JOSE ALVARADO YUMBO, NARCISA AIDA TANGUILA NARVAEZ, BERTHA ANTONIA YUMBO TANGUILA, GLORIA LUCRECIA TANGUI GREFA, FRANCISO VICTOR TRANGUIL GREFA, ROSA TERESA CHIMBO TANGUILA, JOSE GABRIEL REVELO LLORE, MARIA CLELIA REASCOS REVELO, MARIA MAGDALENA RODRI BARCENES, JOSE MIGUEL IPIALES CHICAIZA, HELEODORO PATARON GUARACA, LUISA DELIA TANGUILA NARVAEZ, LOURDES BEATRIZ CHIMBO TANGUIL, MARIA HORTENCIA VIVER CUSANGUA, SEGUNDO ANGEL AMANTA MILAN, OCTAVIO ISMAEL CORDOVA HUANCA, ELIA ROBERTO PIYAHUA PAYAHUAJE, DANIEL CARLOS LUSITAND YAIGUAJE, BENANCIO FREDY CHIMBO GREFA, GUILLERMO VICENTE PAYAGUA LUSITANTE, DELFIN LEONIDAS PAYAGU PAYAGUAJE, ALFREDO DONALDO PAYAGUA PAYAGUAJE, MIGUEL MARIO PAYAGUAJE PAYAGUAJE, TEODORO GONZALO PIAGUAJ PAYAGUAJE, FERMIN PIAGUAJE PAYAGUAJE, REINALDO LUSITANDE YAIGUAJE, LUIS AGUSTIN PAYAGUA PIAGUAJE, EMILIO MARTIN LUSITAND YAIGUAJE, SIMON LUSITANDE YAIGUAJE, ARMANDO WILFRIDO PIAGUA PAYAGUAJE, ANGEL JUSTINO PIAGUAG LUCITANT, KEMPERI BAIHUA HUANI, AHUA BAIHUA CAIGA, PENTIBO BAIHUA MIIPO, DABOTA TEGA HUANI, AHUAME HUANI BAIHUA, APARA QUEMPERI YATE, BAI BAIHUA MIIPO, BEBANCA TEGA HUANI, COMITA HUANI YATE, COPE TEGA HUANI, EHUENGUINTO TEGA, GAWARE TEGA HUANI, MARTIN BAIHUA MIIPO, MENCAY BAIHUA TEGA, MENEMO HUANI BAIHUA, MIIPO YATEHUE KEMPERI, MINIHUA HUANI YATE, NAMA BAIHUA HUANI, NAMO HUANI YATE, OMARI APICA HUANI, OMENE BAIHUA HUANI, YEHUA TEGA HUANI, WAGUI COBA HUANI, WEICA APICA HUANI, TEPAA QUIMONTARI WAIWA, NENQUIMO VENANCIO NIHUA, COMPA GUIQUITA, CONTA NENQUIMO QUIMONTARI, DANIEL EHUENGEI, NANTOQUI NENQUIMO, OKATA QUIPA NIHUA, CAI BAIHUA QUEMPERI, OMAYIHUE BAIHUA, TAPARE AHUA YETE, TEWEYENE LUCIANA NAM TEGA, ABAMO OMENE, ONENCA ENOMENGA, PEGO ENOMENGA, WANE IMA, WINA ENOMENGA, CAHUIYA OMACA, MIMA YETI,

 *Defendants*,

ANDREW WOODS, LAURA J. GARR, H5,

 *Respondents*

# SA967

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................v

INTRODUCTION.............................................................................................. 1

JURISDICTIONAL STATEMENT ................................................... 3

STATEMENT OF THE ISSUES........................................................ 4

STATEMENT ......................................................................................... 5

I.    For two decades, Ecuadorian rainforest communities seek—and ultimately win—a judgment holding Chevron responsible for dumping billions of gallons of toxic waste into the Amazon................... 5

    A.    Chevron pollutes the Ecuadorian Amazon (1970s & 1980s)......................................................................................... 5

    B.    Ecuadorians bring an environmental case against Chevron in New York, and Chevron convinces the court to dismiss the case by promising to satisfy any Ecuadorian judgment against it (1993-2002) ................................................. 8

    C.    Disregarding its promises to this Court, Chevron repeatedly tries to thwart the Ecuadorian case (2003-2010).......................................................................................11

    D.    Hundreds of site inspections and expert reports—including those from Chevron's own experts—confirm Chevron violated the law (2006-10)..........................................20

    E.    Chevron shifts its strategy to collateral attacks outside Ecuador and adopts the "demonize Donziger" playbook (2007-2011)..............................................................................21

    F.    Chevron obtains unprecedented discovery in U.S. courts .........24

    G.    Chevron uses the vast "universe" of documents it obtained in discovery to carry out its "demonize Donziger" strategy ...................................................29

    H.    The Ecuadorian court enters a preliminary judgment against Chevron (February 2011)..............................................33

# SA968

I.     The Ecuadorian court clarifies its judgment (March 2011)........36

J.     Chevron declines to challenge the preliminary judgment under Ecuador's Collusion Prosecution Act ..............................36

K.     An Ecuadorian three-judge court reviews the case de novo and enters a substitute judgment against Chevron (2012).................................................................................38

L.     The Ecuadorian Supreme Court grants "cassation" review, affirms liability, and reduces damages (2013) ...............39

II.   Chevron brings this action as yet another collateral, preemptive attack on enforcement of the Ecuadorian judgment ..............................40

A.     Chevron files this action............................................40

B.     The district court grants a temporary restraining order ...........42

C.     The district court issues a worldwide injunction......................44

D.     This Court, in *Chevron v. Naranjo*, promptly reverses the injunction and orders dismissal of the severed ninth claim ........46

E.     Chevron immediately attempts to evade *Naranjo* ......................47

F.     The district court refuses to allow the defendants to drop their collateral-estoppel defenses .................................................48

G.     The court allows Chevron to drop its "sham litigation" claim.................................................................................48

H.     Chevron forces Donziger to proceed *pro se* and drops its damages claim on the eve of trial to avoid a jury......................50

III.  After a seven-week bench trial, the district court again issues a decision preemptively nullifying the Ecuadorian judgment ..................51

A.     The court holds a seven-week bench trial.................................51

1.     Chevron's allegations of impropriety regarding the judgment.................................................................52

## SA969

2.    Chevron's allegations of fraud regarding the
Cabrera Report.................................................................61

3.    Chevron's allegation that the Ecuadorian judiciary
is corrupt.......................................................................64

B.    The court issues its decision ...................................................65

STANDARD OF REVIEW ...................................................................... 67

SUMMARY OF ARGUMENT.................................................................. 68

ARGUMENT ............................................................................................ 69

I.    Because Chevron lacks standing, the district court lacked
jurisdiction to issue its opinion and judgment. ......................................69

A.    Chevron cannot show that the alleged trial-level
misconduct caused the substitute judgment of the three-
judge appellate court...............................................................72

1.    The appellate court's substitute judgment—the
product of a de novo review of the record—breaks
any causal link between alleged trial-level
improprieties and Chevron's injuries.............................73

2.    The district court's conclusion about the standard of
review contradicts Ecuador's highest court on a
question of Ecuadorian appellate procedure. .................75

B.    Chevron failed to demonstrate any concrete injuries that
could be redressed by the relief sought. .....................................79

C.    Because the district court lacked jurisdiction to hear this
case, its findings—particularly findings related to
professional misconduct—should be vacated. ...........................82

II.    Chevron's collateral attack on the Ecuadorian judgment violates
bedrock international-comity principles and is authorized by
neither state nor federal law. ................................................................84

A.    The district court's "non-statutory" analysis provides no
legitimate basis to circumvent *Naranjo*.......................................86

B. The federal RICO statute does not provide a vehicle for collaterally attacking a judgment—let alone the judgment of a foreign sovereign's court system. ........................................94

III. Chevron's wholesale attack on the integrity and competence of the Ecuadorian judiciary is foreclosed by judicial estoppel, offensive to international comity, and contradicted by Chevron's own evidence. ................................................................99

A. Chevron's arguments that Ecuador's judiciary is systemically unfair are estopped by its directly contrary stance during the *Aguinda* litigation. .........................100

B. Chevron's promise to submit to Ecuadorian jurisdiction further estops it from arguing that it should not be subject to the Ecuadorian judgment, and the defenses it reserved do not apply here. ................................................103

C. Chevron's own evidence suggests that Ecuador's situation has improved since the time Chevron characterized its judiciary as adequate and promised to submit to its jurisdiction. ..........................................................105

IV. Even setting aside the lack of jurisdiction or legal authority, Chevron had no cause of action under RICO and RICO does not authorize any of the relief granted by the district court. .....................110

A. The relief granted by the district court pushes RICO's already strained language far beyond the breaking point. .......110

B. The district court did not find that Chevron satisfied RICO's statutory prerequisites for a private right of action. ..................................................................113

C. The absence of any authorization for equitable relief in RICO's civil-remedies provision, far from justifying a judgment for Chevron, is an independent reason for rejecting Chevron's claims. ....................................................116

CONCLUSION ...............................................................119

# SA971

## TABLE OF AUTHORITIES

**Cases**

*Aguinda v. Texaco*, 945 F. Supp. 626 (S.D.N.Y. 1996) ............................................... 8

*Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534 (S.D.N.Y. 2001) ..................... 9, 10, 76

*Aguinda v. Texaco, Inc.*, 303 F.3d 470 (2d Cir. 2002) ........................................ passim

*Anza v. Ideal Steel Corporation*, 547 U.S. 451 (2006) ................................................ 114

*Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d
   103 (2d Cir. 2001) ...................................................................................................... 99

*Banco Do Brasil v. Madison S. S. Corp.*, 307 N.Y.S.2d 341 (N.Y. Sup. Ct.
   1970) .......................................................................................................................... 90

*Bank Melli Iran v. Pahlavi*, 58 F.3d 1406 (9th Cir. 1995) ....................................... 109

*Bechtel v. Competitive Technologies, Inc.*, 448 F.3d 469 (2d Cir. 2006) ....................... 67

*Bridgeway Corp. v. Citibank*, 201 F.3d 134 (2d Cir. 2010) ............................... 101, 109

*Chevron Corp. v. Donziger*, 768 F.Supp.2d 581 (S.D.N.Y. 2011) ........................ 44, 45

*Chevron v. Naranjo*, 667 F.3d 232 (2d Cir. 2012) ............................................... passim

*CIBC Mellon Trust Co. v. Mora Hotel Corp. N.V.*, 792 N.E.2d 155 (N.Y.
   2003) .......................................................................................................................... 89

*Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138 (2013) ............................................... 80

*Crouse v. McVickar*, 100 N.E. 697 (N.Y. 1912) ........................................................ 90

*Cunningham v. BHP Petroleum Great Britain PLC*, 427 F.3d 1238 (10th Cir.
   2005) .......................................................................................................................... 82

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) ................................................ 70

*Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006) ..................................... 113

*Diorinou v. Mezitis*, 237 F.3d 133 (2d Cir. 2001) ...................................................... 76

*Earle v. McVeigh*, 91 U.S. 503 (1875) ........................................................................ 82

# SA972

*Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460 (D.N.J. 1998)...........................95

*Erie R.R. v. Tompkins*, 304 U.S. 64 (1938) .......................................................76, 88

*Evans Prods. Co. v. West Am. Ins. Co.*, 736 F.2d 920 (3d Cir.1984) ..........................93

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994) ..................114

*Gaubert v. Fed. Home Loan Bank Bd.*, 863 F.2d 59 (D.C. Cir. 1988) ..........................98

*Grossman v. Johnson*, 674 F.2d 115 (1st Cir. 1982)....................................................98

*Guaranty Trust v. York*, 326 U.S. 99 (1945)................................................................88

*Gulf Petro Trading Co. v. Nigerian Nat'l Petroleum,* 512 F.3d 742 (5th Cir. 2008)...........................................................................................................................96

*Hendrick v. H.E. Avent*, 891 F.2d 583 (5th Cir. 1990) ...............................................98

*Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992)...........................................114

*Homola v. McNamara*, 59 F.3d 647 (7th Cir. 1995) ...................................................95

*Hubbard v. Haley*, 262 F.3d 1194 (11th Cir. 2001)....................................................98

*In re Application of Chevron Corp.*, 709 F. Supp. 2d 283 (S.D.N.Y. 2010)...................26

*In re Application of Chevron Corp.*, 749 F. Supp. 2d 135 (S.D.N.Y. 2010)..............26, 27

*In re Application of Chevron Corp.*, No. 3:10-cv-00686, Dkt. 108 (M.D. Tenn. Sept. 21, 2010)..............................................................................................92

*In re Application of the Republic of Ecuador re Diego Borja*, No. C 10-00112 (N.D. Cal.).............................................................................................................17

*In re Chevron Corp.*, 633 F.3d 153 (3d Cir. 2011)......................................................24

*In re Goldstein*, 430 F.3d 106 (2d Cir. 2005).............................................................83

*In re Robinson,* 151 A.D. 589, 136 N.Y.S. 548 (1st Dept.1912) ................................83

*Intellivision v. Microsoft Corp.*, 484 F. App'x 616 (2d Cir. 2012)................................68

*Jota v. Texaco, Inc.*, 157 F.3d 153 (2d Cir. 1998) ...................................................... 9

# SA973

*Kamilewicz v. Bank of Boston Corp.*, 92 F.3d 506 (7th Cir. 1996) ...............................95

*Keach v. Cnty. of Schenectady*, 593 F.3d 218 (2d Cir. 2010)........................................83

*Khallad v. Blanc*, 947 N.Y.S.2d 859 (N.Y. App. Div. 2012) ....................................90

*Knight v. Mooring Capital Fund, LLC*, 749 F.3d 1180 (10th Cir. 2014) ......................94

*Lapin v. Shulton, Inc.*, 333 F.2d 169 (9th Cir. 1964)....................................................90

*Leon v. Million Air, Inc.*, 251 F.3d 1305 (11th Cir. 2011).......................................110

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)......................................... 72, 73, 79

*Maharaj v. Bankamerica Corp.*, 128 F.3d 94 (2d Cir. 1997) ....................................101

*Manez v. Bridgestone Firestone N. Am. Tire*, 533 F.3d 578 (7th Cir. 2008)....................91

*McDonald v. McDonald*, 239 N.Y.S. 533 (N.Y. 1930) .................................................90

*McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d. Cir. 2008)................................113

*Motorola Credit Corp. v. Uzan*, 322 F.3d 130 (2d Cir. 2003) ....................................114

*Murray v. Schooner Charming Betsy*, 6 U.S. 64 (1804)...................................................98

*National Org. for Women, Inc. v. Scheidler*, 267 F.3d 687 (7th Cir. 2001)............118, 119

*New Hampshire v. Maine*, 532 U.S. 742 (2001) ................................................101, 102

*Oscar v. Univ. Students Coop. Ass'n*, 965 F.2d 783 (9th Cir. 1992) ...........................113

*Overseas Dev. Bank in Liquidation v. Nothmann*, 480 N.Y.S.2d 735 (N.Y. App. Div. 1984)................................................................................89

*Pennzoil v. Texaco*, 481 U.S. 1 (1987).......................................................................91

*Pinkley v. City of Frederick*, 191 F.3d 394 (4th Cir. 1999) ...........................................93

*Polur v. Raffe*, 912 F.2d 52 (2d Cir. 1990) ...............................................................95

*Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076 (9th Cir. 1986) ...........................117

*Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384 (2d Cir. 2011)......................passim

# SA974

*Republic of Ecuador v. ChevronTexaco Corp.*, 269 F. App'x 124 (2d Cir. 2008) .................................................................................. 21

*Republic of Ecuador v. ChevronTexaco Corp.*, 499 F. Supp. 2d 452 (S.D.N.Y. 2007) .................................................................................. 21

*Republic of Ecuador v. TestAmerica Labs. Inc.*, No. 4:11-mc-00088 (N.D. Fla.) .................................................................................. 18

*Rodriguez v. Doral Mortgage Corp.*, 57 F.3d 1168 (1st Cir. 1995) ................. 93

*Rose Hall, Ltd. v. Chase Manhattan Overseas Banking Corp.*, 576 F. Supp. 107 (D. Del. 1983) ........................................................... 92

*Schultz v. Boy Scouts of America, Inc.*, 480 N.E.2d 679 (N.Y. 1985) ............. 92

*Sedima S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479 (1985) ........... 115, 117, 118

*Sheppard v. River Valley Fitness One, L.P.*, 428 F.3d 1 (1st Cir. 2005) ......... 83

*Smith v. Bayer*, 131 S. Ct. 2368 (2011) ................................................. 91

*Sosa v. DIRECTV, Inc.*, 437 F.3d 923 (9th Cir. 2006) ........................... 112

*Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178 (2d Cir. 2008) ........... 67, 116

*State Farm Mutual Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) ............. 40

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ......................... 82

*Trane Co. v. O'Connor Sec.*, 718 F.2d 26 (2d Cir. 1983) ............................ 118

*Trebilcox v. McAlpine*, 17 N.Y.S. 221 (N.Y. App. Div. 1891) ...................... 90

*United States v. Aluminum Co. of Am.*, 148 F.2d 416 (2d Cir. 1945) ............. 99

*Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138 (2d Cir. 2005) ................... 68

*Veltze v. Bucyrus-Erie Co.*, 154 F.R.D. 214 (E.D. Wis. 1994) ..................... 91

*Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623 (1977) ............................. 91

*Vinokur v. Penny Lane Owners Corp.*, 703 N.Y.S.2d 35 (N.Y. App. Div. 2000) .................................................................................. 89

# SA975

*Yahoo! v. La Ligue Contre Le Racisme*, 433 F.3d 1199 (9th Cir. 2006)..........................91

*Zimmermann, Inc. v. Challoner*, 423 U.S. 3 (1975) .......................................................92

## Constitutional Provisions

U.S. Const. amend. VII .........................................................................................................50

## Statutes

9 U.S.C. § 201 ......................................................................................................................97

18 U.S.C. § 1962...................................................................................................................41

18 U.S.C. § 1964............................................................................................ 112, 116, 119

28 U.S.C. § 1291................................................................................................................... 4

28 U.S.C. § 1331................................................................................................................... 3

28 U.S.C. § 1332................................................................................................................... 3

28 U.S.C. § 1782...............................................................................................................19, 24

28 U.S.C. § 2283...................................................................................................................91

*Código de Procedimiento Civil*, art. 288.........................................................................14

*Código de Procedimiento Civil*, art. 838.........................................................................73

N.Y. C.P.L.R. 5303 ...............................................................................................................89

N.Y. C.P.L.R. 5304(b)(6)......................................................................................................97

## Rules

Federal Rule of Appellate Procedure 4(a) ....................................................................... 3

Federal Rule of Civil Procedure 15(b) ..............................................................................93

Federal Rule of Civil Procedure 39(a)(2)...........................................................................50

Federal Rule of Civil Procedure 44.1 ................................................................................75

Federal Rule of Civil Procedure 60, 1946 Advisory Comm. Notes.................................98

## SA976

Federal Rule of Civil Procedure 61 ....................................................71

**Books and Articles**

José Rafael Bustamente, *Ecuador*, *in Civil Appeal Procedures Worldwide* 262 (Charles Platto ed., 1992) ................................................................74

Lee Coppola & Nicolas DeMarco, *Civil RICO: How Ambiguity Allowed the Racketeer Influenced and Corrupt Organizations Act to Expand Beyond Its Intended Purpose*, 38 New Eng. J. on Crim. & Civ. Confinement 241 (2012) ...............................................................................................111

Mary Cuddehe, *A Spy in the Jungle*, The Atlantic, Aug. 2, 2010, *available at* http://bit.ly/1pUKToW................................................................32

Jose Delreal, *Michele Bachmann: Obama rewrote Constitution*, Politico (Dec. 3, 2013) ........................................................................................106

William Finnegan, *The Secret Keeper*, The New Yorker, Oct. 19, 2009, *available at* http://nyr.kr/UZ94Hf...................................................32

Ted Folkman, *Chevron, Lobbying, and Lago Agrio*, Letters Blogatory (Oct. 4, 2013) ........................................................................................108

Christopher Helman, *Chevron's Expensive Problems*, Forbes, Mar. 4, 2013 issue, *available at* http://onforb.es/1fFj3nk ...................................25

Patrick Radden Keefe, *Reversal of Fortune*, The New Yorker, Jan. 9, 2012, *available at* http://nyr.kr/1wuTEbd. ......................................8, 21

Doug M. Keller, *Interpreting Foreign Law Through an Erie Lens*, 40 Tex. Int'l L. J. 157 (2004) ........................................................................76

Judith Kimerling, *Amazon Crude* 33 (1991)..........................................5

Judith Kimerling, *Disregarding Environmental Law: Petroleum Development in Protected Natural Areas and Indigenous Homelands in the Ecuadorian Amazon*, 14 Hasting Int'l & Comp. L. Rev. 849 (1991)....................................5

Clifford Krauss, *Revelation Undermines Chevron Case in Ecuador*, N.Y. Times, Oct. 30, 2009, *available at* http://nyti.ms/T9R1Ne ................16

# SA977

John H. Langbein, *The German Advantage in Civil Procedure*, 52 U. Chi. L. Rev. 823 (1985) ..................................................................................74

John Henry Merryman & Rogelio Pérez-Perdomo, *The Civil Law Tradition: An Introduction to the Legal Systems of Western Europe and Latin America* 121 (3d ed. 2007) ..................................................................74

Ralph Nader, *The Rule of Law or the Rule of Men?*, The Huffington Post (Feb. 5, 2013) ...............................................................................106

Simon Romero & Clifford Krauss, *Chevron Offers Evidence Of Bribery Scheme In Ecuador Lawsuit*, N.Y. Times, Sept. 1, 2009, *available at* http://nyti.ms/1qJV15Q .......................................................................16

Charles Wright & Arthur Miller, *Federal Practice & Procedure* (3d ed. 2014) ............................................................................76, 90

SA978

## INTRODUCTION

For the second time, the district court has granted Chevron an extraordinary injunction. It bars collection anywhere on the globe of an Ecuadorian court's judgment in favor of Ecuadorian citizens, based on Ecuadorian law, arising from pollution of the Ecuadorian rainforest. Last time, this Court warned the district court not to sit as a "transnational arbiter" and "dictate to the entire world which judgments are entitled to respect and which countries' courts are to be treated as international pariahs." *Chevron v. Naranjo*, 667 F.3d 232, 242 (2d Cir. 2012). This time, Chevron circumvented that warning by painting the rainforest communities' two-decade-long quest for justice as a RICO conspiracy.

Drawing on its bottomless war chest, Chevron has shifted the focus from its own wrongdoing in the Amazon to trumped-up allegations of corruption and misconduct against the Ecuadorian trial judge, advocates for the rainforest communities, and every branch of Ecuador's government. In pursuing this effort, Chevron has left no stone unturned, amassing staggering discovery—hundreds of hours of raw footage from a documentary filmmaker, two decades' worth of litigation files, and even the personal diary of the American lawyer, Steven Donziger, at whom Chevron takes principal aim. Chevron's strategy, in its own words: "demonize Donziger."

# SA979

The scale of Chevron's efforts to avoid compensating its victims is breathtaking. But nobody should lose sight of the one thing that Chevron has chosen *not* to litigate: the fact that Chevron dumped billions of gallons of toxic waste accross a region roughly the size of Rhode Island. Instead, Chevron has sought to reduce this long-running controversy to allegations that an expert report was prepared improperly and that an Ecuadorian trial judge was influenced inappropriately. As to the first, Ecuador's Supreme Court found that Chevron could point to no law or procedure that had been violated. As to the second, Chevron's case rested on a paid witness who admitted to making false statements to sweeten his deal with Chevron—a deal that has netted him well over a million dollars in benefits. If anyone here is guilty of bribery, it isn't Steven Donziger.

But the bigger problem with Chevron's alleged trial-level improprieties is that they have nothing to do with the Ecuadorian judgment that Chevron is attacking. A three-judge appellate court in Ecuador, consistent with the nation's civil-law system, conducted a de novo review of the full record—the equivalent of a retrial—and produced a substitute judgment. Chevron is akin to a criminal defendant who has been given a retrial and has been convicted again but still complains of alleged irregularities in the first trial.

Aware of this fatal causation problem, the district court had a backup argument. Just as it did the last time, the court condemned the entire Ecuadorian

## SA980

judiciary, top to bottom, as incapable of producing decisions worthy of respect. And it did so based on the testimony of an avowed political opponent of Ecuador's current president. The district court's unseemly display of American judicial imperialism is bad enough, and has already caused diplomatic friction. But it is intolerable in light of the history of this litigation: The only reason the case was tried in Ecuador in the first place is that Chevron got what it asked for.

For nearly a decade, Chevron showered praise on Ecuador's judiciary, extolling its virtues to persuade this Court to move the case from New York to Ecuador. That effort succeeded, but only after Chevron promised to satisfy any Ecuadorian judgment subject only to the right to raise a defense in future enforcement proceedings. That promise has to mean something. Because it is "enforceable against Chevron in . . . any future proceedings between the parties," *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 389 n.4 (2d Cir. 2011), it should preclude Chevron from once again changing the forum and stringing its victims along across decades, courtrooms, and continents.

## JURISDICTIONAL STATEMENT

The district court asserted subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1332. The appellants in No. 18-826 timely appealed on April 1, 2014 from the district court's opinion and judgment of March 4, 2014. Fed. R. App. P. 4(a). As explained in the argument below, the district court lacked subject-matter

# SA981

jurisdiction because Chevron lacks Article III standing. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    In light of the Ecuadorian appellate court's substitute judgment and the lack of any concrete injury to Chevron that is likely to be redressed by the district court's judgment, does Chevron lack Article III standing?

2.    In light of *Chevron v. Naranjo*, 667 F.3d 232 (2d Cir. 2012), and principles of international comity, is Chevron's preemptive collateral attack on the substitute Ecuadorian judgment permissible under the common law or RICO?

3.    Is Chevron's wholesale attack on the Ecuadorian judiciary foreclosed by judicial estoppel and international-comity principles and contradicted by Chevron's own evidence?

4.    Given RICO's injury and causation requirements and the absence of any authorization for equitable relief, should the district court have dismissed Chevron's RICO claims in their entirety?

# SA982

## STATEMENT

**I.    For two decades, Ecuadorian rainforest communities seek—and ultimately win—a judgment holding Chevron responsible for dumping billions of gallons of toxic waste into the Amazon**

### A.    Chevron pollutes the Ecuadorian Amazon (1970s & 1980s)

From 1972 to 1990, Chevron drilled for oil in an area of the Ecuadorian rainforest roughly the size of Rhode Island.[1] The *Oriente* region, where this drilling took place, had been "known and revered for [its] high levels of biological diversity" and was "surely the richest biotic zone on Earth."[2] It also "has a rich heritage of indigenous cultures, and is home to eight groups of indigenous people" who have lived in the region "for thousands of years in harmony with their rain forest environment."[3]

Rather than take special care to protect this region, Chevron dug hundreds of unlined waste pits into the jungle floor and filled them with toxic drilling muds and other oil-field waste, including a host of well-known carcinogens—contrary to the prevailing industry practice of pumping waste back into well cavities deep

---

[1] Although it was Texaco that owned and operated the oil fields in Ecuador, Texaco became a wholly owned subsidiary of Chevron in 2001, and between 2001 and 2005 the combined company was known as ChevronTexaco. *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 387 n.1 (2d Cir. 2011). We refer to both companies as "Chevron" unless otherwise noted.

[2] Judith Kimerling, *Amazon Crude* 33 (1991).

[3] Judith Kimerling, *Disregarding Environmental Law: Petroleum Development in Protected Natural Areas and Indigenous Homelands in the Ecuadorian Amazon*, 14 Hasting Int'l & Comp. L. Rev. 849, 853 (1991).

# SA983

underground, where the waste can't harm the environment. Because the pits were unlined, Chevron's toxic chemicals leached into the surrounding soils and groundwater. And Chevron built pipes into the sides of many of its pits so the toxic contents could easily flow into nearby streams relied on by the local population for drinking water. By design, Chevron's drilling activities discharged billions of gallons of toxic production water directly into the local waterways of the Amazon basin.

Chevron does not contest any of these facts. To the contrary, Chevron has admitted that it dumped three million gallons of production waters daily into Amazon waterways, totaling 15.834 billion gallons. A-3139.202. And Chevron's internal memoranda reveal that the company eschewed modern waste-management practices used in the United States in favor of cheaper, outdated, and dangerous methods—which Chevron's own investigators concluded "cannot be considered 'good practice.'" A-1910. An internal memo from 1980, for example, notes that Chevron had studied "the cost and necessity of eliminating possible contamination of the environment by the earthen pits used in the drilling, producing, and workover operations in the *Oriente* Region." A-2072. Even though the unlined pits fell below industry standards, the memo "recommended that the pits neither be fenced, lined, or filled"—solely because of "cost" (less than $5 million). A-2072-73.

# SA984

Another memo, written by a Texaco executive in 1972, directed company employees to take steps to conceal misconduct by not reporting oil spills and other environmental incidents unless the media or government became independently aware of them: "Only major events … are to be reported. … A major event is further defined as one which attracts the attention of press and/or regulatory authorities." A-2071. The memo also ordered the destruction of records: "No reports are to be kept on a routine basis and all previous reports are to be removed … and destroyed." *Id.* These policies remained in effect throughout the relevant period.

Two decades later, as it was winding down operations in Ecuador in the early 1990s, Chevron commissioned a study that found "contamination of soil and water … at well sites, production stations and along roadways, flowlines and secondary pipelines." A-2306. It also found evidence of oil spills at 97% of the sites assessed—158 out of 163—and numerous violations of Ecuadorian law. A-3182-85. The firm that conducted the study recommended that Chevron conduct a comprehensive environmental investigation to determine the full scope of the company's liability. A-3187. Chevron never did so.

Instead, Chevron fled the country, leaving behind hundreds of open pits full of toxic sludge in the backyard of the Amazonian communities. A-2333. These communities, which depend on local waterways for virtually every facet of their

# SA985

lives, have been continuously exposed to toxic and hazardous chemicals not only through their drinking water, but also by cooking, bathing, and washing with contaminated water, by consuming contaminated fish and livestock, and in numerous other ways. *Id.* The harm done by this ongoing exposure can "be measured in cancer deaths, miscarriages, birth defects, dead livestock, sick fish, and the near-extinction of several tribes." Patrick Radden Keefe, *Reversal of Fortune*, The New Yorker, Jan. 9, 2012, *available at* http://nyr.kr/1wuTEbd.

### B.   Ecuadorians bring an environmental case against Chevron in New York, and Chevron convinces the court to dismiss the case by promising to satisfy any Ecuadorian judgment against it (1993-2002)

In 1993—one year after Chevron shuttered its Ecuadorian operations—the victims of its pollution (indigenous people and farmers, known as the *afectados*) sued Chevron in the Southern District of New York, alleging that they and their families had various physical injuries and seeking relief to redress environmental contamination. *See Aguinda v. Texaco*, 945 F. Supp. 626 (S.D.N.Y. 1996).

For the next nine years, Chevron fought vigorously to have the case dismissed on *forum non conveniens* grounds, heaping praise on the Ecuadorian judiciary and swearing by its impartiality and independence.[4] "Ecuador's courts,"

---

[4] Chevron went so far as to "work[] with" the Ecuadorian ambassador to the United States to ghostwrite a letter to the State Department requesting that it support dismissal. A-410. The letter argued that litigating the case in New York

# SA986

Chevron maintained, "conduct and adjudicate cases filed by or against multinationals and oil companies in a fair and impartial manner"; a "history of corruption-free litigation" would "assure a fair adjudication if plaintiffs refile their claims in Ecuador." *Aguinda*, RJN Ex. A at 3 (S.D.N.Y. Apr. 24, 2000). In 1996, the district court (Rakoff, *J.*) granted Chevron's motion to dismiss. *Id.* But this Court reversed, holding that the case may not be dismissed on *forum non conveniens* grounds unless Chevron submitted itself to jurisdiction in Ecuador. *Jota v. Texaco, Inc.*, 157 F.3d 153, 155, 159-60 (2d Cir. 1998).

On remand, Chevron "provided the missing commitment" to submit to the Ecuadorian courts and "renewed its motion to dismiss." *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 538 (S.D.N.Y. 2001). It "unambiguously agreed in writing to being sued on [the plaintiffs'] claims (or their Ecuadorian equivalent) in Ecuador, to accept service of process in Ecuador, and to waive for 60 days after … dismissal any statute of limitations-based defenses that may have matured since the filing of the [case]." *Id.* at 539. Chevron "also offered to satisfy any judgments in Plaintiffs' favor, reserving its right to contest their validity only in the limited circumstances

"would do violence to the international procedural system" because U.S. courts "lack the authority and knowledge needed to consider and judge matters concerning foreign laws and their application," which should "belong[] exclusively to Ecuadorian courts." A-347-48; A-411; A-417. The letter also explained that it "would be highly offensive" and "false" if a U.S. court were to hold that litigants "cannot expect a fair hearing in Ecuadorian courts." A-418.

# SA987

permitted by New York's Recognition of Foreign Country Money Judgments Act," N.Y. C.P.L.R. §§ 5301-09 (hereafter "Recognition Act"). *Republic of Ecuador*, 638 F.3d at 389.

Relying on these promises, the district court again dismissed the case. It held that the case has "everything to do with Ecuador and nothing to do with the United States," that Ecuador's judiciary provides the "modicum of independence and impartiality necessary to an adequate alternative forum," and that "the courts of Ecuador are in the best position to find and apply their own law." *Aguinda*, 142 F. Supp. 2d at 537, 545-46, 552.

This Court affirmed. It rejected the plaintiffs' criticism of Ecuador's judiciary as "subject to corrupt influences" and "incapable of acting impartially," and "found Ecuador to be an adequate forum for hosting tort suits" because its courts are "sufficiently independent and impartial to provide due process." *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 475, 477-78 (2d Cir. 2002). In granting Chevron its requested relief and relying on its promises, this Court adopted those promises, which then became "enforceable against Chevron in ... any future proceedings between the parties." *Republic of Ecuador*, 638 F.3d at 389 n.4. As a result, the Recognition Act is "the sole reserved route for Chevron to challenge any final judgment resulting from the Lago Agrio litigation." *Id.* at 399.

# SA988

## C. Disregarding its promises to this Court, Chevron repeatedly tries to thwart the Ecuadorian case (2003-2010)

The *Aguinda* plaintiffs then did exactly what Chevron had said it wanted them to do. In 2003, they refiled their claims against Chevron in the *Corte Provincial de Justicia de Sucumbíos*—a small courthouse in Lago Agrio, Ecuador, a town that once served as a hub of Chevron's Ecuadorian operations. *See id.* at 390 n.5. But Chevron—now outside the reach of this Court—immediately broke its promise and contested jurisdiction in Ecuador. And early on, Chevron lawyer Ricardo Reis Veiga tried to torpedo the litigation by persuading the country's Attorney General to call the trial judge and urge him to throw out the lawsuit. *See, e.g.*, A-422-23. When a reporter later asked what forum Chevron preferred, a company spokesperson answered: "We didn't want to get sued, period. We don't want to be in any court, much less a court with respect to this kind of claim, which we consider to be frivolous." ECF No. 47-21.

As it would turn out, this was only the beginning. Time and again, as the Ecuadorian case moved forward, Chevron sought to delay or corrupt the proceedings by manipulating testing sites, clogging the courts with repetitive filings, and forcing the recusal of judges who were either unable to keep up with Chevron's document-dump strategy or were falsely accused by Chevron of accepting bribes.

**1. *The judicial site inspections.*** At the heart of the Ecuadorian environmental case against Chevron was a series of dozens of "judicial site

inspections"—where, under the supervision of the judge, the parties' experts collected soil and water samples at the well sites and operating stations, while attorneys for both sides made public arguments and submitted evidence. SPA-64; A-1039. During these inspections, the parties hand-submitted an enormous number of documents to the court. This process was not always orderly, and although these documents were supposed to be logged into the official record, the court's small administrative support staff often struggled to keep up and frequently made mistakes. On one occasion, for example, Chevron filed dozens of motions on a single day—four of which were not logged into the official record. The staff bunched the documents they received into small stacks (or *cuerpos*) that were "sewed with a thick thread" or "fixed with elastic bands to avoid scattering around" and then manually maintained over an eight-year period. ECF No. 1413-10. By the end, the record exceeded 200,000 pages.

**2. *Testing-site manipulation*.** Chevron went to great lengths to sabotage the site inspections. It conducted secret pre-inspection testing of various sites to pre-determine "safe" sampling locations within the contemplated inspection sites, hoping to conceal the true extent of the contamination. A-1874.

Chevron's experts once secretly conducted pre-inspection sampling at a critical site called Guanta Station. A-3209-10. What they found worried them: Their sampling revealed unusually high levels of contamination, including high

# SA990

levels of arsenic, chromium, and polycyclic aromatic hydrocarbons (or PAHs, many of which are well-known carcinogens). *Id.* This was particularly worrisome to Chevron because the Guanta site was one of the last fields discovered and developed. If it was contaminated because of substandard practices, then all sites were likely contaminated. *See* A-3210.

So Chevron requested that the Ecuadorian court cancel the Guanta inspection. But it didn't stop there: The day before the inspection was set to take place, Chevron's lawyers rushed to the court armed with what the company claimed was a military intelligence report calling for the suspension of the inspection to avert a threatened riot. A-1091-93; A-1918; A-2080. That report, it later became clear, was fake. An investigation by an Ecuadorian intelligence agency confirmed that the report had been improperly obtained at the request of Chevron's security officer—unsupported by actual intelligence. A-1920. The agency further explained that it had never received or reported any threat in connection with the scheduled inspection. *Id.* Nevertheless, Chevron's ploy worked: Unaware that the report was bogus, the Court granted Chevron's last-minute request and suspended the inspection, causing substantial delay.

**3.  *Chevron's document-dump strategy.*** Chevron's gamesmanship extended beyond the systematic disruption and delay of the discovery process. It was also designed to create the appearance of supposedly unfair treatment and

# SA991

due-process violations. One example is Chevron's vexatious document-dump strategy, which aimed to take advantage of a unique feature of Ecuadorian law—the statutory requirement that a judge must act on any motion within three days. Any judge who fails to do so may be recused from the case, while any who takes more than nine days must withdraw.[5]

Chevron abused this obscure procedural rule by repeatedly filing multiple motions to delay the proceedings and force successive judges who presided over the case to withdraw. To give just two examples: On August 5, 2010, minutes before the court closed, Chevron filed 17 motions in rapid-fire succession, the majority of which challenged the same ruling. A-1934-2013. And on October 14, 2010, Chevron filed 39 motions within a 50-minute window, each one separately addressing different aspects of a court order issued three days earlier. A-2014. Notably, only 35 of these motions made it into the official court record—an illustration of the difficulty the court's tiny administrative staff had in formally processing all the paper thrust upon it.[6]

---

[5] *Código de Procedimiento Civil*, art. 288 (requiring that "court orders [be issued] within three days"); *id.* art. 856 (providing for recusal of judge if "[h]e does not hear the case within three times the time period provided for by law").

[6] As the Republic of Ecuador recently explained, "*Cuerpo* 1989 ends with Chevron's Motion filed at 5:44 PM—the 35th of 39 Chevron filed that evening. *Cuerpo* 1990 starts with the Court's Order addressing those 39 motions." A-2168 at n.35.

# SA992

Chevron's filings were also regularly accompanied by the submission of thousands of documents. Any court would have difficulty handling this deluge, and the Ecuadorian court was no exception. It found that Chevron's tactic was improper and that most of its massive submissions were irrelevant or time-barred. Yet the tactic has persisted throughout this sprawling litigation: As the three-judge *Corte Provincial* would later note in criticizing Chevron's "abusive," "overtly aggressive[,] and hostile" approach, the many "thousands [of] documents submitted by Chevron Corporation bloated the case … so much that at this stage alone there were almost two hundred record binders (about twenty thousand pages), not counting the more than two hundred thousand papers in the first instance case." A-454; A-467.

**4. *Chevron's first concocted "bribery" allegation.*** In an effort to cause the presiding judge's removal from the case—this time on the eve of an anticipated judgment—a long-time Chevron contractor named Diego Borja and a convicted felon named Wayne Hansen sought to entrap the judge (Judge Núñez) in an elaborate "bribery" scheme in which he was secretly videotaped. Based on the recording, Chevron launched a public-relations campaign accusing Judge Núñez of bribery. It triumphantly declared in August 2009 that it had obtained recordings "reveal[ing] a $3 million bribery scheme implicating" the judge presiding over the case. Chevron Press Release, *Videos Reveal Serious Judicial Misconduct and Political*

## SA993

*Influence in Ecuador Lawsuit* (Aug. 31, 2009), *available at* http://bit.ly/1l4kx26. Chevron said that the two men who recorded the scheme—Borja and an "American businessman," according to Chevron—were environmental-remediation contractors "pursuing business opportunities in Ecuador" who had happened upon "serious judicial misconduct." *Id.* Chevron claimed that the videos showed that the two men were able to coax the judge into revealing that he would rule in favor of the Ecuadorian plaintiffs. *Id.*; *see also* Simon Romero & Clifford Krauss, *Chevron Offers Evidence Of Bribery Scheme In Ecuador Lawsuit*, N.Y. Times, Sept. 1, 2009, *available at* http://nyti.ms/1oJV15Q.

None of that was true. To begin with, neither Borja nor Hansen was an environmental remediation contractor. ECF No. 175-10. Borja was still under contract with Chevron at the time, charged with handling litigation-related laboratory samples and moving Chevron laboratory equipment. CA-41. His spouse had also been a Chevron contractor, while his uncle was "the legal representative for the company." *Id.*; A-1601. And Hansen was a convicted felon and drug-trafficker. *See* Clifford Krauss, *Revelation Undermines Chevron Case in Ecuador*, N.Y. Times, Oct. 30, 2009, *available at* http://nyti.ms/T9R1Ne. Moreover, the recordings show that Judge Núñez never asked for and was never offered a bribe of any kind and repeatedly declined invitations to say which way he intended to rule. CA-41. Indeed, the only U.S. judge who reviewed the transcripts and commented

# SA994

on them said that he saw no evidence of a bribe. *See* Hearing Tr. 11/10/10, at 38:19-39:5, *In re Application of the Republic of Ecuador re Diego Borja*, No. C 10-00112 (N.D. Cal.) ("[T]here was no hint in there about him taking a bribe.").

After the tapes were released, Chevron publicly distanced itself from Borja. It represented to the Ecuadorian court that his "[w]ork [for Chevron] had already concluded" and that his "functions had nothing to do with the sampling process." ECF No. 366-22 at 2. But that too was untrue: Borja was still working as Chevron's "Sample Manager" for the "Litigation Team" even after his failed bribery allegation. CA-45.

What *is* true, however, is that Borja's own, unguarded statements at the time implicate *Chevron*—not Judge Núñez—in illegal activity. Between August and October 2009, Borja's childhood friend, Santiago Escobar, recorded conversations in which Borja conceded that the bribery scheme was illusory. A-1547; A-1564; A-1580; A-1595; *see also* ECF No. 152-2 ("Because really, there was no bribe. I mean there was never … there was never a bribe."). Borja also asserted that Chevron, among other things, "cooked" the evidence in the Ecuadorian case, used labs that were supposedly independent but actually belonged to Chevron, and generally engaged in misconduct that, if publicly revealed, would cause the courts to "close [Chevron] down." A-1585-90. Borja explained:

> I have the [e]mails. … I have correspondence that talks about things
> you can't even imagine, dude … I can't talk about them here, dude,

## SA995

> because I'm afraid, but they're things that can make the Amazons win
> this just like that [snapping fingers]. … [W]hat I have is conclusive
> evidence, photos of how they managed things internally.

A-1571-72. Escobar subsequently testified under oath in Ecuador that, according
to Borja, Chevron knowingly substituted soil samples taken from contaminated well
sites with clean soil taken from areas 10 to 20 kilometers away. Office of Public
Prosecution of the Republic of Ecuador, Ex. 39, ECF No. 1-41, filed in *Republic of
Ecuador v. TestAmerica Labs. Inc.*, No. 4:11-mc-00088 (N.D. Fla.). Finally, Borja made
clear that if Chevron did not look after him, he would publicly reveal the
company's misdeeds. ECF No. 152-2 ("[I]f something bad happened to me … and
they don't give my wife what they have to … There's a document for that, where I
… immediately go to the other side.").

Chevron apparently took the threat seriously. Borja and his family were
plucked from Ecuador shortly after the recordings were made public and installed
in a gated community roughly one mile from Chevron's California headquarters.
ECF No. 152 at 26. Chevron provided furnishings, a car, and a cell phone, as well
as a job for Borja's wife. CA-46. Through counsel, Chevron also pays Borja's
monthly rent, characterized as "Witness Rent Payments," as well as other perks
and benefits. CA-13-40; *see also* ECF Nos. 174-44, 174-51, 174-52. Chevron has
even paid Borja's state and federal income taxes. ECF Nos. 174-56, 174-57. And
although Borja performs no work for Chevron, the company gives him a $5,000 to

# SA996

$10,000 monthly "stipend." *See* ECF Nos. 174-2, 174-6, 174-10, 174-16, 174-18, 174-19, 174-26, 174-36, & 174-58; A-3155. Altogether, Chevron gave Borja more than $2.2 million in benefits in the first 29 months after he was relocated. CA-47. As he put it, "crime does pay." A-1553. Chevron's money seems to be well spent: In 2010, under the supervision of Chevron's counsel, Borja signed two declarations ostensibly renouncing his previously recorded statements. CA-2; CA-5.

As for Chevron's "American businessman," convicted felon Wayne Hansen, he too threatened to reveal information damaging to Chevron if the company did not improve his situation. CA-1. It is unclear whether his wish was granted, but this much is clear: The Republic of Ecuador filed a 28 U.S.C. § 1782 discovery application against Hansen in his home state of California in September 2010; he never showed up, and by the next month was living a life of leisure in a Peruvian beach town, in the market for a beach house with maid service and a private chef. CA-8.

Notwithstanding the falsity of Chevron's bribery charges, they nevertheless achieved their intended result: Although Judge Núñez denied any wrongdoing, he recused himself to eliminate any appearance of impropriety—thereby delaying final resolution of the case for another eighteen months. *See* A-360-61.

**D.    Hundreds of site inspections and expert reports—including those from Chevron's own experts—confirm Chevron violated the law (2006-10)**

Despite Chevron's best efforts to distract attention from its wrongdoing—and despite its unlimited resources—Chevron could not combat the growing mountain of evidence showing the devastating and widespread environmental contamination caused by its drilling practices. Even Chevron's own handpicked evidence, limited and distorted as it was, confirmed the company's culpability. Two of its experts found significant toxic contamination at 91% of the wells operated solely by Chevron. A-2330. Half the sites had illegal amounts of two carcinogenic PAHs, 90% had illegal amounts of the PAH pyrene, and 82% had illegal amounts of naphthalene. *Id.* Even more damning, a number of these pits were certified as "completely remediated" by Chevron following a sham cleanup it conducted in the mid-1990s. A-2348-50.

Chevron also tested sediment in nearby streams and swamps, showing that the pollution had spread and persisted almost two decades later. A-2330. Although Chevron conducted only modest sediment sampling, more than half of its samples showed unlawful amounts of contamination. *Id.* Chevron's sampling of the surface water showed even clearer evidence of pollution: It detected phenols—a soluble toxic component of crude oil—at every location tested, nearly 20 years after the drilling had stopped. A-2331.

# SA998

### E.  Chevron shifts its strategy to collateral attacks outside Ecuador and adopts the "demonize Donziger" playbook (2007-2011)

Unable to overcome the mounting evidence against it, and desperate to avoid paying for its wrongdoing, Chevron shifted gears, adopting a strategy to collaterally attack the Ecuadorian litigation in any forum possible, through any means possible. The company's message, according to one of its lobbyists, was simple: "We can't let little countries screw around with big companies like this." Keefe, *Reversal of Fortune*. "We're going to fight this until hell freezes over," a company spokesman declared. *Id.* "And then we'll fight it out on the ice." *Id.*

**1.** Chevron's opening gambit was to file an arbitration proceeding against the Republic of Ecuador before the American Arbitration Association and then offer to dismiss the arbitration in exchange for the government's "intervention" in the Ecuadorian litigation. But the district court stayed the arbitration and rejected all of Chevron's arguments, including its argument that Ecuador was bound by a 1960s-era joint-operating agreement that was "executed in Florida between two American corporations." *Republic of Ecuador v. ChevronTexaco Corp.*, 499 F. Supp. 2d 452, 460, 469 (S.D.N.Y. 2007). This Court summarily affirmed. 269 F. App'x 124 (2d Cir. 2008).

Chevron next initiated international proceedings against Ecuador under the U.S.-Ecuador Bilateral Investment Treaty. *Republic of Ecuador*, 638 F.3d at 390;

## SA999

ECF No. 65-4. Chevron requested that a private arbitration panel—meeting in secret without allowing the *afectados* to participate—declare that Chevron has "no liability or responsibility for environmental impact ... or for performing further environmental remediation" in Ecuador and order Ecuador's executive branch to compel the judiciary to dismiss the case. *Republic of Ecuador*, 638 F.3d at 390. Chevron made two primary arguments: (1) that its sham cleanup during the 1990s precluded "any judgment issued against it," and (2) that "Ecuador's judicial branch" has disregarded "Ecuadorian law, international standards of fairness, and Chevron's basic due process and natural justice rights," and its executive branch "improperly interfered" with the case because the current president, Rafael Correa, expressed public "support for the plaintiffs." *Id.* Chevron also asked for fees, costs, and "moral damages." *Id.* Later, Chevron submitted Borja's secretly recorded videotapes to the panel, claiming that they showed Judge Núñez had been bribed. But after that scheme backfired, Chevron quietly dropped the allegation. The panel has not yet ruled.

**2.** Around this time, Chevron also began to train its focus on Steven Donziger—an American lawyer who had joined the case early in his legal career, after working as a newspaper reporter in Latin America and, following law school, as a public defender representing juvenile defendants and at a social-justice nonprofit. A-3387-88. Donziger was not the only lawyer on this case; he worked

# SA1000

alongside a team of Ecuadorian lawyers, one of whom (Pablo Fajardo) was the lead trial counsel. A-3391. But Donziger had emerged over time as a principal spokesperson for the *afectados* in the United States. In the mid-to-late 2000s, hoping to bring attention to their plight, he and Ecuadorian counsel decided to give an acclaimed American filmmaker (Joseph Berlinger) substantial behind-the-scene access to make a documentary about the case, eventually entitled *Crude: The Real Price of Oil*, which premiered at the Sundance Film Festival in January 2009.

*Crude* not only conveyed the painful saga of the *afectados* and their quest for justice; it also captured the unfiltered range of Donziger's personality: his brashness and tendency toward hyperbole; his tenacity and passion in the service of his clients; his courage in the face of Chevron's unremitting attacks; and his often irreverent, over-the-top sense of humor. When Chevron's public-relations team saw the film, it sensed an opportunity. After one strategist stated his belief that Chevron "should not tread on Berlinger" because he "put some balance into the documentary," a company publicist, in an internal email to his colleagues, stressed the game plan: "Our [long-term] strategy is to demonize Donziger. This film provides us a great opportunity to do so." CA-9-10. This came after another Chevron strategist wrote a memo to company officials recommending that they launch a campaign to cast Ecuador "as the next major threat to America"—like "Iran"; a "Cuban missile crisis in the making"—and Donziger as "the most

## SA1001

powerful man in Ecuador," "pulling the strings of an emerging banana republic." ECF No. 1324-11, at 10.

### F.    Chevron obtains unprecedented discovery in U.S. courts

With this new strategy in place, Chevron began using a little-known U.S. statute permitting discovery "for use" in foreign litigation, 28 U.S.C. § 1782, in an effort to show—preemptively and somewhat "ironically," given its earlier position in *Aguinda*—that "the judicial process in Ecuador is corrupt." *In re Chevron Corp.*, 633 F.3d 153, 158-59 (3d Cir. 2011). Chevron also sought to expose what it claimed was fraud in the relationship between the Ecuadorian plaintiffs' legal team, Donziger, and an environmental expert named Richard Cabrera who was appointed by the *Corte Provincial de Justicia de Sucumbíos* to provide a report on the economic value of damages at the plaintiffs' request—one of many expert reports submitted to the court throughout the litigation.

The scale of this discovery effort, like all of Chevron's efforts to avoid compensating its victims in Ecuador, has been breathtaking. By 2011, the company had initiated "an extraordinary series of at least 25 requests to obtain discovery from at least 30 different parties" in more than a dozen federal courts across the country, *In re Chevron*, 633 F.3d at 159—"an effort the Third Circuit aptly characterized as 'unique in the annals of American judicial history,'" *Naranjo*, 667 F.3d at 236 (quoting *In re Chevron Corp.*, 650 F.3d at 282 n.7). This unprecedented

## SA1002

assault was designed to isolate the plaintiffs' contacts with Dr. Cabrera from the context of Ecuadorian law and ultimately gain access to huge amounts of evidence that it hoped would derail the Ecuadorian case, all the while draining the plaintiffs of their resources by forcing them to simultaneously litigate these cases nationwide. As Chevron CEO John Watson would later say: The litigation "will end when the plaintiffs' lawyers give up." Christopher Helman, *Chevron's Expensive Problems*, Forbes, Mar. 4, 2013 issue, *available at* http://onforb.es/1fFj3nk.

Chevron originally based its extraordinary requests on a single scene in *Crude*. The scene showed a meeting between the Ecuadorian plaintiffs and their lawyers, including Donziger, while a member of Dr. Cabrera's staff was present. Chevron argued that this proved that Dr. Cabrera was not independent. Yet Chevron identified no provision of the Ecuadorian Civil Code prohibiting a party from communicating *ex parte* with a court-appointed expert, formulating a work plan for the expert, or drafting materials for that expert's adoption as his own. A-3545-46. Distinguished Ecuadorian law professors have also attested that nothing in Ecuadorian law at that time prevented a party from meeting with a court-appointed expert *ex parte*, planning the work the expert will perform, and drafting proposed findings for the expert. A-424; A-440. Indeed, Chevron's technical consultant met with Dr. Marcelo Muñoz Herrería—a "neutral," court-appointed expert like Dr. Cabrera—at a hotel for a "technical planning meeting" to plan his

# SA1003

expert report. A-2075. This meeting took place before Muñoz was formally appointed by the Ecuadorian court. *Id.* Dr. Muñoz also stated that his work plan was "requested and approved" by Chevron's technical consultant. A-2076.

Still, Chevron took advantage of American courts' unfamiliarity with Ecuadorian procedure to obtain an unprecedented volume of discovery in these proceedings—at least a million documents worth. Of the 25 proceedings before 16 different judges, the two most successful were against Berlinger (the *Crude* filmmaker) and Donziger. *See In re Application of Chevron Corp.*, 709 F. Supp. 2d 283 (S.D.N.Y. 2010) (Berlinger); *In re Application of Chevron Corp.*, 749 F. Supp. 2d 135 (S.D.N.Y. 2010) (Donziger). The Honorable Lewis A. Kaplan of the Southern District of New York was the judge in both proceedings.

***The Berlinger § 1782 proceeding.*** In the first proceeding, Chevron successfully demanded all 600-plus hours of *Crude* outtakes. SPA-160. The court declined a request to wait until the Ecuadorian court ruled on an application asking whether it would be "receptive to 1782 discovery in the United States"—the purpose of the statute. ECF No. 287-1 (Hearing Tr. 4/30/10, at 35:9-36:10). The court did not hide why: "Believe me, if this were the High Court in London, you can be sure I'd wait." *Id.* The district court's view, it later made clear, was that Ecuador should wait for it, not the other way around. *See* ECF No. 287-5 (Hearing Tr. 11/22/10, at 33:15-21) ("The one inescapable, overwhelmingly obvious fact in

# SA1004

this whole scenario is that Danziger [sic] and his clients, the Lago Agrio plaintiffs, utterly refuse any delay in Ecuador to permit the proceedings here to move at a more deliberate speed. Each and every time I have asked that question, I've gotten a flat no. Don't talk to me about urgency."); *see also id.* at 26:19-24 ("[I]t's a giant game here. It's a giant game. The name of the game is to string it out. … That is the Danziger [sic] Lago Agrio strategy. And it has been from the beginning.").

*The Donziger § 1782 proceeding.* In the second proceeding, the court ordered Donziger to turn over to Chevron his entire eighteen-year litigation file—including virtually every scrap of correspondence that he and the other lawyers had made about the case—and to sit for fourteen days of deposition testimony. "[H]e has one privilege left," Chevron's counsel told the court. "He can assert the Fifth Amendment." ECF No. 287-3 (Hearing Tr. 9/23/10, at 64:1-2). The court agreed with Chevron that Donziger had waived "each and every privilege claim" because he filed his privilege log too late. *In re Chevron Corp.*, 749 F. Supp. 2d at 185. The court acknowledged that the log "took a good deal of effort" to prepare—it was over 2,000 pages and identified 8,652 documents as privileged, and Donziger did not have a staff of associates to help him go through it—but the court nevertheless ordered Donziger to produce "each and every document responsive to the subpoenas (irrespective of whether any privilege or other protection against disclosure has been or hereafter is or may be claimed) forthwith." *Id.* at 184-85, 188.

# SA1005

As Judge Kaplan put it: "The subpoenas called for the universe. And I said give them the universe." ECF No. 287-5 (Hearing Tr. 11/22/10, at 13:10-14).[7]

That "universe" amounted to more than 200,000 pages of material, much of it personal—including Donziger's tax returns, his bank-account information, his personal computers, mobile devices, text messages, private phone records—even a copy of the eulogy he delivered after the death of his mother. Chevron's lawyers at Gibson Dunn pored through stacks of memos and emails marked "Confidential" and "Attorney Work Product," at a clip of 5,000 pages a day, and made complete copies of his hard drives. When his counsel protested that this would give Chevron access to his "communications to his wife" as well as "his communications on other matters," Judge Kaplan responded: "He doesn't have any other matters. Let's not worry about that. This is his life." ECF No. 287-3 (Hearing Tr. 9/23/10, at 27:6-10).

Chevron didn't worry. When its lawyers scanned Donziger's computer files, they found his entire personal diary—a running account of his most private thoughts, including his hopes, dreams, and doubts; his perpetual fear that Chevron was corrupting the process; his unvarnished opinions of close professional

---

[7] During an earlier hearing, Judge Kaplan opined: "[T]he likelihood that there is actually an attorney-client communication under any of this I think is about the same as the likelihood that the Ecuadorian Air Force is going to take over New Jersey. Let's get real." ECF No. 287-3 (Hearing Tr. 9/23/10, at 36:21-24).

Case: 18-855, Document 107, 03/11/2019, 2515864, Page119 of 292
Case 1:18-cv-855 Document 150 Filed 11/26/2014 Page 119 of 292
Case 1:18-cv-855 Document 150 Filed 11/26/2014 Page 119 of 292 135

## SA1006

colleagues; even his reflections on the impact his work in Ecuador was having on his marriage. A-2513. When Chevron filed the document with the court—in its entirety—it entered the public domain.

### G. Chevron uses the vast "universe" of documents it obtained in discovery to carry out its "demonize Donziger" strategy

With this unprecedented quantity of material in tow, Chevron's public-relations operation went to work, often taking Donziger's words out of context—even twisting them to mean the *opposite* of what he said—to shift the focus from Chevron's wrongdoing to Donziger, which wasn't hard to do because of his personality and speaking style.

Chevron, for instance, has repeatedly quoted Donziger as saying: "If you repeat a lie a thousand times it becomes the truth," as if he were speaking about his own beliefs. But he was talking *about Chevron*—not himself. What he actually wrote was "*Si repitan una mentira mil veces se hace la verdad*," accurately translated as: "if *they* repeat a lie a thousand times it becomes the truth." A-1288.6. The "they" was Chevron/Texaco. Chevron has also constantly quoted Donziger as professing what Chevron claims is a personal motto: "Facts do not exist. Facts are created." *See, e.g.*, ECF No. 1855, at 141. But he goes on to say: "And you talk to Texaco, because *they* create facts. *Texaco* creates facts. They create standards. … That's what I am saying. They create fiction." ECF No. 7-8, at 4 (emphasis added). In another scene, he tells the camera that he and the *afectados* are:

# SA1007

going to confront the judge **who we believe is paid by Texaco. We believe he is corrupt, and we're gonna confront him, ah, with—with our suspicions about his corruption** and let him know what time it is. And, ah, you know, this is something that you would never do in the United States. I mean, this is something you would, I mean, this is just out of bounds, both in terms of judicial behavior, and what—what lawyers would do. But Ecuador, you know, there's almost no rules here. And this is how the game is played, it's dirty. ***And, you know, they're playing dirty, we're honest, they're dirty. They play dirty, we have to occasionally use, um, pressure tactics to neutralize their corruption. And today is one of those examples.***

ECF No. 6-4 at 6 (emphasis added). But when Chevron presented this clip to the court, it excluded all the bold text above. A-1038.1. A clip in which Donziger expresses frustration at Chevron's corrupt practices was transformed into a clip in which Donziger appears to admit his own corruption. The transcript that Chevron provided to the court did not indicate with an ellipsis that 25 words had been omitted midsentence. *Id.*

When Donziger's counsel brought Chevron's omissions to the attention of the district court, Chevron conceded that it had doctored several clips, but blamed the error on its transcriptionist. ECF No. 1661 at 5 ("Chevron's transcriber … did not realize that material had been redacted from this clip, and, as a result, she did not note or identify the redaction in the transcript … Chevron's counsel did not pick up on that omission."). The court acknowledged that "the custom is to put ellipses in," but did not press the issue. ECF No. 1792 at 182.

# SA1008

Time and again, using carefully edited clips, Chevron sought to portray Donziger as corrupt—the head of a vast criminal conspiracy. In truth, however, most of the statements were him venting about *Chevron*—its scorched-earth tactics, massive war chest, and strategy of delay—or expressing frustration or fear that what he said to American courts in the 1990s would come to pass: that Chevron would corrupt the process.[8]

Chevron also sought to instill fear in anyone who might be sympathetic to the plaintiffs' cause. Shortly after an expert named Harry Dunkelberger agreed to help the Ecuadorian plaintiffs estimate the environmental damage caused by Chevron, "two men in dark suits" appeared at his door on a Friday evening while he was about to go out to dinner with his family and pressured him to "turn[]" on Donziger. A-646.2. Days later he received a call from a Gibson Dunn associate who warned Dunkelberger that he would be better off "do[ing] it the easy way" rather than the "alternative." *Id.*

---

[8] *See, e.g.*, A-2579 (Donziger in personal diary: "We are winning on the proof, but we are losing the larger war because of time."); A-2586 (Donziger in personal diary: "I am getting this creeping feeling that we are not going to make it. There are just too many obstacles—the structure and weakness of the court, the obvious friendly ties of the judge and his staff to the Texaco lawyers, our own disorganization and lack of resources, a lack of fight among the affected communities and indigenous tribes which is a reflection of weakness resulting from the violence Texaco has inflicted on them for so many years.").

# SA1009

Up until this point, Chevron had been "losing the PR battle, if not the whole war." Mary Cuddehe, *A Spy in the Jungle*, The Atlantic, Aug. 2, 2010, *available at* http://bit.ly/1pUKToW. So Chevron "regrouped and hired Kroll [& Associates]," *id.*—a firm known for its "corporate espionage" work—to start spying on the *afectados* and their lawyers.[9] Kroll offered to pay one freelance journalist tens of thousands of dollars to "go undercover as a journalist-spy in the Ecuadorian Amazon" for a few weeks. *Id.* "There was a reason they wanted me," she said: "With one Google search, anyone could see that I was, in fact, a journalist. If I went to Lago Agrio as myself and pretended to write a story, no one would suspect that the starry-eyed young American poking around was actually shilling for Chevron." *Id.* Although she found the offer enticing, she ultimately resisted Chevron's advances. *Id.*

Chevron also began spying on Donziger. Although the full extent and duration of this activity is not publicly known, when Donziger hired a former FBI agent to investigate whether he was under surveillance, the investigator confirmed that "three vehicles followed [Donziger]" around New York, even getting out of their cars when he did and then "walk[ing] towards" him. A-646. When Donziger

---

[9] *See*, William Finnegan, *The Secret Keeper*, The New Yorker, Oct. 19, 2009, *available at* http://nyr.kr/UZ94Hf ("With its international intelligence networks and their sometimes unnerving abilities," Kroll is often "described as 'a private C.I.A.'").

returned home to his apartment, where he lives with his wife and young child, the men "took up positions on the street." *Id.*

Chevron has never denied that it has engaged in extensive surveillance of Donziger and his family. Daniel Karson, Kroll's Chairman and the case manager for the Donziger project, acknowledged that Kroll had drafted "between 20 and 30 reports regarding Mr. Donziger" since the company was retained in August 2009. CA-8.2; CA-8.4. Kroll operatives were also active in Ecuador; the record includes several photographs of the plaintiffs' lawyers captured by Kroll operatives in Quito. ECF Nos. 754-02-05. All this surveillance came at an astronomical cost to Chevron—the total figure, as of June 10, 2013, is available in the sealed volume of the appendix but cannot be disclosed in this brief because Chevron has designated it as confidential. CA-8.3.

## H.  The Ecuadorian court enters a preliminary judgment against Chevron (February 2011)

Meanwhile, the litigation in Ecuador was heading toward a conclusion. On February 14, 2011—after eight years of litigating the case in Ecuador, a 215,000-page court record, and scores of inspections and expert reports detailing the extensive scope of Chevron's malfeasance—the *Corte Provincial* entered a provisional *sentencia* (or "preliminary judgment," as this Court called it) against Chevron in a comprehensive 188-page decision. A-1039; *Naranjo*, 667 F.3d at 242 n.1. Several aspects of this decision are worth highlighting.

# SA1011

*First*, the court addressed Chevron's concerns about expert objectivity by granting its request and refusing to take into consideration either the Cabrera Report or the submissions of the plaintiffs' expert, Dr. Charles Calmbacher, in issuing its verdict. A-1086-89. The court also gave reduced weight to an expert report on health effects because its author disclosed that he had been hired by the Amazon Defense Front, a nonprofit environmental organization assisting the plaintiffs. *Id.*

*Second*, the court compensated for the experts' perceived lack of objectivity by relying repeatedly on test results by Chevron's own experts—and on Chevron's own admissions—to support the conclusion that Chevron had contaminated the environment. For example, although Chevron had argued that the "production waters" it dumped into the environment posed no environmental risk, the Ecuadorian court cited contrary sample results by Chevron's own expert and a statement by Chevron experts that even if production waters didn't contain significant concentrations of toxic compounds, they might "represent a potential harm to receptive bodies and to vegetation." A-1183.

*Third*, the court also addressed Chevron's charges of misconduct by Donziger, which Chevron tried to establish by presenting carefully edited outtakes from *Crude* that it had obtained in the § 1782 proceeding against him. Judge Nicolás Zambrano condemned both Donziger's statements criticizing the

## SA1012

Ecuadorian judiciary—which Donziger made out of fear that the judiciary would be corrupted by *Chevron*, not him—as well as Chevron's attempts to trash Donziger's reputation by quoting the *Crude* outtakes out of context.[10]

*Finally*, the court calculated the actual damages at $8.646 billion. The court rejected the plaintiff's request for damages for excess cancer deaths and unjust enrichment—the two highest-value categories that they advocated. A-1222-24. The breakdown of the damages award was as follows: $5.396 billion for soil remediation; $1.4 billion for health care costs; $800 million for deaths due to cancer; $600 million for groundwater remediation; $200 million for damage to the ecosystem; $150 million for drinking water remediation; and $100 million for damages to indigenous culture. *In re Chevron Corp.*, 650 F.3d at 280-81. The total cleanup cost awarded by the court, assessed per cubic meter, is well within the average for oil spills of this magnitude, including the 1978 Amoco Cadiz spill in France, the 1989 Exxon Valdez spill in Alaska, the 1991 spills in Kuwait, and the

---

[10] The court held: "[I]nsofar as concerns the merits of [Donziger's] statements, they are rejected—especially the unwarranted statements regarding the Ecuadorian Judiciary—and the Court does not recognize anything that Mr. Donziger might say or do when he is in front of the cameras or in any other act. No pressure has effectively been exerted on this Court. In addition, the Court notes that [even if it had] the power to judge Mr. Donziger due to his disrespectful statements, it could not do so based on such limited portions, chosen and edited from hours of taping, and without giving the accused the right to defend himself or explain the context of those statements." A-1089-90.

# SA1013

2002 Prestige spill in Spain. Republic of Ecuador Rejoinder, at 91-92, *available at* http://bit.ly/1xjS3p5.

The court also assessed $8.646 billion in punitive damages (100% of the remedial damages) in light of Chevron's egregious procedural and substantive misconduct and the need to dissuade Chevron and others from similar misconduct in the future. A-1086-89. But the court gave Chevron the option to avoid punitive damages by issuing a public apology—"a symbolic measure of moral redress" recognized by the Inter-American Court of Human Rights. A-1224. Chevron did not do so. Nor has it paid a dime of the judgment to the people it injured.

## I.  The Ecuadorian court clarifies its judgment (March 2011)

On March 4, 2011, the *Corte Provincial* issued a 24-page order in response to a laundry list of requests by Chevron for clarification of the judgment. Importantly, the order confirmed the provisional judgment's exclusion of the Cabrera Report, explaining that "the report had NO bearing on the decision," which is why the court had "refused to void the entire case" against Chevron based on allegations concerning the report's preparation. A-1245.

## J.  Chevron declines to challenge the preliminary judgment under Ecuador's Collusion Prosecution Act

At this point, Chevron had two ways in which it could seek relief from the provisional judgment—each with its own, non-mutually-exclusive procedural path. The first: Challenge the judgment's legal and factual basis by asking a three-judge

## SA1014

panel to review the record de novo and issue a substitute judgment. The second: Challenge the legitimacy of the proceeding by bringing a separate action to nullify the provisional judgment as tainted by fraud—irrespective of whether it reached the right result. Both options are available to losing parties under Ecuadorian law, but they must be kept separate; one is not a substitute for the other.

Chevron chose not to avail itself of the second option—Ecuador's exclusive remedy for aggrieved parties who allege that a proceeding was collusive or fraudulent. Indeed, the Collusion Prosecution Act expressly allows such parties to make their collusion allegations in a separate action, and to submit whatever evidence they have to support those allegations, even if it lies outside the original proceeding's record. SPA-631 (Collusion Prosecution Act, art. 6). If the grounds for the claim are confirmed, the Act mandates that "measures to cancel the collusi[ve] proceeding" will be issued, "cancelling the act or acts, … and [redressing] the damage caused … and, in general, returning … things to the state they were before the collusion." *Id.*[11]

Even though Chevron has not yet pursued this remedy, it is still available. Recognizing that evidence of fraud can take time to come to light, the Act has a

---

[11] To ensure the effectiveness of this remedy, the Act also provides for two levels of appellate review—the first entirely de novo. SPA-631 (CPA art. 8).

five-year limitations period. SPA-632 (CPA, art. 10). Chevron thus has until February 14, 2016 to avail itself of this local remedy.

## K.   An Ecuadorian three-judge court reviews the case de novo and enters a substitute judgment against Chevron (2012)

Chevron did, however, avail itself of its other remedy—seeking direct, de novo review of the trial court's decision. The Ecuadorian plaintiffs did the same. In March 2011, after the trial court issued its clarification order, a panel of three judges from the same court was randomly selected to review the trial court record and issue a substitute judgment of its own. A-1228.

The three-judge court issued its modified, substitute judgment in January 2012—nearly ten months after the first panel had been selected. A-452. The court's opinion addressed and rejected each of the Ecuadorian plaintiffs' grounds for appeal. *Id.* It also rejected Chevron's contention that "fraud and corruption of plaintiffs, counsel and representatives" should serve as a basis to reverse the decision. A-462. The court explained that its obligation was to assess the evidence "as a whole." A-464. After "evaluating the evidence collectively," the court found that it amply supported the decision. *Id.*

The three-judge court later clarified its decision at Chevron's request, confirming that it had considered all of Chevron's charges of "irregularities in the preparation of the trial court judgment" and found them to be pure speculation, belied by the trial-court record. A-491. The court declined to "make a

pronouncement on the interminable and reciprocal accusations over misconduct of some of the parties' attorneys, experts or contractors" because they "could not affect the final result of the lawsuit." A-492.

### L. The Ecuadorian Supreme Court grants "cassation" review, affirms liability, and reduces damages (2013)

Chevron then filed a "cassation" petition with the *Corte Nacional*—Ecuador's highest non-constitutional court—seeking review of the substitute judgment, which the Court granted. The Court issued an opinion in November 2013 largely affirming the judgment. A-3449. The Court addressed Chevron's complaints about the Cabrera Report, explaining that "the trial court's judgment did not take [the report] into account," and Chevron has "not indicate[d] which law [was] violated" by the judgment, nor has it explained how its allegations, even if true, "affect[ed] the validity of the proceeding" or "harm[ed]" Chevron in any way. A-3545-46.

More broadly, the Court explained that Chevron's claim of a "great collusive demonstration" in the trial court was irrelevant to its cassation appeal. A-3543. For one thing, the Court stressed that "the court decision sought to be annulled here is the one rendered by the [three-judge] court of appeals, and not the one issued by a trial court, something which the cassation appellant has confused in this allegation." A-3548. For another, the Court explained that it lacked jurisdiction to consider Chevron's collusion claim anyway because "[w]hen collusion is an independent action" it is "regulated under the Collusion Prosecution

Case: 14-826, Document 150, 04/12/2014, 271881, Page 130 of 292

# SA1017

Act"—the exclusive remedy provided by Ecuadorian law. A-3543. And so "it is not possible," the Court emphasized, "to seek the cassation of a judgment by making these kinds of allegations." *Id.* The Court thus affirmed the appellate court's conclusion that Chevron's claims of "procedural fraud" and "collusion" were "not within [the] scope of [its] jurisdiction." *Id.*[12]

But the *Corte Nacional* did not affirm the substitute judgment in its entirety. Quite the contrary, the Court struck the entire punitive damages award—thus cutting the damages award nearly in half, by $8.646 billion—because the Court found that "there is no legal justification" for it. A-3669. *Cf. State Farm Mutual Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003).

Chevron has now sought relief from the *Corte Constitucional del Ecuador* (or Constitutional Tribunal of Ecuador), which granted its petition for review and will consider Chevron's due-process arguments.

## II. Chevron brings this action as yet another collateral, preemptive attack on enforcement of the Ecuadorian judgment

### A. Chevron files this action

Rather than exhausting its remedies under Ecuadorian law, Chevron filed this case in New York in early 2011—two weeks *before* the preliminary Ecuadorian

---

[12] *See also id.* ("If, as [Chevron] alleges, there were irregularities in the proceeding, Ecuadorian legislation establishes actions that can be brought for these kinds of facts, … but allegations of this kind may not be made nor may cassation of the relevant judgment be sought without any reasoned legal basis.").

## SA1018

judgment was entered and nearly a year before the three-judge court issued its substitute judgment. ECF No. 1. Chevron named more than 50 people as defendants: Donziger, Pablo Fajardo (the *afectados'* lead Ecuadorian lawyer), and dozens of indigenous people who have never left the jungles of Ecuador.

Chevron's complaint quotes Judge Kaplan, who "summarized" the case "a few months" before it was filed: "[T]he name of the game is, arguably, to put a lot of pressure on the courts to feed them a record in part false for the purpose of getting a big judgment or threatening a big judgment, which conceivably might be enforceable in the U.S. or in Britain or some other such place, in order to persuade Chevron to come up with some money. Now, do the phrases Hobbs Act, extortion, RICO, have any bearing here?" *Id.* at 118 (quoting Hearing Tr. 9/23/10, at 24:6-22).

The complaint alleges that they do. It originally asserted nine claims:

(1) substantive RICO violations under 18 U.S.C. § 1962(c), including "extortion in violation of [the] Hobbs Act, 18 U.S.C. § 1951";

(2) conspiracy to violate RICO under 18 U.S.C. § 1962(d);

(3) common-law fraud (under New York law);

(4) tortious interference with contract (under New York law);

(5) trespass to chattels (under New York law);

(6) unjust enrichment (under New York law);

(7) civil conspiracy (under New York law); and

(8) violations of New York Judiciary Law § 487.

# SA1019

ECF No. 1, at 119-144. The ninth claim, which was later severed from the rest, was a request that the anticipated Ecuadorian judgment be deemed "unenforceable and non-recognizable, including but not limited to under the United States Constitution, federal common law, New York common law principles of comity, and/or New York's Recognition [Act]," on "grounds of fraud, failure to afford procedures compatible with due process, lack of impartial tribunals, and contravention of public policy." *Id.* at 144. Under this claim, Chevron also sought an injunction barring anyone "from commencing, prosecuting, or advancing in any way—directly or indirectly—any attempt to recognize or enforce any Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad." *Id.* at 145.

When filing the complaint, Chevron noted on the cover sheet that the case was "related to" the two § 1782 proceedings presided over by Judge Kaplan. Judge Kaplan accepted the case, immediately issued an order to show cause why a temporary restraining order shouldn't be granted, and set a hearing for *five days later*. ECF Nos. 3, 4.

## B.   The district court grants a temporary restraining order

Just before the hearing—after Chevron had filed a 70-page preliminary-injunction motion and nearly 7,000 pages of supporting affidavits and exhibits, *see* ECF Nos. 4-58—Donziger hand-delivered a letter to the court informing it that he

# SA1020

had returned from a trip to Ecuador only the day before and had not been able to retain counsel on such short notice. He asked the court to briefly continue the hearing. But the court refused and said that it would grant Chevron a temporary restraining order. The court explained its thinking: "[W]e are dealing here with a company of considerable importance to our economy that employs thousands all over the world, that supplies a group of commodities, gasoline, heating oil, other fuels and lubricants on which every one of us depends every single day. I don't think there is anybody in this courtroom who wants to pull his car into a gas station to fill up and finds that there isn't any gas there because these folks have attached it in Singapore or wherever else." Hearing Tr. 2/8/2011, at 49:21-50:4.

The next day—eight days after Chevron filed its complaint and without an evidentiary hearing—the court issued a temporary restraining order preventing the defendants from taking any steps to enforce "any [Ecuadorian] judgment entered against Chevron" anywhere in the world outside of Ecuador, where Chevron has no assets. ECF No. 77. The court gave Donziger and the other defendants two days to file oppositions to Chevron's preliminary-injunction motion—even though there was still no Ecuadorian judgment, let alone an enforceable one—and set a hearing for a week later. *Id.* Donziger was unable to retain counsel until the day before the hearing.

# SA1021

At the preliminary-injunction hearing, the court made clear that it wouldn't let Donziger submit any filings, even though his professional reputation and life's work were on the line. The court was emphatic: "[Donziger] had until the date I gave him to file papers. He didn't, it's over … Over. Closed. … If for whatever reason Mr. Donziger just elected or failed to submit papers, well, that's what happens." Hearing Tr. 2/18/11, at 79:18-80:16. That is indeed what happened. One week later, after Donziger's new counsel worked around the clock to prepare a brief on his behalf, the court refused to accept it, denying him any opportunity to respond in writing to Chevron's unprecedented motion. *See* ECF No. 137.

## C.    The district court issues a worldwide injunction

In March 2011, still without having held an evidentiary hearing, the court entered a preliminary injunction nullifying the Ecuadorian judgment and blocking any attempt to enforce it outside of Ecuador. *Chevron Corp. v. Donziger*, 768 F. Supp. 2d 581 (S.D.N.Y. 2011).[13]

Based on what it called "abundant evidence," the court found that "the Ecuadorian judgment in this case 'was rendered under a system which does not

---

[13] Although the court gave Mr. Donziger no opportunity to be heard, its opinion (a) referred to him by name 190 times, (b) used carefully edited *Crude* outtakes—which the Ecuadorian court had criticized—to impugn his character, (c) placed him at the center of an alleged conspiracy to subvert the Ecuadorian justice system and deny justice to Chevron, and (d) faulted him for failing to explain his statements "under oath" and to submit "sworn proof" to counter Chevron's evidence. *Id.* at 595, 606.

# SA1022

provide impartial tribunals or procedures compatible with the requirements of due process of law.'" *Id.* at 633, 636. That "abundant evidence" consisted of three things: (1) a report submitted by Vladimiro Álvarez Grau, an avowed political opponent of President Correa, from which the court thought it was "reasonable to infer" that the entire Ecuadorian judiciary was corrupt, *id.* at 634; (2) Donziger's own statements from the *Crude* outtakes expressing his fears that the Ecuadorian judiciary was corrupt (the same position he advanced—and the court rejected—in *Aguinda*), *id.* at 634-35; and (3) State Department and World Bank reports saying the same thing they did in the 1990s, when Chevron was the Ecuadorian judiciary's staunchest defender. *Id.* at 535; A-387-408.

The court was transparent about its intentions: "This Court's judgment should finally determine the controversy worldwide" because a "decision by this Court holding that the judgment is unenforceable and enjoining its enforcement would bind all of the parties that potentially could enforce the judgment and therefore should foreclose even the filing of foreign enforcement suits." 768 F. Supp. 2d at 638, 647. "Moreover," the court continued, "even if enforcement actions were to be filed abroad in violation of an injunction, a decision by this Court with respect to the enforceability of the Ecuadorian judgment likely would be recognized as sufficiently persuasive authority—if not binding on the parties—to dispose of the question of enforceability in the foreign fora." *Id.* at 647.

# SA1023

### D.    This Court, in *Chevron v. Naranjo*, promptly reverses the injunction and orders dismissal of the severed ninth claim

In September 2011, this Court heard oral argument in the preliminary-injunction appeal. During the argument, it became clear that no precedent supported the district court's sweeping injunction and that it raised profound international-comity concerns regardless. *See* Oral Arg. Tr. 9/16/11, at 58:11-60:12. Toward the end of the argument, a panel member expressed concern that, even if the court were to reverse the district court's order and vacate the injunction, Chevron "would then go back to Judge Kaplan and ask to reactivate the RICO claims and seek the same injunction under those claims." *Id.* at 76:19-77:7. Chevron's counsel dodged the question and instead asked the Court to wait "just a few weeks" so it could have a "full trial record." *Id.* at 77:25-78:14.

This Court declined the invitation. The very next business day, it vacated the injunction and stayed proceedings on the ninth claim—the only claim over which it had jurisdiction—and announced that an opinion would follow. ECF No. 351; *see also Chevron Corp. v. Naranjo*, 2011 WL 4375022 (2d Cir. Sept. 19, 2011). In vacating the injunction, the Court declined Chevron's invitation to keep it "in place in light of Chevron's RICO and state-law claims," which were "based on" the same "underlying allegations." Chevron Br. in *Naranjo* at 70-71.

In the opinion that followed, this Court explained that New York's "Recognition Act and the common-law principles it encapsulates are motivated by

an effort to *provide for* the enforcement of foreign judgments, not to prevent them." *Naranjo*, 667 F.3d at 241. They do not create "causes of action by which disappointed litigants in foreign cases can ask a New York court to restrain efforts to enforce those foreign judgments against them, or to preempt the courts of other countries from making their own decisions about the enforceability of such judgments." *Id.* at 243. The Court also emphasized the "far graver" affront to international comity that would result from a contrary interpretation. *Id.* at 244.

The Court reversed the judgment, vacated the "radical" injunction, and remanded the case to the district court with instructions to dismiss Chevron's ninth claim—the only claim before the Court—"in its entirety." *Id.* at 244, 247.

### E. Chevron immediately attempts to evade *Naranjo*

About a month after this Court's decision, Chevron again asked the district court for a preemptive ruling that the substitute Ecuadorian judgment, which had just been issued, was not entitled to recognition—this time in its RICO case. *See* ECF Nos. 396 & 397. Chevron's new theory was that *the defendants* had put the judgment at issue by raising the affirmative defense of collateral estoppel in their answers. So Chevron moved for summary judgment, hoping that the court would reject the defense on the ground that the judgment wasn't entitled to recognition under New York law. *See id.* The defendants responded by making clear that they "are not asserting in this lawsuit the affirmative defenses of res judicata and/or

# SA1025

collateral estoppel." ECF No. 450, at 2. And "lest there be any doubt," the defendants "affirmed that they will never assert in this case the defense of res judicata or collateral estoppel with respect to the Ecuadorian Judgment"—a position they have taken ever since. *Id.* at 3.

## F.    The district court refuses to allow the defendants to drop their collateral-estoppel defenses

The court rejected the defendants' express disavowals and kept the collateral-estoppel defense in the case—putting the Ecuadorian judgment's enforceability once again at issue. ECF No. 550, at 67-71; *see also* Hearing Tr. 10/18/12, at 11:1-3 ("I am not going to allow you to amend to delete the res judicata or collateral estoppel defense, period. That's not going to happen."). Only later, in denying a recusal motion, did the court acknowledge that, just as the plaintiff is the master of the complaint, the defendants "of course" have "the option" of selecting their own defenses. ECF No. 1407, at 15 n.50. Chevron's counsel said the same to this Court: The defendants, he represented, "still have the right to [assert the defense] or not. … If they didn't press it [at trial], it won't be in the case. It will not be in the case." Oral Arg. Tr. 9/26/13, at 19:16-21.

## G.    The court allows Chevron to drop its "sham litigation" claim

As the case proceeded, the defendants requested all of Chevron's documents concerning the scientific evidence of its pollution in Ecuador. They argued that this

# SA1026

evidence was needed to disprove the complaint's repeated allegations that the Ecuadorian case was "sham litigation" that was "objectively baseless." *See* ECF No. 705-1. Chevron took steps to ensure that this wouldn't happen by dropping the allegations and renouncing any attempt to prove that the litigation was baseless:

> Chevron does not intend here to relitigate the environmental conditions existing in the Oriente or the relative, substantive merit of scientists' expert opinions on that subject. In that regard the discrete inquiry here will be whether the judgment's findings have any support untainted by fraud in the record that existed before the Ecuadorian court at the time the judgment was issued.

ECF No. 705, at 3-4. The district court granted the request, saying that it would let Chevron "clarif[y] its position with respect to the 'sham' allegations." ECF No. 720. But even though the "discrete inquiry" was now "whether the judgment's findings have any support untainted by fraud in the [Ecuadorian] record," *id.*, the court refused to allow the defendants to submit evidence from the Ecuadorian record of Chevron's contamination in Ecuador, calling their attempts to do so "a joke." Tr. 501-02.

Shortly thereafter, the court again denied a request by the defendants to allow them to withdraw their collateral-estoppel defense. ECF No. 826. The defendants had argued that "the Court in substance amended plaintiff's complaint" by letting Chevron drop its "sham litigation" allegations, and that they should be treated similarly, but the court disagreed. *Id.* at 2-3.

## SA1027

### H.     Chevron forces Donziger to proceed *pro se* and drops its damages claim on the eve of trial to avoid a jury

In May 2013, shortly after its CEO declared that the case would not end until the other side's lawyers gave up, Chevron forced Donziger's lawyer to do just that. ECF No. 1100. In his withdrawal motion, John Keker explained why: "Through scorched-earth litigation, executed by its army of hundreds of lawyers, Chevron is using its limitless resources to crush defendants and win this case through might rather than merit." *Id.* 1-2. Donziger and his lawyers couldn't keep up with Chevron's "endless drumbeat of motions" and depositions "from Park Avenue to Peru." *Id.* The case, Keker lamented, had "degenerated into a Dickensian farce." *Id.* at 1. Donziger represented himself for the next five months.

One month before trial—faced with the prospect of having a jury evaluate its evidence—Chevron dropped its request for billions of dollars in damages against the Ecuadorian defendants. ECF No. 1404. It did so because the U.S. Constitution guarantees every defendant in a federal case the right to a jury only so long as "the amount in controversy shall exceed twenty dollars." U.S. Const. amend. VII. Three weeks later—on the last possible day—Chevron did the same with respect to Donziger, but only "upon a finding from [the] Court under Fed. R. Civ. P. 39(a)(2) that all issues in this case will be tried by the Court." ECF No. 1469. The court made the finding and denied the request for a jury trial. ECF No. 1500.

# SA1028

## III. After a seven-week bench trial, the district court again issues a decision preemptively nullifying the Ecuadorian judgment

### A.    The court holds a seven-week bench trial

When the trial started in October 2013, the resource disparity between the two sides could not have been starker, or more visual: On one side, a phalanx of Chevron's lawyers filled the booths, lined the walls, and occupied a large overflow room that had been annexed and converted into a Gibson Dunn war room. Chevron's General Counsel attended nearly every day for the full seven weeks. On the other side were Donziger, his new counsel (two lawyers who had entered their appearances only the week before), and a handful of youthful volunteers, some on leave from their day jobs with environmental groups, as well as counsel for the Ecuadorians (a solo practitioner who had never handled a jury trial). ECF No. 1507. When the defendants wanted to confer as a group, they met in a room the size of a closet. Tr. 838:3-11.

Chevron's case at trial rested on four primary allegations—two new and two old. The new allegations, although new, provoked a sense of déjà vu: Chevron claimed that the defendants bribed the first-level Ecuadorian judge and ghostwrote the judgment he issued. But this time, instead of relying on Diego Borja, Chevron relied on Alberto Guerra—a man who confessed to bribing judges as an attorney and accepting bribes as a judge. Tr. 1216:20-1218:8. The old allegations were that the defendants corrupted the entire case by working with Cabrera and that

# SA1029

Ecuador's judicial system is so systemically inadequate that any judgment emanating from it is unworthy of respect.

Of these four allegations, the first three do not in any way implicate the substitute Ecuadorian judgment. The fourth—systemic inadequacy—does not in any way implicate the defendants. Chevron's sole reason for including it in the case is to show, as its post-trial brief argues, that the "judgment is not subject to recognition" under New York's Recognition Act. ECF No. 1847, at 274-80.

## 1. Chevron's allegations of impropriety regarding the judgment

*a. Chevron's second alleged "bribery" scheme.* Chevron's star witness at trial was Guerra, a former Ecuadorian judge who contacted Chevron in 2012 with "a story to tell" about "the drafting of the judgment at the trial court level." A-2916.[14] At that time, Guerra was making $500 per month in Ecuador and had no savings, and his son was facing "serious [immigration] problems" in the United States. A-2902-03; CA-102. Chevron arranged for Kroll representatives to

---

[14] This was not the first time Guerra made an overture to Chevron. In October 2009, he reached out to Chevron's lawyers offering to "'fix' the entire case" in Chevron's favor. A-1864-65. One or two months later, he made the same offer to Chevron in person. A-1865; *see* A-2600-01. Guerra later claimed that he and Judge Zambrano struck a deal with the plaintiffs and Donziger at a Quito restaurant shortly thereafter—in mid-to-late November or December 2009—even though Donziger's immigration records show that he was outside the country at that time because his mother was dying from cancer. Tr. 919-922; A-1356; A-1291. The district court declined to credit this part of Guerra's testimony, finding that it conflicted with a previous account he had given. SPA-251.

# SA1030

meet Guerra in a Quito hotel room, where he told them that he had helped ghostwrite the judgment in exchange for $300,000 from the Ecuadorian plaintiffs' lawyers. CA-96, 115, 134, 170, 173. He said this story was "worth a million dollars." CA-118.

When Chevron's representatives met Guerra a few weeks later, they brought a bag filled with $20,000 in cash. A-2769. Although this amount was 40 times his monthly income, Guerra was unimpressed, calling it "very little" and asking: "Couldn't you add a few zeros?" *Id.*; A-2778. "[M]oney talks," he said, but "gold screams." A-2778. (When asked at trial whether he said these words, he answered: "I don't recognize that adage that you are quoting. It's not something that's typical in my country. But in one way or another I did express that feeling." A-800.) A few minutes later, a Kroll investigator explained that Chevron wanted photocopies of Guerra's day planners and access to his email accounts, prompting this exchange:

> GUERRA: "[A]ctually, actually … I have some attachment to that, right? All the information I have there.
>
> ANDRÉS RIVERO: That can be fixed.
>
> INVESTIGATOR 5: You will become more attached to what you can buy with the money we pay you. [LAUGHS]
>
> RIVERO: Yes, sure, true, true.
>
> GUERRA: It helps, but, but it's so little.

*     *     *

# SA1031

INVESTIGATOR 5: "[W]e'll make a deal on the way to your house. This is what we have in cash. Between now and afternoon's end we'll have managed to have a little more. How much is it?

RIVERO: How much? Not when. I said how much. [LAUGHS]

GUERRA: Make it fifty thousand.

A-2784.

Chevron ended up paying Guerra much more than fifty thousand. As it did with Borja, Chevron has paid Guerra hundreds of thousands of dollars in cash and over a million in benefits, much of which continues to this day, including:

- $18,000 and a new laptop in exchange for his hard drive, USB drives, day planners, and access to his email accounts;

- $20,000 and a new cell phone in exchange for his phone records, bank records, old cell phone, and access to his bank account;

- $10,000 for handing over an 8-page Word document and several bank deposit slips;

- an ongoing monthly stipend of $10,000, even though he has performed no work for Chevron besides getting ready for trial;

- an ongoing monthly housing allowance of $2,000;

- a personal lawyer whose bills Chevron pays;

- all moving expenses—including airfare and a temporary hotel—for him, his wife, his son, and his son's family;

- $12,000 to purchase household items for his new life in the U.S.;

- a car with insurance;

- health insurance covering him, his wife, and his son's family; and

Case: 14-826, Document 150, 07/26/2014, 1272881, Page 145 of 292

## SA1032

- payment of all legal fees to finalize the immigration of his entire family.

A-770-82; A-801-04; A-1370.

Once Chevron started paying him, Guerra began changing his story. He admitted that the Ecuadorian plaintiffs' lawyers did not in fact promise him $300,000 to write the judgment, calling this "an exaggeration [on his] part towards Chevron's people in order to secure a better position for [himself]." A-816. By "exaggeration," he meant: "It was not true." *Id.*; A-3002; A-3007.

Guerra also changed his story of how he wrote the judgment. He previously claimed to have worked on it at his home in Quito after Judge Zambrano gave him a flash drive containing a draft. A-790-91. But when no corroborating evidence was found, Guerra claimed that he actually wrote the judgment in Lago Agrio, on Fajardo's laptop. A-2941. His explanation for the change was that his "memory improved regarding those facts." A-809.

Guerra's story shifted in another important respect. When he first met with Chevron's investigators, he told them that Fajardo had emailed him a short background document to use while drafting the judgment (the so-called "memory aid"). CA-180. When asked whether he could provide proof of the email, Guerra replied: "Uhmm. That, damn, well, technically it can be obtained, right?" *Id.* A couple weeks later, after a Chevron investigator again asked him for the email, Guerra said that he "[didn't] know anything about that." A-2767. The investigator

# SA1033

explained that Chevron could access Guerra's account and find the email for him, to which Guerra responded: "Well, you know that I, in that one … precisely a few days ago I had problems with my email." A-2767-68 (ellipsis in original). Later, when the email didn't turn up—and Fajardo's email address didn't even appear in Guerra's list of contacts—Guerra said that he "recalled that [Fajardo] personally handed [him] the document in the nighttime hours of the first of day of [his] review." A-1343; Tr. 1012:9-12. Guerra explained that he hadn't been able to locate the document before because "[i]t was stuck to some other ones that [he] had in [his] possession." A-773. He never provided a draft of the judgment he supposedly worked on, nor could Chevron's investigators ever find one. A-803-04.

Guerra did not deny that he kept changing his story. As with his admittedly made-up $300,000 bribery allegation, he claimed that his shifting narrative served a purpose—to net him more money from Chevron. He was transparent about this: "I said many things to the gentlemen, to their representatives from Chevron. On many of those I was exaggerating. I wanted to improve my position regarding these gentlemen." A-807-08. And: "I did tell them some exaggerated things because it was my intention or for the purpose of bettering or improving my position." A-813. And again: "I told Chevron several things. Some of them were true, others were exaggerations." A-3020.

Case: 18-855, Document 150, 09/26/2017, 2127881, Page147 of 292

# SA1034

Although the district court was cagey about the extent to which it relied on Guerra's testimony, the court determined that "Guerra was an impressive witness" and credited his story that he was bribed to ghostwrite the provisional Ecuadorian judgment. SPA-262, 277, 291-93. The court was not troubled by the money he received to testify, dismissing it as "a private witness protection program created for him by Chevron." SPA-234.

***b. Chevron's ghostwriting allegation.*** Closely related to its bribery allegation is Chevron's claim that the plaintiffs' legal team—Donziger, Fajardo, and others—secretly ghostwrote the preliminary Ecuadorian judgment under an agreement they struck with Guerra in late 2010. A-1361. Like the bribery allegation, this allegation does not in any way implicate the three-judge court's substitute judgment. Even so, Chevron was unable to provide any direct evidence to support its ghostwriting theory. Despite having access to the entire "universe" of computer files and internal communications, Chevron could not produce a single draft of any allegedly ghostwritten judgment or find any correspondence among the plaintiffs' lawyers mentioning one. Nor could Chevron identify any emails showing that the plaintiffs had a relationship with Judge Zambrano or knew of his intentions.

The emails Chevron identified actually show the opposite. On December 31, 2010—shortly after the alleged deal with Guerra was struck and six weeks before

# SA1035

the judgment was issued—Fajardo emailed Donziger expressing concern that the

plaintiffs had not yet submitted their *alegato* (or final post-trial brief) to the court:

> Nobody knows when the Judge may issue the judgment; he may do it
> in two weeks, several months, or even years. If he does it in several
> months, he may possibly consider the memoranda of law, but if the
> judge issues the judgment soon, we will end up with the document in
> hand and it will be useless to us. We are not going to run that risk.

A-1900. He concluded: "I'm sorry my friends, but we are behind schedule with this

memorandum of law, which could have serious consequences for the case." *Id.*

When Chevron filed its own *alegato* one week later, Fajardo grew even more

worried that the plaintiffs might lose the case. He emailed the team on January 8:

> As you can see, my concerns are well founded. Chevron has gotten
> ahead of us by filing their *alegato*, while we are still writing ours. All the
> more reason to speed up our work, otherwise the Judge could be
> convinced by Chevron's theory.

A-1905. After another team member expressed his surprise that Chevron had filed

so quickly, Fajardo responded: "The one who strikes first has greater success or

causes greater impact…They want to influence the judge with their theory. It is a

mistake on our part to have fallen asleep for so long on the *alegato*." A-1904 (ellipsis

in original).[15] Chevron did not explain why Fajardo would have been so concerned

if he had already arranged for a favorable judgment.

---

[15] The district court determined that these emails are "classic hearsay" and
thus inadmissible evidence. SPA-286. But the emails were not offered to prove the
truth of the matter asserted—that the plaintiffs were actually late in filing their

# SA1036

Nor did Chevron explain why the judgment would have denied many of the plaintiffs' damages requests if the plaintiffs had actually written it, as illustrated below:

| Type of Remediation | Damages Requested By Plaintiffs | Damages Awarded By Court |
|---|---|---|
| *Groundwater* | $394 to $910 million (Cabrera: $3.24 billion) | $600 million |
| *Potable Water System* | $536 to $541 million. | $150 million |
| *Ecosystem Restoration* | $874 million to $1.697 billion | $200 million |

A-1217; A-1220-22; A-3139.186-87; A-3139.191-93.

Instead, Chevron based its ghostwriting theory on similarities between language in the preliminary judgment and in some of the plaintiffs' work product that was supposedly never filed. *See, e.g.,* PX 3800. Chevron's experts reached this conclusion without having reviewed by hand approximately 100,000 pages in the record—which is unavailable electronically—and without accounting for how Chevron had filed motions and other documents that are not part of the official record (either because they were never formally logged or because they were not properly maintained). *See* ECF No. 918-52.

*alegato*, or that their delay would actually have serious affects for the case. They were offered instead to show the lawyers' state of mind at the time: that they were worried the judge would rule against them. The emails thus fall under a well-recognized hearsay exception—despite the district court's conclusory assertion to the contrary. *See Headley v. Tilghman*, 53 F.3d 472 (2d Cir. 1995).

# SA1037

Based on this theory, Chevron subjected Judge Zambrano to a lengthy cross-examination during trial, forcing him to endure a pop quiz—through translation—about a 188-page decision he wrote nearly three years before. Here are some examples of what Chevron's counsel asked Judge Zambrano:

1. MR. MASTRO: "[S]ir, please tell us what the judgment says on page 107 is 'the most powerful carcinogenic agent considered in this decision.' Please tell us what that was." A-820-21.

2. MR. MASTRO: "Sir, can you tell us what theory of causation the judgment says its author agrees with on page 88 of the judgment? Do not look at the judgment, sir. Do not look at the judgment, please." A-826.

3. MR. MASTRO: [C]an you tell me, Mr. Zambrano, what report the judgment says at page 134 is the "statistical data of highest importance to delivering this ruling," yes or no? Yes or no?
MR. MASTRO: He's leafing through the document, your Honor.
THE COURT: Mr. Zambrano, stop. Put the document down and answer the question. A-823.

Judge Zambrano did not know the exact answer to every question. Unlike Guerra—who had met with Chevron's lawyers at Gibson Dunn approximately 50 times before taking the stand, A-767-68—Judge Zambrano had not been prepared for his testimony, nor was he paid to give it. Tr. 1807:25. When Guerra told him that Chevron would offer Judge Zambrano over $1 million in exchange for his testimony, he declined. Tr. 1915:1-2.

The district court determined that the judgment was ghostwritten. SPA-252. The court did not believe that Judge Zambrano could have written the decision himself and refused to consider the possibility that other judges who presided over

# SA1038

the case (like Judge Núñez) could have contributed to its preparation along the way but that Judge Zambrano, in an attempt to salvage some pride and dignity, had nonetheless claimed sole credit. Judge Kaplan reasoned that no judge could have reviewed the record in the case and written a 188-page decision only two months after trial—a conclusion he made in a 586-page decision issued three months after trial in this case, which has its own 100,000-plus-page record. SPA-203-04.

## 2. Chevron's allegations of fraud regarding the Cabrera Report

Chevron's next allegation focused on the way in which the report by a damages expert, Richard Cabrera, was prepared. As it did before this Court in *Naranjo*, Chevron claimed that the Ecuadorian plaintiffs' lawyers had irreparably corrupted the Ecuadorian proceeding by working with Cabrera—an argument Chevron also made, unsuccessfully, to all three levels of Ecuador's judiciary.

Despite Chevron's allegations, the interactions between Cabrera and the plaintiffs' lawyers were fully consistent with Ecuadorian law and practice at the time, which permitted parties to communicate *ex parte* with court-appointed experts (as Chevron itself did). A-427–31; A-441–43; A-2075–76. It also permitted parties to create work plans and to draft materials for the experts to adopt as their own (as Chevron did too). *Id.* And it permitted—indeed, *required*—that the party who requested the expert pay for the fees and expenses. Although Chevron contended that the Ecuadorian plaintiffs' lawyers paid Cabrera additional money to influence

his conclusions, this money covered only expenses for work he had actually performed or was set to perform. The plaintiffs' lawyers advanced the money (which they were obligated by law to pay) so that his work would not be delayed. One contemporaneous internal email, for example, explained that the Ecuadorian trial court had been "taking [its] time in resolving [Chevron's] recusal" motion, which prevented the court from acting on Cabrera's request that "we pay him for financing the costs of the field work." A-1288.1. "[I]f there's no money," the email continues, "the job simply becomes paralyzed," and "the expert's job can't wait" until "the judge orders us to pay" his "expenses." *Id.* The money for Cabrera's expenses was therefore paid out of a segregated account (an account kept secret from the employees of the law firm, which was having difficulty making payroll as litigation expenses mounted) in anticipation of court approval. A-3435-36.

None of the three Ecuadorian courts found anything improper about this arrangement, but nonetheless set aside the Cabrera Report because it was unnecessary to their decisions. The first-level court granted Chevron's request that the report "not be taken into account" (rather than waste time addressing Chevron's "excessively voluminous" filings regarding it) and later clarified that "the report had NO bearing on the decision." A-1089; A-1245. The second-level court, reviewing the evidence de novo, similarly declined to rely on the report and found that Chevron's allegations "could not affect the final result of the lawsuit" given the

# SA1040

overwhelming evidence of Chevron's liability. A-492. And the Supreme Court confirmed that the judgment "did not take [the report] into account." A-3545-46. It noted that Chevron had "not indicate[d] which law [was] violated," nor had it explained how the allegations, even if true, "affect[ed] the validity of the proceeding" or "harm[ed]" Chevron in any way. *Id.*

That conclusion is not surprising. Throughout the Ecuadorian litigation, Chevron took the position that it owed *nothing* to the victims of its pollution and refused to work with Cabrera as he prepared his report on damages. Instead of providing an alternative damages calculation, Chevron tried to obstruct the process: It "filed a considerable number of motions" attacking Cabrera and took out full-page ads in several prominent publications assailing his "complete lack of integrity"—an attempt to force his withdrawal through public humiliation. A-1088; ECF Nos. 154-2, 154-3, 154-4.

Nonetheless, the district court again sided with Chevron. Citing the *current* version of an Ecuadorian statute governing the payment of experts in *criminal* proceedings, the district court concluded that the payments to Cabrera "were illegal or at least improper" as a matter of Ecuadorian law, SPA-105-06—even though Ecuador's highest court found that Chevron could "not indicate which law [was] violated." A2545-46. And the district court determined that the judgment had actually relied on the Cabrera Report—despite the Ecuadorian courts' express

# SA1041

statements to the contrary—because the judgment used a "pit count" of 880 to calculate damages. SPA-546. That number, however, was based on a review of "aerial photographs," plus documents "submitted by the parties" and "the expert Gerardo Barros." A-1163. The Ecuadorian court explained that it wasn't based on the Cabrera Report, where "[t]he number 880 does not appear." Tr. 1337:1-5. The Ecuadorian Supreme Court, addressing this very issue, independently held that "the judge did not weigh the challenged report" or "contradict[] any principles of logical evaluation" in calculating the total number of pits. A-3607. And Chevron did not give the Ecuadorian trial court its own pit count—of *its own* pits—nor did it do so below. *See* A-1163. In other words, Chevron did not contest that there were at least 880 pits.

### 3.    Chevron's allegation that the Ecuadorian judiciary is corrupt

Aware that none of its case-specific allegations could carry the day—particularly with respect to the substitute judgment—Chevron proceeded to attack the Ecuadorian judiciary as a whole. The basis for this attack was the same as before: State Department reports, Donziger's own unguarded statements, and the testimony of a single person—Dr. Vladimiro Álvarez Grau, a man this Court has described as "an avowed political opponent of the country's current President, Rafael Correa." *Naranjo*, 667 F.3d at 238.

# SA1042

Dr. Álvarez, a former presidential candidate and current newspaper columnist, is the kind of figure who would be a regular on Fox News or MSNBC in the United States. Admitting at trial that he did not "know anything at all regarding the Lago Agrio case other than what is made public," Tr. 2041:1-2, Dr. Álvarez instead denounced Ecuador's judiciary with broad, politically barbed statements about judicial independence and the rule of law. For the proposition that Ecuador's judicial reforms in the mid-2000s violated the separation of powers, Dr. Álvarez cited his own comments in Ecuador's media. A-1418. Dr. Álvarez then argued that the administration of justice in the Lago Agrio case could not have been impartial because Correa made public statements in support of the LAPs. A-1473. Nonetheless, for this sweeping criticism of Ecuador's judiciary Chevron paid Dr. Álvarez at least $150,000. A-829. The district court bought wholesale these statements by a foreign political figure, citing Dr. Álvarez's testimony 52 times in nine pages and corroborating his claims only once. SPA-420-28.

## B.    The court issues its decision

The district court issued a 586-page decision, including appendices, ruling for Chevron across the board and finding that the Ecuadorian judgment "was obtained by corrupt means." SPA-497.

The court concluded that Chevron had Article III standing. Of the nine injuries that Chevron alleged, the district court found that three were sufficiently

# SA1043

redressable to generate standing: the loss of Ecuadorian trademarks held by a Chevron subsidiary; the loss of an arbitral award against the Republic of Ecuador; and the present and future costs associated with defending against the enforcement of the Ecuadorian judgment around the world. SPA 325-27.

The court also reasoned that the Ecuadorian appellate court's de novo review of the facts and the substitute judgment it issued did not break the chain of causation required for standing. It found as a matter of fact that the appellate court did not engage in de novo review because the judges had too little time to review the record. SPA-428. The court further reasoned that, in any event, "the subsequent appellate rulings are not entitled to any recognition in consequence of the systemic deficiencies of the Ecuadorian legal system." SPA-326.

Turning to the defendants' claim that Chevron was estopped from making a wholesale attack on Ecuador's judiciary in light of its promise to submit to Ecuadorian jurisdiction, the court concluded that when this Court found in *Republic of Ecuador* that Chevron had merged with Texaco, it was "misinformed." SPA-469. The district court therefore held that "Chevron is not bound by any of the statements made in *Aguinda* by Texaco," including the promise to submit to Ecuadorian jurisdiction. *Id.*

The court then issued its relief, including (1) a constructive trust on all property that the defendants receive that is "traceable to the [Ecuadorian]

# SA1044

Judgment or the enforcement of the Judgment anywhere in the world"; and (2) an injunction against "[f]iling or prosecuting any action for recognition or enforcement of the Judgment or any New Judgment … in any court in the United States." SPA-590. The court defined "New Judgment" as "any judgment or order that hereafter may be rendered in the Lago Agrio Case [by] any court in Ecuador." SPA-592. The district court determined that this relief was consistent with this Court's decision in *Naranjo* because *Naranjo* was "limited to the panel's interpretation of New York's Recognition Act." SPA-493.

In addition to Chevron's RICO claim, the court grounded the relief in what it called Chevron's "non-statutory claims for equitable relief with respect to the judgment." SPA-330. It did not identify which, if any, of the claims in Chevron's complaint constituted this category.

Following the court's decision, Chevron moved for $32 million in attorneys' fees from Donziger, arguing that the fees are mandatory under RICO. ECF Nos. 1889-90. The district court deferred consideration of fees pending appeal.

## STANDARD OF REVIEW

A district court's determination of its own subject-matter jurisdiction is reviewed de novo. *Bechtel v. Competitive Techs., Inc.*, 448 F.3d 469, 471 (2d Cir. 2006). Whether a claim states a cause of action is also reviewed de novo. *See, e.g.*, *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008). Finally, whether

# SA1045

to apply judicial estoppel is a "pure question of law," *Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 143 (2d Cir. 2005), and should therefore be reviewed de novo as well. *Intellivision v. Microsoft Corp.*, 484 F. App'x 616 (2d Cir. 2012) (declining to decide the standard of review for judicial estoppel but applying de novo review).

## SUMMARY OF ARGUMENT

**I.** Because Chevron lacks standing, the district court lacked jurisdiction. There is no causal link between the conduct of which Chevron complains and the injuries Chevron alleges. The decision Chevron attacks is the substitute judgment of the appellate court. But Chevron alleges misconduct only at the trial level. And it has not even sought to contest its environmental liability.

Chevron's standing problems do not end there. When it comes to relief, Chevron is stuck between Article III and *Naranjo*. If Chevron's injunction satisfies *Naranjo*, it is too narrow and speculative to redress Chevron's injuries; if it prevents collection of the judgment worldwide, it is no more valid than the injunction this Court struck down in *Naranjo*.

**II.** This Court has already held that "[t]here is no legal basis for the injunction that Chevron seeks." *Naranjo*, 667 F.3d at 242. Neither RICO nor the district court's "non-statutory claims for equitable relief" provide a valid basis for circumventing *Naranjo*. Doing so would violate bedrock principles of international comity and transform the Second Circuit into a magnet for collateral attacks by

# SA1046

disappointed litigants around the world.

**III.** Even if Chevron were to make it past standing and *Naranjo*, it would be judicially estopped both by its prior representations regarding the adequacy of Ecuador's judiciary and by its promise to this Court that it would submit to Ecuador's jurisdiction as a condition of its *forum non conveniens* dismissal. Despite the district court's attempts to rewrite history, that promise is "enforceable against Chevron." *Republic of Ecuador*, 638 F.3d at 389 n.4.

**IV.** Finally, Chevron has no cause of action under RICO. RICO's causation and injury requirements are more stringent than Article III's, and the relief awarded by the district court awarded pushes RICO's already strained language far beyond the breaking point.

## ARGUMENT

## I.    Because Chevron lacks standing, the district court lacked jurisdiction to issue its opinion and judgment.

When it filed this RICO action in 2011, Chevron made grand promises. It promised to show that a two-decade quest by indigenous Ecuadorians to seek justice for Chevron's pollution of their rainforest homeland was nothing but "sham litigation." ECF No. 1 at 2. But along the way, Chevron dropped *any* attempt to contest the overwhelming evidence that it willfully polluted the water, land, and air of the Amazon for decades. Then, on the eve of trial, Chevron dropped *all* of its damages claims—a transparent maneuver designed to deprive Donziger of his

## SA1047

constitutional right to a trial by jury. And, finally, in its post-trial briefing, Chevron ditched its request for an injunction against all foreign enforcement proceedings—an apparent attempt to avoid the serious international-comity concerns that led this Court in *Naranjo* to reverse the district court's previous worldwide anti-enforcement injunction.

These three strategic decisions, taken together, leave Chevron on the horns of an intractable legal dilemma. On the one hand, nobody may bring a case in federal court without demonstrating the requirements of Article III standing: (1) a legally cognizable injury that is (2) "fairly traceable to the defendant's allegedly unlawful conduct" and (3) "likely to be redressed by the requested relief." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006). As the plaintiff, Chevron must show that it satisfies these three elements—injury, causation, and redressability—for each claim and form of relief it seeks. *Id.* at 352. Until it has done so, there is no jurisdiction over the case and the court has "no business deciding it." *Id.* at 341. Because there has been no attempt to enforce the Ecuadorian judgment in the U.S., Chevron and the district court had to attempt to demonstrate standing by giving the injunction real teeth—by proving that it binds foreign courts in a way that makes it likely to redress Chevron's claimed injury.

On the other hand, Chevron and the district court had to try to satisfy the international-comity principles identified in *Naranjo*. That means they had to

appear to strip the injunction of any binding effect—by showing that it preserves the ability of foreign courts to make their own decisions about how to apply their own laws on enforceability. The dilemma facing Chevron and the district court is that they had to somehow do both—a logical impossibility.

In addition to the dilemma it faces with its relief, Chevron faces a severe causation problem. Its claimed injuries stem from the three-judge court's substitute judgment, which in Ecuador's civil-law system is effectively the product of a retrial. And yet the wrongdoing Chevron alleges all occurred at the trial level. To be clear, Mr. Donziger vigorously contests every one of these allegations: The accusation that he bribed a judge itself hinges on the paid testimony of a man who confesses to bribing and being bribed, Tr. 1216:20-1218:8, and Ecuador's own Supreme Court pointed out that Chevron has "not indicate[d] which law [was] violated" in the preparation of the Cabrera Report. A3545-46.

But even setting that aside, Chevron's position is akin to that of a criminal defendant who complains of procedural irregularities in a trial, is retried and convicted once again, but continues to complain about the first trial in his habeas petition. In that situation, no sensible reviewing court would reach out to overturn the second trial. *Cf.* Fed. R. Civ. P. 61 ("[T]he court must disregard all errors and defects that do not affect any party's substantial rights."). The intermediate

## SA1049

appellate court's "de novo review and entry of its own valid final judgment cured any error." *Executive Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165, 2175 (2014).

This lack of causation also means that Chevron's injuries will not be redressed by the relief it sought and obtained. None of Chevron's alleged injuries will be remedied by the district court's prospective injunction, and its future harms are speculative and incapable of being prevented by an injunction that falls short of the worldwide injunction rejected in *Naranjo*. Chevron should not be allowed to obtain a U.S. court's "advisory opinion" to be deployed for its persuasive value in enforcement proceedings around the world. *Naranjo*, 667 F.3d at 246.

### A.    Chevron cannot show that the alleged trial-level misconduct caused the substitute judgment of the three-judge appellate court.

Chevron lacks standing because it cannot, as a matter of logic, prove "a causal connection between [its] injury and the conduct complained of." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Chevron's case boils down to two things: that an expert report submitted at trial was allegedly prepared improperly and that the trial judge who issued the preliminary judgment was allegedly influenced inappropriately. But Chevron seeks relief from the *substitute judgment* issued by the three-judge court, which did not include the trial judge and did not consider the report. And Chevron has chosen not to contest its liability for environmental damage, which the three-judge court found based on an

# SA1050

"independent and complete review of the conflicting evidence." *Arkison*, 134 S. Ct. at 2175. Chevron therefore cannot demonstrate that its alleged injuries are "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party." *Lujan*, 504 U.S. at 560.[16]

> **1.** **The appellate court's substitute judgment—the product of a de novo review of the record—breaks any causal link between alleged trial-level improprieties and Chevron's injuries.**

Chevron has failed to prove any causal link between its alleged injuries (which flow from the substitute judgment) and the alleged wrongdoing (which concerns the provisional judgment). After the trial court issued its 2011 judgment, an independent three-judge court reviewed the record *por el merito de los autos*—a standard of review that this Court has recognized is "similar to the American standard of de novo review" but "applicable to questions of both fact and of law." *Naranjo*, 667 F.3d at 237; SPA-629 (*Código de Procedimiento Civil*, art. 838). Indeed, in

---

[16] The district court considered it "hornbook law" that standing is determined only at the time the action is brought, and that the jurisdictional problems raised are therefore questions of mootness, not standing. SPA-320 n.1230. But when a party "seeks new relief, he must show (and the District Court should have ensured) that he has standing to pursue it." *Salazar v. Buono*, 559 U.S. 700, 731 (2010) (Scalia, J., concurring). As the "party invoking federal-court jurisdiction," Chevron "'bears the burden of showing that [it] has standing for each type of relief sought.' A plaintiff cannot sidestep Article III's requirements by combining a request for injunctive relief for which he has standing with a request for injunctive relief for which he lacks standing." *Id.* (quoting *Summers v. Earth Island Institute*, 555 U.S. 488 (2009); citing *Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)).

civil-law systems like Ecuador's, the term "'appeal' has a special meaning … that is unfamiliar in the United States" because the reviewing court "arrive[s] at an independent determination of what the facts are and what their significance is." John Henry Merryman & Rogelio Pérez-Perdomo, *The Civil Law Tradition: An Introduction to the Legal Systems of Western Europe and Latin America* 121 (3d ed. 2007). In these systems, "fact-finding will be reassigned from the court that did the primary fact-gathering," John H. Langbein, *The German Advantage in Civil Procedure*, 52 U. Chi. L. Rev. 823, 856-57 (1985), resulting in a "[f]ull redetermination of the law and the facts" and a "substitute trial court decision[]." José Rafael Bustamente, *Ecuador, in Civil Appeal Procedures Worldwide* 262, 263, 266 (Charles Platto ed., 1992).[17]

Chevron cannot overcome this causation problem by pointing to the three-judge court's refusal to adjudicate Chevron's criminal accusations against Donziger. Just as a U.S. court would not hold a criminal hearing amid a civil trial to assess a possible violation of a witness-bribery statute, the three-judge Ecuadorian court lacked "jurisdiction to hear [Chevron's claims of] collusive action," which Chevron could bring separately under Ecuador's Collusion Prosecution Act. A-3543. Chevron received a full review of the factual and legal determinations on appeal—

---

[17] For this reason, "Chevron's expert on Ecuadorian law" previously admitted to this Court that "the Ecuadorian judgment remained unenforceable until the intermediate court issued its decision." *Naranjo*, 667 F.3d at 237; *see also Código de Procedimiento Civil*, art. 300(5); *Ley de Casación*, art. 10.

# SA1052

determinations that it declined to challenge here—and the judgment against it disregarded the allegedly tainted evidence. That dooms its case for causation.

## 2.    The district court's conclusion about the standard of review contradicts Ecuador's highest court on a question of Ecuadorian appellate procedure.

Aware of Chevron's causation problem, the district court tried to get around it in two ways: (1) by launching a wholesale attack on Ecuador's judiciary based on the testimony of a political talking head, SPA-326 n.1251, and (2) by "finding" that the three-judge court did not actually engage in de novo review. SPA-426. But questions of foreign law are questions of law, not fact. *See* Fed. R. Civ. P. 44.1. And in Ecuador, as in the United States, the question whether a court applied the correct standard of review is a question of law. It is also one the Ecuadorian Supreme Court answered: It found that the intermediate court properly exercised de novo review—directly contradicting the district court's "finding" in this case. A-3605 ("[T]here has been a correct weighing of the evidence in accordance with legal standards.").

A federal district court cannot use its authority as a fact finder to make pronouncements of another nation's law that contravene that nation's highest court. The purpose of Rule 44.1 was "to abandon the fact characterization of foreign law and to make the process of determining [foreign] law identical with the method of ascertaining domestic law to the extent that it is possible to do so." Wright & Miller,

# SA1053

11 *Fed. Prac. & Proc.* § 2444 (3d ed. 2014). If the rule means anything, it is that the pronouncements of a foreign supreme court *on the same issue, in the same case* control. Federal courts are bound by the decisions of state high courts when sitting in diversity jurisdiction. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64 (1938). A sovereign nation's high court deserves at least as much respect "as a matter of comity." *Diorinou v. Mezitis*, 237 F.3d 133, 142 (2d Cir. 2001); *see* Doug M. Keller, *Interpreting Foreign Law Through an Erie Lens*, 40 Tex. Int'l L. J. 157 (2004).

Even beyond comity, it is difficult to understand how a U.S. trial judge would be better positioned than Ecuador's Supreme Court to assess an Ecuadorian appellate court's compliance with Ecuadorian standards of review. As Judge Rakoff noted in *Aguinda*, the idea that an American judge "is better equipped than an Ecuadorian judge to apply Ecuadorian law to Spanish-language testimony and documents relating to 30 years' of activities … in an Amazonian rain forest is preposterous." *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 552 (S.D.N.Y. 2001), *aff'd as modified*, 303 F.3d 470 (2d Cir. 2002). It is even more "preposterous" in light of the history: This litigation was moved from the U.S. to Ecuador in the first place based in part on Chevron's representation that "Ecuador's courts are far better suited to apply their own laws." Appellee Br. 67 in *Aguinda v. Texaco, Inc.*, No. 2001-7756 (2d Cir., filed Dec. 20, 2001).

# SA1054

In any event, the Ecuadorian Supreme Court was correct to conclude that the three-judge court considered the record with care. That court found a number of small errors in the previous court's analysis: that it had mistakenly read a unit of measurement as milligrams, instead of micrograms, A-463; that one sample had the wrong expert's name attributed to it, *id.*; that a sample showing a certain amount of benzene contamination was misreported, *id.* When Chevron alleged that the trial judge's ruling referred to evidence not in the record (which Chevron claimed was proof of fraud), the three-judge panel found where in the record the evidence was located. A-463. And the court's judgment reversed the trial court's findings as to mercury contamination, noting an error in the judge's assessment of the evidence. A-468.

Disregarding all of this, the district court based its "factual finding" on uninformed assumptions about Ecuadorian appellate procedure. The court asserted—without citation—that "additional evidence presented at trial reveals" that the three-judge court did not engage in the appropriate level of review. SPA-426 n.1568. What evidence, exactly? The court did not say.

Instead, the court surmised that "it would have been impossible for any court to have conducted a *de novo* review of the 188-page judgment and the trial record in the time the appellate court rendered its decision." SPA-427. But elsewhere, the court admitted that it had been given no "evidence or foreign law

# SA1055

materials explaining the procedure for selection of appellate judges under Ecuadorian law." SPA-295 n.1149. So on what basis did the court make this determination other than armchair speculation? There were nine months between the selection of the first appellate panel and the issuance of the substitute judgment. A-1228. Yet, in the absence of any evidence, the district court not only refused to defer to Ecuador's Supreme Court but also made the most unfavorable assumptions possible: that the only time in which the three judges could review the case was after establishment of the *final* panel, five weeks before the judgment, and that this length of time made it impossible for them to engage in meaningful review. Although the court pointed to the total number of pages in the Ecuadorian record to back up its assumptions, that number is surely inflated by Chevron's known propensity to "bombard [courts] with distracting and irrelevant documents." *Republic of Ecuador,* 638 F.3d at 388 n.2. And the district court itself issued a 586-page decision with over 1,800-plus footnotes less than a month after briefing was completed in this case.

In a particularly strange and conclusory statement, the district court declared that "Chevron's injuries are not attributable to a cause independent of defendants' ghostwriting, bribery, and other misconduct." SPA-416. But the court did not explain how it ruled out the obvious independent cause: Chevron's own decades-long illegal pollution in Ecuador, which Chevron chose not to contest here.

# SA1056

Reconsidering the evidence of that pollution de novo, the three-judge court held Chevron liable and entered judgment against it—a judgment on which Chevron has cast no doubt in this appeal. As a result, Chevron cannot prove that its injuries are "fairly traceable" to the misconduct it alleges, and so it does not have constitutional standing to bring this case. *Lujan*, 504 U.S. at 560.[18]

### B. Chevron failed to demonstrate any concrete injuries that could be redressed by the relief sought.

To have standing, Chevron must also demonstrate that it is "likely, as opposed to merely speculative, that [its] injury will be redressed by a favorable decision." *Id.* at 561. Chevron has not done so. The district court grounded Chevron's standing in three asserted injuries—none of which will be likely redressed by the relief granted.

Chevron first asserts that it has suffered harm due to the seizure of trademark assets belonging to one of its subsidiaries in Ecuador. ECF No. 1847 at 6. But Chevron has not demonstrated that its relief will likely redress this injury. Chevron does not contend that the relief nullifies the embargo over the trademarks in Ecuador. Rather, Chevron says that it has satisfied redressability because the relief bars the Ecuadorian defendants from receiving funds from a future auction of

---

[18] This is to say nothing of Chevron's failure to show "but for" causation under RICO, which we address in Section IV. *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992).

# SA1057

the trademarks, which would instead go "in constructive trust for Chevron." ECF No. 1863 at 13. That relief, according to Chevron, is "more than adequate" to establish standing. *Id.* at 14.

Hardly. Here is what would have to happen for the district court's injunction to redress this injury:

(1) The Republic of Ecuador would have to hold an auction of the subsidiary's trademark at some point in the future;

(2) someone would have to buy the trademarks;

(3) the Ecuadorian co-defendants *in this case* would have to be selected out of all the individuals eligible to receive the funds from the auction;

(4) the Ecuadorian courts (which Chevron claims do "not follow the rule of law," *id.*) would have to agree to enforce this Court's judgment deeming them corrupt; and

(5) the Ecuadorian courts would then have to give the money back to Chevron.

That is not only well short of "likely"—it is completely far-fetched. A plaintiff "cannot rely on speculation about 'the unfettered choices made by independent actors not before the court,'" and no foreign court is bound by this Court's decision. *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1150 n.5 (2013). It is nothing short of absurd to think that Chevron has pursued this lawsuit to obtain compensation for the loss of the dormant Ecuadorian trademarks of its subsidiary.

Chevron's second asserted injury relied on by the district court is the Ecuadorian courts' embargo of a $96 million arbitral award against the Republic

# SA1058

of Ecuador. SPA-326. But Chevron has not even alleged, let alone proven, that this award will likely be redressed by the district court's injunction. As with the trademark injury, redressability depends on Ecuadorian courts (a) enforcing the district court's opinion, (b) directing the embargoed funds to the two Ecuadorian defendants in this case, and then (c) requiring them to turn the money over to Chevron. Neither the district court nor Chevron gives any reason to think such a chain of events is even plausible, much less likely.

Moreover, Chevron cannot rely on either of these two alleged injuries to obtain standing for its claims against Mr. Donziger. He has not received any funds from any auction, nor from any arbitral award, nor is he slated to do so. Chevron makes no effort whatsoever to tie him to these so-called injuries or to otherwise establish how its claims against him could be rooted in them.

The final injury on which the district court relies to assert jurisdiction is Chevron's legal fees to defend against enforcement of the judgment. SPA-327. But neither the fees already incurred nor those that Chevron expects to incur in the future would be redressed by the district court's injunction. As for fees incurred, Chevron cannot recover them because it dropped its damages claim. As for fees expected, the district court's injunction, by its own terms, does not prevent anyone from enforcing the judgment overseas. SPA-496. So Chevron's money will be spent regardless of the district court's injunction.

# SA1059

### C.  Because the district court lacked jurisdiction to hear this case, its findings—particularly findings related to professional misconduct—should be vacated.

There is no such thing as "hypothetical" jurisdiction—"[w]ithout jurisdiction the court cannot proceed at all in any cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998). For that reason, a court's decision that proceeds despite a lack of jurisdiction is "utterly void and unavailable for any purpose." *Earle v. McVeigh*, 91 U.S. 503, 507 (1875). But lacking such jurisdiction, the district court declared a lawyer guilty of bribing a judge and pilloried a nation's entire judiciary, basing those findings almost entirely on paid testimony from an admitted bribe-taker and a foreign politician. In *Naranjo*, this Court made clear that it was inappropriate for Chevron to seek "such an advisory opinion." 667 F.3d at 246. Now that Chevron has obtained one in the form of the district court's opinion, the only remedy for those affected by the court's declaratory findings is to explicitly vacate them. *See Cunningham v. BHP Petroleum Great Britain PLC*, 427 F.3d 1238, 1245–46 (10th Cir. 2005) (vacating all actions of the district court where the court lacked subject-matter jurisdiction). That is what this Court should do.

But even if this Court does not vacate all the district court's findings, it should at least vacate those that implicate Mr. Donziger in professional misconduct. This Court's power to vacate factual findings of professional misconduct is well established, and the district court's findings here amounted to "much more than

## SA1060

implied criticism." *In re Goldstein*, 430 F.3d 106, 111 (2d Cir. 2005). Because such findings result in significant "reputational consequences and potential costs," *id.*, they can be subject to appeal when there is "a finding that an attorney is guilty of specific misconduct," *Keach v. Cnty. of Schenectady*, 593 F.3d 218, 225 (2d Cir. 2010). "Even factual findings by themselves" can be grounds for an appeal where appellate jurisdiction would otherwise be lacking. *Sheppard v. River Valley Fitness One, L.P.*, 428 F.3d 1, 6 (1st Cir. 2005).

The district court—without providing the standards of proof or procedural safeguards that the Constitution mandates for criminal trials—found that Mr. Donziger, as an attorney, gave his "express authorization" for payments to bribe a judge. SPA-293. And the court based this finding solely on the testimony of a paid witness, Alberto Guerra, who admitted to making false statements about the Ecuadorian proceedings to sweeten his deal with Chevron. A-813. Chevron paid Guerra a monthly stipend of $10,000 in addition to particular payments for individual pieces of evidence, such as $20,000 for his phone and bank records. A-771; A-800. Such payments are "absolutely indefensible." *In re Robinson*, 136 N.Y.S. 548 (N.Y. App. Div. 1912) ("The payment of a sum of money to a witness to 'tell the truth' is as clearly subversive of the proper administration of justice as to pay him to testify to what is not true."); ECF No. 1423-2 (Erwin Chemerinsky declaration explaining that "payment of a salary to a witness, in exchange for the

# SA1061

witness's agreement to testify … is a clear violation" of ethics rules). If any case calls for vacating a court's findings for lack of jurisdiction, this one does.

## II. Chevron's collateral attack on the Ecuadorian judgment violates bedrock international-comity principles and is authorized by neither state nor federal law.

This is *Naranjo* all over again. Then, as now, Chevron sought and obtained from the district court a determination that the Ecuadorian judgment was procured by fraud and an injunction preventing its enforcement. *Naranjo*, 667 F.3d at 238. Chevron sought, as its complaint put it, a declaration that "any Lago Agrio judgment is unenforceable and non-recognizable, including but not limited to under the United States Constitution, federal common law, New York common law principles of comity, and/or New York's Recognition of Foreign Country Money Judgments Act," on "grounds of fraud, failure to afford procedures compatible with due process, lack of impartial tribunals, and contravention of public policy." ECF No. 1, at 144; *see also* ECF No. 283, at 162.

In addition to that breathtakingly broad claim, Chevron also asked this Court, in the alternative, to affirm the district court's preliminary injunction "in light of Chevron's RICO and state-law claims, which are based on—among other things—Donziger and his co-defendants' racketeering enterprise aimed at extorting a 'settlement' from Chevron" and "common law fraud." Appellee Br. 70-71 in *Chevron v. Naranjo*, No. 11-1150 (2d Cir., filed June 23, 2011).

# SA1062

This Court was unpersuaded. It reversed the injunction the day after oral argument. And it not only reversed but ordered Judge Kaplan to dismiss Chevron's declaratory-relief claim "in its entirety." *Naranjo*, 667 F.3d at 247. The Court held that there was "no legal basis for the injunction that Chevron seeks" and that, "on these facts, there will be no such basis until judgment-creditors affirmatively seek to enforce their judgment in a court governed by New York or similar law." *Id.* at 242. The Court took care to anchor its holding not only in an interpretation of New York's Recognition Act, but also in "the common law principles it encapsulates" as well as principles of international comity and the role of American courts as "responsible participant[s] in an international system of justice" and an "overall enforcement-facilitation framework." 667 F.3d at 241-43.

Yet tucked away at the tail end of its opinion, the district court now offers a reading of *Naranjo* as "limited to the panel's interpretation of the New York's Recognition Act." SPA-493. It dismisses this Court's discussion of international comity as "tied to the panel's discussion of the Recognition Act," whereas the current injunction is based on "an entirely different statute, RICO, and non-statutory state law causes of action about which the *Naranjo* panel said nothing substantive." *Id.* But this Court necessarily rejected Chevron's alternative argument for affirmance on its RICO and common-law theories when it reversed the

## SA1063

injunction: Had it found those arguments persuasive, it would have, and should have, upheld the injunction on those grounds.

More broadly, the district court's decision, if upheld, would render *Naranjo* a dead letter. If the district court is correct, disappointed litigants from around the globe should pack their bags and book a one-way ticket to Foley Square. They may not obtain a decree that will be obeyed back home, and they may never actually face enforcement in New York, but they can air their grievances of fraud, corruption, misconduct, and bias and be guaranteed an advisory opinion by a judge in New York. Such a regime would "unquestionably provoke extensive friction between legal systems," unnecessarily foster "challenges to the legitimacy of foreign courts" (even where, as here, the enforceability of the judgment "might never be presented in New York"), and encourage litigants to "seek a res judicata advantage" for use in "potential enforcement efforts in other countries." *Naranjo*, 667 F.3d at 246. But as we now explain, even if *Naranjo* permitted it, even the most expansive sources of state law (the common law) and federal law (RICO) do not provide a basis for the extraordinary relief granted by the district court here.

**A.    The district court's "non-statutory" analysis provides no legitimate basis to circumvent *Naranjo*.**

Of all the oddities in the district court's 586 pages of opinion and appendices, its discussion of what the court calls the "non-statutory claims for equitable relief with respect to the judgment" is perhaps the oddest. SPA-330-346. Invoking Lord

# SA1064

Coke and John Marshall, the court concludes that the common law authorizes the very thing this Court rejected in *Naranjo*—a "cause of action[] by which disappointed litigants in foreign cases can ask a New York court to restrain efforts to enforce those foreign judgments against them." *Naranjo*, 667 F.3d at 243. Along the way to that surprising conclusion, the court cites a law student's note from 1928; several eighteenth- and nineteenth-century English cases (including one from 1750 in which the Lord Chancellor settled a boundary dispute between the colonies); and a bookshelf's worth of equity treatises. SPA-330-346. From all this, the court draws the lesson that courts at equity could enjoin judgments procured by fraud "at least since the seventeenth century," and that "[t]here is a good deal of learning" on the sort of fraud that supports an independent action for relief from a judgment. SPA-331; SPA-334.

The court assembles an impressive library of authorities, but what exactly are these "non-statutory claims" and how did they end up in this case? Are they related to any claim pleaded in Chevron's complaint, or were they dreamt up in chambers after the trial? How many of these "non-statutory claims" are there anyway? (The opinion vacillates between the singular and the plural.) Are they grounded in state or federal law? If federal law, under what authority? If state law, how does any of this square with *Naranjo*? And why in the world would New York's common law govern litigation conduct in a South American jungle courthouse

# SA1065

three thousand miles away? To say the least, the district court's opinion raises more questions than it answers.

For starters, although the cases cited by the district court are overwhelmingly federal, its analysis cannot be properly grounded in federal law. There is a simple reason: "There is no federal general common law." *Erie*, 304 U.S. at 78. As every first-year law student learns, "[t]he source of substantive rights enforced by a federal court under diversity jurisdiction, it cannot be said too often, is the law of the States." *Guaranty Trust v. York*, 326 U.S. 99 (1945). The state, "whether its voice be the legislature or its highest court," supplies the rule of decision—not the wisdom of learned federal district judges. *Id.* And that is true "whether the remedies be sought at law or may be had in equity." *Id.*

But the district court effectively declared the existence of a new cause of action under New York law—an affirmative fraud-on-the-court claim by a judgment debtor—without so much as a nod in the direction of New York's "legislature" *or* "its highest court." The court didn't even bother to cite any New York decisions from the past century.

Whatever may have been true "in the time of Lord Coke" (SPA-332), New York's Uniform Foreign Country Money-Judgments Recognition Act, N.Y. C.P.L.R. §§ 5301-5309 (article 53), enacted in 1970, codifies the preexisting common law. *CIBC Mellon Trust Co. v. Mora Hotel Corp. N.V.*, 792 N.E.2d 155, 159

# SA1066

(N.Y. 2003). This is presumably what this Court meant in *Naranjo* when it grounded its decision in both the Recognition Act and "the common law principles it encapsulates." 667 F.3d at 240. New York courts have been clear: For foreign money judgments that "come directly within the scope of article 53," the Act displaces and preempts the common law. *Overseas Dev. Bank in Liquidation v. Nothmann*, 480 N.Y.S.2d 735, 738 (N.Y. App. Div. 1984). And the Recognition Act presumes, as a matter of New York law, that a foreign money judgment "is conclusive between the parties" until challenged in an enforcement proceeding." N.Y. C.P.L.R. § 5303. The district court's decision to fashion a new common-law claim thus contravenes both *Naranjo* and the New York Recognition Act and "would turn [the international judgment-enforcement] framework on its head." *Naranjo*, 667 F.3d at 241.

In any event, New York's common law would not recognize such a claim even apart from the Recognition Act or international-comity considerations: "A litigant's remedy for alleged fraud in the course of a legal proceeding 'lies exclusively in that lawsuit itself,' … not a second plenary action collaterally attacking the judgment in the original action." *Vinokur v. Penny Lane Owners Corp.*, 703 N.Y.S.2d 35, 36 (N.Y. App. Div. 2000). This does not mean that a "defeated litigant" is "without redress" for fraud; rather, "[h]e can apply in the original action, and in a proper case obtain relief." *Crouse v. McVickar*, 100 N.E. 697, 698

## SA1067

(N.Y. 1912). If it is a foreign judgment, the judgment debtor has two choices: seek relief from the judgment in the foreign forum or wait and raise fraud as a defense in an enforcement proceeding in New York, if such a proceeding is ever brought.[19]

Federal civil procedure follows a similar approach. If a litigant complains that another court's judgment was procured by fraud and seeks relief under Rule 60—a procedure not raised by Chevron here but invoked by the district court, SPA-331 n.1263—the rule is simple: "The court that was the victim of the fraud is the *only* court that can decide the question and it cannot be raised by an independent action in another court." Wright & Miller, 11 *Fed. Prac. & Proc.* § 2870 (3d ed. 2014) (emphasis added). There are good reasons for that longstanding rule. The federal courts recognize that "for a nonissuing court to entertain an action for such relief would be seriously to interfere with, and substantially to usurp" the issuing court's authority. *Lapin v. Shulton, Inc.*, 333 F.2d 169, 172 (9th Cir. 1964). Thus, "considerations of comity and orderly administration of justice demand that the nonrendering court should decline jurisdiction of such an action" *Id.* Of course, the intrusion and affront to comity are far greater when a court does what it did here: prematurely leaps to declare a judgment of a foreign sovereign's courts—and,

---

[19] *See McDonald v. McDonald*, 239 N.Y.S. 533, 536 (N.Y. 1930); *Khallad v. Blanc*, 947 N.Y.S.2d 859, 862 (N.Y. App. Div. 2012); *Trebilcox v. McAlpine*, 17 N.Y.S. 221, 223 (N.Y. App. Div. 1891); *Banco Do Brasil v. Madison S. S. Corp.*, 307 N.Y.S.2d 341, 345 (N.Y. Sup. Ct. 1970).

## SA1068

indeed, a nation's entire legal system—to be unworthy of respect. *Naranjo*, 667 F.3d at 242-246.[20]

Neither Chevron nor the district court could point to a single case in which a U.S. court entertained a preemptive action to enjoin enforcement or collection of a foreign judgment based on alleged fraud on the foreign court. If comity considerations dictate that a federal district court in New York lacks authority to entertain a collateral attack on the judgment of a sister district court in, say, Connecticut, then *a fortiori*, it lacks "authority to evaluate [a lawyer's] actions before [foreign] courts." *Manez v. Bridgestone Firestone N. Am. Tire*, 533 F.3d 578, 588 (7th Cir. 2008) ("Whether the proceedings in [Mexico] were conducted in an honest and upright manner is a matter for the Mexican judicial authorities and bar authorities, not for us."); *Veltze v. Bucyrus-Erie Co.*, 154 F.R.D. 214, 217 (E.D. Wis. 1994) ("[T]he proper forum … to challenge the enforceability of the Peruvian judgment is in the Peruvian court"). One of the many district courts in which

_____

[20] By preemptively enjoining enforcement in all 50 states, the district court's injunction also raises a *domestic* comity problem. *Cf. Pennzoil v. Texaco*, 481 U.S. 1 , 11 (1987). Indeed, "the Anti-Injunction Act bars federal injunctions against the enforcement of judgments allegedly obtained by fraud." 19 Stacy L. Davis & Lisa A. Zakolski, *Federal Procedure, Lawyer's Ed.*, 47:117 (2014); 28 U.S.C. § 2283; *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623 (1977). But the district court precluded enforcement proceedings in all 50 states without even considering whether "the relevant legal standards differed." *Smith v. Bayer*, 131 S. Ct. 2368 (2011); *see also Yahoo! v. La Ligue Contre Le Racisme*, 433 F.3d 1199, 1213 (9th Cir. 2006) (highlighting the "difficult" question of "whose law governs" when a dissatisfied litigant seeks a ruling that a foreign' court's judgment is "unenforceable anywhere in this country").

# SA1069

Chevron brought § 1782 proceedings summed it up: "While fraud on any court is a serious accusation that must be investigated, it is not within the power of this court to do so, any more than a court in Ecuador should be used to investigate fraud on *this* court." *In re Application of Chevron Corp.*, No. 3:10-cv-00686, ECF No. 108, at 3 (M.D. Tenn. Sept. 21, 2010).

And even if a federal district court in New York were somehow an appropriate forum for such issues, it would be *Ecuadorian* law—not New York law—that would govern the relevant conduct. *See Schultz v. Boy Scouts of America, Inc.*, 480 N.E.2d 679, 198 (N.Y. 1985) (when "the appropriate standards of conduct, rules of the road, for example" are at issue, "the law of the place of the tort" usually controls); *see also Rose Hall, Ltd. v. Chase Manhattan Overseas Banking Corp.*, 576 F. Supp. 107, 127-28 (D. Del. 1983) (applying Jamaican law to a fraud-on-the-court claim concerning a Jamaican court). A district court is bound to apply state conflict-of-laws rules, even when the rule directs the court to apply the substantive law of a foreign country. *See Zimmermann, Inc. v. Challoner*, 423 U.S. 3, 3-4 (1975) (reversing for failure to apply Cambodian law in Texas to a dispute between an American solider and American company arising out of a tort in Cambodia). As it happens, Ecuadorian law provides a tailor-made remedy that New York law does not: the Collusion Prosecution Act, which creates a private civil action to air collateral allegations of fraud in Ecuadorian court proceedings. SPA-630. Moreover,

# SA1070

Chevron has filed a case with the Constitutional Tribunal of Ecuador in which it has raised its fraud claims. The availability of these local remedies should counsel further hesitation before any unnecessary and unauthorized intervention by U.S. courts.

Finally, the district court's invention of a new common-law claim after trial raises serious due-process concerns. In our system, courts may not surprise defendants with decisions on "totally unpleaded, unlitigated claim[s]." *Pinkley v. City of Frederick*, 191 F.3d 394, 402 (4th Cir. 1999). In an apparent anticipation of this objection, the district court decreed, under Federal Rule of Civil Procedure 15(b) that "all of the issues were tried by consent even if all were not specifically raised in the pleadings." SPA-475. But Rule 15(b) permits relief on a theory that didn't appear in the complaint "only if that theory was squarely presented and litigated by the parties at some stage or other of the proceedings." *Evans Prods. Co. v. West Am. Ins. Co.*, 736 F.2d 920, 923–24 (3d Cir.1984). Here, "the absence of express or implied consent renders it impossible to fit the district court's freelancing within the confines of Rule 15(b)." *Rodriguez v. Doral Mortgage Corp.*, 57 F.3d 1168, 1173 (1st Cir. 1995). A court so quick to condemn another nation's courts for lacking due process should take better care to ensure it at home.

## SA1071

### B. The federal RICO statute does not provide a vehicle for collaterally attacking a judgment—let alone the judgment of a foreign sovereign's court system.

Chevron's attempt to circumvent *Naranjo* and the Recognition Act by framing its fraud-on-the-court claims as RICO claims fares no better. RICO is many things, but it is not boundless. One thing it is not is an all-purpose tool for attacking the judgments of courts around the world. This Court shouldn't open the floodgates.

**1.** It's no surprise that RICO has attracted more than its fair share of unhappy litigants hawking disguised fraud-on-the-court claims. But every circuit to consider the question has held the same thing: That "the remedies under RICO do not include setting aside a prior judgment or undermining its preclusive effect by a collateral attack." *Knight v. Mooring Capital Fund, LLC*, 749 F.3d 1180, 1187 (10th Cir. 2014) ("The circuits to consider the matter have rejected such relief."). With respect to domestic judgments, these decisions rest on the unavailability of collateral attack as a remedy under RICO, collateral-estoppel and res-judicata principles, and the need for finality of judgments and an orderly end to litigation. *Id.* When it comes to foreign judgments and arbitral awards, they also rest on comity and respect for the applicable international enforcement framework. Ultimately, they reflect a widely shared understanding that "the judicial system cannot tolerate

## SA1072

litigants who refuse to accept adverse decisions." *Homola v. McNamara*, 59 F.3d 647, 651 (7th Cir. 1995).[21]

Because RICO is a magnet for fraud-on-the-court claims, courts must frequently reprimand litigants for "seek[ing] to relitigate [a previous case] by recasting [their] allegations as a federal RICO claim." *Polur v. Raffe*, 912 F.2d 52, 56 (2d Cir. 1990); *see also Kamilewicz v. Bank of Boston Corp.*, 92 F.3d 506, 511 (7th Cir. 1996) (affirming dismissal of a case that "was 'dressed up' as a claim for RICO damages" but "was, nevertheless, a collateral attack on a state court judgment"). Chevron's litigation budget may be a bit larger than that of the typical disaffected litigant who cries RICO, but the essence of its claim is no different.

If RICO is unavailable as a vehicle for collaterally attacking the result of prior proceedings generally, as the circuits have uniformly held, then it is surely unavailable as a vehicle for attacking the judgment of a *foreign* court system—in this case, the Ecuadorian appellate court's substitute judgment, as affirmed by Ecuador's Supreme Court. To treat acts of alleged litigation misconduct as "predicate acts for purposes of RICO claims" would "improperly apply the RICO statute, invite forum shopping of the most pernicious sort, and embroil this Court in the supervision and review of proceedings in … a foreign court." *Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 483 (D.N.J. 1998) ("The remedy for any asserted

---

[21] To be clear, we are *not* asserting a collateral-estoppel defense.

# SA1073

improprieties Lilly believes may have occurred in … the Italian [courts] … lie[s] with the … Italian courts," not under RICO). Indeed, our research has not uncovered a single case in which an American court has found it appropriate to invoke RICO as authority to vindicate a claim that a foreign court's judgment has been procured by fraud, or to preemptively enjoin the enforcement and collection of a foreign judgment.

*Gulf Petro Trading Co. v. Nigerian Nat'l Petroleum*, 512 F.3d 742, 749 (5th Cir. 2008), a case much like this one, shows how other circuits have approached the problem. There, an American oil company filed a complaint in federal court under RICO and the common law, arguing that bribery, corruption, and *ex parte* communications had tainted a foreign arbitral proceeding. *Id.* at 749. The company's argument was that it had "alleged a pattern of racketeering and conspiratorial conduct that, while arising in the context of [the foreign] proceedings, constitute[d] an independent violation of federal and state law and compel[led] relief analytically distinct from vacatur." *Id.* at 747. The Fifth Circuit disagreed. Even though "the specific allegations of bribery and corruption" were "separate" from the underlying dispute, the claims nevertheless constituted a collateral attack because the company's fundamental claim was "that wrongdoing had tainted" the proceedings such that the result was procured by fraud. *Id.* at 750.

# SA1074

Chevron's case is no different. Here, as there, "the ultimate significance of the conduct [Chevron] complains of can only be found in the effect that it had" on the Ecuadorian judgment, and it is plain that Chevron's "true objective in this suit" is to redress harm it will allegedly suffer as a result of the judgment. *Id.* This is self-evident from the district court's opinion and judgment: *All* of the remedies granted to Chevron are related to the enforcement or collection of the Ecuadorian judgment. SPA-589. As the district court itself puts it: "Chevron here seeks a determination that the defendants procured the Judgment by fraud and through violation of the RICO statute." SPA-493. And while *Gulf Petro* involved a foreign arbitration proceeding, the upshot is the same: Both the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, at issue there, and the New York Recognition of Foreign Country Money Judgments Act, at issue here, provide the exclusive means for recognizing and enforcing the results of foreign proceedings. *Compare* N.Y. C.P.L.R. § 5304(b)(6) *with* 9 U.S.C. § 201. In either case, a RICO suit whose alleged injury stems entirely from the judgment would turn the relevant international enforcement framework "on its head." *Naranjo*, 667 F.3d at 241.

**2.** Chevron's attempted use of RICO to collaterally attack the Ecuadorian judgment is also inconsistent with Federal Rule of Civil Procedure 60, which provides an exclusive federal scheme for relief from a judgment absent a "clear

## SA1075

inconsistency" or "demonstrated congressional purpose" to displace it. *Grossman v. Johnson*, 674 F.2d 115, 122 (1st Cir. 1982). Rule 60 is intended to "deal with the practice in every sort of case in which relief from final judgments is asked, and prescribe the practice." Fed. R. Civ. P. 60, 1946 Advisory Comm. Notes; *see, e.g.,* *Hendrick v. H.E. Avent*, 891 F.2d 583, 585–87 (5th Cir. 1990) (holding that a collateral attack could not be accomplished through RICO, but had to be brought via a Rule 60 motion in the original court). It would be very odd indeed to make Rule 60 and its limited exceptions the only means for relief from a judgment in federal court and then allow for a broad statutory cause of action for relief from a judgment under RICO—one that allowed relief in alternative forums to boot. There is no evidence that Congress intended such an odd result. RICO, like any federal statute, must be "construed as to harmonize with the Federal rules if that is at all feasible." *Hubbard v. Haley*, 262 F.3d 1194, 1197 (11th Cir. 2001). Absent "a clear exemption from the Rule" by Congress, Rule 60's exclusive framework controls. *Gaubert v. Fed. Home Loan Bank Bd.*, 863 F.2d 59, 67 (D.C. Cir. 1988).

**3.** Because "an act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains," *Murray v. Schooner Charming Betsy*, 6 U.S. 64, 118 (1804), RICO also should not be extended to allow collateral attacks on foreign judgments in the teeth of clear principles of international law. RICO is an "expansive" statute, and "when an interpretation of

## SA1076

a broad, general statute would implicate foreign relations, the Supreme Court has proceeded cautiously and looked for a clear expression of congressional intent as to the statute's scope." *Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 128 (2d Cir. 2001). As Judge Hand explained, "we are not to read general words . . . without regard to the limitations customarily observed by nations upon the exercise of their powers." *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 443 (2d Cir. 1945). This Court has endorsed this approach in interpreting RICO. *See R.J. Reynolds*, 268 F.3d at 128 ("Adherence to this principle will ensure that the courts interpret RICO consistently with international law."). And in *Naranjo*, this Court held that concerns for the law of nations are "particularly weighty" when a court in one jurisdiction acts pursuant to legislation in its own jurisdiction to issue opinions about the courts of the world. 667 F.3d at 244. The radical step of transforming RICO into a right of global appellate review should not be taken without the explicit approval of Congress.

## III. Chevron's wholesale attack on the integrity and competence of the Ecuadorian judiciary is foreclosed by judicial estoppel, offensive to international comity, and contradicted by Chevron's own evidence.

As explained in Part I, Chevron's case has an Achilles' heel: Chevron cannot prove that any of the alleged misconduct about which it complains actually *caused* the three-judge appellate court's substitute judgment or the Ecuador Supreme Court's affirmance of it. It hasn't even tried. Instead, Chevron argued below, and

## SA1077

the district court agreed, that this problem can be escaped by simply declaring that the work of the Ecuadorian appellate tribunals is "not entitled to any recognition in consequence of the systemic deficiencies of the Ecuadorian legal system." SPA-314 n.1251. But that argument fails for three independent reasons: Chevron is estopped by its previous contrary representations to this Court about the adequacy of Ecuador's judiciary; Chevron is further estopped by its promise to abide by the judgment of an Ecuadorian court; and Chevron's own evidence demonstrates that Ecuador's judiciary has actually improved since the *forum non conveniens* determination in *Aguinda*.

Given the grave threat to comity and the paucity of the evidence, the district court should not have jumped to condemn an entire nation's legal system on the basis of arguments that Chevron is estopped from making. And this Court should not become an accomplice to Chevron's two-faced attempt to thwart the *afectados'* search for justice by shifting the goalposts across decades and continents.

### A. Chevron's arguments that Ecuador's judiciary is systemically unfair are estopped by its directly contrary stance during the *Aguinda* litigation.

Chevron is judicially estopped by its years of ardent representations that "Ecuador can and does dispense independent and impartial justice."[22] Chevron's

---

[22] Appellee Br. 57 in *Aguinda v. Texaco, Inc.*, No. 2001-7756 (2d Cir., filed Dec. 20, 2001) (hereafter "*Aguinda* Br.").

# SA1078

insistence that Ecuador is an adequate forum, like Chevron's promise to submit to Ecuadorian jurisdiction, was designed to "make the district court more likely to grant its motion to dismiss." *Republic of Ecuador*, 638 F.3d at 389 n.4. These arguments succeeded, and Chevron got what it asked for—but then changed its tune when the Ecuadorian trial didn't reach the conclusion it preferred. This is exactly the kind of thing that the doctrine of judicial estoppel is designed to prevent: Chevron has "secured a judgment in [its] favor by virtue of assuming a given position in a prior legal proceeding" and is now "assuming an inconsistent position in a later action." *Maharaj v. Bankamerica Corp.*, 128 F.3d 94, 98 (2d Cir. 1997). Chevron has used the same evidence it used fourteen years ago to reach opposite conclusions, "changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 743 (2001). Chevron's request that this Court endorse its about-face threatens "the integrity of the judicial process" and is precluded by estoppel. *Id.*

Chevron's briefing in the district court contradicts its prior stances so completely that it could have been written by its opposing party in *Aguinda*.

- The district court and Chevron now analogize this case to *Bridgeway Corp. v. Citibank*, 201 F.3d 134 (2d Cir. 2010). ECF No. 1847 at 275; SPA-418 n.1582. But as Chevron argued in *Aguinda*, "[t]he circumstances in Ecuador

## SA1079

are not remotely like those that prevailed in Liberia when this Court decided *Bridgeway*." *Aguinda* Br. 56.

- Although the district court accepted Chevron's argument that "the rule of law is not respected in Ecuador in cases that have become politicized," SPA-428, Chevron's previous stance was that "[t]he public scrutiny these cases will receive in Ecuador and/or Peru will further assure a fair adjudication." *Aguinda* Br. 57.

- The district court opinion "draws significant support also from the U.S. Department of State's Country Reports," SPA-419 n.1586, which Chevron offered in support of its post-trial briefing. *See, e.g.*, ECF No. 1847 at 46 n.12. But just ask Chevron—these reports "have limited probative value" because they "do not focus in any detail on civil litigation" and instead "focus on human rights violations that largely relate to criminal cases." *Aguinda* Br. 58-59.

Such blatant flip-flopping could only be dictated by the "exigencies of the moment," *New Hampshire v. Maine*, 532 U.S. at 750, betraying a complete inconsistency when it comes to Chevron's representation of the facts.

**B.    Chevron's promise to submit to Ecuadorian jurisdiction further estops it from arguing that it should not be subject to the Ecuadorian judgment, and the defenses it reserved do not apply here.**

In addition to being estopped by its inconsistent statements regarding Ecuador's adequacy as a forum, Chevron is also estopped by its promise "to satisfy any judgments in [the Ecuadorians'] favor," which it said it would contest "only in the limited circumstances permitted by New York's Recognition [Act]." *Republic of Ecuador,* 638 F.3d at 389.

This promise was not a gesture or incidental to the litigation in any way—it was a condition that this Court required to uphold the *form non conveniens* dismissal that Chevron sought. *Aguinda v. Texaco*, 303 F.3d at 475. This Court has since held that "that promise, along with Texaco's more general promises to submit to Ecuadorian jurisdiction, is enforceable against Chevron in this action and any future proceedings between the parties." *Republic of Ecuador*, 638 F.3d at 389 n.4.

This RICO action lies far outside of the "limited circumstances" under which Chevron may contest the judgment. To be sure, when Chevron pursued arbitration with Ecuador this Court noted that Chevron's promise does not "restrict the kind of forum or type of proceeding in which Chevron can raise those defenses." *Id.* at 397. But that proceeding involved "different parties and distinct claims" from this litigation and was held in an arbitral forum pursuant to an international treaty. *Id.* at 396. It therefore did not raise the same estoppel concerns.

# SA1081

As this Court stated, judicial estoppel's purpose is "to protect the integrity of the *judicial* process." *Id* at 397 (emphasis added). Moreover, Judge Lynch, the author of both the *Republic of Ecuador* and *Naranjo* opinions, noted during oral arguments in *Naranjo* that when Chevron attempts to get a U.S. court to preemptively weigh in on a foreign judgment its promise arises in a "completely different context" from the *Republic of Ecuador* arbitration. Oral Arg. Tr. 9/16/11, at 66:9-19. Chevron is limited by "the scope of the statute and the availability of a forum prepared to address its claims." *Republic of Ecuador*, 638 F.3d at 397. Judicial estoppel makes this forum unavailable for these claims. Chevron's claims here run counter to the letter and the spirit of this Court's findings in *Aguinda II*—findings this Court made while granting Chevron's request and relying on Chevron's representations.

Chevron and the district court have attempted to resurrect an argument this Court put to rest three years ago—that Chevron "is not bound by the promises made by its predecessors in interest Texaco and ChevronTexaco, Inc." *Republic of Ecuador*, 638 F.3d at 389. The district court attempted to sidestep this Court's rejection of the argument by making a factual "find[ing]" that "Chevron did not merge with Texaco" and concluding that this Court was "misinformed" when it held to the contrary. SPA-457 n.170. But the district court cannot rewrite history. On December 20, 2001, ChevronTexaco filed a brief in this Court that could hardly have been clearer: "As generally known (and thus this Court may take

## SA1082

judicial notice), *Texaco merged with Chevron* Inc." *Aguinda* Br. 10 (emphasis added).
There is no doubt that "Chevron Corporation therefore remains accountable for
the promises upon which [this Court] and the district court relied." *Republic of
Ecuador*, 638 F.3d at 389 n.3.

> **C.    Chevron's own evidence suggests that Ecuador's situation
>          has improved since the time Chevron characterized its
>          judiciary as adequate and promised to submit to its
>          jurisdiction.**

Chevron tries to cover its inconsistency by alleging that the facts about
Ecuador's judiciary have changed—but the only legitimate evidence it offers
suggests that the changes have been for the better. The district court once again
rests its sweeping denunciation of Ecuador's judiciary "almost exclusively on the
declaration of Dr. Vladimiro Álvarez Grau." *Naranjo*, 667 F.3d at 238. But Dr.
Álvarez admitted at trial that he does not "know anything at all regarding the Lago
Agrio case other than what is made public," Tr. 2041:1-2, and offered no evidence
even suggesting impropriety in the conduct of the judges handling the Lago Agrio
case or the *Corte Provincial de Justicia de Sucumbíos* generally.

Instead, Álvarez offered sweeping pronouncements, including his charge that
Ecuador is a "hypocritical democracy," A1410, where "the judicial branch is under
the control of President Correa." A1430. Dr. Álvarez—a former presidential
candidate and current editorial columnist—is "an avowed political opponent of the
country's current President." *Naranjo*, 667 F.3d at 238. Even in the United States,

where our legal system is the envy of the world, we are accustomed to hearing similarly broad, politically charged statements from domestic figures who declare that there is a "systematic breakdown of the rule of law," Ralph Nader, *The Rule of Law or the Rule of Men?*, The Huffington Post (Feb. 5, 2013),[23] or that the President "has rewritten the Constitution for himself as a part of his effort to fundamentally transform the United States of America," Jose Delreal, *Michele Bachmann: Obama rewrote Constitution*, Politico (Dec. 3, 2013).[24] But the district court nearly copied verbatim the testimony of this Ecuadorian political talking head, citing Dr. Álvarez 52 times in nine pages and corroborating his claims only once. SPA-420-28. Chevron paid Dr. Álvarez at least $150,000 for his broadsides. A-829.

In addition to their questionable provenance, Dr. Álvarez's claims are contradicted by Chevron's own evidence, which shows that the quality of Ecuador's judiciary has actually remained the same or improved since Chevron fought for dismissal in *Aguinda*. This hasn't stopped Chevron from mischaracterizing the evidence, of course. The U.S. State Department Country Reports have presented nearly identical descriptions of Ecuador since the mid-1990s. But Chevron and the district court cite only the later reports. The district court, for instance, points to the 2009 State Department Human Rights Report's

---

[23] *Available at* http://huff.to/1lz5eKm.
[24] *Available at* http://bit.ly/1xqol.

# SA1084

language that "[w]hile the constitution provides for an independent judiciary, in practice the judiciary was at times susceptible to outside pressure and corruption." SPA-429 n.1642. Compare that with the language from previous reports[25]:

- 2006, 2007, 2008: "While the constitution provides for an independent judiciary, in practice the judiciary was at times susceptible to outside pressure and corruption."

- 2004: "The judiciary is constitutionally independent but, in practice, was inefficient and susceptible to outside pressure."

- 2000: "The judiciary is constitutionally independent, but in practice is inefficient and susceptible to outside pressure."

- 1996: "Members of the Supreme Court preside over a judiciary that is constitutionally independent but in practice is susceptible to outside pressure."

The language is identical or nearly so. Elsewhere, the reports indicate that Ecuador's judicial reforms in the mid-2000s had a positive effect: Beginning in 2006—two years after the district court claims Ecuador "changed dramatically" for the worse, SPA-420—every annual report has remarked that Ecuador's courts are "generally considered independent and impartial." Dr. Álvarez, who was a member of the pre-reform government, characterizes Ecuador's judicial reforms in the mid-2000s as "the greatest institutional crisis in recent history," saying they created a "disguised dictatorship." A-1409-10. The State Department Reports, upon which Chevron and the district court both selectively rely, clearly disagree.

[25] State Department Country Reports are available by year at http://1.usa.gov/1iXBpsh.

# SA1085

What's more, the State Department reports have grown more favorable over time despite Chevron's attempts to lobby the highest levels of the State Department regarding their contents. *See* Ted Folkman, *Chevron, Lobbying, and Lago Agrio*, Letters Blogatory (Oct. 4, 2013), *available at* http://bit.ly/1z7zTZu. Chevron cited the more-negative 2000 report in *Aguinda* to argue that "[t]he current Government of Ecuador has taken and continues to take vigorous steps to further the independence and impartiality of the judiciary." *Aguinda* Br. at 39. Now, it cites the more-positive recent reports to claim that Ecuador is systemically corrupt. Rather than tailor its arguments to the evidence, Chevron has tailored the evidence to its arguments.

The other evidence given fails to impugn Ecuador's judiciary at all. The district court points to a series of actions by President Correa, such as his declaration in a radio broadcast that "he want[ed] our indigenous friends to win," or his evaluation of the judgment as a "historic ruling." SPA-432. But statements by an elected official on noteworthy court battles are not evidence of judicial inadequacy. It is not "uncommon for an American president to comment on ongoing criminal prosecutions and even urge that wrongdoers be prosecuted in accord with the president's priorities." *In re Chevron Corp.*, 650 F.3d at 293. In the wake of BP's 2010 Deepwater Horizon oil spill, for instance, President Obama remarked that BP had "moral and legal obligations here in the Gulf for the damage

# SA1086

that has been done," and that "[w]e will make BP pay for the damage their company has caused."[26] Similarly, the district court's concern over President Correa's appointment of a former friend to the position of Prosecutor General is not an adequate basis for condemning a nation's legal system. "After all, presidential transitions in the United States also typically include the replacement of high-level officials, oftentimes with persons who are friends, or have an even closer relationship to the incoming president, and it is not uncommon to see a shift in priorities along with a change in the presidential administration." *In re Chevron Corp.*, 650 F.3d at 293. President Kennedy named his own brother as Attorney General; nobody seriously contends that rendered our system corrupt.

The fact of the matter is that Ecuador is not comparable to those few places that federal courts have found to lack basic levels of fairness. The district court cited two examples—Liberia (*Bridgeway*) and Iran (*Bank Melli Iran*). But Ecuador is not in a "state of chaos" as Liberia was during its civil war, where hundreds of thousands died and "judges" carried out the will of warring factions. *Bridgeway*, 45 F. Supp. 2d at 287. And Ecuador is not Iran, where religious courts conduct secret trials and assert their jurisdiction over civil judicial authorities. *Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1412 (9th Cir. 1995).

---

[26] David Jackson, *Obama: BP has 'moral and legal obligations' to Gulf Coast*, USA Today, *available at* http://usat.ly/1qf1Yf1; *Full text of President Obama's BP Oil Spill speech*, June 16, 2010, *available at* http://reut.rs/1jnzWWW.

## SA1087

"Though it is obvious that the Ecuadorian judicial system is different from that in the United States, those differences provide no basis for disregarding or disparaging that system. American courts, though justifiably proud of our system, should understand that other countries may organize their judicial systems as they see fit." *In re Chevron Corp.*, 650 F.3d at 294 (declining to find serious problems in Ecuador's justice system); *see also Leon v. Million Air, Inc.*, 251 F.3d 1305, 1313-14 (11th Cir. 2011) (same). Joseph Staats, a political science professor at the University of Minnesota who specializes in Latin American judicial performance, evaluates Ecuador as "equal to or better than 55% of all the countries of the world" when it comes to protecting political rights and civil liberties. ECF No. 400-14 at 214. The district court's decision that Ecuador's judicial system is plagued with problems on par with those of Iran or war-torn Liberia is contrary to both comity and reality.

## IV. Even setting aside the lack of jurisdiction or legal authority, Chevron had no cause of action under RICO and RICO does not authorize any of the relief granted by the district court.

### A. The relief granted by the district court pushes RICO's already strained language far beyond the breaking point.

Congress's "declared purpose" for enacting RICO was "to seek the eradication of organized crime in the United States." *United States v. Turkette*, 452 U.S. 576, 589 (1981). But "[v]irtually everyone who has addressed the question agrees that civil RICO is now being used in ways that Congress never intended when it enacted the statute in 1970." William H. Rehnquist, *Remarks of the Chief*

## SA1088

*Justice*, 21 St. Mary's L.J. 5, 9 (1989). The "lure of triple damages and access to a federal courtroom" has led to "inventive" uses of the statute against defendants—from the Catholic Church to Major League Baseball—that Congress could never have foreseen. Lee Coppola & Nicolas DeMarco, *Civil RICO: How Ambiguity Allowed the Racketeer Influenced and Corrupt Organizations Act to Expand Beyond Its Intended Purpose*, 38 New Eng. J. on Crim. & Civ. Confinement 241, 253-55 (2012).

The district court's decision, however, takes this extension of RICO to the point of absurdity. The "racketeering" on which the decision is based arises from Donziger's assertion of claims on behalf of Ecuadorian villagers, seeking damages resulting from an environmental disaster that Chevron does not deny causing. The lawsuit was "extortion," the district court held, because it caused Chevron to "fear … an economic loss." SPA-370. Emails containing legal opinions and characterizing the extent of environmental damage were "wire fraud" because the statements "falsely portray[ed] the extent of [Chevron's] potential exposure and the likelihood of an adverse result." SPA-391-93. And other attempts to hold Chevron accountable for its damage to Ecuador's environment—including an "expansive media campaign" and the lobbying of public officials and shareholders—were part of the scheme because they were designed to "driv[e] Chevron to the settlement table." SPA-307. None of this is "extortion"; it is an exercise of the freedom to speak and to petition government that the First

# SA1089

Amendment is designed to protect. *See Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 932 (9th Cir. 2006) (holding that litigation-related conduct was protected petitioning under the First Amendment and thus immune from RICO liability).

Moreover, the remedy the district court granted for this alleged criminal enterprise was not damages, as RICO's plain language provides for, but *equitable* relief against enforcement of the Ecuadorian court's judgment—a judgment independently examined and reaffirmed by that nation's highest courts. The district court's decision brands as criminals not only Donziger and his legal team, but the Ecuadorian judicial system responsible for upholding that judgment. And it does so without even the benefit of a jury trial.

The district court was able to reach that result only by setting aside virtually every statutory limit on civil causes of action under RICO. 18 U.S.C. § 1964(c). As explained below, the court ignored that section's injury and causation requirements, finding them inapplicable for the paradoxical reason that the section does not authorize the equitable relief that the court was granting. That unprecedented interpretation would allow a single district judge vast power, untethered by RICO's usual statutory limits, to grant injunctions, seize assets, and dissolve or reorganize companies "to prevent or restrain" alleged RICO violations anywhere in the world.

## B.    The district court did not find that Chevron satisfied RICO's statutory prerequisites for a private right of action.

Section 1964(c) creates a private right of action for damages under RICO, allowing "any person injured in his business or property by reason of a violation of section 1962" to "sue therefor in any appropriate United States district court" for "threefold the damages he sustains." By its plain language, RICO thus allows plaintiffs to sue only when they have been "injured" and when the cause of the injury is "by reason" of a RICO violation. In light of the potential for vast civil liability within RICO's scope, both the Supreme Court and this Court interpret these statutory limits as "more rigorous" than Article III's analogous injury and causation requirements. *Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006). Chevron fails both requirements.

First, RICO's requirement of "damage to business and property" requires an "actual, quantifiable injury." *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 227 (2d. Cir. 2008). Although it has made broad statements about the costs of the Ecuadorian litigation and the allegedly fraudulent statements by the defendants, Chevron has not alleged any actual damages or identified specific monetary losses. *See Oscar v. Univ. Students Coop. Ass'n*, 965 F.2d 783, 785 (9th Cir. 1992) (en banc) ("A showing of injury requires proof of concrete financial loss."). Moreover, the risk of future loss is not enough: "[A] cause of action does not accrue under RICO until the amount of damages becomes clear and definite." *First Nationwide Bank v. Gelt*

# SA1091

*Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994). Given that Chevron has yet to pay *any* damages on the Ecuadorian judgment, and that it continues to fight enforcement, the company cannot come close to satisfying the "clear and definite" standard. *See Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135-36 (2d Cir. 2003) (holding that claims for damages based on fraudulent loans were not a "cognizable injury under RICO" before the loans had been foreclosed). RICO does not allow Chevron to recover for "all losses that *may occur*, but only for those actually suffered." *First Nationwide*, 27 F.3d at 768 (emphases added).

Second, RICO's requirement that a private party be "injured … by reason of" a statutory violation is a "demand for some *direct relation* between the injury asserted and the injurious conduct alleged." *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992) (emphasis added); *see also Anza v. Ideal Steel Corporation*, 547 U.S. 451, 461 (2006) (describing the proper inquiry as "whether the alleged violation led directly to the plaintiff's injuries"). That means a plaintiff must prove that the RICO violations were "not only … a 'but for' cause of [its] injury, but … the proximate cause as well." *Holmes*, 503 U.S. at 268. The district court's 586-page decision devotes just one sentence to that critical question. It says: "Significantly, Chevron's injuries are not attributable to a cause independent of defendants' ghostwriting, bribery and other misconduct." SPA-416. But the district court did

## SA1092

not explain how it ruled out the obvious "independent" cause: Chevron's own illegal pollution.

Although the district court acknowledged that RICO ordinarily requires a plaintiff to prove "injury to business or property … caused by the violation of Section 1962," SPA-366, it wrongly assumed that this requirement was relevant only "[i]n a suit for *damages* for such a violation." *Id.* (emphasis added). Because "Chevron at this point … seeks only equitable relief," the court wrote, the company was required to prove only that a violation of RICO took place—that is, "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Id.* Chevron, in other words, was required by the district court to prove only that a violation of RICO occurred, not that it was injured by the violation.

The district court cited no authority for that conclusion, and there is none. Indeed, the two cases on which the court relied say the opposite. In the first, *Sedima, S.P.R.L. v. Imrex Co., Inc.*, the Supreme Court wrote that "the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property *by the conduct constituting the violation*." 473 U.S. 479, 496 (1985) (emphasis added). In the second, *Spool v. World Child Int'l Adoption Agency*, this Court wrote that, "[t]o establish a RICO claim," a plaintiff must show not just "a violation of the RICO statute," but also "an injury to business or property" and "that the injury was caused by the violation of Section 1962.'" 520 F.3d 178, 183

# SA1093

(2d Cir. 2008) (quoting *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001)). Neither case even suggests, much less holds, that a different standard applies to claims for equitable relief.

Nor does anything in RICO itself support any limitation to its requirement that a plaintiff prove an injury "by reason of a violation of" the law's substantive provisions. 18 U.S.C. § 1964(c). To be sure, the cause of action in § 1964(c) authorizes awards of *damages*, not equitable relief. But the lack of any statutory authorization for Chevron's requested relief is hardly a reason for granting that relief untethered from other statutory requirements.

## C. The absence of any authorization for equitable relief in RICO's civil-remedies provision, far from justifying a judgment for Chevron, is an independent reason for rejecting Chevron's claims.

RICO's civil-remedies provision grants district courts "jurisdiction to prevent and restrain violations" of RICO by issuing the full range of "appropriate orders" available to courts of equity. *Id.* § 1964(a). But it limits *who* can seek such equitable relief: Whereas "[t]he Attorney General may institute proceedings under this section"—and the court may issue temporary relief in them "as it shall deem proper"—private parties are not similarly empowered; they "may sue therefor in any appropriate United States district court and shall recover threefold the damages . . . sustain[ed]," plus attorney's fees and costs. *Id.* § 1964(b), (c). Thus, as

## SA1094

RICO's text and structure makes clear, the statute does not authorize equitable relief in private civil actions.

The analysis should end there. But if this Court needs further confirmation, there is no shortage of evidence in the statute's legislative history that limiting RICO's private cause of action to damages claims was a deliberate choice by Congress. The Supreme Court has explained that RICO's civil-remedies provision was "limited to injunctive actions by the United States," and that a proposed "amendment that would have allowed private injunctive actions" was withdrawn because it was "greeted with some hostility." *Sedima, S.P.R.L*, 473 U.S. at 487; *see Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1084-85 (9th Cir. 1986) (reviewing legislative history).

Based on the statute's language and history, virtually all courts that have addressed the question have concluded that RICO's civil-damages provision means what it says: Plaintiffs are entitled to damages, not injunctions and other equitable relief. In the only court of appeals decision to squarely confront the issue, the Ninth Circuit held that equitable relief is "not available to a private party in a civil RICO action." *Wollersheim*, 796 F.2d at 1084. And this Court has twice strongly suggested that, were it to address the question, it would conclude the same. *See Sedima, S.P.R.L v. Imrex Co.*, 741 F.2d 482, 490 n.20 (2d Cir. 1984), *rev'd on other grounds*, 473 U.S. 479 (stating that RICO "was not intended to provide private parties injunctive

# SA1095

relief"); *Trane Co. v. O'Connor Sec.*, 718 F.2d 26, 28-29 (2d Cir. 1983) (expressing "serious doubt" about the "propriety of private party injunctive relief" under RICO). So too have other circuits.[27]

Without addressing this Court's reasons for doubting the availability of equitable relief in *Sedima* and *Trane Co.*, the district court sided against the majority and with the Seventh Circuit's now-vacated decision in *National Org. for Women, Inc. v. Scheidler*, 267 F.3d 687 (7th Cir. 2001), *rev'd on other grounds*, 537 U.S. 393 (2003). But even assuming that *Scheidler* was decided correctly, it would not support the district court's decision here.[28] Although the Seventh Circuit did uphold injunctive relief, the plaintiffs in *Scheidler* also sought and were awarded damages. *Id.* at 693. *Scheidler* is thus expressly predicated on the assumption that the plaintiffs had "been

---

[27] *See, e.g.*, *Wheeling-Pittsburgh Steel Corp. v. Mitsu Corp.*, 221 F.3d 924, 927 n.2 (6th Cir. 2000) ("[O]nly treble damages, attorneys' fees and costs are afforded to private parties under RICO."); *Johnson v. Collins Ent. Co.*, 199 F.3d 710, 726 (4th Cir. 1999) (expressing "substantial doubt whether RICO grants private parties . . . a cause of action for equitable relief," which is "especially acute in light of the fact that Congress has declined to authorize injunctive remedies for private parties"); *In re Fredeman Litig.*, 843 F.2d 821, 830 (5th Cir. 1988) ("Congress indeed had several opportunities to give express authorization to private injunctive actions but chose not to do so, apparently because it hesitated in the face of the ramifications of that remedy.").

[28] The Solicitor General filed a brief in the Supreme Court in *Scheidler* expressing the United States' view that RICO does not authorize private parties "to seek equitable remedies." Br. of United States, 2005 WL 2138277, at *19-*27.

injured in their business or property by reason of a RICO violation" and satisfied RICO's injury and causation requirements. *Id.* at 696.

Neither *Scheidler* nor, to our knowledge, any other court has held, as the district court did here, that injunctive relief is available in the absence of any damages claim and regardless of § 1964(c)'s requirements. In this way, too, the district court's decision was truly unprecedented.

## CONCLUSION

The district court's judgment should be reversed and its findings should be vacated.

Respectfully submitted,

*/s/ Deepak Gupta*
_____
Deepak Gupta
Gregory A. Beck
Jonathan E. Taylor
GUPTA BECK PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741

Justin Marceau
John Campbell
University of Denver
Sturm College of Law
2255 E. Evans Avenue
Denver, CO 80208
(303) 871-6000

# SA1097

July 16, 2014

*Counsel for Defendants-Appellants Steven Donziger, The Law Offices of Steven Donziger, and Donziger & Associates PLLC*[29]

---

[29] Counsel gratefully acknowledge the contributions of the following law students: Daniel Townsend of Yale Law School; Shelby Leighton of Georgetown University Law Center; and Aaron Belzer, Matt Fogg, Jonathan Goldstein, Meagan Healy, Alex Jennings, Katie McAuley, Juliana Okulski, Sam Peaslee, and Brycen Williams of the University of Denver, Sturm College of Law.

# SA1098

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)

I hereby certify that my word processing program, Microsoft Word, counted 28,945 words in the foregoing brief, exclusive of the portions excluded by Rule 32(a)(7)(B)(iii).

*/s/ Deepak Gupta*
_____
Deepak Gupta

July 16, 2014

**SA1099**

### CERTIFICATE OF SERVICE

I hereby certify that on July 16, 2014, I electronically filed the foregoing Corrected Brief for Defendants-Appellants Steven Donziger, The Law Offices of Steven Donziger, and Donziger & Associates PLLC with the Clerk of the Court of the U.S. Court of Appeals for the Second Circuit by using the Appellate CM/ECF system. All participants are registered CM/ECF users, and will be served by the Appellate CM/ECF system.

/s/ Deepak Gupta
_____
Deepak Gupta

1        Q.    If you look at the last page of
2    Exhibit 12, Doctor, of the Spanish version, this
3    document was filed in the Lago Agrio courthouse on
4    February 14th, 2005, and attached to it is the
5    signature page that you see there.
6        A.    Right.
7        Q.    Is that your signature, Doctor?
8        A.    It appears to be, yes.
9        Q.    And do you know when you signed this
10   document?
11       A.    I don't remember signing this document,
12   but a document that was supposed to be for Sacha 94.
13   That would have been in November of 2004 that I
14   signed that.
15       Q.    You signed what you believed was a report
16   that was going to be filed for Sacha 94 in November
17   of 2004; is that correct?
18       A.    Correct.
19       Q.    And could this be the signature page that
20   you signed for that document?
21       A.    Yes, it well could.
22       Q.    The report that you authorized to be filed
23   an Sacha 94, can you tell us generally what you
24   concluded in that report?
25       A.    I concluded that I did not see significant

Defendants' Objection(s): Relevance

1    contamination that posed immediate threat to the
2    environment or to humans or wildlife around it.  I
3    did not make a significant comment on the chemicals
4    that were there because they were not of interest.
5          They -- I remember that the report that
6    was given to me did mention the heavy metals, you
7    know, the chromium, the led, the barium, but it just
8    said they were there, you know, and they were this
9    much over an established amount.  But that -- I
10   didn't draw any conclusions from that.  So they're
11   there.  I mean, that was the -- you know, there's no
12   answer, or the answer is that that doesn't prove it's
13   from any sort of petroleum activity, so I didn't draw
14   a conclusion to that effect.
15       Q.    While you were working as a judicial
16   inspection expert for the plaintiffs, did you ever
17   conclude that TexPet had failed to adequately
18   remediate one of the sites?
19       A.    I didn't no.
20       Q.    While you were working as a judicial
21   inspection expert for the plaintiffs, did you ever
22   conclude that any particular site posed a risk to
23   human health or the environment?
24       A.    No.
25       Q.    Let's look at Exhibit 13.

Defendants' Objection(s): Relevance

# RESPONSE TO STATEMENTS BY MR. CABRERA REGARDING ALLEGED IMPACTS TO WATER RESOURCES IN THE PETROECUADOR-TEXACO CONCESSION AREA

## Oriente Region, Ecuador

**Maria Aguinda et al. vs. ChevronTexaco Corporation,**
Superior Court of Justice of Nueva Loja, Ecuador
Case No. 002-2003



**August 29, 2008**                                              Volume 1 of 1

John Connor, P.E., P.G., D.E.E.
Roberto Landazuri, MSc.



**GSI Environmental, Inc.**
2211 Norfolk, Suite 1000, Houston, Texas 77098-4054
Tel: (713) 522-6300      Fax: (713) 522-8010


PLAINTIFF'S EXHIBIT
**8064**
11 Civ. 0691 (LAK)

# SA1103

*Issued: August 29, 2008*



- **Groundwater**: Mr. Cabrera reports that 32% of the groundwater samples that he analyzed contain Total Petroleum Hydrocarbons (TPH) levels in excess of 0.325 mg/L (which, according to Mr. Cabrera, corresponds to the Ecuadorian regulatory limit) due to contamination from oilfield pits (Cabrera, 2008, pages 23 to 24 of 60). Furthermore, given the extent of Texpet's oilfield operations and the shallow depth of the groundwater, he concludes that all groundwater in this region is affected (Cabrera, 2008, Annex R, pages 2 to 5).

- **Surface Water**: Mr. Cabrera recognizes that the numerous surface water samples analyzed by the experts proposed by the Defendants demonstrate that there is no contamination in excess of regulatory limits. Nevertheless, he expresses doubt that these samples have been collected in the appropriate pathways of migration, and therefore, he instead relies upon the results of two studies conducted more than 14 years ago (Jochnick et al., 1994 and Fugro-McClelland, 1992), which, according to Mr. Cabrera, indicate that there were widespread impacts by TPH, metals, and other contaminants in rivers and streams in this region, as a result of produced water discharge (Cabrera, 2008, pages 25 to 26 of 60). However, in the case of the Fugro-McClelland study, Mr. Cabrera ignores the conclusion reached in the report regarding the responsibility for the contamination: "*Based on field observations and assumptions described herein, approximately 70 percent of the hydrocarbon contamination at the production facilities and 50 percent of the drill pads and pits contamination was attributed to PETROAMAZONAS' operations from 1990 through 1992.*"

- **Regional Water Systems:** Given the "uncertainties" regarding groundwater and surface water conditions in the former Concession, Mr. Cabrera recommends the installation of 3 new regional drinking water systems with surface water intake points located upstream of the areas of "petroleum related activities" (Cabrera, 2008, Annex R, page 9). In order to "provide clean potable water to the Concession population", the 3 new regional systems would include aqueducts of 100, 120, and 185 Km length in order to reach intake points located west of the former Concession area (Cabrera, 2008, pages 48 to 49 of 60, and Annex R, pages 9 to 16). The total cost estimated by Mr. Cabera for the 3 systems is $428 million, which is based on an estimated population of 348,233 in the year 2027 (Cabrera, 2008, Annex R, Table 5).

## 3.0 REBUTTAL OF ASSERTIONS BY MR. CABRERA WITH REGARD TO THE CURRENT CONDITIONS OF WATER RESOURCES

As summarized in Figure 1, the results of this evaluation of the current conditions of the water resources in the former Petroecuador-Texaco Concession area support the following principal conclusions regarding the assertions in the report of Mr. Cabrera:

## 1) There Are No Impacts to Water Resources from the Past Operations of Texpet

- **Drinking Water in the Former Concession Area Is Not Impacted by Texpet Operations**: As seen in Figure 2, the analytical test results of 221 drinking water

---

# SA1104

*Issued: August 29, 2008*



sampling points[1] in the former Petroecuador-Texaco Concession area show that 99% of these points, including 100% of the public drinking water supplies, meet the most stringent drinking water criteria among those established by Ecuador, the U.S. Environmental Protection Agency (USEPA), and the World Health Organization (WHO) during the period in which Texpet operated the Concession (see Attachment A). Specifically, based upon analysis of substances potentially associated with petroleum operations, there is no evidence of impact by petroleum or produced water. The only sampling points that contain such compounds in excess of these criteria (only 2 out of 221) are not related with the past operations of Texpet, but with natural causes (1 domestic water supply sample with naturally elevated salinity and 1 surface water sample with elevated metal concentrations due to natural sediments, neither of which exhibits signs of impacts from petroleum or produced water). Additional information on the results of the analysis of drinking water in the former Concession area is presented in Attachment B.

---

[1] The 221 drinking water sampling points correspond to: i) 149 points sampled by the experts proposed by the Defendant during the judicial inspections from 2004 to 2007, ii) 47 points sampled by the Defendants during site visits of Mr. Cabrera in 2007, iii) 18 points from the sampling program conducted by the Defendants of public water supplies in May, 2008, and iv) 7 sampling points from independent studies.

Plaintiff's Exhibit 8064   p. 10 of 62

# No. 14-826(L)

**No. 14-832(CON)**

---

## In the United States Court of Appeals
## for the Second Circuit

_____

CHEVRON CORPORATION,

*Plaintiff-Appellee,*

V.

STEVEN DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER,
DONZIGER & ASSOCIATES, PLLC, HUGO GERARDO CAMACHO NARANJO,
JAVIER PIAGUAJE PAYAGUAJE,

*Defendants-Appellants,*

(*caption continues on inside cover*)

_____

On Appeal from the United States District Court for the
Southern District of New York (The Honorable Lewis A. Kaplan)

_____

**CORRECTED REPLY BRIEF FOR DEFENDANTS-APPELLANTS
STEVEN DONZIGER, THE LAW OFFICES OF STEVEN DONZIGER,
AND DONZIGER & ASSOCIATES PLLC**

_____

JUSTIN MARCEAU
JOHN CAMPBELL
University of Denver
Sturm College of Law
2255 E. Evans Ave.
Denver, CO 80208
(303) 871-6000

DEEPAK GUPTA
GREGORY A. BECK
JONATHAN E. TAYLOR
Gupta Beck PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741

*Counsel for Defendants-Appellants Steven Donziger,*
*The Law Offices of Steven Donziger, and Donziger & Associates PLLC*

January 6, 2015

# SA1106

STRATUS CONSULTING, INC., DOUGLAS BELTMAN, ANN MAEST,

*Defendants-Counter-Claimants*,

PABLO FAJARDO MENDOZA, LUIS YANZA, FRENTE DE DEFENSA DE LA AMAZONIA, AKA AMAZON DEFENSE FRONT, SELVA VIVA SELVIVA CIA, LTDA, MARIA AGUINDA SALAZAR, CARLOS GREFA HUATATOCA, CATALINA ANTONIA AGUINDA SALAZAR, LIDIA ALEXANDRA AGUIN AGUINDA, PATRICIO ALBERTO CHIMBO YUMBO, CLIDE RAMIRO AGUINDA AGUINDA, LUIS ARMANDO CHIMBO YUMBO, BEATRIZ MERCEDES GREFA TANGUILA, LUCIO ENRIQUE GREFA TANGUILA, PATRICIO WILSON AGUINDA AGUINDA, CELIA IRENE VIVEROS CUSANGUA, FRANCISCO MATIAS ALVARADO YUMBO, FRANCISCO ALVARADO YUMBO, OLGA GLORIA GREFA CERDA, LORENZO JOSE ALVARADO YUMBO, NARCISA AIDA TANGUILA NARVAEZ, BERTHA ANTONIA YUMBO TANGUILA, GLORIA LUCRECIA TANGUI GREFA, FRANCISO VICTOR TRANGUIL GREFA, ROSA TERESA CHIMBO TANGUILA, JOSE GABRIEL REVELO LLORE, MARIA CLELIA REASCOS REVELO, MARIA MAGDALENA RODRI BARCENES, JOSE MIGUEL IPIALES CHICAIZA, HELEODORO PATARON GUARACA, LUISA DELIA TANGUILA NARVAEZ, LOURDES BEATRIZ CHIMBO TANGUIL, MARIA HORTENCIA VIVER CUSANGUA, SEGUNDO ANGEL AMANTA MILAN, OCTAVIO ISMAEL CORDOVA HUANCA, ELIA ROBERTO PIYAHUA PAYAHUAJE, DANIEL CARLOS LUSITAND YAIGUAJE, BENANCIO FREDY CHIMBO GREFA, GUILLERMO VICENTE PAYAGUA LUSITANTE, DELFIN LEONIDAS PAYAGU PAYAGUAJE, ALFREDO DONALDO PAYAGUA PAYAGUAJE, MIGUEL MARIO PAYAGUAJE PAYAGUAJE, TEODORO GONZALO PIAGUAJ PAYAGUAJE, FERMIN PIAGUAJE PAYAGUAJE, REINALDO LUSITANDE YAIGUAJE, LUIS AGUSTIN PAYAGUA PIAGUAJE, EMILIO MARTIN LUSITAND YAIGUAJE, SIMON LUSITANDE YAIGUAJE, ARMANDO WILFRIDO PIAGUA PAYAGUAJE, ANGEL JUSTINO PIAGUAG LUCITANT, KEMPERI BAIHUA HUANI, AHUA BAIHUA CAIGA, PENTIBO BAIHUA MIIPO, DABOTA TEGA HUANI, AHUAME HUANI BAIHUA, APARA QUEMPERI YATE, BAI BAIHUA MIIPO, BEBANCA TEGA HUANI, COMITA HUANI YATE, COPE TEGA HUANI, EHUENGUINTO TEGA, GAWARE TEGA HUANI, MARTIN BAIHUA MIIPO, MENCAY BAIHUA TEGA, MENEMO HUANI BAIHUA, MIIPO YATEHUE KEMPERI, MINIHUA HUANI YATE, NAMA BAIHUA HUANI, NAMO HUANI YATE, OMARI APICA HUANI, OMENE BAIHUA HUANI, YEHUA TEGA HUANI, WAGUI COBA HUANI, WEICA APICA HUANI, TEPAA QUIMONTARI WAIWA, NENQUIMO VENANCIO NIHUA, COMPA GUIQUITA, CONTA NENQUIMO QUIMONTARI, DANIEL EHUENGEI, NANTOQUI NENQUIMO, OKATA QUIPA NIHUA, CAI BAIHUA QUEMPERI, OMAYIHUE BAIHUA, TAPARE AHUA YETE, TEWEYENE LUCIANA NAM TEGA, ABAMO OMENE, ONENCA ENOMENGA, PEGO ENOMENGA, WANE IMA, WINA ENOMENGA, CAHUIYA OMACA, MIMA YETI,

*Defendants*,

ANDREW WOODS, LAURA J. GARR, H5,

*Respondents.*

**SA1107**

# TABLE OF CONTENTS

Table of Authorities ........................................................... iii

Introduction ...................................................................... 1

Argument ........................................................................... 5

    I.   Because the district court lacked subject-matter jurisdiction, this Court should reverse and vacate the factual findings. ........................... 5

        A.   Chevron has not shown that the alleged trial-level misconduct caused the substitute judgment of the three-judge appellate court. ............................................... 8

        B.   Chevron has not proved that its requested relief will likely redress an actual or imminent injury. ........................12

            1. Unrelated arbitral award owed by Ecuador. .................12

            2. Ecuadorian trademarks of indirect subsidiaries. ...............15

            3. Costs of defending against enforcement actions. ..............18

        C.   It is Chevron's burden to show that it had standing to seek its requested relief, not the defendants' burden to establish mootness. ................................................20

        D.   Chevron does not deny that if the district court lacked jurisdiction, this Court should vacate its findings in their entirety. ...............................................23

    II.  Neither state nor federal law authorizes Chevron's preemptive collateral attack on the Ecuadorian judgment. .........................25

        A.   New York law does not authorize preemptive collateral attacks on foreign money judgments. ......................25

         B.   RICO does not provide a vehicle for preemptive collateral attacks on foreign court judgments. .........................31

    III.  Chevron is judicially estopped from making a wholesale attack on the integrity of the Ecuadorian judicial system, and the evidence for that attack is inadequate in any event. ...........................35

i

**SA1108**

IV.  Chevron has established neither a cause of action under RICO
     nor an entitlement to equitable relief. .....................................40

     A.  Chevron has not met RICO's statutory prerequisites for a
         private right of action. ..........................................40

         1. RICO Injury. ....................................................41

         2. RICO Causation. .................................................43

     B.  RICO does not authorize a private cause of action solely
         for equitable relief. ..............................................45

     C.  As the majority of courts have held, equitable relief is *never*
         available to private parties under RICO. ...........................49

     D.  Even if equitable relief were available as a general matter,
         it is unwarranted here. ............................................54

         1. Chevron has several adequate remedies at law. ..................54

         2. Chevron has not shown irreparable injury. ......................56

         3. The constructive trust was unwarranted. ........................57

V.   In the event of a remand, this case should be reassigned to a
     different district judge. ...............................................58

Conclusion ....................................................................60

# SA1109

## TABLE OF AUTHORITIES

**Cases**

*Agency Holding Corp. v. Malley-Duff & Associates, Inc.*,
    483 U.S. 143 (1987) ...................................................................53

*Aguinda v. Texaco, Inc.*,
    142 F. Supp. 2d 534 (S.D.N.Y. 2001) .....................................12, 38

*American Medical Ass'n v. United Healthcare Corp.*,
    588 F. Supp. 2d 432 (S.D.N.Y. 2008) ..........................................50

*Amusement Industry, Inc. v. Stern*,
    786 F. Supp. 2d 758 (S.D.N.Y. 2011) ...........................................57

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451 (2006) ...................................................................45

*ASARCO Inc. v. Kadish*,
    490 U.S. 605 (1989) ...................................................................14

*Basic v. Fitzroy Engineering, Ltd.*,
    949 F. Supp. 1333 (N.D. Ill. 1996),
    *aff'd*, 132 F.3d 36 (7th Cir. 1997) ................................................. 8

*Bixler v. Foster*,
    5964 F.3d 751 (10th Cir. 2010) ....................................................42

*Chafin v. Chafin*,
    133 S. Ct. 1017 (2013)................................................................21

*Chase Manhattan Bank, N.A. v. Hoffman*,
    665 F. Supp. 73 (D. Mass. 1987) ..................................................26

*Chevron Corp. v. Naranjo*,
    667 F.3d 232 (2d Cir. 2012) ..............................................*passim*

*Chevron Corp. v. Republic of Ecuador*,
    949 F. Supp. 2d 57 (D.D.C. 2013),
    *appeal docketed*, No. 13-7103 (D.C. Cir.) ...............................13, 42

# SA1110

*Clapper v. Amnesty International USA,*
133 S. Ct. 1138 (2013) ................................................................ *passim*

*Comer v. Cisneros,*
37 F.3d 775 (2d Cir. 1994) ..........................................................23

*County of Los Angeles v. Davis,*
440 U.S. 625 (1979) ......................................................................20

*Cover v. Schwartz,*
133 F.2d 541 (2d Cir. 1942) .........................................................19

*DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332 (2006) .......................5, 12, 15

*DeMent v. Abbott Capital Corp.,*
589 F. Supp. 1378 (N.D. Ill. 1984) ..........................................51, 52

*Denney v. Deutsche Bank AG,*
443 F.3d 253 (2d Cir. 2006) .........................................................40

*Ellerman Lines, Ltd. v. Read,* [1928] 2 K. B. 144 .............................29

*Executive Benefits Insurance Agency v. Arkison,*
134 S. Ct. 2165 (2014) .................................................................11

*First Nationwide Bank v. Gelt Funding Corp.,*
27 F.3d 763 (2d Cir. 1994) ..........................................................42

*Franklin v. Gwinnett County Public Schools,*
503 U.S. 60 (1992). .....................................................................47

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,*
528 U.S. 167 (2000) ......................................................................21

*Grand Light & Supply Co. v. Honeywell, Inc.,*
771 F.2d 672 (2d Cir. 1985) .........................................................30

*Great-West Life & Annuity Insurance Co. v. Knudson,*
534 U.S. 204 (2002) ......................................................................58

*Gulf Petro Trading Co. v. Nigerian National Petroleum Corp.,*
512 F.3d 742 (5th Cir. 2008) .......................................................33

iv

## SA1111

*Harbinger Capital Partners Master Fund I, Ltd. v. Wachovia Capital Markets, LLC,*
   347 F. App'x 711 (2d Cir. 2009) ....................................................................41

*Harris v. Interstate Training Service,*
   140 N.Y.S.2d 8 (Sup. Ct. 1955) ....................................................................29

*Heldman on Behalf of T.H. v. Sobol,*
   962 F.2d 148 (2d Cir. 1992) ....................................................................15, 17

*Hemi Group, LLC v. City of New York,*
   559 U.S. 1 (2010). ....................................................................44

*High Adventure Ministries, Inc. v. Commissioner of Internal Revenue,*
   726 F.2d 555 (9th Cir. 1984) ....................................................................57

*Highmark Inc. v. Allcare Health Management System, Inc.,*
   134 S. Ct. 1744 (2014) ....................................................................36

*Hispanics for Fair & Equitable Reapportionment v. Griffin,*
   958 F.2d 24 (2d Cir. 1992) ....................................................................59

*Holmes v. Securities Investor Protection Corp.,*
   503 U.S. 258 (1992) ....................................................................52

*In re Merrill Lynch Ltd. Partnerships Litigation,*
   154 F.3d 56 (2d Cir. 1998) ....................................................................43

*Island Territory of Curacao v. Solitron Devices, Inc.,*
   489 F.2d 1313 (2d Cir. 1973) ....................................................................26

*Kamilewicz v. Bank of Boston Corp.,*
   92 F.3d 506 (7th Cir. 1996) ....................................................................32

*Kimm v. Chang Hoon Lee & Champ, Inc.,*
   196 F. App'x 14 (2d Cir. 2006) ....................................................................43

*Kiobel v. Royal Dutch Petroleum Co.,*
   133 S. Ct. 1659 (2013) ....................................................................34

*Knight v. Mooring Capital Fund, LLC,*
   749 F.3d 1180 (10th Cir. 2014) ....................................................................31

*Lia v. Saporito,*
 541 F. App'x 71 (2d Cir. 2013).............................................36

*Ligon v. City of New York,*
 736 F.3d 118 (2d Cir. 2013) ...................................................58

*Lorillard Tobacco Co. v. Chester, Willcox & Saxbe,*
 546 F.3d 752 (6th Cir. 2008) .................................................36

*Lujan v. Defenders of Wildlife,*
 504 U.S. 555 (1992) ..................................................... *passim*

*Mackler Productions, Inc. v. Cohen,*
 225 F.3d 136 (2d Cir. 2000) ............................................59, 60

*Maio v. Aetna, Inc.,*
 221 F.3d 472 (3d Cir. 2000) .................................................41

*Manson v. Stacescu,*
 11 F.3d 1127 (2d Cir. 1993) .................................................41

*Massachusetts v. E.P.A.,* 549 U.S. 497 (2007) .............................19

*McLaughlin v. American Tobacco Co.,*
 522 F.3d 215 (2d Cir. 2008) .................................................41

*Mei Yun Chen v. Mei Wan Kao,*
 97 A.D.3d 730 (N.Y. App. Div. 2012) .................................57

*Minnesota v. Northern Securities Co.,*
 194 U.S. 48 (1904) ...............................................................51

*Monsanto Co. v. Geertson Seed Farms,*
 561 U.S. 139 (2010) ..............................................................54

*Morales v. Trans World Airlines, Inc.,*
 504 U.S. 374 (1992) ..............................................................54

*Morgan Drexen, Inc. v. Consumer Financial Protection Bureau,*
 979 F. Supp. 2d 104 (D.D.C. 2013) ....................................56

*Motorola Credit Corp. v. Uzan*,
  202 F. Supp. 2d 239 (S.D.N.Y. 2002),
  *rev'd on other grounds*, 322 F.3d 130 (2d Cir. 2003) ..........................................48, 53

*Motorola Credit Corp. v. Uzan*,
  322 F.3d 130 (2d Cir. 2003) ...........................................................................41

*National Organization for Women, Inc. v. Scheidler*,
  267 F.3d 687 (7th Cir. 2001)
  *rev'd on other grounds*, 537 U.S. 393 (2003) .......................... 46, 47, 48, 51

*New Hampshire v. Maine*,
  532 U.S. 742 (2001) .....................................................................................37

*Newman-Green, Inc. v. Alfonzo-Larrain*,
  490 U.S. 826 (1989) .....................................................................................21

*Oscar v. University Students Co-operative Association*,
  965 F.2d 783 (9th Cir. 1992) .........................................................................41

*Overseas Development Bank in Liquidation v. Nothmann*,
  480 N.Y.S.2d 735 (N.Y. App. Div. 1984) ....................................................29

*Paine Lumber Co. v. Neal*,
  244 U.S. 459 (1917) .....................................................................................52

*Pentz v. Kuppinger*,
  107 Cal. Rptr. 540 (Cal. Ct. App. 1973).......................................................28

*Petroleum Enhancer, LLC v. Woodward*,
  690 F.3d 757 (6th Cir. 2012) .........................................................................42

*Phoenix Mutual Life Insurance Co. v. Bailey*,
  80 U.S. 616 (1871) .......................................................................................55

*Raytheon Co. v. Ashborn Agencies, Ltd.*,
  372 F.3d 451 (D.C. Cir. 2004).......................................................................18

*Reisman v. Caplin*,
  375 U.S. 440 (1964) .....................................................................................55

*Religious Technology Center v. Wollersheim*,
  796 F.2d 1076 (9th Cir. 1986) .......................................................................53

# SA1114

*Renegotiation Board v. Bannercraft Clothing Co.*,
415 U.S. 1 (1974) ............................................................. 57

*Republic of Ecuador v. Chevron Corp.*,
638 F.3d 384 (2d Cir. 2011) ........................................... 37, 38

*Salazar v. Buono*,
559 U.S. 700 (2010) ........................................................ 22

*Sedima, S.P.R.L. v. Imrex Co.*,
473 U.S. 479 (1985) ..................................................... 51, 52

*Sedima, S.P.R.L. v. Imrex Co.*,
741 F.2d 482 (2d Cir. 1984),
*rev'd on other grounds*, 473 U.S. 479 (1985) .................. 53

*Shcherbakovskiy v. Da Capo Al Fine, Ltd.*,
490 F.3d 130 (2d Cir. 2007) ........................................... 59

*Solomon v. Vilsack*,
628 F.3d 555 (D.C. Cir. 2010) ........................................ 36

*Sosa v. Alvarez-Machain*,
542 U.S. 692 (2004) ........................................................ 34

*State of Georgia v. City of Chattanooga*,
264 U.S. 472 (1924) ........................................................ 55

*Steel Co. v. Citizens for a Better Environment*,
523 U.S. 83 (1998) ...................................................... 5, 23

*Talenti v. Clinton*,
102 F.3d 573 (D.C. Cir. 1996) ........................................ 15

*Tamimi v. Tamimi*,
38 A.D.2d 197 (2d Dep't 1972) ...................................... 28

*Trane Co. v. O'Connor Securities*,
718 F.2d 26 (2d Cir. 1983) ............................................. 53

*UFCW Local 1776 v. Eli Lilly & Co.*,
620 F.3d 121 (2d Cir. 2010) ........................................... 44

# SA1115

*Underhill v. Hernandez*,
   168 U.S. 250 (1897) ...............................................................34

*United States v. Hays*,
   515 U.S. 737 (1995) ................................................................ 9

*United States v. Khan*,
   129 F.3d 114 (2d Cir. 1997) ...................................................54

*United States v. Quattrone*,
   441 F.3d 153 (2d Cir. 2006) ...................................................60

*United States v. Robin*,
   553 F.2d 8 (2d Cir. 1977) ........................................................60

*United States v. Simon*,
   393 F.2d 90 (2d Cir. 1968) ......................................................60

*University of Texas Southwestern Medical Center v. Nassar*,
   133 S. Ct. 2517 (2013) ............................................................44

*US Ecology, Inc. v. U.S. Department of Interior*,
   231 F.3d 20 (D.C. Cir. 2000) ..................................................15

*Uzdavines v. Weeks Marine, Inc.*,
   418 F.3d 138 (2d Cir. 2005) ...................................................36

*Venizelos v. Venizelos*,
   30 A.D.2d 856 (2d Dep't 1968) ..............................................28

*Woodling v. Garrett Corp.*,
   813 F.2d 543 (2d Cir. 1987) ...................................................28

## Legislative Materials

15 U.S.C. § 4 ...............................................................................51

18 U.S.C. § 1964(b).....................................................................50

18 U.S.C. § 1964(c) ............................................................... *passim*

*Código Orgánico de Planificación y Finanzas Públicas*, art. 170 (Ecuador
   2010) ...........................................................................13, 14

ix

## SA1116

116 Cong. Rec. 27,739 (1970)................................................................52

116 Cong. Rec. 35,227 (1970)................................................................52

H.R. Rep. No. 91-1549 (1970).............................................................52

S. 13, 93d Cong. (1973)........................................................................53

S. 16, 92d Cong. (1972)........................................................................53

**Books and Articles**

American Law Institute, *Restatement (Third) of Restitution and Unjust Enrichment* (2011)...............................................................................58

William M. Fletcher, et al., *Fletcher Cyclopedia of the Law of Corporations* (2010)...............................................................................................42

Note, *Injunction Against Enforcement of Judgment Rendered in Foreign Country or Other State*, 64 A.L.R. 1136 (1930) .............................................29

Note, *Injunctions-Foreign Judgment-Enforcement Abroad Restrained*, 38 Yale L.J. 261 (1928).................................................................................29

Mia Levi, *Inconsistent Application: Enforcing International Arbitral Awards in National Courts*, 27 N.Y. Int'l L. Rev. 47 (2014).................................29

Jed S. Rakoff, *RICO: Civil and Criminal Law and Strategy* (2014) ...............48

Charles Alan Wright & Arthur Miller, *Federal Practice & Procedure* (3d ed. 2014) ......................................................................................10, 55

# SA1117

## INTRODUCTION

Chevron asks this Court to do the very thing it refused to do in *Chevron Corp. v. Naranjo*, 667 F.3d 232, 243 (2d Cir. 2012)—create new "causes of action by which disappointed litigants in foreign cases" can preemptively attack judgments from anywhere on the globe. But, in nearly two hundred pages of briefing, Chevron makes virtually no effort to show that the relief it seeks would redress any injuries— a requirement to get in the courthouse door.

Instead, Chevron openly admits (at 92 n.19) that what it really wants is a "freestanding determination" of the facts for use abroad. But our Constitution does not empower federal courts to author amicus briefs to foreign courts. "If such an advisory opinion were available, any losing party in litigation anywhere in the world" could "litigate the validity of [a] foreign judgment in this jurisdiction." *Id*. at 246. The Second Circuit would be transformed from a court with a limited charter into a worldwide fact-finding commission, a body from which losing parties could seek to extract findings, based on handsomely paid witnesses, for use on some distant shore.

When it comes to causation—yet another building block for any case in federal court—Chevron puts its head in the sand. Chevron refuses to accept the Ecuadorian Supreme Court's decision concluding that the court of appeals correctly engaged in de novo review of the facts and produced a substitute

# SA1118

judgment, such that "the court decision sought to be annulled here is the one rendered by the court of appeals, and not the one issued by [the] trial court, something which [Chevron] has confused." A-3605, A-3548. Chevron, to put it plainly, has been aiming at the wrong target.

Taken together, all this means that Chevron lacks standing and the district court lacked jurisdiction. And it means that the fact findings must be vacated—a consequence Chevron doesn't deny. Anything less would reward Chevron for using its bottomless war chest to brand Steven Donziger a criminal and Ecuador an international pariah, all on the flimsiest of evidence.

On the merits, Chevron's claims lack a basis in RICO or New York law. Because "a far better remedy is available" via enforcement proceedings, such claims inject federal courts into foreign relations unnecessarily. *Naranjo*, 667 F.3d at 246. And Chevron offers no sensible limiting principle to prevent hordes of global litigants from beating a path to the Second Circuit's door. Finally, Chevron's no-damages RICO theory—which lets private parties bring quasi-criminal cases without a jury—has no statutory basis.

For the Court's convenience, the following diagrams illustrate the decision trees in this appeal, and the burden that Chevron faces on its state and federal claims. To prevail, Chevron must be able to answer "Yes" to *every* question. We prevail, by contrast, if any one of the answers is "No."

# RICO Claim: Chevron's Burden
## SATHS



# Common Law Claim: Chevron's Burden



# SA1121

## ARGUMENT

## I.  Because the district court lacked subject-matter jurisdiction, this Court should reverse and vacate the factual findings.

Before this Court may consider anything else, it must first answer a single, fundamental question: Has Chevron established that its requested relief is likely to *redress* a legally cognizable injury *caused* by the defendants' alleged wrongdoing—in other words, that it has standing to sue?

This question, though basic, is as important as any confronting a federal court, for it goes to the very "nature and limits of the judicial power of the United States," which are "inflexible and without exception." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998). It is so foundational, in fact, that the Supreme Court "presume[s] that federal courts lack jurisdiction unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006). If the plaintiff cannot overcome this presumption—if it cannot carry its burden of establishing standing throughout "the successive stages of the litigation," including "at the trial stage," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)—then the "dispute is not a proper case or controversy" and the court has "no business deciding it." *DaimlerChrysler*, 547 U.S. at 341.

Has Chevron carried its burden here? That is the question. And yet, for all of its massive filings, Chevron makes virtually no attempt to prove an actual or imminent injury, caused by the alleged wrongdoing, that its requested relief will

likely redress. The reason Chevron resists engaging the question is that no such injury exists. Although Chevron originally tried to ground its standing in nine different theories of injury, *see* S.D.N.Y.-Dkt. 1861, that list has now shrunk to just three:

(1)    the "attachment" of an arbitral award Chevron previously obtained against the Republic of Ecuador in a separate matter, "to the extent that the award otherwise would have been enforceable in Ecuador," SPA-326;

(2)    the "attachment," two years ago, of dormant Ecuadorian trademarks held by Chevron's "indirect subsidiaries," SA721; and

(3)    "legal fees to defend current and future enforcement proceedings," Chevron Br. 71, which Chevron's relief does not even purport to prevent.

Chevron argues that these injuries, moreover, were all caused by the alleged improprieties at the trial level in Ecuador—not Chevron's own liability for environmental pollution there (which it chose never to contest here) and not the substitute judgment of the three-judge intermediate court (which Ecuador's Supreme Court has held supplants the trial court's judgment because a proper de novo review occurred, A-3545-48).

# SA1123

It is worth pausing to consider how truly strained these arguments are. What gives a U.S. court jurisdiction over this case, apparently, is the "attachment" in Ecuador of dormant trademarks "relating to industrial lubricants in Ecuador only," which were owned by "a subsidiary held through another subsidiary" of Chevron, SA3693-96, as well as some unrelated arbitral award that Chevron has not sought to enforce in Ecuador and for which the sovereign Republic of Ecuador has not appropriated any funds. These theories of injury and redressability are so convoluted that it is no wonder Chevron says almost nothing about them. One even gets the sense that Chevron persists with its third asserted injury—which plainly isn't redressed by its requested relief—only to help convey the impression that there is some real, cognizable injury for the courts to remedy.

But, in the end, Chevron all but admits that it is not asking this Court to resolve any concrete case or controversy. What it really wants out of this proceeding—*all* it wants out of this proceeding—is "a freestanding determination" of what it calls "the true facts," which Chevron believes is "critical" to help persuade foreign courts to take its side in foreign enforcement proceedings. Chevron Br. 92 n.19. Its post-trial brief lays this strategy bare:

> Chevron intends to ask any foreign courts in which Defendants have initiated recognition or enforcement actions to consider this Court's injunction *and the findings supporting it*. On that basis Chevron believes it is likely that the foreign court would decline to award Defendants any relief, but any effect accorded to this Court's order would be the decision of the foreign court.

# SA1124

S.D.N.Y.-Dkt. 1847, at 343 (emphasis added). Put differently, Chevron wants this Court to "exercise its remedial power" to leave in place the district court's "factual findings," so that Chevron can file them in far-flung jurisdictions in aid of its global anti-enforcement strategy—even as the enforcement decisions themselves, Chevron is quick to assure this Court, remain "the prerogative of courts in other nations," not this one. Chevron Br. 5, 92 n.19. Article III, however, does not sanction such advisory opinions.

Fortunately for this Court, "a far better remedy is available." *Naranjo*, 667 F.3d at 246. Indeed, it is mandated by our Constitution: "Instead of entertaining jurisdiction" here, in a case with "no immediate controversy between the parties since it is not certain that [Chevron] will ever be compelled to pay [the Ecuadorian] judgment," the Court should "dismiss[] the case as it is without jurisdiction." *Basic v. Fitzroy Eng'g, Ltd.*, 949 F. Supp. 1333, 1338 (N.D. Ill. 1996), *aff'd*, 132 F.3d 36 (7th Cir. 1997). This Court has already "agree[d] with the court in *Basic*" once. *Naranjo*, 667 F.3d at 246. It should do so again.

### A. Chevron has not shown that the alleged trial-level misconduct caused the substitute judgment of the three-judge appellate court.

To satisfy standing for any asserted injury, Chevron must prove that the injury is caused by "the challenged action of the defendant, and not the result of the independent action of some third party." *Lujan*, 504 U.S. at 560 (alterations

8

omitted). The insurmountable hurdle for Chevron is that it is attacking the wrong judgment. It alleges only trial-level improprieties concerning the provisional judgment, while its asserted injuries all flow from the substitute judgment produced by the three-judge court after reviewing the record *por el merito de los autos*. That standard of review, this Court has recognized, is "similar to the American standard of de novo review" but "applicable to questions of both fact and of law." *Naranjo*, 667 F.3d at 237.

Although Chevron claims (at 103) that it "defies common sense" that the three-judge court applied the correct standard of review, Chevron spends most of the next 50 pages discussing the subject, and begins by lamely crying waiver.[1] Chevron's arguments go downhill from there, ultimately reaching the point of flyspecking the quality of the three-judge court's legal analysis.

But Chevron studiously avoids the elephant in the room: Scrutinizing an Ecuadorian appellate court's opinion is the role of the *Ecuadorian Supreme Court*, and it held—*in this very case*—that "there has been a correct weighing of the evidence in accordance with legal standards" in Ecuador. A-3605. As a result, the Supreme Court emphasized, "the court decision sought to be annulled here is the one

---

[1] We have not waived this argument. We repeatedly raised it in the district court, including in our motion to dismiss for lack of jurisdiction. *See* S.D.N.Y-Dkt. 1860, at 9-10. Regardless, "standing is not subject to waiver." *United States v. Hays*, 515 U.S. 737, 742 (1995).

Case 18-855, Document 97-3, 11/12/2019, 2515264, Page239 of 292
Case 18-826, Document 91, 01/06/2015, 1409154, Page22 of 292

SA1126

rendered by the court of appeals, and not the one issued by [the] trial court, something which [Chevron] has confused." A-3548.

Chevron cannot get around this decision. Its fraud case reduces to two basic allegations: that an expert report submitted at trial was prepared improperly and that the trial judge was influenced inappropriately. Let there be no doubt, Mr. Donziger vigorously contests these allegations. But what matters for causation is that the case then went to a three-judge appellate court, which did not include the trial judge and did not consider the report. And the Ecuadorian Supreme Court squarely held that the three-judge court reviewed the record de novo and produced a modified, substitute judgment. It is *that* judgment from which Chevron now seeks relief. That is fatal to Chevron's case for causation.

So Chevron clings desperately to the district court's odd conclusion that the Ecuadorian Supreme Court's decision is "inadmissible hearsay" because the question whether the standard of review was properly applied is "a question of fact, not law." Chevron Br. 116 n.28. But the whole purpose of Rule 44.1, as we said in our opening brief, was "to abandon the fact characterization of foreign law and to make the process of determining [foreign] law identical with the method of ascertaining domestic law to the extent" possible, and Chevron does not contend otherwise. 9A Charles Wright & Arthur Miller, *Fed. Prac. & Proc.* § 2444 (3d ed. 2014). There can be no serious dispute that whether an Ecuadorian court correctly

## SA1127

applied the standard of review is a question of Ecuadorian law. Nor can there be any serious dispute that the Ecuadorian Supreme Court has resolved that question in this case. So how can its holding—on the same issue, in the same case—not govern here?

Imagine that the shoe were on the other foot. Would a trial court in Ecuador be free to second-guess the U.S. Supreme Court's holding in *Executive Benefits Insurance Agency v. Arkison*, 134 S. Ct. 2165, 2175 (2014)—that there had been de novo review in that case—by asking whether there was *really* de novo review in that case, on the theory that the Supreme Court's decision is "hearsay"? On what basis would the foreign trial judge answer the question? Dueling amicus briefs, like those filed in this Court? Or would he just engage in armchair speculation about the finer points of appellate procedure, as the district court did here, from a continent away?

By disregarding the Ecuador Supreme Court's decision, the district court put itself in a position of having to make assumptions about how foreign judges discharged their duties under foreign law. That exercise is bound to end badly. And, sure enough, the district court's conclusion that de novo review was "impossible" here because there were "only five weeks" to review the record has already been proved false. SPA-427-28. Chevron itself has admitted that "even accounting for changes in the panel's membership, each judge had at least 147 days (approximately five *months*, not five weeks) to examine the record and resolve

11

# SA1128

the appeal." ROE Br. 36. Perhaps Judge Rakoff was right, after all, when he concluded that it is "preposterous" to think that an American judge "is better equipped than an Ecuadorian judge"—much less the Ecuadorian Supreme Court—"to apply Ecuadorian law" to an Ecuadorian dispute. *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 552 (S.D.N.Y. 2001).

Ultimately, Chevron is forced to retreat back to its all-purpose "wholesale attack" argument, and to rely on a vague assertion that it has "proved various other injuries beyond those" caused by the substitute judgment. Chevron Br. 5. Neither is enough. The former falls apart on inspection, as discussed in Part III; the latter does not even spell out what these "other injuries" are, let alone how they were caused by the defendants or could be redressed by Chevron's requested relief.

## B. Chevron has not proved that its requested relief will likely redress an actual or imminent injury.

Even setting causation aside, Chevron "bears the burden" of proving the other two elements of standing: that the relief it requested at trial will *likely redress* an *actual or imminent injury*. *Lujan*, 504 U.S. at 560-61. This "requires careful judicial examination" of each asserted injury. *DaimlerChrysler*, 547 U.S. at 352. Chevron has not come close to carrying its burden.

### 1. Unrelated arbitral award owed by Ecuador. Chevron's first attempt at a redressable injury is the claimed "loss of a $96 million arbitral award Chevron had obtained against the ROE." Chevron Br. 70. But Chevron has not

12

## SA1129

"lost" that award. To the contrary, it has never sought to enforce the award in Ecuador, the Ecuadorian legislature has never appropriated any funds to satisfy the award, and Chevron does not have any funds in Ecuador that could even be attached. So how could the "attachment" of the award cause Chevron any harm?[2]

Indeed, Chevron is currently seeking to enforce the award in the United States and prevailed in the district court, and the appeal is now pending in the D.C. Circuit. *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 60 (D.D.C. 2013), *appeal docketed*, No. 13-7103 (D.C. Cir.). If Chevron is ultimately able to enforce the award outside Ecuador, then it obviously hasn't been harmed by the award's attachment inside Ecuador. But the same is true even if it's unable to enforce the award outside Ecuador. The only way Chevron could possibly be harmed by the attachment is if it successfully sought to enforce the award *in Ecuador*—which it has neither done nor claimed that it will do—and then lost the money to satisfy the Ecuadorian substitute judgment. That is not a "certainly impending" injury. *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1150 (2013).

Then there's likely redressability—Chevron's "most obvious problem." *Lujan*, 504 U.S. at 568. Because no funds have been attached in Ecuador, the

---

[2] Only the award had been "attached" in Ecuador; under Ecuadorian law, the treasury funds themselves may not be attached. *See Código Orgánico de Planificación y Finanzas Públicas*, art. 170 (Ecuador 2010) ("The resources of the Sole Treasury Account cannot be subject to attachment or to any kind of enforcement proceeding or provisional or injunctive measure.").

13

Case 18-855, Document 91-3, 03/11/2019, 2515264, Page242 of 292
Case 18-826, Document 31-3, 01/06/2015, 1409154, Page26 of 292

SA1130

defendants have not received any money as a result of the award's "attachment."

And they will not receive any in the future unless the following things all happen:

    (1) Chevron seeks to enforce the award in Ecuador;

    (2) Chevron succeeds;

    (3) Ecuador's National Assembly decides to appropriate funds out of the nation's general tax revenues to satisfy the award;[3]

    (4) Chevron decides to set up a bank account in Ecuador, thereby voluntarily subjecting itself to process in a country it has fled and from which it has removed all assets;

    (5) the Republic of Ecuador tenders payment to that bank account;

    (6) an Ecuadorian court decides to immediately redirect the money to the trust set up to satisfy the Ecuadorian judgment; and

    (7) the trustee then decides to distribute the money in a way that allows it to go to Steven Donziger, rather than to land and water remediation or the satisfaction of debts.[4]

---

    [3] Under Ecuadorian law, where "compliance [with a court order] necessitates disbursement of public resources, payment shall be funded through the budget appropriation for the respective entity." *Código Orgánico de Planificatión y Finanzas Públicas*, art. 170 (Ecuador 2010).

    [4] Alternatively, the Lago Agrio plaintiffs could try to lobby the Ecuadorian legislature to pay them the amount of the award directly, as they would surely like it to do (*see, e.g.*, Press Release, http://bit.ly/1uZgp6Z). After all, they have waited decades for someone to clean up their polluted homeland, while the harm continues unabated. But whether they will succeed in that effort is entirely too uncertain for likely redressability. Because their request, if granted, would not discharge Ecuador's obligation to satisfy the award, it would be tantamount to a gift from the sovereign Republic to the Lago Agrio plaintiffs—a quintessential policy decision too speculative to satisfy Article III. *See ASARCO Inc. v. Kadish*, 490 U.S. 605, 614 (1989) (redressability cannot turn on "pure speculation" about how (continued…)

Case 18-855, Document 91-7, 03/11/2019, 2515864, Page244 of 292
Case 18-826, Document 31-7, 01/06/2015, 1409154, Page247 of 293

SA1131

Chevron has not even tried to "demonstrate the likelihood" of this exceedingly speculative scenario. *Heldman ex rel. T.H. v. Sobol*, 962 F.2d 148, 157 (2d Cir. 1992). Although it dismisses these acts as "ministerial" (at 71), "the decision of how to allocate" general tax revenue "is the very epitome of a policy judgment committed to the broad and legitimate discretion of lawmakers, which the courts cannot presume either to control or to predict." *DaimlerChrysler*, 547 U.S. at 345. For that reason, "[c]ourts have been loath to find standing when redress depends largely on policy decisions yet to be made by government officials." *US Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000); *Talenti v. Clinton*, 102 F.3d 573, 577-78 (D.C. Cir. 1996) ("A court is rightly reluctant to enter a judgment which may have no real consequence, depending on" the decisions of a foreign government "over whom it has no jurisdiction and about whom it has almost no information.").

**2. *Ecuadorian trademarks of indirect subsidiaries.*** Next up to bat are the trademarks. Although Chevron provides few details, it claims a "loss of revenue streams" from trademarks attached in Ecuador two years ago. Chevron Br. 70. These trademarks seem to be held by various "indirect subsidiaries and affiliates of Chevron," and concern "industrial lubricants in Ecuador only," a

---

legislatures will decide to appropriate "general funds"). It also wouldn't remedy any *injury*, of course, because Ecuador would still owe Chevron the arbitral award.

# SA1132

country Chevron has fled. SA721; SA3693. Chevron has made no attempt, however, to offer any evidence (let alone "concrete evidence") or point to any facts (let alone "specific facts") showing that its subsidiaries and affiliates have lost *any* revenue in the last two years as a result of the attachment of these trademarks. *Clapper*, 133 S. Ct. at 1149 n.4, 1154. So how, one might wonder, could a threatened future injury be "certainly impending" if no one has suffered any real injury to date? *Id.* at 1150. Chevron does not say.

But Chevron's real problem is likely redressability. On this question, even more so than injury, Chevron defaults. Rather than point to any evidence, Chevron simply asserts that the injury is "partially redressed by the constructive trust, which secures for Chevron any proceeds from [the attached trademarks] which flow to Appellants." Chevron Br. 70. That, of course, just begs the question. Chevron must prove (with concrete evidence) that it is "likely, as opposed to merely speculative" that the defendants will *actually receive* any proceeds from the trademarks. *Lujan*, 504 U.S. at 561.

It has to show, in other words, that the following events will likely all occur:

(1) the Republic of Ecuador will hold an auction of the trademarks at some point in the future;

(2) someone will decide to buy them;

(3) the buyer will pay enough that the proceeds will outweigh the costs of the auction;

16

## SA1133

(4) the Republic of Ecuador will decide to deposit the net proceeds into the trust created to distribute the damages owed under the Ecuadorian judgment and overseen by the Ecuadorian court; and

(5) the trustee will decide to distribute the money in a way that allows it to go to Steven Donziger, rather than directing the funds to provide land remediation, pay others, satisfy debts, or to any number of possible higher priorities.

Not one of these events has occurred in the two years since the trademarks were attached. Each "requires action" by an independent actor not before the court, *id*. at 571, and "guesswork as to how [they] will exercise their judgment," *Clapper*, 133 S. Ct. at 1150. Chevron cannot achieve standing by relying on such "speculation about the unfettered choices made by independent actors not before the court." *Id*. at 1150 n.5.

Because Chevron cannot possibly establish that all the necessary events will likely occur, it tries to shift the burden. It faults the defendants for failing to "offer[] [a] reason" why they will not occur. Chevron Br. 71. But that gets things backwards: To satisfy redressability, Chevron must "demonstrate the likelihood," *Heldman*, 962 F.2d at 157, by "adduc[ing] facts showing that," in this case, "the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict ... have been or will be made in such manner as to produce causation and permit redressability of injury," *Lujan*, 504 U.S. at 562. Needless to say, Chevron has not done so.

17

**3. Costs of defending against enforcement actions.** Chevron's final bid for standing is the weakest of all: "the expense of legal fees to defend current and future enforcement proceedings." Chevron Br. 70. How will Chevron's relief redress this asserted injury when Chevron itself says (at 94) that "the relief here does not 'preclude the courts of every other nation from ever considering the effect of that foreign judgment'"? Indeed, in the district court, Chevron repeatedly made "clear that it is not seeking to enjoin the filing or litigation of foreign enforcement actions." S.D.N.Y.-Dkt. 1847, at 339. And the relief the court granted does not purport to do so. Far from it: The relief expressly exempts foreign enforcement actions from its scope. SPA-591.

That dooms Chevron's case for redressability. As the D.C. Circuit held in an opinion joined by then-Judge John Roberts: When the plaintiff's requested relief "would not do anything to redress the injury [it] suffers as a result of having to defend itself" in foreign litigation—because the plaintiff, "perhaps wisely, is not seeking to enjoin its adversary from pursuing litigation abroad"—then "the costs and burdens" of responding to foreign litigation will not create Article III standing. *Raytheon Co. v. Ashborn Agencies, Ltd.*, 372 F.3d 451, 454 (D.C. Cir. 2004). When that's the case, the plaintiff "simply cannot demonstrate it is 'likely, as opposed to merely speculative, that [its] injury will be redressed by a favorable decision.'" *Id.* As in *Raytheon*, there is no "reason to believe" that the foreign enforcement actions

## SA1135

will be prevented by the relief sought here, and thus "the Company lacks Article III standing to sue." *Id.*[5]

One last point: The mechanics of standing doctrine, concededly, might seem dry or technical, at least when applied to a given case. Chevron surely thinks so. In the district court, as it was fumbling to try to find some injury that would satisfy all three elements, Chevron complained that our jurisdictional challenge was too "technical." S.D.N.Y.-Dkt. 1863, at 11. But, as this Court long ago explained, "[t]here is nothing 'technical'" in Article III's requirements, "unless all decisions in conformity with constitutional restraints on the powers of the federal judiciary are 'technical.'" *Cover v. Schwartz*, 133 F.2d 541, 551 (2d Cir. 1942). Nor is there anything "technical" in Chevron's strategic decision to rob Steven Donziger of his constitutional right to a jury. And there certainly isn't anything "technical" in ensuring that a federal court will not be transformed into a worldwide fact-finding commission, or a source of amicus briefs aspiring to influence the outcomes of foreign proceedings. Because Chevron admits that this is all it really wants from

---

[5] Chevron argues (at 72) that by enjoining U.S. enforcement and "denying [Donziger] the profits from any judgment against Chevron, the injunction will reduce the chances of further enforcement proceedings," which "is sufficient to satisfy the redressability requirement" under *Massachusetts v. EPA*, 549 U.S. 497, 526 (2007). But the standard is "likely redressability"—not whether the relief "will reduce the chances" of future harm. As for *Massachusetts v. EPA*, the Court *relaxed* the standing requirements in that case because it determined that Massachusetts was "entitled to special solicitude in [the] standing analysis" due to "its quasi-sovereign interests." *Id.* at 518, 520.

## SA1136

this Court—a "freestanding determination" of the facts, Chevron Br. 92 n.19—the Court must dismiss the case for lack of jurisdiction.

**C.    It is Chevron's burden to show that it had standing to seek its requested relief, not the defendants' burden to establish mootness.**

Unable to carry its burden of establishing standing, Chevron takes the extraordinary position that it didn't have to—that it *never* had to show that the relief it requested at trial would likely redress a cognizable injury caused by the alleged wrongdoing. Instead, Chevron argues that it satisfied its obligation of establishing standing at trial because certain relief that it *wasn't* requesting—billions of dollars in damages and a global anti-enforcement injunction—*would have* given it standing. The reason for this, according to Chevron and the district court, is that "subject matter jurisdiction—including standing—is determined as of the time the action is brought," and the "defendants do not suggest that Chevron lacked standing when the action was brought." SPA-319-20 (footnote omitted); *see also* Chevron Br. 69. As a result, Chevron asserts, the question is really whether the defendants have established mootness, a "heavy" burden that requires showing that no effectual relief is possible, not whether Chevron has established standing. *Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979).[6]

---

[6] Although Chevron does not do so, the district court drew support from Professor Henry P. Monaghan's classic description of "mootness as the doctrine of (continued…)

## SA1137

But, again, "the party asserting federal jurisdiction when it is challenged has the burden of establishing it," *DaimlerChrysler*, 547 U.S. at 342 n.3, and this burden exists throughout "the successive stages of the litigation," *Lujan*, 504 U.S. at 561. A court cannot respond to standing challenges by simply "[a]ssuming the existence of a case or controversy" and then putting the burden on the defendant to show otherwise, as the district court thought. SPA-321. It must do the opposite: assume a lack of jurisdiction unless the plaintiff can show otherwise; "it is *[the plaintiff's]* burden to prove their standing by pointing to specific facts, not the [defendants'] burden to disprove standing." *Clapper*, 133 S. Ct. at 1149 n.4 (citation omitted).

True, standing "ordinarily depends on the facts as they exist when the complaint is filed," *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989), but the requirement does not go by the wayside thereafter, and certainly not when

---

standing set in a time frame." SPA-320 n.1231. But that description of mootness is "not comprehensive" because the same "conduct may be too speculative to support standing," which requires the plaintiff to establish an actual or "certainly impending" injury, "but not too speculative to overcome mootness," on which the defendant "bears [a] formidable burden." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000).

For example, in *Chafin v. Chafin*, cited by Chevron, a mother filed suit in federal court seeking an order returning her child to Scotland. 133 S. Ct. 1017, 1022 (2013). The district court granted the relief. The Supreme Court held that the child's return to Scotland "pursuant to such an order" did not moot "appeal of the order," regardless of whether the father could show that reversing the order ("typical appellate relief") would bring his daughter back. *Id.* at 1021, 1024-26. Because the issue was mootness, the standard was whether "it is impossible for a court to grant any effectual relief whatever," not redressability. *Id.* at 1023.

## SA1138

a plaintiff changes its requested relief. To the contrary, if a plaintiff "seeks new relief"—or, in Chevron's words (at 94), relief that is "qualitatively different from" the relief initially sought—then it "must show (and the District Court should have ensured) that [it] has standing to pursue it." *See Salazar v. Buono*, 559 U.S. 700, 731 (2010) (Scalia, J., concurring). Any other rule would allow a plaintiff to "sidestep Article III's requirements" by playing bait-and-switch with its requested relief. *Id.*

Chevron's only response is to draw a distinction between when a plaintiff "ask[s] a court to expand" an injunction, as in *Salazar, id.*, and when it "narrow[s] its request for relief," as in this case. Chevron Br. 69 n.13. From Article III's perspective, however, this makes no difference. Just as a plaintiff cannot "combin[e] a request for injunctive relief for which [it] *has* standing with a request for injunctive relief for which [it] *lacks* standing," nor can a plaintiff replace its request with relief that *wouldn't* likely redress an actual injury caused by the alleged wrongdoing. *Salazar*, 559 U.S. at 731 (Scalia, J., concurring). Were it otherwise, a plaintiff could do what Chevron did here: first ask for sweeping and unprecedented relief; later withdraw that request for strategic reasons (to avoid a jury and, Chevron hopes, another reversal by this Court); and then ask for different relief that doesn't redress an actual injury caused by the defendants, on the theory that "the remedy it initially sought" would have done so. SPA-324. That view makes no

## SA1139

sense, isn't supported by a single case cited by Chevron or the district court, and certainly isn't "horn book" law. *See* Chevron Br. 69 n.13.[7]

**D.  Chevron does not deny that if the district court lacked jurisdiction, this Court should vacate its findings in their entirety.**

Although Chevron contends that the district court had jurisdiction, it does not contest the consequence of a lack of jurisdiction: The court's findings must be vacated in their entirety. *See* Donziger Br. 82-84. Vacatur of the findings is particularly warranted here given that Chevron itself considers the findings to be "critical" relief (at 92 n.19)—and no court without jurisdiction is authorized to grant such relief. To do so would be "to act ultra vires." *Steel Co.*, 523 U.S. at 102.

Worse, to allow the findings to stand in this case would reward Chevron for using its unlimited resources to purchase made-up testimony from an admitted liar who accuses an American lawyer of bribing a foreign judge, without affording the accused a right to trial by jury. Indeed, Chevron does not deny that it has paid (and continues to pay) its star witness, Alberto Guerra, hundreds of thousands of dollars in cash and more than a million in benefits for his "bribery" tale, as detailed on page 54 of our opening brief. And indeed, Chevron makes no serious attempt to

---

[7] Chevron cites *Comer v. Cisneros*, 37 F.3d 775, 800 (2d Cir. 1994), for the proposition that a "plaintiff's loss of desire for the sought-after relief 'is really a mootness argument.'" Chevron Br. 69 n.13. But our argument isn't that Chevron has lost any *desire* for the sought-after relief; it's that Chevron *changed* the sought-after relief.

Case 18-855, Document 91, 03/11/2019, 2515264, Page253 of 292
Case 18-855, Document 91, 01/06/2015, 1409154, Page36 of 73

SA1140

defend its actions. Its only response (at 31) is to dismiss the payments as mere "assistance" for Guerra's "relocation" from Ecuador. But Guerra, for one, viewed it differently: As Chevron does not dispute, he began changing his story as soon as Chevron started paying him, concocting new and contradictory allegations seemingly by the day to net him more money from Chevron.

Astonishingly, Chevron gives no explanation whatsoever for Guerra's lies or shifting narrative. It does not acknowledge the flimsiness of the corroborating evidence—despite having spent hundreds of millions of dollars trying to unearth something real—nor does it say anything about the contemporaneous emails that refute Guerra's account. And Chevron does not contest that, before it had Guerra, it tried to cook up a bribery scheme with one of its contractors (Diego Borja), later buying his silence after the scheme backfired and he was poised to expose its misdeeds to the world. Donziger Br. 15-19. On this point, too, Chevron is silent; it offers no defense at all of these payments. Under such troubling circumstances, this Court should have little hesitation vacating the district court's findings in full.

The findings should also be vacated for the additional reason that they disparage a country's entire judicial system, top to bottom, based on the testimony of "an avowed political opponent of the country's current President." *Naranjo*, 667 F.3d at 238. The findings have in fact *already* caused diplomatic friction, once again forcing the Republic of Ecuador to file an amicus brief defending the integrity of its

## SA1141

judges from a preemptive smear. As an illustration of the harm the findings have already done to foreign relations—and of why Chevron asks this Court (at 92 n.19) "to exercise its remedial power to uphold the … findings"—the Republic's brief states that "Chevron sought, and in Judge Kaplan found, a friendly forum to issue improper findings that it is already using in the pending arbitration against the Republic." ROE Br. 3. The Republic explicitly requests vacatur of "the District Court's extraordinary findings regarding the Republic and its judiciary." *Id.*

It is right to do so. No country deserves to be branded an "international pariah" by a court without jurisdiction, especially not based on the uncorroborated testimony of a disgruntled partisan. *Naranjo,* 667 F.3d at 242. And, by the same token, no defendant deserves to be branded a criminal by a court without jurisdiction, especially not based on the paid-for testimony of a perjured crook.

## II. Neither state nor federal law authorizes Chevron's preemptive collateral attack on the Ecuadorian judgment.

### A. New York law does not authorize preemptive collateral attacks on foreign money judgments.

When it comes to the basis for its common-law claim, Chevron hides the ball. The real question here is whether, under New York law, a judgment debtor may bring a preemptive action for relief from a money judgment entered in a foreign country—the action this Court rejected in *Naranjo.* Chevron dances around that question until page 167 of its brief, where it tries to convey the impression that

## SA1142

preemptive actions of this sort are routine. But Chevron cannot identify a single case (from any state, let alone from New York) that has allowed a preemptive collateral attack on a foreign money judgment despite the existence of the Recognition Act.

Chevron's failure to find any authority is unsurprising. As Chevron admits, the Recognition Act, enacted in 1970, was "a codification of pre-existing New York case law." Chevron Br. 169 (quoting *Island Territory of Curacao v. Solitron Devices, Inc.*, 489 F.2d 1313, 1318 n.6 (2d Cir. 1973)); *cf. Chase Manhattan Bank, N.A. v. Hoffman*, 665 F. Supp. 73, 76-77 (D. Mass. 1987) (state's Recognition Act "supersedes any common law action" with respect to foreign money judgments). That's why this Court's analysis in *Naranjo* was explicitly grounded in "[t]he Recognition Act *and the common-law principles it encapsulates*." 667 F.3d at 241 (emphasis added). *Naranjo*, as a matter of New York law, emphatically rejected the very thing Chevron seeks—an "affirmative cause of action to declare foreign judgments void and enjoin their enforcement." *Id.* at 240. It found that "Chevron's theory of relief" was not "consistent with New York law" and that there was "*no legal basis* for the injunction that Chevron seeks, and, on these facts, there *will be no such basis* until judgment-creditors affirmatively seek to enforce their judgment in a court governed by New York or similar law." *Id.* at 242 (emphasis added). It's hard to see how the Court could have been much clearer than that.

26

## SA1143

Yet, in an effort to bypass *Naranjo* and the Recognition Act, Chevron now argues that preemptive relief from a foreign judgment "is wholly distinct from judgment enforcement" and that allowing preemptive attacks would not "undermine the statute's goal of promoting recognition of New York judgments abroad." Chevron Br. 170. That argument is entirely at war with *Naranjo*, which went out of its way to explain why precisely the opposite is true—allowing preemptive collateral attacks *would* undermine the Recognition Act's goals and upset the international judgment-enforcement framework on which it is based. "Chevron," this Court explained, "would turn that framework on its head and render a law designed to facilitate 'generous' judgment enforcement into a regime by which such enforcement could be preemptively avoided." *Naranjo*, 667 F.2d at 241. To allow such a claim would thwart New York's policy decision to "act as a responsible participant in an international system of justice—not to set up its courts as a transnational arbiter to dictate to the entire world which judgments are entitled to respect and which countries' courts are to be treated as international pariahs." *Id.* at 242.[8]

---

[8] Chevron also cannot evade *Naranjo* by absurdly arguing that the defendants "have placed the recognition of the Ecuadorian court orders at issue in the course of this litigation." Chevron Br. 172. An impermissible preemptive collateral attack does not somehow become permissible because the defendant *defends against that attack*. The same goes for the district court's logic that the defendants have made "a collateral estoppel defense or an effort to gain legal recognition of these decisions" (continued…)

# SA1144

This Court is bound by *Naranjo*'s interpretation of state law "absent a subsequent decision" by the state's highest court that "cast[s] doubt on that ruling." *Woodling v. Garrett Corp.*, 813 F.2d 543, 557 (2d Cir. 1987). But even if *Naranjo* didn't exist, Chevron would have no basis for a preemptive attack on a foreign money judgment. The only two New York cases that Chevron cites (at 167) are more than 40 years old and do not "cast doubt" on *Naranjo*'s reading of New York law. Quite the contrary: Neither case involved foreign money judgments at all; both were divorce disputes. *Venizelos v. Venizelos*, 30 A.D.2d 856 (2d Dep't 1968); *Tamimi v. Tamimi*, 38 A.D.2d 197 (2d Dep't 1972). So they fall squarely outside the scope of the Recognition Act, which applies only to "any judgment of a foreign state granting or denying recovery of a sum of money, other than … a judgment for support in matrimonial or family matters." N.Y. C.P.L.R. § 5301. The same would have been true of Chevron's only other case—a 40-year-old California divorce case—had it been brought in New York. *Pentz v. Kuppinger*, 107 Cal. Rptr. 540 (Cal. Ct. App. 1973).

The New York courts have been clear that the Recognition Act displaces the common law only as to foreign judgments that "come directly within the scope of article 53." *Overseas Dev. Bank in Liquidation v. Nothmann*, 480 N.Y.S.2d 735, 738 (N.Y.

---

in this case. SPA-422. The defendants repeatedly made clear below that they were *not* making such a defense. *See, e.g.*, Dist. Ct. Dkt. 1857, 34-35 ("So let there be no doubt—that defense is out of the case.").

# SA1145

App. Div. 1984). Chevron's cases don't. Because "article 53 is specifically limited to money judgments," this means that "other types of foreign judgments"—like divorce judgments—are "governed instead by common-law principles and existing case law," which "the Legislature did not intend to pre-empt." *Id.* The Recognition Act makes that intent clear; it specifically provides that the Act does not apply to judgments "not covered by this article." N.Y. C.P.L.R. § 5307.

Aside from two New York divorce cases (only one of which postdates the Recognition Act), Chevron's support for its common-law claim is feebler still: a two-sentence section in a treatise on New York law that cites no post-Act cases and discusses neither the Act nor the propriety of preemptive attacks[9]—and a case annotation from 1930, four decades before the Act's enactment.[10] *See* Chevron Br.

---

[9] The most recent case cited in that section is from 1955—the decision of a trial judge in Monroe County, New York who *refused* to hear a preemptive attack on a judgment from Manhattan, concluding that he "should not entertain this action, but should relegate plaintiff to his right to move in the court in New York County which granted the judgment." *Harris v. Interstate Training Serv.*, 140 N.Y.S.2d 8, 11 (Sup. Ct. 1955). That hardly helps Chevron.

[10] That annotation, *Injunction Against Enforcement of Judgment Rendered in Foreign Country or Other State*, 64 A.L.R. 1136 (1930), concerns a controversial English case from the 1920s, *Ellerman Lines, Ltd. v. Read*, [1928] 2 K. B. 144, that preemptively enjoined a Turkish judgment. "But no previous case has been found which enjoins enforcement of a foreign judgment abroad." *Injunctions Foreign Judgment Enforcement Abroad Restrained*, 38 Yale L.J. 261, 262 (1928). "Parties have still moved for anti-enforcement injunctions of foreign decisions; however, they have not been successful." Mia Levi, *Inconsistent Application: Enforcing International Arbitral Awards in National Courts*, 27 N.Y. Int'l L. Rev. 47, 61 (2014) (discussing *Ellerman* and citing Judge Kaplan's injunction as an outlier globally).

## SA1146

167. One would think Chevron could do a bit better if it were true that "precedent firmly establishes" its common-law claim (it doesn't) or if courts really had allowed such claims "consistently" for "well over a century" (they haven't). *Id.* at 65, 167.

But even assuming for the sake of argument that such a claim exists, its late-breaking appearance in this case should not be tolerated. Despite a 165-page complaint and a seven-week trial, Chevron failed to plead, or even mention, this mystery common-law claim before it made its first appearance in the district court's post-trial opinion. Chevron concedes as much, making the eye-popping argument that "the *district court* properly amended Chevron's complaint" after trial, and citing authority from this Court for the proposition that "a district court may amend a pleading." *Id.* at 174 (citing *Grand Light & Supply Co. v. Honeywell, Inc.*, 771 F.2d 672, 680 (2d Cir. 1985)). In fact, *Grand Light* discusses when "a district court may *allow a party* to amend its pleading." *Grand Light*, 771 F.2d at 680 (emphasis added). Chevron identifies no case involving anything remotely close to this *sua sponte* post-trial amendment.

The only argument Chevron pulls out of its hat is this: It is sufficient, says Chevron (at 174-75), that the shadow of some form of common-law equitable claim "entered the case" (Chevron does not say how, where, or by whom) in the context of an interlocutory appeal in a different case in which Donziger had a limited role as an intervenor. Nonsense. If a district court may amend the complaint to add a

Case 18-855, Document 91-3, 11/06/2019, 2515864, Page260 of 292
Case 18-855, Document 91-3, 11/06/2019, 1469154, Page283 of 292

SA1147

claim so off-the-radar and nebulous that no reasonable litigant would have had notice of its existence or contours, then there is no point in even pretending that the proceedings were governed by the Federal Rules of Civil Procedure.

### B.   RICO does not provide a vehicle for preemptive collateral attacks on foreign court judgments.

That leaves Chevron's federal claim. Chevron does not deny that it is attempting to invoke RICO as the basis for a preemptive collateral attack on a judgment. Nor does it deny that it seeks only equitable relief from the judgment— not the money damages authorized by RICO's private cause of action. 18 U.S.C. § 1964(c) (allowing an injured private person to sue for "threefold the damages he sustains"). RICO's text alone dooms that attempt. *See* Part IV.B, *infra*. Chevron does not even offer an argument based on RICO's text, structure, purpose, or history to suggest that Congress intended that RICO be used in this manner. Nor does Chevron identify a single case in which RICO has been employed to preemptively attack a court judgment. The circuits are in harmony: "[T]he remedies under RICO do not include setting aside a prior judgment" via "collateral attack." *Knight v. Mooring Capital Fund, LLC*, 749 F.3d 1180, 1187 (10th Cir. 2014) (collecting cases). A contrary holding would open the floodgates to dissatisfied litigants of all stripes.

Worse, Chevron asks this Court not only to break with all the other circuits on this point but to extend RICO further still, to authorize preemptive attacks on

Case 18-855, Document 91-3, 01/06/2019, 2452864, Page264 of 292
Case 18-826, Document 91-7, 01/06/2019, 1469154, Page264 of 292

SA1148

the judgments of the courts of *foreign sovereigns*. But much of what this Court said of the New York Recognition Act is equally true of RICO: "Nothing in the language, history, or purposes of the Act suggests that it creates causes of action by which disappointed litigants in foreign cases can ask a [U.S.] court to restrain efforts to enforce those foreign judgments against them." *Naranjo*, 667 F.3d at 243. And taking that unprecedented step would multiply the pool of litigants seeking to relitigate their disputes in U.S. courts, transforming the Second Circuit into the world court of last resort. That, in turn, "would unquestionably provoke extensive friction between legal systems by encouraging challenges to the legitimacy of foreign courts in cases in which the enforceability of the foreign judgment might otherwise never be presented in New York." *Id.* at 246.

Chevron dismisses these concerns out of hand. "This case," in Chevron's view, "involves a straightforward application of RICO by one private party against another," nothing more, and there are simply no "'foreign relations' implications that might result from the decision below." Chevron Br. 97. Such blithe assertions should provide this Court with little comfort, particularly because (as we pointed out in our opening brief at 94-97) the federal reports already contain many examples of collateral attacks "dressed up" as RICO suits, *Kamilewicz v. Bank of Boston Corp.*, 92 F.3d 506, 511 (7th Cir. 1996), including attempted attacks on

foreign proceedings. *See, e.g., Gulf Petro Trading Co. v. Nigerian Nat'l Petroleum Corp.*, 512 F.3d 742, 749 (5th Cir. 2008).

Apart from distinguishing our cases on their facts, Chevron offers no limiting principles that would prevent the floodgates from opening wide, no framework for limiting the harm to international comity, and no acknowledgment that such harm is likely. Instead, Chevron ridicules the "parade of global litigants imagined by Donziger" as a fiction, suggesting that background limits like personal jurisdiction will be enough to stem the tide. Chevron Br. 95. But given New York's role as the world center of law and finance, much hard-fought litigation, from Brazil to Botswana, will have some local nexus that can be exploited by litigation losers eager to employ the unique jurisprudence that would arise from a win for Chevron. *See* U.S. Chamber Br. 1-2 (in light of increased litigation with "transnational businesses being filed in courts outside the United States," "it would be a mistake to conclude" that similar litigation is "unlikely to recur").

Yet another reason to resist the proposed transformation of RICO is that it would implicate serious separation-of-powers concerns by needlessly injecting the courts into foreign affairs. With its unnecessary attack on the systemic integrity of Ecuador's judiciary, the district court thrust itself into an arena that has been traditionally reserved for the political branches. Opening up our courts to such inquiries undermines the traditional delegation of decisions implicating

33

international relations to the President and Congress. That prospect of enabling a broad private right of action in the international arena "should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 695 (2004). Judicial concerns about separation of powers in the foreign policy arena are reflected in longstanding doctrines like the act-of-state doctrine, which holds that "the courts of one country will not sit in judgment on the acts of another done within its own territory," *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897), and the presumption against extraterritorial application of statutes, which "helps ensure that the Judiciary does not erroneously adopt an interpretation of U.S. law that carries foreign policy consequences not clearly intended by the political branches." *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013).

Simply put, the federal courts don't have a foreign policy. But allowing RICO suits like Chevron's would beckon private litigants seeking to preemptively challenge the particular and systemic merits of forums around the world, squarely injecting Article III judges into sensitive disputes. To see why this is so, consider how these disputes would play out. Presumably, foreign nations whose judiciaries are attacked will feel compelled to defend themselves, either as intervenors or amici, as Ecuador has. Would the State Department then feel compelled to inject itself into the fray, perhaps to defend U.S. allies in our own courts? And how would

## SA1151

judges decide how much to honor American foreign policy in these disputes? A U.S. court preemptively weighing in on the adequacy of a foreign nation's judiciary is sure to have significant political and economic ramifications, and the current suit would not be the last to draw the attention of ambassadors and presidents. While the United Nations may be in New York City, the Second Circuit is not the world's court—nor is that the structure envisioned by our Constitution. Out of respect for international comity, separation of powers, and the limited role of the federal courts, this Court should decline to read RICO to permit unnecessary, preemptive attacks on foreign judgments and foreign judiciaries.

**III.  Chevron is judicially estopped from making a wholesale attack on the integrity of the Ecuadorian judicial system, and the evidence for that attack is inadequate in any event.**

One would search in vain for a better illustration of the danger of such unnecessary, preemptive attacks than this very case and, in particular, the district court's sweeping takedown of Ecuador's legal system. That takedown is even more troubling because it accepts representations by Chevron directly contrary to those the company made when it asked to move this case to Ecuador in the first place and promised this Court that it would submit to jurisdiction there. Promises to a court have to mean something—a concept enshrined in the legal doctrine of judicial estoppel.

# SA1152

The district court, however, brushed aside that doctrine here. Hoping to insulate the court's holding from review, Chevron focuses on the standard of review for judicial-estoppel issues. Chevron asserts (at 120) that "all of the other circuits to have decided the question" have "adopt[ed] an abuse of discretion standard." But here is what the case that Chevron cites actually says: "our sister circuits are split as to whether dismissal on grounds of judicial estoppel should be reviewed *de novo*." *Lia v. Saporito*, 541 F. App'x 71, 73 n.1 (2d Cir. 2013). As *Lia* explains, the Sixth and D.C. Circuits both apply de novo review. *See Solomon v. Vilsack*, 628 F.3d 555, 561 (D.C. Cir. 2010); *Lorillard Tobacco Co. v. Chester, Willcox & Saxbe*, 546 F.3d 752, 757 (6th Cir. 2008). This Court has consistently applied de novo review on the understanding that judicial estoppel "is a pure question of law." *Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 143 (2d Cir. 2005). Chevron has given this Court no persuasive reason "to reconsider [its] precedent favoring *de novo* review." *Lia*, 541 F. App'x at 73 n.1. In any event, the outcome here is the same regardless because the district court "necessarily abuse[d] its discretion" when it based its denial of judicial estoppel on "an erroneous view of the law" and "a clearly erroneous assessment of the evidence." *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1748 n.2 (2014).

**1.** Chevron first asserts (at 122) that its promise to abide by the Ecuadorian judgment (subject only to its defenses under the Recognition Act) is not grounds for

## SA1153

estoppel because the "offer was [not] accepted or otherwise relied upon," "appears nowhere in any court opinion," and was not included in "the stipulation signed by the parties." But this Court has already heard and rejected that argument as a matter of law: "While the district court did not include Texaco's promise to satisfy any Ecuadorian judgment in its stipulation and order, an express adoption of the prior inconsistent position is not required. The court need only adopt the position 'in some manner, such as by rendering a favorable judgment.'" *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 389 n.4 (2d Cir. 2011). As the Court reasoned, Chevron assured the *Aguinda* court that it would satisfy an Ecuadorian judgment because Chevron had a "well-founded belief that such a promise would make the district court more likely to grant its motion to dismiss." *Id.*[11] Now, years after the motion was granted on the basis of that promise, Chevron has changed its tune. This is precisely the "deliberate[] changing [of] positions according to the exigencies of the moment" that the doctrine of judicial estoppel proscribes. *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001).

---

[11] Both Chevron and the district court characterize this Court's "conclu[sion]" that Texaco's promises were "enforceable against Chevron," *Republic of Ecuador*, 638 F.3d at 389 n.4, as mere "dicta." SPA-471 n.1754; Chevron Br. 121 n.31. But that conclusion was essential to resolving "[t]he basic question" before the court: "whether Chevron's actions in pursuing BIT arbitration constitute a breach of those ... promises." *Republic of Ecuador*, 638 F.3d at 396.

# SA1154

Nor can Chevron evade judicial estoppel simply by sowing doubt as to when—or whether—Texaco merged with Chevron. On this point, again, Chevron and the district court stand directly athwart the Second Circuit: "[I]n seeking affirmance of the district court's *forum non conveniens* dismissal, lawyers from ChevronTexaco appeared in this Court and reaffirmed the concessions that Texaco had made in order to secure dismissal of Plaintiffs' complaint. In so doing, ChevronTexaco bound itself to those concessions." *Republic of Ecuador*, 638 F.3d at 389 n.3. Judge Kaplan rejected that holding of this Court, reasoning that this Court "had been misinformed" when it observed that ChevronTexaco had appeared in Court in *Aguinda,* and that "[e]ven assuming that [the lawyers who appeared] were Chevron employees at the time of the *Aguinda* appeal, they acted as attorneys for Texaco and their statements as Texaco's attorneys did not bind Chevron." SPA-469-470 n.1750. But this Court wasn't "misinformed": Chevron's lawyers in *Aguinda* explicitly asked "this Court [to] take judicial notice" that "Texaco merged with Chevron Inc. on October 9, 2001," and "ChevronTexaco, Inc." explicitly appeared on the signature page. Appellee Br. 10, 89 in *Aguinda v. Texaco, Inc.*, No. 2001-7756 (2d Cir., filed Dec. 20, 2001).

**2.** Aware that the Second Circuit has rejected these arguments before, Chevron devised—and the district court accepted—a new one: that judicial estoppel shouldn't apply because the "characteristics of the Ecuadorian courts"

# SA1155

have changed since the promise was made. SPA-468. But in order to make that finding without any evidence of corruption in the appellate court or Supreme Court in this case, the district court had to find that the Ecuadorian judiciary, through and through, was—and is—incapable of "provid[ing] impartial tribunals or procedures compatible with due process of law"—a designation that U.S. appeals courts have given only to ayatollah-controlled Iran and war-torn Liberia. SPA-445. The court based its sweeping condemnation of Ecuador's judiciary almost exclusively on the testimony of partisan Álvarez Grau. The district court cited Álvarez's testimony more than 50 times in nine pages, SPA-431-440, and Chevron, in turn, cites those pages 17 times in four pages (at 132-35) to show that the record "amply" supports its wholesale attack on the Ecuadorian judiciary.

But even Dr. Álvarez admitted that "it would be irresponsible" for anyone "to generalize that all of the judges and all of the justices, that all of the members of the legal branch are corrupt" based on his testimony. Republic of Ecuador Appendix, RA-2-3, Álvarez Dep. Tr. (Sept. 7, 2011) at 137:22-138:2. The district court apparently felt more at liberty to generalize.

Recognizing that the district court's sweeping condemnation of the Ecuadorian judiciary won't hold up, Chevron tries (at 123) to occupy the ostensibly more defensible position that Ecuador's judiciary is incapable of delivering justice only in "highly politicized" cases. But what belongs in Chevron's category of

## SA1156

"highly politicized" cases? Surely, if anything, cases between President Correa's government and Chevron itself would fit the bill. But did Chevron believe the Ecuadorian courts were incapable administering justice when Texaco won a $1.5 million judgment against Correa's government in 2007? RA-388-89. Or when an Ecuadorian appellate court reversed a lower court's dismissal of another multi-million-dollar Texaco suit against Ecuador in 2008? RA-350. What about when an Ecuadorian court dismissed charges against Chevron lawyers in 2011? RA-248.

Chevron seems to have gerrymandered a category of "systemic inadequacy" that includes just one case: "this one." Chevron Br. 130. Because Chevron can't show that the appellate judges (or the Justices of the Ecuador Supreme Court) were corrupt, biased, or unqualified, it hopes to persuade this Court that Ecuador's judiciary was "systematically corrupt" in this case alone. That's an oxymoron.

## IV. Chevron has established neither a cause of action under RICO nor an entitlement to equitable relief.

### A. Chevron has not met RICO's statutory prerequisites for a private right of action.

As we explained in our opening brief, RICO imposes injury and causation prerequisites that are "more rigorous" than Article III's. *Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006); *see* 18 U.S.C. § 1964(c). Chevron comes up short on both: It has not established a cognizable RICO injury that would be likely

Case 18-855, Document 91, 03/11/2019, 2515264, Page270 of 292
Case 18-826, Document 317, 01/06/2015, 1409154, Page58 of 73

SA1157

redressed by its requested relief, nor has it shown that the alleged RICO violations are the but-for and proximate causes of any such injury.

**1. *RICO Injury*.** Unlike the district court, Chevron does not deny that it must establish an "actual, quantifiable" RICO injury with "proof of concrete financial loss." *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 227-28 (2d Cir. 2008); *Oscar v. Univ. Students Coop. Ass'n*, 965 F.2d 783, 785 (9th Cir. 1992) (en banc); *see also Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000) (RICO requires "proof of actual monetary loss, *i.e.*, an out-of-pocket loss."). Nor does Chevron contest that "the amount of damages" must be "clear and definite," *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003), so that if "damages are still unknown," the injury will be too "speculative" and "unprovable" for RICO. *Harbinger Capital Partners Master Fund I, Ltd. v. Wachovia Capital Mkts., LLC*, 347 F. App'x 711, 713 (2d Cir. 2009).

But Chevron makes almost no effort to actually meet these strict requirements. It again relies primarily (at 78) on the attachment of the Ecuadorian trademarks and the arbitral award. Even assuming those are cognizable injuries under Article III (which they are not), neither is cognizable under RICO.

As for the trademarks, they are owned by Chevron's subsidiaries, not Chevron, and Chevron cannot "bring an individual action under RICO to redress injuries" to its subsidiaries. *Manson v. Stacescu*, 11 F.3d 1127, 1131 (2d Cir. 1993)

## SA1158

(holding that a plaintiff lacks standing to do so even if "the plaintiff is the sole shareholder of the injured corporation"); *see Bixler v. Foster*, 596 F.3d 751, 758 (10th Cir. 2010) (following the "uniform holdings of other circuits" that "corporate shareholders do not have standing to sue under the civil RICO statute for alleged injuries to the corporation"); *cf. Petroleum Enhancer, LLC v. Woodward*, 690 F.3d 757, 770 (6th Cir. 2012) ("[A]n 'injury arising solely out of harm to a subsidiary corporation is generally insufficient to confer standing on a parent corporation.'" (quoting 9 William M. Fletcher, et al., *Fletcher Cyclopedia of the Law of Corporations* § 4227 (2010)). Chevron must therefore show that it has "sustain[ed] an injury that is separate and distinct from [any] injury sustained by" its subsidiaries. *Manson*, 11 F.3d at 1131. It hasn't even tried.

As for the arbitral award, Chevron hasn't lost any money that it would have received but for the alleged RICO violations. To the contrary, as previously explained, Chevron is seeking to enforce the award in the United States and prevailed in the district court. *See Republic of Ecuador*, 949 F. Supp. 2d at 60. There is simply no way that the Ecuadorian court's "attachment" of the award has caused any concrete financial loss to Chevron. "[A] plaintiff who claims that a debt is uncollectible because of the defendant's conduct" must first show that its "rights to payment have been frustrated" by the alleged RICO violations before bringing a claim. *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994); *see*

### SA1159

*also In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 59 (2d Cir. 1998) ("RICO injury is speculative when … legal remedies remain which hold out a real possibility that the debt, and therefore the injury, may be eliminated.").

Probably aware that these injuries will not carry the day, Chevron tries to find a few more. It makes a vague reference to "harm to reputation and goodwill," as well as to the legal fees it spent in its own "discovery actions." Chevron Br. 77-78. But these injuries are unquestionably inadequate under RICO. The "generalized reputational harms alleged" are too indirect, vague, and "speculative to constitute an injury to business or property." *Kimm v. Chang Hoon Lee & Champ, Inc.*, 196 F. App'x 14, 16 (2d Cir. 2006). Nor would they be redressed by Chevron's requested relief. The same goes for the legal fees Chevron has incurred, which were not directly caused by any alleged RICO violations, and are also neither clear nor definite. Just as a plaintiff cannot "manufacture standing" under Article III through "self-inflicted injuries," *Clapper*, 133 S. Ct. at 1151-52, it cannot bootstrap a RICO claim by relying on the costs of *uncovering* an alleged "fraudulent scheme" as the legally cognizable injury *inflicted* by that scheme.

**2. RICO Causation.** Even assuming that Chevron could clear RICO's injury hurdle, it cannot get past RICO's causation requirement. For whatever injury Chevron claims, it "must show that the RICO violation was the but-for (or transactional) cause of [that] injury, meaning that but for the RICO violation, [it]

## SA1160

would not have been injured." *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 132 (2d Cir. 2010); *see also Hemi Group, LLC v. City of New York*, 559 U.S. 1, 9 (2010). Under "traditional principles of but-for causation," Chevron must provide "proof that [its asserted injury] would not have occurred in the absence of the alleged wrongful action or actions." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

Chevron makes no attempt—none whatsoever—to meet this bedrock requirement. One can combine Chevron's nearly 200-page brief in this Court, its nearly 400-page post-trial brief below, and the district court's nearly 600-page opinion and appendices, and still find only a single conclusory sentence even attempting to meet this critical prerequisite. *See* SPA-416 (court's unexplained assertion that "Chevron's injuries are not attributable to a cause independent of defendants' ghostwriting, bribery and other misconduct"). That's not enough.

Because all of Chevron's possible RICO "injuries" would have occurred even if a much, much smaller judgment were entered against it, Chevron must effectively show that there would be *no* judgment against it in Ecuador but for the alleged wrongdoing. As a matter of logic, Chevron cannot do so. Although it originally sought to prove that the environmental lawsuit in Ecuador was nothing but "sham litigation," S.D.N.Y.-Dkt. 1, at 2, Chevron later dropped any attempt to contest its environmental liability. And when the defendants tried to submit

44

## SA1161

evidence of Chevron's contamination in Ecuador, the district court ridiculed their attempts as "a joke" and refused to let them do so. Tr. 501-02. But RICO causation is no joke, and it is certainly "relevant to this action." Chevron Br. 147 n.42.

That is to say nothing of proximate causation. As already discussed, none of Chevron's asserted injuries (at least no redressable, cognizable injury) was proximately caused by the alleged improprieties in the Ecuadorian trial court. The Ecuadorian intermediate court reviewed the record de novo and produced a substitute judgment, which the Supreme Court of Ecuador affirmed. Thus, Chevron cannot show that "the alleged violation *led directly* to the plaintiff's injuries," as RICO requires. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) (emphasis added). And although Chevron seeks to get around this problem by making several vague and unsubstantiated references to "other injuries [it] sustained that are distinct from the Lago Agrio judgment itself," it does not say what these are. Chevron Br. 79-80. Both Article III and RICO demand more.

### B. RICO does not authorize a private cause of action solely for equitable relief.

In defending the district court's grant of equitable relief under RICO, Chevron argues that any plaintiff "*authorized to bring an action*" under RICO is entitled to equitable relief—either under 18 U.S.C. § 1964(a)'s broad authorization of "appropriate orders" or a district court's general authority to issue ancillary relief

## SA1162

in support of a judgment. Chevron Br. 82 (emphasis added). But that proposition—on which this Court has expressed doubts and a majority of other courts disagree—is largely beside the point here because RICO does *not* authorize Chevron to bring an action solely for equitable relief. The private right of action spelled out in § 1964(c), by its plain language, provides a right of action for *damages*. Thus, even assuming equitable relief is ever appropriate *in addition to* money damages (as Chevron asserts), it would still not be appropriate *in place* of them.

The statutory language is straightforward: it says that "[a]ny person injured in his business or property by reason of a violation of [RICO] may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains." 18 U.S.C. § 1964(c). That is the *only* cause of action the statute provides private parties, and it is expressly limited to claims for *damages*. A private plaintiff not seeking damages, therefore, has no RICO cause of action and is entitled to no relief under the statute, equitable or otherwise. On that, the authorities are unanimous. No case or authority holds to the contrary, and Chevron cites none.

The Seventh Circuit has not held, as Chevron asserts, that § 1964(a) includes a "general grant of authority for district courts to enter injunctions." Chevron Br. 82 (citing *Nat'l Org. for Women, Inc. v. Scheidler*, 267 F.3d 687, 696 (7th Cir. 2001), *rev'd on other grounds*, 537 U.S. 393 (2003)). Whatever the meaning of § 1964(a), it

## SA1163

cannot be read as a freestanding grant of authority for district courts to order equitable relief where the relief is not tethered to a plaintiff's assertion of a valid cause of action. Both the plain language of § 1964(c) and Article III's limitation of the judicial power to cases and controversies prohibit that result. Fundamentally, "[f]ederal courts cannot reach out to award remedies when the Constitution or laws of the United States do not support a cause of action." *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 74 (1992).

*Scheidler*'s holding is in fact much narrower than Chevron suggests. Although the Seventh Circuit did uphold injunctive relief, the plaintiffs there—as our opening brief explains—also sought and were awarded more than $250,000 in a jury trial. 267 F.3d at 693. Accordingly, the injunctive relief in *Scheidler* was predicated on the district court's finding that the plaintiffs had "been injured in their business or property by reason of a RICO violation" and stated a claim under RICO's private right of action. *Id.* at 696. So even if it were true that § 1964(a) "sets out general remedies, including injunctive relief, that all plaintiffs authorized to bring suit may seek," a plaintiff not seeking damages is not "authorized to bring suit" and thus not entitled to *any* relief under RICO. *Id.*

In addition to § 1964(a), Chevron relies on a federal district court's general authority to enter appropriate relief in support of a judgment—a theory adopted by Judge Rakoff in *Motorola Credit Corp. v. Uzan*, 202 F. Supp. 2d 239 (S.D.N.Y.

2002), *rev'd on other grounds*, 322 F.3d 130 (2d Cir. 2003). But, again, a district court's power to enter such relief is not an unlimited authority to enter injunctions as the court sees fit, unmoored from a valid cause of action. That would be an invitation for district courts to enter orders in the absence of a concrete case or controversy between parties—the definition of an advisory opinion.

Thus, even assuming the correctness of Judge Rakoff's view that a district court has inherent power to order equitable remedies ancillary to a RICO judgment, the court's authority to enter such relief must depend on the existence of a cause of action over which the court has jurisdiction—namely, RICO's private right of action for damages. That was the case in *Uzan*, which involved $2.7 billion in damages *in addition to* the claimed equitable relief. 202 F. Supp. 2d at 242. As in *Scheidler*, Judge Rakoff's injunction in *Uzan* depended on the existence of those damages claims. *Id.* at 244 (holding that § 1964(c) provides "a private right of action *for damages*" (emphasis added)). Indeed, Judge Rakoff has elsewhere expressly repudiated Chevron's position that RICO authorizes injunctive relief in the absence of a damages claim. As his RICO treatise explains: "Civil RICO claims are *only* available where monetary relief is sought … Thus, if the suit is in essence a claim … for injunctive relief, RICO will not be a suitable vehicle." Jed S. Rakoff, *RICO: Civil and Criminal Law and Strategy* § 7.022 (2014) (emphasis added).

Chevron's only response to these points is its general assertion that there is

Case 18-855, Document 97-3, 11/02/2019, 2515864, Page278 of 292
Case 18-855, Document 51, 01/06/2015, 1409154, Page61 of 73

SA1165

"no support in the law for Donziger's assertion that equitable relief must be coupled with an award of monetary damages." Chevron Br. 86. But the support is § 1964(c)'s express limitation to damages claims. If Chevron wants to set aside that statutory limitation to create a *new* equitable cause of action under RICO then it is Chevron that should be expected to cite authority—or at least compelling reasons—for setting aside the statutory text. It has not done so.

Adherence to the statute's text on this point is no mere technicality. By limiting RICO's extraordinary powers of quasi-criminal prosecution to private parties seeking damages, the statute ensures that nobody may be branded a criminal without the safeguard of a trial by jury. Chevron's decision to abandon its damages claims on the eve of trial was a tactical one, designed to deprive Mr. Donziger of his Seventh Amendment rights. Chevron must now live with its decision: by abandoning its damages claims, it abandoned its cause of action under RICO and any claim to relief under the statute.

## C. As the majority of courts have held, equitable relief is *never* available to private parties under RICO.

Section 1964(c)'s creation of a private right of action for "damages" establishes, at the very least, that a valid damages claim is a prerequisite to any award of relief under RICO. But many courts—including this one—have suggested that § 1964(c)'s limit to actions for "damages" has a deeper significance: by granting private litigants a right of action for damages while saying nothing about other

Case 18-855, Document 91-3, 11/06/2019, 2515364, Page279 of 292
Case 18-826, Document 91-3, 11/06/2019, 1409154, Page62 of 292

SA1166

forms of relief, Congress expressly limited available relief to the form it specified. In the face of Congress's statutory choice, courts are not free to add *additional* forms of relief. *See Am. Med. Ass'n v. United Healthcare Corp.*, 588 F. Supp. 2d 432, 445-46 (S.D.N.Y. 2008) (a court interpreting RICO's private right of action "can neither infer a meaning that is unexpressed, nor ignore Congress's seemingly willful silence on the matter").[12]

Chevron does not dispute that the language of § 1964(c)'s cause of action expressly mentions only damages. Instead, it finds support for its equitable remedy in the "plain language" of § 1964(a), a *separate* subsection that, on its face, broadly grants district courts "jurisdiction to prevent and restrain violations of section 1962" through "appropriate orders." It is true, as Chevron asserts, that § 1964(a), when read in isolation, does not limit the identity of parties who may obtain such "appropriate orders" under the statute. But the subsection does not appear in isolation. The question of *who* may invoke subsection (a) is spelled out in the next paragraph, which authorizes only "[t]he Attorney General" to "institute proceedings under [the] section." 18 U.S.C. § 1964(b). As Solicitor General Olson

---

[12] The same issue is now before this Court in *Sykes v. Harris & Assocs.*, No. 13-2742, in which Appellant Leucadia National (represented by the same law firm that represents Chevron here) argues forcefully that "the RICO statute does not afford injunctive relief to private parties. Indeed, the text and history of the RICO statute show that Congress affirmatively decided not to authorize private injunctive claims." Br. of Appellant Leucadia Nat'l Corp. 15-16 (2013 WL 5502487).

explained to the Supreme Court in *Scheidler*, "the sole authority to seek final and interim injunctive relief against racketeering activities and enterprises is given to the Attorney General." Br. of U.S., at 7, in *Scheidler* (No. 01-1119). In contrast, the private right of action in subsection (c) does not refer to proceedings under the section at all—instead it creates a separate procedure, allowing plaintiffs to "sue … in any appropriate United States district court." 18 U.S.C. § 1964(c).

The structure of RICO's civil remedies section, and the linked nature of subsections (a) and (b), makes sense in light of the statute's development. The Senate bill that eventually became RICO included what later became § 1964(a) and (b), but contained no private right of action. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 486 (1985) ("The civil remedies in the bill passed by the Senate, S. 30, were limited to injunctive actions by the United States…"). Subsections (a) and (b) mimicked—and still do—Section 4 of the Sherman Act, 15 U.S.C. § 4, which the Supreme Court had construed to authorize injunctive actions only by the *government*, not by private parties. *See Minnesota v. N. Sec. Co.*, 194 U.S. 48, 70-71 (1904). If Congress had "intended a private RICO plaintiff to be able to obtain injunctive relief, it surely would have avoided language that had previously been held by the Supreme Court not to permit such relief." *DeMent v. Abbott Capital Corp.*, 589 F. Supp. 1378, 1383 (N.D. Ill. 1984).

The private right of action—subsection (c)—was added only later, in

## SA1168

committee by the House, without changing the remainder of Section 1964, and was "modeled … on the civil-action provision of the federal antitrust laws, [Section] 4 of the Clayton Act." *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 267 (1992); *Sedima*, 473 U.S. at 489; H.R. Rep. No. 91-1549, at 35, 58 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4007, 4010, 4034. "[T]he House Committee's addition of the private damages remedy" thus did "not alte[r] the public-action thrust of the other subsection[s] of S. 30." *DeMent*, 589 F. Supp. at 1383.. And its model in the Clayton Act, Section 4, was understood to allow private actions only for *damages*— as the Supreme Court had previously construed it. *See Paine Lumber Co. v. Neal*, 244 U.S. 459, 471 (1917) ("[A] private person cannot maintain a suit for an injunction under [Section] 4 of the [Clayton Act].").

Indeed, two separate amendments that would have authorized private injunctive actions were proposed and rejected by the House—once in committee and again on the chamber floor. *See* 116 Cong. Rec. 27,739 (1970) (committee); *id.* at 35,228; 35,346 (floor); *see also Sedima*, 473 U.S. at 487. The sponsor of both, Congressman Steiger, complained that the bill passed by the House "fail[ed] to provide … [an] important substantive remed[y] included in the Clayton Act: … equitable relief in suits brought by private citizens." 116 Cong. Rec. 35,227; 35,228 (1970). But other members were concerned about "the potential consequences that this new remedy might have," and so Mr. Steiger's amendments were omitted from

52

## SA1169

the final bill. 116 Cong. Rec. 35,346 (remarks of Rep. Poff); *see also Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 154-55 (1987) (citing 116 Cong. Rec. 35,346). Subsequent Congresses have twice considered "broaden[ing] even further the remedies available under RICO" by "permit[ing] private actions for injunctive relief," *Agency Holding Corp.*, 483 U.S. at 155, and both times have declined to do so. *See* S. 16, 92d Cong. (1972); S. 13, 93d Cong. (1973).

Based on the statute's language and structure, it is not surprising that most courts that have addressed the question have concluded that RICO's civil-damages provision means what it says: plaintiffs are entitled to damages, not injunctions and other equitable relief. *See, e.g., Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1084 (9th Cir. 1986) (holding equitable relief is "not available to a private party in a civil RICO action"). And while this Court has "never definitively ruled on the issue" whether RICO permits a private plaintiff to seek injunctive relief, *Uzan*, 202 F. Supp. 2d at 243, the Court has expressed strong doubts about whether such relief is available. "It seems altogether likely," the Court wrote in *Sedima, S.P.R.L. v. Imrex Co.*, "that [RICO] as it now stands was not intended to provide private parties injunctive relief." 741 F.2d 482, 489 n.20 (2d Cir. 1984), *rev'd on other grounds*, 473 U.S. 479 (1985); *see also Trane Co. v. O'Connor Sec.*, 718 F.2d 26, 28-29 (2d Cir. 1983) ("We have the same doubts as to the propriety of private party injunctive relief.").

As in *Sedima* and *Trane*, this Court need not definitively answer that question

## SA1170

in this case, and may thus avoid wading into the growing split in authority. Because Chevron has no damages claim, it has no cause of action under RICO and thus no claim to relief under *any* of RICO's civil-remedies subsections, including § 1964(a). This Court need go no further to decide this case.

> ### D. Even if equitable relief were available as a general matter, it is unwarranted here.

The Supreme Court has emphasized that "[a]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). "[C]ourts of equity should not act" where, as here, "the moving party has an adequate remedy at law and will not suffer irreparable injury if denied injunctive relief." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). The same requirements apply to a constructive trust, which "is not appropriate when remedies exist at law and elsewhere." *United States v. Khan*, 129 F.3d 114, at *2 (2d Cir. 1997) (unpublished decision). Chevron asserts that the district court was "well within its discretion" in granting the anti-enforcement injunction and worldwide constructive trust. Chevron Br. 92. But at least three adequate remedies exist at law. And Chevron has barely attempted to prove irreparable injury.

> ### 1. Chevron has several adequate remedies at law. Chevron never

once tries to explain why it cannot avail itself of the most "obvious alternative remedy"—raising its defenses in an enforcement proceeding—which this Court has

Case 18-855, Document 91, 03/11/2019, 2515264, Page284 of 292
Case 18-826, Document 31, 01/06/2015, 1409154, Page287 of 293

SA1171

described, in this very litigation, as "not only a 'better' approach," but one that would still allow Chevron to "argue the same points" against the Ecuadorian judgment. *Naranjo*, 667 F.3d at 245. If an entitlement to equitable relief is defeated by the existence of only an "adequate" remedy, then it must certainly be defeated by this "obvious" and "better" alternative remedy. And it is black-letter law that, where the "plaintiff can assert the claim as a defense in some other proceeding, the alternative remedy is adequate." 11A Wright & Miller, *Fed. Prac. & Proc. Civ.* § 2944 (3d ed.); *see State of Georgia v. City of Chattanooga*, 264 U.S. 472, 483-84 (1924). Chevron doesn't deny its ability to defend itself in an appropriate enforcement proceeding. "[I]t is difficult to see what remedy, more nearly perfect and complete," Chevron can have "than is afforded [it] by [its] right to make defence at law." *Phoenix Mut. Life Ins. Co. v. Bailey*, 80 U.S. 616, 623 (1871); *accord Reisman v. Caplin*, 375 U.S. 440, 443 (1964). Where, as here, "a far better remedy is available," *Naranjo*, 667 F.3d at 246, equitable relief of any kind is impermissible.

Chevron also has adequate remedies in Ecuador itself, one of which it has already invoked: an action before the Constitutional Tribunal of Ecuador alleging a denial of due process. And Chevron does not deny that it has the ability to seek relief from the judgment under Ecuador's Collusion Prosecution Act, but has chosen not to do so. Rather than address the merits of these legal remedies in the forum, Chevron (at 177) simply falls back on its broad condemnation of the entire

## SA1172

Ecuadorian judiciary. Chevron's failure to address either of these remedies in any depth underscores the unnecessarily preemptive nature of this unusual proceeding.

**2. *Chevron has not shown irreparable injury.*** Nor can Chevron show that it will suffer irreparable injury if it is denied equitable relief in this proceeding. Again, Chevron can raise the same challenge "as a defense in [an] enforcement proceeding," where "any harm alleged" could "be remedied by a favorable ruling." *Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau*, 979 F. Supp. 2d 104, 112 (D.D.C. 2013). Chevron's sole attempt to establish irreparable injury is through a vague reference, without explanation, to injuries to its "reputation, goodwill, and ability to conduct business." Chevron Br. 92-93. Where exactly has this harm to Chevron's reputation and ability to conduct business occurred? Is Chevron suggesting that the lawsuit predicated on redressing harm to thousands of Ecuadorian villagers and a vast swath of the Amazon damaged its reputation, but that the 15.834 billion gallons of petroleum product that it admits to dumping into Amazonian waterways did not? Is accountability somehow more harmful to Chevron's "goodwill" than decades of litigious attempts to escape it?

Chevron cannot establish irreparable injury through such vague and conclusory statements. Even if Chevron had suffered real injury, the way to repair it is through a defense in an enforcement proceeding. The only plausible harm here would be the additional litigation cost of having to face enforcement proceedings.

## SA1173

Not only are those proceedings inevitable, but courts have uniformly recognized that "[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury." *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974). Chevron therefore "suffers no damage before having an opportunity to assert [its] defenses." *High Adventure Ministries, Inc. v. Comm'r of Internal Revenue*, 726 F.2d 555, 558 (9th Cir. 1984).

   ***3. The constructive trust was unwarranted.*** Even if equitable relief were otherwise appropriate, Chevron cannot show an entitlement to a constructive trust on Donziger's contingency interest in the Ecuadorian judgment. Entitlement to the remedy turns on four elements: (1) a fiduciary relationship between the parties, (2) a promise, (3) an asset transfer in reliance on the promise, and (4) unjust enrichment flowing from a breach of the promise. *Mei Yun Chen v. Mei Wan Kao*, 97 A.D.3d 730, 730 (N.Y. App. Div. 2012). Though equity is flexible, courts frequently deny constructive trusts when a party fails even a single element. *See, e.g., Amusement Indus., Inc. v. Stern*, 786 F. Supp. 2d 758, 785 (S.D.N.Y. 2011) (Kaplan, J.). Here, Chevron can't possibly satisfy *any* of these elements: There is no fiduciary relationship, no promise, and no reliance—and nobody contends otherwise. The district court correctly recognized that "the key is unjust enrichment," SPA-487 n.1812, but it previously dismissed Chevron's unjust enrichment claim as premature. S.D.N.Y.-Dkt. 468, at 47. "As the Donziger Defendants have not

## SA1174

recovered on the Judgment to date," it held, "the unjust enrichment claim is premature at best. The essence of an unjust enrichment claim is that one party *has received* money or a benefit at the expense of another." *Id.* (emphasis added); *see also Restatement (Third) of Restitution and Unjust Enrichment* § 55 (2011).

In any event, the constructive trust granted by the district court is a remedy at law, not equity, and Chevron circumvented a jury trial by promising to "seek only equitable relief." S.D.N.Y.-Dkt. 469. The trust does not attach to an *existing, traceable* asset (a remedy available at equity), but instead to a *contingent, future* interest in the judgment (a remedy available only at law). *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002). For that reason, too, the constructive trust fails.

## V.     In the event of a remand, this case should be reassigned to a different district judge.

This Court should "dismiss the present claim[s] in [their] entirety," *Naranjo*, 667 F.3d at 239, leaving no room for a remand. But if there is a remand, the case should be reassigned. "Reassigning a case to a different district judge, while not an everyday occurrence, is not unusual in this Circuit," and is "simply a mechanism that allows the courts to ensure that cases are decided by judges without even an appearance of partiality." *Ligon v. City of New York*, 736 F.3d 118, 128-29 (2d Cir. 2013). It "does not imply any personal criticism of the judge." *Id.*

Given this litigation's history, the "original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his … mind

# SA1175

previously-expressed views or findings" and "reassignment is advisable to preserve the appearance of justice." *Mackler Prods., Inc. v. Cohen*, 225 F.3d 136, 147 (2d Cir. 2000). Take, for example, the judge's position on the Ecuador Supreme Court: "Believe me, if this were the High Court in London, you can be sure I'd wait." S.D.N.Y.-Dkt. 287-1 (Hearing Tr. 4/30/10, at 35:9-36:10). The same goes for the judge's "visceral judgment on appellant's personal credibility," *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 142 (2d Cir. 2007)—referring to Mr. Donziger's litigation strategy, early on, as "a giant game" in which "Mr. Donziger is trying to become the next big thing in fixing the balance of payments deficit." *Chevron v. Naranjo*, 11-1150-cv S.D.N.Y.-Dkt. 287-5 ("*Naranjo* Docket") (Hearing Tr. 11/22/10, at 26:19-24). The "firmness" with which the judge established these determinations from the outset also favors reassignment. *Hispanics for Fair & Equitable Reapportionment v. Griffin*, 958 F.2d 24, 26 (2d Cir. 1992). The judge admits that he "got it from the beginning." *Naranjo* Docket, 287-5 (Hearing Tr. 11/22/10, at 26:13). Indeed, both of Chevron's surviving claims originated with the judge, who initially asked (*before* the complaint was filed) if "the phrases Hobbs Act, extortion, RICO, have any bearing here?" (S.D.N.Y.-Dkt. 1, at 118 (quoting hearing transcript)) and then took it upon himself to amend Chevron's complaint (*after* the bench trial) to include a new common-law theory. All this raises at least "a

59

## SA1176

suspicion of partiality"—nothing more is required. *United States v. Simon*, 393 F.2d 90, 91 (2d Cir. 1968).

Nor would reassignment "entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." *Mackler Prods.*, 225 F.3d at 147. To the contrary, "[w]here the judge sits as the fact-finder, reassignment is the preferable course, since it avoids any rub-off of earlier error." *United States v. Robin*, 553 F.2d 8, 10 (2d Cir. 1977). And "where a judge has repeatedly adhered to an erroneous view after the error is called to his attention"—as demonstrated by the court's inability to adhere to *Naranjo* and other prior precedents of this Court— reassignment avoids "an exercise in futility (in which) the Court is merely marching up the hill only to march right down again." *Id.* at 11. Because "the contentions of the parties in this difficult and complex matter have taken a toll on all involved," the case should "be reassigned to another judge upon remand." *United States v. Quattrone*, 441 F.3d 153, 192 (2d Cir. 2006).

### CONCLUSION

The district court's judgment should be reversed, its factual findings should be vacated, and this action should be dismissed in its entirety. A remand for further proceedings is unnecessary, but in the event of a remand the case should be reassigned to a different district judge.

# SA1177

Respectfully submitted,

*/s/ Deepak Gupta*

Deepak Gupta
Gregory A. Beck
Jonathan E. Taylor
GUPTA BECK PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741

Justin Marceau
John Campbell
University of Denver
Sturm College of Law
2255 E. Evans Avenue
Denver, CO 80208
(303) 871-6000

January 6, 2015

*Counsel for Defendants-Appellants Steven Donziger, The Law Offices of Steven Donziger, and Donziger & Associates PLLC*[13]

---

[13] Counsel gratefully acknowledge the contributions of the following law students: Brycen Williams, Bradley Kloewer, Ashley Basta, Mary Ledoux, Ty Nagamatsu, Sherri Giger, Tim Berrier, and Dale Ratliff of the University of Denver, Sturm College of Law.

## SA1178

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)**

I hereby certify that my word processing program, Microsoft Word, counted 14,868 words in the foregoing brief, exclusive of the portions excluded by Rule 32(a)(7)(B)(iii).

*/s/ Deepak Gupta*

January 6, 2015                     Deepak Gupta

**SA1179**

### CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2015, I electronically filed the foregoing Corrected Reply Brief for Defendants-Appellants Steven Donziger, The Law Offices of Steven Donziger, and Donziger & Associates PLLC with the Clerk of the Court of the U.S. Court of Appeals for the Second Circuit by using the Appellate CM/ECF system. All participants are registered CM/ECF users, and will be served by the Appellate CM/ECF system.

*/s/ Deepak Gupta*
Deepak Gupta