# 19-1584-cv(L)

## 18-2191-cv(Con), 18-0855-cv(Con)

# United States Court of Appeals
### *for the*
# Second Circuit

CHEVRON CORPORATION,

*Plaintiff-Counter-Defendant-Appellee*,

- v. -

DONZIGER & ASSOCIATES, PLLC, STEVEN DONZIGER,
THE LAW OFFICES OF STEVEN R. DONZIGER,

*Defendants-Counter-Claimants-Appellants*.
*(caption continued on inside cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
CASE NO. 1:11-CV-00691-LAK-JCF | THE HONORABLE LEWIS A. KAPLAN

**SUPPLEMENTAL APPENDIX
VOLUME 1 OF 2
(PAGES SA1 to SA148)**

Randy M. Mastro
Andrea E. Neuman
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166

Thomas G. Hungar
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., NW
Washington, D.C. 20036

William E. Thomson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071

*Attorneys for Chevron Corporation*

PABLO FAJARDO MENDOZA, LUIS YANZA, FRENTE DE DEFENSA DE LA AMAZONIA, AKA AMAZON DEFENSE FRONT, SELVA VIVA SELVIVA CIA, LTDA, MARIA AGUINDA SALAZAR, CARLOS GREFA HUATATOCA, CATALINA ANTONIA AGUINDA SALAZAR, LIDIA ALEXANDRA AGUIN AGUINDA, PATRICIO ALBERTO CHIMBO YUMBO, CLIDE RAMIRO AGUINDA, LUIS ARMANDO CHIMBO YUMBO, BEATRIZ MERCEDES GREFA TANGUILA, LUCIO ENRIQUE GREFA TANGUILA, PATRICIO WILSON AGUINDA, CELIA IRENE VIVEROS CUSANGUA, FRANCISCO MATIAS ALVARADO YUMBO, FRANCISCO ALVARADO YUMBO, OLGA GLORIA GREFA CERDA, LORENZO JOSE ALVARADO YUMBO, NARCISA AIDA TANGUILA NARVAEZ, BERTHA ANTONIA YUMBO TANGUILA, GLORIA LUCRECIA TANGUI GREFA, FRANCISCO VICTOR TANGUILA GREFA, ROSA TERESA CHIMBO TANGUILA, JOSE GABRIEL REVELO LLORE, MARIA CLELIA REASCOS REVELO, MARIA MAGDALENA RODRI BARCENES, HUGO GERARDO CAMACHO NARANJO, JOSE MIGUEL IPIALES CHICAIZA, HELEODORO PATARON GUARACA, LUISA DELIA TANGUILA NARVAEZ, LOURDES BEATRIZ CHIMBO TANGUIL, MARIA HORTENCIA VIVER CUSANGUA, SEGUNDO ANGEL AMANTA MILAN, OCTAVIO ISMAEL CORDOVA HUANCA, ELIAS ROBERTO PIYAHUA PAYAHUAJE, JAVIER PIAGUAJE PAYAGUAJE, DANIEL CARLOS LUSITAND YAIGUAJE, BENANCIO FREDY CHIMBO GREFA, GUILLERMO VICENTE PAYAGUA LUSITANTE, DELFIN LEONIDAS PAYAGU PAYAGUAJE, ALFREDO DONALDO PAYAGUA PAYAGUAJE, MIGUEL MARIO PAYAGUAJE, TEODORO GONZALOPIAGUAJE PAYAGUAJE, FERMIN PIAGUAJE PAYAGUAJE, REINALDO LUSITANDE YAIGUAJE, LUIS AGUSTIN PAYAGUA PIAGUAJE, EMILIO MARTIN LUSITAND YAIGUAJE, SIMON LUSITANDE YAIGUAJE, ARMANDO WILMER PIAGUAJE PAYAGUAJE, ANGEL JUSTINO PIAGUAG LUCITANT, KEMPERI BAIHUA HUANI, AHUA BAIHUA CAIGA, PENTIBO BAIHUA MIIPO, DABOTA TEGA HUANI, AHUAME HUANI BAIHUA, APARA QUEMPERI YATE, BAI BAIHUA MIIPO, BEBANCA TEGA HUANI, COMITA HUANI YATE, COPE TEGA HUANI, EHUENGUINTO TEGA, GAWARE TEGA HUANI, MARTIN BAIHUA MIIPO, MENCAY BAIHUA TEGA, MENEMO HUANI BAIHUA, MIIPO YATEHUE KEMPERI, MINIHUA HUANI YATE, NAMA BAIHUA HUANI, NAMO HUANI YATE, OMARI APICA HUANI, OMENE BAIHUA HUANI, YEHUA TEGA HUANI, WAGUI COBA HUANI, WEICA APICA HUANI, TEPAA QUIMONTARI WAIWA, NENQUIMO VENANCIO NIHUA, COMPA GUIQUITA, CONTA NENQUIMO QUIMONTARI, DANIEL EHUENGEI, NANTOQUI NENQUIMO, OKATA QUIPA NIHUA, CAI BAIHUA QUEMPERI, OMAYIHUE BAIHUA, TAPARE AHUA YETE, TEWEYENE LUCIANA NAM TEGA, ABAMO OMENE, ONENCA ENOMENGA, PEGO ENOMENGA, WANE IMA, WINA ENOMENGA, CAHUIYA OMACA, MIMA YETI,

  *Defendants*,

STRATUS CONSULTING, INC., DOUGLAS BELTMAN, ANN MAEST,

  *Defendants-Counter-Claimants*,

ANDREW WOODS, LAURA J. GARR, H5,

*Respondents*.

# TABLE OF CONTENTS

PAGE

Email Thread between Aaron Page, Steven Donziger and others,
    Produced by Aaron Page and Bates Stamped
    AMPagePJD_0004172-74, dated November 6, 2017.......................... SA1

Supplemental Judgment as to Donziger Defendants and Defendants
    Camacho and Piaguaje, filed February 28, 2018 (Dkt. 1962) ............ SA4

Proposed Order to Show Cause to Grant Chevron Corporation's Ex
    Parte Application for Discovery and a Preservation Order in
    Furtherance of this Court's March 4, 2014 Judgment and to Set a
    Hearing Date Subsequent to that Discovery on Chevron's
    Application to have Steven Donziger held in Contempt, filed
    March 19, 2018 (Dkt. 1965)............................................... SA6

Default Judgment as to Defaulted Defendants, filed April 23, 2018
    (Dkt. 1985) ...................................................................... SA9

Exhibit 1 to Chevron's Motion to Compel Donziger to Respond to
    Post-Judgment Discovery Requests, Filed May 4, 2018 (Dkt.
    1989-1)

    Chevron Corporation's First Set of Requests for Production of
    Documents in Aid of the Supplemental Judgment to Defendants
    Steven Donziger, The Law Offices of Steven R. Donziger, And
    Donziger & Associates, PLLC, Chevron Corporation's First
    Information Subpoena in Aid of the Supplemental Judgment to
    Defendants Steven Donziger, The Law Offices of Steven R.
    Donziger, And Donziger & Associates, PLLC, Notice to
    Judgment Debtor or Obligor, Chevron Corporation's Subpoena
    Ad Testificandum to Steven R. Donziger, dated April, 26, 2018, .... SA14

Excerpted Transcript from May 8, 2018 Oral Argument,......................... SA54

Order granting Chevron's second motion to compel, filed October 18,
    2019 (Dkt. 2108) ........................................................... SA58

Exhibit 12 to Declaration of Anne Champion in Support of Chevron
    Corporation's Motion to Hold Steve Donziger in Contempt of
    Court for his failure to Comply with the RICO and Default

ii

PAGE

Judgments and the April 16, 2018 Restraining Notice, filed
October 24, 2018 (Dkt. 2114-2)

Email Chain forwarding a July 10,2016 Email Chain among
Steven Donziger Bill Twist and John van Merkensteijn, Dated
October 22, 2016 .......................................................................... SA61

Exhibit 89 to Declaration of Anne Champion in Support of Chevron
Corporation's Motion to Hold Steve Donziger in Contempt of
Court for his failure to Comply with the RICO and Default
Judgments and the April 16, 2018 Restraining Notice, filed
October 24, 2018 (Dkt. 2114-9)

Email Chain among Bill Twist and John van Merkensteijn,
Dated August 3, 2016 ................................................... SA69

Declaration of John Slavek in Support of Chevron Corporation's
Motion to Hold Steve Donziger in Contempt of Court for his
failure to Comply with the RICO and Default Judgments and the
April 16, 2018 Restraining Notice, filed October 24, 2018 (Dkt.
2115) ........................................................................................... SA73

Exhibit 2 to Declaration of John Slavek in Support of Chevron
Corporation's Motion to Hold Steve Donziger in Contempt of
Court for his failure to Comply with the RICO and Default
Judgments and the April 16, 2018 Restraining Notice, filed
October 24, 2018 (Dkt. 2115-1)

Investment Agreements Reviewed and Comparison with Known
Investor Deposits into Donziger-Related Bank Accounts, Time
Period May 2016 through January 2018 ......................... SA95

Exhibit 4-A to Declaration of John Slavek in Support of Chevron
Corporation's Motion to Hold Steve Donziger in Contempt of
Court for his failure to Comply with the RICO and Default
Judgments and the April 16, 2018 Restraining Notice, filed
October 24, 2018 (Dkt. 2115-1)

iii

PAGE

Analysis of TD Bank Accounts – Balances, Investor Deposits
and Transfers Between Accounts, Time Period January 1, 2016
through June 30, 2018 ................................................................. SA96

Exhibit 7-A to Declaration of John Slavek in Support of Chevron
Corporation's Motion to Hold Steve Donziger in Contempt of
Court for his failure to Comply with the RICO and Default
Judgments and the April 16, 2018 Restraining Notice, filed
October 24, 2018 (Dkt. 2115-1)

Summary of TD Bank Visa & American Express Credit Card –
Top 50 Payees, Time Period January 2016 through June 30, 2018 ... SA99

Exhibit 7-B to Declaration of John Slavek in Support of Chevron
Corporation's Motion to Hold Steve Donziger in Contempt of
Court for his failure to Comply with the RICO and Default
Judgments and the April 16, 2018 Restraining Notice, filed
October 24, 2018 (Dkt. 2115-1)

Summary of TD Bank Visa & American Express Credit Card
Expenses & Related Payments by Month & Card User, Time
Period January 2016 through June 30, 2018 ...................................SA100

Declaration of Mary K. Sullivan in Support of Chevron Corporation's
Motion to Hold Steve Donziger in Contempt of Court for his
failure to Comply with the RICO and Default Judgments and the
April 16, 2018 Restraining Notice, filed October 24, 2018 (Dkt.
2116) ...........................................................................................SA101

Exhibit 38 to Declaration of Mary K. Sullivan in Support of Chevron
Corporation's Motion to Hold Steve Donziger in Contempt of
Court for his failure to Comply with the RICO and Default
Judgments and the April 16, 2018 Restraining Notice, filed
October 24, 2018 (Dkt. 2116-3)

Letter from Aaron Page to Frank Libby, Dated May 3, 2018 ..........SA124

Exhibit 39 to Declaration of Mary K. Sullivan  in Support of Chevron
Corporation's Motion to Hold Steve Donziger in Contempt of

iv

Court for his failure to Comply with the RICO and Default
Judgments and the April 16, 2018 Restraining Notice, filed
October 24, 2018 (Dkt. 2116-3)

Copy of Checks, Dated May 3, 2018 ...............................................SA127

Donziger's Letter Motion to Expedite Contempt Motions, filed
October 25, 2018 (Dkt. 2118) .........................................................SA130

Chevron Corporation's Letter Motion regarding Discovery, filed
October 26, 2018 (Dkt. 2119) .........................................................SA133

Exhibit B to Chevron Corporation's Letter Motion regarding
Discovery, filed October 26, 2018 (Dkt. 2119-2)

Email between Steven Donziger and Anne Champion, dated
October 25, 2018 ...........................................................................SA136

Declaration of Steven Donziger in Support of Steven Donziger's
Opposition to Chevron's Contempt Motion, filed October 31,
2018 (2122-1) ................................................................................SA138

Declaration of John Slavek in Support of Chevron Corporation's
Reply Memorandum of Law in Support of Its Motion to Hold
Steve Donziger, The Law Offices of Steven R. Donziger, and
Donziger Associates, PLLC in Contempt of Court for their
failure to Comply with the RICO and Default Judgments and the
April 16, 2018 Restraining Notice, filed November 7, 2018 (Dkt.
2129) ..............................................................................................SA149

Exhibit A to Chevron Corporation's Letter to Court regarding
Donziger's Email on Contempt of Forensic Order, filed March
12, 2019 (Dkt. 2173-1)

Email from Steven Donziger to Forensic Expert, dated March
11, 2019 ........................................................................................SA155

v

PAGE

Exhibit B to Chevron Corporation's Letter to Court regarding
Donziger's Email on Contempt of Forensic Order, filed March
12, 2019 (Dkt. 2173-2)

Email from Forensic Expert to Matt Burke, dated March 11,
2019 ............................................................................................... SA162

Exhibit 2 to Declaration of Anne Champion in Support of Chevron
Corporation's Motion to Hold Donziger in Contempt of
Paragraphs 1 and 5 of the Rico Judgement Based on his
Transactions with David Zelman, filed March 20, 2019 (Dkt.
2180-2)

Responses of David Zelman to Chevron's Discovery Requests,
dated January 7, 2019 ................................................................... SA164

Exhibit 5 to Declaration of Anne Champion in Support of Chevron
Corporation's Motion to Hold Donziger in Contempt of
Paragraphs 1 and 5 of the Rico Judgement Based on his
Transactions with David Zelman, filed March 20, 2019 (Dkt.
2180-5)

Biographical Description of David Zelman, dated January 30,
2019 ............................................................................................... SA246

Exhibit 8 to Declaration of Anne Champion in Support of Chevron
Corporation's Motion to Hold Donziger in Contempt of
Paragraphs 1 and 5 of the Rico Judgement Based on his
Transactions with David Zelman, filed March 20, 2019 (Dkt.
2180-8)

Excerpts from deposition transcript of David Zelman, dated
February 27, 2019 ........................................................................ SA249

Exhibit 11 to Declaration of Anne Champion in Support of Chevron
Corporation's Motion to Hold Donziger in Contempt of
Paragraphs 1 and 5 of the Rico Judgement Based on his
Transactions with David Zelman, filed March 20, 2019 (Dkt.
2180-11)

vi

Email between Steven Donziger and David Zelman, dated
December 21, 2016.......................................................................SA263

Declaration of Steven Donziger, filed May 29, 2019 (Dkt. 2217) ...........SA264

Order regarding Donziger's Motion for Extension of Time, filed May
29, 2019 (Dkt. 2218) .....................................................................SA266

Order Regarding Chevron's Motion to Hold Donziger in Contempt for
Failure to Comply with the Court's March 5, 2019 Order, filed
May 29, 2019 (Dkt. 2219).............................................................SA268

Order Finding Steven Donziger is in Wilful Contempt of Paragraph 5
of the March 5, 2019 Order, The Forensic Inspection Protocol,
filed June 4, 2019 (Dkt. 2222) .......................................................SA269

Order requiring Parties File Stipulation regarding Donziger's
Contempt, filed June 5, 2019 (Dkt. 2223) ......................................SA270

Excerpted Hearing Transcript from in Chevron Corporation. v. Steven
Donziger et al, Case No. 11-CV-691 (LAK) filed June 10, 2019,
(Dkt. 2352)  ..................................................................................SA271

Order Imposing Additional Coercive Civil Contempt Sanctions, filed
June 11, 2019 (Dkt. 2232) .............................................................SA276

Donziger's Emergency Motion to Stay Fines and Sanctions Pending
Appeal or in the Alternative for an Administrative Stay, filed
June 12, 2019 (Dkt. 2234) .............................................................SA278

Chevron Corporation's Memorandum of Law in Support of Its Motion
for Attorneys' Fees, filed on June 18, 2019 (Dkt. 2244) .................SA293

Exhibit A to Declaration of Anne Champion in Support of Chevron
Corporation's Memorandum of Law in Support of Its Motion for
Attorneys' Fees, filed on June 18, 2019 (Dkt. 2245-1)

Gibson Dunn Attorney Fees to Chevron, filed June 18, 2019..........SA316

vii

PAGE

Order Concerning Coercive Civil Monetary Sanctions with Respect to
Contempt of Forensic Inspection Protocol Paragraphs 4 and 5,
filed June 28, 2019 (Dkt. 2252) .....................................................SA405

Donziger's Opposition to Untimely Motion for Attorney's Fees, filed
July 1, 2019 (Dkt. 2253) ................................................................SA406

Order regarding Donziger's Emergency Motion to Stay Fines and
Sanctions Pending Appeal or in the Alternative for an
Administrative Stay, filed July 2, 2019 (Dkt. 2254) .......................SA411

Order Granting Chevron Corporation's Motion for Award of
Attorneys' Fees, filed July 16, 2019 (Dkt. 2264)............................SA415

Order to Show Cause Why Defendant Steven Donziger Should Not be
Held in Criminal Contempt, filed July 31, 2019 (Dkt. 2276) ..........SA417

Order to Show Cause Why Defendant Steven Donziger Should Not Be
Held in Criminal Contempt, dated August 5, 2019 (Dkt. 1) ............SA427

Excerpted Hearing Transcript in U.S.A. v Steven Donziger, Case No.
19-CR-561 (LAP), dated August 6, 2019, ......................................SA437

Minute Order in U.S.A. v Steven Donziger, Case No. 19-CR-561
(LAP) , Dated December 4, 2019 ....................................................SA439

**SA1**

| From: | Guadalupe De Heredia <lupitadeheredia@gmail.com> |
|---|---|
| Sent: | Monday, November 6, 2017 10:38 AM |
| To: | Steven Donziger <sdonziger@donzigerandassociates.com> |
| Cc: | Peter Grant <pgrant@grantnativelaw.com>; lfontaine <lfontaine@ishkonigan.com>; edjohn@fns.bc.ca; John Phillips <john.phillips@legaladvocates.ca>; Ian Watson <iw@genagro.net>; Victoria Watson <victoriawatson@me.com>; Rex Weyler <rexweyler1@gmail.com>; Lisa Gibbons <lisaweylergibbons@gmail.com>; lbmiller104@gmail.com; Luis Yanza <lfya62@gmail.com>; Aaron Marr Page <aaron@forumnobis.org>; Karen Hinton <karen@fenton.com>; Howard Glaser <hglaser1@gmail.com>; juanaulestia01@gmail.com; cristina muñoz <crisamunoz@gmail.com>; patriciosalazarcordova@gmail.com; agustin.salazar@salazarcordova.com; Katie Sullivan <katie@streamlinefamilyoffice.com> |
| Subject: | Re: Chevron case: Meeting today FYI |

The best of luck for all and thanks for your great work!
Hugs
Lupita

María Guadalupe De Heredia
Tel. 593-999-707-369 Ecuador
Casilla Postal 17-22-20522

2017-11-06 10:17 GMT-05:00 Steven Donziger <sdonziger@donzigerandassociates.com>:

> I second that. Please delete all emails related to this and again, keep the info confidential.
>
> Thanks, Steven
>
> ---
>
> **From:** Peter Grant <pgrant@grantnativelaw.com>
> **Sent:** Monday, November 6, 2017 10:10:17 AM
> **To:** Steven Donziger; lfontaine; edjohn@fns.bc.ca; John Phillips; Ian Watson; Victoria Watson; Rex Weyler; Lisa Gibbons; lbmiller104@gmail.com; Luis Yanza; aaron@forumnobis.org; Karen Hinton; Howard Glaser; juanaulestia01@gmail.com; lupitadeheredia@gmail.com; cristina muñoz; patriciosalazarcordova@gmail.com; agustin.salazar@salazarcordova.com; Katie Sullivan
> **Subject:** RE: Chevron case: Meeting today FYI
>
> I give you very best wishes on this and will now delete all emails relating to this. I recommend others do as well after what I saw the opposition acquired.
>
> PETER R. GRANT
>
> Grant Huberman
>
> Barristers & Solicitors
>
> Suite 1620 - 1075 W. Georgia Street
>
> Vancouver, BC V6E 3C9
>
> Phone: 604-685-1229
>
> Fax: 604-685-0244
>
> website: www.grantnativelaw.com
>
> CONFIDENTIALITY CAUTION
>
> This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged and confidential. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and delete your copy.

**SA2**

---

**From:** Steven Donziger [mailto:sdonziger@donzigerandassociates.com]
**Sent:** Monday, November 06, 2017 6:47 AM
**To:** lfontaine; edjohn@fns.bc.ca; John Phillips; Peter Grant; Ian Watson; Victoria Watson; Rex Weyler; Lisa Gibbons; lbmiller104@gmail.com; Luis Yanza; aaron@forumnobis.org; Karen Hinton; Howard Glaser; juanaulestia01@gmail.com; lupitadeheredia@gmail.com; cristina muñoz; patriciosalazarcordova@gmail.com; agustin.salazar@salazarcordova.com; Katie Sullivan
**Subject:** Re: Chevron case: Meeting today FYI

Friends,

Please keep this information that Katie sent strictly confidential.

As with most institutional investors, this is a heavy lift with a very uncertain outcome.  If this information goes beyond our tight circle, it likely wi counterproductive in terms of our objectives.

Also, please know there are many interested parties out there who want to meet with us, not just this particular group.

But thanks to all for the good wishes.  We will keep you posted on any progress.

Thanks, Steven

---

**From:** lfontaine <lfontaine@ishkonigan.com>
**Sent:** Monday, November 6, 2017 9:38:10 AM
**To:** edjohn@fns.bc.ca; John Phillips; Peter Grant; Ian Watson; Victoria Watson; Rex Weyler; Lisa Gibbons; lbmiller104@gmail.com; Luis Yanza; aaron@forumnobis.org; Karen Hinton; Howard Glaser; juanaulestia01@gmail.com; lupitadeheredia@gmail.com; cristina muñoz; patriciosalazarcordova@gmail.com; agustin.salazar@salazarcordova.com; Katie Sullivan
**Cc:** Steven Donziger
**Subject:** Re: Chevron case: Meeting today FYI

Best wishes!

Get Outlook for Android

---

**From:** Katie Sullivan <Katie@Streamlinefamilyoffice.com>
**Sent:** Monday, November 6, 2017 5:59:46 AM
**To:** lfontaine; edjohn@fns.bc.ca; John Phillips; Peter Grant; Ian Watson; Victoria Watson; Rex Weyler; Lisa Gibbons; lbmiller104@gmail.com; Luis Yanza; aaron@forumnobis.org; Karen Hinton; Howard Glaser; juanaulestia01@gmail.com; lupitadeheredia@gmail.com; cristina muñoz; patriciosalazarcordova@gmail.com; agustin.salazar@salazarcordova.com
**Cc:** Steven Donziger
**Subject:** Chevron case: Meeting today FYI

Hi all,

I hope this email finds you all in great health and spirits. It was such an honor to spend time with you in Ecuador at the end of September and to witness the powerful momentum since then has been amazing.

I've been helping Steven strategize how to connect financial capital with the case. I wanted to share with you that late on Friday through one of my clients, we

coordinated a meeting with Elliott Management in NYC for today at 4pm with Jesse Cohn and Lee Grinberg. Jesse is a partner and leads the US equity activist investments and Lee led the team in the Argentina bond deal. Elliott is a hedge fund with approx. $34B under management. We are hopeful that their tenacity, courage, influence and power in the financial markets will be a complement to this case and allow Steven & team to supercharge their efforts.

Please send along any positive thoughts & vibes to keep this momentum moving in the right direction!

With gratitude,
Katie

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in: Security, archiving and compliance. To find out more Click Here.

DISCLAIMER: The information contained in this email is private, confidential, copyright and proprietary to Ishkonigan and its affiliated organizations. If you have received this message or any files transmitted with it in error, please notify the Sender immediately and delete it permanently from your system. If you are not the intended recipient disclosing, copying or distributing the information enclosed is strictly prohibited.

AMPagePJD_0004174

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHEVRON CORPORATION,

                              Plaintiff,


          -against-                                              11 Civ. 0691 (LAK)


STEVEN DONZIGER, et al.,

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/28/2018

## SUPPLEMENTAL JUDGMENT AS TO DONZIGER
## DEFENDANTS AND DEFENDANTS CAMACHO AND PIAGUAJE

LEWIS A. KAPLAN, *District Judge.*

          This action was brought against defendants Steven Donziger, The Law Offices of

Steven R. Donziger, Donziger Associates, PLLC (these three defendants referred to collectively as

the "Donziger Defendants"), Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje (these two

defendants referred to collectively as the "LAP Representatives"), Stratus Consulting, Inc., Douglas

Beltman, Anne Maest (these three defendants being referred to collectively as the "Stratus

Defendants"), and others.  The case has been tried and the Court has rendered its findings of fact and

conclusions of law with respect to all claims against the Donziger Defendants and the LAP

Representatives.  Judgment, which among other things awarded costs in favor of plaintiff and against

the Donziger Defendants and the LAP Representatives, was entered against them on March 4, 2014

(the "Judgment").  DI 1875.  The Judgment was affirmed in all respects and certiorari was denied.

Subsequently, the Clerk taxed costs against the Donziger Defendants and the LAP Representatives.

Steven Donziger thereafter moved for review of the Clerk's taxation of costs.  The Court construed

2

that motion as having been made on behalf of all of the Donziger Defendants. It today granted that

motion in part and denied it in part in a memorandum opinion.

Accordingly, the Judgment is supplemented in that it is hereby further

ORDERED, ADJUDGED, AND DECREED, that plaintiff shall recover of the

Donziger Defendants and the LAP Representatives, jointly and severally, the sum of $813,602.71.

Dated:  February 28, 2018

_____
Lewis A. Kaplan
United States District Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
   :
CHEVRON CORPORATION,   :
   :
       Plaintiff,   :
   :
     v.   :   11 Civ. 0691 (LAK)
   :
STEVEN DONZIGER, *et al.*,   :
   :
       Defendants.   :
   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**[PROPOSED] ORDER TO SHOW CAUSE TO GRANT CHEVRON CORPORATION'S EX PARTE APPLICATION FOR DISCOVERY AND A PRESERVATION ORDER IN FURTHERANCE OF THIS COURT'S MARCH 4, 2014 JUDGMENT AND TO SET A HEARING DATE SUBSEQUENT TO THAT DISCOVERY ON CHEVRON'S APPLICATION TO HAVE STEVEN DONZIGER HELD IN CONTEMPT**

WHEREAS, on March 19, 2018, petitioner Chevron Corporation ("Chevron") filed a Motion By Order to Show Cause to grant Chevron's *ex parte* application to (1) require Donziger, as well as any other person or entity acting at his direction or in concert with him, to preserve and maintain within the U.S. any and all documents or evidence relating to the Judgment or compliance therewith; (2) authorize Chevron *ex parte* to serve post-judgment discovery on Donziger and any other person or entity reasonably calculated to possess information relevant to enforcement of the Judgment, and; (3) set a prompt briefing schedule and hearing date to adjudicate Donziger's contempt and determine the appropriate remedy to compel Donziger's compliance with the Judgment, following an appropriate period of time for Chevron to conduct the requested discovery.

The Court has considered the accompanying Memorandum of Law In Support Of Chevron's Application, Declarations of Randy Mastro and Lee Grinberg (and attached exhibits), and arguments presented, and sufficient reason appearing, it is hereby:

ORDERED that Chevron shall serve on Donziger, by hand, facsimile, or e-mail a copy of this Order to Show Cause and all papers submitted in support thereof on or before ___:____ __.m. on March __, 2018; and

ORDERED that Donziger, as well as any other person or entity acting at his direction or in concert with him, including, without limitation, Katie Sullivan, Streamline Family Office, Inc., Jonathan Bush, and athenahealth, Inc., preserve and maintain within the United States any and all documents or evidence relating to the Judgment or compliance therewith;

ORDERED that Chevron may serve post-judgment discovery requests and subpoenas on Donziger and any other person or entity reasonably calculated to possess information relevant to enforcement of the Judgment, including, without limitation, Katie Sullivan, Streamline Family Office, Inc., Jonathan Bush, and athenahealth, Inc., in the form of the discovery requests and subpoenas submitted with this Application; and

ORDERED that the Court shall permit a reasonable period of 60 days or more for Chevron to conduct this discovery up to and including _____, 2018, and, afterward, permit briefing and then hold a hearing on Chevron's Application on the dates set forth below;

ORDERED that, after conducting discovery, Chevron shall file and serve additional papers in support of its Application to have Donziger held in contempt, if any, on or before _____, 2018; and

ORDERED that Donziger shall file and serve papers in opposition to Chevron's Application to have him held in contempt, if any, on or before _____, 2018; and

**SA8**

ORDERED that Chevron shall file reply papers in support of its Application to have Donziger held in contempt, if any, on or before _____, 2018;

ORDERED that Donziger must show cause before this Court, at the United States District Courthouse, Room 12D, 500 Pearl Street, New York, New York, on _____, 2018 at ___:____ __.m. why an order should not be entered holding Donziger in contempt for his refusal to comply with the Judgment and imposing sanctions.

IT IS SO ORDERED.

Dated: New York, New York
March __, 2018

_____
United States District Judge

**SA9**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

CHEVRON CORPORATION,                      :
                                          :
                    Plaintiff,            :
                                          :
          v.                              :        11 Civ. 0691 (LAK)
                                          :
STEVEN DONZIGER, et al.,                  :
                                          :
                    Defendants.           :

------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4-23-18

### DEFAULT JUDGMENT AS TO DEFAULTED DEFENDANTS

This action having been commenced on February 1, 2011 by the filing of the

Summons and Complaint; and a copy of the Summons and Complaint having been served on the

Defaulted Defendants (as defined below) by overnight mail on February 3, 2011, by email on

February 4, 2011 (as authorized by this Court), and by personal service on February 15, 2011, and

proof of service having been filed on February 8, 2011 (Dkt. 75), February 15, 2011 (Dkts. 92, 93,

96, 98), February 17, 2011 (Dkts. 115, 116), February 18, 2011 (Dkt. 117), and March 11, 2011

(Dkt. 206) and the Defaulted Defendants not having answered the Complaint or the Amended

Complaint, and the time for answering the Complaint and the Amended Complaint having expired,

the Clerk having entered certificates of default (Dkts. 469, 1984), and the Court having concluded

that it has personal jurisdiction over each of the Defaulting Defendants,[1] it is hereby

---

[1]    The Court specifically held after trial that it had personal jurisdiction over the LAP
       Representatives, as that term is defined in DI 1875, at 1. DI 1874, at 343-355. The same
       reasoning applies to the other LAPs, a term defined at DI 1874, at 1, who are most of the
       Defaulted Defendants.  It holds also that it has personal jurisdiction over all of the
       Defaulted Defendants, substantially for the reasons stated in DI 1977, at 15-18.

**ORDERED, ADJUDGED AND DECREED** that Chevron Corporation ("Chevron") have judgment as against the Defaulted Defendants as follows:

1.      The Court hereby imposes a constructive trust for the benefit of Chevron on all property, whether personal or real, tangible or intangible, vested or contingent, that the Defaulted Defendants have received, or hereafter may receive, directly or indirectly, or to which the Defaulted Defendants now have, or hereafter obtain, any right, title or interest, directly or indirectly, that is traceable to the Judgment or the enforcement of the Judgment anywhere in the world including, without limitation, any and all stock they may hold in Amazonia. The Defaulted Defendants, and each of them, shall transfer and forthwith assign to Chevron all such property that he or she now has or hereafter may obtain.

2.      The Defaulted Defendants shall execute in favor of Chevron a stock power transferring to Chevron all of their right, title and interest in his, her, or its shares of Amazonia, if any, and shall execute such other and further documents as Chevron reasonably may request or as the Court hereafter may order to effectuate the foregoing provisions of this Judgment.

3.      The Defaulted Defendants are hereby enjoined and restrained from:

3.1      Filing or prosecuting any action for recognition or enforcement of the Judgment or any New Judgment or seeking the seizure or attachment of assets based on the Judgment or any New Judgment, in each case in any court in the United States.

3.2      Seeking prejudgment seizure or attachment of assets based upon the Judgment or any New Judgment, in each case in any court in the United States.

4.      The Defaulted Defendants are hereby further enjoined and restrained from undertaking any acts to monetize or profit from the Judgment, as modified or amended, or any New

Judgment, including without limitation by selling, assigning, pledging, transferring, or encumbering any interest therein.

       5.     Notwithstanding anything to the contrary in this Judgment, nothing herein enjoins, restrains, or otherwise prohibits the Defaulted Defendants, or any of them, from (a) filing or prosecuting any action for recognition or enforcement of the Judgment or any New Judgment, or any for prejudgment seizure or attachment of assets based in courts outside the United States; or (b) litigating the action or any appeal of any order or judgment issued in this action.

       6.     The following terms are defined as follows for purposes of this Judgment:

       6.1    "Amazonia" means Amazonia Recovery Limited; an entity registered in Gibraltar, together with its successors and assigns.

       6.2    "Chevron" means Chevron Corporation and its subsidiaries and affiliates.

       6.3    "Defaulted Defendants" means Pablo Fajardo Mendoza, Luis Yanza, Frente de Defensa de la Amazonia, Selva Viva Selviva Cia, Ltda., Maria Aguinda Salazar, Carlos Grefa Huatatoca, Catalina Antonia Aguinda Salazar, Lidia Alexandra Aguinda Aguinda, Patricio Alberto Chimbo Yumbo, Clide Ramiro Aguinda Aguinda, Luis Armando Chimbo Yumbo, Beatriz Mercedes Grefa Tanguila, Lucio Enrique Grefa Tanguila, Patricio Wilson Aguinda Aguinda, Celia Irene Viveros Cusangua, Franscisco Matias Alvarado Yumbo, Francisco Alvarado Yumbo, Olga Gloria Grefa Cerda, Lorenzo Jose Alvarado Yumbo, Narcisa Aida Tanguila Narvaez, Bertha Antonia Yumbo Tanguila, Gloria Lucrecia Tanguila Grefa, Francisco Victor Tanguilla Grefa, Rosa Teresa Chimbo Tanguila, Jose Gabriel Revelo Liore, Maria Clelia Reascos Revelo, Maria Magdalena Rodriguez Barcenes, Jose Miguel Ipiales Chicaiza, Heleodoro Pataron Guaraca, Luisa Delia Tanguila

-3-

Narvaez, Lourdes Beatriz Chimbo Tanguila, Maria Hortencia Viveros Cusangua, Segundo Angel

Amanta Milan, Octavio Ismael Cordova Huanca, Elias Roberto Piyahuaje Payahuaje, Daniel Carlos

Lusitande Yaiguaje, Benancio Fredy Chimbo Grefa, Guillermo Vicente Payaguaje Lusitante, Delfin

Leonidas Payaguaje Payaguaje, Alfredo Donaldo Payaguaje Payaguaje, Teodoro Gonzalo Piaguaje

Payaguaje, Miguel Mario Payaguaje Payaguaje, Fermin Piaguaje Payaguaje, Reinaldo Lusitande

Yaiguaje, Luis Agustin Payaguaje Piaguaje, Emilio Martin Lusitande Yaiguaje, Simon Lusitande

Yaiguaje, Armando Wilfrido Piaguaje Payaguaje, and Angel Justino Piaguage Lucitante, and each

of them.

      6.4    The "Judgment" means the judgment entered in the Lago Agrio Case

on February 14, 2011 as modified by subsequent proceedings.

      6.5    "Lago Agrio Case" means Lawsuit No. 2003-0002, entitled *Maria

Aguinda y Otros v Chevron Corporation*, in the Sucumbios Provincial Court of Justice of the

Republic of Ecuador and all appeals with respect to any judgment, order or decree entered therein.

      6.6    "New Judgment" means any judgment or order that hereafter may be

rendered in the Lago Agrio Case by any court in Ecuador in or by reason of the Lago Agrio Case,

or any judgment or order issued by any other court that has recognized or enforced the Judgment or

any such subsequent judgment.

      7.    In accordance with Federal Rule of Civil Procedure 65(d)(2), this Judgment

is binding upon the parties; their officers, agents, servants, employees, and attorneys; and other

persons who are in active concert and participation with any of the foregoing.

      It is hereby further

      **ORDERED, ADJUDGED AND DECREED**, as follows:

-4-

8.    Chevron shall recover from the Defaulted Defendants, jointly and severally, the costs of this action pursuant to Fed. R. Civ. P. 54(d)(1) and 28 U.S.C. § 1920.

9.    This Judgment finally disposes of all claims in this action between and among Chevron and the Defaulted Defendants.  All other defendants either have settled the action or judgment has already been entered as to them.  Accordingly, there is no just reason for delay, and the Clerk shall enter this Judgment as a final judgment with respect to all claims between and among Chevron and the Defaulted Defendants.  This Court retains jurisdiction of this case and over these parties for purposes of enforcing and resolving any disputes concerning this Judgment.

Dated:        April 23, 2018
Issued at:    10:58 A.M.

_____
Lewis A. Kaplan
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                                         X
CHEVRON CORPORATION,                     :
                                         :
              Plaintiff,                 :
                                         :
       v.                                :    11 Civ. 0691 (LAK)
                                         :
STEVEN DONZIGER, et al.,                 :
                                         :
                                         :
              Defendants.                :
                                         x
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
```

**CHEVRON CORPORATION'S FIRST SET OF REQUESTS FOR PRODUCTION OF
DOCUMENTS IN AID OF THE SUPPLEMENTAL JUDGMENT TO
DEFENDANTS STEVEN DONZIGER, THE LAW OFFICES OF STEVEN R.
DONZIGER, AND DONZIGER & ASSOCIATES, PLLC**

In the above entitled action in the United States District Court for the Southern District of

New York,[1] a supplemental judgment was entered on February 28, 2018 in favor of Chevron

Corporation against Steven Donziger, The Law Offices of Steven R. Donziger, Donziger &

Associates, PLLC, and others, for the sum of $813,602.71, which remains due and unpaid.

**YOU ARE HEREBY COMMANDED**, pursuant to Rule 69 of the Federal Rules of

Civil Procedure and CPLR Sections 5223 and 5224, to produce on or before April 27, 2018

---

[1] The parties to this action are Chevron Corporation (Plaintiff) and Defendants Steven Donziger, The Law Offices of Steven R. Donziger, Donziger & Associates, PLLC, Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje, Stratus Consulting, Inc. Douglas Beltman, Anne Maest, Pablo Fajardo Mendoza, Luis Yanza, Frente de Defensa de la Amazonia A/K/A Amazon Defense Front, Selva Viva Selviva Cia, Ltda, Maria Aguinda Salazar, Carlos Grefa Huatatoca, Catalina Antonia Aguinda Salazar, Lidia Alexandra Aguinda Aguinda, Patricio Alberto Chimbo Yumbo, Clide Ramiro Aguinda Aguinda, Luis Armando Chimbo Yumbo, Beatriz Mercedes Grefa Tanguila, Lucio Enrique Grefa Tanguila, Patricio Wilson Aguinda Aguinda, Celia Irene Viveros Cusangua, Francisco Matias Alvarado Yumbo, Francisco Alvarado Yumbo, Olga Gloria Grefa Cerda, Lorenzo Jose Alvarado Yumbo, Narcisa Aida Tanguila Narvaez, Bertha Antonia Yumbo Tanguila, Gloria Lucrecia Tanguila Grefa, Francisco Victor Tanguilla Grefa, Rosa Teresa Chimbo Tanguila, Jose Gabriel Revelo Liore, Maria Clelia Reascos Revelo, Maria Magdalena Rodriguez Barcenes, Jose Miguel Ipiales Chicaiza, Heleodoro Pataron Guaraca, Luisa Delia Tanguila Narvaez, Lourdes Beatriz Chimbo Tanguila, Maria Hortencia Viveros Cusangua, Segundo Angel Amanta Milan, Octavio Ismael Cordova Huanca, Elias Roberto Piyahuaje Payahuaje, Daniel Carlos Lusitande Yaiguaje, Benancio Fredy Chimbo Grefa, Guillermo Vicente Payaguaje Lusitante, Delfin Leonidas Payaguaje Payaguaje, Alfredo Donaldo Payaguaje Payaguaje, Teodoro Gonzalo Piaguaje Payaguaje, Miguel Mario Payaguaje Payaguaje, Fermin Piaguaje Payaguaje, Reinaldo Lusitande Yaiguaje, Luis Agustin Payaguaje Piaguaje, Emilio Martin Lusitande Yaiguaje, Simon Lusitande Yaiguaje, Armando Wilfrido Piaguaje Payaguaje, and Angel Justino Piaguage Lucitante.

1

responses and/or objections to each document request to counsel at Gibson, Dunn & Crutcher

LLP, 200 Park Avenue, New York, NY 10166-0193.

## INSTRUCTIONS

1.      The definitions and rules of construction set forth in Rule 26.3 of the Local Rules

for the Southern and Eastern Districts of New York are incorporated herein.

2.      This First Set of Requests for the Production of Documents ("REQUEST" or

"REQUESTS") calls for the production of all DOCUMENTS ("documents" INCLUDES

electronically stored information) in YOUR possession, or subject to YOUR custody or

CONTROL, INCLUDING DOCUMENTS in the possession, custody, or CONTROL of YOUR

agents, attorneys, or representatives (INCLUDING to attorneys in this action, attorneys in the

ECUADOR LITIGATION, Pablo Fajardo Mendoza, Servicios Fromboliere Compania Limitada,

Luis Yanza, Julio Prieto Méndez, Juan Pablo Sáenz, Andrew Woods, Aaron Marr Page, Laura

Garr, Brian Parker, Joseph Kohn, Patricio Salazar Cordova, Agustin Salazar, Serafin Angel Cajo,

and SELVA VIVA).  Possession, custody, or CONTROL INCLUDES DOCUMENTS stored in

electronic form by third-party service providers but accessible to YOU or YOUR agents,

attorneys, representatives, or others acting on YOUR behalf, INCLUDING email accounts, FTP

servers, instant messaging applications, texts, WhatsApp, portable storage media such as USB

drives, cloud storage services such as Dropbox, iCloud, Google Drive, or OneDrive, and online

workspaces such as WebEx.

3.      Each REQUEST herein constitutes a request for DOCUMENTS in their entirety,

with all enclosures and attachments, and without abbreviation, redaction, or expurgation.

DOCUMENTS attached to each other, INCLUDING by staple, clip, tape, email attachment, or

"Post-It" note, shall not be separated, although any page on which a Post-It note covers or

2

obscures text on the DOCUMENT shall be produced both with and without the Post-It note. The production must also INCLUDE, where applicable, any index tabs, file dividers, designations, binder spine labels, or other similar information as to the source and/or location of the DOCUMENTS.

4.      YOU shall produce any and all drafts and copies of each DOCUMENT that are responsive to any REQUEST, INCLUDING copies containing handwritten notes, markings, stamps, or interlineations. The author(s) of all handwritten notes shall be identified.

5.      Responsive DOCUMENTS that exist only in paper form shall be organized as they have been kept in the ordinary course of business.

6.      If with respect to any REQUEST there are no responsive DOCUMENTS, so state in writing.

7.      Chevron will meet and confer with YOU to discuss the logistics of production, but absent an alternative agreement with Chevron, responsive DOCUMENTS shall be produced in TIFF format with the accompanying text of the DOCUMENTS in a load file that also INCLUDES the metadata, subject to the following:

a. responsive DOCUMENTS that cannot be produced in TIFF format due to technical reasons shall be produced in a computer-readable and text searchable format to be mutually determined by the parties;

b. Microsoft Excel files, PowerPoint files, and other responsive DOCUMENTS that can be meaningfully viewed only in their native electronic format shall be produced in their native electronic format; and

    c. to the extent data maintained in a database is responsive and not privileged or otherwise subject to protection, the parties shall meet and confer over the scope and format of production.

8. YOU shall produce the following metadata and production information associated with responsive DOCUMENTS (INCLUDING Microsoft Word DOCUMENTS that preserve and reveal any hidden notations, creation or alteration records) and make it reasonably accessible to Chevron: BEG_PROD_NUM, END_PROD_NUM, BEGATTACH, ENDATTACH, FROM, RECIPIENT, CC, BCC, DATE (sent date for email, create date for files), SUBJECT (subject line for email, filename for file, title for hard copy), UNREAD (unread status of email messages) DOCTYPE, FILENAME, ALL CUSTODIANS FILE PATHS, MD5 HASH, REVISION (revision number of DOCUMENT), AUTHOR, MODIFY DATE, MODIFIED BY, TOTAL EDIT TIME, LAST PRINTED, and ALL CUSTODIANS. This INCLUDES metadata that is stored as part of the responsive document, and metadata stored by the file system in which the responsive DOCUMENT is stored. YOU shall preserve all metadata associated with all responsive DOCUMENTS, INCLUDING metadata that is not produced pursuant to this instruction, and Chevron reserves the right to request the production of native copies of responsive DOCUMENTS for which the produced metadata is incomplete to the extent native copies are not already called for by these REQUESTS. This instruction shall be read in accordance with the requirements and limitations imposed by Rules 26(b) and 34 of the Federal Rules of Civil Procedure. Chevron will meet and confer with YOU to discuss metadata and expects to generally follow the guidance provided by the United States District Court for the Southern District of New York in *Nat'l Day Laborer Organizing Network v. U.S. Immigration and Customs Enforcement Agency*, 2011 WL 381625 (S.D.N.Y. Feb 7, 2011) (Scheindlin, J.).

9.      If YOU object to a portion or an aspect of a REQUEST, state the grounds for YOUR objection with specificity and respond to the remainder of the REQUEST.  If any DOCUMENTS, or portion thereof, are withheld because YOU claim that such information is protected under the attorney-client privilege, work product doctrine, or other privilege or doctrine, YOU are required to PROVIDE a privilege log, specifying for each such DOCUMENT or withheld information:  (1) the type of DOCUMENT, e.g., letter or memorandum; (2) the general subject matter of the DOCUMENT; (3) the date of the DOCUMENT; and (4) the author of the DOCUMENT, the addressees of the DOCUMENT, and any other recipients, and, where not apparent, the relationship of the author, addressees, and recipients to each other.

10.      If YOU claim that a portion of a DOCUMENT is protected from disclosure for any reason, produce such DOCUMENT with redaction of only the portion claimed to be protected.  Any DOCUMENT produced in redacted form shall clearly indicate on its face that it has been redacted.

11.      If YOU object that a REQUEST is vague or ambiguous, identify the objectionable aspect of the REQUEST, state YOUR interpretation of the REQUEST and respond to that interpretation.

12.      If any DOCUMENT called for by the REQUESTS has been destroyed, lost, discarded, or is otherwise no longer in your possession, custody, or CONTROL, identify such DOCUMENT as completely as possible, and specify the date of disposal of the DOCUMENT, the manner of disposal, the reason for disposal, the PERSON authorizing disposal, and the PERSON disposing of the DOCUMENT.

13.      Defined terms may be capitalized for the convenience of the parties; the definitions herein apply whether or not the term is capitalized.

## DEFINITIONS

1.    The term "ACCOUNT" as used herein means and INCLUDES savings accounts, checking accounts, money market accounts, brokerage accounts, certificates of deposit, lines of credit, and any other credits or debits.

2.    The term "ACCOUNTING" means and refers to any record of financial information.  This INCLUDES accountings, financial statements, bank statements, ledgers, books, audits, registers, financial reconciliations, summaries of financial information, and reports of financial information.

3.    The term "ASSET" means any tangible or intangible PROPERTY, INCLUDING real PROPERTY, personal PROPERTY, intellectual PROPERTY, chattels, cash, securities, derivative products, ACCOUNTS, debts, contract rights, security interests, claims, and causes of action, anywhere in the world.

4.    The term "PROPERTY" means anything that may be the subject of OWNERSHIP.

5.    The terms "OWN" and "OWNERSHIP" mean owned directly or indirectly, in whole or in part, as sole owner or jointly with others, either of record or beneficially, including without limitation as a partner, general or limited, limited liability member, fiduciary, and as an equity or debt holder, or demand deposit holder.

6.    The term "CONTROL" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any PERSON or ENTITY, shall mean the possession, directly or indirectly, of the power to direct or cause the actions, direction of the management, or policies of such PERSON or ENTITY, whether through the OWNERSHIP of voting securities, by contract or otherwise.

7.     The terms "ENTITY" and "ENTITIES" shall INCLUDE all corporations, associations, partnerships, joint ventures, companies, funds, trusts, limited liability companies, limited liability partnerships, any government or regulatory authority, and all other forms of incorporated and unincorporated organizations that are not natural persons.

8.     The terms "INCLUDE" and "INCLUDING" mean including, but not limited to. When the word "INCLUDE" or "INCLUDING" is followed by one or more specific examples, those examples are illustrative only and do not limit in any way the information requested.

9.     "AMAZONIA RECOVERY LIMITED" means and refers to Amazonia Recovery Limited, an organization registered and/or incorporated under the Companies Act of Gibraltar on or around May 4, 2012, and any current and former subsidiaries, affiliates, partners, officers, directors, employees, representatives, agents, and any other PERSON acting, or purporting to act, on their behalf, and any predecessors or successors of the foregoing and any parent, subsidiary, division, or successor ENTITY.

10.     "AMAZON DEFENSE FRONT" means and refers to the Frente de Defensa de la Amazonía a/k/a Amazon Defense Front and INCLUDES the Front's officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates.

11.     "AMAZONIA RECOVERY LIMITED STEERING COMMITTEE" means and refers to the "advisory steering committee [to Amazonia Recovery Limited] that will be appointed by the Claimants to advise and assist the Claimants in respect of the Claim (INCLUDING with respect to remediation efforts)" as defined in paragraph 95 of Amazonia Recovery Limited's February 27, 2013 amended Memorandum of Association.

12.     "ECUADOR ENFORCEMENT ACTIONS" means and refers to any proceeding seeking recognition and/or enforcement of the ECUADOR JUDGMENT anywhere in the world.

13.    "ECUADOR JUDGMENT TRUST" means and refers to the trust discussed in the March 30 filing of Pablo Fajardo Mendoza to the Provincial Court of Justice of Sucumbíos regarding the "Commercial Trust for the Administration of Funds ADAT, granted by Maria Victoria Aguinda Salazar, Lidia Alexandra Aguinda Aguinda, et al., the AMAZON DEFENSE FRONT and Compañia Fiduciaria Ecuador FIDUECUADOR S.A. funds and trusts administrator" executed on March 1, 2012 by Dr. Sandra Veronica Barrazueta Molina.

14.    "ECUADOR JUDGMENT" means and refers to the judgment entered in the ECUADOR LITIGATION on February 14, 2011, as modified by subsequent proceedings.

15.    "ECUADOR LITIGATION" means and refers to the proceeding *Maria Aguinda y Otros v. Chevron Corporation*, in the Provincial Court of Justice of Sucumbíos in Ecuador, and all appellate proceedings and subsequent proceedings stemming therefrom.

16.    "LAGO AGRIO PLAINTIFFS" means and refers to Defendants Alfredo Donaldo Payaguaje Payaguaje; Ángel Justino Piaguaje Lucitante; Armando Wilfrido Piaguaje Payaguaje; Beatriz Mercedes Grefa Tanguila; Benancio Freddy Chimbo Grefa; Bertha Antonia Yumbo Tanguila; Carlos Grega Huatatoca; Catalina Antonia Aguinda Salazar; Celia Irene Viveros Cusangua; Clide Ramiro Aguinda Aguinda; Daniel Carlos Lusitande Yaiguaje; Delfín Leonidas Payaguaje Payaguaje; Elias Roberto Piyahuaje Payahuaje; Emilio Martín Lusitande Yaiguaje; Fermín Piaguaje Payaguaje; Francisco Alvarado Yumbo; Francisco Matias Alvarado Yumbo; Francisco Victor Tanguila Grefa; Gloria Lucrecia Tanguila Grefa; Guillermo Vicente Payaguaje Lusitante; Heleodoro Pataron Guaraca; Hugo Gerardo Camacho Naranjo; Javier Piaguaje Payaguaje; José Gabriel Revelo Llore; José Miguel Ipiales Chicaiza; Lidia Alexandra Aguinda Aguinda; Lorenzo José Alvarado Yumbo; Lourdes Beatriz Chimbo Tanguila; Lucio Enrique Grefa Tanguila; Luis Agustín Payaguaje Piaguaje; Luis Armando Chimbo Yumbo; Luisa Delia

Tanguila Narvaez; Maria Aguinda Salazar; María Clelia Reascos Revelo; María Hortencia Viveros Cusangua; Maria Magdalena Rodriguez Barcenes; Miguel Mario Payaguaje Payaguaje; Narcisa Aida Tanguila Narváez; Octavio Ismael Córdova Huanca; Olga Gloria Grefa Cerda; Patricio Alberto Chimbo Yumbo; Patricio Wuilson Aguinda Aguinda; Reinaldo Lusitande Yaiguaje; Rosa Teresa Chimbo Tanguila; Segundo Ángel Amanta Milán; Simon Lusitande Yaiguaje; and Teodoro Gonzalo Piaguaje Payaguaje.

17.    "PERSON" means and refers to any natural person or any business, legal or governmental ENTITY, or association.

18.    "REPUBLIC OF ECUADOR" means and refers to the governing political body in Ecuador, INCLUDING all branches of government and political subdivisions, its current and former presidents, attorneys general, judges, prosecutors, other officials, politicians, partners, contractors, employees, representatives, agents, agencies, officers, attorneys, accountants, assigns, or any other person acting, or purporting to act, on the REPUBLIC OF ECUADOR's behalf, either directly or indirectly, INCLUDING: Lenín Moreno; Rafael Correa; Martha Escobar; Patricio Garcia; Alexis Mera; Alberto Acosta; Ana Alban; Galo Chiriboga; Rene Vargas Pazos; Mauricio Montalvo Samaniego; Judge Alberto Guerra Bastidas; Judge Efrain Novillo Guzmán; Judge Germán Yánez Ricardo Ruiz; Judge Juan Evangelista Núñez Sanabria; Judge Leonardo Ordóñez Pina; Judge Nicolás Augusto Zambrano Lozada; Judge Juan Carlos Encarnación Sanchez; Judge Cruz María Ávila Delgado; Judge Marco Antonio Yaguache Mora; Judge Milton David Rafael Toral Zevallos; Judge Alejandro Kleber Orellana Pineda; Judge Lilia Marlene Ortiz Vásquez; José María Borja; Washington Pesántez; Cecilia Armas Erazo de Tobar; Jorge German; Diego Borja (former Economic Policy Minister); Esperanza Martinez; Diego

García Carrión; Alianza Pais; the National Intelligence Secretariat; and any current or former official at the offices of the Fiscal, Prosecutor General, or Attorney General.

19.    "SELVA VIVA" means and refers to Defendant Selva Viva Selviva Cia. Ltda., and its officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates.

20.    "YOU" and "YOUR" mean and refer to Steven Donziger, The Law Offices of Steven R. Donziger, and Donziger & Associates, PLLC, and where applicable, their officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates.

## DOCUMENTS REQUESTED

1.    All DOCUMENTS evidencing or relating to any domestic or foreign ASSET that YOU OWN or CONTROL.

2.    All DOCUMENTS evidencing or relating to any information concerning the identity, location and/or value of YOUR domestic or foreign PROPERTY, domestic or foreign income, and/or domestic or foreign ASSETS.

3.    All DOCUMENTS evidencing or relating to YOUR OWNERSHIP or other interest in, and value of, any domestic or foreign real estate.

4.    All DOCUMENTS evidencing or relating to any OWNERSHIP interest, direct or beneficial, that YOU have in any real or personal PROPERTY, whether domestic or foreign, INCLUDING cooperative corporation shares, automobiles, trucks, other motor vehicles, boats, artwork, jewelry, aircraft, stocks, bonds, commodities, securities, partnership interests, patents, inventions, trade names, copyrights, royalty agreements, promissory notes, drafts or other commercial paper, or causes of action.

5.    All DOCUMENTS evidencing or relating to YOUR current OWNERSHIP of any inherited PROPERTY, INCLUDING those ASSETS YOU received or are entitled to future

receipt of, from any estates in which YOU may have or have had an interest, as well as the current value of such PROPERTY.

6.      All DOCUMENTS evidencing or relating to YOUR current OWNERSHIP interest in any domestic or foreign ENTITIES or ACCOUNTS, as well as the current value of such PROPERTY and, if the PROPERTY was sold or transferred since the issuance of the Court's March 4, 2014 Judgment (Dkt. 1875), as modified, the date of such transfer, the identity of the purchaser, and the value received for such transfer.

7.      All originals or copies of all financial statements, checks (fronts and backs of all checks) and/or wire transfers for bank, brokerage or trust ACCOUNTS, whether active or inactive, open or closed, relating to YOUR ASSETS, dated on or after the issuance of the Court's March 4, 2014 Judgment (Dkt. 1875), as modified.

8.      All DOCUMENTS evidencing or relating to any balance sheets, income statements, inventories, profit and loss statements, and any other documents or information showing YOUR ASSETS, PROPERTY, expenses, and/or liabilities, dated on or after the issuance of the Court's March 4, 2014 Judgment (Dkt. 1875), as modified.

9.      All DOCUMENTS evidencing or relating to any claims, lawsuits, proceedings, liens or demands that have been threatened and/or filed against YOU since the issuance of the Court's March 4, 2014 Judgment (Dkt. 1875), as modified.

10.      All DOCUMENTS evidencing or relating to any domestic or foreign savings ACCOUNTS, checking ACCOUNTS, money market ACCOUNTS, investment ACCOUNTS, certificates of deposit, or any other ACCOUNTS in which YOU have or have had an interest since March 4, 2014, wherever found.

11. All DOCUMENTS evidencing or relating to any means by which YOU, since March 4, 2014, have transferred, paid, received, or conducted any financial transactions or any other transaction involving an exchange of value.

12. All DOCUMENTS evidencing or relating to any interest in any ASSET that YOU have transferred, sold, assigned, pledged, gifted, encumbered, or otherwise disposed of since the issuance of the Court's March 4, 2014 Judgment (Dkt. 1875), as modified.

13. All DOCUMENTS evidencing or relating to any debts or credits due, owing, or which will become due or owing to YOU, wherever found, including documents relating to any terms on which such debts may be, have been, are, or will be forgiven or not enforced.

14. YOUR filed federal tax returns from 2014 until the present.

15. YOUR filed state tax returns from 2014 until the present.

16. All DOCUMENTS evidencing or relating to filed federal corporate tax returns from 2014 until the present that relate to YOUR ASSETS.

17. All DOCUMENTS evidencing or relating to filed state corporate tax returns from 2014 until the present that relate to YOUR ASSETS.

18. All DOCUMENTS evidencing or relating to any financing provided to YOU, INCLUDING all promissory notes, security agreements, and UCC-1 financing statements. This REQUEST INCLUDES documents sufficient to show the original amount of the financing, the PERSON or ENTITY to whom due, balance owing, payments, maturity and collateral, and any other DOCUMENTS relating to any such debt.

19. All DOCUMENTS evidencing or relating to all PROPERTY, whether personal or real, tangible or intangible, vested or contingent that YOU have received, or hereafter may receive, directly or indirectly, or to which YOU have or hereafter obtain any right, title or

interest, directly or indirectly, that is traceable to the ECUADOR JUDGMENT or the enforcement of the ECUADOR JUDGMENT anywhere in the world.

20.     All DOCUMENTS evidencing or relating to any acts taken by YOU or the LAGO AGRIO PLAINTIFFS to monetize or profit from the ECUADOR JUDGMENT since March 4, 2014, INCLUDING by selling, assigning, pledging, promising, transferring, borrowing against, or encumbering any interest therein.

21.     All DOCUMENTS evidencing or relating to any communication between YOU and any PERSON or ENTITY since March 4, 2014 concerning the ECUADOR JUDGMENT or any attempts by anyone, successful or not, to monetize or profit from it.

22.     All DOCUMENTS evidencing or relating to any PERSON or ENTITY who financially supported or invested in, was asked to financially support or invest in, or who offered to financially support or invest in any aspect of the ECUADOR JUDGMENT or the enforcement thereof.

23.     All DOCUMENTS related to the ECUADOR JUDGMENT TRUST.

24.     All DOCUMENTS related to AMAZONIA RECOVERY LIMITED, INCLUDING:

a.  All DOCUMENTS using or discussing the creation of any code names, alternate names, pseudonyms, nicknames or other naming conventions ("alternate names"), other than the legal name for AMAZONIA RECOVERY LIMITED;

b.  All DOCUMENTS related to the appointment of any PERSON, INCLUDING Julian Jarvis, Ermel Gabriel Chavez Parra, Luis Francisco Yanza Angamarca, and Pablo Fajardo Mendoza to the board of directors of AMAZONIA RECOVERY LIMITED;

13

c.  All DOCUMENTS related to the membership, responsibilities and operations of the AMAZONIA RECOVERY LIMITED STEERING COMMITTEE;

d.  All ACCOUNTINGS related to AMAZONIA RECOVERY LIMITED;

e.  All DOCUMENTS related to any shares, rights, title, or interest in AMAZONIA RECOVERY LIMITED held directly or indirectly by YOU at any time;

f.  All DOCUMENTS related to GT Nominees Limited, Torvia Limited, or any other shareholder in AMAZONIA RECOVERY LIMITED;

g.  All DOCUMENTS related to the true beneficial OWNERS of the shares of AMAZONIA RECOVERY LIMITED;

h.  All DOCUMENTS, INCLUDING ACCOUNT opening documents and periodic statements, related to all savings, checking, money market, brokerage or any other credit or debit ACCOUNTS belonging to AMAZONIA RECOVERY LIMITED, operated by AMAZONIA RECOVERY LIMITED, CONTROLLED by AMAZONIA RECOVERY LIMITED or for which AMAZONIA RECOVERY LIMITED is a signatory; and

i.  All DOCUMENTS related to any PERSON or ENTITY, who financially supported or invested in, was asked to financially support or invest in, or who offered to financially support or invest in AMAZONIA RECOVERY LIMITED.

25.  All DOCUMENTS evidencing or relating to any past or present trust, corporation, or other ENTITY created to hold, distribute, administer, or otherwise affect any proceeds of the ECUADOR JUDGMENT.

26.  All DOCUMENTS evidencing or relating to any payment, proceeds, compensation, revenue, or any other thing of value YOU have received, contracted to receive, or

have been promised related to any aspect of YOUR involvement in the ECUADOR LITIGATION, ECUADOR JUDGMENT, and/or ECUADOR ENFORCEMENT ACTIONS.

27.     All DOCUMENTS evidencing or relating to any attempted or completed sale or transfer of any license, copyright, life rights, trademark, media rights, or other right to exploit, market or publicize any aspect of the ECUADOR LITIGATION, the ECUADOR JUDGMENT, and/or the ECUADOR ENFORCEMENT ACTIONS, and YOUR involvement or the involvement of any other PERSON or ENTITY therein.

28.     All DOCUMENTS evidencing or relating to any actual, contemplated, anticipated, or potential movie, documentary, book, television program, podcast, or other media project relating in any way to the ECUADOR LITIGATION, the ECUADOR JUDGMENT, or the ECUADOR ENFORCEMENT ACTIONS, INCLUDING YOUR role and any value YOU might receive in connection therewith.

29.     All DOCUMENTS evidencing or relating to any payment, compensation, revenue, or any other thing of value YOU have delivered, contracted to deliver, or have promised to any PERSON or ENTITY from any proceeds that may be received from the ECUADOR JUDGMENT or the ECUADOR ENFORCEMENT ACTIONS.

30.     All DOCUMENTS evidencing or relating to any attempted or completed sale, assignment, or transfer of rights, title, claims, or interest of any proceeds or other interest held by YOU, whether directly or indirectly, in the ECUADOR JUDGMENT or the ECUADOR ENFORCEMENT ACTIONS, whether or not such attempt was successful.

31.     All DOCUMENTS evidencing or relating to any distribution of the proceeds from enforcement of the ECUADOR JUDGMENT.

32.    All DOCUMENTS evidencing or relating to any dispute concerning or relating to any monies raised in connection with the ECUADOR LITIGATION, the ECUADOR JUDGMENT, the ECUADOR ENFORCEMENT ACTIONS, and/or the ECUADOR JUDGMENT TRUST, INCLUDING any dispute regarding the beneficiary or beneficiaries of the ECUADOR JUDGMENT and ECUADOR JUDGMENT TRUST.

33.    All DOCUMENTS evidencing or relating to funding commitments in support of the ECUADOR LITIGATION or ECUADOR ENFORCEMENT ACTIONS from any PERSON or ENTITY, INCLUDING from the following:

     a.    Kohn Swift & Graf, P.C.

     b.    Russell DeLeon

     c.    Orin Kramer

     d.    Torvia Limited

     e.    Burford

     f.    88 Capital

     g.    Equitable Outcomes

     h.    Jonaks Limited

     i.    Satee GMBH

     j.    David Sherman III

     k.    Glenn Krevlin

     l.    Michael Donziger

     m.    Russell O. Wiese

     n.    TC Payment Services International

     o.    AMAZONIA RECOVERY LIMITED

    p.  Woodsford Litigation Funding Limited

34.    All DOCUMENTS evidencing or relating to how monies (totaling $32,360,647) shown in the below chart as "commitments" from investors in the ECUADOR LITIGATION were expended, the identification of any ACCOUNTS into which any portion of said monies were deposited, or any specific amounts received or expended by YOU at any time:

## Funding for the Enterprise

| Investor | Investments Contributed | Commitment Amounts[1] |
|---|---|---|
| Kohn Swift & Graf, P.C. | $ 6,360,647 | $ 6,360,647 |
| Russell DeLeon | $ 1,500,000 | $ 2,000,000 |
| Orin Kramer | $ 150,000 | $ 150,000 |
| Torvis Limited | $ 3,413,367 | $ 7,250,000 |
| Burford | $ 4,000,000 | $ 15,000,000 |
| 88 Capital | | $ 250,000 |
| Equitable Outcomes | | $ 150,000 |
| Jonaks Limited | | $ 200,000 |
| Satee GMBH | | $ 300,000 |
| David Sherman III | | $ 250,000 |
| Glenn Krevlin | | $ 250,000 |
| Michael Donziger | | $ 150,000 |
| Russell O. Wiese | | $ 50,000 |
| TC Payment Services International | $ 424,948 | |
| Amazonia Recovery Limited | $ 149,000 | |
| **TOTAL** | **$ 15,997,963** | **$ 32,360,647** |

PX 2143   Confidential

PLAINTIFF'S EXHIBIT 2143

Plaintiff's Exhibit 2143  p. 1 of 1
Plaintiff's Exhibit 4900  p. 114 of 144

35.    All DOCUMENTS evidencing or relating to any ACCOUNTINGS, reports, summaries, analyses, statements, ledgers, or any other kind of record relating to how funds received in support of the ECUADOR LITIGATION, ECUADOR JUDGMENT, and/or ECUADOR ENFORCEMENT ACTIONS have been received or expended, INCLUDING

17

anything prepared in response to a demand by the Union of People Affected by Texaco (aka UDAPT) and their agents and representatives.

36.     All DOCUMENTS evidencing or relating to any and all ASSETS, benefits, payments, or things of value that have been or will be conferred, offered, or promised to YOU or any agent, attorney, or representative of YOU or the LAGO AGRIO PLAINTIFFS (INCLUDING attorneys in this action, attorneys in the ECUADOR LITIGATION, Pablo Fajardo Mendoza, Servicios Fromboliere Compania Limitada, Luis Yanza, Julio Prieto Méndez, Juan Pablo Sáenz, Andrew Woods, Aaron Marr Page, Laura Garr, Brian Parker, Joseph Kohn, Patricio Salazar Cordova, Agustin Salazar, Serafin Angel Cajo, and SELVA VIVA), by the REPUBLIC OF ECUADOR, INCLUDING the date, description, medium and purpose of such benefits, payments, or things of value and the identification of all PERSONS and/or ENTITIES involved in, and documents concerning such ASSETS, benefits, payments, or things of value.

37.     All DOCUMENTS evidencing or relating to the current ASSETS or liabilities of the AMAZON DEFENSE FRONT.

38.     All DOCUMENTS evidencing or relating to YOUR current OWNERSHIP interest in AMAZONIA RECOVERY LIMITED.

Dated: April 16, 2018
      New York, New York         GIBSON, DUNN & CRUTCHER LLP

By: _____

Randy M. Mastro
Andrea E. Neuman
200 Park Avenue, 47th Floor
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

William E. Thomson

18

333 South Grand Avenue
Los Angeles, California 90071
Telephone: 213.229.7891
Facsimile: 213.229.6891


STERN, KILCULLEN & RUFOLO LLC
Herbert J. Stern
Joel M. Silverstein
325 Columbia Tpke, Ste 110
P.O. Box 992
Florham Park, New Jersey 07932-0992
Telephone: 973.535.1900
Facsimile: 973.535.9664

*Attorneys for Chevron Corporation*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

CHEVRON CORPORATION,

        Plaintiff,

     v.                         11 Civ. 0691 (LAK)

STEVEN DONZIGER, et al.,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## CHEVRON CORPORATION'S FIRST INFORMATION SUBPOENA IN AID OF THE SUPPLEMENTAL JUDGMENT AND RESTRAINING NOTICE TO DEFENDANTS STEVEN DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER AND DONZIGER & ASSOCIATES, PLLC

In the above entitled action in the United States District Court for the Southern District of

New York,[1] a supplemental judgment was entered on February 28, 2018 in favor of Chevron

Corporation against Steven Donziger, The Law Offices of Steven R. Donziger, Donziger &

Associates, PLLC, and others, for the sum of $813,602.71, which remains due and unpaid.

---

[1] The parties to this action are Chevron Corporation (Plaintiff) and Defendants Steven Donziger, The Law Offices of Steven R. Donziger, Donziger & Associates, PLLC, Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje, Stratus Consulting, Inc. Douglas Beltman, Anne Maest, Pablo Fajardo Mendoza, Luis Yanza, Frente de Defensa de la Amazonia A/K/A Amazon Defense Front, Selva Viva Selviva Cia, Ltda, Maria Aguinda Salazar, Carlos Grefa Huatatoca, Catalina Antonia Aguinda Salazar, Lidia Alexandra Aguinda Aguinda, Patricio Alberto Chimbo Yumbo, Clide Ramiro Aguinda Aguinda, Luis Armando Chimbo Yumbo, Beatriz Mercedes Grefa Tanguila, Lucio Enrique Grefa Tanguila, Patricio Wilson Aguinda Aguinda, Celia Irene Viveros Cusangua, Francisco Matias Alvarado Yumbo, Francisco Alvarado Yumbo, Olga Gloria Grefa Cerda, Lorenzo Jose Alvarado Yumbo, Narcisa Aida Tanguila Narvaez, Bertha Antonia Yumbo Tanguila, Gloria Lucrecia Tanguila Grefa, Francisco Victor Tanguilla Grefa, Rosa Teresa Chimbo Tanguila, Jose Gabriel Revelo Llore, Maria Clelia Reascos Revelo, Maria Magdalena Rodriguez Barcenes, Jose Miguel Ipiales Chicaiza, Heleodoro Pataron Guaraca, Luisa Delia Tanguila Narvaez, Lourdes Beatriz Chimbo Tanguila, Maria Hortencia Viveros Cusangua, Segundo Angel Amanta Milan, Octavio Ismael Cordova Huanca, Elias Roberto Piyahuaje Payahuaje, Daniel Carlos Lusitande Yaiguaje, Benancio Fredy Chimbo Grefa, Guillermo Vicente Payaguaje Lusitante, Delfin Leonidas Payaguaje Payaguaje, Alfredo Donaldo Payaguaje Payaguaje, Teodoro Gonzalo Piaguaje Payaguaje, Miguel Mario Payaguaje Payaguaje, Fermin Piaguaje Payaguaje, Reinaldo Lusitande Yaiguaje, Luis Agustin Payaguaje Piaguaje, Emilio Martin Lusitande Yaiguaje, Simon Lusitande Yaiguaje, Armando Wilfrido Piaguaje Payaguaje, and Angel Justino Piaguage Lucitante.

**YOU ARE HEREBY COMMANDED,** pursuant to Rule 69 of the Federal Rules of Civil Procedure and CPLR Sections 5223 and 5224, to answer, in writing and under oath, separately and fully, each question in the questionnaire accompanying this subpoena, each answer referring to the question to which it responds; and that you return the answers together with the original questions within 10 days after your receipt of the questions and this subpoena to Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166-0193.  False swearing or failure to comply with this subpoena is punishable as a contempt of court.

I HEREBY CERTIFY THAT THIS INFORMATION SUBPOENA COMPLIES WITH RULE 5224 OF THE CIVIL PRACTICE LAW AND RULES AND SECTION 601 OF THE GENERAL BUSINESS LAW THAT I HAVE A REASONABLE BELIEF THAT THE PARTY RECEIVING THIS SUBPOENA HAS IN THEIR POSSESSION INFORMATION ABOUT THE DEBTOR THAT WILL ASSIST THE CREDITOR IN COLLECTING THE JUDGMENT.

Pursuant to Rule 69 of the Federal Rules of Civil Procedure and CPLR Section 5222, **YOU ARE HEREBY RESTRAINED**, as detailed below.

### RESTRAINING NOTICE

**TAKE NOTICE** that, pursuant to CPLR 5222(b), which is set forth in full herein, you are hereby **FORBIDDEN** to make or suffer any sale, assignment, transfer or interference with any PROPERTY in which YOU have an interest, or pay over or otherwise dispose of any debt owed to YOU, except as provided in Section 5222.

**TAKE FURTHER NOTICE** that this notice INCLUDES all PROPERTY in which YOU have an interest hereafter coming into YOUR possession or custody and all debts of any other PERSON hereafter coming due to YOU.

2

**SA35**

**TAKE FURTHER NOTICE** that disobedience of this Restraining Notice is punishable as contempt of court.

## CIVIL LAW AND PRACTICE RULES

5222(b) Effect of restraint; prohibition of transfer; duration. A judgment debtor or obligor served with a restraining notice is forbidden to make or suffer any sale, assignment, transfer or interference with any property in which he or she has an interest, except as set forth in subdivisions (h) and (i) of this section, and except upon direction of the sheriff or pursuant to an order of the court, until the judgment or order is satisfied or vacated. A restraining notice served upon a person other than the judgment debtor or obligor is effective only if, at the time of service, he or she owes a debt to the judgment debtor or obligor or he or she is in the possession or custody of property in which he or she knows or has reason to believe the judgment debtor or obligor has an interest, or if the judgment creditor or support collection unit has stated in the notice that a specified debt is owed by the person served to the judgment debtor or obligor or that the judgment debtor or obligor has an interest in specified property in the possession or custody of the person served. All property in which the judgment debtor or obligor is known or believed to have an interest then in and thereafter coming into the possession or custody of such a person, including any specified in the notice, and all debts of such a person, including any specified in the notice, then due and thereafter coming due to the judgment debtor or obligor, shall be subject to the notice except as set forth in subdivisions (h) and (i) of this section. Such a person is forbidden to make or suffer any sale, assignment or transfer of, or any interference with, any such property, or pay over or otherwise dispose of any such debt, to any person other than the sheriff or the support collection unit, except as set forth in subdivisions (h) and (i) of this section, and except upon direction of the sheriff or pursuant to an order of the court, until the expiration of one year after the notice is served upon him or her, or until the judgment or order is satisfied or vacated, whichever event first occurs. A judgment creditor or support collection unit which has specified personal property or debt in a restraining notice shall be liable to the owner of the property or the person to whom the debt is owed, if other than the judgment debtor or obligor, for any damages sustained by reason of the restraint. If a garnishee served with a restraining notice withholds the payment of money belonging or owed to the judgment debtor or obligor in an amount equal to twice the amount due on the judgment or order, the restraining notice is not effective as to other property or money.

3

## SUBPOENA DEFINITIONS AND INSTRUCTIONS

1.     The definitions and rules of construction set forth in Rule 26.3 of the Local Rules for the Southern and Eastern Districts of New York are incorporated herein.

2.     The term "ACCOUNT" as used herein means and INCLUDES savings accounts, checking accounts, money market accounts, brokerage accounts, certificates of deposit, lines of credit, and any other credits or debits.

3.     The term "ACCOUNTING" means and refers to any record of financial information. This INCLUDES accountings, financial statements, bank statements, ledgers, books, audits, registers, financial reconciliations, summaries of financial information, and reports of financial information.

4.     The term "ASSET" means any tangible or intangible PROPERTY, INCLUDING real PROPERTY, personal PROPERTY, intellectual PROPERTY, chattels, cash, securities, derivative products, ACCOUNTS, debts, contract rights, security interests, claims, and causes of action, anywhere in the world.

5.     The term "PROPERTY" means anything that may be the subject of OWNERSHIP.

6.     The term "CONTROL" (INCLUDING, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any PERSON or ENTITY, shall mean the possession, directly or indirectly, of the power to direct or cause the actions, direction of the management, or policies of such PERSON or ENTITY, whether through the OWNERSHIP of voting securities, by contract or otherwise.

7.     The term "ENTITY" and "ENTITIES" shall INCLUDE all corporations, associations, partnerships, joint ventures, companies, funds, trusts, limited liability companies,

4

limited liability partnerships, any government or regulatory authority, and all other forms of incorporated and unincorporated organizations that are not natural persons.

8.   The terms "INCLUDE" and "INCLUDING" mean including, but not limited to. When the word "INCLUDE" or "INCLUDING" is followed by one or more specific examples, those examples are illustrative only and do not limit in any way the information requested.

9.   The terms "OWN" and "OWNERSHIP" mean owned directly or indirectly, in whole or in part, as sole owner or jointly with others, either of record or beneficially, INCLUDING as a partner, general or limited, limited liability member, fiduciary, and as an equity or debt holder, or demand deposit holder.

10.   "AMAZON DEFENSE FRONT" means and refers to the Frente de Defensa de la Amazonía a/k/a Amazon Defense Front, and INCLUDES the Front's officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates.

11.   "ECUADOR ENFORCEMENT ACTIONS" means and refers to any proceeding seeking recognition and/or enforcement of the ECUADOR JUDGMENT anywhere in the world.

12.   "ECUADOR JUDGMENT" means and refers to the judgment entered in the ECUADOR LITIGATION on February 14, 2011 as modified by subsequent proceedings.

13.   "ECUADOR JUDGMENT TRUST" means and refers to the trust discussed in the March 30 filing of Pablo Fajardo Mendoza to the Provincial Court of Justice of Sucumbiós regarding the "Commercial Trust for the Administration of Funds ADAT, granted by Maria Victoria Aguinda Salazar, Lidia Alexandra Aguinda, et al., the AMAZON DEFENSE FRONT and Compañia Fiduciaria Ecuador FIDUECUADOR S.A. funds and trusts administrator" executed on March 1, 2012 by Dr. Sandra Veronica Barrazueta Molina.

14.     "ECUADOR LITIGATION" means and refers to the proceeding *Maria Aguinda y Otros v. Chevron Corporation*, in the Provincial Court of Justice of Sucumbíos in Ecuador, and all appellate proceedings and subsequent proceedings stemming therefrom.

15.     "LAGO AGRIO PLAINTIFFS" means and refers to Defendants Alfredo Donaldo Payaguaje Payaguaje; Angel Justino Piaguaje Lucitante; Armando Wilfrido Piaguaje Payaguaje; Beatriz Mercedes Grefa Tanguila; Benancio Freddy Chimbo Grefa; Bertha Antonia Yumbo Tanguila; Carlos Grega Huatatoca; Catalina Antonia Aguinda Salazar; Celia Irene Viveros Cusangua; Clide Ramiro Aguinda Aguinda; Daniel Carlos Lusitande Yaiguaje; Delfin Leonidas Payaguaje Payaguaje; Elias Roberto Piyahuaje Payahuaje; Emilio Martin Lusitande Yaiguaje; Fermin Piaguaje Payaguaje; Francisco Alvarado Yumbo; Francisco Matias Alvarado Yumbo; Francisco Victor Tanguila Grefa; Gloria Lucrecia Tanguila Grefa; Guillermo Vicente Payaguaje Lusitante; Heleodoro Pataron Guaraca; Hugo Gerardo Camacho Naranjo; Javier Piaguaje Payaguaje; José Gabriel Revelo Llore; José Miguel Ipiales Chicaiza; Lidia Alexandra Aguinda Aguinda; Lorenzo José Alvarado Yumbo; Lourdes Beatriz Chimbo Tanguila; Lucio Enrique Grefa Tanguila; Luis Agustin Payaguaje Piaguaje; Luis Armando Chimbo Yumbo; Luisa Delia Tanguila Narvaez; Maria Victoria Aguinda Salazar; Maria Clelia Reascos Revelo; Maria Hortencia Viveros Cusangua; Maria Magdalena Rodriguez Barcenes; Miguel Mario Payaguaje Payaguaje; Narcisa Aida Tanguila Narvaez; Octavio Ismael Cordova Huanca; Olga Gloria Grefa Cerda; Patricio Alberto Chimbo Yumbo; Patricio Wuilson Aguinda Aguinda; Reinaldo Lusitande Yaiguaje; Rosa Teresa Chimbo Tanguila; Segundo Angel Amanta Milan; Simon Lusitande Yaiguaje; and Teodoro Gonzalo Piaguaje Payaguaje.

16.     "REPUBLIC OF ECUADOR" means and refers to the governing political body in Ecuador, INCLUDING all branches of government and political subdivisions, its current and

former presidents, attorneys general, judges, prosecutors, other officials, politicians, partners, contractors, employees, representatives, agents, agencies, officers, attorneys, accountants, assigns, or any other PERSON acting, or purporting to act, on the REPUBLIC OF ECUADOR's behalf, either directly or indirectly, INCLUDING: Lenín Moreno; Rafael Correa; Martha Escobar; Patricio Garcia; Alexis Mera; Alberto Acosta; Ana Alban; Galo Chiriboga; Rene Vargas Pazos; Mauricio Montalvo Samaniego; Judge Alberto Guerra Bastidas; Judge Efrain Novillo Guzmán; Judge Germán Yánez Ricardo Ruiz; Judge Juan Evangelista Núñez Sanabria; Judge Leonardo Ordóñez Pina; Judge Nicolás Augusto Zambrano Lozada; Judge Juan Carlos Encarnación Sanchez; Judge Cruz María Ávila Delgado; Judge Marco Antonio Yaguache Mora; Judge Milton David Rafael Toral Zevallos; Judge Alejandro Kleber Orellana Pineda; Judge Lilia Marlene Ortiz Vásquez; José María Borja; Washington Pesántez; Cecilia Armas Erazo de Tobar; Jorge German; Diego Borja (former Economic Policy Minister); Esperanza Martinez; Diego García Carrión; Alianza Pais; the National Intelligence Secretariat; and any current or former official at the offices of the Fiscal, Prosecutor General, or Attorney General.

17.    "PERSON" means and refers to any natural person or any business, legal or governmental ENTITY or association.

18.    "SELVA VIVA" means and refers to Defendant Selva Viva Selviva Cia. Ltda., and its officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates.

19.    "YOU" and "YOUR" mean and refer to Steven Donziger, The Law Offices of Steven R. Donziger, and Donziger & Associates, PLLC, and, where applicable, their officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates.

20.    Defined terms may be capitalized for the convenience of the parties; the definitions herein apply whether or not the term is capitalized.

7

21.    If any information called for by this subpoena is withheld on the basis of privilege, please state the nature of the information being claimed as privileged, the type of privilege claimed, and all circumstances upon which you are relying to support each claim of privilege with enough specificity so that a court can determine the appropriateness of the objection.

## SUBPOENA

The following questions must be answered separately and fully, in writing under oath, and are to be returned as provided in the attached subpoena.  If you cannot give the full information called for by a particular question, so state and give the best information you have on the subject.

1.    Identify and describe in detail any domestic or foreign ASSET that YOU OWN or CONTROL, INCLUDING identifying the value of such ASSET, how and where the ASSET is held, and what documents relate to such ASSET.

2.    Identify and describe in detail any interest in any domestic or foreign ASSET that YOU have transferred, sold, assigned, pledged, gifted, encumbered, or otherwise disposed of since the issuance of the Court's March 4, 2014 Judgment (Dkt. 1875), as modified, INCLUDING describing in detail the relevant transactions and the circumstances surrounding such transfer, sale, assignment, pledging, gift, encumbrance, or other disposition.

3.    Identify and describe in detail all YOUR current sources of income or revenue of any nature, whether domestic or foreign.

4.    Identify and describe in detail the status of YOUR OWNERSHIP or other interest in, and value of, any domestic or foreign real estate.

5.      Identify and describe in detail any domestic or foreign savings ACCOUNTS, checking ACCOUNTS, money market ACCOUNTS, investment ACCOUNTS, certificates of deposit, or any other ACCOUNTS held, either directly or indirectly, by YOU, as well as the date each such ACCOUNT or certificate of deposit was opened, created, or closed, and their current and greatest historical value.

6.      Identify and describe in detail the status of YOUR OWNERSHIP interest, direct or beneficial, in any real or personal PROPERTY, whether domestic or foreign, INCLUDING cooperative corporation shares, automobiles, trucks, other motor vehicles, boats, artwork, jewelry, aircraft, stocks, bonds, commodities, securities, partnership interests, patents, inventions, trade names, copyrights, royalty agreements, promissory notes, drafts or other commercial paper, or causes of action.

7.      Identify and describe in detail the status of YOUR current OWNERSHIP in any inherited PROPERTY, INCLUDING those ASSETS YOU received or are entitled to future receipt of, from any estates in which YOU may have or have had an interest, as well as the current value of such PROPERTY.

8.      Identify and describe in detail any life interest or remainder interest, either vested or contingent, in any trust or estate.  If YOU are a beneficiary of any trust, furnish the: (a) name of trust or estate, (b) value of assets, (c) value of YOUR interest, and (d) any amounts received.

9.      Identify and describe in detail the status of YOUR current OWNERSHIP interest in any domestic or foreign ENTITIES or ACCOUNTS, as well as the current value of such PROPERTY and, if the PROPERTY was sold or transferred since the issuance of the Court's March 4, 2014 Judgment (Dkt. 1875), as modified, the date of such transfer, the identity of the purchaser, and the value received for such transfer.

10.    Identify and describe in detail all ACCOUNTS in which YOU have or have had an interest since March 4, 2014, wherever found, the location of those ACCOUNTS, the ACCOUNT number, the amount in said ACCOUNTS, the date/approximate date the ACCOUNT was opened, and the date/approximate date when the ACCOUNT was closed (if applicable).

11.    Identify all means by which YOU have transferred, paid, received, or conducted any financial transactions since March 4, 2014, or any other transaction involving an exchange of value.

12.    Identify any device, electronic or otherwise, that YOU have used to access any ACCOUNT or conduct any financial transaction since March 4, 2014, INCLUDING credit, debit, and/or automatic teller (ATM) cards, regardless of whether such device or card is titled in YOUR name.

13.    Identify all internet-based services used by YOU and/or the other Defendants for ACCOUNTING, banking, document storage, collaboration, file sharing, and creating and/or modifying documents.

14.    Identify and describe in detail all debts or credits due, owing, or which could or will become due or owing to YOU, wherever found, the location of those debts or credits, the amount of the debt or credit, and the date and time at which such debt or credit will be payable to YOU.

15.    Identify YOUR current net worth.

16.    State the total amount of money YOU have received from YOUR involvement in the ECUADOR LITIGATION and any subsequently related litigation and identify the source and date of all such payments.

17.     Identify and describe in detail any ASSET, payment, compensation, revenue, or any other thing of value YOU have received, contracted to receive, or have been promised at any time related to any aspect of YOUR involvement in the ECUADOR LITIGATION, the ECUADOR JUDGMENT, or the ECUADOR ENFORCEMENT ACTIONS.

18.     Identify and describe in detail any attempted or completed sale or transfer of any license, copyright, life rights, trademark, media rights, or other right to exploit, market or publicize any aspect of the ECUADOR LITIGATION, ECUADOR JUDGMENT, or ECUADOR ENFORCEMENT ACTIONS, and YOUR involvement or the involvement of any other PERSON therein.

19.     Identify and describe in detail any actual, contemplated, anticipated, or potential movie, documentary, book, television program, podcast, or other media project relating in any way to the ECUADOR LITIGATION, the ECUADOR JUDGMENT, or the ECUADOR ENFORCEMENT ACTIONS, INCLUDING YOUR role and any value YOU might receive in connection therewith.

20.     Identify and describe in detail any and all ASSETS that YOU CONTROL, that YOU have received, or hereafter may receive, directly or indirectly, or to which YOU have or hereafter obtain, any right, title or interest, directly or indirectly, that are traceable to the ECUADOR LITIGATION, the ECUADOR JUDGMENT or the enforcement of the ECUADOR JUDGMENT anywhere in the world.

21.     Identify and describe in detail any act that YOU, the LAGO AGRIO PLAINTIFFS, or any PERSON acting on YOUR behalf or on behalf of the LAGO AGRIO PLAINTIFFS, has undertaken to monetize or profit from the ECUADOR JUDGMENT, INCLUDING by selling, assigning, pledging, transferring, or encumbering any interest therein.

11

22.     Identify and describe in detail any communication after March 4, 2014, between YOU and any PERSON concerning the ECUADOR JUDGMENT or any attempts by anyone, successful or not, to monetize or profit from it.

23.     Identify any PERSON who financially supported or invested in, was asked to financially support or invest in, or who offered to financially support or invest in any aspect of the ECUADOR JUDGMENT or the enforcement thereof and describe in detail the terms or proposed terms of such investment or support.

24.     Identify and describe in detail any funding commitments in support of the ECUADOR LITIGATION or ECUADOR ENFORCEMENT ACTIONS from any PERSON or ENTITY, INCLUDING from the following:

      a.   Kohn Swift & Graf, P.C.

      b.   Russell DeLeon

      c.   Orin Kramer

      d.   Torvia Limited

      e.   Burford

      f.   88 Capital

      g.   Equitable Outcomes

      h.   Jonaks Limited

      i.   Satee GMBH

      j.   David Sherman III

      k.   Glenn Krevlin

      l.   Michael Donziger

      m.  Russell O. Wiese

n.  TC Payment Services International

o.  Amazonia Recovery Limited

p.  Woodsford Litigation Funding Limited

25.   Identify and describe in detail any ASSET, payment, proceeds, compensation, revenue, or any other thing of value YOU have delivered, contracted to deliver, or have promised to any PERSON or ENTITY from any proceeds received or that may be received from the ECUADOR JUDGMENT, enforcement of the ECUADOR JUDGMENT, or any investment in the ECUADOR JUDGMENT.

26.     Describe in detail how the monies (totaling $32,360,647) shown in the below
chart as "commitments" from investors in the ECUADOR LITIGATION were expended,
INCLUDING in YOUR description the identification of any ACCOUNTS into which any
portion of said monies were deposited and the specific amounts received or expended by YOU at
any time:

## Funding for the Enterprise

| Investor | Investments Contributed | Commitment Amounts[1] |
|---|---|---|
| Kohn Swift & Graf, P.C. | $6,360,647 | $6,360,647 |
| Russell DeLeon | $1,500,000 | $2,000,000 |
| Orin Kramer | $150,000 | $150,000 |
| Torvia Limited | $3,413,367 | $7,250,000 |
| Burford | $4,000,000 | $15,000,000 |
| 88 Capital | | $250,000 |
| Equitable Outcomes | | $150,000 |
| Jonaks Limited | | $200,000 |
| Satee GMBH | | $300,000 |
| David Sherman III | | $250,000 |
| Glenn Krevlin | | $250,000 |
| Michael Donziger | | $150,000 |
| Russell O. Wiese | | $50,000 |
| TC Payment Services International | $424,948 | |
| Amazonia Recovery Limited | $149,000 | |
| **TOTAL** | **$15,997,963** | **$32,360,647** |

PX 2143     Confidential

Commitment amounts are presumed to be based on written or each individual or entity's respective funding agreement to "Commitment amount" or "Capital Commitment." And a commitment amount is based upon funds representation of investments contribution in its respective institution, or until payment began and date records.

PLAINTIFF'S
EXHIBIT
2143

Plaintiff's Exhibit 2143  p. 1 of 1
Plaintiff's Exhibit 4900  p. 114 of 144

27.     Identify and describe in detail any ACCOUNTINGS, reports, summaries,
analyses, statements, ledgers, or any other kind of record relating to how funds received in
support of the ECUADOR LITIGATION, ECUADOR JUDGMENT, or ECUADOR
ENFORCEMENT ACTIONS have been received or expended, INCLUDING anything prepared

in response to any demand by the Union of People Affected by Texaco (aka UDAPT) and their agents and representatives.

     28.    Identify and describe in detail all ASSETS, benefits, payments, or things of value that have been or will be conferred, offered, or promised to YOU or any agent, attorney, or representative of YOU or the LAGO AGRIO PLAINTIFFS (INCLUDING attorneys in this action, attorneys in the ECUADOR LITIGATION, Pablo Fajardo Mendoza, Servicios Fromboliere Compania Limitada, Luis Yanza, Julio Prieto Méndez, Juan Pablo Sáenz, Andrew Woods, Aaron Marr Page, Laura Garr, Brian Parker, Joseph Kohn, Patricio Salazar Cordova, Agustin Salazar, Serafin Angel Cajo, and SELVA VIVA), by the REPUBLIC OF ECUADOR, INCLUDING the date, description, medium and purpose of such benefits, payments, or things of value, and identify all PERSONS and/or ENTITIES involved in, and documents concerning such ASSETS, benefits, payments, or things of value.

     29.    Identify and describe in detail the ASSETS and liabilities of the AMAZON DEFENSE FRONT.

     30.    Identify and describe in detail YOUR current OWNERSHIP interest in Amazonia Recovery Limited, INCLUDING identifying the value of such ASSET, how and where the ASSET is held, and what documents relate to such ASSET.

     31.    Identify and describe in detail any past or present trust, corporation, or other ENTITY created to hold, distribute, administer, or otherwise affect any proceeds of the ECUADOR JUDGMENT.

Dated: April 16, 2018
      New York, New York

GIBSON, DUNN & CRUTCHER LLP

By: _____

Randy M. Mastro
Andrea E. Neuman
200 Park Avenue, 47th Floor
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile:  212.351.4035

William E. Thomson
333 South Grand Avenue
Los Angeles, California 90071
Telephone: 213.229.7891
Facsimile:  213.229.6891

STERN, KILCULLEN & RUFOLO LLC
Herbert J. Stern
Joel M. Silverstein
325 Columbia Tpke, Ste 110
P.O. Box 992
Florham Park, New Jersey 07932-0992
Telephone: 973.535.1900
Facsimile: 973.535.9664

*Attorneys for Chevron Corporation*

### NOTICE TO JUDGMENT DEBTOR OR OBLIGOR

Money or property belonging to you may have been taken or held in order to satisfy a judgment or order which has been entered against you. Read this carefully.

### YOU MAY BE ABLE TO GET YOUR MONEY BACK

State and federal laws prevent certain money or property from being taken to satisfy judgments or orders. Such money or property is said to be "exempt". The following is a partial list of money which may be exempt:

1. Supplemental security income, (SSI);

2. Social security;

3. Public assistance (welfare);

4. Spousal support, maintenance (alimony) or child support;

5. Unemployment benefits;

6. Disability benefits;

7. Workers' compensation benefits;

8. Public or private pensions;

9. Veterans benefits;

10. Ninety percent of your wages or salary earned in the last sixty days;

11. Twenty-five hundred dollars of any bank account containing statutorily exempt payments that were deposited electronically or by direct deposit within the last forty-five days, including, but not limited to, your social security, supplemental security income, veterans benefits, public assistance, workers' compensation, unemployment insurance, public or private pensions, railroad retirement benefits, black lung benefits, or child support payments;

12. Railroad retirement; and

13. Black lung benefits.

If you think that any of your money that has been taken or held is exempt, you must act promptly because the money may be applied to the judgment or order. If you claim that any of your money that has been taken or held is exempt, you may contact the person sending this notice.

Also, YOU MAY CONSULT AN ATTORNEY, INCLUDING ANY FREE LEGAL SERVICES ORGANIZATION IF YOU QUALIFY. You can also go to court without an

attorney to get your money back. Bring this notice with you when you go. You are allowed to try to prove to a judge that your money is exempt from collection under New York civil practice law and rules, sections fifty-two hundred twenty-two-a, fifty-two hundred thirty-nine and fifty-two hundred forty. If you do not have a lawyer, the clerk of the court may give you forms to help you prove your account contains exempt money that the creditor cannot collect. The law (New York civil practice law and rules, article four and sections fifty-two hundred thirty-nine and fifty-two hundred forty) provides a procedure for determination of a claim to an exemption.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

        Plaintiff,

v.

                               11 Civ. 0691 (LAK)

STEVEN DONZIGER, et al.,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**CHEVRON CORPORATION'S SUBPOENA AD TESTIFICANDUM TO**
**STEVEN R. DONZIGER**

In the above entitled action in the United States District Court for the Southern District of

New York,[1] a supplemental judgment was entered on February 28, 2018 in favor of Chevron

---

[1] The parties to this action are Chevron Corporation (Plaintiff) and Defendants Steven Donziger, The Law
Offices of Steven R. Donziger, Donziger & Associates, PLLC, Hugo Gerardo Camacho Naranjo, Javier
Piaguaje Payaguaje, Stratus Consulting, Inc., Douglas Beltman, Anne Maest, Pablo Fajardo Mendoza, Luis
Yanza, Frente de Defensa de la Amazonia A/K/A Amazon Defense Front, Selva Viva Selviva Cia, Ltda, Maria
Aguinda Salazar, Carlos Grefa Huatatoca, Catalina Antonia Aguinda Salazar, Lidia Alexandra Aguinda
Aguinda, Patricio Alberto Chimbo Yumbo, Clide Ramiro Aguinda Aguinda, Luis Armando Chimbo Yumbo,
Beatriz Mercedes Grefa Tanguila, Lucio Enrique Grefa Tanguila, Patricio Wilson Aguinda Aguinda, Celia Irene
Viveros Cusangua, Francisco Matias Alvarado Yumbo, Francisco Alvarado Yumbo, Olga Gloria Grefa Cerda,
Lorenzo José Alvarado Yumbo, Narcisa Aida Tanguila Narváez, Bertha Antonia Yumbo Tanguila, Gloria
Lucrecia Tanguila Grefa, Francisco Victor Tanguilla Grefa, Rosa Teresa Chimbo Tanguila, José Gabriel Revelo
Liore, María Clelia Reascos Revelo, María Magdalena Rodríguez Barcenes, José Miguel Ipiales Chicaiza,
Heleodoro Pataron Guaraca, Luisa Delia Tanguila Narváez, Lourdes Beatriz Chimbo Tanguila, María Hortencia
Viveros Cusangua, Segundo Ángel Amanta Milán, Octavio Ismael Córdova Huanca, Elías Roberto Piyahuaje
Payahuaje, Daniel Carlos Lusitande Yaiguaje, Benancio Fredy Chimbo Grefa, Guillermo Vicente Payaguaje
Lusitante, Delfín Leonidas Payaguaje Payaguaje, Alfredo Donaldo Payaguaje Payaguaje, Teodoro Gonzalo
Piaguaje Payaguaje, Miguel Mario Payaguaje Payaguaje, Fermin Piaguaje Payaguaje, Reinaldo Lusitande
Yaiguaje, Luis Agustín Payaguaje Piaguaje, Emilio Martín Lusitande Yaiguaje, Simon Lusitande Yaiguaje,
Armando Wilfrido Piaguaje Payaguaje, and Ángel Justino Piaguage Lucitante.

Corporation against Steven Donziger, The Law Offices of Steven R. Donziger, Donziger &

Associates, PLLC, and others, for the sum of $813,602.71, which remains due and unpaid.

Pursuant to Rule 69 of the Federal Rules of Civil Procedure and Rules 5223 and 5224 of

the New York Civil Practice Law and Rules, **YOU ARE COMMANDED** to appear at the time,

date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are

an organization, you must designate one or more officers, directors, or managing agents, or

designate other persons who consent to testify on your behalf about the following matters, or

those set forth in an attachment.

Place: Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York NY 10166
Date: May 7, 2018
Time: 9 AM

**PLEASE TAKE NOTICE** that the deposition will be conducted before a notary public

or other person authorized by law to administer oaths, and will be recorded by both stenographic

means and audiovisual recording.  LiveNote will be used during this deposition, and the

transcript and video recording of the deposition may be transmitted through LiveNote's web

streaming feature for real time viewing by counsel for Chevron.

**PLEASE TAKE NOTICE THAT** false swearing on such examination or failure to

comply with this SUBPOENA is punishable as a contempt of court under CPLR 5223.

Date:   April 16, 2018

Randy M. Mastro
Andrea E. Neuman
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 47th Floor
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

William E. Thomson

2

333 South Grand Avenue
Los Angeles, California 90071
Telephone 213.229.7000

STERN, KILCULLEN & RUFOLO LLC
Herbert J. Stern
Joel M. Silverstein
325 Columbia Tpke, Ste 110
P.O. Box 992
Florham Park, New Jersey 07932-0992
Telephone:  973.535.1900
Facsimile:  973.535.9664

*Attorneys for Chevron Corporation*

**SA54**

1

i582che1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CHEVRON CORPORATION,

4              Plaintiff,              New York, N.Y.

5         v.                          11 Civ. 691(LAK)

6   STEVEN DONZIGER, et al.,

7              Defendants.

8   ------------------------------x   Argument

9                                     May 8, 2018
                                      4:40 p.m.
10
    Before:
11
                    HON. LEWIS A. KAPLAN,
12
                                      District Judge
13

14
                       APPEARANCES
15

16
    GIBSON, DUNN & CRUTCHER, LLP
17       Attorneys for Plaintiff
    BY:  RANDY M. MASTRO
18       ANDREA E. NEUMAN
         ANNE CHAMPION
19       ALEJANDRO A. HERRERA

20
    STERN & KILCULLEN, LLC
21       Attorneys for Plaintiff
    BY:  HERBERT J. STERN
22

23  STEVEN R. DONZIGER
         Pro Se Defendant
24

25
```

**SA55**

I58HChe2

1    evidence, or Ms. Sullivan, that I ever have attempted or ever

2    have sold my shares.  I am allowed, if I sell the shares of my

3    clients, to get paid for my work on this case.  You yourself

4    said that in the April 25 order and I can quote that right

5    here.

6           You said:  "Thus as long as no collections are made in

7    respect to the Lago Agrio judgment," which has never happened,

8    "the New York judgment could not prevent Donziger from being

9    paid just as he has been paid" -- you put an amount of money in

10   there -- "over the last nine or ten years."  I'm going on your

11   guidance from April 25.

12          Further, I feel like I have been acting in full

13   compliance with the order as explained in docket 1801.  His

14   little booklet is almost all citing docket 1875.  But in 1801,

15   your Honor explicitly said we could sell shares to fund the

16   litigation.  You said it in multiple ways.

17          In terms of monetization -- let me just cite one other

18   quote.  You said on page 3 of the judgment, 1801:

19   "Significantly, the New York judgment did not restrict the

20   other LAPs, who remain free to sell, assign, or transfer their

21   interests, if any, in the Lago Agrio judgment and to seek to

22   enforce it anywhere in the world."

23          I'm selling, as an intermediary, the points or the

24   aspects of the judgment that are held by my clients.  I am not

25   selling my own shares, because that obviously is prohibited by

I58HChe2

1     your Honor's RICO judgment.

2          On page 7, you write -- you distinguish between a

3     contingency fee and being paid a retainer from selling -- from

4     generating investments to sell --

5          THE COURT:  You're going to have to clarify,

6     Mr. Donziger, because docket 1801 is a notice by a court

7     reporter of the filing of a transcript.  So I don't know what

8     you're referring to.

9          MR. DONZIGER:  I'm sorry.  It's 1901.  My apologies.

10          THE COURT:  OK.  Thank you.

11          MR. DONZIGER:  Anyway, on page 7 of 1901, this is what

12     you wrote:  "While any payments of a contingent fee would be

13     traceable to the Lago Agrio judgment, and thus subject to the

14     constructive trust imposed by paragraph 1, the same would not

15     be true of monthly retainer payments unless those payments were

16     traceable to the Lago Agrio judgment."

17          THE COURT:  So why wouldn't a retainer payment, the

18     funds for which were raised from an investor in exchange for an

19     interest in the judgment, be directly traceable to the

20     judgment?

21          MR. DONZIGER:  Because you made a distinction between

22     funds from collecting on the judgment, that is, as a result of

23     enforcement and then executing, and selling interest to pay

24     litigation expenses to pursue valid enforcement actions in

25     other jurisdictions, which you yourself said was valid and,

I58HChe2

1        THE COURT:  In what affidavit by you does it explain

2   exactly what's happening?

3        MR. DONZIGER:  I don't believe I should be obligated

4   to present evidence because they haven't met any of their

5   burden.  What evidence have they presented to show I have sold

6   a single piece of my interest?  Zero.  And it hasn't happened.

7   I'll make that representation right now.

8            This is an attempt, with all due respect to my friends

9   at Gibson Dunn, it is an attempt to dig into my personal

10  finances, to dig in and figure out who the heck is funding this

11  case and to go subpoena them, as they've already done to

12  Ms. Sullivan, in an effort to dry up our funding.  That is why

13  I say at times, even though I know you probably disagree with

14  me, that this is a SLAAP attack.  We have a right to pursue

15  enforcement in other countries.  That can't happen without at

16  least some money to pay expenses.

17       THE COURT:  Mr. Donziger, lower the temperature.  I've

18  heard this SLAAP attack argument for years.  You know I don't

19  accept it, and if the name of the game is to catch a fish, at

20  least put the hook near the fish.

21       MR. DONZIGER:  I'm not sure I know what you mean by

22  that, but I'll say this:  Going back to 1901, you said that the

23  New York -- this is page 10 -- "The New York judgment,

24  including paragraph 5" -- this is the key paragraph on

25  monetization -- "in fact would deprive Donziger of the ability

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**MEMO ENDORSED**

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,        :

         Plaintiff,        :

       v.        :     11 Civ. 0691 (LAK)

STEVEN DONZIGER, *et al.*,        :

         Defendants.        :

       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/18/2018
```

**CHEVRON CORPORATION'S SECOND MOTION TO COMPEL DONZIGER**
**TO RESPOND TO POST-JUDGMENT DISCOVERY REQUESTS**

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

STERN, KILCULLEN & RUFOLO LLC
325 Columbia Tpke, Ste 110
P.O. Box 992
Florham Park, New Jersey 07932-0992
Telephone: 973.535.1900
Facsimile: 973.535.9664

*Attorneys for Plaintiff Chevron Corporation*

i

<u>Memorandum Endorsement</u>                    <u>Chevron Corp. v. Donziger, 11-cv-691 (LAK)</u>

        Chevron moves again to compel Donziger to respond to post-judgment discovery requests.  It asserts that he has (1) withheld responsive documents on the basis of scope and purported First Amendment objections that the Court already has rejected, unsubstantiated privilege claims, and a supposed lack of resources, (2) refused to answer dozens of questions at his deposition, (3) failed to provide substantive responses to Chevron's Information Requests, (4) concealed the existence of and failed to produce documents from a TD Bank account reflecting payments of hundreds of thousands of dollars to him and alleged co-conspirators, and (5) admittedly failed to make a reasonable search for documents responsive to Chevron's requests and withheld "a few hundred pages" of other responsive documents.  Donziger's response essentially is that he has appealed earlier orders in this case and that he should not be required to comply with these discovery requests.

        The short answer to Donziger's position is that this Court ordered Donziger to respond to certain of Chevron's discovery requests by August 15, 2018.  (DI 2056)  That order remains in effect and has not been stayed.  Donziger is obliged to comply with it in each and every respect on pain of contempt.

        Without limiting the generality of the foregoing, it is further

        ORDERED, that Chevron's motion is granted in its entirety.  Without limiting the generality of the foregoing, it is further

        ORDERED, as follows:

        1.     As Donziger has failed to comply with  Fed. R. Civ. P. 26(b)(5) and S.D.N.Y. Civ. R. 26.2 – and as (a) this is not the first time that he has ignored the requirements of those rules, *e.g.*, *In re Chevron Corp.*, 749 F. Supp. 2d 170 (S.D.N.Y. 2010), *aff'd sub nom. Lago Agrio Plaintiffs v. Chevron Corp.,* 409 Fed. App'x 393 (2d Cir. 2010), and (b) Donziger failed to comply even after Chevron asserted that his prior failure should result in waiver of any otherwise applicable privileges – the Court holds that Donziger has waived or forfeited any claim of privilege to responsive documents and information that otherwise might have applied.  Accordingly, Donziger shall comply fully with the outstanding discovery requests forthwith without withholding any responsive documents or information on privilege grounds.

        2.     Donziger shall appear for and respond to questions at a further deposition on a date to be agreed upon in writing by the parties or, failing such an agreement on or before October 25, 2018, on a date to be fixed by the Court.

        3.     Given Donziger's stonewalling of post-judgment discovery and the other circumstances described in Chevron's memorandum, it is appropriate that Donziger's electronic devices be imaged and examined for any responsive documents that Donziger has not thus far produced under appropriate safeguards of the interests of all parties.   The parties, on or before October 26, 2018, shall agree upon or, in default of an agreement, notice for settlement an order

providing for the selection, compensation and precise duties of a third party to whom Donziger will be obliged to produce for forensic imaging all computers and electronic, optical and magnetic storage devices and media within his possession, custody or control (a "Third Party"). Any such Third Party, at a minimum, will be obliged to retain any forensic images in confidence pending further order of the Court.

SO ORDERED.

Dated:          October 18, 2018

_____

Lewis A. Kaplan
United States District Judge

2

| | |
|---|---|
| **From:** | John van Merkensteijn <jhvm@rossteq.com> |
| **Sent:** | Saturday, October 22, 2016 3:24 PM |
| **To:** | 'John van Merkensteijn' |
| **Subject:** | FW: Deal terms attached |
| **Attachments:** | INVESTOR.Summary.July2016.docx |
| | |
| **Categories:** | KF2 |

John H. van Merkensteijn III
Managing Director
Rossi Technologies LLC
60 Riverside Boulevard
Suite 2101
New York, NY. 10069
Phone (212) 769-4055

jhvm@rossteq.com

---

**From:** Steven Donziger
**Date:** Sunday, July 10, 2016 at 6:58 PM
**To:** Bill Twist
**Cc:** "John H. van Merkensteijn III"
**Subject:** Re: Deal terms attached
**Resent-From:**

There are no priority shares. Shares are a percentage of the total claim owed which is now a little over $11b with statutory interest in Canada. Expenses come off the top upon recovery. There are approximately $10 million in expenses plus some outstanding fees we owe various law firms; this number could rise modestly in coming years as most costs at behind us. On a $10b recovery, the amount of funds available to pay expenses, investors, and lawyers will be approximately $1.5b and could be as high as $3b depending on how many shares we issue to sustain the case going forward.

I can explain the economics in more detail on Tuesday or feel free to follow up with questions in the meantime.

The larger point is that absent some unforseen event, there will be plenty of funds to pay investors should there be a recovery. Payments to investors are also securitized by a commitment from our Canadian lawyer (who will be collecting the funds in Canada and holding them in escrow until distributed) in addition to the authorized client representatives. Several sophisticated individuals have performed due diligence and invested, including two just in the last few weeks.

JVM 002161

I am also attaching an updated investor summary (dated July 2016) that includes the recent U.S. Supreme Court decision restricting the use of the RICO statute. Please use this summary, rather than the one I sent you yesterday.

Again, please reach out with any more questions.

Thanks!

Best, Steven

---

**From:** Bill Twist
**Sent:** Sunday, July 10, 2016 6:36:26 PM
**To:** Steven Donziger
**Cc:** John H. van Merkensteijn III
**Subject:** Fwd: Deal terms attached

Steven,
Are there any priority shares in the mix or are everyone's shares treated the same? The shares are expressed as a percentage of what? — total recovery less debts and expenses???
Bill

Begin forwarded message:

**From:** Steven Donziger <sdonziger@donzigerandassociates.com>
**Subject: Deal terms attached**
**Date:** July 10, 2016 at 3:25:31 PM PDT
**To:** "btwist@pachamama.org" <btwist@pachamama.org>

Confirmed for Tuesday at 1. Thanks for setting it up.

Also, here is the analysis of the U.S. Supreme Court decision on the RICO matter (going to incorporate it into the investment summary I sent you):

http://www.csrwire.com/press_releases/39075-U-S-Supreme-Court-Deals-Blow-to-Chevron-on-Ecuador-Pollution-Case-In-Latest-RICO-Decision

## U.S. Supreme Court Deals Blow to Chevron on Ecuador ...

www.csrwire.com

NEW YORK , Jun. 27 /CSRwire/ - Chevron last week suffered a major setback when a U.S. Supreme Court decision s

JVM 002162

## CONFIDENTIAL MEMORANDUM

1.    INVESTMENT OPPORTUNITY.

This is an opportunity to support a landmark case for justice for the thousands of people in Ecuador who have suffered as a result of the Chevron Corporation's deliberate actions in contaminating the Ecuadoran rainforest.

As detailed below, the Claimants hold an enforceable judgment from Ecuador's highest court in an amount in excess of $9,500,000,000 against Chevron (the "Judgment"). Because of statutory interest, that judgment has grown to roughly $10,500,000,000 in Canada. Further funds are currently being sought by the Claimants to, among other things, finance an international enforcement strategy in Canada to ensure that Chevron meets its legal obligations under the Judgment. In exchange for providing funding in support of the Claim, Investors will receive the right to an agreed upon share of the proceeds received by the Claimants in respect of the Claim. Further details are available for qualifying investors.

The Claimants have put together a world-class team to manage the enforcement of the Judgment. In Canada, they are represented by Alan Lenczner of Lenczner Slaght in Toronto. In Brasil, they are represented by Sergio Bermudes Advogados en Rio de Janiero. Other best of breed law firms and service-providers will be engaged in other jurisdictions, as appropriate. International enforcement is necessary because Chevron, in anticipation of losing the Ecuador case, stripped its remaining assets from the country during the proceeding and now refuses to pay the judgment.

**Copies of significant court decisions and media coverage can be accessed via the links at the end of this document. Chevron's relevant court filings can be found at www.Chevron.com or via the contact below.**

2.    BACKGROUND.

From 1964 to 1992, Chevron[1] built and operated more than 350 well sites and oil production facilities in an approximately 1,500 square mile concession area in Ecuador's rainforest. This concession area is home to five indigenous groups and approximately 80 farmer communities. Throughout the course of its operations in Ecuador, Chevron committed multiple acts of environmental contamination that left a legacy of environmental contamination and degradation from which the local population continues to suffer today. The amount of oil and contaminated water discharged into the Amazonian rainforest by Chevron is several orders of magnitude greater than the BP Deepwater Horizon spill. Moreover, the trial court found that Chevron's contamination was intentional, not accidental, and resulted from, among other things, Chevron's grossly substandard practices carried out over decades of its drilling operations in Ecuador. The litigation was held in Ecuador at Chevron's request after the company agreed to accept jurisdiction there and to abide by any judgment, subject only to enforcement defenses available under New York state law.

The Ecuadorian trial court and the appellate court (in its affirmation such Judgment) found that, during its operations of this concession, Chevron deliberately:

o    dumped many billion of gallons of production water (containing BTEX, TPH and polycyclic hydrocarbons) directly into the Ecuadoran rainforest floor and the nearby rivers and streams used by residents for drinking and bathing;

o    gouged more than 900 unlined open waste pits out of the jungle floor – pits that to

---

[1] Texaco Petroleum Company was a wholly-owned subsidiary of Texaco, Inc. at all times during its operations in Ecuador until Chevron and Texaco, Inc. merged in 2001.

this day continue to leach toxic waste into soils, groundwater and streams;

○   burned hundreds of millions of cubic feet of gas and waste oil into the atmosphere, poisoning the air and creating "black rain" that inundated the area during tropical thunderstorms; and

○   violated then-current U.S. industry standards, Ecuadoran environmental law, Chevron's own contract with the Ecuadoran government (which prohibited Chevron from using production methods that contaminated the environment) and international law.

Even Chevron's own internal audits of the environmental impacts found extensive contamination at Chevron's oil production facilities. The Ecuadorian trial court also took note of evidence that cancer rates in the concession area where Chevron operated are significantly higher than the norm, according to independent health evaluations. Several indigenous groups have seen their cultures decimated, largely because of Chevron's intentional contamination.

3.   JUDGMENT AGAINST CHEVRON IN ECUADOR.

On February 14, 2011, the Lago Agrio trial court entered the Judgment against Chevron, which was subsequently affirmed by the Sucumbios intermediate appellate court on January 3, 2012. The Judgment and affirmation collectively awarded the following amounts to or for the benefit of the Claimants:

➢   USD $8,646,000,000.00 in basic damages (the "Remediation Award");

➢   an additional USD $8,646,000,000.00 in punitive damages (the "Punitive Damages Award"); and

➢   an additional amount equal to ten percent (10%) of the Remediation Award (the "10% Award")

On January 3, 2012, the intermediate appellate court issued its order affirming the Judgment in its entirety. On November 13, 2013, Ecuador's National Court of Justice unanimously affirmed the liability portion of the judgment, but removed the punitive damages award. Chevron has one further and limited appeal pending before Ecuador's Constitutional Court that does not stop the enforceability of the Judgment now, since Chevron failed to request for and post a bond – the only way that such enforceability can be suspended.

4.   ENFORCEMENT OF ECUADOR JUDGMENT IN CANADA.

On May 30, 2012, the Ecuadorian claimants filed an action to seize Chevron's assets in Canada (estimated to be worth roughly $15 billion) to satisfy the entirety of the Ecuador judgment. Chevron tried to block the action, largely by claiming the Ecuadorians could not establish jurisdiction given that Chevron's assets in Canada were held by a wholly-owned subsidiary. On December 17, 2013, the Ontario Court of Appeal unanimously rejected Chevron's arguments and ruled in a 3-0 decision that the villagers could proceed with their enforcement action. Chevron appealed to Canada's Supreme Court. On September 4, 2015, Canada's Supreme Court ruled unanimously in favor of the Ecuadorians in a 7-0 decision. In all, the Ecuadorians have swept each of the ten appellate judges in Canada to rule on the jurisdictional aspects of the case; the same holds for all eight Ecuadorian appellate judges to rule on the merits of the case. The villagers now have an 18-0 record in Ecuador and Canada among appellate judges.

Armed with the unanimous Supreme Court ruling on jurisdiction, the Ecuadorians forced Chevron in October 2015 to file a written defense in the trial court in the Ontario Superior Court of Justice in Toronto. The villagers subsequently filed a motion to strike Chevron's defenses to

2

JVM 002164

the enforcement action on the grounds they were already litigated and resolved in the company's preferred forum of Ecuador, where the underlying trial was held. Chevron filed a motion again raising its largely repetitive jurisdictional arguments. A hearing on the motions is scheduled for September 12, 2016. If the Canada trial court rules in favor of the villagers and strikes most or all of Chevron's defenses, the enforcement action will be scaled back considerably and the time frame to a final resolution likely will accelerate.

If there is no settlement and the villagers prevail in their recognition action in Canada, Chevron will have a right to appeal the decision the Ontario Court of Appeal and ultimately to Canada's Supreme Court. Interest on the Ecuadorian judgment in Canada is running at 3% per annum, or approximately $275 million annually.

## 5.   RELATED LITIGATION – U.S.

On February 1, 2011, Chevron filed a civil action in the SDNY against the Claimants, certain of Ecuadoran and U.S. counsel, and other advisors to the Claimants. In its complaint, Chevron alleged, among other things, that the defendants named in this civil action violated the Racketeer Influenced and Corrupt Organizations Act (RICO), by committing what Chevron tried to characterize as "fraud" and "extortion" (e.g. "fraudulently" pursuing claims the defendants "knew" to be meritless and "extorting" Chevron though public pressure into paying a settlement). Count 9 of Chevron's RICO complaint requested a declaratory judgment that any judgment from the Ecuadorian trial court be rendered unenforceable because of inherent fraud in the Ecuadorian judicial system. In February 2011, Judge Kaplan of the Southern District of New York, without any supporting precedent, granted Chevron's request for a preliminary injunction (the "Preliminary Injunction") that purported to bar enforcement of the Judgment anywhere in the world, pending the outcome of the RICO proceeding. Information later emerged that Judge Kaplan held undisclosed investments in Chevron while making this and other rulings in the case.

The defendants appealed and on September 19, 2011 – the first day after oral argument -- the Second Circuit issued a summary order vacating the Preliminary Injunction in its entirety. On January 26, 2012, the Second Circuit issued its written opinion dismissing the Preliminary Injunction and the claim for declaratory relief under Count 9 in its entirety on grounds that a court's power to determine the enforceability of a foreign judgment could only be exercised when a plaintiff-creditor had sought enforcement under its recognition laws and not as an affirmative lever to bar recognition actions in its courts and, much less, around the world. Notably, the Second Circuit ruling stated that the "[Claimants] hold a judgment from an Ecuadorian court. They may seek to enforce that judgment in any country in the world where Chevron has assets." In addition, it should be noted that the Ecuadorian appellate court specifically confirmed that it had considered and rejected all of Chevron's claims regarding fraud by the Claimants.

After the Preliminary Injunction was reversed on appeal, Judge Kaplan allowed Chevron to continue to pursue its civil RICO claims. During a trial in late 2013, Judge Kaplan openly disparaged the Ecuadorians and their counsel, denied the villagers and their counsel a jury, and refused to consider any of the voluminous evidence of environmental contamination relied on by Ecuador's courts to find Chevron liable. He also allowed Chevron to pay $2 million to a fact witness who claimed, without any credible corroborating evidence and after 53 days of coaching by Chevron's lawyers, that certain of the defendants offered a bribe to the Ecuador trial judge in exchange for ghostwriting a favorable judgment. (The allegations already had been rejected by Ecuador's Supreme Court.) On March 4, 2014, Judge Kaplan found the defendants liable for the RICO violations and imposed an order prohibiting them from enforcing their judgment in the United States or collecting it anywhere in the world. That decision is currently under appeal to the same court that previously reversed Judge Kaplan's preliminary injunction ruling. The Kaplan decision has no dispositive impact on any enforcement action in Canada or other jurisdictions, as affirmed by the actions of the appellate

3

JVM 002165

courts (including the country's Supreme Court) as explained above.

Subsequent to the RICO decision, and while the appeal was pending, Chevron suffered two significant setbacks that we believe have caused the factual predicate of its claims to unravel. First, Chevron's main witness in the RICO case (Alberto Guerra) to whom it had paid $2 million recanted key portions of his testimony related to the bribery allegation and admitted he had lied on the stand. Second, a computer forensic analysis ordered by a separate international arbitration panel hearing a dispute between Chevron and Ecuador's government (described below) concluded that the trial court judgment had in fact been authored by the trial judge, and had not been ghostwritten as Chevron had alleged and Judge Kaplan had concluded. In fact, this analysis found that the trial judge opened and saved a draft document on his office computer that became the judgment at least 480 times. These developments have been brought to the attention of the appellate court hearing the appeal of Judge Kaplan's decision.

The U.S. Supreme Court also dealt a severe blow to Chevron's prospects in the RICO matter when it ruled in June 2016 to severely restrict the application of the law. This is another factor that we believe has a negative impact on Chevron's prospects in this aspect of the litigation. (See here for background on this court decision.)

6.    RELATED LITIGATION – INTERNATIONAL ARBITRATION.

In September 2009, Chevron sued the Republic of Ecuador ("ROE") under Ecuador's Bilateral Investment Treaty (BIT) with the United States, which permits private, commercial arbitration between investors and host country governments. Chevron's claims revolve primarily around a series of settlement and release agreements with Ecuador, which Chevron argues relieve it from liability for environmental impact arising out of its activities in Ecuador, including liability for any judgment rendered in the Lago Agrio case. Alternatively, Chevron asserts that the releases require the ROE to indemnify it for any sums collected against Chevron in any Lago Agrio judgment.

During the BIT proceedings, the arbitration panel has issued "interim orders" and "interim awards" purporting to order the ROE to use all measures necessary to enjoin all enforcement of any judgment against Chevron in the Lago Agrio case. The ROE has argued that Ecuadoran constitutional separation of powers principles prevent the executive branch of government from interfering in any way with the judicial process, in particular on behalf of any particular litigant, and that, accordingly, the ROE has very few measures "at its disposal." Accordingly, the ROE has taken the position that it has complied with the interim orders and award, while simultaneously arguing that such ruling are inappropriate, unnecessary and beyond the scope of the BIT arbitrators' power and, as such, should be vacated.

In addition, the Ecuadorian appellate court has ruled on more than one occasion that neither it nor any Ecuadoran court can give effect to any act by the BIT tribunal or by any international tribunal that would have the effect of undermining fundamental human rights guaranteed by Ecuador's Constitution and by international law. Ecuador's courts also have noted that the Lago Agrio case involved citizens exercising their fundamental rights to judicial access and protection, and that any pro-investment principle of commercial rights could not trump those rights and was inapplicable in the context of this case.

The Claimants agree with the ROE and more broadly assert that the BIT proceedings themselves have no application to their claims against Chevron and that any orders emanating from the BIT proceedings will have no binding effect on Claimants or their right to enforcement of the Judgment in or outside Ecuador. The Claimants are not allowed under the BIT system to participate in the state-investor private arbitration, and the ROE is not a party to the Lago Agrio litigation. A recent legal brief on the arbitration is here and an article on this issue is here.

4

JVM 002166

## KEY LEGAL DECISIONS, LEGAL BRIEFS

Ecuador Supreme Court decision affirming judgment against Chevron:
http://chevrontoxico.com/assets/docs/2013-11-12-supreme-court-ecuador-decision-english.pdf

Canada Supreme Court decision affirming right to enforcement:
http://chevrontoxico.com/assets/docs/2015-09-04-chevron-v-yaiguaje-canada-decision.pdf

Ontario Court of Appeal decision affirming right to enforcement:
http://stevendonziger.com/wp-content/uploads/2013/12/Ontario-appeals-reversal-121713.pdf

Motion by Villagers to Strike Chevron Defenses in Canada:
http://chevrontoxico.com/assets/docs/2016-01-20-factum-of-the-respondents-plaintiffs.pdf

Arbitration proceeding – key legal brief of Ecuador government:
http://chevrontoxico.com/assets/docs/2015-03-17-roe-3rd-supp-rejoinder.pdf

Appeal of Judge Kaplan's Decision in RICO Case by Counsel:
http://guptawessler.com/wp-content/uploads/2012/05/CA2-brief-corrections-RC4.pdf

Appeal of RICO decision by Ecuadorian villagers:
http://guptawessler.com/wp-content/uploads/2014/01/LAP-Brief.pdf

## KEY MEDIA ON LITIGATION

Further general background, videos and materials related to the case can be found at www.chevrontoxico.com and in numerous media articles, including:

*60 Minutes* segment, 2009: https://www.youtube.com/watch?v=UGG1nIwxNhs

*Vanity Fair*: http://www.vanityfair.com/news/2007/05/texaco200705

Video of Chevron defrauding Ecuador court:
http://amazonwatch.org/news/2015/0408-the-chevron-tapes

New York Times on Canada enforcement action:
http://www.nytimes.com/2015/09/05/business/international/court-says-chevron-can-be-pursued-in-canada-over-ecuadorean-damage.html

Chevron Faces Major Difficulties in Canada:
http://www.csrwire.com/press_releases/38268-Chevron-Facing-Major-New-Difficulties-In-Ecuador-Pollution-Case-After-Losing-Before-Canada-Supreme-Court

Chevron Faces Potential "Litigation Catastrophe" in 2016:
http://www.csrwire.com/press_releases/38590-In-2016-Chevron-Faces-Potential-Litigation-Catastrophe-Over-Ecuador-Pollution-Liability

Profile of Alan Lenczner, Canadian counsel:
http://business.financialpost.com/legal-post/meet-alan-lenczner-the-man-fighting-for-ecuadorean-villagers-in-their-canadian-case-against-chevron

##

JVM 002167

**SA68**

July 2016
INQUIRIES:
Steven Donziger and Joshua Rizack
sdonziger@donzigerandassociates.com/9175662526
jrizack@therisinggroup.com/203-246-2639

JVM 002168

| | |
|---|---|
| **From:** | Bill Twist <brtwist@gmail.com> on behalf of Bill Twist |
| **Sent:** | Wednesday, August 3, 2016 4:15 AM |
| **To:** | John van Merkensteijn |
| **Subject:** | Re: New draft agreement |
| | |
| **Categories:** | KFLaw |

A. Steven says to use the new document if we want. Put our terms and MFN clause in. He says there is some push back on the MFN clause because it requires a lot of admin work if they have to go back to investors and get amendments signed and distribute to us and the other two investors all of the documentation for the new deal. But he said for us to put it in and then his lawyers will comment.

B. I talked to him about the three points and more:

1. timing - 5 to 10 years vs 3 to 4. He gets the point about it has already taken nearly three years and he says it is just a good conservative analysis by Gregory. He says look it could be even less than three years if settlement talks arise and it could be never. Obviously no one knows.

2. The corporate/wholly owned sub issue - he is aware that the Canadian court specifically did not rule on the issue. He also knows there are no prior rulings on point. He feels that from the standpoint of equity and public sympathy for the plight of the victims Chevron will not be able to hide behind this defense in Canada. Alan thinks the same. Who knows. I know what I think the right answer is here.

3. Forensic evidence of fraud. He says yes there were passages in some work papers that were identical to ruling in Ecuador. He said that was not unusual and in Ecuador maybe more than in US courts, judges use parts of submissions of both parties in writing their opinion. And this didn't appear to present a problem to the Ecuadorian courts. (I know this is contradictory to Gregory's statement that in the US if this happened there would be an immediate rejection of the ruling and criminal charges filed). He feels confident in Canada when all of the evidence can be submitted and Guerra testimony is challenged that there will not be a finding of corruption and fraud.

4. Arbitration hearing - he thinks isn't going to make any difference. If there is a ruling that the arbitration panel says that Chevron is not liable on the diffuse versus personal claims, Canada won't care. It's an arbitration panel ruling and the claimants aren't even parties to the arbitration. What it will mean is that Chevron will then sue Ecuador for recovery of its loss. Steven thought that would be ironic. It would amount to a tax payer bailout of Chevron. Also he imagined the populist outrage at another example of how NAFTA, the TPP and other trade agreements are rigged in favor of corporations and against people every where. Here would be an appointed panel of three anonymous people can make a ruling that trumps the laws of some foreign country to the disadvantage of its citizens and to the advantage of increasingly unaccountable corporations. Doesn't mean it won't happen but Steven thinks it won't affect Canadian courts.

This still obviously isn't conclusive. I will only be with Steven for a little while in the morning. I'd like to call at 8:30am when you are in the car. We can talk just for a moment. There may be another time tomorrow night at around 10pm your time.

Bill

JVM 004911

On Aug 2, 2016, at 5:01 PM, John van Merkensteijn <jhvm@rossteq.com> wrote:

I think you and I are in the same place
best thing might be to have him proceed to get approval
and then use the trip to have some time to talk about the issues
and see what you feel when you come back
I will do this if you do but if you decide not to do this
I will not either

if you call me in the morning I doubt I will have any new insights

I want to do this and am concerned about the issues tagged by Kaye Scholer's
preliminary review


John H. van Merkensteijn III
Managing Director
Rossi Technology LLC
60 Riverside Boulevard
Suite 2101
New York, NY. 10069
Phone (212) 769-4055
jhvm@rossteq.com


**From:** Bill Twist <brtwist@gmail.com>
**Date:** Tuesday, August 2, 2016 at 7:29 PM
**To:** John van Merkensteijn <jhvm@rossteq.com>
**Subject:** Re: New draft agreement

I haven't seen Steven yet and might not see him tonight. We are scheduled to meet at 7am
tomorrow for breakfast.  I saw that he wanted to check in with you tonight or in the morning. He
won't be meeting with his clients until later in the morning so maybe he and I talk first and then
we try to call you. I suggest that we call you at 7:30 our time, 8:30am your time.
Bill

On Aug 2, 2016, at 2:48 PM, John van Merkensteijn <jhvm@rossteq.com> wrote:

THANKS

Tried to call

I am at 212 769 4055

Just to be clear -----

JVM 004912

the insertion of the Canadian Law Firm and the effort to not be visible has nothing to do with money laundering

it is taking some precaution against the possibility that Chevron would attempt to continue its scorched earth

policy against investors—so better to not be visible to them.  For the same reason I thnk it best of we each

invest in the financing from an LLC to be formed

best

JHvMIII

John H. van Merkensteijn III
Managing Director
Rossi Technology LLC
60 Riverside Boulevard
Suite 2101
New York, NY. 10069
Phone (212) 769-4055
jhvm@rossteq.com

---

**From:** Derek Stoldt <Derek.Stoldt@kayescholer.com>
**Date:** Tuesday, August 2, 2016 at 4:46 PM
**To:** John van Merkensteijn <jhvm@rossteq.com>
**Cc:** Gregory Wallance <Gregory.Wallance@kayescholer.com>, Michael Ben-Jacob <Michael.Ben-Jacob@kayescholer.com>
**Subject:** New draft agreement

John,

As we discussed this morning, I've used the draft agreement you provided to me last evening as a new base and included provisions such as the MFN and Follow-on Investment Right from the prior draft, as we as some drafting improvements from my prior draft.

This draft does include the escrow/confidentiality arrangements from the prior agreement.  They seem to be those used with George Crossman from the prior investor.  Is that your understand?  As discussed with George, these provisions are of very little utility since he immediately turns over the funds once received.  According to George, the only benefit to this arrangement was an effort to hide the identity of the Funder from Chevron.  All in all, it is a very odd arrangement and gives me some pause, especially in light of the discussion with Greg this morning.   There is some part of this that feels like the steps people may take when they are laundering money.  It does give me some pause.

Following up on our conversation with Greg, I am not sure there is much we can do in this agreement to mitigate any fraud that might be involved.  If Steve Donziger is as bad as Judge Kaplan and the Forbes opinion article say he is, you

JVM 004913

simply may never see this money again.  I am not sure I can write a provision to
stop that.

Please review the attached (there are a number of questions for you in
footnotes) and let's please discuss once you have done so.

Thanks,
Derek


Derek Stoldt
Kaye Scholer LLP
250 West 55th Street | New York, New York 10019-9710
T: (212) 836-8032 | F: (212) 836-6532
Derek.Stoldt@kayescholer.com | www.kayescholer.com

This message may contain confidential and/or legally privileged information from the law firm
Kaye Scholer LLP. If delivered to anyone other than the intended recipient, please notify the
sender immediately by return email or by telephone (212) 836-8032 and delete the message,
along with any attachments, from your computer. Thank you.

JVM 004914

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,                                    :

            Plaintiff,                                    :

          v.                                    :    11 Civ. 0691 (LAK)

STEVEN DONZIGER, et al.,                                    :

            Defendants.                                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF JOHN A. SLAVEK IN SUPPORT OF**
**CHEVRON CORPORATION'S**
**MOTION TO HOLD STEVEN DONZIGER IN CONTEMPT OF COURT**
**FOR HIS FAILURE TO COMPLY WITH THE RICO AND DEFAULT JUDGMENTS**
**AND THE APRIL 16, 2018 RESTRAINING NOTICE**

I, JOHN A. SLAVEK, hereby declare under penalty of perjury pursuant to 28 U.S.C.

§ 1746, that the following is true and correct:

**Background**

1.      I am a Managing Director of Business Intelligence and Investigations at Kroll.  I

have been a Certified Public Accountant for approximately 22 years.  I make this declaration in

support of Chevron Corporation's ("Chevron") Motion to Hold Steven Donziger in Contempt of

Court for His Failure to Comply with the Rico and Default Judgments and the April 16, 2018

Restraining Notice.

2.      Since joining Kroll in 1998, I have assisted clients in assessing a wide range of

finance and accounting issues, including corporate fraud, embezzlement, business income losses,

bankruptcy, contractual disputes, and internal control evaluation.  I have testified in judicial

proceedings on numerous issues involving fraudulent financial reporting, improper accounting,

lost profits, piercing the corporate veil, and violations of a non-compete agreement.

3.      My previous accounting experience includes working for four years as a forensic financial investigator and auditor at KPMG.  As an auditor, my engagements included various financial institutions, healthcare entities, manufacturers, retailers, and distributors.  I also previously worked as the Manager of Financial Reporting and Analysis for Admiral Insurance, a property and casualty insurance company.

4.      I provided a Declaration of John Slavek in Support of Chevron Corporation's Supplemental Brief Regarding the Contempt Implications of Donziger's Retention Agreements and Other Agreements Among Entities with Interests in the Ecuadorian Judgment on July 24, 2018.  Since providing that declaration, I have received and reviewed an extensive amount of additional source materials.

**Documents Reviewed and Relied Upon and Donziger-Related Bank Accounts and Investors Identified**

5.      Document productions from eight different sources were reviewed and relied upon throughout the course of these analyses, as shown below.

| # | Source | Bates # Prefix |
|---|--------|----------------|
| 1 | TD Bank | TD BANK 000… |
| 2 | Chase Bank | CHASEPJD000… and DONZ00… |
| 3 | Josh Rizack | JRIZACK000… |
| 4 | Mary Katherine Sullivan | MKS0000… |
| 5 | American Express | AMEX000... |
| 6 | JV Merkensteijn | JVM00… |
| 7 | BBVA Compass | BBVA Compass-000 |
| 8 | Bank of America | BANA_ 0… |

The transcript of June 27, 2018 deposition of Josh Rizack was also reviewed.

6.    **Donziger Bank Accounts**:  During the course of these analyses, we identified a total of 16 bank accounts held in the name of Steven Donziger ("Donziger") or his law firm, Donziger and Associates PLLC.  At Chase, there were seven accounts identified and at TD Bank there were eight accounts identified (the "Donziger TD Bank Accounts").  Donziger also had an account at BBVA Compass Bank in Jacksonville, Florida.  A list of these accounts, last known opened or closed status, and first and last activity dates is attached here as Exhibit 1.  I reviewed Donziger's June 15, 2018 discovery response in which he states: "My bank accounts are as follows: TD Bank x8174; TD Premier Checking x8132; TD Relationship Checking x3420; TD Business Premier Checking x8783; and TD Select Savings x9857. A printout from the TD Bank website reflecting the current status of these accounts is attached. I hereby attest that these are the only bank accounts I presently use and the only bank accounts I have used since March 4, 2014."[1] Based on my analyses of the documents produced by TD Bank and BBVA Compass, this last statement is false.

7.    During this time frame, Donziger had at least four other bank accounts, including the following:

- TD Bank Personal Relationship Savings **2388 which had a $4,513.95 balance on March 4, 2014 and a balance of $4,515.43 when it was closed on July 9, 2014.

- TD Bank Personal Relationship Checking **2265 which had a $56,602.63 balance on March 4, 2014. This account had its highest ending monthly balance of $421,831.98 on September 11, 2014 before being closed on December 27, 2016.

---

[1] The underlined portion of the last sentence was underlined on Donziger's June 15, 2018 discovery response.

- TD Bank Personal Relationship Savings **6418 which was opened with deposits totaling $312,236.41 on June 25, 2015.  This account had its highest ending monthly balance of $312,765.55 on October 31, 2015 before being closed on April 23, 2018.

- BBVA Compass account **9997 which had a $15,957.87 balance on March 4, 2014 and a $115,306.41 balance that was transferred to Donziger's TD Personal Savings **6418 when this BBVA Compass account was closed on June 25, 2015.

8.      Two of the accounts that Donziger failed to disclose in his discovery response historically have contained the large majority of the total funds in his bank accounts, whereas the accounts he did disclose historically have contained relatively little of the total funds in his accounts.  Personal Savings Account **6418 and Personal Checking Account **2265 had the two highest monthly average balances at $134,359,86 and $110,695.03, respectively, for the months they were open during the period from December 2012 through June 2018.  Business Checking Account **8174 had the next highest monthly average at $96,697.51; however, it was only opened for two months during the period (May and June 2018) and had one large deposit of $342,045.16 that accounted for this average. The other five accounts had average monthly balances ranging from $13,646.17 to $52,629.52 for the months they were open during the period from December 2012 through June 2018.

9.      In addition, in or about late 2017, Donziger entered into a business relationship with Streamline Family Office Inc. ("Streamline").  [MKS0001264] Based on documentation reviewed in this matter, Mary Katherine Sullivan is the President of Streamline.  [MKS-0006383] On or about December 22, 2017, Sullivan opened a Business Advantage Checking account at the Bank of America under the name "Streamline Family Office Inc. DBA CWP ASSOCIATES" (the "CWP Account") with an initial deposit of $100.00. [MKS-0006473-475] I have assumed for

purposes of this analysis that this account was also controlled by Donziger. For the purposes of

these analyses, I thus refer to the following accounts as the "Donziger Bank Accounts":

| TD Bank Accounts | Chase Bank Accounts |
|---|---|
| Personal Relationship Savings **2388 | Personal Select Checking w/Interest **5365 |
| Personal Relationship Checking **2265 | Business Classic Checking **0218 |
| Personal Relationship Savings **6418 | Business IOLTA Account **9822 |
| Personal Relationship Checking **3420 | Personal Private Client Checking **5678 |
| Personal Select Savings **9857 | Business Classic w/Interest **2758 |
| Personal Premier Checking **8132 | Business IOLTA Trust Account 2 **0989 |
| Business Premier Checking **8783 | Personal Private Client Savings **9890 |
| Business Convenience Plus Checking **8174 | |

| Other Accounts | |
|---|---|
| Steven Donziger; P Campbell Ford, BBVA Compass Bank<br>Business Advantage Checking ***9158 | |
| Streamline Family Office Inc. DBA CWP Associates, Bank of America<br>Built-to-Order Checking ***9997 | |

Donziger may also have other accounts of which we are unaware which are, of course, excluded

from these analyses.

10.     **Post RICO Investing Agreements Reviewed**: In connection with these analyses,

I reviewed 12 partial and fully executed agreements dated between January 22, 2016 and January

2, 2018 which, per their terms, provided investors with an interest in the Ecuadorian judgment in

exchange for a cash investment. Attached hereto as Exhibit 2 is a schedule of these investor

agreements with the investor, date of the agreement, amount invested, and equity interest received

per the terms of the agreements indicated. I have also reviewed documents indicating that one of

these investments, the January 2, 2018 Agreement signed only by Glenn Krevlin [MKS-0000594-

595] may have been a conversion of loans previously made to Donziger to equity interests in the

Ecuadorian judgment [MKS-0001769], but this conversion is not reflected on the face of the

investment agreements and I have not been provided with any related loan documents. For the

purposes of these analyses, the investors shown on the investment agreements summarized on Exhibit 2 are referred to here as "Investors."

## Questions Presented

11.     I was asked by counsel for Chevron to provide the following analyses and answer the following questions:

- Provide an analysis of all Investor payments transferred into the Donziger Bank Accounts after January 1, 2016.

- What is the total amount of Investor transfers to Donziger Bank Accounts after January 1, 2016?

- What percentage of funds received in Donziger Bank Accounts after January 1, 2016 came from Investors?

- What is the total amount of Investor transfers to Donziger Bank Accounts since August 2004, and what are the sources of those transfers?

- Provide an analysis to determine how the Investor payments were maintained, transferred, and disbursed by and between all Donziger Bank Accounts since the entry of the RICO judgment.

- Provide an analysis of Donziger's uses of Investor monies since the entry of the RICO judgment.   Provide an analysis of whether and to what extent Investor monies were commingled with Donziger's personal funds by Donziger.

- Do the documents produced by Joshua Rizack accurately depict the funds received and disbursed via the Donziger Bank Accounts and do any of his analyses conform with commonly accepted accounting practices?

### Analyses of Deposits into and Transfers between the Donziger Bank Accounts
### Description of Attached Analyses

12.      I have prepared five analyses, Exhibits 3-A and 3-B, and 4-A through 4-C, in order to analyze the deposits into and transfers between the various Donziger Bank Accounts beginning with the initial post-RICO Investor payment in January 2016.  Since January 1, 2016 and through June 30, 2018 there was a total of $1,315,973.31 in deposits from external sources into the Donziger Bank Accounts.  As shown on Exhibit 3-A, George Waters deposited $150,000 directly into Donziger's accounts in three separate deposits.

13.      Deposits into the Donziger Bank Accounts also came from seven additional Investors.  However, these Investors directly deposited funds in accounts that are not apparently within Donziger's control—including accounts owned by Lenczner Slaght Royce Smith Griffin LLP ("Lenczner Slaght") —and then the owners of those accounts transferred the funds to Donziger.

14.      As shown on Exhibit 2, five Investors (Glenn Krevlin, Cliff Eisler, WDIS Finance LLC/John van Merkensteijn, Wellbeck Partners/Jay L. Goldstein, and Indigenous People Limited/Ian Watson) signed investment agreements that included Lenczner Slaght as a party or party and escrow agent to the agreement.  These agreements totaled $1,417,500.00 after the deduction of certain fees.  Related wire transfers from Lenczner Slaght totaling $625,940.00 were deposited into Donziger's TD Business Account **8783 between May 2016 and February 2017 (Refer to Exhibits 2 and 3-A).  The balance of $791,500.00 remained with Lenczner Slaght.[2]

15.      Donziger also received Investor monies via the CWP Account.  The only three external deposits into the CWP Account came from three Investors for a total of $750,000, as follows:

---

[2] The $60.00 difference is due to the $10.00 wire transfer fees for each of the six deposits into Donziger's account.

    a.  Antony Abbiati $250,000.00 on January 2, 2018;

    b.  James McCaffrey $250,000.00 on January 5, 2018; and

    c.  Glenn J. Krevlin $250,000.00 on January 18, 2018.

16.    A portion of this $750,000.00 total was used to pay for Donziger-related expenses out of the CWP Account (as shown on Exhibit 6). Excluding Donziger, who received $467,045.16 of this $750,000.00 in his accounts, the highest total paid out of the CWP Account was the $106,581.71 to Peter Grant. The next two highest totals were $41,151.66 to the University of Calgary for "the full contract amount for the Banff center" for a November 2018 "Indigenous Solutions for Environmental Catastrophe" conference [MKS-0001549] (where Donziger and Aaron Marr Page are scheduled to speak) and $23,904.19 in payments on Donziger's American Express cards. As shown on Exhibit 8, seven out of the remaining thirteen known payees in the CWP Account also received payments out of Donziger's TD Bank Accounts, including Anton Tabuns, Forum Nobis, and the Frente De Defensa De La Amazonia. In addition, the previously noted $467,045.16 out of this $750,000.00 was transferred to the Donziger Bank Accounts in four transactions.

17.    Three of the four transactions transferring funds from CWP to Donziger were direct transfers from the CWP Account to Donziger TD accounts of (1) $25,000.00 on January 30, 2018, (2) $25,000.00 on February 2, 2018, and (3) $75,000.00 on March 13, 2018. A fourth deposit for $342,045.16 was received into Donziger's personal account **8132 on May 8, 2018.

18.    However, this last amount was not transferred directly from the CWP Account, but rather, it was first routed through the firm Forum Nobis PLLC ("Forum Nobis") and its Managing Attorney, Aaron Marr Page. The transaction was initiated with two cashier's checks from the CWP Account which totaled $342,045.16. Both checks were dated May 3, 2018 and included

directions to "Pay To The Order Of AARON MARR PAGE FBO FDA."  [See Exhibit MKS-0021203]

19.     Five days later, on May 8, 2018, a wire transfer in the amount of $342,045.16 from Forum Nobis was received in one of Donziger's personal checking accounts (**8132) at TD Bank. As further explained below, two days later $50,000.00 from those funds were wired transferred back to Forum Nobis from a Donziger account.

20.     On May 10, 2018, Donziger opened a new business checking account at TD Bank (**8174). The opening deposit into this account was a transfer of the $342,045.16 from his personal checking account (**8132).  [See Exhibit TD BANK 0000659]

21.     On that same date, May 10, 2018, Donziger transferred a total of $210,000 out of this new checking account via the following three transactions [also on Exhibit TD BANK 0000659]:

> a. a $50,000.00 wire transfer to Forum Nobis;
>
> b. a $35,000.00 withdrawal transfer back to personal checking account (**8132); and
>
> c. a $125,000.00 withdrawal transfer to another Donziger TD business checking account (**8783).

22.     The total deposits of Investors' funds into the Donziger TD Bank Accounts, directly and through Lenczner Slaght, CWP Associates, and Forum Nobis, equals $1,242,985.16.  As shown on Exhibit 3-A, this represents 94.5 percent of the total $1,315,973.31 deposits into the Donziger TD Bank Accounts from external sources for the period from January 1, 2016 through June 30, 2018.  Deposits into the Donziger TD Bank Accounts from other external sources other than investors during this two-and-a-half-year period totaled $72,988.15.

23.     The 13 Investor-related deposits into the Donziger Bank Accounts are shown in chronological order on Exhibit 3-A. As noted on this Exhibit, the first Investor payment, the $50,000.00 from George R. Waters, was deposited into a Donziger personal checking account. The final Investor transaction on this Exhibit, the May 8, 2018 payment of $342,045.16 from Forum Nobis, was also deposited into a Donziger personal checking account. The remaining 11 Investor and Investor-sourced payments were initially deposited into the Donziger & Associates, PLLC business account (**8783).

24.     An additional schedule was prepared in order to quantify the total Investor payments to Donziger's accounts dating back to the initial payments from Kohn Swift & Graf in 2004.[3] As shown on Exhibit 3-B, Donziger has received a total of more than $9.4 million over 14 ½ years based on the available (though incomplete) bank records, with the highest annual totals occurring in 2010 ($2,550,000.00) and 2007 ($1,999,911.36).  No known Investor deposits were made in 2014 or 2015.  We have not had access to any bank accounts out of the U.S. and cannot confirm what other Donziger-controlled bank accounts may have existed during this period.

### Commingling of Accounts

25.     Although 11 of the Investor and Investor-sourced payments were initially deposited into law firm account (**8783), the amounts generally did not remain there long. I have prepared three analyses that show the transfers and related commingling of funds between various Donziger personal and business bank accounts at Exhibits 4-A, 4-B and 4-C.  Each Exhibit shows a series of withdrawals from one of the Donziger Bank Accounts along with the corresponding deposit into another Donziger Bank Account.

---

[3] In addition to Kohn Swift & Graf, the additional Investors included Magister Law, Russ DeLeon, Torvia, Patton Boggs, LLP, Olswang LLP (Woodsford), Orin Kramer, Michael Donziger, and Amazonia Recovery Limited.

10

26.     The transfer history within the TD Bank Accounts beginning at January 1, 2016 is shown on Exhibit 4-A.  Seven different Donziger TD Bank Accounts are shown on this Exhibit. The first five accounts in the column headings are personal checking and savings accounts; the last two are business checking accounts.  This schedule also shows a beginning and average monthly balance for each account, along with a monthly combined total for all seven accounts.

27.     A total of 32 transfers between accounts are shown on Exhibit 4-A, with 10 transfers between personal accounts, one transfer between the two business accounts, one transfer from a personal account to a business account, and 20 transfers from a law firm business account to a Donziger personal account.  In total, more than $1.2 million was transferred between the various accounts over the two-and-a-half years represented on this Exhibit.  The net effect of this analysis shows that the law firm business accounts transferred $510,000.00 to Donziger personal checking and savings accounts between May 13, 2016 and June 4, 2018.  The analysis shows that funds from investors and personal funds were comingled in all seven accounts, and that funds from investors were never kept in a segregated account, but transferred to personal accounts on numerous occasions and used to pay personal expenses.

28.     In order to determine if there is a potential relationship between the timing of the Investor deposits and the transfers, the relevant Investor deposits and four transfers from CWP Associates and Forum Nobis are also shown on Exhibit 4-A.

29.     As previously noted, the $50,000.00 Investor payment from George R. Waters was deposited into a Donziger personal checking account (**2265) January 25, 2016; this was never transferred to a law firm account.

30.     The first Investor payment that is deposited directly into a law firm account (**8783) is the $74,990.00 payment transferred via the Lenczner Slaght account that was received on May 10, 2016.  As shown on Exhibit 4-A, $70,000.00 (93.3 percent of $74,990.00) is then

transferred from the law firm account to a Donziger personal checking account (**2265) three days later, on May 13, 2016.

31.     Two months later the next Investor payment, $104,990.00, again via the Lenczner Slaght account, is deposited directly into the same law firm account (**8783) on July 19, 2016. Again, three days later, on July 22, 2016, $100,000.00 (95.2 percent of $104,990.00) is transferred from the law firm account to a Donziger personal account (**6418).  The $335,000.00 transferred to Donziger's personal checking and savings accounts during the time frame of the Lenczner Slaght transactions represents 53.5 percent of the $625,940.00 transferred to Donziger by Lenczner Slaght.

32.     There were eight Investor payments totaling $725,940.00 that were deposited into a law firm business account between January 1, 2016 and June 30, 2018. Exhibit 4-B shows the 20 transfers from the two law firm accounts to the personal accounts.  As previously noted, a net amount of $510,000.00 was transferred from a law firm account to a Donziger personal account during this two-and-a-half-year period.  Exhibit 4-B also shows the two Investor deposits that went directly into a personal checking account, and one transfer that went from a personal to a law firm account (the $342,045.16 payment from Forum Nobis that was transferred within two days).

33.     The numerous transfers between accounts and the commingling of funds from investors and personal funds also occurred in the Donziger Chase Bank accounts prior to the RICO Judgment.  As shown on Exhibit 4-C, there were 126 transfers between four business accounts (Law Firm, Ecuador Case, DeLeon IOLA, and IOLA Trust) and three personal accounts (one checking and two savings).  In total, almost $6 million was transferred between the various accounts in the less than three years represented on this Exhibit.  The net effect of this analysis shows that the law firm and IOLA business accounts transferred $2,543,024.85 to Donziger personal checking and savings accounts.

34.     There were two additional transfers from Donziger law firm accounts to personal accounts.  When Donziger was shutting down his Chase Bank accounts in late 2012 and early 2013, he transferred $241,131.58 and $24,970.00 from the closed Chase law firm account (**0218) into his personal checking and savings account at TD (**2265 and **2388).  Based on TD Bank account opening records, these TD personal accounts were opened on December 3, 2012. The Chase law firm account was closed in early January 2013 and a TD business account (**8783) was not opened until May 7, 2013.  Thus, it appears that Donziger operated his law firm without a business bank account for three months in early 2013.

35.     The remaining funds in the Donziger Chase Bank accounts were used to fund the opening of two personal accounts at TD Bank.  On December 3, 2012, the Donziger TD savings account (**2388) was opened with an initial deposit of $419,027.71, which was comprised of three withdrawals on the same day from the Donziger Chase accounts, as follows:

      a.   $176,318.59 was withdrawn from the Donziger Personal Savings account (**9890), leaving the account with a zero balance;

      b.   $1,577.54 was withdrawn from the Donziger Personal Checking account (**5365), leaving the account with a zero balance; and

      c.   $241,131.58 was withdrawn from the Donziger Law Firm Checking account (**0218), leaving the account with a balance of $24,970.00.  As noted above, this amount would later be withdrawn on January 7, 2013 and deposited on January 25, 2013 into the Donziger TD Personal Checking account (**2265).

36.     As shown on page 3 of Exhibit 4-C, a total of $443,997.71 in funds, including $266,101.58 from the law firm accounts, were withdrawn from the Donziger Chase accounts and used to fund the opening of the Donziger personal accounts at TD Bank.

**Payments from the Commingled Donziger TD Bank Accounts**

37.      I have prepared three analyses that show summaries of the total payments to each recipient out of the various Donziger personal and business bank accounts at Exhibits 5-A through 5-C.  Exhibit 5-A is for the period when the TD Bank accounts were opened in December 2012 through June 30, 2018. Exhibit 5-B covers the period from January 1, 2016 through June 30, 2018. Exhibit 5-C is a summary of the total payments to each recipient out of the various Donziger personal and business bank accounts for the period preceding the RICO Judgment, from December 2012 through March 4, 2014.

38.      As shown on Exhibit 5-A, a total of $3,110,556.89 was paid out of the Donziger Bank Accounts over the approximate five-and-a-half-year period from December 2012 through June 30, 2018.  The totals by recipient (or payee) are shown in descending order on this Exhibit, with American Express, Laura Miller, and Wells Fargo Home Mortgage as the three payees with the largest totals, having been paid $717,773.89, $399,523.65 ($135,000.00 directly from Donziger's law firm accounts), and $320,795.69, respectively. This Exhibit also quantifies the distribution of payments that were made out of Donziger's personal accounts compared to his law firm business accounts. As shown on Exhibit 5-A, $2,622,890.26 (or 84.3 percent) of the $3,110,556.89 total was paid out of the personal checking and savings accounts, while $487,666.63 was paid out of the two business accounts.

39.      Only six of the 61 payees were paid solely out of the business accounts.  These are: Forum Nobis, PLLC ($50,000.00); Frente De Defensa De La Amazonia ($38,320.00); Rex Weyler ($10,900.97); Gross Law Attorney Trust ($5,000.00); 3BI Media, LLC ($4,600.00); and Ann Corbett ($2,000.00).

40.      The other 55 payees were either paid exclusively from the personal bank accounts or from both the personal and business accounts.  These include Keker & Van Nest ($300,000.00)

14

and Friedman Rubin ($150,000.00) whose payments came just from the personal accounts.  Others include Deepak Gupta, who was paid $100,000.00 from a personal account and another $25,000.00 from a law firm account, and Aaron Page, who received seven payments totaling $82,000.00 from Donziger's personal checking account and six payments totaling $40,000.00 from the Donziger & Associates, PLLC business account.

41.    Exhibit 5-B shows a similar pattern after January 1, 2016, although not quite as extreme.  A total of $1,343,028.57 was paid out of the Donziger TD Bank Accounts over the period from January 1, 2016 through June 30, 2018. This schedule also quantifies the distribution of payments that were made out of Donziger's personal accounts compared to his law firm business accounts at TD Bank. As shown on Exhibit 5-B, $862,401.94 (or 64.2 percent) of the $1,343,028.57 total was paid out of the personal checking and savings accounts, while $480,626.63 was paid out of the two business accounts.

42.    A third analysis was undertaken which revealed that very little was paid out of the business accounts during the stub period between the closing of the Chase law firm account in January 2013 and the March 4, 2014 RICO Judgment date. As shown on Exhibit 5-C, while there was a total of $1,359,357.04 in payments during this period, only $8,000.00 was paid out of the business accounts.  This was comprised of two payments, one for $5,000.00 to Gross Law Attorney Trust on August 1, 2013 and a second for $3,000.00 to Anton Tabuns on August 2, 2013.

**Payments on Behalf of Donziger from the CWP Associates Bank Account**

43.    As previously noted, $750,000.00 in Investor moneys was initially deposited into the CWP Associates bank account and a total of $467,045.16 out of this $750,000.00 was transferred to the Donziger Bank Accounts.  The use of the balance of $282,954.84 is shown on Exhibit 6.

44.     The recipients of the largest total payments from the CWP Associates account, excluding Donziger, were the Peter Grant Law Firm ($106,581.71), the University of Calgary ($41,151.66 as down payments for a Fall 2018 conference), American Express ($23,904.19), and Anton Tabuns ($20,000.00).

**Donziger American Express and TD Bank Credit Card Charges and Payments**

45.     I have prepared two analyses that show summaries of the total payments to each recipient from Donziger's American Express and TD Bank credit cards at Exhibits 7-A and 7-B. As with the Donziger TD Bank Account transfers and payments, the pattern of these credit card payments confirms the commingling of funds.  As shown, credit card payments are made both from personal and law firm accounts without any discernible distinction regarding the nature of the underlying charges.

46.     As shown on Exhibit 7-A, there were total charges of $189,119.19 and $186,914.10 on Donziger's American Express and TD Bank credit cards, respectively, over the two-and-a-half-year period from January 1, 2016 through June 30, 2018.  The totals by recipient (or payee) are shown in descending order on this Exhibit, with American Airlines ($21,958.86), Gym Precision ($14,040.00), Avianca Ecuador ($13,138.08), Delta Airlines ($12,890.79), and 3BL Media LLC ($11,705.00) as the five payees with the largest totals, having been paid more than $10,000.00 each.  Grouping the payments by category shows that a total of $82,117.87 was spent on Airfare, with the next four largest categories being Hotels ($59,230.80), Fitness/Exercise Equipment ($20,380.00), Meals ($18,168.86), and Internet/Phone ($14,279.61).

47.     Exhibit 7-B shows the same American Express and TD Bank credit card charges broken out by total per month from January 1, 2016 through June 30, 2018.  It also shows related payments on these charges out of the Donziger personal and business and CWP bank accounts. Credit card spending in 2016 was at a higher monthly average than in the following two years with

an average of $15,592.09 per month versus $12,902.38 per month to date in 2018 and $9,292.83 per month in 2017.

### Disposition of the Investor Moneys Deposited into the Donziger Accounts

48.     A reconciliation of the Investor payments to and through the Donziger Bank Accounts is shown below.

|  | Investor Payments to Donziger |  |  | Funds Paid Indirectly to Donziger through CWP Associates were disbursed as follows: |  |
|---|---|---|---|---|---|
| Paid Directly to Donziger | $ | 150,000.00 | Direct Transfers to Donziger from CWP | $ | 125,000.00 |
| Paid Indirectly through Lenczner | | 625,940.00 | To Donziger via Forum Nobis | | 342,045.16 |
| Paid Indirectly through CWP Associates | | 750,000.00 | CWP Payments on Behalf of Donziger | | 282,954.84 |
| **Total Investor Payments to Donziger** | $ | 1,525,940.00 | Paid Indirectly to Donziger | $ | 750,000.00 |

| Reconciliation of the Investor Payments to Donziger |  |  |
|---|---|---|
| Direct from Investors to Donziger Accounts | $ | 150,000.00 |
| Direct Transfers to Donziger from Lenczner | | 625,940.00 |
| Direct Transfers to Donziger from CWP | | 125,000.00 |
| To Donziger via Forum Nobis | | 342,045.16 |
| **Total Investor Amounts to Donziger Accounts** | $ | 1,242,985.16 |
| CWP Payments on Behalf of Donziger | | 282,954.84 |
| **Total Investor Payments to or on Behalf of Donziger** | $ | 1,525,940.00 |

49.     As previously noted, a total of $1,242,985.16 in Investor moneys was deposited into the Donziger Bank Accounts.  The combined opening balances of the Donziger TD Bank Accounts as of January 1, 2016 was $277,152.34.  Based on the calculation below, it appears that the combined ending balances as of June 30, 2018 were approximately $250,097.08, as many of these statements are partially redacted.  This also agrees with our estimated ending balances on Exhibit 4-A.

| Reconciliation of the Beginning and Ending Balances, Investor and Other Deposits, and Total Spend |  |  |  |
|---|---|---|---|
| Beginning Balances in Three Donziger TD Accounts at 1/1/16 | $ | 277,152.34 | |
| Total Investor Amounts to Donziger Accounts Post-1/1/16 | | 1,242,985.16 | |
| Total Other External Deposits to Donziger Accounts Post-1/1/16 | | 72,988.15 | |
| Total Available Cash 1/1/16 - 6/30/18 | $ | 1,593,125.65 | |
| Less: Total 1/1/16 - 6/30/18 Spend per TD Bank Analysis | | (1,343,028.57) | 84.3% |
| Estimated Ending Balances in Five Donziger TD Accounts at 6/30/18 | $ | 250,097.08 | |

50.     As shown on Exhibit 8, I was able to trace the spend for approximately $1,012,065.54, or 81.4 percent of the $1,242,985.16 in Investor deposits into the Donziger TD Bank Accounts between January 2016 and June 2018. The tracing of Investor deposits was complicated by the commingling of money between multiple personal and business accounts.  In addition, my analyses show that a portion of the $342,045.16 Forum Nobis deposit on May 8, 2018 was likely included in the estimated $250,097.08 ending balance for the TD bank accounts, as there was limited spending out of the relevant accounts after the May 8, 2018 deposit.  As such, the analysis in Exhibit 8, which identifies the use of 81.4 percent of the Investor deposits, is conservative in relation to the Total Spend during the period at 84.3 percent of Total Available Cash, as noted above.

51.     Our methodology and other assumptions for this analysis included the following:

a. Current account balances at the time that Investor deposits and transfers were deposited into individual bank accounts were factored into our calculations. The funds were considered "spent" up until the point that a close approximation of these balances still remained, or another deposit or transfer was made into the account.

b. After another Investor deposit or related transfer was made into an individual account, the "spending" calculation process would begin again.

c. Money is fungible or interchangeable. However, as the Investor payments comprised 94.5 percent of the total deposits into Donziger's TD bank accounts, I believe that our analyses capture a fairly accurate presentation of how the Investor funds were spent.

d. All of the moneys deposited into the CWP Associates bank account came from three Investors, except for an initial $100.00 opening deposit.  Given this fact, we

can be certain that all but $100 in this account was spent as we have calculated and shown on Exhibit 6.

52.     The three largest payees of the Donziger Bank Accounts were Laura Miller ($297,000.00), TD Bank ($160,021.89 primarily in TD credit card payments), and Peter Grant Law Group ($106,581.71). In addition to the $297,000.00 paid to Laura Miller, she incurred $54,037.01 in American Express charges during 2016 that was also paid for out of the Donziger Bank Accounts.  Payments from the Peter Grant Law Group came fully from the CWP account.

53.     These analyses again demonstrate that the Investor moneys were commingled within both the business and personal Donziger Bank Accounts and were used without regard to maintaining accurate business records as 53.5 percent of the total $1,012,065.54 in Investor deposits traced through the TD Bank accounts was spent out of the personal accounts.  If the funds had been deposited and maintained in strictly business accounts (as they appear to have been in the CWP Account), the tracing exercise would have been much more straightforward.

**Review of Josh Rizack Financial Records**

54.     I have analyzed the financial and accounting records prepared and/or maintained by Josh Rizack that were provided in the aforementioned Rizack production.  Rizack ostensibly served as Donziger's personal bookkeeper and financial consultant and was apparently the person responsible for documenting and tracking how funds received and disbursed by Donziger were accounted for. The Rizack production consisted mostly of various Excel files and scanned PDF's. My review of these files identified numerous inconsistencies, poor record-keeping, and an apparent overall absence of compliance with even rudimentary accounting and bookkeeping principles. Below are examples of issues and errors identified during my analysis of the files in the Rizack production.

55.     In a schedule titled "Historic Payments ($)" (JRIZACK0000018), Rizack notes that Donziger received approximately $4.8 million from July 2007 through January 2013. However, another schedule produced by Rizack differs completely. In the Excel file named "Final Steven Acct 2007-2016 (2.2.17)" and contained within an Excel worksheet titled "Summary 2007-2016", Rizack shows that Donziger's fees over the same period were approximately $2.4 million, a discrepancy of $2.4 million. Both schedules fail to adequately explain how Rizack was able to arrive at the $4.8 and $2.4 million amounts and why these amounts were different.

56.     All of Rizack's schedules were prepared with Microsoft Excel; however, he appeared to only have a basic understanding of the program (at best), as his files and worksheets had numerous errors, inconsistencies, and inefficiencies.

57.     One such example is included in the previously referenced "Final Steven Acct 2007-2016 (2.2.17).xlsx" file.  One of the worksheets in this file is titled "Atty Checking" which appears to list all activity for multiple Donziger Chase Law Firm accounts from March 2007 to July 2011.  However, there is no indication which account any given line item is linked to.

58.     At the top right of this schedule (in Cell I5) is a summary of credits and debits for 2010.  The formula used to total the credits and debits for 2010 is a SUM across the range (C153:C290).  The range includes all the line items for 2010, but also the subtotal for 2010, causing the 2010 total to be 4,600,306.00 rather than the actual sum of 2,300,153.00 for the line items recorded. (See Exhibit screen shots from "Final Steven Acct 2007-2016 (2.2.17)", pages 1 and 2.)

59.     The formula used to total the credits and debits for 2011 is also a SUM across a specified range.  The range specified here, however, omits the first line item and the last two line items, causing the totals to be lower than if all line items were accurately included.

60.     In general terms, Rizack's files lacked consistency and organization.  Financial records appeared to be prepared for ad hoc purposes and there were no uniform year-over-year

analyses.  There was also a clear absence of supporting documentation or workpapers maintained in an organized and "easy to follow" format.  In addition, Rizack did not follow any commonly accepted accounting methodology in either creating or verifying the information on his spreadsheets.

61.     Based on my review and analysis of the documents produced by Josh Rizack and findings discussed above, said documents should not be relied upon for any financial or accounting purpose, including but not limited to presenting an accurate depiction of case funds received and/or disbursed by Donziger.

## Restraining Notice

62.     I have been provided with a copy of the Restraining Notice, which Chevron has represented to me was served on Donziger on April 16, 2018.  According to the Notice, Donziger is prohibited from "mak[ing] or suffer[ing] any sale, assignment, transfer or interference with any PROPERTY in which [he has] an interest . . . ."  From my analysis of the relevant accounts, since the date of service, April 16, 2018, Donziger has continued to transfer funds from four of his five open TD Bank accounts and the CWP Account. The fifth TD Bank account is Personal Savings account **9857.  The relevant statement for this account covers the period from April 1, 2018 through June 30, 2018 [TD BANK 0000010] and shows a beginning balance of $10,163.51; however, except for two interest payments received and two maintenance fees paid, the rest of the statement, including the ending balance, is redacted.

## Comparison of Known Investment Commitments and Known Investments at the Date of the RICO Judgment and as of September 26, 2018

63.     As part of my analysis and quantification of Investor payments transferred into the Donziger Bank Accounts, I also reviewed investment agreements, related records, and deposits of Investor funds for the periods before the RICO Judgment as well as those that became known after

21

March 4, 2014. As shown on Exhibit 9, Known Investment Commitments increased by $6,829,281 from $32,360,647 at March 4, 2014 to $39,189,928 as of September 26, 2018. This increase is due to the subsequent discovery of commitments made prior to the RICO Judgment that were still unknown at March 4, 2014, as well as commitments made by Investors after March 4, 2014.

64.     The Known Investment increased by $3,081,000 from $15,997,962 at March 4, 2014 to $19,078,962 as of September 26, 2018. This $3,081,000 increase is comprised of the $2,402,000 in Investor funds deposited into the Lenczner Slaght, CWP Associates, and Donziger accounts between January 1, 2016 and January 18, 2018; and $679,000 in payments made by Torvia, Amazonia Recovery Limited, Michael Donziger, and Woodsford prior to March 4, 2014 that were still unknown at the time of the RICO Judgment.

Executed on this 30th day of September, 2018 at New York, New York.

John A. Slavek

Chevron Corporation v. Steven Donziger, et al.

**Investment Agreements Reviewed and Comparison with Known Investor Deposits into Donziger-Related Bank Accounts**      **Exhibit 2**

Time Period: May 2016 through January 2018

| Instr. # | Investor | Date of Agreement | Execution Status [1] | Equity Interest [1] | Lenczner Slaght Role(s) [1] | Agreement Amount | After Fees | [2] Remained w/ Lenczner Slaght | Deposit into Donziger or Other Account Amount | Date | Bank | Account Name | Acct. # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **LENCZNER SLAGHT ROYCE SMITH ("LENCZNER SLAGHT") RELATED INVESTORS** | | | | | | | | | | | | | |
| I | Glenn Krevlin | 5/2/16 | Partial | 0.125% | Party | $ 250,000.00 | $ 250,000.00 | $ 175,000.00 | $ 74,990.00 | 5/10/16 | TD | Donziger & Associates | **8783 |
| I | Glenn Krevlin | 7/11/16 | Partial | 0.050% | Party | $ 100,000.00 | $ 100,000.00 | $ 100,000.00 | $ - | | | | |
| II | Cliff Eisler | 7/11/16 | Full | 0.125% | Party and Escrow Agent | $ 250,000.00 | $ 250,000.00 | $ 145,000.00 | $ 104,990.00 | 7/19/16 | TD | Donziger & Associates | **8783 |
| III | WDIS Finance LLC (John van Merkensteijn) | 8/24/16 | Full | 0.165% | Party and Escrow Agent | $ 300,000.00 | $ 285,000.00 | $ 141,500.00 | $ 143,490.00 | 10/6/16 | TD | Donziger & Associates | **8783 |
| IV | Wellbeck Partners (Jay L. Goldstein) | 8/24/16 | Full | 0.110% | Party and Escrow Agent | $ 200,000.00 | $ 200,000.00 | $ 100,000.00 | $ 99,990.00 | 10/21/16 | TD | Donziger & Associates | **8783 |
| III | WDIS Finance LLC (John van Merkensteijn) | 11/10/16 | Full | 0.055% | Party and Escrow Agent | $ 100,000.00 | $ 95,000.00 | $ 30,000.00 | $ 64,990.00 | 12/19/16 | TD | Donziger & Associates | **8783 |
| V | Indigenous People Limited [2] | 11/24/16 | Full | 0.1375% | Party and Escrow Agent | $ 250,000.00 | $ 237,500.00 | $ 100,000.00 | $ 137,490.00 | 2/21/17 | TD | Donziger & Associates | **8783 |
| | **LENCZNER SLAGHT-RELATED TOTALS** | | | | | $ 1,450,000.00 | $ 1,417,500.00 | $ 791,500.00 | $ 625,940.00 | | | | |
| **OTHER INVESTORS / INVESTMENTS** | | | | | | | | | | | | | |
| **FENWICK (GEORGE R. WATERS) RELATED** | | | | | | | | | | | | | |
| VI | Fenwick (George R. Waters) | 1/22/16 | Full | None | N/A | $ 102,000.00 | $ 100,000.00 | N/A | $ 50,000.00 | 1/25/16 | TD | Steven R. Donziger | **2265 |
| VI | Fenwick (George R. Waters) | 2/3/17 | Full | 0.076% | N/A | $ 50,000.00 | $ 50,000.00 | N/A | $ 50,000.00 | 2/14/17 | TD | Donziger & Associates | **8783 |
| VI | Fenwick (George R. Waters) | 12/17/17 | Not Exect'd | 0.025% | N/A | $ 50,000.00 | $ 50,000.00 | N/A | $ 50,000.00 | 12/11/17 | TD | Donziger & Associates | **8783 |
| | **FENWICK (GEORGE R. WATERS) TOTALS** | | | | | $ 202,000.00 | $ 200,000.00 | | $ 150,000.00 | | | | |
| **OTHER INVESTMENTS DEPOSITED WITH STREAMLINE FAMILY OFFICE INC DBA CWP ASSOCIATES ("CWP ASSOCIATES")** | | | | | | | | | | | | | |
| VII | CHV LLC / Tony Abbiati & Client (appears to be James McCaffrey) | 12/20/17 | Full | 0.250% | N/A | $ 500,000.00 | $ 500,000.00 | N/A | $ 250,000.00 | 1/2/18 | Bank of America | CWP Associates | **9158 |
| | | | | | | | | | $ 250,000.00 | 1/5/18 | Bank of America | CWP Associates | **9158 |
| I | Glenn Krevlin | 1/2/18 | Partial | 0.16675% | N/A | $ 250,000.00 | $ 250,000.00 | N/A | $ 250,000.00 | 1/18/18 | Bank of America | CWP Associates | **9158 |
| | **DEPOSITED WITH CWP ASSOCIATES TOTALS** | | | | | $ 750,000.00 | $ 750,000.00 | | $ 750,000.00 | | | | |
| | **GRAND TOTALS** | | | | | $ 2,402,000.00 | $ 2,367,500.00 | $ 791,500.00 | $ 1,525,940.00 | | | | |

**Notes:**

[1]   In addition to Agreements, Kroll identified the "Execution Status," "Equity Interest", and "Lenczner Slaght Role(s)" based on documents provided in the Mary Katherine Sullivan productions.

[2]   Per JVM 002466, Lenczner Slaght has retained $691,500 of the $1,417,500 it has received to satisfy outstanding legal fees. The $100,000 difference is likely due to the timing of the Indigenous People Ltd. Agreement transactions.
      JVM 002466 was dated February 2, 2017, prior to the February 21, 2017 payment into the Donziger & Associate's TD Bank account.
      It also identifes the $237,500.00 After-Fees amount for the Indigenous People Ltd. Agreement as "Available Cash" in the Lenczner Slaght Escrow Account.

Chevron Corporation v. Steven Donziger, et al.

**Analysis of TD Bank Accounts - Balances, Investor Deposits and Transfers Between Accounts**   **Exhibit 4-A**

**Time Period: January 1, 2016 through June 30, 2018**

| | Transfers between accounts | | Investor deposit into a Personal account | | Investor deposit into a Law Firm account | |
|---|---|---|---|---|---|---|

| Acct #: | **2265 | | **6418 | | **3420 | | **9857 | | **8132 | | **8783 | | **8174 | | TOTAL | |
| Name: | SRD Personal Checking Acct | | SRD Personal Savings Acct | | SRD Personal Checking Acct | | SRD Personal Savings Acct | | SRD Personal Checking Acct | | Law Firm Checking Acct | | Law Firm Checking Acct | | | |
| Month | Beg. Bal. | Avg. Bal. | Beg. Bal. | Avg. Bal. | Beg. Bal. | Avg. Bal. | Beg. Bal. | Avg. Bal. | Beg. Bal. | Avg. Bal. | Beg. Bal. | Avg. Bal. | Beg. Bal. | Avg. Bal. | Beg. Bal. | Avg. Bal. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan-16 | 8,975.88 | 52,876.65 | 262,968.14 | 244,514.09 | | | | | | | 5,208.32 | 5,208.32 | | | 277,152.34 | 302,599.06 |
| 1/13/16 | 12,000.00 | | (12,000.00) | | | | | | | | | | | | | |
| 1/14/16 | 25,000.00 | | (25,000.00) | | | | | | | | | | | | | |
| 1/25/16 | 50,000.00 | Payment from George R Waters into Personal account - **none** transferred to a Law Firm account | | | | | | | | | | | | | | |
| Feb-16 | 72,487.15 | 53,979.34 | 226,060.03 | 226,100.33 | | | | | | | 5,178.32 | 5,178.32 | | | 303,725.50 | 285,257.99 |
| Mar-16 | 41,995.71 | 35,746.56 | 226,140.63 | 226,183.73 | | | | | | | 5,147.32 | 5,148.32 | | | 273,283.66 | 267,078.61 |
| Apr-16 | 30,220.17 | 11,070.95 | 226,226.83 | 226,264.53 | | | | | | | 5,118.32 | 5,118.32 | | | 261,565.32 | 242,453.80 |
| May-16 | (962.38) | 42,807.96 | 226,303.23 | 226,341.57 | | | | | | | 5,088.32 | 14,510.57 | | | 230,429.17 | 283,660.10 |
| 5/10/16 | | | Payment from Lenczner Slaght Royce Smith deposited to Law Firm account | | | | | | | | 74,990.00 | Three days later $70,000 transferred to Personal | | | | |
| 5/13/16 | 70,000.00 | | | | | | | | | | (70,000.00) | | | | | |
| Jun-16 | 35,632.55 | 12,321.50 | 226,379.90 | 180,039.52 | | | | | | | 6,993.32 | 6,993.32 | | | 269,005.77 | 199,354.34 |
| Jul-16 | (2,220.45) | 27,654.49 | 133,698.14 | 197,145.08 | | | | | | | 6,963.32 | 18,727.02 | | | 138,441.01 | 243,526.59 |
| 7/19/16 | 50,000.00 | | (50,000.00) | | | | | | | | | | | | | |
| 7/19/16 | | | Payment from Lenczner Slaght Royce Smith deposited to Law Firm account | | | | | | | | 104,990.00 | Three days later $100,000 transferred to Personal | | | | |
| 7/22/16 | | | 100,000.00 | | | | | | | | (100,000.00) | | | | | |
| Aug-16 | 26,229.53 | 17,739.19 | 260,592.01 | 214,073.11 | | | | | | | 11,908.32 | 8,298.32 | | | 298,729.86 | 240,110.62 |
| Sep-16 | 13,123.17 | 40,208.92 | 167,554.20 | 142,584.83 | | | | | | | 8,298.32 | 8,124.98 | | | 188,975.69 | 190,918.73 |
| 9/19/16 | 50,000.00 | | (50,000.00) | | | | | | | | | | | | | |
| Oct-16 | 24,003.68 | 17,562.76 | 117,615.45 | 116,101.25 | | | | | | | 7,228.32 | 151,727.51 | | | 148,847.45 | 285,391.52 |
| 10/6/16 | | | Payment from Lenczner Slaght Royce Smith deposited to Law Firm account | | | | | | | | 143,490.00 | | | | | |
| 10/21/16 | | | Payment from Lenczner Slaght Royce Smith deposited to Law Firm account | | | | | | | | 99,990.00 | Ten days later $25,000 transferred to Personal | | | | |
| 10/31/16 | 25,000.00 | | | | | | | | | | (25,000.00) | | | | | |
| Nov-16 | 21,900.45 | 1,681.36 | 114,587.05 | 114,480.82 | $    - | $ 21,354.87 | | | | | 200,248.32 | 192,330.89 | | | 336,735.82 | 329,847.94 |
| 11/14/16 | (20,000.00) | | | | 20,000.00 | | | | | | | | | | | |
| 11/14/16 | (1,897.73) | | | | 1,897.73 | | | | | | | | | | | |
| Dec-16 | 226.04 | 211.91 | 114,374.58 | 114,393.96 | 20,652.86 | 20,872.42 | | | | | 189,034.85 | 165,437.17 | | | 324,288.33 | 300,915.46 |
| 12/19/16 | | | Payment from Lenczner Slaght Royce Smith deposited to Law Firm account | | | | | | | | 64,990.00 | Eight days later $80,000 transferred to Personal | | | | |
| 12/27/16 | | | 80,000.00 | | | | | | | | (80,000.00) | | | | | |
| Jan-17 | | | 114,413.33 | 114,432.77 | 20,892.64 | 65,626.15 | | | | | 114,562.85 | 114,328.01 | | | 249,868.82 | 294,386.93 |
| Feb-17 | | | 114,452.20 | 114,469.76 | 35,774.23 | 26,070.71 | | | | | 113,522.85 | 170,970.52 | | | 263,749.28 | 311,510.99 |

Chevron Corporation v. Steven Donziger, et al.

**Analysis of TD Bank Accounts - Balances, Investor Deposits and Transfers Between Accounts**   **Exhibit 4-A**

**Time Period: January 1, 2016 through June 30, 2018**

Legend: Transfers between accounts | Investor deposit into a Personal account | Investor deposit into a Law Firm account

| Acct #: | **2265** SRD Personal Checking Acct | | **6418** SRD Personal Savings Acct | | **3420** SRD Personal Checking Acct | | **9857** SRD Personal Savings Acct | | **8132** SRD Personal Checking Acct | | **8783** Law Firm Checking Acct | | **8174** Law Firm Checking Acct | | **TOTAL** | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | Beg. Bal. | Avg. Bal. | Beg. Bal. | Avg. Bal. | Beg. Bal. | Avg. Bal. | Beg. Bal. | Avg. Bal. | Beg. Bal. | Avg. Bal. | Beg. Bal. | Avg. Bal. | Beg. Bal. | Avg. Bal. | Beg. Bal. | Avg. Bal. |
| 2/14/17 | Payment from George R Waters deposited to Law Firm account | | | | | | | | | | 50,000.00 | | | | | |
| 2/21/17 | Payment from Lenczner Slaght Royce Smith deposited to Law Firm account | | | | | | | | | | 137,490.00 Over the next 6 months $60,000 transferred to Personal | | | | | |
| Mar-17 | | | 114,487.32 | 94,743.44 | 19,999.40 | 13,033.77 | | | | | 285,917.85 | 268,490.36 | | | 420,404.57 | 376,267.57 |
| 3/20/17 | | | | | 25,000.00 | | | | (25,000.00) ← | | | | | | | |
| Apr-17 | | | 74,999.56 | 37,507.18 | 27,870.21 | 19,943.23 | - | 37,505.95 | | | 250,472.11 | 244,593.33 | | | 353,341.88 | 339,549.69 |
| 4/19/17 | | | (74,999.56) → | | | | 74,999.56 | | | | | | | | | |
| May-17 | | | 14.80 | | 12,109.76 | 9,362.26 | 75,011.89 | 75,027.82 | | | 232,594.65 | 216,343.09 | | | 319,731.10 | 300,747.97 |
| Jun-17 | | | 14.80 | 14.80 | 6,877.86 | 4,665.46 | 75,043.74 | 75,059.16 | | | 210,213.94 | 171,937.64 | | | 292,150.34 | 251,677.06 |
| 6/27/17 | | | | | 10,000.00 | | | | (10,000.00) ← | | | | | | | |
| Jul-17 | | | 14.80 | 14.80 | 4,923.07 | 6,581.04 | 75,074.58 | 75,090.52 | | | 127,900.44 | 127,204.95 | | | 207,912.89 | 208,891.31 |
| Aug-17 | | | 14.81 | 14.81 | 515.36 | 8,550.54 | 75,106.46 | 75,122.41 | | | 126,360.44 | 78,367.38 | | | 201,997.07 | 162,055.14 |
| 8/8/17 | | | | | 25,000.00 | | | | (25,000.00) ← | | | | | | | |
| Sep-17 | | | 14.81 | 14.81 | 12,689.04 | 10,434.58 | 75,138.36 | 62,651.78 | | | 63,326.70 | 39,070.61 | | | 151,168.91 | 112,171.78 |
| 9/15/17 | | | | | 10,000.00 ← | | | | (10,000.00) | | | | | | | |
| 9/22/17 | | | | | 15,000.00 ← | | | | (15,000.00) | | | | | | | |
| Oct-17 | | | 14.81 | 14.81 | 15,359.73 | 11,725.44 | 50,165.20 | 32,807.31 | | | 20,336.26 | 19,076.90 | | | 85,876.00 | 63,624.46 |
| Nov-17 | | | 14.81 | 14.81 | 4,422.91 | 4,018.77 | 15,449.41 | 12,944.08 | | | 17,866.26 | 17,024.52 | | | 37,753.39 | 34,002.18 |
| 11/30/17 | | | | | 5,000.00 ← | | | | (5,000.00) | | | | | | | |
| Dec-17 | | | 14.81 | 14.81 | 3,798.36 | 10,816.94 | 10,438.74 | 10,431.68 | | | 11,523.26 | 33,154.38 | | | 25,775.17 | 54,417.81 |
| 12/11/17 | Payment from George R Waters deposited to Law Firm account | | | | | | | | | | 50,000.00 Over the next ~6 weeks $45,000 transferred to Personal | | | | | |
| 12/18/17 | | | | | 25,000.00 | | | | (25,000.00) ← | | | | | | | |
| Jan-18 | | | 14.81 | 14.81 | 19,777.44 | 14,325.47 | 10,424.62 | 10,417.57 | | | 35,438.26 | 29,792.13 | | | 65,655.13 | 54,549.98 |
| 1/11/18 | | | | | 5,000.00 | | | | (5,000.00) ← | | | | | | | |
| 1/24/18 | | | | | 15,000.00 | | | | (15,000.00) ← | | | | | | | |
| 1/30/18 | Payment from Streamline Family Office deposited to Law Firm account | | | | | | | | | | 25,000.00 | | | | | |
| Feb-18 | | | 14.81 | 14.81 | 2,700.26 | 4,822.93 | 10,410.51 | 10,403.41 | | | 40,393.26 | 43,309.68 | | | 53,518.84 | 58,550.83 |
| 2/5/18 | Payment from Streamline Family Office deposited to Law Firm account | | | | | | | | | | 25,000.00 Over the next ~5 weeks $20,000 transferred to Personal | | | | | |
| 2/7/18 | | | | | 10,000.00 | | | | (10,000.00) ← | | | | | | | |
| Mar-18 | | | 14.81 | 14.81 | 5,532.38 | 7,401.79 | 10,396.31 | 10,279.91 | | | 44,708.26 | 55,169.16 | | | 60,651.76 | 72,865.67 |
| 3/13/18 | | | | | 10,000.00 | | | | (10,000.00) ← | | | | | | | |

Chevron Corporation v. Steven Donziger, et al.

**Analysis of TD Bank Accounts - Balances, Investor Deposits and Transfers Between Accounts**     **Exhibit 4-A**

**Time Period: January 1, 2016 through June 30, 2018**

| | Transfers between accounts | | Investor deposit into a Personal account | | | Investor deposit into a Law Firm account | |
|---|---|---|---|---|---|---|---|

| Acct #: | **2265 | | **6418 | | **3420 | | **9857 | | **8132 | | **8783 | | **8174 | | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Name: | SRD Personal Checking Acct | | SRD Personal Savings Acct | | SRD Personal Checking Acct | | SRD Personal Savings Acct | | SRD Personal Checking Acct | | Law Firm Checking Acct | | Law Firm Checking Acct | | TOTAL | |
| Month | Beg. Bal. | Avg. Bal. | Beg. Bal. | Avg. Bal. | Beg. Bal. | Avg. Bal. | Beg. Bal. | Avg. Bal. | Beg. Bal. | Avg. Bal. | Beg. Bal. | Avg. Bal. | Beg. Bal. | Avg. Bal. | Beg. Bal. | Avg. Bal. |
| 3/13/18 | Payment from Streamline Family Office deposited to Law Firm account | | | | | | | | | | 75,000.00 Over the next ~7 weeks $45,000 transferred to Personal | | | | | |
| Apr-18 | | | 14.81 | 7.41 | 2,375.60 | 4,602.80 | 10,163.51 | 10,156.43 | | | 77,313.19 | 61,479.85 | | | 89,867.11 | 76,246.48 |
| 4/12/18 | | | | | 10,000.00 | | | | (10,000.00) | | | | | | | |
| 4/16/18 | | | | | 15,000.00 | | | | (15,000.00) | | | | | | | |
| 4/25/18 | | | | | 10,000.00 | | | | (10,000.00) | | | | | | | |
| May-18 | | | 0.00 | | 4,562.81 | 5,302.17 | 10,149.34 | 10,142.27 | 0.00 | 52,629.52 | 42,313.19 | 115,861.57 | $ - | 101,187.86 | 57,025.34 | 285,123.39 |
| 5/3/18 | | | | | 10,000.00 | | | | (10,000.00) | | | | | | | |
| 5/8/18 | Payment from Forum Nobis into Personal account | | | | | | | | $342,045.16 | | | | | | | |
| 5/10/18 | | | | | | | | | (342,045.16) | | | | 342,045.16 | | | |
| 5/10/18 | | | | | | | | | | | 125,000.00 | | (125,000.00) | | | |
| 5/10/18 | | | | | | | | | 35,000.00 | | | | (35,000.00) | | | |
| 5/14/18 | | | | | 10,000.00 | | | | (10,000.00) | | | | | | | |
| Jun-18 | | | (604.51) | 3,412.03 | 10,121.03 | Redacted | 33,142.65 | Redacted | 147,283.19 | 137,283.19 | 99,719.66 | 92,207.16 | 289,662.02 | 232,902.38 | | |
| 6/4/18 | | | | | 10,000.00 | | | | (10,000.00) | | | | | | | |
| 6/4/18 | | | | | 10,000.00 | | NO INVESTOR DEPOSITS | | (10,000.00) | | | | | | | |
| Ending Balance at June 30, 2018 | $ - | | $ (104.45) | | $ 10,121.03 | | $ 28,102.65 | | $ 127,283.19 | | $ 84,694.66 | | $ 250,097.08 | | | |
| | | | | | at 5/31/18 | | at 6/18/18 | | | | at 6/11/18 | | | | | |

**Note:**

The CWP / Forum Nobis to Donziger $342,045.16 related transactions are outlined.

Chevron Corporation v. Steven Donziger, et al.

**Summary of TD Bank Visa & American Express Credit Card Expenses - Top 50 Payees**   **Exhibit 7-A**
**Time Period: January 2016 through June 30, 2018**

| # | Payee Name | American Express | TD Bank Visa Card | | Total |
|---|---|---|---|---|---|
| 1 | American Airlines | 12,123.08 | 9,835.78 | $ | 21,958.86 |
| 2 | Gym Precision | 780.00 | 13,260.00 | | 14,040.00 |
| 3 | Avianca Ecuador | 6,586.70 | 6,551.38 | | 13,138.08 |
| 4 | Room & Board | 12,890.79 | - | | 12,890.79 |
| 5 | Delta Airlines | 10,516.18 | 1,681.15 | | 12,197.33 |
| 6 | 3BL Media LLC | - | 11,705.00 | | 11,705.00 |
| 7 | AT&T | 2,910.70 | 6,477.93 | | 9,388.63 |
| 8 | Browns Hotel | - | 9,371.17 | | 9,371.17 |
| 9 | TAP Air Internet | 6,895.92 | - | | 6,895.92 |
| 10 | Precision Athlete | 6,340.00 | - | | 6,340.00 |
| 11 | United Airlines | 653.09 | 5,037.10 | | 5,690.19 |
| 12 | Air Canada | 4,061.05 | 1,536.92 | | 5,597.97 |
| 13 | Walkers | 2,341.11 | 2,884.61 | | 5,225.72 |
| 14 | Time Warner Cable | 2,484.69 | 2,406.29 | | 4,890.98 |
| 15 | Hotel Tonight | 1,239.36 | 3,489.89 | | 4,729.25 |
| 16 | JetBlue | 233.10 | 4,286.50 | | 4,519.60 |
| 17 | Thompson Hotel | 3,673.56 | 375.53 | | 4,049.09 |
| 18 | Charles Hotel | 2,412.35 | 1,633.74 | | 4,046.09 |
| 19 | Nylo Hotel | 312.17 | 3,452.11 | | 3,764.28 |
| 20 | Intuit | 3,762.03 | - | | 3,762.03 |
| 21 | Henry's Restaurant | 1,894.47 | 1,761.23 | | 3,655.70 |
| 22 | Limelight Hotel | - | 3,452.04 | | 3,452.04 |
| 23 | Sfoglia | 1,863.74 | 1,586.12 | | 3,449.86 |
| 24 | Vila Vita Parc | 3,273.59 | - | | 3,273.59 |
| 25 | British Airways | - | 3,155.90 | | 3,155.90 |
| 26 | Norwegian Air | - | 3,135.60 | | 3,135.60 |
| 27 | Le Compagnie | - | 3,058.42 | | 3,058.42 |
| 28 | Club Med | 2,865.46 | 134.20 | | 2,999.66 |
| 29 | Tap Portugal | 2,770.00 | - | | 2,770.00 |
| 30 | NYC Taxi | 1,054.82 | 1,712.09 | | 2,766.91 |
| 31 | Intercontinental Hotels | 1,484.20 | 1,238.84 | | 2,723.04 |
| 32 | Hotels.com | 769.39 | 1,913.05 | | 2,682.44 |
| 33 | Acme Fine Wines | - | 2,578.00 | | 2,578.00 |
| 34 | Fairmont Hotels | 1,693.56 | 876.14 | | 2,569.70 |
| 35 | Hotel Bachaumont | - | 2,567.44 | | 2,567.44 |
| 36 | The White Hart Inn | 162.36 | 2,157.24 | | 2,319.60 |
| 37 | Appeal Tech | 172.02 | 2,085.39 | | 2,257.41 |
| 38 | Olissipo Lapa Palace | 2,249.43 | - | | 2,249.43 |
| 39 | CarmelLimoPass.com | 1,221.40 | 986.10 | | 2,207.50 |
| 40 | The Red Cat | 1,310.94 | 887.53 | | 2,198.47 |
| 41 | Westin Hotels | 266.72 | 1,913.89 | | 2,180.61 |
| 42 | Hotel Quito | - | 2,103.81 | | 2,103.81 |
| 43 | Dinahs Garden Hotel | 2,100.57 | - | | 2,100.57 |
| 44 | CVS | 2,062.96 | 13.27 | | 2,076.23 |
| 45 | Omni Hotel | 2,011.54 | 37.45 | | 2,048.99 |
| 46 | Amtrak | 1,341.00 | 657.00 | | 1,998.00 |
| 47 | Apple | 1,825.26 | 153.25 | | 1,978.51 |
| 48 | Hillstone | 463.00 | 1,359.47 | | 1,822.47 |
| 49 | Jean Georges | 152.38 | 1,664.26 | | 1,816.64 |
| 50 | New York City MTA | 680.00 | 1,097.10 | | 1,777.10 |
| | **Subtotal - Top 50 Entities** | **$  113,904.69** | **$  126,269.93** | **$** | **240,174.62** |
| | **Subtotal - 603 Remaining Entities** | **75,214.50** | **60,644.17** | | **135,858.67** |
| | **Total Charges** | **$  189,119.19** | **$  186,914.10** | **$** | **376,033.29** |

**SA100**

Chevron Corporation v. Steven Donziger, et al.

**Summary of TD Bank Visa & American Express Credit Card Expenses & Related Payments by Month & Card User**          **Exhibit 7-B**
**Time Period: January 2016 through June 30, 2018**

| Period | American Express | | | | TD Bank Visa | Amex & TD | Payments on Credit Cards from... | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | L. Miller | M. Sullivan | Donziger | Total | Donziger | Combined Total | Donziger Personal TD | Donziger Business TD | CWP and Streamline [2] | Total |
| Jan-16 | 1,546.13 | - | 5,350.17 | 6,896.30 | - | 6,896.30 | 19,139.64 | - | - | 19,139.64 |
| Feb-16 | 4,816.36 | - | 5,575.59 | 10,391.95 | - | 10,391.95 | 6,857.59 | - | - | 6,857.59 |
| Mar-16 | 17,806.03 | - | 8,051.53 | 25,857.56 | - | 25,857.56 | 7,168.60 | - | - | 7,168.60 |
| Apr-16 | 4,155.71 | - | 13,551.64 | 17,707.35 | - | 17,707.35 | 14,495.36 | - | - | 14,495.36 |
| May-16 | 4,207.86 | - | 9,108.33 | 13,316.19 | - | 13,316.19 | 22,984.19 | - | - | 22,984.19 |
| Jun-16 | 1,805.60 | - | 14,253.77 | 16,059.37 | - | 16,059.37 | 20,432.55 | - | - | 20,432.55 |
| Jul-16 | 1,829.11 | - | 16,343.05 | 18,172.16 | - | 18,172.16 | 8,844.43 | - | - | 8,844.43 |
| Aug-16 | 15,991.23 | - | 11,449.40 | 27,440.63 | - | 27,440.63 | 5,832.59 | - | - | 5,832.59 |
| Sep-16 | 1,878.98 | - | 13,633.21 | 15,512.19 | - | 15,512.19 | 28,340.23 | - | - | 28,340.23 |
| Oct-16 | - | - | - | - | 12,065.32 | 12,065.32 | 30,443.39 | - | - | 30,443.39 |
| Nov-16 | - | - | - | - | 14,444.04 | 14,444.04 | - | 9,173.47 | - | 9,173.47 |
| Dec-16 | - | - | - | - | 9,242.06 | 9,242.06 | 10,012.35 | 14,222.00 | - | 24,234.35 |
| **Subtotal - 2016** | **$ 54,037.01** | **$ -** | **$ 97,316.69** | **$ 151,353.70** | **$ 35,751.42** | **$ 187,105.12** | **$ 174,550.92** | **$ 23,395.47** | **$ -** | **$ 197,946.39** |
| Jan-17 | - | - | - | - | 7,731.96 | 7,731.96 | - | - | - | - |
| Feb-17 | - | - | - | - | 10,698.62 | 10,698.62 | 17,728.73 | - | - | 17,728.73 |
| Mar-17 | - | - | - | - | 6,957.15 | 6,957.15 | - | 10,445.74 | - | 10,445.74 |
| Apr-17 | - | - | - | - | 13,432.21 | 13,432.21 | - | 11,297.46 | - | 11,297.46 |
| May-17 | - | - | - | - | 11,143.54 | 11,143.54 | - | 9,587.71 | - | 9,587.71 |
| Jun-17 | - | - | - | - | 7,270.76 | 7,270.76 | - | 8,198.50 | - | 8,198.50 |
| Jul-17 | - | - | - | - | 9,764.36 | 9,764.36 | - | - | - | - |
| Aug-17 | - | - | - | - | 3,922.96 | 3,922.96 | - | 13,008.74 | - | 13,008.74 |
| Sep-17 | - | - | - | - | 16,284.32 | 16,284.32 | - | 9,725.00 | - | 9,725.00 |
| Oct-17 | - | - | - | - | 11,161.03 | 11,161.03 | 14,725.62 | - | - | 14,725.62 |
| Nov-17 | - | - | - | - | 3,477.15 | 3,477.15 | - | 6,313.00 | - | 6,313.00 |
| Dec-17 | - | - | - | - | 9,669.84 | 9,669.84 | 6,119.00 | - | - | 6,119.00 |
| **Subtotal - 2017** | **$ -** | **$ -** | **$ -** | **$ -** | **$ 111,513.90** | **$ 111,513.90** | **$ 38,573.35** | **$ 68,576.15** | **$ -** | **$ 107,149.50** |
| Jan-18 | - | 4,306.84 | - | 4,306.84 | 14,996.82 | 19,303.66 | 9,850.00 | - | - | 9,850.00 |
| Feb-18 | - | 1,733.36 | 220.06 | 1,953.42 | 12,259.43 | 14,212.85 | - | 10,655.00 | 4,492.75 | 15,147.75 |
| Mar-18 | - | 2,735.71 | 1,974.16 | 4,709.87 | 8,682.29 | 13,392.16 | - | 12,325.07 | - | 12,325.07 |
| Apr-18 | - | 109.85 | 21,043.73 | 21,153.58 | 393.46 | 21,547.04 | 9,256.15 | - | 16,284.30 | 25,540.45 |
| May-18 | - | 1,148.97 | 247.74 | 1,396.71 | 2,842.10 | 4,238.81 | - | - | 11,796.20 | 11,796.20 |
| Jun-18 | - | 4,445.07 | (200.00) | 4,245.07 | 474.68 | 4,719.75 | 3,620.43 | - | 3,548.35 | 7,168.78 |
| **Subtotal - 2018** | **$ -** | **$ 14,479.80** | **$ 23,285.69** | **$ 37,765.49** | **$ 39,648.78** | **$ 77,414.27** | **$ 22,726.58** | **$ 22,980.07** | **$ 36,121.60** | **$ 81,828.25** |
| **Total [1]** | **$ 54,037.01** | **$ 14,479.80** | **$ 120,602.38** | **$ 189,119.19** | **$ 186,914.10** | **$ 376,033.29** | **$ 235,850.85** | **$ 114,951.69** | **$ 36,121.60** | **$ 386,924.14** |

[1] As shown above, Donziger switched from an American Express credit card to a TD Bank credit card in October 2016.  Donziger began using American Express again in February 2018,.

[2] Kroll notes that CWP and Streamline both made payments towards the American Express charges.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ x
                                                  :
CHEVRON CORPORATION,                              :
                                                  :
              Plaintiff,                          :
                                                  :
     v.                                           :     11 Civ. 0691 (LAK)
                                                  :
STEVEN DONZIGER, et al.,                          :
                                                  :
                                                  :
              Defendants.                         :
------------------------------------------------ x

## DECLARATION OF MARY K. SULLIVAN

I, MARY K. SULLIVAN hereby declare under penalty of perjury pursuant to 28 U.S.C.

§ 1746, that the following is true and correct:

**A.     Background**

1.     My name is Mary Katherine Sullivan, but I am called Katie.  I reside in Dover,

Massachusetts.

2.     I graduated from the University of Rhode Island with a degree in Psychology in

1994.  Since 2003, I have owned and operated my own "wealth coordination" business called

Streamline Family Office, Inc. ("Streamline").  Streamline provides private wealth coordination

to individuals and families with significant assets—usually between $100 million and $500

million.

3.     I first met Steven Donziger in August 2016, when I traveled to Ecuador as part of

a 10-day "founders" trip hosted by the Pachamama Alliance, a non-profit organization.  My

motivation to attend the trip was to meet one of the founders.  I began learning more about and

exploring the possibility of supporting the work Steven was engaged in around November of

1



**Exhibit 33**
**Sullivan**
9/28/2018
Reporter: Kimberly A. Smith

2016 and stopped having any contact with him on or around March 26, 2018, after receiving the preservation order in this action.

4.      While I was trying to understand the current status and objectives of the Ecuador case and the various people involved, I helped Steven in several areas relating to the Ecuador judgment: managing paperwork related to investors past and present, attempting to create budgets for the case, and receiving and distributing investor funds.  I also offered to and did connect him with potential investors.  In my experience, Steven did not have adequate documentation on or keep clear records of who had previously invested in the Ecuador judgment, and did not have adequate documentation of past or expected expenses to create an accurate budget.  From my perspective, he lacked the skills, focus, and support to effectively manage the details.  He seemed to have full authority to decide how investor money was spent, and a majority of the investor funds were allocated to himself for what he claimed were case management and reimbursements, and on items relating to an ongoing out-of-court strategy against Chevron.

5.      During the time I worked with Steven, we were in contact on at least a weekly basis, and sometimes on a daily basis.  I met with Steven approximately seven times during the time that we worked together.  We communicated primarily by email, phone, and WhatsApp.  We also communicated via text message.  We used Dropbox to share documents.

6.      My understanding of the RICO judgment came from Steven.  He said that there was a court judgment against him in a RICO case brought by Chevron in New York and that the RICO judgment prevented him from recovering his contingency interest in the underlying Ecuador case.  But he explained that he could continue to raise funds from investors and be paid a retainer out of those funds.  He also said he could continue to manage the case.  Steven never

told me, nor did I hear him tell anyone else, that the RICO judgment required him to assign his

interest in the Ecuador judgment to Chevron.  Steven added that he believed the RICO judgment

came as a result of false evidence presented to the New York court.

**B.      Donziger Spent His Time Coordinating a Pressure Campaign Against Chevron**

7.      During the 18 months that I knew and explored helping him, Steven spent the

majority of his time coordinating "out of court" "non-legal" strategies to put "pressure" on

Chevron.[1]  The goal of his pressure campaign was twofold: to increase the potential for

obtaining new investors and to ultimately to force Chevron to pay some portion of Ecuador

judgment.  While I worked with him on what he called his pressure campaign and on obtaining

investor money, I did not work with Steven on any legal issues or observe him working on any.

8.      **Press Releases**:  I saw a number of press releases distributed through CSRwire on

behalf of the FDA.  Steven told me that the FDA was his client.  At no time did Steven disclose

to me that the FDA was an organization that he created and controlled.  In the course of our

conversations, Steven told me that he wrote all those press releases himself.  I estimated, based

on my observations and discussions with Steven, that Steven spent about 15 hours on each press

release, and that there had been over fifty press releases in the past three years or so.  Steven

seemed obsessed with the press releases and I was trying to demonstrate that, perhaps, his time

and energy could be channeled in a more productive manner.

9.      Steven frequently sent his press releases to investors and potential investors, and

had me do the same.  Attached hereto as Exhibit 2 (**MKS-0000799; MKS-0002519**) are true and

correct copies of emails we sent to potential investors citing the press releases that Steven had

---

[1]   Attached hereto as Exhibit 1 is a true and correct copy of an email chain from Steven to Ian Watson, John van Merkensteijn, and myself dated January 18, 2018.  MKS-0004126.

**SA104**

drafted.  In connection with seeking investments in the judgment, Steven would tell investors that these press releases would "help hold Chevron accountable."  I did not verify the accuracy of any of these press releases before distributing them.  I relied on Steven for the accuracy of the information contained in them.

10.     **Shareholder Resolutions**:  Steven also worked with Ben Barnes and Simon Billenness on Steven's strategies to pressure Chevron.  From my work on budgets, case expenses, and documenting persons with interests in the Ecuador judgment, I know that Ben Barnes had been promised a 0.6% interest in the judgment.[2]  I also know that Simon Billenness was compensated for his work with Steven on shareholder pressure strategies.[3]  I learned that Billenness, among other things, was focused on out-of-court strategies designed to pressure Chevron to settle the case.  Although his work was directed by Steven, he wanted to maintain the appearance that it was separate from the legal team, as he said it would be "counterproductive" if the legal team were "seen doing" the things he was hired to do.[4]

11.     **Canada Pressure Campaign**:  In September 2017, I took another trip to Ecuador with Steven that he had planned and described as key to putting pressure on Chevron to settle.[5]

---

[2]   Attached hereto as Exhibit 3 is a true and correct copy of a document I helped Steven prepare which outlined the equity interests that had been granted in the Ecuador judgment.  **MKS-0016124.**  Ben Barnes's 0.6% interest is listed under his initials, BB.

[3]   Attached hereto as Exhibit 4 is a true and correct copy of a document dated March 10, 2018 and titled Equity Contract Status, that I created when organizing the documents, which shows that Billenness was to be compensated with an equity stake equal to a $100,000 investment in the Ecuador judgment.  **MKS-0006498.**

[4]   Attached hereto as Exhibit 5 is true and correct email of an email from Simon Billenness to Steven dated February 4, 2018.  **MKS-0001583.**  Attached hereto as Exhibit 6 is a true and correct copy of an email chain between Pat Tomaino, Simon Billenness, and others that was forwarded to me by Steven on March 12, 2018 MKS-0005821.  Attached hereto as Exhibit 7 is a true and correct copy of an email chain between Simon Billenness, Steven, and Tony Chappelle that was forwarded to me by Steven on January 10, 2018.  **MKS-0016326.**

[5]   Attached hereto as Exhibit 8 is a true and correct copy of an email I sent on November 6, 2017 to the other individuals who attended the September 2017 trip to Ecuador.  **MKS-0000037.**

-4-

He invited and paid for Chief Ed John and Phil Fontaine, former Chief of the Assembly of First Nations Canada ("AFN"), to participate in this trip.[6] Also on this trip, with expenses covered by Steven and the FDA (at Steven's direction, as it was my experience and understanding that Steven decided how funds were spent), were Steven's wife Laura Miller and their son, Aaron Page, Canadian lawyers John Phillips and Peter Grant, Ian and Victoria Watson, Greenpeace activist Rex Weyler, Lisa Gibbons, Karen Hinton and her husband Howard Glaser, Juan Aulestia, Lupita de Heredia, and Cristina Munoz. Steven drafted and distributed press releases describing meetings that occurred during this trip as ones where indigenous leaders "joined forces."[7] I was aware that the trip was planned for the Canadian delegates and all of their costs to participate would be covered out of funds controlled by Steven.

12. Steven was also planning to offer Chief Ed John an equity stake in the Ecuador judgment in exchange for his services.[8] Similarly, in May 2017, Steven directed the FDA to grant Phil Fontaine a 0.125% interest in the Ecuador judgment in return for "professional services" that were to be defined at a later time.[9] Steven then organized a follow-up meeting with the AFN in December 2017 in Canada, which I attended.[10] Steven told me that the purpose of this meeting was for AFN representative Chief Bellegarde and the FDA to sign a protocol of

---

[6] Attached hereto as Exhibit 9 is a true and correct copy of an email dated October 2, 2017 that Steven sent to Chief Ed John, Phil Fontaine, and others instructing them to submit invoices to him for reimbursement of their expenses related to the Ecuador trip. **MKS-0003325.**

[7] Attached hereto as Exhibit 10 is a true and correct copy of an email dated September 22, 2017 Steven sent to investors attaching a press release regarding the September 2017 trip to Ecuador. **MKS-0004190.**

[8] Attached hereto as Exhibit 11 is a true and correct copy of an email chain between Steven, Aaron, and myself dated December 14, 2017. **MKS-0001080.**

[9] Attached hereto as Exhibit 12 is a true and correct copy of an investment agreement between Mr. Fontaine and the FDA, signed by Mr. Fontaine. **MKS-0000796.**

[10] Attached hereto as Exhibit 13 is a true and correct copy of an email I sent to Steven on November 14, 2017, providing a draft message Steven could send to an existing investor, Cliff Eisler, regarding a follow-on investment following the AFN conference. **MKS-0001415.**

cooperation that Steven planned to use as another pressure point against Chevron.[11]  Steven

issued a press release about the meeting and the protocol.  I do not know whether Steven

disclosed to Chief Bellegarde that he had any role in organizing the meeting or drafting the

protocol.

13.     In or around October 2017, Steven also began to work with Kathleen Mahoney,

Phil Fontaine's partner and a Professor at the University of Calgary, on organizing a November

2018 conference on the Ecuador litigation to take place in Alberta, Canada, under the auspices of

the University of Calgary.  As Professor Mahoney put it, "The concept would be to re-frame the

case, assuming resolution in the form of a win-win settlement.  If we could get representation

from the oil industry here in Calgary, the epicenter of the oil industry in Canada, that would, I

think, bring significant pressure to bear on Chevron to come to the table instead of following

their scorched earth policy which does not fly well in Canada."  The conference is titled the

"Indigenous Solutions for Environmental Challenges" and Steven has referred to it as "a key part

of our out-of-court strategy."[12]  Steven told me that he and the other conference organizers did

not intend to charge any fees for attending the conference and that they intended even to pay for

the attendees' accommodations at a luxury hotel and resort.  The details of the financial

obligations of the conference were not fully known by me, other than Steven included a line item

in the 2018 budget to cover the anticipated costs.

14.     At Steven's direction, I paid from the CWP account (discussed below) the

following expenses related to this conference:  (1) on March 9, 2018, I made a $19,993 payment

---

[11]  Attached hereto as Exhibit 14 is a true and correct copy of the protocol that was signed at the AFN conference.
**MKS-0005889.**

[12]  Attached hereto as Exhibit 15 is a true and correct copy of an email sent by Steven to Ian Watson, John van
Merkensteijn, and me on January 18, 2018. **MKS-0003232.**

to the University of Calgary; and (2) on March 16, 2018, I made a $21,158 payment to the University of Calgary.  I am unaware of whether Professor Mahoney disclosed to the University or others that her partner signed an agreement to obtain a percentage interest in the Ecuador judgment or that the conference was funded by Steven using monies raised based on the Ecuador judgment.

### C.   Raising Money Based on the Ecuador Judgment

15.    Starting in December 2016, at Steven's request, when an opportunity arose in my network with those I thought might find the opportunity interesting, I mentioned the opportunity to purchase a 0.125% interest in the Ecuador judgment in return for an investment of $250,000. Given my business, it is very common for people to want to share their ideas with me even though it has always been clear that I would never, under any circumstances, receive any compensation if it translated into an investment.  Steven instructed me to tell potential investors that they would receive a return of 50 times their initial investment, based on a $12 billion judgment recovery.[13]  While I was not shown documentation of this, Steven told me that the FDA was authorized to sell 30% of the Ecuador judgment as a whole.[14]

16.    Steven, with assistance from Aaron Page, prepared a memorandum that they had me send to potential investors.[15]  This memo claimed that "the evidence behind" this Court's factual findings in the RICO case "has largely collapsed."  This memo also linked to multiple

---

[13]  Attached hereto as Exhibit 16 is a true and correct copy of an email dated December 10, 2016 that I sent to Steven Haley, a confidant and someone whose opinion I value. **MKS-0001521.**

[14]  Attached hereto as Exhibit 17 is a true and correct copy of a February 2018 draft of my ideas, based on information provided to me, to raise capital for the Ecuador judgement.  The plan notes that Steven has been authorized to sell up to 30% of the judgment to investors. This document was never discussed after I shared it. **MKS-0006028.**

[15]  Attached hereto as Exhibit 18 is a true and correct copy of the memorandum prepared by Steven and Aaron. **MKS-0001523.**

press releases Steven had written about the case.  Using this memo and other approaches and

materials, I had conversations with several people whom I believed to be sophisticated investors

and whom I thought might be interested in learning more.  Of the persons I mentioned this

opportunity to, only one, Tony Abbiati, invested.  In addition, although they did not invest, I

arranged and participated in a meeting with Elliott Management.  I was interested to hear what

other people thought of this opportunity as an investment and, being action oriented, I created

conversations to share and learn.

### D.    Elliott Management Solicitation

17.    After a few people mentioned that Elliott Management might be interested in this

type of litigation investment and, because I enjoy a challenge, I sent Paul Singer, the head of

Elliott, a Led Zeppelin book and miniature musical box, knowing that he was a fan of Led

Zeppelin, along with a hand written note asking him for a meeting.[16]  When Singer did not

respond, I talked to a client who I thought likely had contacts at Elliott, as the fund was in the

process of acquiring his company.  He immediately made a phone call to put me in contact with

Jesse Cohn at Elliott and then had no further involvement.  Mr. Cohn, who I understood to be

responsible for investment decisions at Elliott, agreed to an introductory meeting on November

6, 2017 to discuss a potential investment or partnership.  I told Steven about the meeting and

encouraged him to attend.[17]

---

[16]  Attached hereto as Exhibit 19 is a true and correct copy of an email chain between Steven and myself dated
October 19, 2017.  **MKS-00000139.**

[17]  Attached hereto as Exhibit 20 is a true and correct copy of an email chain between Jesse Cohn, Natalie
Underwood, and myself, which I forwarded to Steven on November 3, 2017.  **MKS-0000130.**

18.     After discussing it with Steven, I emailed the individuals who were on the trip to Ecuador in September of 2017 to tell them about the upcoming meeting with Elliott.[18]  But then, after I sent the email, Steven became upset that the email had gone out to what he called a wide group of people, including Lupita de Heredia.  Steven told me that if the many people who performed work for him without payment, in particular in Ecuador, "became aware that there was money coming, they would all demand to be paid for their services, as they often worked for months or even years without any compensation from Steven.

19.     Steven replied to the email I sent and asked the recipients to keep the information "strictly confidential" as a leak could "be counterproductive."  Peter Grant, a Canadian lawyer, suggested that all recipients of the message delete it because of what he "saw the opposition acquired."  Steven and Aaron Page also encouraged the recipients of my email to delete it.   I have deleted some emails related this exchange, but produced all copies in my possession, and to the best of my knowledge, what I produced is a complete record of the exchanges related to my initial message.

20.     The hour and half meeting with Elliot was attended by Steven, Jesse Cohn, Lee Grinberg, and myself.  Mr. Cohn left after 15-20 minutes.  Steven and Mr. Grinberg did most of the talking.  Steven's pitch to Elliott was that the Ecuadorian plaintiffs had a strong chance of success in their enforcement action in Canada, and that this was therefore an opportune time to settle the case.  Steven told Mr. Grinberg that Chevron wanted to avoid a trial in Canada.  The subject of how many shares of the judgment had already been sold came up—Steven told Mr.

---

[18]  Attached hereto as Exhibit 21 is a true and correct copy of this email chain between Steven, Aaron, Peter Grant, myself, and others, dated November 6, 2018.  **MKS-0000090.**

Grinberg that he held a 6.3% interest and that another 15%-16% was held by others. The subject

of the RICO injunction also came up, but I do not recall it being discussed in detail.

21.     When I did not hear anything from Elliott for over a month and a half after the

meeting, I sent Mr. Grinberg a follow up email. In response to my email, Mr. Grinberg advised

me that Elliot was not interested.

### E.     Tony Abbiati Investment

22.     In mid-November 2017, I spoke to Tony Abbiati, a money manager and someone

I consider to be a good friend and a highly sophisticated investor, and the topic of learning more

about my second trip to Ecuador and making an investment in the Ecuador judgment came up.

After we finished talking, I sent Tony links to a number of articles discussing the background of

the Ecuador litigation, and told him what a tremendous opportunity I believed it was.[19]

23.     By November 27, 2017, Tony told me that he could raise a $500,000 investment

"in about 30 seconds," but that he was on the fence about investing given the publicly available

information regarding the RICO judgment against Steven.[20] During a subsequent phone call

between Steven, myself, and Tony, it is my recollection that Steven told Tony that the RICO

judgment was based on fabricated evidence and that Chevron's key witness in the RICO lawsuit

was bribed and now lives under protective custody. I heard Steven make these same statements

whenever he addressed the RICO judgment with others.

24.     On November 28, 2017, I emailed Tony to provide him with additional

information. In that email, I told Tony that investors were not "flocking" to fund Steven's efforts

---

[19]  Attached hereto as Exhibit 22 is a true and correct copy of an email chain between Tony, Steven, and myself dated November 19-November 20, 2017. **MKS-0017007**.

[20]  Attached hereto as Exhibit 23 is a true and correct copy of an email chain between John van Merkensteijn and myself dated November 27, 2017. **MKS-0001359**.

because investors were afraid "of Chevron finding out," which is what Steven had told me. I also passed along a "33 page detailed rebuttal to the civil [RICO] judgement [sic] against Steven," from a May 2017 FDA press release.   I also told Tony, per Steven's direction, that the RICO case against Steven was "over" and that the case was now moving into a new phase in Canada.  Finally, I told Tony that, if I had been in a financial position to do so, I would have invested in Steven's efforts myself.[21]  I was sharing everything I believed to be true at that time largely based on information provided to me by Steven.

25.     On December 16, 2017, Tony executed an investment agreement under which he agreed to invest $500,000 in exchange for a .25% interest in the Ecuador judgment.  On December 23, 2017, I sent countersigned copies of the investment agreement in both English and Spanish to Tony.[22]  In total, $500,000 was deposited into the Bank of America account held by CWP Associates as result of this investment.

26.     I've come to realize that my trust in Steven was misplaced.  During the time I knew him, I experienced a lack of integrity and transparency.  In reflection, I would not have introduced him to any of my contacts, including Tony, had I known then what I know now.  In retrospect, the information I passed along to Tony was one-sided.  While I was not aware of it at the time, it has become clear to me that Steven took advantage of my lack of understanding of the legal system (many times telling me that I was naïve) and misled me about the RICO case and the nature of the court findings against him.

---

[21]  Attached hereto as Exhibit 24 is a true and correct copy of an email chain between Tony and myself dated November 28, 2017.  **MKS-0001914.**

[22]  Attached hereto as Exhibit 25 is a true and correct copy of an email I sent to Tony on December 23, 2017.  **MKS-0016397.**  Attached hereto as Exhibit 26 is a true and correct copy of a fully-executed investment agreement between Tony and the FDA. **MKS-0016398.**

F.     **Investment Agreements and Investor Status**

27.     In late 2017, I offered to help organize all the investor documents and details related to the Ecuador judgment because I couldn't imagine exploring a solution if there was a lack of clarity on how the past investments were structured.  In my worldview, following the flow of funds is a critical component to understanding the current situation and informs how best to proceed.  I was confused on how conversations could be had with potential investors or about a settlement without this information readily available.

28.     In connection with seeking investors, I discussed with Steven the current status of investors in the judgment, how much money he was trying to raise, and what we should tell investors about how the money they invested would be spent.  On the topics of how much money we were trying to raise in total and what we should tell investors about how the money would be spent, Steven told me that his fundraising goal was to "just get as much as [he] can get."

29.     As to the existing investors of the Ecuador judgment, Steven never provided me with adequate documentation to confirm the status of all prior investments, nor did he seem to be tracking the totality of the investments himself.  In fact, in reviewing the documents Steven provided me, I found that a number of the investment agreements did not contain the name of the investor.  Steven told me that the name of the investor was sometimes intentionally often left off the investment agreements for confidentiality purposes.

30.     Despite these challenges, in late 2017 and early 2018, I attempted to document the various interests granted in the Ecuador judgment based on the documents Steven made available to me.  When I was working on this project, Steven told me that some investors had "forfeited" their interests in the judgment by settling with Chevron because entering into a settlement meant that the investor was breaking confidentiality or "walking away" from their investment.  There

was also another category of contingency interests that Steven classified as "disputed."
According to Steven, disputed interests were ones he did not recognize as legitimate even though
these were held by persons who had been granted interests in the judgment and had not settled
with Chevron.  I did not do any independent analysis regarding whether interests were
"disputed" or "forfeited" and, instead, listed the status of each interest as legitimate, forfeited, or
disputed according to Steven and Aaron's direction.

      31.     For example, Steven told me to characterize the interest of Pablo Fajardo (through
his law firm Fromboliere) as "disputed." *See* Exhibit 3 at 3 (MKS-0016124). Aaron mentioned
Fajardo as a lawyer representing the Ecuadorian plaintiffs in Ecuador.  While Steven never
talked about Fajardo in detail, Aaron confided in me that, at one point, Fajardo and Steven had
been very close—like a "father and son," type of relationship while they were in Ecuador
working on the case—and that Steven had helped Fajardo win a Goldman Environmental Prize.
I understood from Aaron that, at some point, Fajardo and Steven had a falling out.

      32.     Attached hereto as Exhibit 3 (**MKS-0016124**) is the most complete schedule of
interests in the Ecuador judgment I was able to create based on the information available to me.
I do not believe that I had complete information and thus cannot verify all of the information on
this schedule.  To the extent I had copies of investment agreements related to the Ecuador
judgment, I produced true and correct copies of those agreements and their terms are reflected on
Exhibit 3.  Although they have received payments from Steven for their involvement in the
pressure against Chevron, I do not know whether Simon Billenness, Rex Weyler, and Kathleen
Mahoney have interests in the Ecuador judgment.  Neither do I know whether Charles Nesson
has an interest in the Ecuador judgment.

33.     To the best of my knowledge and based on the documents shared with me, the equity holders in the Ecuador judgment according to Steven are: (1) Glenn Krevlin; (2) Cliff Eisler; (3) WDIS Finance LLC (which I understood to be acting at the direction of John van Merkensteijn); (4) Indigenous People Limited (which I understood to be acting at the direction of Ian Watson); (5) Fenwick (which I understood to be acting at the direction of Roger Waters); (6) Wellbeck Partners (which I understood to be an investment sourced by Josh Rizack); (7) CHV LLC (which I understood to be acting at the direction of Tony Abbiati); (8) Steven; (9) Aaron Page; (10) Patricio Salazar; (11) Augustin Salazar; (12) Eva Golinger; (13) Karen Hinton; (14) Downey McGrath; (15) The Rising Group (which I understood to be acting at the direction of Josh Rizack); and (16) Phil Fontaine.  These individuals and entities are listed by their initials in Exhibit 3.  Equity investments were contemplated for Peter Grant, John Philips, Ben Barnes, and Campbell Ford, but I am not aware of any executed contract regarding these potential investments.

**G.     Awarding of Interests in the Judgment in Exchange for Services**

34.     Based on my review of the outstanding equity contracts, I was aware that Steven had given equity interests in the Ecuador judgment to various people who were not investors—including Aaron Page, Karen Hinton, Ben Barnes, and Josh Rizack.  I understood from my conversations with Steven that these were people who were performing or had performed services at Steven's direction, including in support of the pressure campaign or other activities related to the Ecuador judgment.  Steven gave his bookkeeper before me, Rizack, a 0.25% interest; Aaron a 0.25% interest; Hinton a 0.125% interest; and considered awarding Barnes a 0.6% interest.

35.     Steven and I had a conversation about similarly compensating me for my services by granting me an interest in the Ecuador judgment. I was still determining how I wanted to be involved and fairness or value created would be a critical component of my decision. Steven was the one driving the conversation that he could give me a percentage of equity. A contract was never drafted to reflect this, but my potential interest was listed on the summary since he mentioned it.

**H.     Conversion of Personal Debt to Interests in the Judgment**

36.     Steven told me and potential investors that he held a 6.3% interest in the Ecuador judgment. I was not aware, and Steven never mentioned, that the Ecuadorian plaintiffs had determined that he had to give back part of this interest after evidence of fraud emerged in U.S. courts. I noted in some of the documents that his lawyers during the RICO trial were granted a percentage of his 6.3% and this was documented in the equity summary.

37.     Based on the documents I reviewed and my discussions with Steven, I became aware that, on or about February 17, 2011, Glenn Krevlin, an investor in the Ecuador judgment, had made a personal loan to Steven of $250,000.[23] Steven initially wanted to pay this loan off with a portion of his claimed 6.3% interest in the Ecuador judgment.[24] But he later decided that he wanted to change the method of paying off of the Krevlin loan "from SRD share to direct equity," that is, Krevlin would be given an interest in the judgment without reducing Steven's 6.3% share. *See* Exhibit 4. **MKS-0006498.** I am not aware whether the loan Krevlin made to Steven was converted to equity in the Ecuador judgment.

---

[23]  Attached hereto as Exhibit 27 is a true and correct copy of a letter dated May 9, 2012 sent by Purrington Moody Weil LLP to Mr. Krevlin and attaching two replacement promissory notes evidencing Steven's debt to Mr. Krevlin. **MKS-0002564.**

[24]  Attached hereto as Exhibit 28 is a true and correct copy of an email chain between Steven, Aaron, and myself dated January 2, 2018. **MKS-0002169.**

38.     Steven wanted to treat a personal loan from David Sherman similarly. *See* Exhibit 4. **MKS-0006498.** I am not aware of whether Sherman's loan was ultimately converted into equity in the judgment. However, Steven provided me with capitalization tables, initially prepared by Josh Rizack, that list Sherman as having a portion of Steven's equity stake. I was told that Steven paid back $125,000 of the $250,000 loan, but never saw any supporting documentation.

39.     Steven also discussed converting shares in his 6.3% interest that I understood were held by his trial counsel in the RICO case, Zoe Littlepage and Rick Friedman, into general shares in the judgment. I am not aware whether this was done.

40.     Steven also instructed me to prepare an agreement granting "[e]quity" in exchange for "$100k of services" to Campbell Ford. I had never heard of Mr. Ford previously and noticed that he was an attorney based in Jacksonville, FL.[25] Steven told me it was a personal matter. I am not sure whether this agreement was executed.

**I.      Forward Looking Budget for Investors and Potential Investors**

41.     In late 2017, Glenn Krevlin insisted that Steven provide him with a budget for expenses going forward before Krevlin would agree to make any further investment. Attached hereto as Exhibit 30 (**MKS-0016057**) is the budget for 2018 that I created to provide to Mr. Krevlin. Steven provided me with the figures for this budget, which he reviewed and approved, and told me it included payments to persons who had received payments from Steven in the past for their services.

---

[25]   Attached hereto as Exhibit 29 is a true and correct copy of an email chain between Steven and myself dated March 9, 2018. **MKS-0002083.**

42.     As reflected on Exhibit 30, the budget represents that going forward the bulk of the money would be spent on Steven and others working with him on his pressure campaign, including Aaron Page.  The single largest line item in the budget was a $300,000 allocation for Steven's "retainer," and a $150,000 line item that he described as "reimbursement" for "back salary" and "direct expenses."  Thus, out of a total budget of $1.278 million for 2018, more than a third of it was earmarked to be paid to Steven.

43.     The budget also included allocations for cash payments to a number of individuals and entities that provide services to Steven in support of his efforts to wage a pressure campaign against Chevron.  For example, the budget included payments to Aaron Page.  In my observation, Aaron did whatever Steven asked.  From what Steven shared with me, Aaron's work was prioritized by Steven on a weekly or monthly basis.  Based on the agreement I reviewed and my discussions with him, in addition to receiving cash payments, Aaron was granted a 0.25% equity stake in the Ecuador judgment on January 11, 2017.  When I was working on these budgeting issues and managing the expenses paid, Aaron told me he was surprised that Steven was giving me access to so much of the financial information because he usually did not allow anyone access to that information.

44.     The budget also included a $120,000 annual salary for a full-time attorney, which Steven told me was slated for Anton Tabuns, a Canadian attorney hired to work on out-of-court strategies and to leverage Steven's time.  He mentioned that Anton was familiar with the case already, although I was not aware in what capacity.  Additionally, the budget provided for payments to Cristina Muñoz, a journalist; Rex Weyler, one of the founders of Greenpeace, who was paid to write articles about the case; and Simon Billenness, who worked on shareholder strategies against Chevron in the United States.

45.     The other budget items were payments to a number of individuals and entities in Ecuador, the purposes of which were not explained in detail to me, including $36,000 in payments to the FDA, for what I was told were annual overhead expenses; $24,000 in payments to Juan Aulestia for "Ecuador management;" and $12,000 to Luis Yanza for "Ecuador community / client relations." Mr. Yanza was paid through his daughter, Shuyana Natalia Alluaca.

46.     In the cover email to Krevlin to which the budget was attached, which I helped edit, Steven explained that he was seeking "major capital partners" "whose participation will help put major pressure on Chevron to settle the matter."[26]

47.     Steven also asked me to create a document that would summarize what he called his "investment" in the Ecuador case so that he could show the FDA what he had personally invested in the case. Upon Steven's approval, Josh Rizack shared a spreadsheet that he explained to me tracked Steven's supposed investment. However, the spreadsheet was so disorganized that I could not use it and there was no documentation to substantiate anything in it. When I reviewed some of the historical materials contained in the boxes that Josh Rizack passed along, I did note that a personal credit card summary reflected approximately 40% of the expenses during that period were allocated to restaurants.

J.     **Canadian Counsel's Involvement in Fundraising and the CWP Account**

48.     From my discussions with Steven and review of documents, I learned that prior to my involvement, Lenczner Slaght Royce Smith Griffin LLP, and in particular, Alan Lenczner (who Steven told me represents the Ecuadorian plaintiffs in the Canadian enforcement action)

---

[26]  Attached hereto as Exhibit 31 is a true and correct copy of the cover email Steven sent to Glen Krevlin on December 11, 2017. **MKS-0002338.**

were signatories on investor agreements, received investor funds in an account in Canada, and then passed on some of those funds to Steven. After I got involved, Steven told me that he wanted to change this practice and have me open an account and manage the investor funds going forward. Steven told me that he didn't want the investor funds to be directed to Lenczner because it was no longer necessary now that Lenczner's firm had been sufficiently compensated and he was afraid that Lenczner would ask for more money if Lenczner knew that there were new investors. Steven asked if a Canadian bank account could be established and, upon doing some research, I learned that the account owner had to be a Canadian citizen or landowner. Beginning in or around December 2017, according to the investment summary, Alan Lenczner was left off of any new investment agreements and I am not aware if he knew of the new investments.

49.     In order to be in a position to manage investor monies as Steven had requested, in December of 2017, I created a d/b/a entity called "CWP," for "Chevron Will Pay," and opened a bank account at Bank of America (the "CWP Account"). The d/b/a CWP Associates is a pass-through entity under the umbrella of my company, Streamline. Attached hereto as Exhibit 32[27] is a true and correct copy of the Bank of America CWP Account statement for the period from December 22, 2017, through December 31, 2017.

50.     The purpose of the CWP Account was to receive and disburse investor monies at Steven's direction. As far as I could tell, Steven had complete control and discretion over how this money, which belonged to the FDA, was spent. I was not aware of any approval process that existed or was followed with respect to any of the funds disbursed from the CWP Account pursuant to Steven's directions. I never saw any approval from the FDA, the Ecuadorian

---

[27] MKS-0006473.

plaintiffs, or others for Steven's retainer or other invoices or for any payments of his invoices, or any agreement reflecting his entitlement to these payments. He told me that he spoke to the FDA regularly regarding the way funds were allocated and spent. I understood Luis Yanza and Carmen Cartuche to be associated with the FDA.

51.     **Deposits**: Following the opening of the CWP Account, on or around January 2, 2018, an entity called CHV, LLC (Tony Abbiati's investment vehicle) wired $250,000 into the account pursuant to an investment agreement. On or about January 5, 2018, James McCaffrey, who I understood to be acting with Tony and the CHV entity, transferred another $250,000 into the CWP Account. On or around January 18, 2018, Glenn Krevlin, another investor in the Ecuador judgment, wired $250,000 into the CWP Account. The total amount that investors wired into the CWP account over the few months during which it was active was $750,000. Attached hereto as Exhibit 33[28] are true and correct copies of the Bank of America CWP Account statements confirming these deposits.

52.     **Payments**: As soon as I had the CWP account opened and investor money had been deposited, Steven immediately sent me various "invoices" payable to him. Specifically, he sent me the 4 invoices attached hereto as Exhibit 34 (**MKS-0000396; MKS-0000398; MKS-0000405; MKS-0000404; MKS-0000389**), seeking total payments of $325,000 from the $750,000 in investor monies we had just received. No back-up was ever provided to me for these invoices. I paid three of the invoices in the total amount of $125,000 at Steven's direction in the period from January 30, 2018 to March 9, 2018. I did not pay a $200,000 invoice Steven submitted to me on February 5, 2018 for a "[p]artial reimbursement for legal and consultative services and expenses/Ecuador environmental case," which directed that $50,000 be paid to

---

[28] MKS-0006477.

Laura Miller (Steven's wife), and the remaining $150,000 be paid to Steven. I did not pay the February 5, 2018 invoice because Steven told me to hold off.

53.       In addition, in April 2018, I processed two payments from the CWP account to pay Steven's monthly American Express credit card expenses. On or about April 2, 2018, I paid Steven's American Express credit card balance in the amount of $1,115.86. On or about April 16, 2018, I paid Steven's American Express credit card balance in the amount of $10,992. Attached hereto as Exhibit 35[29] is a true and correct copy of the Bank of America CWP Account statement for the period from April 1, 2018 to April 30, 2018, which reflects these payments.

54.       At Steven's instruction, I also processed a number of payments to a variety of individuals or entities. These payments can be seen in the CWP P&L Detail chart I created, which is attached hereto as Exhibit 36 (**MKS-0006026**).

55.       I understood the $15,286 and $2,000 payments to Fundación Naupa that are documented in Exhibit 36 to be intended for Juan Aulestia, an Ecuadorian. I had met Aulestia in person when I visited Ecuador in September 2017, and I understood that he had a role in coordinating things in Ecuador, but I was not sure as to his specific role, and I do not know what services were provides in exchange for these payments. I understood Fundación Naupa to be the name of Juan's consulting firm.

56.       **Closing the CWP Account:** In or around March 2018, I decided that working with Steven was going to be a challenge and began considering how to move on and transfer the bookkeeping responsibilities. Thereafter, on March 19, 2018, I received a document preservation order from counsel for Chevron and on April 13, 2018, I received document and deposition subpoenas from Chevron. About one week after receiving the preservation order, I

---

[29] MKS-0006493.

told Steven that this work was no longer going to be a part of my future and ceased

communication.  I then received a series of WhatsApp messages from Aaron.  Aaron requested

that I put him in touch with my lawyer and threatened that, if I did not turn the balance of CWP

Account over to him, he and Steven would be forced to take legal action against me.[30]

57.     After consultation with my lawyer at the time, Frank Libby, on May 3, 2018, I

closed the CWP account and, after all outstanding payments had been made, transferred the

remaining funds to Aaron.  Per Aaron's request, and after consulting with counsel, I also

transferred to Aaron my case related files, after first making a copy of the same.

58.     Aaron acknowledged receipt of these funds and files in a letter to my attorney

Frank Libby, dated May 3, 2018.  A true and correct copies of the May 3, 2018 letter is attached

hereto as Exhibit 38.[31]

59.     I made the payment to Aaron by obtaining a cashier's check in the amount of

$342,045.  A true and correct copy of the Cashier's Check Customer Copy is attached hereto as

Exhibit 39.[32]

60.     Before closing the CWP Account and transferring the remaining funds to Aaron, I

paid Steven's American Express credit card statement in the amount of $11,796 via a cashier's

check, and also issued a cashier's check in the amount of $2,580 to myself to cover my out- of-

pocket expenses in connection with this project.  *See* Exhibit 39.  I was not aware that, shortly

after these funds were transferred to Aaron, he transferred them to an account controlled by

Steven.

---

[30]  Attached hereto as Exhibit 37 is a true and correct copy of my WhatsApp messages with Aaron, which is an
excerpt of the WhatsApp messages that I produced in this action.  **MKS-0020982.**

[31]  **MKS-0021204.**

[32]  **MKS-0021203.**

61.     I am no longer involved with Steven or his efforts related to the Ecuador

judgment.

Executed on this 28th day of September, 2018 at Boston, Massachusetts.

Mary K. Sullivan

international law * human rights * the environment

*Forum Nobis* pllc

A PROFESSIONAL
LIMITED LIABILITY
COMPANY

Aaron Marr Page
*Managing Attorney*
Forum Nobis PLLC
1015 15th Street NW, Ste 1110
Washington, D.C. 20005
+1 202 618 2218
aaron@forumnobis.org

May 3, 2018

<u>VIA FIRST-CLASS MAIL</u>

Frank Libby, Esq.
LibbyHoopes, P.C.
399 Boylston Street, Suite 600
Boston MA 02116

RE:    Acknowledgment of receipt: FDA-related materials, documents, and funds

Dear Mr. Libby:

This letter sets forth certain parameters and acknowledgments regarding the transfer of materials, documents, and funds from your client, Ms. Katie Sullivan, to me, in my capacity as a representative of the *Frente de Defensa de la Amazonzia* (FDA).

<u>Preliminary Statement</u>

To be clear, I will be acting in this transfer process on behalf of the FDA and not as an agent for Mr. Steven Donziger in his personal capacity.

I am an attorney admitted to practice in the District of Columbia since June 2007. I presently reside in Iowa, where I am also admitted to practice since January 2018.

Ms. Sullivan has transferred, and I have accepted, certain materials and documents relating to—and monies derived from—the Funding Escrow Account as that term has meaning in various FDA investment contracts (hereinafter "the Materials and Funds"). I agree to hold the Materials and Funds solely for uses provided within or consistent with such investment contracts (for example, the Ecuador Judgment Investment Agreement dated Dec. 16, 2017).

I am aware of no Order or other writing from any source having the force or effect of precluding either Ms. Sullivan's transfer or my receipt of the Materials and/or Funds under the terms and conditions set forth herein. To the extent any Order or writing impacts, is deemed to impact, or hereafter comes to impact the Materials and/or Funds, any such Order and/or writing will be duly observed by me.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0021204

**SA125**

**Frank Libby**
May 3, 2018
Page 2 of 3

## Acknowledgment of Receipt

This will acknowledge my receipt of the following categories of Materials and Funds as described more fully below: (A) Business records and other operating documents relating to FDA investment contracts previously in Ms. Sullivan's possession; (b) certain monies previously held on account for the benefit of the FDA.

### *The Materials*

(1) Two boxes of documents collected from Mr. Joshua Rizack.

(2) One 3-ring binder entitled "CWP Associates 2018," containing investment documents.

(3) One redwell containing statements and transaction detail for a certina American Express card issued in the name of "Steven R. Donziger" (acct number ending in 611013).

(4) Statements and account activity for Bank of America account issued to CWP Associates (account ending in 9158).

(5) Quickbooks reconciliation summaries for CWP Associates.

(6) Invoices/receipts for various litigation related expenses incurred by and reimbursed to Ms. Sullivan.

(7) Invoices covering various litigation-related expenses submitted to Ms. Sullivan by Steven Donziger, the U.S. Representative for the FDA.

I further understand that Ms. Sullivan has retained copies of the above-described Materials.

### *The Funds*

The Funds have been transferred from Bank of America account ending in 9158, opened Dec. 22, 2017 ("BOA Account"). An accounting of the funds—as of the date of account closing—appears immediately below:

Total deposits as of May 1, 2018: $825,120 (includes returned wire transfers).

Total debits as of May 1, 2018: $468,698.34 (includes returned wire transfers).

Balance as of May 1, 2018: $356,421.66.

Payments for each of the following litigation-related expenses were made prior to closing out the BOA account:

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

Frank Libby
May 3, 2018
Page 3 of 3

    1.  $2580.30 to Ms. Katie Sullivan for various litigation related expenses incurred by her;

    2.  $11,746.20 to American Express to cover postage and other litigation-related charges incurred by Mr. Donziger from April 10, 2018 to May 1, 2018.

Net funds transferred: $342,045.16 (less any standard wire or bank check fee).

RECEIPT ACKNOWLEDGED

  I hereby acknowledge receipt of the Materials and Funds

_____       5/3/2018
Aaron Marr Page                    DATE

*Acting for the benefit of the*
*Frente de Defensa de la Amazonia*

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0021201

Notice to Purchaser - In the event that this check is lost, misplaced or stolen, a sworn statement and 90-day waiting period will be required prior to replacement. This check should be negotiated within 90 days.

Cashier's Check - Customer Copy

No. 1462010035

Void After 90 Days        30-1/1140
                          NTX

Date 05/03/18 10:18:03 AM

NEEDHAM
0005      0088231      0040

**BANK OF AMERICA**

Pay
**Three Hundred Forty One Thousand Nine Hundred Forty Five and 16/100 Dollars**

**\*\*$341,945.16\*\***

To The
Order Of    AARON M PAGE FBO FDA

CLOSING BALANCE

Not-Negotiable
Customer Copy
Retain for your Records

Remitter (Purchased By):   CWP ASSOCIATES

Bank of America, N.A.
SAN ANTONIO, TX

001641005388

---

Notice to Purchaser - In the event that this check is lost, misplaced or stolen, a sworn statement and 90-day waiting period will be required prior to replacement. This check should be negotiated within 90 days.

Cashier's Check - Customer Copy

No. 1462010034

Void After 90 Days        30-1/1140
                          NTX

Date 05/03/18 10:16:09 AM

NEEDHAM
0005      0088231      0039

**BANK OF AMERICA**

Pay
**One Hundred and 00/100 Dollars**

**\*\*$100.00\*\***

To The
Order Of    AARON M PAGE FBO FDA

CLOSING BALANCE

Not-Negotiable
Customer Copy
Retain for your Records

Remitter (Purchased By):   CWP ASSOCIATES

Bank of America, N.A.
SAN ANTONIO, TX

001641005388

**SA128**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0021202

Notice to Purchaser - In the event that this check is lost, misplaced or stolen, a sworn statement and 90-day waiting period will be required prior to replacement. This check should be negotiated within 90 days.

Cashier's Check - Customer Copy

No. 1462010032

Void After 90 Days          30-1/1140
                                 NTX

Date 05/03/18 10:11:34 AM

NEEDHAM
0005      0088231      0037

Pay    BANK OF AMERICA    2580 30

**Two Thousand Five Hundred Eighty and 30/100 Dollars**

**$2,580.30**

To The
Order Of    KATIE SULLIVAN

Not-Negotiable
Customer Copy
Retain for your Records

Remitter (Purchased By):  CWP ASSOCIATES

Bank of America, N.A.
SAN ANTONIO, TX

001641005388

---

Notice to Purchaser - In the event that this check is lost, misplaced or stolen, a sworn statement and 90-day waiting period will be required prior to replacement. This check should be negotiated within 90 days.

Cashier's Check - Customer Copy

No. 1462010033

Void After 90 Days          30-1/1140
                                 NTX

Date 05/03/18 10:13:04 AM

NEEDHAM
0005      0088231      0038

Pay    BANK OF AMERICA    11796 20

**Eleven Thousand Seven Hundred Ninety Six and 20/100 Dollars**

**$11,796.20**

To The
Order Of    AMERICAN EXPRESS

Not-Negotiable
Customer Copy
Retain for your Records

Remitter (Purchased By):  CWP ASSOCIATES

Bank of America, N.A.
SAN ANTONIO, TX

001641005388

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0021203

**Bank of America** | Cashier's Check | No. 1462010034

Notice to Purchaser - In the event that this check is lost, misplaced or stolen, a sworn statement and 90-day waiting period will be required prior to replacement. This check should be negotiated within 90 days.

Void After 90 Days | 30-1/1140 NTX | Date 05/03/18 10:16:09 AM

NEEDHAM
0005    0088231    0039

Pay

BANK OF AMERICA ONE ZERO ZERO CTSCTS 100.00

**$100.00**

**One Hundred and 00/100 Dollars**

To The Order Of   AARON M PAGE FBO FDA

CLOSING BALANCE

Remitter (Purchased By):   CWP ASSOCIATES

Bank of America, N.A.
SAN ANTONIO, TX

AUTHORIZED SIGNATURE

00-53-3364B  11-2010

⑈1462010034⑈ ⑇114000019⑇ 00164100538811⑈

THE ORIGINAL DOCUMENT HAS A REFLECTIVE WATERMARK ON THE BACK. HOLD AT AN ANGLE TO VIEW WHEN CHECKING THE ENDORSEMENTS.

---

**Bank of America** | Cashier's Check | No. 1462010035

Notice to Purchaser - In the event that this check is lost, misplaced or stolen, a sworn statement and 90-day waiting period will be required prior to replacement. This check should be negotiated within 90 days.

Void After 90 Days | 30-1/1140 NTX | Date 05/03/18 10:18:03 AM

NEEDHAM
0005    0088231    0040

Pay

BANK OF AMERICA THREE FOUR ONE NINE FOUR FIVE CTSCTS 341945.16

**$341,945.16**

**Three Hundred Forty One Thousand Nine Hundred Forty Five and 16/100 Dollars**

To The Order Of   AARON M PAGE FBO FDA

CLOSING BALANCE

Remitter (Purchased By):   CWP ASSOCIATES

Bank of America, N.A.
SAN ANTONIO, TX

AUTHORIZED SIGNATURE

00-53-3364B  11-2010

⑈1462010035⑈ ⑇114000019⑇ 00164100538811⑈

THE ORIGINAL DOCUMENT HAS A REFLECTIVE WATERMARK ON THE BACK. HOLD AT AN ANGLE TO VIEW WHEN CHECKING THE ENDORSEMENTS.

October 25, 2018

<u>**VIA ECF**</u>

Honorable Lewis A. Kaplan
United States District Judge
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

   RE:   *Chevron v. Donziger*, Case No. 11 Civ. 691 (LAK)

Dear Judge Kaplan:

I write to respectfully inform the Court that I will be unable to comply with the order dated October 18, 2018 directing me to produce a potentially massive quantity of confidential and privileged documents and communications to Chevron.

I note that I have firmly asserted privilege over these documents in a manner consistent with the context of the proceedings and my abilities as a sole practitioner facing an onslaught of litigation in multiple fora. Many of Chevron's requests are ridiculously overbroad. For example, Request No. 21: "All DOCUMENTS evidencing or relating to any communication between YOU and any PERSON or ENTITY since March 4, 2014 concerning the ECUADOR JUDGMENT." As the Court knows, largely the entirety of my professional life revolves around the Ecuador case, which in turns revolves around the Ecuador Judgment. This one request sweeps in unknown thousands or tens of thousands of documents and communications, many of which are obviously likely to reflect highly protected attorney opinion work product and attorney-client communications or confidential information derived from such communications. Chevron has repeatedly refused to narrow this Request or any other Request. The Court cannot with a straight face suggest that I should be required to fully log, describe, and individually assert privilege regarding each of these documents and communications in order to maintain the privilege, especially when key preliminary legal questions remain unresolved (see below). If Chevron wishes to proceed with discovery, it should work with me to narrowly target its requests to information relevant to its claims regarding the litigation finance efforts and the existence

of my assets, and this Court should resolve my long-standing objections to the basic foundation of these post-judgment proceedings.

This brings us to the real issue—the elephant in the room that I have been trying to draw attention to for over six months. I have repeatedly pleaded with the Court to explain to me how it can even pretend that it was "contemptuous" of me to continue to raise funds through pre-collection litigation finance when the Court itself acknowledged in its April 2014 Opinion on my stay motion that "[t]his case *always has been financed* on the movants' side by outside investors" and assured me that the RICO Judgment "*would not prevent Donziger from being paid*, just as he has been paid at least $958,000 and likely considerably more over the past nine or ten years." Dkt. 1901. In the same Opinion, the Court explained that the RICO Judgment's constructive trust and monetization provisions only impacted "proceeds" of a "collection" on the Ecuadorian Judgment. *Id.* And when I worried that the RICO Judgment would freeze up financing for my appeal and for ongoing Canadian litigation, the Court dismissed my concerns as so "fanciful" and "far fetched" as to "border on the irresponsible." *Id.*

The Court now appears to have changed its mind regarding what the word "traceable" means. I don't think that is proper as a matter of the law of the case, but even that is a separate issue. Even if the Court has improperly changed its position and now regards "traceable" as that described in its August 15, 2018 Order, and even if the Court's Default Judgment has changed the scope of allowable financing efforts in the United States, the Court cannot pretend that it has the ability to travel back in time and make "traceable" mean something different than what was described the April 2014 Opinion. As the Court knows, a finding of contempt against me is only possible if I knowingly and willfully disobeyed a clear and unambiguous order of the Court. In light of the Court's own words to me in its April 2014, it is impossible to maintain that a prohibition against litigation financing was so clear between April 2014 and August 2018 that I might lawfully be found in contempt. As such, the Court should have long ago ruled against Chevron on its original contempt motion filed in March 2018—thus eliminating the main basis to proceed with Chevron's massive post-judgment discovery which now has resulted in a wholly unjustified waiver of all of my privileges and a blank warrant for the company and its lawyers to target supporters of my clients in an effort to dry up funding for the case and the corporate accountability campaign.

Instead, apparently trapped by its own words, the Court has responded to this grave violation of my Constitutional rights and those of my clients with a transparently abusive strategy of silence and non-action. It has refused to address the key issue underlying Chevron's original contempt motion for over six months now. Meanwhile, the Court has greenlighted Chevron's outrageously intrusive discovery, intimidation, and demonization campaign—all of which, again, has zero basis to proceed if there is no colorable contempt

case against me.[1] Were I to comply with the Court's October 18 Order (including without any assurances as to the scope of the individual requests, because the Court has refused to rule on my individual scope and burden objections), Chevron would succeed in gaining near wholesale access to my confidential, privileged, and protected documents, without any legitimate basis.

The Court's refusal to rule on the core issue in Chevron's original contempt motion has also strategically denied me an uncomplicated avenue of appellate relief—even though I do maintain that I have legitimate grounds for both a direct and interlocutory appeal and am pursuing those appeals in the Second Circuit. If the Court really thinks that a prohibition on litigation finance was so clear after April 2014 that I can be held in contempt thereof, it should make such a finding directly, which would allow me to seek appellate review. Because the Court refuses to do this, I apparently must take a contempt sanction in this second-layer discovery context, try to consolidate it with the pending appeals, and trust that the Second Circuit will be able to appreciate it all in totality and in the larger and deeply disturbing context of these post-judgment proceedings generally.  I would urge the Court to rule on these critical issues or hold me in contempt and thereby allow me to appeal to the Second Circuit.

Sincerely,

/s _____

Steven R. Donziger

---

[1]   Chevron's massive and growing discovery campaign against me and third-parties (including most recently public media outlets) is also illegitimate for the reason that it seeks to intrude on confidential internal deliberations and strategies of the loose team of advocates seeking to hold Chevron accountable for its contamination in Ecuador, and thus works a clear violation of the First Amendment right to association as protected by Second Circuit and Supreme Court precedent. Chevron is establishing the foundations of this constitutional violation day by day as it expands its vitriolic attacks on the "environmental, indigenous and shareholder activists, academics, and others who partake in [] efforts to force Chevron into a settlement" for its Ecuador liability. Dkt. 2107 at 1 (Chevron motion).

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Randy M. Mastro
Direct: +1 212.351.3825
Fax: +1 212.351.5219
RMastro@gibsondunn.com

October 26, 2018

<u>VIA ECF</u>

The Honorable Lewis A. Kaplan
United States District Judge
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, 10007

Re:     *Chevron Corp. v. Donziger*, No. 11 Civ. 0691 (LAK)

Dear Judge Kaplan:

I write as counsel for Plaintiff Chevron Corporation ("Chevron") to provide the Court with Chevron's proposed Forensic Inspection Protocol (the "Protocol") (attached hereto as Exhibit A) and to respectfully request that the Court order Donziger to appear for deposition on December 12, 2018, pursuant to this Court's October 18, 2018 order granting Chevron's Second Motion to Compel Donziger to Respond to Post-Judgment Discovery Requests.  Dkt. 2108.  Chevron also requests that the Court appoint a Special Master to preside over the deposition given Donziger's stated intent to limit the scope of the deposition improperly.

In its October 18 Order, the Court directed Donziger to appear for a deposition on a date agreed to by the parties by October 25, 2018, or on a date fixed by the Court.  The Court also ordered that Donziger's electronic devices be forensically imaged and examined, and directed the parties to agree on a procedure for the imaging and examination of Donziger's electronic information by October 26, 2018.  Chevron's counsel attempted to meet and confer with Donziger.[1]  *See* Exhibit B.  Donziger, however, refused to engage in any substantive discussion regarding either issue during the scheduled meet and confer teleconference (which was delayed twice at his request).  Instead, he insisted that he was going to send Chevron's counsel an email.  *Id.* at 1.

Donziger then sent an email in which he states that he intends to "go into contempt" with respect to this Court's order.  *Id*. at 2.  Donziger also stated that "I would like to see any deposition as an opportunity to help you understand the nature (and legitimacy) of the litigation finance efforts.  If you choose to use the deposition differently, i.e. to harangue me

---

[1]  Attached hereto as Exhibit B is a true and correct copy of email correspondence between Chevron's counsel and Donziger dated October 25, 2018.

Beijing • Brussels • Century City • Dallas • Denver • Dubai • Frankfurt • Hong Kong • Houston • London • Los Angeles • Munich
New York • Orange County • Palo Alto • Paris • San Francisco • São Paulo • Singapore • Washington, D.C.

The Honorable Lewis A. Kaplan
October 26, 2018
Page 2

about miscellaneous topics unrelated to the financing or my assets, I will probably choose not to cooperate for very long." *Id*. at 2.

Counsel for Chevron followed up with Donziger in writing, asking him to consent to a date for a deposition, seeking to confirm that he did not intend to comply with this Court's order regarding the forensic imaging of his electronic devices, and requesting that he confirm no devices or information had been destroyed. *Id*. Donziger did not respond, and yesterday, confirmed his intention to refuse to comply with this Court's order in a letter to the Court. Dkt. 2118 at 1.[2]

Accordingly, Chevron is providing the Court with its proposed Protocol for the collection, imaging, and analysis of Donziger's electronic devices without Donziger's input. The Protocol proposes the appointment of Alix Partners as a Neutral Forensic Expert that will collect and image Donziger's devices and accounts. *See* Protocol at ¶ 1. Alix Partners is a highly qualified vendor that has provided no prior services in this litigation or related litigation.[3] The Protocol also provides for the inspection and analysis of the forensic images of Donziger's devices and accounts by Chevron's Forensic Expert. *See* Protocol at ¶ 11–16, 19. This inspection and analysis is necessary to identify relevant documents, as well as to investigate any potential attempts to delete or hide relevant information. Chevron will be filing proposed search terms and a brief in support of the adoption of its proposed Protocol shortly.

Additionally, Chevron respectfully requests that the Court order Donziger to appear for a deposition on December 12, 2018. Chevron proposes the date of December 12, 2018 on the assumption that the imaging and searching of Donziger's devices for responsive documents, as well as their production, will be complete by then. Chevron reserves the right to request that the Court order the deposition to take place on a later date should circumstances change. In view of Donziger's stated intention to limit the scope of the deposition improperly, Chevron also requests that the Court appoint a Special Master to preside over the deposition.

---

[2] Chevron disputes the allegation that it has "repeatedly refused to narrow" the document Request identified by Donziger in his letter, or any other Request. Dkt. 2118 at 1. Rather, it is Donziger that has refused to engage in any cooperative discovery process, necessitating two motions to compel, and he still has yet to produce even those documents he apparently does not dispute he must produce, documents regarding "litigation finance efforts and the existence of [his] assets." *Id*. at 1-2. It is far too late for Donziger to fall back on the meet and confer process to further avoid or delay compliance with his discovery obligations, as set forth in this Court's orders.

[3] Attached hereto as Exhibit C is an email dated October 25, 2018 from Sean Dowd of Alix Partners, providing a rate range for Alix Partners' work.

The Honorable Lewis A. Kaplan
October 26, 2018
Page 3


Sincerely,


Randy M. Mastro

RMM/sdb

**Champion, Anne**

| | |
|---|---|
| **From:** | Champion, Anne |
| **Sent:** | Thursday, October 25, 2018 4:04 PM |
| **To:** | 'Steven Donziger' |
| **Cc:** | Neuman, Andrea E. |
| **Subject:** | RE: Correspondence from Steven Donziger |

Dear Mr. Donziger,

This is to confirm that Ms. Neuman and I called you this morning to meet and confer on the Court's recent forensic imaging order (Dkt. #2108 at 2-3) and you refused to engage on any substantive issue – insisting instead that you would be sending us an email. I asked during our call that you discuss both a mutually agreeable forensic expert and a deposition date. You refused to discuss either. We are now in receipt of your email below regarding the pending order that we were scheduled (yesterday and this morning) to meet and confer on.

In reference to the Court's October 18, 2018 order, you state below that you are "going into contempt". We understand this to mean that you are (1.) refusing to jointly recommend a forensic expert to the Court to conduct the imaging of your devices and accounts, (2.) refusing to discuss or agree to protocols pursuant to which that imaging will take place, and (3.) refusing to produce your devices and accounts. If this is not correct, please inform us of which, if any, of these items you are <u>not</u> refusing to do immediately. As to your deposition, it needs to take place after your devices and accounts have been imaged and searched and responsive documents have been produced. We have thus proposed the date of December 6, 2018, but we do not agree to your purported exercise of unilateral control over the subject matter of the deposition as described below. We will inform the Court today of this exchange and Chevron's proposed deposition date and request that the deposition take place in the presence of a Special Master.

In addition, please confirm that you have not altered or otherwise disposed of any devices and accounts at any time during these proceedings, including but not limited to since the issuance of the Court's most recent order.

Best regards,

**Anne Champion**

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
200 Park Avenue, New York, NY 10166-0193
Tel +1 212.351.5361 • Fax +1 212.351.5281
AChampion@gibsondunn.com • www.gibsondunn.com

---

**From:** Steven Donziger <sdonziger@donzigerandassociates.com>
**Sent:** Thursday, October 25, 2018 10:02 AM
**To:** Champion, Anne <AChampion@gibsondunn.com>; Neuman, Andrea E. <ANeuman@gibsondunn.com>
**Subject:** Correspondence from Steven Donziger

[External Email]
Anne and Andrea,

I write to advise you of my anticipated course of action regarding Judge Kaplan's order regarding the motion to compel that waived all of my privileges. To be clear, I continue to assert all of my privileges and my position is that I have not waived any of my privileges.

As you know, I have yet to receive a ruling from the court regarding your client's original motion to hold me in contempt filed in March of this year. This is highly unusual and violates my due process rights, among other problems, in that it prevents me and my clients in Ecuador from knowing what the court considers appropriate fundraising in light of the RICO judgment and the later clarification order issued in April 2014 that clearly authorized fundraising for the case and payments to me for my work on the same.

As a result, I presently see no choice other than to go into contempt until I can get a ruling on the most basic issues that are driving what I believe to be your entirely inappropriate, over-broad, intrusive, and constitutionally infirm discovery rampage targeting financial supporters and others of the Ecuadorians that is clearly designed to dry up funding for the case and to intimidate those who support both the litigation and the broader corporate accountability campaign (what you call a "pressure" campaign) against your client Chevron.

I don't want to go into contempt, but I genuinely feel that the court has given me no choice in light of its failure to rule, which is obviously designed to shield its many problematic decisions from appellate review. I will be apprising Judge Kaplan of my position as soon as I can.

That said, I am not unwilling to cooperate with you on getting you information sufficient for you to fully understand the litigation finance efforts of the past few years and the full extent of my assets, especially in light of the extent of the disclosures made by Ms. Sullivan.  I am also fine coming in for a deposition. Again, in light of Ms. Sullivan's disclosures, I would like to see any deposition as an opportunity to help you understand the nature (and legitimacy) of the litigation finance efforts. If you choose to use the deposition differently, i.e. to harangue me about miscellaneous topics unrelated to the financing or my assets, I will probably choose not to cooperate for very long.


Steven

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

CHEVRON CORPORATION,

               Plaintiff,

    v.

STEVEN DONZIGER *et al.*,

               Defendants.

11 Civ. 0691 (LAK)

---

**DECLARATION OF STEVEN DONZIGER**

I, Steven Donziger, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

**<u>Limited Nature of the Affidavit</u>**

1.  This affidavit addresses discrete issues to the best of my personal knowledge and recollection. This affidavit is not intended to be exhaustive regarding the voluminous amount of factual allegations in Chevron's motion given that most of those allegations are false, misleading, tangential, or irrelevant to the legitimate issues in these post-judgment proceedings. The absence of a response in this affidavit to certain of Chevron's factual allegations in its motion does not in any way suggest I concede their veracity. I maintain all applicable privileges.

**<u>Background</u>**

2.  Since the early 1990s, I have worked as an attorney and advocate for Indigenous and farmer communities in Ecuador's Amazon region, specifically in the provinces of Sucumbíos and Orellana. My clients live in roughly 80 communities and towns and are organized through

various entities, one of which is called the Frente de Defensa de la Amazonia or the "Frente" which is also known by its Spanish acronym, FDA.

3.   The FDA is the beneficiary under Ecuadorian law of the judgment in the *Aguinda v. ChevronTexaco* case and is responsible for the execution of the judgment against Chevron's assets both in Ecuador and other jurisdictions where the affected communities choose to enforce. As the entity that organized and sustained the representative *Aguinda* action, the FDA was named in that judgment as the beneficiary of an independent award under Ecuador's Environmental Management Act.[1]   The FDA has been my client for several years, including all of the years following the imposition of the RICO judgment issued in 2014 by the U.S. district court in the *Chevron v. Donziger* case. I also have an attorney-client relationship with certain affected community members and constituent community organizations.

4.   I have worked closely with the leaders of the FDA and certain community members for decades. These individuals include, among others, Luis Yanza, Carmen Cartuche,

---

[1]   The Unión de Afectados y Afectadas por las Operaciones de las Petroleras Texaco (UDAPT) ("Union of Persons Affected by Texaco") is a more newly-created grassroots advocacy organization that grew out of what was formerly known as "the Assembly," an informal or "de facto" organization (initially sponsored by the FDA) that held periodic meetings starting in 2001 where representatives from the various affected communities were invited to share the views of their respective communities about the legal case and related issues. While the UDAPT formally registered as an organization in 2011, it remains a novel and uniquely flexible organization with a number of different mandates, including maintaining solidarity between the suffering affected communities and providing an outlet for those communities' diverse range of views and perspectives. The UDAPT, however, does not exercise any legal authority over the environmental damages award, or its enforcement, or the subsequent environmental remediation that will be accomplished with the funds once collected. It also has no formal authority over the execution of the judgment in Canada or elsewhere, although it is actively involved in said efforts. The UDAPT is also not the "exclusive" voice of the affected people, as there are many different grassroots organizations working in the affected communities, each of which has a role to play. My impression is that the UDAPT has been "taken over" in recent years by my former colleague Pablo Fajardo, who often uses the organization as a vehicle to publicly attack me and thus regrettably serve the purposes of his supposed opponent, Chevron. Mr. Fajardo's motives are not worth dwelling on, except to note that his attacks on me serve at times to distract from the outrage in the affected communities that followed Mr. Fajardo's decision to waive—at the request of the Ecuadorian government, but without consulting his clients—a legal embargo the communities had obtained on $112 million in government funds payable to Chevron that should have been redirected to community health and environmental remediation projects.

Alejandro Soto (deceased in 2018), Rosa Moreno (deceased in 2016), Ermel Chavez, Hugo Camacho, and Medardo Shingue. The FDA and its duly authorized leaders instruct me both in writing and orally. I travel to Ecuador to meet with them several times a year and I participate in conference calls and one-on-one calls with FDA leadership regularly. My relationship with this organization and some of its individuals stretches back 25 years, and is grounded in deep trust based on our shared commitment to obtain justice for those harmed by Chevron's reckless environmental practices and the resulting devastation which was the basis of the liability imposed by the *Aguinda* court.

**General Responsibilities**

5. My responsibilities as an attorney (subject to interim suspension which I am contesting) and advocate for the FDA are intentionally broad. I serve as both a legal case manager and social justice campaign manager for my clients in what is widely recognized as one of the most complex and important corporate accountability battles in the last half-century, or even in all of history.

6. My responsibilities in this regard have included, but are not limited to, the following: a) providing advice regarding strategy, including judgment enforcement activities and efforts in resistance to Chevron's various SLAPP lawsuits, including this RICO action; b) providing advice regarding the corporate accountability campaign my clients have carried out against Chevron since the inception of the case in 1993, which is designed to educate the public about Chevron's toxic dumping and its impacts on people, Indigenous culture, and the environment; c) helping my clients raise and administer funds to pay expenses for both litigation and campaign-related activities concerning Chevron's misconduct in Ecuador, and its impacts; d) engaging in advocacy and public education with government

officials and non-government leaders in the United States, Canada and elsewhere to ensure relevant individuals are adequately informed about the viewpoint of the FDA with regard to various issues, among them, what the FDA believes to be the illegitimate arbitration action initiated by Chevron against the Republic of Ecuador; e) enlisting lawyers to carry out various legal and legal-related activities and to defend against Chevron's retaliatory SLAPP litigation in Ecuador, Canada, the United States, and elsewhere; and f) enlisting support from individuals and organizations, including non-profit advocacy organizations such as Amazon Watch, Rainforest Action Network, and Global Witness, to help publicize the campaign of the Ecuadorians. My work requires me to communicate regularly with the FDA leadership and community leaders, which in turn necessitates regular trips to Ecuador to conduct meetings, community listening sessions, networking events, and the like.

**Obtaining Funding**

7. I have been given authority by the FDA (and other client organizations or representatives of the affected communities) to undertake efforts to raise funds necessary to continue the enforcement of the *Aguinda* judgment and the overall corporate accountability campaign against Chevron over its toxic dumping in Ecuador. While the specifics of such efforts are intentionally left to my discretion, my work is subject to regular oversight from the leadership of the FDA and those individuals have final word should our views come into conflict.

8. As part of my effort to assist the FDA obtain funds, since the 2014 RICO judgment issued I often have served as an intermediary between the FDA leadership and potential funders. I believed, and still believe, that the language of the April 2014 Opinion assured me and others that the scope of the RICO injunction was limited to proceeds on a collection on a

judgment, meaning I could continue to assist my clients in raising funds to finance the RICO appeal, the enforcement litigation in Canada, the broader corporate accountability campaign, and specifically that I could continue to pay my own fees "just as [I had] been paid . . . over the past nine or ten years," *i.e.* from "finance[ing] [provided] by outside investors." Dkt. 1901 at 7-8, 14. On behalf of the FDA, I have helped potential funders and supporters understand the nature of the *Aguinda* case and provided relevant materials for review. I have always encouraged those interested to undertake independent due diligence, including by reviewing Chevron's materials and public filings. To the best of my understanding of the relevant transactions, I have never "monetized" my contingency interest with an investor in any way. To the best of my understanding, and consistent with my efforts, all fund-raising arrangements were designed to be lawful under the injunctive scope of the RICO Judgment and the Court's April 25, 2014 Opinion, as I understood them.

9.  I have repeatedly been given authority and instructions by the FDA to spend and direct the distribution of funds from investors. These funds were necessary to continue the enforcement litigation and overall corporate accountability campaign against Chevron. Again, the specifics of such expenditures have been intentionally left by the FDA to my discretion, an arrangement which the FDA leaders feel comfortable with given my demonstrated long-term loyalty and deep experience working on the case and advocacy campaign. My work and that of others in this regard and others is subject to FDA oversight which takes place on a regular basis through phone communication and in-person meetings in Ecuador.

10. FDA representatives have assured me on multiple occasions that they understand my unique value to their litigation and accountability campaign  given my years of experience

working on it; my deep institutional knowledge, given that I am the only lawyer who originated the case in 1993 still working for the clients; my wide network of personal contacts with supporters and investors across multiple countries; and, my range of legal and advocacy skills.

11. The FDA has committed to compensate me at a fixed rate of $25,000 per month for my work on all the responsibilities described above. Given the amount of hours I spend on the matter in an average month, this actually translates into a relatively modest hourly rate. It is often the case that there are not funds available to pay me and meet other critical case expenses. Often, I insist that certain other critical expenses (such as legal fees in enforcement jurisdictions) are covered first. Although it is understood that any unpaid monthly fee gets rolled into arrears, non-payment has occurred frequently enough over the course of many years (including long stretches without any compensation) that full payment of my arrears has become highly unlikely, a situation that FDA leadership has explicitly recognized in discussions with me. Accordingly, again in light of the long-standing and trusting relationship I have with my clients, the FDA has authorized me to pay down my arrears to the extent possible, at my discretion and in light of other demands on available funds. I have endeavored to do this responsibly as regards my clients without short-shifting what I am due under my agreements with them. I did not always provide detailed invoices because the FDA leaders not only did not request them, but in fact repeatedly expressed a preference that all of my past invoices be resolved essentially by way of settlement when sufficient funds might be available.

12. Similarly, the FDA, through its representatives and after extensive consultation, has been apprised of the substantial outstanding debts I am owed by the case arising from times

when I was forced to rely on personal funds to keep case operations going. Again, the FDA though its representatives has agreed that investor-provided funds should be used to pay down such debt to the extent possible given the availability of funds and the exigency of other funding needs. The FDA, through its representatives and after extensive consultation, also has agreed that all of my legal expenses incurred in responding to Chevron's SLAPP-style and other attacks on me (including the RICO case itself, appeals thereto, and post-judgment proceedings) are properly considered expenses owing to the overall litigation that should be paid from investor-provided funds as they become available and in light of other funding needs.

13. Even though I often was legally entitled draw down funds to satisfy the debts and arrears discussed above as soon as funds were raised, I typically chose to pay other members of our team prior to reimbursing myself for expenditures.  Other times, I would pay myself as appropriate, but later, as funds became tight once again, I would pay other individuals and case expenses from my personal accounts so that necessary efforts could continue with minimal interruption.

14. Because funds for the litigation and enforcement efforts related to the *Aguinda* judgment generally were not sufficient to meet the diverse needs of the litigation and corporate accountability campaign and to pay regular fees to all of those working on it, I sought to reduce overhead by administering funds myself and with help from colleagues like Mr. Josh Rizack rather than engaging costly outside professionals. This did lead to some degree of disarray in the bookkeeping. While the Slavek assessment of Mr. Rizack's work (paragraphs 54-61 of his declaration) is undoubtedly harsh, in Mr. Rizack's defense I note that it appears he was paid a total of $12,566.33 over a period of more than five years

# SA145

ending June 2018—that is, just over $2,000 per year. I also knew that all transactions taking place were accounted for electronically and would be reconciled as soon as we got the resources to hire an appropriate entity to do so.

15. As a result of this and for other reasons, I gratefully accepted the offer of financial management help from Ms. Katie Sullivan and her company, Streamline Family Office. Once Ms. Sullivan signed on, I had Mr. Rizack transfer to her all of the materials he had gathered over a period of years regarding case expenses and my personal expenditures on the case. Ms. Sullivan played an instrumental role in helping our team raise funds in transactions designed, as always, to be lawful under the injunctive scope of the RICO Judgment and the Court's April 25, 2018 Opinion. Ms. Sullivan left our team soon after Chevron subpoenaed her in the Spring of 2018. She later admitted under oath to signing an affidavit written by Chevron lawyers at the Gibson Dunn firm—including many of the same lawyers who signed the company's various motions to hold me in contempt that are still pending—that contained a number of statements for which she possessed no knowledge and which are demonstrably false.

**The Donziger Bank Accounts**

16. The Slavek analysis submitted by Chevron is mistaken in some respects, but it confirms critical information in others. Investor-provided funds almost always were deposited into my law firm account, and from there transferred to other accounts for administrative convenience as part of the process of distributing funds to meet case expenses. Case expenses often were transferred to me before being transferred to other for reasons of administrative convenience, or due to the payment-repayment process outlined above.

17. Some exceptions to the foregoing involved a payment from Mr. Waters in January 2016

that was initially characterized as a personal gift and later converted by me to equity as part of an agreement approved by the FDA. Another example is the transfer of the remaining case funds from Ms. Sullivan to me by Mr. Page, once Ms. Sullivan had made the decision to withdraw. Although the funds sent by Mr. Page were accidentally wired to a personal account, once received by me I immediately opened a new business checking account at the suggestion of an employee in my bank for purposes of administrative convenience. I then proceeded to distribute these funds to meet various case expenses and outstanding fees, including my own and Mr. Page's.

18. The remaining investor funds from Ms. Sullivan's account were provided first to Mr. Page at the insistence of her former lawyer, Frank Libby. I never had any direct communication with Mr. Libby by telephone or in person and he refused such contact with me. For reasons not understood by me, Mr. Libby refused to transfer the remaining case funds directly to me even though I was named as the lead representative of the FDA in the United States. He also refused to explain the basis for this refusal.

19. Mr. Libby was willing to transfer the remaining funds held by Ms. Sullivan to Mr. Page. After Mr. Page received them in his lawyer trust account in Washington, D.C., I instructed him to transfer the funds to me for distribution and expenditure in the normal course pursuant to my FDA-granted authority. He and I both understood that the funds were not "traceable" to the Ecuador Judgment in light of how the Court had defined that term in its April 2014 Opinion for the reasons set forth in paragraph 8 above and explained repeatedly to the Court. The Court had not at the time of the Libby transfer even suggested any contrary understanding of "traceable" and I expected the Court to promptly confirm my understanding of the express terms of its April 2014 understanding given the

uncontroverted evidence that I have never benefited from proceeds traceable to the judgment. Because the Court's default judgment against the FDA and others used precisely the same language as the RICO Judgment, I understood that the limited scope of the RICO Judgment applied equally to the default judgment.

20. The TD accounts in existence when I provided that information to Chevron in June of this year were accurate. They had been given to me when I went personally to a TD Bank branch only days earlier and asked for a list of accounts. Although the Slavek analysis strains to suggest that there was some meaningful impropriety in my disclosure, Slavek's own data confirms what I disclosed to Chevron:  that those were the only five accounts that were open as of June 15, 2018. I was not aware that other accounts had been closed and did not think to ask the TD Bank representative. One of the accounts Slavek claims was "missing" was in fact closed over a year earlier with funds consolidated for administrative purposes in one or more of the other accounts that was disclosed. I do not recall any such transfer as being meaningful at the time of my disclosures. Another "missing" account according to Slavek was closed roughly two months before my disclosures. Again, I believe this account was simply shifted or transformed into a different account that was disclosed.

21. The contingency interest stated in the updated power of attorney signed by FDA leadership in November 2017 was not intended to grant a new interest, but to recognize my existing interest in any *Aguinda* recovery. The Court has now coerced me into signing what I understand to be the entirety of my contingency interest over to Chevron. I am not taking the position that the November 2017 contract is protected or separable from the Court's other orders with respect to my contingency interest. If Chevron feels like it needs some additional documentation with respect to the November 2017 power, it should just ask me

rather than rush to file for contempt.


DATED:        October 31, 2018                Respectfully submitted,


                                             *s/ Steven R. Donziger*
                                             Steven R. Donziger
                                             245 W. 104th Street, #7D
                                             New York, NY 10025
                                             Tel: (917) 678-3943
                                             Fax: (212) 409-8628
                                             Email: sdonziger@donzigerandassociates.com

                                             *Pro se*